Scott A. Kronland (SBN 171693)
Stacey M. Leyton (SBN 203827)
Eileen B. Goldsmith (SBN 218029)
Danielle E. Leonard (SBN 218201)
Robin S. Tholin (SBN 344845)
James Baltzer  (SBN 332232)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel. (415) 421-7151
Fax (415) 362-8064
skronland@altber.com
sleyton@altber.com
egoldsmith@altber.com
dleonard@altber.com
rtholin@altber.com
jbaltzer@altber.com

*Attorneys for Plaintiffs*

[Additional Counsel on signature page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO; AMERICAN FEDERATION OF STATE COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO;  et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, et al., <br><br> Defendants. | Case No. 25-cv-01780-WHA <br><br> **PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER** |

1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................................ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 3

I.    OPM's Unlawful Surprise Mass Termination Program ......................................... 3

II.   Laws Governing Termination of Federal Employees and the Role of OPM ..................... 8

III.  Ongoing Harm Caused by OPM's Unlawful Surprise Mass Termination Program
and False Terminations Predicated on Employee "Performance"................................... 11

ARGUMENT ...................................................................................................................... 15

I.    This Court Should Enjoin the Unlawful OPM Termination Program ........................... 15

      A.    Plaintiffs Are Likely to Succeed on Merits of Their *Ultra Vires* and
            APA Claims.......................................................................................................... 15

            1.    OPM's Actions Exceed Statutory Authority and Are *Ultra Vires* ........... 15

            2.    OPM's Mass Termination Program Violates the APA ........................... 18

                 a.    OPM's Actions Are Contrary to Law............................................. 18

                 b.    OPM's Actions Are Arbitrary and Capricious ............................ 19

                 c.    OPM Failed to Comply with Notice and Comment
                     Rulemaking...................................................................................... 21

            3.    This Court Has Jurisdiction to Hear These Claims ................................. 22

                 a.    Plaintiffs Have Article III Standing................................................. 22

                   b.    Plaintiffs Should Not Be Channeled to Agency Adjudication ...... 24

      B.    OPM's Actions Have and Will Continue to Cause Irreparable Harm to
            Plaintiff Organizations and Their Members ........................................... 27

      C.    The Balance of Equities Weigh in Plaintiffs' Favor, and a Temporary
            Restraining Order Is in the Public Interest ........................................... 30

CONCLUSION ................................................................................................................... 30

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Federal Cases**

4

*AFGE v. Ezell*,
    D. Mass. Case No. 25-cv-10276 (Order of Feb. 12, 2025) .........................................25, 26, 27

5

6

*AFSA v. Trump*,
    D.D.C. Case No. 25-cv-352 (Order of Feb. 21, 2025) ......................................................25, 26

7

*In re Aiken Cnty.*,
    725 F.3d 255 (D.C. Cir. 2013).........................................................................................16, 18

8

9

*American Trucking Ass'ns v. City of Los Angeles*,
    577 F.Supp.2d 1110 (C.D. Cal. 2008) .....................................................................................28

10

11

*Arizona Alliance for Retired Americans v. Mayes*,
    117 F.4th 1165 (9th Cir. 2024), *pet. for reh'g or reh'g en banc pending* ........................22, 23

12

*Axon Enters., Inc. v. Federal Trade Comm'n*,
    598 U.S. 175 (2023) ........................................................................................................25, 27

13

14

*Bennett v. Spear*,
    520 U.S. 154 (1997) ...............................................................................................................19

15

*Bowsher v. Synar*,
    478 U.S. 714 (1986) ...............................................................................................................16

16

17

*Chamber of Com. of U.S. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996).................................................................................................16

18

19

*Chief Probation Officers of Cal. v. Shalala*,
    118 F.3d 1327 (9th Cir. 1997).................................................................................................21

20

21

*Chrisanthis v. United States*,
    No. C 14-02784 WHA, 2015 WL 887578 (N.D. Cal. Feb. 27, 2015), *aff'd*, 682 F.
    App'x 631 (9th Cir. 2017).........................................................................................................26

22

23

*City & Cnty. of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018).................................................................................................16

24

*Clarke v. Ofc. of Fed. Housing Enterp. Oversight*,
    355 F.Supp.2d 56 (D.D.C. 2004).............................................................................................30

25

26

*Clinton v. City of New York*,
    524 U.S. 417 (1998) ...............................................................................................................16

27

*Cnty. of Santa Clara v. Trump*,
    250 F.Supp.3d 497 (N.D. Cal. 2017).......................................................................................28

28

*Dep't of Commerce v. New York,*
    588 U.S. 752 (2019) ...................................................................................25

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
    591 U.S. 1 (2020) .....................................................................................20

*Dist. Hosp. Partners, L.P. v. Burwell,*
    786 F.3d 46 (D.C. Cir. 2015)....................................................................20

*Drs. for Am. v. Off. of Pers. Mgmt.,*
    Case No. CV 25-322 (JDB), 2025 WL 452707 (D.D.C. Feb. 11, 2025) .............20

*E. Bay Sanctuary Covenant v. Trump,*
    932 F.3d 742 (9th Cir. 2018) ...................................................................18

*E. Bay Sanctuary Covenant v. Trump,*
    994 F.3d 962 (9th Cir. 2020) ...................................................................30

*Ecology Ctr. v. Castaneda,*
    574 F.3d 652 (9th Cir. 2009) ...................................................................20

*Empire Health Found. for Valley Hosp. Med. Ctr. v. Azar,*
    958 F.3d 873 (9th Cir. 2020) *reversed and remanded on other grounds, sub nom.*
    *Becerra v. Empire Health Foundation,* 597 U.S. 424 (2022) ........................21

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.,*
    36 F.4th 850 (9th Cir. 2022) ....................................................................19

*Fed. Express Corp. v. U.S. Dep't of Com.,*
    39 F.4th 756 (D.C. Cir. 2022) ............................................................17, 18

*Feds for Med. Freedom v. Biden,*
    63 F.4th 366 (5th Cir.) (*en banc*), *judgment vac'd on other grounds,* 144 S. Ct. 480
    (2023) ...............................................................................................25, 26

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.,*
    82 F.4th 664 (9th Cir. 2023) (en banc)...................................................22, 23

*Food & Drug Admin. v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024) .................................................................................22

*Franklin v. Mass.,*
    505 U.S. 788 (1992) (Scalia, J., concurring) ............................................18

*Ft. Funston Dog Walkers v. Babbitt,*
    96 F.Supp.2d 1021 (N.D. Cal. 2000).......................................................29

*Golden Gate Restaurant Ass'n v. City and County of San Francisco,*
    512 F.3d 1112 (9th Cir. 2008)..................................................................28

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ................................................................................22

*J.I. Case Co. v. Borak,*
    377 U.S. 426 (1964) ................................................................................25

*Kalispel Tribe of Indians v. U.S. Dep't of the Interior,*
    999 F.3d 683 (9th Cir. 2021) ...................................................................19

*Kaweah Delta Health Care Dist. v. Becerra,*
    123 F.4th 939 (9th Cir. 2024) ...........................................................18, 19

*Kerr v. Jewell,*
    836 F.3d 1048 (9th Cir. 2016) .................................................................25

*Kisor v. Wilkie,*
    588 U.S. 558 (2019) (plurality opinion)...................................................27

*Larson v. Domestic & Foreign Com. Corp.,*
    337 U.S. 682 (1949) ................................................................................17

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton,*
    752 F.3d 755 (9th Cir. 2014) ...................................................................29

*Leedom v. Kyne,*
    358 U.S.184 (1958) .................................................................................16

*Loper Bright Enterprises v. Raimondo,*
    603 U.S. 369 (2024) ....................................................................16, 26, 27

*Lopez v. Heckler,*
    713 F.2d 1432 (9th Cir. 1983) .................................................................28

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ................................................................................16

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923) ................................................................................16

*Melendres v. Arpaio,*
    695 F.3d 990 (9th Cir. 2012) .............................................................27, 30

*Missouri Serv. Comm'n v. FERC,*
    337 F.3d 1066 (D.C.Cir. 2003)................................................................20

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ..................................................................................20

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA,*
    595 U.S. 109 (2022) ................................................................................16

*Nat'l Treasury Emps. Union v. Newman*,
   768 F. Supp. 8 (D.D.C. 1991)...................................................................21, 26, 29

*Northwest Environmental Advocates v. U.S. E.P.A.*,
   537 F.3d 1006 (9th Cir. 2008) ........................................................................... 19

*NTEU v. Helfer*,
   53 F.3d 1289 (D.C. Cir. 1995)..................................................................18, 19, 26

*NTEU v. Trump*,
   DDC Case No. 25-cv-420 (Order of Feb. 20, 2025) ......................................25, 26

*NTEU v. U.S. Dept. of Treasury*,
   838 F. Supp. 631 (D.D.C. 1993).......................................................................30

*NTEU v. Vought*,
   DDC Case No. 25-cv-381-ABJ (Feb. 14, 2025) .................................................3

*Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*,
   465 F.3d 977 (9th Cir. 2006) ............................................................................ 19

*Oregon v. Ashcroft*,
   368 F.3d 1118 (9th Cir. 2004), *aff'd sub nom. Gonzales v. Oregon*, 546 U.S. 243
   (2006) .................................................................................................................... 19

*Pangea Legal Servs. v. U.S. Dept. of Homeland Security*,
   512 F.Supp.3d 966 (N.D. Cal. 2021).................................................................30

*Patchak v. Zinke*,
   583 U.S. 244 (2018) ........................................................................................ 16

*Plaut v. Spendthrift Farm, Inc.*,
   514 U.S. 211 (1995) ........................................................................................ 16

*Rana v. Gu*,
   220 F.Supp.3d 989 (N.D. Cal. 2016).................................................................28

*Rivera v. Patino*,
   524 F. Supp. 136 (N.D. Cal. 1981)....................................................................21

*Rodriguez v. Robbins*,
   715 F.3d 1127 (9th Cir. 2013) ...........................................................................27

*Save Strawberry Canyon v. Dep't of Energy*,
   613 F. Supp. 2d 1177 (N.D. Cal. 2009)..............................................................29

*Sierra Club v. Trump*,
   963 F.3d 874 (9th Cir. 2020), *judgment vac'd on other grounds, sub nom. Biden v.
   Sierra Club*, 142 S.Ct. 46 (2021)................................................................ 16, 17

*State v. Su,*
    121 F.4th 1 (9th Cir. 2024) ........................................................................................... 18

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) ....................................................................................... 24, 25, 27

*Townley v. Miller,*
    722 F.3d 1128 (9th Cir. 2013) ..................................................................................... 22

*United States v. McIntosh,*
    833 F.3d 1163 (9th Cir. 2016) ..................................................................................... 17

*United States v. Stanchich,*
    550 F.2d 1294 (2d Cir. 1977) ...................................................................................... 20

*Veit v. Heckler,*
    746 F.2d 508 (9th Cir. 1984) ....................................................................................... 26

*Washington v. Trump,*
    847 F.3d 1151 (9th Cir. 2017) ..................................................................................... 27

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.,*
    586 U.S. 9 (2018) ......................................................................................................... 25

