Scott A. Kronland (SBN 171693)
Stacey M. Leyton (SBN 203827)
Eileen B. Goldsmith (SBN 218029)
Danielle E. Leonard (SBN 218201)
Robin S. Tholin (SBN 344845)
James Baltzer  (SBN 332232)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel. (415) 421-7151
Fax (415) 362-8064
skronland@altber.com
sleyton@altber.com
egoldsmith@altber.com
dleonard@altber.com
rtholin@altber.com
jbaltzer@altber.com

*Attorneys for Plaintiffs*

[Additional Counsel on signature page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO; AMERICAN FEDERATION OF STATE COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO;  et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, et al., <br><br> Defendants. | Case No. 25-cv-01780-WHA <br><br> **REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE** |

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

ARGUMENT .........................................................................................................1

    I.      OPM Directed Federal Agencies to Terminate Probationary Workers ......................1

    II.    OPM's Actions Exceed Statutory Authority and Are Unlawful .................................7

    III.   Plaintiffs Can Sue to Enjoin Unlawful *Ultra Vires* Action that Exceeds Statutory Authority ....................................................................................10

    IV.   Plaintiffs Are Likely to Succeed on Their APA Claims.............................................11

    V.    Congress Did Not Send Plaintiffs' APA Claims Against OPM to Labor Agencies ....................................................................................................12

          A.    The Nonprofit Organization Plaintiffs' APA Claims Cannot Be Sent to an Administrative Agency ........................................................................12

          B.    Unions' and Their Members' Claims Against OPM Also Belong in this Court .......................................................................................................14

    VI.   Plaintiffs Show Standing and Irreparable Harm for Purposes of Obtaining Preliminary Injunctive Relief .........................................................17

    VII.  Plaintiffs' Injuries Will Be Redressed by the Requested TRO, Which Is Not Overly Broad and Will Not Harm the Government or Public Interest.....................20

CONCLUSION .....................................................................................................22

1

# TABLE OF AUTHORITIES

2

3

**Page(s)**

4

**Federal Cases**

5

*Acosta v. Pacific Enterprises*,
    950 F.2d 611 (9th Cir. 1991) ........................................................................................... 20

6

*In re Aiken Cnty.*,
    725 F.3d 255 (D.C. Cir. 2013) ........................................................................................... 9

7

8

*Alexander v. Sandoval*,
    532 U.S. 275 (2001) ......................................................................................................... 15

9

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
    559 F.3d 1046 (9th Cir. 2009) ......................................................................................... 20

10

11

*Arison v. Postal Service*,
    No. 3:21-cv-01669-HL, 2023 WL 6004200 (D. Oregon Aug 1. 2023) ........................... 13

12

13

*Bessent v. Dellinger*,
    U.S. S. Ct. No. 24A790 ..................................................................................................... 16

14

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988) ......................................................................................................... 11

15

16

*Bresgal v. Brock*,
    843 F.2d 1163 (9th Cir. 1987) ......................................................................................... 21

17

18

*California. v. Azar*,
    911 F.3d 558 (9th Cir. 2018) ........................................................................................... 21

19

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ........................................................................................................... 6

20

21

*City & Cnty. of San Francisco v. Barr*,
    965 F.3d 753 (9th Cir. 2020) ........................................................................................... 22

22

23

*City & Cnty. of San Francisco v. United States Citizenship & Immigr. Servs.*,
    944 F.3d 773 (9th Cir. 2019) ..................................................................................... 17, 19

24

*Clinton v. City of New York*,
    524 U.S. 417 (1998) ........................................................................................................... 9

25

26

*Cnty. of Santa Clara v. Trump*,
    250 F.Supp.3d 497 (N.D. Cal. 2017) ............................................................................... 20

27

*Dargo v. United States*,
    176 Ct. Cl. 1193 (Ct. Cl. 1966) ......................................................................................... 7

28

*Dalton v. Specter*,
   511 U.S. 462 (1994). .................................................................................................... 10

*Department of Commerce v. New York*,
   588 U.S 752 (2019). ................................................................................................ 6, 11

*E. Bay Sanctuary Covenant v. Biden*,
   993 F.3d 640 (9th Cir. 2021) ................................................................................ 21, 22

*E. Bay Sanctuary Covenant v. Garland*,
   994 F.3d 962 (9th Cir. 2020) .......................................................................... 20, 21, 22

*E.E.O.C. v. Peabody W. Coal Co.*,
   610 F.3d 1070 (9th Cir.2010) ...................................................................................... 20

*Elgin v. Dep't of Treasury*,
   567 U.S. 1 (2012) ........................................................................................................ 13

*Fed. L. Enf't Officers Ass'n v. Ahuja*,
   62 F.4th 551 (D.C. Cir. 2023) ..................................................................................... 15

*Feds for Med. Freedom v. Biden*,
   63 F.4th 366 (5th Cir.) (*en banc*), *judgment vac'd on other grounds*, 144 S. Ct. 480
   (2023) ................................................................................................................... 13, 15

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
   98 F.4th 1180 (9th Cir. 2024) ................................................................................... 6, 7

*Flynt Distrib. Co. v. Harvey*,
   734 F.2d 1389 (9th Cir. 1984) ...................................................................................... 6

*Gearhart v. United States Dep't of Educ.*,
   No. 19-CV-00750-YGR, 2020 WL 1322919 (N.D. Cal. Mar. 20, 2020) ...................... 6

*Goldie's Bookstore, Inc. v. Superior Ct. of State of Cal.*,
   739 F.2d 466 (9th Cir. 1994) ....................................................................................... 17

*Grundmann v. Trump*,
   No. 25-425 (D.D.C.) .................................................................................................... 16

*Harris v. Bd. of Supervisors*,
   366 F.3d 754 (9th Cir. 2004) ....................................................................................... 17

*Harris v. Bessent*,
   No. 25-412 (D.D.C.) .................................................................................................... 16

*Horne v. United States*,
   419 F.2d 416 (Ct. Cl. 1969) .......................................................................................... 7

*Innovation Law Lab v. Wolf,*
   951 F.3d 1073 (9th Cir. 2020), *cert. granted,* 141 S.Ct. 617 (2020), *vacated and remanded,* 141 S.Ct. 284 (2021), *vacated as moot,* 5 F.4th 1099 (9th Cir. 2021) .................21

*Kerr v. Jewell,*
   836 F.3d 1048 (9th Cir. 2016) ............................................................................13

*Loper Bright Enterprises v. Raimondo,*
   603 U.S. 369 (2024) ............................................................................................16

*McGuffin v. Soc. Sec. Admin.,*
   942 F.3d 1099 (Fed. Cir. 2019) ...........................................................................7

*Murphy Company v. Biden,*
   65 F.4th 1122 (2023) .........................................................................................10

*Myers v. U.S.,*
   272 U.S. 52 (1926) ..............................................................................................9

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA,*
   595 U.S. 109 (2022) ............................................................................................9

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
   145 F.3d 1399 (D.C. Cir. 1998) ........................................................................21

*Pangea Legal Servs. v. U.S. Dep't Homeland Sec'y,*
   501 F.Supp.3d 792 (N.D. Cal. 2020)..................................................................22

*Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec'y,*
   279 F.Supp.3d 1011 (N.D. Cal. 2018).................................................................21

*Regents of Univ. of Cal. v. U.S. Dep't. Homeland Sec'y,*
   908 F.3d 476 (9th Cir. 2018), *vacated in part on other grounds,* 591 U.S. 1 (2020) .......21, 22

*Sackett v. EPA,*
   566 U.S. 120 (2012) ....................................................................................11, 15

*Seila Law LLC v. Consumer Fin. Protection Bureau*
   591 U.S. 197 (2020) ............................................................................................9

*Shaw v. United States,*
   622 F.2d 520 (Ct. Cl. 1980).................................................................................7

*Sierra Club v. Trump,*
   929 F.3d 670 (9th Cir. 2019) .............................................................................10

