UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO,
et al.,

        Plaintiffs,

      v.

UNITED STATES OFFICE OF
PERSONNEL MANAGEMENT, et al.,

        Defendants.

No.  C 25-01780 WHA

**MEMORANDUM OPINION AND
ORDER AMENDING TRO**

**STATEMENT**

On January 20, 2025, Acting Director of the Office of Personnel Management Charles Ezell, defendant, issued a memo to department and agency heads directing them to identify all employees serving probationary periods by January 24, and to "promptly determine whether those employees should be retained at the agency."  Probationary employees are those who have served less than one year in the competitive service or less than two in the excepted service.

On February 13 OPM communicated with the heads of several federal agencies in a private conference call.  Neither the participants nor the contents of that call are directly in the record.

The next day, OPM sent an email to federal agencies' chief human capital officers (and their deputies) stating:

> Over the past several days, agencies have worked to review, clean up, and finalize their lists of probationary employees they wish to keep, and wish to terminate, and begin taking action.
>
> We have asked that you separate probationary employees that you have not identified as mission-critical no later than end of the day Monday, 2/17.  We have attached a template letter.  The separation date should be as soon as possible that is consistent with applicable agency policies (including those in CBAs).

(Dkt. No. 37-1).

The large-scale termination of probationary employees from myriad federal agencies followed.  Plaintiffs contend that those employees were terminated at the direction of OPM.

Dr. Andrew Frassetto, for example, was hired as a program director at the National Science Foundation on September 9, 2024 (Frassetto Decl. ¶3).  Dr. Frassetto and over 100 other NSF employees were terminated *en masse* during a Zoom meeting on February 18 (*id.* ¶ 10; Evans Decl. ¶28).  A time-stamped transcript of that meeting, generated by an automated closed captioning system,  is attached to Dr. Frassetto's declaration (Exh. B).  In response to inquiries by the terminated employees, NSF's chief management officer, Micah Cheatham, stated that "[w]e were directed last Friday [February 14] by OPM to terminate all probationers except for a minimal number of mission critical probationers" (*id*. at 18).  Asked if NSF had attempted to negotiate with the administration to minimize the number of terminations, Cheatham responded:  "There's no negotiation" (*id*. at 25).

In fact, when the NSF officials orchestrating the firings were confronted by the terminated probationers, they stated that "[u]p until Friday [February 14]. Yes.  We were told by OPM it was the agency's discretion whether to remove probations or not.  *We chose to retain them all*" (*id*. at 17).  But "late Friday night," "[t]hey told us that they directed us to remove probationers" (*ibid.*).  "[T]here was no limited discretion.  *This is not a decision the agency made*.  *This is a direction we received*" (*id*. at 12) (emphasis added).

2

Plaintiffs further allege that OPM ordered agencies to use template notices — supplied by OPM — to implement the ordered terminations, and that those templates falsely premised the *en masse* terminations on individual performance. The Department of Agriculture, National Science Foundation, Federal Aviation Administration, Department of Veterans Affairs, and Department of Health and Human Services each issued substantially similar letters (Bachelder Decl., Exh. 1; Evans Decl., Exh. B; Ronneberg Decl., Exh. 1; Schwarz Decl., Exh. A). Each stated that the recipient was fired because "[t]he Agency finds, *based on your performance*, that you have not demonstrated that your further employment at the Agency would be in the public interest" (*ibid.* (emphasis added)). The empty template provided to DOD by OPM likewise declares — despite empty "[NAME]" "[TITLE]" and "[ORGANIZATION]" fields — that "the Agency finds, based on your performance, that you have not demonstrated that your further employment at the agency would be in the public interest" (Schwarz Decl., Exh. D).

Dr. Frassetto is again illustrative. In a February 13 performance review — *five days* before he was terminated "based on [his] performance" — Dr. Frassetto's supervisor reported:

> [H]is role [is] mission critical. Dr. Frassetto has been an outstanding program director, and he has taken the lead role in overseeing this important and complicated portfolio for the division. Dr. Frassetto came to NSF with a unique skill set in interdisciplinary scientific research . . . . He has already demonstrated an outstanding ability to balance the various aspects of his job responsibilities and is highly effective at organizing and completing all his work in an accurate and timely manner.
>
> . . .
>
> Dr. Frassetto's work on this portfolio has been outstanding and he has brought important experience to the role and has demonstrated highly competent project management and oversight. He is a program director who has needed minimal supervision and eagerly seeks special assignments at higher levels of difficulty. He has been an outstanding contributor to the division, directorate, and agency.

(Frassetto Decl., Exh. A).

The NSF officials who fired Dr. Frassetto (and over 100 of his peers) via Zoom on February 18 stated: "The cause comes from boilerplate we received from OPM. The cause

United States District Court<br>Northern District of California

3

says that the agency finds based on your performance that you have not demonstrated that your further employment at the agency would be in the public interest" (Frassetto Decl., Exh. B at 21).

On February 26, 2025, Civilian Personnel Policy Council members at the Department of Defense (DOD) stated by email:  "In accordance with direction from OPM, beginning February 28, 2025, all DOD Components must terminate the employment of all individuals who are currently serving a probationary or trial period" (Schwarz Decl., Exh. C at 1).

Tracey Therit, chief human capital officer for the VA, testified under oath at a congressional hearing before the House Committee on Veterans Affairs on February 25:

> **RANKING MEMBER TAKANO**:  So nobody ordered you to carry out these terminations?·
>
> You did it on your own?
>
> **MS. THERIT**:  There was direction from the Office of Personnel Management.

(Walls Decl. (Reply), Exh. A at 8).

