**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**

|  |  |  |
|---|---|---|
| **U.S. OFFICE OF SPECIAL COUNSEL,** | ) | |
| *ex rel.* **Former Employee** ▬▬▬▬ | ) | |
| **Petitioner** | ) | **Docket No.** |
| | ) | |
| **v.** | ) | |
| | ) | **Date:** February 21, 2025 |
| **OFFICE OF PERSONNEL MANAGEMENT,** | ) | |
| **Respondent.** | ) | |
| | ) | |

**U.S. OFFICE OF SPECIAL COUNSEL'S**
**INITIAL REQUEST FOR STAY OF PERSONNEL ACTIONS**

The U.S. Office of Special Counsel (OSC) requests that the Merit Systems Protection

Board (Board) stay for 45 days the probationary termination of former federal employee MC,

hereinafter "Complainant MC," by the Office of Personnel Management (OPM).[1] *See* 5 U.S.C. §

1214(b)(1)(A); 5 C.F.R. § 1201.134.  OSC requests that this stay request be adjudicated together

with the concurrently-filed requests to stay the probationary terminations of former federal

employees EA, TP, DB, JH, and AJ (collectively with Complainant MC, the "Complainants"), by

the Department of Education (ED), Department of Energy (DOE), Department of Housing and

Urban Development (HUD), Department of Veterans Affairs (VA), and Department of

Agriculture (USDA) (collectively with OPM, the "Agencies").

---

[1] To ensure compliance with the Board's procedural requirements, Complainant MC has consented to be identified
in this stay request, but asks that the Board use a pseudonym in its decision and any other publicly-available
document.  In consideration of this request, OSC has used Complainant MC's name in the caption, but otherwise
refers to them by their initials and asks that the Board do the same.  Complainant MC is fully identified in the
attached termination notice and declaration, which they provided to OSC in support of their prohibited personnel
practice complaint.

OSC has reasonable grounds to believe that the Agencies engaged in prohibited personnel practices under 5 U.S.C. § 2302(b)(12) by terminating Complainants in violation of the federal laws and regulations governing probationary terminations and reductions in force (RIF). *See* 5 U.S.C. § 3502; 5 C.F.R. Part 351; 5 C.F.R. § 315.801 *et seq.* As a result, OSC has an obligation to request relief from the Board where appropriate. 5 U.S.C. § 1212(a) ("The Office of Special Counsel *shall*…protect employees…from prohibited personnel practices…and, where appropriate [] bring petitions for stays") (emphasis added).

## INTRODUCTION

In accordance with its legal responsibility to safeguard the merit system, OSC seeks this stay because the probationary terminations at issue in this matter appear to have been effectuated in a manner inconsistent with federal personnel laws. In most cases, probationary employees in the competitive service may only be terminated if their performance or conduct demonstrates that they are unfit for federal employment. If agencies wish to terminate probationary employees not for performance or conduct, but as part of a general restructuring or downsizing, they must initiate a reduction in force (RIF) and follow the relevant procedures for that process.

As described below, the rules for probationary terminations and conducting RIFs are not technicalities. Rather, they implicate federal employees' substantive and procedural rights.

## STATEMENT OF FACTS

## I.    PREPARATIONS MADE TO REDUCE AND REORGANIZE THE FEDERAL WORKFORCE

Between January 20 and February 11, 2025, President Trump and OPM issued executive orders and memoranda in connection with plans to reduce and reorganize the federal workforce. For example, on January 20, 2025, the President issued an Executive Order establishing the Department of Government Efficiency, and OPM issued guidance on probationary periods,

advising agencies that probationary periods are "an essential tool for agencies to assess employee performance and manage staffing levels," directing agencies to provide OPM with a list of all probationary employees, and instructing agencies to "promptly determine" whether probationary employees should be retained.[2]  On February 11, 2025, the President issued an Executive Order directing agency heads to "promptly undertake preparations to initiate large-scale reductions in force…" and to develop "[r]eorganization [p]lans."[3]  According to public reporting, on February 13, 2025, OPM officials met with federal agency leaders to provide guidance on how to carry out probationary termination actions as part of the broader effort to restructure and downsize the federal workforce.[4]

## II.    THE AGENCIES' TERMINATIONS OF COMPLAINANTS

Between February 12 and February 14, 2025, the Agencies terminated Complainants, probationary employees at six separate federal agencies, from federal service.  Based on public reporting, each was terminated at the same time as significant numbers of other federal employees.[5]  The language in Complainants' termination notices is quite similar and does not describe any specific issues with any of the Complainants' performance or conduct.  Notably,

---

[2] EXEC. ORDER NO. 14158, *Establishing and Implementing the President's "Department of Government Efficiency,"* 90 Fed. Reg. 8441 (Jan. 20, 2025); U.S. OFF. OF PERSONNEL MGMT., Guidance on Probationary Periods, Administrative Leave and Details (Jan. 20, 2025).

[3] EXEC. ORDER NO.14210, *Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative*, 90 Fed. Reg. 9669 (Feb. 11, 2025); *see* WHITE HOUSE, Fact Sheet: President Donald J. Trump Works to Remake America's Federal Workforce (Feb. 11, 2025) (explaining that DOGE will assist with "shrink[ing] the size of the federal workforce," "large-scale reductions in force," "reducing the size and scope of the federal government," and "shrink[ing] the administrative state.").

[4] Jory Heckman, *OPM advises agencies to fire probationary employees after 'deferred resignation' deadline*, Fed. News Network (Feb.13, 2025), https://federalnewsnetwork.com/workforce/2025/02/opm-fires-probationary-employees-after-deferred-resignation-deadline/; Ted Oberg, *Trump administration tells federal agencies to fire probationary employees*, NBC4 (Feb. 13, 2025), https://www.nbcwashington.com/news/president-trump-politics/opm-federal-agencies-probationary-employees-trump-administration/3844634/.

[5] Tami Luhby et al., *Thousands of probationary employees fired as Trump administration directs agencies to carry out widespread layoffs*, CNN (Feb. 14, 2025), https://www.cnn.com/2025/02/14/politics/probationary-federal-employees-agencies-firings-doge/index.html.

only three of the notices mention performance or conduct at all as a justification for the termination, and none provide any detail or individualized assessment.

The following is the specific factual information relevant to each Complainant, based on the information OSC has reviewed to this point:

### 1.    *ED Program Support Specialist*

Complainant EA served as a probationary Program Support Assistant in the competitive service with ED.  Ex. 1, Complainant EA Declaration, ¶¶ 3-4.  Complainant EA was hired with a 100% disabled veteran's preference after 14 years with the Army.  *Id.*, ¶ 5.  Throughout his tenure, he received consistent praise from leadership, and there is no evidence of any performance issues.  *Id.*, ¶ 9.  However, on February 12, 2025, Complainant EA was issued a termination notice that stated, in relevant part:

> I regrettably inform you that I am removing you from your position of Program Support Specialist with the agency and the federal civil service effective today.

Ex. 2, ED Notice.  Earlier that same day, Complainant EA's supervisor had commended his exceptional performance, praising his dedication and calling him a perfect fit for the team.  Ex. 1, ¶ 11.

Both Complainant EA and the media reported that, on or around February 12, 2025, about 60 probationary employees at ED received written notifications that they were being terminated, effective immediately.  *Id.*, ¶ 15.[6]

---

[6] Joey Garrison, *Firings across federal government begin after Trump, Musk order sweeping cuts*, USA TODAY (Feb. 13, 2025), https://www.usatoday.com/story/news/politics/2025/02/13/trump-musk-federal-workforce-mass-firings/78524273007/.

### 2.    DOE Program Communications Specialist

Complainant DW served as a probationary Program Communications Specialist with DOE in the excepted service.  Ex. 3, Complainant DW Declaration, ¶¶ 3-4.  Complainant DW's performance record was strong, with no documented performance or conduct issues.  *Id.,* ¶¶ 8-9.  In December 2024, Complainant DW received a "Significantly Exceeds Expectations" performance rating.  *Id.*  Despite her supervisor's request for the agency to retain her, she was terminated on February 13, 2025.  *Id.*, ¶ 3.  The termination notice stated, in relevant part:

> Per OPM instructions, DOE finds that your further employment would not be in the public interest.  For this reason, you are being removed from your position with DOE and the federal civil service effective today.

Ex. 4, DOE Notice.

On or around February 13, 2025, DOE terminated between 1,200 and 2,000 employees, including probationary employees.  According to public reporting, notices provided to many of these employees stated that their further employment would not be in the public interest.[7]  A DOE official reportedly said that DOE removed OPM's suggested phrasing citing "performance reasons" from its termination letters because many of the terminated employees had performed well during their probationary period.[8]

### 3.    HUD Trial Attorney

Complainant TP served as a probationary Trial Attorney in the excepted service with HUD.  Ex. 5, Complainant TP Declaration, ¶¶ 3-4.  Complainant TP had very good performance and, in November 2024, Complainant TP received an "4" performance rating.  *Id.*, ¶ 9.

---

[7] Gabe Whisnant & Peter Aitken, *Trump Moves to Fire Staff Overseeing Nuclear Weapons Then Backtracks—Report*, NEWSWEEK (Feb. 14, 2025), https://www.newsweek.com/trump-fires-hundreds-staff-overseeing-nuclear-weapons-report-2031419.

[8] Shannon Bond et al., *Sweeping cuts hit recent federal hires as Trump administration slashes workforce*, NPR (Feb. 13, 2025), https://www.npr.org/2025/02/13/nx-s1-5296928/layoffs-trump-doge-education-energy.

Complainant TP has also received several performance awards and has not been informed of any performance or conduct issues. *Id.* On February 14, 2025, Complainant TP received a notice of termination that contained the following language:

> The purpose of this notice is to notify you of the decision to terminate your employment with the U.S. Department of Housing and Urban Development (HUD), during your trial period, in order to promote the efficiency of the federal service in accordance with the priorities of the Administration…After careful consideration, the Agency is terminating your employment as of the date of the transmission of this email, during your trial period as *part of a workforce restructuring of the Agency*.

Ex. 6, HUD Notice (emphasis added).

Senator Patty Murray issued a press release expressing concern from several senators over reports that HUD had terminated hundreds of probationary employees on February 14.[9]

### 4.    *OPM Benefits Analyst*

Complainant MC worked at OPM as a probationary Benefits Analyst in the excepted service. Ex. 7, Complainant MC Declaration, ¶¶ 1, 3.[10] Complainant MC received a positive performance rating during her tenure, with no indication of any performance or conduct issues. *Id.*, ¶ 2. Although Complainant MC's managers repeatedly requested that Complainant MC be retained, on February 13, 2025, Complainant MC's employment was terminated. *Id.*, ¶ 5. The termination notice states, in relevant part:

> The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest. For this reason, the Agency informs you that effective at the close of business today (February 13, 2025), you are being terminated from your position with the Agency and the federal civil service during your trial period.

---

[9] Press Release, U.S. Senator Patty Murray. Murray, Warren, Gillibrand, Smith, and Schumer Demand Trump & Elon Halt Cuts to HUD Workforce, Press for Answers on HUD's Capacity to Meet Critical Functions & Deliver Essential Services (Feb. 16, 2025), https://www.murray.senate.gov/murray-warren-gillibrand-smith-and-schumer-demand-trump-elon-halt-cuts-to-hud-workforce-press-for-answers-on-huds-capacity-to-meet-critical-functions-deliver-essential-servic/.

[10] Due to an apparent numbering error, this declaration repeats several paragraph numbers.

Ex. 8, OPM Notice (emphasis removed).  Complainant MC's supervisor, who was caught off

guard by the termination, clarified that the action was not based on poor performance.  Ex. 7,

¶¶ 5, 11.

According to public reporting, OPM terminated approximately 70 probationary

employees on February 13, 2025.  These employees were also told the agency finds "[b]ased on

your performance, that you have not demonstrated that your further employment at the agency

would be in the public interest."[11]

### 5.    *VA Training Specialist*

Complainant JH, a disabled U.S. Navy veteran dedicated to serving fellow veterans,

served in the excepted service as a probationary Training Specialist with the VA.  Ex. 9,

Complainant JH Declaration, ¶¶ 3-4, 6.  Despite having no indication of performance or conduct

issues, on February 13, 2025, Complainant JH received a termination notice.  *Id.*, ¶¶ 3, 11.  Until

it was issued, Complainant JH's supervisor was unaware of the termination action, which stated,

in relevant part:

> The Agency finds, based on your performance, that you have not demonstrated that your
> further employment at the Agency would be in the public interest.  For this reason, the
> Agency informs you that the Agency is removing you from your position with the
> Agency and the federal civil service effective February 13, 2025.

*Id.*, ¶ 12, Ex. 10, VA Notice.

Complainant JH was one of over 1,000 probationary employees who were terminated on

February 13, 2025.  The agency released a statement that day, attributing the terminations to a

---

[11] Heckman, *supra* at n.5.

