OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
TONY LOPRESTI, State Bar #289269
KAVITA NARAYAN, State Bar #264191
MEREDITH A. JOHNSON, State Bar #291018
RAPHAEL N. RAJENDRA, State Bar #255096
JENNY S. LAM, State Bar #259819
STEFANIE L. WILSON, State Bar #314899
70 West Hedding Street, East Wing, Ninth Floor
San José, California  95110-1770
Telephone: (408) 299-5900
Facsimile:  (408) 292-7240
E-Mail:    Tony.LoPresti@cco.sccgov.org
           Kavita.Narayan@cco.sccgov.org
           Meredith.Johnson@cco.sccgov.org
           Raphael.Rajendra@cco.sccgov.org
           Jenny.Lam@cco.sccgov.org
           Stefanie.Wilson@cco.sccgov.org

Attorneys for *Amicus Curiae*
*County of Santa Clara, Calif.*

*Additional amici and counsel are listed on signature pages*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### San Francisco Division

| | |
|---|---|
| **American Federation of Government Employees, AFL-CIO; American Federation of State County and Municipal Employees, AFL-CIO**, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>**United States Office of Personnel Management**, et al.,<br><br>Defendants. | No. 3:25-cv-01780-WHA<br><br>**BRIEF OF AMICI CURIAE COUNTY OF SANTA CLARA AND 43 ADDITIONAL LOCAL GOVERNMENTS AND LOCAL GOVERNMENT OFFICIALS IN SUPPORT OF PLAINTIFFS**<br><br>Judge:      Hon. William H. Alsup<br>Place:      Courtroom 12, 19th Floor<br><br>Trial Date:   Not set |

# TABLE OF CONTENTS

Table of Contents...................................................................................................... i

Table of Authorities .................................................................................................. ii

I.    Statement of Interest ........................................................................................1

II.   Summary of Argument .....................................................................................2

III.  Argument ..........................................................................................................4

    **A.**    Close and Ongoing Collaboration and Interdependence Among Local, State, and Federal Officials Have Longstanding Constitutional and Statutory Bases.............4

        **1.**    Federal, State, and Local Personnel Effectuate Constitutional Federalism Through Robust Interaction on Matters Essential to the Public Good. .......4

        **2.**    Federal Employment-Related Laws Recognize and Respect Multilayered Governance and the Interrelationships Through Which It Is Practiced.....10

    **B.**    Local Governments and the People Themselves Depend on Adequately Staffed Federal Agencies....................................................................................................12

        **1.**    Effective Preparedness and Response to Public Safety Emergencies Demands Adequately Staffed Federal Agencies........................................13

        **2.**    Dismantling Federal Agencies Will Undermine and Stymie Local Public Health Agency Efforts, With Devastating Effects on Public Health.........19

IV.   Conclusion ......................................................................................................25

Additional Amici .....................................................................................................26

1

# TABLE OF AUTHORITIES

2

Page(s)

3

## Cases

4

*Alden v. Maine*,
   527 U.S. 706 (1999)......................................................................................................10

5

*Atl. Richfield Co. v. Christian*,
6
   590 U.S. 1 (2020)............................................................................................................6

7

*Bond v. United States*,
   564 U.S. 211 (2011)........................................................................................................4

8

*Bond v. United States*,
9
   572 U.S. 844 (2014).....................................................................................................4, 5

10

*California v. United States*,
11
   438 U.S. 645 (1978)........................................................................................................6

12

*Harris v. McRae*,
   448 U.S. 297 (1980)........................................................................................................6

13

*Health & Hosp. Corp. of Marion Cnty. v. Talevski*,
14
   599 U.S. 166 (2023)........................................................................................................5

15

*Hodel v. Virginia Surface Min. & Recl. Ass'n, Inc.*,
   452 U.S. 264 (1981), *overruled on other grounds by*
16
   *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985) ...................................6

17

*King v. Smith*,
   392 U.S. 309 (1968)........................................................................................................6

18

*Medtronic, Inc. v. Lohr*,
19
   518 U.S. 470 (1996)........................................................................................................4

20

*Nat'l League of Cities v. Usery*,
   426 U.S. 833 (1976), *overruled on other grounds by*
21
   *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985) ...................................5

22

*New York v. United States*,
   505 U.S. 144 (1992)........................................................................................................5

23

*NFIB v. Sebelius*,
24
   567 U.S. 519 (2012)........................................................................................................5

25

*Printz v. United States*,
   521 U.S. 898 (1997)........................................................................................................5

26

*Sturgeon v. Frost*,
27
   587 U.S. 28 (2019)..........................................................................................................6

28

*Wisconsin Dep't of Health & Fam. Servs. v. Blumer*,
   534 U.S. 473 (2002)........................................................................................................6

1

## Statutes

2  2 U.S.C. § 1501 .................................................................................................................6

3  2 U.S.C. § 1534 .................................................................................................................6

4  5 U.S.C. § 301 .................................................................................................................10

5  5 U.S.C. § 3101 ...............................................................................................................10

6  5 U.S.C. § 3502 ...............................................................................................................11

7  6 U.S.C. § 121 ...................................................................................................................7

8  6 U.S.C. § 321k .................................................................................................................7

9  6 U.S.C. § 361 ...................................................................................................................9

10 6 U.S.C. § 753 ...................................................................................................................7

11 6 U.S.C. § 776 ...................................................................................................................7

12 7 U.S.C. § 7656 .................................................................................................................7

   7 U.S.C. § 8914 .................................................................................................................8

13 12 U.S.C. § 4118 ...............................................................................................................8

14 15 U.S.C. § 8521 ...........................................................................................................8, 9

15 16 U.S.C. § 551 ...............................................................................................................18

16 16 U.S.C. § 551c-1 ............................................................................................................8

17 21 U.S.C. § 350f ................................................................................................................8

18 21 U.S.C. § 393 ...............................................................................................................24

19 33 U.S.C. § 3204 ...............................................................................................................7

20 34 U.S.C. § 60506 .............................................................................................................8

21 38 U.S.C. § 303 ...............................................................................................................11

22 42 U.S.C. § 247d-3a ..........................................................................................................7

23 42 U.S.C. § 280g-18 ..........................................................................................................7

24 42 U.S.C. § 290bb-36c ......................................................................................................7

25 42 U.S.C. § 300hh-10 ........................................................................................................7

26 42 U.S.C. § 3121 ...............................................................................................................8

27 42 U.S.C. § 4370j ..............................................................................................................9

   42 U.S.C. § 5143 ...............................................................................................................7

28 42 U.S.C. § 5144 ...............................................................................................................7

43 U.S.C. § 3101 ..........................................................................................................7

43 U.S.C. § 3102 ..........................................................................................................7

47 U.S.C. § 615 ............................................................................................................7

Harmful Algal Bloom and Hypoxia Research and Control Amendments Act of 2014,
    Pub. L. 113-124, § 4, 128 Stat. 1379, 1380 ........................................................8

Stewart B. McKinney Homeless Assistance Amendments Act of 1988,
    Pub. L. 100-628, § 1091, 102 Stat. 3224, 3284 ..................................................7

### Regulations

21 C.F.R. § 312.300 ...................................................................................................21

21 C.F.R. § 312.310 ...................................................................................................21

21 C.F.R. Part 312, Subpart I .....................................................................................21

5 C.F.R. §§ 315.804-806 ............................................................................................11

5 C.F.R. §§ 351.801-803 ............................................................................................11

### Other Authorities

Bridget A. Fahey,
    *Coordinated Rulemaking and Cooperative Federalism's Administrative Law*,
    132 Yale L.J. 1320 (2023) ...............................................................................5, 6

Bridget A. Fahey,
    *Data Federalism*, 135 Harv. L. Rev. 1007 (2022)................................................5

Executive Order 13,100 of August 25, 1998,
    63 Fed. Reg. 45,661 (Aug. 25, 1998) ("President's Council on Food Safety") .................8

Executive Order 13,132 of August 4, 1999,
    64 Fed. Reg. 43,255 (Aug. 10, 1999) ("Federalism")........................................6

*The Federalist* No. 39 (James Madison) (Clinton Rossiter ed., 1961) ..........................4

*The Federalist* No. 43 (James Madison) (Clinton Rossiter ed., 1961) ..........................5

*The Federalist* No. 45 (James Madison) (Clinton Rossiter ed., 1961) ..........................5

*The Federalist* No. 51 (James Madison) (Clinton Rossiter ed., 1961) ..........................4

# I.  STATEMENT OF INTEREST[1]

The work of government is the work of government employees.  At its core, government works to protect and serve the public.  But governments cannot work effectively when their workforces are cut so dramatically and abruptly that public facilities are shuttered, applications go unreviewed, emails go unanswered, processes go unexecuted, and calls for assistance languish in unmonitored voicemail systems.  That is why the widescale terminations at issue in this case do not simply present a concern for terminated federal employees, the federal staff left behind to pick up the pieces, or the individual agencies where staff is cut.  By constitutional design, in myriad congressional enactments, and through day-to-day practice, *all* layers of government work in tandem and reliance on one another, ultimately generating and supporting services that local governments furnish directly to their residents in the forms of emergency management, public safety, healthcare, and disease prevention, among others.  So the abrupt hobbling of *federal* agencies prevents *local* governments from serving the public with which they interact every single day.  Amici, local governments and their officials from across the country, experience this reality first-hand.

Within local government, staff who operate all sorts of programs—from emergency planning and response, to infrastructure repair and environmental protection, to healthcare and public health, and beyond—depend on their federal (and state) counterparts to pick up the phone, reply to emails, share information, review applications and requests, attend meetings, and simply collaborate on shared work.  Local government staff must also confront and mitigate the harms to residents and the public health that result when federal agencies lose the staff they need to conduct agricultural inspections, respond to urgent requests for federally controlled medications, participate in safety drills ahead of major events, and disseminate weather reports.  This is why, when Defendants Office of Personnel Management (OPM) and its acting director Charles Ezell ordered agencies across the federal government to conduct abrupt and overbroad terminations *en masse*, it dramatically heightened the risk of serious and irreparable harms to the American people themselves.

