UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO,
et al.,

          Plaintiffs,

    v.

UNITED STATES OFFICE OF
PERSONNEL MANAGEMENT, et al.,

          Defendants.

No.  C 25-01780 WHA

**MEMORANDUM**

**INTRODUCTION**

Each federal agency has the statutory authority to hire and fire its employees, even at scale, subject to certain safeguards.  The Office of Personnel Management has no authority to hire and fire employees in another agency.  Yet that is what happened here — *en masse*.  OPM directed all (or at least most) federal agencies to terminate all probationary employees for "performance."  Because the organizational plaintiffs in this case have shown they will suffer irreparable harm resulting from the immediate impairment of public services (and meet other tests), they are entitled to a preliminary injunction.  The Court granted it from the bench — ordering the reinstatement of probationary employees at the relevant agencies.

United States District Court
Northern District of California

**STATEMENT**

*First*, OPM directed other agencies to fire their probationary employees.

A "Forest Service Briefing Paper" circulated by its human resource management to "Supervisor[s]/Leader[s]" stated:

> All federal agencies, including the Department of Agriculture, were notified on February 12, 2025, by the Office of Personnel Management (OPM) to terminate all employees who have not completed their probationary or trial period. . . .  OPM *directed* agencies to separate Probationary employees starting 2/13/25 . . . . Based on this *direction* it is necessary to start providing notices of separation to employees in probationary and trial period positions starting 2/13/25.

(Dkt. No. 71 at 16 (emphasis added) (February 13, 2025)).

Then, in February 13 and 14 phone calls, OPM discussed probationary employee terminations with leadership from other agencies.  Defendants have not provided transcripts of those calls nor declarations from any person who attests to having participated on one.

On February 13, the Department of Energy sent a probationary business cost analyst a termination letter stating:  "*Per OPM instructions*, DOE finds that your further employment would not be in the public interest" (Dkt. No. 70-14 at 15 (emphasis added)).

That same day, a probationer at the Bonneville Power Administration (within the DOE) received a termination letter that stated:  "*Per OPM instructions*, DOE finds that your further employment would not be in the public interest.  For this reason, you are being removed from your position with DOE and the federal civil service effective today" (Dkt. No. 39-4 at 10 (emphasis added)).

On February 14, a probationer terminated by the Foreign Agricultural Service asked the Department of Agriculture's deputy chief human capital officer by email about the "specific details of my performance that were evaluated and found to be insufficient" (Dkt. No. 39-6 at 5–6).  The response:  "[A]gencies were *directed* to begin providing termination notices . . . beginning immediately upon OPM notification" (*ibid*.).

On February 18, meanwhile, the National Science Foundation fired its probationers *en masse* via Zoom.  During that call, NSF officials stated:  "We were *directed* last Friday

2

[February 14] by OPM to terminate all probationers except for a minimal number of mission critical probationers" (Dkt. No. 18-9 at 27 (emphasis added)). When confronted by the terminated probationers, the officials continued: "Up until Friday [February 14]. Yes. We were told by OPM it was the agency's discretion whether to remove probations or not. We chose to retain them all" (*id*. at 26). But "late Friday night," "[t]hey told us that they *directed* us to remove probationers" (*ibid*. (emphasis added)). "[T]here was no limited discretion. This is not a decision the agency made. This is a *direction* we received" (*id*. at 21) (emphasis added). Asked if NSF had at least *attempted* to negotiate with OPM to minimize the number of terminations, NSF responded: "There's no negotiation" (*id*. at 34). Defendants concede that on March 3, three days after the undersigned issued a memorandum opinion and amended the temporary restraining order, NSF's director re-hired nearly all the probationers terminated February 18.

In a February 21 Internal Revenue Service "town hall," IRS Chief Human Capital Officer Traci DiMartini stated:

> I'm not sure why it's happening . . . . Regarding the removal of the probationary employees, again, that was something that was *directed* from OPM. And even the letters that your colleagues received yesterday were letters that were written by OPM, put forth through Treasury, and given to us . . . . I cannot explain to you why this has happened. I've never seen OPM *direct* people at any agency to terminate.

