UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, et al., <br><br> Defendants. | No. C 25-01780 WHA <br><br> **ORDER RE SUBJECT-MATTER JURISDICTION** |

**INTRODUCTION**

Early on, I followed three recent decisions in other district courts holding that claims brought by public-sector unions concerning federal employee terminations had to be channeled through the Merit Systems Protection Board and/or the Federal Labor Relations Authority and therefore the district court had no subject-matter jurisdiction over those claims, although I accepted subject-matter jurisdiction over claims by the organizational plaintiffs. After further briefing, however, this order holds that the district court does have subject-matter jurisdiction over these claims by public-sector unions and that my earlier ruling to the contrary was mistaken.

# ANALYSIS

"The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. "Not *may* have jurisdiction, but *shall*." *Axon Enter. v. FTC*, 598 U.S. 175, 205 (2023) (Gorsuch, J., concurring). Congress nonetheless may countermand jurisdiction by enacting other schemes for specific claims — usually review by an agency and then by an appeals court. The result is that a district court shall hear a challenge to an agency action unless (1) Congress provided a statutory review scheme limiting Section 1331 and (2) the claims brought are of the type Congress intended to be reviewed within it. *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1994) (also identifying guideposts for inferring Congress's intent); *Axon Enter.*, 598 U.S. at 185–96 (applying guideposts to hold that despite statutory review schemes plaintiffs' claims needed to be heard in district court, reversing Court of Appeals for the Ninth Circuit).

In this case, all agree that the Civil Service Reform Act of 1978 established a comprehensive system for reviewing personnel action against federal employees and practices related to collective bargaining. *United States v. Fausto*, 484 U.S. 439, 455 (1988); *Karahalios v. Nat'l Fed'n of Fed. Emps., Loc. 1263*, 489 U.S. 527, 536–37 (1989). That system features review by the Merit Systems Protection Board of certain employee terminations (*e.g.*, 5 U.S.C. §§ 1204(a), 4303(e)–(f), 7511–13), and review by the Federal Labor Relations Authority of certain unfair labor practices (§ 7105(a)(2)). All agree this scheme impliedly excludes district courts from reviewing the same kinds of claims. This order therefore focuses on what the public-sector union plaintiffs claim and whether those claims are of the type intended to be channeled into this scheme.[1]

What the public-sector unions claim — along with other plaintiffs — is that the Office of Personnel Management acted *ultra vires* when it directed agencies to terminate tens of

---

[1] This order uses "public-sector unions" because it concerns the five labor-union plaintiffs that represent federal employees — not the one labor-union plaintiff that represents private-sector employees (*compare* 2d Am. Compl. ¶¶ 15–19, *with id.* ¶ 26). The one private-sector union, the Association of Flight Attendants-CWA, AFL-CIO, complains that slashed staffing at the Federal Aviation Administration jeopardizes commercial-flight safety. The prior order already decided the district court has subject-matter jurisdiction for such organizations' claims (TRO Mem. 13).

thousands of probationary employees *en masse* using "performance" as a pretext (2d Am. Compl. Claim I). Plaintiffs also bring three Administrative Procedure Act claims against OPM occasioned by these events: That OPM's directive was "in excess of [OPM's] authority," "arbitrary" as to real employee performance or agency need, and procedurally busted — violating APA Subsections 706(2)(C), (A), and (D) (Claims II, III, and IV). A final APA claim alleges that OPM directed other agencies' employees to report to OPM — violating Subsection 706(2)(D) (Claim V). The public-sector unions assert associational and organizational standing. How are they injured? Their members' unlawful terminations cause the public-sector unions to lose dues, divert or raise resources to help those terminated, and suffer legal wrongs (*id.* ¶¶ 145–49). As relief, they seek a declaration and a recission of the directives, ensuring parties — and employees — remain in the positions they held but for the unlawful directives.

Whether these claims are of the type that should be channeled through the CSRA is informed by *Thunder Basin*'s three factors. Claims are not channeled into the CSRA's scheme if they are "outside the agency's expertise," "if the suit is 'wholly collateral to [the] statute's review provisions,'" and "if 'a finding of preclusion could foreclose all meaningful judicial review.'" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Thunder Basin*, 510 U.S. at 212–13). Of course, "the same conclusion might follow if the factors point in different directions. The ultimate question is how best to understand what Congress has done . . . ." *Axon Enter.*, 598 U.S. at 186. This order takes each factor in turn.

