Page 1

1           UNITED STATES DISTRICT COURT

2       FOR THE NORTHERN DISTRICT OF CALIFORNIA

3             SAN FRANCISCO DIVISION

4    _____

5    AMERICAN FEDERATION OF

6    GOVERNMENT EMPLOYEES, AFL-CIO;

7    AMERICAN FEDERATION OF STATE

8    COUNTY AND MUNICIPAL EMPLOYEES,

9    AFL-CIO, et al.,

10          Plaintiffs,

11       v.                        Case No.

12    UNITED STATES OFFICES OF       3:25-cv-01780-WHA

13    PERSONNEL MANAGEMENT, et al.,

14          Defendants.

15    _____

16

17

18

19

20

21

22

1                    VIDEOTAPED DEPOSITION OF

2                         NOAH PETERS

3    DATE:           Wednesday, March 26, 2025

4    TIME:           1:16 p.m.

5    LOCATION:       Bredhoff & Kaiser PLLC

6                    805 15th Street Northwest, Suite 1000

7                    Washington, DC 20005

8    REPORTED BY:    Samuel Pachon

9    JOB NO.:        7269168

10

11

12

13

14

15

16

17

18

19

20

21

22

1                    A P P E A R A N C E S

2      ON BEHALF OF PLAINTIFFS AMERICAN FEDERATION OF

3      GOVERNMENT EMPLOYEES, AFL-CIO AND AMERICAN FEDERATION

4      OF STATE COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO:

5           DANIELLE E. LEONARD, ESQUIRE

6           ALTSHULER BERZON LLP

7           177 Post Street, Suite 300

8           San Franscisco, CA 94108

9           dleonard@altber.com

10          (415) 421-7151

11          ROBIN THOLIN, ESQUIRE

12          ALTSHULER BERZON LLP

13          177 Post Street, Suite 300

14          San Francisco, CA 94108

15          rtholin@altber.com

16          MATTHEW STARK BLUMIN, ESQUIRE

17          American Federation of State, County and

18          Municipal Employees, AFL-CIO

19          1625 L Street, Northwest

20          Washington, DC 20036

21          mblumin@afscme.org

22          (202) 775-5900

Page 4

1              A P P E A R A N C E S (Cont'd)

2      ON BEHALF OF PLAINTIFFS AMERICAN FEDERATION OF

3      GOVERNMENT EMPLOYEES, AFL-CIO AND AMERICAN FEDERATION

4      OF STATE COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO:

5              POOJA CHAUDHURI, ESQUIRE

6              STATE DEMOCRACY DEFENDERS FUND

7              600 Pennsylvania Avenue Southeast #15180

8              Washington, DC 20003

9              pooja@statedemocracydefenders.org

10             (202) 594-9958

11             RUSHAB SANGHVI, ESQUIRE

12             AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES

13             80 F Street, Northwest

14             Washington, DC 20001

15             sanghr@afge.org

16             (202) 639-6426

17

18

19

20

21

22

1              A P P E A R A N C E S (Cont'd)

2    ON BEHALF OF DEFENDANT UNITED STATES OFFICES OF

3    PERSONNEL MANAGEMENT:

4         YURI FUCHS, ESQUIRE

5         CHRISTOPHER HALL, ESQUIRE

6         U.S. Department of Justice

7         1100 L Street Northwest

8         Washington, DC 20005

9         yuri.s.fuchs@usdoj.gov

10        christopher.hall@usdoj.gov

11        (202) 598-3869

12        ROBERT C. BIGLER, ESQUIRE

13        Office of the General Counsel | U.S. Office of

14        Personnel Management

15        1900 E Street Northwest

16        Washington, DC 20415

17        robert.bigler@opm.gov

18        (202) 936-3089

19

20   ALSO PRESENT:

21        Norman Eisen, Co-Counsel

22        Gene Aronov, Videographer

1                    I N D E X

2    EXAMINATION:                                    PAGE

3        By Ms. Leonard                              10

4

5                  E X H I B I T S

6    NO.            DESCRIPTION                      PAGE

7    Exhibit 1      Guidance on Probationary Periods  39

8    Exhibit 2      Temporary Transition Schedule C   43

9    Exhibit 3      CHCO Website Printout             54

10   Exhibit 4      2/13/25 Defendant's Disclosure    66

11   Exhibit 5      Deferred Resignation Memorandum   75

12   Exhibit 6      2/12/25 Email, Probationary

13                  Employee Actions                  82

14   Exhibit 7      2/12/25 Email, Activity in Case  104

15   Exhibit 8      Fork in the Road Program Closed  105

16   Exhibit 9      Memorandum Template              109

17   Exhibit 10     2/14/25 Email, CHCO Council

18                  Special Session                  113

19   Exhibit 11     Forest Service Briefing Paper    120

20   Exhibit 12     2/28/25 Email, Statement from OPM 141

21   Exhibit 13     March 4th Revision               143

22   Exhibit 14     Presidential Action 3/20/25      153

Page 7

1                    E X H I B I T S (Cont'd)

2     NO.                DESCRIPTION                    PAGE

3     Exhibit 15      Declaration of Charles Ezell      157

4     Exhibit 16      Declaration of Noah Peters        160

5

6              QUESTIONS INSTRUCTED NOT TO ANSWER

7                     PAGE        LINE

8                      24          3

9                      38          17

10

11

12

13

14

15

16

17

18

19

20

21

22

1              P R O C E E D I N G S

2              THE VIDEOGRAPHER:  Good afternoon.  We

3    are going on the record at 1:16 p.m. on May [sic] 26,

4    2025.  Please note that the microphones are sensitive

5    and may pick up whispering in private conversations.

6    Please mute your phones at this time.

7              Audio and video recording will continue

8    to take place unless all parties agree to go off the

9    record.

10             This is media unit 1 of the

11   videorecorded deposition of Noah Peters, taken by

12   Counsel for Plaintiff in the matter of American

13   Federation of Government Employees, et al. vs. United

14   States Office of Personnel Management, et al. filed in

15   the United States District Court for the Northern

16   District of California, San Francisco Division, case

17   number 3:25-cv-01780-WHA.

18             The location of this deposition is

19   Bredhoff & Kaiser at 805 15th Street Northwest, Suite

20   1000, Washington, DC.  My name is Gene Aronov

21   representing Veritext, and I'm the videographer.  The

22   court reporter is Samuel Pachon from the firm

Page 9

1    Veritext.

2                    I'm not authorized to administer an

3    oath, I am not related to any party in this action,

4    nor am I financially interested in the outcome.

5                    If there are any objections to the

6    proceeding, please state them at the time of your

7    appearance.

8                    Counsel, and all present, including

9    remotely, will now state the appearances and

10   affiliations for the record beginning with the

11   noticing attorney.

12                   MS. LEONARD:  Good afternoon.  Danielle

13   Leonard.  With me, as counsel for plaintiffs, Robin

14   Tholin, Matt Blumin, Rushab Sanghvi, and Pooja

15   Chaudhuri.

16                   MR. FUCHS:  Yuri Fuchs from the

17   Department of Justice on behalf of Defendants.  With

18   me is Chris Hall and Bob Bigler.

19                   THE VIDEOGRAPHER:  Will the court

20   reporter please swear in the witness, and then Counsel

21   may proceed.

22                   THE REPORTER:  Okay.

Page 10

1           Please raise your right hand.

2    WHEREUPON,

3                    NOAH PETERS,

4    called as a witness and having been first duly sworn

5    to tell the truth, the whole truth, and nothing but

6    the truth, was examined and testified as follows:

7               THE REPORTER:  You may proceed.

8                    EXAMINATION

9    BY MS. LEONARD:

10        Q    Okay.  Ready to proceed, Mr. Peters?

11        A    Yeah.

12        Q    Good afternoon, Mr. Peters.  Again, Danielle

13   Leonard, counsel for the plaintiffs.  Mr. Peters, did

14   you review any documents that refresh your

15   recollection in preparation for this deposition here

16   today?

17        A    No.

18        Q    Did you review any documents on your own

19   without counsel in preparation for this deposition

20   today?

21        A    No.

22        Q    You are currently employed as the senior

Page 11

1   advisor to the director of the United States Office of

2   Personnel Management; correct?

3        A    Yes.

4        Q    And you began your federal employment in

5   that position on January 20, 2025.  Is that right?

6        A    Yes.

7        Q    You started working at OPM on Inauguration

8   Day?

9        A    Yes.

10       Q    Did you watch the inauguration or did you

11  get right to work?

12                  MR. FUCHS:  Objection.  Vague.

13                  THE WITNESS:  We watched the

14  inauguration.

15  BY MS. LEONARD:

16       Q    And how long did you spend watching the

17  inauguration that day?

18       A    Maybe an hour.

19       Q    And Inauguration Day on January 20th -- that

20  was also a federal holiday, Martin Luther King Day;

21  right?

22       A    Yes.

```
                                            Page 12
 1        Q    And so that was a holiday for the regular
 2   career OPM staff?
 3        A    No.  They -- the regular career OPM staff
 4   were all there to assist with the transition.
 5        Q    They were all there?
 6        A    To my knowledge, the ones -- the career
 7   staff -- at least the leadership was all there.
 8        Q    And can you describe what you did for OPM
 9   that day -- just in general terms, meaning you
10   personally?
11        A    What I did that day in general terms?  I --
12   I went to -- we walked over to the OPM building.  We
13   watched the -- we watched the inauguration.
14             There was -- we also signed our paperwork to
15   become, you know, federal employees in our positions.
16   So we signed our appointment papers, we signed all
17   of -- we filled out all of our initial employee forms,
18   and there are quite a -- there were quite a few of
19   them, as I recall.
20             And the HR -- one of the HR people -- I know
21   her name, I -- I just don't remember it right now.
22   She was there, and gave us all of our papers.  And
```

Page 13

1    then there were about -- I remember we all had name

2    tags -- so we went to the conference room.  We all had

3    name tags.

4             We had a briefing, or we met with the

5    career -- several members of the career staff.  We got

6    set up.  And so then I think we -- we were waiting --

7    waiting for -- you know, so then Chuck was introduced

8    as the agency head.

9             And then we all -- and then I think that we

10   were -- wait -- I remember that -- that might have

11   happened around 3 or 4 p.m when his -- when his

12   paperwork came.

13            And then I remember Allison Kidd-Miller, our

14   Deputy GC was there.  Some members of the executive

15   secretariat were there.  And then we kind of did a

16   bunch of -- of work stuff after that.  And some -- and

17   I -- so I think that's -- I think that's about it.

18   That's about it.

19        Q    What time did you finish working that night?

20        A    I have -- don't remember.

21        Q    Okay.  The new OPM acting Director, Charles

22   Ezell, started on January 20th.  Is that who you refer

1    to as Chuck?

2        A    Yes.  His name is, you know, Charles Ezell,

3    but he goes by Chuck.

4        Q    Are you having difficulty with your phone?

5        A    No.

6        Q    Mr. Peters?  Okay.  Because if you need to

7    go off the record, we can.

8        A    No -- no.

9        Q    Okay.  Amanda Scales started as the new OPM

10   chief of staff, as well?

11              MR. FUCHS:  Objection.  Vague.

12              THE WITNESS:  Yes.  She did.

13   BY MS. LEONARD:

14       Q    And had you met Chuck Ezell prior to January

15   20th?

16       A    No.

17       Q    Had you met Amanda Scales prior to January

18   20th?

19       A    Yes.

20       Q    In what context had you met Amanda Scales?

21       A    We went -- sat -- and were introduced on

22   Friday -- the Friday before Inauguration Day, and we

Page 15

1    had a meeting.

2              And we met with her and Brian Bjelde,

3    B-J-E-L-D-E.  And I think we -- we talked briefly

4    about what we might do -- what might happen on the

5    Monday, January 20th, when we all kind of -- when we

6    were kind of starting.

7         Q    Who else was at this meeting on the Friday

8    before?

9         A    It was just Brian and Amanda.

10        Q    And so when you said we, were you referring

11   to yourself or any other people who were at this

12   meeting?

13        A    No.  I was just referring to -- to myself.

14        Q    So when you and Amanda Scales and Brian met

15   on the Friday before you started at OPM, you were not

16   yet a federal employee; correct?

17        A    No.  I was not yet a federal employee.

18        Q    And to your knowledge, Amanda Scales was not

19   yet a federal employee at that meeting, as well;

20   correct?

21        A    You -- answering for what I knew at -- at

22   the time?  I didn't know one way or the other, whether

Page 16

1    she was a federal employee or not.

2              I don't think it would've -- I don't think

3    it would've changed how I interacted with her had

4    I -- had I known that, but I -- I don't recall having

5    a specific recollection of whether she was a -- a

6    federal employee or -- or not.

7         Q    In January 2025, prior to coming on board at

8    OPM, you were employed by a law firm called Brewer,

9    Attorneys & Counselors.  Is that right?

10        A    I was employed by Brewer Attorneys from

11   approximately September 20th or 22nd of -- it might

12   have been early -- it might have been the 15th -- of

13   2022, so before the end of September of 2022.

14             And then I was employed by Brewer from that

15   time until -- until I think I was employed through

16   Inauguration Day of January 20, 2025.

17        Q    When did your employment with Brewer end,

18   exactly?  Which day?

19        A    My last day of employment with Brewer was

20   January 20th of 2025.

21        Q    Are you saying you overlapped by one day or

22   that it ended?

Page 17

```
 1        A    That was the date that I provided as the --
 2    as the end date for my employment there.
 3        Q    And during the time that you were employed
 4    by Brewer, you had some role at the Heritage
 5    Foundation's Project 2025?
 6        A    No.
 7        Q    Are you aware that you were listed on the
 8    Project 2025 website among personnel for that project?
 9        A    I do not recall being -- no.  I was -- to my
10    knowledge, I was not listed.  I was listed on some --
11    on a website that was set up by an NGO called Project
12    2025, like, Data or something.
13            That was a list that was compiled by an NGO,
14    like, based on news reports about who was affiliated
15    with -- I think it was Project 2025 Info.
16            And it was compiled by, like, Democracy
17    Foundation or some -- something, like, Democracy
18    Defenders, or some title like that.  But it -- it
19    was -- so, it was not compiled by the people who
20    were -- it wasn't compiled by, like, Heritage.
21            It was just a -- like, a page that they
22    created during the election.  I think it was, like,
```

Page 18

1    August or September of 2024, and it listed --

2        Q    So Mr. Peters, I'm going to interrupt you

3    there, and I don't usually do this, but we're

4    under -- we're on a clock, and I'm going to ask

5    specific questions.

6            And I'm going to ask that you give me

7    specific answers to the questions that I ask and not

8    go on these tangents to run out the clock.  Is that

9    okay?

10       A    I was -- I was not running out the clock.  I

11   was just -- I was trying to think through the

12   answer -- the best answer to that question.

13       Q    Understood and appreciated.  So the question

14   was, were you aware that you were listed on the

15   Project 2025 website from the Heritage Foundation as

16   among the personnel for that project?  And I believe

17   your answer was no, you were not aware of that.  Is

18   that correct?

19               MR. FUCHS:  Objection.  Asked and

20   answered.

21               THE WITNESS:  Yeah.  I mean, not only

22   was I not -- not aware, I don't believe that I was

1    ever on -- I was never on the Heritage website as a

2    member or contributor or anything for Project 2025.

3    BY MS. LEONARD:

4         Q    Were you involved in any way in the Heritage

5    Foundation's Project 2025, Mr. Peters?

6         A    No.

7         Q    This is not your first time as a federal

8    employee; correct?

9         A    Yes.

10        Q    So you were the Solicitor General of the

11   FLRA from approximately September 2019, to September

12   2022?

13        A    No.  I wish it had the title "Solicitor

14   General", but it was -- the title was just

15   "Solicitor".

16        Q    Oh, I'm sorry.  Thank you for that

17   clarification.  So is it fair to say, as a solicitor

18   of the FLRA, you needed to be familiar with laws

19   pertaining to federal employment, including the CSRA

20   and the FSLMRS?

21                    MR. FUCHS:  Objection.  Leading

22   Objection.  Vague.  Objection.  Compound.

 1                    THE WITNESS:  Well, I would like
 2    to -- that's a great -- that's a great setup for a
 3    cross question, by the way.  Well done.
 4                    But it -- it is compound.  And I also
 5    was -- I -- I would have to look at my position
 6    description to know exactly what it said.
 7                    So I -- I don't want to answer
 8    inaccurately, but my -- but I -- I believe that I was,
 9    during that time -- I mean, I did build up a
10    familiarity with -- with the statute and with the
11    CSRA.
12    BY MS. LEONARD:
13        Q    And is it also fair to say that you have
14    some familiarity with appeal rights for federal
15    employees under those statutes?
16                    MR. FUCHS:  Objection.  Leading.
17    Objection.  Vague.
18                    THE WITNESS:  It -- I think some --
19    some familiarity is accurate.
20    BY MS. LEONARD:
21        Q    You accepted the offer to become senior
22    advisor at OPM, presumably at some point prior to your

```
                                              Page 21
 1   first day?
 2                  MR. FUCHS:  Objection.  Lack of
 3   foundation.  Objection to the form of the question.
 4                  THE WITNESS:  I think that -- oh,
 5   sorry -- sorry.  Sorry.
 6                  MR. FUCHS:  Yeah.  Go ahead.
 7                  THE WITNESS:  Okay.  I -- I got to stop
 8   doing that.  Did I -- I accepted the offer to be
 9   senior advisor before January 20th.
10                  I was fingerprinted -- and I was
11   fingerprinted in advance of January 20th.  And so I
12   probably would have accepted the position about
13   Thursday of the week before.
14   BY MS. LEONARD:
15       Q    So roughly Thursday -- January -- I'm going
16   to say 16th -- something like that?
17       A    A rough -- yeah.  Very roughly it
18   would've -- it would've been the 16th.
19       Q    And who made you the job offer?
20       A    So the job offer was sent via email.  My
21   recollection is that it was sent by -- by Carmen
22   Garcia, who's our chief human capital officer at OPM.
```

Page 22

1        Q    And were you given a job description, either
2     orally, or in writing, for your role as senior advisor
3     to the OPM director?
4        A    I -- I would have to look at my offer letter
5     to see what -- what was on there.  I remember that it
6     being very, very, very general about -- about the job
7     and the -- the job description.
8        Q    Other than the Friday conversation that you
9     have described with Amanda Scales and Bill, did you
10    have any other conversations with anyone about your
11    upcoming role at OPM?
12                   MR. FUCHS:  Objection.  Vague.
13                   THE WITNESS:  Did I have any
14    conversations with anyone about my upcoming role at
15    OPM?  That's a -- that's a -- a really, really good
16    question.
17                   I don't recall any specific
18    conversations about my -- like, my role.  I was, you
19    know, sent the -- the offer letter on Thursday.
20                   You know, I remember that I was -- I
21    was happy to be at -- at OPM.  I think it was very
22    aligned with my, like, prior experience, but I don't

Page 23

1    recall any specific conversations about what my role

2    would be.

3    BY MS. LEONARD:

4         Q    Did you help prepare any documents prior to

5    January 20 of '25 related to your role at OPM?

6                   MR. FUCHS:  Objection.  Vague.

7    Objection.  Lack of foundation.

8                   THE WITNESS:  Related to my role at

9    OPM?  No.

10    BY MS. LEONARD:

11        Q    Related to OPM in general, did you work on

12    any documents in advance of January 20, 2025 --

13    sorry -- January 20, 2025?

14                   MR. FUCHS:  Same objections.

15                   THE WITNESS:  Yeah.  We prepared -- I

16    worked on the drafts of two -- two different memos.  I

17    think they were the ones that were the ones that were

18    issued on day one.

19    BY MS. LEONARD:

20        Q    Who else worked with you on the drafts of

21    the memos that were issued on day one, meaning January

22    20th?

Page 24

```
 1              MR. FUCHS:  Objection to the extent
 2     that this calls for any kind of intra-agency
 3     discussion around a draft memorandum.  I'd instruct
 4     the witness not to answer based on the deliberative
 5     process privilege.
 6              MS. LEONARD:  Mr. Peters was not an
 7     employee at the time.  That's not a proper basis for
 8     an instruction.
 9     BY MS. LEONARD:
10         Q    You can answer the question.
11         A    I was -- I drafted the -- I remember I
12     worked on those two by myself.
13         Q    You spontaneously started drafting memos for
14     your upcoming role at OPM by yourself, Mr. Peters?  Is
15     that your testimony here today?
16         A    Yes.  I drafted the -- I began drafting the
17     memos entirely on -- on my own, and I didn't discuss
18     them with -- until we got to -- until I got on the
19     job.  I didn't -- didn't discuss them with -- with
20     anyone.
21         Q    You just testified a moment ago about a
22     meeting that you had on the Friday before you started
```

Page 25

1   working at OPM with Amanda Scales and Bill.  Is it

2   your testimony that you did not discuss those memos at

3   that meeting, Mr. Peters?

4       A    So the two people were -- were Amanda Scales

5   and Brian Bjelde, and we didn't discuss those memos.

6   I think we might've discussed, like, different things

7   that would happen during the day, but we didn't

8   discuss those memos in terms of the content or

9   anything like that.

10           I mean, as far as like -- so one of the two

11  was on -- you know, was on, like, temporary

12  authorities for Schedule C employees, and the other

13  was the one that I assume that you're going to ask

14  about at some point, which was the one on

15  administrative leave and probationary periods.

16           And I didn't -- I don't even know that they

17  had looked at those documents.

18      Q    So your testimony is, you didn't talk to

19  anyone else -- anyone -- about either of those memos

20  before you started working on January 20th?

21               MR. FUCHS:  Objection.  Vague.

22               THE WITNESS:  I wrote the -- those two

Page 26

```
 1   memos by myself.  Yeah.  I -- I don't -- don't recall
 2   any conversations with people about them.
 3   BY MS. LEONARD:
 4       Q    Mr. Peters, the memos were entirely your
 5   idea without talking to anyone else?  Is that your
 6   testimony?
 7                   MR. FUCHS:  Objection.  Leading
 8   Objection.  Asked and answered.
 9                   THE WITNESS:  The memos that I -- that
10   were drafted -- the day one memos were written
11   entirely by me without -- without any input from
12   anyone else.
13   BY MS. LEONARD:
14       Q    Let's ask a slightly different question.
15   The idea for the memos, Mr. Peters -- did you discuss
16   the idea for the memos with anyone else before January
17   20th?
18                   MR. FUCHS:  Objection.  Lack of
19   foundation.
20                   THE WITNESS:  I might have discussed
21   the -- I -- we might have had discussions about ideas
22   around administrative leave.
```

```
 1              There was a fellow named -- there was a
 2     fellow named Keenan Kmiec who was involved in -- who
 3     I -- I had discussions about the idea of, like, rules
 4     around administrative leave with.  So that memo, I
 5     think, I might have discussed with Keenan.
 6     BY MS. LEONARD:
 7          Q    What about the part pertaining to
 8     probationary employees in that memo, which was issued
 9     on January 20th?  Did you discuss probationary
10     employees with anyone else before January 20th,
11     Mr. Peters?
12          A    So to clarify the -- the last answer with --
13     with Keenan -- I think I just talked about the idea
14     of -- of administrative leave.
15              The probationary periods -- that piece of
16     the memo was entirely something that I thought of on
17     my own, and I did not discuss that with a soul before
18     January 20th.
19          Q    We will come back to that.
20          A    And -- and may -- may I just add to that,
21     the idea -- the -- what was the thought process behind
22     that was -- as stated in the memo, was that agencies
```

would make lists -- would simply gather information on who qualified for the category of people who did not have MSPB -- you know, for whom there wouldn't be necessarily be a -- you know, a drawn out MSPB process for terminating them.

So these would be people on an initial probationary period. These wouldn't be employees who had served a probationary period in another role and then were promoted.

This would be people who were simply employees on an initial probationary period in the federal service.

And the memo just said, identify and make -- identify who you wish to keep and who you -- you wish to retain. It was -- I don't even -- yeah.

I mean, it was not fire every probationary employee, and it was not a direction to agencies to fire any probationary employee.

And I -- it wasn't -- and it wasn't taken -- I don't think anybody at the time interpreted it as fire every single probationary employee.

Q Well, let's go back to your idea, which you

Page 29

1    testified here today was yours alone, to tell agencies

2    to collect the names of every probationary employee

3    and submit them to OPM.  That was your idea?  Is that

4    right?

5         A    Well, I don't know that it was -- so how --

6    I don't even think that the -- and I -- I'm not 100

7    percent clear on what -- I -- I've never reviewed what

8    the agency submitted, but I don't think that the

9    agencies even submitted names.

10            I think that that was just an internal

11   process that they were going to run through, which is

12   just you yourself identify who -- who these people

13   are.  So with that clarification, I don't know if

14   that -- if that gets us anywhere on this.

15        Q    The reason that you had the idea that

16   agencies should start identifying all of their

17   probationary employees and report that to OPM was

18   because these employees, in your view, were easy to

19   terminate; correct?

20                MR. FUCHS:  Objection.  Compound.

21   Objection.  Leading.  Objection.  Lack of foundation.

22                THE WITNESS:  The -- no.  That's not

1    why -- that's not why.  I -- I was mentioning that in

2    terms of defining what -- who was the people that were

3    expected to be on -- that we were looking for them to

4    identify.

5              The reason was not because they didn't

6    have appeal -- what -- was not because they didn't

7    have initial appeal rights though, or because they

8    didn't have appeal rights.

9              The reason was because we cited the

10   MSPB report from 2005, which said that probationary

11   periods are not being effectively used in the federal

12   service to actually, like, say -- do you add -- like,

13   is your performance such that you are going to be a

14   long-term asset to the federal government?

15             Like get -- actually using the

16   probationary period to assess employee performance.

17   And the data shows that the agencies were not doing

18   that.

19             The agencies were just using -- were

20   kind of treating the probationary period as a -- with

21   the expectation that, you know, people are just going

22   to stay, and that there isn't going to be any serious

Page 31

 1    consideration of their performance, or any serious

 2    consideration of the agency's needs going forward.

 3                    So no, the reason was not simply to

 4    pick people who might be vulnerable to, like, some

 5    sort of process.

 6                    The reason was for agencies to conduct

 7    a focused review of who was serving these periods,

 8    which is the reason why the probationary periods were

 9    created -- or they're called trial periods -- for

10    employees in the accepted service -- the reasons

11    they're supposed to be a -- a trial.

12                    And the regulations say specifically

13    that the employee bears -- you know, the agencies are

14    supposed to use these periods to assess employee

15    performance and see whether they have demonstrated

16    their fitness for continued employment or continued

17    permanent appointment in the federal service, which

18    has very -- you know, which has important consequences

19    in terms of, you know, getting a degree of -- a -- a

20    very kind of high degree of process around

21    termination.

22                    But, you know, but the -- but the --

Page 32

1    the agencies have always been encouraged to use the

2    periods very -- you know, very stringently, but it

3    just wasn't happening to my knowledge at the time, so.

4    BY MS. LEONARD:

5        Q    So that was the reason you thought it was a

6    good idea to write this memo telling agencies to

7    collect lists of all their probationary employees

8    because you believe the agencies were not using the

9    performance assessments correctly?  Is that right?

10                   MR. FUCHS:  Objection.  Lack of

11   foundation.  Objection.  Leading.

12                   THE WITNESS:  Yeah.  I mean, it's

13   certainly a leading question.

14                   MS. LEONARD:  This is cross, by the

15   way.

16                   THE WITNESS:  No.  I -- I understand.

17   It's just -- you know, and you're doing -- you're

18   doing what you're supposed to be doing, which is

19   leading, and especially given the short timeframe, it

20   may -- it absolutely makes sense for you to lead and

21   lead very aggressively.  But what -- sorry.  Can you

22   repeat the question?

Page 33

1    BY MS. LEONARD:

2        Q    Sure.  I'll ask a different question

3    actually, Mr. Peters.  So when you had the idea --

4        A    Oh, let me -- let me go back to what I --

5    what I was going to say.

6        Q    I'll ask -- Mr. Peters, I'm going to ask a

7    different question.

8        A    Yeah.

9        Q    So, Mr. Peters, when you had the idea for

10   this memo telling federal agencies to collect the

11   names of all of their probationary workers -- when you

12   had that idea, you were -- you believed that those

13   employees had fewer appeal rights to the MSPB than

14   other civil service employees; right?

15                   MR. FUCHS:  Same objections.

16                   THE WITNESS:  I think that the -- the

17   idea was that there would be new leadership at the

18   agencies who could give a fresh look to -- to some of

19   these issues because we've wanted to make sure that

20   agencies were -- had effective -- I mean, this

21   one -- you know, want to make sure that agencies have

22   effective performance -- you know, systems.

1            And so the reason -- so the -- you

2    know, but as I said, the -- the fact is that the --

3    you can't kind of separate the process from the

4    substance in this case.

5            The reason why the substance is

6    different is because the process ramps up radically

7    after the probationary or trial period.  And so -- so

8    they're kind of interconnected.

9            So it's not just -- we're not just kind

10   of picking people in the school yard to go, you know,

11   say, "Hey, you know, get that guy."

12            The reason is because the -- the

13   process that they -- that is provided for in the

14   federal statute -- it's higher because you have a

15   gating mechanism -- because you have a trial period.

16   So it's almost like -- think about it this way -- when

17   you go to court and you get a judgment; right?

18            MS. LEONARD:  Okay.  I'm going to cut

19   you off with the narrative because it is

20   non-responsive.  I'm going to move to strike your

21   answer as non-responsive, Mr. Peters.

22            THE WITNESS:  The entire -- the entire

Page 35

1    answer?

2    BY MS. LEONARD:

3         Q    I'm going to ask you to answer the questions

4    that I ask.  When you -- the question, Mr. Peters, is

5    when you wrote this memo, which you have testified was

6    your idea alone --

7         A    Yeah.

8         Q    And you own that -- that that was that memo

9    on January 20th, telling everyone to collect the names

10   of their probationary employees.  That was your idea?

11                  MR. FUCHS:  Objection.  Asked and

12   answered --

13   BY MS. LEONARD:

14        Q    Without talking to anybody else.  Is that

15   your testimony?

16        A    I'm not -- I mean, when you say own that,

17   that's kind of colloquial -- I mean, own it in -- in

18   what context?

19        Q    Is that your testimony, Mr. Peters?

20        A    My -- my testimony is -- is that I -- the --

21   I -- the memo and particularly -- especially the part

22   about probationary periods, was entirely my idea.  And

1    I never spoke about it with anybody later, like,
2    before or -- or later until well into my time at -- at
3    OPM.
4        Q    And when you wrote that you believed that
5    the process, as you just described it, for
6    probationary employees to object to any termination,
7    was less substantial than the appeal rights for civil
8    service employees; right?
9                MR. FUCHS:   Objection.   Vague.
10   BY MS. LEONARD:
11       Q    That's a yes or no question.
12       A    Well, think about it like -- so it's called
13   a trial period; right?   Think about it, like, you have
14   a trial and then you have a judgment; right?
15            And it's actually very, very difficult to
16   undo a judgment because there -- you know, when you --
17   what's gone into a judgment has been a lot of vetting,
18   a lot of work, a lot of scrutiny.   So it's -- it's
19   actually -- it can be easy to -- for a judge, for
20   example, to change his mind before judgment --
21       Q    I'm going to -- I do not do this.   I'm going
22   to interrupt you and ask you to answer the questions.

Page 37

```
 1              If you continue to do this, we will hold
 2      this deposition open, we will get more time from Judge
 3      Alsup, and you will be back here longer.  So please
 4      answer my questions directly without these extended
 5      narratives.  Can you agree to do that, Mr. Peters.
 6      Yes, or no?
 7          A    Yes --
 8                  MR. FUCHS:  Please don't badger the
 9      witness.
10      BY MS. LEONARD:
11          Q    Thank you.  At the memo on -- day one
12      memo -- January 20th -- that was issued to all federal
13      agencies.  Do you recall that?
14          A    Yes.  The document said that it was issued
15      to -- it went to all -- heads of all departments and
16      agencies, and I believe it also had a CC line on it,
17      as well.
18          Q    And you gave all federal agencies four days,
19      including the federal holiday, until January 24th to
20      collect the names of every probationary employee.  Do
21      you recall that?
22                  MR. FUCHS:  Objection.  Lack of
```

Page 38

1   foundation.

2                   THE WITNESS:  The memo went out -- did

3   not go out from -- from me.  I mean, it wasn't -- it

4   wasn't me, Noah Peters giving people a deadline.

5                   It was the -- the agency it was

6   from -- the agency had -- and, you know, Chuck

7   reviewed and signed the -- the memo.  So I didn't -- I

8   didn't send anything out to heads of departments or

9   agencies.

10  BY MS. LEONARD:

11       Q    Are you suggesting that Chuck Ezell changed

12  the deadline you had drafted and made it January 24th?

13  Is that your suggestion, Mr. Peters?

14                  MR. FUCHS:  Objection to the extent

15  that that calls for testimony about internal agency

16  deliberations once he was senior advisor.  I'd

17  instruct the witness not to answer on the basis of

18  deliberative process privilege.

19                  MS. LEONARD:  You have put the facts at

20  issue with respect to what was told to agencies.

21  Mr. Peters has submitted a declaration.  You've waived

22  any privilege that pertains to this.

1              We can address that during a break.

2    I'm not going to waste time on the record on that, but

3    you've put the facts at issue and the privilege is not

4    well taken.

5              We'll call the Judge during a break to

6    get clarification on that, and I suspect I know where

7    he will land.  But for now, we'll move on.  I'm going

8    to mark this as Exhibit 1.

9                    (Exhibit 1 was marked for

10                   identification.)

11             MR. FUCHS:  Yeah.  I'll say for the

12   record, communications with agencies -- but

13   communications within OPM would be subject to

14   deliberative process privilege.  And we haven't waived

15   that privilege.

16             MS. LEONARD:  We'll discuss it during

17   the break.

18             THE WITNESS:  What was the -- what was

19   the waiver?

20             MS. LEONARD:  We'll discuss it during

21   break.  Okay.  We're marking that as Exhibit 1.  You

22   can hand that to -- so that's your -- that's the copy

Page 40

1    for counsel.  You can take the copy with the exhibit

2    number on it is for you.  Okay.  Back on the record.

3    BY MS. LEONARD:

4         Q    Mr. Peters, if you could take a look at

5    what's been marked as Exhibit 1.  This is the January

6    20, 2025, OPM memorandum to heads and acting heads of

7    departments and agencies called Guidance on

8    Probationary Periods, Administrative Leave and

9    Details.

10             Mr. Peters, this is the day one memo to

11   which you've been referring that you drafted prior to

12   January 20th; correct?

13        A    This is the memo that was initially issued

14   on January 20th, but I do want to note that this was

15   revised on March 5th in response to the temporary

16   restraining order.

