Scott A. Kronland (SBN 171693)
Stacey M. Leyton (SBN 203827)
Eileen B. Goldsmith (SBN 218029)
Danielle E. Leonard (SBN 218201)
Robin S. Tholin (SBN 344845)
James Baltzer (SBN 332232)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel. (415) 421-7151
Fax (415) 362-8064
skronland@altber.com
sleyton@altber.com
egoldsmith@altber.com
dleonard@altber.com
rtholin@altber.com
jbaltzer@altber.com

*Attorneys for Plaintiffs*

[Additional Counsel on signature page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO; AMERICAN FEDERATION OF STATE COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, et al., <br><br> Defendants. | Case No. 25-cv-01780-WHA <br><br> **PLAINTIFFS' RESPONSE RE: SUBMISSION OF DEPOSITION TRANSCRIPT OF NOAH PETERS** |

PLFS' RESPONSE RE: SUBMISSION OF PETERS DEPOSITION, #3:25-cv-01780-WHA

Plaintiffs provide the following citations to the deposition of Defendant U.S. Office of Personnel Management ("OPM") Senior Advisor Noah Peters, in response to Defendants' submission of the entire deposition transcript without specific citation, and in further support of Plaintiff State of Washington and Public-Sector Union Plaintiffs' pending requests for injunctive relief.  In sum, Plaintiffs demonstrate below that while Mr. Peters repeated the unsupported assertions from his declaration (Dkt. 77) that OPM did not order other federal agencies to terminate their probationary employees, that testimony was undermined by other admissions regarding OPM's communications with agencies directing those terminations and requiring the use of the template letter falsely stating that termination was based on performance.  Mr. Peters further undermined that testimony by contradicting his declaration, contradicting himself in the deposition, testifying evasively, and providing answers that otherwise lacked credibility.  Plaintiffs have categorized the relevant citations below.

**Background**

As this Court is aware, in support of their opposition to Plaintiffs' Motion for Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction, Defendants relied on a single declaration from OPM Acting Director Charles Ezell.  Dkt. 33, 34.  Defendants later withdrew rather than make Mr. Ezell available for deposition or cross-examination, in defiance of this Court's orders that Mr. Ezell appear at the March 13, 2025 preliminary injunction hearing.  Dkt. 97.  On March 10, 2025, Defendants then submitted a new declaration from Mr. Peters in support of their Ex Parte Application to quash that March 13 preliminary injunction hearing, which this Court denied (Dkt. 77, 89).  In that Declaration, Mr. Peters described a limited number of calls and emails between OPM and agency officials and claimed that OPM did not direct agencies to fire any probationary employees.  Dkt. 77.  Mr. Peters did not attest that anything in that declaration was based on his personal knowledge.  *Id*.  Defendants did not state that they were submitting or relying on the declaration in opposition to the pending requests for injunctive relief.  Dkt. 77.  Defendants also refused to make Mr. Peters available for cross-examination.  Dkt. 97, 106, 106-1.

On March 13, 2025, after granting a preliminary injunction to the non-profit organizational plaintiffs, this Court ordered Defendants to make Mr. Peters available for deposition in Washington,

1   DC for three hours, within two weeks.  Dkt. 120.  The parties agreed upon a date and time of March
2   26, 2025.  Dkt. 145.  Plaintiffs deposed Mr. Peters on that date, and the transcript was completed
3   soon thereafter.  Defendants waited to file the entire transcript until after hours on April 8, 2025, on
4   the eve of the further hearing on the Public Sector Unions' and State of Washington's preliminary
5   injunction requests, without indication of whether or what parts of this deposition Defendants
6   intended to rely on with respect to those motions.  Dkt. 188, 188-1.  Plaintiffs orally moved to strike
7   the late-filed transcript, which the Court denied at hearing, and authorized Plaintiffs to file this
8   response.  Plaintiffs have submitted herewith a thumb-drive containing the certified video recording
9   of that deposition, should the Court wish to review that video to assess credibility.