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ......................................................................................................... 15

*Wolford v. Lopez,*
    116 F.4th 959 (9th Cir. 2024) ...................................................................................... 30

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ..................................................................................................... 16

*Ziglar v. Abbasi,*
    582 U.S. 120 (2017) ..................................................................................................... 25

**Federal Statutes and Regulations**

5 U.S.C.
    § 301 ............................................................................................................. 10, 17
    § 302 ............................................................................................................. 10, 17
    § 551 ............................................................................................................. 18, 21
    § 553 ....................................................................................................... 13, 21, 27
    § 701 *et seq.* ................................................................................................... 1, 27
    § 704 .................................................................................................................. 19
    § 706 ....................................................................................................... 18, 19, 21
    § 1101 ........................................................................................................... 10, 11
    §§ 1101-1105 ..................................................................................................... 17
    § 1102 .............................................................................................................. 11
    § 1103 ......................................................................................................... *passim*
    § 1105 ......................................................................................................... *passim*
    § 2101 .............................................................................................................. 10
    § 2105 .............................................................................................................. 10
    § 2302 .............................................................................................................. 25
    § 3101 ........................................................................................................... 10, 17
    § 3502 ........................................................................................................... 10, 18
    § 4303 ........................................................................................................... 10, 18
    § 4304 ........................................................................................................... 11, 17
    § 4305 ........................................................................................................... 11, 17
    § 7102 ........................................................................................................... 13, 14
    § 7134 .............................................................................................................. 27
    § 7513 ........................................................................................................... 10, 18
    § 7514 ........................................................................................................... 11, 17

10 U.S.C.
    § 111 .................................................................................................................. 9
    § 113 .................................................................................................................. 9

12 U.S.C.
    § 5491 ................................................................................................................ 9
    § 5492 ................................................................................................................ 9

16 U.S.C.
    § 551 .............................................................................................................. 9, 18
    § 554a ................................................................................................................ 9
    § 554e ................................................................................................................ 9

20 U.S.C.
    § 3461 ................................................................................................................ 9

26 U.S.C.
    § 7801 ................................................................................................................ 9
    § 7803 ................................................................................................................ 9
    § 7804 ................................................................................................................ 9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

28 U.S.C.
    § 1331 ................................................................................................................24

38 U.S.C.
    § 301 ...................................................................................................................9
    § 303 ...................................................................................................................9
    § 510 ...................................................................................................................9

42 U.S.C.
    § 202 ...................................................................................................................9
    § 203 ...................................................................................................................9
    § 281 ...................................................................................................................9
    § 282 ...................................................................................................................9
    § 3411 .................................................................................................................9
    § 3412 .................................................................................................................9
    § 7131 .................................................................................................................9
    § 7231 .................................................................................................................9
    § 7253 .................................................................................................................9

51 U.S.C.
    § 20111 ...............................................................................................................9
    § 20113 ...............................................................................................................9

5 C.F.R.
    § 315.804 ..........................................................................................................10
    § 316.304 ..........................................................................................................10
    § 351.402 ..........................................................................................................10
    § 351.801 ..........................................................................................................10
    § 351.803 ..........................................................................................................10

**Rules**

Fed. R. Civ. P.
    Rule 65 ..............................................................................................................15

**INTRODUCTION**

On February 13, 2025, Defendant United States Office of Personnel Management ("OPM") ordered federal agencies across the government to effectively eliminate the category of probationary employee, by terminating tens of thousands of federal employees en masse. OPM directed federal agencies who employ these workers to send standardized OPM-mandated termination notices that falsely informed all of these employees they were being fired *for performance reasons*. Waves of mass terminations of probationary workers (who are largely in their first two years of service in their position, but not necessarily new to the federal government) began that same day throughout the government. Reports of thousands of new terminations have continued every day since. OPM has not publicly revealed who has been or will be fired under this program.

OPM's order issued to federal agencies that were established by Congress, to which Congress granted the power to make employment and budgetary decisions for their own personnel, requiring them to terminate all probationary workers, is entirely unlawful. OPM has no constitutional or statutory authority to direct agencies to terminate their employees, or to do so in a manner that ignores all applicable statutory requirements. Therefore, this mass termination program is *ultra vires* and violates multiple provisions of the Administrative Procedure Act, 5 U.S.C. §701 *et seq.* No federal agency had announced any terminations of probationary employees in the positions each agency carefully vetted, authorized, and hired employees to perform, prior to OPM's order. Even worse, OPM required agencies to send probationary employees notices premised on a lie: these terminations have *nothing* to do with employee performance, and everything to do with the administration's goal of dramatically reducing the size and spending of the federal government.

The chaotic, no-advance-notice, mass terminations of federal employees are hitting every agency of the government and workers who perform vital services. To name just a few: national park and forest service workers in California (who have halted certain fire prevention efforts as a result); Federal Aviation Administration ("FAA") workers at airports around the country; staff providing support for the nation's veterans including in San Francisco; Department of Agriculture experts helping California's farmers feed the world; and research scientists at the National Science

Foundation ("NSF")).[1]  The former Yosemite National Park Superintendent and former National Parks Service Director explain the dire consequences of these ill-considered terminations for the parks and the environment.  *See* Declarations of Don L. Neubacher and Jonathan B. Jarvis.  Similar harms are being replicated in every sector.  Over 200,000 probationary employees nationwide are in their first two years of federal service, including more than 15,000 in California.  Recent reports, breaking on Friday, February 21, 2025, are that the U.S. Department of Defense ("DOD") is poised this upcoming week to terminate over 5,600 probationary employees performing services on DOD installations nationwide, including civilian firefighters who provide vital safety protections for servicemembers, their family members, and other civilians working on U.S. Naval bases, not to mention valuable military assets.[2]

OPM's unlawful order has thrown the lives of federal workers and their families into chaos.  They are facing immediately effective termination, resultant loss of income, imminent loss of health insurance, and the need to conduct a new job search with a false stain on their performance record.  The remaining employees at these agencies must do more, with far less support.  The workers' union representatives cannot play the representative role Congress intended and face institutional harms that undermine their core representative mission, including because the government is not even telling them (or the public) who has been or will be fired.  And millions of Californians and others nationwide who rely on federal services, state and local governments that will have to step in to fill the void in services, and the public all face irreparable injury from these patently unlawful actions.

Plaintiffs, a coalition of labor, environmental, veterans, and small business groups, seek an immediate temporary restraining order, as soon as the Court is able to consider this request, ordering OPM and all those acting in concert to (1) halt any further unlawful terminations of probationary federal employees; (2) identify the employees who have been fired under this unlawful program; and (3) rescind OPM's unlawful termination directive and restore agencies and their employees to their

---

[1] Including a scientist who was fired while working *in Antarctica*.  Evans Dec. ¶29.

[2] https://www.defense.gov/News/Releases/Release/Article/4074278/dod-probationary-workforce-statement/; *see also* Nemeth-Greenleaf Dec. ¶¶7-8 (describing some of the critical services provided by probationary employees and the impacts mass terminations will have on those services); Kelley Dec. ¶¶27-29.

status prior to this unlawful order.  District courts have granted emergency injunctive relief to halt

similar unlawful excesses.  *See*, *e.g.*, *NTEU v. Vought*, DDC Case No. 25-cv-381-ABJ (Feb. 14,

2025) (granting TRO barring termination of CFPB employees and shut down of entire agency).[3]

Plaintiffs request a TRO, as set forth in the accompanying proposed order, that will preserve this

Court's ability to make a considered decision on a preliminary injunction with full briefing.

Plaintiffs are overwhelmingly likely to succeed on the merits of these claims, and all other

factors support immediate relief.  OPM lacks constitutional, statutory, or regulatory power to order

other federal agencies to terminate employees who Congress authorized those agencies to hire and

manage.  *See infra* at 15-18; Declaration of Former OPM Director Katherine Archuleta ¶11.

Certainly, OPM has no authority to do so by requiring agencies to perpetrate a massive fraud on the

federal workforce through false representations that these terminations are based on poor

performance.  *Id*. ¶¶12-14.  Because of OPM's actions, Plaintiffs have faced and will continue to face

irreparable harm, and the public interest and balance of equities weigh strongly in favor of a TRO.

OPM cannot be permitted, consistent with the APA and the Constitution, to run roughshod over the

fundamental protections against unlawful and arbitrary federal action, and to inflict such widespread

harm.

## BACKGROUND

### I.    OPM's Unlawful Surprise Mass Termination Program

On January 20, 2025, President Trump appointed a new Acting OPM Director.[4]  On his very

first day, Acting Director Ezell distributed a memo to "Heads and Acting Heads of Departments and

Agencies" regarding "Guidance on Probationary Periods, Administrative Leave and Details,"

directing department and agency heads to submit to OPM, by January 24, a report listing all

"employees on probationary periods, who have served less than a year in a competitive service

appointment, or who have served less than two years in an excepted service appointment."[5]  The

---

[3] "Defendants shall not terminate any CFPB employee, except for cause related to the specific employee's performance or conduct; nor shall Defendants issue any notice of reduction-in-force to any CFPB employee." *Id.*

[4] https://www.whitehouse.gov/presidential-actions/2025/01/designation-of-acting-leaders/

[5] https://www.opm.gov/media/yh3bv2fs/guidance-on-probationary-periods-administrative-leave-and-details-1-20-2025-final.pdf

memorandum further directed agencies to "promptly determine whether those employees should be retained at the agency."[6]  If agencies wanted to retain any employees, they were required to adhere to a 200-character limit to justify that retention to OPM.[7]  Then, on February 11, President Trump issued Executive Order 14210, entitled "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative," which instructed "Agency Heads [to] promptly undertake preparations to initiate large-scale reductions in force (RIFs)."[8]

However, OPM did not wait for agencies to plan for or initiate any RIF.  Instead, as widely reported in the press, on February 13, OPM called a (non-public) meeting of agency leaders across the federal government and ordered them to begin firing their probationary employees without following RIF procedures.[9]  While OPM did not publicly announce the wholesale elimination of this category of workers from federal employment,[10] information that became public in the subsequent days reveals that is what OPM did: with few exceptions, it required federal agencies to eliminate probationary workers.

This order came directly from OPM, not the implementing federal agencies.  *E.g.*, Frassetto Dec. ¶16, Exh. B at 2, 16; *see also* Bachelder Dec. ¶9; Ronneberg Dec. ¶10; Blake Dec. ¶¶7-8; Eaton Dec. ¶¶13, 20; Frassetto Dec. ¶22; Evans Dec. ¶26 (standardized language from OPM in termination notices). As CBS News reported:

> The decision on probationary workers … **came from the Office of Personnel Management**, which serves as a human resources department for the federal government.  The notification was confirmed by a person familiar with the matter, who spoke on condition of anonymity because they weren't authorized to discuss it publicly.[11]

---

[6] *Id.*

[7] https://federalnewsnetwork.com/workforce/2025/02/opm-asks-agencies-to-justify-keeping-probationary-employees/.

[8] https://www.whitehouse.gov/presidential-actions/2025/02/implementing-the-presidents-department-of-government-efficiency-workforce-optimization-initiative/.