*Sierra Club v. Trump,*
   963 F.3d 874 (9th Cir. 2020), *vacated and remanded on other grounds, sub nom.*
   *Biden v. Sierra Club,* 142 S. Ct. 46 (2021)........................................................10

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*,
   240 F.3d 832 (9th Cir. 2001) ..................................................................6

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
   578 U.S. 590 (2016) ...............................................................11, 15

*United State v. Fausto*,
   484 U.S. 439 (1988) ...................................................................13

*Univ. of Tex. v. Camenisch*,
   451 U.S. 390 (1981) .....................................................................6

*Veit v Heckler*,
   746 F.2d 508 (9th Cir. 1984) ...........................................................13

*Washington v. Trump*,
   847 F.3d 1151 (9th Cir. 2017) (per curiam) ...............................................17

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
   586 U.S. 9 (2018) .....................................................................12

**Federal Constitutional Provisions, Statutes, and Regulations**

U.S. Constitution Article II ...........................................................8, 9, 16
5 U.S.C.
   §§ 701-706 ...........................................................................12
   § 704 ..............................................................................10, 11
   § 706 ............................................................................16, 20, 21
   §§1103 ...............................................................................14
   § 1105 ...............................................................................14
   § 1202 ...............................................................................16
   § 1211 ...............................................................................16
   § 2301 ................................................................................7
   § 7104 ...............................................................................16
   § 7701 ...............................................................................13
   § 7703 ...............................................................................16
5 C.F.R. pt. 351 ........................................................................8

5 C.F.R. § 315.803 ...................................................................5, 6

5 C.F.R. § 315.804 ......................................................................7

5 C.F.R. § 315.804(a) ...................................................................8

Civil Service Reform Act of 1978, Pub. Law 95–454 (1978)
   § 3 .................................................................................19

**Federal Rules of Civil Procedure**

FRCP 19(a)(1) ..........................................................................20

FRCP 65(c)(2)(C) ........................................................................................................................... 20

**INTRODUCTION**

Plaintiffs have presented the Court with substantial evidence, including OPM's own documents and agency admissions and documents from across the government, that OPM ordered federal agencies across the government to terminate probationary workers with few exceptions and to use a standard notice falsely claiming performance justification. In response, OPM submits a single declaration from Acting OPM Director Ezell, created for purposes of this litigation, that denies ordering terminations, contradicts his own attachments, is unsupported by *any testimony from the agencies that supposedly made these decisions,* and is simply not credible.

Because Plaintiffs are correct that OPM ordered these terminations and use of a termination notice OPM knew was a lie, this Court has more than enough evidence to issue a TRO maintaining the status quo. OPM's actions broke the law. OPM largely focuses on jurisdictional roadblocks, but each point fails. Plaintiffs and their members have documented their ongoing, irreparable harm across the country. Plaintiffs' claims against OPM are not the type of claims channeled to administrative agencies. And OPM is flat wrong that this Court lacks authority to enter an injunction that stops OPM's unlawful acts in their entirety and orders OPM and all those acting in concert to maintain the status quo. Plaintiffs respectfully request the Court enter their proposed TRO and stop the unlawful action that is harming our government and our country.

**ARGUMENT**

**I.      OPM Directed Federal Agencies to Terminate Probationary Workers**

OPM would have the Court believe they had nothing to do with the mass termination of probationary employees across the entire federal government, except to provide guidance, and that it was the agencies' independent decision whether and how to terminate those employees. This assertion is based on a single Declaration from Acting OPM Director Ezell, and *none* from any agency that supposedly made these decisions. And the account is at odds with all the available evidence *including OPM's own*. All the evidence available at this stage of litigation, except Acting OPM Director Ezell's declaration, and including additional evidence obtained by Plaintiffs in the past few days since filing this TRO motion, demonstrates that Plaintiffs are very likely to succeed in proving that OPM directed the terminations of probationary employees and directed agencies to

provide a false rationale to those employees that their terminations were based on "performance."

Notably, OPM's own evidence shows that on February 14, 2025, OPM sent an email to agencies, through the Chief Human Capital Officers (CHCO) Council, telling them:

> We have asked that you separate probationary employees that you have not identified as mission-critical no later than end of the day Monday, 2/17. We have attached a template letter.

Dkt. 37-1, Ezell Dec. (Dkt. 34) ¶4, Ex. B at 1. The "we" is OPM.

OPM's claim that OPM "did not create a 'mass termination program'" and that "agencies took their own actions to terminate employees the agencies did not wish to retain" is entirely contradicted by the remaining available record. Tellingly, Acting Director Ezell does not deny the account, widely reported (and consistent with the above e-mail stating that it was "[f]ollow[ing] up" on actions taken "[o]ver the past several days"), that on February 13, 2025, on a (non-public) telephone meeting of agency leaders across the federal government, OPM ordered agencies to fire their probationary workers. TRO Mem. at 4. Mr. Ezell says nothing about that call at all.

Moreover, statements from officials at multiple federal agencies admit that the agencies carried out the terminations not at their own discretion, but on the direct orders of OPM. Under oath at a congressional hearing on February 25, 2025, Tracey Therit, the Chief Human Capital Officer of the VA, responded to questioning:

> RANKING MEMBER TAKANO: So nobody ordered you to carry out these terminations? You did it on your own?
> MS. THERIT: There was direction from the Office of Personnel Management.

Supp. Walls Dec. Exh. A at 8. Leaders at other agencies across the federal government have likewise stated they acted pursuant to OPM directives:

- On February 26, 2025, Civilian Personnel Policy Council Members at the Department of Defense (DoD) received an email stating: "*In accordance with direction from OPM*, beginning February 28, 2025, all DoD Components *must terminate* the employment of all individuals who are currently serving a probationary or trial period." Schwarz Dec. Exh. C. at 1 (emphasis added).

- Leadership at NSF told employees: "We are following orders," and "We were directed last Friday by OPM to terminate all probationers except for a minimal number of mission critical probationers." Frassetto Dec. Exh. B at 16, 18.

- Termination letters to employees at the Bonneville Power Administration stated: "*Per OPM instructions*, DOE finds that your further employment would not be in the public interest. For this reason, you are being removed from your position with DOE and the federal civil service."  Schwarz Dec. Exh. B (emphasis added).

- When an employee of the Foreign Agricultural Service emailed USDA's Deputy Chief Human Capital Officer to ask what "specific details of my performance that were evaluated and found to be insufficient," that officer responded: "Last night, agencies were notified by the Office of Personnel Management (OPM) that the Administration has decided probationary employees are not eligible for the Deferred Resignation program and also that these employees are to be terminated." Supp. Blake Dec. Exh. A.

- In an online town hall for IRS employees, the IRS' chief human capital officer told employees, "Regarding the removal of the probationary employees, again, that was something that was directed from OPM.  And even the letters that your colleagues received yesterday were letters that were written by OPM, put forth through Treasury, and given to us."  Lezra Dec. Exh. A at 4.

These statements are consistent and unequivocal: the agencies that terminated probationary employees acted at OPM's direction, not on their own initiative.  OPM does not submit a single declaration from any agency corroborating Acting Director Ezell's account, or denying these admissions.

Further, the evidence is uncontroverted that OPM required agencies to send probationary employees notices falsely attributing the terminations to "performance."  Although OPM did not provide the Court with the "attached [] template letter," referenced in OPM's February 14, 2025 email, OPM's template letter was included as an attachment to the DoD's email.  *See* Schwarz Dec. Exh. C ("As provided by OPM, and for your convenience, a Notification of Termination During Probationary Period template is provided.").  That template included the language immediately used by agencies throughout the government:

> Based on the OPM guidance referenced above, *the Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest*.