On February 14, a probationer terminated by the Foreign Agricultural Service asked USDA's deputy chief human capital officer by email about the "specific details of my performance that were evaluated and found to be insufficient" (Blake Suppl. Decl., Exh. A at 1).  The response:  "[A]gencies were directed to begin providing termination notices . . . and directed [*sic*] the use of a specific template and language for the notice beginning immediately upon OPM notification" (*id*. at 2).

In a "town hall" for IRS employees on February 21, the IRS's chief human capital officer (CHCO) stated:

> I'm not sure why it's happening . . . .  Regarding the removal of the probationary employees, again, that was something that was directed from OPM.  And even the letters that your colleagues received yesterday were letters that written by OPM, put forth through Treasury, and given to us . . . .  I cannot explain to you why this has happened.  I've never seen OPM direct people at any agency to terminate.

(Lezra Decl., Exh. A at 4–5).

The IRS had to "get permission" to make even minor alterations to the template OPM termination letter:

> There was a modification because we created our own email box for employees to send questions to HR directly after they separate. We felt it was important to have an avenue of communication open for them if they had questions about their final paycheck, or benefits, or leave payouts. So we did get permission to add that email in there.

(*id*. at 4–5). The IRS CHCO continued:

> And our actions are being watched by OPM. So that's, again, something else that's unprecedented. . . . Everything we do is scrutinized. Everything is being looked at twice. Any changes that are made in our system that show any type of action that has been deemed impermissible, we have to respond to why it happened.

(*id*. at 3–4).

A termination letter received by a probationer at the Bonneville Power Administration (within the Department of Energy) stated: "*Per OPM instructions*, DOE finds that your further employment would not be in the public interest. For this reason, you are being removed from your position with DOE and the federal civil service effective today" (Schwarz Decl., Exh. B at 10 (emphasis added)).

As many as 200,000 probationary federal employees are at risk of termination (Br. at 19). Those already terminated rank somewhere in the tens of thousands (*ibid*.). OPM and the federal agencies involved have not disclosed the number or identity of those terminated (even to their unions) (*ibid*.).

The ongoing, *en masse* termination of probationary employees across the federal government's agencies has sown significant chaos. By way of example, Major General (Ret.) Paul Eaton states that the termination of over 1,000 employees across the VA has crippled the agency's administration of the Veterans Crisis Line (Eaton Decl. ¶¶ 8–9). When functioning as intended, the VCL offers our veterans, who suffer from high rates of post-traumatic stress disorder and suicide, 24/7 mental health care in moments of crisis (*ibid*). Don Neubacher,

United States District Court
Northern District of California

formerly the Superintendent at Yosemite National Park, states that the ongoing firing of National Park System probationers will inflict immediate, foreseeable harm onto our national parks and the habitats and animals therein (Neubacher Decl.).  The Western Watershed Project, meanwhile, has already had its ecological mission frustrated, as terminations at BLM have rendered that agency unable to respond to the Project's FOIA requests (Molvar Decl. ¶ 7).

*                *                *

Plaintiffs in this action fall into two groups.  *First*, the union plaintiffs:  American Federation of Government Employees, AFL-CIO (AFGE); American Federation of Government Employees Local 1216; American Federation of Government Employees Local 2110; American Federation of State County and Municipal Employees, AFL-CIO; and United Nurses Associations of California/Union of Health Care Professionals, AFSCME, AFL-CIO. *Second*, the organizational plaintiffs:  Main Street Alliance, Coalition to Protect America's National Parks, Western Watersheds Project, Vote Vets Action Fund Inc., and Common Defense Civic Engagement.

Plaintiffs filed a complaint for declaratory and injunctive relief on February 19, 2025 (Dkt. No. 1).  Four days later, on February 23, they filed an amended complaint and moved for a temporary restraining order (Dkt. Nos. 17, 18).

*First*, plaintiffs argue that OPM directed federal agencies to fire probationary employees, and that the action was an *ultra vires* act because it exceeded the scope of OPM's statutory authority, intruded upon the statutory authority of the individual federal agencies and their heads, violated the Civil Service Reform Act's (CSRA) provisions governing agency terminations based on performance and reductions in force (RIFs), and violated the General Authority to Employ enacted by Congress (Dkt. No. 17 at 25–26).  *Second*, plaintiffs argue that the OPM directive to terminate probationary employees constituted a final agency action that violated the APA because it exceeded the agency's statutory or constitutional authority, was otherwise unlawful, was arbitrary and capricious, and did not undergo the necessary notice and comment process (*id*. at 26–30).

Plaintiffs' motion for a TRO seeks an order enjoining defendants from taking any actions to effectuate OPM's probationary employee termination directive.

## ANALYSIS

The standard for a temporary restraining order is the same as that for a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "A plaintiff seeking a preliminary injunction must establish that [1] he is likely to succeed on the merits, that [2] he is likely to suffer irreparable harm in the absence of preliminary relief, that [3] the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

### 1.    LIKELIHOOD OF SUCCESS ON THE MERITS.

#### A.    PLAINTIFFS' ULTRA VIRES CLAIM.

Plaintiffs argue that OPM's termination directive constituted an *ultra vires* act that violated, and — unless recalled — continues to violate the scope of its and all impacted agencies' statutory authority as established by Congress.

"The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). "Equitable actions to enjoin *ultra vires* official conduct do not depend upon the availability of a statutory cause of action; instead, they seek a 'judge-made remedy' for injuries stemming from unauthorized government conduct, and they rest on the historic availability of equitable review." *Sierra Club v. Trump*, 963 F.3d 874, 890–91 (9th Cir. 2020) (citing *Armstrong*, 575 U.S. at 327), *vacated and remanded on other grounds (mootness)*, 142 S. Ct. 46 (2021).