"government-wide Trump Administration effort to make agencies more efficient, effective and responsive to the American People."[12]

### 6.   *USDA Loan Specialist*

Complainant AJ worked at USDA in the competitive service as a probationary loan specialist.  Ex. 11, Complainant AJ Declaration, ¶¶ 3-4.  Throughout this tenure, he consistently exhibited strong performance and received positive feedback.  *Id.*, ¶¶ 7-8.  On February 13, 2025, Complainant AJ was notified of his termination.  *Id.*, ¶ 3.  The termination notice states, in relevant part:

> The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest.  For this reason, the Agency informs you that the Agency is removing you from your position….

Ex. 12, USDA notice.  While the notice indicates that the action is based on Complainant AJ's performance, Complainant AJ had not been informed of any performance issues, nor did the notice cite specific concerns.  Ex. 11, ¶ 11.  Complainant AJ's supervisor was "shocked" by the action, offering to rehire Complainant AJ and serve as a reference. Ex. 11, ¶ 12.

Around the same time, USDA terminated probationary employees across three of its subagencies, including the U.S. Forest Service—which alone terminated up to 3,400 probationary workers.[13]  As with Complainant AJ, according to public reporting, these terminated employees received a letter informing them that "[t]he Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest."[14]

---

[12] Press Release, U.S. Dep't of Veterans Affs. VA dismisses more than 1,000 employees (Feb. 13, 2025), https://news.va.gov/press-room/va-dismisses-more-than-1000-employees/.

[13] Tami Luhby et al., *supra* at n.6.

[14] Leah Douglas, *USDA probationary staff fired at three agencies, sources say*, REUTERS (Feb.14, 2025), https://www.reuters.com/world/us/usda-probationary-staff-fired-two-research-agencies-sources-say-2025-02-14/.

**ARGUMENT**

## I.    LEGAL STANDARD FOR STAY REQUESTS

OSC may request any member of the Board to order a stay of any personnel action for a period of 45 days if OSC determines that reasonable grounds exist to believe that a personnel action was taken, or is to be taken, as a result of a prohibited personnel practice.  5 U.S.C. § 1214(b)(1)(A)(i).  Indeed, pursuant to 5 U.S.C. 1212, OSC has a legal obligation to protect federal employees from prohibited personnel practices and petition for a stay "where appropriate."  See 5 U.S.C. § 1212(a).

OSC may file a stay request after the effective date of a personnel action.  *Special Counsel ex rel. Perfetto v. Dep't of Navy*, 83 M.S.P.R. 169, 173 (1999).  The Board member "shall" grant the stay "unless the [Board] member determines that, under the facts and circumstances involved, such a stay would not be appropriate."  5 U.S.C. § 1214(b)(1)(A)(ii).

In evaluating the sufficiency of a stay request, the Board will view the facts in the light most favorable to a finding that the personnel action to be stayed is the result of a prohibited personnel practice.  *Special Counsel v. Dep't of Treasury*, 70 M.S.P.R. 578 (1996).  OSC's stay request need merely fall within the "range of rationality" to be granted.  *Perfetto,* 83 M.S.P.R. at 173 (quoting *In re Kass*, 2 M.S.P.R. 79, 96 (1980) (interpreting the predecessor provision to 5 U.S.C. § 1214)).

## II.    OSC HAS REASONABLE GROUNDS TO BELIEVE THAT THE COMPLAINANTS' TERMINATIONS VIOLATE 5 U.S.C. § 2302(B)(12)

Under 5 U.S.C. § 2302(b)(12), it is a prohibited personnel practice for an agency to take or fail to take a personnel action where "the taking of or failure to take such action violates any law, rule, or regulation implementing, or directly concerning, the merit system principles contained in [5 U.S.C. § 2301]."  Complainants allege that the probationary terminations

described in this Initial Request for Stay of Personnel Actions (Stay Request) are personnel

actions, as defined at 5 U.S.C. § 2302(a)(2)(A), that violate 5 U.S.C. § 3502, 5 C.F.R. Part 351,

and 5 C.F.R. § 315.801 *et seq*.  These statutes and regulations concern the following merit system

principles:

- Selection and advancement should be determined solely on the basis of relative ability, knowledge, and skills;

- All employees should receive fair and equitable treatment with proper regard for their constitutional rights;

- The Federal work force should be used efficiently and effectively;

- Employees should be retained on the basis of the adequacy of their performance; and

- Employees should be protected against arbitrary action.

*See* 5 U.S.C. §§ 2301(b)(1), (2), (5), (6), (8)(A).  As set forth below, OSC has reasonable

grounds to believe that the terminations therefore constitute prohibited personnel practices under

section 2302(b)(12).

### A.      The Probationary Terminations Appear to Violate RIF Statute and Regulations

The available evidence indicates that Agencies improperly used the probationary status of

employees to accomplish a RIF without affording the employees the substantive rights and due

process they are entitled to by law.[15]  Based on public statements, the Agencies' decision to

terminate large numbers of probationers was to accomplish reorganizations and cost savings; in

other words, a RIF.

---

[15] *See* U.S. OFF. OF PERSONNEL MGMT., Workforce Reshaping Operations Handbook A Guide for Agency Management and Human Resource Offices (2017), https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force/workforce_reshaping/.

Because 1) agencies are prohibited from circumventing the requirements set forth in the RIF statute and regulations, which apply equally to probationary employees, 2) the evidence indicates that Agencies improperly terminated Complainants without reference to those requirements, and 3) the violation denied Complainants both substantive and procedural rights, OSC has reasonable grounds to conclude that Agencies have engaged in prohibited personnel practices.

### 1.    Agencies are Prohibited from Circumventing RIF Requirements

Agencies must follow the RIF statute and regulations when the employee's release is required for reasons including lack of work, shortage of funds, and reorganization.  *See* 5 C.F.R. § 351.201.  The regulations define a reorganization as "the planned elimination, addition, or redistribution of functions or duties in an organization."  5 C.F.R. § 351.203.  The Federal Circuit has "defined a 'reduction in force' as an 'administrative procedure' by which agencies eliminate jobs and reassign or separate employees who occupied the abolished positions."  *See Tippins v. U.S.*, 93 F.4th 1370, 1375 (Fed. Cir. 2024).  OPM's website similarly explains that, "An agency is required to use the RIF procedures when an employee is faced with separation or downgrading for a reason such as reorganization, lack of work, [or] shortage of funds…."[16]

Each agency has the right to decide whether a RIF is necessary and when the RIF will take place.  However, agencies do not have discretion to bypass RIF procedures when they are reorganizing or reducing the size of components based on lack of work or budgetary concerns.  *See James v. Von Zemenszky,* 284 F.3d 1310, 1321 (Fed. Cir. 2002) (holding that the VA did not have "the authority to implement a system for implementing RIFs contrary to the title 5 RIF

---

[16] *Reductions in Force*, U.S. OFF. OF PERSONNEL MGMT., https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force/ (last visited Feb. 17, 2025).

framework mandated by Congress"). Importantly, probationary employees are not excluded

from RIF procedures. *See* 5 C.F.R. § 351.202. It is an agency's burden to prove before the

Board that its decision not to use RIF procedures complied with the regulations. *See Carter v.*

*Small Bus. Admin.*, 23 M.S.P.R. 309, 311-312 (1984) (citing *Losure v. Interstate. Com. Comm'n*,

2 M.S.P.R. 361, 365-66 (1980)).

Agencies cannot avoid following the RIF requirements when the purpose of the action is

to address a shortage of funds or a reorganization. *See McClure v. Fed. Emergency Mgmt.*

*Agency*, 32 M.S.P.R. 672, 676 (1987); *see also Moody v. Dep't of Justice*, 2009 MSPB LEXIS

1917, *7 (April 2, 2009).

> ### 2. *The Agencies Likely Cannot Meet their Burden to Show that RIFs Were Not Required to Terminate the Probationers*

Based on the evidence OSC has reviewed, including official directives, public statements,

and the termination notices issued to Complainants, it appears that the Agencies terminated

probationary employees not to eliminate poor performers but rather because of a purported lack

of work, shortage of funds, and reorganization, which require use of RIF procedures. *See* 5

C.F.R. § 351.201. For example, OPM directed agencies to provide lists of all probationary

employees and stated that "probationary periods are an essential tool for agencies to assess

employee performance and *manage staffing levels*."[17]

Additionally, the February 11, 2025 Executive Order directed agencies to start planning

for RIFs that would prioritize eliminating "offices that perform *functions* not mandated by statute

or other law" and excluding "*functions* related to public safety, immigration enforcement, or law

---

[17] U.S. OFF. OF PERSONNEL MGMT., Guidance on Probationary Periods, Administrative Leave and Details, *supra* at n.3 (emphasis added).

enforcement" from RIFs.[18]  Two days later, an OPM spokesperson described the mass

terminations as actions "in support of the President's broader efforts to *restructure* and

*streamline* the federal government."[19]

      USDA and VA made their own public statements confirming that the purpose of their

February 13 terminations of Complainants and other probationary employees was supporting the

President's direction to downsize government agencies and reduce spending.[20]  A DOE official

reportedly described that OPM "had suggested the agency use a template that cited 'performance

reasons'" for probationary terminations but that DOE "had removed that phrasing because many

of the employees had performed well during their probationary period."[21]  These public

statements indicate that Agencies terminated Complainants and other probationary employees for

reasons that would require compliance with RIF regulations.

      The content of the Complainants' termination notices further signals that the terminations

were issued to reduce the numbers of overall employees rather than because the Complainants

failed to meet expectations during their trial periods.  The Complainants all received their

termination notices between February 12 and 14.  *See* Ex. 2, 4, 6, 8, 10, 12.  The notices OPM,

USDA, and VA issued to Complainants all state that: "The Agency finds, based on your

performance, that you have not demonstrated that your further employment at the Agency would

be in the *public interest*." Ex. 4, 8, 10, 12 (emphasis added).  The DOE termination notice plainly

---

[18] EXEC. ORDER NO.14210, *Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative*, *supra* at n.4 (emphasis added).

[19] Rebecca Beitsch, *OPM Directs Agencies To Fire Government Workers Still On Probation*, THE HILL (Feb. 13, 2025), https://thehill.com/homenews/administration/5144113-federal-probationary-employees-fired/ (emphasis added).

[20] Robert Thorpe, *List of Federal Agencies That Have Begun Mass Layoffs of Probationary Employees*, NEWSWEEK (Feb. 14, 2025), https://www.newsweek.com/federal-agencies-that-have-begun-mass-layoffs-probationary-employees-doge-2031543; U.S. Dep't of Veterans Affs., *VA Dismisses More than 1,000 Employees*, *supra* at n.13.

[21] Shannon Bond et al., *supra* at n.9.

states that it is acting "*[p]er OPM instructions*." Ex. 4 (emphasis added). ED's notice did not

provide any reason for the Complainant's immediate termination. Ex. 2. HUD's explanation in

its notice to the Complainant did not mention performance and instead explained that it was

terminating Complainant "*as part of a workforce restructuring of the Agency.*" Ex. 6 (emphasis

added).

Based on the evidence available to OSC, there are reasonable grounds to believe that the

Agencies improperly circumvented RIF regulations by terminating Complainants and other

probationary employees *en masse* without regard to each employee's individual performance for

the purpose of restructuring government agencies and reducing costs.

### 3.    *Failing to Use RIF Requirements Deprives Employees of Substantive and Procedural Rights*

The Agencies' failure to apply RIF regulations has deprived Complainants of substantive

as well as procedural rights that could allow them to keep their jobs or be reassigned to new

positions and would have allowed them, at a minimum, to remain employed during the RIF

process. RIF regulations provide for an orderly process of determining which employees are

retained rather than separated and ensuring that those decisions are made according to merit-

based factors. *See* 5 U.S.C. § 3502; 5 C.F.R. §§ 351.501-506. The law requires that employees

with better performance ratings and disabled veterans with veterans' preference are retained over

other competing employees in their retention groups. 5 U.S.C. § 3502. For both excepted and

competitive service employees, probationary employees are placed in the second of three

retention groups. *See* 5 C.F.R. §§ 351.501-502.

The Complainants EA and JH are disabled veterans, whose status would afford them

preference in the RIF retention schedules. Ex. 1, 9. The excepted service Complainants, whose

probationary period is two years, terminated from DOE, HUD, USDA, and OPM all had

favorable annual performance ratings and tenure of more than one year, which could likewise give them preference over employees with shorter tenure and less favorable performance in a RIF.  Ex. 3, 5, 7, 11.  Thus, it is not a foregone conclusion that Complainants would be separated during a RIF.