Amici represent counties and cities—the level of government closest to the people and most

---

[1] No party's counsel authored this brief in whole or in part, and no person or entity other than Amici or their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

directly responsible for their well-being.  Amici, therefore, are uniquely exposed to the ways Defendants' wholesale dismantling of *one* level of government will prevent *all* levels of government from functioning effectively to keep crime off the streets, planes in the sky, water safe to drink, residents from getting sick and dying, and communities from collapsing after devastating fires and floods.  Amici submit this brief to illuminate the breadth and depth of the ways that Defendants' actions threaten the American people and the local governments that serve them.[2]

## II.  SUMMARY OF ARGUMENT

The Constitution presumes and requires that governance by and for the American people is carried out by multiple layers of government.  Each has capacity, expertise, and power within its own realm, and each acts in concert and reliance on the effectiveness, partnership, support, and limits of the others.  The result is a constitutional ecology in which local, state, and federal governments regularly interact with one another to share resources and information; develop, approve, and carry out plans, approvals, and agreements; respond to emergencies; and otherwise advance the common good.  By design and in day-to-day practice, this body of work—and the interrelationships and mutually agreeable cooperation on which it depends—ultimately serves to protect and advance the health, safety, welfare, and liberty of the public.  As the layer of government closest to the people, local governments have the vantage point to see how these interrelationships directly serve the American public.  Because of that perspective, local governments like Amici are also uniquely well positioned to explain why mass disruption and dismantling of federal agencies harm the public by making it much more difficult to serve and protect the American people.

---

[2] There are 44 Amici comprising 17 local governments and 27 local government officials.  Local government Amici are the County of Santa Clara, Calif.; the City and County of San Francisco, Calif.; the County of Alameda, Calif.; the County of Marin, Calif.; the County of San Diego, Calif.; the City of Santa Monica, Calif.; the City of Chicago, Ill.; the City of Columbus, Ohio; the City of Evanston, Ill.; the City of Minneapolis, Minn.; the City of New York, New York; the City of Pittsburgh, Pa.; the City of Tucson, Ariz.; El Paso County, Tex.; Harris County, Tex.; King County, Wash.; and the Metropolitan Government of Nashville & Davidson County, Tenn.  Local government official Amici are the City Attorney for the City of Oakland, Calif.; the Prosecuting Attorney for Washtenaw County, Mich.; the County Attorney for Harris County, Tex.; the Mayors of the Cities of Evanston, Ill., Hoboken, New Jersey, Olympia, Wash., and Ridgway, Colo.; the Mayor *pro tem* of the City of Austin, Tex.; the County Executive of Pierce County, Wash.; the Auditor of the City of Syracuse, NY; the President of the Norristown Area School District in Norristown, Pa.; and 16 members of elected boards of supervisors, boards of commissions, or city councils that oversee municipalities from coast to coast.

Like all ecologies, this system of inter-related governance contemplates that each layer of government makes its own choices about its operations—including by exercising its own authority, within lawful bounds, over employment matters. But as Plaintiffs have shown, Defendants OPM and Ezell exceeded those bounds by directing agencies to terminate probationary employees *en masse*. The result has been the devastation of the workforces and capacities of the many dozens of federal agencies on which Amici and other local and state governments rely. The laws violated by OPM's overreach preclude centralized government-wide termination of probationary employees, particularly on grounds that are quite obviously unrelated to any individualized considerations. These laws instead establish that federal agencies must exercise their employment authority in deliberate and careful ways—and, critically, that they do so with due regard for the consequences their staffing choices have on the state and local governments with which they work. As these laws establish the rights of federal employees themselves, they also protect the American people. When the federal government destabilizes and dismantles its own agencies—and especially when it does so abruptly, without careful planning and adequate notice—it prevents local and state governments from implementing programs and taking actions that protect and serve their residents.

This is not simply theoretical. Amici's experiences demonstrate the extraordinarily wide range of ways in which local governments' fulfillment of their duty to safeguard their residents' health and safety requires them to interact with and rely on federal agencies, just as the limited reach of the federal government requires federal agencies to work with local governments. As a result, prompt and time-sensitive interactions between local and federal staff are critical in matters as diverse as treating rare, infectious, or emergent diseases; protecting the public from hazardous materials; preparing for, responding to, and helping residents recover from floods, wildfires, natural disasters, and massive public safety events; preventing and reducing homelessness; and charting a path forward on artificial intelligence. The fundamental, century-and-a-half-long premise underpinning this interdependence is that as the federal government has gathered the resources and built the infrastructure to shape American society and support the American people, it has committed to operating its institutions in predictable ways that collaborate with and support—and, at a bare minimum, do not undercut—state and local government protection of their residents.

This interaction in service of the common, public good is the daily work of government—and, therefore, of government employees.  This is precisely why OPM's attempt to abruptly demolish the federal workforce at so many different agencies all at once poses such serious, imminent, and often irreparable harms to the American people.

## III. ARGUMENT

### A. Close and Ongoing Collaboration and Interdependence Among Local, State, and Federal Officials Have Longstanding Constitutional and Statutory Bases.

Constitutional text and practice establish "the compound republic of America," through which multilayered governance operates coherently for the health, safety, well-being, and liberty of the people whom government serves.  *The Federalist* No. 51, at 323 (James Madison) (Clinton Rossiter ed., 1961); *see also The Federalist* No. 39, at 244-45 (James Madison) (Clinton Rossiter ed., 1961).  These layers each have their own expertise, strengths, capacities, roles, and limitations, which they leverage for the benefit of the American people by working together, not in silos.  The resulting ecosystem is a complex and multidimensional relationship among localities, states, and the federal government that is carried out every day by the employees through which governments do their work.  Congress has recognized, facilitated, structured, and protected this ecosystem in a vast array of contexts, including through the laws governing federal employment that Defendants disregard.

### 1. Federal, State, and Local Personnel Effectuate Constitutional Federalism Through Robust Interaction on Matters Essential to the Public Good.

As the unit of government closest to the people, localities are the front line for carrying out the fundamental province of government: to protect "the lives, limbs, health, comfort, and quiet of all persons," *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (internal quotation marks and citation omitted), and to act broadly "for the public good," *Bond v. United States*, 572 U.S. 844, 854 (2014).  The Constitution recognizes the critical role of local governance by establishing a "federal structure [that] allows local policies 'more sensitive to the diverse needs of a heterogeneous society,' . . . enables greater citizen 'involvement in democratic processes,' and makes government 'more responsive'" to the people.  *Bond v. United States*, 564 U.S. 211, 221 (2011) (citation omitted); *see*

1   *also The Federalist* No. 43, at 272-73 (James Madison) (Clinton Rossiter ed., 1961); *The Federalist*

2   No. 45, at 289 (James Madison) (Clinton Rossiter ed., 1961); *cf. Nat'l League of Cities v. Usery*, 426

3   U.S. 833, 851 (1976) (recognizing constitutional importance of local control in "such areas as fire

4   prevention, police protection, sanitation, public health, and parks and recreation"), *overruled on*

5   *other grounds by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985).

6          Our constitutional structure recognizes and protects the role of states and local governments

7   in preserving the well-being of the American people.  *NFIB v. Sebelius*, 567 U.S. 519, 535-36 (2012)

8   ("the vital functions of modern government" are grounded in the "police power" exercised by state

9   and local governments).  In some instances, American law preserves that role by emphasizing the

10  federal government's limited and enumerated powers.  *E.g.*, *Bond*, 572 U.S. at 854.  For example,

11  the Constitution's prohibition on commandeering limits the federal government's ability to require

12  non-voluntary cooperation from states and local governments.  *See, e.g.*, *Printz v. United States*, 521

13  U.S. 898, 918-20 (1997); *New York v. United States*, 505 U.S. 144, 161-66 (1992); *see also Health*

14  *& Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 203 n.6 (2023) (Thomas, J., dissenting)

15  (noting that "[t]he anticommandeering doctrine protects 'political subdivisions' of States against

16  federal cooptation, as well as the States themselves").

17         In many instances, however, governments at multiple levels protect the public health and

18  welfare by *interacting* and *working with* one another on shared initiatives.  *See generally* Bridget A.

19  Fahey, *Coordinated Rulemaking and Cooperative Federalism's Administrative Law*, 132 Yale L.J.

20  1320 (2023); Bridget A. Fahey, *Data Federalism*, 135 Harv. L. Rev. 1007, 1074-79 (2022).  As

21  described below, Congress has passed myriad laws that recognize, respect, and facilitate

22  interrelationships among local, state, and federal governments, and agencies have developed rules

23  and procedures that do so even more.  Congress has also established structures that all but guarantee

24  that state and local governments will experience and need to address the harmful externalities that

25  arise when federal agencies lose capacity to conduct their own work.

26         Some kinds of congressionally sanctioned interactions among levels of government fall

27  within the rubric of "cooperative federalism."  In this model, a statutory or regulatory scheme

28  contemplates formalized interactions among levels of government to establish and implement state-

specific rules for federal programs.  Medicaid is the paramount example, both because its funding accounts for a large percentage of state and local budgets and because it has such a direct and visible connection to the  health and lives of millions of people.  *See, e.g.*, *Wisconsin Dep't of Health & Fam. Servs. v. Blumer*, 534 U.S. 473, 495 (2002); *Harris v. McRae*, 448 U.S. 297, 308 (1980).  But it is by far not the only one.  Many programs deploy this framework, stretching back to at least the turn of the century.  *See, e.g.*, *Atl. Richfield Co. v. Christian*, 590 U.S. 1, 24 (2020) (recognizing CERCLA as an example of cooperative federalism); *Sturgeon v. Frost*, 587 U.S. 28, 57 (2019) (same for Alaska National Interest Lands Conservation Act (ANILCA)); *California v. United States*, 438 U.S. 645, 650-51 (1978) (same for Reclamation Act of 1902); *Hodel v. Virginia Surface Min. & Recl. Ass'n, Inc.*, 452 U.S. 264, 289 (1981) (same for Surface Mining Act), *overruled on other grounds by Garcia*, 469 U.S. 528; *King v. Smith*, 392 U.S. 309, 316 (1968) (same for Aid to Families with Dependent Children program).  Many of these programs apply a "standard cross-governmental template that our governments use to jointly author a wide range of important legislative rules": federal agencies set parameters, states submit proposals within those parameters, and federal agencies then review and approve or disapprove them.  Fahey, *Coordinated Rulemaking*, 132 Yale L.J. at 1326, 1333-43 & 1333 n.35.