(Dkt. No. 39-5 at 8–9 (emphasis added)).

She continued:

> And our actions are being watched by OPM. So that's, again, something else that's unprecedented. . . . Everything we do is scrutinized. Everything is being looked at twice. Any changes that are made in our system that show any type of action that has been deemed impermissible, we have to respond to why it happened.

(*id*. at 7–8).

United States District Court
Northern District of California

On February 25, Tracey Therit, chief human capital officer for the Department of Veterans Affairs, testified under oath at a congressional hearing before the House Committee on Veterans Affairs:

> **RANKING MEMBER TAKANO**:  So nobody ordered you to carry out these terminations?
>
> You did it on your own?
>
> **MS. THERIT**:  There was *direction* from the Office of Personnel Management.

(Dkt. No. 39-1 at 13 (emphasis added)).

On February 26, members of the Civilian Personnel Policy Council at the Department of Defense stated by email:  "In accordance with *direction* from OPM, beginning February 28, 2025, all DOD Components must terminate the employment of all individuals who are currently serving a probationary or trial period" (Dkt. No. 39-4 at 14 (emphasis added)).

In a March 6 sworn declaration filed in the District of Maryland and introduced into the record by plaintiffs, meanwhile, IRS CHCO DiMartini stated:

> I attended several virtual meetings with Trevor Norris and other Human Capital Officers at Treasury agencies (which include the Office of the Comptroller of the Currency, the Bureau of Engraving and Printing, and the U.S. Mint) during which we discussed the *directive* to conduct mass terminations of probationary employees.
>
> . . . .
>
> Mr. Norris informed us that Charles Ezell, the Acting Director of OPM, Amanda Scales, Mr. Ezell's Chief of Staff, and Noah Peters, were the individuals spearheading the termination of probationary employees at OPM.
>
> . . . .
>
> Mr. Norris specifically instructed me and the other Human Capital Officers at Treasury that *OPM would not allow us to exempt military veterans from the probationary terminations*.

(Dkt. No. 94-1 at 3–4 (emphasis added)).

4

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Second*, OPM directed agencies to fire those employees under the pretense of "performance."

In early February, OPM disseminated a template termination letter to agency chief human capital officers (Dkt. No. 87-1). The OPM template was largely generic, with placeholder text to be filled out by each respective agency (its image reproduced here, in two excerpts):

[DATE], 2025

MEMORANDUM FOR [EMPLOYEE], [TITLE], [ORGANIZATION]

FROM:                [NAME]
                     [TITLE]

SUBJECT:             Notification of Termination During Probationary Period

REFERENCES:          5 U.S.C. § 7511
                     [5 U.S.C. § 3321(a)]
                     [5 C.F.R. §§ 315.803 and 804]
                     [5 C.F.R. § 316.304]
                     [INSERT AGENCY POLICY]

This is to provide notification that the Agency is removing you from your position of [TITLE] and federal service consistent with the above references.

On [INSERT DATE OF APPOINTMENT], the Agency appointed you to the position of [TITLE]. As documented on your appointment Standard Form 50 (SF-50), you appointment is subject to a probationary/trial period. The agency also informed you of this requirement in the job opportunity announcement for the position.

(*ibid.*).

While it did not account for the specific employee (or even agency), the OPM template *did* articulate a specific reason for termination:

The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest. For this reason, the Agency informs you that the Agency is removing you from your position of [TITLE] with the Agency and the federal civil service effective [insert date and time, if necessary].

(*ibid.* (highlighting added)).

5

From IRS CHCO DiMartini:

> My colleagues and I asked Mr. Norris what the termination letter for affected probationary employees should consist of, and they informed me that OPM had drafted a letter, Treasury made a few modifications, and that we were instructed to send this letter out.

(Dkt. No. 94-1 at 3–4).