**1.   OUTSIDE THE AGENCY'S EXPERTISE?**

The public-sector unions' claims "raise[ ] only a 'standard' issue of administrative and constitutional law, relating not at all to 'considerations of agency policy.'" *Id.* at 188 (quoting *Free Enter. Fund*, 561 U.S. at 491). The *ultra vires* claim asks whether the OPM had *any* authority to direct another agency to terminate its employees, and whether by purporting to speak such power into existence the executive violated the constitution's separation of executive and legislative functions. "The [MSPB and FLRA] know[ ] a good deal about [employment and labor] policy, but nothing special about the separation of powers. For that

3

1  reason, [the Supreme Court has observed], 'agency adjudications are generally ill suited to
2  address structural constitutional challenges' — like those [ ] here." *See id.* at 194–95 (quoting
3  *Carr v. Saul*, 593 U.S. 83, 92 (2021)) (re FTC).
4      Nor are the public-sector unions' *ultra vires* and APA claims intertwined with factual and
5  policy questions that would benefit from the MSPB's or the FLRA's expertise. This is not a
6  case where a threshold question requires their expertise — such as whether an employee's
7  "resignation amounted to a constructive discharge" — before reaching a statutory or
8  constitutional claim about the directive to terminate. *E.g.*, *Elgin v. Dep't of Treasury*, 567 U.S.
9  1, 22–23 (2012) (employee's claims proper before MSPB). Nor is it one where the core
10 questions are wrapped up in the employer-agency policy choices that the MSPB or the FLRA
11 commonly parse — such as whether one military branch acted arbitrarily when it ordered its
12 dual-status employees to wear military uniforms while performing civilian functions, sowing
13 "confusion . . . when having or not having the protections of the Geneva Conventions [wa]s all
14 too real." *E.g.*, *AFGE v. Sec'y of the Air Force*, 716 F.3d 633, 635, 638 (D.C. Cir. 2013)
15 (cleaned up) (unions' claims channeled to FLRA). "[T]he Government here [ ] pretend[s] that
16 [the] constitutional claims are similarly intertwined with or embedded in matters on which the
17 [MSPB and the FLRA] are expert." *See Axon Enter.*, 598 U.S. at 195. But defendants point to
18 no specific fact or issue in our circumstances.
19     **2.**    **COLLATERAL TO THE STATUTE'S REVIEW PROVISIONS?**
20     The public-sector unions' claims are also collateral to the types of claims brought before
21 the MSPB or the FLRA. The channeling "inquiry contemplates (as our collateral-order
22 doctrine also does) that even [if some underlying agency] proceeding is pending, an occasional
23 claim may get immediate review [in a district court] — in part because it involves something
24 discrete." *Id.* at 194; *cf. Abney v. United States*, 431 U.S. 651, 659 (1977) (double jeopardy
25 collateral to guilt or innocence).
26     Here, the public-sector unions' *ultra vires* or "separation-of-powers claim is not about"
27 each employer agency's purported decision to terminate any or all of its employees. *Cf. Axon*
28 *Enter.*, 598 U.S. at 191. Instead, it is about a prior controlling event: Did the OPM exceed its

4

authority when it directed all federal agencies to terminate their probationers *en masse*? This distinguishes these claims from others that have attacked, substantively or procedurally, one agency's decision about one employee or its own workforce, which are the kinds of claims appellate courts have channeled into the CSRA. *E.g.*, *Fausto*, 484 U.S. at 441–43 (challenge to FWS decision to terminate one FWS employee — channeled to MSPB); *Elgin*, 567 U.S. at 22–23 (IRS decision to terminate one IRS employee, in light of OPM's employment-eligibility findings per regulations — to MSPB); *Veit v. Heckler*, 746 F.2d 508, 509 (9th Cir. 1984) (SSA's merit rating of one SSA employee — district court review refused); *Saul v. United States*, 928 F.2d 829, 831, 837, 843–44 (9th Cir. 1991) (SSA supervisors' "job-related wrongs" upon one SSA employee — to MSPB); *Karahalios*, 489 U.S. at 533 (one DOD employee's fair representation by union before DOD — to FLRA); *Air Force*, 716 F.3d at 635–36, 639–40 (Air Force dress code for Air Force workforce — to FLRA). The claims here are instead like others challenging the executive's power to impose government-wide personnel policy, not "any [one] personnel action," claims which have remained in district court. *E.g.*, *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 369 (5th Cir.) (en banc), *vacated as moot*, 144 S. Ct. 480 (2023).