17             And it now includes a specific

18   clarification, which was always the intent, which is

19   that this was not -- never was any sort of direction

20   to terminate any employee.

21                  MS. LEONARD:  For the record, Norm

22   Eisen, co-counsel in the case, is now in the room too.

1    BY MS. LEONARD:

2        Q    This Exhibit 1 is the January 20th

3    memorandum that was issued to agencies by OPM;

4    correct?

5        A    Well, it looks like this is a copy that was

6    filed with the Court, 'cause it has a court -- it

7    looks like this is -- was filed on the docket at some

8    point.

9        Q    By your counsel?

10       A    Okay.  Yeah.  So I assume -- I assume that

11   the -- that it's the one.

12       Q    Okay.  So this is the memo we've been

13   talking about with respect to probationary periods.

14   You see that section right there?

15       A    Yes.

16       Q    And this states, "By no later than January

17   24, 2025, agencies should identify all employees on

18   probationary periods."  Do you see that?

19       A    Yeah.  And I think one -- one thing that's

20   important to note is that -- yeah.  I mean, that's --

21   that was -- what was said in the memo.

22       Q    And it also says, "And send a report to OPM

1   listing all such employees."  Do you see that?

2        A    Yes.

3        Q    So the memo required federal agencies to

4   send a list of all probationary employees to OPM by no

5   later than January 24, 2025.  Do you see that?

6        A    Yeah.  Although I would note that I did not

7   look at those reports, and I don't know whether they

8   actually had, like -- I -- I don't know that they

9   listed the names.

10       Q    If you didn't look at them, how do you know

11  that they didn't list the names, Mr. Peters?

12       A    I don't think that, at least initially,

13  they -- they listed the names, but I -- you're --

14  you're right.  I don't know one way or the other.

15       Q    So when you drafted this memo prior to

16  January 20th, did it include this instruction to

17  agencies to compile all the names and send them to OPM

18  by January 24th?  Did your draft include that

19  instruction, Mr. Peters?

20       A    Yes.

21       Q    This was not the only memorandum that OPM

22  issued on day one to all agencies and agency heads;

Page 43

1    correct?

2         A    That's right.  There was another one.

3         Q    There was more than one.  So we're going to

4    mark the next as Exhibit 2.

5                   (Exhibit 2 was marked for

6                   identification.)

7         A    This.

8         Q    Okay.  Mr. Peters, you've been marked --

9    with what's been identified as Exhibit 2.  It's a

10   January 20, 2025, memorandum from OPM to heads and

11   acting heads of departments and agencies, and it is

12   entitled "Temporary Transition Schedule C and Schedule

13   C Authorities and Non-Career Senior Executive Service

14   Appointing Authorities."  Do you see that?

15        A    Are you going to give me time to read it?

16        Q    I'm not going to ask you questions

17   about -- I'm not -- are you familiar with this

18   memorandum, Mr. Peters?

19        A    Are you going to give me time to read it?

20        Q    Mr. Peters, are you familiar with this

21   memorandum?

22        A    I'd like a -- I'd like a minute to read it,

Page 44

1    please.

2         Q    Mr. Peters, did you draft this memorandum?

3                   MR. FUCHS:  Just let the deponent give

4    it -- have some time to read it.

5                   MS. LEONARD:  We're not going -- we can

6    go off the record.

7                   THE VIDEOGRAPHER:  Off the record at

8    2:03 p.m.

9                   (Off the record.)

10                  THE VIDEOGRAPHER:  We're back on the

11   record.  The time is 2:05 p.m.

12   BY MS. LEONARD:

13        Q    Okay.  Mr. Peters, you've had a moment to

14   look at Exhibit 2.  This is a memorandum dated January

15   20th to heads and acting heads titled "Temporary

16   Transition Schedule C."  Do you see the full title

17   there on the document?

18        A    Yes.

19        Q    This is a memo that you wrote prior to

20   January 20th; correct?

21                  MR. FUCHS:  Objection.  Lack of

22   foundation.

Page 45

1              THE WITNESS:  Yes.

2    BY MS. LEONARD:

3         Q    And you previously testified here today that

4    you wrote two memorandums prior to day one, January

5    20th.  This is one of them; right?

6         A    Yes.  And I would note that this is almost

7    word for -- this is very, very similar to the January

8    8, 2025, memo from acting OPM Director Rob Shriver.

9    This is very, very similar to that memo.

10             I think that the big change to this was -- I

11   think it removed the cap for temporary transition

12   Schedule C.

13             And I think it might have had a different --

14   I -- I don't remember what the difference was.  I

15   think the apportionment or the allocation for the

16   non-career and limited SES may have been different

17   from what had -- what was in the -- the January 8,

18   2025 Rob Shriver memo.

19             MS. LEONARD:  Move to strike as

20   non-responsive.

21   BY MS. LEONARD:

22        Q    Mr. Peters, this memo for temporary

Page 46

1    transition Schedule C employees would apply to Amanda

2    Scales; correct?

3                    MR. FUCHS:  Objection.  Lack of

4    foundation.

5                    THE WITNESS:  I -- I have no -- no

6    clue.

7    BY MS. LEONARD:

8        Q    You're aware that Amanda Scales continues to

9    be employed by Elon Musk's AI company, even though she

10   is serving as the chief of staff of OPM?

11                   MR. FUCHS:  Objection.  Relevance.

12                   THE WITNESS:  Yeah.  I -- I am not

13   aware of that.  I have no idea.

14   BY MS. LEONARD:

15       Q    And is it your testimony that you did not

16   talk about this memo with Amanda Scales in the Friday

17   meeting before you started work for OPM?

18       A    I did not.  We did not have any conversation

19   about this -- this memo when -- like I said, this is

20   almost exactly -- like, this is very, very similar to

21   the January 8, 2025, memo that was put in -- put out

22   by the former acting director of -- of OPM.

Page 47

```
 1          Another change was that the allocations for
 2    inspector generals, I believe were -- was removed from
 3    this as I read the footnote.
 4              MS. LEONARD:  Move to strike everything
 5    after I did not talk about this with her.
 6              THE WITNESS:  Is -- is this cross or is
 7    this a deposition?  Because you're treating the --
 8    I've never seen somebody treat a deposition exactly
 9    like cross.
10              So that might be an appropriate
11    objection if you're, like, cross-examining somebody in
12    court.  That is a completely inappropriate question if
13    you're going to - if this is a deposition.  So which
14    is it?  Is this cross or is this a deposition?
15    BY MS. LEONARD:
16      Q    Do you have any other feelings about this
17    deposition that you'd like to put on the record,
18    Mr. Peters?
19      A    I just think your -- your objection is
20    frivolous.  If you -- you -- the move to strike --
21    there's nobody to strike the answer.  It's a
22    deposition.  What -- are you going to cross it out?
```

Page 48

1    Like, what are you -- what are you doing?

2                    MR. FUCHS:  Let's go off the record.

3                    MS. LEONARD:  Would you like to take a

4    break?

5                    MR. FUCHS:  Yeah.

6                    THE WITNESS:  Yeah.

7                    MS. LEONARD:  Okay.

8                    THE VIDEOGRAPHER:  We're going off the

9    record.  The time is 2:09 p.m.

10                    (Off the record.)

11                    THE VIDEOGRAPHER:  We're back on the

12   record.  The time is 2:13 p.m.

13   BY MS. LEONARD:

14       Q    Okay.  Mr. Peters, before we took the break,

15   we were discussing memoranda that OPM issued to

16   federal agencies on January 20th, including

17   number -- Exhibit No. 2 that you have in front of you.

18   Do you see that?

19       A    Yes.

20       Q    Okay.  And if you look at that memoranda,

21   you will see language -- actually, we'll come back to

22   that.  Ah, there it is.  It goes from page 1 to page

1    2.

2            If you look at the bottom of the first page,

3    it says, "By this memorandum, OPM approves the

4    unlimited use of TTCs.  This expansion of the use of

5    TTCs is necessary to drive the unusually expansive and

6    transformative agenda the American people elected

7    President Trump to accomplish."  Do you see that

8    language?

9        A    Yes.

10        Q    And did you write that language?

11        A    Like I said, my recollection is I drafted --

12    I did the -- drafted this document.

13        Q    Okay.  And so this reference to the

14    unusually expansive and transformative agenda that

15    President Trump was elected to accomplish -- those are

16    your words?

17                MR. FUCHS:  Objection.  Asked and

18    answered.

19                THE WITNESS:  I -- yeah.  I guess those

20    are -- those are -- were -- I initially came up with

21    the idea to use those words.

22    //

Page 50

1    BY MS. LEONARD:

2        Q    Okay.  And the expansive and transformative

3    agenda that President Trump is seeking to accomplish

4    includes downsizing the size and number of federal

5    employees; right?

6                    MR. FUCHS:  Objection.  Lack of

7    foundation.

8                    THE WITNESS:  I can -- that is not what

9    I was thinking about -- I can tell you -- when -- when

10   I chose these words.  I think I -- I was -- I wasn't

11   thinking about anything.  I don't think I was thinking

12   about any specific part of the agenda.

13   BY MS. LEONARD:

14       Q    You weren't thinking about telling agencies

15   to terminate all of their probationary employees

16   because they don't have any appeal rights?

17                    MR. FUCHS:  Objection.  Leading.

18   Objection.  Vague.

19                    THE WITNESS:  And I already answered

20   that.  The answer is no, not by this memo or by the

21   other one.  This is not a coded reference.  This is

22   not, like, coded language, like, go fire probationary

Page 51

1    employees.  It was not -- it was totally not like that
2    at all.
3    BY MS. LEONARD:
4        Q    But that is part of the expansive and
5    transformative agenda that you believe in.  Isn't it?
6                    MR. FUCHS:  Objection.  Lack of
7    foundation.
8                    THE WITNESS:  That I believe in?  I
9    mean, that -- so what -- the firing -- firing
10   employees is part of the transformational, unusually
11   expansive and transformative agenda that I believe in?
12                   MS. LEONARD:  That's the question.
13                   MR. FUCHS:  Objection.  Argumentative.
14                   THE WITNESS:  I have never and would
15   never advocate that people be fired arbitrarily, or
16   fired without some sort of reason.  So I -- I
17   don't -- it's not what I believe in at all.
18   BY MS. LEONARD:
19       Q    You wouldn't advocate, Mr. Peters, that
20   people be fired for performance when they are not in
21   fact being fired for performance?
22                   MR. FUCHS:  Objection.  Vague.

Page 52

1    Objection.  Relevance.  Objection.  Lack of
2    foundation.
3                    THE WITNESS:  No.  I would not.
4    Certainly not.
5    BY MS. LEONARD:
6        Q    You didn't instruct federal agencies to fire
7    people for performance using a template that says
8    performance, Mr. Peters?
9                    MR. FUCHS:  Objection.  Argumentative
10   Objection.  Lack of foundation.
11                   THE WITNESS:  No.
12   BY MS. LEONARD:
13       Q    OPM told federal agencies to use a template
14   that says people are being fired for performance
15   because those employees don't have appeal rights.
16   Isn't that true, Mr. Peters?
17                   MR. FUCHS:  Objection.  Lack of
18   foundation.
19                   THE WITNESS:  No.  I think you're
20   referring to -- I mean, if we want to make this -- and
21   I think we should bring in the actual emails and --
22   and documents that you're referring to at this point.

Page 53

1              But, I mean, to give some background,

2     we had had requests from agencies for template

3     letters, and so we provided a template letter.

4              But the -- I think the -- certainly the

5     second email provided a very detailed sort of

6     framework for an analysis of -- of employee

7     performance that we encouraged, you know, agencies to

8     use.

9              But it wasn't -- we didn't require --

10    we didn't -- we didn't -- like, there was a lot of

11    language in your -- in your kind of windup that I

12    wouldn't agree with.

13    BY MS. LEONARD:

14        Q    When you say we, you mean OPM?

15        A    I don't -- I -- in that -- the context of my

16    last answer, I think that we probably referred to OPM.

17        Q    Okay.  Going back to the memos that were

18    issued on January 20th, there was the -- on the very

19    first day of this new administration, there was the

20    memo with respect to probationary employees, Exhibit

21    1, the memo with respect to TTCs, Exhibit 2.

22              And do you recall whether there were other

Page 54

1    memos also issued on January 20th instructing federal

2    agencies to do things with respect to their employees?

3                    MR. FUCHS:  Objection.  Vague.

4                    THE WITNESS:  To -- to my recollection,

5    there were only -- there was this -- there was this

6    memo, which by the way points out that non-career

7    limited SES appointees do not have any appeal rights.

8                    There was this and there was the one on

9    probationary periods, administrative leave, and

10   details.

11   BY MS. LEONARD:

12       Q    Okay.  I think we can short circuit putting

13   all of the memoranda in front of you by doing this.

14   Let's mark this as Exhibit 3.

15                    (Exhibit 3 was marked for

16                    identification.)

17                    And I'll represent to you, Mr. Peters, that

18   Exhibit 3 is a printout from the CHCO website on which

19   transmittals from OPM to the CHCOs are posted by OPM.

20   Are you familiar with that website, Mr. Peters?

21       A    Yes.

22       Q    And when I say CHCO, you understand that I'm

Page 55

1    referring to the Chief Human Capital Officer of

2    Federal Agencies?

3         A    Yes.  And what I -- what I would note is

4    that this is -- these are not just being transmitted

5    to the CHCOs.

6              This is something called the CHCO Council,

7    which -- and so these -- it says at the top, "These

8    are being transmitted --" well, the memorandums are

9    directed to the -- the CHCO HR directors in the heads

10   of agencies.  But the -- the memos are public and

11   any -- anybody can look at them.

12        Q    Okay.  Thank you for that clarification.

13   Let's go -- they're in reverse chron order.  And if

14   you go to what I think is page 6 of 11 of the

15   document, you can see the ones listed with the date

16   January 20th.  Do you see that there?

17        A    Yes.

18        Q    Okay.  So OPM on January 20th issued not

19   only the two memoranda that we've been looking at, but

20   also something called the Federal Civilian Hiring

21   Freeze.  Do you see that?

22        A    It says -- it lists here a joint memo

Page 56

1    between OMB and OPM called Federal Civilian Hiring

2    freeze Guidance.

3         Q    Did you write that one before January 20th,

4    as well, Mr. Peters?

5                   MR. FUCHS:  Objection.  Relevance.

6                   THE WITNESS:  No.

7    BY MS. LEONARD:

8         Q    And you see January 21, the next day,

9    there's an additional OPM memo regarding initial

10   guidance regarding DEIA executive orders that was sent

11   to the federal agencies.  Do you see that?

12        A    Yes.  It says, "Initial guidance regarding

13   DEIA executive orders."

14        Q    And then on the following day, January 22nd,

15   a guidance on the return to work.  Do you see that?

16        A    Yes.  It says, "Guidance on presidential

17   memorandum, return to in-person work."

18        Q    And then on the 24th, another guidance on

19   RIFs of the DEIA offices -- that was sent by OPM to

20   the heads of federal agencies, as well.  Do you see

21   that?

22        A    Yes.  It says, "Guidance regarding RIFs of

Page 57

1    DEIA offices."

2        Q    And then on Monday, January 27th, another

3    joint OMB OPM memorandum regarding return to office

4    implementation plans.  Do you see that was sent to

5    federal agencies, as well?

6        A    Yes.  It says that there's a joint memo from

7    OMB and OPM called Agency Return to Office

8    Implementation Plans.

9        Q    Okay.  And if you turn the next page,

10   there's another January 27th memorandum -- OPM

11   memorandum, "Re Schedule Policy Career Guidance."  Do

12   you see that one?

13       A    I think that's the -- the file name.  But

14   the formal title was Guidance on Implementing

15   President Trump's Executive Order Titled, Restoring

16   Accountability to Policy Influencing Positions Within

17   the Federal Workforce.

18       Q    Also known as the Schedule F memo.  Is that

19   fair?

20               MR. FUCHS:  Objection.  Relevance.

21               THE WITNESS:  No.  It's -- the memo is

22   the -- was given a title.

Page 58

```
1     BY MS. LEONARD:
2          Q    Okay.  And you wrote that January 27th
3     memorandum, as well, didn't you, Mr. Peters?
4                    MR. FUCHS:  Same objection.
5                    THE WITNESS:  No.
6     BY MS. LEONARD:
7          Q    You did not?
8          A    No.  I did not.
9          Q    Okay.  But this is all in the first week.
10    These are all memorandums, as you just testified, that
11    OPM is sending to the CHCOs, as well as the agency
12    heads; correct?
13         A    These are all memos that were -- I believe,
14    that were directed to heads of departments and
15    agencies, CHCOs, deputy CHCOs, HR directors, perhaps
16    others.  I don't know what the distribution was for
17    the OMB-specific memos.
18         Q    And in this same time period, you are not
19    aware of any memoranda that were issued from the heads
20    of agencies to OPM about federal employment, are you,
21    Mr. Peters?
22                    MR. FUCHS:  Objection.  Lack
```

Page 59

1    foundation.  Objection.  Relevance.

2                    MS. LEONARD:  Counsel, I'm going to

3    just say this once.  Relevance is not a proper

4    objection in a deposition, and I would ask that you

5    read the standing order that Judge Alsup has on this

6    specific point, and I have a copy for you if you need

7    it.

8                    But go ahead.  So let me ask the

9    question again so we get a clear answer.

10                   THE WITNESS:  Yeah.  I mean, it's --

11   it's a rhetorical question because there is -- you

12   know, there's certain regulatory -- you know, there's

13   a certain jurisdiction that OPM has, and so -- but,

14   you know, there's -- I don't know.

15                   But, you know, the agencies also have

16   powers to send memos to their employees.  They just

17   don't send the -- you know, they just don't send them

18   to OPM.

19                   So agencies were sending lots of memos

20   to their employees during the same time period,

21   probably more than are listed here for OPM sending to

22   the heads of departments and agencies.

Page 60

1   BY MS. LEONARD:

2        Q    Mr. Peters, you're not aware of any

3   memoranda whereby agencies provided instruction to OPM

4   during the first week of the administration regarding

5   federal employment, are you?

6        A    If -- no -- I am not aware, but that would

7   be a non-sequitur.  I mean, it -- like, I -- I don't

8   even know why -- there would be no reason for them to

9   do that.

10            But if -- if the idea is that the agencies

11  are -- are disempowered, the agencies were sending

12  numerous memos to their own employees during this

13  time.

14       Q    Mr. Peters, in addition to these memos, OPM

15  sent out other government-wide instructions with

16  respect to federal employees during the first few

17  weeks of the administration; correct?

18       A    What do -- what do you mean?

19       Q    You're aware of other instructions that OPM

20  sent out to federal agencies regarding federal

21  employees during the first few weeks of the

22  administration --

1          MR. FUCHS:  Objection.  Vague.

2          THE WITNESS:  So, and I think that this

3    is a good place to let -- let me take -- take the

4    break, but if you want to say -- do I recall -- like,

5    are all -- is this an authentic printout of all of the

6    memos that OPM has posted to the CHCO Council page?

7    It -- you know, I have no reason to doubt that.

8    BY MS. LEONARD:

9        Q    That's not -- that is not the question.  You

10   can set that aside.  I was actually asking about your

11   knowledge of other instructions that OPM has sent out

12   to federal agencies regarding federal employment.

13       A    Yeah.  OPM has -- has other ways, other than

14   the CHCO Council of sending out guidance.  I

15   don't -- I'm not aware of whether everything is

16   specifically posted on the CHCO Council page.

17       Q    For example, OPM created a server in which

18   it could -- from which OPM could send out emails to

19   all federal employees during the first few weeks of

20   this administration, did it not?

21          MR. FUCHS:  Objection.  Lack of

22   foundation.

Page 62

1                    THE WITNESS:  OPM didn't -- did not

2       create any server.

3                    Can we go off the record?

4                    THE VIDEOGRAPHER:  -- 2:28 --

5                    THE WITNESS:  Yeah.  2:28.  Yeah.

6       Let's go.

7                    MS. LEONARD:  Okay.

8                    THE VIDEOGRAPHER:  We're going off the

9       record.  This is the end of media unit 1.  The time is

10      2:28 p.m.

11                   (Off the record.)

12                   THE VIDEOGRAPHER:  We're back on the

13      record.  This is the beginning of media unit 2.  The

14      time is 3:29 p.m.

15      BY MS. LEONARD:

16           Q    Okay.  Mr. Peters, one of your

17      responsibilities as a senior advisor to the director

18      of OPM includes meeting with CHCOs and deputy CHCOs.

19      Is that right?

20           A    I don't know that that's my responsibility.

21      I've done it.  I've certainly spoken at the CHCO

22      Council before.

Page 63

1          Q     And the CHCO Council meetings are held

2     typically by videoconference.  Is that right?

3          A     They have been typically held by

4     videoconference, you know?  Yeah.

5          Q     And since January 20th, the CHCO Council

6     videoconferences have been held with some frequency.

7     Is that fair to say?

8                     MR. FUCHS:  Objection.  Form.

9                     THE WITNESS:  Yes.  The CHCO Council

10    has held lots of different sessions, mostly relating

11    to administering the Deferred Resignation Program.

12    BY MS. LEONARD:

13         Q     And at one point in time, in early February,

14    was the CHCO Council meeting with OPM every day?

15         A     Yes.  During the time around the Deferred

16    Resignation Program, the CHCO Council was meeting

17    every day.  And what was happening was, as is supposed

18    to happen at the CHCO Council -- is CHCOs were asking

19    questions, providing input, you know, and we were kind

20    of engaged in a -- in a dialogue with the CHCOs as

21    they administered this -- this program.

22                     And, you know, we wanted to do it in a way

1    that was consistent across the government, was fair to

2    the employees -- you know, complied with the intent.

3    And somehow, you know, we -- we made it work.

4              It was -- but it was a group effort.  It

5    took a lot of work from the CHCOs, and I think the

6    CHCOs appreciated having the daily availability where

7    they could ask questions and -- and also provide their

8    own guidance to -- to OPM as we kind of worked our way

9    together through administering the Deferred

10   Resignation Program.

11      Q    In fact, on some of those videoconference

12   meetings with the CHCOs, you read from a script;

13   correct?

14              MR. FUCHS:  Objection.  Form.

15              THE WITNESS:  I -- I would on a few of

16   them.  So if there was, like, a -- a complicated legal

17   issue, we would, you know, have a script ready.

18              And on a couple of -- and on the -- the

19   one call that we did regarding -- well, the one on the

20   Friday -- the -- the February 14th, I certainly read

21   from a script.

22   //

```
                                                    Page 65

 1    BY MS. LEONARD:

 2         Q    You also held videoconference meetings with

 3    other agency officials during your time since January

 4    20th in this position; correct?

 5                   MR. FUCHS:  Objection.  Form.

 6                   THE WITNESS:  We -- as is pertinent to

 7    this litigation, we had a February 13th -- we had

 8    three calls with the chiefs of staff, one on Friday,

 9    one on Monday, and one on Thursday regarding

10    probationary employees.

11    BY MS. LEONARD:

12         Q    When you say one on Friday -- one -- sorry.

13    What -- Friday?  What we -- what?  Thursday, Friday

14    and Monday?  And what dates are you talking about?

15         A    My recollection is that we had three very

16    short calls, the first being Friday, February 7th, the

17    second being Monday, February 10th, and then the third

18    being Thursday, February 13th.

19         Q    With the chiefs of staff and other political

20    appointees at federal agencies?

21                   MR. FUCHS:  Objection.  Form.

22                   THE WITNESS:  I think that's -- that's
```

1    probably fair.  It was probably about maybe 7 to 15.

2    It might have been more.

3    BY MS. LEONARD:

4        Q    Okay.  Let's mark this as the next -- this

5    is Exhibit 4.

6                    (Exhibit 4 was marked for

7                    identification.)

8                Mr. Peters, you've been handed what's been

9    marked as Exhibit 4.  It is a document called

10   Defendant's Disclosure of February 13, 2025, OPM Call

11   Participants.

12               And if you turn to the second and third page

13   of this document, there are a list of individuals who

14   are listed as having participated in a February 13,

15   2025, call with OPM.  Do you see that?

16       A    Yes.

17       Q    And your name is on this list; correct?

18       A    Yes.  I was -- I participated on -- in

19   this -- in this call.

20       Q    And is this February -- the list of

21   participants here referring to the February 13th call

22   that you were just describing with the chiefs of staff

Page 67

1    and other political appointees?

2         A    Yeah.  It looks like there were about 30 --

3    I'm -- my rough count is about 30 people.  I think the

4    invitation was -- was to the chiefs of staff and DOGE

5    leads.

6         Q    You can set that aside.  After OPM issued

7    the January 20th memo in which it instructed the

8    agencies to provide the list of every probationary

9    employee by January 24th, you participated in meetings

10   with the CHCOs at which that instruction was

11   discussed; correct?

12                   MR. FUCHS:  Objection.  Form.

13                   THE WITNESS:  To the extent we

14   discussed it with the CHCOs before February 7th, it

15   was in passing, and it wasn't substantive.

16                   The -- I -- the only -- the reason why

17   we -- it came to my radar on February 7th was because

18   I had learned that the Small Business Administration

19   planned to terminate all of its probationary employees

20   like that day immediately.

21                   And so that's why we scheduled -- so

22   I -- the call was very -- on February 7th, which

Page 68

1    didn't include all of the different participants on

2    this -- on this list -- was scheduled, like, very

3    quickly in the afternoon I -- as I recall, after I

4    learned that about SBA.

5    BY MS. LEONARD:

6        Q    Well, let's go back a little bit back in

7    time, because the deadline that was given in the memo

8    was January 24th.

9        A    Yes.

10       Q    There were calls before January 24th with

11   the CHCOs in which you participated to discuss the

12   requirement that they submit lists of probationary

13   employees; correct?

14       A    No.  I don't know where you're -- where

15   that's coming from, but I don't recall any calls like

16   that.

17       Q    And in fact, you had a Zoom call with the

18   CHCOs the very next day, January 21st.  Did you not?

19              MR. FUCHS:  Objection.  Form.

20              THE WITNESS:  I -- if we did, I don't

21   recall being on that -- that particular CHCO call.

22   //

1    BY MS. LEONARD:

2        Q    And in fact, the CHCOs expressed concern

3    about that January 24th deadline, because it simply

4    was not possible to compile lists of all of their

5    probationary employees and provide them to OPM by that

6    date?  Do you recall that?

7                    MR. FUCHS:  Objection.  Form.

8                    THE WITNESS:  I was not on any call on

9    January 21st like -- that was like that.

10   BY MS. LEONARD:

11       Q    Do you recall if CHCOs -- on any meeting,

12   expressing concern about the requirement that they

13   compile lists of every probationary employee and

14   submit it to OPM?

15                   MR. FUCHS:  Objection.  Form.

16                   THE WITNESS:  No.  I don't.

17   BY MS. LEONARD:

18       Q    If a CHCO were to testify that they

19   expressed those concerns directly to you, would they

20   be lying?

21                   MR. FUCHS:  Objection.  Form.

22                   THE WITNESS:  Directly to me, Noah

Page 70

1    Peters, that they couldn't get -- that they couldn't
2    compile the lists by January 24th?  I don't recall
3    having any conversations like that with any CHCO.
4    BY MS. LEONARD:
5         Q    So it might be true.  You just don't
6    remember?
7                    MR. FUCHS:  Objection.  Form.
8                    THE WITNESS:  I don't remember, and I
9    don't think it's true.
10   BY MS. LEONARD:
11        Q    Okay.  So they would -- CHCO -- if they
12   testified that way, they'd be lying?
13                   MR. FUCHS:  Objection.  Form.
14                   THE WITNESS:  I don't recall any direct
15   conversations with CHCOs in the period of January 20th
16   to January 24th, where they expressed concern about
17   not being able to compile the list of the probationary
18   employees.
19   BY MS. LEONARD:
20        Q    Well, you were aware that OPM had never
21   asked for such lists to be provided to it by any
22   federal agency before; correct?

Page 71

```
 1                    MR. FUCHS:  Objection.  Form.
 2                    THE WITNESS:  I was aware of what?
 3    BY MS. LEONARD:
 4         Q    That OPM had never asked the agencies to
 5    provide these lists of every probationary employee
 6    before?
 7                    MR. FUCHS:  Same objection.
 8                    THE WITNESS:  No.  I was not aware of
 9    that.
10    BY MS. LEONARD:
11         Q    Because the CHCOs told you that; right?
12                    MR. FUCHS:  Same objection.
13                    THE WITNESS:  No.  The CHCOs
14    never -- again, I wasn't on all of the -- the CHCO
15    calls, so I don't want to say that something never
16    happened because there might have been a call that I
17    wasn't on in the -- especially, I -- as I recall, I
18    only started participating in the CHCO calls after the
19    Deferred Resignation Program on January 28th.
20                    For the first week or so, I wasn't on
21    all of the calls or any of the calls.  So I don't know
22    what was said or if CHCOs had said, we've never --
```

1    we've never done this before.  I just -- I just don't

2    know.

3    BY MS. LEONARD:

4        Q    So I believe you just testified a little

5    earlier that you were on some CHCO calls before

6    January 24th?

7        A    No.  I -- I don't recall being on any CHCO

8    calls before January 24th.  My recollection -- my

9    strong recollection is I only started participating in

10   them after the -- after the Deferred Resignation

11   Program was rolled out on January 28th.

12       Q    So the Deferred Resignation Program that was

13   rolled out on January 28th was an OPM program whereby

14   every federal employee was made an offer that they

15   could resign from federal employment; correct?

16                   MR. FUCHS:  Objection.  Form.

17                   THE WITNESS:  The offer was that they

18   could take advantage of nine months -- or was

19   it -- would've been from February -- it would've been

20   from January.

21                   So it would've been eight months of

22   administrative leave along with -- and then there were

Page 73

1    also -- I think, added into that eventually there was

2    also flexibility along -- around voluntary early

3    retirement authority that was later included.

4                    But the -- the idea was that people who

5    did not want to return to the office or just didn't

6    want to, for whatever reason, continue their federal

7    service, could take advantage of a voluntary program

8    that was announced government-wide, whereby they

9    could, you know, opt in and -- and not -- not have to

10   return to the office and could kind of just exit

11   from -- from their federal employment, which was a far

12   more generous offer than I think was ever made to

13   employees in the federal service and was much more

14   generous than any comparable private sector offer.

15   BY MS. LEONARD:

16       Q    And OPM sent that out via an OPM email

17   address on January 28th to all federal employees;

18   correct?

19                    MR. FUCHS:  Objection.  Form.

20                    THE WITNESS:  Yes.

21   BY MS. LEONARD:

22       Q    And the agencies didn't even know about it

Page 74

1    before OPM did it; right?

2                    MR. FUCHS:  Objection.  Form.

3                    THE WITNESS:  I don't know what the

4    agencies knew or didn't know.

5    BY MS. LEONARD:

6        Q    You didn't tell any of the CHCOs or chiefs

7    of staff about the Deferred Resignation Program before

8    the email went out, did you, Mr. Peters?

9                    MR. FUCHS:  Objection.  Form.

10                   THE WITNESS:  I certainly did not.

11   BY MS. LEONARD:

12       Q    And the memo that was posted by OPM via the

13   CHCO transmittal to heads and acting heads of

14   departments was dated January 28th that provided

15   guidance regarding the email that had gone out.  Do

16   you recall that?

17       A    Yes.  I recall that we -- we sent out

18   guidance to agencies regarding the Deferred

19   Resignation Program.

20       Q    And do you recall what the original

21   expiration date was for the deferred resignation

22   offer?

Page 75

1      A    The -- the original -- I think it might have

2    been initially -- I know it was held open for -- for a

3    few days longer.  I couldn't -- it was maybe

4    February -- this is, like, a memory quiz.

5            It was maybe February 6th, and then it was

6    the 12th, or something like that.  February 5th and

7    then the 12th.  I don't know.

8      Q    Okay.  You don't recall off the top of your

9    head whether it was February 6th?

10     A    That may be right.  I -- yeah.

11     Q    Well, let's mark this as Exhibit 5.

12              (Exhibit 5 was marked for

13              identification.)

14            This is the January 28th Deferred

15   Resignation Memorandum.  And I'm not going to ask you

16   about the details.

17            I'll just direct your attention to the third

18   page, Q and As, which talk about the deadline, when

19   the court reporter hands it to you.  And do you see

20   there, there's a reference for the period between

21   January 28, 2025, and February 6, 2025?

22     A    Yes.  And this refreshes my recollection

Page 76

1    that the original closing date was February 6, 2025.

2        Q    And is it your testimony that you were not

3    aware of or involved -- well, I'll ask it one more

4    time.

5            Were you aware of any of the federal agency

6    submissions pursuant to the January 20th memorandum

7    requiring agencies to give lists of all their

8    probationary employees prior to February 7th?

9                    MR. FUCHS:  Objection.  Form.

10                   THE WITNESS:  No.

11   BY MS. LEONARD:

12       Q    You did not have access to the email

13   accounts on to which those were being sent?

14                   MR. FUCHS:  Objection.  Form.

15                   THE WITNESS:  I just never saw them.  I

16   don't know whether I had access or not.  I -- I

17   don't -- I don't think that I was included on -- on

18   the access.

19   BY MS. LEONARD:

20       Q    You were not responding to questions that

21   agencies were sending in with respect to their

22   submissions, Mr. Peters?

Page 77

1           MR. FUCHS:  Objection.  Form.

2               THE WITNESS:  Their submissions

3    regarding?

4    BY MS. LEONARD:

5        Q    Probationary employee lists?

6        A    No.  Except on -- except on maybe, like, if

7    you consider the February 14th call and maybe some --

8    on some of the other calls -- we might have had

9    questions about probationary employees, but it

10   would've been after the -- my strong recollection is

11   that I didn't start participating in the CHCO calls

12   until after the Deferred Resignation Program.

13           And I wasn't providing one-on-one guidance

14   regarding the lists to CHCOs or to anyone else at

15   federal agencies.

16       Q    Were you responding to any of the emails

17   that agencies sent in about the probationary employee

18   issue prior to February 7th?

19               MR. FUCHS:  Objection.  Form.

20               THE WITNESS:  I don't believe I -- I

21   would not have responded directly to the agencies, and

22   I don't remember fielding any questions about the

Page 78

1    lists before.  Yeah.  I don't -- I don't remember,

2    like, fielding any of those questions.

3    BY MS. LEONARD:

4        Q    And when you say you were not involved in

5    the CHCO meetings until after the Deferred Resignation

6    Program, do you mean after it went out on January

7    28th, or after it was closed on February 6th?