**Discussion**

**1.  Admissions that OPM required agencies to submit "requests" listing probationary employees to that they wished to exempt from termination for approval *by OPM*.**

Mr. Peters repeatedly claimed that OPM told agencies to make the decisions to terminate their workers.  However, Mr. Peters testified at length regarding the "requests" by agencies to OPM to approve "exemptions" from the requirement that agencies terminate their probationary employees. Tr. 84-88; *see also* 89:3-7; 116:7-117:6; 134:5-135:18.  For example:

> Q.   And what is the basis of your knowledge that agencies were sending lists of employees they wish to keep and wish to separate as opposed to what this memorandum says, which is send lists of all of your probationary employees?
>
> THE WITNESS:
>    Well, what this -- this memorandum says -- and is that -- in addition, agencies should promptly determine whether those employees should be retained at the agency.  My understanding from talking to other people at the office was that the lists at some point became -- *that those two requests* were kind of combined into a single -- into a single list from the agency.
>
> Q.   And who told you about those requests from the agencies?
>
> A.   Who told me about the requests?
>
> Q.   You just used the word request, Mr. Peters. Who told you about the requests from agencies to keep their employees?
>
> A.   Again, so I -- sometimes the requests would go to -- so in a couple instances, like, somebody – a few instances, somebody asked me, "Hey, you know, do we -- we'd like to keep all of our probationary employees."

PLFS' RESPONSE RE: SUBMISSION OF PETERS DEPOSITION, NO. 25-cv-01780-WHA      2

>           And I -- and I said, "Yes." That was from EEOC. And then I remember reviewing some sort of exemption request from the nuclear -- some sort of nuclear inspection agency. *And we also granted that request for a full exemption.*
>
> Q.     Any other agencies that you recall OPM granting the request for an exemption?
> …
> THE WITNESS:
>           Yes. The Department of Justice was another one.
>
> Q.     Any others?
>
> A.     I'm not aware of all the requests, nor am I aware of all the -- *of all the grants*. I know that we -- we certainly exempted the FAA air traffic controllers.
>           And there were other -- I think that we -- the general -- like, a general theme at that time was that the exemptions -- you know, you -- you can certainly exempt people who were exempt from the hiring freeze.
>           So, you know, categories where things were going to break or there was going to be mission -- you know, mission critical tasks that the agency should -- should exempt in those cases *and should ask for the exemption*.

Tr. 87:4-88:16 (emphasis added); *see also* 89:3-7 ("Q Some agencies sent that information to OPM, and OPM granted that request?  THE WITNESS: I think that was probably how -- how it was phrased.").

**2.    Other admissions regarding centralized planning for the termination of probationary employees government-wide without agency input and based on pretext of performance.**

a.    Mr. Peters began employment with the federal government as a Senior Advisor to the OPM Director on January 20, 2025, which was Inauguration Day and a federal holiday.  Tr. 11-12. Mr. Peters testified that he personally drafted the January 20 OPM memorandum, issued that first day, requiring all federal agencies to submit lists of every probationary employees to OPM, and to "promptly determine whether those employees should be retained at the agency." Dkt. 111-1; Tr. 42:15-20.  Mr. Peters repeatedly testified that he prepared this plan *without* consulting or communicating with anyone at all, including from any federal agency. Tr. 24-27.  OPM issued the memo without agency input.  Tr. 97: 10-14 ("we issued the memo on the – on the very first day. So there was no opportunity for agencies to come to us and say, you know, 'OPM, please engage in -- in a list making exercise or a review process.'").

b.    Mr. Peters confirmed that OPM issued a series of directives within the first weeks of

the new Administration to all federal agencies to act with respect to employees, including two memos to agencies he personally drafted, among others in those first weeks.  Tr. 55-58; *see also* Tr. 72:12-73:20 (OPM created the "Fork in the Road" deferred resignation program emailed to all federal employees by OPM on January 28, 2025).  He confirmed these were all directed by OPM to agencies, and not vice versa.  Trs. 60:2-13.  He also confirmed that he "certainly did not" tell agencies in advance before OPM imposed the Fork in the Road program on agencies and their employees.  Tr. 74:10.