[9] https://www.cbsnews.com/news/federal-layoffs-probationary-workers-warnings-bigger-cuts-on-way; https://apnews.com/article/trump-federal-workers-layoffs-doge-406752da1614755b8fabe9c94e0c71a8; https://thehill.com/homenews/administration/5144113-federal-probationary-employees-fired/.

[10] https://www.opm.gov/news/ (containing no public announcements)

[11]https://www.cbsnews.com/news/federal-layoffs-probationary-workers-warnings-bigger-cuts-on-way/  *See also* Associated Press (Feb. 19, 2025) available at: https://apnews.com/article/trump-federal-workers-layoffs-doge-406752da1614755b8fabe9c94e0c71a8 ("On Feb. 13, the administration ordered agencies to lay off nearly all such workers").

Agencies told their employees OPM directed this.  For example, at an emergency NSF meeting for

probationary employees called with one hour's notice, employees were told the following:

> You've been invited here today because you were either a probationary employee or you are an expert on intermittent appointment.

> We've asked you here today to tell you face to face that we will be terminating your employment at the end of the day today.

> We've been directed by the administration to remove all term probationary employees.

> Today at 11 o'clock, each of you will receive a termination letter by email.

> At 1 p.m, you will lose access to the network[.]  And at the end of the day today, you'll be terminated. …

> So for those of you that have federal benefits.  Sorry.  Okay.  For those of you that have federal benefits, your health insurance will be terminated at the end of the pay period.

> Your federal dental and vision insurance plan, they will terminate at the end of the pay period. There is no extension for coverage under FedVIP.
> …
> This is in executing Government-wide guidance from the administration.  I'm sure you've read in the news that all agencies are terminating probationary employees.
> …
> So there was no limited discretion.  This is not a decision the agency made.  This is a direction we received, first of all.  Second of all, this is the first of many forthcoming workforce reductions.
> …
> We are following orders.  We are part of the executive branch.  We follow that.  I apologize for people that have made life-changing career moves.
> …
> **We were directed last Friday by OPM to terminate all probationers except for a minimal number of mission critical probationers**.

Frassetto Dec. ¶¶13–20 & Exh. B (Transcript of NSF meeting); *see also*, *e.g.*, *supra* at 3-4 (OPM

demands to agency heads for probationary employee information); *infra* at 6-7 (describing template

termination letters); Bachelder Dec. ¶17 (USDA employee told by chief USDA HR officer that her

performance was not considered in the termination decision and the "language used in the

termination letter was provided by OPM for all terminations of probationary employees across the

1    federal government"); Phetteplace Dec. Exh. 1 at 2 (Letter from Sen. Edward Markey to SBA

2    demanding to know why SBA supervisors were not informed of terminations at their agency).[12]

3        OPM's order to terminate probationary employees was a surprise and abrupt directive.  There

4    was no advance or public notice by OPM regarding this massive government program, designed to

5    restructure the federal workforce; no Executive Order; and no directive or guidance.[13]  As of early

6    January 2025, neither OPM nor any federal agency had ever announced any plans to fire substantial

7    numbers of employees within their first two years of federal service.  Indeed, on January 16, 2025,

8    then-Acting OPM Director gave an interview touting OPM's work helping "agencies recruit and

9    retain early-career employees."[14]

10        Agencies that previously had no plans to terminate their probationary employees complied

11   with that order by initiating en masse terminations.  Very few agencies made public announcements

12   (like the VA: "The dismissals announced today are part of a government-wide Trump Administration

13   effort to make agencies more efficient, effective and responsive to the American People.").[15]  Instead,

14   the media began reporting as employees (and their supervisors) went public.[16]

15        OPM also required agencies to use template notices it supplied to implement the terminations

16   it ordered.  OPM ordered agencies to premise the terminations on a false narrative -- those notices

17   uniformly and falsely told probationary employees that they were being terminated *for their*

18   *performance*: "**The Agency finds, based on your performance, that you have not demonstrated**

19   **that your further employment at the Agency would be in the public interest**."  Bachelder Dec.

20   ¶9, Exh. 1 (emphasis added); Frassetto Dec. ¶22, Exh. C; Evans Dec. ¶26, Exh. B; *see also, e.g.*,

21   Ronneberg Dec. ¶10; Blake Dec. ¶¶7-8; Eaton Dec. ¶¶13, 20; Jacobs Dec. ¶¶9-10, Exh. 1.  Officials

22   at that NSF meeting confirmed: "The cause comes from boilerplate we received from OPM.  The

23

24       [12] *See also* https://thehill.com/homenews/administration/5144113-federal-probationary-
     employees-fired/.
25       [13] https://www.opm.gov/news/ (containing no public announcements)
         [14] https://federalnewsnetwork.com/workforce/2025/01/after-years-of-work-opm-is-hitting-on-all-
26   cylinders-acting-director-says/
         [15] https://news.va.gov/press-room/va-dismisses-more-than-1000-employees/ (Feb. 13, 2025,
27   9:06pm)
         [16] *See.,e.*g., https://www.cbsnews.com/news/federal-layoffs-probationary-workers-warnings-
28   bigger-cuts-on-way/

cause says that the agency finds based on your performance that you have not demonstrated that your further employment at the agency would be in the public interest."  Frassetto Dec. ¶17, Exh. B at 21.

The employee notice was false: the immediate, across-the-board terminations are not based on any performance evaluation.  As a former OPM Director explains, it was not possible for every agency to simultaneously and immediately decide to terminate employees and conduct required performance evaluations in such a short time.  Archuleta Dec. ¶¶12-14; *see also* Neubacher Dec. ¶6 (based on his experience as Yosemite National Park Superintendent, mass terminations could not have been based on individual evaluations).  In fact, many of the terminated employees had exceptional performance records.  Evans Dec. ¶¶14-15, Exh. A (outstanding rating and performance review stating "Tom excelled in his first year"); Frassetto Dec. ¶8, Exh. A (described as "outstanding" in review); Blake Dec. ¶19; Jacobs Dec. ¶17; Kelley Dec. ¶26;[17]  Agency management did not want to make these cuts.  *See* Frassetto Dec. Exh. B at 17; Nemeth-Greenleaf Dec. ¶10.

While neither OPM nor federal agencies are disclosing the number or identity of fired workers (including to their unions), tens of thousands have been terminated with tens of thousands more to come.  *E.g.*, Eaton Dec. ¶ 7 (VA has terminated over 1,000 probationary employees); Neubacher Dec. ¶4 (National Park Service; more than 1,000 probationary employees); Phetteplace Dec. ¶6 (hundreds of SBA employees); Kelley ¶14 (more than 500 employees in several agencies); Frassetto Dec. ¶23 (nearly 170 NSF employees); Ronneberg Dec. ¶14 (FAA; 45 employees); Bachelder Dec. ¶10 (Foreign Ag. Service; 22 employees).[18]  Approximately 200,000 probationary federal employees across the country are at risk.[19]

By way of comparison, during a six-month window in FY2024 (according to the most recent available OPM data), only 364 federal employees (probationary and permanent) were terminated for performance throughout all of California.  Walls Dec. ¶3.

---

[17] Bachelder Dec. ¶¶9, 17; Ronneberg Dec. ¶¶10, 19; Eaton Dec. ¶20.

[18] In addition to the evidence of Plaintiffs' declarants, news reports in recent weeks have documented thousands of terminations across multiple agencies.  *See* First Amended Compl., ¶64 and citations.  Agencies are not releasing to the Plaintiffs the numbers of affected employees.  *E.g.*, Kelley Dec. ¶14; Blake Dec. ¶11.

[19] https://www.businessinsider.com/trump-administration-fired-probationary-federal-workers-veterans-affairs-agencies-2025-2; *see also* Walls Dec. ¶4 (there were at least 150,544 total permanent and probationary employees in California as of August 2024).

Neither OPM nor the agencies are providing any formal advance notice to the public, to their employees, to those employees' labor representatives, or to state and local governments. Bachelder Dec. ¶10; Ronneberg Dec. ¶12; Jacobs Dec. ¶11 (CDC; some employees locked out of work equipment and accounts within minutes of receiving termination email); Frassetto Dec. Exh. B at 2 ("At 1 p.m, you will lose access to the network[.] And at the end of the day today, you'll be terminated."); *see also* Evans Dec. ¶8-12; 24; 30 (NSF employees had paperwork designating them "Permanent" and unaware they were classified as probationary until February 2025 or even until termination meeting). But reports continue, every day, regarding future planned terminations.

As of February 21, 2025, the DOD plans to terminate over 5,600 probationary employees "next week." Kelley Dec. ¶27; Nemeth-Greenleaf Dec. ¶¶7, 10. DOD is one of the largest federal employers in California. Walls Dec. ¶5 & Exh. A. To Plaintiffs' knowledge, no employee there has yet received any notice that they will be fired. Kelley Dec. ¶27; Nemeth-Greenleaf Dec. ¶¶7, 10.

The daily revelations are relentless, revealing additional terminations directly impacting critical government services: "*F.D.A. Firings Hit Teams That Review Medical Device Safety*";[20] "*Air Safety Concerns Grow as Trump Administration Fires More FAA Employees*";[21] "*Trump's Cuts Could Make Parks and Forests More Dangerous, Employees Say*;[22] "*Kauai's Precious Habitats are 'Literally Screwed' After Federal Cuts*";[23] "*California's Mountain Towns Crushed as Trump Guts Forest Service.*"[24]

## II.    Laws Governing Termination of Federal Employees and the Role of OPM

Congress established the federal administrative agencies by statute, and specifically authorized the heads of those agencies—not OPM—to manage federal employment and make employment decisions.