Schwarz Dec. Exh. D (emphasis added); *accord id.* Exh. B; Bachelder Dec. (Dkt. 18-5) ¶9, Exh. 1; Frassetto Dec. (Dkt. 18-9) ¶22, Exh. C; Evans Dec. (Dkt. 18-8) ¶26, Exh. B.  Extensive evidence available even at this initial stage of litigation includes multiple admissions from agencies that the language used was required by OPM.  Frassetto Dec. (Dkt. 18-9) Exh. B (NSF: "The cause comes

from boilerplate we received from OPM."); Supp. Blake Dec. Exh. A (USDA FAS: "Agencies were directed to begin providing termination notices to affected employees and directed the use of a specific template and language for the notice beginning immediately upon OPM notification."); *see also* Supp. Walls Dec. Exh. A at 10 (VA: "MS. THERIT: It is my signature on the letter.  RANKING MEMBER TAKANO: Did you write and -- did you write the memo? MS. THERIT: The memo was provided.").

Finally, OPM does not even attempt to respond to Plaintiffs' showing that that it would not have been possible for every agency to decide which employees to terminate and to conduct required performance evaluations in such a short time.  Former OPM Director Archuleta Dec. (Dkt. 18-4) ¶¶12-14; *see also* Neubacher Dec. (Dkt. 18-15) ¶6 (based on his experience as Yosemite National Park Superintendent, mass terminations could not have been based on individual evaluations).  And substantial record evidence shows that many of the terminated employees had exceptional performance records.  Evans Dec. (Dkt. 18-8) ¶¶14-15, Exh. A; Blake Dec. (Dkt. 18-6) ¶19; Jacobs Dec. (Dkt. 18-10) ¶17; Kelley Dec. (Dkt. 18-12) ¶26; Schwarz Dec. ¶14; Supp. Blake Dec. ¶6; *see also* Bachelder Dec. (Dkt. 18-5) ¶¶9, 17; Ronneberg Dec. (Dkt. 18-17) ¶¶10, 19; Eaton Dec. (Dkt. 18-7) ¶20.  One NSF scientist received a progress review *five days* before his termination stating that "his role [is] mission critical" and "[h]e has been an outstanding contributor to the division, directorate and the agency."  Frassetto Dec. (Dkt. 18-9) ¶8, Exh. A.

Plaintiffs have also provided evidence that even with respect to the small number of exceptions agencies were permitted to propose, *OPM made the final decision on who to terminate*. When NSF was initially told "it was the agency's discretion whether to remove probations or not[, w]e chose to retain them all*." Frassetto Dec. (Dkt. 18-9) Exh. B (emphasis added).  When the agency was nevertheless then directed to "remove all term probationary employees," except mission critical employees, it was "not given any real significant discretion in that area": "[M]ore than half of people were identified as mission critical *and that was too many*."  *Id.* (emphasis added).[1]  One NSF scientist

---

[1] *See also* Walls Supp. Dec. Exh. E (CDC; source told *Wired* that "CDC went through a very, very deliberate effort to characterize our probationary employees as mission critical or not, and that way we could keep those that would have real impacts to the mission should they get terminated," …

received a progress review *five days* before his termination stating that "his role [is] mission critical" and "[h]e has been an outstanding contributor to the division, directorate and the agency." Frassetto Dec. (Dkt. 18-9) ¶8, Exh. A.

Against this mountain of evidence that OPM orchestrated and directed these terminations—including directing the false statements that they were based on performance—OPM offers only Acting Director Ezell's declaration prepared for this litigation. Acting Director Ezell asserts that "OPM did not direct agencies to terminate probationary employees," and that "[a]gencies were responsible for deciding which probationary employees to keep and to terminate. Agencies were responsible for taking action to terminate their own employees they no longer wished to retain." Ezell Dec. ¶10. OPM thus asks this Court to simply accept, without corroboration, that multiple federal agencies independently and coincidentally chose to interpret and act upon OPM's "remind[er]," *id.*, in exactly the same way, and then independently and coincidentally chose to lie to Congress, the public, and their employees about why they did so. This is not credible.

OPM's own evidence also flies in the face of its denial of responsibility. OPM's message of February 14, 2025 *directed the agencies to "separate probationary employees* that you have not identified as mission-critical no later than end of the day Monday, 2/17." Ezell Dec., Exh. B at 1 (emphasis added). In support of that demand, OPM set out a new definition of "qualifications for continued employment," as used in 5 C.F.R. § 315.803: "OPM believes 'qualifications for continued employment' in the current context means that only the highest-performing probationers in mission-critical areas should be retained." *Id.* at 2. After setting forth that definition, the message directed agencies as follows:

> *After actioning*, please update the previous probationary employee spreadsheet you've sent us to include the information below. **Please resend the updated version to tracking@opm.gov with Amanda Scales and Jamie Sullivan on cc by 8:00pm EST Monday.** This tracker should include:
> - Which probationary employees have been terminated and which you plan to keep. For those you plan to keep, provide an explanation of why.

---

"None of that was taken into account. They just sent us a list and said, 'Terminate these employees effective immediately.'"). These revelations are consistent with other recent actions taken by OPM to direct agency action with respect to federal employees government-wide, none of which were subject to notice-and-comment rulemaking. Walls Supp. Dec. ¶¶4-5 & Exhs. B-D.

*Id.* (italics added; boldface in original). This email alone is sufficient to demonstrate that OPM directed agencies to redefine their standards for qualification (to only cover the highest performing employees in mission-critical roles), terminate everyone else, report back on terminations "[a]fter actioning." The directive to the agencies could not possibly be clearer.

This evidence is more than sufficient to meet Plaintiffs' burden at this preliminary stage. "[G]iven the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (TRO standard is "substantially identical" to preliminary injunction standard). And at this stage, "[t]he trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024) (quoting *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)). Despite the haste with which Plaintiffs have had to collect evidence in the face of the government's concealment of even such fundamental issues as the total number of probationary terminations in various agencies, the record provides ample evidence to show that Plaintiffs are likely to succeed in showing OPM is responsible for the mass termination of probationary employees.

Finally, if the Court requires further evidence, this record amply justifies discovery into OPM's actions, including examination of Acting Director Ezell and agencies on the receiving end of OPM's directives, by deposition or in a hearing.[2] The discrepancies between Acting Director Ezell's declaration denying OPM direction, OPM's own documents, and numerous agencies' public admissions make discovery particularly appropriate here.

---

[2] Even in APA record review cases, "a 'strong showing of bad faith or improper behavior,' … may justify extra-record discovery." *Department of Commerce v. New York*, 588 U.S. at 781 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)); *see also Gearhart v. United States Dep't of Educ.*, No. 19-CV-00750-YGR, 2020 WL 1322919, at *2 (N.D. Cal. Mar. 20, 2020) ("[E]vidence showing that the proffered basis for an agency's decision is pretextual may justify extra-record discovery.").

**II.      OPM's Actions Exceed Statutory Authority and Are Unlawful**

If Plaintiffs are correct that OPM ordered federal agencies to terminate their employees, then OPM's actions were unlawful.  TRO Mem. at 15-22.  OPM fails to respond to, and therefore concedes, Plaintiffs' argument that OPM has *no* statutory authority of its own to terminate agency employees, and by doing so, OPM intrudes on dozens of authorizing statutes whereby Congress gave agencies, and not OPM, the authority to hire and fire employees at the agencies Congress created.  *Id.* at 8-11, 17-18.

OPM makes only two merits arguments in defense of the legality of these terminations, neither of which saves this entirely unlawful scheme, by which OPM ordered federal agencies to fire their employees en masse and to lie to them in the process.

First, OPM argues that probationary workers can be fired at will, en masse, and for reasons having to do with the government's policy priorities.  Opp. at 8-9, 18-19, 21-22.  That is wrong.

*All* federal employees, including probationary employees, enjoy the rights to "be retained on the basis of the adequacy of their performance" and to be "protected against arbitrary action."  5 U.S.C. §2301(b)(6), (b)(8)(A).  Applying these merit principles, a federal agency *may* terminate a probationary employee for inadequate performance, *see* 5 C.F.R. §315.804, but "[t]he employer … 'must *honestly* be dissatisfied with the probationer's conduct or performance after giving him a fair trial on the job.'"  *McGuffin v. Soc. Sec. Admin.*, 942 F.3d 1099, 1102 (Fed. Cir. 2019) (quoting *Shaw v. United States*, 622 F.2d 520, 544 (Ct. Cl. 1980) (emphasis added)); *see also Dargo v. United States*, 176 Ct. Cl. 1193, 1206 (Ct. Cl. 1966) (termination of probationary employee for "competence" reasons must reflect agency's "honest judgment"); *Horne v. United States*, 419 F.2d 416, 419 (Ct. Cl. 1969) (termination of probationary employee may not be "so lacking in rational support that it must be characterized as arbitrary or capricious").  These rulings make OPM's order to agencies to terminate these workers *regardless* of their individual performance unlawful for reasons in addition to OPM's lack of authority over agency employment decisions.