Plaintiffs are likely to succeed on their *ultra vires* claim. No statute — anywhere, ever — has granted OPM the authority to direct the termination of employees in other agencies. "Administrative agencies [like OPM] are creatures of statute. They accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595

1   U.S. 109, 117 (2022).  Congress's statutory scheme grants to each agency head the authority to

2   manage their own affairs, including the hiring and firing of employees.  5 U.S.C. § 3101

3   ("Each Executive agency, military department, and the government of the District of Columbia

4   may employ such number of employees of the various classes recognized by chapter 51 of this

5   title as Congress may appropriate for from year to year."); 5 U.S.C. § 301 ("The head of an

6   Executive department or military department may prescribe regulations for the government of

7   his department, the conduct of its employees . . . ."); *see also, e.g.,* 38 U.S.C. §§ 303, 510

8   (VA); 10 U.S.C. § 113 (DOD).

9        The same is true of OPM.  Congress has vested its director with the authority to "secur[e]

10  accuracy, uniformity, and justice in the functions of the Office," "appoint[] individuals to be

11  employed by the Office, and "direct[] and supervis[e] employees of the Office."  5 U.S.C. §

12  1103(a)(1)–(3).  But that's it.  OPM did not have the authority to direct the firing of employees,

13  probationary or otherwise, in any *other* federal agency.

14       OPM concedes that it lacks the authority to direct firings outside of its own walls and

15  argues, instead, that it "did not direct agencies to terminate any particular probationary

16  employees based on performance or misconduct, and did not create a 'mass termination

17  program'" — it merely "asked agencies to engage in a focused review of probationers based on

18  how their performance was advancing the agencies' mission, and allowed them at all times to

19  exclude whomever they wanted" (Ezell Decl. ¶ 7).  OPM's factual contention rests entirely on

20  the Ezell Declaration.

21       Plaintiffs, meanwhile, have mustered a mountain of evidence that points in the other

22  direction, from a broad range of federal agencies:  "In accordance with *direction* from OPM . .

23  . all DOD Components must terminate the employment of all individuals who are currently

24  serving a probationary or trial period" (DOD), "[t]here was *direction* from the Office of

25  Personnel Management" (VA), "agencies were *directed* to begin providing termination notices

26  . . . immediately upon OPM notification" (USDA), "that was something that was *directed* from

27  OPM" (IRS), "[w]e were *directed* last Friday by OPM" (NSF), "[t]hey told us that they

28  *directed* us to remove probationers" (NSF) (emphases added).  A full accounting is above.  The

8

weight of the evidence supports plaintiffs' contention that OPM exceeded the bounds of its authority by unlawfully directing the mass termination of probationary employees across a wide range of federal agencies.

OPM's Article II argument likewise rests on the factual contention that OPM's actions constituted mere "guidance," and is rejected on the facts (Opp. at 26). Article II, moreover, is irrelevant here. Congress's statutory scheme *created* the agency, *vested the agency with authority*, and *defined the bounds of that authority*. It is an OPM action that is being challenged and, as explained above, the evidence supports the contention that OPM's direction to other agencies fell outside its limited statutory authority.

## B.    PLAINTIFFS' APA CLAIMS.

Plaintiffs have also shown that their APA claims are likely to succeed.

Under the APA, only "final agency action[s]" — those that "mark the consummation of the agency's decisionmaking process" and determine "rights or obligations . . . from which legal consequences will flow" are subject to judicial review. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up) (citing 5 U.S.C. § 704). OPM's direction to the other agencies constituted a final agency action for the purposes of the APA. Plaintiffs have marshalled significant evidence from numerous agencies stating that they were acting at the direction of OPM.

As explained above, OPM's direction to other agencies was not supported by any statutory authority. Plaintiffs are therefore likely to show that OPM's directive constituted an agency action that was "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" that must be "[held] unlawful and set aside." 5 U.S.C. § 706(2)(C).

Plaintiffs are also likely to show that the OPM directive was an arbitrary and capricious action. *Id*. § 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the

9

choice made.'" *Ibid*. (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)). The key fact here is that the template letters sent from OPM to the directed agencies stated: "[T]he Agency finds, *based on your performance*, that you have not demonstrated that your further employment at the Agency would be in the public interest" (Schwarz Decl., Exh. D). *First*, it is unlikely, if not impossible, that the agencies themselves had the time to conduct *actual* performance reviews of the thousands terminated in such a short span of time (Archuleta Decl. ¶ 14). It is even less plausible that *OPM alone* managed to do so. In at least one instance, a terminated scientist had received a glowing review — "[h]e has been an outstanding contributor to the division, directorate, and agency" — five days before he was terminated "for [his] performance" (Frassetto Decl., Exh. A at 1; Exh. C at 1). "Reliance on facts that an agency knows are false at the time it relies on them is the essence of arbitrary and capricious decisionmaking." *Missouri Serv. Comm'n v. Fed. Energy Regul. Comm'n*, 337 F.3d 1066, 1075 (D.C. Cir. 2003).

Lastly, plaintiffs are likely to show that OPM failed to comply with notice and comment rulemaking. "'Rule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . . ." 5 U.S.C. § 551(4). Rules are subject to the notice and comment process prior to enactment. 5 U.S.C. § 553. OPM's January 20 memo and February 14 email are likely to constitute a "rule" under the APA (*see, e.g.,* Dkt. No. 37-1 at 2) ("OPM believes 'qualifications for continued employment' in the current context means that only the highest-performing probationers in mission-critical areas should be retained."). It is beyond cavil that they did not go through notice and comment rulemaking.