In addition to the substantive rights to be considered for retaining their position or being reassigned to another position, the RIF regulations require agencies to provide employees with 60 days of notice and to keep employees in a paid status during that time if possible.  *See* 5 C.F.R. §§ 351.803; 351.806.  The notice is also required to provide employees with information about their right to reemployment and career transition assistance.  *See* 5 C.F.R. § 351.803.

The regulations also provide employees subject to RIF with notice and the right to appeal their termination, demotion, or more than 30-day furlough to the Board.  *See* 5 C.F.R. § 351.901. The Board's jurisdiction to hear an appeal of an action taken pursuant to a RIF or that should have been conducted pursuant to a RIF is not dependent on the individual's probationary status or on the length of the individual's current continuous service.  *Bielomaz v. Dep't of Navy*, 86 M.S.P.R. 276, 280 (2000).

Accordingly, the Agencies' actions appear to have deprived Complainants of their entitlement to some additional period of employment, compensation, benefits, career transition assistance information, possible accrual of tenure, as well as due process rights.[22]

---

[22] Board precedent is consistent that the remedy to improper circumvention of RIF regulations is to cancel the action the agency took.  *See e.g., Williams v. Dep't of Army*, 49 M.S.P.R. 405, 414 (1991).

**B.      The Probationary Terminations of Competitive Service Employees Appear to Violate Applicable Regulations**

The Civil Service Reform Act ("CSRA") provides that individuals hired into the competitive service must serve a one-year probationary or trial period.[23]  5 C.F.R. § 315.801-802.  For these employees, the regulations promulgated by OPM state explicitly that agencies "*shall* utilize the probationary period as fully as possible *to determine the fitness of the employee* and shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment."  5 C.F.R. § 315.803 (emphasis added). In short, to terminate a probationary employee, an agency "must honestly be dissatisfied with the probationer's conduct or performance after giving him a fair trial on the job."  *McGuffin v. SSA*, 942 F.3d 1099, 1102 (Fed. Cir. 2019) (citing *Shaw v. United States*, 622 F.2d 520, 223 (Ct. Cl. 1980); *see also Perlongo v. United States*, 215 Ct. Cl. 982, 983 (1977).

Where an employee's "work performance or conduct during [his probationary] period fails to demonstrate his fitness or his qualifications for continued employment," an agency may terminate the employee by notifying him "in writing as to why he is being separated and the effective date of the action."  5 C.F.R. § 315.804(a).  This notice "shall, as a minimum, consist of the agency's conclusions as to the inadequacies of his performance or conduct."  *Id*.

Probationary employees have only limited rights to challenge personnel actions taken against them.  5 C.F.R. § 315.806.  However, while the threshold for terminating a probationary

---

[23] The use of a probationary period to assess new employees has been an integral part of the civil service for over 100 years.  Congress established a probationary period in the 1883 Pendleton Act, 22 Stat. 403, ch. 27 (amended 1978); *see* 22 Stat. 404, ch. 27, § 2(2)4; *see also Kato v. Ishihara*, 360 F.3d 106, 113 (2d Cir. 2004); *INS v. FLRA*, 709 F.2d 724, 725 n.1 (D.C. Cir. 1983).  Congress reaffirmed the importance of the probationary period with the Civil Service Reform Act of 1978 ("CSRA"), 5 U.S.C. §§ 7101–7135, which expanded the probationary period beyond new employees to existing employees who are appointed to managerial and supervisory positions.  *Compare* 5 U.S.C. § 3321 (1976) (establishing a "period of probation before an appointment in the competitive service becomes absolute") *with* 5 U.S.C. § 3321(a) (1982) (authorizing a probationary period for new employees and appointments to managerial and supervisory positions); *see also Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.*, 737 F.3d 273, 276–77 (4th Cir. 2013).

employee is significantly lower than for a tenured employee, it is not zero – probationary employees cannot be terminated "at will."  Agencies must inform probationary employees of the specific reasons for their termination, which necessarily requires agencies to conduct an individualized assessment of their performance and conduct.  This requirement is not a simple bureaucratic technicality – compelling agencies to assess the specific fitness of each employee prior to terminating them ensures that outstanding employees are not arbitrarily lost and that terminations are truly in the best interests of the federal service and consistent with merit system principles.

For these reasons, terminating probationary employees in the competitive service for reasons other than their individual fitness for federal employment violates 5 C.F.R. § 315.801 *et seq*.  As these regulations and statutes implement or directly concern the merit system principles described in 5 U.S.C. §§ 2301(b)(1), (5), (6), and (8)(A), violating them constitutes a prohibited personnel practice under section 2302(b)(12).

Two of the Complainants in this matter were in the competitive service and OSC has reasonable grounds to believe that they were terminated in violation of 5 C.F.R. § 315.801 *et seq*. The declarations submitted by these Complainants lead OSC to believe that ED and USDA have not conducted any individualized assessments of their employees and instead seem to have issued form letters to terminate probationary employees *en masse*.

### 1. *Complainant EA*

The termination letter ED sent to Complainant EA states that "I regrettably inform you that I am removing you from your position of Program Support Specialist with the agency and the federal civil service effective today, February 12, 2025."  Ex. 2 (ED letter).  The letter does not allege that ED was taking this action due to any performance or conduct issues.  *Id*.

17

Complainant EA submitted a declaration averring that he had no performance or conduct issues, and in fact that the feedback he had received was very good. Ex. 1, ¶ 9. Complainant EA also stated neither his upper management or his supervisor had been aware of his termination and that his supervisor was surprised by it. *Id.*, ¶¶ 11-12. Complainant EA stated that he was aware of one other probationary employee who received an identical letter and believes the same is true of about 60 other probationary employees. *Id.*, ¶ 15. This evidence, combined with the public statements discussed above about the government's rationale for removing probationary employees, provide OSC with reasonable grounds to believe that Complainant EA had no performance or conduct issues and that his termination constitutes a prohibited personnel practice under section 2302(b)(12) that should be stayed.

### 2. Complainant AJ

The termination letter USDA sent to Complainant AJ states that "The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest." Exhibit 12 (USDA letter).

Although performance was referenced in the letter, there is no indication that USDA did an individual assessment of Complainant's work. In a declaration, Complainant AJ also averred that his supervisor told him she was unaware of his termination and that his program director wanted to retain him. Ex. 11, ¶¶ 11-12. Complainant AJ believes that six probationary employees in his department were terminated with an identical letter and stated that he understood the same was true of every USDA probationary employee in California. *Id.*, ¶¶ 13-16. This evidence, combined with the public statements discussed above about the government's rationale for terminating probationary employees, provide OSC with reasonable grounds to

believe that Complainant AJ had no performance or conduct issues and that his termination constitutes a prohibited personnel practice under section 2302(b)(12) that should be stayed.

It is noteworthy that, as discussed in detail above, the termination letters DOE, HUD, OPM, and VA issued to their own probationary employees follow a similar pattern. In no case do the letters OSC has reviewed demonstrate that Agencies are conducting individualized assessments to ensure they are terminating probationary employees only for performance, conduct, or pre-appointment conditions. Rather, the text of these letters and public statements indicate that Agencies terminated probationary employees to accomplish organizational objectives and not due to the performance or conduct of individual probationers.

## III. A 45-DAY STAY OF COMPLAINANTS' TERMINATIONS IS APPROPRIATE

The Board must grant the Special Counsel's request for a stay unless the Special Counsel's claim is "inherently unreasonable." *Special Counsel v. Dep't of Veterans Affairs*, 45 M.S.P.R. 403, 405 (1990) (citing *Kass*, 2 M.S.P.R. at 91).

Here, OSC has reasonable grounds to believe that the Agencies violated 5 U.S.C. § 2302(b)(12) because 1) for all the named Complainants, the Agencies failed to comply with applicable RIF statutes and regulations; and 2) in terminating Complainants EA and AJ, the relevant Agencies did not comply with 5 C.F.R. 315.804. *See* 5 U.S.C. § 1214(b)(1)(A)(i). A stay of these terminations will allow OSC to investigate further their complaints and minimize the adverse consequences of the apparent prohibited personnel practice. *See Special Counsel v. Dep't of Navy*, 85 M.S.P.R. 92, 25 (2000) ("A stay granted pursuant to 5 U.S.C. § 1214(b) is issued to maintain the *status quo ante…*"); *see also Special Counsel v. Dep't of Veterans Affairs*, 60 M.S.P.R. 40 (1993). Here, the consequences for Complainants are grave, including loss of pay and benefits, loss of their federal careers, and deprivation of their legal rights.

## REQUEST FOR RELIEF

OSC requests that a member of the Board:

1.  Order the Office of Personnel Management to stay, for a period of 45 days, Complainant MC's probationary termination and return Complainant MC to full pay and duty status until the stay expires or is otherwise lifted;

Respectfully submitted,

_Hampton Dellinger_

_____

Hampton Dellinger
Special Counsel

Bruce D. Fong
Associate Special Counsel
U.S. Office of Special Counsel
1730 M Street, N.W., Suite 218
Washington, D.C. 20036-4505

**DECLARATION OF HAMPTON DELLINGER**

I, Hampton Dellinger, hereby state:

1.      I am the Special Counsel for the U.S. Office of Special Counsel and overseeing the prohibited personnel practice complaint OSC File No. MA-25-001448.

2.      I have personal knowledge of the contents of the OSC complaint file.

3.      Based on this knowledge, I believe the facts alleged in the attached Request for Stay of Personnel Action are true and correct.

I declare under penalty of perjury that the above statements are true and correct. Executed this 21st day of February 2025, in Durham, NC.

_____
Hampton Dellinger

## CERTIFICATE OF SERVICE

I, an employee with the U.S. Office of Special Counsel, hereby certify that on February 21, 2025, I caused the Initial Request for Stay of Personnel Action and Attachments to be served to the following in the manner indicated:

<u>By USPS and Electronic Mail</u>

Julie Ferguson Queen
Associate General Counsel
Office of the General Counsel
U.S. Office of Personnel Management
1900 E St., NW
Washington, DC 20415
202-936-0120
julie.fergusonqueen@opm.gov

Hampton Dellinger

**EXHIBIT 1 - Redacted**

<u>**STATEMENT IN SUPPORT OF OSC COMPLAINT**</u>

1. My Name is ██████████

2. My address is ████████████████████████ My email is ████████████████████ My phone is ████████████

3. On **12 February 2025**, I was summarily terminated from my position as a **Program Support Assistant, 0330, GS 8 Step 1,** with **The U.S. Department of Education – Office for Civil Rights (OCR)**.

4. I was employed with the Agency for **45 Days.** I began working at DoED on **29 December 2024**, as a **Veterans Preference/Competitive Service** employee. I am preference eligible veteran.

5. **I served 14 years in the United States Army & 100% a Disabled Veteran. OPM Credited me for 11 years and 3 months of federal service**.

6. **10 Pt Veterans Preference**

7. My job duties at DoED included: **Processing all intake complaint for Civil Right violations from all federally funded educational institutions for an entire region consisting of 4 states. This region has the most volume throughout the continental United States. Managed case load for attorneys and prepare documents for mediation and litigation.**

8. During my tenure, my work included **Assisting with mediating and resolving several district and university discrimination cases involving students with disabilities.**

9. My performance record during my tenure at the Agency was very good. I received positive feedback on my work from supervisors and colleagues, including:

    **-Positive praise from the Regional director, Program Manager and Special Assistant to Director and Secretary (HQ's).**

10. My Agency provided me opportunities for training and development, including **Case Management System, FOIA training, Mediation Training**.

11. [Please provide a narrative of the day you were terminated]. **On February 12, 2025 I logged on for work and proceeded to process civil rights complaints. On that date I also met with my supervisor to review my expectations as new employee. That meeting concluded with positive praise and gratitude for my military service and by stating that I was the perfect fit for the team. My supervisor commended my efforts and willingness to go above and beyond. After that meeting I checked my email and**

1

noticed a received a Termination letter from ███████ No specific reason was given except that I was a probationary employee.

12. **My termination letter was not a shock considering all the talk of probationary employees, however I had been optimistic that I would be able to stay on because of my credited military service and veterans status. My director and all the upper management were not aware of this action to fire me. My director and most upper management have already stated that they would be of reference for me and the need for me to continue to be employed.**

13. My supervisor was **completely shocked and unaware of this action of termination**. I am not aware of whether they were given the opportunity to advocate on my behalf, but they did advise if given the opportunity to do so that they would.

14. After I received the termination letter all of my system access was revoked and I received a letter informing me that I needed to offboard through Pivot.