But Congress and federal agencies also recognize, foster, and structure interactions among local, state, and federal public employees to carry out the work of government in all sorts of other circumstances, too, even those well outside the process of establishing program rules through formally structured exchanges.  In fact, Congress has made clear that federal willingness to collaborate, consult, and interact with participating local and state governments is a matter of *government-wide* importance: it enacted the Unfunded Mandates Reform Act of 1995 "to strengthen the partnership between the Federal Government and State, local, and tribal governments," 2 U.S.C. § 1501(1), which it does by requiring agencies to invite and receive "meaningful and timely input" on regulatory proposals from the "elected officers of State, local, and tribal governments" or their designees, 2 U.S.C. § 1534(a); *accord* Executive Order 13,132 of August 4, 1999, at § 6, 64 Fed. Reg. 43,255, 43,257-58 (Aug. 10, 1999) ("Federalism") (similar).

Solicitude for local and state partnership and collaboration echoes throughout the United

States Code and in all manner of administrative actions and structures unrelated to the formal model of cooperative federalism exemplified by Medicaid.  There are thousands of examples, and the fact and wide breadth of ways that Congress has built out and endorsed these structures underscores its awareness that effective governance depends on interaction and mutually agreeable collaboration among the levels of government.  Congressional insistence that federal agencies coordinate with local and state officials is especially pronounced in emergency preparedness and response. Examples include FCC planning for deployment of modern 9-1-1 systems, 47 U.S.C. § 615; United States Geological Survey work to identify, assess, and plan for potential landslide hazards, 43 U.S.C. §§ 3101(8), 3102(b); the work of the Department of Homeland Security "to ensure appropriate exchanges of information . . . relating to threats of terrorism," 6 U.S.C. § 121(d)(8); EPA and FEMA's creation of a tsunami hazard mitigation program with coordinating committees, 33 U.S.C. § 3204(b); HHS's national suicide and mental health hotlines, 42 U.S.C. §§ 280g-18(c)(4), 290bb-36c(c)(3); USDA's deployment of a team to address crises such as "threat[s] to human health from food-borne pathogens," 7 U.S.C. § 7656(b)(6), (d); FEMA's responsibilities to develop operational plans, 6 U.S.C. § 753(b)(2), craft "model standards and guidelines for credentialing critical infrastructure workers" who respond to disasters, 6 U.S.C. § 321k, establish programs for temporary housing during emergencies, 6 U.S.C. § 776(a)(1), and ensure that every federal agency "emergency response team[] . . . work[s] in coordination with State and local officials and onsite personnel," 42 U.S.C. § 5144(b)(3); and presidentially appointed Federal coordinating officers' work to "coordinate the administration of relief" in the immediate wake of a declaration of emergency, 42 U.S.C. § 5143(b), (c).  Federal law's invitation to collaborate with local and state governments also runs through statutory schemes concerning preparation and response to public health incidents,[3] problems

---

[3] *See, e.g.*, 42 U.S.C. § 247d-3a(g)(1) (requiring HHS to consult with state and local governments when developing criteria to assess preparedness to respond to public health emergencies); 42 U.S.C. § 300hh-10(b)(4) (requiring HHS to "[c]oordinate with State, local, and tribal public health officials" and others "to ensure effective integration of Federal public health and medical assets during a public health emergency" and "coordinat[e] with State and local health officials" when "carry[ing] out drills and operational exercises" concerning "all-hazards medical and public health preparedness and response"); Stewart B. McKinney Homeless Assistance Amendments Act of 1988, Pub. L. 100-628, § 1091, 102 Stat. 3224, 3284 (HUD must coordinate with EPA, other federal agencies, and state and local governments, among others, when developing "a policy for dealing with radon contamination").

with the food supply,[4] management of natural resources,[5] criminal justice,[6] and amelioration of hardships faced by low-income people.[7]

This framework lives not just in statute, but in the daily work of federal employees and their local and state counterparts. Environmentally focused agencies offer several representative exemplars. The National Weather Service has a multipronged system to coordinate with state and local governments.[8] It touts that it "works closely" with state and local officials around emergency planning: among other things, NWS "provides direct support to government decision makers and safety officials," "can reach locally into the communities by providing consistent Impact-based Decision Support Services" to local emergency-management personnel, and "work[s] hand-in-hand with" these personnel "to coordinate weather impacts for major events that have an impact on public safety."[9] NWS explains that "[t]his teamwork is important, not just when emergencies happen, but also behind the scenes to better plan for critical events."[10] NWS's parent agency, the National

---

[4] *See, e.g.*, 7 U.S.C. § 8914(b)(2) (USDA must share information and coordinate with state and local governments when developing and executing comprehensive strategic plans to respond to diseases or pests of concern); 21 U.S.C. § 350f(b), (d)(3), (i)(2) (when addressing the safety of the food supply, FDA must "coordinate regulatory efforts with," receive information from, and disseminate information to state and local public health officials); *see also* Executive Order 13,100 of August 25, 1998, 63 Fed. Reg. 45,661 (Aug. 25, 1998) ("President's Council on Food Safety") (establishing President's Council on Food Safety and requiring it to coordinate with state and local governments).

[5] *See, e.g.*, 16 U.S.C. § 551c-1(b) (USDA must "coordinate[] with the applicable State government and local fire officials" in order to authorize a prescribed burn on Forest Service land subject to an extreme fire danger level); Harmful Algal Bloom and Hypoxia Research and Control Amendments Act of 2014, Pub. L. 113-124, § 4, 128 Stat. 1379, 1380 (requiring NOAA to "coordinate with and work cooperatively with regional, State, tribal, and local government agencies and programs that address marine and freshwater harmful algal blooms and hypoxia" in connection with its efforts to manage algal bloom).

[6] *See, e.g.*, 34 U.S.C. § 60506(a) (Attorney General and other federal agency heads must collaborate and coordinate with local, state, and tribal governments, among others, on programs "relating to the reentry of individuals returning from incarceration to the community").

[7] *See, e.g.*, 12 U.S.C. § 4118 (requiring HUD to "confer with any appropriate State or local government agency" regarding low-income housing relief and to "give consideration to the views of any such agency when making determinations"); 42 U.S.C. § 3121(a)(5) (calling for "improved coordination" among "Federal, State, tribal, and local economic development activities" to address "chronic high unemployment, underemployment, outmigration, and low per capita incomes").

[8] NWS, *Information for State and Local Governments*, https://www.weather.gov/dsb/state_local [https://perma.cc/RU5P-7CVN].

[9] NWS, *Federal, State and Local Partners*, https://www.weather.gov/about/fsl-partners [https://perma.cc/P2ZS-2YYM].

[10] *Id.* It is, in this regard, unsurprising that Congress recognizes local and state personnel as among the "NWS Core partners." 15 U.S.C. § 8521(d).

1  Oceanic and Atmospheric Administration (NOAA), also works "with other federal agencies and

2  with state and local governments" in other contexts, including to manage and enhance the value of

3  the "human and natural ecosystems of the U.S. coastal areas."[11]  Indeed, myriad agencies have

4  offices of external and intergovernmental affairs responsible for prioritizing collaboration with state

5  and local officials.[12]

6      The EPA is another example.  Congress has established a Municipal Ombudsman within the

7  highest levels of the EPA and charged that person with providing "technical assistance to

8  municipalities" concerning the Federal Water Pollution Control Act.  42 U.S.C. § 4370j(b).

9  Recognizing the myriad contexts beyond "technical assistance" in which local governments may

10 need help to understand and comply, and the ways that local compliance serves the EPA's own

11 mission to protect federal waters, the EPA subsequently positioned the Ombuds not just to give

12 localities technical assistance on the law itself, but to serve more generally as a "resource to assist

13 municipalities in navigating EPA's Clean Water Act programs."[13]  And the establishment of the

14 Ombuds is just one of several ways EPA positions and encourages its staff to interact with state and

15 local officials every day to implement and effectuate environmental protection on matters from the

16 mundane to the exceptional.  For instance, EPA has offered resources to local governments

17 regarding climate change,[14] and EPA and FEMA work with states and localities to train first

18 responders and help emergency-management officials plan for and respond to radiological

19

20

21

22 [11] NOAA, *NOAA By The Numbers*, https://sciencecouncil.noaa.gov/noaa-by-the-numbers
   [https://perma.cc/AQ6L-PAQT] (noting that NOAA works with federal, state, and local
23 governments to manage diverse and complex human and natural ecosystems of the U.S. coastal
   areas, including great lakes and rivers); *see also* 15 U.S.C. § 8521(f), (h)(2) (requiring USDA to
24 report on local and state governments' use of NOAA forecasts).

25 [12] *See, e.g.*, 6 U.S.C. § 361 (establishing DHS Office of State and Local Coordination); USDA
   Office of External and Intergovernmental Affairs: https://www.usda.gov/about-usda/general-
   information/staff-offices/office-congressional-relations/office-external-and-intergovernmental-
26 affairs [https://perma.cc/A2MX-ME5L].

27 [13] *See* EPA Municipal Ombudsman: https://www.epa.gov/ocir/municipal-ombudsman
   [https://perma.cc/CS7D-8G6K].