The IRS did not consider probationer performance:

> My office did not review or consider the actual job performance or conduct of any IRS probationary employee when issuing the termination notices.  I also know that Treasury did not review or consider the actual job performance or conduct of any IRS probationary employee when issuing the termination notices.  I know this because this fact was discussed openly in meetings. Practically speaking, it would take weeks or months to evaluate the job performance of 6,700 probationary employees.

(*id.* at 4).

The Department of Agriculture used the OPM template to terminate probationers "based on [their] performance" (Dkt. No. 18-5 at 11 (emphasis added)).  USDA's deputy chief human capital officer stated OPM "*directed* the use of a specific template and language for the notice beginning immediately upon OPM notification" (Dkt. No. 39-6 at 6 (emphasis added)).  The Department of Transportation informed probationers that "based on your performance you have not demonstrated that your further employment at the DOT FAA would be in the public interest" (Dkt. No. 18-17 (emphasis added)).  The Department of Defense circulated the OPM template to its civilian personnel policy council members, "[a]s provided by OPM, and for your convenience" (Dkt. No. 39-4 at 15).

On February 13, Leandra Bailey, a Physical Science Information Specialist for the Forest Service, was terminated (Dkt. No. 71).  In her most recent performance review, she received the highest mark possible in every category (*id.* at 11).  The OPM template she received nevertheless stated:  "The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest" (*id.* at 13 (emphasis added)).

6

United States District Court
Northern District of California

1    On February 18, Dr. Andrew Frassetto, a probationer terminated by the NSF, received the

2    OPM template (Dkt. No 18-9 at 38).  In a February 13 performance review — *five days* before

3    he was terminated "*based on* [*his*] *performance*" — Dr. Frassetto's supervisor reported in a

4    performance review:

> [H]is role [is] mission critical.  Dr. Frassetto has been an
> outstanding program director, and he has taken the lead role in
> overseeing this important and complicated portfolio for the
> division.  Dr. Frassetto came to NSF with a unique skill set in
> interdisciplinary scientific research . . . .  He has already
> demonstrated an outstanding ability to balance the various aspects
> of his job responsibilities and is highly effective at organizing and
> completing all his work in an accurate and timely manner.
>
> . . . .
>
> Dr. Frassetto's work on this portfolio has been outstanding and he
> has brought important experience to the role and has demonstrated
> highly competent project management and oversight.  He is a
> program director who has needed minimal supervision and eagerly
> seeks special assignments at higher levels of difficulty.  He has
> been an outstanding contributor to the division, directorate, and
> agency.

15    (*id*. at 7–8).

16    NSF said:  "The cause comes from boilerplate we received from OPM.  The cause says

17    that the agency finds based on your performance that you have not demonstrated that your

18    further employment at the agency would be in the public interest" (*id*. at 30 (emphasis added)).

19    Other agencies made slight tweaks to OPM's language — but maintained the central

20    pretense.  For example, the Department of Health and Human Services reworded the OPM

21    template's "performance" language — "based on your performance, [] you have not

22    demonstrated that your further employment at the Agency would be in the public interest" —

23    to "fitness":  "Unfortunately, the Agency finds that *you are not fit for continued employment*

24    because your ability, knowledge, and skills do not fit the Agency's current needs . . . ." (Dkt.

25    No. 18-10 (emphasis added)).  They otherwise stayed true to the OPM template, down to the

26    footnotes (*ibid*.).

27    OPM directed agencies to fire their probationers under the pretense of "performance" to,

28    at least in part, circumvent statutory and regulatory reduction in force procedures and foreclose

7

United States District Court
Northern District of California

appeal to the Merit Systems Protection Board.  In defendant Ezell's words:  "Employees on probationary periods can be terminated during that period without triggering appeal rights to the Merit Systems Protection Board (MSPB)" (Dkt. No. 37 at 1).

Virtually all the foregoing facts were uncovered by counsel for plaintiffs.  Defendants have provided virtually no transparency.