When reckoning with this caselaw, defendants vague out: They do not attempt to show how the facts of this case compare with the first string of cases, instead merely saying that plaintiffs never "distinguish the facts of their case" from those of *Fausto*, *Elgin*, or *Veit* (Defs.' TRO Opp. 14). Plaintiffs plainly did, and do so again (Pls.' TRO Br. 26; Pls.' Supp. Br. 7). Nor do defendants meaningfully attempt to show how the facts of this case contrast with those of *Feds for Medical Freedom*, instead shrugging off that decision as "inapposite" only because the separation-of-powers claims were there brought against the president, not against the OPM (Defs.' TRO Opp. 14–15). But defendants fail to persuade why that distinction makes a difference here. Defendants are correct that these claims do not attack the constitutionality of an agency review scheme itself, unlike other separation-of-power claims recently channeled out of agency schemes and into district court. *E.g.*, *Free Enter. Fund*, 510 U.S. at 490–91, 497–98. But a separation-of-powers claim is a separation-of-powers claim. And, these claims

5

still zero in on the "illegitimate decisionmaker" that ordered the terminations, not on any one resulting termination. *Cf. Axon Enter.*, 598 U.S. at 191.

The public-sector unions' "separation-of-powers claim is not [simply] about" OPM's rulemaking. Instead, the *ultra vires* challenge to OPM's directive to terminate agencies' probationers — about ten percent of some agencies' workforces — presents structural, constitutional questions akin to those that would arise if the OPM directed agencies to impound ten percent of their funding or shutter ten percent of their services. In short, the claims here are collateral to the employer agencies' actions regarding any one employee. The claims attack a different agency without any such authority.

### 3. PRECLUDED FROM ALL MEANINGFUL JUDICIAL REVIEW?

The public-sector unions' *ultra vires* and other claims will not be subject to judicial review if not litigated here. *See id.* at 190 (rule). As it turns out, the *ultra vires* claim is not one that can be brought directly in the MSPB or the FLRA. Worse, there is not even some other claim that could be brought reliably through the MSPB or the FLRA such that this one might be resurrected by a court of appeals. This is unsurprising: OPM Acting Director Charles Ezell told all agency heads that terminations of probationary employees were unreviewable through the MSPB:

> Probationary periods are an essential tool for agencies to assess employee performance and manage staffing levels. Employees on probationary periods can be terminated during that period without triggering appeal rights to the [MSPB].

(Dkt. No. 64-1 (January 20, 2025, memorandum)). Nor did Ezell note any prospect for review via collective bargaining agreements or the FLRA.

#### A. VIA THE MERIT SYSTEMS PROTECTION BOARD?

Under the MSPB's statutory scheme, there is arguably no way to bring a direct challenge to a mass removal. But this issue matters none for probationary employees. "An employee" cannot contest even "a removal" *if she is probationary*. 5 U.S.C. § 7513(d) (relief); *id.* §§ 7511(a)(1), 7512 (bar); *id.* § 4303(e)–(f); *Forest v. MSPB*, 47 F.3d 409, 412 (Fed. Cir. 1995).

6

Under the MSPB's statutory scheme, a probationer could ask the Office of Special Counsel to investigate a "prohibited personnel practice" implicated by her termination. 5 U.S.C. § 1214(a)(1)(A). The OSC could choose to seek a stay of the action at the MSPB, and later petition for its correction there, too. *Id.* § 1214(b)(1)–(2). If the MSPB took up the petition, its decision would be reviewable by a federal court. *Id.* § 1214(c) (incorporating Section 7703(b)). But the OSC's decision to decline to petition the MSPB would not be. Only a "final order or decision of the [MSPB]" is reviewable. *Ibid.* Thus, Section 1214 "provides only for judicial review of [*MSPB*] action, and not every [*OSC*] action is encapsulated in a final [*MSPB*] order." *See Free Enter. Fund*, 561 U.S. at 490.

This is like the situation in *Free Enterprise Fund*, where the Supreme Court "found that the [Securities] Exchange Act provided no 'meaningful avenue of relief' for [an accounting] firm, given the separation between the [Public Company Accounting Oversight] Board and the [Securities and Exchange] Commission. Not every [PCAOB] action, we explained, culminates in [SEC] action — which alone the statute makes reviewable in a court of appeals." *Axon Enters.*, 598 U.S. at 188 (citation omitted) (quoting 561 U.S. at 490–91). "That meant the [claimant], absent district court jurisdiction, might never have had judicial recourse." *Id.* at 190.

### B.  VIA THE FEDERAL LABOR RELATIONS AUTHORITY?

Now, we turn to peer down the pathways trodden by collective bargainers, some of which also lead through the MSPB, but most of which lead through the FLRA.