8        A    No.  I think my recollection is that for,

9    like, the first week of my employment, I didn't

10   participate in the CHCO calls, and then I began

11   getting involved with the CHCO calls because -- after

12   the Deferred Resignation Program is my -- my strong

13   recollection.

14       Q    Meaning after it went out on January 28th or

15   after it was to close on February 6th?

16       A    No.  After the initial -- after it went out

17   on January 28th.

18       Q    Okay.  And Mr. Peters, February 7th, the day

19   after the deferred resignation deadline was to expire,

20   was the originally planned date for the termination of

21   probationary employees; correct?

22                  MR. FUCHS:  Objection.  Form.

Page 79

1                    THE WITNESS:  No.

2       BY MS. LEONARD:

3           Q    There was a relationship between the

4       expiration of the Fork in the Road Deferred

5       Resignation Program and the termination of

6       probationary employees wasn't there?

7                    MR. FUCHS:  Objection.  Form.

8                    THE WITNESS:  Not to my knowledge.  No.

9       BY MS. LEONARD:

10          Q    You told CHCOs that on the calls with CHCOs,

11      didn't you, Mr. Peters?

12                   MR. FUCHS:  Objection.  Form.

13                   THE WITNESS:  I don't remember saying

14      anything -- anything like that.

15      BY MS. LEONARD:

16          Q    And if you -- if a CHCO testified that you

17      personally told them that the plan deadline for

18      terminating probationary employees was February 7th,

19      are you saying that they would be lying?

20                   MR. FUCHS:  Objection.  Form.

21                   THE WITNESS:  There was no termination

22      date given to CHCO's on at that -- on any time, but

Page 80

1    that never happened.

2    BY MS. LEONARD:

3        Q    And you're aware that the District Court in

4    Massachusetts issued a TRO that extended the deadline

5    for the Deferred Resignation Program on February 6th?

6    Are you familiar with that?

7                    MR. FUCHS:  Objection.  Form.

8                    THE WITNESS:  I'm familiar that there

9    was a TRO, but the -- the thing about giving a -- a

10   deadline to the CHCOs to fire people on February

11   7th -- 7th is completely false.

12   BY MS. LEONARD:

13       Q    And you say that because your testimony is

14   you did not do that?

15                   MR. FUCHS:  Objection.  Form.

16                   THE WITNESS:  I was at those calls and

17   there was no deadline like that given.

18   BY MS. LEONARD:

19       Q    You were at all the calls?

20       A    I was at the calls between -- after the

21   Deferred Resignation Program happened -- was announced

22   on January 28th.

Page 81

1      Q    And in fact, the CHCOs asked for you to put

2   those orders in writing, didn't they?

3                    MR. FUCHS:  Objection.  Form.

4                    THE WITNESS:  No.  No CHCOs made

5   that -- there was never an order, and there was never

6   a request that an order be given in writing.

7   BY MS. LEONARD:

8      Q    And if a CHCO were to testify that you

9   personally were asked to put those orders in writing,

10  and you said no, would they be lying?

11                   MR. FUCHS:  Objection.  Form.

12                   THE WITNESS:  Yeah.  They would be

13  lying.  I never asked anyone to put the CHCOs -- I

14  don't recall any CHCO asking me to put an order in

15  writing.

16  BY MS. LEONARD:

17     Q    And do you recall that the date -- I believe

18  you mentioned it earlier -- the date that the Fork

19  program actually ended up closing because the TRO was

20  lifted?

21     A    The date that the program closed was

22  February 12th.

1          Q     And on February 12th, OPM then ordered the

2     agencies to commence termination of probationary

3     employees; correct?

4                         MR. FUCHS:  Objection.  Form.

5                         THE WITNESS:  No.  What -- OPM on

6     February 12th sent an email calling for the agencies

7     who had not gone through the exemption process to

8     separate from the employees that they had identified

9     as wanting to terminate.

10    BY MS. LEONARD:

11         Q     Okay.  Let's look -- let's mark this as

12    Exhibit 6.

13                        (Exhibit 6 was marked for

14                         identification.)

15                   All right.  Mr. Peters, you've been handed

16    what has been marked as Exhibit 6.  It's an email from

17    an email address called Tracking to James Sullivan and

18    Amanda Scales with a copy to you and Brian Bjelde,

19    subject line, "Action Due 2/13 Probationary Employee

20    Actions."  Do you see that?

21         A     Yes.

22         Q     And do you recognize this email, Mr. Peters?

Page 83

1        A    Yes.

2        Q    Did you write this email?

3        A    No.

4        Q    But you received it?

5        A    Yes.  I'm on the CC line.

6        Q    Okay.  And the subject line, "Action due

7    2/13" -- the action in that subject means

8    terminations; right?

9                    MR. FUCHS:  Objection to form.

10                    THE WITNESS:  In this context, it looks

11    like it does.

12    BY MS. LEONARD:

13        Q    And you see the bold statement there in the

14    second paragraph.  It says, "Please partner with your

15    CHCO to action those you know you wish to separate

16    from by the end of the day tomorrow, 2/13/2025, using

17    the attached template letter."  You see that?

18        A    Yes.  And it says, "Those that you wish to

19    separate from."

20        Q    Sure.  But this is not an email from an

21    agency telling OPM that the agency is going to action

22    these employees.  Is it?

Page 84

1              MR. FUCHS:  Objection.  Form.

2              THE WITNESS:  Well, the agencies had

3    been preparing lists of employees that they wanted to

4    keep and wanted to separate from over the past couple

5    weeks before that.

6              And so this was more just giving --

7    giving a steer that, you know, since you've indicated

8    you wish to separate from these employees, you know,

9    we are kind of encouraging you to act.

10              So, you know, but it -- throughout the

11   process, they could have exact -- they had full

12   opportunity to exempt themselves, and some agencies

13   did exempt all of their probationary employees from

14   this kind of review process.

15   BY MS. LEONARD:

16      Q    Mr. Peters, I believe you testified that you

17   did not receive or see any of the lists that the

18   agencies were sending to OPM.

19              So how is it that you're testifying that the

20   agencies were sending lists of employees they wish to

21   keep and which to separate from?

22              MR. FUCHS:  Objection.  Form.

Page 85

1                    THE WITNESS:  Well, I mean, that's what
2      we had asked them in the January 20th memo.  So I --
3      but I didn't -- I didn't lay eyes on -- on the lists
4      that they were sending.
5      BY MS. LEONARD:
6          Q    So the January 20th memo, which is Exhibit
7      1, says, "Agencies should identify all employees on
8      probationary periods and send a report to OPM listing
9      all such employees."
10                    Mr. Peters, how is it that you're aware that
11      agencies were sending lists of employees that you
12      claim that they wanted to keep and wanted to separate
13      if you didn't see any of the lists?
14                    MR. FUCHS:  Objection.  Form.
15                    THE WITNESS:  I just was -- my
16      awareness of what was happening at the time was that I
17      was aware that agencies were sending lists, but I just
18      didn't look at them.
19      BY MS. LEONARD:
20          Q    So you don't know whether agencies were
21      actually, in fact, sending lists to OPM of employees
22      they wish to keep and wish to separate?  That was just

Page 86

1    your speculation a moment ago?

2                MR. FUCHS:  Objection.  Form.

3                THE WITNESS:  No.  I -- I knew, but I

4    just didn't -- but I just didn't look at them

5    myself -- myself.

6    BY MS. LEONARD:

7        Q    And what is the basis of your knowledge that

8    agencies were sending lists of employees they wish to

9    keep and wish to separate as opposed to what this

10   memorandum says, which is send lists of all of your

11   probationary employees?

12               MR. FUCHS:  Objection.  Form.

13               THE WITNESS:  Well, what this -- this

14   memorandum says -- and is that -- in addition,

15   agencies should promptly determine whether those

16   employees should be retained at the agency.

17               My understanding from talking to other

18   people at the office was that the lists at some point

19   became -- that those two requests were kind of

20   combined into a single -- into a single list from the

21   agency.

22   //

Page 87

1    BY MS. LEONARD:

2        Q    And who told you about those requests from

3    the agencies?

4        A    Who told me about the requests?

5        Q    You just used the word request, Mr. Peters.

6    Who told you about the requests from agencies to keep

7    their employees?

8        A    Again, so I -- sometimes the requests would

9    go to -- so in a couple instances, like, somebody -- a

10   few instances, somebody asked me, "Hey, you know, do

11   we -- we'd like to keep all of our probationary

12   employees."

13            And I -- and I said, "Yes."  That was from

14   EEOC.  And then I remember reviewing some sort of

15   exemption request from the nuclear -- some sort of

16   nuclear inspection agency.  And we also granted that

17   request for a full exemption.

18       Q    Any other agencies that you recall OPM

19   granting the request for an exemption?

20            MR. FUCHS:  Objection.  Form.

21            THE WITNESS:  Yes.  The Department of

22   Justice was another one.

Page 88

1    BY MS. LEONARD:

2         Q    Any others?

3         A    I'm not aware of all the requests, nor am I

4    aware of all the -- of all the grants.  I know that

5    we -- we certainly exempted the FAA air traffic

6    controllers.

7              And there were other -- I think that we --

8    the general -- like, a general theme at that time was

9    that the exemptions -- you know, you -- you can

10   certainly exempt people who were exempt from the

11   hiring freeze.

12             So, you know, categories where things were

13   going to break or there was going to be mission -- you

14   know, mission critical tasks that the agency should --

15   should exempt in those cases and should ask for the

16   exemption.

17        Q    And at the bottom of the email on February

18   12th, you see the last bullet where it says, "Through

19   the exemptions process."  Is the process you just

20   described the exemptions process referred to here?

21        A    Yes.  But the exemptions process -- and I

22   don't know that it was limited to the criteria here.

Page 89

1    I -- so I think that -- so some agencies just exempted
2    all of their employees.
3         Q    Some agencies sent that information to OPM,
4    and OPM granted that request?
5                    MR. FUCHS:  Objection.  Form.
6                    THE WITNESS:  I think that was probably
7    how -- how it was phrased.  But, you know, if an
8    agency wanted to exempt employees, there was nothing
9    OPM could do to say, "No -- no -- don't -- you can't."
10                    So, you know, it was kind of structured
11   that way.  But at any time an agency could have just
12   said, "We're not -- we're not going to do anything."
13   And in fact, some agencies just ignored it.
14   BY MS. LEONARD:
15        Q    And you don't work at a federal agency other
16   than OPM, do you, Mr. Peters?
17        A    No.  I don't.
18        Q    So you don't have personal knowledge of
19   whether the agencies, in fact, believed they could
20   ignore the orders from OPM, do you?
21                    MR. FUCHS:  Objection.  Form.
22                    THE WITNESS:  I don't have personal

Page 90

1    knowledge of what people at other agencies were --
2    were thinking or were not thinking.  But I do -- I
3    will -- I do know that the -- we had no power to
4    require people to go ahead with and participate in
5    this -- this exercise.
6                And I think -- you know, I think
7    it's -- that was always -- that was always known to
8    the agencies.  But, you know, a lot of people wanted
9    to -- you know, people wanted to be on board with, you
10   know, what other agencies were doing.
11   BY MS. LEONARD:
12       Q    Mr. Peters, can you point me to a single
13   document from January or February 2025, in which OPM
14   told any agency they did not have to participate in
15   the terminations of their probationary employees?
16                MR. FUCHS:  Objection.  Form.
17                THE WITNESS:  I -- I cannot, which --
18   but I think that, like I said, in many cases the
19   agencies just said, you know, we're -- we're exempting
20   themselves, or they would -- you know, they would
21   submit -- like, for example, in the case of the
22   Department of Justice, they just said, "We're

Page 91

1    exempting all of our probationary employees."
2    BY MS. LEONARD:
3        Q    And you just described that in your earlier
4    testimony; correct?
5        A    I described the fact that we obviously had,
6    you know -- if -- if an agency didn't want to take
7    termination actions, there was no -- there was no
8    mechanism for OPM to require them to do things that
9    they didn't want to do.
10       Q    Because it would, in fact, be unlawful if
11   OPM ordered them to terminate their probationary
12   employees; right?  You knew that.
13                   MR. FUCHS:  Objection.  Form.
14                   THE WITNESS:  Well, it wasn't -- that
15   assumes that we would've wanted to -- may impose some
16   sort of requirement, and we didn't -- we didn't want
17   to impose any requirement like that.
18                   It's not -- we weren't like, oh, we
19   really wanted to, but the law said we couldn't.  I
20   mean, it just -- that was just the -- the framework
21   was that there were -- you know, that agencies
22   could -- had to take or not take these actions.

Page 92

1    BY MS. LEONARD:

2         Q    And can you point me to a single document

3    from OPM to a federal agency from January or February

4    2025, where OPM told the agencies it was not a

5    requirement that they do this?

6                        MR. FUCHS:  Objection.  Form.

7                        THE WITNESS:  Point you to a single

8    document where the -- where OPM told agencies that

9    this was not a requirement?

10                       Well, we -- we certainly -- on the

11   March 5th revision to this -- to this memo, we

12   certainly made that clear.

13                       And I think what we said was there --

14   you know, we're clarifying that there is not, and has

15   never been a requirement to terminate any specific

16   probationary employee or employees.

17   BY MS. LEONARD:

18        Q    And prior to the March 5th revision to the

19   January 20th memo, can you point me to a single

20   document where OPM told agencies they did not have to

21   terminate their probationary employees?

22                       MR. FUCHS:  Objection.  Form.

Page 93

1                    THE WITNESS:  Can I -- can I point you

2      to a specific document where -- where we said that?

3                    I don't know all of the documents at

4      this time, but I'm just -- you know, the understanding

5      throughout the process was that we -- the agencies --

6      you know, I think it's -- it said here, "The ones you

7      wish to separate from."  It was always, which ones did

8      they wish to separate from.

9      BY MS. LEONARD:

10         Q    And the next sentence actually says, "The

11     separation date should be either immediately or as

12     soon as possible consistent with applicable agency

13     policies, including those in CBAs."

14                   Can you point me to a single document where

15     OPM told agencies they did not have to separate their

16     probationary employees immediately or as soon as

17     possible?

18                   MR. FUCHS:  Objection.  Form.

19                   THE WITNESS:  I think that this -- this

20     was our -- you know, our strong encouragement of the

21     agencies, saying this is what you should -- we should

22     be doing as kind of the completion of the exemptions

Page 94

1    and list making process.

2    BY MS. LEONARD:

3        Q    This document does not say strong

4    encouragement, does it, Mr. Peters?

5                    MR. FUCHS:  Objection.  Form.

6                    THE WITNESS:  Well, I -- I mean, it

7    says, "Should."  It doesn't say must or are required

8    to.

9                    And the reason why it says that is

10   because we didn't -- we didn't -- obviously didn't

11   have the power to direct performance-based

12   terminations using an email.

13   BY MS. LEONARD:

14       Q    You are aware that no notice had been

15   provided to the employees that OPM was telling federal

16   agencies that they should terminate immediately?

17                   MR. FUCHS:  Objection.  Form.

18                   THE WITNESS:  No notice was provided

19   what?

20   BY MS. LEONARD:

21       Q    To the employees?

22                   MR. FUCHS:  Same objection.

1                      THE WITNESS:  To the employees?  To the

2    employees --

3    BY MS. LEONARD:

4        Q    You're aware that no notice had been

5    provided to employees that OPM was telling agencies

6    they had to fire immediately?

7                      MR. FUCHS:  Same objection.

8                      THE WITNESS:  Sorry.  Say -- no notice

9    was being provided to?

10   BY MS. LEONARD:

11       Q    I can rephrase it.

12       A    Yeah.

13       Q    You're aware, Mr. Peters, that no notice had

14   been provided to employees that OPM was telling

15   agencies to fire immediately?  You knew that?

16                     MR. FUCHS:  Objection.  Form.

17                     THE WITNESS:  We -- we were not in

18   the -- so, I -- I understand, I -- I guess with the

19   government-wide email, there were -- there was now

20   kind of a mechanism for -- are you trying to tie the

21   government-wide email to like -- to this -- to the

22   probationary actions?

Page 96

```
 1   BY MS. LEONARD:
 2        Q    Well, we can start with that.  OPM had
 3   certainly not used that government-wide email to tell
 4   probationary employees that they were going to be
 5   fired; correct?
 6                  MR. FUCHS:  Objection.  Form.
 7                  THE WITNESS:  Well, did we use the
 8   government-wide email to tell probationary employees
 9   that they would be fired?
10                  I think that -- that -- I mean, the --
11   the fact that no -- and the fact that we didn't do
12   that underscores that this was an agency-driven
13   process where, you know, we were having discussions
14   with agencies about actions that the agencies would
15   or -- or would not take.
16   BY MS. LEONARD:
17        Q    You can't point me to any document or
18   communication from an agency where they said, "We
19   would like to submit to you lists of the people that
20   we have fired," can you?
21                  MR. FUCHS:  Objection.  Form.
22                  THE WITNESS:  We would like -- well, I
```

Page 97

1    mean, we sent the -- the -- as you've pointed out, we

2    sent the guidance on the very first day of the new

3    administration.

4    BY MS. LEONARD:

5        Q    And so in this email on February 12th, OPM

6    is now telling agencies that they should send updated

7    lists after actioning.  Do you see that?  The

8    second -- the -- sorry -- the third paragraph.

9        A    Yeah.  And I -- I'd like to point out that

10   we -- there was no -- like, we -- we issued the memo

11   on the -- on the very first day.

12            So there was no opportunity for agencies to

13   come to us and say, you know, "OPM, please engage

14   in -- in a list making exercise or a review process."

15            But, you know, the agencies began taking

16   action regarding -- taking action -- began terminating

17   probationary employees before 2/13.

18            So, like I said, SBA had decided to

19   terminate probationary employees on February 7th, was

20   my understanding.

21            And then the Department of Agriculture, and

22   I believe the Department of the Interior, had already

Page 98

1  decided to start terminating probationary employees

2  before this February 13th email.

3       Q    You are not -- you don't have personal

4  knowledge of any decision made by SBA, Department of

5  Agriculture, or Interior, to terminate probational

6  employees; correct?

7       A    I do.  No.  I do.  They told me about it

8  when -- so I -- or I learned about it on February 7th,

9  at least in the case of the Small Business

10  Administration.

11       Q    Did the Small Business Administration tell

12  you directly or did you, "Learn about it?"

13                 MR. FUCHS:  Objection.  Form.

14                 THE WITNESS:  I think a request -- I

15  think he -- there was a request for a form letter

16  because they had decided to take the action to -- they

17  had decided to -- to terminate their probationary

18  employees.

19  BY MS. LEONARD:

20       Q    Because they understood that the original

21  deadline for doing so was February 7th, the day after

22  the Fork program closed; correct?

```
                                                Page 99
   1                  MR. FUCHS:  Objection.  Form.
   2                  THE WITNESS:  No.  That's not correct
   3     at all.  There was never a deadline that was set for
   4     any probationary terminations.
   5     BY MS. LEONARD:
   6          Q    And again, did someone ask you directly for
   7     this form letter?
   8                  MR. FUCHS:  Objection.  Form.
   9                  THE WITNESS:  I was asked -- I -- I was
  10     asked for form letters.  Yes.
  11     BY MS. LEONARD:
  12          Q    By whom?
  13          A    I recall it being Wes Coopersmith.
  14          Q    And who was that?
  15          A    That was the SBA chief of Staff.
  16          Q    And when you say USDA and DOI, you believe
  17     they started terminating people on February 12th.  Is
  18     that right?
  19          A    No.  They started -- I believe that they had
  20     been planning to do it before February 12th and had
  21     made -- had made those determinations before then.
  22          Q    Again, because the original deadline that
```

 1   OPM gave the agencies was February 7th; correct?

 2                    MR. FUCHS:  Objection.  Form.

 3                    THE WITNESS:  No.  We never gave a

 4   February 7th deadline to agencies.

 5   BY MS. LEONARD:

 6       Q    And your knowledge of the USDA and DOI comes

 7   directly from individuals at those agencies, or did

 8   you hear about it through someone at OPM?

 9                    MR. FUCHS:  Object to form.

10                    THE WITNESS:  No.  It comes directly

11   from individuals at those agencies.

12   BY MS. LEONARD:

13       Q    Who at the USDA told you that they were

14   preparing to terminate probationary employees?

15       A    Well, we discussed it on this call that

16   happened on the 13th.  She shared -- Kaylee Brewer

17   [ph] shared her experiences in terminating the

18   employees, 'cause that process was underway at

19   Agriculture.  I believe that they had to submit --

20   they had to, like, pull them back and submit it again.

21       Q    And Department of Interior -- who told you

22   that they had -- that they were planning to terminate

Page 101

1    probationary employees?

2         A    If I can look at the disclosure on the -- of

3    the call participants.

4         Q    It should be Exhibit -- you've got it.

5         A    I think it -- it was -- as I recall, I think

6    it was Tyler from Interior spoke about it.

7         Q    Tyler?

8         A    It could have been.  It could have been

9    somebody -- one of the other three -- two people who

10   are identified.

11        Q    No other agencies had told you personally

12   that they were planning to terminate their

13   probationary employees before this February 12th

14   communication; correct?

15                   MR. FUCHS:  Objection.  Form.

16                   THE WITNESS:  I think I might have

17   known that GSA, Education -- GSA, Education, and

18   perhaps also HUD.

19   BY MS. LEONARD:

20        Q    And that was based on the CHCO calls that

21   you had been having since you began participating?

22        A    No.  That was not.  It was just based on

Page 102

1    hearing things around -- around the office and

2    speaking with some of the individuals.

3         Q    Speaking with some of the individuals?

4         A    At the agencies.

5         Q    At the agencies in one-on-one conversations?

6         A    Yeah.  I think sometimes they would -- they

7    would call and ask for a template or say, I think a --

8    and we had -- had a -- a couple of discussions on the

9    7th and the 11th with -- the Friday and the Monday --

10   I think it might've been the 10th.

11        We'd had discussions -- a lot of -- around

12   the interaction between the termination of

13   probationary employees and the Deferred Resignation

14   Program because the issue that arose was the DRP was

15   still around and it was still open.

16        And so what happens when somebody -- when --

17   if you send out these notices and then everybody just

18   takes a DRP, what happens then?

19        And do you want to make -- when do you make

20   the effective date of the termination?  Should you

21   allow -- you know, what happens if -- should people be

22   able to get full appointee status while they're on the

1    DRP?  So these are all very kind of complex issues.

2            And so some -- when the agencies would have

3    questions, a lot of times they would come to OPM and

4    ask, you know, "Hey, we're planning to terminate all

5    our probationary employees on -- or terminate the ones

6    on our list on this date.  You know, when should we --

7    do you have a form we can use?  Or when should we make

8    the effective date?"

9        Q    In relationship to the close of the -- you

10    called it the DRP -- the Deferred Resignation Program?

11        A    Some of them were freestanding requests

12    for -- for template letters.  Some of them were in

13    connection with -- were more -- I mean, what should we

14    do?  How should we handle the interaction with the

15    DRP?

16        Q    Okay.  But in fact, Mr. Peters, you told the

17    agencies they should terminate their probationary

18    employees after the DRP closed; right?

19                MR. FUCHS:  Objection.  Form.

20                THE WITNESS:  No.  And in fact, some of

21    the -- like I said, like, Small Business

22    Administration had sent out notices, I believe, before

Page 104

1    the DRP closed.

2    BY MS. LEONARD:

3        Q    And because that was the original date that

4    the DRP was going to close; correct?

5        A    No.  And you can say that as many times as

6    you want, but that's not true.

7        Q    Okay.  So the TRO was lifted at 5:30 p.m. on

8    the 12th.  Are you aware of that?

9                    MR. FUCHS:  Objection.  Form.

10                    THE WITNESS:  I'm not aware of the

11    specific time it was lifted.

12    BY MS. LEONARD:

13        Q    Okay.  Let's mark the next exhibit, which I

14    believe is Exhibit 7.

15                    (Exhibit 7 was marked for

16                    identification.)

17                    Okay.  All right.  Mr. Peters, you're going

18    to be handed a email, which I'm going to represent to

19    you as an ECF notification from the United States

20    District Court of District of Massachusetts.

21                    And it says, "Notice of electronic filing of

22    an order from Judge George O'Toole," which says, "The

Page 105

1    temporary restraining order previously entered is

2    dissolved."

3              And you see where it says, "The following

4    transaction was entered on February 12th at 5:34 p.m.

5    Eastern Standard Time."  Do you see that?

6         A    Yes.

7         Q    So does this refresh your recollection that

8    the TRO was lifted at 5:30 on February 12th?

9                   MR. FUCHS:  Objection.  Form.

10                   THE WITNESS:  I did -- I don't know

11   whether I ever had an awareness that the TRO was

12   lifted.  I know the TRO was lifted at some point, but

13   I don't recall.  I don't know if I was aware that it

14   was at 5:34 p.m. Eastern Standard Time.

15   BY MS. LEONARD:

16        Q    Okay.  Let's mark the next as Exhibit 8.

17                   (Exhibit 8 was marked for

18                   identification.)

19              And you are aware, Mr. Peters, that the Fork

20   in the Road program was closed very soon after the TRO

21   was lifted; correct?

22                   MR. FUCHS:  Objection.  Form.

1            THE WITNESS:  Yes.  I'm aware that

2   they -- they took action to close it, or they

3   announced that it was closed very quickly after.

4   BY MS. LEONARD:

5        Q    Okay.  So Exhibit 8 is a OPM email at

6   www.opm.gov/fork.  And what time does this website say

7   that the Fork program was closed?

8        A    The printout you've given me says 7:20, but

9   we continued accepting -- we continued accepting

10  submissions that -- I believe that most of the

11  agencies submitted ones that were submitted up to and

12  including, like, one in the morning.

13       Q    Okay.  So Mr. Peters on Exhibit 7, Judge

14  O'Toole lifts the TRO at 5:34 p.m. Eastern.  You see

15  that; right?

16       A    Yes.

17       Q    And then the Fork program is closed

18  according to this OPM website at 7:20 p.m. Eastern.

19  You see that?

20       A    Yes.

21       Q    And then the email in Exhibit 6 that was

22  sent to the agencies with action due the very next

1   day -- why don't you tell me what time that was sent?

2       A    According to the timestamp here, it says

3   this was sent at 8:12.

4       Q    p.m.?

5       A    p.m.

6       Q    Right after the close of the Fork program;

7   right?

8                   MR. FUCHS:  Objection.  Form.

9                   THE WITNESS:  It would've been, like,

10  an -- maybe an hour after we announced it.

11  BY MS. LEONARD:

12      Q    And this is the email where OPM was telling

13  agencies to separate their probationary employees by

14  the end of the day, tomorrow, February 13, 2025, using

15  the attached template; right?

16                  MR. FUCHS:  Objection.  Form.

17                  THE WITNESS:  Yes.  And my

18  understanding was that a lot of them had already

19  started that process before February 12th.

20  BY MS. LEONARD:

21      Q    Because OPM ordered them to?

22                  MR. FUCHS:  Objection.  Form.

1           THE WITNESS:  No.  We did not give any

2     sort of February 7th deadline to the agencies to

3     terminate people on their lists.

4           MS. LEONARD:  Okay.  Why don't we take

5     a short break?  I think we've been going for some

6     time, maybe.  Do you want five minutes?

7           MR. FUCHS:  That good for you?

8           THE WITNESS:  Yeah.

9           MR. FUCHS:  Okay.

10          THE VIDEOGRAPHER:  We're going off the

11    record.  This is the end of media unit 2.  The time is

12    4:18 p.m.

13          (Off the record.)

14          THE VIDEOGRAPHER:  We're back on the

15    record.  This is the beginning of media unit 3.  The

16    time is 4:28 p.m.

17    BY MS. LEONARD:

18    Q    Mr. Peters, there was only ever one template

19    termination letter that OPM provided to the federal

20    agencies; correct?

21          MR. FUCHS:  Objection.  Form.

22          THE WITNESS:  Yeah.

Page 109

1    BY MS. LEONARD:

2        Q    And this was not the only template letter

3    that OPM provided to federal agencies for personnel

4    actions during this time; right?

5                    MR. FUCHS:  Objection.  Form.

6                    THE WITNESS:  I don't know all the --

7    the templates that OPM would've provided, but we --

8    we, you know, often do provide templates.

9    BY MS. LEONARD:

10       Q    Do you recall that OPM also provided

11   agencies a template for placing DEIA employees on

12   administrative leave?

13                   MR. FUCHS:  Objection.  Form.

14                   THE WITNESS:  I think it might have

15   been attached to one of the -- we might have had

16   something like that attached to one of the memos.

17   BY MS. LEONARD:

18       Q    And let's look at the template that OPM

19   provided with respect to probationary employees.  We

20   can mark this -- I think we're up to 9.

21                   (Exhibit 9 was marked for

22                   identification.)

Page 110

1           You've seen this before?

2      A    It looks like this is something that has

3   been filed in the -- the lawsuit.

4      Q    I will represent to you that this is the

5   template that your counsel filed in response to one of

6   the Judge's information requests.  That's why it has

7   the ECF stamp on top.

8      A    Yes.

9      Q    So you've seen the template that was

10  provided to federal agencies with respect to

11  probationary employees; correct?

12     A    I have, yeah.

13     Q    And it's the same template that was attached

14  to the February 12th and February 14th emails;

15  correct?

16     A    Yes.  This was the -- the template.

17     Q    And this template does not provide a space

18  or brackets for any agency to fill in the reasons that

19  an individual's performance was deemed unsatisfactory,

20  does it?

21              MR. FUCHS:  Objection.  Form.

22              THE WITNESS:  It -- it doesn't, but I

Page 111

1    think this was provided in Word, so the agencies --

2    and, you know, as -- as in the nature of a template,

3    you know, it could always be -- be adjusted to what

4    the agency wanted.

5              But then, you know -- so it doesn't --

6    it doesn't have -- but I think this was provided as a

7    Word document.

8    BY MS. LEONARD:

9        Q    And if you go back to Exhibit 6, which is

10   the Action Due 2/13 Probationary Employee Actions

11   email -- the February 12th email.  Do you have that in

12   front of you?

13       A    The -- are you talking about the February

14   13th or the -- the February 12th one?

15       Q    Yes.

16       A    Yes.

17       Q    Yes.  And you remember the line, "The

18   separation date should either be immediately or as

19   soon as possible"?  You see that?

20       A    Yes.

21       Q    And if you go down a little further, there's

22   a bullet point second to the bottom.  Can you read

1    that for me?

2        A    "Employees do not need to have received any

3    particular performance rating previously to be

4    separated."

5        Q    So OPM was telling agencies to terminate

6    probationary employees immediately, but they don't

7    have to have received any particular performance

8    evaluation in order to be separated.  That's what this

9    email says; correct?

10                    MR. FUCHS:  Objection.  Form.

11                    THE WITNESS:  Well, I think that was

12    provided as additional guidance around a common

13    question.  And, you know, with a yearly performance

14    rating cycle, a lot of employees would not have had

15    the opportunity to have had a performance rating at

16    that point.

17                    But, I mean, you know, if there was

18    employees who were -- you know, who they wish to

19    separate from for whatever reason, you know, we were

20    just saying that it's not, like, a formal requirement

21    that they have gone through the performance review

22    process, which, you know, I understand is just the way

Page 113

1    that -- that it works.

2    BY MS. LEONARD:

3        Q    And you understand that there would not have

4    been time between the February 12th email and a

5    immediate termination of probationary employees for

6    agencies to have conducted a performance evaluation;

7    right?

8                    MR. FUCHS:  Objection.  Form.

9                    THE WITNESS:  Well, I think our point

10   was -- was broader, that they were -- that -- that was

11   not required -- that was not, like, a formal

12   prerequisite.  It wasn't -- if that -- I think that --

13   that answers your question; right?

14   BY MS. LEONARD:

15       Q    Indeed.  We'll mark this as the next, which

16   I think is Exhibit 10.

17                    (Exhibit 10 was marked for

18                    identification.)

19           And Mr. Peters, you're going to be -- oh,

20   sorry.  You were handed what's been marked as Exhibit

21   10.  The ECF stamp is fuzzy, but this is the way it

22   happened.

Page 114

1          It was also submitted by your counsel to the

2    Court in the underlying litigation.  Do you recognize

3    Exhibit 10, Mr. Peters?

4        A    Yes.  This is where it was kind of a

5    follow-up email that we sent after the Friday CHCO

6    Council, where we talked in great depth about how we

7    were suggesting that agencies view performance, which

8    kind of ties to, you know, the process of identifying

9    exempt employees and really who is it.

10          You know, we don't -- our guidance was not

11    to fire everybody who was -- happened to be on a

12    probationary period, but it was to kind of engage in

13    a -- a kind of review that looked at both the agency

14    needs and the individual performance, but is kind of

15    encouraging them to look at the two concepts kind of

16    together, like, is the employee's performance

17    advancing the mission?

18        Q    And what you told the agencies in this

19    email, actually on the second page, if you look at the

20    top of the second page, is that OPM believes,

21    "Qualifications for continued employment," in the

22    current context means only the highest performing

Page 115

1   probationers in mission critical areas should be
2   retained.  That's what OPM told the agencies; right?
3        A    Yeah.  And I think it -- it's noteworthy
4   that this was phrased as, you know, OPM's belief.
5   This wasn't, you know, agencies are required to have
6   the same view.
7             It was just kind of our -- how we were
8   encouraging agencies to look at performance in the
9   current -- in the current context.
10       Q    Sure.  And on the first page, if you flip
11  back to that, OPM has also asked that agencies
12  separate probationary employees that you have not
13  identified as mission critical by no later than end of
14  day Monday, February 17th -- sorry -- February 17th.
15  That is accurate.
16            You asked agencies to separate employees,
17  they have not identified as mission critical by no
18  later than the end of the day Monday, February 17th.
19  Is that right?
20                 MR. FUCHS:  Objection.  Form.
21                 THE WITNESS:  No.  I think that's a
22  little bit imprecise.  I think what we meant was that

Page 116

1    you have not identified as ones that you wish to keep,

2    but, you know, I think it was -- it was phrased that

3    way to kind of emphasize how important it is that the

4    agencies look at the kind of broader mission when

5    making those determinations.

6    BY MS. LEONARD:

7        Q    And when you say, "Identified the ones you

8    wish to keep through the exemptions process," we

9    previously discussed in your testimony.  Is that

10   right?

11                   MR. FUCHS:  Objection.  Form.

12                   THE WITNESS:  Yeah.  That they have not

13   identified through the -- the exemptions process or

14   otherwise.  I mean, it could have been -- they could

15   have just, again, chosen not to do anything in

16   response to this.

17   BY MS. LEONARD:

18       Q    Can you identify any document in which OPM

19   told agencies in January or February 2025, that they

20   could have, "Chosen not to do anything in response to

21   these directions from OPM,"  Mr. Peters?