   c. Mr. Peters testified that as of early February 2025, OPM was communicating directly with federal agencies regarding employment matters via the Chief Human Capital Officer ("CHCO") Council—which was meeting with OPM "every day," and that he participated in those communications:

> Q. And since January 20th, the CHCO Council videoconferences have been held with some frequency. Is that fair to say?
>
> THE WITNESS:
>  Yes. The CHCO Council has held lots of different sessions, mostly relating to administering the Deferred Resignation Program.
>
> Q. And at one point in time, in early February, was the CHCO Council meeting with OPM every day?
>
> A. Yes. During the time around the Deferred Resignation Program, the CHCO Council was meeting every day.

Tr. 63; *see also* Tr. 71:17-19 (admitting he "started participating in the CHCO calls after the Deferred Resignation Program on January 28th").

  Mr. Peters confirmed that when he met with the CHCOs in February 2025, he at times read from a "script."  Tr. At 64.  He admitted that on February 14, 2025 he read from a script that corresponded to the email sent by OPM to CHCOs which required agencies to "separate probationary employees that you have not identified as mission-critical no later than the end of the day Monday, 2/17" and that provided a "template letter."  Tr. 169:4-17; Dkt. 111-2.  That email instructed, "The separation date should be as soon as possible…"  Dkt. 111-2.  That email also instructed that "An employee's performance must be measured in light of the existing needs and interest of government"

1   and "OPM believes "qualifications for continued employment in the current context means that only

2   the highest-performing probationers in mission-critical areas should be retained." *Id.*

3           d.     Mr. Peters confirmed that he also conducted calls with agency chiefs of staff and other

4   officials regarding probationary employees. Tr. 65:6-66:2. He confirmed that on February 12, 2025

5   he read a script to these officials that tracked the email sent that same night. Tr. 168:16-169:3; Dkt.

6   111-5. That email instructed agencies to terminate their probationary employees:

> **Please partner with your CHCO to action those you know you wish to separate from by the end of the day tomorrow, 2/13/2025, using the attached template letter (modified to account for whether the employee is in the competitive or excepted service).**

Dkt. 111-5 (emphasis in original). That email also instructed: "Employees do not need to have received any particular performance rating previously to be separated." *Id*.

        e.     Mr. Peters admitted at the time OPM provided the template termination notice requiring agencies to terminate based on performance, while telling agencies to terminate immediately, OPM did not "require[]" agencies to conduct performance evaluations:

> Q.    And if you go down a little further, there's a bullet point second to the bottom. Can you read that for me?
>
> A.    "Employees do not need to have received any particular performance rating previously to be separated."
>
> Q.    So OPM was telling agencies to terminate probationary employees immediately, but they don't have to have received any particular performance evaluation in order to be separated. That's what this email says; correct?
>
> THE WITNESS:
>     Well, I think that was provided as additional guidance around a common question. And, you know, with a yearly performance rating cycle, a lot of employees would not have had the opportunity to have had a performance rating at that point.
>
>     But, I mean, you know, if there was employees who were -- you know, who they wish to separate from for whatever reason, you know, we were just saying that it's not, like, a formal requirement that they have gone through the performance review process, which, you know, I understand is just the way that -- that it works.
>
> Q.    And you understand that there would not have been time between the February 12th email and a immediate termination of probationary employees for agencies to have conducted a performance evaluation, right?
>
> THE WITNESS:
>     Well, I think our point was – was broader, that they were – that – that was not required

> -- that was not, like, a formal prerequisite. It wasn't – if that – I think that – that answers your question; right?