---

[20] https://southfloridareporter.com/f-d-a-firings-hit-teams-that-review-medical-device-safety/ (Feb. 23, 2025)
[21] https://www.fox5dc.com/news/concerns-about-air-safety-grow-trump-administration-cuts-more-staff-from-faa (Feb. 18, 2025)
[22] https://www.nytimes.com/2025/02/18/climate/trump-layoffs-park-and-forest-service-workers.html (Feb, 18, 2025)
[23] https://www.sfgate.com/hawaii/article/hawaii-kauai-wildlife-refuges-trump-20174133.php
[24] https://www.sfgate.com/california/article/california-mountain-towns-trump-forest-service-20177786.php

Each federal agency has its own authorizing statutes that govern its administration, including statutory provisions that authorize one or more individuals to act as the head of the agency. *See e.g.*, 10 U.S.C. §§111, 113 (Defense); 12 U.S.C. §5491 (CFPB); 16 U.S.C. §551 (Agriculture/Forest Service); 26 U.S.C. §§7801, 7803 (IRS); 38 U.S.C. §§301, 303 (VA); 42 U.S.C. §§202, 203 (HHS); 42 U.S.C §§281, 282 (NIH); 42 U.S.C. §§3411, 3412 (Education); 42 U.S.C. §7131 (Energy); 51 U.S.C. §20111 (NASA). Congress has then authorized each agency head to exercise powers of management over that agency and its employees, including the hiring and firing of employees, consistent with any generally applicable laws. For example:

- 26 U.S.C. §§7803, 7804 (IRS: "Commissioner of Internal Revenue is authorized to employ such number of persons as the Commissioner deems proper for the administration and enforcement of the internal revenue laws, and the Commissioner shall issue all necessary directions, instructions, orders, and rules applicable to such persons.");

- 42 U.S.C. §§7231, 7253 (Energy: "Secretary is authorized to appoint and fix the compensation of such officers and employees, including attorneys, as may be necessary to carry out such functions. Except as otherwise provided in this section, such officers and employees shall be appointed in accordance with the civil service laws …"; "the Secretary is authorized to establish, alter, consolidate or discontinue such organizational units or components within the Department as he may deem to be necessary or appropriate.");

- 20 U.S.C. §3461 (Education: "Secretary is authorized to appoint and fix the compensation of such officers and employees, including attorneys, as may be necessary to carry out the functions of the Secretary and the Department. Except as otherwise provided by law, such officers and employees shall be appointed in accordance with the civil service laws …");

- *See also, e.g.,* 12 U.S.C. §5492 (CFPB: management and employment authority); 16 U.S.C. §§551, 554a, 554e (Agriculture; management and employment in Forest Service); 38 U.S.C. §§303, 510 (VA: Secretary; "control, direction, and management of the Department"; "authority to reorganize offices"); 10 U.S.C. §113 (DOD: Secretary; "authority, direction, and control over the Department of Defense"); 42 U.S.C. §203 (HHS: Secretary, management authority); 42 U.S.C. §282 (NIH: Director, management authority); 51 U.S.C. §§20111, 20113 (NASA: Administrator "shall have authority and control over all personnel and activities thereof.").

In addition to the specific authority these authorizing statutes grant to each agency leader, Congress also enacted a "General Authority to Employ" statute that applies to all federal agencies:

Each Executive agency, military department, and the government of the District of Columbia may employ such number of employees of the various classes recognized by chapter 51 of this title as Congress may appropriate for from year to year.

5 U.S.C. §3101; *see also* 5 U.S.C. §301 (delegating general authority to each federal agency head to adopt regulations "for the government of his department, the conduct of its employees, the distribution and performance of its business…"); 5 U.S.C. §302 (authorizing agency heads to delegate their authority to subordinate employees).

Congress also enacted the CSRA in 1978 to establish uniform standards for agencies and civil service employment across the federal government.  5 U.S.C. §2101 (defining "civil service"); *id.*, §2105 (defining "employee").  And Congress provided specific direction to the employing agencies regarding the conditions under which employees may be terminated for cause (5 U.S.C. §4303(a); 5 U.S.C. §7513(a)), or through large-scale layoffs (reductions in force, or "RIFs") (5 U.S.C. §3502).

With respect to probationary employees, federal agencies may "terminate an employee serving a probationary or trial period because his work performance or conduct during this period fails to demonstrate his fitness or his qualifications for continued employment" and must "notify[] him in writing as to why he is being separated."  5 C.F.R. §315.804(a).  The notice must, "as a minimum, consist of the agency's conclusions as to the inadequacies of his performance or conduct." *Id.; see also id.*, §316.304 (same notice rights for other trial-period employees).

By contrast, in a reduction-in-force (RIF), agencies must adhere to detailed requirements for retention preferences, considerations for veterans, and the consideration of tenure of employment and length of service.  5 U.S.C. §3502(a)(1), (3); *see also* 5 C.F.R. §351.402 (agencies must establish "competitive areas in which employees compete for retention").  Agencies also must provide advance notice to employees (5 C.F.R. §351.801(a), (b)) *and* to states and local governments for any RIFs of 50 or more employees in an affected geographic area so they can be prepared to assist affected employees (5 U.S.C. §3502; 5 C.F.R. §351.803).

The same year it enacted the CSRA, Congress established the OPM by statute.  5 U.S.C. §1101.  Notably, OPM was created by way of, through a Presidential Reorganization Plan submitted to and approved by Congress, under which President Carter sought and received constitutionally-required authorization for his plans.  5 U.S.C. §1101 (Notes, containing Reorganization Plan No. 2 of 1978; 43 F.R. 36037).  Congress did *not* authorize OPM to hire or fire any federal employees

employed by any agency other than OPM itself.  5 U.S.C. §§1102, 1103.  Rather, OPM's statutory role is to provide human resources support for the federal government agencies, including by creating and publishing government-wide rules in compliance with the APA.  5 U.S.C. §§1103, 1105; *see* §1101 (Notes) (President's message: "The positive personnel management tasks of the government--such as training, productivity programs, examinations, and pay and benefits administration--would be the responsibility of an Office of Personnel Management.").  Further, OPM's authority with respect to the termination of employees of other agencies and departments is limited to providing technical assistance and promulgating regulations.  5 U.S.C. §§4304, 4305, 7514.

**III.     Ongoing Harm Caused by OPM's Unlawful Surprise Mass Termination Order and False Terminations Predicated on Employee "Performance"**

OPM's mass termination program has disrupted and continues to disrupt the lives of federal workers and their families.  Wages immediately ceased, and workers, their spouses, and dependents will lose their health benefits imminently.  Blake Dec. ¶¶18-19; Eaton Dec. ¶10; Jacobs Dec. ¶16; Frassetto Dec. ¶¶25-26; *see also* Bachelder Dec. ¶¶12-13; Ronneberg Dec. ¶16.

Employees were terminated without any notice or time to prepare, requiring them to immediately begin searching for alternative employment in a job market suddenly full of other newly unemployed federal workers.  Bachelder Dec. ¶10; Ronneberg Dec. ¶12; Evans Dec. ¶33; *see also* Evans Dec. ¶¶24 (some NSF employees first learned they were still considered probationary at termination meeting), 33; Arbulu Dec. ¶8.  Many federal workers relocate to remote locations (Antarctica, Alaskan parks, the East Side of the Sierra, to name few), and have lost housing and must relocate.  Evans Dec. ¶29; Neubacher Dec. ¶7; *see* Jarvis Dec. ¶4.  One worker—the only locksmith in Yosemite National Park—was fired after a four-year apprenticeship and only three weeks before the end of his probationary status, and immediately lost his housing.[25] All these employees will suffer the adverse impact in their future job searches of an employment termination falsely predicated on performance deficiencies.  *E.g.*, Bachelder Dec. ¶¶9, 17; Ronneberg Dec. ¶¶10, 19.

---

[25] https://www.sfgate.com/california-parks/article/yosemite-locksmith-fired-20178362.php; *see* Neubacher Dec. Exh B.

OPM's mass termination program has also disrupted the lives of remaining federal workers, who must now do more with fewer resources to serve the public and their agencies' mission. Nemeth-Greenleaf Dec. ¶8; Turner-Nichols Dec. ¶¶12-13; Evans Dec. ¶¶36-37.  For example, the mass firing of probationary firefighters "will have a detrimental effect on the Navy's ability to perform its mission and protect the military personnel and families that live and work on the many naval facilities across the United States."  Nemeth-Greenleaf Dec. ¶8 ("Personally, I fear that these actions will adversely affect my safety when performing my duties at the Portsmouth Naval Shipyard.").  The mass termination of probationary employees at VA medical facilities will have similar consequences.  Turner-Nichols Dec. ¶13 ("[I]nsufficient staffing leads to burnout, which in turn worsens staffing shortages…diminishing the quality of care provided.").  Mass terminations at the NSF—which affected more than 10% of agency employees—will dramatically increase the burdens on remaining employees to review proposals and manage ongoing funding awards, "undermining NSF's ability to provide effective and timely support for vital scientific research." Evans Dec. ¶36; *see* Frassetto Dec. ¶24 ("[C]rucial support for scientific projects across the country will likely be significantly delayed.").

OPM's mass termination program has disrupted and threatens to disrupt services here in California and throughout the country.  For example, the Department of Veterans Affairs medical facilities' ability to provide medical services to veterans who need them will be seriously damaged as implementation of the mass termination program continues.  *See* Turner-Nichols Dec. ¶13 ("When staffing levels are insufficient, patient care suffers, and so do caregivers."); *see also*, *e.g.*, Neubacher Dec. ¶4, 7 ("[T]he mass termination of NPS employees will be catastrophic for the park system and for the visitor experience."); Phetteplace Dec. ¶¶8-9 ("The termination of large numbers of SBA employees is likely to slow down the process of securing loan guarantees… [and to] slow down the provision of [SBA] services... inhibiting some entrepreneurs from getting their businesses off the ground."); Bachelder Dec. ¶20 ("Without the dozens of employees who have been terminated that provide very specialized expertise to the mission of the agency, the Foreign Agricultural Service will have a harder time keeping up with trade barriers, leading to missed market opportunities and unchallenged restrictions that put U.S. farmers and exporters at a disadvantage … weake[ning]

relationships between U.S. farmers and international buyers, slowing export growth and cutting into U.S. farmer incomes."); Ronneberg Dec. ¶22 (describing "negative impact that the terminations of employees from various FAA departments will have on the agency's safety mission."); Evans Dec. ¶¶34-38 (mass termination program will disrupt NSF's funding of critical scientific research).

The unannounced and government-wide nature of OPM's directive have prevented Plaintiff labor unions as well as veterans, environmental, and shall business organizations from exercising their statutory rights to comment on the illegality of this program. 5 U.S.C. §553 (notice-and-comment rule-making); §1103, 1105 (requiring OPM to comply with APA rulemaking procedures in §553); *see also* 5 U.S.C. §7102 (granting employees right to "to present the views of the labor organization to heads of agencies and other officials of the executive branch of the Government, the Congress, or other appropriate authorities"). And it has prevented the union Plaintiffs from playing the representative role Congress intended. Blake Dec. ¶¶12-17, 25; Kelley Dec. ¶¶8-14, 31; Turner-Nichols Dec. ¶¶7-13; Bachelder Dec. ¶¶11-16; Ronneberg Dec. ¶¶15-18; Nemeth-Greenleaf Dec. ¶12. These organizations have been forced to unexpectedly and immediately divert substantially all of their resources to counseling and assisting affected federal employees in the days following implementation of the unlawful program. Blake Dec. ¶¶12-17; Kelley Dec. ¶¶ 8-14; Turner-Nichols Dec. ¶¶7-13; Bachelder Dec. ¶¶11-16, 23; Ronneberg Dec. ¶¶15-22; Nemeth-Greenleaf Dec. ¶12; *see also* Arbulu Dec. ¶11 (Common Defense would have mobilized members in response to notice of terminations).

Plaintiffs have a first-hand view into the federal services that will be disrupted by the mass termination program. For example, mass terminations of civilian DOD employees in the coming week will impair services provided to servicemembers and their families at military facilities in the U.S. and overseas. Kelley Dec. ¶¶27-29. The terminations at CDC swept in all of the IT employees with certain cybersecurity credentials, placing highly sensitive CDC data at risk of exposure. Jacobs Dec. ¶18; *see also* Eaton Dec. ¶8 ("VA has dismissed over 1,000 probationary employees across various roles, including those in mental health research, cancer treatment, addiction recovery, prosthetics, and burn pit exposure studies"); Phetteplace Dec. ¶¶ 8-9 (mass termination program will disrupt Small Business Administration services relating to loan guarantees, education programs,

emergency financial assistance for disaster relief, and contracting opportunities); Turner-Nichols

Dec. ¶¶12-13 (mass termination program will disrupt VA medical services); Bachelder Dec. ¶20

(mass termination program will disrupt Foreign Agricultural Service programs, competitively

disadvantaging American farmers); Ronnenberg Dec. ¶ 22 (mass termination will disrupt FAA safety

programs).