Next, OPM argues that in terminating employees for "performance," agencies "must take into account the existing needs and interests of government."  Opp. at 8 (citing Ezell Dec. (Dkt. 34) ¶11).  This was OPM's non-response to this Court's question: "How can an agency lawfully terminate a

probationary employee on the basis of 'performance' if that employee's performance was in fact satisfactory?" Dkt. 26 at 1. OPM's answer has no basis in law. Incredibly, OPM does not even try to cite any authority for this assertion beyond Acting OPM Director Ezell's say-so.[3]

Neither OPM nor any agency may lawfully terminate a probationary employee based on performance for reasons that have nothing to do with the employee's performance. If it were otherwise, the regulatory requirement that the agency must provide the "*agency's conclusions as to the inadequacies of [the employee's] performance or conduct*," 5 C.F.R. §315.804(a) (emphasis added), would be rendered a nullity. That plain language, which was adopted in formal regulations enacted by OPM through the full APA process (in contrast to the OPM actions challenged here), focuses squarely on *the employee's performance or conduct.* Nothing in this regulation permits an agency to "take into account the existing needs and interests of government" when deciding whether to terminate an employee *for performance*. Opp. at 8 (citing Ezell Dec. (Dkt. 34) ¶11).[4] If an individual employee's performance is inadequate such that it does not suit the agency, the agency must explain why, by reference to that employee's performance. If not—if, instead, the agency decides to reduce headcount based on newly-announced "existing needs and interests of government"—the agency must follow the regulations for a reduction in force that are well-suited to such circumstances (and require advance notice and detailed analysis of competition areas to protect the rights of all employees including probationary employees, *see generally* 5 C.F.R. Part 351).

Because OPM's Directives plainly violate the statutes and regulations that apply to OPM's authority (or lack thereof) to terminate workers, as well as to the termination or RIF of probationary employees, OPM resorts here to reliance on Article II of the U.S. Constitution, arguing that "OPM's guidance" to agencies "constitute[s] a lawful exercise[] of the President's and OPM's well-established constitutional and statutory authority to regulate the federal workforce" and that, "absent

---

[3] As explained *infra* at 11-12, OPM's attempted revision of the definition of performance, which is set forth in a published rule, is itself a rule subject to the APA, as blackletter administrative law holds, and as OPM *concedes* by failing to argue otherwise.

[4] *See also* Dkt. 37-2 at 1 (OPM FAQs distributed to agencies; "An employee's performance must be viewed through the current needs and best interest of the government, in light of the President's directive to dramatically reduce the size of the federal workforce."; "OPM believes 'qualifications for continued employment' means that only the highest performing probationers in mission-critical areas should be retained.").

congressional action purporting to limit his authority the President has inherent constitutional authority under Article II to act as chief executive officer of the Executive Branch, determining how best to manage the Executive Branch, including whom to hire and remove…"  Opp. at 19.

This is not the law.  Congress, not the President, creates administrative agencies.  *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*, 595 U.S. 109, 117 (2022).  And Article II does not give the President (nor any agency) the power to exercise Congress's Article I powers by attempting to unilaterally enact, amend, or repeal duly enacted statutes.  *Clinton v. City of New York*, 524 U.S. 417, 438–39 (1998); *see also In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) ("the President may not decline to follow a statutory mandate or prohibition simply because of policy objections … Those basic constitutional principles apply to the President and subordinate executive agencies").

*Seila Law LLC v. Consumer Fin. Protection Bureau* does not hold that the President has authority to hire and fire employees of the administrative agencies created by Congress and to whom Congress has expressly delegated that authority.  591 U.S. 197, 217 (2020).  The Article II Executive authority recognized in *Seila Law* extends to hiring and firing the Senate-confirmed head of an independent agency without constraint by Congress, and does not reach their "inferior" subordinate employees.  *Id.*; *see also Myers v. U.S.*, 272 U.S. 52, 114 (1926) (President's power to remove Senate-confirmed officers).  Just as the President may not create (or destroy) administrative agencies created by Congress, nor may the President (or those acting at his direction) contravene Congress's delegation of authority over hiring and firing of federal employees, *or* the civil service protections that Congress has enacted.  OPM's stunningly incorrect argument also ignores what the government just argued to the Supreme Court last week: that the President has only the authority to hire and fire agency heads, and agency heads have the authority to hire and fire employees. TRO Mem. at 17 n.29.

Article II's take care clause means what it says:  the President must take care that Congress's laws are faithfully executed.  U.S. Const. art. II, §1.  Article II cannot be wielded here to justify OPM's violation of the statutes Congress enacted.[5]

---

[5] OPM is trying to have things both ways: on the one hand, disclaiming that OPM ordered these terminations, while on the other, asserting that the terminations were the effectuation of the President's authority to fire federal employees.

1    **III.    Plaintiffs Can Sue to Enjoin Unlawful *Ultra Vires* Action that Exceeds Statutory**

2    **Authority**

3        OPM concedes, as it must, that the Ninth Circuit "recognize[s] an equitable cause of action

4    for ultra vires review" for actions that exceed statutory authority.  Opp. at 18.  OPM nonetheless

5    urges that *ultra vires* review is unavailable, for two reasons, neither of which has merit.

6        First, OPM argues that *ultra vires* review is not available where there is some other

7    meaningful opportunity for judicial review—which they contend the CSRA administrative scheme

8    provides.  Opp. at 18.  This argument conflates with OPM's channeling argument, and APA section

9    704 argument, both of which fail for the same reason: because agency adjudication does not provide

10   Plaintiffs with meaningful review of these claims against OPM.  *Infra* at 11-12, 12-17.

11       Second, OPM asserts that by "contending that the challenged actions violate the separation of

12   powers, Plaintiffs are advancing the same argument the Supreme Court rejected in *Dalton* [*v. Specter*,

13   511 U.S. 462, 473 (1994)]."  Opp. at 20.  But as the Ninth Circuit has repeatedly explained, *Dalton*

14   did not hold that a plaintiff may never bring a separation of powers claim based on the absence of

15   congressional authority; to the contrary, constitutional challenges are justiciable "so long as a

16   plaintiff claims that the president has 'violate[d] … constitutional separation of powers principles'

17   because the President's action lacked both 'statutory authority' and 'background constitutional

18   authority.'"  *Murphy Company v. Biden*, 65 F.4th 1122, 1130 (2023) (quoting *Sierra Club v. Trump*,

19   929 F.3d 670, 696-97 (9th Cir. 2019)); *see also id.* ("Contemporary Ninth Circuit jurisprudence

20   weighs in favor of justiciability by taking an expansive view of the constitutional category of claims

21   highlighted in *Dalton*"); *Sierra Club v. Trump*, 963 F.3d 874, 889-90 (9th Cir. 2020), *vacated and*

22   *remanded on other grounds, sub nom. Biden v. Sierra Club*, 142 S. Ct. 46 (2021).  For all the reasons

23   explained in Plaintiffs' opening Memorandum and above, *supra* at 7-9, this is precisely the nature of

24   Plaintiffs' separation of powers claim, because neither the statutes governing OPM nor any inherent

25   constitutional authority allow OPM to issue this directive.  In any event, the Court need not reach the

26   question whether the unlawfulness of OPM's mass termination program is constitutional in nature,

27   because it is enough for Plaintiffs' ultra vires claim that the program is unlawful for this TRO to

28   issue.