OPM's counters on this point rely on the jurisdictional "channeling" of the organizational plaintiffs or the factual contention that OPM did not issue a directive and are rejected on those grounds.

United States District Court
Northern District of California

### C.    SUBJECT-MATTER JURISDICTION.

*First*, it is likely that the undersigned lacks jurisdiction to hear the union plaintiffs' claims for the reasons stated in recent denials of similar claims made by unions representing federal employees. *See, e.g.*, *Nat'l Treasury Emps. Union v. Trump*, No. 25-CV-420 (CRC), 2025 WL 561080, at *5–8 (D.D.C. Feb. 20, 2025) (Judge Christopher Cooper) (denying TRO); *Am. Foreign Serv. Ass'n, Inc. v. Donald Trump*, No. 1:25-CV-352 (CJN), 2025 WL 573762, at *8– 11 (D.D.C. Feb. 21, 2025) (Judge Carl Nichols) (dissolving TRO); *Am. Fed'n of Gov't Emps. v. Ezell*, No. CV 25-10276-GAO, 2025 WL 470459, at *2 (D. Mass. Feb. 12, 2025) (Judge George O'Toole, Jr.) (dissolving TRO).

"Congress may preclude district court jurisdiction by establishing an alternative statutory scheme for administrative and judicial review." *Am. Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019). Congress set forth such statutory schemes by way of the Federal Service Labor-Management Relations Statute (FSLMRS) and the CSRA. The relevant statutory background has been summarized in *National Treasury*:

> The Federal Service Labor-Management Relations Statute ("the Statute" or "FSLMRS"), set forth in Title VII of the Civil Service Reform Act ("CSRA"), governs labor relations between the executive branch and its employees. It grants federal employees the right to organize and bargain collectively, and it requires that unions and federal agencies negotiate in good faith over certain matters. The Statute further establishes a scheme of administrative and judicial review. Under that scheme, the Federal Labor Relations Authority ("FLRA"), a three-member agency charged with adjudicating federal labor disputes, reviews matters including negotiability and unfair labor practice disputes. When reviewing unfair labor practice complaints, the FLRA resolves whether an agency must bargain over a subject, violated the duty to bargain in good faith, or otherwise failed to comply with the Statute.

> Direct review of the FLRA's decisions is available in the courts of appeals. 5 U.S.C. § 7123(a).

> . . .

> Separately, the CSRA also established a comprehensive system for reviewing personnel action taken against federal employees. If an agency takes a final adverse action against an employee — removal, suspension for more than 14 days, reduction in grade or pay, or furlough for 30 days or less — the employee may appeal to the Merit Systems Protection Board ("MSPB"). The MSPB may order relief to prevailing employees, including reinstatement,

> backpay, and attorney's fees.  Probationary employees, however, generally do not enjoy a right to appeal to the MSPB.  Employees may appeal final MSPB decisions to the Federal Circuit, which has exclusive jurisdiction over such appeals.  This statutory review scheme, too, is exclusive, even for employees who bring constitutional challenges to federal statutes.

*Nat'l Treasury*, 2025 WL 561080, at *4–5 (cleaned up).

Under *Thunder Basin Coal Co. v. Reich*, a claim may fall outside of the scope of a special statutory scheme where "a finding of preclusion could foreclose all meaningful judicial review," the claims considered are "wholly 'collateral'" to a statute's review provisions, or the claims are "outside the agency's expertise."  510 U.S. 200, 212–13 (1994).  "These considerations do not form three distinct inputs into a strict mathematical formula.  Rather, they serve as general guideposts useful for channeling the inquiry into whether the particular claims at issue fall outside an overarching congressional design."  *Trump*, 929 F.3d at 755 (cleaned up).

The union plaintiffs' attempts to distinguish their instant claims from those channeled to the FLRA and MSPB in *National Treasury*, *American Foreign Service*, and *Ezell* are unconvincing, and the analysis laid out in those decisions applies with equal force here:  The union plaintiffs and their members must adjudicate their claims through the FLRA and MSPB.  The union plaintiffs' claims "are the vehicle by which they seek to reverse the removal decisions, to return [members] to federal employment, and to [collect] the compensation they would have earned but for the adverse employment action."  *Elgin v. Dep't of Treasury*, 567 U.S. 1, 22 (2012); *Heckler v. Ringer*, 466 U.S. 602, 614 (1984).  That the FLRA or MSPB may lack the authority to adjudicate the union plaintiffs' constitutional and APA claims does not constitute a foreclosure on all meaningful judicial review:  Those issues can be "'meaningfully addressed in the Court of Appeals' that Congress [has] authorized to conduct judicial review."  *Elgin*, 567 U.S. at 17 (quoting *Thunder Basin*, 510 U.S. at 215).  Both schemes "provide[] review in . . . an Article III court fully competent to adjudicate [plaintiffs'] claims."  *Ibid*.

*Second*, OPM argues that the CSRA and FSLMRS intended to channel *all* disputes that touch on a federal employment relationship to administrative review, *no matter the party*

12

*bringing such a dispute*.  But a claim brought by Western Watersheds Project (WWP), for example, against OPM, alleging that the latter issued an unlawful, arbitrary and capricious rule that undermined the BLM's ability to respond to WWP's FOIA requests, does not feature a federal employee, their union representative, or their federal employer (in this example BLM).  The plaintiff's injury — frustration of its ecological mission — is equally ill-suited to adjudication by a *labor* board.  True, the termination of a federal employee remains embedded within the dispute:  WWP's injury, it argues, occurred *because* OPM demanded, unlawfully, that the probationary employees at BLM be terminated.  That, standing alone, is not enough to bring a claim within the scope of the statutory schemes created for the resolution of bargaining disputes and employee claims.  Asked to provide a single example of a claim brought by a third party, against a third party, that had been administratively channeled via *Thunder Basin*, OPM could not.  Such a rule would stretch that doctrine too far.