15. In my office, other probationary employees were also terminated. **I personally know of 1 other person but though the agency there were about 60 employees**. To the best of my knowledge, they were all terminated at the same time, same date and the same manner. **All terminated because they were simply probationary employees**

16. During my probationary period, I believed that if I worked hard and demonstrated performance, my supervisors would evaluate me fairly. **I am certain that amongst my peers I was in the upper quadrant in terms of performance and overall presence.**

17. Being summarily terminated by my Agency has severe immediate consequences. **This has severely impacted my mental health. I supper from PTSD, anxiety and depression. I am disabled veteran who has 4 dependents with one being special needs and nonverbal. I depend on this employment not only for the pay but health insurance. My family will have several hardships moving forward in the short term with lasting long term effects.**

18. **I have been a civil servant for the last 15 years, as I volunteer for military service. I have committed to a lifelong commitment of service to my country in the military and now as a civilian. I made a commitment to uphold the constitution against all…no matter if foreign or domestic.**

19. **I just want this to be fair for all. Politics aside let's take care of Americans. Not through personal option but by the rights constitutionally given to use. As a decorated veteran I recognize this as a hostile takeover!**

I, ███████████ , do hereby declare:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on

2/18/2025
_____
Date

███████
_____
Signature

2

EXHIBIT 2 - Redacted



## UNITED STATES DEPARTMENT OF EDUCATION

February 12, 2025

**MEMORANDUM FOR** ▆▆▆▆▆▆▆▆, **Program Support Specialist, Office for Civil Rights**

FROM:          ▆▆▆▆▆▆▆▆
               Deputy Assistant Secretary Office for Civil Rights

SUBJECT:       Notification of Termination During Probationary/Trial Period

REFERENCES:    5 U.S.C. § 7511
               5 U.S.C. § 3321(a)
               5 C.F.R. §§ 315.803 and 804
               5 C.F.R. § 316.304
               HCP 315.1 (Probationary Period)
               HCP 302.1 (Employment in Excepted Service)

This is to provide notification that I am removing you from your position of Program Support Specialist and federal service consistent with the above references.

On December 29, 2024, the agency appointed you to the position of Program Support Specialist. As documented on your appointment Standard Form 50 (SF-50), your appointment is subject to a probationary/trial period. The agency also informed you of this requirement in the job opportunity announcement for the position.

Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final until the probationary/trial period is over," and the probationary/trial period is part of "the hiring process for employees."[1] "A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service"[2] "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the  civil service for this particular individual."[3]

I regrettably inform you that I am removing you from your position of Program Support Specialist with the agency and the federal civil service effective today, February 12, 2025.

If you believe this action is being taken based on partisan political reasons or marital status, you have a right to file an appeal with the Merit Systems Protection Board (MSPB) under 5 C.F.R. § 315.806. You must file an appeal within thirty (30) days of the effective date of this decision or 30 days after the date of your receipt of this decision, whichever is later. You should review MSPB

---

[1] OPM, *Practical Tips for Supervisors of Probationers*.
[2] *See* U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005)
[3] *Id.*

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

regulations at 5 C.F.R. §§ 1201.14 and 1201.24 for instructions on how to file an electronic appeal and content requirements of the appeal, respectively. For more information, please visit www.mspb.gov or contact your local MSPB regional or field office at: **Washington Regional Office**: 1901 S. Bell Street, Suite 950, Arlington, VA 22202 Telephone: (703) 756-6250; Fax: (703) 756-7112.

I appreciate your service to the Agency and wish you the greatest of success in your future endeavors. If you have any questions, please contact me directly at ███████████

███████████

Deputy Assistant Secretary

**EXHIBIT 3 - Redacted**

<u>**STATEMENT IN SUPPORT OF OSC COMPLAINT**</u>

1. My Name is ███████████

2. My address is 4███████████████████████. My email is ███████████████.
   My phone is ███████████.

3. On February 13, 2025, I was summarily terminated from my position as a Program Communications Specialist, Series 0301, GS-0301-12-13; GS-13 Step 6, with the U.S. Department of Energy (DOE), Office of Energy Efficiency and Renewable Energy (EERE), Solar Energy Technologies Office (SETO).

4. I was employed with the Agency for 1 year and 4 months. I began working at the Energy Department on October 8, 2023, as a Schedule A employee. On October 18, 2024, my SF-50 was updated to state that my initial probationary period was complete, and I was no longer excepted service, but instead competitive service. I had a one year probationary period which I completed and converted to the competitive service. I am told that the head of DOE Human Capital has said that that was an error. I am not a preference eligible veteran. My last within grade increase was a Quality Step Increase on December 1, 2024, which I received because I received a rating of "Significantly Exceeds Expectations" on my performance appraisal.

5. I started working for the U.S. Department of Energy (DOE) as a contractor with ████ ██████████ on November 12, 2016. I continued as a DOE contractor with ██████████ ████████ starting on March 13, 2018. I was continuously employed as a DOE contractor with no break in service from November 12, 2016, until the day I started my federal employment on October 8, 2023.

6. I was hired as a Schedule A employee with a disability. I am proud of my disability and the fact that it does not impede my ability to do my job and do it well. We are all imperfect humans, and my disability provided me with a different lens into working with my teams and supporting them.

7. My job duties at the U.S. Department of Energy included:

   <u>External Communications:</u>
   • Graphic Design: Plan, design and develop, and/or direct and approve visual materials for external communications across diverse mediums, including campaigns, website content, documents, presentations, social media, newsletters, data visualization, video, collateral, and email blasts.
   • Stakeholder engagement: Use appropriate platforms, such as meetings, webinars, and conferences to advance SETO goals through stakeholder engagement in a thoughtful, professional, and effective way. Maintain relationships with internal and external stakeholders for collaboration and outreach improvements.
   • Written external communications: Contribute to the development and review of SETO's newsletter, email blasts, press releases, blog posts, social media, etc.

1

Maintain and update SETO's website on a regular basis, and work with DOE CMS support and other DOE offices to continually improve user experience. Ensure topline messaging is aligned with administration priorities and is reflected throughout SETO's materials.
- Cultivates and leverages strategic relationships and resources to shape advice and guidance for SETO strategy and engagement leadership, especially relationships with EERE Front Office and other DOE communications teams.
- Task management: Executes on SETO strategy and engagement plan and fosters organizational alignment on strategic plans and goals by clearly articulating goals, tasks, and messaging to the team and tracking progress, incorporating feedback, and delivering results.

Event Coordination and Execution:
- Facilitates coordination of SETO Operations and Strategy and Engagement teams on event delivery. Meets with stakeholders to identify requirements and prepare agendas for events.
- Provides expert advice to SETO teams and leadership on effective strategies for events and DOE policies and approval processes. Proactively addresses roadblocks and develops solutions to internal and external challenges.
- Maintains an internal calendar of events and engagements, identifies risks with event schedules and logistics, such as DOE leadership requests, and provides recommendations to SETO leadership.
- Serves in a project management capacity to support the organization and delivery of SETO-wide office events.
- Provides guidance and oversees operations team to enable teams to effectively run their own events in Forrestal.

Internal Communications:
- Prepares, maintains, and oversees high-quality internal communications materials for staff to use to enhance branding and workplace productivity, including a master presentation deck, document templates, and operations resources.
- Oversees the work of contractor staff in managing controlled correspondence, congressional reports, and the solar inbox, as well as related FOIA or unsolicited proposal requests.
- Oversees tasks of the operations contractors related to effectively managing office space needs, including mail distribution, furniture and equipment requests, conference room and event logistics, visitor management, and supply store management.
- Serves as a delegated Federal back-up to the Operations Supervisor and/or Strategy and Engagement Manager as assigned.

8. During my tenure, I received the following rewards in recognition of my performance:

- Individual Cash Award for performance on 07/31/2024
- Quality step increase based on performance on 12/01/2024

9. My performance record during my tenure at the Agency significantly exceeded expectations. I received positive feedback on my work from supervisors and colleagues, including:

- My latest Annual Performance Plan and Appraisal Plan Review included these statements:

    █████ *consistently develops high-quality products. She also plays an important role in enabling her teammates to work at a high level by providing mentoring, prioritization, and work/life balance guidance.*

    █████ *significantly exceeded expectations in the level and quantity of impactful events that she managed throughout the year. She managed logistics for the SETO Peer Review with about 400 posters and nearly 700 attendees. She effectively planned the logistics for more than 20 RE+ workshops, panels, and side events, including S3 and DOE-wide coordination that resulted in a highly effective representation of SETO interests.*

    █████ *was highly effective in leading important office internal communications activities throughout the year, including the officewide branding standards and trainings, new employee orientations, and leading the development and implementation of a peer-to-peer mentoring program for which more than 50 people or half the office have benefited.*

    █████*expanded her skillsets and the office's capabilities in tracking and managing 9 support service contracts, the fellowship program, and challenges with the management of a constrained travel management budget and the logistics of more than 250 federal trips. Each of these contributions allowed to the office to seamlessly execute the mission."*

- I received a Cash Award for my performance on 07/31/2024 with this description:

    █████ *played a leadership role organizing and executing the 2024 SETO Peer Review. She was tasked with overseeing speeches, slides, and communication materials for the event. Not only did she deliver high-quality, fresh, and visually appealing materials, she also actively encouraged a positive and inclusive culture that fostered teamwork and led to the event's success.*

    *From* █████████ "

- I received accolades from former Secretary of Energy, ████████████, personally, for work I contributed to:

    *"I wanted to send along a big thank you for all the hard work that went into the creation, promotion, and briefing you provided me on the Solar Futures Study.*

*This report showcases DOE at it's very best – the in-depth technical research from NREL, the knowledge and expertise of the SETO team, ==**the polished and informative graphics from the Design team**==, and the strategic and effective media roll out from the Communications and Public Affairs team. It is incredible what this agency can accomplish when every single team is operating, in concert, at such a high level.*

*I am so deeply grateful to work alongside you all as we pursue solutions to tackle the climate crisis. I was overjoyed to learn that the New York Times article on the Solar Futures Study was one of its top news stories last week. This shows, that even as we face immense and frequent climate challenges, people are energized and hopeful. ==**Every day, I am so proud I get to work with you all on capturing the imagination of the public and proving what is possible**==.*

*We are going to need courage, determination, and ambition to meet the urgency of the climate crisis, but with this team behind me, I feel confident we can do it.*

*Thank you for a perfect ending to an incredible Summer of Solar!*

*With gratitude,*

███"

- I received recognition from the former EERE Deputy Assistant Secretary, ███████ ████████████:

  *"**Heroes of the Week:**  This week, I want to recognize four individuals who were instrumental to preparing and hosting an incredibly successful March 25 SETO Quarterly Webinar:* ████████████  ████████████  ████████████ ████████████  *This team pulled together an exceptional and informative webinar that included remarks from our own Secretary* ████████ *and White House National Climate Advisor* ████████████, *as well as virtual tours of solar technology labs, and a Q&A session with* ████████████ *and me. The webinar was so well attended that this team had to scramble to work with our Information Technologies Services Office (ITSO) to make sure the Zoom meeting wouldn't reach a capacity limit. Together, they pulled off a great webinar attended by more than 1,200 participants!"*

- I received office-wide recognition as the "Solar Star of the Month":

  *Congratulations to* ████████████ *for being SETO's Star of the Month for March. To know* ████ *is to know she's a hidden jewel here in the office. It was noted by her nominator that* ████ *is a key contributor in helping to keep the office afloat, because she quietly and diligently toils away completing all her tasks and helping others as well. Her hard work and dedication became abundantly clear to everyone during the week of SETO's S1 announcement. Aside from the fact that she juggles two full-time jobs—as our web manager and graphic designer (full-time job*

*No. 3 as a parent of four kids and a puppy)—she spent a cumulative four to six hours on the phone to figure out how and if the S1 livestream could happen as planned after being told it could not. SETO was later informed the day of the announcement that we were good to go live.*

 *diligence led to the success of the 18 webpages posted in time for the S1 announcement. Each of the webpages had to be built and updated, and all needed to include active links. The Drupal 8 migration would've been a lot to handle for anyone under normal circumstances and threw a huge wrench into the announcement preparations. On top of that, it was █████who discovered that SETO's Google analytics and website navigation were completely broken and then alerted DOE. Again, █████ impressive detail-oriented skills saved the day.*

*In the midst of all the chaos, she completed the graphics for the all announcements, including the Perovskite Startup Prize, the HBCU flyer, and the two goals webpages. Ultimately, she constantly ensures that people can access the information we all work so hard to provide, never forgetting key details like getting transcripts for webinars and publication numbers for reports.*

*SETO applauds █████for her impressive detail-oriented skills, hard work, and being the backbone of our office. In the words of her nominator, "Thank you, █████, for being an unsung hero to so many of us!"*

- I received kudos from a former acting Communications Director for EERE regarding a comprehensive digital analytics report I had pulled together:

  *:*

  *This is great! Thank you for taking the time to compile it and to whittle down the most important points. I think you set a standard in SETO for everyone to follow.*

  *Well done!*
  *"*

- A former technology manager sent this thank you note about our thorough work and how it would shape the quality of future work and research SETO funds:

  *"Hello █████*

  *I want to thank you, █████████████████ for all the work you all put on this. Preparing the content for the website, coming up with creative ideas to make sure we can promote these programs, navigating the approval process, creating graphics and success stories…*

  *Your support has always been timely and effective, and I am sure this will translate into a dramatic improvement of the quality of the applications we will receive.*

*Thanks!*

"

10. My Agency provided me opportunities for training and development, including a "Delegating Effectively Workshop" developmental training on November 14, 2024; "GovDelivery Essentials: Online Training" on September 23, 2024; "Setting Performance Expectations and Accountability" developmental course on July 16, 2024; and a 3-day external course form Management Concepts called "Fundamentals of Contracting" on June 12-14, 2024. I had additional trainings lined up for 2025.