28 [14] EPA, *EPA Climate Resources for Local Governments*,
   https://www.epa.gov/system/files/documents/2024-12/climate-links-lgac-us-letter-landscape.pdf
   [https://perma.cc/U6CE-P8J7].

1    emergencies.[15]  EPA's guidance in this regard recognizes that in radiological and nuclear terrorism

2    incidents, it may be necessary for "federal departments and agencies [to] coordinate during a

3    response with state and local government counterparts," and that emergency-response personnel may

4    need to establish an incident command or unified command structure that involves "close

5    coordination with federal, state and local officials" in the immediate aftermath followed by federal

6    support for technical analyses and remediation processes in the intermediate and long runs.[16]

7            In these and many other ways, Congress and the agencies it has created foster collaboration,

8    interaction, interdependence, and mutually agreeable partnerships among local, state, and federal

9    officials.  These partnerships play an indispensable role in the day-to-day life of "our federalism"

10   under which local, state, and federal governments are "joint participants in the governance of the

11   Nation."  *See Alden v. Maine*, 527 U.S. 706, 748 (1999).

       **2.      Federal Employment-Related Laws Recognize and Respect Multilayered
12              Governance and the Interrelationships Through Which It Is Practiced.**
13

14           The centrality and ubiquity of interactions and relationships among local, state, and federal

15   government employees is an essential backdrop against which to understand three features of the

16   way Congress has structured the federal workforce.  *First*, the power to hire and fire an agency's

17   employees resides in the head of that agency, not in any centralized office such as OPM.  5 U.S.C.

18   §§ 301, 3101.  *Second*, even for employees in probationary, trial, or waiting periods, the agency

19   head's termination power is limited: termination must be based on the agency's good-faith and

20   individualized determination that the probationary employee's "work performance or conduct during

21   this period fails to demonstrate his fitness or his qualifications for continued employment"; the

22   agency must give the employee its reasons in writing; and the agency must consider the employee's

23

24   [15] EPA, *EPA for State and Local Governments*, https://www.epa.gov/ocir/epa-state-and-local-governments [https://perma.cc/SKG5-2UYD]; EPA, *RadNet*, https://www.epa.gov/radnet

25   [https://perma.cc/SD9W-N4AA]; https://www.epa.gov/radiation/protective-action-guides-pags [https://perma.cc/DM2J-QNEL].

26   [16] EPA, *PAG Manual: Protection Action Guides and Planning Guidance for Radiological Incidents*, at 73 (Jan. 2017), at https://www.epa.gov/sites/default/files/2017-

27   01/documents/epa_pag_manual_final_revisions_01-11-2017_cover_disclaimer_8.pdf [https://perma.cc/T75V-CJ5D]. It is worth noting that FEMA also offers plain-language guidance to

28   local and state agencies on the process that results in federal emergency declarations.  FEMA, How a Disaster Gets Declared: https://www.fema.gov/disaster/how-declared [https://perma.cc/N5F2-Z2ZX].

1    response before reaching a final decision (which the employee can appeal to the Merit Systems

2    Protection Board).  5 C.F.R. §§ 315.804-806; *see also* 5 U.S.C. § 2301(b)(2), (6).  And *third*, where

3    an agency head seeks to reorganize the agency itself, terminations necessary to effectuate the

4    reorganization must follow procedural rules governing Reductions in Force (RIFs), including, for

5    RIFs involving "a significant number of employees," giving 30 or 60 days' advance notice to the

6    states and "the chief elected official of such unit or each of such units of local government as may be

7    appropriate."  5 U.S.C. § 3502(d); *see* 5 C.F.R. §§ 351.801-803.

8            Each of these rules recognizes and preserves the interrelationships upon which effective

9    multilayered American governance relies.

10           Consider first that each federal agency, acting through its head, is ultimately responsible for

11   its own workforce.  This makes sense: agencies conduct their work through their workforces, and

12   when Congress establishes the agency head position, it assigns to that position ultimate

13   responsibility and accountability for the successful achievement of the agency's mission.  For

14   instance, Congress holds the Secretary of Veterans Affairs "responsible for the proper execution and

15   administration of all laws administered by the Department and for the control, direction, and

16   management of the Department."  38 U.S.C. § 303.  An agency head acting with good-faith

17   awareness of and sensitivity to their duties would appreciate the importance of hiring and retaining

18   personnel dedicated to the agency and capable of advancing its objectives, be able to develop

19   agency-specific criteria to identify those personnel, and understand that abruptly decimating their

20   workforce undercuts their own ability to achieve their agency's mission—including, as pertinent

21   here, continuation of the agency's relationships and interdependencies with its local and state

22   counterparts through which it fulfills statutory mandates or otherwise conducts its work.

23           Together, the individualized, employee-specific assessments necessary to terminate

24   probationary employees and the advance notice of RIFs to employees and state and local

25   governments also have the effect of recognizing and accounting for the relationships between federal

26   agencies and their local and state counterparts.  For any employee responsible for intergovernmental

27   collaboration, the assessment must necessarily consider the extent to which the employee engages in

28   the collaborative interactions that statute, agency policy, and job description demand.  And the

1  individualized nature of the process prevents widespread and abrupt changes to an agency's

2  capacity.  At the same time, the RIF regulations expressly acknowledge and protect

3  intergovernmental relationships: an agency must inform its local and state partners well before it

4  undertakes any major reorganization or reduction in force precisely because changes to the agency

5  affect the local and state governments within the ecosystem, and advance notice allows local and

6  state governments to plan for an agency's reorganization or reduction in its workforce.

7                                  *          *          *

8          Local governments—and, through them, the people themselves—rely on the legal framework

9  and the daily practice of interdependent collaboration.  Government workers give life and meaning

10  to the agencies they staff and the collaborations that support them.  Local governments and officials

11  like Amici have an interest in the stability of the federal workforce and, therefore, in compliance

12  with the deliberative and considered path that Congress requires agencies to follow to make

13  employment decisions, reduce their workforces, and reorganize.  It is thus hardly surprising that

14  Defendants' actions to generate abrupt, widespread, and chaotic workforce cuts simultaneously

15  violate those laws *and* pose risks to local governments and the health, safety, and welfare of the

16  people they serve.

17      **B.     Local Governments and the People Themselves Depend on Adequately Staffed
              Federal Agencies.**

18

19          Amici's experiences working with federal agency staff concretize and illuminate the risks of

20  Defendants' actions.  Amici's experiences reflect that these risks are not limited to the specific

21  agencies at which the unlawful workforce decimations occurred.  To the contrary, because local and

22  federal governments are interdependent, the effects radiate outward to the detriment of American

23  health, safety, and welfare for which all levels of government are responsible.  To underscore that

24  these consequences directly affect residents' lives and health, Amici focus here primarily on matters

25  related to public safety and public health—but those are by no means the only matters in which the

26  devastation of the federal workforce harms local governments and populations.[17]

27  ─────────────────

28  [17] For example, local government offices dedicated to veterans, like Santa Clara's Office of Veterans
    Services, expect that the abrupt termination of VA's probationary workforce starting last month will
    reverse the work they have done to enroll veterans in VA services, increase already high rates of

1   **1.    Effective Preparedness and Response to Public Safety Emergencies
       Demands Adequately Staffed Federal Agencies.**

2

3          Amici operate law enforcement, criminal justice, and other public safety agencies, employ

4   first responders, and engage in public communications that place them on the front lines of preparing

5   for and responding to natural disasters and other emergencies.  These lines of work require heavy

6   coordination and collaboration with federal and state counterparts.

7          Take, for example, the Super Bowl.  Every year a local jurisdiction hosts this massive annual

8   event.  Santa Clara hosted Super Bowl L in 2016, at Levi's Stadium.  It is preparing to host Super

9   Bowl LX in February 2026 in the same stadium, where it will also host several games of the World

10  Cup in Summer 2026.[18]  Other local jurisdictions host similar large-scale sporting events, such as the

11  Indianapolis 500 and the Kentucky Derby.  These events are so large and concentrated, and present

12  public-safety risks of such magnitude, that DHS's Office of Operations Coordination (OPS) assigns

13  them the highest available DHS Special Event Assessment Ratings (SEARs)[19] and facilitates

14  interagency coordination to prepare for them.

15

16

17  suicide and homelessness among veterans, and cause veterans to forgo care.  Local experience
    working with veterans underscores that the private-sector alternatives to the VA cannot replicate the
    VA's extensive outreach to veterans and simply lack the training or relevant experiences to

18  reproduce the VA's rapport with veterans, on which veterans' enrollment decisions are often based.
    The County itself will need to absorb the effects of veterans' reduced enrollment in benefit programs

19  and participation in other components of its social safety net.  Similarly, law enforcement and public
    safety officials in Washtenaw County, Michigan, will need to confront the effects of diminished

20  staffing at the VA's health care campus in Ann Arbor, where federal employees not only provide
    health care services but also police the campus; that could include increased crime in addition to

21  diminished healthcare.  And Head Start programs across the country may need to close or
    dramatically reduce services because the federal agency staff assigned to process their

22  reimbursements have been terminated, resulting in payment delays that are so long that many Head
    Start organizations simply cannot afford stay open.  The result can be devastating for families with

23  young children, especially in rural counties like Columbia County in upstate New York, where Head
    Start is an essential provider of early education services as well as childcare, and where Head Start

24  officials could not speak with federal agency program staff because the assigned staff had been
    terminated.

25  [18] City of Santa Clara, *Super Bowl LX and FIFA World Cup* (Feb. 26, 2025),

26  https://www.santaclaraca.gov/our-city/santa-clara-stadium-authority/super-bowl-lx-and-fifa-world-
    cup; NFL, *San Francisco Bay Area to Host Super Bowl LX in 2026* (May 23, 2023),

27  https://operations.nfl.com/updates/the-game/san-francisco-bay-area-to-host-super-bowl-lx-in-2026
    [https://perma.cc/9YPD-6CJG].