*          *          *

Plaintiffs filed their complaint on February 19, 2025 (Dkt. No. 1).  Four days later, they amended that complaint and moved for a temporary restraining order (Dkt. Nos. 17, 18).  The undersigned ordered expedited briefing and held a hearing on February 27, during which a temporary restraining order was granted.  A memorandum opinion and an amended TRO followed the next day (Dkt. No. 28).  As part of that order, the undersigned required that defendant Ezell, who had volunteered his own declaration in support of defendants' opposition to a TRO, be cross-examined during a forthcoming evidentiary hearing on preliminary injunction.  Plaintiffs, meanwhile, subpoenaed several agency employees to testify.  Defendants were afforded the opportunity to request the production of any number of plaintiffs' declarants but did not.  On March 10, three days before the evidentiary hearing, defendants moved to vacate that hearing, quash all subpoenas, and be relieved from having to produce defendant Ezell and other witnesses for deposition (Dkt. No. 75-1).  The Court denied the motion to vacate, granted in part the motion to quash the subpoenas to appear, but denied relief as to defendant Ezell, who uniquely was a party and had volunteered his own testimony (Dkt. No. 89 at 2).  Defendants ultimately withdrew Ezell's declaration and he did not appear.  Finally, also on March 11, plaintiffs filed a second amended complaint that added several federal agencies (and their heads) as relief defendants, bringing them within this Court's ability to grant relief.

The March 13 hearing went ahead, and the undersigned issued a preliminary injunction from the bench, on the record to date and counsels' argument.  As stated at the hearing, the preliminary injunction flows only from claims made by organizational plaintiffs.

United States District Court
Northern District of California

**ANALYSIS**

"A plaintiff seeking a preliminary injunction must establish that [1] he is likely to succeed on the merits, that [2] he is likely to suffer irreparable harm in the absence of preliminary relief, that [3] the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

*First*, OPM's directive constituted an *ultra vires* act that violated its and all impacted agencies' statutory authority.

"The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). "Equitable actions to enjoin *ultra vires* official conduct do not depend upon the availability of a statutory cause of action; instead, they seek a 'judge-made remedy' for injuries stemming from unauthorized government conduct, and they rest on the historic availability of equitable review." *Sierra Club v. Trump*, 963 F.3d 874, 890–91 (9th Cir. 2020) (citing *Armstrong*, 575 U.S. at 327), *vacated and remanded on other grounds (mootness)*, 142 S. Ct. 46 (2021).

No statute — anywhere, ever — has granted OPM the authority to direct the termination of employees in other agencies. "Administrative agencies [like OPM] are creatures of statute. They accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 117 (2022).

Instead, Congress's statutory scheme grants to each agency head the authority to manage its own affairs, including the hiring and firing of employees. 5 U.S.C. § 3101 ("Each Executive agency, military department, and the government of the District of Columbia may employ such number of employees of the various classes recognized by chapter 51 of this title as Congress may appropriate for from year to year."); 5 U.S.C. § 301 ("The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees . . . ."); *see also, e.g.,* 42 U.S.C. § 7231 (DOE) (re employees); *id.* § 7253 (re reorgs.); 38 U.S.C. §§ 303, 510 (VA); 10 U.S.C. § 113 (DOD).

The same is true of OPM. Congress has vested its director with the authority to "secur[e] accuracy, uniformity, and justice in the functions of the Office," "appoint[] individuals to be employed by the Office," and "direct[] and supervis[e] employees of the Office." 5 U.S.C. § 1103(a)(1)–(3). But that's it. OPM did not have the authority to direct the firing of employees, probationary or otherwise, in any *other* federal agency.

Defendants concede as much. Their opposition to relief rests instead on the factual contention that OPM did not issue a directive. The sanitized record provided in support — press releases and a feeble start to a yet-to-come "administrative record" (Dkt. Nos. 110, 111) — is unpersuasive.