We start with the collective bargaining agreements themselves: Employees covered by such agreements can elect to challenge agency actions under the statutory scheme (above) or under their agreement's scheme (arbitration). *See* 5 U.S.C. § 7121. But no party here argues that any agreement provided an avenue for arbitrating the issues in this case.

The other collective-bargaining related pathways are also unavailing. They focus on preserving the opportunity for workers to bargain as such, *e.g.*, *id.* § 7105(a)(2)(G), 7116, 7118, which again no party contends is implicated here. That distinguishes this case from *AFGE v. Trump*, which challenged an executive order that expressly sought to constrain how

7

agencies bargained. 929 F.3d 748, 753–54 (D.C. Cir. 2019) (channeled to FLRA). There, those bargaining claims could carry with them — whether reviewed by the FLRA or reached *de novo* by the court of appeals — the constitutional and statutory claims. *Id.* at 756. The problem here is that there are no bargaining claims to begin with. The challenge to the OPM directive that ordered mass terminations across all (or most) agencies cannot readily be recast as a dispute on, for instance, negotiability. 5 U.S.C. §§ 7105(a)(2)(E) (incorporating Section 7117(c)(1)). And, in any case, the FLRA appears unable to review grievances about "a Government-wide rule or regulation" as such. *Id.* § 7117(a)(1); *see Trump*, 929 F.3d at 757; *U.S. Dep't of Treasury v. FLRA*, 996 F.2d 1246, 1252 & n.6 (D.C. Cir. 1993).

For similar reasons, asking the FLRA's General Counsel to investigate the OPM's directive as an unfair labor practice is unavailing. 5 U.S.C. § 7118(a). Even were the General Counsel to investigate the termination, there is no assurance it would submit a complaint to the FLRA. The General Counsel must issue a "written statement" explaining its decision, *ibid.*, but the statutory scheme does not provide for judicial review of the statement — only for review of "any final order of the [FLRA]," *id.* § 7123(a). Once again, that separation "mean[s] the [public-sector unions], absent district court jurisdiction, might never have [ ] judicial recourse." *Axon Enters.*, 598 U.S. at 190. And that sums up the prospective pathways through the FLRA.

In sum, but for district court jurisdiction, the public-sector unions will be precluded from judicial recourse and relief even for their separation-of-powers claim. Because "Congress rarely allows claims about agency action to escape effective judicial review," particularly constitutional claims, this final *Thunder Basin* factor favors permitting them to go forward in district court. *Axon Enter.*, 598 U.S. at 186 (citing *Bowen v. Mich. Acad. Of Fam. Physicians*, 476 U.S. 667, 670 (1986)); *see Thunder Basin*, 510 U.S. at 207 n.8 (citing *Dunlop v. Bachowski*, 421 U.S. 560, 567 (1975)); *cf. Mathews v. Eldridge*, 424 U.S. 319, 330 (1976).

\*       \*       \*

The resulting conclusion is not the one reached before. And, it is not the one three other district courts reached in recent orders, all at the outset of the actions (TRO Mem. 11–12): *Am.*

8

*Foreign Serv. Ass'n v. Trump*, No. 25-cv-352 (CJN), 2025 WL 573762, at *8–11 (D.D.C. Feb. 21, 2025) (Judge Carl Nichols) (dissolving TRO); *AFGE v. Ezell*, Civ. No. 25-10276-GAO, 2025 WL 470459, at *2 (D. Mass. Feb. 12, 2025) (Judge George O'Toole, Jr.) (dissolving TRO); *Nat'l Treasury Emps. Union v. Trump*, No. 25-cv-420 (CRC), 2025 WL 561080, at *5–8 (D.D.C. Feb. 20, 2025) (Judge Christopher Cooper) (denying TRO). This order pauses to point out why this decision now comes out differently than these orders.

In *American Foreign Service*, the plaintiff unions represented employees of the United States Agency for International Development. 2025 WL 573762, at *1, 8–11. But those employees were subject to the Foreign Service Act of 1980, not the CSRA. Because the employees *could* seek relief through the FSA's review scheme (including for constitutional claims on appeal), there was no basis for their unions to do so in district court.

In *Ezell*, the plaintiff unions represented employees across the federal government who received a "Fork in the Road" email purporting to offer deferred resignation — to stop work now, resign later, and get paid between. 2025 WL 470459, at *1. After concluding the unions in any case lacked standing, the district court applied all three *Thunder Basin* factors in one paragraph, asserting that the unions' aggrieved members — who were not exclusively probationary — could bring claims through the CSRA's processes. *Id.* at *2. Not so here.