22                   MR. FUCHS:  Objection.  Form.

                                                    Page 117

1                    THE WITNESS:  I don't know if we put it

2        in the -- put anything like that.  You know, we

3        weren't -- we were kind of just, like I said -- like,

4        we were just running through -- I think the way that

5        we were structuring it was through an exemptions

6        process.

7                    But, you know, I think that really

8        until this lawsuit, the idea that OPM was directing

9        terminations wasn't something that we were kind of

10       thinking about and optimizing for.

11                   So it wouldn't have occurred to us to

12       say -- to say that because we only were alerted to

13       that kind of legal theory after this lawsuit was

14       filed.

15                   MS. LEONARD:  In fact --

16                   THE WITNESS:  And -- and to be fair,

17       you only came to that legal theory after a -- another

18       lawsuit had been filed, I believe.

19                   I don't think that -- that -- I think

20       that -- I recall there being a lawsuit in front of

21       Judge -- Judge Cooper in DC, and I don't know if the

22       OPM directing the terminations theory was as central

Page 118

1    to that lawsuit as it was in the second lawsuit, which

2    is this lawsuit.

3                    And then that's where we really got the

4    OPM termination -- OPM directed determinations theory

5    was in this lawsuit.

6                    And then we got another lawsuit in

7    Maryland, which was based on kind of a

8    different -- which I don't even think mentioned the --

9    the OPM directed determinations theory.

10                   So it was -- there was a lot of very

11   kind of creative legal thought that went into coming

12   up with this that we at the time did not anticipate.

13                   But had we known that this lawsuit was

14   coming, we absolutely would've issued the

15   clarification, you know, from the -- at that time.  We

16   just didn't -- didn't see it coming.

17   BY MS. LEONARD:

18       Q    Well, somewhere in there, Mr. Peters, is the

19   truth on which these lawsuits are based, and the

20   agencies certainly publicly were stating that OPM

21   ordered them to terminate their probationary

22   employees.  You're aware of that; right?

Page 119

1                    MR. FUCHS:  Objection.  Form.

2                    THE WITNESS:  I only became -- I -- I

3    think that there might be statements that I read in

4    your complaint, or in the opinion, but again, I only

5    became aware of -- and I was not -- had no

6    contemporaneous knowledge of that prior to -- of

7    statements like that, prior to this lawsuit.

8    BY MS. LEONARD:

9        Q    So if any CHCO testifies that they told you

10   that you were ordering us to fire probationary

11   employees, and you cannot do that because it's

12   unlawful, you'd say they're lying?

13                   MR. FUCHS:  Objection.  Form.

14                   THE WITNESS:  I -- I never had a

15   conversation with a CHCO where a CHCO said, "You are

16   ordering us to do something that's unlawful that we

17   don't want to do."

18                   You know, "Please put your order in

19   writing, sir."  Like, I never had that -- there was

20   never a conversation with a CHCO that was like that.

21                   MS. LEONARD:  Okay.  Let's mark the

22   next -- I think -- 12.

Page 120

1              THE REPORTER:  Eleven.

2              MS. LEONARD:  Eleven?  Thank you.

3    BY MS. LEONARD:

4        Q    So Mr. Peters, you've been handed what's

5    been marked as Exhibit 11.

6              (Exhibit 11 was marked for

7              identification.)

8              And this is a document that was filed in the

9    case before the Judge, and it is a Forest Service

10   Briefing Paper dated February 13, 2025.

11             And the language that I'm going to direct

12   you to is in the background and recommended briefing

13   points questions.  So let me know when you're ready.

14       A    Yeah.  And this is the first time I'm seeing

15   this -- this document.

16       Q    Oh, and I've actually handed you my

17   highlighted copy, so I apologize for that.

18       A    No.  That's helpful.

19       Q    That's the language.

20       A    Yeah.  This is the first time I'm -- I'm

21   seeing this document.  I realize that this was filed

22   on -- it looks like this was filed on March 7th.

1        But the -- I mean, just in what you've
2   highlighted here -- I mean, you can see like -- just
3   by comparing what we said on the 12th, that we did not
4   notify Forest Service to terminate all employees who
5   have not completed their probationary or trial period.
6        Q    Mr. Peters, this says, "All federal
7   agencies, including the Department of Agriculture,
8   were notified on February 12, 2025, by the Office of
9   Personnel Management, OPM, to terminate all employees
10  who have not completed their probationary trial or
11  trial period."  You see that language?
12       A    Yeah.  And some of this other stuff is not
13  correct either, like OPM has advised that probationary
14  employees are not eligible for the Deferred
15  Resignation Program.  We never advised that.  Lots of
16  probationary employees took the Deferred Resignation
17  Program.
18       Q    Mr. Peters, going back to the language I
19  just read to you, is it your testimony that this
20  statement is not true?
21                 MR. FUCHS:  Objection.  Form.
22                 THE WITNESS:  Yeah.  I mean, the -- but

1    the statement is not true.  But you would know that by

2    reading this document, which talks about how -- about

3    the exemptions process in the -- the last bullet, so.

4    BY MS. LEONARD:

5         Q    And the sentence -- the first bullet under

6    recommended briefing -- "OPM directed agencies to

7    separate probationary employees starting February 13,

8    2025."  Is it your testimony that this statement by

9    the Forest Service is not true?

10                   MR. FUCHS:  Objection.  Form.

11                   THE WITNESS:  I mean, it's -- it's not

12   only my -- my statement, it's also what -- what we put

13   in the email, which was we -- we never told -- we

14   never told agencies to fire all probationary

15   employees.

16                   And so I think what that -- what this

17   shows -- what this indicates is that there was,

18   like -- I think it shows how much kind of static there

19   was and how much, like, a game of telephone this was,

20   'cause somebody would tell -- somebody would tell

21   somebody that, you know, this is what OPM is telling

22   us.

Page 123

1           But actually when you go back to the
2    source document, it's not what we were telling them.
3    And we -- like, any -- nobody would've told Forest
4    Service, like, go terminate all of your
5    probationary -- all employees who have not completed
6    your probationary or trial period.
7    BY MS. LEONARD:
8         Q    So the third bullet point down -- "Based on
9    this direction, it is necessary to start providing
10   notices of separation to employees in probationary and
11   trial period positions starting February 13, 2025."
12   Based on this direction.  Is it your testimony that
13   was not true?
14              MR. FUCHS:  Objection.  Form.
15              THE WITNESS:  "Based on this direction,
16   it is necessary to start providing notices of
17   separation to employees in probationary and trial
18   period -- period positions starting February 13,
19   2025."  That is not -- that is not our -- was not our
20   direction to any agency.
21   BY MS. LEONARD:
22        Q    And on February 25, 2025 -- you can set that

```
                                              Page 124

 1    aside, Mr. Peters.  On February 25, 2025, Tracey

 2    Therit, who's the CHCO of the DA, testified to

 3    Congress as follows: Ranking Member Takano -- "So

 4    nobody ordered you to carry out these terminations?

 5    You did it on your own?"

 6              Ms. Therit -- "There was direction from the

 7    Office of Personnel Management."  Is it your testimony

 8    that Ms. Therit was lying, Mr. Peters?

 9                  MR. FUCHS:  Objection.  Form.

10                  THE WITNESS:  No.  Of course not.

11    There -- what -- what -- you know, I -- I mean, I -- I

12    watched that exchange, which -- you know, was where

13    the kind of congressman was screaming at her and

14    yelling at her and was very -- like, very

15    unprofessional.

16              But what she -- I mean, there -- we

17    gave a -- a kind of a steer -- you know, to go ahead

18    and do -- with respect to the ones that you want to

19    terminate, you know, go ahead and do it on this date.

20              But we didn't -- you know, but we

21    didn't give, like, you must do it -- do this.  We --

22    we just said -- you know, we just made -- kind of made
```

Page 125

1    the request that the ones that they wish to separate

2    from -- that they do it, you know, on a particular

3    date.

4                    So there's kind of a -- so, you know,

5    so it was a -- it was kind of what we wanted --

6    expected, as far as the timing goes.  But there was

7    never a directive to fire a particular probationary

8    employee.

9                    But I -- you know, so I don't -- I

10   don't think it's -- it's right that, you know, she was

11   lying.  I think that, you know, what -- what was

12   happening was, you know, a -- a congressman was

13   yelling at her red-faced, you know, losing his temper,

14   and was kind of being abrasive.

15                   And, you know -- and she was kind of

16   going back to -- to some of, you know, the -- the

17   emails.  But, you know, so I wouldn't say that she was

18   lying, but I do think that the emails and the guidance

19   that we -- or you know what -- whatever the emails

20   that we provided kind of are what they are.

21   BY MS. LEONARD:

22        Q    All right.  So on Friday, February 14th,

1    there's a Deputy CHCO at the USDA named Crystal

2    Harris, and she wrote to an employee and said, "Last

3    night, agencies were notified by the Office of

4    Personal Management, OPM, that the administration had

5    decided probationary employees are not eligible for

6    the Deferred Resignation Program, and also these

7    employees are to be terminated."

8              Is it your testimony that Ms. Harris was

9    lying to this employee?

10                   MR. FUCHS:  Objection.  Form.

11                   THE WITNESS:  I -- like I said, I -- I

12   think -- you know, it's a nice kind of rhetorical

13   trick for kind of a cross to say, "Were you lying

14   then, or was she -- were you lying now?"

15                   But like -- or was she lying?  And I

16   don't -- that's certainly not accurate that

17   probationary employees were not eligible for the

18   Deferred Resignation Program because many of them did

19   take the Deferred Resignation Program and there was no

20   incident with it.

21                   I think that our -- our guidance was

22   even that they could finish out their probationary

1    period while -- you know, without further action,

2    while they were on -- I -- I seem to recall some

3    discussions around that.

4                    But there was, you know, the email that

5    we sent was -- you know, it's an email.  It -- it's

6    a -- however -- like, what it says is that, you know,

7    please partner with your CHCO to action those you wish

8    to separate from.

9                    We also had engaged in a robust

10   exemptions process where over the course of several

11   weeks, agencies provided us lists of exemptions that

12   in most cases, they themselves unilaterally determined

13   and some agencies exempted all of their probationary

14   employees.

15                   So there was not for -- the idea that

16   there was a firm -- there was a direction or command

17   or a legal -- like, a final agency action where OPM

18   was firing people beyond its four walls I -- is not

19   accurate.

20   BY MS. LEONARD:

21        Q    Ms. Harris continued, "Agencies were

22   directed to begin providing termination notices to

Page 128

1    affected employees and directed the use of a specific

2    template and language for the notice beginning

3    immediately upon OPM notification."  Are you saying

4    Ms. Harris is not telling the truth?

5                    MR. FUCHS:  Objection.  Form.

6                    THE WITNESS:  The email that we sent

7    kind of speaks for itself.  There is no -- I mean, I

8    think it's important to clarify that, to my knowledge,

9    I don't think there was anything additional to the --

10   to the email.

11                   There was no -- like, there was -- we

12   just sent -- we sent the email.  We had a meeting

13   where we read the email to chiefs of staff and took

14   questions.

15                   And lots of them, you know, just shared

16   feedback on their own processes with terminating

17   probationary employees, which, you know, in some

18   agencies had been bumpy.

19                   And then we read from this during the

20   CHCO call on Friday.  But that's kind of the extent of

21   what happened.  The --

22   //

Page 129

1    BY MS. LEONARD:

2         Q    So on February 18, 2025, at the National

3    Science Foundation, there was a meeting for all

4    probationary employees where CHCO Wonzie Gardner, who

5    I believe you know -- do you know Wonzie?

6         A    Yeah.  I know Wonzie.

7         Q    Okay.  So CHCO Wonzie Gardner and Micah

8    Cheatham, the chief management officer, told the NSF

9    employees, "We were directed by OPM to terminate all

10   probationers except for a minimum number of mission

11   critical probationers."

12             "This is not a decision the agency made.

13   This is a direction we received."  Are you saying that

14   Mr. Peters was lying?

15                  MR. FUCHS:  Objection.  Form.

16                  THE WITNESS:  Well, I'm certainly not

17   saying Mr. Peters was lying.  I don't think I'm saying

18   as far as --

19   BY MS. LEONARD:

20        Q    Sorry.  Are you saying that Mr. Cheatham was

21   lying?

22                  MR. FUCHS:  Same objection.

1              THE WITNESS:  I -- like, responding to

2      statements from other people that you're reading to

3      me -- you know, I don't know what they -- and I think

4      lying kind of is -- says that they had some sort of

5      intent.

6              I mean, what happened was we sent the

7      emails, we engaged in the exemptions process -- you

8      know, I don't know what the -- what -- I mean, and

9      so -- and they had a meeting and it -- and every

10     agency chose to break it, you know, to the employees.

11             And well, the agencies all did it in a

12     different way, to my knowledge, you know, so if

13     that's -- that's what they said -- you know, if -- if

14     you're telling me that's what they said, you know,

15     that's -- that's what he said.

16             But the documents we have, I think,

17     refer to an exemptions process, and he refers to it,

18     you know, and they -- we had them -- you know, we

19     asked them to look -- to look to the performance in

20     the context of organizational needs.

21             And, you know, if -- so, if that's

22     what -- if that's what he said, I don't want to

1    ascribe any intent or wrongdoing to him, but it's just

2    the -- the guidance or the -- the emails that we sent

3    are just the emails.

4    BY MS. LEONARD:

5        Q    So we've got statements from agency

6    officials at the USDA, at the National Science

7    Foundation, at the Department of Defense, at the IRS

8    part of Treasury.  And I could keep reading all of

9    them.

10            Is it your testimony that they were all just

11   misinformed or confused and didn't understand the

12   direction that OPM was giving?

13                    MR. FUCHS:  Objection.  Form.

14                    THE WITNESS:  Is it my direction that

15   they were -- that they were confused?  I -- you

16   haven't read to me all of the statements first that

17   you're -- and nor have I -- nor have I read them, nor

18   was I aware of them before this lawsuit.

19                    So I -- I'm aware of the ones -- there

20   were some that were sent that didn't refer to

21   OPM's direction that we provided.

22                    But, you know, I think that however --

Page 132

1    whatever they said -- you know, however they were

2    choosing to tell employees what had happened or -- or

3    why they were being separated, or why they were taking

4    the action -- you know, would've reflected what they

5    felt -- what was most comfortable to kind of say

6    for -- for them.

7              I think at any -- like I said, at any

8    time the agencies had free reign to exempt people from

9    any sort of termination, and these were actions that

10   they were taking -- and, you know, we didn't direct

11   any specific terminations.

12             We just asked them -- not invoking any

13   sort of formal power -- just to undertake a focused

14   review of probationers and determine which ones met a

15   certain high standard of performance.

16   BY MS. LEONARD:

17        Q    So if managers from the CDC were to say that

18   they went through a very deliberate process to

19   characterize their probationary employees as mission

20   critical and submitted those to OPM to try to save

21   people who worked at the CDC and were told, "No,

22   terminate these employees effective immediately -- the

Page 133

1    entire list," you would say that's not true?
2                    MR. FUCHS:  Objection.  Form.
3                    THE WITNESS:  I don't think that we --
4    we certainly did not tell people to terminate all
5    probationary employees.  So I don't know who the --
6    who would've said that to them.
7    BY MS. LEONARD:
8        Q    Were you involved in the conversations with
9    CDC about which employees they could save?
10                   MR. FUCHS:  Objection.  Form.
11                   THE WITNESS:  No.  I was involved in --
12   in no conversations with CDC about which ones they --
13   they could -- when you say save -- I mean, which ones
14   they could retain at the agency.
15   BY MS. LEONARD:
16       Q    And what about the National Science
17   Foundation?  Were you involved in the conversations in
18   which they were told that their list contained too
19   many people to retain?
20                   MR. FUCHS:  Objection.  Form.
21                   THE WITNESS:  I'm not aware that any
22   such conversations took place.

Page 134

1    BY MS. LEONARD:

2        Q    Who would've had them at OPM?

3                MR. FUCHS:  Objection.  Form.

4    BY MS. LEONARD:

5        Q    Who would've been discussing the lists and

6    the exemption process with -- let's start with CDC?

7    Who would've had that conversation?

8                MR. FUCHS:  Same objection.

9                THE WITNESS:  I don't know.

10   BY MS. LEONARD:

11       Q    You don't know?

12       A    I don't know who would've had that -- that

13   conversation, or if any conversation occurred.  I

14   don't know.

15       Q    So you don't know whether agencies were

16   actually permitted to make the decision to keep and

17   retain their employees because you don't know who was

18   having that conversation or what the conversation

19   contained; right?

20                MR. FUCHS:  Objection.  Form.

21                THE WITNESS:  I mean, I had some

22   understanding of the process, you know, that was

1    occurring with respect to determining which employees

2    were mission critical or not.

3                   But I don't -- wasn't aware of -- I

4    don't know every conversation that takes place at --

5    at OPM, but I'm kind of testifying based on my own

6    personal knowledge of -- of the conversations that

7    were -- that I -- I'm aware of.

8    BY MS. LEONARD:

9        Q    Okay.  So, and it's your testimony that you

10   were not personally involved in any of the

11   conversations with the agencies through this exemption

12   process; correct?

13                  MR. FUCHS:  Objection.  Form.

14                  THE WITNESS:  I told you I was involved

15   in -- in some where -- you know, where, like, the --

16   with respect to the EEOC where they said, "We'd like

17   to keep all of our probationary employees," and it was

18   fine, you know.

19   BY MS. LEONARD:

20       Q    You said, "Fine"?

21       A    Yeah.  And DOJ.

22       Q    You said, "Fine," to DOJ too?

1    A    I don't think I said, "Fine."  I think DOJ

2    just said, "We're not doing this."  And I don't even

3    know that there was any reach back on or any response

4    to that.

5              And I'm aware of -- with respect to the

6    nuclear regulatory safety -- something along those

7    lines -- I'm aware that they received a 100 percent

8    exemption.

9    Q    After they initially followed

10    OPM's direction to terminate those employees, they

11    reached out, got an exemption, and were allowed to put

12    them back; correct?

13              MR. FUCHS:  Objection.  Form.

14              THE WITNESS:  No.  My understanding

15    was -- was not that.  I think that they just -- they

16    just asked.

17    BY MS. LEONARD:

18    Q    Same for the food safety researchers at FDA.

19    They had to fire everyone, but then they were allowed

20    to reach out to OPM and were given the authority to

21    put them back; right?

22              MR. FUCHS:  Objection.  Form.

215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

```
                                               Page 137
1                 THE WITNESS:  No.  The idea that people
2     had to fire people was -- is not accurate at all, so.
3     BY MS. LEONARD:
4         Q    Is there anyone else at any agency that you
5     can point me to who actually believes that,
6     Mr. Peters?
7                 MR. FUCHS:  Objection.  Form.
8                 THE WITNESS:  Who actually believes
9     that they didn't have to fire people?  I mean, the
10    ones that didn't fire people certainly know that they
11    didn't have to fire people.
12    BY MS. LEONARD:
13        Q    Can you point me to any written document --
14    any communication where agencies are agreeing with you
15    that they didn't have to fire people?  Anything in
16    writing, Mr. Peters?
17                MR. FUCHS:  Objection.  Form.
18                THE WITNESS:  Yeah.  I mean, I wasn't
19    engaged in this litigation -- like, I was -- I wasn't,
20    like, litigating this issue back in February when
21    all -- all of this was going on.
22                I just, you know -- we weren't -- I
```

Page 138

1    wasn't, like, looking at the -- this complaint and

2    thinking, oh, no, we have to make sure that this

3    theory doesn't get -- become the -- like, we were --

4    I -- it didn't even occur to me that -- that you guys

5    would file a lawsuit like this, or that people

6    would -- that this would become some sort of legal

7    theory that we would get sued on.

8              If I -- if I had, we would've -- I

9    mean, obviously we would've done things -- I mean, as

10   soon as we got the TRO from the judge, we immediately

11   sought to clarify the guidance.

12             But it's not our intent to do anything

13   that was unlawful or that was reached beyond our

14   powers.  We were very -- you know, we always try to be

15   very careful to obey all the laws, and not only to

16   obey them, but also to ensure that, you know, agencies

17   are -- are following them.

18             I mean, a lot of these processes were

19   meant for vetting of -- of legal questions.  And in

20   fact, we had a call with all of the general counsels

21   around this time of all the agencies to kind of alert

22   ourselves to any -- be able to discuss legal issues

Page 139

1    around the DRP, not around probationary periods.

2                    I think we might've had a call on

3    the -- on the 14th with all general -- general

4    counsel.  So we were not -- the idea that -- that we

5    were reaching beyond our powers or that we were

6    directing -- doing firings outside of our four walls

7    was not on our radar screen.

8                    And to be fair, I don't think initially

9    it was on your radar screen, 'cause there -- the

10   initial lawsuit, I don't think, mentioned this theory.

11                   I may be wrong, but I -- my

12   recollection is that the lawsuit in front of Judge

13   Cooper didn't have the OPM beyond the four walls

14   theory.  I think that that was just -- and it's -- you

15   know, so we weren't thinking about the lawsuit or this

16   legal theory at the time.

17   BY MS. LEONARD:

18       Q    You were just asking agencies to action

19   their probationary employees by no later than February

20   13th in the February 12th email, and then again in the

21   February 14th email by no later than February 27th;

22   correct?

Page 140

1                    MR. FUCHS:  Objection.  Form.

2                    THE WITNESS:  What we were asking was

3        for having gone through a -- you know, two, three

4        weeks of an exemption process and having given

5        guidance -- you know, having told agencies what -- how

6        we viewed performance in this context, we were, you

7        know, giving them an action date.

8        BY MS. LEONARD:

9            Q    And did you just testify that you were

10       involved in the communications with the agencies that

11       OPM issued after the TRO was issued in this case?

12           A    I was involved in what?

13           Q    Sorry.  The communications that went out to

14       the agencies that were subject to the TRO in this

15       case?  I believe you mentioned that in that prior

16       testimony.

17           A    No.  No.  I was not involved in those

18       communications.  What I said was, as soon as the -- so

19       as soon -- what we did was we clarified -- immediately

20       clarified this guidance from January 20th.  I -- I am

21       aware of that.

22                    I believe that -- that DOJ reached out to

1    all of those agencies not speaking on -- I don't know

2    what exactly what they said, but my understanding is

3    that the employees were all reinstated, like,

4    immediately after the TRO.  But that --

5         Q    I don't want you to reveal anything that you

6    may have learned via conversations with counsel.  So

7    if --

8                   MR. FUCHS:  Yeah.

9    BY MS. LEONARD:

10        Q    If there is something there in that last

11   answer, you are free to tell us, and we'll talk about

12   that after the fact.

13              But I'm going to mark this as the next, and

14   then we can just ask some clarifying questions.  The

15   next being --

16                   MS. LEONARD:  This is not my

17   superpower.  I lose track.

18                   MS. THOLIN:  Exhibit 12.

19                   MS. LEONARD:  Twelve.  Thank you.

20                   (Exhibit 12 was marked for

21                   identification.)

22   //

Page 142

1    BY MS. LEONARD:

2        Q    Okay.  Take a look at this communication

3    from Amanda Scales on Friday, February 28, 2025.  It's

4    got some redacted names.

5            And my question simply is this, Mr. Peters.

6    Are you one of the names that was redacted here?  Are

7    you one of the recipients of this email or copied?

8        A    Oh, I don't know.  I -- I -- honestly, I

9    don't know.  Actually, no.  Oh, no.  I -- I don't --

10   so I think that my understanding is that this was --

11   it -- that this is just to the people.  I think what

12   they did is they just redacted the email addresses.

13       Q    Okay.  But if you are not one of the

14   redacted names, then?

15       A    But I don't think that there are any

16   redacted names.  I just think that they redacted the

17   email addresses.

18       Q    It's a little hard to tell.  But the

19   question is simply, do you -- were you copied on the

20   communications that went out after the TRO to the

21   various agencies?

22                    MR. FUCHS:  Objection.  Form.

Page 143

1                    THE WITNESS:  I don't remember.  I -- I

2    really don't.

3    BY MS. LEONARD:

4        Q    Okay.  All right.  We can mark this as the

5    next -- this is the March 4th revision, and this is

6    going to be Exhibit 13.

7                    (Exhibit 13 was marked for

8                    identification.)

9            So Mr. Peters, you've been referring to the

10   March 5th revision.  Actually, this says revised March

11   4th, so I'm not sure whether -- do you know whether it

12   was revised on the 5th or the 4th?

13       A    No.  This has the language.  I think it

14   might have been -- maybe it was the 4th.  I -- I might

15   have just been saying the 5th.

16       Q    Okay.  So the language you're referring to

17   is at the top of page 2.  Is that where -- "Please

18   note by this memorandum, OPM is not directing agencies

19   to take any specific performance-based actions."

20       A    Yeah.  That's right.

21       Q    So on March -- we'll just say March 4th.

22   March 4th issued a revision to the January 20th

1    memorandum that had instructed the federal agencies to

2    collect and submit lists of probationary workers.

3    That's what this revision is; right?

4        A    Yeah.  And it was in response -- I think it

5    was in response to the TRO.

6        Q    So I don't want you to reveal anything you

7    were aware of because of attorney-client

8    communications.  So I'm just going to make that clear.

9    All right?

10            By this time, March 4th, it had been nearly

11   a month and a half after the original memo; right?

12       A    Yeah.  I mean, it had -- it had been, you

13   know, 50 -- or maybe -- I don't know -- 40, 50 days.

14       Q    And by that time, agencies had been

15   collecting and submitting lists of their probationary

16   employees to OPM for weeks; right?

17       A    Well, like I said, we weren't -- we weren't

18   aware of this legal theory until the lawsuit came.  So

19   that's the reason for the -- for any delay, was just

20   that it wasn't on -- it wasn't on our radar screen

21   that you have to watch out for this in terms of -- or

22   that -- wow.

Page 145

1          That -- that's not -- you can't do that.
2     Like, the -- the legal theory was only -- I think
3     the -- this only came on our radar screen after the
4     complaint was filed.
5          Q     So my question was a factual one, slightly
6     different.  By the time of this revision, the agencies
7     had been collecting and submitting lists of their
8     probationary workers to OPM for weeks; correct?
9          A     They -- I believe so.
10         Q     And by this time, thousands of probationary
11    employees had already been terminated; correct?
12                    MR. FUCHS:  Objection.  Form.
13                    THE WITNESS:  My -- it's, my
14    understanding is that there were -- you know, whatever
15    the numbers were.
16    BY MS. LEONARD:
17         Q     So after all of those probationary employees
18    had been fired, OPM added two sentences to this
19    January memorandum telling agencies that they should
20    make their own decisions; correct?
21                    MR. FUCHS:  Objection.  Form.
22                    THE WITNESS:  Well, but the reason we

Page 146

1    were -- we were adding that was not because we

2    were -- not because it had just occurred to us after

3    50 days.

4                It was in response -- because we were

5    not aware of this legal theory or this kind of factual

6    theory until -- until, you know, the lawsuit was

7    filed.

8                And as soon as we got the TRO we wanted

9    to, you know -- and after the Judge ordered it, we

10   immediately amended and tried to make clear that --

11   that we're not directing agencies to take any -- do

12   any specific performance-based actions regarding

13   probationary employees, which was not -- I -- you

14   know, the intention was never to have them do that.

15   BY MS. LEONARD:

16        Q    Notwithstanding the template that said,

17   "Fire everyone because of performance," Mr. Peters?

18                MR. FUCHS:  Objection.  Form.

19                THE WITNESS:  The template was -- so we

20   provided a template, but we never said, "Fire everyone

21   because of performance."  We never said, "Fire every

22   probationary employee."

Page 147

1    BY MS. LEONARD:

2        Q    You just told the agencies to tell the

3    employees that; right?

4                    MR. FUCHS:  Objection.  Form.

5                    THE WITNESS:  We gave the -- so we

6    attached a form termination letter because the

7    agencies had been asking, "Do you have a form?"

8    BY MS. LEONARD:

9        Q    So this language that was added -- it does

10   not tell federal agencies that OPM no longer considers

11   performance to mean only those who are mission

12   critical, does it?

13                   MR. FUCHS:  Objection.  Form.

14                   THE WITNESS:  Does it say it?  It -- it

15   doesn't say that, but I -- I don't know -- I don't

16   know that we ever said that OPM considers performance

17   to be only mission critical.

18                   What I -- I think we were -- you know,

19   to the extent -- yeah.  I -- I don't think we -- we

20   said that.  I also -- I think this was also edited so

21   that it -- it didn't say managed staffing.

22                   I think it said, "Ensure that a

Page 148

1    probationer's conduct and performance have established

2    that the individual will be an asset to the

3    government."  So I think there are actually two

4    revisions to this.

5    BY MS. LEONARD:

6        Q    There is no document prior to this March 4th

7    revision to the January 20th memo from OPM to any

8    agency that says agencies can make the decision

9    whether to fire probationary employees themselves;

10   correct?

11                   MR. FUCHS:  Objection.  Form.

12                   THE WITNESS:  There was never -- there

13   was -- sorry.  Say that again?

14   BY MS. LEONARD:

15       Q    There's no document prior to the March 4,

16   2025, revision to this January 20th memo that says

17   agencies can make this decision themselves; correct?

18                   MR. FUCHS:  Same objection.

19                   THE WITNESS:  That says agencies can

20   make this decision themselves?  I think that's what we

21   meant by agencies have ultimate decision-making

22   authority over and responsibility for such personnel

1    actions.

2    BY MS. LEONARD:

3         Q    In the revision on March 4th; right?

4         A    That's what we said in the revision, but I

5    think that that's what we always meant.

6         Q    But there's no document that you can point

7    me to where you actually tell -- OPM tells agencies,

8    agencies can make the decision with respect to

9    probationary employees themselves; correct?

10                   MR. FUCHS:  Objection.  Form.

11                   THE WITNESS:  Well, this -- this was

12    sent to all -- we recirculated the documents, so we

13    recirculated this to all heads and acting heads of

14    departments.

15                   We recirculated this to the chief human

16    capital officers, to the CHCOs, to human resource

17    directors, and we put in the transmittal -- we -- we

18    put that language that we are clarifying that agencies

19    have ultimate decision-making authority over and

20    responsibility for performance-based actions regarding

21    probationary employees.

22    //

1    BY MS. LEONARD:

2        Q    So, well, I'll ask my question again,

3    Mr. Peters.  Prior to this March 4th revision, there

4    is no document in which OPM tells the agencies you can

5    make this decision yourselves; correct?

6        A    Like I said --

7                MR. FUCHS:  Objection.  Form.

8                THE WITNESS:  -- this -- this was not

9    on our radar screen -- this legal theory was not on

10   our radar screen until the lawsuit was filed -- this

11   lawsuit was filed.

12                So it didn't -- it didn't occur to us

13   to -- to revise this because it wasn't something we

14   were thinking -- oh no, we're going to be accused of,

15   you know, doing something illegal.

16                So we -- if -- if we -- if we had

17   known, we would have put in that language sooner.  But

18   your -- the lawsuit that was filed here was the first

19   time that the beyond the four walls theory that I was

20   aware of -- of it -- or that anybody at OPM was aware

21   of it.

22   //

Page 151

1    BY MS. LEONARD:

2        Q    So the answer to my question of whether

3    there's any document before the March 4, 2025,

4    revision that tells agencies they can make the

5    decisions with respect to probationary employees

6    themselves is no; correct?

7                    MR. FUCHS:  Objection.  Form.

8                    THE WITNESS:  It's -- I don't know that

9    it's no.  I haven't reviewed every -- every document,

10   but I -- I don't know what you're -- I mean, if

11   there's something that says it -- I'm not aware of

12   anything that says it in these words, but like I said,

13   I don't think it's something that we were thinking

14   about.

15   BY MS. LEONARD:

16       Q    Are you aware -- there's no document that

17   says it in any other words, either?  You can't point

18   me to a document that tells agencies, "You can make

19   this decision yourselves"; correct?

20                   MR. FUCHS:  Objection.  Form.

21                   THE WITNESS:  Well, you -- you have --

22   I mean, you haven't seen all the documents.  Like,

Page 152

1   there's -- there's documents -- like, I don't --
2   I'm -- I -- I can't think of something off the top of
3   my head that says the -- says -- it says something so
4   precise, but I -- I think that the reason was -- is --
5   'cause just we weren't -- we weren't thinking about it
6   because the -- we only -- this theory only kind of
7   came to our -- on our radar screen because the lawsuit
8   was filed.
9   BY MS. LEONARD:
10      Q    Are you familiar, Mr. Peters, with a
11   presidential memoranda that was issued on March 20th
12   for the Director of the Office of Personnel Management
13   called Strengthening the Suitability and Fitness of
14   the Federal Workforce?
15                  MR. FUCHS:  Objection.  Form.
16                  THE WITNESS:  Yes.  I'm -- I'm aware of
17   it.
18   BY MS. LEONARD:
19      Q    Okay.  Let's mark this as the next.  And
20   I'll represent -- I printed this from the White House
21   website myself, so this should be 14.
22   //

Page 153

1                    (Exhibit 14 was marked for

2                    identification.)

3              Mr. Peters, this document in section 1

4     describes -- it says, "Delegation of authority to make

5     suitability determinations."  You see that?

6         A    Yes.

7         Q    And it says, "The director of OPM has

8     delegated the authority to make final suitability

9     determinations and take suitability actions regarding

10    employees in the executive branch based on

11    post-appointment conduct consistent with applicable

12    law."  Do you see that?

13        A    Yes.

14        Q    Prior to March 20, 25, the president had not

15    attempted to delegate to the director of OPM, any

16    authority to make final suitability determinations or

17    take suitability actions regarding post-appointment

18    conduct; correct?

19                    MR. FUCHS:  Objection.  Form.

20                    THE WITNESS:  That's false.

21    BY MS. LEONARD:

22        Q    You can point me to a delegation by the

Page 154

1    president to the director of OPM prior to March 20,

2    2025, in which the president makes that delegation?

3        A    First off, this is completely outside the

4    bounds of -- of this case, but second off, there have

5    been numerous executive orders where there were --

6    and, you know -- where -- that have discussed

7    suitability actions in continuous vetting and -- and

8    all of that after -- you know -- being, you know,

9    conducted by the OPM director.

10       Q    So you believe there are prior executive

11   orders in which the president attempted to delegate

12   the authority to the OPM director that is contained in

13   this document?

14                  MR. FUCHS:  Objection.  Form.

15                  THE WITNESS:  I am telling -- I think

16   that this -- this is completely irrelevant to anything

17   related to the case that is we're having right now.

18   I -- I -- but there -- there -- OPM has taken actions

19   based on post-appointment conduct for decades.