Tr. 111:21- 113:1.

    f.    Mr. Peters admitted that after requiring the federal agencies to collect lists of probationary employees and submit them to OPM, and then going through the "exemptions process" (described above), and after having provided the agencies with instructions that "we [i.e., OPM] viewed performance in this context," then "we were, you know, *giving them an action date*." Tr. 140:2-7 (emphasis added); *see also* 83:6-11 (referring to Dkt. 111-5 (Feb. 12, 2025 email from OPM to agencies): "And the subject line, 'Action due 2/13' – the action in that subject means terminations; right? THE WITNESS: In this context, it looks like it does.").

**4.    Admissions contradicting the Declaration.**

    a.    In Mr. Peters' Declaration to this Court, he refers only to calls with agency chiefs of staff on February 7, 10, and 12, and *one* CHCO call on February 14. Dkt. 77. As discussed above, in deposition he testified that there were "daily" CHCO calls, in which he began participating after January 28, as well as "one-on-one conversations" with agencies regarding probationary terminations:

> We'd had discussions – a lot of – around the interaction between the termination of probationary employees and the Deferred Resignation Program because the issue that arose was the DRP was still around and it was still open.

Tr. 102:11-15. Mr. Peters also testified to myriad communications between agencies and OPM regarding the requests for "exemptions," by which he meant exemptions from terminating probationary employees, as described above, that he did not mention in the declaration either. *E.g.*, Tr. 84-88; 89:3-7; 116:7-117-6; 134:5-135:18.

    b.    In Mr. Peters' Declaration to this Court, he asserts that with respect to the four calls he does describe that "[a]t no point on these calls did OPM direct or require any agencies to terminate probationary employees." Dkt. 77 at ¶9. As discussed above, in his deposition Mr. Peters testified at length regarding the agencies' requests to OPM to be able to save their employees from termination, and OPM's decisions whether or not to grant those requests through this "exemptions" process, including exemptions that Mr. Peters himself approved. Tr. 84-88; *see also* 89:3-7; 116:7-117-6;

134:5-135:18.

**5.   Other statements undermining credibility.**

a.   Mr. Peters initially testified that the Friday prior to beginning work at OPM on January 20, 2025, he met with two other individuals who would also become senior OPM officials: Amanda Scales and Brian Bjedle.  Tr. 14-15.[1]

Mr. Peters also testified that prior to his employment by OPM he prepared "two different memos. I think they were the ones that were the ones that were issued on day one." Tr. 23:17-18.  He confirmed that one of those memos was the January 20 memo regarding probationary employees.  Tr. 27:15-18.  That memo required every agency across the federal government to compile and submit to OPM, for the first time ever, lists of probationary employees and to prepare to terminate those employees, within four days.  Dkt. 111-1 (Jan. 20 OPM Memorandum from Acting Director Charles Ezell to "Heads and Acting Heads of Departments and Agencies").  That Memo ordered agencies:

> No later than January 24, 2025, agencies should identify all employees on probationary periods, who have served less than a year in a competitive service appointment, or who have served less than two years in an excepted service appointment, and send a report to OPM listing all such employees to employeeaccountability@opm.gov, with a copy to Amanda Scales at amanda.scales@opm.gov. In addition, agencies should promptly determine whether those employees should be retained at the agency.

*Id.*; *see also* Tr. 42:15-20 ("Q. So when you drafted this memo prior to January 20th, did it include this instruction to agencies to compile all the names and send them to OPM by January 24th? Did your draft include that instruction, Mr. Peters? A. Yes.").  The memo required agencies to send those lists to the same Amanda Scales whom Mr. Peters met with three days prior to sending out this memo.

Mr. Peters was asked: "Who else worked with you on the drafts of the memos that were issued on day one, meaning January 20th?" Tr. 23:20-22.  Counsel objected on the ground of "intra-agency discussion around a draft memorandum" and instructed the witness not to answer "based on the deliberative process privilege." Tr. 24:1-5.  Counsel for Plaintiffs pointed out that Mr. Peters had

---

[1] Amanda Scales became the OPM Chief of Staff, and Brian Bjelde became an OPM Senior Advisor. *See, e.g.*, Time Magazine, "This Obscure Office Is at the Center of Elon Musk's Efforts to Harness Federal Data", available at:  https://time.com/7213990/elon-musk-doge-opm/ (Feb. 7, 2025, last checked April 10, 2025).