OPM's directive has widespread impacts.  For example, National Park Service employees

"participate in active monitoring of air and water quality, wildlife species, vegetation, snow pack,

rainfall, and climate on an ongoing and routine basis that provides essential data for scientists and

meteorologists who then advise downstream communities and agricultural businesses on the

predictability of stream flow, flooding, wildfires and water availability."  Jarvis Dec. ¶15.  This

monitoring "provides early warning that saves lives."  *Id.*  Park Service workers also engage in

wildland fire fighting, operate search and rescue, and provide utilities such as potable water and

sewer in the parks.  *Id*. ¶5.[26]  And immediate impacts on firefighting and monitoring will be

compounded by the effects on future prevention and mitigation efforts: At least three program

directors at NSF assigned to a working group to advance research on the future risks associated with

wildland fires were terminated on February 18, 2025 in implementation of OPM's unlawful orders.

Evans Dec. ¶38.  Three of the five former firefighters working on DHHS's Firefighter Fatality

Investigation and Prevention Program and the Firefighter Cancer Registry were terminated, crippling

research intended to reduce the risk of firefighter deaths on the job.  Kelley Dec. ¶24.  OPM's

directive has also resulted in the removal of hundreds of employees at crucial public safety agencies,

including the Federal Aviation Administration, the National Highway Traffic Safety Administration,

the Pipelines and Hazardous Materials Safety Administration, and the National Nuclear Security

Administration.[27]

---

[26] *See also* https://www.nytimes.com/2025/02/15/climate/us-forest-service-layoffs-wildfires.html ("In California, the Forest Service's efforts to remove underbrush are on pause, according to a person who manages an organization that runs wildfire prevention projects in the state and who spoke on the condition of anonymity out of concern of reprisals.").

[27] *See* Ronneberg Dec. ¶14 (FAA); https://apnews.com/article/doge-faa-air-traffic-firings-safety-67981aec33b6ee72cbad8dcee31f3437; https://www.politico.com/news/2025/02/18/layoffs-auto-pipeline-safety-00204715; https://www.reuters.com/world/us/sweeping-us-energy-department-layoffs-hit-nuclear-security-loans-office-sources-2025-02-14/.

1    In particular, the harm to the environment will be immediate and irreparable.  Fewer

2    employees managing limits on livestock grazing will damage "riparian habitats and spawning streams

3    critical to the survival of [] sensitive species."  Molvar Dec. ¶10.  And as the former Superintendent

4    of Point Reyes National Seashore and Yosemite National Park explained, reductions in staffing levels

5    at national parks leads directly to environmental damage: "There is no way to accommodate current

6    visitation levels without additional staff support during the upcoming peak season.  When there was a

7    partial government shutdown in 2018, visitors trashed scenic viewpoints, defecated outside locked

8    restrooms and trampled sensitive ecological areas with their vehicles and dogs."  Neubacher Dec. ¶5.

9    These impacts will continue to unfold across every sector of government. Phetteplace Dec. ¶¶

10    8-9 (Small Business Administration); Turner-Nichols Dec. ¶¶12-13 (VA medical services);

11    Bachelder Dec. ¶20 (Foreign Agricultural Service); Ronnenberg Dec. ¶ 22 (FAA); Nemeth-Greenleaf

12    Dec. ¶7 (Department of Navy); Evans Dec. ¶¶34-38 (NSF); Frassetto Dec. ¶24 (NSF); Jarvis Dec. ¶5-

13    10 (National Parks Service and businesses that rely on it); Neubacher Dec. ¶4-5, 7 (National Parks);

14    Molvar Dec. ¶¶8-10 (Bureau of Land Management, Forest Service).

15    **ARGUMENT**

16    A temporary restraining order is warranted where the moving party establishes that (1) it is

17    likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary relief; (3)

18    the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest.  Fed.

19    R. Civ. P. 65(c); *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008); Fed. R. Civ. P.

20    65(b)(1).  All of these factors strongly favor Plaintiffs.

21    **I.    This Court Should Enjoin the Unlawful OPM Termination Program**

22    **A.    Plaintiffs Are Likely to Succeed on Merits of Their *Ultra Vires* and APA Claims**

23    **1.    OPM's Actions Exceed Statutory Authority and Are *Ultra Vires***

24    OPM has no authority to order federal agencies to terminate employees and in doing so it has

25    overridden and rewritten the statutory authority of other agencies, as established by Congress, as well

26    as its own statutory authority, also set by Congress.  This action is *ultra vires* and a violation of

27    separation of powers protections in the Constitution.

28    The President and Executive branch agencies have no constitutional power to exercise

Congress's Article I powers by attempting to unilaterally enact, amend, or repeal duly enacted statutes. *Clinton v. City of New York*, 524 U.S. 417, 438–39 (1998); *see also In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) ("the President may not decline to follow a statutory mandate or prohibition simply because of policy objections … Those basic constitutional principles apply to the President and subordinate executive agencies").[28]  Indeed, because "the accumulation of all powers, legislative, executive, and judiciary, in the same hands ... pose[s] an inherent threat to liberty[,]" each branch of the federal government must stay within its proper domain. *Patchak v. Zinke*, 583 U.S. 244, 250 (2018) (plurality op.) (cleaned up); *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923); *see also Bowsher v. Synar*, 478 U.S. 714, 721–22 (1986) ("there can be no liberty where the legislative and executive powers are united in the same person") (quoting The Federalist No. 47, p. 325 (J. Cooke ed. 1961)).  Moreover, as the Supreme Court recently reaffirmed, "Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*, 595 U.S. 109, 117 (2022).

When one of the three branches exceeds the scope of its statutory or constitutional authority, it falls to the federal courts to reestablish the proper division of federal power. *See, e.g.*, *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218 (1995) (rebuking Congress's intrusion into judicial sphere); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577 (1992) (preventing judiciary from intruding into executive sphere); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 655 (1952) (halting President's encroachment upon legislative sphere); *cf. also Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391-92 (2024) (refusing to imply into APA any deference to agency decisions interpreting laws, because that would permit other branches to usurp Article III).

Federal agency action outside of any constitutional or statutory authority therefore may be struck down as *ultra vires*. *E.g.*, *Sierra Club v. Trump*, 963 F.3d 874, 888-93 (9th Cir. 2020), *judgment vacated on other grounds*, *sub nom. Biden v. Sierra Club*, 142 S.Ct. 46 (2021); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996); *see also Leedom v. Kyne*, 358 U.S.184,

---

[28] This constitutional principle likewise extends to rewriting statutory appropriations by refusing to expend funds, here on personnel. *See City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018).

188 (1958); *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 691 (1949); *cf. United States v. McIntosh*, 833 F.3d 1163, 1174 (9th Cir. 2016) ("both federalism and separation-of-powers constraints in the Constitution serve to protect individual liberty, and a litigant in a proper case can invoke such constraints '[w]hen government acts in excess of its lawful powers.'").  It is well-established that there is "'extreme' agency error where the agency has 'stepped so plainly beyond the bounds of [its statutory authority], or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court.'"  *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) (analyzing both "extent of the agency's delegated authority" and whether "agency has acted within that authority") (quotations omitted); *see also Sierra Club*, 963 F.3d at 888-93.

OPM's actions run roughshod over the statutes creating and granting authority to other federal agencies as well as its own (limited) statutory mandate.  As such, they rise to the level of such "extreme" agency error as to be enjoined as an *ultra vires* attempt to usurp legislative power.

First, Congress authorized the federal agencies, through the head of each agency, to make their own employment decisions, manage their own personnel, and determine how to spend their own associated budgets.  *Supra* at 9-10

 (collecting authorizing statutes).  Congress also granted the "General Authority to Employ" to all federal agencies.  5 U.S.C. §3101; *see also id.* §§301, 302 (authority to regulate including employment).  OPM's actions seek to override these statues by claiming for OPM itself the authority of other agencies' employment decisions.  These statutes are the basis for the Acting Solicitor General recent argument to the U.S. Supreme Court on behalf of the President and other federal officials that: *"[a]gency heads control hiring and firing decisions for subordinates*."[29]  *See also* Former OPM Director Archuleta Dec. ¶11.

Second, Congress' grant of authority to the OPM did *not* include authority to hire or fire federal workers employed by agencies other than OPM itself.  5 U.S.C. §§1101-1105.  OPM's authority regarding other agencies' employment decisions is limited to providing technical assistance

---

[29] *See* Application to Vacate the Order Issued by the United States District Court for the District of Columbia and Request for an Immediate Administrative Stay, *Bessent v. Dellinger*, No. 24A790 (filed U.S. Supreme Court Feb. 16, 2025), at *27 (available at https://www.documentcloud.org /documents/25536868-dellinger-scotus-emergency-filing/?mode=document at 27) (emphasis added).

1  and writing regulations.  5 U.S.C. §§4304, 4305, 7514; *see also* Former OPM Director Archuleta

2  Dec. ¶11 ("Our role at OPM was to support those agencies in those decisions, not to make those

3  decisions for them.").  OPM lacks authority to order any terminations, period.

4      Third, even if OPM did have the power to terminate employees of other agencies, it cannot

5  evade the statutory requirements that agencies must comply with before doing so.  In the CSRA,

6  Congress established uniform standards for civil service employment across the federal government,

7  which govern agencies' termination of employees for cause based on performance (5 U.S.C.

8  §4303(a); 5 U.S.C. §7513(a)), and agency layoffs ("reductions in force," or "RIFs") (5 U.S.C.

9  §3502); *supra* at 10.  By requiring agencies to terminate employees immediately, without notice or

10 performance reviews, based on false representations, OPM seeks to override these statutes.

11     OPM's directive that agencies effectively eliminate the category of probationary employee is

12 so "extreme" and far outside OPM's delegated power as to assume legislative authority in violation

13 of the Constitution's separation of powers and myriad statutes described above, and is therefore *ultra*

14 *vires*. *Fed. Express*, 39 F.4th at 764.  As in *In re Aiken County*, "our constitutional system of

15 separation of powers would be significantly altered if we were to allow executive and independent

16 agencies to disregard federal law in the manner asserted in this case …."  725 F.3d at 266-67.