1

### IV. Plaintiffs Are Likely to Succeed on Their APA Claims

2

In responding to the merits of Plaintiffs' APA claims, OPM principally relies on its

3 channeling argument. For the reasons explained below, those channeling arguments are wrong. *See*

4 TRO Mem. 24-27; *infra* at 12-17.

5

OPM argues that section 704 forecloses review for the same reason that claims should be

6 channeled. *See* 5 U.S.C. §704 (requiring judicial review of "final agency action for which there is no

7 other adequate remedy in a court [is] subject to judicial review"); Opp. at 21. But OPM gives far too

8 short shrift to the "presumption of reviewability for all final agency action," and misreads applicable

9 APA law. *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 601-02 (2016) (quoting

10 *Sackett v. EPA*, 566 U.S. 120 (2012)); *see Dep't of Commerce v. New York*, 588 U.S. 752, 771-72

11 (2019) (APA "command[s]" judicial review of federal agency action and embodies "basic

12 presumption of judicial review").[6]

13

*U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, 578 U.S. 590 (2016), supports Plaintiffs,

14 making clear that the mere existence of alternative procedures does not preclude §704 judicial review

15 if those alternatives are not "adequate." *Id.* at 600-01 (rejecting government's argument that §704

16 review was not available because seeking judicial review of unfavorable permitting decision was not

17 adequate alternative to APA review); *see also, e.g.*, *Sackett v. EPA*, 566 U.S. 120, 127 (2012); *Bowen*

18 *v. Massachusetts*, 487 U.S. 879, 904 (1988) (rejecting government's "novel submission" that

19 plaintiff's "entire action is barred by §704" because "the doubtful and limited relief available in the

20 Claims Court is not an adequate substitute for review in the District Court") (citations omitted). "A

21 restrictive interpretation of §704 would unquestionably … run counter to" the APA's purpose "to

22 remove obstacles to judicial review of agency action under subsequently enacted statutes." *Bowen*,

23 487 U.S. at 904 (citation omitted). *Hawkes*, and this entire line of APA caselaw, foreclose OPM's

24 argument (in addition to the reasons that OPM's channeling arguments are not correct), and Section

25 704 commands judicial review of Plaintiffs' APA claims.

26

27

---

[6] OPM does not dispute (nor could it) that OPM's mass-termination directive constitutes final agency action under the APA. *See* TRO Mem. 19; Opp. 21-22.

28

OPM makes two more half-hearted attempts to respond to the merits of Plaintiffs' substantive APA claims. First, OPM argues that Plaintiffs cannot use arbitrary and capricious review to challenge a "policy judgment." Opp. at 21. But the termination of these employees is not the type of agency discretionary decision that evades APA review. *E.g.*, *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9 (2018). Second, OPM falls back on its factual assertions that it did not do anything beyond provide guidance, which is plainly belied by the evidence. *Supra* at 1-6.

Finally, OPM has no real response to Plaintiffs' procedural APA claim other than to mischaracterize it. Plaintiffs are not contending that they did not get to comment on a forthcoming RIF (Opp. at 10-11). Rather, OPM's actions prevented Plaintiffs from commenting on OPM's unlawful order to agencies to terminate their probationary employees (or, in OPM's own words, its redefinition of the term "performance," *supra* at 3-5). Those are *rules*, and OPM does not even attempt to argue otherwise.

## V.    Congress Did Not Send Plaintiffs' APA Claims Against OPM to Labor Agencies

### A.  The Nonprofit Organization Plaintiffs' APA Claims Cannot Be Sent to an Administrative Agency

OPM advances an argument of startling breadth: that Congress, by creating an administrative adjudication process for individual federal employees to challenge adverse personnel actions and for their unions to challenge labor practices, somehow silently intended to foreclose subject matter jurisdiction over APA claims brought by third parties. Opp. at 14-18. On this view, OPM (or any other agency) could promulgate sweeping policies entirely upending the functions performed or services provided by the government, contrary to Congressional design, while insulating those policies from any possible challenge from those directly affected, simply by connecting the policies in some manner (however tenuous) to some aspect of federal employment. No authority supports this argument, and this Court should not engage in such a profound expansion of *Thunder Basin* unmoored to any statutory language or purpose, and in direct contravention of express provisions in the APA requiring judicial review. *See* 5 U.S.C. §§701-706.

OPM cites no case extending *Thunder Basin* to third parties who do not participate in agency adjudication, because no such case exists. In the employment context, the CSRA cases in this Circuit

are limited to claims by federal employees.[7]  TRO Mem. at 26.  Even in the context of federal

employment, the Ninth Circuit has held that the same employee plaintiff may have some channeled

claims (because they challenge the employer's adverse employment action) and some non-channeled

claims (because they are not cognizable in that administrative scheme).  *See Kerr*, 836 F.3d at 1052-

53 (channeling some claims into CSRA administrative scheme but refusing to channel other claims

that were not of type Congress intended to be channeled).

     Likewise, neither the Supreme Court nor any other federal court decision has extended

*Thunder Basin* to a third party's claims simply because the challenged policy or rule at issue involves

federal employees.  To the contrary, the Fifth Circuit, en banc, just permitted such a claim, *even when

brought by a federal employee organization.  Feds for Med. Freedom v. Biden*, 63 F.4th 366, 378 (5th

Cir.) (*en banc*), *judgment vac'd on other grounds* (mootness), 144 S. Ct. 480 (2023).

     OPM presents the far-fetched idea that any federal employment-related claims, regardless of

who brings them, must go to administrative agencies (despite Congress never saying that), as the

"exact conclusion" reached by the Ninth Circuit in *Veit v Heckler*, 746 F.2d 508, 510-11 (9th Cir.

1984).  But that case involved an individual federal employee's challenge to his employing agency's

prohibited personnel practice.  Opp. at 14.  Nothing about *Veit* extended that holding to third party

organizations bringing APA claims to challenge the illegality of government action, and neither did

the other two cases cited by OPM: *United States v. Fausto*, 484 U.S. 439 (1988) (individual

employee challenge to employer action) or *Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012) (individual

employee challenge to employer action).

     There is no argument grounded in the text, structure or purpose of the CSRA or FSL-MRS

that Congress intended for anyone other than federal employees or their representatives to challenge

the actions of their employers in these agency proceedings.  *E.g.*, 5 U.S.C. §7701 (MSPB: "An

---

     [7] *See, e.g.*, *Kerr v. Jewell*, 836 F.3d 1048, 1054 (9th Cir. 2016) ("[The CSRA and FSL-MRS] establish a comprehensive scheme whereby *federal employees* can obtain administrative and judicial review...") (emphasis added); *Arison v. Postal Service*, No. 3:21-cv-01669-HL, 2023 WL 6004200, at *10 (D. Oregon Aug 1. 2023) ("The congressional intent of the CSRA, *insofar as federal employees were concerned*, was to 'permit federal court review as provided in the CSRA or not at all") (emphasis added); *see also*, *e.g.*, *United State v. Fausto*, 484 U.S. 439, 445 (1988) (the CSRA establishes "an integrated scheme of administrative and judicial review, designed to balance the legitimate interests of *the various categories of federal employees* with the needs of sound and efficient administration…").

1  employee, or applicant for employment, may submit an appeal…"); *id.* §7703 ("Any employee or

2  applicant for employment adversely affected or aggrieved by a final order or decision of the

3  [MSPB…]"); *id.* §7118 (FLRA: defining unfair labor practice procedures limited to individuals, labor

4  organizations, and agencies under *id.* §7301(a)(1)); *id.* §7123 (FLRA: appeal rights to individuals,

5  labor organizations, and agencies").  This Court should reject this entirely meritless attempt to avoid

6  jurisdiction and judicial review authorized by the APA.