In sum, it is unlikely that this Court has jurisdiction over the union plaintiffs, but it likely does have jurisdiction to hear the claims of the organizational plaintiffs.  This order moves to consider whether the latter group has standing.

### D. STANDING.

The Supreme Court has set the bar for standing as follows:

> [T]he irreducible constitutional minimum of standing contains three elements.  *First*, the plaintiff must have suffered an injury in fact — an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.  *Second*, there must be a causal connection between the injury and the conduct complained of — the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court.  *Third*, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up; emphases added).  Where plaintiff seeks prospective injunctive relief, he "must demonstrate that he has suffered or is threatened with a concrete and particularized legal harm, coupled with a sufficient likelihood that he will again be wronged in a similar way." *Fellowship of Christian Athletes v. San Jose*

United States District Court
Northern District of California

*Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 680–81 (9th Cir. 2023) (en banc) (quoting *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc)).  "[I]n an injunctive case this court need not address standing of each plaintiff if it concludes that one plaintiff has standing." *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009).  Given the nature of this action and the injunction requested, however, it is necessary that standing be evaluated as to each organizational plaintiff.

"An organization has standing to bring suit on behalf of its members ["representational standing"] if '(1) at least one of its members would have standing to sue in his own right, (2) the interests the suit seeks to vindicate are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Fellowship of Christian Athletes*, 82 F.4th at 681 (quoting *Fleck & Assocs., Inc. v. City of Phoenix*, 471 F.3d 1100, 1105–06 (9th Cir. 2006)).

An organization has direct organizational standing, meanwhile, "where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021).  "Of course, organizations cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all, but they can show they would have suffered some other injury had they not diverted resources to counteracting the problem." *Ibid.*  (internal quotation marks omitted); *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 384–86 (2024).  At bottom, the test is whether an organization's ability to perform the services they were formed to provide has been "perceptibly impaired" by the challenged action. *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 765 (9th Cir. 2018) (cleaned up).

### (i)    The Coalition to Protect America's National Parks (The Coalition) and Main Street Alliance (MSA).

"Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal

protection through the judicial process." *Sierra Club v. Morton*, 405 U.S. 727, 734 (1972). In *Desert Citizens Against Pollution v. Bisson*, for example, BLM sought to exchange 1,745 acres of federal land in Imperial County for a 2,642-acre parcel in the Santa Rosa and Little Chuckwalla Mountains owned by Gold Fields, a mining company. 231 F.3d 1172, 1175 (9th Cir. 2000). Gold Fields aimed to turn the Imperial County tract into a landfill; the members of Desert Citizens aimed to save it from that grim fate via an APA action. *Ibid.* Our court of appeals held that the members' continued use of the federal lands established an injury in fact: "The recreational or aesthetic enjoyment of federal lands is a legally protected interest whose impairment constitutes an actual, particularized harm sufficient to create an injury in fact for purposes of standing." *Id.* at 1176 (citing *Sierra Club*, 405 U.S. at 734).

The National Park Service has terminated close to 1,000 newly hired employees (Neubacher Decl., Exh. A). Coalition board member Don Neubacher, the former Superintendent at Yosemite National Park (2010–2016) and Point Reyes National Seashore (1995–2010) submitted a declaration stating:

> The Coalition to Protect America's National Parks ("Coalition") is a non-profit organization made up of over 3,400 members, all of whom are current, former, and retired employees and volunteers of the National Park Service. Together, they have accumulated over 50,000 years of experience caring for America's most valuable natural and cultural resources. . . . *Our members and their families are regular and avid users of the National Park System who would be adversely affected by any degradation of the parks or the programs of the NPS to preserve and protect the parks and make them available to visitors. Based on my experience as a park Superintendent, the termination of so many NPS employees at once will have an immediate adverse impact on the parks and park visitors.* For example, at Yosemite, the park will likely have to stop specific functions and close park areas. There is no way to accommodate current visitation levels without additional staff support during the upcoming peak season. When there was a partial government shutdown in 2018, visitors trashed scenic viewpoints, defecated outside locked restrooms and trampled sensitive ecological areas with their vehicles and dogs. The park receives annual visitation of over 4 million people.

(Neubacher Decl. ¶¶ 2–5 (emphasis added)). In a separate declaration, Jonathan B. Jarvis, the former Director of the National Parks Service, underscores the immediacy and scope of the harm to park operations, environmental protection, and natural resource monitoring (Dkt. No.

United States District Court
Northern District of California

18-11).  Some of the likely, imminent harms laid out above have already come to pass.  A member of the Coalition reported this week that they and their party were forced to abandon a trip to Joshua Tree National Park because the Black Rock Nature Center, which ordinarily provides shelter and commodes to the public, remained unstaffed and closed well after its scheduled opening time (Neubacher Suppl. Decl. ¶ 4).

The Coalition has standing.  Its members' continued use and enjoyment of our national parks will likely be, and in at least one case already has been, injured by the terminations that have taken place at the National Parks Service.