11. On Thursday, February 13, 2025, my immediate supervisor called me on Teams around 12:45 p.m., clearly distraught. She had just been informed that the terminations were happening that day and that my name was on the list. That afternoon we had an open "Office Hours" where would were given space to ask questions about any events unfolding. Our director, in an effort of ongoing transparency and support, let staff know that the terminations were happening, and that the affected staff's electronic access would be shut off at midnight. I was able to download and forward to myself all of my personnel files (that I could think to download). Neither I nor the others terminated like me received anything in writing until the termination letters hit our email inboxes. I have nothing but the utmost respect for how the Solar Energy Technologies Office leadership has handled this impossible situation with empathy and care. I cannot say the same for Department-wide.

12. On Thursday afternoon/evening, I had been watching my DOE email inbox, knowing it was imminent. As others in my office started sharing that they received their letters, I knew I would likely receive mine last as it appeared they were going alphabetically. I was emailed the termination letter on Thursday, February 13, 2025, 8:46:07 PM. I was surprised to read this statement in my termination: *"Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the civil service for this particular individual." Per OPM instructions, DOE finds that your further employment would not be in the public interest. For this reason, you are being removed from your position with DOE and the federal civil service effective today."* They did not state what could possibly be the reason why my further employment would not be in the public interest, and that statement felt like a knife in the back. To imply that the work I had been so profoundly proud of, and my dedicated service to the American public was all in vain and not in the public interest is cruelty at its finest. The termination letter appeared to be a form letter where they simply plugged in my name, position, and alleged end of my probationary period. The letter says nothing regarding any conduct or performance issues that would justify terminating me. The letter does not explain why retaining me would not be in the public interest. My terminated colleagues received similar letters.

13. My supervisor had told me earlier in the week that they had asked to keep me on by providing in writing a supportive statement of my performance and service. My director was actively trying to correct what we thought was a mistake regarding my probationary

2E3B54AE-5B2E-4C1A-8241-A4FE8ED622F9

status. Multiple people, including my managers, were involved in trying to protect my employment.

14. After I received the termination letter from ██████, the political appointee in the Office of Energy Efficiency and Renewable Energy (EERE), I replied to him stating that I believed I received the termination letter in error and attached my SF-50. They have apparently since walked that back and said the SF-50 stating I was no longer probationary was an error (a FOIA would show this, I'm certain) and I was indeed still probationary. I did not receive the courtesy of a response, even though I provided my personal email and phone number.

15. In my office, the Solar Energy Technologies Office, 6 other probationary employes were also terminated the same way the Agency terminated me. In my greater office, the Office of Energy Efficiency and Renewable Energy, about 60 other probationary employees were also terminated the same way the Agency terminated me. To the best of my knowledge, they were all terminated at the same time and the same manner.

16. I am aware of numerous other probationary employes terminated at my agency, also on the same date.

17. During my probationary period, I believed that if I worked hard and demonstrated good performance, my supervisors would evaluate me fairly and I would continue to be given opportunities to expand my knowledge and skillset and further grow in the area of leadership, as a seasoned employee. I believed that I had a life-long career ahead of me, serving the American people, due to my performance and abilities.

18. Being summarily terminated by my Agency has severe immediate consequences for me and my family. I support a family of six in an incredibly high-cost-of-living area. I am receiving zero severance, which is inhumane. I am not even receiving travel comp time hours in payout—hours spent traveling to do my job and away from my family; and others are not receiving their Time Off awards in payout either, which they earned from good performance. My family relies on our medical insurance, and with different disabilities and ongoing health issues—switching to private insurance is going to be extremely expensive and with less coverage, all while reeling from no paycheck or severance.

19. Being a civil servant means the world to me. I am a mother of four children, whose future deserves to be bright. I am a daughter and sister, with a very large family—all of whom, likely unknowingly, reap the many benefits and services the Federal government provides. I am the wife of someone who was recently diagnosed with Early-onset Parkinson's Disease, for which there is no cure and relies on federally-funded research to make advances in. I believe in what the Federal government stands for, and what it means to be dedicated to service. I know in my heart and soul that our work is important and crucial to people now and in future generations. I think that until you are actually working in the government you cannot realize the true scope and reach of everything it does and all the lives it betters. I have sacrificed hours upon hours of a very long commute over the years,

just to continue doing this work. I have dedicated a decade of my life to serving the American public and will continue to stand up for what is right and what they deserve.

20. Probationary federal employees have served the public but are not being honored or protected. The probationary period was not designed to allow probationary employees like me to be fired at will and without cause regardless of my contributions. There is absolutely no reason for my termination. My office's work is congressionally-mandated, and my work is critical to its success. I was fired illegally by the very institution that should protect me the most.

21. I just want my job back. And I want protection that I will not be terminated again in retaliation for my advocacy of myself and the civil service in light of the Federal Government's illegal terminations.

I, ███████████████████, do hereby declare:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on
2/18/2025
_____
Date

███████████████ _____
Signature



# Department of Energy
### Washington, DC 20585

February 13, 2025

MEMORANDUM:

TO:                    ███████████████
                       PROGRAM COMMUNICATIONS SPECIALIST

FROM:                  ███████████████
                       Principal Deputy Assistant Secretary
                       Energy Efficiency and Renewable Energy

SUBJECT:               Notification of Termination During
                       Probationary/Trial Period

REFERENCES:            5 U.S.C. § 7511
                       5 U.S.C. § 3321(a)
                       5 C.F.R. § 316.304, if applicable

This is to provide you with notice that the Department of Energy (DOE) is removing you from your position of PROGRAM COMMUNICATIONS SPECIALIST and federal service consistent with the above references.

Your appointment to this position was subject to the satisfactory completion of an initial probationary/trial period ending on 10/6/2025.

Guidance from the Office of Personnel Management (OPM) states, "An appointment is not final until the probationary period is over," and the probationary period is part of "the hiring process for employees."[1] "A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service."[2] "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the civil service for this particular individual."[3]

Per OPM instructions, DOE finds that your further employment would not be in the public interest. For this reason, you are being removed from your position with DOE and the federal civil service effective today.

Terminations during probationary/trial period are not covered under applicable grievance procedures. Your status as an employee serving a probationary period

---

[1] OPM, Practical Tips for Supervisors of Probationers.
[2] See U.S. Merit Systems Protection Board Report to the President and Congress, The Probationary Period: A Critical Assessment Opportunity (August 2005)
[3] Id.

Printed with soy ink on recycled paper

provides you with limited appeal rights to the Merit Systems Protection Board (MSPB). According to 5 CFR § 315.806, you may appeal this termination to MSPB only if you feel this action was based on discrimination of partisan political activity or marital status. An appeal must be filed within 30 calendar days of the effective date of this action. The MSPB regulations are available on its website, www.mspb.gov. Appeals may be filed by mail, by facsimile, by commercial overnight delivery, by personal delivery, or by the Board's electronic filing procedure, e-Appeal Online (https://e-appeal.mspb.gov). We have also included a copy of the MSPB Form 185 for your convenience. If you decide to file an appeal with MSPB, you should notify the MSPB that the Agency point of contact for your MSPB appeal is:

> Jenny Knopinski
> Deputy Assistant General Counsel for
>   Personnel Law and Administrative Litigation
> Office of the General Counsel, GC-21
> U.S. Department of Energy
> 240-678-7837
> jenny.knopinski@hq.doe.gov

You have the right to contact an Equal Employment Opportunity counselor and to file a complaint through the discrimination complaint process within 45 days of your receipt of this letter if you believe this action is being taken because of your race, color, religion, sex, national origin, disability, age, genetics, or in retaliation for your previous participation in the EEO process.  You can initiate or amend a complaint by email civilrights@hq.doe.gov, or by phone at (202) 586-2218. Information regarding the EEOC complaint process can be found at www.eeoc.gov.

If you believe this action was taken because of a prohibited personnel practice, you have the right to seek corrective action with the Office of Special Counsel (OSC). Information regarding the OSC complaint process can be found at www.osc.gov.

Please note your filing with any of these entities, including MSPB, may impact your right to file with the other entities.

You may contact the Employee Benefits Division at: OHROCBenefits@hc.doe.gov for benefits guidance.

DOE's Employee Assistance Program (EAP) and its services are available to you and your immediate family at no cost and are confidential. Should you or a family member need individual counseling you may contact, at your discretion, the Federal Occupational Health (FOH) at 1-800-222-0364 (888-262-7848, hearing-impaired) for support.

We appreciate your service to DOE and wish you success in your future endeavors. If you have any questions, please contact OPLER@hq.doe.gov.

**EXHIBIT 5 - Redacted**

## STATEMENT IN SUPPORT OF OSC COMPLAINT

1.  My Name is ██████████.

2.  My address is ██████████████████████████████    My email is ██████████████████████. My phone is ████████████.

3.  On February 14th, 2025, I was summarily terminated from my position as a Trial Attorney, Excepted Appointment, and Grade-0905-14 Step 02, with  U.S. Department of Housing and Urban Development, Office of General Counsel- Fair Housing.

4.  I was employed with the Agency for 1 year and 6 months.  I began working at  the Agency on August 14, 2023 , as an excepted service employee.  I am not a preference eligible veteran.  My last promotion/within grade increase was on January 12, 2025.

5.  Prior to working for the Agency I was employed at The Legal Aid Society and The National Education Association.  This was my first federal position.

6.  My job duties at HUD included leading investigations, litigation, and settlement negotiation in collaboration with a team of attorneys, investigators, and economists.

7.  My duties also included assisting with the drafting of regulations, policy guidance documents, and legal memoranda regarding a broad variety of fair housing and fair lending cases.

8.  During my tenure, my work included :

    - Assessing claims of housing discrimination under the Violence Against Women Act;
    - Assessing reasonable accommodations and modifications under federal nondiscrimination laws;
    - Assessing housing discrimination claims under the Fair Housing Act;
    - Provided guidance on fair housing and civil rights issues.

9.  My performance record during my tenure at the Agency was very good.  I received positive feedback on my work from supervisors and colleagues, including:

    - A 4 Rating on my Annual Performance Review (for period 2023-2024), issued to me on November 4, 2024;
    - A monetary bonus award in connection with my 2023-2024 review;
    - A time off bonus award.

10. My Agency provided me with opportunities for training and development, including annual continuing legal education credits.

11. On February 14, 2025 at 9:05 A.M. I received a Microsoft Teams phone call from my supervisor informing me that I would receive a termination email later that day. He informed me that this was not a reflection of my performance but he was notified that morning that some probationary employees were being terminated as a part of the administration's efforts to "reduce the workforce". At 3:08 P.M. I received an email stating that I was being terminated during my probationary period, effectively immediately with an attached memo to be used as guidance. I have not received an official SF-50 Form.

12. When I was notified that I would be terminated I was immediately panicked as my performance reviews had been great and I recently returned from maternity leave. I was not planning on leaving my Agency and was suddenly without a job needing to care for a 7 month old child without warning or cause.

13. I received my termination notice by email on February 14, 2025. The letter is formatted in memo form and doesn't include my name. It appears as a mass email. It states the reason for my termination as an effort "to promote the efficiency of the federal service in accordance with the priorities of the Administration."

14. The termination letter issued to me appears to be a generic form letter that was not tailored to me in any way. The letter does not include my name, my position, the start of my employment, or any particulars regarding my performance or duties.

15. When I spoke to my supervisor, he was surprised by my termination. He informed me that my office did not recommend me to be terminated.

16. In my office, other probationary employees were also terminated. To the best of my knowledge, they were all terminated at the same time and the same manner. They were not terminated with regards to their performance or any particular individual circumstances beyond their potential probationary status.

17. I have also heard that numerous other probationary employees were recently terminated at HUD. I am aware that at least 2 other attorneys in the Office of General Counsel were terminated late in the evening on February 13, 2025. I understand that numerous others were terminated in a similar fashion. Again, to my knowledge, they were not terminated with regards to their performance or any particular individual circumstances beyond their potential probationary status.

18. During my probationary period, I believed that if I worked hard and demonstrated strong performance, my supervisors would evaluate me fairly and I would be evaluated on my work performance resulting in a long civil rights career at HUD.