28  [19] *See* DHS, *Fact Sheet, SEAR*,
    https://www.dhs.gov/sites/default/files/publications/19_0905_ops_sear-fact-sheet.pdf
    [https://perma.cc/GD7L-RDSH].

1      Testimony from federal, state, and local officials all underscore that no level of government

2   can effectively manage the public safety risks of such large events alone.  Taking as a case study

3   Super Bowl XLVIII, played in February 2014 at MetLife Stadium in New Jersey, public safety

4   officials from all three levels of government each underscored this point.  The primary federal

5   coordinator testified that federal agencies organized themselves into a Federal Cooperation Team

6   with staff "drawn from the local jurisdiction of the event to capitalize on the existing relationships in

7   that community" precisely because it produced "a diverse team" of federal employees "with strong,

8   local relationships."[20]  This was essential to overall safety preparations, because, as a state police

9   official noted, officials needed to "coordinate[] the activities of over 100 different Federal, State,

10  county, and local agencies" comprising "28 subcommittee working groups" and "many disciplines."

11  This ultimately supported the work of the local fire department, which, its chief explained, "prepared

12  an overall operation and response plan to strategically deploy assets throughout a coordinated

13  response effort," including interagency training, drills, and other preparatory activities.[21]  The same

14  heightened, intense, and long-term interagency coordination, planning, training, and drills was true

15  and will again be true for Santa Clara,[22] just as it was true for New Orleans last month and Las

16  Vegas last year.[23]  Without such expansive support and timely access to these resources, local

17

18  [20] *Mass Gathering Security: A Look at the Coordinated Approach to Super Bowl XLVIII in New Jersey and Other Large-Scale Events: Field Hearing Before the Subcomm. on Emergency*

19  *Preparedness, Response, and Comms.*, H.R. Rep. Serial No. 113-73 (June 23, 2014), at 7, 9-10 (testimony of DHS Special Agent in Charge Andrew McLees),

20  https://www.congress.gov/113/chrg/CHRG-113hhrg90883/CHRG-113hhrg90883.pdf [https://perma.cc/HP3J-P3CS].

21  [21] *Id.* at 12, 18 (testimony of New Jersey State Police Deputy Superintendent Edward Cetnar and City of Newark Fire Chief John G. Centanni).

22  [22] DHS, *Secretary Johnson Highlights Super Bowl 50 Security Operations* (Feb. 3, 2016)

23  (describing, among other things, extensive coordination and cross-agency trainings with local and state law enforcement in Bay Area), https://www.dhs.gov/archive/news/2016/02/03/secretary-

24  johnson-highlights-super-bowl-50-security-operations [https://perma.cc/J9KE-RPRB].

25  [23] In fact, interagency coordination was even more pronounced in New Orleans in light of the New Year's Day terrorist attack in 2025 in that city.  *See* DHS, *DHS Agencies Support Super Bowl LIX*

26  *Security* (Feb. 3, 2025) (noting the "heightened threat environment" based on the terror attack and that "[m]ore than 690 employees representing 12 DHS agencies are in New Orleans . . . as part of a 20-year partnership with the [NFL] and state and local law enforcement."),

27  https://www.dhs.gov/news/2025/02/03/dhs-agencies-support-super-bowl-lix-security [https://perma.cc/5U3U-UW48]; *see also* New Orleans Police Dep't, *NOPD Announces Security*

28  *Update For Superbowl & Mardi Gras* (Jan. 28, 2025), https://nopdnews.com/post/january-2025/nopd-announces-security-update-for-superbowl-mardi [https://perma.cc/4QB5-4NDG]; J.

1    governments cannot adequately prepare for, protect, and mitigate harm to their jurisdictions during

2    such large-scale events.

3         Emergency management addresses much more than large, one-off sporting events, and local

4    emergency-management officials collaborate with federal counterparts in a variety of ways to plan

5    for and respond to emergencies.  For Santa Clara's Office of Emergency Management, for instance,

6    weather is always a critical preparedness factor to understand clearly—both because weather itself

7    can present emergent risks and also because weather is a key part of the situational awareness that

8    emergency responders must have.[24]  This is why OEM, like many other local emergency-

9    management agencies, has long relied on its relationships with the National Weather Service to

10   proactively provide real-time information about emergent threats, respond promptly to requests for

11   information and briefings for local officials, and, when necessary, develop detailed spot weather

12   reports for specific areas of concern—particularly when assessing wildfires, floods, hazardous

13   materials risks, search and rescue operations, and other public-safety threats and severe weather

14   events.[25]  NWS develops and disseminates this information through the work of its staff, who gather

15   data from satellites, radar, and other systems, develop and operate computer modelling programs,

16   interpolate observers' collected data and visual confirmation, synthesize it all to create "accurate

17

18   _____

19   Bebon, *How Feds Are Tackling Security for Super Bowl LIX*, Facilities Management Advisor (Feb. 6, 2025), https://facilitiesmanagementadvisor.blr.com/security/how-feds-are-tackling-security-for-super-bowl-lix [https://perma.cc/62JV-YEHR]; DHS, *DHS Works with NFL, Nevada, and Las Vegas*

20   *Partners to Secure Super Bowl LVIII* (Feb. 7, 2024) ("[f]or the past 18 months, DHS employees worked with local officials to assess potential risks and developed plans to address them," and

21   "[o]ver 385 DHS personnel are deployed in Las Vegas") https://www.dhs.gov/archive/news/2024/02/07/dhs-works-nfl-nevada-and-las-vegas-partners-secure-

22   super-bowl-lviii [https://perma.cc/62JV-YEHR].

23   [24] Cnty. of Santa Clara, *Emergency Ops. Plan* (Jan. 2022), at 79 ("Current weather forecast" is the first item on the typical Daily Situation Awareness Update),

24   https://files.santaclaracounty.gov/exjcpb1566/migrated/2022%20EOP_County%20of%20Santa%20 Clara_01.20.2022%20Accessibility%20Check.pdf; *see also id.* at 8-9, 14-15 (noting potential for

25   weather-related emergencies).

26   [25] *Id.* at 8-9, 14-15; NWS, *Instruction 10-401: Fire Weather Services Product Specification*, at 10-15 (describing spot forecasts and their functions) (Apr. 15, 2024), https://www.weather.gov/media/directives/010_pdfs/pd01004001curr.pdf [https://perma.cc/Z6YB-

27   ZD53]; Nat'l Wildfire Coordinating Group, *Types of Fire Weather Forecasts* (Jan. 7, 2025), https://www.nwcg.gov/publications/pms425/3-types-of-fire-weather-forecasts

28   [https://perma.cc/4NLW-USH5]; NWS, *Spot Forecast Requests Instructions*, https://www.weather.gov/hfo/fws [https://perma.cc/V6G5-25LC]; *see also* Part I.A.1 and footnotes 8-10 above.

outlooks, forecasts, and warnings," continuously update NWS's heavily trafficked website, and interface directly with emergency management and other officials at all levels of government.[26] OEM relies on the NWS employees who produce these reports because NWS's precise and specific predictions form the platform for local first responders' efforts to prevent fatalities, injuries, and property-related loss and damage during and after emergencies.  Without adequate knowledgeable, responsive staff at local NWS offices to immediately prepare and share such information, local governments may well be unable to access the time-sensitive and expert work of the NWS, which could in turn substantially diminish the effectiveness of its emergency response.  Media reports confirm that the public-safety consequences of inadequate NWS staffing is a matter of critical national consequence.[27]

The Federal Emergency Management Agency and other federal agencies are also essential partners for effective local response to, and recovery from, disasters.  FEMA's employees provide local governments, communities, and individuals critical, time-sensitive operational support during and after natural disasters such as hurricanes, floods, tornadoes, and wildfires, as well as emergencies like mass shootings and terrorist attacks.  Over the last four years, FEMA's workforce has responded to 278 disasters nationwide, providing 50.8 million liters of water, 31.4 million meals, and more than 2,200 generators to meet individuals' immediate needs; paying over $12 billion to disaster survivors for recovery; and awarding over $133 billion to local governments and others for the extraordinary expenses incurred for emergency response and recovery.[28]  Underscoring its appreciation for the coordination required in disaster recovery, FEMA has published a "Post-Disaster Guide for Local Officials" which recognizes that "[s]uccessful recovery requires accessing

---

[26] *See* NWS, *Who We Are* (Feb. 1, 2010), https://www.weather.gov/media/mkx/general/noaa-nws-who-we-are.pdf [https://perma.cc/R6FH-YEX8].

[27] A. Graff & C. Baker, *Cuts to National Weather Service Leave Forecasters Reeling*, N.Y. Times (Mar. 1, 2025), https://www.nytimes.com/2025/03/01/weather/national-weather-serivce-cuts-trump-impact.html.  Local governments depend on other components of NOAA, too, including, for example, the City of San Diego's coordination with NOAA to protect local marine animals under the Marine Mammal Protection Act.