For example, defendants point to a February 14 OPM memo where OPM "asked" the agencies to select for termination only those probationers they did *not* identif[y] as mission-critical no later than end of the day Monday, 2/17" (Dkt. No. 111-2 at 1 (emphasis added)). But the balance of the record shows the actual situation was not as this memo would make it seem. *First*, even the fig leaf of agency discretion allowed for in the letter was illusory. As the NSF officials implementing the OPM directive stated: "Up until Friday [February 14]. Yes. We were told by OPM it was the agency's discretion whether to remove probations or not. We were told by OPM it was the agency's discretion whether to remove probations or not. *We chose to retain them all*" (Dkt. No. 18-9 at 26). But "late, late Friday night," "[t]hey told us that they *directed* us to remove probationers" (*ibid.* (emphasis added)). "[T]here was no limited discretion. *This is not a decision the agency made*. This is a *direction* we received" (*id*. at 21) (emphasis added). An "ask," followed by a directive, is a directive. *Second*, even if the agency discretion were real (it wasn't), the February 14 OPM memo directed that discretion towards evaluating who was "mission-critical," not who was high-performing (Dkt. No. 111-2 at 1). The OPM template letter used to effectuate those terminations — "[t]he Agency finds, *based on your performance*, that you have not demonstrated that your further employment at the Agency would be in the public interest" (Dkt. No. 87-1 at 1 (emphasis added)) — was an obvious pretext intended to obstruct appeal

10

and avoid statutory and regulatory reduction-in-force procedures (for example, the honoring of veteran preferences in the order of retention) (Dkt. No. 94-1 at 3–5).

The declaration of OPM senior advisor Noah Peters fares no better (Dkt. No. 77). *First*, Peters does not claim personal knowledge as to *anything* in his declaration. *Second*, Peters does not state that he participated in *any* of the calls he describes. Defense counsel argued, as to Acting Director Ezell's declaration, that *agency heads* "lack[ ] specific knowledge of disputed issues of fact," and "such declarations are based on information obtained by the official in course of performing his or her official duties and provide background information and summarize agency decision making reflected in other, sometimes lengthy or complex official documents" (Dkt. No. 75 at 8). Peters is not an agency head, he is a "senior advisor" who joined OPM two months ago. Peters' concluding paragraph — "At no point on these calls did OPM direct or require any agencies to terminate probationary employees. At all times, the tone was friendly, cordial, and cooperative." — is hearsay within hearsay (Dkt. No. 77 at 3 (emphasis added)). Defendants concede that *someone* from OPM *was* present on each of the calls described but have refused to provide the Court with declarations from *any* such employee with direct knowledge of the facts. *Finally*, Peters' assertion that there was no directive is cabined to "these calls." Nowhere does he state that OPM did not issue a directive *at all* (*ibid.*).

Plaintiffs have nourished the record with a mountain of countervailing evidence (agency memos, termination letters, congressional testimony, meeting transcripts, emails, and more) including, for example: "In accordance with *direction* from OPM . . . all DOD Components must terminate the employment of all individuals who are currently serving a probationary or trial period" (DOD), "[t]here was *direction* from the Office of Personnel Management" (VA), "agencies were *directed* to begin providing termination notices . . . immediately upon OPM notification" (USDA), "that was something that was *directed* from OPM" (IRS), "[t]hey told us that they *directed* us to remove probationers" (NSF), "OPM *directed* agencies to separate Probationary employees starting 2/13/25" (Forest Service) (emphases added).

1    Also on the merits, plaintiffs' APA claims are likely to succeed for much the same

2    reason. OPM's *ultra vires* directive is likely to constitute an unlawful final agency action that

3    is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in

4    excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and

5    "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

6        Based on the full record at the time of injunction, some of it excerpted here, defendants'

7    opposition is rejected (except to the extent addressed next on jurisdiction and standing).

8        As to jurisdiction, the conclusions in the February 28 memorandum stand (for now).

9    Facts not before the court during the TRO hearing suggest that the FLRA and MSPB may be

10   alternative channels in theory alone (if at all). The undersigned ordered further briefing on that

11   point and will not yet disturb the prior conclusion, which is incorporated here.