Finally, in *National Treasury*, the plaintiff unions (none overlapping with ours) represented federal employees who faced termination because of an executive order that directed "mass firings through RIFs" in ways violating requirements for RIFs. Am. Compl. ¶¶ 9, 31, 38–39, 42–44, 52, *Nat'l Treasury*, No. 25-cv-420 (CRC) (D.D.C. Feb. 17, 2025). "In addition," the unions alleged that "OPM has contacted agencies to direct them to terminate their probation[ers]," and that "OPM invited [2.2 million employees] to opt into a deferred resignation program." *Id.* ¶¶ 53–62, 63–68. These allegations boiled down to two claims: That the "mass firing of employees and the attempt to force resignations across the federal civilian workforce [I] violate separation of powers principles" and "[II] the [APA] by implementing RIFs contrary to regulations." *Id.* at Count I, II. In its order applying *Thunder Basin*, the district court emphasized the FLRA's and MSPB's experience in labor relations and

complex reduction-in-force provisions. 2025 WL 561080, at *8 & n.5. Because some claims could go forward through one or both schemes (the order did not specify which claims or where), and because constitutional claims could be asserted on appeal, channeling the claims into CSRA review did not foreclose judicial recourse. *Id.* at *7. Not here. As above, our case does not turn on the intricacies of RIFs, nor take on *non-probationers'* terminations. In our case, the alleged wrongs — of sweeping separations-of-powers violations and generic APA rulemaking violations — will go without judicial recourse if not brought in district court.

That said, this order is not the first to decide district courts have subject-matter jurisdiction to hear claims related to the same OPM directive to terminate probationary employees. In *Maryland v. United States Department of Agriculture*, state governments complained of the federal government's failure to notify them before probationers' mass terminations, as RIF provisions oblige. Civ. No. JKB-25-0748, 2025 WL 800216, at *3 (D. Md. Mar. 13, 2025) (Judge James Bredar), *appeal docketed*, No. 25-1248 (4th Cir. Mar. 17, 2025). The district court concluded that the CSRA provided no prospect for judicial recourse, and thus that "the CSRA does not preclude this Court's jurisdiction." *Id.* at *15. For some of the same reasons (and for some different ones, above), this Court determines the same is ultimately true here for the public-sector unions' claims.

\*     \*     \*

The foregoing is dispositive. It is unnecessary to reach the further question whether any impairment by the president of the OSC, MSPB, or FLRA — or argument by the government attacking the constitutionality of the OSC, MSPB, and FLRA in its other pending cases — provides a further basis for subject-matter jurisdiction in the district court for the claims in this case.[2]

---

[2] The CSRA's review channels are being restrained. *As for the OSC*, Special Counsel Hampton Dellinger was fired by the president on February 7, 2025 — about a week before the OPM's phone calls with agency heads concerning mass terminations. Dellinger took to district court and on summary judgment won an injunction to remain in his post but resigned following the appeals court's stay pending appeal. The new special counsel, Secretary of Veterans Affairs Doug Collins, retains both posts. *As for the MSPB*, three days after firing Special Counsel Dellinger, the President fired MSPB Chair Cathy Harris, reducing the number of presiding board members to just one — below the quorum to render final decisions. Chair Harris, like Special Counsel

10

All three *Thunder Basin* factors counsel that the public-sector unions' claims are not of the kind Congress intended to be reviewed through the CSRA. As in *Free Enterprise Fund*, 561 U.S. at 489, "we presume that Congress does not intend to limit" its command: The district court "shall have original jurisdiction." 28 U.S.C. § 1331.

**CONCLUSION**

The district court has subject-matter jurisdiction to hear and decide the public-sector union plaintiffs' claims. It also has subject-matter jurisdiction to hear and decide the organizational plaintiffs' claims for the reasons set out before (TRO Mem. 12–13).

**IT IS SO ORDERED.**

Dated: March 24, 2025.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

---

Dellinger, won permanent injunctive relief in the district court but now faces possible vacatur pending appeal. This would not be the first time that the MSPB's ability to provide relief was disabled. From January 7, 2017 to March 3, 2022, the MSPB "could not decide any petitions for review or other headquarters cases requiring [MSPB board] action because it did not have a quorum of members," creating a backlog of 3,793 cases. MSPB Press Release (Oct. 1, 2024), https://www.mspb.gov/publicaffairs/press_releases/MSPB_Provides_Update_on_Inherited_Inventory.pdf. *As for the FLRA*, also on February 10, the President fired FLRA Chair Susan Tsui Grundmann. She also won injunctive relief against her removal, and "the government has not yet appealed the court's order" (Defs.' Supp. Br. 8).