20   BY MS. LEONARD:

21       Q    And you believe that there are documents in

22   which the president has delegated that to the director

Page 155

1    of OPM -- the suit -- the ability to make suitability

2    determinations for post-appointment conduct?

3                    MR. FUCHS:  Objection.  Form.

4                    THE WITNESS:  Well, yes.  In multiple

5    executive orders over the course of multiple

6    administrations.  Yes.

7    BY MS. LEONARD:

8        Q    Mr. Peters, was there any point in time

9    prior to today that you have met with Elon Musk

10   regarding terminating probationary employees?

11       A    No.

12       Q    Is there any point in time prior to today

13   that you have met with the president regarding

14   terminating probationary employees?

15                   MR. FUCHS:  I'm going to --

16                   MS. LEONARD:  That one I think the

17   answer might overrun the --

18                   MR. FUCHS:  Yeah.  Okay.

19                   THE WITNESS:  That's, like, executive

20   privilege.

21                   MR. FUCHS:  Yeah.  It's okay --

22                   MS. LEONARD:  The answer is --

Page 156

1              THE WITNESS:  It was, like, when the --

2      when they say, do you want to -- you know, the FBI

3      would like to speak with you.

4              MS. LEONARD:  So --

5              MR. FUCHS:  The answer no is fine.

6              THE WITNESS:  Okay.

7      BY MS. LEONARD:

8          Q    So, Mr. Peters, I understand that you're

9      being considered for a nomination to the Federal Labor

10     Relations Authority.  Is that true?

11         A    No.

12             MR. FUCHS:  Objection.  Form.

13     BY MS. LEONARD:

14         Q    That's not your reward?

15         A    No.  No.

16             MS. LEONARD:  Okay.  With that, we will

17     take a short break and we will see if there's anything

18     more.  I think we just have a few more minutes.

19             THE VIDEOGRAPHER:  We're going off the

20     record.  This is the end of media unit 3.  The time is

21     5:17 p.m.

22                  (Off the record.)

Page 157

1                    THE VIDEOGRAPHER:  We're back on the
2       record.  This is the beginning of media unit 4.  The
3       time is 5:31 p.m.
4       BY MS. LEONARD:
5            Q    We are going to mark the next, which I think
6       is 15.
7                         (Exhibit 15 was marked for
8                          identification.)
9                    And this is the Declaration of Charles
10      Ezell, acting director of OPM, that was submitted and
11      then withdrawn in this case.  I will direct your
12      attention to paragraph 1.  Mr. Peters, do you see
13      that?
14           A    Yes.
15           Q    And Mr. Ezell says here, "This declaration
16      is based on my personal knowledge and information
17      provided to me in my official capacity by others."
18      Are you among the others who provided information to
19      Mr. Ezell for purposes of creating this declaration?
20                    MR. FUCHS:  Objection.  Form.
21                    THE WITNESS:  Yes.
22      //

Page 158

1    BY MS. LEONARD:

2        Q    And what information in this declaration was

3    provided by you?

4                    MR. FUCHS:  To the extent that anything

5    touches on attorney-client conversations, I instruct

6    the witness not to answer with that caveat.

7                    THE WITNESS:  I think I provided all --

8    all of the information for this.

9    BY MS. LEONARD:

10       Q    And when did you do that?

11       A    Before it was filed.

12       Q    Okay.  So if we look at the -- it's dated

13   February 26th.

14       A    Yes.

15       Q    Do you have any recollection of when, before

16   February 26th, you provided the information to

17   Mr. Ezell?

18       A    It -- it would've been for -- for all the

19   things in this declaration -- it might've been at --

20   at different times, but I -- you know, like, I think

21   he -- obviously he knew that -- he knew about the

22   guidance.

1          I mean, I didn't give that information to

2     him.  The CHCO meeting -- I think he might've been

3     there for part of it, although I don't remember the --

4     he would've been aware of the probationary FAQs.

5          He would've been aware that OPM did not

6     direct agencies to terminate particular employees.  He

7     would've -- I think he would've been aware the --

8     well --

9          Q    How would Mr. Ezell have been aware that OPM

10    did not direct agencies to terminate probationary

11    employees, Mr. Peters?

12                    MR. FUCHS:  Objection.  Form.

13                    THE WITNESS:  Well, I think from having

14    reviewed the communications that we provided.

15    BY MS. LEONARD:

16         Q    Any other basis for saying that.

17         A    He certainly knew that -- about OPM

18    terminating its own probationary employees.  But I

19    don't want to speculate.  I don't know -- I don't know

20    when he -- when he learned of -- of this stuff and I

21    don't know from who.

22         Q    Okay.  I just want to make sure I understand

1    and exhaust the basis that when you said he would've

2    known that OPM did not direct agencies -- that is

3    based on the communications that you believe he

4    reviewed and his termination of the OPM employees?

5              MR. FUCHS:  Objection.  Form.

6    BY MS. LEONARD:

7         Q    Is that right?

8         A    I -- I think we're now so outside of my

9    personal knowledge that I don't think it would be

10   useful for me to answer that.

11        Q    Okay.  So there's no other basis for the

12   statement that he would've known that, that you

13   can -- that you feel comfortable telling --

14        A    You have to -- you really have to ask him.

15   I don't know.

16        Q    Okay.  All right.  Let's mark this one as

17   Exhibit 16.

18              (Exhibit 16 was marked for

19              identification.)

20              Mr. Peters, you've been handed Exhibit 16,

21   which is your own declaration that was submitted to

22   the Court in support of Defendant's ex parte motion to

Page 161

1    vacate the March 13, 2025, evidentiary hearing.  I

2    take it you are familiar with this document?

3         A    Yeah.  And I -- I would like to clarify that

4    I was present at these.  I know that the Judge said I

5    might not have been.

6              I was present at the February 7th, the

7    February 10th, and the February 13th, and the February

8    14th meetings that are described here.  And I know --

9    I know what was said at -- at those meetings.

10        Q    And, well, let's start with -- the signature

11   here is an electronic signature.  Did you authorize

12   your signature to be applied to this document?

13        A    I did.

14        Q    Okay.  And did you do that on March 10th?

15        A    May -- might've been March 9th.  I don't

16   know.

17        Q    Okay.  And the document does not say that

18   you were providing this information as on the basis of

19   personal knowledge, which I believe is what led to the

20   Judge's comments.

21             Are you representing that the information in

22   this declaration is, in fact, based on personal

1    knowledge?

2         A    Yes.

3         Q    And that includes the telephone calls with

4    CHCOs and chief of staff that are discussed here?

5         A    Yes.

6         Q    Okay.  And the February 7, 2025, call was

7    with chiefs of staff.  Is that correct?

8         A    Chiefs of staff.  Yes.

9         Q    Was it also with -- actually, if you could

10   look at the disclosure exhibit, which is the February

11   13th list?

12        A    Yes.

13        Q    And do you have the February 12th email?

14   And apologies for not knowing the exhibit number off

15   the top of my head, but it should be in the stack

16   that's in front of you -- the February 12th email.

17            It should be in there somewhere.  I have

18   another copy of it.  It's Exhibit 6, if that helps.  I

19   can also -- if you don't -- I can --

20        A    The February 12th email?

21        Q    Yes.

22        A    I have it.

Page 163

1          Q     Okay.  So there's a line here at the top

2     that says, "BCC: COS and Key Partners, DOGE leads."

3     Do you see that?

4          A     Yes.

5          Q     Okay.  So COS refers to chiefs of staff;

6     correct?

7          A     Yes.

8          Q     Key partners -- does that refer to other

9     political appointees at federal agencies?

10                    MR. FUCHS:  Object to form.

11                    THE WITNESS:  I -- I think it refer --

12     it probably refers to the same people on the

13     disclosure, but I don't know who this was specifically

14     sent to.

15     BY MS. LEONARD:

16          Q     That's because it was sent as a BCC?

17          A     Yeah.  That's right.  I don't.

18          Q     Okay.  And DOGE leads -- does that refer to

19     individuals associated with DOGE who are embedded at

20     federal agencies or something else?

21                    MR. FUCHS:  Objection.  Form.

22                    THE WITNESS:  I don't know who it

1    refers to.

2    BY MS. LEONARD:

3        Q    Okay.  On that list from February 13th, do

4    you recognize the names of individuals who are

5    affiliated with DOGE?

6                    MR. FUCHS:  Objection.  Form.

7                    THE WITNESS:  Affiliated with DOGE?

8    What do you mean?

9    BY MS. LEONARD:

10       Q    So the February 12th email is listed as

11   being sent to DOGE leads, and I'm wondering whether

12   anyone on the February 13th list you recognize as

13   being affiliated with DOGE?

14                   MR. FUCHS:  Objection.  Form.

15                   THE WITNESS:  Affiliated with

16   DOGE -- affiliated.  And what do you -- what does

17   affiliated mean?

18   BY MS. LEONARD:

19       Q    Do they work for DOGE?

20       A    No.  In fact, all of these people work

21   for -- I think they all work for the agencies.

22       Q    Are they part of a DOGE team at the

Page 165

1    agencies?

2                    MR. FUCHS:  Objection.  Form.

3                    THE WITNESS:  I don't know.

4    BY MS. LEONARD:

5        Q    Are you part of a DOGE team at OPM?

6        A    No.

7                    MR. FUCHS:  Objection.  Form.

8    BY MS. LEONARD:

9        Q    Do you have a DOGE email address?

10       A    No.

11                   MR. FUCHS:  Objection.  Form.

12   BY MS. LEONARD:

13       Q    Have you been affiliated in any way with

14   DOGE since January 20th?

15                   MR. FUCHS:  Objection.  Form.

16                   THE WITNESS:  Affiliated in any way

17   with DOGE?  I -- I don't know what that means.

18   BY MS. LEONARD:

19       Q    So there are -- you're aware that there are

20   individuals working at federal agencies who have been

21   designated as affiliates of DOGE at those agencies

22   pursuant to the president's executive orders?

```
 1        A    I think just from reading the executive
 2   order.
 3        Q    Are you affiliated in any way with DOGE,
 4   Mr. Peters?
 5                  MR. FUCHS:  Objection.  Form.
 6                  THE WITNESS:  No.
 7   BY MS. LEONARD:
 8        Q    Do you perform any work for DOGE?
 9                  MR. FUCHS:  Same objection.
10                  THE WITNESS:  No.  I mean, I -- I
11   coordinate sometimes with their lawyers, but I don't
12   personally -- I'm not on the -- the DOGE team or
13   anything like that.
14   BY MS. LEONARD:
15        Q    Have you discussed the termination of
16   probationary employees with anyone from DOGE since
17   January 20th?
18                  MR. FUCHS:  Same objection.
19                  THE WITNESS:  No.
20   BY MS. LEONARD:
21        Q    Okay.  Going back to your declaration, the
22   February 7th call that you refer to here -- was
```

Page 167

1    Charles Ezell on that call?

2         A    No.

3         Q    At any time did he come in and out of the

4    conference room while it was on Zoom?

5         A    No.

6         Q    The February 10th call that's referred to

7    here -- was Charles Ezell on that call?

8         A    No.

9         Q    The call that you don't mention here, that

10   happened on February 12th?

11        A    I did -- there was no call on February 12th.

12        Q    There was no call on February 12th?

13        A    There was a CHCO call on February 12th, but

14   there was -- wasn't a chief of Staff call.

15        Q    Okay.  The CHCO call on February 12th.  Was

16   Charles Ezell on that call?

17        A    I don't know.  He might have been.  I think

18   we -- I -- I don't know is the answer.

19        Q    And the February 13th call with the CHCOs

20   that you refer to -- sorry.  The February 13th call

21   with the chiefs of staff -- Charles Ezell was not on

22   that call.  Is that right?

Page 168

1          A     To the best of my recollection, no.

2          Q     And the February 14th call with CHCOs -- was

3     Mr. Ezell on that call?

4          A     He might -- might've been.  I don't -- he

5     might've been at the beginning.  I don't know.  He

6     sometime -- he was often on -- on the -- the CHCO

7     calls.

8          Q     Okay.  So the CHCO call -- let's start with

9     the CHCO call on February 12th.  Was Mr. Ezell on that

10    call?

11         A     I don't know.

12         Q     And was Mr. Ezell on the CHCO call on

13    February 13th?

14         A     I don't know.  I don't know whether he was

15    on any particular CHCO call.

16         Q     And you are the person who read the script

17    to the chief of staff --

18         A     Yes.

19         Q     -- that is referred to in paragraph 5.  Is

20    that correct?

21         A     Yes.

22         Q     And that script was the same as the email

Page 169

1     from February 12th that we've been looking at here

2     today; correct?

3          A     Yes.

4          Q     And you also read a script on the CHCO calls

5     with respect to the terminations of probationary

6     employees; correct?

7          A     Yes.

8          Q     And what was contained in that script that

9     you read to the CHCOs?

10         A     It would've been the same as the -- the

11    email that we sent as the notes of the call.

12         Q     On February 14th?

13         A     Yeah.

14         Q     So the script that you read to the CHCOs on

15    the CHCO calls was the same as the February 14th

16    email; correct?

17         A     Yes.

18         Q     Were there any other scripts that you read

19    regarding probationary employees at any time to either

20    the CHCOs or the chiefs of staff, other than the ones

21    that reflect the February 12th and February 14th

22    emails?

1           MR. FUCHS:  Objection.  Form.

2           THE WITNESS:  I think I might have ran

3    through the -- the FAQs on probationary employees at

4    one of the calls.  I would've just, like, read -- read

5    through it.

6    BY MS. LEONARD:

7       Q    Mr. Peters, why were you reading a script?

8           MR. FUCHS:  Objection.  Form.

9           THE WITNESS:  I think it was just so

10   that it could be vetted and approved by appropriate

11   agency leadership.

12   BY MS. LEONARD:

13      Q    And who vetted and approved the script that

14   you read to the chiefs of staff?

15      A    I think it would've been -- I think Chuck

16   would've.

17      Q    And who vetted and approved the script that

18   you read to the CHCOs?

19      A    I think it would've been approved by Chuck.

20      Q    You think, or you know?

21      A    I think.  I don't -- don't recall

22   specifically.

```
                                              Page 171
 1                    MS. LEONARD:  Okay.  I think that is
 2      all we have.
 3                    THE WITNESS:  Thank you.
 4                    MR. FUCHS:  Yeah.  Nothing further from
 5      us.
 6                    MS. LEONARD:  Okay.  So no redirect?
 7                    MR. FUCHS:  Yeah.  No redirect.  No
 8      cross.
 9                    THE VIDEOGRAPHER:  Please stand by.
10      We're off the record at 5:45 p.m., and this concludes
11      today's testimony given by Noah Peters.  The total
12      number of media units used was four, and they will be
13      retained by Veritext.
14                    (Signature reserved.)
15                    (Whereupon, at 5:45 p.m., the
16                    proceeding was concluded.)
17
18
19
20
21
22
```

CERTIFICATE OF DEPOSITION OFFICER

1

2          I, SAMUEL PACHON, the officer before whom

3     the foregoing proceedings were taken, do hereby

4     certify that any witness(es) in the foregoing

5     proceedings, prior to testifying, were duly sworn;

6     that the proceedings were recorded by me and

7     thereafter reduced to typewriting by a qualified

8     transcriptionist; that said digital audio recording of

9     said proceedings are a true and accurate record to the

10    best of my knowledge, skills, and ability; that I am

11    neither counsel for, related to, nor employed by any

12    of the parties to the action in which this was taken;

13    and, further, that I am not a relative or employee of

14    any counsel or attorney employed by the parties

15    hereto, nor financially or otherwise interested in the

16    outcome of this action.

17                              SAMUEL PACHON

18                         Notary Public in and for the

19                              District of Columbia

20

21    [X] Review of the transcript was requested.

22

Page 173

                    CERTIFICATE OF TRANSCRIBER

1

2              I, RYAN SHARP, do hereby certify that this

3    transcript was prepared from the digital audio

4    recording of the foregoing proceeding, that said

5    transcript is a true and accurate record of the

6    proceedings to the best of my knowledge, skills, and

7    ability; that I am neither counsel for, related to,

8    nor employed by any of the parties to the action in

9    which this was taken; and, further, that I am not a

10   relative or employee of any counsel or attorney

11   employed by the parties hereto, nor financially or

12   otherwise interested in the outcome of this action.

13

14

15                                          RYAN SHARP

16

17

18

19

20

21

22

Page 174

22

1  Yuri Fuchs, Esquire

2  yuri.s.fuchs@usdoj.gov

3                              April 1, 2025

4  RE:    American Federation Of Government Employees Et Al v. United
States Offices Of Personnel Management Et Al

5       3/26/2025, Noah Peters (#7269168)

6       The above-referenced transcript is available for

7  review.

8       Within the applicable timeframe, the witness should

9  read the testimony to verify its accuracy. If there are

10  any changes, the witness should note those with the

11  reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13  Deponent and Errata and return to the deposing attorney.

14  Copies should be sent to all counsel, and to Veritext at

15  cs-midatlantic@veritext.com

16   Return completed errata within 30 days from

17  receipt of testimony.

18    If the witness fails to do so within the time

19  allotted, the transcript may be used as if signed.

20

21

22                    Yours,

23                    Veritext Legal Solutions

24

Page 175

1  1  American Federation Of Government Employees Et Al v. United States

Offices Of Personnel Management Et Al

2  2  Noah Peters (#7269168)

3  3                    E R R A T A   S H E E T

4  4  PAGE_____ LINE_____ CHANGE_____

5  5  _____

6  6  REASON_____

7  7  PAGE_____ LINE_____ CHANGE_____

8  8  _____

9  9  REASON_____

10  0  PAGE_____ LINE_____ CHANGE_____

11  1  _____

12  2  REASON_____

13  3  PAGE_____ LINE_____ CHANGE_____

14  4  _____

15  5  REASON_____

16  6  PAGE_____ LINE_____ CHANGE_____

17  7  _____

18  8  REASON_____

19  9  PAGE_____ LINE_____ CHANGE_____

20  0  _____

21  1  REASON_____

22  2

23  3  _____    _____

24  4  Noah Peters                            Date

25  5

Page 176

1  1 American Federation Of Government Employees Et Al v. United States

Offices Of Personnel Management Et Al

2  2 Noah Peters (#7269168)

3  3            ACKNOWLEDGEMENT OF DEPONENT

4  4     I, Noah Peters, do hereby declare that I

5  5 have read the foregoing transcript, I have made any

6  6 corrections, additions, or changes I deemed necessary as

7  7 noted above to be appended hereto, and that the same is

8  8 a true, correct and complete transcript of the testimony

9  9 given by me.

10  0

11  1 _____    _____

12  2 Noah Peters                        Date

13  3 *If notary is required

14  4            SUBSCRIBED AND SWORN TO BEFORE ME THIS

15  5            _____ DAY OF _____, 20____.

16  6

17  7

18  8            _____

19  9            NOTARY PUBLIC

20  0

21  1

22  2

23  3

24  4

25  5

[& - 2025]                                                                    Page 1

| & | | | |
|---|---|---|---|

**&**   2:5 8:19 16:9

**0**

**0**   175:10,20
176:10,20
**01780**   1:12
8:17

**1**

**1**   6:7 8:10 39:8
39:9,21 40:5
41:2 48:22
53:21 62:9
85:7 153:3
157:12 174:1,3
175:1,11,21
176:1,11,21
**10**   6:3,17
113:16,17,21
114:3 174:11
**100**   29:6 136:7
**1000**   2:6 8:20
**104**   6:14
**105**   6:15
**109**   6:16
**10th**   65:17
102:10 161:7
161:14 167:6
**11**   6:19 55:14
120:5,6 174:12
**1100**   5:7
**113**   6:18

**11th**   102:9
**12**   6:20 119:22
121:8 141:18
141:20 174:13
**120**   6:19
**12th**   75:6,7
81:22 82:1,6
88:18 97:5
99:17,20
101:13 104:8
105:4,8 107:19
110:14 111:11
111:14 113:4
121:3 139:20
162:13,16,20
164:10 167:10
167:11,12,13
167:15 168:9
169:1,21
**13**   6:21 66:10
66:14 107:14
120:10 122:7
123:11,18
143:6,7 161:1
174:14
**13th**   65:7,18
66:21 98:2
100:16 111:14
139:20 161:7
162:11 164:3
164:12 167:19
167:20 168:13
**14**   6:22 152:21
153:1 174:15

**141**   6:20
**143**   6:21
**14th**   64:20 77:7
110:14 125:22
139:3,21 161:8
168:2 169:12
169:15,21
**15**   7:3 66:1
157:6,7 174:16
**15180**   4:7
**153**   6:22
**157**   7:3
**15th**   2:6 8:19
16:12
**16**   7:4 160:17
160:18,20
174:17
**160**   7:4
**1625**   3:19
**16th**   21:16,18
**17**   7:9 174:18
**177**   3:7,13
**17th**   115:14,14
115:18
**18**   129:2
174:19
**19**   174:20
**1900**   5:15
**1:16**   2:4 8:3

| 2 | | | |
|---|---|---|---|

**2**   6:8 43:4,5,9
44:14 48:17
49:1 53:21

62:13 108:11
143:17 174:2
175:2,12,22
176:2,12,22
**2/12/25**   6:12,14
**2/13**   82:19 83:7
97:17 111:10
**2/13/2025**
83:16
**2/13/25**   6:10
**2/14/25**   6:17
**2/28/25**   6:20
**20**   11:5 16:16
23:5,12,13
40:6 43:10
153:14 154:1
174:20 176:15
**20001**   4:14
**20003**   4:8
**20005**   2:7 5:8
**20036**   3:20
**2005**   30:10
**2019**   19:11
**202**   3:22 4:10
4:16 5:11,18
**2022**   16:13,13
19:12
**2024**   18:1
**2025**   2:3 8:4
11:5 16:7,16
16:20 17:5,8
17:12,15 18:15
19:2,5 23:12
23:13 40:6

**[2025 - 600]**                                                                 Page 2

41:17 42:5
43:10 45:8,18
46:21 66:10,15
75:21,21 76:1
90:13 92:4
107:14 116:19
120:10 121:8
122:8 123:11
123:19,22
124:1 129:2
142:3 148:16
151:3 154:2
161:1 162:6
174:3
**20415** 5:16
**20th** 11:19
13:22 14:15,18
15:5 16:11,20
21:9,11 23:22
25:20 26:17
27:9,10,18
35:9 37:12
40:12,14 41:2
42:16 44:15,20
45:5 48:16
53:18 54:1
55:16,18 56:3
63:5 65:4 67:7
70:15 76:6
85:2,6 92:19
140:20 143:22
148:7,16
152:11 165:14
166:17

**21** 56:8 174:21
**21st** 68:18 69:9
**22** 174:1,21
**22nd** 16:11
56:14
**23** 174:22
**24** 7:8 41:17
42:5 174:22
**24th** 37:19
38:12 42:18
56:18 67:9
68:8,10 69:3
70:2,16 72:6,8
**25** 23:5 123:22
124:1 153:14
**26** 2:3 8:3
**26th** 158:13,16
**27th** 57:2,10
58:2 139:21
**28** 75:21 142:3
**28660** 173:13
**28th** 71:19
72:11,13 73:17
74:14 75:14
78:7,14,17
80:22
**2:03** 44:8
**2:05** 44:11
**2:09** 48:9
**2:13** 48:12
**2:28** 62:4,5,10

## 3

**3** 6:9 7:8 13:11
54:14,15,18
108:15 156:20
174:3 175:3,13
175:23 176:3
176:13,23
**3/20/25** 6:22
**3/26/2025**
174:6
**30** 67:2,3
174:17
**300** 3:7,13
**33606** 172:16
**38** 7:9
**39** 6:7
**3:25** 1:12 8:17
**3:29** 62:14

## 4

**4** 6:10 13:11
66:5,6,9
148:15 151:3
157:2 174:4
175:4,14,24
176:4,14,24
**40** 144:13
**415** 3:10
**421-7151** 3:10
**43** 6:8
**4:18** 108:12
**4:28** 108:16
**4th** 6:21 143:5
143:11,12,14

143:21,22
144:10 148:6
149:3 150:3

## 5

**5** 6:11 75:11,12
168:19 174:6
175:5,15,25
176:5,15,25
**50** 144:13,13
146:3
**54** 6:9
**594-9958** 4:10
**598-3869** 5:11
**5:17** 156:21
**5:30** 104:7
105:8
**5:31** 157:3
**5:34** 105:4,14
106:14
**5:45** 171:10,15
**5th** 40:15 75:6
92:11,18
143:10,12,15

## 6

**6** 6:12 55:14
75:21 76:1
82:12,13,16
106:21 111:9
162:18 174:7
175:6,16 176:6
176:16
**600** 4:7

**639-6426** 4:16
**66** 6:10
**6th** 75:5,9 78:7
78:15 80:5

**7**

**7** 6:14 66:1
104:14,15
106:13 162:6
174:8 175:7,17
176:7,17
**7269168** 2:9
174:6 175:2
176:2
**75** 6:11
**775-5900** 3:22
**7:20** 106:8,18
**7th** 65:16 67:14
67:17,22 76:8
77:18 78:18
79:18 80:11,11
97:19 98:8,21
100:1,4 102:9
108:2 120:22
161:6 166:22

**8**

**8** 6:15 45:8,17
46:21 105:16
105:17 106:5
174:9 175:8,18
176:8,18
**80** 4:13
**805** 2:6 8:19

**82** 6:13
**8:12** 107:3

**9**

**9** 6:16 109:20
109:21 174:10
175:9,19 176:9
176:19
**936-3089** 5:18
**94108** 3:8,14
**9th** 161:15

**a**

**ability** 155:1
172:10 173:7
**able** 70:17
102:22 138:22
**above** 174:7
176:7
**abrasive**
125:14
**absolutely**
32:20 118:14
**accepted** 20:21
21:8,12 31:10
**accepting**
106:9,9
**access** 76:12,16
76:18
**accomplish**
49:7,15 50:3
**accountability**
57:16
**accounts** 76:13

**accuracy**
174:10
**accurate** 20:19
115:15 126:16
127:19 137:2
172:9 173:5
**accused** 150:14
**acknowledge...**
176:3
**acknowledg...**
174:13
**act** 84:9
**acting** 13:21
40:6 43:11
44:15 45:8
46:22 74:13
149:13 157:10
**action** 6:22 9:3
82:19 83:6,7
83:15,21 97:16
97:16 98:16
106:2,22
111:10 127:1,7
127:17 132:4
139:18 140:7
172:12,16
173:8,12
**actioning** 97:7
**actions** 6:13
82:20 91:7,22
95:22 96:14
109:4 111:10
132:9 143:19
146:12 149:1

**149:20 153:9**
153:17 154:7
154:18
**activity** 6:14
**actual** 52:21
**actually** 30:12
30:15 33:3
36:15,19 42:8
48:21 61:10
81:19 85:21
93:10 114:19
120:16 123:1
134:16 137:5,8
142:9 143:10
148:3 149:7
162:9
**add** 27:20
30:12
**added** 73:1
145:18 147:9
**adding** 146:1
**addition** 60:14
86:14
**additional** 56:9
112:12 128:9
**additions** 176:6
**address** 39:1
73:17 82:17
165:9
**addresses**
142:12,17
**adjusted** 111:3
**administer** 9:2

**[administered - agency's]**                                        Page 4

| | | | |
|---|---|---|---|
| **administered** | 164:16,17 | 67:8 71:4 | 138:16,21 |
| 63:21 | 165:13,16 | 73:22 74:4,18 | 139:18 140:5 |
| **administering** | 166:3 | 76:7,21 77:15 | 140:10,14 |
| 63:11 64:9 | **affiliates** | 77:17,21 82:2 | 141:1 142:21 |
| **administration** | 165:21 | 82:6 84:2,12 | 143:18 144:1 |
| 53:19 60:4,17 | **affiliations** | 84:18,20 85:7 | 144:14 145:6 |
| 60:22 61:20 | 9:10 | 85:11,17,20 | 145:19 146:11 |
| 67:18 97:3 | **afge.org** 4:15 | 86:8,15 87:3,6 | 147:2,7,10 |
| 98:10,11 | **afl** 1:6,9 3:3,4 | 87:18 89:1,3 | 148:8,17,19,21 |
| 103:22 126:4 | 3:18 4:3,4 | 89:13,19 90:1 | 149:7,8,18 |
| **administrations** | **afscme.org** | 90:8,10,19 | 150:4 151:4,18 |
| 155:6 | 3:21 | 91:21 92:4,8 | 159:6,10 160:2 |
| **administrative** | **afternoon** 8:2 | 92:20 93:5,15 | 163:9,20 |
| 25:15 26:22 | 9:12 10:12 | 93:21 94:16 | 164:21 165:1 |
| 27:4,14 40:8 | 68:3 | 95:5,15 96:14 | 165:20,21 |
| 54:9 72:22 | **agencies** 27:22 | 96:14 97:6,12 | **agency** 13:8 |
| 109:12 | 28:17 29:1,9 | 97:15 100:1,4 | 24:2 29:8 38:5 |
| **advance** 21:11 | 29:16 30:17,19 | 100:7,11 | 38:6,15 42:22 |
| 23:12 | 31:6,13 32:1,6 | 101:11 102:4,5 | 57:7 58:11 |
| **advancing** | 32:8 33:10,18 | 103:2,17 | 65:3 70:22 |
| 114:17 | 33:20,21 37:13 | 106:11,22 | 76:5 83:21,21 |
| **advantage** | 37:16,18 38:9 | 107:13 108:2 | 86:16,21 87:16 |
| 72:18 73:7 | 38:20 39:12 | 108:20 109:3 | 88:14 89:8,11 |
| **advised** 121:13 | 40:7 41:3,17 | 109:11 110:10 | 89:15 90:14 |
| 121:15 | 42:3,17,22 | 111:1 112:5 | 91:6 92:3 |
| **advisor** 11:1 | 43:11 48:16 | 113:6 114:7,18 | 93:12 96:12,18 |
| 20:22 21:9 | 50:14 52:6,13 | 115:2,5,8,11,16 | 110:18 111:4 |
| 22:2 38:16 | 53:2,7 54:2 | 116:4,19 | 114:13 123:20 |
| 62:17 | 55:2,10 56:11 | 118:20 121:7 | 127:17 129:12 |
| **advocate** 51:15 | 56:20 57:5 | 122:6,14 126:3 | 130:10 131:5 |
| 51:19 | 58:15,20 59:15 | 127:11,13,21 | 133:14 137:4 |
| **affected** 128:1 | 59:19,22 60:3 | 128:18 130:11 | 148:8 170:11 |
| **affiliated** 17:14 | 60:10,11,20 | 132:8 134:15 | **agency's** 31:2 |
| 164:5,7,13,15 | 61:12 65:20 | 135:11 137:14 | |

**[agenda - aside]**                                                    Page 5

**agenda** 49:6,14
50:3,12 51:5
51:11
**aggressively**
32:21
**ago** 24:21 86:1
**agree** 8:8 37:5
53:12
**agreeing**
137:14
**agriculture**
97:21 98:5
100:19 121:7
**ah** 48:22
**ahead** 21:6
59:8 90:4
124:17,19
**ai** 46:9
**air** 88:5
**al** 1:9,13 8:13
8:14 174:4,5
175:1,1 176:1
176:1
**alert** 138:21
**alerted** 117:12
**aligned** 22:22
**allison** 13:13
**allocation**
45:15
**allocations**
47:1
**allotted** 174:20
**allow** 102:21

**allowed** 136:11
136:19
**alsup** 37:3 59:5
**altber.com** 3:9
3:15
**altshuler** 3:6,12
**amanda** 14:9
14:17,20 15:9
15:14,18 22:9
25:1,4 46:1,8
46:16 82:18
142:3
**amended**
146:10
**american** 1:5,7
3:2,3,17 4:2,3
4:12 8:12 49:6
174:4 175:1
176:1
**analysis** 53:6
**announced**
73:8 80:21
106:3 107:10
**answer** 7:6
18:12,12,17
20:7 24:4,10
27:12 34:21
35:1,3 36:22
37:4 38:17
47:21 50:20
53:16 59:9
141:11 151:2
155:17,22
156:5 158:6

160:10 167:18
**answered**
18:20 26:8
35:12 49:18
50:19
**answering**
15:21
**answers** 18:7
113:13
**anticipate**
118:12
**anybody** 28:20
35:14 36:1
55:11 150:20
**apologies**
162:14
**apologize**
120:17
**appeal** 20:14
30:6,7,8 33:13
36:7 50:16
52:15 54:7
**appearance** 9:7
**appearances**
9:9
**appended**
176:7
**applicable**
93:12 153:11
174:9
**applied** 161:12
**apply** 46:1
**appointee**
102:22

**appointees**
54:7 65:20
67:1 163:9
**appointing**
43:14
**appointment**
12:16 31:17
153:11,17
154:19 155:2
**apportionment**
45:15
**appreciated**
18:13 64:6
**appropriate**
47:10 170:10
**approved**
170:10,13,17
170:19
**approves** 49:3
**approximately**
16:11 19:11
**april** 174:3
**arbitrarily**
51:15
**areas** 115:1
**argumentative**
51:13 52:9
**aronov** 5:22
8:20
**arose** 102:14
**ascribe** 131:1
**aside** 61:10
67:6 124:1

asked   18:19
  26:8 35:11
  49:17 70:21
  71:4 81:1,9,13
  85:2 87:10
  99:9,10 115:11
  115:16 130:19
  132:12 136:16
asking   61:10
  63:18 81:14
  139:18 140:2
  147:7
assess   30:16
  31:14
assessments
  32:9
asset   30:14
  148:2
assist   12:4
associated
  163:19
assume   25:13
  41:10,10
assumes   91:15
attached   83:17
  107:15 109:15
  109:16 110:13
  147:6 174:12
attempted
  153:15 154:11
attention   75:17
  157:12
attorney   9:11
  144:7 158:5

172:14 173:10
  174:14
attorneys   16:9
  16:10
audio   8:7 172:8
  173:3
august   18:1
authentic   61:5
authorities
  25:12 43:13,14
authority   73:3
  136:20 148:22
  149:19 153:4,8
  153:16 154:12
  156:10
authorize
  161:11
authorized   9:2
availability
  64:6
available   174:7
avenue   4:7
aware   17:7
  18:14,17,22
  46:8,13 58:19
  60:2,6,19
  61:15 70:20
  71:2,8 76:3,5
  80:3 85:10,17
  88:3,4 94:14
  95:4,13 104:8
  104:10 105:13
  105:19 106:1
  118:22 119:5

131:18,19
  133:21 135:3,7
  136:5,7 140:21
  144:7,18 146:5
  150:20,20
  151:11,16
  152:16 159:4,5
  159:7,9 165:19
awareness
  85:16 105:11

**b**

b   6:5 7:1 15:3
back   27:19
  28:22 33:4
  37:3 40:2
  44:10 48:11,21
  53:17 62:12
  68:6,6 100:20
  108:14 111:9
  115:11 121:18
  123:1 125:16
  136:3,12,21
  137:20 157:1
  166:21
background
  53:1 120:12
badger   37:8
based   17:14
  24:4 94:11
  101:20,22
  118:7,19 123:8
  123:12,15
  135:5 143:19

146:12 149:20
  153:10 154:19
  157:16 160:3
  161:22
basis   24:7
  38:17 86:7
  159:16 160:1
  160:11 161:18
bcc   163:2,16
bears   31:13
began   11:4
  24:16 78:10
  97:15,16
  101:21
beginning   9:10
  62:13 108:15
  128:2 157:2
  168:5
behalf   3:2 4:2
  5:2 9:17
belief   115:4
believe   18:16
  18:22 20:8
  32:8 37:16
  47:2 51:5,8,11
  51:17 58:13
  72:4 77:20
  81:17 84:16
  97:22 99:16,19
  100:19 103:22
  104:14 106:10
  117:18 129:5
  140:15,22
  145:9 154:10

154:21 160:3
161:19
**believed** 33:12
36:4 89:19
**believes** 114:20
137:5,8
**berzon** 3:6,12
**best** 18:12
168:1 172:10
173:6
**beyond** 127:18
138:13 139:5
139:13 150:19
**big** 45:10
**bigler** 5:12 9:18
**bill** 22:9 25:1
**bit** 68:6 115:22
**bjelde** 15:2
25:5 82:18
**blumin** 3:16
9:14
**board** 16:7
90:9
**bob** 9:18
**bold** 83:13
**bottom** 49:2
88:17 111:22
**bounds** 154:4
**brackets**
110:18
**branch** 153:10
**break** 39:1,5,17
39:21 48:4,14
61:4 88:13

108:5 130:10
156:17
**bredhoff** 2:5
8:19
**brewer** 16:8,10
16:14,17,19
17:4 100:16
**brian** 15:2,9,14
25:5 82:18
**briefing** 6:19
13:4 120:10,12
122:6
**briefly** 15:3
**bring** 52:21
**broader** 113:10
116:4
**build** 20:9
**building** 12:12
**bullet** 88:18
111:22 122:3,5
123:8
**bumpy** 128:18
**bunch** 13:16
**business** 67:18
98:9,11 103:21

**c**

**c** 3:1 4:1 5:1,12
6:8 8:1 25:12
43:12,13 44:16
45:12 46:1
**ca** 3:8,14
**california** 1:2
8:16

**call** 39:5 64:19
66:10,15,19,21
67:22 68:17,21
69:8 71:16
77:7 100:15
101:3 102:7
128:20 138:20
139:2 162:6
166:22 167:1,6
167:7,9,11,12
167:13,14,15
167:16,19,20
167:22 168:2,3
168:8,9,10,12
168:15 169:11
**called** 10:4 16:8
17:11 31:9
36:12 40:7
55:6,20 56:1
57:7 66:9
82:17 103:10
152:13
**calling** 82:6
**calls** 24:2 38:15
65:8,16 68:10
68:15 71:15,18
71:21,21 72:5
72:8 77:8,11
78:10,11 79:10
80:16,19,20
101:20 162:3
168:7 169:4,15
170:4

**cap** 45:11
**capacity**
157:17
**capital** 21:22
55:1 149:16
**career** 12:2,3,6
13:5,5 43:13
45:16 54:6
57:11
**careful** 138:15
**carmen** 21:21
**carry** 124:4
**case** 1:11 6:14
8:16 34:4
40:22 90:21
98:9 120:9
140:11,15
154:4,17
157:11
**cases** 88:15
90:18 127:12
**categories**
88:12
**category** 28:2
**cause** 41:6
100:18 122:20
139:9 152:5
**caveat** 158:6
**cbas** 93:13
**cc** 37:16 83:5
**cdc** 132:17,21
133:9,12 134:6
**central** 117:22

**certain** 59:12
59:13 132:15
**certainly** 32:13
52:4 53:4
62:21 64:20
74:10 88:5,10
92:10,12 96:3
118:20 126:16
129:16 133:4
137:10 159:17
**certificate**
172:1 173:1
**certify** 172:4
173:2
**change** 36:20
45:10 47:1
175:4,7,10,13
175:16,19
**changed** 16:3
38:11
**changes** 174:11
176:6
**characterize**
132:19
**charles** 7:3
13:21 14:2
157:9 167:1,7
167:16,21
**chaudhuri** 4:5
9:15
**chco** 6:9,17
54:18,22 55:6
55:9 61:6,14
61:16 62:21

63:1,5,9,14,16
63:18 68:21
69:18 70:3,11
71:14,18 72:5
72:7 74:13
77:11 78:5,10
78:11 79:16
81:8,14 83:15
101:20 114:5
119:9,15,15,20
124:2 126:1
127:7 128:20
129:4,7 159:2
167:13,15
168:6,8,9,12,15
169:4,15
**chco's** 79:22
**chcos** 54:19
55:5 58:11,15
58:15 62:18,18
63:18,20 64:5
64:6,12 67:10
67:14 68:11,18
69:2,11 70:15
71:11,13,22
74:6 77:14
79:10,10 80:10
81:1,4,13
149:16 162:4
167:19 168:2
169:9,14,20
170:18
**cheatham**
129:8,20

**chief** 14:10
21:22 46:10
55:1 99:15
129:8 149:15
162:4 167:14
168:17
**chiefs** 65:8,19
66:22 67:4
74:6 128:13
162:7,8 163:5
167:21 169:20
170:14
**choosing** 132:2
**chose** 50:10
130:10
**chosen** 116:15
116:20
**chris** 9:18
**christopher** 5:5
**christopher.h...**
5:10
**chron** 55:13
**chuck** 13:7
14:1,3,14 38:6
38:11 170:15
170:19
**cio** 1:6,9 3:3,4
3:18 4:3,4
**circuit** 54:12
**cited** 30:9
**civil** 33:14 36:7
**civilian** 55:20
56:1

**claim** 85:12
**clarification**
19:17 29:13
39:6 40:18
55:12 118:15
**clarified**
140:19,20
**clarify** 27:12
128:8 138:11
161:3
**clarifying**
92:14 141:14
149:18
**clear** 29:7 59:9
92:12 144:8
146:10
**client** 144:7
158:5
**clock** 18:4,8,10
**close** 78:15
103:9 104:4
106:2 107:6
**closed** 6:15
78:7 81:21
98:22 103:18
104:1 105:20
106:3,7,17
**closing** 76:1
81:19
**clue** 46:6
**coded** 50:21,22
**collect** 29:2
32:7 33:10
35:9 37:20

144:2
**collecting**
144:15 145:7
**colloquial**
35:17
**columbia**
172:19
**combined**
86:20
**come** 27:19
48:21 97:13
103:3 167:3
**comes** 100:6,10
**comfortable**
132:5 160:13
**coming** 16:7
68:15 118:11
118:14,16
**command**
127:16
**commence** 82:2
**comments**
161:20
**common**
112:12
**communication**
96:18 101:14
137:14 142:2
**communicati...**
39:12,13
140:10,13,18
142:20 144:8
159:14 160:3

**company** 46:9
**comparable**
73:14
**comparing**
121:3
**compile** 42:17
69:4,13 70:2
70:17
**compiled** 17:13
17:16,19,20
**complaint**
119:4 138:1
145:4
**complete** 176:8
**completed**
121:5,10 123:5
174:17
**completely**
47:12 80:11
154:3,16
**completion**
93:22
**complex** 103:1
**complicated**
64:16
**complied** 64:2
**compound**
19:22 20:4
29:20
**concepts**
114:15
**concern** 69:2
69:12 70:16

**concerns** 69:19
**concluded**
171:16
**concludes**
171:10
**conduct** 31:6
148:1 153:11
153:18 154:19
155:2
**conducted**
113:6 154:9
**conference**
13:2 167:4
**confused**
131:11,15
**congress** 124:3
**congressman**
124:13 125:12
**connection**
103:13
**consequences**
31:18
**consider** 77:7
**consideration**
31:1,2
**considered**
156:9
**considers**
147:10,16
**consistent** 64:1
93:12 153:11
**cont'd** 4:1 5:1
7:1

**contained**
133:18 134:19
154:12 169:8
**contemporan...**
119:6
**content** 25:8
**context** 14:20
35:18 53:15
83:10 114:22
115:9 130:20
140:6
**continue** 8:7
37:1 73:6
**continued**
31:16,16 106:9
106:9 114:21
127:21
**continues** 46:8
**continuous**
154:7
**contributor**
19:2
**controllers**
88:6
**conversation**
22:8 46:18
119:15,20
134:7,13,13,18
134:18 135:4
**conversations**
8:5 22:10,14
22:18 23:1
26:2 70:3,15
102:5 133:8,12

133:17,22
135:6,11 141:6
158:5
**cooper** 117:21
139:13
**coopersmith**
99:13
**coordinate**
166:11
**copied** 142:7,19
**copies** 174:15
**copy** 39:22
40:1 41:5 59:6
82:18 120:17
162:18
**correct** 11:2
15:16,20 18:18
19:8 29:19
40:12 41:4
43:1 44:20
46:2 58:12
60:17 64:13
65:4 66:17
67:11 68:13
70:22 72:15
73:18 78:21
82:3 91:4 96:5
98:6,22 99:2
100:1 101:14
104:4 105:21
108:20 110:11
110:15 112:9
121:13 135:12
136:12 139:22

145:8,11,20
148:10,17
149:9 150:5
151:6,19
153:18 162:7
163:6 168:20
169:2,6,16
176:8
**corrections**
176:6
**correctly** 32:9
**cos** 163:2,5
**council** 6:17
55:6 61:6,14
61:16 62:22
63:1,5,9,14,16
63:18 114:6
**counsel** 5:13,21
8:12 9:8,13,20
10:13,19 40:1
40:22 41:9
59:2 110:5
114:1 139:4
141:6 172:11
172:14 173:7
173:10 174:15
**counselors** 16:9
**counsels**
138:20
**count** 67:3
**county** 1:8 3:4
3:17 4:4
**couple** 64:18
84:4 87:9

102:8
**course** 124:10
127:10 155:5
**court** 1:1 8:15
8:22 9:19
34:17 41:6,6
47:12 75:19
80:3 104:20
114:2 160:22
**create** 62:2
**created** 17:22
31:9 61:17
**creating** 157:19
**creative** 118:11
**criteria** 88:22
**critical** 88:14
115:1,13,17
129:11 132:20
135:2 147:12
147:17
**cross** 20:3
32:14 47:6,9
47:11,14,22
126:13 171:8
**crystal** 126:1
**cs** 174:16
**csra** 19:19
20:11
**current** 114:22
115:9,9
**currently** 10:22
**cut** 34:18
**cv** 1:12 8:17

**cycle** 112:14

**d**

**d** 6:1 8:1 15:3
**da** 124:2
**daily** 64:6
**danielle** 3:5
9:12 10:12
**data** 17:12
30:17
**date** 2:3 17:1,2
55:15 69:6
74:21 76:1
78:20 79:22
81:17,18,21
93:11 102:20
103:6,8 104:3
111:18 124:19
125:3 140:7
175:24 176:12
**dated** 44:14
74:14 120:10
158:12
**dates** 65:14
**day** 11:8,17,19
11:20 12:9,11
14:22 16:16,18
16:19,21 21:1
23:18,21 25:7
26:10 37:11
40:10 42:22
45:4 53:19
56:8,14 63:14
63:17 67:20

68:18 78:18
83:16 97:2,11
98:21 107:1,14
115:14,18
176:15
**days** 37:18 75:3
144:13 146:3
174:17
**dc** 2:7 3:20 4:8
4:14 5:8,16
8:20 117:21
**deadline** 38:4
38:12 68:7
69:3 75:18
78:19 79:17
80:4,10,17
98:21 99:3,22
100:4 108:2
**decades** 154:19
**decided** 97:18
98:1,16,17
126:5
**decision** 98:4
129:12 134:16
148:8,17,20,21
149:8,19 150:5
151:19
**decisions**
145:20 151:5
**declaration** 7:3
7:4 38:21
157:9,15,19
158:2,19
160:21 161:22

166:21
**declare** 176:4
**deemed** 110:19
176:6
**defendant** 5:2
**defendant's**
6:10 66:10
160:22
**defendants**
1:14 9:17
**defenders** 4:6
17:18
**defense** 131:7
**deferred** 6:11
63:11,15 64:9
71:19 72:10,12
74:7,18,21
75:14 77:12
78:5,12,19
79:4 80:5,21
102:13 103:10
121:14,16
126:6,18,19
**defining** 30:2
**degree** 31:19
31:20
**deia** 56:10,13
56:19 57:1
109:11
**delay** 144:19
**delegate** 153:15
154:11
**delegated**
153:8 154:22

**delegation**
153:4,22 154:2
**deliberate**
132:18
**deliberations**
38:16
**deliberative**
24:4 38:18
39:14
**democracy** 4:6
17:16,17
**demonstrated**
31:15
**department** 5:6
9:17 87:21
90:22 97:21,22
98:4 100:21
121:7 131:7
**departments**
37:15 38:8
40:7 43:11
58:14 59:22
74:14 149:14
**deponent** 44:3
174:14 176:3
**deposing**
174:14
**deposition** 2:1
8:11,18 10:15
10:19 37:2
47:7,8,13,14,17
47:22 59:4
172:1

**depth** 114:6
**deputy** 13:14
58:15 62:18
126:1
**describe** 12:8
**described** 22:9
36:5 88:20
91:3,5 161:8
**describes** 153:4
**describing**
66:22
**description** 6:6
7:2 20:6 22:1,7
**designated**
165:21
**detailed** 53:5
**details** 40:9
54:10 75:16
**determinations**
99:21 116:5
118:4,9 153:5
153:9,16 155:2
**determine**
86:15 132:14
**determined**
127:12
**determining**
135:1
**dialogue** 63:20
**difference**
45:14
**different** 23:16
25:6 26:14
33:2,7 34:6

45:13,16 63:10
68:1 118:8
130:12 145:6
158:20
**difficult** 36:15
**difficulty** 14:4
**digital** 172:8
173:3
**direct** 70:14
75:17 94:11
120:11 132:10
157:11 159:6
159:10 160:2
**directed** 55:9
58:14 118:4,9
122:6 127:22
128:1 129:9
**directing** 117:8
117:22 139:6
143:18 146:11
**direction** 28:17
40:19 123:9,12
123:15,20
124:6 127:16
129:13 131:12
131:14,21
136:10
**directions**
116:21
**directive** 125:7
**directly** 37:4
69:19,22 77:21
98:12 99:6
100:7,10

**director** 11:1
13:21 22:3
45:8 46:22
62:17 152:12
153:7,15 154:1
154:9,12,22
157:10
**directors** 55:9
58:15 149:17
**disclosure** 6:10
66:10 101:2
162:10 163:13
**discuss** 24:17
24:19 25:2,5,8
26:15 27:9,17
39:16,20 68:11
138:22
**discussed** 25:6
26:20 27:5
67:11,14
100:15 116:9
154:6 162:4
166:15
**discussing**
48:15 134:5
**discussion** 24:3
**discussions**
26:21 27:3
96:13 102:8,11
127:3
**disempowered**
60:11
**dissolved** 105:2

**distribution**
58:16
**district** 1:1,2
8:15,16 80:3
104:20,20
172:19
**division** 1:3
8:16
**dleonard** 3:9
**docket** 41:7
**document**
37:14 44:17
49:12 55:15
66:9,13 90:13
92:2,8,20 93:2
93:14 94:3
96:17 111:7
116:18 120:8
120:15,21
122:2 123:2
137:13 148:6
148:15 149:6
150:4 151:3,9
151:16,18
153:3 154:13
161:2,12,17
**documents**
10:14,18 23:4
23:12 25:17
52:22 93:3
130:16 149:12
151:22 152:1
154:21

**doge** 67:4
163:2,18,19
164:5,7,11,13
164:16,19,22
165:5,9,14,17
165:21 166:3,8
166:12,16
**doi** 99:16 100:6
**doing** 21:8
30:17 32:17,18
32:18 48:1
54:13 90:10
93:22 98:21
136:2 139:6
150:15
**doj** 135:21,22
136:1 140:22
**doubt** 61:7
**downsizing**
50:4
**draft** 24:3
42:18 44:2
**drafted** 24:11
24:16 26:10
38:12 40:11
42:15 49:11,12
**drafting** 24:13
24:16
**drafts** 23:16,20
**drawn** 28:4
**drive** 49:5
**driven** 96:12
**drp** 102:14,18
103:1,10,15,18

**[drp - employees]**

Page 13

104:1,4 139:1
**due** 82:19 83:6
106:22 111:10
**duly** 10:4 172:5

**e**

**e** 3:1,1,5 4:1,1
5:1,1,15 6:1,5
7:1 8:1,1 15:3
15:3 175:3,3,3
**earlier** 72:5
81:18 91:3
**early** 16:12
63:13 73:2
**eastern** 105:5
105:14 106:14
106:18
**easy** 29:18
36:19
**ecf** 104:19
110:7 113:21
**edited** 147:20
**education**
101:17,17
**eeoc** 87:14
135:16
**effective** 33:20
33:22 102:20
103:8 132:22
**effectively**
30:11
**effort** 64:4
**eight** 72:21

**eisen** 5:21
40:22
**either** 22:1
25:19 93:11
111:18 121:13
151:17 169:19
**elected** 49:6,15
**election** 17:22
**electronic**
104:21 161:11
**eleven** 120:1,2
**eligible** 121:14
126:5,17
**elon** 46:9 155:9
**email** 6:12,14
6:17,20 21:20
53:5 73:16
74:8,15 76:12
82:6,16,17,22
83:2,20 88:17
94:12 95:19,21
96:3,8 97:5
98:2 104:18
106:5,21
107:12 111:11
111:11 112:9
113:4 114:5,19
122:13 127:4,5
128:6,10,12,13
139:20,21
142:7,12,17
162:13,16,20
164:10 165:9
168:22 169:11

169:16
**emails** 52:21
61:18 77:16
110:14 125:17
125:18,19
130:7 131:2,3
169:22
**embedded**
163:19
**emphasize**
116:3
**employed**
10:22 16:8,10
16:14,15 17:3
46:9 172:11,14
173:8,11
**employee** 6:13
12:17 15:16,17
15:19 16:1,6
19:8 24:7
28:17,18,21
29:2 30:16
31:13,14 37:20
40:20 53:6
67:9 69:13
71:5 72:14
77:5,17 82:19
92:16 111:10
125:8 126:2,9
146:22 172:13
173:10
**employee's**
114:16

**employees** 1:6
1:8 3:3,4,18
4:3,4,12 8:13
12:15 20:15
25:12 27:8,10
28:7,11 29:17
29:18 31:10
32:7 33:13,14
35:10 36:6,8
41:17 42:1,4
46:1 50:5,15
51:1,10 52:15
53:20 54:2
59:16,20 60:12
60:16,21 61:19
64:2 65:10
67:19 68:13
69:5 70:18
73:13,17 76:8
77:9 78:21
79:6,18 82:3,8
83:22 84:3,8
84:13,20 85:7
85:9,11,21
86:8,11,16
87:7,12 89:2,8
90:15 91:1,12
92:16,21 93:16
94:15,21 95:1
95:2,5,14 96:4
96:8 97:17,19
98:1,6,18
100:14,18
101:1,13

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

102:13 103:5
103:18 107:13
109:11,19
110:11 112:2,6
112:14,18
113:5 114:9
115:12,16
118:22 119:11
121:4,9,14,16
122:7,15 123:5
123:10,17
126:5,7,17
127:14 128:1
128:17 129:4,9
130:10 132:2
132:19,22
133:5,9 134:17
135:1,17
136:10 139:19
141:3 144:16
145:11,17
146:13 147:3
148:9 149:9,21
151:5 153:10
155:10,14
159:6,11,18
160:4 166:16
169:6,19 170:3
174:4 175:1
176:1
**employment**
11:4 16:17,19
17:2 19:19
31:16 58:20

60:5 61:12
72:15 73:11
78:9 114:21
**encouraged**
32:1 53:7
**encouragement**
93:20 94:4
**encouraging**
84:9 114:15
115:8
**ended** 16:22
81:19
**engage** 97:13
114:12
**engaged** 63:20
127:9 130:7
137:19
**ensure** 138:16
147:22
**entered** 105:1,4
**entire** 34:22,22
133:1
**entirely** 24:17
26:4,11 27:16
35:22
**entitled** 43:12
**errata** 174:12
174:14,17
**es** 172:4
**especially**
32:19 35:21
71:17
**esquire** 3:5,11
3:16 4:5,11 5:4

5:5,12 174:1
**established**
148:1
**et** 1:9,13 8:13
8:14 174:4,5
175:1,1 176:1
176:1
**evaluation**
112:8 113:6
**eventually** 73:1
**everybody**
102:17 114:11
**evidentiary**
161:1
**ex** 160:22
**exact** 84:11
**exactly** 16:18
20:6 46:20
47:8 141:2
**examination**
6:2 10:8
**examined** 10:6
**examining**
47:11
**example** 36:20
61:17 90:21
**except** 77:6,6
129:10
**exchange**
124:12
**executive** 13:14
43:13 56:10,13
57:15 153:10
154:5,10 155:5

155:19 165:22
166:1
**exempt** 84:12
84:13 88:10,10
88:15 89:8
114:9 132:8
**exempted** 88:5
89:1 127:13
**exempting**
90:19 91:1
**exemption** 82:7
87:15,17,19
88:16 134:6
135:11 136:8
136:11 140:4
**exemptions**
88:9,19,20,21
93:22 116:8,13
117:5 122:3
127:10,11
130:7,17
**exercise** 90:5
97:14
**exhaust** 160:1
**exhibit** 6:7,8,9
6:10,11,12,14
6:15,16,17,19
6:20,21,22 7:3
7:4 39:8,9,21
40:1,5 41:2
43:4,5,9 44:14
48:17 53:20,21
54:14,15,18
66:5,6,9 75:11

**[exhibit - federal]**                                                      Page 15

75:12 82:12,13
82:16 85:6
101:4 104:13
104:14,15
105:16,17
106:5,13,21
109:21 111:9
113:16,17,20
114:3 120:5,6
141:18,20
143:6,7 153:1
157:7 160:17
160:18,20
162:10,14,18
**exit**  73:10
**expansion**  49:4
**expansive**  49:5
49:14 50:2
51:4,11
**expectation**
30:21
**expected**  30:3
125:6
**experience**
22:22
**experiences**
100:17
**expiration**
74:21 79:4
**expire**  78:19
**expressed**  69:2
69:19 70:16
**expressing**
69:12

**extended**  37:4
80:4
**extent**  24:1
38:14 67:13
128:20 147:19
158:4
**eyes**  85:3
**ezell**  7:3 13:22
14:2,14 38:11
157:10,15,19
158:17 159:9
167:1,7,16,21
168:3,9,12

**f**

**f**  4:13 57:18
**faa**  88:5
**faced**  125:13
**fact**  34:2 51:21
64:11 68:17
69:2 81:1
85:21 89:13,19
91:5,10 96:11
96:11 103:16
103:20 117:15
138:20 141:12
161:22 164:20
**facts**  38:19
39:3
**factual**  145:5
146:5
**fails**  174:19
**fair**  19:17
20:13 57:19

63:7 64:1 66:1
117:16 139:8
**false**  80:11
153:20
**familiar**  19:18
43:17,20 54:20
80:6,8 152:10
161:2
**familiarity**
20:10,14,19
**faqs**  159:4
170:3
**far**  25:10 73:11
125:6 129:18
**fbi**  156:2
**fda**  136:18
**february**  63:13
64:20 65:7,16
65:17,18 66:10
66:14,20,21
67:14,17,22
72:19 75:4,5,6
75:9,21 76:1,8
77:7,18 78:7
78:15,18 79:18
80:5,10 81:22
82:1,6 88:17
90:13 92:3
97:5,19 98:2,8
98:21 99:17,20
100:1,4 101:13
105:4,8 107:14
107:19 108:2
110:14,14

111:11,13,14
113:4 115:14
115:14,18
116:19 120:10
121:8 122:7
123:11,18,22
124:1 125:22
129:2 137:20
139:19,20,21
139:21 142:3
158:13,16
161:6,7,7,7
162:6,10,13,16
162:20 164:3
164:10,12
166:22 167:6
167:10,11,12
167:13,15,19
167:20 168:2,9
168:13 169:1
169:12,15,21
169:21
**federal**  11:4,20
12:15 15:16,17
15:19 16:1,6
19:7,19 20:14
28:12 30:11,14
31:17 33:10
34:14 37:12,18
37:19 42:3
48:16 50:4
52:6,13 54:1
55:2,20 56:1
56:11,20 57:5

[federal - form]                                                          Page 16

57:17 58:20
60:5,16,20,20
61:12,12,19
65:20 70:22
72:14,15 73:6
73:11,13,17
76:5 77:15
89:15 92:3
94:15 108:19
109:3 110:10
121:6 144:1
147:10 152:14
156:9 163:9,20
165:20
**federation**   1:5
  1:7 3:2,3,17
  4:2,3,12 8:13
  174:4 175:1
  176:1
**feedback**
  128:16
**feel**   160:13
**feelings**   47:16
**fellow**   27:1,2
**felt**   132:5
**fewer**   33:13
**fielding**   77:22
  78:2
**file**   57:13 138:5
**filed**   8:14 41:6
  41:7 110:3,5
  117:14,18
  120:8,21,22
  145:4 146:7

150:10,11,18
152:8 158:11
**filing**   104:21
**fill**   110:18
**filled**   12:17
**final**   127:17
  153:8,16
**financially**   9:4
  172:15 173:11
**fine**   135:18,20
  135:22 136:1
  156:5
**fingerprinted**
  21:10,11
**finish**   13:19
  126:22
**fire**   28:16,18,21
  50:22 52:6
  80:10 95:6,15
  114:11 119:10
  122:14 125:7
  136:19 137:2,9
  137:10,11,15
  146:17,20,21
  148:9
**fired**   51:15,16
  51:20,21 52:14
  96:5,9,20
  145:18
**firing**   51:9,9
  127:18
**firings**   139:6
**firm**   8:22 16:8
  127:16

**first**   10:4 19:7
  21:1 49:2
  53:19 58:9
  60:4,16,21
  61:19 65:16
  71:20 78:9
  97:2,11 115:10
  120:14,20
  122:5 131:16
  150:18 154:3
**fitness**   31:16
  152:13
**five**   108:6
**flexibility**   73:2
**flip**   115:10
**flra**   19:11,18
**focused**   31:7
  132:13
**follow**   114:5
**followed**   136:9
**following**   56:14
  105:3 138:17
**follows**   10:6
  124:3
**food**   136:18
**footnote**   47:3
**foregoing**
  172:3,4 173:4
  176:5
**forest**   6:19
  120:9 121:4
  122:9 123:3
**fork**   6:15 79:4
  81:18 98:22

105:19 106:6,7
106:17 107:6
**form**   21:3 63:8
64:14 65:5,21
67:12 68:19
69:7,15,21
70:7,13 71:1
72:16 73:19
74:2,9 76:9,14
77:1,19 78:22
79:7,12,20
80:7,15 81:3
81:11 82:4
83:9 84:1,22
85:14 86:2,12
87:20 89:5,21
90:16 91:13
92:6,22 93:18
94:5,17 95:16
96:6,21 98:13
98:15 99:1,7,8
99:10 100:2,9
101:15 103:7
103:19 104:9
105:9,22 107:8
107:16,22
108:21 109:5
109:13 110:21
112:10 113:8
115:20 116:11
116:22 119:1
119:13 121:21
122:10 123:14
124:9 126:10

| | | | |
|---|---|---|---|
| 128:5 129:15 | 61:22 129:3 | **fslmrs** 19:20 | 90:16 91:13 |
| 131:13 133:2 | 131:7 133:17 | **fuchs** 5:4 9:16 | 92:6,22 93:18 |
| 133:10,20 | **foundation's** | 9:16 11:12 | 94:5,17,22 |
| 134:3,20 | 17:5 19:5 | 14:11 18:19 | 95:7,16 96:6 |
| 135:13 136:13 | **four** 37:18 | 19:21 20:16 | 96:21 98:13 |
| 136:22 137:7 | 127:18 139:6 | 21:2,6 22:12 | 99:1,8 100:2,9 |
| 137:17 140:1 | 139:13 150:19 | 23:6,14 24:1 | 101:15 103:19 |
| 142:22 145:12 | 171:12 | 25:21 26:7,18 | 104:9 105:9,22 |
| 145:21 146:18 | **framework** | 29:20 32:10 | 107:8,16,22 |
| 147:4,6,7,13 | 53:6 91:20 | 33:15 35:11 | 108:7,9,21 |
| 148:11 149:10 | **francisco** 1:3 | 36:9 37:8,22 | 109:5,13 |
| 150:7 151:7,20 | 3:14 8:16 | 38:14 39:11 | 110:21 112:10 |
| 152:15 153:19 | **franscisco** 3:8 | 44:3,21 46:3 | 113:8 115:20 |
| 154:14 155:3 | **free** 132:8 | 46:11 48:2,5 | 116:11,22 |
| 156:12 157:20 | 141:11 | 49:17 50:6,17 | 119:1,13 |
| 159:12 160:5 | **freestanding** | 51:6,13,22 | 121:21 122:10 |
| 163:10,21 | 103:11 | 52:9,17 54:3 | 123:14 124:9 |
| 164:6,14 165:2 | **freeze** 55:21 | 56:5 57:20 | 126:10 128:5 |
| 165:7,11,15 | 56:2 88:11 | 58:4,22 61:1 | 129:15,22 |
| 166:5 170:1,8 | **frequency** 63:6 | 61:21 63:8 | 131:13 133:2 |
| **formal** 57:14 | **fresh** 33:18 | 64:14 65:5,21 | 133:10,20 |
| 112:20 113:11 | **friday** 14:22,22 | 67:12 68:19 | 134:3,8,20 |
| 132:13 | 15:7,15 22:8 | 69:7,15,21 | 135:13 136:13 |
| **former** 46:22 | 24:22 46:16 | 70:7,13 71:1,7 | 136:22 137:7 |
| **forms** 12:17 | 64:20 65:8,12 | 71:12 72:16 | 137:17 140:1 |
| **forward** 31:2 | 65:13,13,16 | 73:19 74:2,9 | 141:8 142:22 |
| **foundation** | 102:9 114:5 | 76:9,14 77:1 | 145:12,21 |
| 17:17 18:15 | 125:22 128:20 | 77:19 78:22 | 146:18 147:4 |
| 21:3 23:7 | 142:3 | 79:7,12,20 | 147:13 148:11 |
| 26:19 29:21 | **frivolous** 47:20 | 80:7,15 81:3 | 148:18 149:10 |
| 32:11 38:1 | **front** 48:17 | 81:11 82:4 | 150:7 151:7,20 |
| 44:22 46:4 | 54:13 111:12 | 83:9 84:1,22 | 152:15 153:19 |
| 50:7 51:7 52:2 | 117:20 139:12 | 85:14 86:2,12 | 154:14 155:3 |
| 52:10,18 59:1 | 162:16 | 87:20 89:5,21 | 155:15,18,21 |

**[fuchs - handed]**

Page 18

156:5,12
157:20 158:4
159:12 160:5
163:10,21
164:6,14 165:2
165:7,11,15
166:5,9,18
170:1,8 171:4
171:7 174:1
**full** 44:16 84:11
87:17 102:22
**fund** 4:6
**further** 111:21
127:1 171:4
172:13 173:9
**fuzzy** 113:21

**g**

**g** 8:1
**game** 122:19
**garcia** 21:22
**gardner** 129:4
129:7
**gather** 28:1
**gating** 34:15
**gc** 13:14
**gene** 5:22 8:20
**general** 5:13
12:9,11 19:10
19:14 22:6
23:11 88:8,8
138:20 139:3,3
**generals** 47:2

**generous** 73:12
73:14
**george** 104:22
**getting** 31:19
78:11
**give** 18:6 33:18
43:15,19 44:3
53:1 76:7
108:1 124:21
159:1
**given** 22:1
32:19 57:22
68:7 79:22
80:17 81:6
106:8 136:20
140:4 171:11
176:9
**giving** 38:4
80:9 84:6,7
131:12 140:7
**go** 8:8 14:7
18:8 21:6
28:22 33:4
34:10,17 38:3
44:6 48:2
50:22 55:13,14
59:8 62:3,6
68:6 87:9 90:4
111:9,21 123:1
123:4 124:17
124:19
**goes** 14:3 48:22
125:6

**going** 8:3 18:2
18:4,6 21:15
25:13 29:11
30:13,21,22
31:2 33:5,6
34:18,20 35:3
36:21,21 39:2
39:7 43:3,15
43:16,19 44:5
47:13,22 48:8
53:17 59:2
62:8 75:15
83:21 88:13,13
89:12 96:4
104:4,17,18
108:5,10
113:19 120:11
121:18 125:16
137:21 141:13
143:6 144:8
150:14 155:15
156:19 157:5
166:21
**good** 8:2 9:12
10:12 22:15
32:6 61:3
108:7
**government**
1:6 3:3 4:3,12
8:13 30:14
60:15 64:1
73:8 95:19,21
96:3,8 148:3
174:4 175:1

176:1
**granted** 87:16
89:4
**granting** 87:19
**grants** 88:4
**great** 20:2,2
114:6
**group** 64:4
**gsa** 101:17,17
**guess** 49:19
95:18
**guidance** 6:7
40:7 56:2,10
56:12,15,16,18
56:22 57:11,14
61:14 64:8
74:15,18 77:13
97:2 112:12
114:10 125:18
126:21 131:2
138:11 140:5
140:20 158:22
**guy** 34:11
**guys** 138:4

**h**

**h** 6:5 7:1 175:3
**half** 144:11
**hall** 5:5 9:18
**hand** 10:1
39:22
**handed** 66:8
82:15 104:18
113:20 120:4

[handed - include]

Page 19

120:16 160:20
**handle** 103:14
**hands** 75:19
**happen** 15:4
25:7 63:18
**happened**
13:11 71:16
80:1,21 100:16
113:22 114:11
128:21 130:6
132:2 167:10
**happening** 32:3
63:17 85:16
125:12
**happens**
102:16,18,21
**happy** 22:21
**hard** 142:18
**harris** 126:2,8
127:21 128:4
**head** 13:8 75:9
152:3 162:15
**heads** 37:15
38:8 40:6,6
42:22 43:10,11
44:15,15 55:9
56:20 58:12,14
58:19 59:22
74:13,13
149:13,13
**hear** 100:8
**hearing** 102:1
161:1

**held** 63:1,3,6
63:10 65:2
75:2
**help** 23:4
**helpful** 120:18
**helps** 162:18
**hereto** 172:15
173:11 176:7
**heritage** 17:4
17:20 18:15
19:1,4
**hey** 34:11
87:10 103:4
**high** 31:20
132:15
**higher** 34:14
**highest** 114:22
**highlighted**
120:17 121:2
**hiring** 55:20
56:1 88:11
**hold** 37:1
**holiday** 11:20
12:1 37:19
**honestly** 142:8
**hour** 11:18
107:10
**house** 152:20
**hr** 12:20,20
55:9 58:15
**hud** 101:18
**human** 21:22
55:1 149:15,16

| **i** |
|---|
| **idea** 26:5,15,16 |
| 27:3,13,21 |
| 28:22 29:3,15 |
| 32:6 33:3,9,12 |
| 33:17 35:6,10 |
| 35:22 46:13 |
| 49:21 60:10 |
| 73:4 117:8 |
| 127:15 137:1 |
| 139:4 |
| **ideas** 26:21 |
| **identification** |
| 39:10 43:6 |
| 54:16 66:7 |
| 75:13 82:14 |
| 104:16 105:18 |
| 109:22 113:18 |
| 120:7 141:21 |
| 143:8 153:2 |
| 157:8 160:19 |
| **identified** 43:9 |
| 82:8 101:10 |
| 115:13,17 |
| 116:1,7,13 |
| **identify** 28:13 |
| 28:14 29:12 |
| 30:4 41:17 |
| 85:7 116:18 |
| **identifying** |
| 29:16 114:8 |
| **ignore** 89:20 |

**ignored** 89:13
**illegal** 150:15
**immediate**
113:5
**immediately**
67:20 93:11,16
94:16 95:6,15
111:18 112:6
128:3 132:22
138:10 140:19
141:4 146:10
**implementati...**
57:4,8
**implementing**
57:14
**important**
31:18 41:20
116:3 128:8
**impose** 91:15
91:17
**imprecise**
115:22
**inaccurately**
20:8
**inappropriate**
47:12
**inauguration**
11:7,10,14,17
11:19 12:13
14:22 16:16
**incident** 126:20
**include** 42:16
42:18 68:1

included 73:3 76:17
includes 40:17 50:4 62:18 162:3
including 9:8 19:19 37:19 48:16 93:13 106:12 121:7
indicated 84:7
indicates 122:17
individual 114:14 148:2
individual's 110:19
individuals 66:13 100:7,11 102:2,3 163:19 164:4 165:20
influencing 57:16
info 17:15
information 28:1 89:3 110:6 157:16 157:18 158:2,8 158:16 159:1 161:18,21
initial 12:17 28:6,11 30:7 56:9,12 78:16 139:10

initially 40:13 42:12 49:20 75:2 136:9 139:8
input 26:11 63:19
inspection 87:16
inspector 47:2
instances 87:9 87:10
instruct 24:3 38:17 52:6 158:5
instructed 7:6 67:7 144:1
instructing 54:1
instruction 24:8 42:16,19 60:3 67:10
instructions 60:15,19 61:11
intent 40:18 64:2 130:5 131:1 138:12
intention 146:14
interacted 16:3
interaction 102:12 103:14
interconnected 34:8

interested 9:4 172:15 173:12
interior 97:22 98:5 100:21 101:6
internal 29:10 38:15
interpreted 28:20
interrupt 18:2 36:22
intra 24:2
introduced 13:7 14:21
invitation 67:4
invoking 132:12
involved 19:4 27:2 76:3 78:4 78:11 133:8,11 133:17 135:10 135:14 140:10 140:12,17
irrelevant 154:16
irs 131:7
issue 38:20 39:3 64:17 77:18 102:14 137:20
issued 23:18,21 27:8 37:12,14 40:13 41:3 42:22 48:15

53:18 54:1 55:18 58:19 67:6 80:4 97:10 118:14 140:11,11 143:22 152:11
issues 33:19 103:1 138:22

**j**

j 15:3
james 82:17
january 11:5 11:19 13:22 14:14,17 15:5 16:7,16,20 21:9,11,15 23:5,12,13,21 25:20 26:16 27:9,10,18 35:9 37:12,19 38:12 40:5,12 40:14 41:2,16 42:5,16,18 43:10 44:14,20 45:4,7,17 46:21 48:16 53:18 54:1 55:16,18 56:3 56:8,14 57:2 57:10 58:2 63:5 65:3 67:7 67:9 68:8,10 68:18 69:3,9

70:2,15,16
71:19 72:6,8
72:11,13,20
73:17 74:14
75:14,21 76:6
78:6,14,17
80:22 85:2,6
90:13 92:3,19
116:19 140:20
143:22 145:19
148:7,16
165:14 166:17
**job** 2:9 21:19
21:20 22:1,6,7
24:19
**joint** 55:22
57:3,6
**judge** 36:19
37:2 39:5 59:5
104:22 106:13
117:21,21
120:9 138:10
139:12 146:9
161:4
**judge's** 110:6
161:20
**judgment**
34:17 36:14,16
36:17,20
**jurisdiction**
59:13
**justice** 5:6 9:17
87:22 90:22

**k**

**kaiser** 2:5 8:19
**kaylee** 100:16
**keenan** 27:2,5
27:13
**keep** 28:14 84:4
84:21 85:12,22
86:9 87:6,11
116:1,8 131:8
134:16 135:17
**key** 163:2,8
**kidd** 13:13
**kind** 13:15 15:5
15:6 24:2
30:20 31:20
34:3,8,9 35:17
53:11 63:19
64:8 73:10
84:9,14 86:19
89:10 93:22
95:20 103:1
114:4,8,12,13
114:14,15
115:7 116:3,4
117:3,9,13
118:7,11
122:18 124:13
124:17,22
125:4,5,14,15
125:20 126:12
126:13 128:7
128:20 130:4
132:5 135:5

138:21 146:5
152:6
**king** 11:20
**kmiec** 27:2
**knew** 15:21
74:4 86:3
91:12 95:15
158:21,21
159:17
**know** 12:15,20
13:7 14:2
15:22 20:6
22:19,20 25:11
25:16 28:3,4
29:5,13 30:21
31:13,18,19,22
32:2,17 33:21
33:22 34:2,10
34:11 36:16
38:6 39:6 42:7
42:8,10,14
53:7 58:16
59:12,12,14,14
59:15,17 60:8
61:7 62:20
63:4,19,22
64:2,3,17
68:14 71:21
72:2 73:9,22
74:3,4 75:2,7
76:16 83:15
84:7,8,10
85:20 87:10
88:4,9,12,14,22

89:7,10 90:3,6
90:8,9,10,19,20
91:6,21 92:14
93:3,4,6,20
96:13 97:13,15
102:21 103:4,6
105:10,12,13
109:6,8 111:2
111:3,5 112:13
112:17,18,19
112:22 114:8
114:10 115:4,5
116:2 117:1,2
117:7,21
118:15 119:18
120:13 122:1
122:21 124:11
124:12,17,19
124:20,22
125:2,4,9,10,11
125:12,13,15
125:16,17,19
126:12 127:1,4
127:5,6 128:15
128:17 129:5,5
129:6 130:3,3
130:8,8,10,12
130:13,14,18
130:18,21
131:22 132:1,4
132:10 133:5
134:9,11,12,14
134:15,17,22
135:4,15,18

136:3 137:10
137:22 138:14
138:16 139:15
140:3,5,7
141:1 142:8,9
143:11 144:13
144:13 145:14
146:6,9,14
147:15,16,18
150:15 151:8
151:10 154:6,8
154:8 156:2
158:20 159:19
159:19,21
160:15 161:4,8
161:9,16
163:13,22
165:3,17
167:17,18
168:5,11,14,14
170:20
**knowing**
162:14
**knowledge**
12:6 15:18
17:10 32:3
61:11 79:8
86:7 89:18
90:1 98:4
100:6 119:6
128:8 130:12
135:6 157:16
160:9 161:19
162:1 172:10

173:6
**known**  16:4
57:18 90:7
101:17 118:13
150:17 160:2
160:12

**l**

**l**  3:19 5:7 15:3
**labor**  156:9
**lack**  21:2 23:7
26:18 29:21
32:10 37:22
44:21 46:3
50:6 51:6 52:1
52:10,17 58:22
61:21
**land**  39:7
**language**  48:21
49:8,10 50:22
53:11 120:11
120:19 121:11
121:18 128:2
143:13,16
147:9 149:18
150:17
**law**  16:8 91:19
153:12
**laws**  19:18
138:15
**lawsuit**  110:3
117:8,13,18,20
118:1,1,2,5,6
118:13 119:7

131:18 138:5
139:10,12,15
144:18 146:6
150:10,11,18
152:7
**lawsuits**  118:19
**lawyers**  166:11
**lay**  85:3
**lead**  32:20,21
**leadership**  12:7
33:17 170:11
**leading**  19:21
20:16 26:7
29:21 32:11,13
32:19 50:17
**leads**  67:5
163:2,18
164:11
**learn**  98:12
**learned**  67:18
68:4 98:8
141:6 159:20
**leave**  25:15
26:22 27:4,14
40:8 54:9
72:22 109:12
**led**  161:19
**legal**  64:16
117:13,17
118:11 127:17
138:6,19,22
139:16 144:18
145:2 146:5
150:9 174:22

**leonard**  3:5 6:3
9:12,13 10:9
10:13 11:15
14:13 19:3
20:12,20 21:14
23:3,10,19
24:6,9 26:3,13
27:6 32:4,14
33:1 34:18
35:2,13 36:10
37:10 38:10,19
39:16,20 40:3
40:21 41:1
44:5,12 45:2
45:19,21 46:7
46:14 47:4,15
48:3,7,13 50:1
50:13 51:3,12
51:18 52:5,12
53:13 54:11
56:7 58:1,6
59:2 60:1 61:8
62:7,15 63:12
65:1,11 66:3
68:5 69:1,10
69:17 70:4,10
70:19 71:3,10
72:3 73:15,21
74:5,11 76:11
76:19 77:4
78:3 79:2,9,15
80:2,12,18
81:7,16 82:10
83:12 84:15

85:5,19 86:6
87:1 88:1
89:14 90:11
91:2 92:1,17
93:9 94:2,13
94:20 95:3,10
96:1,16 97:4
98:19 99:5,11
100:5,12
101:19 104:2
104:12 105:15
106:4 107:11
107:20 108:4
108:17 109:1,9
109:17 111:8
113:2,14 116:6
116:17 117:15
118:17 119:8
119:21 120:2,3
122:4 123:7,21
125:21 127:20
129:1,19 131:4
132:16 133:7
133:15 134:1,4
134:10 135:8
135:19 136:17
137:3,12
139:17 140:8
141:9,16,19
142:1 143:3
145:16 146:15
147:1,8 148:5
148:14 149:2
150:1 151:1,15

152:9,18
153:21 154:20
155:7,16,22
156:4,7,13,16
157:4 158:1,9
159:15 160:6
163:15 164:2,9
164:18 165:4,8
165:12,18
166:7,14,20
170:6,12 171:1
171:6
**letter** 22:4,19
53:3 83:17
98:15 99:7
108:19 109:2
147:6
**letters** 53:3
99:10 103:12
**lifted** 81:20
104:7,11 105:8
105:12,12,21
**lifts** 106:14
**limited** 45:16
54:7 88:22
**line** 7:7 37:16
82:19 83:5,6
111:17 163:1
175:4,7,10,13
175:16,19
**lines** 136:7
**list** 17:13 42:4
42:11 66:13,17
66:20 67:8

68:2 70:17
86:20 94:1
97:14 103:6
133:1,18
162:11 164:3
164:12
**listed** 17:7,10
17:10 18:1,14
42:9,13 55:15
59:21 66:14
164:10
**listing** 42:1
85:8
**lists** 28:1 32:7
55:22 68:12
69:4,13 70:2
70:21 71:5
76:7 77:5,14
78:1 84:3,17
84:20 85:3,11
85:13,17,21
86:8,10,18
96:19 97:7
108:3 127:11
134:5 144:2,15
145:7
**litigating**
137:20
**litigation** 65:7
114:2 137:19
**little** 68:6 72:4
111:21 115:22
142:18

**llp** 3:6,12
**location** 2:5
8:18
**long** 11:16
30:14
**longer** 37:3
75:3 147:10
**look** 20:5 22:4
33:18 40:4
42:7,10 44:14
48:20 49:2
55:11 82:11
85:18 86:4
101:2 109:18
114:15,19
115:8 116:4
130:19,19
142:2 158:12
162:10
**looked** 25:17
114:13
**looking** 30:3
55:19 138:1
169:1
**looks** 41:5,7
67:2 83:10
110:2 120:22
**lose** 141:17
**losing** 125:13
**lot** 36:17,18,18
53:10 64:5
90:8 102:11
103:3 107:18
112:14 118:10

138:18
**lots** 59:19
63:10 121:15
128:15
**luther** 11:20
**lying** 69:20
70:12 79:19
81:10,13
119:12 124:8
125:11,18
126:9,13,14,15
129:14,17,21
130:4

**m**

**made** 21:19
38:12 64:3
72:14 73:12
81:4 92:12
98:4 99:21,21
124:22,22
129:12 176:5
**make** 28:1,14
33:19,21 52:20
102:19,19
103:7 134:16
138:2 144:8
145:20 146:10
148:8,17,20
149:8 150:5
151:4,18 153:4
153:8,16 155:1
159:22

**makes** 32:20
154:2
**making** 94:1
97:14 116:5
148:21 149:19
**managed**
147:21
**management**
1:13 5:3,14
8:14 11:2
121:9 124:7
126:4 129:8
152:12 174:5
175:1 176:1
**managers**
132:17
**march** 2:3 6:21
40:15 92:11,18
120:22 143:5
143:10,10,21
143:21,22
144:10 148:6
148:15 149:3
150:3 151:3
152:11 153:14
154:1 161:1,14
161:15
**mark** 39:8 43:4
54:14 66:4
75:11 82:11
104:13 105:16
109:20 113:15
119:21 141:13
143:4 152:19

157:5 160:16
**marked** 39:9
40:5 43:5,8
54:15 66:6,9
75:12 82:13,16
104:15 105:17
109:21 113:17
113:20 120:5,6
141:20 143:7
153:1 157:7
160:18
**marking** 39:21
**martin** 11:20
**maryland**
118:7
**massachusetts**
80:4 104:20
**matt** 9:14
**matter** 8:12
**matthew** 3:16
**mblumin** 3:21
**mean** 18:21
20:9 25:10
28:16 32:12
33:20 35:16,17
38:3 41:20
51:9 52:20
53:1,14 59:10
60:7,18 78:6
85:1 91:20
94:6 96:10
97:1 103:13
112:17 116:14
121:1,2,22

122:11 124:11
124:16 128:7
130:6,8 133:13
134:21 137:9
137:18 138:9,9
138:18 144:12
147:11 151:10
151:22 159:1
164:8,17
166:10
**meaning** 12:9
23:21 78:14
**means** 83:7
114:22 165:17
**meant** 115:22
138:19 148:21
149:5
**mechanism**
34:15 91:8
95:20
**media** 8:10
62:9,13 108:11
108:15 156:20
157:2 171:12
**meeting** 15:1,7
15:12,19 24:22
25:3 46:17
62:18 63:14,16
69:11 128:12
129:3 130:9
159:2
**meetings** 63:1
64:12 65:2
67:9 78:5

161:8,9
**member** 19:2
124:3
**members** 13:5
13:14
**memo** 27:4,8
27:16,22 28:13
32:6 33:10
35:5,8,21
37:11,12 38:2
38:7 40:10,13
41:12,21 42:3
42:15 44:19
45:8,9,18,22
46:16,19,21
50:20 53:20,21
54:6 55:22
56:9 57:6,18
57:21 67:7
68:7 74:12
85:2,6 92:11
92:19 97:10
144:11 148:7
148:16
**memoranda**
48:15,20 54:13
55:19 58:19
60:3 152:11
**memorandum**
6:11,16 24:3
40:6 41:3
42:21 43:10,18
43:21 44:2,14
49:3 56:17

57:3,10,11
58:3 75:15
76:6 86:10,14
143:18 144:1
145:19
**memorandums**
45:4 55:8
58:10
**memory** 75:4
**memos** 23:16
23:21 24:13,17
25:2,5,8,19
26:1,4,9,10,15
26:16 53:17
54:1 55:10
58:13,17 59:16
59:19 60:12,14
61:6 109:16
**mention** 167:9
**mentioned**
81:18 118:8
139:10 140:15
**mentioning**
30:1
**met** 13:4 14:14
14:17,20 15:2
15:14 132:14
155:9,13
**micah** 129:7
**microphones**
8:4
**midatlantic**
174:16

**might've** 25:6
102:10 139:2
158:19 159:2
161:15 168:4,5
**miller** 13:13
**mind** 36:20
**minimum**
129:10
**minute** 43:22
**minutes** 108:6
156:18
**misinformed**
131:11
**mission** 88:13
88:14 114:17
115:1,13,17
116:4 129:10
132:19 135:2
147:11,17
**moment** 24:21
44:13 86:1
**monday** 15:5
57:2 65:9,14
65:17 102:9
115:14,18
**month** 144:11
**months** 72:18
72:21
**morning**
106:12
**motion** 160:22
**move** 34:20
39:7 45:19
47:4,20

**mspb** 28:3,4
30:10 33:13
**multiple** 155:4
155:5
**municipal** 1:8
3:4,18 4:4
**musk** 155:9
**musk's** 46:9
**mute** 8:6

**n**

**n** 3:1 4:1 5:1
6:1 8:1
**name** 8:20
12:21 13:1,3
14:2 57:13
66:17
**named** 27:1,2
126:1
**names** 29:2,9
33:11 35:9
37:20 42:9,11
42:13,17 142:4
142:6,14,16
164:4
**narrative** 34:19
**narratives** 37:5
**national** 129:2
131:6 133:16
**nature** 111:2
**nearly** 144:10
**necessarily**
28:4

**necessary** 49:5
   123:9,16 176:6
**need** 14:6 59:6
   112:2
**needed** 19:18
**needs** 31:2
   114:14 130:20
**neither** 172:11
   173:7
**never** 19:1 29:7
   36:1 40:19
   47:8 51:14,15
   70:20 71:4,14
   71:15,22 72:1
   76:15 80:1
   81:5,5,13
   92:15 99:3
   100:3 119:14
   119:19,20
   121:15 122:13
   122:14 125:7
   146:14,20,21
   148:12
**new** 13:21 14:9
   33:17 53:19
   97:2
**news** 17:14
**ngo** 17:11,13
**nice** 126:12
**night** 13:19
   126:3
**nine** 72:18
**noah** 2:2 7:4
   8:11 10:3 38:4

69:22 171:11
   174:6 175:2,24
   176:2,4,12
**nomination**
   156:9
**non** 34:20,21
   43:13 45:16,20
   54:6 60:7
**norm** 40:21
**norman** 5:21
**northern** 1:2
   8:15
**northwest** 2:6
   3:19 4:13 5:7
   5:15 8:19
**notary** 172:18
   176:13,19
**note** 8:4 40:14
   41:20 42:6
   45:6 55:3
   143:18 174:11
**noted** 176:7
**notes** 169:11
**noteworthy**
   115:3
**notice** 94:14,18
   95:4,8,13
   104:21 128:2
**notices** 102:17
   103:22 123:10
   123:16 127:22
**noticing** 9:11
**notification**
   104:19 128:3

**notified** 121:8
   126:3
**notify** 121:4
**notwithstandi...**
   146:16
**nsf** 129:8
**nuclear** 87:15
   87:16 136:6
**number** 8:17
   40:2 48:17
   50:4 129:10
   162:14 171:12
**numbers**
   145:15
**numerous**
   60:12 154:5

**o**

**o** 8:1
**o'toole** 104:22
   106:14
**oath** 9:3
**obey** 138:15,16
**object** 36:6
   100:9 163:10
**objection** 11:12
   14:11 18:19
   19:21,22,22
   20:16,17 21:2
   21:3 22:12
   23:6,7 24:1
   25:21 26:7,8
   26:18 29:20,21
   29:21 32:10,11

35:11 36:9
   37:22 38:14
   44:21 46:3,11
   47:11,19 49:17
   50:6,17,18
   51:6,13,22
   52:1,1,9,10,17
   54:3 56:5
   57:20 58:4,22
   59:1,4 61:1,21
   63:8 64:14
   65:5,21 67:12
   68:19 69:7,15
   69:21 70:7,13
   71:1,7,12
   72:16 73:19
   74:2,9 76:9,14
   77:1,19 78:22
   79:7,12,20
   80:7,15 81:3
   81:11 82:4
   83:9 84:1,22
   85:14 86:2,12
   87:20 89:5,21
   90:16 91:13
   92:6,22 93:18
   94:5,17,22
   95:7,16 96:6
   96:21 98:13
   99:1,8 100:2
   101:15 103:19
   104:9 105:9,22
   107:8,16,22
   108:21 109:5

**[objection - opm]**

| | | | |
|---|---|---|---|
| 109:13 110:21 | **occur** 138:4 | **okay** 9:22 | **once** 38:16 59:3 |
| 112:10 113:8 | 150:12 | 10:10 13:21 | **ones** 12:6 23:17 |
| 115:20 116:11 | **occurred** | 14:6,9 18:9 | 23:17 55:15 |
| 116:22 119:1 | 117:11 134:13 | 21:7 34:18 | 93:6,7 103:5 |
| 119:13 121:21 | 146:2 | 39:21 40:2 | 106:11 116:1,7 |
| 122:10 123:14 | **occurring** | 41:10,12 43:8 | 124:18 125:1 |
| 124:9 126:10 | 135:1 | 44:13 48:7,14 | 131:19 132:14 |
| 128:5 129:15 | **offer** 20:21 | 48:20 49:13 | 133:12,13 |
| 129:22 131:13 | 21:8,19,20 | 50:2 53:17 | 137:10 169:20 |
| 133:2,10,20 | 22:4,19 72:14 | 54:12 55:12,18 | **open** 37:2 75:2 |
| 134:3,8,20 | 72:17 73:12,14 | 57:9 58:2,9 | 102:15 |
| 135:13 136:13 | 74:22 | 62:7,16 66:4 | **opinion** 119:4 |
| 136:22 137:7 | **office** 5:13,13 | 70:11 75:8 | **opm** 6:20 11:7 |
| 137:17 140:1 | 8:14 11:1 57:3 | 78:18 82:11 | 12:2,3,8,12 |
| 142:22 145:12 | 57:7 73:5,10 | 83:6 103:16 | 13:21 14:9 |
| 145:21 146:18 | 86:18 102:1 | 104:7,13,17 | 15:15 16:8 |
| 147:4,13 | 121:8 124:7 | 105:16 106:5 | 20:22 21:22 |
| 148:11,18 | 126:3 152:12 | 106:13 108:4,9 | 22:3,11,15,21 |
| 149:10 150:7 | **officer** 21:22 | 119:21 129:7 | 23:5,9,11 |
| 151:7,20 | 55:1 129:8 | 135:9 142:2,13 | 24:14 25:1 |
| 152:15 153:19 | 172:1,2 | 143:4,16 | 29:3,17 36:3 |
| 154:14 155:3 | **officers** 149:16 | 152:19 155:18 | 39:13 40:6 |
| 156:12 157:20 | **offices** 1:12 5:2 | 155:21 156:6 | 41:3,22 42:4 |
| 159:12 160:5 | 56:19 57:1 | 156:16 158:12 | 42:17,21 43:10 |
| 163:21 164:6 | 174:5 175:1 | 159:22 160:11 | 45:8 46:10,17 |
| 164:14 165:2,7 | 176:1 | 160:16 161:14 | 46:22 48:15 |
| 165:11,15 | **official** 157:17 | 161:17 162:6 | 49:3 52:13 |
| 166:5,9,18 | **officials** 65:3 | 163:1,5,18 | 53:14,16 54:19 |
| 170:1,8 | 131:6 | 164:3 166:21 | 54:19 55:18 |
| **objections** 9:5 | **oh** 19:16 21:4 | 167:15 168:8 | 56:1,9,19 57:3 |
| 23:14 33:15 | 33:4 91:18 | 171:1,6 | 57:7,10 58:11 |
| **obviously** 91:5 | 113:19 120:16 | **omb** 56:1 57:3 | 58:20 59:13,18 |
| 94:10 138:9 | 138:2 142:8,9 | 57:7 58:17 | 59:21 60:3,14 |
| 158:21 | 150:14 | | 60:19 61:6,11 |

61:13,17,18
62:1,18 63:14
64:8 66:10,15
67:6 69:5,14
70:20 71:4
72:13 73:16,16
74:1,12 82:1,5
83:21 84:18
85:8,21 87:18
89:3,4,9,16,20
90:13 91:8,11
92:3,4,8,20
93:15 94:15
95:5,14 96:2
97:5,13 100:1
100:8 103:3
106:5,18
107:12,21
108:19 109:3,7
109:10,18
112:5 114:20
115:2,11
116:18,21
117:8,22 118:4
118:4,9,20
121:9,13 122:6
122:21 126:4
127:17 128:3
129:9 131:12
132:20 134:2
135:5 136:20
139:13 140:11
143:18 144:16
145:8,18

147:10,16
148:7 149:7
150:4,20 153:7
153:15 154:1,9
154:12,18
155:1 157:10
159:5,9,17
160:2,4 165:5
**opm's** 115:4
131:21 136:10
**opm.gov** 5:17
**opportunity**
84:12 97:12
112:15
**opposed** 86:9
**opt** 73:9
**optimizing**
117:10
**orally** 22:2
**order** 40:16
55:13 57:15
59:5 81:5,6,14
104:22 105:1
112:8 119:18
166:2
**ordered** 82:1
91:11 107:21
118:21 124:4
146:9
**ordering**
119:10,16
**orders** 56:10,13
81:2,9 89:20
154:5,11 155:5

165:22
**organizational**
130:20
**original** 74:20
75:1 76:1
98:20 99:22
104:3 144:11
**originally**
78:20
**outcome** 9:4
172:16 173:12
**outside** 139:6
154:3 160:8
**overlapped**
16:21
**overrun** 155:17
**own** 10:18
24:17 27:17
35:8,16,17
60:12 64:8
124:5 128:16
135:5 145:20
159:18 160:21

**p**

**p** 3:1,1 4:1,1
5:1,1 8:1
**p.m** 13:11
**p.m.** 2:4 8:3
44:8,11 48:9
48:12 62:10,14
104:7 105:4,14
106:14,18
107:4,5 108:12

108:16 156:21
157:3 171:10
171:15
**pachon** 2:8
8:22 172:2,17
**page** 6:2,6 7:2,7
17:21 48:22,22
49:2 55:14
57:9 61:6,16
66:12 75:18
114:19,20
115:10 143:17
175:4,7,10,13
175:16,19
**paper** 6:19
120:10
**papers** 12:16
12:22
**paperwork**
12:14 13:12
**paragraph**
83:14 97:8
157:12 168:19
**part** 27:7 35:21
50:12 51:4,10
131:8 159:3
164:22 165:5
**parte** 160:22
**participants**
66:11,21 68:1
101:3
**participate**
78:10 90:4,14

[participated - peters]                                      Page 29

**participated**
66:14,18 67:9
68:11
**participating**
71:18 72:9
77:11 101:21
**particular**
68:21 112:3,7
125:2,7 159:6
168:15
**particularly**
35:21
**parties** 8:8
172:12,14
173:8,11
**partner** 83:14
127:7
**partners** 163:2
163:8
**party** 9:3
**passing** 67:15
**past** 84:4
**pennsylvania**
4:7
**people** 12:20
15:11 17:19
25:4 26:2 28:2
28:6,10 29:12
30:2,21 31:4
34:10 38:4
49:6 51:15,20
52:7,14 67:3
73:4 80:10
86:18 88:10

90:1,4,8,9
96:19 99:17
101:9 102:21
108:3 127:18
130:2 132:8,21
133:4,19 137:1
137:2,9,10,11
137:15 138:5
142:11 163:12
164:20
**percent** 29:7
136:7
**perform** 166:8
**performance**
30:13,16 31:1
31:15 32:9
33:22 51:20,21
52:7,8,14 53:7
94:11 110:19
112:3,7,13,15
112:21 113:6
114:7,14,16
115:8 130:19
132:15 140:6
143:19 146:12
146:17,21
147:11,16
148:1 149:20
**performing**
114:22
**period** 28:7,8
28:11 30:16,20
34:7,15 36:13
58:18 59:20

70:15 75:20
114:12 121:5
121:11 123:6
123:11,18,18
127:1
**periods** 6:7
25:15 27:15
30:11 31:7,8,9
31:14 32:2
35:22 40:8
41:13,18 54:9
85:8 139:1
**permanent**
31:17
**permitted**
134:16
**person** 56:17
168:16
**personal** 89:18
89:22 98:3
126:4 135:6
157:16 160:9
161:19,22
**personally**
12:10 79:17
81:9 101:11
135:10 166:12
**personnel** 1:13
5:3,14 8:14
11:2 17:8
18:16 109:3
121:9 124:7
148:22 152:12
174:5 175:1

176:1
**pertaining**
19:19 27:7
**pertains** 38:22
**pertinent** 65:6
**peters** 2:2 7:4
8:11 10:3,10
10:12,13 14:6
18:2 19:5 24:6
24:14 25:3
26:4,15 27:11
33:3,6,9 34:21
35:4,19 37:5
38:4,13,21
40:4,10 42:11
42:19 43:8,18
43:20 44:2,13
45:22 47:18
48:14 51:19
52:8,16 54:17
54:20 56:4
58:3,21 60:2
60:14 62:16
66:8 70:1 74:8
76:22 78:18
79:11 82:15,22
84:16 85:10
87:5 89:16
90:12 94:4
95:13 103:16
104:17 105:19
106:13 108:18
113:19 114:3
116:21 118:18

| | | | |
|---|---|---|---|
| 120:4 121:6,18 124:1,8 129:14 129:17 137:6 137:16 142:5 143:9 146:17 150:3 152:10 153:3 155:8 156:8 157:12 159:11 160:20 166:4 170:7 171:11 174:6 175:2,24 176:2 176:4,12<br>**ph** 100:17<br>**phone** 14:4<br>**phones** 8:6<br>**phrased** 89:7 115:4 116:2<br>**pick** 8:5 31:4<br>**picking** 34:10<br>**piece** 27:15<br>**place** 8:8 61:3 133:22 135:4<br>**placing** 109:11<br>**plaintiff** 8:12<br>**plaintiffs** 1:10 3:2 4:2 9:13 10:13<br>**plan** 79:17<br>**planned** 67:19 78:20<br>**planning** 99:20 100:22 101:12 103:4 | **plans** 57:4,8<br>**please** 8:4,6 9:6 9:20 10:1 37:3 37:8 44:1 83:14 97:13 119:18 127:7 143:17 171:9<br>**pllc** 2:5<br>**point** 20:22 25:14 41:8 52:22 59:6 63:13 86:18 90:12 92:2,7 92:19 93:1,14 96:17 97:9 105:12 111:22 112:16 113:9 123:8 137:5,13 149:6 151:17 153:22 155:8 155:12<br>**pointed** 97:1<br>**points** 54:6 120:13<br>**policies** 93:13<br>**policy** 57:11,16<br>**political** 65:19 67:1 163:9<br>**pooja** 4:5,9 9:14<br>**position** 11:5 20:5 21:12 65:4 | **positions** 12:15 57:16 123:11 123:18<br>**possible** 69:4 93:12,17 111:19<br>**post** 3:7,13 153:11,17 154:19 155:2<br>**posted** 54:19 61:6,16 74:12<br>**power** 90:3 94:11 132:13<br>**powers** 59:16 138:14 139:5<br>**precise** 152:4<br>**preparation** 10:15,19<br>**prepare** 23:4<br>**prepared** 23:15 173:3<br>**preparing** 84:3 100:14<br>**prerequisite** 113:12<br>**present** 5:20 9:8 161:4,6<br>**president** 49:7 49:15 50:3 57:15 153:14 154:1,2,11,22 155:13<br>**president's** 165:22 | **presidential** 6:22 56:16 152:11<br>**presumably** 20:22<br>**previously** 45:3 105:1 112:3 116:9<br>**printed** 152:20<br>**printout** 6:9 54:18 61:5 106:8<br>**prior** 14:14,17 16:7 20:22 22:22 23:4 40:11 42:15 44:19 45:4 76:8 77:18 92:18 119:6,7 140:15 148:6 148:15 150:3 153:14 154:1 154:10 155:9 155:12 172:5<br>**private** 8:5 73:14<br>**privilege** 24:5 38:18,22 39:3 39:14,15 155:20<br>**probably** 21:12 53:16 59:21 66:1,1 89:6 163:12 |

**[probational - put]** Page 31

| probational | 114:12 115:12 | 29:11 31:5,20 | **promoted** 28:9 |
|---|---|---|---|

probational
98:5
probationary
6:7,12 25:15
27:8,9,15 28:7
28:8,11,16,18
28:21 29:2,17
30:10,16,20
31:8 32:7
33:11 34:7
35:10,22 36:6
37:20 40:8
41:13,18 42:4
50:15,22 53:20
54:9 65:10
67:8,19 68:12
69:5,13 70:17
71:5 76:8 77:5
77:9,17 78:21
79:6,18 82:2
82:19 84:13
85:8 86:11
87:11 90:15
91:1,11 92:16
92:21 93:16
95:22 96:4,8
97:17,19 98:1
98:17 99:4
100:14 101:1
101:13 102:13
103:5,17
107:13 109:19
110:11 111:10
112:6 113:5

114:12 115:12
118:21 119:10
121:5,10,13,16
122:7,14 123:5
123:6,10,17
125:7 126:5,17
126:22 127:13
128:17 129:4
132:19 133:5
135:17 139:1
139:19 144:2
144:15 145:8
145:10,17
146:13,22
148:9 149:9,21
151:5 155:10
155:14 159:4
159:10,18
166:16 169:5
169:19 170:3
**probationer's**
148:1
**probationers**
115:1 129:10
129:11 132:14
**proceed** 9:21
10:7,10
**proceeding** 9:6
171:16 173:4
**proceedings**
172:3,5,6,9
173:6
**process** 24:5
27:21 28:4

29:11 31:5,20
34:3,6,13 36:5
38:18 39:14
82:7 84:11,14
88:19,19,20,21
93:5 94:1
96:13 97:14
100:18 107:19
112:22 114:8
116:8,13 117:6
122:3 127:10
130:7,17
132:18 134:6
134:22 135:12
140:4
**processes**
128:16 138:18
**program** 6:15
63:11,16,21
64:10 71:19
72:11,12,13
73:7 74:7,19
77:12 78:6,12
79:5 80:5,21
81:19,21 98:22
102:14 103:10
105:20 106:7
106:17 107:6
121:15,17
126:6,18,19
**project** 17:5,8
17:8,11,15
18:15,16 19:2
19:5

**promoted** 28:9
**promptly** 86:15
**proper** 24:7
59:3
**provide** 64:7
67:8 69:5 71:5
109:8 110:17
**provided** 17:1
34:13 53:3,5
60:3 70:21
74:14 94:15,18
95:5,9,14
108:19 109:3,7
109:10,19
110:10 111:1,6
112:12 125:20
127:11 131:21
146:20 157:17
157:18 158:3,7
158:16 159:14
**providing**
63:19 77:13
123:9,16
127:22 161:18
**public** 55:10
172:18 176:19
**publicly** 118:20
**pull** 100:20
**purposes**
157:19
**pursuant** 76:6
165:22
**put** 38:19 39:3
46:21,21 47:17

[put - record]                                                    Page 32

81:1,9,13,14
117:1,2 119:18
122:12 136:11
136:21 149:17
149:18 150:17
**putting**  54:12

**q**

**qualifications**
114:21
**qualified**  28:2
172:7
**question**  18:12
18:13 20:3
21:3 22:16
24:10 26:14
32:13,22 33:2
33:7 35:4
36:11 47:12
51:12 59:9,11
61:9 112:13
113:13 142:5
142:19 145:5
150:2 151:2
**questions**  7:6
18:5,7 35:3
36:22 37:4
43:16 63:19
64:7 76:20
77:9,22 78:2
103:3 120:13
128:14 138:19
141:14

**quickly**  68:3
106:3
**quite**  12:18,18
**quiz**  75:4

**r**

**r**  3:1 4:1 5:1 8:1
175:3,3
**radar**  67:17
139:7,9 144:20
145:3 150:9,10
152:7
**radically**  34:6
**raise**  10:1
**ramps**  34:6
**ran**  170:2
**ranking**  124:3
**rating**  112:3,14
112:15
**reach**  136:3,20
**reached**  136:11
138:13 140:22
**reaching**  139:5
**read**  43:15,19
43:22 44:4
47:3 59:5
64:12,20
111:22 119:3
121:19 128:13
128:19 131:16
131:17 168:16
169:4,9,14,18
170:4,4,14,18
174:10 176:5

**reading**  122:2
130:2 131:8
166:1 170:7
**ready**  10:10
64:17 120:13
**realize**  120:21
**really**  22:15,15
91:19 114:9
117:7 118:3
143:2 160:14
**reason**  29:15
30:5,9 31:3,6,8
32:5 34:1,5,12
51:16 60:8
61:7 67:16
73:6 94:9
112:19 144:19
145:22 152:4
174:12 175:6,9
175:12,15,18
175:21
**reasons**  31:10
110:18
**recall**  12:19
16:4 17:9
22:17 23:1
26:1 37:13,21
53:22 61:4
68:3,15,21
69:6,11 70:2
70:14 71:17
72:7 74:16,17
74:20 75:8
81:14,17 87:18

99:13 101:5
105:13 109:10
117:20 127:2
170:21
**receipt**  174:18
**receive**  84:17
**received**  83:4
112:2,7 129:13
136:7
**recipients**
142:7
**recirculated**
149:12,13,15
**recognize**
82:22 114:2
164:4,12
**recollection**
10:15 16:5
21:21 49:11
54:4 65:15
72:8,9 75:22
77:10 78:8,13
105:7 139:12
158:15 168:1
**recommended**
120:12 122:6
**record**  8:3,9
9:10 14:7 39:2
39:12 40:2,21
44:6,7,9,11
47:17 48:2,9
48:10,12 62:3
62:9,11,13
108:11,13,15

**[record - respect]**                                        Page 33

156:20,22
157:2 171:10
172:9 173:5
**recorded**  172:6
**recording**  8:7
172:8 173:4
**red**  125:13
**redacted**  142:4
142:6,12,14,16
142:16
**redirect**  171:6
171:7
**reduced**  172:7
**refer**  13:22
130:17 131:20
163:8,11,18
166:22 167:20
**reference**  49:13
50:21 75:20
**referenced**
174:7
**referred**  53:16
88:20 167:6
168:19
**referring**  15:10
15:13 40:11
52:20,22 55:1
66:21 143:9,16
**refers**  130:17
163:5,12 164:1
**reflect**  169:21
**reflected**  132:4
**refresh**  10:14
105:7

**refreshes**  75:22
**regarding**  56:9
56:10,12,22
57:3 60:4,20
61:12 64:19
65:9 74:15,18
77:3,14 97:16
146:12 149:20
153:9,17
155:10,13
169:19
**regular**  12:1,3
**regulations**
31:12
**regulatory**
59:12 136:6
**reign**  132:8
**reinstated**
141:3
**related**  9:3 23:5
23:8,11 154:17
172:11 173:7
**relating**  63:10
**relations**
156:10
**relationship**
79:3 103:9
**relative**  172:13
173:10
**relevance**
46:11 52:1
56:5 57:20
59:1,3

**remember**
12:21 13:1,10
13:13,20 22:5
22:20 24:11
45:14 70:6,8
77:22 78:1
79:13 87:14
111:17 143:1
159:3
**remotely**  9:9
**removed**  45:11
47:2
**repeat**  32:22
**rephrase**  95:11
**report**  29:17
30:10 41:22
85:8
**reported**  2:8
**reporter**  8:22
9:20,22 10:7
75:19 120:1
**reports**  17:14
42:7
**represent**
54:17 104:18
110:4 152:20
**representing**
8:21 161:21
**request**  81:6
87:5,15,17,19
89:4 98:14,15
125:1
**requested**
172:21

**requests**  53:2
86:19 87:2,4,6
87:8 88:3
103:11 110:6
**require**  53:9
90:4 91:8
**required**  42:3
94:7 113:11
115:5 176:13
**requirement**
68:12 69:12
91:16,17 92:5
92:9,15 112:20
**requiring**  76:7
**researchers**
136:18
**reserved**
171:14
**resign**  72:15
**resignation**
6:11 63:11,16
64:10 71:19
72:10,12 74:7
74:19,21 75:15
77:12 78:5,12
78:19 79:5
80:5,21 102:13
103:10 121:15
121:16 126:6
126:18,19
**resource**
149:16
**respect**  38:20
41:13 53:20,21

54:2 60:16
76:21 109:19
110:10 124:18
135:1,16 136:5
149:8 151:5
169:5
**responded**
77:21
**responding**
76:20 77:16
130:1
**response**  40:15
110:5 116:16
116:20 136:3
144:4,5 146:4
**responsibilities**
62:17
**responsibility**
62:20 148:22
149:20
**responsive**
34:20,21 45:20
**restoring**  57:15
**restraining**
40:16 105:1
**retain**  28:15
133:14,19
134:17
**retained**  86:16
115:2 171:13
**retirement**  73:3
**return**  56:15,17
57:3,7 73:5,10
174:14,17

**reveal**  141:5
144:6
**reverse**  55:13
**review**  10:14
10:18 31:7
84:14 97:14
112:21 114:13
132:14 172:21
174:8
**reviewed**  29:7
38:7 151:9
159:14 160:4
**reviewing**
87:14
**revise**  150:13
**revised**  40:15
143:10,12
**revision**  6:21
92:11,18 143:5
143:10,22
144:3 145:6
148:7,16 149:3
149:4 150:3
151:4
**revisions**  148:4
**reward**  156:14
**rhetorical**
59:11 126:12
**rifs**  56:19,22
**right**  10:1 11:5
11:11,21 12:21
16:9 29:4 32:9
33:14 34:17
36:8,13,14

41:14 42:14
43:2 45:5 50:5
62:19 63:2
71:11 74:1
75:10 82:15
83:8 91:12
99:18 103:18
104:17 106:15
107:6,7,15
109:4 113:7,13
115:2,19
116:10 118:22
125:10,22
134:19 136:21
143:4,20 144:3
144:9,11,16
147:3 149:3
154:17 160:7
160:16 163:17
167:22
**rights**  20:14
30:7,8 33:13
36:7 50:16
52:15 54:7
**road**  6:15 79:4
105:20
**rob**  45:8,18
**robert**  5:12
**robert.bigler**
5:17
**robin**  3:11 9:13
**robust**  127:9
**role**  17:4 22:2
22:11,14,18

23:1,5,8 24:14
28:8
**rolled**  72:11,13
**room**  13:2
40:22 167:4
**rough**  21:17
67:3
**roughly**  21:15
21:17
**rtholin**  3:15
**rules**  27:3
**run**  18:8 29:11
**running**  18:10
117:4
**rushab**  4:11
9:14
**ryan**  173:2,15

**s**

**s**  3:1 4:1 5:1 6:5
7:1 8:1 175:3
**safety**  136:6,18
**samuel**  2:8 8:22
172:2,17
**san**  1:3 3:8,14
8:16
**sanghr**  4:15
**sanghvi**  4:11
9:14
**sat**  14:21
**save**  132:20
133:9,13
**saw**  76:15

**saying** 16:21
79:13,19 93:21
112:20 128:3
129:13,17,17
129:20 143:15
159:16
**says** 41:22 49:3
52:7,14 55:7
55:22 56:12,16
56:22 57:6
83:14,18 85:7
86:10,14 88:18
93:10 94:7,9
104:21,22
105:3 106:8
107:2 112:9
121:6 127:6
130:4 143:10
148:8,16,19
151:11,12,17
152:3,3,3
153:4,7 157:15
163:2
**sba** 68:4 97:18
98:4 99:15
**scales** 14:9,17
14:20 15:14,18
22:9 25:1,4
46:2,8,16
82:18 142:3
**schedule** 6:8
25:12 43:12,12
44:16 45:12
46:1 57:11,18

**scheduled**
67:21 68:2
**school** 34:10
**science** 129:3
131:6 133:16
**screaming**
124:13
**screen** 139:7,9
144:20 145:3
150:9,10 152:7
**script** 64:12,17
64:21 168:16
168:22 169:4,8
169:14 170:7
170:13,17
**scripts** 169:18
**scrutiny** 36:18
**second** 53:5
65:17 66:12
83:14 97:8
111:22 114:19
114:20 118:1
154:4
**secretariat**
13:15
**section** 41:14
153:3
**sector** 73:14
**see** 22:5 31:15
41:14,18 42:1
42:5 43:14
44:16 48:18,21
49:7 55:15,16
55:21 56:8,11

56:15,20 57:4
57:12 66:15
75:19 82:20
83:13,17 84:17
85:13 88:18
97:7 105:3,5
106:14,19
111:19 118:16
121:2,11 153:5
153:12 156:17
157:12 163:3
**seeing** 120:14
120:21
**seeking** 50:3
**seem** 127:2
**seen** 47:8 110:1
110:9 151:22
**send** 38:8 41:22
42:4,17 59:16
59:17,17 61:18
85:8 86:10
97:6 102:17
**sending** 58:11
59:19,21 60:11
61:14 76:21
84:18,20 85:4
85:11,17,21
86:8
**senior** 10:22
20:21 21:9
22:2 38:16
43:13 62:17
**sense** 32:20

**sensitive** 8:4
**sent** 21:20,21
22:19 56:10,19
57:4 60:15,20
61:11 73:16
74:17 76:13
77:17 82:6
89:3 97:1,2
103:22 106:22
107:1,3 114:5
127:5 128:6,12
128:12 130:6
131:2,20
149:12 163:14
163:16 164:11
169:11 174:15
**sentence** 93:10
122:5
**sentences**
145:18
**separate** 34:3
82:8 83:15,19
84:4,8,21
85:12,22 86:9
93:7,8,15
107:13 112:19
115:12,16
122:7 125:1
127:8
**separated**
112:4,8 132:3
**separation**
93:11 111:18
123:10,17

**[september - stand]** Page 36

september
  16:11,13 18:1
  19:11,11
sequitur  60:7
serious  30:22
  31:1
served  28:8
server  61:17
  62:2
service  6:19
  28:12 30:12
  31:10,17 33:14
  36:8 43:13
  73:7,13 120:9
  121:4 122:9
  123:4
serving  31:7
  46:10
ses  45:16 54:7
session  6:18
sessions  63:10
set  13:6 17:11
  61:10 67:6
  99:3 123:22
setup  20:2
several  13:5
  127:10
shared  100:16
  100:17 128:15
sharp  173:2,15
sheet  174:12
short  32:19
  54:12 65:16
  108:5 156:17

shows  30:17
  122:17,18
shriver  45:8,18
sic  8:3
sign  174:13
signature
  161:10,11,12
  171:14 172:16
  173:13
signed  12:14,16
  12:16 38:7
  174:20
similar  45:7,9
  46:20
simply  28:1,10
  31:3 69:3
  142:5,19
single  28:21
  86:20,20 90:12
  92:2,7,19
  93:14
sir  119:19
size  50:4
skills  172:10
  173:6
slightly  26:14
  145:5
small  67:18
  98:9,11 103:21
solicitor  19:10
  19:13,15,17
solutions
  174:22

somebody  47:8
  47:11 87:9,10
  101:9 102:16
  122:20,20,21
soon  93:12,16
  105:20 111:19
  138:10 140:18
  140:19 146:8
sooner  150:17
sorry  19:16
  21:5,5,5 23:13
  32:21 65:12
  95:8 97:8
  113:20 115:14
  129:20 140:13
  148:13 167:20
sort  31:5 40:19
  51:16 53:5
  87:14,15 91:16
  108:2 130:4
  132:9,13 138:6
sought  138:11
soul  27:17
source  123:2
southeast  4:7
space  110:17
speak  156:3
speaking  102:2
  102:3 141:1
speaks  128:7
special  6:18
specific  16:5
  18:5,7 22:17
  23:1 40:17

50:12 58:17
  59:6 92:15
  93:2 104:11
  128:1 132:11
  143:19 146:12
specifically
  31:12 61:16
  163:13 170:22
speculate
  159:19
speculation
  86:1
spend  11:16
spoke  36:1
  101:6
spoken  62:21
spontaneously
  24:13
stack  162:15
staff  12:2,3,7
  13:5 14:10
  46:10 65:8,19
  66:22 67:4
  74:7 99:15
  128:13 162:4,7
  162:8 163:5
  167:14,21
  168:17 169:20
  170:14
staffing  147:21
stamp  110:7
  113:21
stand  171:9

**standard** 105:5
105:14 132:15
**standing** 59:5
**stark** 3:16
**start** 29:16
77:11 96:2
98:1 123:9,16
134:6 161:10
168:8
**started** 11:7
13:22 14:9
15:15 24:13,22
25:20 46:17
71:18 72:9
99:17,19
107:19
**starting** 15:6
122:7 123:11
123:18
**state** 1:7 3:4,17
4:4,6 9:6,9
**stated** 27:22
**statedemocra...**
4:9
**statement** 6:20
83:13 121:20
122:1,8,12
160:12
**statements**
119:3,7 130:2
131:5,16
**states** 1:1,12
5:2 8:14,15
11:1 41:16

104:19 174:5
175:1 176:1
**static** 122:18
**stating** 118:20
**status** 102:22
**statute** 20:10
34:14
**statutes** 20:15
**stay** 30:22
**steer** 84:7
124:17
**stop** 21:7
**street** 2:6 3:7
3:13,19 4:13
5:7,15 8:19
**strengthening**
152:13
**strike** 34:20
45:19 47:4,20
47:21
**stringently**
32:2
**strong** 72:9
77:10 78:12
93:20 94:3
**structured**
89:10
**structuring**
117:5
**stuff** 13:16
121:12 159:20
**subject** 39:13
82:19 83:6,7
140:14

**submissions**
76:6,22 77:2
106:10
**submit** 29:3
68:12 69:14
90:21 96:19
100:19,20
144:2
**submitted** 29:8
29:9 38:21
106:11,11
114:1 132:20
157:10 160:21
**submitting**
144:15 145:7
**subscribed**
176:14
**substance** 34:4
34:5
**substantial**
36:7
**substantive**
67:15
**sued** 138:7
**suggesting**
38:11 114:7
**suggestion**
38:13
**suit** 155:1
**suitability**
152:13 153:5,8
153:9,16,17
154:7 155:1

**suite** 2:6 3:7,13
8:19
**sullivan** 82:17
**superpower**
141:17
**support** 160:22
**supposed** 31:11
31:14 32:18
63:17
**sure** 33:2,19,21
83:20 115:10
138:2 143:11
159:22
**suspect** 39:6
**swear** 9:20
**sworn** 10:4
172:5 176:14
**systems** 33:22

**t**

**t** 6:5 7:1 175:3
175:3
**tags** 13:2,3
**takano** 124:3
**take** 8:8 40:1,4
48:3 61:3,3
72:18 73:7
91:6,22,22
96:15 98:16
108:4 126:19
142:2 143:19
146:11 153:9
153:17 156:17
161:2

**taken**  8:11
  28:19 39:4
  154:18 172:3
  172:12 173:9
**takes**  102:18
  135:4
**talk**  25:18
  46:16 47:5
  75:18 141:11
**talked**  15:3
  27:13 114:6
**talking**  26:5
  35:14 41:13
  65:14 86:17
  111:13
**talks**  122:2
**tangents**  18:8
**tasks**  88:14
**team**  164:22
  165:5 166:12
**telephone**
  122:19 162:3
**tell**  10:5 29:1
  50:9 74:6 96:3
  96:8 98:11
  107:1 122:20
  122:20 132:2
  133:4 141:11
  142:18 147:2
  147:10 149:7
**telling**  32:6
  33:10 35:9
  50:14 83:21
  94:15 95:5,14

97:6 107:12
112:5 122:21
123:2 128:4
130:14 145:19
154:15 160:13
**tells**  149:7
  150:4 151:4,18
**temper**  125:13
**template**  6:16
  52:7,13 53:2,3
  83:17 102:7
  103:12 107:15
  108:18 109:2
  109:11,18
  110:5,9,13,16
  110:17 111:2
  128:2 146:16
  146:19,20
**templates**
  109:7,8
**temporary**  6:8
  25:11 40:15
  43:12 44:15
  45:11,22 105:1
**term**  30:14
**terminate**
  29:19 40:20
  50:15 67:19
  82:9 91:11
  92:15,21 94:16
  97:19 98:5,17
  100:14,22
  101:12 103:4,5
  103:17 108:3

112:5 118:21
121:4,9 123:4
124:19 129:9
132:22 133:4
136:10 159:6
159:10
**terminated**
  126:7 145:11
**terminating**
  28:5 79:18
  97:16 98:1
  99:17 100:17
  128:16 155:10
  155:14 159:18
**termination**
  31:21 36:6
  78:20 79:5,21
  82:2 91:7
  102:12,20
  108:19 113:5
  118:4 127:22
  132:9 147:6
  160:4 166:15
**terminations**
  83:8 90:15
  94:12 99:4
  117:9,22 124:4
  132:11 169:5
**terms**  12:9,11
  25:8 30:2
  31:19 144:21
**testified**  10:6
  24:21 29:1
  35:5 45:3

58:10 70:12
72:4 79:16
84:16 124:2
**testifies**  119:9
**testify**  69:18
  81:8 140:9
**testifying**  84:19
  135:5 172:5
**testimony**
  24:15 25:2,18
  26:6 35:15,19
  35:20 38:15
  46:15 76:2
  80:13 91:4
  116:9 121:19
  122:8 123:12
  124:7 126:8
  131:10 135:9
  140:16 171:11
  174:10,18
  176:8
**thank**  19:16
  37:11 55:12
  120:2 141:19
  171:3
**theme**  88:8
**theory**  117:13
  117:17,22
  118:4,9 138:3
  138:7 139:10
  139:14,16
  144:18 145:2
  146:5,6 150:9
  150:19 152:6

[therit - today]                                                Page 39

| | | | |
|---|---|---|---|
| **therit**   124:2,6,8 | 109:20 111:1,6 | **thinking**   50:9 | 68:7 76:4 |
| **thing**   41:19 | 112:11 113:9 | 50:11,11,14 | 79:22 85:16 |
| 80:9 | 113:12,16 | 90:2,2 117:10 | 88:8 89:11 |
| **things**   25:6 | 115:3,21,22 | 138:2 139:15 | 93:4 104:11 |
| 54:2 88:12 | 116:2 117:4,7 | 150:14 151:13 | 105:5,14 106:6 |
| 91:8 102:1 | 117:19,19 | 152:5 | 107:1 108:6,11 |
| 138:9 158:19 | 118:8 119:3,22 | **third**   65:17 | 108:16 109:4 |
| **think**   13:6,9,17 | 122:16,18 | 66:12 75:17 | 113:4 118:12 |
| 13:17 15:3 | 125:10,11,18 | 97:8 123:8 | 118:15 120:14 |
| 16:2,2,15 | 126:12,21 | **tholin**   3:11 | 120:20 132:8 |
| 17:15,22 18:11 | 128:8,9 129:17 | 9:14 141:18 | 138:21 139:16 |
| 20:18 21:4 | 130:3,16 | **thought**   27:16 | 144:10,14 |
| 22:21 23:17 | 131:22 132:7 | 27:21 32:5 | 145:6,10 |
| 25:6 27:5,13 | 133:3 136:1,1 | 118:11 | 150:19 155:8 |
| 28:20 29:6,8 | 136:15 139:2,8 | **thousands** | 155:12 156:20 |
| 29:10 33:16 | 139:10,14 | 145:10 | 157:3 167:3 |
| 34:16 36:12,13 | 142:10,11,15 | **three**   65:8,15 | 169:19 174:19 |
| 41:19 42:12 | 142:16 143:13 | 101:9 140:3 | **timeframe** |
| 45:10,11,13,15 | 144:4 145:2 | **thursday**   21:13 | 32:19 174:9 |
| 47:19 50:10,11 | 147:18,19,20 | 21:15 22:19 | **times**   103:3 |
| 52:19,21 53:4 | 147:22 148:3 | 65:9,13,18 | 104:5 158:20 |
| 53:16 54:12 | 148:20 149:5 | **tie**   95:20 | **timestamp** |
| 55:14 57:13 | 151:13 152:2,4 | **ties**   114:8 | 107:2 |
| 61:2 64:5 | 154:15 155:16 | **time**   2:4 8:6 9:6 | **timing**   125:6 |
| 65:22 67:3 | 156:18 157:5 | 13:19 15:22 | **title**   17:18 |
| 70:9 73:1,12 | 158:7,20 159:2 | 16:15 17:3 | 19:13,14 44:16 |
| 75:1 76:17 | 159:7,13 160:8 | 19:7 20:9 24:7 | 57:14,22 |
| 78:8 88:7 89:1 | 160:9 163:11 | 28:20 32:3 | **titled**   44:15 |
| 89:6 90:6,6,18 | 164:21 166:1 | 36:2 37:2 39:2 | 57:15 |
| 92:13 93:6,19 | 167:17 170:2,9 | 43:15,19 44:4 | **today**   10:16,20 |
| 96:10 98:14,15 | 170:15,15,19 | 44:11 48:9,12 | 24:15 29:1 |
| 101:5,5,16 | 170:20,21 | 58:18 59:20 | 45:3 155:9,12 |
| 102:6,7,10 | 171:1 | 60:13 62:9,14 | 169:2 |
| 108:5 109:14 | | 63:13,15 65:3 | |

| | | | |
|---|---|---|---|
| **today's** 171:11 | **traffic** 88:5 | 123:11,17 | 140:3 145:18 |
| **together** 64:9 | **transaction** | **trick** 126:13 | 148:3 |
| 114:16 | 105:4 | **tried** 146:10 | **tyler** 101:6,7 |
| **told** 38:20 | **transcriber** | **tro** 80:4,9 | **typewriting** |
| 52:13 71:11 | 173:1 | 81:19 104:7 | 172:7 |
| 79:10,17 87:2 | **transcript** | 105:8,11,12,20 | **typically** 63:2,3 |
| 87:4,6 90:14 | 172:21 173:3,5 | 106:14 138:10 | **u** |
| 92:4,8,20 | 174:7,20 176:5 | 140:11,14 | **u.s.** 5:6,13 |
| 93:15 98:7 | 176:8 | 141:4 142:20 | **ultimate** |
| 100:13,21 | **transcriptionist** | 144:5 146:8 | 148:21 149:19 |
| 101:11 103:16 | 172:8 | **true** 52:16 70:5 | **under** 18:4 |
| 114:18 115:2 | **transformatio...** | 70:9 104:6 | 20:15 122:5 |
| 116:19 119:9 | 51:10 | 121:20 122:1,9 | **underlying** |
| 122:13,14 | **transformative** | 123:13 133:1 | 114:2 |
| 123:3 129:8 | 49:6,14 50:2 | 156:10 172:9 | **underscores** |
| 132:21 133:18 | 51:5,11 | 173:5 176:8 | 96:12 |
| 135:14 140:5 | **transition** 6:8 | **trump** 49:7,15 | **understand** |
| 147:2 | 12:4 43:12 | 50:3 | 32:16 54:22 |
| **tomorrow** | 44:16 45:11 | **trump's** 57:15 | 95:18 112:22 |
| 83:16 107:14 | 46:1 | **truth** 10:5,5,6 | 113:3 131:11 |
| **took** 48:14 64:5 | **transmittal** | 118:19 128:4 | 156:8 159:22 |
| 106:2 121:16 | 74:13 149:17 | **try** 132:20 | **understanding** |
| 128:13 133:22 | **transmittals** | 138:14 | 86:17 93:4 |
| **top** 55:7 75:8 | 54:19 | **trying** 18:11 | 97:20 107:18 |
| 110:7 114:20 | **transmitted** | 95:20 | 134:22 136:14 |
| 143:17 152:2 | 55:4,8 | **ttcs** 49:4,5 | 141:2 142:10 |
| 162:15 163:1 | **treasury** 131:8 | 53:21 | 145:14 |
| **total** 171:11 | **treat** 47:8 | **turn** 57:9 66:12 | **understood** |
| **totally** 51:1 | **treating** 30:20 | **twelve** 141:19 | 18:13 98:20 |
| **touches** 158:5 | 47:7 | **two** 23:16,16 | **undertake** |
| **tracey** 124:1 | **trial** 31:9,11 | 24:12 25:4,10 | 132:13 |
| **track** 141:17 | 34:7,15 36:13 | 25:22 45:4 | **underway** |
| **tracking** 82:17 | 36:14 121:5,10 | 55:19 86:19 | 100:18 |
| | 121:11 123:6 | 101:9 114:15 | |

**undo** 36:16
**unilaterally**
  127:12
**unit** 8:10 62:9
  62:13 108:11
  108:15 156:20
  157:2
**united** 1:1,12
  5:2 8:13,15
  11:1 104:19
  174:4 175:1
  176:1
**units** 171:12
**unlawful** 91:10
  119:12,16
  138:13
**unlimited** 49:4
**unprofessional**
  124:15
**unsatisfactory**
  110:19
**unusually** 49:5
  49:14 51:10
**upcoming**
  22:11,14 24:14
**updated** 97:6
**usda** 99:16
  100:6,13 126:1
  131:6
**usdoj.gov** 5:9
  5:10 174:2
**use** 31:14 32:1
  49:4,4,21
  52:13 53:8

96:7 103:7
  128:1
**used** 30:11 87:5
  96:3 171:12
  174:20
**useful** 160:10
**using** 30:15,19
  32:8 52:7
  83:16 94:12
  107:14
**usually** 18:3

| v |
| --- |

**v** 1:11 174:4
  175:1 176:1
**vacate** 161:1
**vague** 11:12
  14:11 19:22
  20:17 22:12
  23:6 25:21
  36:9 50:18
  51:22 54:3
  61:1
**various** 142:21
**verify** 174:10
**veritext** 8:21
  9:1 171:13
  174:15,22
**veritext.com**
  174:16
**vetted** 170:10
  170:13,17
**vetting** 36:17
  138:19 154:7

**video** 8:7
**videoconfere...**
  63:2,4 64:11
  65:2
**videoconfere...**
  63:6
**videographer**
  5:22 8:2,21
  9:19 44:7,10
  48:8,11 62:4,8
  62:12 108:10
  108:14 156:19
  157:1 171:9
**videorecorded**
  8:11
**videotaped** 2:1
**view** 29:18
  114:7 115:6
**viewed** 140:6
**voluntary** 73:2
  73:7
**vs** 8:13
**vulnerable**
  31:4

| w |
| --- |

**wait** 13:10
**waiting** 13:6,7
**waived** 38:21
  39:14
**waiver** 39:19
**walked** 12:12
**walls** 127:18
  139:6,13

150:19
**want** 20:7
  33:21 40:14
  52:20 61:4
  71:15 73:5,6
  91:6,9,16
  102:19 104:6
  108:6 119:17
  124:18 130:22
  141:5 144:6
  156:2 159:19
  159:22
**wanted** 33:19
  63:22 84:3,4
  85:12,12 89:8
  90:8,9 91:15
  91:19 111:4
  125:5 146:8
**wanting** 82:9
**washington** 2:7
  3:20 4:8,14 5:8
  5:16 8:20
**waste** 39:2
**watch** 11:10
  144:21
**watched** 11:13
  12:13,13
  124:12
**watching** 11:16
**way** 15:22 19:4
  20:3 32:15
  34:16 42:14
  54:6 63:22
  64:8 70:12

**[way - work]**                                                Page 42

| | | | |
|---|---|---|---|
| 89:11 112:22 | **whispering** 8:5 | 65:6,22 67:13 | 133:3,11,21 |
| 113:21 116:3 | **white** 152:20 | 68:20 69:8,16 | 134:9,21 |
| 117:4 130:12 | **wide** 60:15 | 69:22 70:8,14 | 135:14 136:14 |
| 165:13,16 | 73:8 95:19,21 | 71:2,8,13 | 137:1,8,18 |
| 166:3 | 96:3,8 | 72:17 73:20 | 140:2 143:1 |
| **ways** 61:13 | **windup** 53:11 | 74:3,10 76:10 | 145:13,22 |
| **we've** 33:19 | **wish** 19:13 | 76:15 77:2,20 | 146:19 147:5 |
| 41:12 55:19 | 28:14,15 83:15 | 79:1,8,13,21 | 147:14 148:12 |
| 71:22 72:1 | 83:18 84:8,20 | 80:8,16 81:4 | 148:19 149:11 |
| 108:5 131:5 | 85:22,22 86:8 | 81:12 82:5 | 150:8 151:8,21 |
| 169:1 | 86:9 93:7,8 | 83:10 84:2 | 152:16 153:20 |
| **website** 6:9 | 112:18 116:1,8 | 85:1,15 86:3 | 154:15 155:4 |
| 17:8,11 18:15 | 125:1 127:7 | 86:13 87:21 | 155:19 156:1,6 |
| 19:1 54:18,20 | **withdrawn** | 89:6,22 90:17 | 157:21 158:6,7 |
| 106:6,18 | 157:11 | 91:14 92:7 | 159:13 163:11 |
| 152:21 | **witness** 9:20 | 93:1,19 94:6 | 163:22 164:7 |
| **wednesday** 2:3 | 10:4 11:13 | 94:18 95:1,8 | 164:15 165:3 |
| **week** 21:13 | 14:12 18:21 | 95:17 96:7,22 | 165:16 166:6 |
| 58:9 60:4 | 20:1,18 21:4,7 | 98:14 99:2,9 | 166:10,19 |
| 71:20 78:9 | 22:13 23:8,15 | 100:3,10 | 170:2,9 171:3 |
| **weeks** 60:17,21 | 24:4 25:22 | 101:16 103:20 | 172:4 174:9,11 |
| 61:19 84:5 | 26:9,20 29:22 | 104:10 105:10 | 174:13,19 |
| 127:11 140:4 | 32:12,16 33:16 | 106:1 107:9,17 | **wondering** |
| 144:16 145:8 | 34:22 37:9 | 108:1,8,22 | 164:11 |
| **went** 12:12 | 38:2,17 39:18 | 109:6,14 | **wonzie** 129:4,5 |
| 13:2 14:21 | 45:1 46:5,12 | 110:22 112:11 | 129:6,7 |
| 37:15 38:2 | 47:6 48:6 | 113:9 115:21 | **word** 45:7 87:5 |
| 74:8 78:6,14 | 49:19 50:8,19 | 116:12 117:1 | 111:1,7 |
| 78:16 118:11 | 51:8,14 52:3 | 117:16 119:2 | **words** 49:16,21 |
| 132:18 140:13 | 52:11,19 54:4 | 119:14 121:22 | 50:10 151:12 |
| 142:20 | 56:6 57:21 | 122:11 123:15 | 151:17 |
| **wes** 99:13 | 58:5 59:10 | 124:10 126:11 | **work** 11:11 |
| **wha** 1:12 8:17 | 61:2 62:1,5 | 128:6 129:16 | 13:16 23:11 |
| | 63:9 64:15 | 130:1 131:14 | 36:18 46:17 |

56:15,17 64:3
64:5 89:15
164:19,20,21
166:8
**worked** 23:16
23:20 24:12
64:8 132:21
**workers** 33:11
144:2 145:8
**workforce**
57:17 152:14
**working** 11:7
13:19 25:1,20
165:20
**works** 113:1
**would've** 16:2
16:3 21:18,18
72:19,19,21
77:10 91:15
107:9 109:7
118:14 123:3
132:4 133:6
134:2,5,7,12
138:8,9 158:18
159:4,5,7,7
160:1,12
169:10 170:4
170:15,16,19
**wow** 144:22
**write** 32:6
49:10 56:3
83:2
**writing** 22:2
81:2,6,9,15

119:19 137:16
**written** 26:10
137:13
**wrong** 139:11
**wrongdoing**
131:1
**wrote** 25:22
35:5 36:4
44:19 45:4
58:2 126:2
**www.opm.gov**
106:6

| x |
|---|

**x** 6:1,5 7:1
172:21

| y |
|---|

**yard** 34:10
**yeah** 10:11
18:21 21:6,17
23:15 26:1
28:15 32:12
33:8 35:7
39:11 41:10,19
41:20 42:6
46:12 48:5,6
49:19 59:10
61:13 62:5,5
63:4 67:2
75:10 78:1
81:12 95:12
97:9 102:6
108:8,22
110:12 115:3

116:12 120:14
120:20 121:12
121:22 129:6
135:21 137:18
141:8 143:20
144:4,12
147:19 155:18
155:21 161:3
163:17 169:13
171:4,7
**yearly** 112:13
**yelling** 124:14
125:13
**yuri** 5:4 9:16
174:1
**yuri.s.fuchs** 5:9
174:2

| z |
|---|

**zoom** 68:17
167:4

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.