1  already testified he was not a government employee at the time, and that was not a proper instruction.
2  Tr. 24:6-8.  Mr. Peters then immediately responded by testifying that he worked on those memos "by
3  myself." Tr. 24:11-2.  He explained: "I drafted the – I began drafting the memos entirely on – on my
4  own, and I didn't discuss them with – until we got to – until I got on the job.  I didn't – didn't discuss
5  them with – with anyone." Tr. at 24:16-20.  Thus, notwithstanding the planning meeting with two
6  incoming high-level OPM officials the Friday before Inauguration Day that Mr. Peters had just
7  revealed, he insisted, after his counsel's failed attempt at invoking deliberative process, to testify that
8  he did not talk to Ms. Scales or Mr. Bjelde about those memos. Tr. 24:13-27:18.  And even though
9  the memo in question required every federal agency to take unprecedented (and burdensome) action
10 within four days, Mr. Peters insisted, "I did not discuss that with a soul before January 20th." Tr.
11 27:17-18.  Mr. Peters' testimony, following his attorney's deliberative process objection specifically
12 referring to inter-agency communications, claiming never to have discussed this important memo
13 with anyone (including at a meeting with an individual named in the memo), is simply not credible.[2]

14     b.   As discussed, Mr. Peters admitted he wrote the memo that was issued on January 20
15 regarding probationary employees.  He then attempted to testify that OPM required agencies to
16 compile lists of probationary employees only *for their own use*, as an "internal process that they were
17 going to run through, which is just you yourself identify who – who these people are." Tr. 29:10-14.
18 He later admitted, when confronted with the language of his memo, that OPM ordered agencies to
19 submit the names of every probationary employee *to OPM* within four days (including the holiday),
20 not just to compile the information for an "internal process." Tr. 41:16-42:6; 42:16-20.

21     c.   Mr. Peters admitted OPM created the Deferred Resignation Program (or "Fork in the
22 Road") and imposed that on agencies and their employees. Tr. 72.  That program gave all federal
23 employees a deadline for participation (February 6, 2025) that was originally extended by court
24 order, which was eventually lifted on February 12, 2025.  Tr. 72-75.  Mr. Peters denied that there was
25 "a relationship between the expiration of the Fork in the Road Deferred Resignation Program and the
26 termination of probationary employees," or that OPM was waiting to see which employees took the

27
28
---
[2] Mr. Peters is an attorney.  Tr. 19:13-15 (formerly employed as Solicitor at FLRA); Tr. ***.

PLFS' RESPONSE RE: SUBMISSION OF PETERS DEPOSITION, NO. 25-cv-01780-WHA     8

Fork before terminating probationers. Tr. 79:3-6.

That testimony directly contradicted his other statements that: "We'd had discussions – a lot of – around the interaction between the termination of probationary employees and the Deferred Resignation Program because the issue that arose was the DRP was still around and it was still open." Tr. 102:11-15. And, when confronted with documents, Mr. Peters acknowledged that:

- The District of Massachusetts TRO extending the Fork deadline for all federal employees was lifted at **5:34 pm** on **February 12, 2025**. Tr. 106:13-16.

- OPM closed the Fork Program at **7:20 pm** on **February 12, 2025**. Tr. 106:17-20.

- OPM emailed federal agencies telling them to "action" their probationary employees at **8:12pm** on **February 12, 2025**. Tr. At 106:21:107:5; Dkt. 111-5.

d. Mr. Peters testified that: "I have never and would never advocate that people be fired arbitrarily, or fired without some sort of reason. So I – I don't – it's not what I believe in at all." He was then asked: "Q You wouldn't advocate, Mr. Peters, that people be fired for performance when they are not in fact being fired for performance?" He responded: "No. I would not. Certainly not." He was then asked "Q. You didn't instruct federal agencies to fire people for performance using a template that says performance, Mr. Peters?" To which he responded: "No." Tr. 51:14-52:11.

Mr. Peters later admitted, contrary to this testimony, that OPM sent the template to agencies containing the language terminating employees uniformly for performance and that he then read a script to agencies in which they were told to use that template, and to terminate employees regardless of performance evaluation. Tr. 169:4-17; Dkt. 111-2; Tr. 168:16-169:3; Dkt. 111-5.

f. Mr. Peters was often evasive in responding to questions he did not wish to answer. For example:

> Q. And can you point me to a single document from OPM to a federal agency from January or February 2025, where OPM told the agencies it was not a requirement that they do this?
>
> THE WITNESS: Point you to a single document where the -- where OPM told agencies that this was not a requirement? Well, we -- we certainly -- on the March 5th revision to this -- to this memo, we certainly made that clear. And I think what we said was there -- you know, we're clarifying that there is not, and has never been a requirement to terminate any specific probationary employee or employees.
>
> Q And prior to the March 5th revision to the January 20th memo, can you point me to a single

PLFS' RESPONSE RE: SUBMISSION OF PETERS DEPOSITION, NO. 25-cv-01780-WHA         9

document where OPM told agencies they did not have to terminate their probationary employees?

THE WITNESS: Can I -- can I point you to a specific document where -- where we said that? I don't know all of the documents at this time, but I'm just -- you know, the understanding throughout the process was that we -- the agencies -- you know, I think it's -- it said here, "The ones you wish to separate from." It was always, which ones did they wish to separate from.

Q And the next sentence actually says, "The separation date should be either immediately or as soon as possible consistent with applicable agency policies, including those in CBAs." Can you point me to a single document where OPM told agencies they did not have to separate their probationary employees immediately or as soon as possible?

THE WITNESS: I think that this -- this was our -- you know, our strong encouragement of the agencies, saying this is what you should -- we should be doing as kind of the completion of the exemptions and list making process.

Q This document does not say strong encouragement, does it, Mr. Peters?

THE WITNESS: Well, I -- I mean, it says, "Should." It doesn't say must or are required to.

Tr. 92:2- 94:12.

g. Mr. Peters admitted that OPM was not "thinking about or optimizing for" whether its instructions would be perceived by agencies as orders, until this lawsuit. Tr. 117:10. Mr. Peters repeatedly claimed that the reason OPM never put in writing or otherwise told agencies they could make decisions themselves was "this was not on our radar screen – this legal theory was not on our radar screen until the lawsuit was filed – this lawsuit was filed." Tr. 150: 8-11; *see also* Tr. 139, 144, 145, 149, 152.

h. Mr. Peters initially claimed that he gave "all" of the information to Mr. Ezell for his declaration (Tr.158:7-8) but then eventually admitted he "don't know when he – when he learned of – of this stuff and I don't know from who" (Tr. 159: 19-21) and "you really have to ask him. I don't know." (Tr. 160: 14-15).

6. **Mr. Peters lacked personal knowledge and offered only inadmissible hearsay regarding decision-making by other agencies.**

Mr. Peters worked for OPM not any other federal agency. To the extent that Defendants intend to rely on testimony regarding "his understanding" of agency "decisions" to terminate

probationary employees, that testimony lacks personal knowledge and/or is based entirely on inadmissible hearsay for which there are serious indicia of concern regarding truthfulness, in light of the "mountain" of evidence of OPM direction of these terminations.  Tr. 97-103 (testifying re: his understanding of decisions by SBA and other agencies); *see also* Tr. 84 (claiming that the "Well, the agencies had been preparing lists of employees that they wanted to keep and wanted to separate from over the past couple weeks before that"); Tr. 89: 13 ("And in fact, some agencies just ignored it.").  Mr. Peters admitted:

> Q.   And you don't work at a federal agency other than OPM, do you, Mr. Peters?
>
> A    No. I don't.
>
> Q.    So you don't have personal knowledge of whether the agencies, in fact, believed they could ignore the orders from OPM, do you?
>
> THE WITNESS:
> I don't have personal knowledge of what people at other agencies were -- were thinking or were not thinking.

Tr. at 89:18-90:2.

Despite attempting to use the content of the lists of employees to support his testimony that agencies made their own decisions, he ultimately claimed he never saw them and had no personal knowledge of those either.  Thus, Mr. Peters testified as to the contents of those agency reports to OPM:  "I don't think that the agencies even submitted names." Trs. 29:8-9; see also Tr. 84: 2-5 (claiming agencies were creating "lists of employees that they wanted to keep and wanted to separate").  But he admitted: "I've never reviewed what the agencies submitted" to OPM (Trs. At 29:7-8), and "I did not look at those reports" (Trs. 42:6-7). When asked "If you didn't look at them, how do you know that they didn't list the names, Mr. Peters?", he admitted:  "I don't think that, at least initially, they – they listed the names, but I – you're – you're right. I don't know one way or the other." (Tr. 42:12-14).[3]

---

[3] Mr. Peters made many other statements that would be inadmissible were Defendants to attempt to rely upon them (because he lacked personal knowledge or other foundation, or they would be hearsay offered by Defendants, and for other reasons).  Plaintiffs have not done a line-by-line objection to Defendants' use of this deposition testimony, but reserve the right to assert objections to admissibility should Defendants ever identify the testimony on which they are relying.

**7.     Mr. Peters confirmed Acting Director Charles Ezell's knowledge and involvement**

Mr. Peters testified that Mr. Ezell "vetted and approved" the script that Mr. Peters read on the calls with agencies.  Tr. 170:13-22.  He also testified that Mr. Ezell was "He sometime – he was often on – on the – the CHCO calls."  Tr. 168:5-7.  Mr. Ezell therefore "might've been" on the Feb. 14 CHCO call, and he did not know if Mr. Ezell was on other CHCO calls.  Tr. 168:4-15.  He admitted he lacked knowledge of what Mr. Ezell knows, and "you really have to ask him."  Tr. 160: 14-15.  This testimony is all contrary to Defendants' representation to this Court just two days later, in support of the Ex Parte Motion for Protective Order:  "The testimony of Acting Director Ezell has scant additional evidentiary value on top of these depositions, especially considering his *non-involvement in the actual communications at issue*."  Dkt. 158 at 3 (emphasis added).

Respectfully submitted,

DATED: April 11, 2025

Scott A. Kronland
Stacey M. Leyton
Eileen B. Goldsmith
Danielle E. Leonard
Robin S. Tholin
James Baltzer
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151

By: */s/ Danielle Leonard*

*Attorneys for Plaintiff Organizations*

Norman L. Eisen (*pro hac vice*)
Pooja Chadhuri (SBN 314847)
STATE DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Pooja@statedemocracydefenders.org

By: */s/ Norman L. Eisen*

*Attorneys for Plaintiff Organizations*

Rushab Sanghvi (SBN 302809)
AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES
80 F Street, NW
Washington, DC 20001
Tel: (202) 639-6426
Sanghr@afge.org

By: */s/ Rushab Sanghvi*

*Attorneys for Plaintiff American Federation of Government Employees (AFGE)*

Teague Paterson (SBN 226659)
Matthew Blumin (*pro hac vice*)
AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES
1625 L Street, N.W.
Washington, D.C. 20036
Tel: (202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org

By: */s/Teague Paterson*

*Attorneys for Plaintiff American Federation of State County and Municipal Employees (AFSCME)*

Tera M. Heintz (SBN 241414)
Cristina Sepe (SBN 308023)
Cynthia Alexander, WA Bar No. 46019 (pro hac vice)
Deputy Solicitors General
OFFICE OF THE WASHINGTON STATE ATTORNEY GENERAL
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
tera.heintz@atg.wa.gov
cristina.sepe@atg.wa.gov
cynthia.alexander@atg.wa.gov

By: */s/ Tera M. Heintz*

*Attorneys for Plaintiff State of Washington*