17         **2.    OPM's Mass Termination Program Violates the APA**

18     OPM is an "agency" subject to the APA.  *NTEU v. Helfer*, 53 F.3d 1289, 1292–93 (D.C. Cir.

19 1995); 5 U.S.C. §§551; 1103(a)(5), (7); 1105 (requiring OPM to comply with APA).  Congress

20 granted OPM a single exception to APA compliance, inapplicable here, for rules that extend only

21 internally within OPM's own "Office or its employees."  5 U.S.C. §1103(b)(1).[30]

22     OPM's actions have violated the APA in at least three different ways.

23         **a.    OPM's Actions Are Contrary to Law**

24

25

26     [30] Moreover, while it is unclear whether OPM's actions were at the President's direction, that would
    not excuse OPM from APA compliance.  The APA has long been held to apply with full force to agency
27  action that implements presidential directives.  *See, e.g.*, *Franklin v. Mass.*, 505 U.S. 788, 828 (1992)
    (Scalia, J., concurring); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 770 (9th Cir. 2018); *see*
28  *also* S*tate v. Su*, 121 F.4th 1, 15 (9th Cir. 2024) ("The Supreme Court has never excepted a final rule
    from APA review because it carried out a presidential directive. Nor have we—or any other circuit.").

1    The APA prohibits agency action that exceeds statutory or constitutional authority or is

2    otherwise contrary to law. 5 U.S.C. §706(2)(A), (C); *Kaweah Delta Health Care Dist. v. Becerra*,

3    123 F.4th 939, 944 (9th Cir. 2024) ("[U]nder our system of separation of powers, neither good

4    intentions nor pressing policy problems can substitute for an agency's lack of statutory authority to

5    act."); *Northwest Environmental Advocates v. U.S. E.P.A.*, 537 F.3d 1006, 1025-27 (9th Cir. 2008).

6    As an initial matter, OPM's order that federal agencies terminate their probationary

7    employees constitutes final agency action for APA purposes. 5 U.S.C. §704; *Bennett v. Spear*, 520

8    U.S. 154, 177-78 (1997) (final agency action marks "consummation of the agency's decisionmaking

9    process" and is one by which "rights or obligations have been determined," or from which "legal

10    consequences will flow").[31] OPM's order to terminate probationary workers was not "tentative or

11    interlocutory" (*id.*), and has all the hallmarks of a programmatic decision that constitutes final OPM

12    action. *E.g*, *Helfer*, 53 F.3d at 1292-93 (OPM rulemaking final action subject to APA review). The

13    Ninth Circuit has instructed that courts look at the "practical effect," and in particular, whether

14    "immediate compliance [with the terms] is expected." *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*,

15    465 F.3d 977, 982 (9th Cir. 2006). Here, there can be no question that OPM ordered and expected

16    immediate compliance, as evidenced by the immediate surprise terminations (ignoring all planning

17    and applicable laws), tens of thousands of federal employees that agencies had previously authorized,

18    vetted, and hired over the past ten days, using OPM's own template notices requiring agencies to

19    invoke performance, with more set to occur this upcoming week. *Supra*, at 6-7.

20    For the reasons discussed *supra* at 15-18, OPM has exceeded its own statutory authority and

21    usurped the authority of other agencies, and has therefore violated 5 U.S.C. §706(2)(A) and (C).

22    Accordingly, "the only appropriate remedy is vacatur." *Kaweah*, 123 F.4th at 944.

23    **b.    OPM's Actions Are Arbitrary and Capricious**

24

25

---

26    [31] Final agency action is the programmatic decision, even where further steps are necessary to
implement the program and comply with the directive. *E.g.*, *Oregon v. Ashcroft*, 368 F.3d 1118,
1148 (9th Cir. 2004), *aff'd sub nom. Gonzales v. Oregon*, 546 U.S. 243 (2006) ("An agency action
27    can be final even if its concrete legal effects are contingent upon a future event."); *Env't Def. Ctr. v.
Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 869 (9th Cir. 2022) ("programmatic review" is final
28    agency action regardless of whether "reviewing and approving individual, site-specific permits"
remains).

The APA also prohibits arbitrary and capricious action.  5 U.S.C. §706(2)(A).  *Kalispel Tribe of Indians v. U.S. Dep't of the Interior*, 999 F.3d 683, 688 (9th Cir. 2021).  It requires federal agencies to engage in "reasoned decisionmaking," *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020), meaning an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotations omitted).  OPM's order is entirely lacking in reasoned decisionmaking, contrary to lawful authority, and invalid on that basis alone.  *See, e.g.*, *Drs. for Am. v. Off. of Pers. Mgmt.*, Case No. CV 25-322 (JDB), 2025 WL 452707, at *8 (D.D.C. Feb. 11, 2025) ("[Plaintiff's] arbitrary and capricious argument is simple: the agencies' removal decisions were "completely unreasoned" and thus were not the product of reasoned decisionmaking. … The Court agrees that [Plaintiff] has demonstrated a likelihood of success on the merits as to this claim.").

The evidence presented establishes that OPM *knew* its ordered termination notices were false.  Neither OPM nor the agencies could possibly have engaged in meaningful performance reviews of tens of thousands of employees in the hours or days between the OPM order and the agency termination announcements.  *Supra* at 10-15.  The available evidence shows that the terminations were not based on such performance reviews.  Former OPM Director Archuleta Dec. ¶¶12-14; Bachelder Dec. ¶¶9, 17; Ronneberg Dec. ¶¶10, 19; Eaton Dec. ¶20; Neubacher Dec. ¶6.  One employee fired at NSF received a progress report describing him as "an outstanding contributor" to his agency just *five days* before his termination.  Frassetto Dec. ¶8, Exh. A; *see also* Evans Dec. ¶¶14-15, Exh. A (outstanding rating in annual performance review).

As here, "[r]eliance on facts that an agency knows are false at the time it relies on them is the essence of arbitrary and capricious decisionmaking." *Missouri Serv. Comm'n v. FERC,* 337 F.3d 1066, 1075 (D.C.Cir. 2003); *see also Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 57 (D.C. Cir. 2015) ("An agency contravenes the APA when it "fails to examine the relevant data," which could reveal "that the figures being used are erroneous."); *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 656 (9th Cir. 2009) (arbitrary and capricious includes an "an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or

the product of agency expertise."); *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)) ("Our review is deferential, but we are 'not required to exhibit a naiveté from which ordinary citizens are free.'").

By disregarding limits upon its authority and directing agencies to deceive employees, OPM acted arbitrarily and capriciously in violation of 5 U.S.C. §706(2)(A).

### c.    OPM Failed to Comply with Notice and Comment Rulemaking

The APA further requires the Court to "hold unlawful and set aside" a program for failure to comply with "procedure required by law." 5 U.S.C §706(2)(D).

OPM's directives to agencies qualify as a "rule" under the APA, which "means the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency...." 5 U.S.C. §551(4); *Nat'l Treasury Emps. Union v. Newman*, 768 F. Supp. 8, 11 (D.D.C. 1991) (holding OPM's "new program of examinations governing hiring for 112 career positions within the federal government" was "clearly" rule under APA, subject to notice-and-comment rulemaking. But rules must go through the notice and comment process *before* enactment, so that the public can weigh in and the agency can consider the public's views. 5 U.S.C. §553.

Any OPM rule that applies beyond the office of OPM itself, whether related to personnel actions or otherwise, must go through APA rulemaking. §1105 ("in the exercise of the functions assigned under this chapter, the Director shall be subject to subsections (b), (c), and (d) of section 553 of this title"); *see also id.* §1103(b)(1). There can be no dispute here that OPM failed to do so.

OPM's order and agency implementation thereof were therefore "without observance of procedure required by law" and invalid. *Empire Health Found. for Valley Hosp. Med. Ctr. v. Azar*, 958 F.3d 873, 882 (9th Cir. 2020) *reversed and remanded on other grounds, sub nom. Becerra v. Empire Health Foundation*, 597 U.S. 424 (2022) (quoting 5 U.S.C. §706(2)(D)); *see also Chief Probation Officers of Cal. v. Shalala*, 118 F.3d 1327, 1329 (9th Cir. 1997) ("Rules requiring notice and comment are invalid if the promulgating agency fails to comply with the applicable procedural requirements."); *Rivera v. Patino*, 524 F. Supp. 136, 147 (N.D. Cal. 1981) ("It is fundamental that administrative regulations are void unless they are promulgated in strict compliance with the

1    Administrative Procedure Act.").

2        **3.    This Court Has Jurisdiction to Hear These Claims**

3            **a.    Plaintiffs Have Article III Standing**

4        While all Plaintiffs have standing, this Court can proceed upon finding that even a single

5    plaintiff does.  *See Townley v. Miller*, 722 F.3d 1128, 1135 (9th Cir. 2013).

6        AFGE and AFSCME and their affiliated locals ("the Unions") have standing both in their

7    own right and in their representative capacity.  *Fellowship of Christian Athletes v. San Jose Unified*

8    *Sch. Dist.*, 82 F.4th 664, 681-82 (9th Cir. 2023) (en banc).  As for the Unions' organizational

9    interests, OPM's unlawful actions have "directly affected and interfered with [their] core business

10   activities," not merely their "abstract social interests."  *Food & Drug Admin. v. All. for Hippocratic*

11   *Med.*, 602 U.S. 367, 395 (2024); *see also Arizona Alliance for Retired Americans v. Mayes*, 117 F.4th

12   1165, 1177 (9th Cir. 2024), *pet. for reh'g or reh'g en banc pending*.  The Unions have been, and will

13   continue to be, injured in the performance of their core pre-existing activities of providing

14   representational services to employees in federal government bargaining units.  Blake Dec. ¶¶5, 12-

15   17; Kelley Dec. ¶¶3, 7-13; Turner-Nichols Dec. ¶¶7-13; Bachelder Dec. ¶¶11-16, 23; Ronneberg Dec.

16   ¶¶15-22.  Those representational duties include counseling represented employees on their rights in

17   circumstances of termination, RIFs, or other adverse actions. Blake Dec. ¶5; Kelley Dec. ¶3; Turner-

18   Nichols Dec. ¶8; Bachelder Dec. ¶11-16, 23; Ronneberg Dec. ¶¶15-22.  These injuries are

19   indistinguishable from those found to support standing in *Havens Realty Corp. v. Coleman*, 455 U.S.

20   363, 378-79 (1982), where the defendant provided false information about available housing to the

21   plaintiff organization, which provided counseling services for low-income homeseekers, thereby

22   "perceptibly impair[ing] [Plaintiff's] ability to provide counseling and referral services" with a

23   "consequent drain on the organization's resources.  *See also Hippocratic Medicine*, 602 U.S. at 395

24   (equating injury-in-fact in *Havens Realty* to that suffered by "retailer who sues a manufacturer for

25   selling defective goods to the retailer").

26        Further, by embarking on mass terminations without providing the notice required by the RIF

27   statutes, OPM has precluded the Unions from performing their authorized role to represent

28   employees in RIF proceedings and forced the Unions to devote their resources to counseling

represented employees.  Blake Dec. ¶¶12-17; Kelley Dec. ¶¶7-13.  Moreover, OPM's unlawful

actions have overwhelmed the Unions with queries and demands from probationary employees for

representation, undermining the Unions' ability to effectively assist those and other represented

employees.  Blake Dec. ¶¶12-17; Kelley Dec. ¶¶7-13.  Thus, the Unions do not invoke standing

merely based on voluntary expenditures to educate represented employees about their rights in

response to a defendant's alleged wrongdoing.  *Cf. Ariz. Alliance*, 117 F.4th at 1180-81.  Further, the

loss of union members in represented bargaining units harms the Unions by diminishing their

bargaining power and dues income.  Blake Dec. ¶¶20-23; Kelley Dec. ¶¶15-18.

Causation and redressability are readily satisfied as well.  As explained, the demands placed

upon the Unions to assist represented employees with navigating these mass pretextual terminations

undermine their ability to perform their core representative functions.  And if the Court orders OPM

to rescind the unlawful termination directive and restore the status quo, the injunction would protect

against any such future injury to the Unions.

The Unions also have standing as representatives of their members, who have suffered, or

imminently may suffer, immediate terminations and face moving expenses, new job searches, and the

loss of their healthcare benefits.  Kelley Dec. ¶¶22-23; Blake Dec. ¶¶18-19; Turner-Nichols Dec. ¶7;

Jacobs Dec. ¶¶13, 16-17; Bachelder Dec. ¶¶17-22; Ronneberg Dec. ¶¶19-22; *see also* Kelley Dec.

¶25 (noting sizable percentage of AFGE members who are veterans will suffer from impairment of

VA services); *Fellowship of Christian Athletes*, 82 F.4th at 681 (setting forth standard for

associational standing).

Other Plaintiffs face similar organizational and associational injuries.  For example, Vote Vets

Action Fund, Inc. a non-profit organization committed to providing support services to and "lift[ing]

up the voices of veterans," has "prevented…from performing [its] regular activities to meet the needs

of veterans and their families" by the overwhelming influx of inquiries and requests for support that

have resulted from the mass termination program.  Eaton Dec. ¶¶3, 10.  VoteVets' members will be

and are already being directly harmed by the impairment of crucial mental health services like the

Veterans' Crisis Hotline and disruption to VA services.  *Id.* ¶¶8-9, 14-15.  Common Defense Civic

Engagement's members, also primarily veterans, face similar impairment to the VA services they rely

upon and the organization has similarly been overwhelmed in responding to and assisting its members. Arbulu Dec. ¶¶5-6, 9-10. Members of the Coalition to Protect America's National Parks ("Coalition") regularly use the National Park System and will be adversely affected by any reduction of services, closure of park areas, or degradation of parks that will result from mass terminations. Neubacher Dec. ¶¶3, 5. The Western Watersheds Project has already been told that because of staffing cuts, the Bureau of Land Management is unable to respond to one of its FOIA requests, depriving the organization of timely access to information needed to accomplish its mission of protecting native species and conserving and restoring the habitats they depend on. Molvar Dec. ¶¶3, 6, 7. The Main Street Alliance, a national network of over 30,000 small businesses, has numerous members who are likely to be harmed by the mass termination program as Small Business Administration loan guarantees and potential contracts they could secure are delayed and as emergency financial assistance for small businesses (including for natural disaster relief) becomes less readily available. Phetteplace Dec. ¶¶7-9.

**b.    Plaintiffs Should Not Be Channeled to Agency Adjudication**

This Court has subject matter jurisdiction to hear these federal claims pursuant to 28 U.S.C. §1331. OPM may argue, as the Administration has elsewhere, that this Court lacks jurisdiction over the Unions' claims, on the theory that Congress impliedly intended to "channel" any claims by unions or federal employees into an administrative adjudicatory scheme under the CSRA or the Federal Service Labor-Management Relations Statute (FSLMRS) *before* being heard in federal court, under the doctrine established by *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207-13 (1994). *Thunder Basin* doctrine asks whether a plaintiff's claims are "are of the type Congress intended to be reviewed" within a system of agency adjudication created by a statute, even though the statute does not expressly preclude federal jurisdiction. *Id.* at 212. Here, however, the doctrine is inapplicable, for numerous reasons, to the constitutional separation of powers and APA claims against OPM by the Unions and other Plaintiffs. Recent out-of-circuit district court decisions declining jurisdiction over claims by unions and/or employees challenging administration action are distinguishable and unpersuasive because *Thunder Basin* channeling does not apply to these claims, brought by these

1    Plaintiffs, against these Defendants, for multiple reasons.[32]

2    First, as an initial matter, Plaintiffs include not only labor unions but also environmental,

3    veterans, and small business organizations.[33]  There can be no argument that the claims of these other

4    Plaintiffs should be channeled to administrative adjudication, because Congress has established no

5    agency to hear such claims.  *Kerr v. Jewell*, 836 F.3d 1048, 1052-53 (9th Cir. 2016) (channeling

6    some claims but not claims that are not of the type to be heard in administrative review).

7    In any event, second, Plaintiffs are suing OPM for enacting a government-wide policy and

8    program that intrudes on separation of powers and violates the APA—they are not suing their

9    employing agencies.  No controlling authority has "channeled" *any* type of APA claim against OPM

10   (or any similar entity) based on a government-wide policy or rule, simply because it impacts federal

11   employees.  Thus, the Fifth Circuit recently rejected application of *Thunder Basin* to a challenge to a

12   government-wide federal rule (there, an employee vaccination mandate), holding that the program

13   was different from a "personnel action" performed by an individual with authority that would be

14   adjudicated through agency review under the CSRA section 2302(b).  *Feds for Med. Freedom v.*

15   *Biden*, 63 F.4th 366, 375 (5th Cir.) (*en banc*), *judgment vac'd on other grounds* (mootness), 144 S.

16   Ct. 480 (2023).  The court there explained in great detail why no federal agency could hear such a

17   claim, and why Congress never intended to channel such a claim.  *Id.* at 370-81.

18   In recent years, the Supreme Court has reiterated the APA's "command" of judicial review,

19   *Dep't of Commerce v. New York*, 588 U.S. 752, 772 (2019), and construed exceptions to the APA

20   "quite narrowly."  *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 22-23 (2018).[34]  As

---

[32] *See AFSA v. Trump*, D.D.C. Case No. 25-cv-352 (Order of Feb. 21, 2025); *NTEU v. Trump*, DDC Case No. 25-cv-420 (Order of Feb. 20, 2025);  *AFGE v. Ezell*, D.Mass. Case No. 25-cv-10276 (Order of Feb. 12, 2025)

[33] *See AFSA v. Trump*, D.D.C. Case No. 25-cv-352 (Order of Feb. 21, 2025) at 9 n.1 (expressly noting lack of non-union plaintiffs).

[34] At the same time, it has refused to expand the implied *Thunder Basin* doctrine. *See Axon Enters., Inc. v. Federal Trade Comm'n*, 598 U.S. 175, 180, 195-96 (2023).  While federal courts once readily departed from the text enacted by Congress—fashioning "implie[d]" doctrines as they deemed "necessary to make effective the congressional purpose" expressed in that text, *J.I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964)—today, that approach is recognized as an "ancien regime." *Ziglar v. Abbasi*, 582 U.S. 120, 132 (2017) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001)); *see also Axon Enters.*, 598 U.S.at 217 (Gorsuch, J., concurring) ("Respectfully, this Court should be done with the *Thunder Basin* project. I hope it will be soon.").

1    the Court recently held in rejecting a different implied doctrine, "[t]he text of the APA means what it

2    says." *Loper Bright*, 603 U.S. at 393.  Federal courts have long been understood to have jurisdiction

3    to hear APA claims against OPM.  *E.g.*, *Helfer*, 53 F.3d at 1292-93 (exercising jurisdiction over

4    question whether OPM-promulgated hiring regulations violated APA); *Newman*, 768 F. Supp. at 12

5    (enjoining OPM hiring program based on "failure to comply with the APA's mandate of rulemaking

6    via notice to the public" and obligation "to invite, receive, and respond to comments from the

7    public").

8         While a pre-*Thunder Basin* Ninth Circuit decision did channel a federal employee's claim

9    against his employing agency challenging a personnel action, along with his tag-along APA claim,

10   that was an entirely different case against a different kind of defendant.  *See Veit v. Heckler*, 746 F.2d

11   508, 510-11 (9th Cir. 1984).  Unlike the *Veit* line of cases, Plaintiffs are not employees suing their

12   employer agency or a supervisor for action prohibited by the CSRA.[35]  Plaintiffs challenge the

13   actions of a different component agency of the federal government, which has unlawfully assumed

14   the authority to order the effective elimination of an entire category of federal employment for all

15   agencies government-wide, and ordered the component agencies to comply.  The fact that the effect

16   of the implementation of that government-wide program or rule may result in agency personnel

17   actions vis-à-vis individual employees does not turn this action into a personnel action, any more than

18   the APA challenge to the employee mandate in *Feds for Med. Freedom v. Biden*, 63 F.4th at 375.

19        Third, no controlling authority has ever channeled a *procedural* APA claim based on failure

20   to engage in notice-and-comment rulemaking simply on the ground that federal employees are

21   affected, and none of these recent out-of-Circuit decisions involved such a claim.[36]  For good reason,

22   because 1) no agency exists to hear such a claim; and, further, 2) sending such a claim to

23   administrative adjudication directly contravenes the language of the APA, CSRA, and FSLMRS.

24

25        [35] As this Court has explained, *Veit* recognizes that the CSRA removes initial jurisdiction from
26   individual employee actions against employing agencies that arise from CSRA's prohibitions on
     "prohibited personnel practices" by supervisors.  *Chrisanthis v. United States*, No. C 14-02784 WHA,
27   2015 WL 887578, at *2 (N.D. Cal. Feb. 27, 2015), aff'd, 682 F. App'x 631 (9th Cir. 2017).

          [36] *See AFSA v. Trump*, D.D.C. Case No. 25-cv-352 (Order of Feb. 21, 2025); *NTEU v. Trump*,
28   DDC Case No. 25-cv-420 (Order of Feb. 20, 2025);  *AFGE v. Ezell*, D.Mass. Case No. 25-cv-10276
     (Order of Feb. 12, 2025).

1    Both the CSRA and FSLMRS expressly require compliance with the earlier-enacted APA notice-and-

2    comment rulemaking process when OPM adopts rules that apply beyond its own office.  5 U.S.C.

3    §§1103; 1105 (same), 7134 (same, for labor authority).  The APA expressly makes compliance with

4    section 553 rulemaking judicially reviewable (*see* 5 U.S.C. §§701-706).  Surely the Congress that

5    created OPM and required it to comply with the APA (§§1103, 1105), did not mean to *implicitly*

6    exempt that agency from APA review.

7            In short, *Thunder Basin* channeling does not apply.  And even if this Court were to apply that

8    doctrine and its multi-factor test, *see Axon Enterprises*, 598 US. at 189-96, the result would be the

9    same: (1) there is no mechanism for Plaintiffs to bring APA claims (particularly a procedural claim)

10   against OPM before CSRA or FSLMRS agencies, so judicial review of these claims, by these parties,

11   would be entirely foreclosed, (*Thunder Basin*, 510 U.S. at 207); (2) Plaintiffs' claims are "*wholly*

12   *collateral*" to the CSRA's scheme because they do not challenge individual adverse personnel actions

13   or employer action under a contract; they challenge the substantive and procedural lawfulness of

14   OPM's actions directing the agencies (*id.* at 211); and (3) the labor agencies have no particular

15   expertise in resolving constitutional and administrative law questions, which are the particular

16   province of the Article III courts.  *See Loper Bright*, 603 U.S. at 399.

17           As the Supreme Court has held, the APA was designed to "serve as the fundamental charter of

18   the administrative state," *Kisor v. Wilkie*, 588 U.S. 558, 580 (2019) (plurality opinion) (internal

19   quotation marks omitted).  That is the role the APA must play here, and the reason this Court must

20   hear these important claims.

21       **B.    OPM's Actions Have and Will Continue to Cause Irreparable Harm to Plaintiff**
             **Organizations and Their Members**
22

23           First, "the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"

24   *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012); *Rodriguez v. Robbins*, 715 F.3d 1127,

25   1144–45 (9th Cir. 2013).  Where an executive action causes constitutional injuries, injunctive relief is

26   appropriate.  *See Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017).  These principles apply

27   beyond infringement of individual constitutional rights and extend to structural separation of powers

28   violations.  *See Cnty. of Santa Clara v. Trump*, 250 F.Supp.3d 497, 537–38 (N.D. Cal. 2017).  As this

Court explained:

> [T]his distinction between personal and structural constitutional rights is not recognized in the Ninth Circuit. Although the Government cites to *American Trucking Ass'ns v. City of Los Angeles*, 577 F.Supp.2d 1110, 1127 (C.D. Cal. 2008) for the proposition that "in the case of Supremacy Clause violations," the presumption of irreparable harm "is not necessarily warranted," that case was reversed by the Ninth Circuit. On appeal the court concluded that, even where the constitutional injury is structural, "the constitutional violation alone, coupled with the damages incurred, can suffice to show irreparable harm." *American Trucking [Ass'ns, Inc. v. City of Los Angeles]*, 559 F.3d [1046,] 1058 [9th Cir. 2009)].

*Id.* at 538; *see also Am. Trucking Ass'ns*, 559 F.3d at 1058–59 (holding that forcing truckers to comply with "unconstitutional … agreements" would cause irreparable injury, where constitutional injury was based on federal preemption).  Plaintiffs (and their members) identify harm they have faced from OPM's constitutional violations, and that is sufficient.

Second, Plaintiffs' federal employee members who have been or will be terminated face irreparable injury in the form of losing employer-provided health benefits for themselves and their families, needing to relocate their families (often from remote locations, as in the case of National Parks Service employees), and having to compete for new jobs with the taint of a for-cause-performance-based termination on their records.  *See supra* at 11-12; Blake Dec. ¶¶18-19; Eaton Dec. ¶¶10, 13, 16, 21; Jacobs Dec. ¶16; Jarvis Dec. ¶4; Frassetto Dec. ¶¶25-26; Neubacher Dec. ¶7; Bachelder Dec. ¶¶12-13; Ronneberg Dec. ¶16; *Golden Gate Restaurant Ass'n v. City and County of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008) (loss of health coverage); *cf. Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983) (loss of government benefits); *Rana v. Gu*, 220 F.Supp.3d 989, 995 (N.D. Cal. 2016) ("It is well-established that the loss of an interest in real property constitutes an irreparable injury…. Plaintiffs will suffer the loss of their tenancy in their home.").

Third, Plaintiffs' members face irreparable injury from the disruption of critical government services.  *E.g.*, Eaton Dec. ¶¶7-9, 14-15 (VA services); Turner-Nichols Dec. ¶¶12-13 (VA services); Kelley Dec. ¶¶27-29 (DOD); Jacobs Dec. ¶18 (CDC); Phetteplace Dec. ¶¶8-9 (SBA programs); Ronnenberg Dec. ¶ 22 (FAA safety programs); Nemeth-Greenleaf Dec. ¶8 (Department of Navy).  That includes substantial risks of environmental degradation caused by the terminations of Park and Forest Service workers.  Molvar Dec. ¶¶8-10 (damage from reduced oversight of grazing and poaching); Neubacher Dec. ¶5 (damage from national park visitors without adequate staff).

1   "[E]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is

2   often permanent or at least of long duration, i.e., irreparable." *League of Wilderness Defs./Blue*

3   *Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014) (quoting *Lands*

4   *Council v. McNair*, 537 F.3d 981, 1004 (9th Cir. 2008) (en banc)).  The Coalition's members are also

5   likely to suffer diminished access to national parks.  *Ft. Funston Dog Walkers v. Babbitt*, 96

6   F.Supp.2d 1021, 1040 (N.D. Cal. 2000) (loss of access to national recreational area is irreparable

7   harm).  Based on the experience of the former Yosemite Superintendent, the mass termination of NPS

8   employees means "the park will likely have to stop specific functions and close park areas."

9   Neubacher Dec. ¶7; *see also id.* ¶8 ("The hiring of temporary, seasonal employees cannot make up

10  for the loss of so many permanent employees.").

11       Fourth, Plaintiffs themselves are suffering irreparable organizational injury.  OPM's actions

12  are preventing the Unions from playing the representative role Congress intended.  Blake Dec. ¶¶12-

13  17, 25; Kelley Dec. ¶¶8-14, 31; Turner-Nichols Dec. ¶¶7-13; Bachelder Dec. ¶¶11-16; Ronneberg

14  Dec. ¶¶15-18; Nemeth-Greenleaf Dec. ¶12.  And they are forcing Plaintiffs to unexpectedly and

15  immediately divert substantially all of their resources to counseling and assisting affected federal

16  employees in the days following implementation of the unlawful program.  Blake Dec. ¶¶12-17;

17  Eaton Dec. ¶11; Kelley Dec. ¶¶ 8-14; Turner-Nichols Dec. ¶¶7-13; Bachelder Dec. ¶¶11-16, 23;

18  Ronneberg Dec. ¶¶15-22; Nemeth-Greenleaf Dec. ¶12.

19       Fifth, the lack of notice-and-comment rulemaking injured plaintiffs who would have weighed

20  in, had OPM made public and given proper notice of its ill-considered plans.  Blake Dec. ¶25; Kelley

21  Dec. ¶31; Arbulu Dec. ¶11.  As some courts in other circuits have held, "it is well established that the

22  harm suffered by those who would otherwise participate in agency rulemaking under the APA is to

23  be considered irreparable when the agency fails to afford them their rights to such participation."

24  *Newman*, 768 F. Supp. at 10 (quotations omitted) ); *cf. Save Strawberry Canyon v. Dep't of Energy*,

25  613 F. Supp. 2d 1177, 1187 (N.D. Cal. 2009) (holding that failure to undertake an environmental

26  impact statement when required constitutes "irreparable procedural injury," in conjunction with

27  threatened environmental injury)..

28

1     Finally, damages are not available in APA cases, making monetary harm irreparable. *See*

2  *Pangea Legal Servs. v. U.S. Dept. of Homeland Security*, 512 F.Supp.3d 966, 976 (N.D. Cal. 2021)

3  ("Economic injuries are deemed irreparable in APA cases because plaintiffs are unable to recover

4  money damages."); *E. Bay Sanctuary Covenant v. Trump*, 994 F.3d 962, 984 (9th Cir. 2020)).

5     **C.      The Balance of Equities Weigh in Plaintiffs' Favor, and a Temporary Restraining
               Order Is in the Public Interest**

6

7     The equities and public interest, which merge when the government is a party, tip sharply in

8  favor of the Plaintiffs. *Wolford v. Lopez*, 116 F.4th 959, 976 (9th Cir. 2024). The threatened and

9  actual harm to Plaintiffs far outweighs the federal government's interests in immediately enforcing

10 the OPM termination program, and preserving Plaintiffs' constitutional and statutory rights is in the

11 public interest. *See Melendres*, 695 F.3d at 1002 ("[I]t is always in the public interest to prevent the

12 violation of a party's constitutional rights" (citation omitted)); *NTEU v. U.S. Dept. of Treasury*, 838

13 F. Supp. 631, 640 (D.D.C. 1993) ("The preservation of ... the legality of the process by which

14 government agencies function certainly weighs heavily in the public interest."); *Clarke v. Ofc. of Fed.*

15 *Housing Enterp. Oversight*, 355 F.Supp.2d 56, 66 (D.D.C. 2004) ("there is a substantial public

16 interest in ensuring that [the agency] acts within the limits of its authority").

17    The government will suffer no harm from halting the termination of employees that agencies

18 authorized to work and relied on, and swiftly rescinding the terminations of those already fired (as it

19 recently did with the nuclear safety employees that OPM's order swept within its mandate).[37] The

20 government will certainly continue to function (and will function better) if the status quo is

21 maintained. The balance of equities decidedly supports a temporary restraining order here, and the

22 Court should preserve the status quo until the case can be decided on the merits.

23                                      **CONCLUSION**

24    For the foregoing reasons, Plaintiffs respectfully request this Court grant this Motion and

25 enter the accompanying proposed temporary restraining order.

26

27

28    [37] https://apnews.com/article/nuclear-doge-firings-trump-federal-
      916e6819104f04f44c345b7dde4904d5 (Feb. 23, 2025)

1    DATED:  February 23, 2025                Scott A. Kronland
2                                             Stacey M. Leyton
                                              Eileen B. Goldsmith
3                                             Danielle E. Leonard
                                              Robin S. Tholin
4                                             James Baltzer
                                              ALTSHULER BERZON LLP
5                                             177 Post St., Suite 300
                                              San Francisco, CA 94108
6                                             Tel: (415) 421-7151

7                                    By: /s/ Danielle E. Leonard
8                                             Danielle E. Leonard

9                                             *Attorneys for Plaintiffs*

10

11                                            Norman L. Eisen (*pro hac vice forthcoming*)
                                              Pooja Chadhuri (SBN 314847)
12                                            STATE DEMOCRACY DEFENDERS
                                              FUND
13                                            600 Pennsylvania Avenue SE #15180
                                              Washington, DC 20003
14                                            Tel: (202) 594-9958
                                              Norman@statedemocracydefenders.org
15                                            Pooja@statedemocracydefenders.org

16

17                                   By: /s/ Norman L. Eisen
18                                            *Attorneys for Plaintiffs*

19

20                                            Rushab Sanghvi (SBN 302809)
21                                            AMERICAN FEDERATION OF GOVERNMENT
                                              EMPLOYEES
22                                            80 F Street, NW
                                              Washington, DC 20001
23                                            Tel: (202) 639-6426
                                              Sanghr@afge.org
24

25                                   By: /s/ Rushab Sanghvi
26                                            *Attorneys for Plaintiff American Federation of
27                                            Government Employees (AFGE)*

28

1

2

Teague Paterson (SBN 226659)
Matthew Blumin  (*pro hac vice forthcoming*)
AMERICAN FEDERATION OF STATE, COUNTY,
AND MUNICIPAL EMPLOYEES
1625 L Street, N.W.
Washington, D.C.  20036
Tel: (202) 775-5900
Tpaterson@afscme.org
MBlumin@afscme.org

3

4

5

6

7

8

By: */s/Teague Paterson*

9

10

*Attorneys for Plaintiff American Federation of State
County and Municipal Employees (AFSCME)*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28