7  **B.  Unions' and Their Members' Claims Against OPM Also Belong in this Court**

8          OPM does not give this Court any valid basis, grounded in statute, to channel the Union

9  Plaintiffs' APA claims against OPM either.

10         OPM cites no Supreme Court or Ninth Circuit authority, because there is none, sending an

11  APA claim against OPM to an administrative agency (even one brought by federal employee

12  representatives).  OPM responds by disingenuously and falsely disclaiming responsibility (*supra* at 1-

13  6), and contending that Plaintiffs have therefore sued the wrong defendant.  Opp. at 14.  But if

14  Plaintiffs are correct (and they are) that *OPM* ordered these terminations across agencies, Plaintiffs'

15  claims against OPM should remain in this Court.  TRO Mem. at 25.

16         To portray these claims as falling with the CSRA statutory scheme for agency adjudication,

17  OPM conflates two distinct steps: first, the directive by which OPM creates a government-wide

18  program and rule, imposing requirements on agencies government-wide, in defiance of all appliable

19  law and regulation; and second, the actions of agencies effectuating that rule by taking individual

20  adverse personnel actions.  But Congress expressly *required* OPM to comply with the APA when it

21  creates government-wide rules, 5 U.S.C. §§1103(b), 1105, and the APA has very narrow exceptions

22  to judicial review that do not apply here, TRO Mem. at 25-26.  It defies belief that the *same* Congress

23  that required OPM to comply with the APA would have silently intended for federal jurisdiction to be

24  foreclosed when OPM violates the APA.

25         Because OPM can find no controlling authority, it is forced to ask this Court to be the first in

26  this Circuit to *extend* the *Thunder Basin* doctrine beyond individual employee claims against their

27  employers, to APA challenges to government-wide rules created by other agencies.  The Fifth Circuit

28  correctly declined that invitation, recognizing that "[a] long line of cases establishes that federal

employees can bring facial, pre-enforcement actions against federal policies outside of the CSRA."
63 F.4th at 378.  OPM does not explain why the rationale in *Feds for Medical Freedom* does not
apply to all Plaintiffs' claims, simply falling back on its (untenable) factual assertions.  Opp. at 14-15.

As Plaintiffs have explained, recent Supreme Court case law counsels strongly against such
an expansion.  TRO Mem. at 25-26.  Moreover, another case relied upon here by OPM does as well:
*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590 (Opp. at 21).  OPM contends this case
forecloses a claim under APA (see *supra* at 11-12), but it actually supports Plaintiffs in opposing
implied channeling of *all* of Plaintiffs' claims.

In *Hawkes*, the Supreme Court explained in detail why APA claims should *not* be required, by
implication, to proceed first through agency adjudication.  578 U.S. at 600-01.  The Court held that a
permit application process with subsequent judicial review was not an "adequate alternative to APA
review."  *Id*. at 601.  "[G]iven 'the APA's presumption of reviewability for all final agency action,'
'[t]he mere fact' that permitting decisions are 'reviewable should not suffice to support an
implication of exclusion as to other[ ]' agency actions."  *Id.* (*quoting Sackett v. E.P.A.*, 566 U.S. 120,
129 (2012)) (rejecting implied preclusion of APA claim by Clean Water Act administrative scheme).
Indeed, as *Sackett* explained: "[I]f the express provision of judicial review in one section of a long
and complicated statute were alone enough to overcome the APA's presumption of reviewability for
all final agency action, *it would not be much of a presumption at all.*"  566 U.S. at 129 (emphasis
added).

Thus, instead of staying within the bounds set by the Supreme Court and the Ninth Circuit,
OPM must resort to asking this Court to follow inapposite or unpersuasive D.C. Circuit precedent.

First, OPM relies heavily on *AFGE v. Trump*, but that case, which challenged President's
Executive Orders involving labor issues as ultra vires, did not involve or resolve the question whether
procedural and substantive APA claims should be channeled.

Second, OPM relies on a more recent D.C. Circuit decision that extend *Thunder Basin* to
channel an APA claim against OPM.  *Fed. L. Enf't Officers Ass'n v. Ahuja*, 62 F.4th 551, 561 (D.C.
Cir. 2023).  Among other flaws, *FLEOA* is on a direct collision course with the Supreme Court's
recent rulings on implied doctrine, including *Hawkes*.  *See also Alexander v. Sandoval*, 532 U.S. 275,

288 (2001) (instructing that implied expectations "matter[] only to the extent [they] clarify[y] text"); *accord Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391 (2024). The Court also never addresses the express language of the CSRA and FSLMRS that actually incorporates the APA, and ignores the fact that OPM could not be the respondent in any MSPB and FLRA proceedings (or upon review) (5 U.S.C. §7703(2)), which therefore cannot provide APA remedies against OPM. S*ee* 5 U.S.C. §706 (discussed *infra* at 21). At a bare minimum, no court should reach the statutory interpretation question presented by *Thunder Basin* without accounting for express and applicable statutory language in the CSRA, FSL-MRS, and APA, or recent Supreme Court doctrine.

Finally, the government is trying to have it both ways here: it has taken the position *that the very agencies to which it is trying to send these claims are unconstitutional*.

Congress provided in the CRSA for the leaders of the agencies at issue (the MSRP, the OSC, and the FLRA) to be insulated from removal except for misconduct, so they can provide an independent check on executive branch actions.[8] OPM's position, however, is that those CRSA anti-removal provisions are *unconstitutional*.

The President has already attempted to fire the head of OSC and the chairpersons of the MSPB and FLRA without cause, and the executive branch is defending those firings in court.[9] The official position of the executive branch is that Article II creates a unitary executive and, therefore, that congressional restrictions on the removal of the leaders of agencies like OSC/MSPB/FLRA are unconstitutional.[10] The President has issued an executive order stating that there is no such thing as an independent agency within the executive branch and that all agencies are bound by his

---

[8] 5 U.S.C. §1211 ("The Special Counsel may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office."); 5 U.S.C. §1202(d) (MSPB members can "be removed by the President only for inefficiency, neglect of duty, or malfeasance in office."); 5 U.S.C. §7104(b) (FLRA members "may be removed by the President only upon notice and hearing and only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 7104(b).

[9] *See* United States' Application to Vacate TRO at pp. 13-21 (filed Feb. 16, 2024), in *Bessent v. Dellinger*, U.S. S. Ct. No. 24A790 (arguing that the CSRA provision that insulates Special Counsel Hampton Dellinger from removal is unconstitutional); Defendants' Opposition to TRO at pp. 6-10 (filed Feb. 13, 2024), in *Harris v. Bessent*, No. 25-412 (D.D.C.), Dkt. 6 (arguing that the CSRA provision that insulates MSPB chair Cathy Harris from removal is unconstitutional); *Grundmann v. Trump*, No. 25-425 (D.D.C.) (lawsuit by FLRA chair Susan Grundmann seeking reinstatement).

[10] *See* U.S. Solicitor General Letter to Sen Richard Durbin (Feb. 12, 2024), available at https://fingfx.thomsonreuters.com/gfx/legaldocs/movawxboava/2025.02.12-OUT-Durbin-530D.pdf

interpretation of the law.  *See* EO 14215, 90 Fed. Reg. 10447 (Feb. 24, 2025) ("Ensuring Accountability for All Agencies").

If, as OPM contends, the explicit CSRA provisions that provide for agency independence are unconstitutional, then the logical conclusion is that Congress would not implicitly intend the CSRA to withdraw the federal district courts' jurisdiction to hear challenges to executive branch action.  At the least, OPM's position about the constitutionality of the key CSRA provisions by itself creates sufficient doubt about any jurisdictional argument predicated on those agencies to prevent the Court from issuing a TRO pending further briefing.

## VI.    Plaintiffs Show Standing and Irreparable Harm for Purposes of Obtaining Preliminary Injunctive Relief

To establish standing "'[a]t this very preliminary stage,' plaintiffs 'may rely on the allegations in their Complaint and whatever other evidence they submitted in support of their [preliminary-injunction] motion to meet their burden.'  And they 'need only establish a *risk* or *threat* of injury to satisfy the actual injury requirement.'"  *City & Cnty. of San Francisco v. United States Citizenship & Immigr. Servs.*, 944 F.3d 773, 786–87 (9th Cir. 2019) (quoting *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017) (per curiam) and *Harris v. Bd. of Supervisors*, 366 F.3d 754, 762 (9th Cir. 2004)).  To obtain temporary injunctive relief, Plaintiffs must also establish *likely* irreparable injury from OPM's actions.  Plaintiffs easily meet those standards.

Injuries to Plaintiffs' employee members: OPM's concessions are fatal to it.  First, OPM contends that job loss is not irreparable injury but concede that such damages are *not* available in APA cases and quote Ninth Circuit authority recognizing that even "[m]ere financial injury" is irreparable when "adequate compensatory relief will [not] be available in the course of litigation."  Opp. at 10 (quoting *Goldie's Bookstore, Inc. v. Superior Ct. of State of Cal.*, 739 F.2d 466, 471 (9th Cir. 1994)).  Second, OPM does not contest that the loss of employer-provided health benefits constitutes irreparable harm, arguing only that this (and the above-mentioned financial injury) does not cause "personal injury" to Plaintiffs.  Opp. at 10-11.  But OPM *also* concedes (by not contesting) that the Unions (AFGE, AFSCME, AFGE Local 1216, AFGE Local 2110, and UNAC)

have associational standing and can stand in their members' shoes for purposes of asserting their (non-procedural) injuries. Opp. at 12. And OPM *ignores* that non-profit organization Plaintiffs *also* proceed based on their associational standing and have members who have been terminated. Amd. Compl. (Dkt. 17) ¶25; *see also* Arbulu Dec. (Dkt. 18-5) ¶8; Eaton Dec. (Dkt. 18-7) ¶¶5, 13, 16-21. Thus, Plaintiffs establish both standing and irreparable injury based on the harm to their probationary federal employee members who have been terminated or face impending termination.

      <u>Injuries to government services</u>. Nor is Plaintiffs' demonstration of impairments to government services too speculative to establish actual injury, not to mention irreparable harm. First, OPM entirely ignores the extensive evidence not only of *threatened* harms to services, but *actual* harms that are already underway. *E.g.*, Eaton Dec. (Dkt. 18-7) ¶¶7-8 (loss of staffing in critical services for veterans, including "mental health research, cancer treatment, addiction recovery, prosthetics, and burn pit exposure studies"); *id.* ¶¶14-15 (veteran lost transportation service to get to his medical appointments); Turner-Nichols Dec. (Dkt. 18-18) ¶12 (impact of terminations at VA hospital); Nemeth-Greenleaf Dec. (Dkt. 18-14) ¶¶7-8 (loss of civilian firefighters on Naval bases); Ronneberg Dec. ¶14 (loss of FAA employees working on safety regulations and processing Air Traffic Controller candidates); Molvar Dec. (Dkt. 18-13) ¶7 (reduced staffing has prevented Bureau of Land Management from responding to FOIA request); Bachelder Dec. (Dkt. 18-5) ¶¶20-21 (termination of highly specialized employees of Foreign Agriculture Service impairs ability of FAS to open markets to US agricultural exports); Frassetto Dec. (Dkt. 18-9) ¶24 (termination of 10% of National Science Foundation employees immediately disrupts scientific projects); Kelley Dec. (Dkt. 18-14) ¶24 (immediate impact on programs researching firefighter safety); *see also* Neubacher Supp. Dec. ¶4 (closed visitor center at Joshua Tree National Park); Molvar Supp. Dec. ¶4 (understaffing at hatchery essential to breeding program for recovery of endangered species). Second, the expectation that services to the public will suffer as a result of the termination of tens of thousands of federal employees is not unduly speculative. For example, the former National Park Service Director and Yosemite National Park Superintendent both predicted that services and safety will suffer in the national parks, based on their personal experience managing national parks. Jarvis Dec. (Dkt. 18-11) ¶¶4-15; Neubacher Dec. (Dkt. 18-17) ¶5; *see also* Molvar Dec. (Dkt. 18-13) ¶9 (based on experience,

understaffing impairs operations in national parks).  The anticipated harms to government services on which Plaintiffs and their members (not to mention the general public) rely are "predictable, likely, and imminent."  *City & Cnty. of San Francisco*, 944 F.3d at 787.

      <u>Injuries to organizations</u>.  Apparently conceding that the Union Plaintiffs have standing, OPM argues only that the other nonprofit organization Plaintiffs lack standing.  Opp. at 12.  But OPM ignores the extensive declarations submitted by the veterans, small business, and environmental organizations, which confirm their standing, both as associations representing their members and in their own right.  *See* Eaton Dec. (Dkt. 18-7) ¶¶7-21 (VoteVets; members rely on medical and mental health services provided by the VA); Arbulu Dec. (Dkt. 18-3) ¶¶9-10 (Common Defense; members, who are veterans and military families, rely on VA services that are imperiled); Neubacher Dec. (Dkt. 18-15) ¶3 & Neubacher Supp. Dec. ¶5 (Coalition to Protect America's National Parks; members including Neubacher rely on National Parks for recreation); Phetteplace Dec. (Dkt. 18-16) ¶¶34, 7-8 (Main Street Alliance; members have used and continue to rely on SBA services threatened by staffing reductions); Molvar Dec. (Dkt. 18-13) ¶3 & Molvar Supp. Dec. ¶¶3-8 (Western Watersheds Project; members including Molvar use public lands for study, conservation, and recreation).

      OPM does not dispute that the loss of services to these organizations' members and the damage to the environment likely to result from mass terminations across many agencies would constitute irreparable harm.  *See* Opp. at 10.  Nor could it; Congress itself declared that a primary purpose of the current civil service system is "to provide the people of the United States with a competent, honest, and productive Federal work force …, and to improve the quality of public service."  Civil Service Reform Act of 1978, Pub. Law 95–454 (1978), Sec. 3.  This places users of federal government services, including the members represented by Plaintiff organizations, squarely within the community that a robust civil service system is intended to protect.

      OPM's argument that Plaintiffs lack standing to pursue procedural injury claims is premised on a misunderstanding of Plaintiffs' asserted injury.  Plaintiffs do not claim injury to "a right to comment on a [future] notice of proposed RIFs."  Opp. at 12; *see also id.* at 10.  Rather, Plaintiffs show that OPM's directive to agencies to terminate probationary employees *should have* been subject to notice and comment rulemaking but was not, depriving them of their right to do so.  TRO Mem. at

21-22, 29.  This claim *is* asserted in paragraphs 127-134 of Plaintiffs' Amended Complaint.  OPM does not contest, and thereby concedes, that depriving a plaintiff of the opportunity to engage in notice-and-comment proceedings constitutes irreparable injury.

Constitutional injury.  Finally, OPM contends a constitutional injury must be "personally happening to" Plaintiffs and not shared by "the general public."  Opp. at 9.  But its authority states only that for Article III purposes plaintiffs must have "a personal stake in the outcome of the controversy"—which Plaintiffs have established.  OPM does not respond to Plaintiffs' authority that the Ninth Circuit recognizes structural separation of powers injuries as irreparable.  TRO Mem. at 27-28 (citing *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058-59 (9th Cir. 2009); *Cnty. of Santa Clara v. Trump*, 250 F.Supp.3d 497, 538-58 (N.D. Cal. 2017)).

**VII.    Plaintiffs' Injuries Will Be Redressed by the Requested TRO, Which Is Not Overly Broad and Will Not Harm the Government or Public Interest.**

OPM contends that Plaintiffs' injuries cannot be redressed by their requested injunction (and, therefore, that Plaintiffs lack standing to seek injunctive relief) because the federal agencies that carried out OPM's unlawful orders are not parties to the case.  Opp. at 13.  This Court can and should order, to protect the status quo, that OPM and all those acting in concert (*see* FRCP 65(c)(2)(C)) take specific actions to restore the status quo.  OPM nowhere explains why federal agencies would not be bound to comply with such an order, or why OPM cannot be required to take all actions needed to implement this order.  Plaintiffs' claims are against OPM—the agency that took this unlawful action and ordered federal agencies to comply—but to the extent this Court believes federal agencies are necessary to effectuate relief, Plaintiffs can join them for relief purposes only under FRCP 19(a)(1).  *See E.E.O.C. v. Peabody W. Coal Co*., 610 F.3d 1070, 1079 (9th Cir.2010) (entity against which claim may not be asserted can still be joined solely for purposes of complete relief); *Acosta v. Pacific Enterprises*, 950 F.2d 611, 618 (9th Cir. 1991) (same).

OPM also argues that this Court cannot enjoin OPM's actions on their face and in all applications nationwide.  Opp. at 23.  This is exactly what the APA requires: hold unlawful and set aside OPM's unlawful action. 5 U.S.C. §706(2).  As the Ninth Circuit has explained, the APA directs courts to "'hold unlawful and set aside agency action," and that directive is not limited to "the

geographic boundaries of that circuit." *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 987 (9th Cir. 2020) ("*E. Bay I*") (quoting 5 U.S.C. §706(2)(A)); *accord E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 680-81 (9th Cir. 2021) ("*E. Bay II*").[11]  Thus, the "ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.'" *Regents of Univ. of Cal. v. U.S. Dep't. Homeland Sec'y*, 908 F.3d 476, 511 (9th Cir. 2018), *vacated in part on other grounds*, 591 U.S. 1, 36 n.7 (2020) (quoting *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)) (cleaned up); *see also Innovation Law Lab v. Wolf*, 951 F.3d 1073 (9th Cir. 2020), *cert. granted*, 141 S.Ct. 617 (2020), *vacated and remanded*, 141 S.Ct. 284 (2021), *vacated as moot*, 5 F.4th 1099 (9th Cir. 2021) ("There is a presumption (often unstated) in APA cases that the offending agency action should be set aside in its entirety rather than only in limited geographical areas.").

Moreover, OPM's own authority establishes that a nationwide injunction is appropriate when necessary to give parties relief to which they are entitled, as when "a showing of nationwide impact or sufficient similarity to the plaintiff states" is made.  *Cal. v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018); *see also Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987) (universal injunction is appropriate "if such breadth is necessary to give prevailing parties the relief to which they are entitled"); *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec'y*, 279 F.Supp.3d 1011, 1049 & n.21 (N.D. Cal. 2018) (granting nationwide injunction when "Plaintiffs have established injury that reaches beyond the geographical bounds of the Northern District of California" and "problem affects every state and territory of the United States") (citing *Bresgal*, 843 F.2d at 1170), *aff'd*, 908 F.3d 476.

As the discussion of standing and irreparable harm demonstrates, Plaintiffs have shown nationwide impact, and their memberships and organizational injuries are national in scope.  *Supra* at 17-20.[12]  In such cases, the Ninth Circuit has held that an injunction without geographical limits is

---

[11] *E. Bay I*, 994 F.3d at 985-87, and *E. Bay II*, 993 F.3d at 680-81, affirmed preliminary injunctive relief in all four states along the Mexican border.  OPM cites an earlier motions panel decision in *E. Bay Sanctuary* that the Ninth Circuit deemed non-binding.  *See E. Bay I*, 994 F.3d at 985-88; *E. Bay II*, 993 F.3d at 660-662.

[12] *E.g.*, Kelley Dec. (Dkt. 18-2) ¶2 (AFGE); Blake Dec. (Dkt. 18-6) ¶3 (AFSCME); Phetteplace Dec. (Dkt. 18-16) ¶2 (Main Street Alliance); Eaton Dec. (Dkt. 18-7) ¶3 (VoteVets); Jarvis Dec. (Dkt. 18-11) ¶3 (nationwide harm to national parks); Neubacher Dec. (Dkt. 18-17) ¶¶2-3 (Coalition for

necessary to remedy the organization's injuries.  *See E. Bay I*, 994 F.3d at 986; *E. Bay II*, 993 F.3d at 680.  As explained in *Pangea Legal Servs. v. U.S. Dep't Homeland Sec'y*, "[i]n a number of the recent cases in which the Ninth Circuit limited the scope of nationwide injunctions, the plaintiffs were cities, counties, or states whose operation 'permits neat geographic boundaries,' and where the record had not been developed as to the rule's impact outside those jurisdictions."  501 F.Supp.3d 792, 828 (N.D. Cal. 2020) (quoting *City & Cnty. of San Francisco v. Barr*, 965 F.3d 753, 766 (9th Cir. 2020)).  "Subsequent Ninth Circuit decisions have distinguished those cases from ones 'involving plaintiffs that operate and suffer harm in a number of jurisdictions, where the process of tailoring an injunction may be more complex.'"  *Id.* (quoting *City & Cnty. of S.F.*, 965 F.3d at 766).

There is no realistic way to craft a narrower injunction that would fully redress Plaintiffs' injuries, to themselves and to members all over the country.  As in *Regents of Univ. of Cal.*, "the government fails to explain how the district court could have crafted a narrower injunction that would provide complete relief to the plaintiffs, including the entity plaintiffs[, … n]or does it provide compelling reasons to deviate from the normal rule in APA cases …."  908 F.3d at 512. Finally, it bears emphasis that OPM makes a conclusory assertion that the balance of hardships and public interest weigh against an injunction, Opp. at 22-23, but identifies no actual harm to the federal government from entry of a TRO (and submits no evidence at all in furtherance of this argument). Plaintiffs have documented why the public interest favors issuance of a TRO in order to protect critical government services, to shield Plaintiffs' members from irreparable injuries associated with their abrupt and unlawful terminations, and to vindicate constitutional separation of powers.  TRO Mem. at 27-30; *supra* at 17-20.

## CONCLUSION

The Court should grant the requested TRO and issue an order to show cause.

---

Protection of America's National Parks; same); Molvar Dec. (Dkt. 18-13) ¶4 (Western Watersheds Project; covers all of the western states); *see also* Turner-Nichols Dec. (Dkt. 18-18) ¶¶2, 6; Ronnenberg Dec. (Dkt 18-17) ¶¶14, 20; Schwarz Dec. ¶11, Exh. C (harm to DoD employees nationwide).

1

2   DATED: February 26, 2025                 Scott A. Kronland
                                             Stacey M. Leyton
3                                            Eileen B. Goldsmith
                                             Danielle E. Leonard
4                                            Robin S. Tholin
                                             James Baltzer
5                                            ALTSHULER BERZON LLP
                                             177 Post St., Suite 300
6                                            San Francisco, CA 94108
                                             Tel: (415) 421-7151
7

8                                        By: */s/ Danielle E. Leonard*_____

9                                             Danielle E. Leonard

10                                           *Attorneys for Plaintiffs*

11

12                                           Norman L. Eisen (*pro hac vice forthcoming*)
                                             Pooja Chadhuri (SBN 314847)
13                                           STATE DEMOCRACY DEFENDERS
                                             FUND
14                                           600 Pennsylvania Avenue SE #15180
                                             Washington, DC 20003
15                                           Tel: (202) 594-9958
                                             Norman@statedemocracydefenders.org
16                                           Pooja@statedemocracydefenders.org

17

18                                       By: */s/ Norman L. Eisen*_____

19                                           *Attorneys for Plaintiffs*

20

21                                           Rushab Sanghvi (SBN 302809)
22                                           AMERICAN FEDERATION OF GOVERNMENT
                                             EMPLOYEES
23                                           80 F Street, NW
                                             Washington, DC 20001
24                                           Tel: (202) 639-6426
                                             Sanghr@afge.org
25

26                                       By: */s/ Rushab Sanghvi*_____

27                                           *Attorneys for Plaintiff American Federation of*
28                                           *Government Employees (AFGE)*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Teague Paterson (SBN 226659)
Matthew Blumin  (*pro hac vice forthcoming*)
AMERICAN FEDERATION OF STATE, COUNTY,
AND MUNICIPAL EMPLOYEES
1625 L Street, N.W.
Washington, D.C.  20036
Tel: (202) 775-5900
Tpaterson@afscme.org
MBlumin@afscme.org


By: */s/Teague Paterson*  _____


*Attorneys for Plaintiff American Federation of State
County and Municipal Employees (AFSCME)*