Main Street Alliance likewise has representational standing.  MSA is a "national network of small businesses, with approximately 30,000 members throughout the United States.  MSA helps small business owners realize their full potential as leaders . . . with the aim of creating an economy where all small business owners have an equal opportunity to succeed" (Phetteplace Decl. ¶¶ 2–3).  "MSA's small business members rely on the U.S. Small Business Administration ('SBA') for a variety of valuable services that help small businesses succeed. These services include loans, loan guarantees, and grants; disaster relief; assistance in connecting small businesses with government contracting opportunities; and a national network of some 1,000 Small Business Development centers that provide counseling and training to help entrepreneurs start their own businesses" (*id*. ¶ 4).  A February 20 letter from the Ranking Member of the Senate Committee on Small Business and Entrepreneurship to the Administrator of the SBA cited reporting that hundreds of probationary SBA employees had been terminated across the country and stated that "through our own investigation and public reporting, we have learned that the fired employees included those supporting disaster assistance and oversight of loan programs"  (*id*. Exh. A).  MSA asserts that the mass terminations at the SBA are likely to impair disaster relief, the provision of loan guarantees, and other services necessary for MSA's members to open a business or stay float (*id*. ¶ 9). Some members who already have entered into contracts with the expectation of obtaining timely loan guarantees "are likely to be on the hook for expenses owed to contractors and suppliers without the ability to pay amounts owed" (*id*. ¶ 8).

(ii)    **The Western Watersheds Project (the Project).**

In *Havens Realty Corp. v. Coleman*, an organization "whose purpose was to make equal opportunity in housing a reality in the Richmond Metropolitan Area," HOME, brought a Fair Housing Act claim against Havens Realty, which owned and operated apartment complexes in Richmond.  455 U.S. 363, 368 (1982) (internal quotation marks omitted).  HOME asserted that Havens Realty's unlawful "racial steering" — providing false information regarding the availability of housing to black individuals to maintain a segregated property — had frustrated its mission and, critically, its housing counseling service.  *Id*. at 367, 369.  The Supreme Court rejected Haven Realty's standing challenge, holding:

> If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities — with the consequent drain on the organization's resources — constitutes far more than simply a setback to the organization's abstract social interests.

*Id*. at 379 (citing *Sierra Club*, 405 U.S. at 739).

The Project has standing to challenge OPM's directive to fire probationary employees at BLM and the U.S. Fish and Wildlife Service.  Erik Molvar, a wildlife biologist formerly employed by the U.S. Forest Service and Army Corps of Engineers, and now the Project's Executive Director, states that it "is a non-profit environmental conservation group that works to influence and improve public lands management" (Molvar Decl. ¶¶ 3–4).  Founded in 1993, the group has some 14,000 members, with field offices in Idaho, Montana, Wyoming, Arizona, Nevada, and Oregon.  The group is primarily focused on "the negative impacts of livestock grazing" (*ibid.*).  The group is also an active litigant in the federal courts, where it advocates against commercial grazing on public lands.  *See, e.g., W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011); *W. Watersheds Project v. Abbey*, 719 F.3d 1035 (9th Cir. 2013); *W. Watersheds Project v. Interior Bd. of Land Appeals*, 62 F.4th 1293 (10th Cir. 2023); *W. Watersheds Project v. U.S. Forest Serv.*, 603 F. App'x 612 (9th Cir. 2015) (mem.).

*First*, the Project has shown *actual* harm, namely that its ecological mission has been perceptibly impaired by the termination of employees at the BLM:

> This mass termination of employees will have an immediate adverse effect on the ability of the [Project] to accomplish its mission.
>
> For example, I was told by a federal employee on February 20, 2025, that because of staffing issues the Bureau of Land Management is unable to respond to a Freedom of Information Act request submitted by the [Project]. Our work depends on timely access to public records.

(Molvar Decl. ¶¶ 7–8). The termination of range managers and biologists, meanwhile, will diminish BLM's ability to provide timely "land health assessments to monitor the impact of cattle and sheep grazing on public lands," further undercutting the Project's ability to pursue its stated goals (*id*. ¶ 8).

*Second,* the Project has shown harm to both its members' protected interests in and its own efforts to advocate on behalf of endangered species. The Project is a party in an ongoing litigation in the District of Montana (Molvar Suppl. Decl. ¶ 3). *Ctr. for Biological Diversity v. Haaland,* No. 23-cv-02-BU-DLC (D. Mont.) (Judge Dana Christensen). There, the Project (and its co-plaintiffs) challenged a 2020 finding from the FWS concerning the Missouri River Distinct Population Segment of Arctic grayling, a freshwater fish with precious little habitat left, under the Endangered Species Act (Molvar Suppl. Decl. ¶ 3). Following a partial grant of summary judgment in the plaintiffs' favor, Judge Christensen ordered FWS to make a new finding regarding the status of the upper Missouri River Basin Distinct Population Segment of Arctic grayling by August 2025. *Haaland*, No. 23-cv-02-BU-DLC, Dkt. No. 52 at 53. On February 12 the FWS sought and received an extension of that deadline to February 2027 (Molvar Suppl. Decl. at ¶ 3). In a declaration to Judge Christensen, the FWS conditioned their ability to meet that new deadline on the "assumption[]" that "the Service will continue to have the authority to hire and retain sufficient listing program staff to be able to carry out the specified commitments." *Haaland*, No. 23-cv-02-BU-DLC, Dkt. No. 63-1 ¶ 15. The Project

United States District Court
Northern District of California

represents that, as of February 26, some 400 FWS employees have been terminated (Molvar Suppl. Decl. ¶ 3).

Executive Director Molvar, himself a member of the Project, frequently fishes for Arctic grayling in the lakes of the Sapphire Mountains, in Glacier National Park, and in Alaska (*id*. at ¶ 9). He plans to do so again during a planned July 2025 trip to Alaska (*ibid.*). Under *Sierra Club* and its progeny, therefore, the Project has standing to vindicate its members' legally protected interest in the recreational enjoyment of federal lands and the flora and fauna therein.

### (iii)    Vote Vets Action Fund Inc. (VoteVets) and Common Defense Civic Engagement (Common Defense).

In *Fellowship of Christian Athletes*, an international student ministry challenged the defendant school district's decision to bar its local chapter from formal "recognition" as a student-run organization by the Associated Student Body (ASB). 82 F.4th at 681. The FCA stated it was an international "ministry group formed for student athletes to engage in various activities through their shared Christian faith" that operates through more than 7,000 local chapters. *Id*. at 671–72. Their stated mission was to equip "student athletes from all backgrounds for fellowship, spiritual growth, and service on their campuses." *Ibid*. FCA required that students serving in a leadership capacity affirm certain religious beliefs through a "Statement of Faith" (stating, among other things, that "marriage is exclusively the union of one man and one woman") and a "Sexual Purity Statement." *Id*. at 672–73. The defendant school district, citing the "discriminatory nature" of both statements, first stripped the club of its recognition as an official student club, and then imposed new "non-discriminatory criteria" for all student clubs, under which the local FCA chapter would be denied recognition in future years. *Id*. at 675, 678–79. While FCA's local chapter remained on campus, it lost out on certain campus privileges. *See id*. at 673.

Our court of appeals, sitting en banc, held that the FCA's national office had direct organizational standing because the local chapter's exclusion from the benefits associated with ASB recognition — access to fundraisers, the student yearbook, priority access to meeting spaces, and so on — "undoubtedly hampered," *id*. at 683, the FCA's mission "to lead every

coach and athlete into a growing relationship with Jesus Christ and His church," *id*. at 672.  The FCA's national office moreover, "had to 'divert[] resources' in 'counteracting the problem' posed by the derecognition," including "a huge amount of staff time, energy, effort, and prayer that would normally have been devoted to preparing for school or ministry." *Ibid*.

Plaintiff VoteVets has standing.  VoteVets is a "non-partisan, non-profit organization" that has "nearly 2 million supporters . . . with whom it regularly communicates about issues affecting veterans, including the operations, programs, and services available through the U.S. Department of Veterans Affairs" (Eaton Decl. ¶3).  The VA has "dismissed over 1,000 probationary employees," "rais[ing] concerns about potential staffing shortages and the quality of care provided to veterans" (*id*. ¶ 8).  For example, "the layoffs have hindered the recruitment of essential support staff for VCL positions such as trainers and quality assurance personnel" (*id*. ¶ 9).  This shortage "has overwhelmed existing supervisors and affected the VCL's ability to provide timely assistance to veterans in crisis."  Major General Eaton attests that:

> The February 2025 probationary terminations have had a significant impact on the organizational activities of VoteVets. The time of VoteVets' staff and consultants has been diverted from VoteVets' regular activities to field and respond to inquiries from veterans and their families and to connect them with case workers in congressional offices.  This has taken almost all of our resources since the probationary terminations began, and has prevented us from performing our regular activities to meet the needs of veterans and their families.

(*id*. ¶ 11).  VoteVets' members' access to services critical to the organization's mission has been hampered, and VoteVets itself has been forced to divert "almost all of [their] resources" in "counteracting the problem," depriving the organization of its ability to continue to provide services to its members (*ibid.*).

Plaintiff Common Defense likewise has standing.  Common Defense is a "grassroots membership organization of progressive veterans, military families, and civilian supporters" (Arbulu Decl. ¶ 2).  With approximately 33,187 members in California (about 2,000 of them veterans), Common Defense "mobilize[s] veterans to support and advocate for policies that help veterans, military families, and all working families," offers training and helps members

begin issue campaigns, and otherwise engages in legislative and political advocacy (*id.* ¶¶ 3–5, 11).  Military veterans compose a large percentage of federal employees, and widespread termination — particularly at the VA and DOD — have had a disproportionate impact on persons whom Common Defense typically serves:

> As a result of these developments, Common Defense has had to devote considerable resources to responding to requests from our members and providing guidance about the mass probationary terminations.  Many members believe that the termination of their employment may be imminent, and understandably have asked questions — by email, by phone, and on our members' slack channel — about what the letter means for their rights as employees Responding to members questions, and working to determine what answers we can give to those members, diverts resources from Common Defense's advocacy mission and core priorities, including working to expand ballot access at the state level, advancing initiatives to address climate change, and training and educating members.

(*id.* ¶ 6).  Common Defense, like VoteVets, has diverted considerable resources otherwise intended for the pursuit of its advocacy mission to the problems presented to its members, and its mission, by mass terminations, particularly at the VA and DOD.

*          *          *

*First*, OPM counters that plaintiffs fail on causation:  There was no direction, merely a request; that request was carried out by some agencies; it was those agencies' independent, intervening actions that are the proximate cause of plaintiffs' alleged harm.  This argument rests on OPM's broader factual position that its memos and other communications to agencies regarding probationary employees constituted mere guidance, not direction.  But plaintiffs have assembled a mountain of evidence supporting their more concise causal chain:  OPM directed mass firings and plaintiffs each likely will be (or have been) injured as a result.  Plaintiffs have each established a sufficient causal link between the mass termination of employees at the implicated agencies, and the imminent, foreseeable, and in some cases actual injuries that they face.

1    Next, OPM argues redressability:

> They ask the Court to order agencies to rescind probationary
> removals and reinstate removed employees.  But, apart from OPM,
> no other federal agency is a party here, leaving the Court without
> the power to order those agencies to take any action.  Thus,
> Plaintiffs cannot show that an order of this Court would likely
> grant their requested relief, rendering their claimed injuries non-
> redressable here.

(Dkt. No. 33 at 13).  Plaintiffs fairly allege that they have been harmed by OPM's *direction* to

other agencies to fire their probationary employees.  Declaratory and injunctive relief enjoining

OPM from issuing such a directive — one request among many made by plaintiffs — will

likely redress their alleged injuries.

### 2.    IRREPARABLE HARM.

"[P]laintiffs may not obtain a preliminary injunction unless they can show that irreparable

harm is likely to result in the absence of the injunction."  *All. for the Wild Rockies v. Cottrell*,

632 F.3d 1127, 1135 (9th Cir. 2011).  They have done so here.

"[T]he Supreme Court has instructed us that '[e]nvironmental injury, by its nature, can

seldom be adequately remedied by money damages and is often permanent or at least of long

duration, *i.e.,* irreparable.'"  *Ibid.* (alterations in original) (quoting *The Lands Council v.

McNair*, 537 F.3d 981, 1004 (9th Cir. 2008) (en banc)).  Relatedly, "deprivation of a source of

personal satisfaction and tremendous joy can constitute an irreparable injury."  *Ft. Funston

Dog Walkers v. Babbitt*, 96 F. Supp. 2d 1021, 1039 (N.D. Cal. 2000) (citing *Chalk v. U.S. Dist.

Ct.*, 840 F.2d 701, 709 (9th Cir. 1988)).  That is true as to loss of access to national recreational

areas.  *Ibid.*  The partial closure and degradation of national parks constitutes likely, irreparable

harm due to both environmental injury and loss of access  (*see* Neubacher Decl. ¶¶ 2–5).   In at

least one instance, a closure at Joshua Tree has resulted in actual harm (*see* Neubacher Suppl.

Decl. ¶ 4).  And the Arctic grayling, if it goes, is not coming back (*see* Molvar Suppl. Decl. ¶

3–9).  The Coalition and the Project have established irreparable harm.

Loss of access to essential government services also constitutes likely, and in some cases

actual, irreparable harm.  For example, the Veterans Crisis Line — an indispensable resource

for our veterans in times of crisis — has been "overwhelmed" and its ability to provide care

22

United States District Court
Northern District of California

diminished for lack of staff (Eaton Decl. ¶ 9).  Loss of access to that critical resource, standing alone, constitutes irreparable harm to VoteVets' members.  Its failure to meet the needs of our veterans presents the further likelihood of tragic results.  MSA's members' access to crucial SBA services, including the provision of loan guarantees, is likely to be diminished (Phetteplace Decl. ¶¶ 5–9), and the Western Watersheds Project's access to FOIA production already has been impacted (Molvar Decl. ¶¶ 7–8).

Finally, plaintiffs face irreparable harm because they have diverted significant or even all present resources to responding to the hardships created by the mass termination of probationary employees (*see, e.g.*, Arbulu Decl. ¶ 6; Eaton Decl. ¶ 11).

MSA, the Coalition, the Project, VoteVets, and Common Defense have each established irreparable injury.

OPM's rebuttals, tailored largely to the union plaintiffs, are moot (Dkt. No. 33 at 10).  OPM's assertion, meanwhile, that "[p]laintiffs have produced no credible evidence that terminations of federal employees have caused a disruption in critical government services" (*ibid.*) is refuted by the record, discussed at length in this memorandum's consideration of standing.

### 3.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST.

Because OPM is a party in this action, the balance of the equities and the public interest merge.  *See Nken v. Holder,* 556 U.S. 418, 435 (2009).  Here, they strongly favor plaintiff.  "The preservation of the rights in the Constitution and the legality of the process by which government agencies function certainly weighs heavily in the public interest."  *Nat'l Treasury Emps. Union v. U.S. Dep't of Treasury*, 838 F. Supp. 631, 640 (D.D.C. 1993) (Judge Harold Greene).  Plaintiffs have presented real harms, detailed above, to their organizations, their members, and their missions, while OPM has not provided a substantive opposition (Dkt. No. 33 at 22–23).

In sum, each *Winter* factor favors granting a limited injunction.

1

**CONCLUSION**

Based on the foregoing, the Court granted the following relief at the close of the February

27 argument:

> That OPM's January 20 memo, February 14 email, and all other
> efforts to direct the termination of employees at NPS, BLM, VA,
> DOD, SBA, and NSF are illegal, invalid and must be stopped and
> rescinded.  That OPM must communicate that decision to those
> agencies by the next day, February 27.

(Dkt. No. 41).

This memorandum amends the bench order to address two errors (the inclusion of the

NSF, and the exclusion of FWS).  The Court's TRO is accordingly **AMENDED** to the

following:

It is **ORDERED** that:

> OPM's January 20 memo, February 14 email, and all other efforts
> by OPM to direct the termination of employees at NPS, BLM, VA,
> DOD, SBA, and FWS are unlawful, invalid, and must be stopped
> and rescinded.

> OPM shall provide written notice of this order to NPS, BLM, VA,
> DOD, SBA, and FWS.

The evidentiary hearing described at the February 27 motion hearing shall occur on

**MARCH 13, 2025, AT 8 AM**.  The hearing will be in person in Courtroom 12.

Dated:  February 28, 2025.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California