19. Being summarily terminated by my Agency has severe immediate consequences. I live in the D.C. area purely to work for HUD. I have a 7 month old child who I provide for monetarily and who I have listed on my health insurance. Working on discrimination matters at the federal level has been the goal of my entire career .

20. I entered law school for the purpose of serving others and being a civil servant in the federal government allows me to contribute to the public good on a national level. I believe in standing for the people and fighting for what is right.

21. To the best of my knowledge and belief, at the time of my termination, I was not facing any allegations of misconduct or poor performance. I have no reason to believe that the Agency was considering taking any disciplinary or adverse actions against me, or otherwise investigating me for any such allegations of misconduct.

I, ███████████_____, do hereby declare:
I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and
correct.

Executed on
2/20/2025
_____
Date

██████████████

_____
Signature

3

**EXHIBIT 6 - Redacted**



### U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

*Via e-mail*

February 14, 2025

FROM:           █████████████, performing the Delegable Duties of the Deputy Secretary, as Delegated by the Secretary of the Department of Housing and Urban Development

SUBJECT:            Notice of Termination During Trial Period (Excepted Service)

The purpose of this notice is to notify you of the decision to terminate your employment with the U.S. Department of Housing and Urban Development (HUD), during your trial period, in order to promote the efficiency of the federal service in accordance with the priorities of the Administration.

The purpose of the trial period is to provide the federal government with an opportunity to evaluate a new federal employee's conduct and performance on the job in order to determine if an appointment should become final and if continued employment as a federal employee is warranted.

After careful consideration, the Agency is terminating your employment as of the date of the transmission of this email, during your trial period as part of a workforce restructuring of the Agency. You should work with your supervisor to initiate the separation process and return your HUD equipment before your termination date.  Failure to return government property may result in a deduction of your paycheck. Any personal items left behind in your work area will be mailed to your current address of record. Please let your supervisor know if you have changed your mailing address.

If you had opted into the Deferred Resignation Program by messaging OPM prior to its closing at 7:20pm ET on February 12, 2025, you will receive an Agreement to sign and will be allowed to resign or retire in accordance with the terms of the program. If you believe you opted into the program and are receiving this notice in error, please contact DeferredResignationQuestions@HUD.Gov for verification. Please annotate Probationary Verification in the subject line.

You are advised that you do not have a right to reply to this personnel action or to grieve your termination under either the administrative or negotiated grievance procedure. However, if you believe you received this notice in error because you are not currently in a trial period, please send an e-mail to: ProbationaryNotice@hud.gov with the subject "Verification of Probationary Status."

If you believe that the Department discriminated against you on the basis of your race, color, religion, sex, national origin, age, disability, genetic information, and/or reprisal, you may file a complaint of discrimination. In order to pursue this matter through the discrimination complaints process, you must

contact a HUD EEO Counselor within 45 days of the effective date of this adverse action. A HUD EEO Counselor may be contacted through the HUD Office of Departmental Equal Employment Opportunity (ODEEO) by telephone at (202) 708-3362 or by writing to:

> Department of Housing and Urban Development
> Director of EEO
> 451 7th Street, S.W., Room 2102
> Washington, D.C. 20410

Should you elect to file a complaint of discrimination, your complaint will be processed in accordance with 29 CFR § 1614.

If you believe this termination is being taken against you in reprisal for acts covered under the Whistleblower Protection Enhancement Act, you may seek corrective action by filing a complaint with the Office of Special Counsel (OSC) (see www.osc.gov). If you choose to file a complaint with OSC, and if OSC does not take corrective action, you may then file an Individual Right of Action (IRA) appeal with the MSPB. In an IRA appeal, the only issues before the MSPB are those listed in 5 U.S.C. § 1221(e), i.e., whether the appellant has demonstrated that a protected disclosure or protected activity was a contributing factor in one or more covered personnel actions and, if so, whether the agency has demonstrated by clear and convincing evidence that it would have taken the same personnel action(s) in the absence of the protected disclosure(s). Other than raising an affirmative defense of reprisal for whistleblowing activities, other affirmative defenses, such as claims of discrimination or harmful procedural error, may not be raised. In an IRA appeal that concerns an adverse action under 5 U.S.C. § 7512, the agency need not prove its charges, nexus, or the reasonableness of the penalty.

Your election of one of these avenues of review will be considered final on the date any appeal or complaint is filed.

## EXHIBIT 7

### STATEMENT IN SUPPORT OF OSC COMPLAINT

1. My Name is ▮▮▮▮▮▮▮▮▮▮

2. My address is ▮▮▮ ▮▮▮ ▮▮▮▮ ▮▮▮▮ ▮▮▮▮▮▮ ▮▮ ▮▮▮▮ My email is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. My phone is ▮▮▮▮▮▮▮▮.

3. On February 13th, 2025, I was summarily terminated from my position as a Benefits Analyst, GS 11 Step 4 with The Office of Personnel Management (OPM), Healthcare and Insurance.

1. I was employed with the Agency for ten months. I began working at OPM on April 22nd, 2024, as an excepted service Presidential Management Fellow. I am not a preference-eligible veteran.

4. I previously spent six years as an employee of the Legislative Branch, as well as four federal government internships and a previous unpaid federal government fellowship. I've spent almost ten years in federal service. This included an internship in the White House.

5. I am a Presidential Management Fellow.

6. My job duties at OPM included: reforming the Postal Service Health Benefits (PSHB) program to save taxpayer money, ensuring the Federal Employees Health Benefits Program and the PSHB followed all federal laws and executive orders to provide comprehensive health benefits at an affordable price for all civilian federal employees. My job makes it so that the rest of the civilian federal government can do their jobs, and so that the federal government can compete with the private sector for the excellent civil servants who ensure our government operates in the best interest of the American people.

7. During my tenure, my work included establishing the Postal Service Health Benefits Program, a new bipartisan program designed to integrate postal benefits with Medicare and save taxpayer money. I worked to ensure that the system would work for the millions of postal employees and retirees to enroll in the new health insurance program. OPM was required by Congress to establish and administer the PSHB program and OPM specifically sought and was granted funding from Congress for FTEs to do this work, including my position.[1]

---

[1] *See* FY2024 OPM Budget Justification for PSHB, at https://www.opm.gov/about-us/reports-publications/agency-plans/fy-2024-congressional-budget-justification/postal-service-health-benefits-program/; FY2025 OPM Budget Justification for PSHB, at https://www.opm.gov/about-us/fy-2025-congressional-budget-justification-and-annual-performance-plan/pshb-program/#:~:text=L.,Benefits%20(FEHB)%20Program%20coverage.

2.  My performance record during my tenure at the Agency was very good. I received positive feedback on my work from supervisors and colleagues, including excellent performance reviews where I either met or exceeded expectations in every category.

8.  My Agency provided me opportunities for training and development, including a change management certification, a course in regulatory drafting, and two one-week leadership trainings with 3-hour monthly follow-up trainings.

3.  Presidential Management Fellows are required to complete 180 hours of training during our two-year fellowship because we are advanced-degree holders who are recruited to be future government leaders. In my ten months of service at OPM, I already completed over 140 hours of training. Agencies pay $8,000 to OPM for recruiting a single PMF, and OPM invested an additional $8,000 in additional training opportunities for me.

9.  On Thursday, February 13th, 2025 at 1:00 pm, I received an invitation to a Microsoft Teams meeting invitation for a mandatory HR meeting at 1:30. At 2:00 seventy OPM employees joined the call. A fellow public servant said that she had asked for her union representative to be present and encouraged all of us to reach out to our union representatives, and encouraged us to turn on our cameras so that if we were being terminated, we would at least be given the dignity of being terminated to our faces. Another colleague said she had been informed we were not being permitted to have union representatives present. At that point our cameras, microphones, and chat functions were turned off. As of 2:26 nobody in leadership had joined our meeting, and we were sent a invitation for a 2:30 meeting.

10. The second meeting, at 2:30 p.m., was a unidirectional webinar in which acting Director Chuck Ezell came on screen and read us a 4 minute pre-written statement telling us that we were terminated effective 3:00pm, would lose access to our computers, and if we were on premises, we would be required to leave the building.

4.  At 2:37 pm I received my notice of termination via email. It stated, "The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest." This statement is not true.

5.  I contacted my team and said I was told I was being terminated for poor performance. My boss adamantly informed me that I was <u>NOT</u> being terminated for poor performance. My performance reviews were excellent and both my supervisor and her supervisor confirmed to me that this statement was not true. Both my supervisor, her supervisor, and her supervisor had repeatedly requested that I be kept on as a federal employee in the previous three weeks.

6.  I had a 3:00 meeting in which I am on a team working to save taxpayer money by ensuring we can reclaim erroneous payments made to health insurance companies. Since I had not had my computer turned off, I attended the meeting and told my colleagues I had been

terminated. Several immediately began crying and the meeting had to be canceled.  My computer access was revoked at 3:15 pm.

11. My supervisor was shocked to find out I had been terminated. Both my supervisor, her supervisor, and her supervisor had repeatedly requested that I be kept on as a federal employee in the previous three weeks.

12. After I received the termination letter several of my colleagues reached out to me to tell me that the claim of inadequate performance was inaccurate.

13. In my agency, I believe seventy other probationary employees were also terminated. To the best of my knowledge, they were all terminated at the same time and the same manner, since we were all read the same pre-written statement in the same webinar.

14. I am aware of numerous other probationary employes terminated at my agency, also on the same date. The invitees to my termination meeting, which do include HR staff in addition to probationary employees, were:  OPM    Human    Resources





7. During my probationary period, I believed that if I worked hard and demonstrated performance, my supervisors would evaluate me fairly. I had bi-weekly feedback meetings with my supervisor and regular evaluations, all of which were excellent, which was accurate.

15. Being summarily terminated by my Agency has severe immediate consequences. I am a remote worker and moved into a more expensive apartment so I could have a home office to dedicate to my professional performance. I will now be unable to pay my rent. I am in the middle of medical treatment and will be losing my health insurance. This was my dream job - I applied to be a Presidential Management Fellow in 2012, 2022, and 2023 before I was accepted into this extremely competitive program. I earned a second graduate degree

to extend my eligibility to apply to be a PMF. I am nearly seven years into my ten years of payments for Public Service Loan Forgiveness, and have $300,000 in student loan debt that I will now have to repay. It was going to be forgiven in the summer of 2028, at which time I was looking forward to being financially stable enough to buy property and grow my family. I was planning to use my Thrift Savings Account to afford a down payment, and was aspiring to retire in the federal service.

16. I am a proud American and it was the honor of a lifetime to serve my country. I've dedicated my career to public service, and it was an honor to be in a position in which I was able to serve my fellow public servants. We are dedicated professionals who work every day to serve the American people. My parents both started small business and my mom was a government contractor. I was the recipient of federal aid, first as a reduced-price lunch kid, and later as a pell grant recipient. I appreciated the opportunity to give back to a country that has given me so much, and was hoping to do so for the rest of my professional life.

17. I liked my job and was good at it. My work was important. I hope that I will be reinstated and be allowed to go back to serving the American people.

18. Thank you.

I, _____, do hereby declare:

**I** declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on
2/18/2025
_____

Date

_____

Signature



**UNITED STATES OFFICE OF PERSONNEL MANAGEMENT**
Washington, DC 20415

MEMORANDUM FOR:     ████████████████

Benefits Analyst (Policy)
Healthcare & Insurance

FROM:                              CHARLES EZELL
Acting Director
Office of Personnel Management

DATE:                              February 13, 2025

SUBJECT:                         Termination During Trial Period - Excepted Service Appointment

REFERENCES:                   5 U.S.C. § 7511

On April 22, 2024, you were hired on an Excepted Service appointment as a Benefits Analyst (Policy), GS-0301-11, in the Healthcare & Insurance, at the U.S. Office of Personnel Management (OPM) with a trial period, beginning April 22, 2024.

An appointment is not final until the trial period is over, and the trial period is part of the hiring process for employees.[25] During the trial period, an individual is still an applicant for a finalized appointment to a particular position as well as to the Federal service.[26] Until the trial period has been completed, an individual in the trial period has the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the civil service for this particular individual.[27]

The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest. For this reason, the Agency informs you that effective at the **close of business today (February 13, 2025)**, you are being terminated from your position with the Agency and the federal civil service during your trial period.

If you believe this termination is being taken in whole or in part because of discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, and/or reprisal for prior EEO activity, you may file a discrimination complaint with the OPM Center for Equal Employment Opportunity by contacting an EEO Counselor within forty-five (45) days of the

---

[25] OPM, *Practical Tips for Supervisors of Probationers*.
[26] *See* U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005).
[27] *Id.*

effective date of your termination. This office can be reached at (202) 606-0359 or via email at EEO@opm.gov.

If you believe this action is in retaliation for your making protected whistleblowing disclosures, you may also seek corrective action from the U.S. Office of Special Counsel (OSC). If you do so, your appeal may be limited to whether the Agency took one or more covered personnel actions against you in retaliation for making protected whistleblowing disclosures, and you will not be able to challenge the decision on other bases in that action. To seek corrective action from the OSC, you may submit your complaint online. More information on or about filing a complaint with the OSC may be found at https://osc.gov/Pages/File-Complaint.aspx.  As an alternative, you may communicate in writing to the following address:

Complaints Examining Unit
U.S. Office of Special Counsel
1730 M Street, N.W., Suite 218
Washington, DC 20036-4505

Please note that you must return your Personal Identity Verification (PIV) badge and any other government issued equipment in your possession. Your organization will reach out with further information regarding your offboarding.

We appreciate your service to the Agency and wish you the greatest of success in your future endeavors.  If you have any questions, please contact OPMHumanResources@opm.gov.

EXHIBIT 9 - Redacted

## STATEMENT IN SUPPORT OF OSC COMPLAINT

1. My Name is ██████████

2. My address is ████████████████████████████████████.  My email is ████████████████████████████.  My phone is ████████████████.

3. On 2/13/25, I was summarily terminated from my position as a Training Specialist, 1712, GS 11 Step 5, with Department of Veterans Affairs, Veterans Affairs Acquisition Academy.

4. I was employed with the Agency for four months.  I began working at Agency on 9/23/24, as an excepted service employee. I am a preference eligible veteran.

5. I applied for the position through the competitive examining process, and it was advertised as a competitive service position.  https://www.usajobs.gov/job/793064100/print.  When the Agency made the formal job offer, they did not inform me that I was being hired under special authority.  However, when I was fired, I was told I was excepted service, which was confusing.  After I was fired, I reviewed my appointment  SF-50, and saw for the first time that it states that my appointment was a "Veterans Recruitment Appointment (VRA)", which placed me into the excepted service, and includes the statement: "This appointment is intended to continue for 2 years.  Upon satisfactory completion of 2-year trial period, you will be noncompetitively converted to career-conditional or career appointment.  If performance is not satisfactory, or you fail to satisfactorily  complete program, employment will be terminated."  I believe that my appointment should have been a straightforward competitive service appointment, as I did not apply under any special authority, and that my SF-50 is in error.  I am in the process of contacting my HR department to see about correcting this error.

6. I was an Active Duty Sailor in the U.S. Navy from June 24, 2014 to April 5, 2022 and a Air Force contractor at Parsons from January 17, 2022 to September 13, 2022.

7. My job duties at the Department of Veterans Affairs: As a Training Specialist at the Department of Veterans Affairs, I was responsible for developing, delivering, and evaluating comprehensive training programs for the Warrior to Workforce (W2W) and Acquisition Internship Program (AIP) at the VAAA. These programs were designed to enhance the professional development of veterans and individuals transitioning into the workforce. I designed tailored instructional materials and curricula that aligned with the agency's mission to serve veterans, leveraging tools such as Microsoft Power BI to analyze data and provide actionable insights for decision-making and process improvement. My role involved collaborating with cross-functional teams to identify training needs, conducting workshops, and ensuring content was both engaging and effective. Additionally, I utilized my experience in instructional design and data visualization to create impactful learning experiences, driving continuous improvement across the organization. By prioritizing clear communication and employee development, I contributed to a culture of excellence and accountability, ensuring that participants were fully equipped to succeed in their professional careers.

1

8.  During my tenure, my work included [list significant projects/accomplishments].

    - Updated instructional materials based on updated policies, ensuring accurate and up-to-date information was presented to students.
    - Collaborated with cross-functional teams to identify training needs and ensure effective program design.
    - Contributed to continuous improvement initiatives by gathering feedback and making adjustments to training programs.
    - Supported veterans and participants in successfully transitioning into the workforce or advancing their careers.

9.  My performance record during my tenure at the Agency was excellent.  I received positive feedback on my work from supervisors and colleagues, including:

    - Created a highly praised document that ensured updated information was clearly presented, based on an application, and received exceptional feedback from my team for its clarity and usability.
    - Consistently recognized by my supervisor as an excellent employee, with repeated commendations for my outstanding performance and dedication.
    - Frequently sought after by my supervisor for suggestions on improving the curriculum, where I successfully presented innovative ideas that contributed to enhancing the quality and effectiveness of the training programs.
    - Received numerous compliments from both colleagues and management for my proactive approach to updating and streamlining training materials, ensuring they were always aligned with the latest policies.
    - Earned a reputation as a reliable and trusted team member, consistently praised for my contributions to creating a positive, efficient, and high-performing work environment.

10. My Agency invested significant time and resources into my professional development by providing me with valuable opportunities for growth. I was selected to attend the CLIMB program at the VAAA, which enhanced my leadership and technical skills. Additionally, the agency was going to fund my Harvard Business Certification in Leadership, further expanding my expertise in management. To support my ongoing growth, I was also scheduled to attended a professional conference in Washington, D.C., where I would have gained insights into industry trends and best practices. These opportunities demonstrated the agency's commitment to my development and empowered me to contribute more effectively to the organization's mission.

11. To the best of my knowledge and belief, at the time of my termination, I was not facing any allegations of misconduct or poor performance. I have no reason to believe that the Agency was considering taking any disciplinary or adverse actions against me, or otherwise investigating me for any such allegations of misconduct.

12. On the day of my termination, I was at home reading through my news feed when I came across an article reporting that 1,000 VA employees had been terminated. Curiously, I opened my work laptop and checked my email to confirm whether I was affected. To my dismay, I discovered that I had been terminated as well. The termination notice stated:

- "The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest."

I immediately reached out to my supervisor, who had no prior knowledge of my termination. She contacted the Vice Chancellor, who also had not been informed. She advised me not to log in on Friday, 2/14/2025, and assured me that she would provide updates by Tuesday. However, by 10:00 AM on Friday, my access to all VA systems had been revoked, and I was no longer able to log in or access any of the Agency's resources.

13. After receiving the termination letter, I sat there in disbelief, staring at the screen. I looked at my wife, tears streaming down my face, and told her that I had lost my job. I could hardly find the words to explain it. The letter claimed it was due to my performance, but I was completely blindsided—I had no idea what I had done wrong. I told her, with a heavy heart, that I didn't know what we were going to do. We had just spent over $20,000 moving from Colorado to Maryland for this job, leaving behind everything to start a new chapter. Now, we had a mortgage, bills piling up, and no income to cover them. The weight of uncertainty crushed me—how would we make ends meet? How would we move forward when everything seemed to be falling apart all at once?

14. In my office, two other probationary employes were also terminated. To the best of my knowledge, they were all terminated at the same time and the same manner.

15. During my probationary period, I believed that if I worked hard and demonstrated performance, my supervisors would evaluate me as an exceptional employee and would have elected to keep me as an federal employee.

16. Being abruptly terminated by my Agency has had devastating immediate consequences, as I mentioned earlier. We had just uprooted our lives, moving from Colorado to Maryland to start a new chapter in our journey. I am the sole provider for our home, and my wife is a homemaker. As a service-connected veteran, I joined the VA with the sincere intention of working for and with my fellow veterans. We invested everything we had—our savings, our time, and our energy—into making this career opportunity a reality. The financial strain of relocating and starting this new job was immense, but I believed it would be worth it in the end. Now, we're left with no clear path forward, and I have no idea how we will pay for the bills that are quickly approaching. My family depends on me, and we have ongoing medical needs that cannot go unmet. What's more, this was my dream job. I had planned to stay within the federal government for the next 40+ years, especially as I'm just turning 30 this year. I was also actively pursuing my Master's in Government Contracting and Acquisition to align my education with my career goals, further committing myself to a long-term future with the federal government. The sudden loss of this opportunity has left

3

me feeling not only lost but heartbroken, as it felt like my entire future was taken from me in an instant.

17. Being a civil servant meant dedicating myself to the service of others, particularly my fellow veterans. It was about being part of something greater than myself, contributing to the well-being of my community and my country. It gave me the opportunity to make a real, lasting impact in the lives of those who have sacrificed so much for our nation. The responsibility of upholding the values of integrity, accountability, and service was a privilege, and I took pride in knowing that my work directly supported the mission of improving the lives of veterans and their families. Being a civil servant was not just a job— it was a calling, and I was honored to answer it.

18. I strongly believe that my termination was contrary to the rules and requirements governing the federal civil service. The lack of prior warning, performance evaluations, or any form of constructive feedback on my performance before the termination is a clear violation of established protocols. As a federal employee, I was entitled to a fair process, including performance reviews and the opportunity to address any concerns before such an extreme action was taken. Moreover, the sudden and unexpected nature of the termination, without clear justification or proper communication from my superiors, goes against the principles of transparency and due process that are fundamental to the federal civil service. My belief is that my termination was not only unjustified but also a violation of the very standards that govern federal employment practices.

I, ███████████████████, do hereby declare:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on
2/18/2025
_____
Date

███████████    _____
Signature

4

**EXHIBIT 10 - Redacted**

February 13, 2025

MEMORANDUM FOR ███████████

FROM:              Tracey Therit
                   Chief Human Capital Officer

SUBJECT:           Notification of Termination During Probationary Period

REFERENCES:        5 U.S.C. § 7511
                   5 U.S.C. § 3321(a)
                   5 C.F.R. §§ 315.803 and 804

      This is to provide notification that the Agency is removing you from federal service consistent with the above references.

      On 9/22/2024, the Agency appointed you to your position. As documented on your appointment Standard Form 50 (SF-50), your appointment is subject to a probationary/trial period. The agency also informed you of this requirement in the job opportunity announcement for the position.

      Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final until the probationary period is over," and the probationary period is part of "the hiring process for employees."[1] "A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service." [2] "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the  civil service for this particular individual."[3]

      The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest. For this reason, the Agency informs you that the Agency is removing you from your position with the Agency and the federal civil service effective February 13, 2025.

      You may seek review of this action.  Such reviews include:

    a. appealing this action to the Merit Systems Protection Board (MSPB) if you allege you were discriminated against due to marital status or partisan political reasons or your removal was not effected in accordance with the procedural requirements of 5 C.F.R. 315.805; or
    b. requesting corrective action before the Office of Special Counsel (OSC) for prohibited personnel practices; or
    c. pursuing a discrimination complaint with the Office of Resolution Management (ORM).

Please see below for details on your ability to file some of these claims concurrently. If you are not a supervisor, you shall be deemed to have exercised your option to appeal this action at such time as you timely initiate action to appeal to MSPB.  If you believe this action constitutes a prohibited personnel practice, other than discrimination, under 5 U.S.C. § 2302(b), including retaliation for protected whistleblowing, you may elect to file either an appeal to MSPB, or request corrective action from OSC, and your election is based on which election you file first.  If you are not a supervisor, your election of one of these options precludes the other. If you are a supervisor, the election of remedies does not apply to you, and you may pursue all three options. If you believe that this action was taken against you for discriminatory reasons, other than marital status or political affiliation, refer to the paragraph immediately below.

Equal Employment Opportunity Commission (EEOC):  If you believe this action is based on discrimination on the basis of race, color, religion, sex, national origin, pregnancy, age or disability, you may file a complaint of discrimination.  If you elect to file a complaint of discrimination, you may do so by contacting the Office of Resolution Management (ORM) at 1-888-566-3982.  Such a complaint will be processed in accordance with EEOC regulations at 29 C.F.R., Part 1614.  Your initial contact with the ORM office must be done within 45 calendar days of the effective date of this action.

If this action is also appealable to MSPB, such a discrimination complaint may be a "mixed case complaint," or if you raise the issue of discrimination in any appeal to MSPB, it may be a "mixed case appeal." You may not initially file both a mixed case complaint and a mixed case appeal on the same matter, unless you are a supervisor. If you are not a supervisor, whichever you file first, the MSPB appeal or the complaint of discrimination, will be considered an election to proceed in that forum and will determine the procedures that will be followed. If you are a supervisor, you may elect both MSPB and EEOC.

Merit Systems Protection Board (MSPB):  If you appeal to the MSPB, your appeal may be submitted by mail, facsimile, by commercial overnight delivery, by electronic filing the MSPB Appeal Form (https://e-appeal.mspb.gov), or in person at any time after you receive this letter, but not later than 30 calendar days after the separation has been effected, or 30 calendar days after the date of your receipt of this decision, whichever is later.  The address to mail your appeal can be found here: U.S. Merit Systems Protection Board | Contacts and Locations (https://www.mspb.gov/about/contact.htm).  You must submit an original and one copy of both your appeal and all attachments.  If you do not submit an appeal within the time set by statute, regulation, or order of a judge, it will be dismissed as untimely filed unless a good reason for the delay is shown.  The judge will provide you an opportunity to show why the appeal should not be dismissed as untimely.  A copy of the form is available by request if you are unable to access it at the MSPB website.  Please refer to the MSPB website (www.mspb.gov) for information regarding the appeals process and procedures that must be

followed.  You may be represented by an attorney or other representative of your choice.  If you believe this action was taken against you for discriminatory reasons, refer to the paragraph on EEOC. If you decide to file an appeal with MSPB, you should notify the Board that the agency's point of contact for this appeal is Ochcofrontoffice@va.gov

Office of Special Counsel (OSC):  If you elect to request corrective action by the OSC's Complaints Examining Unit (OSC Appeal Form) (https://osc.gov/), your complaint will be limited to a determination as to whether the agency took one or more personnel actions against you in violation of 5 U.S.C. § 2302(b) (prohibited personnel practices).  This can include, but is not limited to, claims of reprisal for whistleblowing and/or engaging in protected activity.  If you are not a supervisor and you elect to request corrective action with OSC, you will have waived your right to file an appeal with MSPB (if eligible), regarding the same matter, except as follows. If you are making a covered claim of retaliation for engaging in certain protected activities, or for making protected disclosures and OSC terminates its investigation and/or has not timely notified you it will seek corrective action, you may have the right to file an individual right of action (IRA) appeal to the MSPB. Such an appeal will be limited to an adjudication of whether you proved that your protected activity or disclosure was a contributing factor in the effected action (5 U.S.C. § 1214; 5 U.S.C. § 1221). If you are a supervisor, you may pursue remedies from MSPB and OSC concurrently.

If you are not a supervisor, whichever option you may choose to pursue regarding this action (an appeal to the MSPB, a request for corrective action to OSC, or a discrimination complaint), shall be considered an election by you to proceed under that appeal process.  However, if you are not a supervisor, you may still concurrently file a corrective action to OSC and a discrimination complaint. If you are a supervisor, you may elect all three remedies concurrently.

Separating VA employees are required to return their PIV card to their PIV issuing office and their government furnished IT equipment and peripherals to the Office of Information Technology (OIT) for redeployment or disposition.

GFE Equipment
You will immediately take your equipment to the closest VA medical center or 810 Vermont Avenue to turn in your IT equipment. The local OIT staff will collect all assigned government furnished equipment (GFE), including peripherals such as monitors, docking stations, printers, etc.

Regardless of the original issuing site, all local IT teams will accept returned GFE and will adhere to local procedures for equipment accountability.

A return receipt for the equipment will be issued to the employee by local IT staff to acknowledge receipt of the employee's GFE and peripherals.
OIT Facility Requirements

Return any non-IT equipment, office and/or card keys, and PIV card to local facility.

If there is lost equipment a report of survey needs to be completed before you separate.


We appreciate your service to the Agency and wish you the greatest of success in your future endeavors.  If you have any questions concerning this matter or the rights described above, or if you need assistance or additional information, please contact Ochcofrontoffice@va.gov .


/s/
Tracey Therit

**EXHIBIT 11 - Redacted**

## STATEMENT IN SUPPORT OF OSC COMPLAINT

1. My name is ████████████.

2. My address is ████████████████████████████. My email is
   ████████████████. My phone number is ████████████.

3. On February 13, 2025, I was summarily terminated from my position as a Loan Specialist
   (RLTY), 1165, and GS 11, Step 1, with the United States Department of Agriculture
   ("USDA"), Rural Development ("RD"), Single Family Housing. Rural Development
   Single Family Housing Programs give families the opportunity to buy, build, or repair
   homes located in rural America. For more information on the program, you can visit
   USDA's website at https://www.rd.usda.gov/programs-services/single-family-housing-
   programs.

4. I was employed with USDA for 6 months. I began working at USDA on August 12, 2024,
   as a Career Conditional Appointment in the competitive service. I am not a preference
   eligible veteran. My last pay increase was in January 2025.

5. I was selected to be a part of the Western Region Training Cohort in November 2024. This
   project was in the process of improving new hire training for Loan Specialists in the West
   Region. We were working on improving on-the-job and classroom training. We worked
   defining clear learning objectives, creating training material and evaluating the
   effectiveness of the current new hire training process.

6. My job duties at USDA RD include the following:
   - **Loan application review:** Analyzing loan applications, including income and asset
     documents, credit reports, and supporting documentation to determine eligibility.
   - **Creditworthiness assessment**: Evaluating borrower's financial situation to assess
     their ability to repay the loan.
   - **Underwriting**: Making loan decisions based on established guidelines and
     regulations, including loan amount, interest rate and loan terms.
   - **Loan servicing**: Managing existing loan accounts. Other duties include preparing
     lien releases, signing insurance claims checks/analyzing adjuster worksheets, and
     being a point of contact for USDA customers in Southern California.
   - **Technical assistance**: Providing guidance to borrowers on loan application
     processes, eligibility requirements and financial management.
   - **Community outreach**: Collaborating with local organizations and community
     leaders to identify potential borrowers and promote the USDA Rural Development
     program.

7. During my tenure, my work included:
   - Completing USDA University.
   - Successfully underwriting home and repair loans.

- Communicating with relevant USDA RD customers. Customers consistently requested to work with me because of my strong communication skills and sense of urgency.
- Being selected to be the single point of contact for the Coachella Valley Housing Coalition (a local community organization).
- Being selected to be a part of the Self Help group, a new construction team.
- Completing environmental and appraisal reviews.
- As a result of my strong work and performance, I received a "Fully Successful" Q1 performance evaluation.

8. My performance record during my tenure at the Agency was very good.  I received positive feedback on my work from supervisors and colleagues, including:
   - Eager to learn.
   - Goes the extra mile for customers.
   - Willingness to take on any task.
   - Team player.
   - Dependable.
   - Learns at a fast pace.
   - Built strong relationships with title companies, coworkers, and vendors.
   - Quick response time to return phone calls and emails.
   - Not afraid to take on new tasks and responsibilities.

9. USDA provided me opportunities for training and development, including USDA University, on the job training, a discount for Rosetta Stone to learn Spanish, an invitation to join the National Association of Credit Specialists, and USDA also invited me to perform home inspections.

10. On February 13, 2025, I learned that federal agencies were terminating probationary employees. I never thought USDA would fall victim to this mass termination because of its important role in Rural Communities. After work I decided not to watch the news to avoid getting anxious. There were no signs that terminations would occur at USDA. All my coworkers were cheerful and optimistic. I did not receive any verbal notification that terminations would occur at USDA.

11. On February 13, 2025, at around 7:00 p.m., I checked my email inbox to ensure no termination emails were sent to my inbox. However, I was wrong because I received the termination email from HR. The email stated, "The attached notice of termination is based on your probationary status." I opened the attachment and the second page said I am being terminated based on my performance and I have not demonstrated working for the agency is in the public interest. There were no examples provided for why my performance was an issue. The termination email included no information regarding benefits or a severance package. There was no off boarding process being followed. In addition, I never received an SF-50 that included my dismissal of service. While working at the Agency, I have never received negative feedback on my performance or work ethic. Shortly after reading this email, I drove to the Indio field office in case I needed to return my laptop.

12. Shortly after arriving at the office, I witnessed my coworker sobbing at her desk because she received the termination email as well. After seeing this, I immediately called my supervisor, ▮▮▮▮▮▮, and she was shocked and unaware that the termination email was sent to me. She apologized and said I didn't deserve this. She said the agency (USDA) would be willing to retain me because there is a business need for me. She would support my decision to file an appeal and told me I can use her as a reference. Also, I spoke to the Single Family Housing Program Director, ▮▮▮▮▮▮ and she said she wanted to retain me and would rehire me. She wants me to return to USDA and is willing to fight for me.

13. After I received the termination letter, I received text messages from coworkers that other probationary employees were terminated and received the same letter.

14. In my office, there were a total of two people who received the termination email. Losing Loan Specialists will have a negative impact in the Southern California region. The department is already short staffed and everyone has a backlog of work due to the program's popularity. This unlawful mass termination will be doing the taxpayers a disservice.

15. However, in the single family housing department, which I am a part of, six probationary employees received the termination email. As a result of this reduction, combined with impending resignations from the deferred resignation Fork in the Road program, I expect the probationary terminations to have severe consequences for the American people who receive assistance through the RD Single Family Housing programs. For example, for individuals who seek to purchase or build a new family home, the terminations will cause a significant delay in the processing of their loan applications, and I expect this will cause sellers to back out of contracts and find a different buyer. For the programs that help individuals with fixing their homes based on issues pertaining to the safety and structure of their house, including grants for elderly Americans, the delays may cause structural or other issues to remain outstanding for longer periods of time which could lead to further problems and/or injuries. For example, the loans for repairs include repairs for leaking roofs, roof damage, broken windows, floor damage, damage to pipes, and issues with air conditioning. Allowing these problems to continue unabated because of the delays in processing resulting from these probationary terminations has the potential to harm the Americans requesting the repairs.

16. My understanding is that every USDA probationary employee in the state of California received the termination email without regard for their record of performance.

17. During my probationary period, I believed that if I worked hard and demonstrated a strong performance, my supervisors would evaluate me fairly. I was in the process of obtaining my loan approval authority. In addition, I was taking on additional responsibilities, such as ordering draw checks for clients and preparing loan documents for closing. I was very well respected amongst my peers and management.

18. Being summarily terminated by USDA has severe immediate consequences. I will struggle paying next month's rent because my next paycheck will not be a full 80 hours. Instead my

paycheck will only reflect 32 hours. This is a huge setback because my rent is $2,000 a month. Also, my lease does not expire until July 2025. In addition, I will also struggle making my $400 a month car payment. My student loan payment is $200 a month, plus I have credit cards too. I will be on the verge of homelessness because I am not receiving a severance package.

19. Being a civil servant means the world to me. It's something I'm proud of and take pride in. I enjoy helping families and individuals purchase homes. We are the last resort for homeownership for many people in rural America. Helping the common man has given me purpose in life.

20. My termination was contrary to the rules and requirements of civil service for many reasons. First off, I never received the Notice of proposed adverse action. Secondly, I never had an opportunity to respond to the poor performance allegations. And last, I was not given specific examples to justify why my performance did not meet agency standards. The letter was very unprofessionally written and vague.

21. I am more than happy to provide references from my coworkers and management.


I, _____, do hereby declare

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:

2/18/2025
_____
Date

_____
Signature

**EXHIBIT 12 - Redacted**



**United States Department of Agriculture**

Rural Development Business Center

February 13, 2025

MEMORANDUM FOR ██████████, LOAN SPECLST (RLTY), USDA RURAL
DEVELOPMENT

FROM:          MARLON V. TAUBENHEIM
               DIRECTOR OF HUMAN RESOURCES

SUBJECT:       Notification of Termination During Probationary Period

REFERENCES:    5 U.S.C. § 7511
               5 U.S.C. § 3321(a)
               5 U.S.C. §2102
               5 CFR §212.101
               5 C.F.R. §§ 315.803, 315.804, and 315.806
               Departmental Regulation 4020-250-1


        This is to provide notification that the Agency is removing you from your
position of LOAN SPECLST (RLTY) and federal service consistent with the above
references.

        On 8/11/2024, the Agency appointed you to the position of LOAN SPECLST
(RLTY). As documented on your appointment Standard Form 50 (SF-50), your
appointment is subject to a probationary/trial period. The agency also informed you of
this requirement in the job opportunity announcement for the position.

        Guidance from the Office of Personnel Management ("OPM") states, "An
appointment is not final until the probationary period is over," and the probationary
period is part of "the hiring process for employees."[1] "A probationer is still an
applicant for a finalized appointment to a particular position as well as to the Federal
service."[2] "Until the probationary period has been completed," a probationer has "the
burden to demonstrate why it is in the public interest for the Government to finalize an
appointment to the  civil service for this particular individual."[3]

---

[1] OPM, Practical Tips for Supervisors of Probationers.
[2] See U.S. Merit Systems Protection Board Report to the President and Congress, The Probationary Period:
A Critical Assessment Opportunity (August 2005)
[3] Id.

The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest. For this reason, the Agency informs you that the Agency is removing you from your position of LOAN SPECLST (RLTY) with the Agency and the federal civil service effective **close of business, February 13, 2025.**

You may have a right to file an appeal with the Merit Systems Protection Board (MSPB) on the limited grounds set forth in 5 C.F.R. § 315.806. Any such appeal must be filed within 30 days of the effective date of this decision or 30 days after the date of your receipt of this decision, whichever is later. You should review MSPB regulations at 5 C.F.R. §§ 1201.14 and 1201.24 for instructions on how to file an electronic appeal and content requirements of the appeal, respectively. For more information, please visit www.mspb.gov or contact your local MSPB regional or field office at: Western Regional Office, 1301 Clay Street, Suite 1380N, Oakland, CA 94612-5217, Phone: (510) 273-7022.

We appreciate your service to the Agency and wish you the greatest of success in your future endeavors.  If you have any questions, please contact hrfo@usda.gov.

Marlon V. Taubenheim
Director of Human Resources