[28] FEMA, *FEMA Four Years in Review* (Jan. 17, 2025), https://www.fema.gov/press-release/20250121/fema-four-years-review, *archived at* Wayback Machine, https://web.archive.org/web/20250207163643/https://www.fema.gov/press-release/20250121/fema-four-years-review#expand (captured Feb. 7, 2025) [https://perma.cc/T8YE-4AXR].

a full range of federal, state, local, tribal, territorial, private, and non-governmental resources."[29]

Indeed, beyond financial support, local governments depend on FEMA to provide labor-intensive support services in the aftermath of disasters. For instance, during and after the SCU Lightning Complex wildfires that scorched massive swaths of Santa Clara County in Summer 2020, FEMA provided on-the-ground logistical support localized in the place where individuals affected by the fire lived. In coordination with Santa Clara's OEM, and just two weeks after the fires had been contained, FEMA built, opened, and operated a Mobile Registration Intake Center to support residents.[30] This required FEMA staff to retrieve, supply, and drive mobile homes and other vehicles to the affected area, build infrastructure, and then staff the center all day with employees knowledgeable about the processes and requirements for residents to get low-interest loans and other assistance. FEMA's work complemented, but did not replace, local officials' disaster-response work and their efforts to anticipate and mitigate the harms of future fires.[31] Given the heavy workload necessary for FEMA to provide logistical assistance of this kind, and the fact that FEMA was already understaffed, mass terminations at FEMA will almost certainly lead to diminished disaster-recovery support for localities and an increased risk of dislocation, financial and physical harm, and even death for disaster victims.[32] FEMA staff provided similar support to counties throughout California and their residents in the aftermath of severe storms and flooding in Winter 2022-2023,

---

[29] FEMA, *Achieving Equitable Recovery: A Post-Disaster Guide for Local Officials*, at 2 (Jan. 2023), https://www.fema.gov/sites/default/files/documents/fema_achieving-equitable-recovery-a-post-disaster-guide-local-officials-draft.pdf [https://perma.cc/9QAV-FXRU].

[30] FEMA, *Mobile Registration Intake Center Open in Santa Clara County* (Oct. 16, 2020), https://www.fema.gov/press-release/20250121/mobile-registration-intake-center-open-santa-clara-county [https://perma.cc/393B-KPJ6].

[31] *See, e.g.*, Cnty. of Santa Clara Dep't of Planning & Development, *SCU Lightning Complex Fire recovery and rebuild*, https://plandev.santaclaracounty.gov/programs-and-studies/planning-studies/scu-lightning-complex-fire-recovery-and-rebuild; Cnty. of Santa Clara, *County of Santa Clara Ramps Up Wildfire Prevention Efforts* (May 3, 2022), https://news.santaclaracounty.gov/news-release/county-santa-clara-ramps-wildfire-prevention-efforts.

[32] L. Sommer, *What the firings at FEMA could mean for the next hurricane or wildfire*, NPR (Feb. 21, 2025), https://www.npr.org/2025/02/21/nx-s1-5301064/trump-fema-layoffs-disasters-hurricanes [https://perma.cc/KV4V-LYXX] (current and former FEMA employees expect that probationary employee terminations are "likely to hinder FEMA's ability to respond to disasters").

1  opening and staffing labor-intensive disaster recovery centers up and down the state.[33]

2          The same effects are likely to be seen from workforce cuts at EPA and USDA.  Both

3  agencies played critical roles in the aftermath of the SCU Lightning Complex fires, with experienced

4  USDA employees setting up and staffing a nearby field station to help guide ranchers who lost their

5  livestock grazing lands through the process of applying for low-interest loans, obtaining machinery

6  and tools, and even repairing damaged equipment.  EPA also had staff on the ground to help with

7  debris removal and ensure areas were cleared of hazardous waste and other contaminants so that

8  impacted residents could return home safely.

9          Wildfire safety and management is another case in point.  The U.S. Forest Service, which

10 operates under the auspices of the USDA, manages the National Forest System.[34]  The Forest

11 Service coordinates extensively with state and local governments when managing national wildland,

12 including when conducting prescribed burns.[35]  And these efforts are critical to public safety not

13 only within national forests, but also in neighboring cities and counties.  Residents of San Diego, for

14

15

16 [33] *See, e.g.*, FEMA, *FEMA Hiring Locally to Continue Disaster Recovery* (Mar. 7, 2023), https://www.fema.gov/press-release/20230308/fema-hiring-locally-continue-disaster-recovery [https://perma.cc/2YBA-DNLB]; FEMA, *Three Disaster Recovery Centers Open in Santa Cruz County* (Feb. 16, 2023), https://www.fema.gov/press-release/20230217/three-disaster-recovery-centers-open-santa-cruz-county [https://perma.cc/5TLZ-9MWM]; FEMA, *Ventura Disaster Recovery Center Open at Fairgrounds* (Feb. 10, 2023), https://www.fema.gov/press-release/20230211/ventura-disaster-recovery-center-open-fairgrounds [https://perma.cc/8HLX-RYHA]; FEMA, *Disaster Recovery Centers to Open in Alameda and San Mateo Counties* (Feb. 9, 2023), https://www.fema.gov/press-release/20230210/disaster-recovery-centers-open-alameda-and-san-mateo-counties [https://perma.cc/2U2P-ADW3]; FEMA, *Calaveras County Disaster Recovery Center Opens Feb. 1 at Angels Camp* (Jan. 31, 2023), https://www.fema.gov/press-release/20230202/calaveras-county-disaster-recovery-center-opens-feb-1-angels-camp [https://perma.cc/C7M3-KYP6]; FEMA, *Help is Available at the Disaster Recovery Center* (Jan. 25, 2023), https://www.fema.gov/fact-sheet/help-available-disaster-recovery-center [https://perma.cc/ZK4U-DH4F]; FEMA, *Sacramento County Disaster Recovery Center Open* (Jan. 19, 2023), https://www.fema.gov/press-release/20250121/sacramento-county-disaster-recovery-center-open [https://perma.cc/4GNR-3EDE]; FEMA, *Disaster Recovery Center Opens in Merced County* (Jan. 18, 2023), https://www.fema.gov/press-release/20230123/disaster-recovery-center-opens-merced-county [https://perma.cc/WJ27-6FNE]; *see also* FEMA, *FEMA Offers Mobile and Fixed Centers for Assistance* (Feb. 3, 2023), https://www.fema.gov/fact-sheet/fema-offers-mobile-and-fixed-centers-assistance [https://perma.cc/V62X-MSXF].

26 [34] 16 U.S.C. § 551.

27 [35] *See* footnote 5 above; *see also* Nat'l Wildfire Coordinating Group, *About Us*, https://www.nwcg.gov/about-us [https://perma.cc/M9ZW-JHB7]; Dep't of Interior, *Behind the Scenes: Who is Responsible for Wildfire* https://www.doi.gov/wildlandfirenews/behind-scenes-who-responsible-wildfire-management-us [https://perma.cc/F749-9AFA] ; U.S. Forest Serv. *Wildland Fire*, https://www.fs.usda.gov/managing-land/fire.

1    example, suffered greatly in 2003 when a fire that started in the Cleveland National Forest expanded

2    beyond the forest and reached the City of San Diego.  By the time the fire was contained, the fire had

3    consumed some 280,000 acres and killed more than a dozen people.[36]  Within the City of San Diego,

4    the fire burned 28,676 acres, destroyed 335 structures, damaged 71 structures, and caused a loss of

5    $204 million.[37]  Because inadequate staffing, including of experts, in the U.S. Forest Service can

6    preclude or undermine effective wildland management, staffing cuts within the agency place

7    neighboring people, lands, and structures in real, direct, and potentially immediate jeopardy of

8    catastrophic wildfires, flooding, and other natural hazards whose ravages local governments are

9    directly accountable for addressing.  And because the intensity and size of wildfires have increased

10   with climate change, wildfires often require the combined forces of federal, state, local, and even

11   international firefighting departments.  A reduction in Forest Service staff would also mean fewer

12   mutual aid resources available for local jurisdictions and greater demands on local firefighters to aid

13   in fighting fires on federal land.[38]  Marin County faces these risks directly, since it relies on federal

14   agency partners to maintain forest health and prevent wildfires, manage invasive species, monitor

15   and track wildlife, and prevent illegal use of trails on public lands.  In fact, the City of Tucson has

16   already seen the effects of staffing reductions, which have delayed and limited the Forest Service's

17   ability to process programs, travel, and execute a grant.

18              **2.      Dismantling Federal Agencies Will Undermine and Stymie Local Public
                          Health Agency Efforts, With Devastating Effects on Public Health.**
19

20            Many Amici also operate public health programs through which they monitor and address the

21   spread of infectious diseases and other matters of community-wide health concern.  The federal

22   infrastructure related to these needs is robust, and the availability of adequate federal staffing

23   directly affects local governments' ability to protect and treat their individual residents' healthcare

24

25

26   [36] FEMA, *The California Fires Coordination Group: A Report to the Secretary of Homeland Security*, at 15 (Feb. 13, 2004), https://www.fema.gov/pdf/library/draft_cfcg_report_0204.pdf [https://perma.cc/KNA5-8B4C].

27   [37] City of San Diego, *2003 - Cedar Fire*, https://www.sandiego.gov/fire/about/majorfires/2003cedar [https://perma.cc/GD7L-RDSH].

28   [38] U.S. Forest Serv., *Cedar Fire Report Q&As*, https://www.fs.usda.gov/detailfull/cleveland/home/?cid=stelprdb5296748.

needs and safeguard the public health of the community.  These staff work primarily, but not only, in

the Centers for Disease Control (CDC), the Food and Drug Administration (FDA), and other

components of the Department of Health & Human Services (HHS).

Local health departments and emergency management offices rely on the federal government

to quickly deliver medicine during public health emergencies.  Consider the nation's Strategic

National Stockpile, which contains large quantities of medicine and medical supplies available for

deployment in response to terrorist attacks, disease outbreaks, earthquakes, and other emergencies

that would exhaust local supplies.  HHS administers the stockpile through its Administration for

Strategic Preparedness and Response (ASPR), which staffs the office responsible for the stockpile

"24 hours a day, 7 days a week, and 365 days a year."[39]  When a local public health official needs

"emergency medical countermeasures" in the stockpile, that official must submit "critical

information" to "ASPR watch officers," who then coordinate immediately with a variety of federal

officials and hold "a conference call with all involved parties" as soon as possible after a request is

made, often within minutes.[40]  If ASPR approves the request, it works quickly to make the

medication available as quickly as possible.  Federal workers' prompt, indeed *immediate*, response is

necessary because the issues they address may be urgent and life-threatening—"especially for

Category A threats like anthrax or smallpox that require rapid response."[41]  But HHS's ability to

respond quickly to stockpile requests is now questionable based on reports that ASPR staff have

been terminated.[42]

In many other ways, too, local public health efforts depend on federal agencies being

adequately staffed with knowledgeable workers.  The CDC and FDA each act as gatekeepers for

certain drugs that healthcare providers (including local governments that, like Santa Clara, operate

hospitals and clinics) and local public health officials may need to access for "patients with serious

[39] HHS ASPR, *Requesting SNS Assets*, https://aspr.hhs.gov/SNS/Pages/Requesting-SNS-Assets.aspx.

[40] *Id.*; HHS ASPR, *Products: Strategic National Stockpile*, https://aspr.hhs.gov/SNS/Pages/Products.aspx.

[41] HHS ASPR, *Requesting SNS Assets*, footnote 39 above.

[42] A. Tin, *Thousands of probationary federal health agency workers fired by letter this weekend. Here's what it said.*, CBS News (Feb. 15, 2025), https://www.cbsnews.com/news/thousands-of-probationary-federal-health-agency-workers-fired-by-letter-this-weekend.

1    diseases or conditions when there is no comparable or satisfactory alternative therapy to diagnose,

2    monitor, or treat the patient's disease or condition."[43]  For example, the CDC Drug Service controls

3    access to certain drugs to treat anthrax, botulism, smallpox, and mpox, because the drugs are not

4    licensed or commercially available in the United States.[44]  When providers and officials submit

5    time-sensitive requests to the CDC, they depend on Drug Service staff to quickly receive,

6    understand, and assess the request and then take steps to ensure delivery of the requested drug within

7    a day.  When CDC staff is cut—and especially when it is cut so abruptly and dramatically—risks

8    increase considerably that the CDC will not have enough personnel, or the right personnel, to ensure

9    the requesters get timely access to these crucial drugs.  Similarly, the FDA has established

10   application forms, processes, and systems for providers (again including local governments that

11   operate hospitals and clinics) to seek and gain expanded access to investigational drugs unavailable

12   in standard pharmacies and formularies.[45]  Indeed, the FDA expressly recognizes that time can be of

13   the essence in its regulations, which permit authorization by telephone, rather than the default of

14   careful review of written applications, in certain emergency circumstances.[46]  The County of Santa

15   Clara Health System currently holds FDA-approved protocols for its expanded access to Tecovirimat

16   (the treatment for mpox) and has previously obtained expanded access to a particular vaccine for

17   yellow fever when there was a nationwide shortage of the FDA-approved yellow fever vaccine.

18   Cuts to FDA staff are likely to diminish its ability to respond as urgently and promptly to these

19   requests as medical and public health circumstances require.

20        Degradation of the HHS workforce affects local governments and their residents in other

21   ways, too.  For example, local governments that operate pharmacies rely on the FDA's drug

22   shortages list to know when certain drugs are in such short supply that they are authorized to

23

24   [43] FDA, Center for Drug Evaluation and Research (CDER) and Center for Biologics Evaluation and
25   Research (CBER), "Expanded Access to Investigational Drugs for Treatment Use—Questions and
     Answers: Guidance for Industry" (Oct. 2017), available at:
26   https://www.fda.gov/media/85675/download; *see generally* 21 C.F.R. Part 312, Subpart I.

     [44] CDC, *Our Formulary*, https://www.cdc.gov/laboratory/drugservice/formulary.html
27   [https://perma.cc/EMM4-7PN4].

28   [45] 21 C.F.R. § 312.300(a); *see generally* FDA, *Expanded Access* (Jun. 1, 2016),
     https://www.fda.gov/news-events/public-health-focus/expanded-access.

     [46] 21 C.F.R. § 312.310(d).

produce their own compounded drugs as substitutes.[47]  With inadequate staffing, the FDA may not maintain and update the shortage list promptly, thus preventing local compounding pharmacies from making the drugs necessary to protect the health and safety of their patients.  And reductions in the CDC workforce may hinder the swift action necessary for preventing and controlling the spread of serious communicable diseases like measles, infectious tuberculosis, and meningitis.  For individuals flying into their jurisdictions, local health departments rely on the CDC to notify them of travelers who have been diagnosed or exposed with a disease.[48]  Upon receiving that information, local health departments are able to immediately begin case investigation and contact tracing to ensure isolation, quarantine, and other appropriate measures.  For sick and exposed individuals who intend to fly into or out of their jurisdictions and who could thereby expose additional individuals, local health departments also partner with the CDC to elevate issues quickly and get individuals added to the federal Do Not Board list for air travel and the federal Public Health Lookout for travel through a port of entry by land, sea, or air.[49]  The County of Santa Clara's Public Health Department worked with the CDC in 2024, for example, to add a resident with infectious tuberculosis to the Do Not Board list, because the resident refused to comply with his treatment regimen and threatened to board an international flight.[50]

The CDC also operates a Laboratory Response Network that comprises public health

---

[47] FDA, *Compounding when Drugs are on FDA's Drug Shortages List* (Dec. 18, 2024), https://www.fda.gov/drugs/human-drug-compounding/compounding-when-drugs-are-fdas-drug-shortages-list.

[48] CDC, *Protecting Travelers' Health from Airport to Community: Investigating Contagious Diseases on Flights* (May 15, 2024), https://www.cdc.gov/port-health/contact-investigation/index.html [https://perma.cc/DCV9-EMHN].

[49] CDC, *Travel Restrictions to Prevent the Spread of Contagious Disease*, https://www.cdc.gov/port-health/travel-restrictions/index.html [https://perma.cc/HJ53-3PRC]; *see also* CDC, *Travelers' Health, Airplanes & Cruise Ships: Illness & Death Reporting & Public Health Interventions*, https://wwwnc.cdc.gov/travel/yellowbook/2024/air-land-sea/airplanes-and-cruise-ships-illness-and-death-reporting [https://perma.cc/R4HG-72WQ]; CDC, Criteria for Requesting Federal Travel Restrictions for Public Health Purposes, Including for Viral Hemorrhagic Fevers, Notice, 80 Fed. Reg. 16,400 (Mar. 27, 2015).

[50] *See generally* CDC Committee on Analysis to Enhance the Effectiveness of the Federal Quarantine Station Network Based on Lessons Learned from the COVID-19 Pandemic, *Improving the CDC Quarantine Station Network's Response to Emerging Threats*, at 155-56 (2022), https://www.ncbi.nlm.nih.gov/books/NBK583906/pdf/Bookshelf_NBK583906.pdf [https://perma.cc/9JXD-DEXE] (CDC's "collaborations with various STLT [state, territorial, local, and tribal] partners are critical in preventing onward transmission of infectious diseases.").

laboratories run by state and local governments, the CDC, other federal agencies, and other partners. Together, these laboratories form a national network capable of responding to bioterrorism, chemical terrorism, emerging infectious diseases, and other public health emergencies by ensuring rapid testing, notifications, and response coordination among local, state, and federal partners.[51]  In the early days of the COVID-19 pandemic, state and local health departments and healthcare providers had no other option than to send samples to the CDC to confirm whether a patient had COVID-19. While that is no longer the case for COVID-19, it would be for any new and emergent infectious disease, and local governments therefore depend on adequate staffing of experts at the CDC to protect the public health.  Local health departments also rely on the CDC for information sharing about emerging infectious diseases and other public health threats, like mpox;[52] coordination among states to respond to specific cases; guidance on unusual cases; and development of vaccine recommendations, via the CDC's Advisory Committee on Immunization Practices.

HHS's Health Resources & Services Administration (HRSA) is another example.  HRSA administers various programs to ensure quality healthcare for populations that are geographically isolated or economically or medically vulnerable.  These include the Bureau of Primary Health Care, which provides critical funding for federally qualified health centers (FQHCs) serving medically underserved areas, including FQHCs run by local governments; the Ryan White HIV/AIDS program, which local governments administer and which serves as a payor of last resort so that individuals with HIV can access medical care, food, housing, and other support services; and the 340B program, which provides major discounts on prescription drugs to safety net providers, including health systems operated by local governments.  Because HRSA assigns officers to manage grants, oversee local programs, and monitor local program performance, local governments rely on an adequately

---

[51] CDC, *About The Laboratory Response Network* (Oct. 17, 2024) https://www.cdc.gov/laboratory-response-network/php/about/index.html [https://perma.cc/HJ53-3PRC].

[52] CDC, *National Notifiable Diseases Surveillance System (NNDSS)*, https://www.cdc.gov/nchs/hus/sources-definitions/nndss.htm [https://perma.cc/A62Q-QGXQ; CDC, *How We Conduct Case Surveillance*, https://www.cdc.gov/nndss/what-is-case-surveillance/conducting.html [https://perma.cc/3NNZ-LJ4Q]; CDC, *EIP Network Activities*, https://www.cdc.gov/emerging-infections-program/php/network-activities/index.html [https://perma.cc/8RUD-NCHF]; CDC, *Collaborating Office for Medical Examiners and Coroners*, https://www.cdc.gov/emerging-infections-program/php/network-activities/index.html [https://perma.cc/8RUD-NCHF].

staffed office for timely and accurate responses and processing of documents necessary for local governments to access critical sources of funding for the provision of safety net services.

In yet other ways, local governments will feel and need to address the effects of inadequate federal staffing. Food safety typifies this point. While local health departments are responsible for inspecting food facilities, investigating foodborne illnesses, and preventing the spread of communicable diseases, the safety of the nation's food supply ultimately rests with the FDA and USDA. Local health authorities like the County of Santa Clara can—and do—monitor and communicate with the public about the spread of emergent diseases, like the Winter 2025 emergence of Avian Influenza A (H5N1),[53] but the FDA maintains responsibility for ensuring the safety of the milk, dairy products, and animal feed supply[54] and the USDA's Food Safety Inspection Service, which has exclusive jurisdiction of more than 95 percent of animals (other than poultry) slaughtered in the United States, is responsible for ensuring that the nation's meat supply is free from disease and contamination.[55] Yet USDA has been facing recruiting and retention challenges for several years, so its inspection ranks are already stretched too thin for effective regulation and enforcement;[56] further reductions in staffing would spell disaster for local public health officials and hospital systems responsible for treating and responding to people sickened by foodborne illnesses.[57] In similar ways,

---

[53] *See* County of Santa Clara, Department of Public Health, *H5N1 bird flu*, https://publichealth.santaclaracounty.gov/diseases/h5n1-bird-flu.

[54] FDA, *Investigation of Avian Influenza A (H5N1) Virus in Dairy Cattle* (Jan. 17, 2025), https://www.fda.gov/food/alerts-advisories-safety-information/investigation-avian-influenza-h5n1-virus-dairy-cattle; 21 U.S.C. § 393 (establishing the FDA and its mission).

[55] USDA, National Agricultural Statistics Service, https://usda.library.cornell.edu/concern/publications/r207tp32d.

[56] *See, e.g.*, U.S. Government Accountability Office (U.S. GAO), GAO-10-487T, Testimony Before the Subcommittee on Domestic Policy, etc., Humane Methods of Slaughter Act: Weaknesses in USDA Enforcement (Mar. 4, 2010), https://www.gao.gov/assets/gao-10-487t.pdf [https://perma.cc/MJJ2-EDPT]; Hr'g Before Senate Committee on Ag, Nut, and Forestry, 118th Cong (Mar. 16, 2023), at 51 (testimony of Secretary of Agriculture Tom Vilsack) (USDA is "increasing staffing, but candidly, . . . we have significant competition" for employees and "it is tough to work for the government these days. . . . People feel put upon in terms of the criticism that is often the case with public service. I think we need to be very careful about making sure that we are bolstering public service, we are supporting public service so that we can continue to get enough people willing to do the jobs that are important to be done."), https://www.congress.gov/118/chrg/CHRG-118shrg53651/CHRG-118shrg53651.pdf [https://perma.cc/3BZX-9TMD].

[57] U.S. GAO, GAO-25-107613, *Food Safety: USDA Should Take Additional Actions to Strengthen Oversight of Meat and Poultry* (Jan. 2025), https://www.gao.gov/assets/gao-25-107613.pdf

1  local police and law enforcement agencies rely on effective federal partners and will need to clean

2  up the consequence—increased crime, decreased property values, and danger and harm to

3  neighbors—when those federal partner agencies' workforces are decimated.[58]

4                          *          *          *

5         These are just some of the myriad examples in which Amici, and all local governments and

6  their officials across the country, fulfill their own missions to protect and serve their residents

7  through interactions, relationships, voluntary cooperation, and interdependency with the federal

8  employees who staff and operate administrative agencies charged with a wide range of activities that

9  promote the public good.

10                        **IV. CONCLUSION**

11        Governance—the work of government employees—maintains its validity when it advances

12 the common good: when it protects and uplifts people precisely when they would otherwise be left to

13 suffer alone the tragedy of the commons, the pains of market failures, and the costs of unchecked

14 externalities.  Defendants' actions to dismantle federal agency workforces undermines this

15 fundamental office of governance.  Amici's experiences demonstrate that the harm wrought by

16 Defendants' unlawful actions to abruptly and broadly decimate and dismantle federal agency

17 workforces extends far beyond the directly affected agencies and their employees.  As the frontline

18 of American governance, local governments and officials know firsthand just how widespread and

19 devastating the abrupt and unlawful dismantling of federal agency workforces will be for local

20 governments themselves and the lives, limbs, health, comfort, and quiet of all persons they serve.

21        For these reasons, the Court should grant the relief sought by the Plaintiffs.

22

23 Dated:  March 11, 2025                          Respectfully submitted,

24                                                TONY LOPRESTI
                                                 COUNTY COUNSEL

25                                                By:  /s/ Raphael N. Rajendra

26                                                RAPHAEL N. RAJENDRA
                                                 Deputy County Counsel

27

28 [https://perma.cc/78EV-QT8S] (noting that "one in six Americans get sick and 3,000 die from
   foodborne illness every year").

   [58] See, for example, footnote 17 above regarding the VA health center in Ann Arbor, Mich.

KAVITA NARAYAN
MEREDITH A. JOHNSON
JENNY S. LAM
STEFANIE L. WILSON

*Attorneys for Amicus Curiae*
*County of Santa Clara*

*Additional amici and counsel*
*listed below*

## ADDITIONAL AMICI

### Local Governments

DAVID CHIU
City Attorney
City Hall Room 234
One Dr. Carlton B. Goodlett Pl.
San Francisco, CA 94102

*Attorney for the City and County of San Francisco, Calif.*

MARY B. RICHARDSON-LOWRY
Corporation Counsel
121 North LaSalle Street, Suite 600
Chicago, Illinois 60602

*Attorney for the City of Chicago, Ill.*

ZACHARY M. KLEIN
Columbus City Attorney
77 N. Front Street, 4th Floor
Columbus, OH 43215

*Attorney for the City of Columbus, Ohio*

ALEXANDRA RUGGIE
Corporation Counsel
2100 Ridge Avenue
Evanston, IL 60201

*Attorney for the City of Evanston, Ill.*

KRISTYN ANDERSON
City Attorney
City of Minneapolis, Minnesota
350 S. Fifth Street
Minneapolis, MN 55415

*Attorney for the City of Minneapolis, Minn.*

MURIEL GOODE-TRUFANT
Corporation Counsel
100 Church Street
New York, New York 10007

*Attorney for the City of New York, New York*

KRYSIA KUBIAK
City Solicitor and Chief Legal Officer
414 Grant Street
Pittsburgh, PA 15219

*Attorney for the City of Pittsburgh, Pa.*

HEATHER FERBERT
City Attorney
1200 Third Ave., Suite 1620
San Diego, CA 92101

*Attorney for the City of San Diego, Calif.*

DOUGLAS T. SLOAN
City Attorney
1685 Main Street, Room 310
Santa Monica, CA 90401

*Attorney for the City of Santa Monica, Calif.*

MIKE RANKIN
City Attorney
P.O. Box 27210
Tucson, AZ 85726-7210

*Attorney for the City of Tucson, Ariz.*

CHRISTINA SANCHEZ
El Paso County Attorney
320 S. Campbell Street, Suite 200
El Paso, TX 79901

*Attorney for El Paso County, Tex.*

CHRISTIAN D. MENEFEE
Harris County Attorney
JONATHAN G. C. FOMBONNE
Deputy County Attorney & First Assistant
TIFFANY S. BINGHAM
Managing Counsel
Office of the Harris County Attorney
1019 Congress, 15th Floor
Houston, Texas 77002

*Attorneys for Harris County, Tex.*

DAVID J. HACKETT
General Counsel to King County Executive
Chinook Building
401 5th Avenue, Suite 800
Seattle, WA 98104

*Attorney for King County, Wash.*

DONNA R. ZIEGLER
County Counsel
1221 Oak Street, Suite 450
Oakland, California 94612

*Attorney for the County of Alameda, Calif.*

BRIAN E. WASHINGTON
County Counsel
3501 Civic Center Drive, Rm 275
San Rafael, CA 94903

*Attorney for the County of Marin, Calif.*

WALLACE W. DIETZ
Director of Law
108 Metropolitan Courthouse
P.O. Box 196300
Nashville, TN 37219-6300

*Attorney for the Metropolitan Government of Nashville & Davidson County, Tenn.*

## Local Government Officials

RYAN RICHARDSON
*City Attorney, City of Oakland, Calif.*

ELI SAVIT
*Prosecuting Attorney, Washtenaw County, Mich.*

CHRISTIAN D. MENEFEE
*County Attorney, Harris County, Tex.*

VANESSA FUENTES
*Mayor Pro Tem, City of Austin, Tex.*

DANIEL BLISS
*Mayor, City of Evanston, Ill.*

RAVINDER BHALLA
*Mayor, City of Hoboken, New Jersey*

DONTAE PAYNE
*Mayor, City of Olympia, Wash.*

RYAN MELLO
*County Executive, Pierce County, Wash.*

JOHN CLARK
*Mayor, Town of Ridgway, Colo.*

JARED LENTINI
*Director, Town of Manchester, Conn.*

ISABEL PIEDMONT-SMITH
*Councilmember, City of Bloomington, Ind.*

ROBIN WILT
*Councilmember, Town of Brighton, New York*

RICHARD T. WOLF
*Supervisor, Town of Copake, New York*

D. MICHAEL DVORCHAK
*Supervisor, Town of Hillsdale, New York*

MICHELE HIRSCH
*Alderperson, City of Kingston, New York*

TISTRYA HOUGHTLING
*Minority Leader, Town of New Lebanon, New York and*
*Supervisor, Columbia County, New York*

ALEXANDER MARION
*Auditor, City of Syracuse, New York*

GINNY WELSCH
*Councilmember, City of Nashville, Tenn.*

OLGY DIAZ
*Councilmember, City of Tacoma, Wash.*

MICHAEL CHAMEIDES
*Supervisor, Columbia County, New York*

SUSAN HUGHES-SMITH
*Legislator, Monroe County, New York*

ROBERT J. HARVIE, JR.
*Commissioner & Chair, County of Bucks, Pa.*

DIANE M. ELLIS-MARSEGLIA, LCSW
*Commissioner & Vice-Chair, County of Bucks, Pa.*

BRAXTON WHITE
*Commissioner, Clarion County, Penn.*

JACKIE BUTLER
*Commissioner, El Paso County, Tex.*

ILIANA HOLGUIN
*Commissioner, El Paso County, Tex.*

CHRISTOPHER JARAMILLO
*School Board President, Norristown Area School District, Norristown, Pa.*

3225516

---

Brief of Amici Curiae Local Governments and Local Government Officials          Case No. 3:25-cv-01780-WHA