12       Standing was also set out in the February 28 memorandum, with that legal analysis also

13   incorporated here. To be clear, no employees bring claims in this action, and unions' claims

14   on their behalf have not yet been determined to be the sort that can be heard in district court (as

15   above). But the organizational plaintiffs themselves face concrete harms. These flow from the

16   way the unlawfully directed terminations disable the federal agency services on which they or

17   their members depend, or otherwise imperil their organizational mission or membership —

18   such as by requiring the organizations to steal resources from their existing work to solve new

19   problems entirely of OPM's making. For example, Vote Vets Action Fund Inc., has diverted

20   resources from its complementing array of veterans' services to cover primary needs newly

21   unmet by VA services with slashed staffing, like the short-staffed Veterans Crisis Line (*see*

22   Dkt. No. 45 at 20–23). Nearly all the plaintiffs that the TRO found likely to have standing (*id.*

23   at 13–22) have added support to our record since (Coalition to Protect America's National

24   Parks (Dkt. No. 70-19), Common Defense Civic Engagement (Dkt. No. 70-17), Main Street

25   Alliance (Dkt. No. 70-20), and Western Watersheds Project (Dkt. No. 70-18)). Plus, other

26   organizational plaintiffs have shown likely harms at OPM's hand (relevantly, Point Blue

27   Conservation Science (Dkt. No. 70-15), and American Geophysical Union (Dkt. No. 70-16)).

28

United States District Court
Northern District of California

12

United States District Court
Northern District of California

*Second*, irreparable harms are imminent for these plaintiffs if not enjoined.  Fresh record evidence shows that the harms outlined in the TRO go on despite the TRO.  And, the record shows those harms come by more paths than previously understood.  For example, we already knew that slashes to staffing at the USDA's Forest Service were wreaking havoc on Western Watershed Project.  That harm continues, with problems mounting from the Los Padres National Forest to the Sawtooth Valley National Recreation Area (Dkt. No. 70-18 ¶¶ 7–8, 10).  But now, plaintiffs tell us about more problems from USDA staffing cuts, this time at the Natural Resources Conservation Service.  Because staff was cut in grants administration, nonprofit Point Blue Conservation Science has not been paid for work; and, because future project approvals are likewise stalling, Point Blue will likely be frustrated in its ability to improve forestry, agriculture, and wildlife management with the USDA (Dkt. No. 70-15 ¶¶ 4–6).  The American Geophysical Union points to other problems also emanating from terminations at the USDA, and to still others emanating from the Department of Energy (Dkt. No. 70-16).  Similarly, we already knew about the imminent harms to VoteVets and Common Defense (and to those whom they serve) by way of OPM-directed terminations at the DOD and VA.  Now, through a statement made against interest, we see that the Department of Treasury sought to retain its veterans who were probationers — only to be rebuffed by OPM (Dkt. No. 94-1 ¶ 12).  Because stiffer evidence did not shore up the irreparable harms flowing from the unlawful directive to the other proposed agencies, the preliminary injunction did not extend to them.

Each agency had (and still has) discretion to hire and fire its *own* employees.  Here, the agencies were *directed* by OPM to fire all probationary employees, and they executed that directive.  To staunch the irreparable harms to organizational plaintiffs caused by OPM unlawfully slashing other agency's staff required immediately reinstating those employees.

*Finally*, the balance of the equities and the public interest (which merge when the government is the defendant) plainly favor the organizational plaintiffs.  "The preservation of the rights in the Constitution and the legality of the process by which government agencies function certainly weighs heavily in the public interest."  *Nat'l Treasury Emps. Union v. U.S.*

*Dep't of Treasury*, 838 F. Supp. 631, 640 (D.D.C. 1993) (Judge Harold Greene); *see Nken v. Holder*, 556 U.S. 418, 435 (2009).

Each *Winter* factor favored the granting of the injunction.

The Court found security — which defendant did not request — to be proper in the amount of $0.

## CONCLUSION

For the reasons stated from the bench, and further explained above, the Court granted the injunction.

Dated:  March 14, 2025.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE