ployment, while practically all those whose homes were in Washington or vicinity did so and were willing to accept appointment at lower salaries than those without local homes.

4. Many States do not supply eligibles in sufficient numbers to keep up their quotas. The entrance salaries of many positions are not attractive to persons at a distance, and the expense of travel is also a deterrent.

The commission makes constant effort to bring to the attention of citizens of States in arrears the opportunities for appointment which are especially favorable for persons with scientific, technical, or professional training. Examinations are held in places selected for their accessibility to the greatest number of applicants, and all proper means are employed to awaken interest and secure competitors.

## PROBATIONAL PERIOD.

The civil service act provides that there shall be a period of probation before any absolute appointment. The rules fix this period at six months, but provide that, by regulation, the period may be fixed at one year for any specified positions.

The proportion of failures on probation seems small to the commission, being only about one-half of 1 per cent. This may indicate that appointing officers do not in all cases fully scrutinize the conduct and capacity of the probationers and perform the duty of dropping those found unsuitable.

The probational period is part of the examination system. The examination establishes an antecedent probability of fitness, but it does not create certainty that the person will prove a good worker. It is necessary, therefore, that there should be an actual test upon the public work, and that is precisely what the law provides in requiring a period of probation. It is a practical test intended as a complement to the entrance test.

In the belief that the business capacity and fidelity of probationers should be more thoroughly scrutinized, the commission, on October 28, 1920, addressed the following circular letter to the departments:

The small number of persons dropped from the service during or at the end of probation has convinced the commission that the reason underlying the requirement of a probationary period has not received the consideration its importance deserves and that this very essential practical test has not guarded the service against the incompetent or the otherwise unfit as it should. The practice prevailing in some of the bureaus and offices of requiring a definite report and recommendation from the probationer's immediate superior and not permitting the appointment to become absolute passively is doubtless of some effect.

This is in harmony with the finding and recommendation of the Congressional Joint Commission on Reclassification of Salaries. The following is quoted from this report:

Digitized by Google

Original from
HARVARD UNIVERSITY



AR0001

"The commission believes that a more thorough and effective use should be made of the probationary period and that the law should be so changed that probationary appointments could become permanent only by a definite administrative decision.

"*Recommendation 17* (*b*).—The commission therefore recommends that administrative officials be required to submit to the Civil Service Commission such reports regarding the efficiency of probationary appointees as the commission may require and that no permanent appointment be made except on certificate by the commission that the employee has satisfactorily passed his probationary period."

The commission desires to impress very forcibly upon the departments the fact that no probationary appointment should be allowed to become absolute unless the character of service and conduct of the probationer have been entirely satisfactory and the department can certify unconditionally that his retention is believed to be in the interest of the service.

It seems that this matter should preferably be handled administratively and that legislation is unnecessary. Rule XIII, section 1, requires every nominating and appointing officer to report in detail to the commission in such manner as it may prescribe all changes in the service under his authority. The commission requests under this authority report of each absolute appointment over a certificate that the character of service and conduct of the person during probation were entirely satisfactory and that his retention in the interest of the service is believed to be warranted.

### POLITICAL ACTIVITY.

The rule which prohibits political activity by classified employees has been in effect for 15 years. Through warnings posted in Government offices throughout the country this provision of the rules has been well disseminated, except in smaller communities. Nearly all violations occurred in these smaller communities and chiefly involved rural carriers and fourth-class postmasters. An Executive order provides that any rural carrier or fourth-class postmaster who is active politically shall be removed or otherwise disciplined, recommendation as to the penalty to be made by the commission. The department, however, is not obliged to enforce the commission's finding, but has generally done so. Of the 10 cases where the commission recommended merely a reprimand for displaying campaign posters or literature three removals were ordered by the department.

During the year a total of 209 cases were referred to the commission for recommendation, out of which number 103, or 49 per cent, were closed without action, the charges not being substantiated. Of the number of cases where action was taken by the commission, 68 recommendations, or 64 per cent of the total, were for warnings or reprimands, and in the remaining 38 cases, or 36 per cent, removal was recommended.

The investigations, with few exceptions, were made by post-office inspectors, the majority of cases occurring in the Postal Service, and the commission was not represented because of the expense involved.

AR0002

Digitized by Google

Original from
HARVARD UNIVERSITY



**THE PROBATIONARY PERIOD:**

A Critical Assessment
Opportunity

*To Do List*

- ☑ Assess Resume
- ☑ Work Sample Test
- ☑ Structured Interview
- ☑ Check References
- ☑ Offer Probationary Appointment
- ☐ Assess Probationer's Conduct and Performance
- ☐ Decide if Conversion Serves the Public Interest

A Report to the President and the
Congress of the United States by the
U.S. Merit Systems Protection Board
AR0003

THE CHAIRMAN



### U.S. MERIT SYSTEMS PROTECTION BOARD
1615 M Street, NW
Washington, DC  20419-0001

August 2005

The President
President of the Senate
Speaker of the House

Dear Sirs:

In accordance with the requirements of 5 U.S.C. 1204(a)(3), it is my honor to submit this Merit Systems Protection Board report, "The Probationary Period:  A Critical Assessment Opportunity."

The Federal Government's human capital is its most vital asset.  With the wide range of increasingly complex skills needed for the 21st century public service, and the vital responsibility of civilian employees in the defense of our nation, it is more imperative than ever that candidates for Federal appointments are thoroughly assessed.  The probationary period can be a highly effective tool to evaluate a candidate's potential to be an asset to the Government before an appointment becomes final.  However, the probationary period is effective only if agencies use it to assess their candidates and act upon those assessments.

This report explores how agencies are using—or failing to use—the probationary period to ensure only the best candidates receive finalized appointments as Federal employees.  We found that one obstacle is in the phrasing of the law regarding probationers and the limitations it effectively imposes on establishing probationary periods of more than one year.  Our study also reveals that many roadblocks to successfully using the probationary period come from within the agencies themselves.  An unwillingness to assess candidates, or to act upon an assessment, prevents the probationary period from being as effective as it can and should be.  This report provides recommendations for changes in the law to increase the ability of agencies to use the probationary period more effectively.  It also includes suggestions to assist agencies to meet their responsibility to assess probationers and act upon those assessments to ensure the American people are served by the most talented workforce possible.

I believe you will find this report useful as you consider issues affecting the Federal Government's ability to select and maintain a highly qualified workforce.

Respectfully,

Neil A.G. McPhie

AR0005

# THE PROBATIONARY PERIOD:

## *A Critical Assessment Opportunity*



A REPORT TO THE PRESIDENT AND THE
CONGRESS OF THE UNITED STATES BY THE
U.S. MERIT SYSTEMS PROTECTION BOARD

AR0007

# U.S. Merit Systems Protection Board

Neil A. G. McPhie, *Chairman*

Barbara J. Sapin, *Member*

## Office of Policy and Evaluation

*Director*
**Steve Nelson**

*Deputy Director*
**John Crum, Ph.D.**

*Project Manager*
**Sharon Roth**

AR0009

# CONTENTS

**Executive Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .i

   Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .i

   Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .ii

   Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .iv

**Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

   What Is the Probationary Period? . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

   Scope and Methodology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

**The Final Assessment Before Appointment** . . . . . . . . . . . . . . . . . . .5

   Selection Assessment Tools . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

   Implementing the Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

   Consequences of Inaction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

   Probationer Performance and Conduct . . . . . . . . . . . . . . . . . . . . . .10

   Retaining Problem Probationers . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

   Proactive Decisions to Grant Status . . . . . . . . . . . . . . . . . . . . . . . . .13

**Assessing Probationer Performance** . . . . . . . . . . . . . . . . . . . . . . . .17

   Basing Assessment Length on the Position . . . . . . . . . . . . . . . . . . . .17

   Using a Longer Probationary Period . . . . . . . . . . . . . . . . . . . . . . . . .20

   Establishing Performance Standards for Probationers . . . . . . . . . . . .22

   Performance Problems: Probationers Are Different . . . . . . . . . . . . . .23

**Communicating Expectations** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

   Communications Prior to Selection . . . . . . . . . . . . . . . . . . . . . . . . . .26

   Communications After Selection . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

   Supporting Supervisors of Probationers . . . . . . . . . . . . . . . . . . . . . . 30

**Findings and Recommendations** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

   Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**Appendix A: Methodology** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

   The Survey . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37

   Agency Input . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

   The Focus Group . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38

# EXECUTIVE SUMMARY

M any aspects of Federal human capital management are currently being explored for potential reform. The probationary period is one of these areas. This report focuses on the original intent of the probationary period—a crucial assessment opportunity before an appointment to the civil service becomes final. While in many cases the probationary period has become a mere formality, this report by the U.S. Merit Systems Protection Board addresses how it can and should be used as a part of the process to select an applicant for an appointment. To look at a probationer as a candidate for final appointment and not as an employee with the full protections of Federal employment may require a dramatic shift in culture and mindsets. However, this change is necessary if the probationary period is to be fairly and effectively utilized as the valuable assessment tool it was intended to be.

## Background

The purpose of the probationary period is to provide the Government with an opportunity to evaluate an individual's conduct and performance on the job to determine if an appointment to the civil service should become final.[1] Until the probationary period has been completed, a probationer is still an applicant for an appointment, with the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the civil service for this particular individual. Once an appointment is finalized, the probationer becomes an employee who is given a considerable level of protection under the Federal Government's merit system. But, until the appointment is finalized, a probationer has only limited job protections.

One of the primary reasons non-probationary Federal employees are granted protections related to adverse actions is to keep the civil service free from prohibited personnel practices. The requirements for due process help ensure that adverse actions such as removals are based solely on merit and support the public's interest in a capable and efficient workforce. In the case of new-hire probationers, the public interest is served by limiting certain

---

[1] 5 U.S.C. §3321 and 5 CFR §315.803.

rights, including the right to appeal an adverse action. These limitations
ensure that agencies can promptly and effectively act upon their assessments
of probationers.

The probationary period, if used fully, is one of the most valid assessment
tools available for supervisors to determine an individual's potential to fulfill
the needs of the specific position, the agency, and the civil service. However,
this outcome requires that an agency assess its probationers to determine
if they are an asset to the Government. Furthermore, the probationary
period is effective only if action is taken to prevent less than fully successful
individuals from becoming Federal employees—with all the rights that such
an appointment entails. Without this assessment and action, the
probationary period becomes meaningless.

# Findings

**Supervisors want to take responsibility for their probationers receiving
finalized appointments as Federal employees.** Our survey asked
supervisors if they should be required to certify that their probationers are
successful before the individual is converted from a probationary status to
one that provides the full range of protections granted to Federal employees.
Almost 70 percent responded they should be required to provide
certification, while only 5 percent preferred the current method by which
conversion is automatic based upon the passage of a set period of time.

**The probationary period is not being used as a tool to assess
probationers to determine if an appointment to the civil service is in
the Government's best interest.** Despite reporting that they understood the
appointment was not final, many of the supervisors we surveyed indicated
that they did not intend to remove probationers who were not an asset. Our
survey asked supervisors if they would select their probationer again if given
the chance to do it over. More than half of those who said they would not
select their probationer—and over 80 percent of those who were not sure if
they'd select their probationer—said they expected to retain the probationer
beyond the probationary period.

**If agencies do not address problems during the probationary period,
the individual is unlikely to depart afterwards.** According to the Central
Personnel Data File (CPDF) maintained by the U.S. Office of Personnel
Management (OPM), removal of probationers is very rare, but the removal
of non-probationary employees is even rarer. Only 1.6 percent of competi-
tive service workers are removed in their first year of service, the traditional
length of the probationary period. However, after that first year of service,

the removal rate in the competitive service drops to below 0.5 percent and remains there for the next two decades of service. Resignation rates also drop after the first year of service, and remain on a downward trend for the next 20 years.

**Probationers are treated as if they are not much different from non-probationers who have received a finalized appointment to the Federal service.** Both agency cultures and individual supervisors may bear a degree of responsibility for this result. Some agencies informed us that they required their supervisors to use performance improvement plans and time-consuming opportunities for improvement before an action could be taken to remove a poorly performing probationer. When we asked surveyed supervisors who reported performance and conduct deficiencies by probationers how they had addressed their situations, slightly more than half reported providing additional on-the-job training beyond that which was already planned, and almost a third provided additional classroom training. Nine percent said they had reprimanded a probationer, and four percent had suspended a probationer.

**Performance and conduct problems can be expected to occur, but agencies do not provide sufficient support to supervisors for them to address problem probationers.** It is not uncommon for a supervisor to encounter a probationer with performance or conduct problems. When asked about the performance of all probationers they had supervised in the past 3 years, 43 percent of supervisors reported that one or more probationers had performance deficiencies. When asked about conduct in the same time period, 36 percent reported one or more probationers had deficiencies. When we asked supervisors why they kept probationers with identified deficiencies, we received a number of comments that indicated the supervisors felt pressured to either keep the person or lose the resource and have no one to do the work at all.

**Supervisors want their agencies to have greater flexibility to determine the length of the probationary period.** Sixty-five percent of supervisors indicated they would like to see their agency have the authority to determine the length of the probationary period. Supervisors of trainees were twice as likely to want a longer probationary period for their particular positions versus those supervisors who indicated their probationer was not a trainee. Currently, this flexibility is not an option for most agencies. OPM regulations limit the probationary period to one year, and even if that were changed, 5 U.S.C. Chapter 75 would provide full job protection appeal rights under most circumstances after one year, even if the individual was still a probationer.

**Agencies often fail to communicate that the probationary period is important and will be used.** A third of surveyed probationers reported that they did not know they would be required to serve a probationary period when they first began work. Almost a quarter reported that they had never been told of the consequences of being a probationer, even though they had been on board for more than 7 months when they received their surveys. Comments from probationers indicated that many did not think their agency took the probationary period seriously nor had any intent to use it to assess them or their peers.

# Recommendations

1. **The statute and regulations should be changed to better support the use of the probationary period as a time period to assess candidates before they receive finalized appointments as Federal employees. This includes providing agencies with the flexibility to set the length of the probationary period based upon the unique characteristics of their positions and training programs. Specifically:**

   ☑ Congress should amend 5 U.S.C. Chapter 75 to indicate that if an individual is in a probationary status, the individual is not entitled to the protections granted to Federal employees, even if the individual has been in service for more than 1 year. This would help support the message that appointment as a Federal employee must be earned through successful performance and is not an entitlement that automatically results from a job offer or physical presence in the workplace. Amending the statute would also enable OPM to provide all agencies with meaningful flexibility regarding the duration of the probationary period.

   ☑ OPM should establish procedures so that a probationer does not automatically become an employee in the absence of agency action. An agency should be required to certify that a probationer's conduct and performance have established that the individual will be an asset to the Government. In the absence of this certification, the probationer's employment should automatically terminate upon the expiration of the probationary period. The use of a not-to-exceed date for that period can help emphasize that the individual has not been promised a finalized appointment, but rather has been given a time-limited opportunity with the burden on the probationer to demonstrate why a finalized appointment is in the interest of the Government.

☑ If Congress amends 5 U.S.C. Chapter 75 as recommended above, OPM should modify 5 CFR §315.801 and §315.802 so that they will no longer set the probationary period at 1 year with a prohibition on extensions. OPM should, instead, issue regulations that permit agencies to set a probationary period of 1 to 3 years for each occupational area upon showing that the nature of the applicable positions calls for the particular length requested by the agency.

2. **Agencies should create a culture in which probationers are treated with respect as candidates for an appointment, but not as Federal employees with finalized appointments. In particular:**

☑ Performance appraisals for supervisors should include an evaluation of how thoroughly they have used the probationary period as an assessment tool. Supervisors should be held accountable for using the probationary period fairly, fully, and in the best interest of the Federal Government. This should not be considered an additional critical element, but rather should be seen as an intrinsic part of their existing responsibility to thoroughly assess their subordinates and take action when appropriate.

☑ Supervisors should receive training in their responsibilities to the agency, the civil service, and the probationer. They should be made aware when they have hired a probationer, and reminded that their role is to assess the individual for appointment as well as to supervise the performance of work towards organizational goals.

☑ Agency policies should treat unsuccessful probationers differently than Federal employees with finalized appointments. Agencies should ensure that probationers receive clear guidance and a full understanding of performance expectations, as well as the appropriate level of training for an individual with their level of experience. However, agencies should also ensure that probationers and their supervisors recognize that probationers are not similarly situated to other Federal employees and are not entitled to the same level of investment or opportunities for rehabilitation.

☑ Probationers should be notified, *before accepting a job offer*, that they will be probationers and what that means. Human resources staff and supervisors should ensure that probationers are aware they have been offered an opportunity to demonstrate on the job why finalizing their appointment would be in the best interests of the agency and the entire civil service—but that a finalized appointment is not guaranteed.

☑ In their discussions with a probationer, before and after the individual begins work, supervisors should reinforce the message that probationers are still applicants and the probationary period is an extension of the examining process, prior to finalizing probationers' appointments.

**3. Agencies should use the probationary period to terminate probationers who fail to demonstrate the appropriate level of performance and conduct. For example:**

☑ Agencies should support supervisors in their efforts to use the probationary period and avoid sending any messages that could inappropriately discourage supervisors from taking action. For example, if supervisors believe that the authorization or funding for spaces would be lost if they terminated probationers, they may be less likely to terminate marginal/unsuccessful probationers. Supervisors should be given the opportunity to recruit for the right fit, rather than being put in the position of having either the marginal/unsuccessful probationer or nobody at all.

☑ Supervisors should establish performance standards for probationers that address both organizational performance goals and their own expectations for their probationers. Trainees should be measured by both the performance of short-term goals as well as their demonstrated potential to advance to the full-performance level. Standards should be set based upon what could reasonably be expected of a new employee, and those standards should not be modified around the individual. Rather, the individuals should be measured against the standards.

☑ Supervisors should provide clear instructions to probationers as well as guidance and training in order to give probationers a fair opportunity to demonstrate why it is in the public interest to finalize an appointment to the Federal service. If, after this instruction, a probationer is not fully fit for the position, in both performance and conduct, supervisors should terminate the probationer.

# INTRODUCTION

The probationary period is one of many areas of the Federal civil service currently being examined with a view towards creating a more effective public service. Using agency unique legislation or Office of Personnel Management (OPM) demonstration project authority, some agencies are modifying the probationary period to determine if an alternate length would be more effective. However, there is more to the optimum use of the probationary period than setting an appropriate length. The probationary period is one of the most valuable assessment tools available to Federal supervisors because it allows a supervisor to evaluate a candidate based upon the probationer's performance of the actual duties of the position before the appointment becomes final. However, the efficacy of the probationary period relies upon its fair and deliberative use by supervisors and their agencies. Without the use of the assessment aspects of the probationary period—and the will to act based upon the findings of that assessment—the ability of the probationary period to help create a more efficient and effective workforce is severely limited.

## What Is the Probationary Period?

When examining the Federal probationary period it is important to recognize that employment under a probationary period is not the same as other Federal employment. Under statute, an appointment in the competitive service is not final until after the probationary period is complete. The purpose of this period is to provide the Government with an opportunity to evaluate the individual's conduct and performance on the job to determine if an appointment should become final. The history of the Federal probationary period goes back to the creation of the civil service in the Pendleton Act of 1883, which required that there be a period of probation before an appointment becomes final.[2]

Explaining the probationary period is complex, because what it means to be a probationer can vary based upon the circumstances surrounding either the

---

[2] 5 U.S.C. §3321; 5 CFR §315.803; and the Pendleton Act of 1883, sec. 2.

appointment or the individual. A newly-hired employee with no prior Federal experience will not have the same rights as coworkers who have completed their probationary periods. However, an individual who has completed a probationary period in the past can—under limited circumstances—be selected for a position through a method that creates a new probationary period. Such a person may—or may not—retain the rights they earned by previously completing a probationary period. Any situation involving a person with prior Federal service therefore must be examined on a case-by-case basis to determine the individual's rights.

This distinction is important because probationers are not the same as employees with finalized appointments. Non-probationers are entitled to advance written notice and an opportunity to reply to a proposed adverse action, as well as the right to appeal such an action to the U.S. Merit Systems Protection Board (MSPB or the Board) for adjudication. Probationers lack these entitlements. If an agency decides to remove a probationer for post-hire performance or conduct, the agency's only obligation is to notify the probationer in writing of the agency's conclusions regarding the probationer's inadequacies and the effective date of the removal.[3] Anything beyond these limited entitlements is at the discretion of the agency.

This report focuses primarily upon individuals who are new to the Government and have not yet completed a probationary appointment, and are therefore not entitled to the job protection rights referenced above. Through their successful completion of the earlier assessment phases and the presentation of the job offer, these new hires have earned the opportunity to demonstrate why it is in the public interest to offer them an appointment to the civil service. However, they have not yet earned the finalization of the appointment. That can only be done over time by demonstrating proficiency on the job.

Herein lies the greatest challenge for the effective use of the probationary period as an assessment tool. Agencies—leadership, managers, first line supervisors, human resources staff, team leaders, co-workers, and the probationers themselves—must come to see the probationary period as an extension of the application process. Rather than thinking of the probationer as an employee similar to those with finalized appointments, all involved should consider the probationer as an applicant who has successfully completed several phases of the assessment process and is currently engaged in the most important assessment of all—the extended work sample test/job interview that comprises the probationary period.

---

[3] 5 U.S.C. §7513 and 5 CFR §315.804.

This report addresses the reasons why a probationary period is so critical to establishing an effective and efficient civil service, and the changes needed in order to provide for an effective use of the probationary period. The Merit Systems Protection Board undertakes such studies as part of our statutory responsibility to conduct special reviews and studies of the civil service and other Federal merit systems.

## Scope and Methodology

As a part of this study, MSPB sent a survey to approximately 1,000 new-hire probationers and their supervisors to obtain their viewpoints on the probationary period and how it is being used. (Service computation dates were used to ensure the probationers being studied did not have prior service that could have resulted in the completion of a probationary period.) Sixty percent of those who received a survey responded. The survey was conducted in late 2004.

We also consulted with human resources specialists and agency policymakers, who provided us with their insights and with examples of how their agencies manage the probationary period. In addition, we collected data from OPM's Central Personnel Data File (CPDF), which contains a record of personnel actions throughout the Government.

In our discussions, questionnaires, and evaluation of CPDF data, we limited the scope of our study to the competitive service probationary period for new hires. The excepted service has a similar period referred to as a trial period. There is also a supervisory probationary period that applies only to employees when they are first selected for a position in which they supervise other Federal employees. These periods are each designed to provide an agency an opportunity to assess the candidate's performance of the duties of the position. However, they do not all have the exact same rules, length, agency responsibilities, or potential consequences if the probationary period is not successfully completed. While many of the principles and recommendations in this report are appropriate for trial periods and probationary supervisory positions, the report relies solely upon data related to newly-hired probationers in the competitive service and targets recommendations specifically to that group.[4]

More information on our methodology can be found in Appendix A.

---

[4] The use of a not-to-exceed date, the importance of a requirement for a pro-active step before conversion to a finalized appointment, and the call to amend 5 U.S.C. Chapter 75 are just a few examples of recommendations that are equally appropriate for excepted service appointments.

AR0021

# THE FINAL ASSESSMENT BEFORE APPOINTMENT

The probationary period is important because it is one of the most valid assessment tools available to Federal agencies. Many agencies use training and experience (T&E) to assess applicants, even though research has shown that T&E has a limited ability to predict an applicant's potential to succeed in the job.[5] By using the probationary period, a more valid tool, agencies can increase the likelihood that applicants who receive final appointments will succeed on the job. However, the effectiveness of the probationary period relies on the agencies' willingness to act in response to their assessments. Without action, agencies lose the effectiveness of the probationary period as an assessment tool.

## Selection Assessment Tools

There has been extensive study of various assessment methods to determine how to effectively predict likely success by any particular job applicant. As noted in the Board's 2004 report, *Identifying Talent through Technology: Automated Hiring Systems in Federal Agencies,* many Federal applications will ask candidates to specify whether they frequently perform a particular function, or if they have training in it, and assign a number of points to the applicant based upon the level of training and experience they identified. This method is one of the less effective assessment tools available. (The validity of assessing training or experience is greatly improved when those assessments link the training or experience to a behavior—when applicants are not just asked to indicate if they have performed a task, but are instructed to provide an example of how they used the specified task to reach a successful outcome on a particular project. This is known as the behavioral consistency model.)[6]

---

[5] John E. Hunter and Frank L. Schmidt, "The Validity and Utility of Selection Methods in Personnel Psychology: Practical and Theoretical Implications of 85 Years of Research Findings," Psychological Bulletin, vol. 124, No. 2, pp. 262-274, 1988.

[6] Ibid.

In comparison with the training and experience model, other methods for assessing applicants, such as reference checks and structured interviews, have a better likelihood of validly predicting future performance. By combining methods, agencies can increase the probability of a good selection. For this reason, the Board's reports have recommended using a "multiple hurdle" approach in which several assessment tools are used in combination. For example, a structured interview plus a work sample is more effective to assess a candidate than either tool used alone.[7] However, ultimately, all the best methods combined can only increase the potential to select the best candidate—they cannot guarantee that the right person will be chosen. Over the long term, with tens of thousands of Federal vacancies each year, the Federal Government can increase the number of selectees who successfully match the positions for which they were chosen if agencies use the more valid assessment tools, and use them in combination with each other. However, in each individual case, there will still be a very real chance that the top candidate indicated by the assessments may not prove to be an appropriate match for the position.

Some agencies have acknowledged this inherent risk. For example, the Social Security Administration has noted, "The employee's probationary period is the last step in the examination process. It provides the final indispensable test, that of performance on the job, which no preliminary testing methods can approach in validity."[8] It is also an opportunity to identify, before the probationer's appointment becomes final, situations where the match between the person and the employer or position is not sufficient to serve the Government's needs. Therefore, a probationer who does not prove to be a solid match should not be seen as a sign that a mistake was made or that someone did something wrong in the process. Rather, a probationer who is found to be a less than advantageous match should be seen as a sign that supervisors did something right—they continued the assessment process and reached the appropriate conclusion based upon what management observed on the job.

## Implementing the Assessment

The assessment of the probationer during the probationary period can be effective only if the conclusions reached are put into effect. In their work evaluating the validity of various assessment tools, Hunter and Schmidt noted that reluctance by supervisors to terminate marginal performers hampered the effectiveness of the probationary period and made it a less valid test than it could be if used properly.[9]

---

[7] U.S. Merit Systems Protection Board, *The Federal Selection Interview: Unrealized Potential*, February 2003.

[8] Social Security Administration, "Evaluating, Retaining, and Separating the Probationary Employee," S315-1, sec III.

[9] Hunter and Schmidt, op. cit., p. 268.

Our survey responses demonstrated that this concern is well founded; some of our surveyed supervisors indicated they do not plan to act upon the assessments they have performed. One of our questions asked supervisors to indicate if, given the opportunity to do it over, they would select their probationer again. Eleven percent of surveyed supervisors either said they would not hire the probationer or said they were not sure if they would hire the probationer.[10] When asked if they expected to retain their probationer beyond the probationary period (and thus provide a finalized appointment to the civil service), more than half of the same supervisors who said they would not select their probationer again reported they expected to retain the probationer, as illustrated in Table 1, below.[11]

The questions *would you select this individual again and will you retain* are not—or should not be—divergent questions, and therefore should not produce dramatically different answers. If the answer to one question is "no" then we might expect the answer to the other question would typically be "no." Yet, as demonstrated in Table 1, the answers clearly did not match.

**Table 1: Responses from Supervisors Who Reported They Would Not Choose to Hire the Individual Again**

| | |
|---|---|
| Expect to retain the probationer | 52% |
| Do not expect to retain the probationer | 31% |
| Not sure if expect to retain the probationer | 17% |
| Total | 100% |

---

[10] According to OPM's Fedscope database, in FY 2004 more than 55,000 permanent new-hires were given competitive service appointments. (From FY 2000 to FY 2003, the number of accessions ranged between 62,000 and 75,000 each year.) Thus, while the number of probationers varies from year to year, the number of supervisors who would not select the probationer again, but intend to permit the finalization of the appointment, would consistently equate to a large number of individuals, most of whom are required to serve a probationary period.

[11] While 575 supervisors responded to this question, more than 500 supervisors reported they would select the same individual again. Thus, there were only a small number of supervisors able to tell us what they would do with a probationer that they would not select again.

If a supervisor would not choose to select the person if they could do the recruitment process over again, then it appears inconsistent that the supervisor would select the person for the receipt of a finalized appointment. That supervisors could say they would not select the person again—and also report their intention to allow the person to attain status—could be an indication that they misunderstood the purpose of the probationary period or are deliberately not applying it for a variety of reasons.

In most cases, our supervisory respondents seemed to know that probationers have not received finalized appointments as Federal employees. More than 95 percent of our supervisory respondents told us they were aware that an appointment is not final until the probationary period is complete. Thus, their retention of probationers they would not select again seems to result from a decision not to use the probationary period as an assessment tool more than from a lack of knowledge that the appointment is not yet final.

Supervisors' comments indicate that they do not see the probationary period as a real opportunity to assess the individuals for appointment. In the words of one supervisor, "[It] seems to be just a formality. Never actually used to remove an employee. [My agency] must have a really bad employee in order to remove during [the] probationary period." Probationers have also gotten the impression that the probationary period is a mere formality. As one probationer put it, "It is my understanding that as long as you are not a screw-up you will get through the probationary period."

## Consequences of Inaction

If supervisors do not act to ensure that only well-suited, qualified candidates receive a final appointment it can have serious consequences for the civil service. History shows that once an individual has completed the probationary period, the person tends to remain in service for an extended period of time. CPDF data reveal that most resignations and removals occur in the first year. As illustrated in Figure 1, below, if individuals do not resign in their first year on the job, the likelihood that they will choose to depart is greatly reduced, and continues to decline as time passes. Similarly, supervisors become much less likely to remove an individual once the person is a Federal employee, with full appeal rights.



Figure 1: Resignation and Removal Rates Based on Length of Service*

*Central Personnel Data File, Competitive Service only, September 1998-September 2001.

As discussed earlier, the probationary period was created to provide supervisors with the opportunity to identify which individuals will be assets to the Government and which individuals are not well-suited for the positions. It is vital that supervisors make use of this period, because if there is a problem with someone, our data indicate that ignoring it is not likely to make it go away. Rather, delaying action beyond the probationary period makes it more difficult to take action.

Over the course of time, a marginal or poor performer—or a person with poor conduct—can affect the morale of the office, the effectiveness of co-workers, the reputation of the work unit or agency, and the ability of the organization to accomplish its goals. Even some probationers objected to what they saw as their agency's reluctance to act when a probationer was a marginal or poor performer. We received comments such as:

> "I don't feel the [agency] takes full advantage of this probationary period to really come to any conclusion about some new hires. There are people from our hire group that should not have survived as an employee through this period, but did nevertheless. Why threaten people with a probationary period, where they should be doing their best and working their hardest, when it will not be followed through?"

> "Nobody cares about the 1-year probationary period. The reason is that they have never seen it used and it definitely should [be]. There are some very lazy people that slow production and should be weeded out."

"With my understanding of what the probationary period is for, it still surprises me how many people make it through this probationary period when they don't meet the agency's expectations. I guess what I am trying to say is, if you are going to have a probationary period, use it or get rid of it."

## Probationer Performance and Conduct

Probationers with performance or conduct deficiencies are not uncommon according to our survey participants. When asked about all probationers they had hired in the past 3 years, 43 percent of responding supervisors reported that they had experienced performance concerns about at least one of their probationers. Although performance was a more common problem than conduct, 36 percent of responding supervisors stated they had faced problems with the conduct of at least one probationer in the past 3 years. There was extensive overlap between these two responses. Of those supervisors that said at least one employee had performance deficiencies, 78 percent also said at least one employee had a conduct problem. Clearly, not all probationers are successful.

The tools supervisors used to address these problems are one more demonstration that some supervisors are not treating the probationary period as an assessment period prior to the finalized appointment. When handling the conduct and performance deficiencies reported on immediately above, a number of supervisors utilized tools that are designed for employees rather than for probationers. For example, of those supervisors who encountered conduct or performance problems with a probationer, 9 percent reported they had used a reprimand for one or more probationers in the preceding 3-year period. Four percent indicated they had suspended one or more probationers.

It is not impossible that a high quality candidate may make an error serious enough to warrant formal discipline while still showing sufficient potential to be allowed to continue the opportunity to demonstrate why it is in the Government's interest to finalize the appointment. But, when nearly one in ten supervisors report using reprimands or suspensions (or both) on at least one or more probationers, this is a sign that some supervisors may be treating probationers as if they were similarly situated to employees who have completed a probationary period and are therefore entitled to the use of progressive discipline. (Our survey data did not permit us to identify which steps were attempted on the same individual prior to removal and which were applied to other probationers by that same supervisor.) Of those supervisors who reported removing a probationer during the prior 3 years, nearly 10 percent informed us they had used suspensions, and nearly

20 percent reported using reprimands. The use of such disciplinary methods for probationers by some supervisors is an indication that they may not be treating probationers as applicants for a finalized appointment, but rather as employees with finalized appointments, with all of the rights and responsibilities that go with such employment—including progressive discipline.

This treatment of probationers as if they were no different than non-probationers also appears to occur when the quality of work is at issue. Of those supervisors who indicated there was a problem with one or more probationers in the preceding 3 years, just over half reported using additional on-the-job training beyond what was already planned. Nearly one-third reported using additional classroom training. As with conduct issues, it may be appropriate for an otherwise successful candidate to receive some additional training if there is a strong expectation that the individual will be an asset with minor investment. However, with over half of all supervisors with performance concerns making this investment for one or more probationers, it raises a concern that probationers are not being assessed as potential assets as much as they are being treated as permanent employees with finalized appointments.

One supervisor expressed frustration at the manner in which probationers are treated in the same manner as other employees, asking, "When there is a problem with employees who are probationary, why is it so hard to remove them? There was a lot of documentation of counseling and warning letters." Another supervisor claimed that in his agency, "There is no probationary period—anymore." This supervisor reported having a poor-performing probationer who was expected to remain beyond the probationary period. "It is hoped that she will improve with time," the supervisor remarked.

## Retaining Problem Probationers

When we asked our supervisory respondents why they kept probationers whose conduct or performance was not fully acceptable, they gave us explanations ranging from complicated regulations to fear of Equal Employment Opportunity (EEO) complaints. Several indicated that the culture in their agency did not permit them to take immediate action to address a probationer with poor performance. One supervisor reported, "The agency has complicated the dismissal procedures to the point that probationary employees are extremely difficult to get relieved if they cannot or will not do a good job. The process should be returned to the requirements we had years ago. One major infraction and they were walked out." A supervisor in a different agency claimed, "Although the Human Resources Office had approved the dismissal of a non-performing employee, my supervisor threatened to rate me as unsatisfactory for dismissing him."

This last comment, which we hope reflects an atypical experience, is the opposite of what supervisors should experience during the probationary period. The Code of Federal Regulations states, "The agency shall utilize the probationary period as fully as possible to determine the fitness of the employee and shall terminate his services during this period if he fails to demonstrate fully his qualifications for continued employment."[12] Supervisors, as stewards of the public interest and representatives of the agency, should be held accountable for using the probationary period to ensure that probationers are not provided full appointments to the Federal service unless they have demonstrated that such appointments are in the public interest. Second-level supervisors, therefore, should seek to ensure that their subordinate supervisors are using the probationary period fairly and equitably to assess candidates and that supervisors are taking the appropriate measures in response to that assessment.

Unfortunately, the message that agencies appear to be sending to first-line supervisors does not support a thorough use of the probationary period. In the words of one supervisor, "Government organizations want you to overlook a lot—for the sake of filling a position. The philosophy is 'any *body*' to fill the position regardless if they are qualified or suited for the job." This use of the word "body" is prevalent in a number of comments, such as "due to staff shortages, borderline performance and abuse of leave issues are overlooked to keep the 'body'." Also, the human resources specialists in our focus group indicated they believed that the manager's need for "a warm body" was the overriding concern. One specialist noted that supervisors may be reluctant to give up a resource, no matter how flawed, if they have reason to believe they will not be allowed to recruit behind that person.

As we see from these findings, the successful use of the probationary period as an assessment tool relies heavily upon the agency's culture. The probationary period cannot be used effectively if supervisors who decide to step in and prevent the full appointment of a poor or marginal performer are punished, whether through the disapproval of their own supervisor or the withdrawal of funding for a replacement.

Supervisors told us there was yet another reason for keeping a poor-performing probationer. Recruitment in the Federal system is a time- and resource-consuming process. As noted in our recent report, *Managing Federal Recruitment: Issues, Insights, and Illustrations*, some agencies spend millions of dollars per year on recruitment efforts. It is understandable that

---

[12] 5 CFR §315.803.

after investing so much, and waiting months to hire an employee, the supervisor may be reluctant to terminate the probationer and begin the assessment process all over again. However, as expressed earlier in this report, a Federal employee is a long-term commitment. As undesirable as it may seem to have to recruit and assess anew, the consequences of retaining a poor or marginal performer are far worse. Once the probationary period is over, such a performer is likely to stay for years. The level of investment necessary to be sure the selectee is the right person is more than offset by the scope of the long-term investment the Government makes when the appointment of a new Federal employee is finalized.

While human resources, recruitment difficulties, budget concerns, collective bargaining agreements, upper level management, and other factors can affect the environment in which the supervisor makes the decision to retain or remove a probationer, the final responsibility rests with the supervisor. If a first level supervisor is not given the full authority to make this decision, then the responsibility resides in the level of supervision that chose to retain rather than delegate this important authority. Other influences may make the process easier or more difficult for the supervisor, but supervisors are hired to manage subordinates—including making employment decisions. With authority comes responsibility. If supervisors fail to meet this responsibility, then it is the responsibility of those above them to address that failure.

## Proactive Decisions to Grant Status

Once probationers have come on the rolls, they remain on the rolls unless there is an action taken to separate them—whether by termination or resignation. After 1 year, probationers are automatically granted status as full Federal employees, with all of the protections that provides. Some agencies do ask supervisors to assess their probationers as the anniversary approaches, but no requirement is built into the system to compel supervisors to certify that the probationer has been found fit for a finalized appointment before these rights are bestowed. The protections result strictly from the passage of time.



**Figure 2: Supervisors' Opinions on Process to Convert Probationers to Employees**

How do you think employees should be converted from a probationary status to a status that provides the full range of appeal rights?

Automatic After Period Expires — 5%

26% Automatic Unless Problem Indicated

69% Only Upon Certification

The supervisors who participated in our survey indicated a desire for certification to occur before the probationer gains status as a Federal employee. We asked our survey participants, "How do you think employees should be converted from a probationary status to a status that provides the full range of appeal rights?" As noted in Figure 2, only 5 percent supported the current process, where conversion takes place automatically unless the supervisor separates the probationer before the probationary period is completed. Approximately one-quarter approved of the idea that the conversion should be automatic unless the supervisor specifically indicates there is a problem with the employee. However, an overwhelming 69 percent declared that conversion should occur only after receipt of a supervisor's certification that the probationer's conduct and performance are fully acceptable.

Supervisors' comments reflected frustration with the results of the current process. One supervisor said, "I have fairly new employees who passed the probation period but shouldn't have. A manager should have to answer specific questions prior to [the probationer acquiring] full employee status." Another stated, "Supervisors need to be held accountable for employees being passed from probationary to permanent status."

AR0031

Case law has established that under the current system "the employee's separation from the rolls must be effected before the employee has completed his/her probationary or trial period. Otherwise, the procedures applicable to the separation of a career-conditional employee who has completed his probationary period are mandatory."[13] The probationer automatically becomes a Federal employee unless removed before the expiration of the period—the least desirable method to address conversion according to our surveyed supervisors.

In order to ensure that only qualified probationers become Federal employees, we believe the process should be changed. Rather than automatically granting status to a probationer if management fails to remove the individual before the year is finished, the probationer should receive an appointment with rights only if management has certified that, based upon the observed conduct and performance of the individual, such a conversion is in the public interest. In the absence of this certification, the relationship between the probationer and the Government would end upon the expiration of the probationary period.

This change would require that OPM alter its regulations. Instead of allowing agencies to issue a competitive service appointment on the first day of employment, which then becomes final after 1 year, we recommend that OPM create an authority under which a competitive appointment would begin with a not-to-exceed date determined by the length of the probationary period. At the end of this probationary appointment, the agency would be given the authority to convert the probationer to a permanent appointment predicated upon a certification that the individual demonstrated during the probationary period that it is in the Government's interest to provide such an appointment into the civil service. In the absence of such a conversion action, the appointment would expire and the individual's relationship with the Government as an employer would come to a close.[14]

This proposed probationary appointment would not be a temporary or term appointment; two hiring categories that currently exist to provide employment when the need for a worker is short-term and the not-to-exceed date is determined based upon the projected length of the need. Rather, the proposed probationary appointment would be a third type, one where the

---

[13] *Ibrahim v. Dept. of Agriculture*, 51 M.S.P.R. 269 (1991).

[14] This concept is slightly similar to a system that existed under the former U.S. Civil Service Commission, whereby individuals hired under certain methods would serve an appointment of no more than 3 years. At the end of the period, the agency was given 90 days in which it could convert the individual if several conditions were met, including a certification that the individual's performance and conduct had been acceptable. If the certification did not occur, the individual's appointment expired. 5 CFR §315.703a (1977), Conversion to career employment from indefinite or temporary employment.

need for a worker is permanent, and the not-to-exceed date would be based upon the time required to assess the candidate. It would be important that this probationary appointment carry with it the health insurance, life insurance, retirement, and other benefits that are important for attracting qualified candidates to the Federal service.

If the probationary appointment system is put into use, it is foreseeable that because of administrative errors or a lack of timely management action, a few successful probationers could see their probationary employment expire before a certification is processed to convert them to a finalized appointment. Thus, we would recommend that the regulations include provisions to permit the appointment of a probationer whose probationary period expires if the agency certifies that prior to the expiration of the probationary period, management found that conversion to a final appointment was in the Government's interest and the lack of conversion was due to an error or delay on the part of the agency. We expect that as with any new system, as agencies become familiar with it, the number of administrative errors or delays would be greatly reduced.

Despite the potential drawbacks that might possibly result from agency processing delays, the use of a not-to-exceed date is important—not only to compel agencies to certify if their probationers are successful, but also to help clarify that there is not yet a final appointment, and that such an appointment will be founded only upon the acceptable conduct and performance demonstrated during the probationary period. This would better support the role of the probationary period to provide "for a period of probation before an appointment in the competitive service becomes final."[15]

---

[15] 5 U.S.C. §3321.

# ASSESSING PROBATIONER PERFORMANCE

Managing the performance of probationers is one of a supervisor's most important duties and one of the most complex. It requires a sufficient period of time to observe the individual, clear and measurable standards to gauge the performance against, and both the will and the ability to act upon the results of the assessment. The current statute, OPM regulations, and (in some cases) agency policies do not provide supervisors with the level of support and flexibility they need to make the most of their many performance management responsibilities. However, the most serious flaw is the extent to which these authorities fail to create sharp lines that differentiate between a probationer and a Federal employee who has a finalized appointment to the civil service. Supervisors cannot effectively manage the performance of their probationers, in keeping with the intent of the probationary period, if they find themselves hindered by requirements that are designed to protect Federal employees with finalized appointments—something that probationers are not.

## Basing Assessment Length on the Position

Currently, the probationary period for most agencies is 1 year, and cannot be extended. However, there is a developing trend towards longer probationary periods when the nature of the work makes it difficult to assess a candidate in such a short period of time. The Internal Revenue Service (IRS) Restructuring and Reform Act authorized IRS to establish probationary periods of up to 3 years if "the Secretary of the Treasury determines that the nature of the work is such that a shorter period is insufficient to demonstrate complete proficiency in the position."[16] The Departments of Homeland Security and Defense have also been given the flexibility to move beyond a 1-year probationary period, as have several demonstration projects.

The 1-year probationary period is not always practical in today's Government, particularly if the probationer is a trainee and may not perform the full duties of a journeyman level employee for several years. When asked if the

---

[16] Public Law No. 105-206, "Internal Revenue Service Restructuring and Reform Act of 1998," §1201(a).

length of the probationary period was sufficient, many of our respondents told us it was not. In particular, supervisors of trainees sought a longer probationary period. In one agency, more than a third of the responding supervisors said they thought the period should be longer. This was the agency with the highest percentage of trainees. For our entire surveyed supervisory population, only 9 percent of those supervising non-trainees reported the probationary period should be longer, while 22 percent of the supervisors of trainees wanted a longer probationary period. Even those supervisors who did not want a longer probationary period for their own positions still recognized that the 1-year period may not be appropriate for all positions. Sixty-five percent of supervisors indicated they would like to see their components have the authority to determine the length of the probationary period.

Given the increasing complexity of the work performed by Federal employees, and the lengthy period of training required for some positions, a standard probationary period for all occupations and grade levels is no longer appropriate. OPM has already recognized this when it comes to the probationary period for new supervisors. For the supervisory probationary period, their regulation states,

> The authority to determine the length of the probationary period is delegated to the head of each agency, provided that it be of reasonable fixed duration, appropriate to the position, and uniformly applied. An agency may establish different probationary periods for different occupations or a single one for all agency employees.[17]

We recommend that the head of each agency also be authorized to determine the length of the probationary period for their non-supervisory probationers, as has already been granted to the IRS, and more recently, the Departments of Defense and Homeland Security. The need for this flexibility goes beyond agencies engaged in matters of taxes, security, or defense. All agencies should be granted the ability to set the probationary period based upon their particular needs. However, the length should be set based upon the position, not the person. Therefore, as with the supervisory probationary period, the duration should be fixed and uniformly applied to similar positions that have a similar need.

This reform will require a change in statute. While OPM has the authority to set the length of the probationary period, or to delegate it to agencies, the probationer obtains the rights of a Federal employee after 1 year, even if the individual is still a probationer. Chapter 75 of Title 5 of the United States Code currently states:

---

[17] 5 CFR §315.905.

(a) For the purpose of this subchapter—
   (1) "employee" means—
      (A) an individual in the competitive service—
         (i) who is not serving a probationary or trial period under an initial appointment; or
         (ii) who has completed 1 year of current continuous service under other than a temporary appointment limited to 1 year or less… [18]

In 2002, a panel of the U.S. Court of Appeals for the Federal Circuit held that if a probationer meets either (i) or (ii) above, the individual has all of the rights of a Federal employee.[19] This interpretation of the statute restricts the ability of OPM to grant agencies effective flexibility on the length of the probationary period.[20]

We therefore recommend that Congress amend this section to reflect that an individual who is a probationer is not a Federal employee for the purpose of receiving the protections of civil service employment, regardless of the length of service. This would enable OPM to offer agencies discretion in establishing the length of the probationary period based upon the nature of the occupational field and the degree of training necessary before individuals reach the full-performance level. If the law is changed, we recommend that OPM grant to agencies the flexibility to set the length of the probationary period for a period of 1 to 3 years.

This is not to imply that the longer period is appropriate for all positions. OPM should provide agencies with guidance on how to identify when certain positions within a particular occupational field require a longer evaluation period before an informed decision can be reached on the adequacy of the candidate. The longer probationary period should be limited to such positions, and approval should be made at an appropriately high level to ensure consistency within an agency. Where an occupational field or training program is substantially similar throughout the Government, it would be beneficial if OPM issued Government-wide probationary instructions to ensure equity.

---

[18] 5 U.S.C. §7511(a)(1)(A).

[19] *McCormick v. Department of the Air Force*, 307 F.3d 1339 (Fed. Cir. 2002).

[20] It affects the ability of an agency to effectively use a probationary period of more than 1 year, and complicates the use of a probationary period for individuals who have previously completed a probationary period but have been given a new Federal appointment, potentially in a different career field or after an extensive break in service.

# Using a Longer Probationary Period

Agencies should be aware that a longer probationary period does not alter the responsibility to assess probationers throughout the entire period. The IRS is an example of one component that has been given the authority to set longer probationary periods, and has used it with caution and deliberation.[21]

IRS has extended the length of the probationary period for Frontline Manager Trainees, Treasury Enforcement Agents, and Criminal Investigator Special Agents. However, while its legislation allowed the probationary period to be set up to 3 years long, IRS did not set all probationary periods at 3 years. Rather, it reports that probationary period lengths were set based upon the rationale for extending the probationary period. The reason for the longer period is important when deciding whether or not to use a period of more than one year. A longer probationary period is appropriate when an individual is a trainee and will not perform the journey-level work during the first year. Supervisors may be unable to fully assess a candidate until that candidate has completed training and begun performing the actual work of the position. However, a longer probationary period should not be used to delay taking action when there is sufficient data to create an informed decision at an earlier date.

In the memos authorizing the longer probationary periods, the Treasury Department noted that these extensions carry responsibilities. One such memo states, in part:

> We are pleased to see that your formal training curriculum incorporates monthly documented review and feedback to the employee, and additional formal assessments every six months (provided in writing to the employee), to eliminate any potential conflicts between a two-year probationary period and annual career ladder promotions. Your training plan reflects that IRS has taken action to ensure that, for this two-year probationary period, your managers effectively communicate performance expectations to the employees, and ensure that performance elements and standards carefully document the requirements for each successive grade level. Accordingly, we are happy to approve the two-year probationary period for Frontline Manager Trainee positions in IRS, and are pleased to support your judicious use of the personnel flexibilities of 5 U.S.C. §9510.[22]

---

[21] The Departments of Homeland Security and Defense have not yet issued specific details on occupations and pay bands that will be subject to their longer initial service period or their processes for training and assessing individuals in these positions. As a result, these newer systems are not addressed in this report.

[22] Department of the Treasury Memorandum, "Extended Probationary Period for Frontline Manager Trainee Positions," Apr. 9, 2003.

AR0037

Because trainees typically do not perform journey-level work from the start, trainee positions have a particularly high potential to benefit from a longer probationary period. These are also positions with a good likelihood to have career ladder promotions. While assessment for promotion should be an ongoing process, with progress reports regularly provided to the individual, promotions occur no more often than once every 52 weeks (exceptions are possible at grades below GS-05).[23] Probationers should be assessed far more frequently than this. Thus, while assessing a probationer for finalization of the appointment and assessing an individual for a career ladder promotion may be complimentary processes, the decision to promote cannot alone fulfill the responsibility to regularly assess probationers.

A longer probationary period is an opportunity to observe the probationer as the work increases in complexity. However, if a probationer is not successful at an earlier stage, continuation of the probationary employment is not in keeping with the purpose of the probationary period. Certain aspects of conduct and work habits may become evident early in the period, and should be acted upon promptly. It is important that agencies ensure that supervisors of individuals on longer probationary periods are performing an assessment throughout the period, and not using the longer period to delay action. Otherwise, as the probationary period goes on, the agency will have invested more and more in the individual and the probationer may have a false expectation built upon the agency's lack of earlier action.

Therefore, while we recommend longer probationary periods when an agency deems it necessary to fully evaluate a probationer, we also remind agencies of their obligation to ensure that their supervisors manage the probationary period effectively for the entire length of the probationary period. Extending the period cannot resolve the problems that may have caused the agency to seek a longer probationary period unless agencies establish cultures that support the constant assessment of probationers and the separation of probationers who are not a proven asset to the Government. Without this willingness to assess and to act on the assessment, the longer period becomes meaningless.

[23] 5 CFR §300.604.

# Establishing Performance Standards for Probationers

Probationers should have their performance evaluated in terms of their fitness for appointment to the civil service. At the same time, like non-probationers, they should also be assessed in light of the organization's strategic goals and the role of the position in the accomplishment of those goals. In addition, both probationers and non-probationers should be assessed for recognition, including awards (and salary in a pay-for-performance system). Thus, while the performance criteria for probationers and non-probationers can be expected to overlap, they may not necessarily be exactly the same.

According to the Code of Federal Regulations, probationers must fully demonstrate their qualifications for the position.[24] In our survey, we asked supervisors what standard they used to determine if a probationer should obtain status as a non-probationary employee. More than 87 percent of responding supervisors stated that, when assessing probationers, their standard was that the probationer must fully meet the established performance and conduct expectations. However, 7 percent of responding supervisors said that their measurement for continued employment was that the probationer must exceed or greatly exceed expectations. Six percent placed their requirements at a level below fully meeting the established expectations.

One possible explanation for the number of supervisors using a standard other than fully successful is that they are finding the performance standards to be inadequate. One of the most important purposes of performance standards is to identify for removal those probationers who are marginal or unsuccessful. When asked why a probationer who was considered an inadequate fit was retained, one supervisor responded, "Employee met requirements but will not perform well in position." If an individual can meet the performance requirements but be unable to perform well in the position, it can be an indication that the performance requirements are flawed and do not accurately measure the critical aspects of the position.

The supervisor quoted above reported that the probationer in question was a trainee. A trainee position is one in which an individual is selected at a level below that which has been identified as needed to support the organization's mission. The intent at the time of hire is to dedicate time and resources to give the selectee the knowledge and to help build the skills necessary to perform at the required level. This is different from a full-performance-level hire, in which the individual is immediately placed at the grade that has been identified as meeting the agency's needs.

---

[24] 5 CFR §315.803.

For trainees, it may be appropriate to measure not only the quantity and quality of the probationer's work towards mission accomplishment, but also the extent to which the probationer demonstrates the ability to learn new concepts and successfully apply them at the level required in the full-performance position the individual will one day be expected to fill. However, this does not mean requiring the probationer to be more—or less—than fully acceptable on non-trainee standards. Rather, the standards should be adjusted to measure what is actually being sought from the individual: an ability to contribute in the present capacity, as well as an ability to develop into a fully successful employee who will be an asset to the Government. This dual objective may require using different standards for probationers versus non-probationers, a practice that is fully appropriate because these two groups are not similarly situated. The standards should be fair and appropriate for each group—but not necessarily the same.

## Performance Problems: Probationers Are Different

A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service. While most fully appointed Federal employees are entitled to a performance improvement period before a performance-based adverse action may be taken, probationers are different. (It is worth noting that under alternate personnel systems such as those created by the Departments of Homeland Security and Defense, many fully appointed employees may no longer have an entitlement to a formal improvement period, although it will remain an option if a supervisor deems it appropriate.)

If a probationer is not able to perform acceptably, the Government has no obligation to extensively train the individual. Nonetheless, as noted in a previous section, we found widespread use of additional training for probationers. More than half of the supervisors who reported that they had deficient probationers said that they had used additional on-the-job training. Three in ten said that they had used additional classroom training. These additional training investments may or may not have been appropriate.

While the purpose of the probationary period is to continue the assessment process, agencies can expect that some training will be necessary, and this should be planned for when the decision is made to select a probationer. If the probationer is mostly successful with the planned level of training, a small investment in additional training, to see if the probationer can become fully successful, may be in the interest of the Government based upon the potential shown by the probationer. However, extensive training based on the needs of the particular individual is not appropriate for a probationary employee. Instead, probationers have the responsibility to demonstrate they are qualified for the position and are capable of becoming assets to the Government.

We found some indications that agencies may be making it harder on themselves than necessary by creating procedures that treat probationers with performance problems as if they are no different from appointed employees. The following is one component's explanation of how it addresses probationers with performance deficiencies:

> Probationary employees, as well as the general [component] workforce, who demonstrate unacceptable performance are issued a written warning which provides the following information: describes the unacceptable performance; identifies the performance standards which must be attained in order to demonstrate acceptable performance; establishes the period of time allotted to demonstrate acceptable performance; provides a structured performance improvement plan (PIP) which may include developmental assignments, counseling, formal training, on-the-job training, etc.; and explains what actions will be taken if the unacceptable performance continues or [acceptable performance] is not demonstrated.

A component in a different agency set forth similar guidance. While the component permitted a supervisor to take action at any time during the probationary period for "problems with conduct or general character traits" the policy also stated that the probationer "must be given at least 90 calendar days to work under performance standards before action can be taken for performance problems."

This is appropriate guidance—for addressing non-probationary employees. When it comes to probationers, however, an extensive (or resource intensive) performance improvement opportunity is counter to the intent of the probationary period. In the case of a probationer, the Government responsibility is an extension of that which is owed to an applicant. When the agency hired a probationer, it was offering an extensive job interview/work sample opportunity. Just as with a work sample test, the Government owes the applicant clear instructions and the tools to accomplish the assigned tasks. The agency does not owe the probationer the time or training that may be necessary to rehabilitate a poorly performing Federal employee.

When asked why a probationer was allowed to complete the probationary period when he was not successful, one supervisor replied, "The employee was not anywhere near where I had hoped. I gave him additional training without a lot of improvement. By then the 12-month probationary period was over. Since then his performance and conduct have both declined." Another supervisor reported retaining a probationer who was not a good fit because it was "too hard to get [the] person retrained into something else."

These comments are yet another indication that agencies are not treating probationers as applicants in the final assessment phase, but rather as Federal employees with finalized appointments to the civil service—something they are not.

# COMMUNICATING EXPECTATIONS

Agencies should treat probationers as applicants for appointments instead of as employees. Probationers should be made to understand from the start that they are being offered an opportunity to demonstrate why it is in the Government's interest to grant them an appointment, but that the appointment will not be final until the probationary period has been successfully completed. Unfortunately, according to probationary respondents, agencies rarely communicate this. The absence of such communication is yet another indication that agencies do not intend to use the probationary period to assess probationers and act upon that assessment. The message being sent to probationers is that the probationary period is not important enough to warrant being mentioned.

Our probationary respondents to the survey provided us with comments such as:

> "I had no idea there was a probationary period or if I am still on probation."

> "While there was a timely mention that it would take place, there was no effort to explain its purpose or consequences."

> "I knew there was a probationary period, but I don't know whether I'm still in a probationary period because this was never discussed."

> "I assumed there was a probation of 3 months. At 11 months I was asked to sign papers which stated that I [had] completed my [1]-year probation period."

> "I was not aware that I was still under probation or the consequences until I received this survey."

> "The only way I EVER became aware of a probationary period was when I saw it in my service record in the computer. No one ever explained to me that I could even view my service record or what any of it meant. I came upon it by chance while entering a leave request."

> "I was never fully made aware or informed as to what a probationary period is, how long, or even its purpose and what or who decides what happens at the end. I knew of it, that it existed and I was on it, but no more or what I need to do to successfully complete it."

One probationer summed up our point particularly well: "This topic should be discussed thoroughly with the new employee. This would leave no doubt in the new employee's mind of what was expected of him or her. This was never discussed with me."

An agency's silence about the probationary period before bringing a probationer on board speaks volumes about the extent to which the agency's culture fails to take the probationary period seriously.

## Communications Prior to Selection

The message that the probationary period is not a serious matter begins with the first communications between the agency and potential applicants. As noted in our report *Help Wanted: A Review of Federal Vacancy Announcements* (April 2003), vacancy announcements are typically too long and filled with fine print that few people want to read. However, much of that fine print exists because there is important information the Government needs to communicate. One piece of critical information is the notification that a new Federal employee will be required to complete a probationary period.

Not all vacancy announcements carry a notice that the applicant may be required to serve a probationary period, and the announcements that do have this information vary in specificity.[25] Below are a few examples of the language we found on OPM's USAJOBS website.

- Selectee may be required to serve a probationary/trial period.

- One-year trial/probationary period is required.

- New Appointees will be subject to a probationary/trial period. The 1st year of service of an employee who is given a career or career-conditional appointment is probationary when the employee is appointed from a competitive list of eligibles. Reinstatement applicants will be required to serve the 1-year probationary period unless the probationary period has been completed. Employees appointed under the Veterans Recruitment Authority will require 2-year trial period.

The first example does not explain the length, purpose, or potential consequences of being a probationer. The second implies that a trial period is 1 year—not accurate information based upon the hiring authorities advertised in the area of consideration for that announcement. The third example gives the accurate length of the probationary and trial periods, and enough details to confuse some readers who are not familiar with the Federal

---

[25] OPM's Delegated Examining Operations Handbook addresses what must be included in a vacancy announcement. There are both required and recommended items; the probationary period is not mentioned.

civil service. It does not inform the reader that the appointment is not final, or that the probationer does not have the same rights as a Federal employee. It also may imply that the full appointment status automatically comes with the initial selection.

Our survey responses indicated some probationers did notice the references to the probationary period in the vacancy announcements. Specifically, 3 out of every 10 surveyed probationers indicated that the vacancy announcement had informed them that they would be required to complete a probationary period. However, fewer than 1 in 10 reported that they had learned of the potential consequences of being a probationer through the vacancy announcement.

One possible explanation for this lack of emphasis on the probationary period may be an expectation that the performance assessments either will not occur or will not be acted upon. If the human resources staff who create the vacancy announcement believe the probationary period is a mere routine that will not be used to assess an applicant for appointment, it could explain why there does not seem to be a sense of urgency to communicate expectations and consequences in the vacancy announcement.

The vacancy announcement is not the only pre-hire opportunity to communicate with applicants. Some of our surveyed probationers noted that the interview was when they first heard of the probationary period. The interview is an opportunity to describe the probationary period as an assessment period. The supervisor can let the applicant know what the selectee will need to demonstrate during the probationary period in order to qualify for an appointment, and set the applicant's expectations at a reasonable level by explaining that if selected, the individual would still have to successfully complete a probationary period before the appointment could become final.

Of the more than 40 agencies and components that provided us information on their probationary period processes, none mentioned the job interview as a means by which the agency told applicants about the probationary period. Notification during job interviews appears to be primarily a result of individual supervisors taking initiative rather than agency- or component-wide policies or established procedures. Only 20 percent of supervisory respondents reported that they discussed the probationary period at all with their probationers before the probationers entered on duty. We do not know the level of detail in these discussions, but the very absence of any communication from the majority of supervisors about the probationary period before the probationers come on board sends a message to the probationers. The message: the probationary period is so unimportant to their supervisors that it is not even worth mentioning that it exists.

Another opportunity to notify a probationer is the job offer. Several agencies and components informed us that their human resources offices were required to include a notification regarding probation in the job offer. According to our surveyed probationers, the job offer was used to notify them about the probationary period more than any other pre-hire method. Unfortunately, just being notified that the probationary period exists is not enough. While 34 percent of our surveyed probationers were told of a probationary period in the offer, only 25 percent were told of its purpose, and only 17 percent were told of the potential consequences of being a probationer.

Even with all the different communication methods combined, the message that the probationary period exists was often not sent. A third of our responding probationers reported that they did not know they would be required to complete a probationary period until after they reported for duty.

This lack of communication about the probationary period throughout the entire pre-hire process is problematic on several levels. First, the probationers are put into a position where many of them may not know that they are subject to an additional assessment before their appointment becomes final. They are giving up their current situations without being educated about precisely what they are accepting in exchange. With so much at stake, candidates deserve to understand what is being offered and the conditions that come with that offer. Furthermore, in some cases, a lack of notification can invalidate the probationary period.[26]

Secondly, this is the start of the management-employee relationship. Trust is an important element in a productive relationship, and if a probationer feels the employer was disingenuous by failing to mention the probationary period, the relationship can be damaged.

Additionally, silence about the probationary period can send the message that the agency does not take the probationary period seriously, since it is apparently not important enough to mention as an aspect of employment along with salary, benefits, or related matters. This message is sent by the human resources staff, supervisors, and everyone else probationers encounter who do not inform them of the probationary period's existence and potential consequences.

---

[26] If individuals with rights as current Federal employees accept an appointment that by its nature subjects them to a new probationary period, they retain their current rights unless they make a knowing and voluntary decision to relinquish those rights as a condition of accepting the new job. If the decision was not an informed one, the rights are retained. *Edwards v. Department of Justice*, 86 M.S.P.R. 404 (2000); and *Ramos v. Department of Justice*, 94 M.S.P.R. 623, 629 (2003).

## Communications After Selection

In some locations, the message that the probationary period is not important continues to be sent after the probationer reports for duty.

For agencies responding to our questionnaire, the most common time to notify probationers of the existence of the probationary period was when the probationer entered on duty. Several agencies noted that they had developed orientation programs and materials including handbooks, and that notifying probationers of the probationary period was a part of this orientation, which occurred either the first day or soon thereafter. Yet, there were a few probationers who were not aware of the probationary period until they received our survey. These individuals were on appointments subject to the probationary period and reported starting their Federal service at least 7 months prior to completing our survey. Still, 6 percent informed us that despite their communications with their supervisors, human resources offices, co-workers, and friends, they were never told that they would be required to complete a probationary period.

Even for those probationers who were notified, the message sent was sometimes incomplete. Nearly one-quarter of our surveyed probationers told us that the potential consequences of being a probationer were never explained to them. As illustrated by Figure 3, below, most of those who were notified of the potential consequences were told after they came aboard:



**Figure 3: Notification of the Potential Consequences of Being a Probationer**

How were you notified of the potential consequences of your probationary status? (Select all that apply.)

| | |
|---|---|
| Performance Standards | 40% |
| Never Explained | 24% |
| Handbook | 20% |
| Job Offer | 17% |
| Other | 10% |
| Vacancy Announcement | 9% |
| Warning | 1% |

0%  10%  20%  30%  40%  50%

As shown above, the most common time to be told of the consequences of the probationary period was during discussions of the performance standards, cited by 40 percent of probationary respondents. Yet, given the importance of the supervisor's expectations in both the assessment of a probationer and the outcome of that assessment (termination versus retention), 40 percent is a regrettably low number. The link between performance standards and the probationary period is too important to be left out of discussions regarding performance expectations.

Supervisors' expectations and the potential consequences should be communicated to probationers if the probationary period is to be used to separate individuals who are not assets to the Government. Silence on the matter may cause a probationer to assume that all is well, creating an expectation that the appointment either is already finalized, or that the finalization is a mere formality. Probationers deserve to be given the clear message that the probationary period will be used by the agency for assessment purposes and that action will be taken based upon the assessment results. This can and should be done in a positive manner by notifying probationers that the reward for success is a finalized appointment that carries significant job protection rights.

## Supporting Supervisors of Probationers

Supervisors have a critical role in the administration of a probationary period. Ultimately, it is a supervisor who must determine if the probationer's conduct and performance are acceptable. Unfortunately, some of the supervisors who responded to our survey indicated that they are not given adequate information to carry out this critical responsibility. One supervisor told us, "When [the individual] came here I had no idea he was on probation." Another stated, "At a minimum, supervisors should be given some idea at the outset of their advertisement of the employees' rights and options rather than [having to rely on] the 'voyage of discovery' that is currently the norm."

Our survey did not ask supervisors when they became aware they were supervising a probationer. However, we did ask when they received training, guidance, or instructions concerning their role as a supervisor of probationers. As noted in Figure 4, below, almost one in five supervisors never received any training, guidance, or instruction. (For those with 5 years or less as a supervisor, 28 percent reported that they had never received guidance.) A lack of basic information can make it difficult for a supervisor to administer the probationary period effectively. Furthermore, while almost

AR0047

60 percent of supervisors did receive training at some point in their career, less than 10 percent were given instructions as a reminder at the time that they selected a probationer. It is difficult for supervisors to use the probationary period as an assessment tool prior to appointment unless they are aware that they have selected a probationer and know what their role is as the supervisor of a probationer.

### Figure 4: Training, Instructions or Guidelines

**When did your agency provide you training or other guidance/instructions concerning your role as a supervisor during a subordinate's probationary period? (Select all that apply.)**



The supervisors who responded to our survey indicated that they wished they had been given more information. The gaps in knowledge varied from supervisors who said they did not know an individual was a probationer to those who did not know when a subordinate's probationary period would end. (Three percent of our survey's supervisory respondents reported they did not know the length of their subordinate's probationary period, while 4 percent reported a length that is shorter than the 1-year minimum required by OPM regulations.) One supervisor indicated that the problem was not a lack of knowledge about the probationary period, but simply, "As a supervisor I sometimes forget to discuss 'probationary' status with new hires.... It may be helpful to develop an information sheet/form explaining the probationary period and require the employee and supervisor to both sign it for new hires to the Federal system."

Supervisors need support from their agencies in order to meet their responsibilities as supervisors of probationers. Many receive only silence—which itself is a message. If supervisors received the message—through training, guidance, and their own supervisors—that the probationary period is to be taken seriously as an assessment period, and that assessing the probationer is a critical function of being a supervisor, that message could be passed on to the probationer. The current overall lack of communication throughout the pre- and post-hire process indicates that the message is not being adequately communicated to either supervisors or probationers. As long as agencies remain silent on this issue, they can expect supervisors to continue using the probationary period at a level far below its full potential.

# FINDINGS AND RECOMMENDATIONS

The probationary period is an opportunity to assess the conduct and performance of a probationer to determine if the individual is a good match for the needs of the hiring agency before an appointment to the civil service becomes final. However, this assessment frequently does not occur. Our survey responses indicated that even though supervisors are aware that the probationer's appointment is not final, supervisors tend to treat their probationers as fully appointed Federal employees, with all the rights and responsibilities that implies. Agency policies and responses to our questionnaire also indicated that in many cases, probationers who are marginal or unsuccessful are not handled any differently than fully appointed Federal employees.

The message being sent by supervisors, human resources staff, and agency cultures overall is that the probationary period is a mere formality. Some supervisors expressed frustration at the lack of agency support for the full use of the probationary period, and even a number of probationers were perturbed by what they saw as agencies' failure to use the probationary period to remove marginal and poor performers.

The probationary period, if fully used, is one of the most valid tests available to determine if an individual will be a successful employee. However, full and successful usage requires a fair, in-depth assessment of the probationer and a willingness to terminate the probationer if the individual fails to prove that a finalized appointment would be in the public's best interest. Until this occurs, the effectiveness of the probationary period will remain severely limited.

# Recommendations

1. **The statute and regulations should be changed to better support the use of the probationary period as a time period to assess candidates before they receive finalized appointments as Federal employees. This includes providing agencies with the flexibility to set the length of the probationary period based upon the unique characteristics of their positions and training programs. Specifically:**

   ☑ Congress should amend 5 U.S.C. Chapter 75 to indicate that if an individual is in a probationary status, the individual is not entitled to the protections granted to Federal employees, even if the individual has been in service for more than 1 year. This would help support the message that appointment as a Federal employee must be earned through successful performance and is not an entitlement that automatically results from a job offer or physical presence in the workplace. Amending the statute would also enable OPM to provide all agencies with meaningful flexibility regarding the duration of the probationary period.

   ☑ OPM should establish procedures so that a probationer does not automatically become an employee in the absence of agency action. An agency should be required to certify that a probationer's conduct and performance have established that the individual will be an asset to the Government. In the absence of this certification, the probationer's employment should automatically terminate upon the expiration of the probationary period. The use of a not-to-exceed date for that period can help emphasize that the individual has not been promised a finalized appointment, but rather has been given a time-limited opportunity with the burden on the probationer to demonstrate why a finalized appointment is in the interest of the Government.

   ☑ If Congress amends 5 U.S.C. Chapter 75 as recommended above, OPM should modify 5 CFR §315.801 and §315.802 so that they will no longer set the probationary period at 1 year with a prohibition on extensions. OPM should, instead, issue regulations that permit agencies to set a probationary period of 1 to 3 years for each occupational area upon showing that the nature of the applicable positions calls for the particular length requested by the agency.

2. **Agencies should create a culture in which probationers are treated with respect as candidates for an appointment, but not as Federal employees with finalized appointments. In particular:**

☑ Performance appraisals for supervisors should include an evaluation of how thoroughly they have used the probationary period as an assessment tool. Supervisors should be held accountable for using the probationary period fairly, fully, and in the best interest of the Federal Government. This should not be considered an additional critical element, but rather should be seen as an intrinsic part of their existing responsibility to thoroughly assess their subordinates and take action when appropriate.

☑ Supervisors should receive training in their responsibilities to the agency, the civil service, and the probationer. They should be made aware when they have hired a probationer, and reminded that their role is to assess the individual for appointment as well as to supervise the performance of work towards organizational goals.

☑ Agency policies should treat unsuccessful probationers differently than Federal employees with finalized appointments. Agencies should ensure that probationers receive clear guidance and a full understanding of performance expectations, as well as the appropriate level of training for an individual with their level of experience. However, agencies should also ensure that probationers and their supervisors recognize that probationers are not similarly situated to other Federal employees and are not entitled to the same level of investment or opportunities for rehabilitation.

☑ Probationers should be notified, *before accepting a job offer*, that they will be probationers and what that means. Human resources staff and supervisors should ensure that probationers are aware they have been offered an opportunity to demonstrate on the job why finalizing their appointment would be in the best interests of the agency and the entire civil service—but that a finalized appointment is not guaranteed.

☑ In their discussions with a probationer, before and after the individual begins work, supervisors should reinforce the message that probationers are still applicants and the probationary period is an extension of the examining process, prior to finalizing probationers' appointments.

3. **Agencies should use the probationary period to terminate probationers who fail to demonstrate the appropriate level of performance and conduct. For example:**

☑ Agencies should support supervisors in their efforts to use the probationary period and avoid sending any messages that could inappropriately discourage supervisors from taking action. For example, if supervisors believe that the authorization or funding for spaces would be lost if they terminated probationers, they may be less likely to terminate marginal/unsuccessful probationers. Supervisors should be given the opportunity to recruit for the right fit, rather than being put in the position of having either the marginal/unsuccessful probationer or nobody at all.

☑ Supervisors should establish performance standards for probationers that address both organizational performance goals and their own expectations for their probationers. Trainees should be measured by both the performance of short-term goals as well as their demonstrated potential to advance to the full-performance level. Standards should be set based upon what could reasonably be expected of a new employee, and those standards should not be modified around the individual. Rather, the individuals should be measured against the standards.

☑ Supervisors should provide clear instructions to probationers as well as guidance and training in order to give probationers a fair opportunity to demonstrate why it is in the public interest to finalize an appointment to the Federal service. If, after this instruction, a probationer is not fully fit for the position, in both performance and conduct, supervisors should terminate the probationer.

# APPENDIX A: METHODOLOGY

## The Survey

Individuals were selected at random from the Office of Personnel Management's database to participate in our survey. The population was limited to full-time, permanent, non-seasonal employees who had a career-conditional appointment and were first hired into the competitive service within the 6 months preceding the random drawing of participants. Individuals were selected from each of the following agencies:

- Department of the Army
- Department of the Navy
- Department of the Air Force
- Other Department of Defense Components
- Department of Veterans Affairs
- Social Security Administration
- Bureau of Prisons
- Internal Revenue Service
- Department of Agriculture, Forest Service

We sent 1,070 surveys to probationers, and an equal number of a different survey to the supervisors of those probationers. Seventy-two supervisor surveys and 101 probationer surveys were returned as undeliverable. The response rate for each group was approximately 60 percent, with 600 supervisors and 581 probationers responding. Because of the manner in which the survey was conducted it was not possible to associate the responses between a particular probationer and that individual's supervisor.

This survey was not intended to represent the Federal Government as a whole. Rather, its results paint a picture of what is occurring in the agencies that recruit the most probationers, as well as in certain other agencies, to provide a cross-section of the workforce engaged in different occupations.

# Agency Input

We also sent a different set of questions to a number of departments, agencies, and components. The questions addressed how they managed the probationary process, including any flexibility that was available to them. We received a total of more than 40 responses. These responses came from one or more components within, or the headquarters of, the following:

- Department of the Interior
- Department of Defense
- Department of Health and Human Services
- Small Business Administration
- National Aeronautics and Space Administration
- Department of Agriculture
- Department of Veterans Affairs
- General Services Administration
- Department of the Treasury
- Department of Labor
- Department of Education
- Social Security Administration
- Department of Justice

# The Focus Group

Our focus group consisted of approximately 10 members of the Federal Midwest Human Resources Council in Chicago, IL.

U.S. Merit Systems Protection Board
1615 M Street, N.W.
Washington, DC 20419

OFFICIAL BUSINESS
PENALTY FOR PRIVATE USE $300

PRST STD
U.S. POSTAGE PAID
WASHINGTON DC
PERMIT NO. G-113

# THE PROBATIONARY PERIOD:

## A Critical Assessment Opportunity

To Do List

☑ Assess Resume
☑ Work Sample Test
☑ Structured Interview
☑ Check References
☑ Offer Probationary Appointment
☐ Assess Probationer's Conduct and Performance
☐ Decide if Conversion Serves the Public Interest

AR0056

# U.S. Merit Systems Protection Board
## Information Sheet
## Probationary Terminations

### *Purpose*

The purpose of this information sheet is to provide general information. It does not represent an official statement or advisory opinion issued or approved by the Board and is not intended to provide legal advice or to be cited as legal authority. Instead, it is intended only to help the public become familiar with the Board and its procedures. In all instances, statutes, regulations, and case law control with respect to the matters discussed generally here.

### *Who is serving a probationary period?*

An individual serving a probationary or trial period is generally someone serving in his or her first year or first two years of a new appointment. The length of the probation or trial period depends on whether the position is in the competitive service or the excepted service.

### *Do individuals serving a probationary period have a right to appeal their termination to the Board?*

Individuals serving a probationary or trial period generally do not have a statutory right to appeal their termination to the Board. *See* 5 U.S.C. § 7511(a)(1) (defining who is an "employee" for purposes of Board adverse action appeal rights). (But see next section for discussion of whether competitive service employees may have a *regulatory* Board appeal right.)

In the competitive service, the probationary period is one year of service. However, a competitive service individual serving a probationary period is nevertheless entitled to appeal an adverse action to the Board if he or she "has completed 1 year of current continuous service under other than a temporary appointment limited to 1 year or less." Probationary individuals in the competitive service also have limited appeal rights to the Board by regulation. 5 C.F.R. § 315.806.

In the excepted service, a preference-eligible veteran must complete "1 year of current continuous service in the same or similar positions" in order to have appeal rights. A nonpreference eligible in the excepted service must complete "2 years of current continuous service in the same or similar positions in an Executive agency under other than a temporary appointment limited to 2 years or less."

## *What regulatory rights are provided to individuals in the competitive service who are terminated during their probationary period?*

The regulatory rights will depend on whether the individual was terminated for conditions arising prior to, or subsequent to, the appointment. (In addition, individuals serving a probationary period on initial appointments to a supervisory or managerial position are subject to 5 C.F.R. part 315, subpart I, and their rights are not discussed in this Information Sheet.)

If the agency proposes to terminate an individual in whole or in part for conditions arising *before* his or her appointment, the individual is entitled to notice of the reasons for the proposed termination, a reasonable time to answer the proposal notice and to furnish supporting affidavits, and written notice of the agency's decision. That decision will include the reasons for the action and notice of the right to file an appeal with the Board. 5 C.F.R. §§ 315.805 and 315.806. The individual may appeal on the grounds that the termination was not effected in accordance with the procedural requirements of § 315.805.

If the agency terminates the individual for reasons arising *during* the probationary period, the individual is entitled to a written notice stating the basis and the effective date of the termination. 5 C.F.R. § 315.804. However, the Board's jurisdiction over such a termination is limited to allegations that it was based on partisan political reasons or marital status. 5 C.F.R. § 315.806(b). In determining jurisdiction, the Board will consider only allegations of marital status or partisan political discrimination and may not decide whether the stated reasons why the agency terminated the appointment were correct.

Only when an individual establishes jurisdiction under 5 C.F.R. §§ 315.804 or 315.805 can the Board also consider discrimination based on race, color, religion, sex, national origin, age, or disability. 5 C.F.R. § 315.806(d).

There are no regulatory appeal rights for individuals in the excepted service terminated during their trial period unless they are serving in the first year of a Veterans' Recruitment Appointment (VRA). VRA appointees have the same regulatory rights of appeal to the Board as individuals in the competitive service terminated during probation.

## *What other review rights does an individual serving a probationary period have?*

An individual serving a probationary or trial period may have the right to file an Equal Employment Opportunity (EEO) complaint with their employing agency's EEO office, a grievance under the terms of any applicable collective bargaining agreement or employing agency policy, or a request for corrective action with the Office of Special Counsel. The type of complaint or appeal that is filed first may

constitute an "election of remedy" that may limit or preclude other review options. *See* 5 C.F.R. § 1201.3(c)(2) (choice of procedures).

### *Who should an individual terminated during a probationary period contact with questions about MSPB procedures?*

(1) The Regional Office in which the appeal will be filed or is pending.
(2) The Office of the Clerk of the Board at (202) 653-7200 or mspb@mspb.gov.
(3) The Board's website at www.mspb.gov.
(4) The individual's own attorney or non-attorney representative.

AR0059



**United States Government Accountability Office**

Report to the Chairman, Committee on Homeland Security and Governmental Affairs, U.S. Senate

---

**February 2015**

# FEDERAL WORKFORCE

# Improved Supervision and Better Use of Probationary Periods Are Needed to Address Substandard Employee Performance

---

AR0060

# GAO Highlights

Highlights of GAO-15-191, a report to the Chairman, Committee on Homeland Security and Governmental Affairs, U.S. Senate

February 2015

## FEDERAL WORKFORCE

## Improved Supervision and Better Use of Probationary Periods Are Needed to Address Substandard Employee Performance

## Why GAO Did This Study

Federal agencies' ability to address poor performance has been a long-standing issue. Employees and agency leaders share a perception that more needs to be done to address poor performance, as even a small number of poor performers can affect agencies' capacity to meet their missions.

GAO was asked to examine the rules and trends relating to the review and dismissal of federal employees for poor performance. This report (1) describes and compares avenues for addressing poor performance, (2) describes issues that can affect an agency's response to poor performance, (3) determines trends in how agencies have resolved cases of poor performance since 2004, and (4) assesses the extent to which OPM provides guidance that agencies need to address poor performance. To address these objectives, GAO reviewed OPM data, and interviewed, among others, OPM and MSPB officials, selected CHCOs, and selected union officials.

## What GAO Recommends

GAO is making four recommendations to OPM to strengthen agencies' ability to deal with poor performers including working with stakeholders to assess the leadership training agencies provide to supervisors. OPM concurred or partially concurred with all but one recommendation noting that GAO's recommendation to explore using an automated process to notify supervisors when a probationary period is about to end is an agency responsibility. GAO agrees and has clarified the recommendation.

View GAO-15-191. For more information, contact Robert Goldenkoff at (202) 512-2757 or goldenkoffr@gao.gov.

## What GAO Found

Federal agencies have three avenues to address employees' poor performance:

1. **Day-to-day performance management activities** (such as providing regular performance feedback to employees) can produce more desirable outcomes for agencies and employees than dismissal options. However, supervisors do not always have effective skills, such as the ability to identify, communicate, and help address employee performance issues.
2. **Probationary periods** for new employees provide supervisors with an opportunity to evaluate an individual's performance to determine if an appointment to the civil service should become final. According to the Chief Human Capital Officers (CHCOs) that GAO interviewed, supervisors often do not use this time to make performance-related decisions about an employee's performance because they may not know that the probationary period is ending or they have not had time to observe performance in all critical areas.
3. **Formal procedures**—specifically chapters 43 and 75 of title 5 of the United States Code and OPM implementing regulations—require agencies to follow specified procedures when dismissing poor performing permanent employees, but they are more time and resource intensive than probationary dismissals.

Federal employees have protections designed to ensure that they are not subject to arbitrary agency actions. These protections include the ability to appeal dismissal actions to the Merit Systems Protection Board (MSPB) or to file a grievance. If employees are unsatisfied with the final decision of the MSPB or an arbitrator decision, they may seek judicial review.

The time and resource commitment needed to remove a poor performing permanent employee can be substantial. It can take six months to a year (and sometimes longer) to dismiss an employee. According to selected experts and GAO's literature review, concerns over internal support, lack of performance management training, and legal issues can also reduce a supervisor's willingness to address poor performance.

In 2013, agencies dismissed around 3,500 employees for performance or a combination of performance and conduct. Most dismissals took place during the probationary period. These figures do not account for those employees who voluntarily left rather than going through the dismissal process. While it is unknown how many employees voluntarily depart, the CHCOs that GAO interviewed said voluntary departures likely happen more often than dismissals.

To help agencies address poor performance, the Office of Personnel Management (OPM) makes a range of tools and guidance available in different media, including its website, in-person training, and guidebooks. However, CHCOs and other experts said agencies are not always aware of this material and in some cases it fell short of their needs. Going forward, it will be important for OPM to use existing information sources, such as Federal Employee Viewpoint Survey results, to inform decisions about what material to develop and how best to distribute it.

# Contents

| | | |
|---|---|---|
| Letter | | 1 |
| | Background | 4 |
| | Agencies Have Multiple Avenues Available to Address Employee Performance | 5 |
| | Various Considerations Can Reduce Willingness to Deal with Poor Performance | 19 |
| | Agencies Dismissed Around 3,500 Employees for Performance in 2013, but the Overall Magnitude of Employees Leaving for Performance Reasons Is Unknown | 21 |
| | OPM Provides a Range of Tools and Guidance to Address Poor Performance but This Assistance May Not Meet All Agency Needs | 26 |
| | Conclusions | 29 |
| | Recommendations for Executive Action | 30 |
| | Agency Comments and Our Evaluation | 31 |
| Appendix I | Objectives, Scope, and Methodology | 34 |
| Appendix II | Chapters 43 and 75 Similarities and Differences | 37 |
| Appendix III | Appeal of Removal or Demotion Actions | 39 |
| Appendix IV | Examples of Tools and Guidance the Office of Personnel Management Provides to Help Agencies Address Poor Performance | 48 |
| Appendix V | Comments from the Office of Personnel Management | 49 |
| Appendix VI | GAO Contact and Staff Acknowledgments | 52 |

AR0062

Table

Table 1: Comparison of Approaches for Addressing Poor
        Performance – By Legal Authority                    16

Figures

Figure 1: The Dismissal Process under Chapter 43            15
Figure 2: Performance Dismissals By Legal Authority and
        Employment Status – 2013                            22
Figure 3: Trends in Performance Dismissals and Hiring
        Fluctuations (Career Permanent Employees) – 2004-
        2013                                                23
Figure 4: MSPB Decisions on Dismissal Appeals under chapter 43
        – 2013                                              26

**Abbreviations**

| | |
|---|---|
| CHCO | chief human capital officer |
| CSRA | Civil Service Reform Act of 1978 |
| EEOC | Equal Employment Opportunity Commission |
| EHRI | Enterprise Human Resources Integration |
| Federal Circuit | U.S. Court of Appeals for the Federal Circuit |
| FEVS | Federal Employee Viewpoint Survey |
| GEAR | Goals-Engagement-Accountability-Results |
| MSPB | U.S. Merit Systems Protection Board |
| NOA | Nature of Action |
| OPM | Office of Personnel Management |
| OSC | U.S. Office of Special Counsel |
| PAAT | Performance Appraisal Assessment Tool |
| SES | Senior Executive Service |

This is a work of the U.S. government and is not subject to copyright protection in the
United States. The published product may be reproduced and distributed in its entirety
without further permission from GAO. However, because this work may contain
copyrighted images or other material, permission from the copyright holder may be
necessary if you wish to reproduce this material separately.



**GAO**  U.S. GOVERNMENT ACCOUNTABILITY OFFICE

**441 G St. N.W.**
**Washington, DC 20548**

February 6, 2015

The Honorable Ron Johnson
Chairman
Committee on Homeland Security and Governmental Affairs
United States Senate

Dear Chairman Johnson:

A high-performing, effective workforce with the requisite talents, multidisciplinary knowledge, and up-to-date skills is critical to helping the federal government address increasingly complex and rapidly evolving challenges. However, managing employee performance has been a long-standing government-wide issue and the subject of numerous reforms since the beginning of the modern civil service. Without effective performance management, agencies risk not only losing (or failing to utilize) the skills of top talent, they also risk missing the opportunity to observe and correct poor performance. As even a small number of poor performers can negatively affect employee morale and agencies' capacity to meet their missions, poor performance should be addressed sooner rather than later, with the objective of improving it. The Office of Personnel Management (OPM) characterizes poor performance as the failure of an employee to do his or her job at an acceptable level.

Federal employees and agency leaders share a perception that (1) supervisors ineffectively address poor performance, and (2) federal performance management systems are not built to address poor performance. For example, in the 2014 Federal Employee Viewpoint Survey (FEVS), 28 percent of respondents said that steps are taken to deal with a poor performer who cannot or will not improve in his or her work unit.[1] A recent report analyzing the views of agency chief human capital officers (CHCO) found their agencies' respective performance

---

[1]FEVS is a tool offered by OPM that measures employees' perceptions of whether, and to what extent, conditions characterizing successful organizations are present in their agencies. Forty-two percent of respondents disagreed with the statement and 27 percent neither agreed nor disagreed.

management systems make it difficult for managers to address poor performers and that many are doing so inadequately.[2]

We were asked to examine the rules and trends relating to the review and dismissal of employees for poor performance. Our objectives were to (1) describe and compare avenues for addressing poor performance, including the formal procedures required when dismissing employees for poor performance; (2) describe issues that can affect an agency's response to poor performance; (3) determine trends in dismissals and other agency actions taken for poor performance since 2004; and (4) assess the extent to which OPM provides the policy, guidance, and training that agencies say they need to address poor performance.

To address the first objective, we reviewed relevant sections of title 5 of the United States (U.S.) Code–commonly referred to as title 5–and OPM regulations to determine the authority agencies have to address poor performance in the competitive and excepted services and in the senior executive service, including formal procedural and employee appeal rights.[3] To describe issues that can affect an agency's response to poor performance, we interviewed

- OPM officials from the Merit System Accountability and Compliance Office, Office of Employee Services, and other offices that work with agencies to address poor performance;

- officials of the Merit Systems Protection Board (MSPB), including the Executive Director, and representatives from the Office of Regional Operations, the Office of Appeals Counsel, and an administrative judge;

---

[2]Partnership for Public Service, *Embracing Change: CHCOs Rising to the Challenge of an Altered Landscape* (Washington, D.C.: May 2014).

[3]Our discussion of procedural and appeal rights under title 5 applies to competitive service positions as well as those excepted service positions in executive agencies which have not been excluded from these title 5 (and OPM regulation) provisions. Many positions in the excepted service are not covered under title 5 (in whole or in part), including those positions covered under alternative personnel systems. Even where excepted service positions are covered under the procedural and appeal rights under title 5, differences exist in that coverage and will be noted, as appropriate.

- selected CHCOs chosen for their particular expertise in the issue area, as identified through the Executive Director's Office of the CHCO Council and previous GAO work on related topics;

- National Treasury Employees Union officials;

- American Federation of Government Employees officials;
- officials from the Federal Managers Association;

- individual members of the Federal Employees Lawyers Group;

- officials from the Partnership for Public Service;

- officials from the Senior Executives Association; and

- selected individuals with expertise in performance management from academia and the private sector.

To address the third objective, we analyzed data from OPM's Enterprise Human Resources Integration (EHRI) data warehouse to identify trends in ratings and performance-related personnel actions. This includes the number of employees dismissed, demoted, or reassigned for performance reasons and the number of employees who voluntarily resigned or retired over a three year period after receiving a "less than fully successful" or lower performance rating.

We also interviewed individuals with extensive experience in federal performance management issues to better understand the magnitude of other strategies agencies use to address poor performance, such as employees voluntarily leaving as a result of supervisory performance management activities. We reviewed MSPB data on employee appeals for performance-related actions and interviewed MSPB officials to determine the number, time to process, and outcomes of those appeals. We determined the data used in this report to be sufficiently reliable for our purposes. To determine data reliability, we reviewed our past analyses of the data maintained by OPM, interviewed OPM and MSPB officials knowledgeable about the data, and conducted electronic testing of EHRI to assess the accuracy and completeness of the data used in our analyses.

To address the fourth objective, we reviewed the guidance and tools that OPM provides to agencies to assist them in addressing poor performance. We assessed OPM's tools and guidance by comparing their content to what is needed, as determined by CHCOs, key stakeholders,

and experts. For further information on our scope and methodology, see appendix I.

We conducted this performance audit from February 2014 through January 2015 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Background

How and when federal agencies can dismiss or take action to address poor performance has been a long-standing personnel issue that dates back to the creation of the civil service and has been the subject of a number of reforms since the civil service began. Modern merit principles state that appointments should be based upon qualifications, employees should maintain high standards of integrity and conduct, and employees should operate free of political coercion. However, according to the MSPB, the mechanisms put in place to ensure merit principle goals are met have at times been seen as bureaucratic obstructions that reduce civil service effectiveness.[4] The Civil Service Reform Act of 1978 (CSRA) was intended, in part, to address the difficulty of dismissing employees for poor performance.[5] Among other changes, CSRA established new procedures for taking action against an employee based on poor performance set forth under chapter 43 of title 5 of the U.S. Code.[6]

Despite CSRA's enactment, addressing poor performance continues to be a complex and challenging issue for agencies to navigate. In 1996, we testified that the redress system that grew out of CSRA and provides protections for federal employees facing dismissal for performance or other reasons diverts managers from more productive activities and

---

[4]U.S. Merit Systems Protection Board, *Addressing Poor Performers and the Law* (Washington, D.C.: September 2009).

[5]Pub. L. No. 95-454, 92 Stat. 1111 (Oct. 13, 1978).

[6]Prior to CSRA, in order to dismiss an employee for poor performance, an agency had to follow adverse action procedures under chapter 75 of title 5 of the U.S. Code, which permitted removal only if it would promote the efficiency of the service. S. Rep. No. 95-969, at 9-10, 39-43 (1978). CSRA also made amendments to chapter 75.

inhibits some of them from taking legitimate actions in response to performance or conduct problems.[7] In 2005, we reported on ways agencies have sought to better address poor performance, including more effective performance management and efforts to streamline appeal processes.[8] In 2014, we testified that opportunities remain for agencies to more effectively deal with poor performance through enhanced performance management.[9]

## Agencies Have Multiple Avenues Available to Address Employee Performance

In general, agencies have three means to address employees' poor performance, with dismissal as a last resort: (1) day-to-day performance management activities (which should be provided to all employees, regardless of their performance levels), (2) dismissal during probationary periods, and (3) use of formal procedures. Agencies' choices will depend on the circumstances at hand.

## Effective Performance Management Can Produce Desirable Outcomes for Agencies and Employees

The first opportunity a supervisor has to observe and correct poor performance is in day-to-day performance management activities. Performance management and feedback can be used to help employees improve so that they can do the work or—in the event they cannot do the work—so that they can agree to move on without going through the dismissal process. Agencies invest significant time and resources in recruiting potential employees, training them, and providing them with institutional knowledge that may not be easily or cost-effectively replaceable. Therefore, effective performance management – which consists of activities such as expectation-setting, coaching and feedback – can help sustain and improve the performance of more talented staff and can help marginal performers to become better. According to officials we interviewed and our literature review, agencies should seek ways to improve an employee's performance and only dismiss that employee if he or she does not reach an acceptable performance level. OPM's

---

[7]GAO, *Federal Employee Redress: A System in Need of Reform*, GAO/T-GGD-96-110 (Washington, D.C.: Apr. 23, 1996).

[8]GAO, *Issues Related to Poor Performers in the Federal Workplace*, GAO-05-812R (Washington, D.C.: June 29, 2005).

[9]GAO, *Federal Workforce: Human Capital Management Challenges and the Path to Reform*, GAO-14-723T (Washington, D.C.: July 15, 2014).

AR0068

experience suggests that many employees who are considered to exhibit performance problems can often improve when action is taken to address their performance, such as employee counseling, clarification of expectations, or additional training. Performance improvement is considered a win-win for both the agency and the employee because it preserves the investments agencies have already made in that individual and those investments that the individual has made with the agency.

We have previously reported that day-to-day performance management activities benefit from performance management systems that, among other things, (1) create a clear "line of sight" between individual performance and organizational success; (2) provide adequate training on the performance management system; (3) use core competencies to reinforce organizational objectives; (4) address performance regularly; and (5) contain transparent processes that help agencies address performance "upstream" in the process within a merit-based system that contains appropriate safeguards.[10] Implementing such a system requires supervisors to communicate clear performance standards and expectations, to provide regular feedback, and to document instances of poor performance.

In cases where an employee cannot do the work, regular supervisory feedback may help the employee realize that he or she is not a good fit for the position and should seek reassignment to a more appropriate position within the agency or should voluntarily leave the agency, rather than go through the dismissal process. According to the performance management experts and labor union officials we interviewed, an employee voluntarily leaving is almost always preferable to dismissal and benefits all parties. Experts stated that such an arrangement can produce the following benefits:

- The employee maintains a clean record of performance, allowing him or her to pursue a more suitable position. Unacceptable performance scores and dismissal actions can severely limit job prospects for the employee, within and outside of the federal government. In some cases, an employee leaves before a poor rating is issued. Other times, employees and agencies may agree to have the record

---

[10]GAO, *Results-Oriented Cultures: Creating a Clear Linkage between Individual Performance and Organizational Success,* GAO-03-488 (Washington, D.C.: Mar. 14, 2003).

expunged. Organizations we interviewed stressed that agreeing to a clean record of performance as part of a voluntary separation can be appropriate, particularly in cases when an employee has otherwise demonstrated professional aptitude. They cautioned, however, that clean record agreements must be used judiciously, in an effort to avoid making a low-performing employee another agency's problem.[11]

- The supervisor can focus on fulfilling the agency's mission, rather than expending the time and energy associated with the dismissal process.

- The agency and employee avoid costs associated with litigation.

However, effective performance management has been a long-standing challenge for the federal government and the issue is receiving government-wide attention. In 2011, the National Council on Federal Labor-Management Relations (in conjunction with the CHCO Council, labor unions, and others) developed the Goals-Engagement-Accountability-Results (GEAR) framework. The framework was designed to help agencies improve the assessment, selection, development, and training of supervisors. GEAR emphasized that agencies should select and assess supervisors based on supervisory and leadership proficiencies rather than technical competencies, and should hold them accountable for performance of supervisory responsibilities. In June 2014, OPM officials said that the agency will facilitate the collaboration and information-sharing between agencies on their approaches to implement the principles outlined in the GEAR framework. They added that OPM will continue to provide technical support and expertise on successful practices for performance management.[12]

---

[11]According to OPM officials, employees generally expect a clean record to prevent potential employers from learning any adverse information about them. This potentially puts an agency official in the position of avoiding inquiries when asked by a potential employer about an employee's performance on the job. OPM officials noted that clean record agreements should address, among other things, how the agency will be permitted to respond if queried by investigators conducting federal background investigations that will form the basis for future decisions about the individual's suitability or fitness for future federal employment, eligibility for access to classified information, or eligibility for access to federal systems or facilities.

[12]GAO-14-723T.

Given the critical role that supervisors play in performance management, it is important for agencies to identify, promote and continue to develop effective supervisors. However, according to CHCOs we interviewed and to our literature review, performance management continues to be a challenge at many agencies for three reasons:

- Some employees promoted to supervisory positions because of their technical skill are not as inclined towards supervision. According to CHCOs we interviewed, as higher-graded work in the federal government is typically in managerial and supervisory positions, career advancement in many agencies requires that employees take on supervisory responsibilities. However, some employees critical to meeting the agency's mission are not interested in (or as inclined to conduct) supervisory duties, but are promoted by the agency to increase their pay and to retain them. As a result, some supervisors are not able to effectively conduct performance management activities. NASA addresses this problem by offering a dual career ladder structure: one ladder to advance employees who may have particular technical skills and/or education but who are not interested or inclined to pursue a management or supervisory track, and another for those seeking managerial responsibilities. One potential benefit to this approach is that agencies may have more flexibility to promote supervisors who are better positioned to effectively address poor performance.

- Supervisory training may not cover performance management sufficiently. Under 5 U.S.C. § 4121, agencies, in consultation with OPM, are required to establish training programs for supervisors on actions, options, and strategies to use in relating to employees with unacceptable performance and in improving that performance, and in conducting employee performance appraisals, among other things. OPM implementing regulations state that all agencies are required to have policies to ensure they provide training within one year of an employee's initial appointment to a supervisory position.[13] However, some agencies include performance management as part of a general new supervisory curriculum that also includes training on subjects such as cybersecurity, ethics, and an array of human resource policy

---

[13]5 C.F.R. § 412.202(b).

topics. CHCOs told us that receiving training in this way can be "like drinking from a fire hose" and can be difficult to fully retain, particularly for topics that can benefit from experiential learning, such as dealing with poor performance. Some agencies seek to address this problem by assigning a new supervisor a mentor to assist with ongoing coaching in performance management and in other areas where the supervisor may have limited previous experience.

- Agencies may not be using the supervisory probationary period as intended. A new supervisor is given a 1-year probationary period to demonstrate successful performance as a supervisor. During the supervisory probationary period, the agency is to determine whether to retain that employee as a supervisor or to return the employee to a non-supervisory position.[14] The MSPB found that agencies are not consistently using the probationary period to assess new supervisors' capabilities and supervisors in general received varying levels of feedback from management.[15] CHCOs told us a related issue is that the supervisory probationary period may not be long enough for the supervisor to conduct many performance management responsibilities associated with the agency's employee appraisal cycle.[16] As a result of these issues, agencies may not be providing adequate feedback to help new supervisors understand where further development is needed and if they are well suited for supervisory responsibilities, and new supervisors may not have the opportunity to demonstrate

---

[14]A current federal employee who is appointed to a supervisory position for the first time in the competitive service is required to serve a probationary period. 5 U.S.C. § 3321(a)(2). During that period, if the employee does not perform his or her supervisory functions satisfactorily, the agency should remove the employee from the supervisory position and return the employee to a position of no lower grade and pay than the previous position. 5 U.S.C. § 3321(b). An employee properly returned to a non-supervisory position has no appeal rights, unless the employee alleges the action was based on partisan political affiliation or marital status, in which case the employee may appeal to the Merit Systems Protection Board. 5 C.F.R. part 315, subpart I.

[15]U.S. Merit Systems Protection Board, *A Call to Action: Improving First-Level Supervision of Federal Employees* (Washington, D.C.: May 2010).

[16]Under OPM regulations, agencies may determine the length of the probationary period for a supervisor in the competitive service, provided it is of reasonable fixed duration, appropriate to the position, and uniformly applied. An agency may establish different probationary periods for different occupations. 5 C.F.R. § 315.905.

performance management capabilities. MSPB officials told us that some agencies address these issues by providing details or rotation opportunities where employees interested in supervisory positions can observe and, as appropriate, participate in performance management activities in other parts of the organization. These rotations not only give the employee more experience in that role, but can also give the agency time to observe and assess that employee's potential for success as a supervisor. We previously reported that within the Nuclear Regulatory Commission, where a high number of technical experts are employed, rotational assignments are encouraged to build supervisory capacity and to allow interested employees an opportunity to gain new experiences and responsibilities.[17]

As described above, although effective performance management continues to be a challenge at many agencies, individual agencies have taken steps to better identify those employees with an aptitude towards performance management, to develop related leadership skills, and to more fully assess those employees before those individuals are given supervisory responsibilities. According to OPM officials, other agencies have authority to take similar actions as appropriate for their agency.

## Supervisors Need to Make Effective Use of the Probationary Period for Individuals Entering the Competitive Service

When an individual enters the competitive service, he or she is put on a probationary period which lasts for 1 year.[18] Individuals entering the excepted service may serve a trial period, often for 2 years. The probationary period is the last step in the employee screening process during which time, according to an MSPB report, the individual needs to demonstrate "why it is in the public interest for the government to finalize an appointment to the civil service." The appeal rights of an individual in the probationary period are limited. If an agency decides to remove an individual during the probationary period, the agency is not required to follow the formal procedures for removing an employee (described below). Rather, the agency's only obligation is to notify the individual in

---

[17]GAO, *Human Capital: Strategies to Help Agencies Meet Their Missions in an Era of Highly Constrained Resources*, GAO-14-168 (Washington, D.C.: May 7, 2014).

[18]In the competitive service, probationary periods are required by statute. By regulation, OPM has provided for a one year probationary period5 U.S.C. § 3321(a)(1) and 5 C.F.R. § 315.801(a). These provisions do not apply to the excepted service.

writing of its conclusions regarding the individual's inadequacies and the effective date of the removal.[19]

Generally, a probationary employee may not appeal their removal.[20] Appeal rights are extended to employees in the competitive service and to preference eligible employees in the excepted service who have completed 1 year of current continuous service.[21] Appeal rights are extended to non-preference eligible excepted service employees after 2 years of current continuous service.[22]

Because dismissing a poorly performing employee becomes more difficult and time consuming after the probationary period, it is important that agencies use this time to assess employee performance and dismiss those that cannot do the work. However, according to our interviews, supervisors are often not making performance-related decisions about an individual's future likelihood of success with the agency during the probationary period. Interviewees said this can happen for two reasons: (1) the supervisor may not know that the individual's probationary period is ending, and (2) the supervisor has not had enough time to observe the individual's performance in all critical areas of the job. Because of these two possible issues, agencies risk continuing poorly performing

---

[19]5 C.F.R. § 315.804. This requirement applies to competitive service probationary employees.

[20]Probationary employees may only appeal a dismissal action to the MSPB if the employee is in the competitive service and alleges the removal was based on partisan political reasons or due to the employee's marital status. 5 C.F.R. § 315.806(b).

[21]A preference eligible is an individual who is eligible for veterans' preference. This preference affects appeal rights (for those in the excepted service) and is a consideration in hiring and reduction-in-force actions as well. The term is defined in 5 U.S.C. § 2108(3) to include certain veterans, including disabled veterans. The term also extends to individuals having a specified relation to certain veterans, such as widow or widower, wife or husband.

[22]Individuals regarded as probationary employees with limited appeal rights may be entitled to full rights based on prior relevant service, irrespective of the probationary status of that individual. See, *Van Wersch v. Department of Health and Human Services*, 197 F.3d 1144 (Fed. Cir. 1999) and *McCormick v. Department of the Air Force*, 307 F.3d 1339 (Fed. Cir. 2002),*pet. for reh'g in banc denied*, 329 F.3d 1354 (Fed. Cir. 2003). These cases involved the interpretation of 5 U.S.C. § 7511, which defines who is covered under the adverse action provisions of chapter 75 of title 5 of the U.S. Code pertaining to removal and demotions.

individuals in a position in the civil service, with all the rights that such an appointment entails.

According to OPM, to remedy the first problem, some agencies are using a tool, such as an automatic notification issued from the agency's payroll system, to remind supervisors that an individual's probationary period is nearing its end and to take action as appropriate. While not all agencies use this tool, OPM officials told us that all Shared Service Centers' existing HR systems already contain the functionality to notify supervisors that the probationary period is ending. Because it is the agencies' decision whether or not to use automated notifications, it is important that agencies are aware of and understand the potential benefits of this tool. Other agencies require an affirmative decision by the individual's supervisor (or similar official) before deciding whether to retain an individual beyond the probationary period. By sending a reminder or requiring an affirmative decision, supervisors know when the probationary period is ending and are prompted to consider the prospects of the individual, according to CHCOs we interviewed and to our literature review. OPM considers an affirmative decision a leading practice and has implemented it for its supervisors. However, not all agencies have an automated tool to alert supervisors prior to the expiration of an employee's probationary period.

CHCOs also told us supervisors often do not have enough time to adequately assess an individual's performance before the probationary period ends, particularly when the occupation is complex or difficult to assess. This can happen for a number of reasons, including

- the occupation is complex and individuals on a probationary period spend much of the first year in training before beginning work in their assigned areas,

- the occupation is project based and an individual on a probationary period may not have an opportunity to demonstrate all of the skills associated with the position, and

- individuals on a probationary period often rotate through various offices in the agency and supervisors have only a limited opportunity to assess their performance.

In the past, agencies exempt from provisions of title 5 have sought to address this by extending the probationary period and limiting appeal rights during that time. Unless exempt however, a decision to allow

agencies to extend probationary periods beyond 1 year and to limit appeal rights during that period would require legislative action in certain circumstances.[23] CHCOs told us such an extension of the probationary period would provide supervisors with time to make a performance assessment for those occupations that are particularly complex or difficult to assess. However, they cautioned that such an extension would only be beneficial if an agency had effective performance management practices in place and it used the extra time for the purpose intended.

## Formal Procedures Are Required to Dismiss Poor Performing Permanent Employees, but Related Processes Are Time and Resource Intensive

Generally, once an employee has completed a probationary period, if that employee is a poor performer who does not voluntarily leave, an agency is required to follow the procedural requirements under either 5 U.S.C. § 4303 (hereinafter "chapter 43") or 5 U.S.C. § 7513 (hereinafter "chapter 75") in order to take an action such as removal.[24] Though the process for dismissal under both authorities shares several common steps, some key differences exist. One key difference under chapter 43 is the employee must be given a formal opportunity to improve.

While the law and OPM implementing regulations establish requirements and timeframes for certain steps under chapter 43 dismissal actions, experts representing various agency and employee perspectives told us that the practical implementation of chapter 43 is time consuming and resource intensive. For example, based on the experiences of experts we interviewed, it often takes 50 to 110 days to complete steps associated with the performance improvement period (PIP). Overall, it can take six months to a year (and sometimes significantly longer) to dismiss an

---

[23]For example, as noted previously, the provision establishing coverage of procedural and appeal rights for those removed or demoted under the provisions of chapter 75 of title 5 has been interpreted to extend appeal rights irrespective of the probationary status of that individual due to prior relevant service of that individual.

[24]While we refer to "poor" performance for purposes of this report, the term set forth under chapter 43 is "unacceptable" performance, which is defined as performance of an employee which fails to meet established performance standards in one or more critical elements of such employee's position. 5 U.S.C. § 4301(3). References in this report to chapter 43 and 75 process requirements encompass requirements contained in OPM implementing regulations, found at 5 C.F.R. part 432 (for chapter 43) and 5 C.F.R. subpart D of part 752 (for chapter 75).

AR0076

employee.[25] Moreover, once an employee is dismissed from his or her agency, he or she may file an appeal with the MSPB. As we report later, it took the MSPB an average of 243 days in 2013 to adjudicate an appeal from start to finish. Figure 1 illustrates an example of the dismissal process under this procedure. The timeframes cited here are not required by statute or regulation. The length of time to address performance problems can vary based on the facts and circumstances of each situation.

---

[25]Under some collective bargaining agreements, a "pre-PIP" opportunity is required. During the pre-PIP, a supervisor is to alert the employee of slipping or poor performance, discuss the deficiencies, agree on actions needed to improve performance, and consider exchanging assignments among colleagues, if feasible, as an opportunity to improve before using a PIP required under chapter 43. According to federal labor union officials we interviewed, the pre-PIP period does not add time to the process, but rather helps to ensure day-to-day performance management activities occur before a PIP is issued.

**Figure 1: The Dismissal Process under Chapter 43**



Source: GAO analysis of interviews and literature research on the dismissal process under Chapter 43.  | GAO-15-191

The other option for taking action—chapter 75—is largely similar to chapter 43, but has no formal improvement period and does not require a specific standard of performance to be established and identified in advance. The burden of proof for sustaining a dismissal under chapter 75 is higher than under chapter 43.

Depending on the circumstances, the differences between the two approaches make one option preferable over the other for supervisors, according to our interviews and literature research. For example, the formal opportunity to improve provided by chapter 43 makes this option

AR0078

preferable when there is a possibility of the employee improving after receiving additional training or more specific expectations. In contrast, because chapter 75 has no improvement period, it is generally faster and therefore is preferable for agencies when it is unlikely an employee will improve or if the poor performance is in part related to conduct issues. Supervisors, working with agency human resources and legal counsel, have discretion to determine the most appropriate option for dismissing an employee for poor performance. The following table lists examples of circumstances where the use of one authority may be more appropriate than the other.

**Table 1: Comparison of Approaches for Addressing Poor Performance – By Legal Authority**

| chapter 43 | chapter 75 |
|---|---|
| Unacceptable performance may be due to a teachable knowledge gap and training, guidance, and/or clearer expectations may help the employee improve. | Performance is unlikely to be improved with additional training, guidance, or clearer expectations, and a good faith effort has been made to help the employee. |
| There is unacceptable performance in a critical element within the employee's documented performance standards. | There is unacceptable performance against an ad hoc standard, such as explicit instructions or professional standards established for certain occupations, or a critical element. |
| Employee demonstrates a willingness to improve. | Conduct or delinquency is contributing to the employee's poor performance. |
| | The employee is not performing although has demonstrated the capability of doing so. |
| | It is necessary to dismiss the employee as quickly as possible. This may be true for occupations where a single failure could result in loss of life, injury, or a breach of national security. |
| | The employee has a medical condition and cannot perform the essential functions or duties of a job, with or without reasonable accommodation. |

Source: GAO analysis of interviews and literature research. I GAO-15-191

Appendix II provides a full comparison of these two legal authorities for dismissing employees for performance.

The process for taking action against a career member of the Senior Executive Service (SES) for a less-than-fully-successful performance rating differs from that for other civil servants.[26] Career executives are removed from the SES for poor performance as provided for by 5 U.S.C. §§ 3592 and 4314(b). Agencies are

- required to either reassign, transfer, or remove a senior executive who has been assigned an unsatisfactory performance rating;

- required to remove an executive who has been assigned two performance ratings at less than fully successful within a three year period; and

- required to remove an executive who receives two unsatisfactory ratings within five years.

Unlike dismissals for performance for non-SES civil servants, most career SES members are not removed from the agency, but rather from the SES only, and they remain employed at a lower grade. Career SES members serve a 1 year probationary period upon initial appointment.[27] Most career executives removed during the probationary period for performance reasons (and all removed after completing it) are entitled to placement in a GS-15 or equivalent position.[28] Removals from the SES for performance reasons may not be appealed to the MSPB. However, non-probationary career executives may request an informal hearing before an official designated by the MSPB.[29] Additionally, an executive who believes the removal action was based on discrimination may file a discrimination complaint with their agency. Or, if an executive believes the removal was based on a prohibited personnel practice, such as reprisal for whistleblowing, they may go to the Office of Special Counsel (OSC) to

---

[26]Career SES members are individuals with civil service status (permanent) who are appointed competitively to SES positions and serve in positions below the top political appointees in the executive branch of government.

[27]5 U.S.C. § 3393(d).

[28] Guaranteed placement rights after removal from the SES are set forth in 5 U.S.C. §§ 3549. For probationary SES, this right only applies where the executive was appointed into the SES from a civil service position.

[29]5 U.S.C. § 3592(a).

seek corrective action.[30] From 2009-2013, twelve senior executives were removed from the SES for performance reasons.

## Employees Facing Dismissal for Performance Reasons Have Certain Protections

In addition to the procedural requirements agencies must adhere to, federal employees have additional protections designed to ensure that they are not subject to arbitrary agency actions and prohibited personnel actions, such as discrimination and reprisal for whistleblowing. In the event that an agency dismisses an employee for performance reasons, that employee may file an appeal of that agency action with the MSPB. During this appeal, an employee has a right to a hearing before an MSPB administrative judge. If the employee or agency is unsatisfied with the administrative judge's initial decision, either may request that the full 3-member board review the matter by filing a petition for review. If the employee is unsatisfied with the final decision of the MSPB, the employee may seek judicial review of that decision, generally with the United States Court of Appeals for the Federal Circuit (Federal Circuit).[31] In the alternative, an employee who is a member of a collective bargaining unit may instead choose to pursue a grievance under the negotiated grievance procedure, if the appeal has not been excluded from coverage by the collective bargaining agreement. If the matter goes to an arbitrator, judicial review of the arbitration award is also available at the Federal Circuit. Finally, under certain circumstances, judicial review may be sought in United States district court. While these protections are important to ensuring due process, they generally add to the time and resources agencies commit to addressing poor performance, as well as to the overall complexity of the process.

Discrimination complaints and allegations of whistleblowing reprisal are redress options available to employees at any time and are not specific to

---

[30] The Office of Special Counsel is an independent investigative and prosecutorial agency with the primary mission of protecting the employment rights of federal employees and applicants for federal employment.

[31] 5 U.S.C. § 7703(b)(1) and 28 U.S.C. § 1295(a)(9).  Pursuant to the Whistleblower Protection Enhancement Act of 2012, as amended, for a 5-year period of time employees will have the option of seeking review with any court of appeals of competent jurisdiction if challenging the disposition of allegations of whistleblower retaliation.

the dismissal process.[32] Allegations of discrimination in dismissal actions may be filed with an agency's Equal Employment Opportunity office, or under the negotiated grievance procedure, if applicable. Allegations of reprisal for whistleblowing can be made with the OSC. Employees may be more likely to consider such redress options when informed of performance problems or of the possibility for dismissal or demotion, according to experts and our literature review. Appendix III provides more information on appeal avenues available to employees who are dismissed or demoted for poor performance under chapters 43 or 75.

## Various Considerations Can Reduce Willingness to Deal with Poor Performance

A number of agency supports and constraints may reduce a supervisor's willingness to pursue dismissal or other action against a poor performing employee. According to representatives from organizations we interviewed, supervisors may opt against dismissing a poor performer for a variety of reasons, including

**Internal support.** Supervisors may be concerned about a lack of internal support from their supervisors or other internal agency offices involved in the dismissal process. Specifically,

- Upper management may view the supervisor as unable to effectively manage employees, particularly considering that most employees have a history of meeting or exceeding expectations in performance ratings. Our analysis found that employees rarely receive performance ratings that indicate a problem with performance. In 2013, about 8,000 of the nearly 2 million federal employees received "unacceptable" or "less than fully successful" performance ratings. According to one expert we interviewed, senior managers who only have knowledge of an employee's work history through past performance ratings may tell a supervisor, "None of the previous supervisors had problems with him. Why do you?"

- An agency's personnel office may lack the capacity to provide guidance or an agency's general counsel or a senior agency official may be inclined settle a matter or not pursue a dismissal action

---

[32]In contrast, private sector employees are considered "at will" and generally can be dismissed for any reason, except prohibited reasons such as discrimination, or where collective bargaining agreements provide otherwise. Private sector employees may initiate an action against their employer alleging employment discrimination by filing a charge of discrimination with the U.S. Equal Employment Opportunity Commission (EEOC).

because of concern over litigation. According to CHCOs we interviewed, agencies are increasingly settling performance-related actions and discrimination complaints with financial awards, rather than litigating the cases. According to the CHCOs, such financial payouts may provide an incentive to file such appeals and claims–even when they are not valid.

**Time and resource commitment.** As depicted earlier in figure 1, the time commitment for removing an employee under chapter 43 can be substantial. After communicating performance problems to an employee, a supervisor will likely find it necessary to increase the frequency of monitoring and documentation he or she conducts and of feedback sessions he or she provides during the performance improvement period. In turn, this takes time away from other job responsibilities and agency priorities.

**Supervisory skills and training**. Supervisors may lack experience and training in performance management, as well as lacking understanding of the procedures for taking corrective actions against poor performers. Specifically, supervisors may lack (a) confidence or experience having difficult conversations; (b) skills or training on addressing poor performance, including a basic understanding of the processes under chapters 43 and 75; and (c) knowledge or an understanding of requirements for addressing poor performance under collective bargaining agreements. These factors point to the importance of effective selection, assessment, and development of new supervisors, as well as to the importance of providing refresher training for current supervisors.

**Legal concerns**. Supervisors who take performance-based actions may need to be involved in providing depositions, witness statements, internal meetings, and meeting with attorneys and union representatives for an extended period of time where an employee seeks an avenue of redress concerning the performance-based action. Supervisors may be concerned about appeals, grievances, or discrimination complaints if the topic of poor performance is broached.

# Agencies Dismissed Around 3,500 Employees for Performance in 2013, but the Overall Magnitude of Employees Leaving for Performance Reasons Is Unknown

## Performance Dismissals Most Often Occur During the Probationary Period

In 2013, agencies dismissed 3,489 employees for performance or a combination of performance and conduct, representing 0.18 percent of the career permanent workforce.[33] Agencies most often dismissed employees for performance reasons during the probationary period. As noted earlier, dismissing employees during probation is much less time and resource intensive than doing so once they are made permanent and the procedural and appeal provisions of chapter 43 or 75 come into play. As shown in figure 2, dismissals for performance occurred more frequently for employees in probationary periods.

---

[33]Figures in this report do not include dismissals for only conduct reasons.

**Figure 2: Performance Dismissals By Legal Authority and Employment Status – 2013**



Source: GAO analysis of Enterprise Human Resource Integration (EHRI) data.  |  GAO-15-191

Over the last ten years (2004-2013), the number of individuals dismissed for performance or a combination of performance and conduct ranged from a low of 3,405 in 2006 to a high of 4,840 in 2009. On average, around 4,000 individuals were dismissed for performance-related reasons annually. The rate of dismissals for individuals in the career permanent workforce (2004-2013) range from a low of 0.18 percent in 2013 to a high of 0.27 percent in 2009.

Trends in performance dismissals since 2004 are associated with fluctuations in the number of probationary employees. Most employee dismissals for performance took place during the probationary period in each year from 2004 to 2013. The general increase in new hires from 2006 through 2010 is associated with the number of probationary dismissals from 2007 through 2011. As hiring and the number of new employees slowed after 2010, so too did the number of dismissals during probation.

AR0085

**Figure 3: Trends in Performance Dismissals and Hiring Fluctuations (Career Permanent Employees) – 2004-2013**



Number of performance dismissals

Number of new hires

Source: GAO analysis of Enterprise Human Resource Integration (EHRI) data.  |  GAO-15-191

As an alternative to dismissal, agencies may demote or reassign employees for poor performance. Agencies reassigned 652 employees for performance-related reasons in 2013, with nearly all following an unacceptable performance rating. (A reassignment is defined as the change of an employee from one position to another without promotion or change to lower grade, level or band.) According to our interviews and literature review, reassignment is considered appropriate when (1) the employee is willing to improve and does not have conduct or delinquency issues contributing to their performance issues, and (2) the reasons the employee failed in one position is not likely to cause him or her to fail on the next job. There were 168 demotions for performance reasons in 2013, including 58 for an employee's failure to successfully complete the supervisory or managerial probationary period.

## Many Poor Performers Leave Their Agencies Voluntarily, but the Magnitude of Those Leaving for Performance Reasons Is Unknown

As noted above, dismissing employees is and should be a last resort in performance management. Identifying and addressing poor performance "upstream" in the performance management process may result in outcomes that are more desirable than dismissal, most notably improved performance, but also the employee moving to a different position that might be a better fit or voluntarily leaving the agency. The extent to which cases of employee poor performance result in these outcomes is not known.

As mentioned earlier, when the employee cannot perform the work, the employee voluntarily leaving the agency can be the most favorable outcome for both the agency and the employee. Our analysis of OPM data found more than 2,700 cases of employees voluntarily leaving in 2012 after receiving a "less than fully successful" (or lower) performance rating at any point from 2010 to 2012. These cases most likely undercount the number of employees voluntarily leaving for performance reasons because many employees who have performance problems never receive a "less than fully successful" (or lower) performance rating, and performance ratings may be expunged as part of an agreement to voluntarily leave. However, sufficient data does not exist to conclude that employees have voluntarily left federal service due to performance reasons.

Because voluntary retirements or resignations result in the employee leaving without formally having a personnel action taken against him or her, it is not possible to determine from available OPM data the universe of employees voluntarily resigning or retiring for performance-related reasons. However, according to experts we interviewed, such separations happen "all the time." One CHCO we interviewed estimated that a large majority of his agency's performance-related separations would be considered voluntary retirements or resignations and other CHCOs agreed that employees with performance issues are more likely to voluntarily leave than go through the dismissal process. While an "unacceptable" performance rating sends a strong signal to the employee that the agency is going to take action for performance reasons, receiving an "unacceptable" performance rating is not necessarily an indicator that an employee will either be formally dismissed or will voluntarily leave. Of the 2,001 employees receiving an "unacceptable" performance rating in 2009, 1,104 (55 percent) remained employed with the same agency in 2013, while 897 (45 percent) are no longer with the agency. Those remaining with the agency may have improved their performance or may have been reassigned within the agency.

## Almost Half of All Performance-Related Dismissals under Chapter 43 Were Appealed to the MSPB in 2013; Most Were Settled or Dismissed

While agencies rarely use chapter 43 to dismiss employees, of the 280 employees dismissed under this legal option in 2013, 125 (45 percent) were processed by MSPB.[34] As noted above, on average, it took 243 days to complete the appeal process for initial appeals of dismissals that were affirmed.[35] In cases where a decision is rendered, the agency's decision to dismiss is usually affirmed. In 2013, 18 cases were affirmed in the agency's favor and 4 were reversed in the employee's favor. Thirty-six cases were dismissed in 2013. Cases may be dismissed for a variety of reasons, including lack of jurisdiction, lack of timeliness, withdrawal by the appellant, or failure to prosecute.

Sixty-seven of the 125 appeals in 2013 were resolved through settlement, a process whereby both the agency and the employee come to a mutual agreement prior to the case being heard or decided by the MSPB. If at all possible, the MSPB encourages settlements between parties. According to government lawyers we interviewed, employees and agencies have a number of potential settlement options available related to cases involving poor performance. They include expunging poor appraisal ratings in return for the employee separating from the agency and waiving further appeal rights, provision of employment references that do not provide a prospective employer with negative information about the employee, agency payment of the employee's attorney's fees, provisions relating to unemployment compensation, confidentiality clauses, resignation agreements, and reassignments.

Figure 4 shows how the MSPB resolved initial dismissal appeals taken under chapter 43 in 2013.

---

[34]MSPB data for chapter 75 dismissals do not distinguish between dismissals for performance, for misconduct, or for both. Therefore, we did not analyze dismissals under chapter 75.

[35]This average does not include cases that were previously dismissed without prejudice: a process whereby a case is initially dismissed and then later heard after an issue has been resolved, or a process relevant to the appeal which has been completed.



Figure 4: MSPB Decisions on Dismissal Appeals under chapter 43 – 2013

Settled

3% Decided in appellant's favor

14% Decided in agency's favor

54% 29% Dismissed

Source: GAO analysis of Enterprise Human Resource Integration (EHRI) and Merit Systems Protection Board (MSPB) data. | GAO-15-191

## OPM Provides a Range of Tools and Guidance to Address Poor Performance but This Assistance May Not Meet All Agency Needs

Taking action to address poor performance is challenging for agencies, due to time and resource intensity, lack of supervisory skill and training, and other factors (as described earlier). As a result, tools and guidance are needed to help agencies manage employee performance and to navigate dismissal processes.

To meet its strategic goal of enhancing the integrity of the federal workforce, OPM provides guidance, tools, and training to help agencies attain human capital management goals.[36] In addition to its regulations, OPM makes a range of different tools and guidance available to help agencies address poor performance through multiple formats, including through its website, webinars, webcasts, in-person training, guidebooks, and through one-on-one assistance and consultation with agencies, according to OPM officials. Appendix IV provides some examples of the tools and guidance OPM developed to help agencies address poor performance.

---

[36]Office of Personnel Management, *Recruit, Retain, and Honor: Strategic Plan FY2014-FY2018* (Washington, D.C.: 2014).

AR0089

Our interviews with individuals who have expertise in performance management issues indicated that improvements could be made in the tools and guidance OPM produces on poor performance to better meet their needs, including the following areas:

- **Improvements in Content.** Multiple experts we spoke with told us the content of OPM's training and guidance seemed to be written for human resources (HR) officials or lawyers, rather than supervisors. According to one expert, "An average manager will not be able to understand what the guidance means if they don't have time to continuously go to their HR office for assistance." According to OPM, its guidance is often written for HR officials charged with assisting supervisors in addressing poor performance. We have recently reported, however, that HR offices often lack the capacity for assisting in performance management-related activities.[37] Instead, they are focused on transactional human resource activities such as verifying benefits and processing personnel actions. Because of this, tools and guidance developed for HR officials may not be reaching the supervisors who need them.

- **Improvements in Outreach.** CHCOs and organizations representing federal employees and supervisors told us they were unaware of the tools and guidance OPM produces on the topic of managing poor performance. One group told us that a critical gap in training for managers exists, and that "none of the individuals we work with know about [OPM training or tools]." According to CHCOs we interviewed, some supervisors may lack awareness in part because they lack interest in performance management in general and do not seek out tools. The CHCOs said there is a role for both the agencies and OPM in reinforcing the critical importance of effective performance management amongst supervisors.

- **Improvements in Format.** OPM's tools and guidance are generally posted online or as hard-copy guide books. Both of these methods cost-effectively disseminate information to a broad audience and can be used by employees when their schedule allows. At the same time, experts we spoke with said addressing poor performance is more effectively taught in a classroom setting, as it is a sensitive topic

---

[37]GAO, *Human Capital: Strategies to Help Agencies Meet Their Mission in an Era of Highly Constrained Resources,* GAO-14-168 (Washington, D.C.: May 7, 2014).

where the most practical information is gleaned from fellow class participants. According to one expert, "The topic of dealing with poor performers demands interaction amongst participants."

OPM told us that developing and promoting tools and guidance can be costly and that resources available for that purpose are highly constrained. OPM has previously acknowledged that it could do more to better assess the tools and guidance it produces. It is also a challenge to decide what topics to address, particularly as there are frequently changes in human capital initiatives or in topic areas that take precedence. Regular meetings with senior OPM officials, use of training evaluation and feedback forms, and informal feedback from the CHCO Council will help to inform OPM of the tools and guidance to provide. However, agencies are not always aware of this material and in some cases it falls short of their needs. Going forward, it will be important for OPM to fully leverage existing information sources (such as survey results) to inform decisions on what material to develop and how best to distribute it.

According to OPM, the Employee Services group will deploy a comprehensive strategic human capital management needs survey that will be distributed to the CHCO Council. The survey will be designed to directly solicit information from human capital professionals about what relevant tools, guidance, and resources will benefit their human capital management processes. This tool is also intended to help OPM with developing/providing suggested tools. Deployment is planned for the summer of 2015.

While these plans are an important step in helping to ensure agencies get the tools and guidance they need, OPM is not fully leveraging information provided by two existing sources to help prioritize the tools and guidance it develops: the 2014 Federal Employee Viewpoint Survey (FEVS) and the Performance Appraisal Assessment Tool (PAAT), a voluntary self-assessment tool agencies can use to assess the strength of their performance appraisal system.

In FEVS, performance management-related questions receive some of the lowest positive scores in the survey, but OPM told us respondents may not have sufficient information to answer the question. These questions cover topics such as the extent to which employees believe their supervisors are effectively addressing poor performers and whether differences in performance are recognized in a meaningful way.

With respect to the PAAT, agencies identified areas of strength and weakness in their performance appraisal programs. For example, the PAAT includes information on topics such as how often supervisors are required to hold feedback sessions with employees, an important avenue for dealing with poor performance. It also includes information about how agencies deal with unacceptable performance, including the number of PIPs, performance-based dismissals, reassignments, and reductions-in-grade. Agencies' responses provide some insight into their own strengths and weaknesses as well as into to the topics where additional tools and guidance could be more effectively targeted government-wide. Agencies may submit their PAAT results to OPM.[38] However, OPM told us that it was not using these responses to inform the development of resources that would help agencies better address poor performers.

## Conclusions

The process for dismissing an employee after the probationary period ends can be complex and lengthy. But many of these process challenges can be avoided or mitigated with effective performance management. Supervisors who take performance management seriously and have the necessary training and support can help poorly performing employees either improve or realize they are not a good fit for the position. We found that a number of employees voluntarily resign after receiving negative performance feedback.

The probationary period for individuals entering the federal service is the ideal time to remove those who cannot do the work required of the position, but this period could be more effectively used by agencies. Given the number of issues agencies can encounter when addressing poor performance after the probationary period ends, improving how the probationary period is used could help agencies more effectively deal with poor performers.

Effectively addressing poor performance has been a long-standing government-wide challenge. OPM has a role in ensuring that agencies have the tools and guidance they need to effectively address poor performance and to maximize the productivity of their workforces. Though OPM already provides a variety of tools, guidance, and training to help agencies address performance management issues, more can be done to

---

[38]Ten agencies submitted a PAAT to OPM in 2012.

leverage priority information and to make tools and guidance available for agencies when and where they need it.

# Recommendations for Executive Action

To help strengthen the ability of agencies to deal with poor performers, we recommend that the Director of OPM, in conjunction with the CHCO Council and, as appropriate, with key stakeholders such as federal employee labor unions, take the following four actions:

1. To more effectively ensure that agencies have a well-qualified cadre of supervisors capable of effectively addressing poor performance, determine if promising practices at some agencies should be more widely used government-wide. Such practices include (1) extending the supervisory probationary period beyond 1-year to include at least one full employee appraisal cycle; (2) providing detail opportunities or rotational assignments to supervisory candidates prior to promotion, where the candidate can develop and demonstrate supervisory competencies; and (3) using a dual career ladder structure as a way to advance employees who may have particular technical skills and/or education but who are not interested in or inclined to pursue a management or supervisory track.

2. To help ensure supervisors obtain the skills needed to effectively conduct performance management responsibilities, assess the adequacy of leadership training that agencies provide to supervisors.

3. To help supervisors make effective use of the probationary period for new employees

   - educate agencies on the benefits of using automated notifications to notify supervisors that an individual's probationary period is ending and that the supervisor needs to make an affirmative decision or otherwise take appropriate action, and encourage its use to the extent it is appropriate and cost-effective for the agency; and

   - determine whether there are occupations in which—because of the nature of work and complexity—the probationary period should extend beyond 1-year to provide supervisors with sufficient time to assess an individual's performance. If determined to be warranted, initiate the regulatory process to extend existing probationary periods and, where necessary, develop a legislative proposal for congressional action to ensure that formal procedures for taking action against an employee for poor performance (and a

right to appeal such an action) are not afforded until after the completion of any extended probationary period.

4. To help ensure OPM's tools and guidance for dealing with poor performers are cost-effectively meeting agencies' and supervisors' needs, use SHCM survey results (once available), FEVS results, PAAT responses, and other existing information, as relevant, to inform decisions on content and distribution methods. The importance of effective performance management and addressing poor performance may need to be reinforced with agency supervisors so that they more routinely seek out tools and guidance.

## Agency Comments and Our Evaluation

We provided a draft of this product to the Director of OPM and Chairman of MSPB for comment. Written comments were provided by OPM's Associate Director for Employee Services, and are reproduced in appendix V. Of our four recommendations, OPM concurred with one recommendation, partially concurred with two recommendations, and partially concurred with part of a third recommendation. OPM did not concur with the first part of this latter recommendation. For those recommendations OPM concurred or partially concurred with, OPM described the steps it planned to take to implement them. OPM and the Executive Director of MSPB also provided technical comments, which we incorporated as appropriate.

OPM concurred with our recommendation to assess the adequacy of leadership training for supervisors. Specifically, OPM noted that it will evaluate how agencies are training new supervisors and provide agencies guidance on evaluating the effectiveness of leadership training.

OPM partially concurred with our recommendation to determine if promising practices at some agencies should be more widely used government-wide. Importantly, OPM agreed to work with the CHCO Council to (1) determine if technical guidance is needed to help agencies more effectively use the supervisory probationary period, (2) explore more government-wide use of rotational assignments, and (3) discuss options for employees to advance without taking on supervisory or managerial duties. In each of these cases, OPM noted that agencies already have authority to take these actions. We acknowledge OPM's point and have clarified the report accordingly. We maintain, however, that OPM can still play a leadership role and encourage agencies to take these steps.

Our recommendation for OPM to take steps to help supervisors make effective use of the probationary period for new employees contained two parts. OPM partially concurred with the part of the recommendation calling on OPM to determine if certain occupations require a probationary period longer than 1-year to allow supervisors sufficient time to assess an individual's performance. In particular, OPM agreed to consult with stakeholders to determine, among other things, if an extension to the probationary period for certain complex occupations is needed and, if necessary, pursue the established Executive Branch deliberation process for suggesting legislative proposals. OPM noted that it has authority to provide for longer probationary periods under certain circumstances and we have modified the recommendation so that it also calls on OPM to initiate the regulatory process to do so if warranted. As stated in our report, however, extending the probationary period and concurrently limiting appeal rights during that time would require legislative action under certain circumstances.

At the same time, OPM did not concur with the part of the recommendation for OPM to determine the benefits and costs of providing automated notifications to supervisors that an individual's probationary period is ending and that the supervisor needs to make an affirmative decision. OPM stated that choosing the best method to ensure that supervisors are aware that the probationary period is ending and appeal rights will accrue is an agency responsibility. We agree.

OPM also wrote that HR systems at all Shared Service Centers have the functionality to notify supervisors when an employee's probationary period is ending. However, as our report notes, even though OPM considers having a tool in place to notify supervisors that a probationary period is ending to be a leading practice, not all agencies have implemented that practice. Accordingly, we have clarified the recommendation so that it calls on OPM to educate agencies on the benefits and availability of automated notifications to alert supervisors.

OPM partially concurred with our recommendation to use the results of various surveys such as the FEVS and other information sources to help determine the extent to which its tools and guidance for dealing with poor performers are cost-effectively meeting agencies' needs. Specifically, OPM said it would use relevant data from these resources to inform decisions about content and distribution methods for the material OPM makes available to agencies. At the same time, OPM noted that the information contained in these surveys and other data sources had

certain limitations and may not always be relevant. We agree and have clarified the recommendation accordingly.

As agreed with your office, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days from the report date. At that time, we will send copies to the Director of the Office of Personnel Management, the Chairman of the Merit Systems Protection Board, as well as to the appropriate congressional committees and other interested parties. In addition, the report will be available at no charge on the GAO website at http://www.gao.gov.

If you or your staff have any questions about this report please contact me at (202) 512-2757 or goldenkoffr@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made key contributions to this report are listed in appendix VI.

Sincerely yours,

Robert Goldenkoff
Director
Strategic Issues

AR0096

# Appendix I: Objectives, Scope, and Methodology

We were asked to examine the rules and trends relating to the review and dismissal of employees for poor performance. Our objectives were to (1) describe and compare avenues for addressing poor performance, including the formal procedures required when dismissing employees for poor performance; (2) describe issues that can affect an agency's response to poor performance; (3) determine trends in dismissals and other agency actions taken for poor performance since 2004; and (4) assess the extent to which OPM provides the policy, guidance, and training that agencies say they need to address poor performance.

To describe and compare avenues for addressing poor performance, including the formal procedures required when dismissing employees for poor performance, we reviewed relevant sections of title 5 of the United States Code (title 5) and Office of Personnel Management (OPM) regulations to describe the process for addressing poor performance in the competitive, excepted[1], and Senior Executive services. We analyzed the process for taking personnel actions for poor performance under chapter 43 and chapter 75 of title 5, including when use of one authority over the other may be preferable in certain circumstances.

To determine how agencies are addressing poor performance and to understand the practical issues various agency employees consider when addressing poor performance, we interviewed OPM officials from the Merit System Accountability and Compliance Office, Office of Employee Services, and other offices that work with agencies to address poor performance; the Merit Systems Protection Board (MSPB) including the Executive Director, representatives from the Office of Regional Operations, the Office of Appeals Counsel, and an administrative judge; selected chief human capital officers (CHCO) chosen for their particular expertise in the issue area as identified through the Executive Director's Office of the CHCO Council and previous GAO work on related topics, the National Treasury Employees Union, American Federation of Government Employees, the Federal Managers Association, individual members of the Federal Employees Lawyers Group, the Partnership for Public Service and the Senior Executives Association. Additionally, we

---

[1] Our discussion of procedural and appeal rights under title 5 applies to those excepted service positions in executive agencies which have not been excluded from these title 5 (and OPM regulation) provisions. Many positions in the excepted service are not covered under title 5 (in whole or in part), including those positions covered under alternative personnel systems.

interviewed selected experts from academia and the private sector, including Dr. Dennis Daley, Professor of Public Administration, North Carolina State University, School of Public and International Affairs; Dr. Ellen Rubin, Assistant Professor at Rockefeller College of Public Affairs & Policy, University at Albany, State University of New York; Stewart Liff, author of *Improving the Performance of Government Employees: A Manager's Guide* (2011) and *The Complete Guide to Hiring and Firing Government Employees* (2010); and Robin Wink, Esq., who teaches a seminar "Managing the Federal Employee: Discipline and Performance Process." Their expertise was determined by a review of their published materials or training they provide on the topics of performance management and addressing poor performance. We also conducted a literature review.

To determine trends in dismissals and other agency actions taken for poor performance since 2004, we analyzed data from OPM's Enterprise Human Resources Integration (EHRI) data warehouse for fiscal years 2004 through 2013, the most recent year available. We analyzed EHRI data starting with fiscal year 2004 because personnel data for the Department of Homeland Security (which was formed in 2003) had stabilized by 2004. Personnel actions, such as separations, demotions, and reassignments are assigned Nature of Action (NOA) and legal authority codes that describe the action and the legal or regulatory authority for the action. We reviewed OPM's "The Guide to Processing Personnel Actions" to determine which NOA/legal authority combinations are associated with performance-related dismissals, demotions, or reassignments, and with conduct-related dismissals and we confirmed these codes with OPM. In some cases, NOA/legal authority combinations could cover both performance and conduct. In these cases, we counted the action as performance-related only so that a) we would most accurately capture the magnitude of actions taken for performance in the government, and b) avoid double counting dismissals. Thus, some cases counted exclusively as a performance action may have elements of conduct as well.

To identify individuals with poor performance who voluntarily retired or resigned before action was taken against them, we counted separation actions for voluntary retirement or resignations and retirements or resignations in lieu of involuntary action where there was a corresponding unacceptable performance rating within the separation year or year prior to separation. To examine attrition patterns for employees who received unacceptable performance ratings, we tracked the status of employees who received an unacceptable performance rating in 2008 to determine

how many were dismissed and when, how many voluntarily left the
government and when and how many remained in the government as of
2013. There are some data reliability limitations with the rating field. While
ratings generally reflect recent performance, there can be some variation.
Not all rating periods are the same across the agencies and they may not
align with the fiscal year, there may be lags in agencies' updates of
ratings, and some ratings are never updated. Consequently, we looked at
recorded ratings for the past three years to develop a somewhat more
comprehensive picture of employees' performance ratings. To assess the
reliability of EHRI data, we reviewed past GAO assessments of EHRI
data, interviewed OPM officials knowledgeable about the data, and
conducted electronic testing of EHRI to assess the accuracy and
completeness of the data used in our analyses. We reviewed MSPB data
and interviewed officials to determine the number of employee appeals
for actions based on performance, the outcomes of the cases, and how
long it took to resolve those cases. We determined the data used in this
report to be sufficiently reliable for our purposes.

To assess the extent to which OPM provides policy, guidance, and
training to help agencies address poor performance, we reviewed
guidance and tools that OPM provides to agencies to assist them in
addressing poor performance. We compared the content of OPM tools
and guidance to what CHCOs, key stakeholders, and experts said is
needed. We reviewed documentation of guidance and tools that OPM
provides to agencies to the challenges articulated by CHCOs, key
stakeholders, and experts. We interviewed OPM officials about
mechanisms they use to (1) collect information to develop tools and
guidance, and (2) collect feedback from agencies about the usefulness of
existing guidance and tools. We also reviewed documentation and
interviewed OPM officials on its Performance Appraisal Assessment Tool.

We conducted this performance audit from February 2014 through
January 2015 in accordance with generally accepted government auditing
standards. Those standards require that we plan and perform the audit to
obtain sufficient, appropriate evidence to provide a reasonable basis for
our findings and conclusions based on our audit objectives. We believe
that the evidence obtained provides a reasonable basis for our findings
and conclusions based on our audit objectives.

AR0099

# Appendix II: Chapters 43 and 75 Similarities and Differences

|  | chapter 43 | chapter 75 |
|---|---|---|
| Critical Element | Agency must prove the performance deficiency is in a critical element. | Agency is not required to prove the performance deficiency is in a critical element. |
| Establishment of Performance Expectations | When the employee's performance in one or more critical elements is unacceptable, the employee will (1) be notified of the deficiency; (2) be offered the agency's assistance to improve; and (3) be warned that continued poor performance could lead to a change to lower grade or removal. (This is commonly referred to as the PIP, an abbreviation for both performance improvement plan and for performance improvement period.) | The extent to which an employee is on notice of the agency's expectations is a factor in determining the appropriateness of the penalty. Also, an agency cannot require that an employee perform better than the standards that have been communicated to the employee. |
| Decline Following Improvement | If the employee's performance improves during the PIP, and remains acceptable for 1 year, a new PIP is necessary before taking an action under this chapter. | There is no obligation to offer a period of improvement at any point. |
| Efficiency of the Service | Agency is not required to prove that the personnel action will promote the efficiency of the service. | Agency must prove that the personnel action will promote the efficiency of the service. |
| Burden of Proof | Action must be supported by substantial evidence: that a reasonable person might find the evidence supports the agency's findings regarding the poor performance, even though other reasonable persons might disagree. | Action must be supported by a preponderance of the evidence: that a reasonable person would find the evidence makes it more likely than not that the agency's findings regarding the poor performance are correct. |
| Advance Notice | The agency must provide a notice of proposed action 30 days before any action can be taken, and must provide the employee with a reasonable opportunity to reply before a decision is made on the proposal. | |
| Content of Advance Notice | The notice must state the specific instances of unacceptable performance that are the basis for the action and also the critical performance element involved. | The notice must state the specific instances of poor performance that are the basis for the action. |
| Deciding or Concurring Official | A person higher in the chain of command than the person who proposed the action must concur. | The deciding official does not have to be a person higher in the chain of command than the person who proposed the action. |
| Agency Decision | Agency must issue a final decision within an additional 30 days of the expiration of the 30 day advance notice period. | Agency is under no particular time constraint, other than there cannot be a delay so extensive that it constitutes an error that harms the employee. |
| Penalty Mitigation | Once the agency meets the requirements to take an action, the MSPB cannot reduce the agency's penalty. | After finding that the agency meets the requirements to take a chapter 75 action, the MSPB may reduce the agency's penalty. |
| Douglas Factors | The Douglas factors are not used. | The agency must consider the relevant Douglas factors when reaching a decision on the appropriate penalty. Douglas factors are established criteria that supervisors must consider in determining an appropriate penalty to impose to address problems with an employee. |

**Appendix II: Chapters 43 and 75 Similarities and Differences**

|  | chapter 43 | chapter 75 |
|---|---|---|
| Affirmative Defenses | The agency action will not be sustained if the employee was harmed by the agency's failure to follow procedures, if the agency decision was reached as a result of the commission of a prohibited personnel practice, or if the decision is otherwise not in accordance with the law. | |

Source: MSPB I GAO-15-191

# Appendix III: Appeal of Removal or Demotion Actions

Set forth below are the basic appeal avenues available to employees who are removed or demoted for poor performance pursuant to chapters 43 or 75.[1]

In addition to the appeal avenues discussed below, other appeal options are available to employees removed or demoted for poor performance.[2] For example, while probationary employees are generally unable to appeal a removal or demotion to the Merit Systems Protection Board (MSPB), those in the competitive service may do so if they believe the agency action was based on partisan political reasons or due to the employee's marital status.[3] Furthermore, any employee may file an Equal Employment Opportunity (EEO) complaint with his or her agency if the employee believes that the removal or demotion was motivated by unlawful employment discrimination, regardless of whether the employee has due process or appeal rights.[4] Similarly, any employee who believes his or her demotion or removal was the result of a prohibited personnel

---

[1]The reference to chapter 43 and 75 is a reference to agency actions (e.g. removal or demotion) taken under 5 U.S.C. § 4303 (chapter 43) and 5 U.S.C. § 7513 (chapter 75). Generally, employees covered under the appeal provisions of chapters 43 and 75 are those who have already completed a probationary period. However, in certain circumstances, employees serving a probationary period may also be covered by due process and appeal provisions. For example, where a competitive service employee has already completed 1 year of current continuous service (under other than a temporary appointment limited to 1 year or less), that employee has full procedural and appeal rights under chapter 75 even though serving in a probationary period. Additionally, excepted service employees (except those who are preference eligible) do not have appeal rights under chapter 43 or 75 until they have completed 2 years of current continuous service (in the same or similar position). Our discussion of appeal rights under chapter 43 and 75 applies to those positions in the excepted service that have not been excluded from these provisions of title 5 of the United States Code (and OPM's implementing regulations).

[2]While we refer to poor performance for purposes of this report, the term set forth under chapter 43 is "unacceptable performance," which is defined as performance of an employee which fails to meet established performance standards in one or more critical elements of such employee's position. 5 U.S.C. § 4301(3).

[3]5 C.F.R. § 315.806(b).

[4]Generally, this process provides for the informal counseling at the employee's agency, filing a formal complaint, investigation of the complaint by the agency (and possible hearing conducted by an Equal Employment Opportunity Commission (EEOC) administrative judge who issues a recommended decision), and issuance of a final agency decision. The employee may appeal the final agency decision to the EEOC, and may also file a civil action in district court for a de novo trial. 29 C.F.R. part 1614.

practice, such as retaliation for whistleblowing, may go to the Office of
Special Counsel (OSC) to seek corrective action.[5]

# Appeal Avenues: Chapter 43 and 75 Removal or Demotion Actions

Chapters 43 and 75 provide that an employee with appeal rights who
wants to contest an agency decision to remove or demote may file an
appeal of that agency decision with the MSPB.[6] If that employee is a
member of a collective bargaining unit, the employee also has the option
of pursuing a grievance under negotiated grievance procedure if the
appeal has not been excluded from coverage by the collective bargaining
agreement. The employee may pursue either option, but not both.[7]

## Merit Systems Protection Board Appeal

If an employee chooses to appeal his or her removal or demotion to the
MSPB, the employee must do so within 30 days after the effective date of
the agency action or receipt of the agency's decision (to remove or
demote), whichever is later.[8] An employee who files an appeal with the
MSPB has a right to a hearing.[9]

In a performance-based removal or demotion taken under chapter 43, an
agency must establish that (1) OPM approved the agency's performance
appraisal system,[10] (2) the agency communicated to the employee the
performance standards and critical elements of his or her position, (3) the

---

[5]The Office of the Special Counsel may seek to delay the removal or demotion action
pending an OSC investigation if OSC determines there are reasonable grounds to believe
that the demotion or removal action is the result of a prohibited personnel practice.
5 U.S.C. § 1214.

[6]5 U.S.C. §4303(e) and § 7513(d).

[7]5 U.S.C. §7121(e)(1); 5 C.F.R. § 432.106(c), 5 C.F.R. § 752.405(b).

[8]5 C.F.R. § 1201.22(b).

[9]5 U.S.C. § 7701(a)(1).

[10]While an agency has the burden of proving that its performance appraisal system was
approved by OPM, ordinarily the MSPB will presume that OPM has done so. However, the
MSPB will require the agency to submit evidence of such approval where the employee
alleges there is reason to believe OPM did not approve the agency's system or that the
agency's system has undergone significant changes since such approval. *Prichard v.
Department of Defense*, 117 M.S.P.R. 88 (2011).

employee's performance standards are valid[11] (performance standards are not valid if they do not set forth the minimum level of performance that an employee must achieve to avoid removal for unacceptable performance[12]), (4) the agency warned the employee of the inadequacies of his or her performance during the appraisal period and gave the employee a reasonable opportunity to improve, and (5) the employee's performance remained unacceptable in at least one critical element. *White v. Department of Veterans Affairs*, 120 M.S.P.R. 405 (2013).

In a removal or demotion action taken under chapter 75, an agency must establish that the action will "promote the efficiency of the service."[13] A specific standard of performance does not need to be established and identified in advance for the employee; rather, an agency must prove that its measurement of the employee's performance was both accurate and reasonable. *Shorey v. Department of the Army, 77 M.S.P.R. 239 (1998); Graham v. Department of the Air Force,* 46 M.S.P.R. 227 (1990) (agency contention that "basic medical care" was performance standard for physician was not unreasonable).

While it is within an agency's discretion to take an action under chapter 75 rather than chapter 43, an agency taking an action under chapter 75 may not circumvent chapter 43 by asserting that an employee should have performed better than the standards communicated to the employee. *Lovshin v. Department of the Navy, 767 F.2d 826 (Fed. Cir. 1985), cert.denied, 475 U.S. 1111 (1986), reh. denied,* 476 U.S. 1189 (1986).

An employee subject to a removal or demotion action under chapter 75 has no right to a performance improvement period and the failure to afford an employee one is not grounds for reversing the agency action. However, an agency's failure to provide such a period is relevant to the

---

[11]Under 5 U.S.C. § 4302(b)(1), an agency is required to establish performance standards which, to the maximum extent feasible, permit the accurate appraisal of performance, based on objective criteria. The fact that performance standards may call for a certain amount of subjective judgment does not render them invalid, especially where the position involves the type of professional judgment which is not subject to a mechanical rating system. *Neal v. Defense Logistics Agency*, 72 M.S.P.R. 158, 161 (1996).

[12]*Henderson v. National Aeronautics and Space Administration*, 116 M.S.P.R. 96 (2011).

[13]5 U.S.C. § 7513(a); 5 C.F.R. § 752.403.

consideration of whether the penalty (removal or demotion) is reasonable; specifically, whether or not the employee was on notice that the deficient performance might be the basis for an adverse action.; *Fairall v. Veterans Administration*, 844 F.2d 775 (Fed. Cir. 1987); *Madison v. Defense Logistics Agency,* 48 M.S.P.R. 234 (1991).

In an initial decision issued by the MSPB administrative judge, a removal or demotion taken under chapter 43 will be sustained if the agency's decision is supported by substantial evidence or, in a case brought under chapter 75, is supported by a preponderance of the evidence.[14] However, even where the burden of proof is met, if the employee shows harmful error in the agency procedure used in arriving at the decision, or that the decision was based on a prohibited personnel practice, the agency decision may not be sustained.[15]

The initial decision becomes final 35 days after issuance, unless a party requests the full 3-member board (the Board) review the matter by filing a petition for review.[16] OPM may also file a petition for review but only if OPM believes the opinion is erroneous and will have a substantial impact on civil service law, rule, or regulation.[17] If the Board grants the petition for review (for example, where new and material evidence is available or the decision is based on erroneous interpretation of law[18]) the Board may affirm, reverse, or vacate the initial decision (in whole or in part), may

---

[14]5 U.S.C. § 7701(c)(1)(A) and 5 U.S.C. § 7701(c)(1)(B), respectively. Substantial evidence is a lower standard of proof than preponderance of the evidence. 5 C.F.R. § 1201.56(c).

[15]5 U.S.C. § 7701(c)(2). Harmful error is that which is likely to have caused the agency to reach a different conclusion from the one it would have reached absent the error and which caused substantial harm or prejudice to the employee's rights. 5 C.F.R. § 1201.56(c)(3).

[16]Parties must petition within 30 days after receipt of the decision, although the Board may extend the 30-day period for good cause shown. 5 U.S.C. § 7701(e)(1). A party may also request that the initial decision be vacated if a settlement agreement has been entered into by the parties. 5 C.F.R. § 1201.113(a).

[17]5 U.S.C. § 7701(e)(2).

[18]5 C.F.R. § 1201.115.

modify the decision, or may send the matter back to the administrative judge for further processing.[19]

An employee (but not the agency) may obtain judicial review of a final MSPB decision with the United States Court of Appeals for the Federal Circuit (hereinafter referred to as the Federal Circuit) by filing a petition for review within 60 days of the final Board action.[20] Under certain limited circumstances, OPM may also obtain review at the Federal Circuit. However, if OPM did not intervene in the matter before the MSPB, then OPM must first petition the MSPB for a reconsideration of its decision before petitioning the Federal Circuit for review.[21]

The Federal Circuit reviews and sets aside agency action, findings or conclusions found to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, (2) obtained without procedures required by law, rule or regulation being followed, or (3) unsupported by substantial evidence. 5 U.S.C. § 7703(c).

## Negotiated Grievance Procedure

If the employee files a grievance under negotiated grievance procedure, and the parties are not able to resolve the matter, the exclusive representative or the agency may invoke binding arbitration. The employee cannot invoke arbitration.[22] An arbitrator is to adhere to the same burdens of proof for sustaining agency actions under chapter 43 or 75 as are required if appealed at the MSPB.[23] Judicial review of an arbitrator award, as with a final MSPB decision, may be obtained at the Federal Circuit. The Federal Circuit review is conducted in the same

---

[19] 5 C.F.R. § 1201.117.

[20] 5 U.S.C. § 7703(b)(1) and 28 U.S.C. § 1295(a)(9). Pursuant to the Whistleblower Protection Enhancement Act of 2012, as amended, for a 5-year period of time employees will have the option of seeking review with any court of appeals of competent jurisdiction if challenging the disposition of allegations of whistleblower retaliation. Pub. L. No. 112-199, § 108, 126 Stat. 1465, 1469 (Nov. 27, 2012), amended by the All Circuit Review Extension Act, Pub. L. No. 113-170, 128 Stat. 1894 (Sept. 26, 2014).

[21] 5 U.S.C. § 7703(d).

[22] 5 U.S.C. § 7121(b)(1)(C)(iii).

[23] 5 U.S.C. § 7121(e)(2). See also, *Cornelius v. Nutt*, 472 U.S. 648, 660-661, (1985) (arbitrator is to apply the same substantive rules as the MSPB).

manner and under the same conditions as if the matter had been decided by the MSPB.[24]

# Appeal Avenues When Discrimination is Alleged

Where an employee with appeal rights under chapter 43 or 75 believes that unlawful discrimination motivated his or her removal or demotion, the employee may choose to file a discrimination complaint with his or her agency (referred to as a "mixed-case complaint") – or may file an appeal with the MPSB (referred to as a "mixed-case appeal").[25] If the employee is a member of a collective bargaining unit, the employee also has the option of pursuing a grievance alleging discrimination under the negotiated grievance procedure where such appeals have not been expressly excluded from coverage by the collective bargaining agreement. The employee may either pursue a mixed case (complaint or appeal) or a negotiated grievance procedure, but not both.[26]

# Mixed Cases

Where an employee chooses to pursue a mixed-case complaint and has filed a complaint of discrimination,[27] an agency has 120 days from the filing of the complaint to issue a final decision on that complaint of discrimination. If the decision is not issued timely, the employee may appeal to the MSPB at any time after the expiration of the 120 days.[28] Or, if the employee is dissatisfied with a final agency decision, the employee may appeal to the MSPB within 30 days of receipt of the decision.[29] Instead of filing an appeal with the MSPB, the employee also has the

---

[24]5 U.S.C. § 7121(f).

[25]An employee must choose between filing a complaint with his or her agency or filing an appeal with the MSPB, the employee may not do both. 29 C.F.R. § 1614.302.

[26]5 U.S.C. § 7121(d).

[27]Prior to filing a complaint of discrimination, an employee must initiate contact with an EEO counselor within 45 days of the date of the matter alleged to be discriminatory. The employee must file a complaint with the agency within 15 days of receipt of the notice of the right to file a complaint (generated at the close of the pre-complaint processing period). 29 C.F.R. §§1614.105 and 1614.106.

[28]5 U.S.C. § 7702(e)(2); 29 C.F.R. § 1614.302(d), 5 C.F.R. § 1201.154(b)(2).

[29]5 U.S.C. § 7702(a); 29 C.F.R. § 1614.302(d), 5 C.F.R. § 1201.154(b)(1).

AR0107

option of filing a civil action in district court.[30] Filing an action in district court results in a de novo review.[31]

Where an employee chooses to pursue a mixed case appeal, the employee must file with the MSPB within 30 days after the effective date of the removal or demotion action.[32]

If the employee appeals to the MSPB—either under a mixed case complaint or a mixed case appeal—the appeal is to be processed in accordance with MSPB's appellate procedures (including a right to a hearing) and a decision must be rendered by MSPB within 120 days after the appeal is filed.[33] Within 30 days after receiving a final MSPB decision, an employee has the choice of petitioning the U.S. Equal Employment Opportunity Commission (EEOC) to consider the MSPB decision or filing a civil action in district court.[34]

If the employee petitions the EEOC, the EEOC shall determine within 30 days whether to consider the MSPB decision.[35] If the EEOC determines to do so,[36] it has 60 days to consider the MSPB record of the proceedings and either (1) concur in the Board decision or (2) issue an EEOC decision which finds that the Board decision incorrectly interpreted applicable discrimination law or that the decision is not supported by the evidence.[37]

---

[30]5 U.S.C. §7702(a) and (e)(1).

[31]In a *de novo* review, a matter is reviewed anew as if it had not been reviewed before. Both the employee and agency get a full review of their positions.

[32]5 C.F.R. § 1201.154(a).

[33]5 U.S.C. § 7702(a)(1); 5 C.F.R. § 1201.156(a).

[34]If an employee waives the discrimination issue, the appeal may be filed with the Federal Circuit. 5 U.S.C. §7702(a)(3) and (b)(1); 5 C.F.R. § 1201.157. Where an employee files a civil action in district court, while the discrimination claims are subject to de novo review, any non-discrimination claims are reviewed on the record and the MSPB decision on these claims is to be affirmed unless found to be arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence. *Fogg v. Ashcroft*, 254 F.3d 103, 112 (D.C. Cir. 2001).

[35]5 U.S.C. § 7702(b)(2).

[36]If the EEOC determines not to consider the MSPB decision, the employee may file a civil action in district court.   5 U.S.C. § 7702(a)(3)(B).

[37]5 U.S.C. § 7702(b)(3).

If the EEOC concurs with the MSPB decision, the employee may file a civil action in district court.[38]

If the EEOC issues its own decision, the matter is then immediately referred back to the MSPB[39] which has 30 days to consider the decision. The MSPB may either (1) concur with EEOC's decision[40] or (2) find that the EEOC decision incorrectly interprets civil service provisions or that the record does not support the EEOC's decision as to such provisions, and reaffirm its initial decision.[41]

If the MSPB reaffirms its decision, the matter goes to a special panel which has 45 days in which to issue a final decision.[42] The employee may file a civil action in district court if dissatisfied with the special panel decision.[43]

## Grievances

Where an employee chooses to pursue a negotiated grievance procedure which results in an arbitration decision, if unsatisfied with the arbitrator's decision the employee (but not the agency) may request, within 35 days of the decision, the MSPB conduct a review of that decision.[44] The Board may require additional development of the record, through submissions of evidence or a hearing.[45] If not satisfied with the results of the MSPB review decision, the employee may continue on with the administrative

---

[38]5 U.S.C. § 7702(b)(5)(A); 5 C.F.R. § 1201.161(f).

[39]5 U.S.C. § 7702(b)(5)(B); 29 C.F.R. § 1614.305(e).

[40]If the MSPB concurs, the employee may file a civil action in district court. 5 U.S.C. § 7702(c); 5 C.F.R. § 1201.157, § 1201.162(b).

[41]5 U.S.C. § 7702(c); 5 C.F.R. § 1201.162(a). In reaffirming the decision, MSPB may make revisions in the decision, as appropriate.

[42]5 U.S.C. § 7702(d); 5 C.F.R. § 1201.171, § 1201.173(c). The special panel consists of (1) an individual appointed by the President and confirmed by the Senate, (2) one member of the MSPB, and (3) one member of the EEOC. 5 U.S.C. § 7702(d)(6)(A); 5 C.F.R. § 1201.172.

[43]5 U.S.C. § 7702(d)(2).

[44]5 U.S.C. § 7121(d); 5 C.F.R. § 1201.155.

[45]5 C.F.R. § 1201.155(e).

AR0109

**Appendix III: Appeal of Removal or Demotion
Actions**

and judicial appeal process provided for mixed case appeals under 5
U.S.C. § 7702, described above.[46]

---

[46]5 U.S.C. § 7121(d) and 5 U.S.C. § 7702. At a minimum, an employee must first appeal
the arbitrator's decision to the MSPB before seeking judicial review in district court.
*American Federation of Government Employees, Local 2052 v. Reno*, 992 F.2d. 331 (D.C.
Cir. 1993).

# Appendix IV: Examples of Tools and Guidance the Office of Personnel Management Provides to Help Agencies Address Poor Performance

| Tool | Format | Description |
|---|---|---|
| Addressing and Resolving Poor Performance, A Guide for Supervisors (February 2013) | Hard copy guide and online at Human Resources University (free) | This guidebook for supervisors describes the legal process for taking action against an employee for poor performance, provides answers to frequently asked questions, and provides samples of documents provided by a supervisor to an employee at different stages in the process of addressing performance problems. |
| Dealing with Poor Performers | Lecture based (fee for service) | This course provides an overview and tools for dealing with poor performing employees. The course material includes information on communicating performance matters to employees, developing a performance improvement plan, and how to take corrective and legal action when performance continues to decline. |
| Difficult Conversations | Online (free) | The goal of this course is to provide supervisors with the necessary skills to have the difficult conversation that is inherent when dealing with poor performance and to provide a safe environment to practice delivering difficult conversations. |
| Merit System Principles and Prohibited Personnel Practices | Online (free) | This course is intended to enhance Merit System Principles awareness and understanding among managers throughout the Federal Government. |
| Multiple topic areas addressing poor performance | Website | OPM's website provides agencies with guidance on addressing poor performance, including a glossary of terms and concepts used when taking performance based actions, an overview of employee appeal options for performance based actions, and guidance on how to write valid performance standards for employees, among other topics. |
| Assistance and consultation | Email and telephone | OPM provides assistance in response to inquiries on how to address and resolve poor performance. OPM does not become involved in the details of specific cases but will provide agency HR officials or managers with assistance regarding commonly asked questions that arise during the process. |
| Performance Appraisal Assessment Tool (PAAT) | Voluntary self-assessment | The PAAT is designed to help agencies develop and manage performance appraisal programs. To participate in the PAAT, agencies answer questions on their appraisal programs and OPM scores agencies on a scale from 1-100. The PAAT has three questions related to poor performance. |
| The Federal Employee Viewpoint Survey (FEVS) | Electronic survey | The FEVS measures employees' perceptions of whether, and to what extent, conditions characterizing successful organizations are present in their agencies. Agencies are to use this information to make strategic decisions about management. The FEVS includes several questions on performance management and dealing with poor performers. |

Source: GAO Review of OPM Tools and Guidance I GAO-15-191

# Appendix V: Comments from the Office of Personnel Management



**UNITED STATES OFFICE OF PERSONNEL MANAGEMENT**

Washington, DC 20415

JAN 2 1 2015

Employee Services

Robert Goldenkoff
Director, Strategic Issues
Government Accountability Office
441 G Street, NW
Washington, DC 20548

Dear Mr. Goldenkoff:

Thank you for providing the U.S. Office of Personnel Management (OPM) with an opportunity to comment on the Government Accountability Office (GAO) draft report, "FEDERAL WORKFORCE: Improved Supervision and Better Use of Probationary Periods Are Needed to Address Substandard Employee Performance (GAO-15-191)." We appreciate the opportunity to provide you with comments about this report.

**Response to Recommendations for Executive Action**

Recommendation: To help strengthen the ability of agencies to deal with poor performers, we recommend that the Director of OPM, in conjunction with the Chief Human Capital Officers (CHCO) Council and, as appropriate, key stakeholders such as federal employee labor unions, take the following four actions:

1) To more effectively ensure that agencies have a well-qualified cadre of supervisors capable of effectively addressing poor performance, determine if promising practices at some agencies should be more widely used government-wide. Such practices include (1) extending the supervisory probationary period beyond 1-year to include at least one full employee appraisal cycle; (2) providing detail opportunities or rotational assignments to supervisory candidates prior to promotion where the candidate can develop and demonstrate supervisory competencies; and (3) using a dual career ladder structure as a way to advance employees who may have particular technical skills and/or education but who are not interested or inclined to pursue a management or supervisory track.

Response: Partially concur. (1) The authority to determine the length of probationary periods for supervisors and managers is delegated to the head of each agency under 5 CFR 315.905, thus agencies already have authority to provide for longer supervisory probationary periods. OPM has a responsibility, pursuant to 5 U.S.C § 1104(a)(2), to conduct oversight of the manner in which agencies exercise delegations from OPM and can consider this suggestion in exercising that authority. Also, OPM is willing to seek the views of the CHCO Council in assessing whether and how this authority is being used and to offer technical guidance, if appropriate; (2) Providing detail opportunities or rotational assignments to a single supervisory candidate prior to promotion, if not done carefully, could lead to an appearance of pre-selection. However, agencies can already utilize structured leadership development/rotation programs or detail multiple eligible candidates in a way that would prepare or develop a cadre of employees for supervisory or managerial positions. In any case, all candidates should already meet

www.opm.gov          Recruit, Retain and Honor a World-Class Workforce to Serve the American People          www.usajobs.gov

qualifications and demonstrate supervisory competencies at the time of selection to a supervisory or managerial position. OPM will engage the CHCO Council and other stakeholders, if appropriate, to discuss this option further; and 3) Many agencies already have team leads and non-supervisory GS-14 and GS-15 positions which provide a means for employees to advance without taking on supervisory or managerial duties. However, OPM will engage the CHCO Council to discuss this option further.

2) To help ensure supervisors obtain the skills needed to effectively conduct performance management responsibilities, assess the adequacy of leadership training agencies provide to supervisors.

**Response:** Concur. OPM will assess what and how agencies are training new supervisors and provide feedback for improving the curriculum. In addition, OPM will continue to provide agencies guidance on evaluating the effectiveness of leadership training.

3) To help supervisors make effective use of the probationary period for new employees:
   - determine the benefits and costs of notifying supervisors - through automated notifications generated by the payroll system or other mechanism - that an individual's probationary period is ending and that the supervisor needs to make an affirmative decision or otherwise take appropriate action.

   **Response:** Non-concur. Choosing the best method to ensure that supervisors are aware when appeal rights will accrue is an agency responsibility. This recommendation appears to reflect an unsubstantiated assumption that this functionality will exist only in agency payroll systems as opposed to Human Resources (HR) systems. However, OPM has confirmed with all Shared Service Centers that their existing HR systems already contain the functionality to automatically notify supervisors of the end of an individual's probationary period for appropriate management action. It is each agency's decision whether to utilize this functionality. While OPM, through the CHCO Council, can educate agencies on the availability of this functionality, each agency will have to assess whether it finds benefits in utilizing this functionality if they are not already using it. Since this decision is an agency responsibility, OPM respectfully requests this recommendation be deleted from the final report.

   - determine if there are occupations where, because of the nature of work and complexity, the probationary period should extend beyond 1-year to provide supervisors with sufficient time to assess an individual's performance. If determined warranted, develop a legislative proposal for congressional action to ensure that formal procedures for taking action against an employee for poor performance and a right to appeal such action are not afforded until after the completion of any extended probationary period.

   **Response:** Partially concur. Under existing authority, OPM already can provide for longer probationary periods under certain circumstances by making changes to existing regulations through the regulatory process. After consultation with all interested stakeholders (e.g. CHCO Council, labor organizations, management associations, etc.) about the many tools already available today to assist supervisors in managing employee performance, OPM will pursue the established Executive Branch deliberation process for suggesting legislative proposals, if necessary and as appropriate.

4)  To help ensure OPM's tools and guidance for dealing with poor performers are cost-effectively
meeting agencies' and supervisors' needs, use the SHCM survey results (once available), FEVS
results, PAAT responses, and other existing information to inform decisions on content and
distribution methods. The importance of effective performance management and addressing poor
performance may need to be reinforced with agency supervisors so they more routinely seek out
tools and guidance.

**Response:** Partially concur. OPM will review this data, and, to the extent that the Strategic
Human Capital Management (SHCM) survey results, Federal Employee Viewpoint Survey
(FEVS) results, and the Performance Appraisal Assessment Tool (PAAT) responses provide
relevant data to inform decisions about content and distribution methods of OPM's tools and
guidance for dealing with poor performers, OPM will use the data to inform its decisions about
future tools and guidance. For example, while there are questions on accountability and poor
performers on the FEVS, these questions are based on employee views and perspectives on
whether accountability exists in their organization and aren't necessarily relevant to whether their
supervisors have been provided appropriate training and guidance on addressing poor
performance. Also, FEVS results do not reflect actions management may have taken to address
poor performers of which other employees may not be aware. Other FEVS questions may better
inform us regarding improvement of ongoing performance management practices. Use of the
SHCM and the PAAT results is anticipated to offer little, if any, relevant data. We do agree that
the importance of effective performance management and addressing poor performance needs to
be reinforced with supervisors. OPM continues to find ways to help agencies with leadership
development – as set forth in 5 CFR 412 – and to successfully manage performance. With regard
to training and development, including both leadership and performance management, OPM
continues to design policies, guidance, and tools with the objective of identifying Government-
wide approaches and solutions to ensure consistency, high-quality, efficiency, and cost-savings.

Technical comments to the draft are enclosed. Unless otherwise noted, the suggested revisions are
meant to provide technical accuracy and correct statements attributed to OPM.

Please contact Ms. Janet Barnes, Director, Internal Oversight and Compliance on (202) 606-3207,
should your office require additional information.

Again, I extend my thanks to your office for providing this opportunity to update and clarify
information in the draft report.

Sincerely,

Mark D. Reinhold
Associate Director

Enclosure

# Appendix VI: GAO Contact and Staff Acknowledgments

| GAO Contact | Robert Goldenkoff, (202) 512-2757 or goldenkoffr@gao.gov |
|---|---|
| Staff Acknowledgments | In addition to the individual named above, Tom Gilbert, Assistant Director; Shea Bader, Analyst-in-Charge; Sara Daleski; Jeffrey DeMarco; Karin Fangman; Colleen Marks; Donna Miller; Cristina Norland; and Rebecca Shea made major contributions to this report. |

| GAO's Mission | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| Obtaining Copies of GAO Reports and Testimony | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's website (http://www.gao.gov). Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to http://www.gao.gov and select "E-mail Updates." |
| Order by Phone | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, http://www.gao.gov/ordering.htm. <br><br> Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. <br><br> Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| Connect with GAO | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. Subscribe to our RSS Feeds or E-mail Updates. Listen to our Podcasts. Visit GAO on the web at www.gao.gov. |
| To Report Fraud, Waste, and Abuse in Federal Programs | Contact: <br><br> Website: http://www.gao.gov/fraudnet/fraudnet.htm <br> E-mail: fraudnet@gao.gov <br> Automated answering system: (800) 424-5454 or (202) 512-7470 |
| Congressional Relations | Katherine Siggerud, Managing Director, siggerudk@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| Public Affairs | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |



Please Print on Recycled Paper.

UNITED STATES OFFICE OF PERSONNEL MANAGEMENT

# A Handbook for Measuring Employee Performance



MARCH **2017**

AR0117



# table of contents

FOREWORD..................................................................2

**CHAPTER 1**
PERFORMANCE MANAGEMENT: BACKGROUND
  AND CONTEXT  ....................................................4
  Employee Performance Plans  ....................................7

**CHAPTER 2**
DISTINGUISHING ACTIVITIES
FROM ACCOMPLISHMENTS.........................................12
  The Beekeepers and Their Bees..........................  12
  Using Balanced Measures  ..............................  17
  Categories of Work ....................................  18

**CHAPTER 3**
DEVELOPING EMPLOYEE PERFORMANCE PLANS...................20
  Step 1: Look at the Overall Picture  ...................  25
  Step 2: Determine Work Unit Accomplishments......................  28
       Method A: Goal Cascading Method................  29
       Method B: Customer-Focused Method...............  32
       Method C: Work Flow Charting Method ...........  35
  Step 3: Determine Individual Accomplishments
       That Support Work Unit Goals ...................  39
  Step 4: Convert Expected Accomplishments
       Into Performance Elements, Indicating Type and Priority .....43
  Step 5: Determine Work Unit and Individual Measures ...............47
  Step 6: Develop Work Unit and Individual Standards .................52
  Step 7: Determine How To Monitor Performance.....................61
  Step 8: Check the Performance Plan......................67
  Guiding Principles for Performance Measurement .........................68

**CHAPTER 4**
LEARNING AIDS................................................70
  Performance Measurement Quiz........................................70
  Quick Reference: The Eight-Step Process...............................72

**APPENDIX A:** Five-Level Appraisal—Examples..............................75

**APPENDIX B:** Three-Level Appraisal—Examples ...........................80

**APPENDIX C:** Two-Level Appraisal—Examples ............................84

# foreword

This handbook is designed for Federal supervisors and employees and presents an eight-step process for developing employee performance plans that are aligned with and support organizational goals. It also provides guidelines for writing performance elements and standards that not only meet regulatory requirements, but also maximize the capability that performance plans have for focusing employee efforts on achieving organizational and group goals.

The methods presented here are designed to develop elements and standards that measure employee and work unit accomplishments rather than to develop other measures that are often used in appraising performance, such as measuring behaviors or competencies. Although this handbook includes a discussion of the importance of balancing measures, the main focus presented here is to measure accomplishments. Consequently, much of the information presented in the first five steps of this eight-step process applies when supervisors and employees want to measure results. However, the material presented in Steps 6 through 8 about developing standards, monitoring performance, and checking the performance plan apply to all measurement approaches.

# foreword

The handbook has four chapters and three appendices:

| **CHAPTER 1** gives the background and context of performance management that you will need to understand before beginning the eight-step process.

| **CHAPTER 2** defines **accomplishments,** which is key to using this handbook successfully.

| **CHAPTER 3** includes a detailed description of the **eight-step process** for developing employee performance plans that are aligned with and support organizational goals.

| **CHAPTER 4** provides **study tools**, including a followup **quiz** and a **quick reference** for the eight-step process.

| **THE APPENDICES** contain **example standards** that were written specifically for **appraisal programs** that appraise performance on elements at five, three, and two levels.

After reading the instructional material, studying the examples, and completing the exercises in this book, you should be able to:

| **DEVELOP** a performance plan that aligns individual performance with organizational goals

| **USE** a variety of methods to determine work unit and individual accomplishments

| **DETERMINE** the difference between activities and accomplishments

| **EXPLAIN** regulatory requirements for employee performance plans

chapter 1

**PERFORMANCE MANAGEMENT: BACKGROUND AND CONTEXT**

Remember the story about the naive student in his first English literature course who was worried because he didn't know what prose was? When he found out that prose was ordinary speech, he exclaimed, "Wow! I've been speaking prose all my life!"

Managing performance well is like speaking prose. Many managers have been "speaking" and practicing effective performance management naturally all their supervisory lives, but don't know it!

Some people mistakenly assume that performance management is concerned only with following regulatory requirements to appraise and rate performance. Actually, assigning ratings of record is only **one part** of the overall process (and perhaps the least important part).

Performance management is the systematic process of:

- **planning** work and setting expectations
- continually **monitoring** performance
- **developing** the capacity to perform
- periodically **rating** performance in a summary fashion
- **rewarding** good performance

The revisions made in 1995 to the governmentwide performance appraisal and awards regulations support "natural" performance management. Great care was taken to ensure that the requirements those regulations establish would complement and not conflict with the kinds of activities and actions effective managers are practicing as a matter of course.

**PLANNING**   In an effective organization, work is planned out in advance. Planning means setting performance expectations and goals for groups and individuals to channel their efforts toward achieving organizational objectives. Getting employees involved in the planning process will help them understand the goals of the organization, what needs to be done, why it needs to be done, and how well it should be done.

The regulatory requirements for planning employees' performance include establishing the elements and standards of their performance appraisal plans. Performance elements and standards should be measurable, understandable, verifiable, equitable, and achievable. Through critical elements, employees are held accountable as individuals for work assignments or responsibilities. Employee performance plans should be flexible so that they can be adjusted for changing program objectives and work requirements. When used effectively, these plans can be beneficial working documents that are discussed often, and not merely paper work that is filed in a drawer and seen only when ratings of record are required.

**MONITORING**   In an effective organization, assignments and projects are monitored continually. Monitoring well means consistently measuring performance and providing ongoing feedback to employees and work groups on their progress toward reaching their goals.

The regulatory requirements for monitoring performance include conducting progress reviews with employees where their performance is compared against their elements and standards. Ongoing monitoring provides the supervisor the opportunity to check how well employees are meeting predetermined standards and to make changes to unrealistic or problematic standards. By monitoring continually, supervisors can identify unacceptable performance at any time during the appraisal period and provide assistance to address such performance rather than wait until the end of the period when summary rating levels are assigned.

**PERFORMANCE MANAGEMENT'S FIVE KEY COMPONENTS**



AR0122

**DEVELOPING**   In an effective organization, employee developmental needs are evaluated and addressed. Developing in this instance means increasing the capacity to perform through training, giving assignments that introduce new skills or higher levels of responsibility, improving work processes, or other methods. Providing employees with training and developmental opportunities encourages good performance, strengthens job-related skills and competencies, and helps employees keep up with changes in the workplace, such as the introduction of new technology .

Carrying out the processes of performance management provides an excellent opportunity for supervisors and employees to identify developmental needs. While planning and monitoring work, deficiencies in performance become evident and should be addressed. Areas for improving good performance also stand out, and action can be taken to help successful employees improve even further.

**RATING**   From time to time, organizations find it useful to summarize employee performance. This helps with comparing performance over time or across a set of employees. Organizations need to know who their best performers are.

Within the context of formal performance appraisal requirements, rating means evaluating employee or group performance against the elements and standards in an employee's performance plan and assigning a summary rating of record. The rating of record is assigned according to procedures included in the organization's appraisal program. It is based on work performed during an entire appraisal period. The rating of record has a bearing on various other personnel actions, such as granting within-grade pay increases and determining additional retention service credit in a reduction in force.

**REWARDING**   In an effective organization, rewards are used often and well. Rewarding means recognizing employees, individually and as members of groups, for their performance and acknowledging their contributions to the agency's mission. A basic principle of effective management is that all behavior is controlled by its consequences. Those consequences can and should be both formal and informal and both positive and negative.

Good managers don't wait for their organization to solicit nominations for formal awards before recognizing good performance. Recognition is an ongoing, natural part of day-to-day experience. A lot of the actions that reward good performance, like saying "thank you," don't require a specific regulatory authority. Nonetheless, awards regulations provide a broad range of forms that more formal rewards can take, such as cash, time off, and many recognition items. The regulations also cover a variety of contributions that can be rewarded, from suggestions to group accomplishments.

## PERFORMANCE MANAGEMENT AS PROSE

Good managers have been speaking and practicing effective performance management all their lives, executing each key component process well. They not only set goals and plan work routinely , but they also measure progress toward those goals and give feedback to employees. They set high standards, but they also take care to develop the skills needed to reach them. They also use formal and informal rewards to recognize the behavior and results that accomplish their mission. All five components working together and supporting each other achieve natural, effective performance management.

# Employee Performance Plans

Employees must know what they need to do to perform their jobs successfully. Expectations for employee performance are established in employee performance plans. Employee performance plans are all of the written, or otherwise recorded, performance elements that set forth expected performance. A plan must include all critical and non-critical elements and their performance standards.

Performance elements tell employees **what** they have to do and standards tell them **how well** they have to do it. Developing elements and standards that are understandable, measurable, attainable, fair, and challenging is vital to the effectiveness of the performance appraisal process and is what this handbook is all about.

Federal regulations define three types of elements: critical elements, non-critical elements, and additional performance elements. Agency appraisal programs are required to use critical elements (although the agency may choose to call them something else), but the other two types can be used at the agency's option. Before continuing further with this handbook, you should contact your human resources office to determine the types of elements your appraisal program allows.

## A NOTE ABOUT PERFORMANCE PLANS

*This handbook is about developing employee performance plans. However, there is another type of performance plan that you need to be aware of. The Government Performance and Results Act of 1993 requires each agency to prepare an annual performance plan covering each program activity set forth in its budget. These organizational performance plans:*

⏐ *establish program-level performance goals that are objective, quantifiable, and measurable*

⏐ *describe the operational resources needed to meet those goals*

⏐ *establish performance indicators to be used in measuring the outcomes of each program*

*We will be using organizational performance plans during Step 1 of the eight-step process presented in this handbook. Organizational performance plans are key in the process of aligning employee performance with organizational goals.*

## A NOTE ABOUT GROUP OR TEAM PERFORMANCE

*The term "group or team performance" can be confusing sometimes. When we say that critical elements cannot describe group performance, we are saying that the group's performance as a whole cannot be used as a critical element. This does not preclude describing an individual's contribution to the group as a critical element. The key to distinguishing between group performance and an individual's contribution to the group is that group performance is measured at an aggregate level, not for a single employee. An individual's contribution to the group is measured at the individual employee level.*

**CRITICAL ELEMENTS**    A critical element is an assignment or responsibility of such importance that unacceptable performance in that element would result in a determination that the employee's overall performance is unacceptable. Regulations require that each employee have at least one critical element in his or her performance plan. Even though no maximum number is placed on the number of critical elements possible, most experts in the field of performance management agree that between three and seven critical elements are appropriate for most work situations.

Critical elements are the cornerstone of individual accountability in employee performance management. Unacceptable performance is defined in Section 4301(3) of title 5, United States Code, as failure on one or more critical elements, which can result in the employee's reassignment, removal, or reduction in grade. Consequently, critical elements must describe work assignments and responsibilities that are within the employee's control. For most employees this means that critical elements **cannot** describe a group's performance.  However, a supervisor or manager can and should be held accountable for seeing that results measured at the group or team level are achieved. Critical elements assessing group performance may be appropriate to include in the performance plan of a supervisor, manager, or team leader who can reasonably be expected to command the production and resources necessary to achieve the results (i.e., be held individually accountable).

AR0125

**NON-CRITICAL ELEMENTS**   A non-critical element is a dimension or aspect of individual, team, or organizational performance, exclusive of a critical element, that is used in assigning a summary level. Important aspects of non-critical elements include:

| **NO PERFORMANCE-BASED ACTIONS**   Failure on a non-critical element **cannot** be used as the basis for a performance-based adverse action, such as a demotion or removal. Only critical elements may be used  that way. Moreover, if an employee fails on a non-critical element, the employee's performance cannot be summarized as *Unacceptable* overall based on that failure.

| **GROUP PERFORMANCE**   Non-critical elements are the only way an agency can include the group's or the team's performance as an element in the performance plan so that it counts in the summary level. For example, team structured organizations might use a non-critical element to plan, track, and appraise the team on achieving its goals. To do this, each team member's performance plan would include the "team" element (i.e., a non-critical element) and the rating for the team on that element would be counted in the summary level of each team member.

| **WHEN THEY CAN'T BE USED**   Non-critical elements cannot be used in appraisal programs that use only two levels to  summarize performance in the rating of record. This is because they would have no effect on the summary rating level and, by definition, they must affect the summary level. (That is, in a two-level program, failure on non-critical elements cannot bring the summary level down to *Unacceptable,* and assessments of non-critical elements cannot raise the summary level to *Fully Successful* if a critical element is failed.)

| **CAN GREATLY AFFECT THE SUMMARY LEVEL**   Sometimes the word "non-critical" is interpreted to mean "not as important." Prior to 1995, this interpretation was prescribed by regulation. Now, however, depending on how an appraisal program is designed, this need not be the case. Even though consideration of non-critical elements cannot result in assigning an *Unacceptable* summary level, appraisal programs can be designed so that non-critical elements have as much weight or more weight than critical elements in determining summary levels above *Unacceptable*.

*BEFORE YOU CAN USE NON-CRITICAL ELEMENTS IN EMPLOYEE PERFORMANCE PLANS, YOU MUST DETERMINE IF YOUR APPRAISAL PROGRAM ALLOWS THEM.*

### ADDITIONAL PERFORMANCE ELEMENTS

An additional performance element is a dimension or aspect of individual, team, or organizational performance that is not a critical element and is not used in assigning a summary rating level. The essential difference between a non-critical element and an additional performance element is that non-critical elements **do** affect the summary level. Otherwise, the features and limitations of non-critical elements discussed above also apply to additional performance elements. Opportunities for using additional performance elements include:

*CHECK THE RULES*

*OF YOUR PROGRAM BEFORE*

*INCLUDING ADDITIONAL PERFORMANCE*

*ELEMENTS IN YOUR PLANS.*

▎NEW WORK ASSIGNMENT  Managers and employees may want to establish goals, track and measure performance, and develop skills for an aspect of work that they do not believe should count in the summary level. For example, if an employee volunteered to work on a new project that requires new skills, an additional performance element describing the new assignment provides a non-threatening vehicle for planning, measuring, and giving feedback on the employee's performance without counting it in the summary level.

▎GROUP PERFORMANCE  In a two-level appraisal program, additional performance elements are the only way to include a discussion of group performance in the appraisal process. Even though the element assessment does not count when determining the summary level, managers and employees could use it to manage the group's performance.

▎AWARDS  Additional performance elements can be used to establish criteria for determining awards eligibility, especially in a two-level program that no longer bases awards solely on a summary level.

## ELEMENT CHARACTERISTICS

| | REQUIRED IN EMPLOYEE PERFORMANCE PLANS | CREDITED IN THE SUMMARY LEVEL | CAN DESCRIBE A GROUP'S PERFORMANCE |
|---|---|---|---|
| *CRITICAL ELEMENTS* | YES | YES | NO* |
| *NON-CRITICAL ELEMENTS* | NO | YES | YES |
| *ADDITIONAL PERFORMANCE ELEMENTS* | NO | NO | YES |

*\*Except when written for a supervisor or manager who has individual management control over a group's production and resources.*

Additional performance elements were introduced in the September 1995 performance appraisal regulations and have not been used widely yet. We foresee their popularity rising as agencies discover the possibilities they present for managing performance.

## KNOW YOUR PROGRAM FEATURES

Again, it is important to stress that before you continue with this handbook, you need to find out the rules established by your appraisal program; specifically , you will need to know:

- which kinds of elements your program allows you to use
- at how many levels your program appraises employee performance on elements
- how many summary levels your program uses
- if your program allows weighting of elements (see Step 4)
- whether the program requires specific elements and/or uses generic standards

## example program features

This handbook uses an example agency called the "Federal Benefits Bureau," (FBB) which is an agency that specializes in benefits and retirement services. To be able to understand and work through the examples, you need to know the features of FBB's appraisal program (i.e., the same features listed above).
FBB's appraisal program:

- uses critical, non-critical, and additional performance elements
- appraises employee performance on elements at five levels:

  *Unacceptable*
  *Minimally Successful*
  *Fully Successful*
  *Exceeds Fully Successful*
  *Outstanding*

- uses five summary levels, which are the same as the elements' five levels listed above
- allows elements to be weighted according to importance to the organization
- requires **no** specific or generic elements

# chapter 2

## DISTINGUISHING ACTIVITIES FROM ACCOMPLISHMENTS

*CHAPTER 2 DISCUSSES WHAT MAY BE THE MOST IMPORTANT CONCEPT IN THIS HANDBOOK: THE DIFFERENCE BETWEEN MEASURING ACTIVITIES AND MEASURING ACCOMPLISHMENTS. THE FOLLOWING STORY ILLUSTRATES THIS CONCEPT.*

# The Beekeepers and Their Bees

Once upon a time, there were two beekeepers who each had a beehive. The beekeepers worked for a company called Bees, Inc. The company's customers loved its honey and wanted the business to produce more honey than it had the previous year. As a result, each beekeeper was told to produce more honey at the same quality. With different ideas about how to do this, the beekeepers designed different approaches to improve the performance of their hives.

The first beekeeper established a bee performance management approach that measured how many flowers each bee visited. At considerable cost to the beekeeper, an extensive measurement system was created to count the flowers each bee visited. The beekeeper provided feedback to each bee at midseason on his individual performance, but the bees were never told about the hive's goal to produce more honey so that Bees, Inc., could increase honey sales. The beekeeper created special awards for the bees who visited the most flowers.

The second beekeeper also established a bee performance management approach, but this approach communicated to each bee the goal of the hive—to produce more honey. This beekeeper and his bees measured two aspects of their performance: the amount of nectar each bee brought back to the hive and the amount of honey the hive produced. The performance of each bee and the hive's overall performance were charted and posted on the hive's bulletin board for all bees to see. The beekeeper created a few awards for the bees that gathered the most nectar, but he also established a hive incentive program that rewarded each bee in the hive based on the hive's production of honey—the more honey produced the more recognition each bee would receive.

AR0129

# chapter 2

At the end of the season, the beekeepers evaluated their approaches. The first beekeeper found that his hive had indeed increased the number of flowers visited, but the amount of honey produced by the hive had dropped. The Queen Bee reported that because the bees were so busy trying to visit as many flowers as possible, they limited the amount of nectar they would carry so they could fly faster. Also, because the bees felt they were competing against each other for awards (because only the top performers were recognized), they would not share valuable information with each other (like the location of the flower-filled fields they'd spotted on the way back to the hive) that could have helped improve the performance of all the bees. (After all was said and done, one of the high-performing bees told the beekeeper that if he'd been told that the real goal was to make more honey rather than to visit more flowers, he would have done his work completely differently.) As the beekeeper handed out the awards to individual bees, unhappy buzzing was heard in the background.

The second beekeeper, however, had very different results. Because each bee in his hive was focused on the hive's goal of producing more honey, the bees had concentrated their efforts on gathering more nectar to produce more honey than ever before. The bees worked together to determine the highest nectar-yielding flowers and to create quicker processes for depositing the nectar they'd gathered. They also worked together to help increase the amount of nectar gathered by the poor performers. The Queen Bee of this hive reported that the poor performers either improved their performance or transferred to another hive. Because the hive had reached its goal, the beekeeper awarded each bee his portion of the hive incentive payment. The beekeeper was also surprised to hear a loud, happy buzz and a jubilant flapping of wings as he rewarded the individual high-performing bees with special recognition.

**THE MORAL OF THIS STORY IS:  MEASURING AND RECOGNIZING ACCOMPLISHMENTS RATHER THAN ACTIVITIES—AND GIVING FEEDBACK TO THE WORKER BEES—OFTEN IMPROVES THE RESULTS OF THE HIVE.**

Although it somewhat oversimplifies performance management, the beekeepers' story illustrates the importance of measuring and recognizing accomplishments (the amount of honey production per hive) rather than activities (visiting flowers). This handbook is designed to help you develop elements and standards that center around accomplishments, not activities.

The chart below depicts the type of measurement that should occur at each organizational level of Bees, Inc., and includes measurements used by the beekeepers.

### PERFORMANCE PYRAMID
*Note that outputs occur at two levels—the work unit and the employee level.*



OUTCOMES

CAN BE APPRAISED USING NON-CRITICAL AND ADDITIONAL PERFORMANCE ELEMENTS

(increased sales of honey)

PROGRAM (Bees, Inc.)

OUTPUTS
ACCOMPLISHMENTS (I.E., PRODUCTS OR SERVICES)

(honey produced per hive)

WORK UNIT (hive)

(nectar collected per bee)

CAN BE APPRAISED USING CRITICAL ELEMENTS

EMPLOYEE (bee)

ACTIVITIES
(flowers visited)

AR0131

**Activities** are the actions taken to produce results and are generally described using verbs. In the beekeeper story, the *activity* being measured was *visiting* flowers. Other examples of activities include:

- *filing* documents
- *developing* software programs
- *answering* customer questions
- *writing* reports

**Accomplishments** (or outputs) are the products or services (the results) of employee and work unit activities and are generally described using nouns. The examples of *outputs* used in the story include the amount of *nectar* each bee collected and the *honey* production for the hive. Other examples include:

- *files* that are orderly and complete
- a software *program* that works
- accurate *guidance* to customers
- a *report* that is complete and accurate

**Outcomes** are the final results of an agency's products and services (and other outside factors that may affect performance). The example of an outcome used in the beekeeper story was increased sales of honey for Bees, Inc. Other examples of outcomes could include:

- reduced number of transportation-related deaths
- improved fish hatcheries
- a decrease in the rate of teenage alcoholism
- clean air

## A NOTE ABOUT FEDERAL EFFORTS TO MEASURE OUTCOMES AND OUTPUTS

*Because of the requirements set by the Government Performance and Results Act of 1993 (i.e., the Results Act), Federal agencies are measuring their organizational outcomes and outputs. The Results Act requires agencies to have strategic plans, which include outcome-related goals and objectives for the major functions and operations of the agency. Those outcome goals must be objective, quantifiable, and measurable. The Results Act also requires agencies to develop annual performance plans that cover each one of their programs. Performance plans must include performance goals, which define the annual, often incremental, progress in achieving the outcome goals in the strategic plan. Performance goals are often output-oriented because they address single-year performance. We will talk more about strategic plans with their outcome goals, and performance plans with their output goals, in Chapter 3.*

On the performance pyramid illustrated on page 14, notice that accomplishments can be measured at two levels in the organization—the employee level and the work unit level. Employee accomplishments can be included in employee performance plans using all three types of performance elements. Work unit accomplishments also can be included in the appraisal process—through non-critical elements if the agency desires to have work unit performance affect ratings (and only if the appraisal program uses more than two summary levels) or through additional performance elements if work unit performance is not to affect ratings. However they are used in performance appraisal, work unit as well as employee accomplishments can always be recognized through an awards program.

If supervisors, team leaders, and employees want to develop performance plans that support the achievement of organizational outcomes, they might try the second beekeeper's approach of sharing organizational goals with the hive, measuring and rewarding accomplishments rather than activities, and providing feedback on performance.

AR0133

# Using Balanced Measures

*THIS HANDBOOK FOCUSES ON MEASURING ACCOMPLISHMENTS AT THE WORK UNIT AND EMPLOYEE LEVELS. THERE MAY BE SITUATIONS, HOWEVER, WHEN ACTIVITIES, BEHAVIORS, OR PROCESSES MAY BE IMPORTANT TO INCLUDE IN AN EMPLOYEE'S PERFORMANCE PLAN. THIS HANDBOOK DOES NOT FOCUS ON HOW TO DEVELOP THOSE KINDS OF MEASURES. HOWEVER, WE WOULD BE REMISS NOT TO INCLUDE A DISCUSSION ABOUT THE IMPORTANCE OF BALANCING MEASURES IN YOUR MEASUREMENT SYSTEM. THEREFORE, A SHORT DESCRIPTION OF BALANCED MEASURES FOLLOWS.*

Traditionally, many agencies have measured their organizational performance by focusing on internal or process performance, looking at factors such as the number of full-time equivalents (FTEs) allotted, the number of programs controlled by the agency, or the size of the budget for the fiscal year. In contrast, private sector businesses usually focus on the financial measures of their bottom line: return-on-investment, market share, and earnings-per-share. Alone, neither of these approaches provides the full perspective on an organization's performance that a manager needs to manage effectively. But by balancing customer and employee satisfaction measures with results and financial measures, managers will have a more complete picture and will know where to make improvements.

**BALANCING MEASURES** Robert S. Kaplan and David P. Norton have developed a set of measures that they refer to as "a balanced scorecard." These measures give top managers a fast but comprehensive view of the organization's performance and include both process and results measures. Kaplan and Norton compare the balanced scorecard to the dials and indicators in an airplane cockpit. For the complex task of flying an airplane, pilots need detailed information about fuel, air speed, altitude, bearing, and other indicators that summarize the current and predicted environment. Reliance on one instrument can be fatal. Similarly, the complexity of managing an organization requires that managers be able to view performance in several areas simultaneously. A balanced scorecard—or a balanced set of measures—provides that valuable information.

**MANAGING PERFORMANCE FROM THREE PERSPECTIVES** A variety of studies have shown that both the public and private sectors have used balanced measures to help create high-performing organizations. Because balancing the perspectives of business, customers, and employees plays a key role in organizational success, OPM regulations (effective November 13, 2000) now require agencies to evaluate senior executive performance using balanced measures, which should take into account the following factors:

> **The business perspective,** which has a different interpretation in the Government than in the private sector. For many organizations, there are actually two separate sets of measures: the outcomes, or social/political impacts, which define the role of the agency/department within the Government and American society; and the business processes needed for organizational efficiency and effectiveness. Many of the outcome-oriented goals agencies establish in their strategic plans under the Government Performance and Results Act include the business perspective. To gain the business perspective, Federal managers must answer the question: *How do we look to Congress, the President, and other stakeholders?*

| **The customer perspective,** which considers the organization's performance through the eyes of its customers, i.e., American citizens, so that the organization retains a careful focus on customer needs and satisfaction. To achieve the best in business performance, agencies must incorporate customer needs and wants and must respond to them as part of their performance planning. Federal managers must answer the question: *How do customers see us?*

| **The employee perspective,** which focuses attention on the performance of the key internal processes that drive the organization, including employee development and retention. This perspective directs attention to the basis of all future success—the organization's people and infrastructure. Adequate investment in these areas is critical to all long-term success. Federal managers must answer the question: *Do employees view the organization as a good place to work and develop their skills?*

**TIE-IN TO EMPLOYEE PERFORMANCE**  The balanced measures philosophy need not apply only at the organizational or senior executive level.  A balanced approach to employee performance appraisal is an effective way of getting a complete look at an employee's work performance. Too often, employee performance plans with their elements and standards measure behaviors, actions, or processes without also measuring the results of employees' work. By measuring only behaviors or actions in employee performance plans, an organization might find that most of its employees are appraised as *Outstanding* when the organization as a whole has failed to meet its objectives.

By using balanced measures at the organizational level, and by sharing the results with supervisors, teams, and employees, managers are providing the information needed to align employee performance plans with organizational goals. By balancing the measures used in employee performance plans, the performance picture becomes complete.

# Categories of Work

Sometimes performance plans describe elements using categories of work. Categories are classifications of work types often used to organize performance elements and standards. If, for example, the first beekeeper in our fable had used categories of work for his elements, he might have used the broad category of "making honey" as the element and then included a grouping that described all the activities the bees did to make the honey , such as gather nectar, report to the drones, etc. Other examples of categories of work and the types of activities that are often described under these categories include:

| customer service (greets customers with a smile, answers the phone promptly)

| teamwork (cooperates with others, shares information)

| communication (writes well, gives presentations)

| office duties (files papers, prepares reports)

*THIS HANDBOOK DOES NOT EXPLAIN HOW TO DESCRIBE AND MEASURE CATEGORIES OF WORK. HERE YOU ARE ASKED TO CONCENTRATE ON MEASURING ACCOMPLISHMENTS.*

AR0135

**EXERCISE ON DISTINGUISHING ACTIVITIES FROM ACCOMPLISHMENTS:**

It is time to check your understanding of the differences among activities, accomplishments, and categories. Please check the column that best describes each item.

| | ACCOMPLISHMENT | ACTIVITY | CATEGORY |
|---|---|---|---|
| Trains employees | | | |
| Supervision | | | |
| A completed case | | | |
| Public relations | | | |
| Recommendations | | | |
| Customer service | | | |
| HR policy interpretations | | | |
| Writes agency policy | | | |
| Solutions to problems | | | |
| Develops software programs | | | |
| Ideas and innovations | | | |
| Files paperwork | | | |
| Writes memos | | | |
| Computer systems that work | | | |
| Teamwork | | | |
| A completed project | | | |
| Satisfied customers | | | |
| Answers the phone | | | |
| Assists team members | | | |

*ANSWERS ON PAGE 88*

# chapter 3

## DEVELOPING EMPLOYEE PERFORMANCE PLANS

Y ou are now going to begin an eight-step process for developing employee performance plans that support organizational goals. Before you begin, however, we want to briefly review a process for developing performance plans that you may have followed in the past but will **NOT** be learning here.

Traditionally in some organizations, performance plans have been developed by copying the activities described in an employee's job description onto the appraisal form. This handbook asks that you **NOT** begin with the position description. Even though a performance plan must reflect the type of work described in the employee's position description, the performance plan does not have to mirror it.

The next two pages illustrate what happens when you develop a performance plan solely from a position description. Page 22 is a simplified position description for a Retirement Benefits Specialist within the Claims Division branch of our example agency — the Federal Benefits Bureau (FBB). Notice how the duties and responsibilities in the position description all begin with a verb. They describe **activities**, not **accomplishments**.

# chapter 3

A performance plan for a Retirement Benefits Specialist follows on page 23.  It was written by copying the simplified position description from page 22 onto the appraisal form.  Note that by copying the activities from the position description onto the appraisal form, FBB has developed a performance plan that only measures **activities,** not accomplishments.  Also, by developing a performance plan without using a process that links **accomplishments** to organizational goals, the organization has lost the opportunity to use the appraisal process to communicate its goals to its employees and to align employee efforts with its goals.

REMEMBER THAT FBB'S APPRAISAL PROGRAM APPRAISES EMPLOYEE PERFORMANCE ON ELEMENTS AT FIVE LEVELS. THE FORM ON PAGE 23 SHOWS FIVE POSSIBLE LEVELS OF PERFORMANCE: UNSATISFACTORY (U), MINIMALLY SUCCESSFUL (MS), FULLY SUCCESSFUL (FS), EXCEEDS FULLY SUCCESSFUL (EFS), AND OUTSTANDING (O).

DEVELOPING EMPLOYEE PERFORMANCE PLANS

*POSITION DESCRIPTION*

*THE DUTIES AND RESPONSIBILITIES IN THE POSITION DESCRIPTION ALL BEGIN WITH A VERB. THEY DESCRIBE ACTIVITIES.*

| |
|---|
| POSITION DESCRIPTION: #123456<br>ORGANIZATIONAL TITLE:  RETIREMENT BENEFITS SPECIALIST |
| **INTRODUCTION**<br><br>The incumbent of this position serves in a highly responsible capacity as a Retirement Benefits Specialist in an office responsible for the adjudication of claims for retirement and insurance benefits.<br>The work requires the services of an experienced, fully-trained Retirement Benefits Specialist.  This position is responsible for considering and acting on all aspects of claims and applications for retirement and insurance benefits in an assigned area. |
| **MAJOR DUTIES AND RESPONSIBILITIES**<br><br>❙ Determine entitlement to and the amount of retirement annuities and survivor bene-fits, as well as payments to adult students and the entitlements and payments to cer-tain other parties such as former spouses.<br><br>❙ Develop the record in individual cases, determining what is necessary and the sources of needed information.<br><br>❙ Adjudicate cases.<br><br>❙ Review and approve recommendations and decisions made by other Specialists, and provide training, advice, and assistance.<br><br>❙ Respond to inquiries from various customer sources and provide clear, responsive explanations of actions taken and the bases for them. |
| *APPROVING AUTHORITY SIGNATURE* | *DATE* |

**PERFORMANCE PLAN**

**X** *THIS IS NOT THE TYPE OF PERFORMANCE PLAN THAT YOU WILL DEVELOP IF YOU FOLLOW THE METHOD PRESENTED IN THIS HANDBOOK.*

| EMPLOYEE PERFORMANCE PLAN | | | |
|---|---|---|---|
| **Name** | | | **Effective Date** |
| *JOB TITLE*<br>Retirement Benefits Specialist | | *NAME OF OFFICE*<br>Office of Retirement Services | |
| *ELEMENTS* | *TYPE* | *STANDARDS* | *RATING* |
| *TECHNICAL AND POLICY EXPERT*<br>❙ Determine entitlement to and the amount of retire-ment annuities and survivor benefits, as well as pay-ments to adult students and the entitlements and pay-ments to certain other par-ties such as former spouses.<br>❙ Develop the record in individ-ual cases, determining what is necessary and the sources of needed information.<br>❙ Adjudicate cases of unusual technical difficulty. | Critical | *FULLY SUCCESSFUL:*<br>Amounts of payments are accurate and determine timely.<br>Amounts of paym accurate and de ely. | ☐ MS<br>☐ FS<br>☐ EFS<br>☐ O |
| *LEADERSHIP*<br>❙ Review and approve recom-mendations and decisions made by other Specialists, and provide advice and assistance. | Criti | *FULLY SUCCESSFU*<br>Reviews cases as Provides high-quality back and advice to other | ☐ U<br>MS<br>S<br>☐ EFS<br>☐ O |
| *CUSTOMER SERVICE*<br>❙ Respond to inquiries from various customer sources and provide clear, responsive explanations of actions taken and the bases for them. | Critical | *FULLY SUCCESSFUL:*<br>Customer inquiries are rou-tinely addressed accurately and in a timely fashion. | ☐ U<br>☐ MS<br>☐ FS<br>☐ EFS<br>☐ O |
| *COMMENTS:* | | | |
| *APPRAISING OFFICIAL SIGNATURE* | | *EMPLOYEE SIGNATURE* | |

DEVELOPING EMPLOYEE PERFORMANCE PLANS

*HAVING REVIEWED HOW TO DEVELOP A PERFORMANCE PLAN THAT FOCUSES ONLY ON ACTIVITIES, WE WILL NOW DEVELOP A PERFORMANCE PLAN THAT ESTABLISHES ELEMENTS AND STANDARDS, ADDRESSING ACCOMPLISHMENTS THAT LEAD TO ORGANIZATIONAL GOAL ACHIEVEMENT.* **AN EIGHT-STEP PROCESS HAS BEEN DEVELOPED TO PRODUCE SUCH PLANS.** *EACH STEP IN THE EIGHT-STEP PROCESS WE PRESENT IN THIS HANDBOOK BUILDS ON THE PREVIOUS STEP; YOU CANNOT SKIP A STEP AND END UP WITH GOOD RESULTS.*

# step 1

## step 1: look at the overall picture

### DEVELOPING EMPLOYEE PERFORMANCE PLANS

Instead of beginning at the bottom of the organization with the position description to develop employee performance plans, begin the process by looking at your agency's goals and objectives. Gather the following information:

**WHAT ARE YOUR AGENCY'S GENERAL OUTCOME GOALS AS OUTLINED IN ITS STRATEGIC PLAN?**

The Government Performance and Results Act of 1993 (i.e., GPRA) requires all agencies to develop a strategic plan that includes objective, quantifiable, and measurable performance goals. Agencies submitted their first strategic plans to Congress in September 1997. You will be referring to your agency's strategic plan while creating employee performance plans.

**WHAT ARE THE SPECIFIC PERFORMANCE GOALS ESTABLISHED FOR YOUR PROGRAM AREA AS OUTLINED IN YOUR AGENCY'S ANNUAL PERFORMANCE PLAN?**

GPRA also requires each agency to have an annual performance plan that sets out measurable goals that define what will be accomplished during a fiscal year. The goals in the annual performance plan describe the incremental progress toward achieving the general goals and objectives in the strategic plan. Performance plan goals are usually more specific and may be more output-oriented than the general outcome goals found in the strategic plan. Since performance plan goals should be used by managers as they direct and oversee how a program is carried out, these are the goals to which employee performance plans should be linked.

**WHAT PERFORMANCE MEASURES ARE ALREADY IN PLACE?**

You should be aware of the measurement systems that you can access for information on performance, including measures used for determining progress toward achieving Results Act goals and customer satisfaction surveys.

**EXAMPLE OF ORGANIZATIONAL GOALS**

Again, this handbook will continually refer to the Retirement Benefits Specialist position located within the Retirement Claims Division (a division of the Office of Retirement Services) of our example agency - the Federal Benefits Bureau (FBB). One of the primary functions of this position is to process retirement claims. FBB's strategic, outcome-oriented goals and two of the Office of Retirement Service's performance goals established in FBB's annual performance plan serve as examples of organizational goals. You will use this information in the next step of our eight-step process.

# example organizational goals

### )%%VSTRATEGIC GOALS

**Provide.**   Offer a wide range of benefits and retirement services that will enhance recipients' quality of life.

**Diversity.**   Create and maintain an inclusive work environment that values diversity and allows every employee the opportunity to reach their highest potential.

**Serve.**   FBB's customer service, benefits, and retirement services meet the evolving needs of Federal employees and their families.

**Integrity.**   Act as model agency within the Federal Government through fiscally responsible business practices and a commitment to excellence.

example *organizational goals*

**FBB'S ANNUAL PERFORMANCE PLAN GOALS FOR THE**

**OFFICE OF RETIREMENT SERVICES (ORS)**

*ORS GOAL #2*

Retirement claims processing times are reduced and more customer services are delivered through self-servicing technology, while customer satisfaction is maintained at last fiscal year's level.

| | |
|---|---|
| | *DIRECTLY LINKED TO FBB'S THIRD GOAL: SERVE* |

*MEANS:* (ONLY TWO MEANS ARE PRESENTED HERE.)

- We will use the ORS Calculator implemented through the automation improvement project to reduce the time needed to process claims.
- We will continue the availability of both Interactive Voice Response and Internet technology to make annuity payment account changes.

*CUSTOMER SATISFACTION INDICATORS*

- Customers who received their first payment either before or when they expected. (The goal is to reach 80 percent.)
- Annuitants who indicate overall satisfaction with the handling of their retirement claims. (The goal is to reach 95 percent.)

*BUSINESS PROCESS INDICATORS*

- Interim payment processing time. (The goal is 4.5 days.)
- Annuity processing time. (The goal is 90 days.)
- Annuity claims accuracy. (The goal is 92 percent.)

*FINANCIAL INDICATOR*

Claims processing unit cost. (The goal is $190 per claim.)

# step 2:
# determine work unit accomplishments

DEVELOPING EMPLOYEE PERFORMANCE PLANS

The next step in this eight-step method is to determine the accomplishments (i.e., the products or services) of the work unit. Identifying work unit accomplishments lets you identify appropriate measures in the following steps of this process.

A work unit is a small group of employees that, in a traditional work structure, is supervised by the same first-line supervisor. Work units are generally the smallest organizational group on the organizational chart and usually include between 5 and 20 people. A work unit can also be a team—permanent or temporary—where the team members work interdependently toward a common goal.

Because not all types of work situations and structures are the same, this handbook offers three different ways to determine what to measure at the work unit level:

A.    A GOAL CASCADING METHOD

B.    A CUSTOMER-FOCUSED METHOD

C.    A WORK FLOW CHARTING METHOD

You can use one or all three methods, depending on what fits your situation. Whichever you use, remember to describe accomplishments (using nouns) rather than activities (using verbs).

# method A:
## cascade the agency's goals down to the work unit level

The **goal cascading method** works best for agencies with clear organizational goals and objectives, such as those established in the strategic plans and annual performance plans that agencies have prepared under the Government Performance and Results Act. This method requires answers to each of the following questions:

### WHAT ARE THE AGENCY'S SPECIFIC GOALS AND OBJECTIVES?

These can be found in the agency's annual performance plan and customer service standards. (Note that this question repeats Step 1 of the eight-step process.)

### WHICH AGENCY GOAL(S) CAN THE WORK UNIT AFFECT?

Often, work units may affect only one agency goal, but in some situations, agency goals are written so broadly that work units may affect more than one.

### WHAT PRODUCT OR SERVICE DOES THE WORK UNIT PRODUCE OR PROVIDE TO HELP THE AGENCY REACH ITS GOALS?

Clearly tying work unit products and services to organizational goals is key to this process. If a work unit finds it generates a product or service that does not affect organizational goals, the work unit needs to analyze the situation. It may decide to eliminate the product or service.

CASCADING AGENCY GOALS TO WORK UNITS



AR0146

29

example
method A

## EXAMPLE OF CASCADING AGENCY GOALS TO A WORK UNIT

*FBBStrategic Goal*

**FBB's THIRD GOAL: SERVE**

FBB's customer service, benefits, and retirement services meet the evolving needs of Federal employees and their families.

*An Office of Retirement Services (ORS) annual performance plan goal that cascades from FBB's THIRD GOAL: SERVE*

**ORS GOAL #2**

Retirement claims processing times are reduced and more customer services are delivered through self-servicing technology, while customer satisfaction is maintained at last fiscal year's levels.

*Some of Office of Retirement Services(ORS) GOALS*

**A.** Reduce overall processing times for annuity claims by processing fully developed annuity claims in an average of 90 days (re ORS Goal #2).

**B.** Reduce claims processing error rates by providing increased training in workplace competencies (re ORS Goal #2).

*Retirement Claims Division GOALS FBB*

• Claims processed in less time and with lower error rates.
• Increased number of individuals who can process insurance claims.

## EXERCISE ON CASCADING GOALS

In the spaces below, begin mapping your agency's strategic and performance goals and how those goals cascade or "trickle down" through your organization. Try to show how your work unit's products or services link to your agency's goals. Remember to describe work unit accomplishments in terms of products or services (i.e., the end result of all the unit's activities).

*YOUR AGENCY'S GOALS*

*YOUR ORGANIZATION'S GOALS*

*YOUR WORK UNIT'S PRODUCTS OR SERVICES*

# method B:
## determine the products and services the work unit provides for its customers

The **customer-focused method** works well when there are no clear agency goals and when the work unit knows who its customers are and what they expect. Often this method is easier to apply to administrative work units that provide support functions, such as a human resources unit, an acquisitions unit, or a facilities maintenance unit. This method focuses on achieving customer satisfaction and requires answers to each of the following questions:

| Who are the customers of the work unit? If the work unit provides a support function, most of its customers may be internal to the agency.

| What products and/or services do the customers expect? Remember to describe accomplishments, not activities.

One way to approach this method is to build a map, as shown below. Place an oval representing the work unit in the center of a blank piece of paper. List the customer groups around the oval and describe the products or services the customers expect in the box under the customer groups.



AR0149

## EXAMPLE OF IDENTIFYING CUSTOMERS AND THEIR EXPECTATIONS

The example below diagrams the accomplishments of the Office of Retirement Service's Claims Division from a customer-focused approach. Note that the accomplishments listed are the **results** of the team's work.





retiring clients

*COMPLETE CLAIM*

Claims Div.

*TRAINING, GUIDANCE*

*RESPONSE TO INQUIRIES*

other ORS employees

correspondents

## EXERCISE FOR IDENTIFYING CUSTOMERS AND THEIR EXPECTATIONS

Use method B—the customer-focused method—to develop the product(s) or service(s) that your work unit provides.

   1) Identify your work unit's customers

   2) Determine what product(s) or service(s) your work unit supplies or provides to its customers

YOUR WORK UNIT

# method C:
## develop a work flow chart for the work unit, establishing key steps in the work process

The **work flow charting method** works well for work units that are responsible for a complete work process, such as the processing of a case, the writing of a report, or the production of a customer information package. This method asks work units to develop work flow charts. A work flow chart is a picture of the major steps in a work process or project. It begins with the first step of the work process, maps out each successive step, and ends with the final product or service. To illustrate, the work flow chart to the right depicts a work process for building a house.

1. Foundation

2. Walls

3. Chimney

4. Roof

5. A complete house



STEP 2: DETERMINE WORK UNIT ACCOMPLISHMENTS

**TO HELP YOU BUILD YOUR WORK FLOW CHART, ANSWER THESE QUESTIONS:**

▌ How does the work unit produce its products or services? List the most basic steps in the process. For this purpose, you do not need to list all the activities required. (If you were analyzing the work to find ways of improving the process, you would need to list every activity.)

▌ Which are the most important steps in the process? By determining these steps, you highlight areas for performance measurement.

As you map out the process, you may find yourself describing activities. Try to group the activities into key steps by describing the results of those activities as one step in the process. As an example, the activities described in the following columns are all the activities that a publication team described when it was trying to create a work flow chart for the process of developing a newsletter. By grouping the related activities into the same columns, it was easier for the team to determine the results of those activities. Those results are written at the top of the column and became the key steps in the work flow chart.

## example method C

| RESULTS | PLAN FOR NEXT ISSUE | THE DRAFT VERSION OF THE ARTICLES | THE EDITED VERSION OF THE ARTICLE | THE CAMERA-READY COPY |
|---|---|---|---|---|
| ACTIVITIES | brainstorm ideas | interview contacts | review articles for errors | crop pictures |
| | meet to discuss ideas | get contact review and edits of article | make suggestions for improvements | develop the original graphics |
| | research various resources for ideas | get pictures or graphics, if used | make necessary changes | create layout boards |
| | get management approval of proposed plan | write article | consider the overall effect of the entire issue | format issue |

**WORK FLOW CHART**    PLAN FOR NEXT ISSUE ▬ DRAFT ARTICLES    EDIT ARTICLES ▬ CREATE CAMERA-COPY

AR0153

## ANOTHER EXAMPLE OF WORK FLOW CHARTING

This example of the results of method C—which focuses on the work flow and the key steps in the work process—uses a work flow chart that maps the key steps in processing retirement claims. Notice that the steps are described as products. In other words, all the activities to complete the steps are not listed individually but have been grouped and described as products.



example method C

Nondisability Claim Received

Annuity Computation

An authorized first annuity payment is dispersed

An updated annuity roll master record

A completed and filed claim

## EXERCISE ON WORK FLOW CHARTING

1) Select a product or services that your work unit provides.

2) As best you can, map out the work process your unit uses. Focus on the major categories or steps of the work. You may need to first list the smaller steps of the work and then group them into subproducts. (Remember to describe products and services when you can, not activities.)

# step 3:
# determine individual accomplishments
## that support work unit goals

**DEVELOPING EMPLOYEE PERFORMANCE PLANS**

The performance elements that will be measured in the overall employee performance plan can include both individual and group assignments and responsibilities. The most important, results-oriented aspects of a unit's performance (which are its products or services) were identified in Step 2. (Other types of processes that work units may want to measure and include as elements in their plans—but which are not products or services and would not be identified through Step 2—include internal group dynamics processes, such as decision-making or problem-solving processes, or group/team development.)

Elements that address individual accomplishments can be identified using a role-results matrix. A role-results matrix is simply a table that identifies the results each work unit member must produce to support the unit's accomplishments. To build the matrix, list the work unit's products or services across the top row of a table. List each member of the work unit or each job position down the left column of the matrix. For each cell of the table, ask this question: What must this unit member produce or perform (i.e., accomplish) to support this particular work unit product or service? List those employee products or services (i.e., accomplishments) in the appropriate cell. The products or services you list for each unit member are possible performance elements that might be included in the employee's performance plan. All performance elements should be either quantifiable or verifiable and should be described as accomplishments (nouns), not activities (verbs).

## A ROLE-RESULTS MATRIX

| UNIT EMPLOYEES | UNIT PRODUCT OR SERVICE | UNIT PRODUCT OR SERVICE | UNIT PRODUCT OR SERVICE | UNIT PRODUCT OR SERVICE |
|---|---|---|---|---|
| EMPLOYEE 1 | ACCOMPLISHMENT | ACCOMPLISHMENT | ACCOMPLISHMENT | ACCOMPLISHMENT |
| EMPLOYEE 2 | ACCOMPLISHMENT | ACCOMPLISHMENT | ACCOMPLISHMENT | *N/A |
| EMPLOYEE 3 | ACCOMPLISHMENT | *N/A | ACCOMPLISHMENT | ACCOMPLISHMENT |
| EMPLOYEE 4 | *N/A | ACCOMPLISHMENT | ACCOMPLISHMENT | ACCOMPLISHMENT |

*The employee had no part in this work unit product or service.

## EXAMPLE OF A ROLE-RESULTS MATRIX

An example of a role-results matrix is shown below. It was built for a work team that pro-
duces a bimonthly policy newsletter. The team has five members: the editor, three writers,
and a graphic artist. The final product or output is the newsletter. (The expected outcome
is better educated employees.) The team created a work flow chart (see page 36), which identified
four key steps in the work process. The team then used these key steps to build the matrix and
will use it to develop performance elements.

Note that the main steps of the work process are laid out along the top of the matrix. The
team members are listed down the left-hand column. Accomplishments are listed for each
team member. Also, note that not all members have assignments or responsibilities for every
team accomplishment. (This often will occur in cross-functional work units that include a
variety of different job series.)

When building a role-results matrix, you may identify certain aspects of performance at
either the work unit level or the individual level that you may not be able to measure (e.g.,
the effect a human resources program has on organizational performance) or over which the
unit or the employee has no control (i.e., a portion of the product must be completed by
someone outside the work unit). Also, certain aspects of performance may cost too much to
measure or the agency may not have the resources to measure them. You should not include
these aspects of performance as elements in the performance plan, but they are still legitimate
parts of the role-results matrix.

A role-results matrix is a valuable management tool. When supervisors involve employees in the
process of completing the matrix, everyone's role in the work unit is very clear, which is important
to the successful performance of the group. The whole process of determining work unit products
and services, and then completing a role-results matrix, is a beneficial team-building exercise.

## example role-results matrix

**A ROLE-RESULTS MATRIX FOR A NEWSLETTER TEAM:**

TEAM ACCOMPLISHMENTS →

| TEAM MEMBERS | THE PLAN FOR THE NEXT ISSUE | THE DRAFT VERSION OF THE ARTICLES | THE EDITED VERSION OF THE ARTICLES | THE CAMERA-READY COPY |
|---|---|---|---|---|
| EDITOR | TOPICS TO BE COVERED | | ARTICLES THAT HAVE BEEN EDITED | |
| WRITER A | RECOMMENDATIONS FOR ARTICLES | DRAFT ARTICLE(S) | | |
| WRITER B | RECOMMENDATIONS FOR ARTICLES | DRAFT ARTICLE(S) | | |
| WRITER C | RECOMMENDATIONS FOR ARTICLES | DRAFT ARTICLE(S) | | |
| GRAPHIC ARTIST | RECOMMENDATIONS FOR LAYOUT | | | A CAMERA-READY COPY |

## ANOTHER EXAMPLE OF A ROLE-RESULTS MATRIX

The table below displays example data gathered for FBB's Office of Retirement Service's Claims Division using the cascading method as described on pages 29-30 and the customer-focused method on pages 33-34. Note that the products or services (i.e., the work unit accomplishments) identified through the process of Step 2 are shown along the top of the matrix. Employees are listed down the left side of the matrix. Employee work accomplishments are included in each cell. Notice that the employee work responsibilities are described as accomplishments (i.e., products or services) rather than activities or behaviors.

example role-results matrix

| EMPLOYEES | WORK UNIT PRODUCTS OR SERVICES | | |
|---|---|---|---|
| *DIVISION MGR\** | *CLAIMS PROCESSED IN LESS TIME AND WITH LOWER ERROR RATES* | *RESPONSES TO INQUIRIES* | *INCREASED NUMBER OF EMPLOYEES WHO CAN PROCESS CLAIMS* |
| *RETIREMENT BENEFITS SPECIALIST* | *A COMPLETED **CLAIM** **SUGGESTION(S)** FOR IMPROVING THE PROCESS* | *N/A* | ***GUIDANCE,** TRAINING, AND **TECHNICAL ASSISTANCE** TO OTHER SPECIALISTS* |
| *CUSTOMER SERVICE SPECIALISTS* | *CLAIM CONTROL **LOG*** | ***CORRESPONDENCE** THAT IS FORMATTED, MAILED, AND FILED **ANSWERS** TO CUSTOMER TELEPHONE QUESTIONS* | *N/A* |

*\*Note that the Division Manager is on the same row as work unit accomplishments. This shows that the Branch Manager is responsible for work unit results.*

## EXERCISE FOR BUILDING A ROLE-RESULTS MATRIX

Fill in the role-results matrix for your work unit. Place the work unit products or services that you developed in Step 2 (using method A, page 31, method B, page 34, and/or method C, page 38) along the top of the matrix. Fill in the names or the job titles of the work unit's employees in the left-hand column.  Then fill in the employees' accomplishments that contribute to each work unit accomplishment.

| EMPLOYEES | WORK UNIT PRODUCTS OR SERVICES | | | |
|---|---|---|---|---|
| ORGANIZATIONAL CHIEF | | | | |
| | | | | |
| | | | | |
| | | | | |

AR0159

# step 4

## step 4:
## convert expected accomplishments into performance elements, indicating type and priority

DEVELOPING EMPLOYEE PERFORMANCE PLANS

In Steps 2 and 3 of the process presented in this handbook, you developed the expected accomplishments for the work unit and the unit's employees. Now, in Step 4, you will:

- identify which accomplishment(s) should be included as elements in the performance plan
- select which type of element to use
- assign weights or priorities

All employees must have at least one critical element in their performance plan. Critical elements must address individual performance only, except in the case of supervisors who may be held responsible for a work unit's products or services. Work unit performance can be addressed through non-critical or additional performance elements. In appraisal programs with only two summary levels, work unit performance can be addressed only through additional performance elements.

Once you have classified elements as either critical, non-critical, or additional, and if your appraisal program allows, prioritize them so that work units and employees know which elements are most important. One way to do this is to distribute 100 percentage points across the elements based on each one's importance to the organization. (Programs usually allocate weights in five-percent increments.)

### HOW CAN YOU DETERMINE WHICH ELEMENTS ARE CRITICAL?

Remember that critical elements are work assignments or responsibilities of such importance that unacceptable performance on the element would result in a determination that an employee's overall performance is unacceptable. Defining critical elements must be done thoughtfully because an employee's unacceptable performance on any critical element could be the basis for an adverse action. To help decide whether an element should be classified as critical or not, answer the following questions:

- Is the element a major component of the work? If you answered "yes," the element might be critical.
- Does the element address individual performance only? Elements measuring group performance cannot be critical elements, except as explained for supervisors and only under certain circumstances.
- If the employee performed unacceptably on the element, would there be serious consequences to completing the work of the organization? If employee error on the element affects the work unit's accomplishments, the element may be critical.
- Does the element require a significant amount of the employee's time? If you answered "yes," the element might be critical.

Unless prescribed by your appraisal program, there is no fixed or uniform number of critical elements to be included in the performance plan; the number varies with the work assignments and may vary from year to year in response to changing program emphases. However, every employee must have at least one critical element.

## EXAMPLE OF IDENTIFYING ELEMENTS

The Claims Division within the Office of Retirement Services (ORS) has been used on the following page as an example for identifying elements. The expected accomplishments of the Retirement Benefits Specialist (as outlined in the role-results matrix on page 41) are listed down the left side of the matrix on the next page. The work unit accomplishments for the Division are also listed. The next column shows how the Division Manager and employees designated elements as critical, non-critical, or additional. Finally, priority points are assigned to each element to give them relative weights. (Remember that ORS's appraisal program uses five levels to appraise employee performance on elements and summarizes performance overall at five levels and that non-critical and additional performance elements are allowed.)

example *identifying elements*

Note the following in the matrix on page 45:

**1.** The Division decided that "Suggestions for Improving the Process" should not affect the summary level, but the Division wanted to track and measure the value of the suggestions in order to recognize individuals who help improve the process. Therefore, it was included as an additional element and given a weight of 0. The Division plans to use the results of performance on this element as a criterion for awards recognizing innovation by individuals within ORS.

**2.** The Division decided that claims completed by individuals should be a critical element for Benefits Specialists, but the Division also felt it was important to count in employee performance plans the group's performance as a whole on claims completed. The Division felt that counting group performance on claims processed would encourage specialists to work together as a group and promote collaboration. Since this Division is under a five-level appraisal program and it wants to count this group element in the appraisal process, it will be a non-critical element. (If it were in a two-level appraisal program, the group element would have to be an additional performance element.)

**3.** For the group goal of increased number of employees who can process insurance claims, the Division decided not to count group performance in the appraisal process. Because of the importance of this group goal, however, management decided to make it an additional element and use it as a basis for recognizing the group if it meets specific goals. (Note that the Division is measuring individual performance to support this group goal and is counting individual performance as a critical element.)

**4.** The Division determined the priority of each element by distributing 100 points across the critical and non-critical elements. The priority points let employees know which elements are more important to the organization. Priority points also are used in this example to affect how the summary level will be determined. Using this method allows non-critical elements to count significantly in the summary level determination. (Failure on the non-critical element would not cause performance to be *Unacceptable*; it would merely count as 0 priority points and could lower the summary level—but not to *Unacceptable*.)

example identifying elements

**ORS RETIREMENT CLAIMS DIVISION**
**RETIREMENT BENEFITS SPECIALIST**

| ELEMENT | ELEMENT TYPE | WEIGHT or POINTS |
|---|---|---|
| │ Completed claims | Critical (CE) | 50 |
| │ Suggestion(s) for improving the process | Additional (AE) | 0 |
| │ Guidance and technical assistance to other specialists | Critical (CE) | 35 |
| WORK PRODUCTS OR SERVICES | | |
| Claims processed in less time and with lower error rates | Non-critical (NC) | 15 |
| Increased number of employees who can process claims | Additional (AE) | 0 |

## EXERCISE ON IDENTIFYING ELEMENTS

Based on the accomplishments that you identified for your job in the role-results matrix that you made on page 42 and working within the rules established by your appraisal program, identify appropriate elements and categorize them as critical, non-critical, and, if appropriate, additional performance elements. Write those elements and their type under the columns marked "Element" and "Type" on the foldout form on the back cover. (If you have a two-level appraisal program—that is, a pass/fail program—you cannot use non-critical elements.) If applicable, prioritize the elements by distributing 100 points among the elements, giving more points to elements that are more important. Write the priority points you assign under the column labeled "priority" on the foldout form on the back cover .

**FOLD OVER INSIDE BACK COVER FLAP AS SHOWN TO FILL OUT CHART**



# step 5: determine work unit and individual measures

## DEVELOPING EMPLOYEE PERFORMANCE PLANS

In Step 4 of this process, you designated the critical, non-critical, and additional performance elements you will include in your performance plan. In Step 5, you will determine how to measure performance on those elements.

Measures are the yardsticks used to determine how well work units and employees produced or provided products or services. To develop specific measures of performance for each element in your performance plan, you first must determine the general measures that apply to each. Once you determine the general and specific measures, you will be able to develop the standards for your elements, which you will do in Step 6 of this process. Your standards will be worded in terms of the specific measures developed in this step.

The performance pyramid below shows the types of general measures that are used at different levels in the organization. Note that the balanced measures incorporating the business, customer, and employee perspectives are appropriate for measuring managerial performance and are sometimes appropriate for supervisory or even work unit performance. At the bottom of the pyramid, the four general measures normally used for measuring work unit and employee performance are quality, quantity, timeliness, and cost-effectiveness.

### PERFORMANCE PYRAMID FOR IDENTIFYING PERFORMANCE MEASURES



AR0164

## GENERAL MEASURES

**QUALITY** addresses how well the employee or work unit performed the work and/or the accuracy or effectiveness of the final product. Quality refers to accuracy, appearance, usefulness, or effectiveness. Quality measures can include error rates (such as the number or percentage of errors allowable per unit of work) and customer satisfaction rates (determined through a customer survey).

**QUANTITY** addresses how much work the employee or work unit produced. Quantity measures are expressed as a number of products produced or services provided, or as a general result to achieve.

**TIMELINESS** addresses how quickly, when, or by what date the employee or work unit produced the work.

**COST-EFFECTIVENESS** addresses dollar savings or cost control for the Government. You should develop measures that address cost-effectiveness on specific resource levels (money, personnel, or time) that you can generally document and measure in agency annual fiscal year budgets. Cost-effectiveness measures may include such aspects of performance as maintaining or reducing unit costs, reducing the time it takes to produce or provide a product or service, or reducing waste.

## DEVELOPING SPECIFIC MEASURES

To develop specific measures, you first must determine the general measure(s) that are important for each element (i.e., quantity, quality, timeliness, or cost-effectiveness). Then, determine how to measure the quantity, quality, timeliness, and/or cost-effectiveness for the element. If you can measure an accomplishment with numbers, record the form of measurement. If you can only describe performance (i.e., observe and verify), clarify who will appraise the performance and the factors they will appraise.

The kinds of questions you should ask in this process include the following.

**FIRST:** For each element, decide which general measures apply:

- Is quality important? Does the stakeholder or customer care how well the work is done?

- Is quantity important? Does the stakeholder or customer care how many are produced?

- Is it important to accomplish the element by a certain time or date?

- Is it important to accomplish the element within certain cost limits?

- What measures are already available?

**SECOND:** For each general measure, ask:

- How could [quality, quantity, timeliness, and/or cost-effectiveness] be measured?

- Is there some number or percent that could be tracked?

If the element does not lend itself to being measured with numbers and can only be described, ask:

- Who could judge that the element was done well?

- What factors would they look for?

**FINALLY:** Write down or otherwise record the specific measures.  If the measure is numeric, list the units that you will track.  If the measure is descriptive, identify the judge and list the factors that the judge will look for to observe and verify performance.

# example
## general & specific measures

### CLAIMS DIVISION

Note that general and specific measures have been added to the elements for a Retirement Benefits Specialist (see page 45).

Also note that only the measures have been identified, not the standard that describes how well the element should be done. (Standards are addressed in the next step in the process.)

RETIREMENT BENEFITS SPECIALIST

| PRIORITY POINTS | ELEMENT | TYPE | GENERAL MEASURES | SPECIFIC MEASURES |
|---|---|---|---|---|
| 50 | Completed *claim* | CE | Quality | The accuracy of annuity amounts. |
| | | | | The completeness of the paperwork |
| | | | Quantity | The number of claims processed per week |
| | | | Timeliness | The average number of days it takes to process a claim* |
| 35 | *Guidance* and *technical assistance* to other specialists | CE | Quality | The accuracy of the information, as determined by supervisor |
| | | | | The perceptions of other specialists that the incumbent is willing to assist and that feedback is helpful |
| | | | Timeliness | The number of hours it takes for the incumbent to respond to other specialists' requests for assistance |
| 15 | **Division Element:** Division *claims* processed in less time and with lower error rates | NC | Quality | The accuracy rate for annuity amounts from the whole Division |
| | | | Quantity | The number of claims the Division processes per week |
| | | | Timeliness | The average number of days it takes to process a claim* |
| 0 | Suggestion(s) for improving the process (for special individual recognition) | AE | Quality | The supervisor's and reviewers' judgment that the suggestion(s) improve(s) efficiency, productivity, and flexibility |
| | | | Quantity | The number of suggestions made |
| | | | Cost-Effectiveness | The amount of money saved by adopting the suggestion |
| 0 | **Division Element:** Increased number of employees who can process claims | AE | Quantity | The number of employees who can do claims |
| | | | Quality | The accuracy rate of annuities processed |

*Note: Using the average adjusts for the varying levels of difficulty in claims and ensures that specialists will not focus only on easy claims and ignore the difficult ones. Also, all specialists are assigned equal numbers of easy and difficult claims to ensure fairness of the standard. Finally, the average can be prorated when necessary.*

**EXERCISE FOR DETERMINING GENERAL AND SPECIFIC MEASURES**

Determine the general measures for your job based on the elements that you created in the previous exercise on page 46. Next, identify some specific measures. Write down those general and specific measures under the columns labeled "General Measure" and "Specific Measure" on the foldout form on the back cover.

*FOLD OVER INSIDE BACK COVER FLAP AS SHOWN TO FILL OUT CHART*



# step 6:
# develop work unit and
# individual standards

DEVELOPING EMPLOYEE PERFORMANCE PLANS

The next step in the process of developing a performance plan is to establish standards for the elements. To work through this section successfully, you will need to know the number of levels your appraisal program uses to appraise elements. You also will need to know which performance level your program uses as the retention standard. (A definition of retention standard is included in this section.) The discussions below address performance standards and what to avoid when writing standards.

## WHAT IS A PERFORMANCE STANDARD?

Performance standards are management-approved expressions of the performance threshold(s), requirement(s), or expectation(s) that employees must meet to be appraised at particular levels of performance.

Each critical element must have a *Fully Successful* or equivalent standard established. Technically, neither non-critical elements nor additional performance elements require a *Fully Successful* or equivalent standard. However, to help employees and work units understand the expectations for performance on these elements, we recommend that they have a clear idea of what is considered fully successful performance.

*(NOTE: NON-CRITICAL ELEMENTS MUST BE APPRAISABLE AT LEAST ON TWO LEVELS, BUT THOSE LEVELS CAN BE ESTABLISHED HIGHER THAN THE FULLY SUCCESSFUL LEVEL.)*

step 6

## WHAT SHOULD PERFORMANCE STANDARDS INCLUDE?

Once you have established the specific measures that apply to the elements, you can begin to write the standards. Before writing the *Fully Successful* standard, you must know the number of levels that your appraisal program uses to appraise elements. For example, if you are under an appraisal program that uses two levels to appraise elements, the *Fully Successful* standard would describe a single point of performance. Any performance at or above that point is *Fully Successful,* and anything below it is *Unacceptable.* If, however, your appraisal program uses five levels to appraise performance, you would describe the *Fully Successful* standard as a range. Performance that exceeds the top of that range would be appraised at the level(s) above *Fully Successful,* and performance below the bottom of that range would be *Minimally Successful* (or equivalent) or *Unacceptable.* How you write the *Fully Successful* standard depends on the number of levels your program uses to appraise performance on elements.

If a specific measure for an element is numeric, for example, you would list the units to be tracked and determine the range of numbers (or the single number in a program that appraises elements at two levels) that represents *Fully Successful* performance. If the specific measure is descriptive, you would identify the appraiser(s) who would judge performance, list the factors that the appraiser(s) would look for, and determine what he or she would see or report that verifies that *Fully Successful* performance for that element had been met. (Remember to express performance standards in terms of the specific measure[s] determined in Step 5 of this process.)

# develop standards

Several examples of elements and standards are included below. The specific measures are in italics; the performance (or range of performance) that actually establishes the level of the standard is in boldface type.

## ELEMENT: CASES COMPLETED

**Fully Successful Standard** in an appraisal program that appraises elements at five levels (to meet this standard, all of the bullets listed must be present or occur):

- no more than **3-4** *valid customer complaints per year*, as determined by the supervisor
- no more than **2-3** *errors per quarter*, as spotted by the supervisor
- no more than **4-5** *late cases per year* (processed later than 10 working days from receipt)

(If this standard had been written for an appraisal program that appraised elements at only two levels, the standard would have been "no more than **4** *valid customer complaints per year*," "no more than **3** *errors per quarter*," and "no more than **5** *late cases per year*.")

## ELEMENT: MEETINGS SCHEDULED

**Fully Successful Standard** in an appraisal program that appraises elements at five levels (to meet this standard, all of the bullets listed must be present or occur):

The **meeting leader and attendees generally are satisfied** that

- *the room size matched the group size*
- *attendees were notified of the meeting*
- *attendees knew whom to call for information*
- *the meeting was set up by the deadline*

## ELEMENT: LEGAL ADVICE

**Fully Successful Standard** in an appraisal program that appraises elements at five levels (to meet this standard, all of the bullets listed must be present or occur):

- Consistent with attorney's grade, attorney **usually** *carries an adequate workload of projects*, **frequently** *takes on new projects* to meet the needs of the office, and **generally** *shows personal initiative* in handling projects (generally, projects are of average difficulty)
- Consistent with attorney's grade, legal advice rendered is **infrequently** *modified by practice group leaders and supervisors* in a **significant** way
- Advice given to clients is **usually** *timely and thorough* and of **average** *quality*, and **usually** *shows sensitivity* to program and agency needs

*ADDITIONAL EXAMPLES OF ELEMENTS AND STANDARDS SPECIFICALLY WRITTEN FOR APPRAISAL PROGRAMS THAT APPRAISE ELEMENTS AT FIVE, THREE, AND TWO LEVELS ARE INCLUDED IN THE APPENDICES.*

## WHAT SHOULD YOU AVOID WHEN WRITING RETENTION STANDARDS?

By "retention" standard, we mean the standard that describes the level of performance necessary to be retained in a job (i.e., the standard written for performance one level above the *Unacceptable* level). In appraisal programs that do not have a *Minimally Successful* or equivalent level available for appraising elements, the retention-level standard is the *Fully Successful* standard. Otherwise, the retention standard is the *Minimally Successful* or equivalent standard.

The Merit Systems Protection Board (MSPB) and the courts have issued many decisions on the topic of valid performance standards. This section highlights what the Board deems to be two major errors to avoid when writing standards. In order to avoid reversal by the MSPB, agencies must ensure that "retention" standards:

    | are not impermissibly absolute (i.e., allow for some error)

    | inform the employee of the level of performance needed to retain his or her job

### AVOID ABSOLUTE RETENTION STANDARDS

An "absolute" retention standard—one that allows for no errors—is acceptable only in very limited circumstances. When a single failure to perform under a critical element would result in loss of life, injury, breach of national security, or great monetary loss, an agency can legitimately defend its decision to require perfection from its employees. In other circumstances, the MSPB and the courts usually will find that the agency abused its discretion by establishing retention standards that allow for no margin of error.

When writing standards, you should avoid the appearance of requiring perfection at the retention level. In appraisal programs that do not appraise elements at the *Minimally Successful* or equivalent level, you must carefully word the *Fully Successful* or equivalent standards so that they are not absolute. For example here are *Fully Successful* standards used by agencies that the MSPB would consider absolute retention standards if they were used in a two-level appraisal program:

    | Work is timely, efficient, and of acceptable quality

    | Communicates effectively within and outside of the organization

MSPB considers these standards absolute because they appear to require that work is *always* timely, efficient, and of acceptable quality and that the employee *always* communicates effectively. When writing standards—especially retention standards—avoid simply listing tasks without describing the regularity of the occurrence of the task—but also avoid the requirement to do it *always*.

Also, in appraisal programs that appraise elements at levels above *Fully Successful*, the *Fully Successful* standard itself—as well as the *Exceeds Fully Successful* standard when an *Outstanding* or equivalent level is possible—should not be absolute. If it is supposed to be possible to exceed, make sure it is written that way.

To help determine whether you are writing an absolute standard, ask yourself:

| How many times may the employee fail this requirement and still be acceptable?

| Does the retention standard use words such as "all," "never," and "each"? (These words do not automatically create an absolute standard, but they often alert you to problems.)

| If the retention standard allows for no errors, would it be valid according to the criteria listed above (risk of death, injury, etc.)?

The examples of elements and standards included in the appendices were carefully written to avoid absolute requirements.

### AVOID "BACKWARD" STANDARDS

Case law requires that an employee understand the level of performance needed for retention in the position. When using a *Minimally Successful* level of performance, a common tendency is to describe it in terms of work that does not get done instead of what must be done to meet that retention standard. Describing negative performance actually describes *Unacceptable* performance. Standards such as "fails to meet deadlines" or "performs work inaccurately" allow an employee to do virtually no work or to do it poorly and still meet that retention standard. MSPB considers these "backward" retention standards invalid. To help you determine whether you are writing a backward retention standard, ask:

| Does the standard express the level of work the supervisor wants to see or does it describe negative performance? (Example of describing negative performance: Requires assistance more than 50 percent of the time.)

| If the employee did nothing, would he or she meet the standard, as written? (Example: Completes fewer than four products per year.)

AR0173

## MORE EXAMPLE STANDARDS

Example standards for a Retirement Benefits Specialist are shown on the next two pages. These standards were written for elements that are appraised at five levels. The appraisal regulations only require that a *Fully Successful* standard be established for each element. However, to clarify at the outset what employees need to do to exceed the *Fully Successful* level (as well as what they must do to be retained in the position) the Claims Division includes standards for the *Minimally Successful*, *Fully Successful*, and *Exceeds Fully Successful* levels of performance. (Performance below the minimum of the *Minimally Successful* range of performance is considered *Unacceptable*, and performance above the maximum of the *Exceeds Fully Successful* range of performance is *Outstanding*.)

Most of the example standards on the next two pages are quantifiable. The numbers used are based on work flow data. Examples of descriptive standards written at a variety of levels are found in the appendices. In all these examples, distinguishing between *Fully Successful* and levels above or below *Fully Successful* requires careful planning and forethought.

*NOTE THAT THE STANDARDS TYPICALLY DESCRIBE A RANGE OF PERFORMANCE. ALSO NOTE THAT THE ELEMENTS HAVE BEEN REARRANGED TO ORDER THE ELEMENTS BY WEIGHT.*

example
develop standards

*RETIREMENT BENEFITS SPECIALIST*

| ELEMENT | GENERAL MEASURES | SPECIFIC MEASURES | STANDARDS * | | |
|---|---|---|---|---|---|
| | | | MINIMALLY SUCCESSFUL | FULLY SUCCESSFUL | EXCEEDS FULLY SUCCESSFUL |
| Completed *claims*<br><br>▌Critical Element<br><br>▌50 priority points | Quality | The accuracy of annuity amounts<br><br>The completeness of the paperwork | 82-87% of annuity amounts are accurate and of claims are complete | 88-93% of annuity amounts are accurate and of claims are complete | 94-97% of annuity amounts are accurate and of claims are complete |
| | Quantity | The number of claims processed per week | 10-12 claims processed per week | 13-16 claims processed per week | 17-20 claims processed per week |
| | Timeliness | The average number of days it takes to process a claim | An average of 101-110 days to complete claim | An average of 90-100 days to complete claim | An average of 75-90 days to complete claim |
| *Guidance* and *technical assistance* to other specialists<br><br>▌Critical Element<br><br>▌35 priority points | Quality | The accuracy of the information, as determined by supervisor<br><br>The perceptions of other specialists that the incumbent is willing to assist and that feedback is helpful | Usually accurate<br><br><br><br>50-59% of specialists agree that incumbent is routinely willing to assist and that feedback is helpful | Usually accurate<br><br><br><br>60-80% of specialists agree that incumbent is routinely willing to assist and that feedback is helpful | Almost always accurate<br><br>81-89% of specialists agree that incumbent is routinely willing to assist and that feedback is helpful |
| | Timeliness | The number of hours it takes for the incumbent to respond to other specialists' requests for assistance | Usually responds within 9-12 working hours from receipt of request | Usually responds within 4-8 working hours from receipt of request | Usually responds within 2-3 working hours from receipt of request |
| **Claims Division:** *claims* processed in less time and with lower error rates<br><br>▌Non-critical Element<br><br>▌15 priority points | Quality | The accuracy rate for annuity amounts from the whole Division | N/A** | 88-93% annuity amounts are accurate | 94-97 % annuity amounts are accurate |
| | Quantity | The number of claims the Division processes per week | | 220-230 claims processed by the Division per week | 231-244 claims processed by the Division per week |
| | Timeliness | The average number of days it takes to process a claim | | An average of 90-100 days to complete claim | An average of 75-90 days to complete claim |

AR0175

example develop standards

*RETIREMENT BENEFITS SPECIALIST, CONTINUED*

| ELEMENT | GENERAL MEASURES | SPECIFIC MEASURES | STANDARDS* | | |
|---------|------------------|-------------------|------------|---|---|
| | | | MINIMALLY SUCCESSFUL | FULLY SUCCESSFUL | EXCEEDS FULLY SUCCESSFUL |
| Suggestion(s) for improving the process (for special individual recognition) | Quality | The supervisor's and reviewers' judgment that the suggestion(s) improve(s) efficiency, productivity, and flexibility | N/A** | Management and Division members determine that the suggestion(s) is/are worth adopting | Management and Division members determine that the suggestion(s) is/are worth adopting |
| ▌ Additional Performance Element | Quantity | The number of suggestions made | | Incumbent provides 1-2 adopted suggestions per year | Incumbent provides 3-5 adopted suggestions per year |
| ▌ 0 priority points | Cost Effectiveness | The amount of money saved by adopting the suggestion | | The incumbent's suggestion saved up to 10% of costs | The incumbent's suggestion saved 10-25% of costs |
| **Claims Division:** Increased number of employees who can process claims | Quantity | The number of employees who can do claims | N/A** | 35- 50% of Division employees can process claims | 51-75% of Division employees can process claims |
| | Quality | The accuracy rate of annuities processed | | 88-93% of annuity amounts are accurate | 94-97% of annuity amounts are accurate |
| ▌ Additional Performance Element | | | | | |
| ▌ 0 priority points | | | | | |

*To meet the performance level of the standards described for each element, each listed part of the standard must be present or occur.

**The Division decided that there was no benefit to establishing a *Minimally Successful* standard for a non-critical or an additional performance element.

If these standards had been written for an appraisal program that appraises elements at only two levels, only the *Fully Successful* standard would have been included and it would describe a single point, not a range. So, for example, on the first element (i.e., completed case files) instead of establishing an 88-93 percent accuracy rate, etc., as the *Fully Successful* standard, the standard would be:

▌ 88% accuracy or better

▌ at least 13 cases processed per week;

▌ takes an average of 100 days to complete case

Another point of interest in the example is that the elements and standards written for the Division were included in each Division employee's performance plan as group elements and standards.

### EXERCISE FOR WRITING STANDARDS

Based on the elements and measures you established in the previous exercise on page 51, develop *Fully Successful* standards for your elements. Write those standards under the column labeled "Standards" on the foldout form on the back cover. Remember to write standards that specifically match the measurement levels of your appraisal program (i.e., two-level or more than two-level). This exercise is asking you to develop only the *Fully Successful* standard. However, if your appraisal program appraises elements at more than two levels, you may also want to define the other levels of performance that are possible.

**FOLD OVER INSIDE BACK COVER FLAP AS SHOWN TO FILL OUT CHART**



step 7

# step 7:
# determine how to
## monitor performance

Monitoring performance means measuring performance and providing feedback to employees. Agency appraisal programs are required to provide ongoing appraisal, which includes, but is not limited to, conducting one or more progress reviews during each appraisal period. In addition to a once– or twice–a–year progress review, which is some-times a formal part of the appraisal process, supervisors and employees should discuss performance informally and often.

Determining how to monitor performance is an important step in developing perfor-mance plans. You may have worked through the previous six steps of the process presented in this handbook, developed what you thought were great elements and standards, and then found that monitoring performance on an element is impossible, or too costly, or too time-consuming. If this happens, think through other specific measures that indicate performance—measures that are as specific as possible.

To complete this step in the process:

> Determine what data to collect for each performance element, the source of the data, and whether to collect all the data or just a sample

> Determine when to collect the data, who will collect it, and who will receive it

> Review existing reports for possible use as feedback reports

> Create feedback tables or graphs where necessary or applicable

> Try to design feedback processes that give feedback automatically

## FEEDBACK

Effective and timely feedback addressing employee performance on elements and standards is an essential component of a successful performance management program. People need to know in a timely manner how they are doing, what is working, and what is not working.

Feedback can come from many different sources: managers and supervisors, measurement systems, peers, and customers, just to name a few. Using multiple sources of feedback, which is sometimes called 360-degree assessment or multirater appraisal, is done in a variety of ways, but most methods are computerized and the raters are anonymous. Whether you need or want to use multirater appraisal depends on what you want to measure. For example, if you want to measure customer satisfaction, the best way to get the information is to ask the customer directly. (If customer survey tools are not available, or they are too expensive to develop, you may have to rely on other feedback sources, such as the number of complaints received.)

However feedback occurs, certain factors ensure its effectiveness:

**SPECIFICITY**  Feedback works best when it relates to a specific goal, such as those established in elements and standards. Basing feedback on the employee's performance against his or her elements and standards is key to providing tangible, objective, and powerful feedback. Telling employees that they are doing well because they exceeded their goal by 10 percent is more effective than simply saying "you're doing a good job."

**TIMELINESS**  Employees should receive information about how they are doing in as timely a fashion as possible.  If they need to improve their performance, the sooner they find out about it, the sooner they can correct the problem. If employees have reached or exceeded a goal, the sooner they receive positive feedback, the more rewarding it is to them.

**MANNER**  Give feedback in a manner that will best help improve performance. Since people respond better to information presented in a positive way, express feedback in a positive manner. This is not to say that information should be sugar-coated. Present accurate, factual, and complete feedback; it is more effective when it reinforces what the employee did right and then identifies what the employee needs to do in the future. Constant criticism eventually falls on deaf ears.

**NATURALLY OCCURRING FEEDBACK**  Some kinds of feedback occur naturally while other kinds require careful planning and management.  Naturally occurring feedback can be classified into two categories. The first type is self-evident feedback—information that employees can see for themselves as they do their work. For instance, a team of materials handlers who are given the assignment of moving ten stacks of supplies from one side of the warehouse to the other by the end of the day will know that if only one of ten stacks is moved by noon, it is not likely to complete the assignment on time. This information is self-evident and is obtained by the employees making their own comparisons against a specific goal.

Another kind of self-evident feedback can be gained by having a broader scope of work. The broader the employee's scope of work, the better the employee can determine the quality of the finished product. For example, a writer/editor assigned to write a portion of an article may feel satisfied with the section he wrote. But the same writer/editor , if assigned responsibility for the entire article, would see that his independently written section had no relation to the rest of the article and needed revision.

The second category of naturally occurring feedback is carefully planned feedback characterized by automatic, frequent delivery through a measurement system. It is possible to design feedback into a work process or a measurement system so that employees receive it automatically. For example, feedback loops designed into many work processes provide performance measures daily, such as a production or printing process (i.e., number of copies printed per day as determined by machine count). Also, total quality and reengineering programs use extensive work process measurement methods. Employees measure for themselves how they and their team are doing.

Designing effective feedback into a performance management program will improve individual and team performance and will make your organization more effective. With effective feedback processes, employees can see their progress and that motivates them to reach their performance goals successfully.

# example
## feedback sources

*RETIREMENT BENEFITS SPECIALIST*

| ELEMENT | GENERAL MEASURES | SPECIFIC MEASURES | STANDARDS* | | | FEEDBACK SOURCE FOR MONITORING |
| | | | MINIMALLY SUCCESSFUL | FULLY SUCCESSFUL | EXCEEDS FULLY SUCCESSFUL | |
|---|---|---|---|---|---|---|
| Completed *claims*  ▌Critical Element  ▌50 priority points | Quality | The accuracy of annuity amounts. The completeness of the paperwork | 82-87% of annuity amounts are accurate and of claims are complete | 88-93% of annuity amounts are accurate and of claims are complete | 94-97 % of annuity amounts are accurate and of claims are complete | Data from automated system |
| | Quantity | The number of claims processed per week | 10-12 claims processed per week | 13-16 claims processed per week | 17-20 claims processed per week | Data from automated system |
| | Timeliness | The average number of days it takes to process a claim | An average of 101-110 days to complete claim | An average of 90-100 days to complete claim | An average of 75-90 days to complete claim | Data from automated system |
| *Guidance* and *technical assistance* to other specialists  ▌Critical Element  ▌35 priority points | Quality | The accuracy of the information, as determined by supervisor | Usually accurate | Usually accurate | Almost always accurate | Random supervisor observation and 360-degree tool |
| | | The perceptions of other specialists that the incumbent is willing to assist and that feedback is helpful | 50-59% of specialists agree that incumbent is routinely willing to assist and that feedback is helpful | 60-80% of specialists agree that incumbent is routinely willing to assist and that feedback is helpful | 81-89% of specialists agree that incumbent is routinely willing to assist and that feedback is helpful | |
| | Timeliness | The number of hours it takes for the incumbent to respond to other specialists' requests for assistance | Usually responds within 9-12 working hours from receipt of request | Usually responds within 4-8 working hours from receipt of request | Usually responds within 2-3 working hours from receipt of request | 360-degree tool |
| **Claims Division:** Division *claims* processed in less time and with lower error rates  ▌Non-Critical Element  ▌15 priority points | Quality | The accuracy rate of annuity amounts for the whole Division | N/A** | 88-93% annuity amounts are accurate | 94-97 % annuity amounts are accurate | Data from automated system |
| | Quantity | The number of claims the Division processes per week | | 220-230 claims processed by Division per week | 231-244 claims processed by Division per week | Data from automated system |
| | Timeliness | The average number of days it takes to process a claim | | An average of 90-100 days to complete claim | An average of 75-90 days to complete claim | Data from automated system |

AR0181

example *feedback sources*

| ELEMENT | GENERAL MEASURES | SPECIFIC MEASURES | STANDARDS * | | | FEEDBACK SOURCE FOR MONI- TORING |
| | | | MINIMALLY SUCCESSFUL | FULLY SUCCESSFUL | EXCEEDS FULLY SUCCESSFUL | |
|---|---|---|---|---|---|---|
| Suggestion(s) for improving the process (for special individual recognition) | Quality | The supervisor's and reviewers' judgment that the suggestion(s) improve(s) efficiency, productivity, flexibility, and/or usability | N/A** | Management and Division members determine that the suggestion(s) is/are worth adopting | Management and Division members determine that the suggestion(s) is/are worth adopting | Supervisor and Branch members' judgment |
| ▎Additional Performance Element | Quantity | The number of suggestions made | | Incumbent provides 1-2 adopted suggestions per year | Incumbent provides 3-5 adopted suggestions per year. | Supervisor tracks |
| ▎0 priority points | Cost Effectiveness | The amount of money saved by adopting the suggestion. | | The incumbent's suggestions saved up to 10% of costs | The incumbent's suggestions saved up to 10-25% of costs | Data from automated system |
| **Claims Division:** Increased number of employees who can process claims | Quantity | The number of employees who can do claims | N/A** | 35-50% of Division employees can process claims | 51-75% of Division employees can process claims | Supervisor observation |
| | Quality | The accuracy rate of annuities processed | | 88-93% of annuity amounts are accurate | 94-97% of annuity amounts are accurate | Data from automated system |
| ▎Additional Performance Element | | | | | | |
| ▎0 priority points | | | | | | |

*To meet the performance level of the standards described for each element, each listed part of the standard must be present or occur.
**The Division decided that there was no benefit to establishing a *Minimally Successful* standard for a non-critical or an additional performance element.

## EXERCISE ON DEFINING FEEDBACK SOURCES

Now that you have developed elements, measures, and standards in previous exercises, what are the best sources of feedback for those elements? How often is it feasible to receive feedback? Who needs to see the feedback? Write down those sources of feedback under the column labeled "Feedback Source" on the foldout form on the back cover.

**FOLD OVER INSIDE BACK COVER FLAP AS SHOWN TO FILL OUT CHART**



step 8:
check the
performance plan

step 8

Once you have developed a performance plan using the previous seven steps, checking your work is always a good idea. Use the checklist below to ensure that the elements and standards you developed to include in the performance plan are effective and meet regulatory requirements:

❚ Are the critical elements truly critical? Does failure on the critical element mean that the employee's overall performance is unacceptable?

❚ Is the range of acceptable performance clear? Are the performance expectations quantifiable, observable, and/or verifiable?

❚ Are the standards attainable? Are expectations reasonable?

❚ Are the standards challenging? Does the work unit or employee need to exert a reasonable amount of effort to reach the fully successful performance level?

❚ Are the standards fair? Are they comparable to expectations for other employees in similar positions? Do they allow for some margin of error?

❚ Are the standards applicable? Can the appraiser(s) use the standards to appraise performance? Can the appraiser(s) manage the data collected through the measurement process?

❚ Will work units and employees understand what is required?

❚ Are the elements and standards flexible? Can they be adapted readily to changes in resources or objectives?

❚ If your program permits appraising elements at levels above the *Fully Successful* or equivalent level, is the *Fully Successful* or equivalent standard surpassable? Is it possible for a work unit's or an employee's performance to exceed it?

# Guiding Principles for Performance Measurement

The principles listed below contain some valuable lessons learned about measuring performance.

**VIEW PERFORMANCE MEASUREMENT AS A VALUABLE TOOL, NOT AS AN EVIL**
People view measurement systems from at least two different perspectives. When used constructively, they see a measurement system as a helpful feedback tool that provides information to managers and employees about how well they are doing in reaching their goals and where they might have room for improvement. It also provides information on which to base awards and recognition. When used poorly, however, people see a measurement system as a punishing club with which to hit people over the head if the numbers or results are bad. Managers and employees must trust that the measurement system is beneficial to them and the organization; otherwise, the temptation to game the numbers to avoid discipline will overwhelm them.

**ACCEPTANCE OF THE PERFORMANCE MEASUREMENT PROCESS IS ESSENTIAL TO ITS SUCCESS**  Involving employees in the development of the elements and standards included in the performance plan is an excellent way to clarify expectations and measurement terminology. Active employee participation in creating valid measures that accurately reflect performance decreases the possibility that employees may feel manipulated through the measurement system.

**MEASURE WHAT IS IMPORTANT—NOT WHAT IS EASY TO MEASURE**  It is easy to count the number of days since a project began, but if that is all that you measure, is that enough information to assess performance? No, probably not. Or if, for example, a customer service team only measures the number of calls that come into the team (the easy measure) and does not attempt to measure customer satisfaction with its service (the more difficult measure), the team does not have complete information about its performance and has no idea how well it is serving its customers. In addition, because what gets measured gets done, the team will probably focus on how it can increase the number of calls it receives and ignore the quality of service it provides.

As a result, organizations need to anticipate the behavioral and unintended consequences of measuring performance. As an example, recently a medical laboratory came under fire because of the errors it made in certain of its cancer tests. A high number of cancer tests that the laboratory had approved as negative turned out to be wrong—cancer had actually been

evident. An investigation found that the laboratory had been measuring and rewarding its employees on the number of slides they reviewed daily, not on the accuracy of the reviews. Knowing that the more slides they reviewed, the more recognition they received, employees were quickly moving from slide to slide to slide without accurately reading them. As a result, the lab's errors in measuring what was important allowed cancer to go untreated and people who could have been saved through early detection and treatment lost their lives.

**DEVELOP EMPLOYEE PERFORMANCE PLANS THAT ARE FLEXIBLE ENOUGH TO ALLOW FOR CHANGES IN PROGRAM GOALS TO KEEP THE PROCESS CREDIBLE**  Do not design performance plans that are set in concrete; build in flexibility so you can adjust them as program goals and work assignments change. Even though employees must work at least a minimum period of time on elements and standards before they receive performance ratings, the agency minimum appraisal period usually provides enough time during the appraisal period for changes in elements and standards. (Minimum appraisal periods usually range from 30-120 days, depending on the agency. Check with your agency to find out the minimum appraisal period that applies to you.)

**RELY ON MULTIPLE MEASURES**  Don't rely on a single measure. Remember the story of the three blind men who went for a walk and came across an elephant? One felt the animal's trunk and claimed that the elephant was like a large snake. Another explored the elephant's leg and claimed that the elephant was like a big tree trunk. The third blind man touched the elephant's side and said that the elephant was like a tall, wide wall. All three of them were right, but all of them were wrong. Each one was relying on only one measure from one perspective. If the measures had been used together, the three men would have had a more accurate picture of the elephant.

**EMPLOYEES SHOULD PERCEIVE THAT PERFORMANCE MEASUREMENT IS IMPORTANT**
In many organizations, employees have been exposed to a variety of management fads that seem to appear and then fade away as the next fad takes its place. Employees need to know that management is serious and committed to measuring and improving performance.

**MANAGEMENT SHOULD DEMONSTRATE THAT PERFORMANCE IS CRITICAL TO ORGANIZATIONAL AND INDIVIDUAL SUCCESS**  Closely related to the previous principle, this principle observes that not only should employees perceive that performance measurement is important, but also management must demonstrate that performance matters. When management tolerated poor performance in the past and employees see that the new measurement system has not changed the situation (in other words, Joe or Mary still comes to work and reads the paper for most of the day), employees know that performance is not important, despite the new system.

LEARNING AIDS

# Performance Measurement Quiz

Circle the correct answer(s).

1. Circle the accomplishments listed below:

   a. A completed, accurate report
   b. Types reports and correspondence
   c. Teamwork
   d. Guidance and technical assistance
   e. Satisfied customers
   f. Answers phones

2. Non-critical elements have to be weighted less than critical elements.

   a. True
   b. False

3. Standards should be written in terms of specific measures.

   a. True
   b. False

4. Which of the following is/are NOT regulatory requirements for critical elements?

   a. Each employee must have a minimum of one critical element
   b. Critical elements must measure individual performance
   c. Critical elements generally can be used to measure team-level performance
   d. Critical elements must have an established standard at least at a *Fully Successful* level
   e. Critical elements must be given greater weight than non-critical elements in deriving a summary level rating

5. Which of the following statement(s) is/are true about feedback?

   a. Peers can be included as sources of input for appraisals
   b. Feedback should be specific
   c. Whether to use 360-degree feedback depends on what you're measuring
   d. Feedback should be timely
   e. Feedback should be given in a manner that will best help improve performance
   f. All of the above are true

# chapter 4

6. Performance plans must be built from the employee's position description.

   a.  True

   b.  False

7. You can't measure results at the individual level.

   a.  True

   b.  False

8. The four general measures for measuring employee and work unit performance are cost-effectiveness, quantity, timeliness, and:

   a.  Flexibility

   b.  Quality

   c.  Agency strategy

   d.  Teamwork

9. Absolute standards can never be used.

   a.  True

   b.  False

10.  A *Fully Successful* standard is a retention standard when (circle one or more):

   a.  The standard is used in a Pass/Fail program with critical elements appraised at only two levels

   b.  When there is no *Minimally Successful* level available in the appraisal program

   c.  None of the above.

11. Measurement should be used for performance improvement.

   a.  True

   b.  False

**ANSWERS ON PAGE 88**

# Quick Reference: The Eight-Step Process

**STEP 1**        **LOOK AT THE OVERALL PICTURE**

Review organizational goals and objectives and performance measures already available.

Determine which goals and measures the employee's work unit can affect.

**STEP 2**        **DETERMINE WORK UNIT ACCOMPLISHMENTS USING ANY OR ALL OF THE FOLLOWING METHODS:**

*METHOD A*        **A GOAL CASCADING METHOD**
Cascade the agency's goals to the work unit level. Determine the work unit's accomplishment(s) that directly affect the organization's goals.

*METHOD B*        **A CUSTOMER-FOCUSED METHOD**
Determine the product(s) or service(s) that the work unit provides to its customers.

*METHOD C*        **A WORK FLOW CHARTING METHOD**

Develop a work flow chart for the work unit, establishing key steps(s) in the work process.

**STEP 3**        **DETERMINE INDIVIDUAL ACCOMPLISHMENTS THAT SUPPORT WORK UNIT GOALS**

Elements that address individual performance can be identified using a role-results matrix. List the work unit accomplishments across the top of the matrix. List each member of the work unit or each job position down the left side of the matrix. In each cell, list the accomplishment (i.e., performance element) that the member must produce or perform to support the work unit accomplishment. All performance elements should be either quantifiable or verifiable.

**STEP 4**        **CONVERT EXPECTED ACCOMPLISHMENTS INTO PERFORMANCE ELEMENTS, INDICATING TYPE AND PRIORITY**

All employees must have at least one critical element. Critical elements must address individual performance only. Work unit performance can be addressed through non-critical or additional elements. In appraisal programs with only two summary levels, work unit performance can be addressed only through additional performance elements.

**STEP 5**        ***DETERMINE WORK UNIT AND INDIVIDUAL MEASURES***

For each element, determine which general measure(s) (i.e., quantity, quality, timeliness, or cost-effectiveness) are important. Determine how to measure the quantity, quality, timeliness, and/or cost-effectiveness for the element. If an accomplishment can be measured with numbers, determine the unit of measurement to be used. If performance can only be described (i.e., observed and verified), clarify who would appraise the work and what factors they would look for.

**STEP 6**        ***DEVELOP WORK UNIT AND INDIVIDUAL STANDARDS***

A *Fully Successful* or equivalent standard must be established for each critical element. If the measure for the element is numeric, determine the range of numbers that would represent *Fully Successful* performance. For critical elements appraised at two levels, the *Fully Successful* standard identifies the level of performance below which performance is *Unacceptable*. For critical elements appraised at more than two levels, establish a range of performance above which special recognition may be warranted and below which a performance problem exists.

If the measure for the element is descriptive, determine what the appraiser would see or report that would verify that performance is *Fully Successful*. For critical elements appraised at two levels, describe performance for that element below which is *Unacceptable* performance. For elements appraised at more than two levels, and for elements for which stretch goals are desired, determine what exceeding expectations would look like. Describe what the appraiser would see happening when expectations are exceeded.

**STEP 7**        ***DETERMINE HOW TO MONITOR PERFORMANCE***

Determine what data to collect for each performance element, which source the data should come from, and whether to collect all the data or just a sample. Determine when to collect the data, who should collect it, and who should receive it. Review existing reports for possible use as feedback reports. Create feedback tables or graphs where appropriate or necessary. Try to design feedback processes that give employees feedback automatically.

**STEP 8**    **CHECK THE PERFORMANCE PLAN USING THE FOLLOWING GUIDELINES:**

| Are the critical elements truly critical? Does failure on the critical element mean that the employee's overall performance is unacceptable?

| Is the range of acceptable performance clear? Are the performance expectations quantifiable, observable, and/or verifiable?

| Are the standards attainable? Are expectations reasonable?

| Are the standards challenging? Does the work unit or employee need to exert a reasonable amount of effort to reach a fully successful performance level?

| Are the standards fair? Are they comparable to expectations for other employees in similar positions? Do they allow for some margin of error?

| Are the standards applicable? Can the appraiser(s) use the standards to appraise performance? Can the appraiser(s) manage the data collected through the measurement process?

| Will work units and employees understand what is required?

| Are the elements and standards flexible? Can they be adapted readily to changes in resources or objectives?

| If your program permits appraising elements at levels above the *Fully Successful* or equivalent level, is the *Fully Successful* or equivalent standard surpassable? Is it possible for a work unit's or an employee's performance to exceed it?

AR0191



# Five-Level Appraisal–Examples

*THE FOLLOWING EXAMPLES OF ELEMENTS AND STANDARDS WERE WRITTEN SPECIFICALLY FOR APPRAISAL PROGRAMS THAT APPRAISE PERFORMANCE ON ELEMENTS AT FIVE LEVELS.*

*HUMAN RESOURCES ASSISTANT*

| ELEMENT | STANDARDS* |
|---|---|
| **CUSTOMER SATISFACTION** | *FULLY SUCCESSFUL* **STANDARD**<br>(To meet this standard, the employee must meet all of the following requirements).<br><br>As determined by the supervisor through direct observation and/or discussions with several customers and/or peers:<br><br>▎ Usually communicates clearly, courteously, and effectively with customers<br><br>▎ Routinely responds to each customer request with the most accurate and complete information available. If the information to a telephone call can not be provided immediately upon request, usually provides an answer within 3 working days of receipt of call. Email responses are usually answered within 5 working days. Formal written correspondence is produced within agencywide standards (usually 10 working days)<br><br>▎ Generally mails requested information within 3 working days of receipt of request<br><br>▎ Whenever possible, elicits customer feedback to improve service<br><br>▎ If the employee cannot answer a customer's question completely, he/she generally provides name and phone number for the proper contact. If the question requires additional research, keeps the customer apprised of progress<br><br>▎ If requested material is temporarily unavailable to mail to customers, usually notifies the customers when they may expect to receive it<br><br>*OUTSTANDING* **STANDARD**<br>Exceeds the *Fully Successful* standard plus two of the following occur:<br><br>▎ Receives praise and/or written commendations from customers<br><br>▎ On own initiative, assumes and accomplishes a significant amount of work beyond the normal load of assigned duties to achieve customer satisfaction<br><br>▎ Proactively communicates with customers to establish good working relationship and assess customer needs<br><br>▎ Consistently demonstrates in-depth knowledge of customer programs<br><br>*MINIMALLLY SUCCESSFUL* **STANDARD**<br>The employee meets the first two requirements listed for *Fully Successful* and of the four remaining requirements, meets all but number(s) 4 & 6 . |

*Note: We have purposely listed the Minimally Successful standard last to emphasize performance that is Fully Successful and higher more than performance that is less than Fully Successful.*

*The standards include measures that can be tracked without using a customer survey. *Exceeds Fully Successful* falls between the performance described for *Fully Successful* and that described for *Outstanding*. *Unacceptable* performance falls below the minimum of *Minimally Successful*.

# A appendix

## HUMAN RESOURCES SPECIALIST

| ELEMENT | STANDARDS* |
|---|---|
| **HR POLICY PRODUCTS**<br>(e.g., written guidance, reports, overviews, workshops, formal presentations) | **FULLY SUCCESSFUL STANDARD**<br>(To meet this standard, the employee must meet all of the following requirements.)<br><br>**QUALITY**<br><br>▎ Written products generally follow plain English principles, including logical organization, descriptive section headings, simple terms, and good use of tables, lists, graphics, and white space<br><br>▎ Assigned presentations and workshops are generally well-organized with a logical flow, a use of simple terms, and graphics that illustrate concepts to help audience understanding. The overall audience rating of any presentation given is at least acceptable<br><br>▎ Products usually reflect sound analytical thinking and present recommendations consistent with sound HR principles and supportive of Administration initiatives<br><br>**QUANTITY**<br><br>▎ Produces (or does significant work for)<br>a) at least one major product (e.g., a workshop; a complex paper or report, often over 10 pages long)<br>b) at least three intermediate-in-scope products (e.g., topic papers 3-10 pages long)<br>c) at least five minor products (e.g., articles or 1-2 page papers)<br>d) a combination of these<br>    (To meet the definition of "produces," the report or paper at least must be cleared by the Division Chief.)<br><br>**TIMELINESS**<br><br>▎ Draft written products are usually completed and submitted for review by the date agreed to at initial assignment. Revisions are usually done and returned within the agreed-upon time frame<br><br>**OUTSTANDING STANDARD**<br>▎ Produces more than two major products, more than five intermediate-in-scope products, more than eight minor products, OR a combination of these<br><br>▎ Exceeds the quality and timeliness criteria<br><br>▎ Plus meets at least three of the following:<br>a) On own initiative, proposes the subject of the product<br>b) Completes extensive research to complete the product<br>c) Develops applicable, understandable models and examples<br>d) Synthesizes complex issues and condenses and explains them so that they are understandable to a general audience<br>e) Product content provides leadership in the program, fits the HR policy into the big picture of management, links HR policy to organizational goals, and/or highlights the links of HR policy with other management functions<br>f) Develops original understandable graphics that illustrate the concept being presented<br><br>**MINIMALLY SUCCESSFUL STANDARD**<br>The employee accomplishes the work described at the *Fully Successful* level except that intermediate and minor products of a routine nature are produced with moderate but not excessive rework. |

*Note: We have purposely listed the Minimally Successful standard last to emphasize performance that is Fully Successful and higher more than performance that is less than Fully Successful.*

*\*Exceeds Fully Successful falls between the performance described for Fully Successful and that described for Outstanding.*
*Unacceptable falls below Minimally Successful.*

AR0193

a p p e n d i x

# A

*MEDICAL RECORDS TECHNICIAN*

| ELEMENT | STANDARDS* |
|---|---|
| **MEDICAL RECORDS** that include accurately filed documentation | **FULLY SUCCESSFUL STANDARD**<br>(To meet this standard, the employee must meet all of the following requirements.) As determined by the supervisor and from doctor/clinic feedback:<br><br>**QUALITY**<br><br>▎Paperwork is usually filed according to hospital documentation regulations, with only a few errors or complaints<br><br>▎With few exceptions, paperwork is date stamped the same day it arrives in the Medical Records Section<br><br>▎The employee can usually locate records, whether they are in their filing shelves or checked out to doctors/clinics<br><br>▎With few exceptions, medical records requested by a doctor/clinic/emergency room contain the paperwork received by the Medical Records Section within the last 3 working days, with contents usually filed accurately<br><br>**QUANTITY**<br><br>▎The backlog of paperwork to be filed usually does not exceed the amount received within the last 3 working days<br><br>**TIMELINESS**<br><br>▎Medical records are usually supplied to requestors by the time requested. In emergency situations, medical records are supplied consistently within an hour of request<br><br>**OUTSTANDING STANDARD**<br>The employee exceeds the *Fully Successful* standard plus meets all of the following:<br><br>▎On own initiative, systematically reviews assigned files to ensure accuracy of paperwork placement in the file<br><br>▎Very few records are more than three inches thick (i.e., overly thick files have been split into additional volumes)<br><br>▎Voluntarily conducts systematic searches for missing paperwork or records, including verifying checkout cards<br><br>▎At least one of the employee's suggestions for improvements in the filing process or to records management is adopted<br><br>▎Most medical record jackets are in good condition (i.e., torn or worn jackets have been replaced, as supplies allow)<br><br>**MINIMALLY SUCCESSFUL STANDARD**<br>To meet this standard, the employee completes the requirements of the *Fully Successful* standard except that the backlog often exceeds 3 days but usually does not exceed 4 days and the _third_ quality requirement is not met. |

*Note: We have purposely listed the Minimally Successful standard last to emphasize performance that is Fully Successful and higher more than performance that is less than Fully Successful.*

*Exceeds Fully Successful falls between the performance described for Fully Successful and that described for Outstanding.
Unacceptable falls below Minimally Successful.*

AR0194

# A appendix

*HUMAN RESOURCES SPECIALIST (EMPLOYEE RELATIONS)*

| ELEMENT | STANDARDS* |
|---|---|
| **TECHNICAL INFORMATION, ADVICE, AND ASSISTANCE** | *FULLY SUCCESSFUL* **STANDARD**<br><br>▎ Provides timely and reliable technical advice and assistance to agency and other officials on employee relations and appellate matters. Advice is based on good knowledge and proper application of regulation, precedent cases, and relationships among human resources programs. Discusses advantages, disadvantages, and feasible options in connection with issues and problems presented.  Coordinates with other agency offices, as appropriate.  Brings unique or potentially difficult issues and problems to the attention of the supervisor with options and recommendations for further action<br>▎ Gains useful feedback from agencies and other organizations within the agency on the impact of policies and processes under the employee relations program.  Provides suggestions on how best to use information and insights to improve employee relations programs and procedures<br>▎ Thoroughly reviews and provides timely comments on materials presented for review by other offices.  Comments take into account applicable regulations, case law, and policy objectives in the areas of employee relations and appellate policies.  Training and briefings provided to employees are well conceived, effectively presented, and well received<br><br>*OUTSTANDING STANDARD:*<br>▎ Is uncommonly effective in dealing with officials who present difficult issues and problems for resolution.  Options and recommended solutions are creative, pertinent, and demonstrate an in-depth understanding of the issues. Where appropriate, recites successful practices and programs in other agencies. Displays deep knowledge of HRM policies, precedent cases, agency needs, and the likely impact on management and employees of solution proposed<br>▎ Based on knowledge and insights, is able to propose significant changes to policies and procedures which hold the potential for improvement<br>▎ In reviewing the products of other organizations, is able to point out major issues or problems not otherwise foreseen or to make suggestions for significant improvement as warranted<br>▎ Is able to cause major changes in policies to be considered, where appropriate, through the persuasiveness and thoroughness of written comments and/or informal meetings<br>▎ Review and commentary is timely, even in the event of competing priorities and large workload<br><br>*MINIMALLY SUCCESSFUL STANDARD:*<br><br>▎ Answers to questions about employee relations policies are usually accurate and provided in a timely manner<br>▎ Regularly gains useful feedback from organizations on agency policies and programs in employee relations.  Occasionally surfaces feedback in a manner that is useful to management<br>▎ As requested, furnishes comments to other offices on proposed policy materials, training courses, and legislation.  Comments point out technical inaccuracies or inconsistency with established policy |

*Note: We have purposely listed the Minimally Successful standard last to emphasize performance that is Fully Successful and higher more than performance that is less than Fully Successful.*

*Exceeds Fully Successful falls between the performance described for Fully Successful and that described for Outstanding. Unacceptable falls below Minimally Successful. This example does not include a Minimally Successful standard.*

AR0195

a p p e n d i x

A

**ATTORNEY ADVISOR**

| ELEMENT | STANDARDS* |
|---|---|
| **WRITTEN MATERIALS** (e.g., legal memoranda, briefs, and pleadings) | **FULLY SUCCESSFUL STANDARD** (must meet all of the following) **QUALITY** As determined by the supervisor, written materials  Are generally considered to be of average professional quality  Are infrequently returned for substantial revision  Usually fully analyze relevant legal and policy issues  Usually reflect thorough investigation of factual and legal resources  Usually do not contain significant extraneous or inappropriate material **QUANTITY**  In most instances, written materials are developed as needed **TIMELINESS**  Written materials are generally completed and presented in accordance with established deadlines or time frames **OUTSTANDING STANDARD** (must meet all of the following) Written materials:  Are routinely considered to be of highest professional quality  Are rarely returned for substantial revision  Consistently fully analyze relevant legal and policy issues  Reflect thorough investigation of factual and legal resources  Do not contain significant extraneous or inappropriate material  Are completed before established deadlines or time frames  Are always completed as needed |

*Exceeds Fully Successful falls between the performance described for *Fully Successful* and that described for *Outstanding*. *Unacceptable* falls below *Minimally Successful*. This example does not include a *Minimally Successful* standard.

NOTE: We have purposely left out a Minimally Successful standard in this example to emphasize performance that is Fully Successful and higher. In the event that an employee's performance fell below the Fully Successful level, a Minimally Successful standard would be established and communicated.

# B a p p e n d i x

# Three-Level Appraisal–Examples

**THE FOLLOWING EXAMPLES OF ELEMENTS AND STANDARDS WERE WRITTEN SPECIFICALLY FOR APPRAISAL PROGRAMS THAT APPRAISE PERFORMANCE ON ELEMENTS AT THREE LEVELS.**

**TEAM LEADER, PACKAGING PRODUCTION TEAM**

| ELEMENT | FULLY SUCCESSFUL STANDARD* <br> (To meet the *Fully Successful* standard for an element, all of the bullets listed for the element must be met.) |
|---|---|
| **Quality products** | <ul><li>Usually 90% to 95% of pallets have no defects</li><li>With few exceptions, no more than 1.5 to 2 hours of down time per week</li><li>Normally, the packaging production schedule is met 5 out of 7 days</li><li>Normally, the shipment schedule is met 5 out of 7 days</li></ul> |
| **Safe work environment** | <ul><li>Safety problems are corrected or improvements usually are made by agreed-on date</li><li>Routinely holds one safety audit per week</li><li>Very rarely has any lost time hours</li></ul> |
| **Effective leadership** | <ul><li>Team goals are met 60-80% of the time</li><li>Manager judges that the team leader periodically initiates ways to reduce costs</li><li>Manager judges that decisions are well thought out and support organizational goals.</li></ul> |
| **Productive subordinates** | Manager is generally satisfied that: <ul><li>Training requirements of the team are met</li><li>Discipline is provided fairly and consistently</li><li>Most team members understand the department's goals and how their performance affects these goals</li><li>Team members understand how they're performing against their goals</li><li>Team members receive rewards for good performance</li></ul> |

*To achieve the *Outstanding* level, the employee must consistently exceed a majority of the bullets listed for the *Fully Successful* standard. *Unacceptable* performance occurs when the employee fails to meet one or more of the bullets listed for *Fully Successful* performance.

AR0197

a p p e n d i x

B

*PROGRAM ANALYST*

---

**ELEMENT: ORAL PRESENTATIONS**

**STANDARDS\*** (To meet a standard, all of the statements listed for the standard must be met.)

*OUTSTANDING* STANDARD

When attendee evaluations are available:

▌ Sixty to eighty-four percent of attendees rated the employee's presentation good or very good.

When attendee evaluations are not available, the supervisor determines that the employee:

▌ Presents information in a clear, concise, and well-organized manner

▌ Responds well to questions, including unanticipated ones

▌ Creates a favorable impression for effective communication by seeking the views of others and respecting different points of view

▌ Asks probing questions to ensure that everyone understands the matters discussed

▌ Clearly distinguishes between fact and opinion and avoids disclosing sensitive or tentative information prematurely

▌ Listens well, responds appropriately and articulately, and remains calm in adverse situations

▌ Knows when and how to use visual aids, speaks authoritatively on subject matter , and displays ability to respond directly to questions raised

▌ Encourages active participation by others

▌ Senses audience's receptivity to presentation and adjusts accordingly

▌ Shows thorough knowledge of issues and their relationship to broader issues

▌ Presents technical information clearly and persuasively, demonstrating the importance and relevancy of planning.

*FULLY SUCCESSFUL* STANDARD

When attendee evaluations are available:

▌ More than 60-84% of attendees rated the employee's presentation good or very good

When attendee evaluations are not available, the supervisor determines that the employee:

▌ Usually presents information clearly, concisely, and in a well-organized manner

▌ Routinely shows respect for comments of participants

▌ Generally keeps discussion on track

▌ Usually elicits comments of others

▌ Generally weighs consequences of statements before speaking, clearly distinguishing between fact and opinion, and avoids disclosing sensitive or tentative information prematurely

▌ Usually listens well, responds to issues at hand, and minimizes extraneous information

▌ Usually answers most questions and invites additional questions to ensure understanding

---

**\****Unacceptable* performance occurs when the employee fails to meet one or more of the bullets listed for *Fully Successful* performance.

# B

## appendix

**GRAPHICS DESIGNER**

---

**ELEMENT:  GRAPHIC DESIGNS**

---

**STANDARD**

### OUTSTANDING STANDARD

In addition to meeting all criteria of the *Fully Successful* standard, the supervisor determines that the employee meets at least four of the following:

| Designs are often of such high quality that they generate spontaneous praise from clients

| The elegance of designs often enhances their purpose in unexpected ways

| Designs consistently reflect the highest professional standards and raise the standards for other agency designers

| The most complex design tasks are handled with little or no difficulty

| Suggestions are made that improve the agency's design processes

| Potential problems are anticipated, brought to the supervisor's attention as appropriate, and usually solved independently

### FULLY SUCCESSFUL STANDARD

To meet this standard, all of the following must be met:

The supervisor determines that:

| The quality of information-material design is usually acceptable to the client and sufficient to achieve the purposes intended

| In most cases, designs are in accordance with the agency's graphic standards system and meet commonly accepted criteria for professional work

| Logical planning, due consideration of priorities, and efficient application of technical graphics skills usually result in creation of graphic designs in time to meet reasonable deadlines

| Generally nonwasteful work habits reflect a consideration of costs to the Government

| Instructions from supervisors are most often followed as given, major revisions are rarely necessary, and routine problems are usually resolved with a minimum of supervision

*a p p e n d i x*

**B**

**TRAINING COORDINATOR**

| ELEMENT | FULLY SUCCESSFUL STANDARD*<br>(To meet the *Fully Successful* standard for an element, **all** of the bullets listed for the element must be met.) |
|---|---|
| **CERTIFIED PROGRAMMERS** | Most of the supervisors of certified programmers say that the trained pro-grammer(s):<br><br>▎ Could handle their assignments right away<br>▎ Didn't bother coworkers and supervisor for covered objectives<br>▎ Demonstrated certified skill/knowledge assessment was accurate<br><br>Recommended trainees generally complete the training within the following time frames:<br>▎ Average of 18 to 25 working days to complete Phase I training<br>▎ Average of 18 to 23 working days to complete Phase II training<br>▎ Average of 10 to 15 working days to complete Phase III training<br><br>Most of the supervisors of the trained programmers say that the topics covered match what is needed on the job |
| **TRAINING PLANS** | ▎ Most internal customers agree that the training plan will meet their needs and commit dollars and trainee time<br>▎ Supervisor is generally satisfied that the training plan contains standard components, has realistic time lines and objectives, is based on input from representative sample, and is consistent with agency long-range goals, objectives, and philosophy<br>▎ The incumbent meets agreed-upon deadline for first approved draft |
| **CROSS-TRAINED ANALYSTS** | ▎ 60%-80% trainees meet learning objectives<br>▎ Trainees' supervisors are generally satisfied with analysts' improvement in their ability to communicate with programmers and solve minor problems without a programmer |
| **TRAINING FACILITY READY FOR TRAINING** | The supervisor is generally satisfied that:<br>▎ The training room is ready for training when needed<br>▎ Materials are available<br>▎ Speaker's needs have been determined and addressed |
| **CUSTOMER SERVICE MANUAL** | The supervisor is generally satisfied that the manual:<br>▎ Covers most if not all job dimensions<br>▎ Has most if not all standard components<br>▎ The customer service supervisor says the document is useful |

*To achieve the *Outstanding* level, the employee must consistently exceed a majority of the bullets listed for the *Fully Successful* standard. *Unacceptable* performance occurs when the employee fails to meet one or more of the bullets listed for *Fully Successful* performance.

AR0200

C *a p p e n d i x*

# Two-Level Appraisal–Examples

**THE FOLLOWING EXAMPLES OF ELEMENTS AND STANDARDS WERE WRITTEN SPECIFICALLY FOR APPRAISAL PROGRAMS THAT APPRAISE PERFORMANCE OF ELEMENTS AT ONLY TWO LEVELS.**

**POLICY PROCESSING CLERK**

| ELEMENT | FULLY SUCCESSFUL STANDARD<br>(To meet the *Fully Successful* standard for each element, **all** of the bullets listed for the element must be present or occur.) |
|---|---|
| **COMPLETED AUDITS** | No more than 5 errors per month are found on audits<br><br>For at least 10 weeks per year, no audits are more than 30 days old |
| **QUOTES AND PROPOSALS** | No more than 5 quotes and proposals per month are found to be inaccurate at issuing<br><br>No more than 5 quotes per month are processed in more than 5 days<br><br>No more than 5 proposals per month are processed in more than 24 hours |
| **SOLUTIONS** | No more than 2 times per quarter are incorrect results or procedures spotted by the supervisor or other team members<br><br>No more than 2 times per quarter are problems corrected in more than 3 business days |
| **FINISHED POLICIES** | No more than 5 errors per month are spotted by team members<br><br>No more than 5 times per month when someone can't do the next step on a policy due to illegibility, incompleteness, or vagueness in the file<br><br>No more than 3 times per month someone on the team gets a second call for the same issue/problem<br><br>For at least 10 weeks per year, there are no changes more than 30 days old<br><br>For at least 5 weeks per year, there is no new business more than 10 days old |
| **ANSWERS TO QUESTIONS** | 60% of surveyed team members and a sample of people outside the team say:<br>— The technician stops what (s)he's doing and immediately tries to answer the question<br>— They don't find out later that the answer is wrong<br>— If the technician doesn't know the answer, (s)he either researches the solution or directs the person to the correct source |

a p p e n d i x

C

**RESEARCH CHEMIST**

| ELEMENT | FULLY SUCCESSFUL STANDARD<br>(To meet the *Fully Successful* standard for each element, **all**<br>of the bullets listed for the element must be present or occur .) |
|---|---|
| **ANALYTICAL RESULTS AND SPECIFICATIONS** | The Research Manager is routinely satisfied that:<br>▎ The method measures the appropriate variable<br>▎ The results are relevant<br>▎ The method is scientifically sound<br>▎ There is a well-written protocol<br>▎ The method is accurate, precise, reproducible, fast, and cost-effective<br><br>The customer is generally satisfied that:<br>▎ They can understand and observe the results<br>▎ The cost is within the budget<br>▎ The information gives understandable answers to their questions |
| **SOLUTIONS TO CUSTOMER PROBLEMS** | The Research Manager is routinely satisfied that:<br>▎ Reports and solutions address the question that was asked<br>▎ The assumptions or hypotheses are based on scientific principles<br>▎ The proposed solutions, suggestions, and/or recommendations are understandable<br>▎ The recommendations were provided within the agreed-on time frame.<br><br>The customer is generally satisfied that:<br>▎ The report and any answers to questions address the question that was asked<br>▎ The proposed solutions, suggestions, and/or recommendations are understandable<br>▎ The proposed recommendations were provided within the agreed-on time frame<br>▎ The solutions work<br>▎ The information gives understandable answers to their questions<br>▎ They are able to implement the recommendations |

*C appendix*

*ENGINEER*

| ELEMENT | FULLY SUCCESSFUL STANDARD<br>(To meet the *Fully Successful* standard for each element, **all** of the bullets listed for the element must be present or occur .) |
|---|---|
| **DESIGNS FOR CAPITAL IMPROVEMENTS AND OPERATIONS CHANGES** | The supervisor is routinely satisfied that:<br>❚ The cost estimate is sufficiently itemized<br>❚ There is backup documentation for all cost estimates<br>❚ There is consistency across design documents<br>❚ The design looks like it will solve the problem or meet the need<br>❚ The design doesn't cause new problems while solving the original problem<br>In addition:<br>❚ There is no significant cost overrun due to inaccurate quantities<br>❚ The design is routinely completed by the agreed-on deadline |
| **BUDGET REPORT** | ❚ The budget report is generally submitted by the fifteenth day of the month<br>❚ The engineer is routinely able to answer questions about project financial status at any time |
| **COMPLETED PROJECTS** | The supervisor is routinely satisfied that:<br>❚ The project is constructed according to the design<br>❚ Unexpected conditions are successfully worked around<br>❚ Recommendations are made by agreed-on deadline<br>❚ The contract cost is within 5% of the estimate |

a p p e n d i x C

**PROGRAM ANALYST (BUDGET)**

| ELEMENT | FULLY SUCCESSFUL STANDARD<br>(To meet the *Fully Successful* standard for each element, **all**<br>of the bullets listed for the element must be present or occur .) |
|---|---|
| **BUSINESS DECISION RECOMMENDATIONS, INCLUDING BUDGET ANALYSIS AND COST INFORMATION/ANALYSIS** | The supervisor is routinely satisfied that:<br>▌ Cost impacts surrounding the decision have been identified and evaluated<br>▌ The numbers are accurate and do not require second-guessing or rework<br>▌ Reports/analysis logically state the issues and reach conclusions that are supported by the data and analysis<br>▌ The analysis is useful and answers the question asked<br>▌ The analysis/information was provided by the agreed-on deadline |
| **FINANCIAL SYSTEMS IMPROVED** | The supervisor as well as the users of the system are generally satisfied that:<br>▌ The system change is within the scope of control<br>▌ The change provides information in a more efficient, accurate, and useful manner than previously<br>▌ The time required to implement the change meets the customer's needs and deadlines<br>▌ The value of the improvements exceeds the cost of the implementation |
| **BUDGET PROCESS EVALUATION AND ANALYSIS** | The supervisor is routinely satisfied that:<br>▌ The reports/analysis logically state the issues and reach conclusions that are supported by the data and analysis<br>▌ The evaluations address all issues and cost impacts |

notes

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

answers from page 19

**TRAINS EMPLOYEES—** *ACTIVITY,* **SUPERVISION—** *CATEGORY,* **A COMPLETED CASE—** *ACCOMPLISHMENT,* **PUBLIC RELATIONS—** *CATEGORY,*
**RECOMMENDATIONS—** *ACCOMPLISHMENT,* **CUSTOMER SERVICE—** *CATEGORY,* **HR POLICY INTERPRETATIONS—** *ACCOMPLISHMENT,*
**WRITES AGENCY POLICY—** *ACTIVITY,* **SOLUTIONS TO PROBLEMS—** *ACCOMPLISHMENT,* **DEVELOPS SOFTWARE PROGRAMS—** *ACTIVITY,*
**IDEAS AND INNOVATIONS—** *ACCOMPLISHMENT,* **FILES PAPERWORK—** *ACTIVITY,* **WRITES MEMOS—** *ACTIVITY,*
**COMPUTER SYSTEMS THAT WORK—** *ACCOMPLISHMENT,* **TEAMWORK—** *CATEGORY,* **A COMPLETED PROJECT—** *ACCOMPLISHMENT,*
**SATISFIED CUSTOMERS—** *ACCOMPLISHMENT,* **ANSWERS THE PHONE—** *ACTIVITY,* **ASSISTS TEAM MEMBERS—** *ACTIVITY*

answers from pages 70-71

| | | |
|---|---|---|
| **1**—*A  D  E* | **5**—*F* | **9**—*B* |
| **2**—*B* | **6**—*B* | **10**—*A  B* |
| **3**—*A* | **7**—*B* | **11**—*A* |
| **4**—*C  E* | **8**—*B* | |

notes

notes



*FOLD OVER INSIDE BACK COVER FLAP AS SHOWN TO FILL OUT CHART.*
*SEE PAGES 46, 51, 60, AND 66 FOR FURTHER INSTRUCTIONS*

| PRIORITY POINTS | ELEMENT | TYPE | GENERAL MEASURE | SPECIFIC MEASURE | STANDARDS AND FEEDBACK |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

Please cut at this line. Line does not print

AR0208



**U.S. Office of Personnel Management**

Employee Services

1900 E Street, NW, Washington, DC 20415

**OPM**.GOV

ES/SWP-02803-03-17

**A Report by a Panel of the**
# NATIONAL ACADEMY OF PUBLIC ADMINISTRATION
**for the U.S. Office of Personnel Management**

# Elevating Human Capital:
## *Reframing the U.S. Office of Personnel Management's Leadership Imperative*







**March 2021**
AR0210

*This page is intentionally left blank.*

AR0211

March 2021

A Report by a Panel of the

# NATIONAL ACADEMY OF PUBLIC ADMINISTRATION

for the U.S. Office of Personnel Management

# Elevating Human Capital:
## *Reframing the U.S. Office of Personnel Management's Leadership Imperative*

**PANEL OF FELLOWS**

**Janet Hale (Chair)***

**J. Edward Kellough***

**Peter Levine***

**Ellen Tunstall***

**David Walker***

*Academy Fellow*



NATIONAL ACADEMY OF
PUBLIC ADMINISTRATION®

## Officers of the Academy

**David Wennergren,** * *Chair of the Board*
**Norton Bonaparte,** * *Vice Chair*
**David Mader,** * *Treasurer*
**Jane Fountain,** * *Secretary*
**Teresa W. Gerton,** * *President and Chief Executive Officer*

## Study Team

**Brenna Isman,** *Director of Academy Studies*
**Cynthia Heckmann,** * *Project Director*
**Sukumar Rao,** *Senior Advisor*
**Jonathan Tucker,** *Senior Analyst*
**Chloe Yang,** *Senior Analyst*
**Elise Johnson,** *Senior Research Associate*
**E. Jonathan Garcia,** *Research Associate*

## Additional Contributors

**Mark Thorum,** *Senior Advisor*
**Julius Biggs,** Intern

***Academy Fellow***

National Academy of Public Administration

1600 K Street, NW
Suite 400
Washington, D.C. 20006
www.napawash.org

March 2021
Printed in the United States of America
Academy Project Number: 102253

AR0213

## About the Academy

The National Academy of Public Administration is an independent, nonprofit, and non-partisan organization established in 1967 and chartered by Congress in 1984. It provides expert advice to government leaders in building more effective, efficient, accountable, and transparent organizations. To carry out this mission, the Academy draws on the knowledge and experience of its over 900 Fellows—including former cabinet officers, Members of Congress, governors, mayors, and state legislators, as well as prominent scholars, career public administrators, and nonprofit and business executives. The Academy helps public institutions address their most critical governance and management challenges through in-depth studies and analyses, advisory services and technical assistance, congressional testimony, forums and conferences, and online stakeholder engagement. Learn more about the Academy and its work at www.NAPAwash.org.

*This page is intentionally left blank.*

AR0215

# Foreword

Setting an agenda for the future of governance, the National Academy of Public Administration launched Grand Challenges in Public Administration in 2019. The public sector's inability to respond quickly and flexibly to the ever-growing challenges and demands confronting government shaped the burning platform for this initiative. If the nation is to address critical issues successfully, all sectors of society must work together, and government must improve its operations to tackle problems in new ways and, importantly, earn the public's trust.

A key foundational element for effective governance—human capital management—is among the twelve Grand Challenges identified. *Modernize and Reinvigorate the Public Service* sets the stage for addressing the full suite of human capital challenges. As government is increasingly called upon to address complex and interconnected "wicked problems," the need for leaders, managers, technical experts, and front-line workers in the right jobs, with the right skills, at the right time has never been greater. Unfortunately, federal (and state/local) government struggles today to build a public service workforce that can meet the unique demands of our time. It is limited by rigid and outdated hiring, pay, and performance policies and practices. Public managers and employees also struggle to adapt to the rapidly changing nature of work. As a result, we face a significant risk that in the near future, many public organizations will not have the workforce capacity necessary to achieve their critical missions and provide services to the public.

The Academy has provided insight on human capital principles and practices for decades. Two recent white papers by Academy Panels, *No Time to Wait, Building a Public Service for the 21st Century, Parts 1 and 2*, offered strategies and steps to (1) reform the federal government's human capital system and processes and (2) strengthen agencies' ability to attract, recruit, retain, motivate, pay, and hold accountable a high-performing workforce to meet those challenges. The title of the white papers telegraphs the urgency of actions required—there is "no time to wait."

This report, *Elevating Human Capital: Reframing the U.S. Office of Personnel Management's Leadership Imperative*, complements the Academy's efforts by highlighting the important role of human capital management in carrying out agency missions and initiatives and solving complex problems. It presents the results of a Congressionally mandated study of the Office's functions and the associated challenges in executing those functions. The study imparts a roadmap of actions needed to raise the attention on, and value of, human capital for addressing critical workforce issues by reframing OPM's mission and affording the agency the foundation needed to lead strategic human capital management government-wide. Timing is fortuitous. With a new Administration and Congress, the report provides an opportunity for a fresh look at changes OPM can make to become both the organization and the government-wide leader it was always meant to be. The new Administration cannot accomplish its ambitious agenda without an effective workforce—an effective OPM is absolutely critical to this undertaking.

The Academy looks forward to working with the Administration and Congressional leaders to implement the Panel's recommendations offered in this report. We believe it provides a roadmap for an important transformation of OPM and federal human capital management—and, in turn, affords a path for building the workforce of the 21st century.

Teresa W. Gerton
President and Chief Executive Officer
National Academy of Public Administration

*This page is intentionally left blank.*

AR0217

# Table of Contents

List of Tables ................................................................................................................. i

List of Figures ................................................................................................................ i

Acronyms and Abbreviations ..................................................................................... ii

Executive Summary ...................................................................................................... 1

    Panel Recommendations ........................................................................................ 3

Introduction .................................................................................................................. 7

    Study Scope ............................................................................................................... 9

    Results in Brief ........................................................................................................ 10

    Methodology ........................................................................................................... 11

    Organization of the Report .................................................................................... 12

Section 1:   OPM Role, Leadership, and Mission ................................................. 13

    The Civil Service Reform Act and OPM—Unrealized Expectations ......................... 13

    OPM Leadership Role Weakened by Expanding Role of OMB in Human Capital
    Management .............................................................................................................. 15

    Need for an Independent Government-wide Human Resource Agency Affirmed .... 16

    Impact of the Merger Proposal on OPM Operations and Staff .............................. 18

    Lack of Sustained Leadership Impedes Mission Execution ..................................... 19

    CHCO Council—Missed Opportunities to Advance Federal Human Capital
    Management .............................................................................................................. 21

    OPM Role and Leadership—Roadmap to Address Challenges ............................... 22

    Achieving a Reframed Mission—OPM Organization and Operating Model ............ 23

    Panel Recommendations ......................................................................................... 26

Section 2:   OPM Core Mission Functions and Programs ................................... 29

    2A: Policy ................................................................................................................. 29

    Reorientation Needed from Reactive to Proactive, Forward-Looking Policy
    Development ............................................................................................................. 29

    Action Steps to Refocus Policy Development ......................................................... 33

    Panel Recommendations ......................................................................................... 34

    2B: Oversight ........................................................................................................... 35

    Shift Needed in Oversight Approach ....................................................................... 35

    Modernizing Oversight and Ensuring Accountability ............................................. 38

    Panel Recommendations ......................................................................................... 38

    2C: Services .............................................................................................................. 39

Re-Examining Customer-Focused, Fee-Based Products and Services......................39

Executive and Leadership Development: Building Federal Workforce Capabilities .41

HR Staff Development: Capacity Building Essential to Advance Human Capital
Management.............................................................................................................42

Opportunities to Increase No-Cost Technical Assistance and Strengthen HR Staff
Capacity...................................................................................................................43

Panel Recommendations ........................................................................................44

2D: Program Execution ............................................................................................45

Research and Demonstration Projects: Current Approach Limited in Promoting
Innovative Human Capital Management ..............................................................45

Benefits Programs: Overall Positive Feedback, but Attention Needed on Automating
Processes..................................................................................................................46

Suitability and Credentialing: A Focus on Standards and Vetting Process
Improvements..........................................................................................................47

Changes Needed to Encourage Innovation and Support Employee Benefit Programs
....................................................................................................................................48

Panel Recommendation..........................................................................................49

**Section 3:    Supporting Functions Enabling Mission Execution** .......................................... **51**

3A: Federal Human Capital Data and Analytics: A Critical Strategic Asset.................51

Federal Human Capital Data Landscape...................................................................52

Challenges in Sharing HR Information and Data .....................................................55

Harnessing Opportunities to Improve the Quality and Use of Data and Data
Analytics...................................................................................................................55

Panel Recommendations .........................................................................................57

3B: OPM's Information Technology: The Need for Modern and Secure Systems and
Tools .............................................................................................................................58

Outdated, Antiquated Technology Environment ....................................................59

Lack of Consistent IT Leadership and Effective IT Governance: A Chronic Problem60

OPM's Customer Facing Website: Customer Focus Needed ...................................61

Recent Efforts to Address IT Issues .........................................................................61

Information Technology: Ongoing Organizational Commitment and Support
Required....................................................................................................................62

Panel Recommendations .........................................................................................64

3C: Funding: Structure and Level Hinder Agency Performance ..................................64

Sources of Funding Authorities ...............................................................................64

Funding of Mission Functions: A Mix of Funding Streams and Resource Constraints
....................................................................................................................................65

Funding of Common Services: Limitations in Internal Methodology for Funding Mission Support .................................................................................................. 66

Budget Development and Appropriation Processes: Opportunities for More Efficient and Effective Resource Management ................................................... 67

Funding of Major IT Investments: Enabling Sustained Investment in IT Modernization and Operations ........................................................................... 68

Moving to a More Sustainable and Accountable Funding Model ........................ 70

Panel Recommendations .................................................................................... 70

**Appendices** .................................................................................................. **73**

Appendix A:   Panel and Study Team Member Biographies ...................... 73

Panel of Academy Fellows ................................................................................. 73

Study Team ........................................................................................................ 74

Appendix B:   List of Interviewees .......................................................... 77

Appendix C:   OPM Organizational Profile ............................................. 85

Appendix D:   Selected References .......................................................... 91

## List of Tables

Table 1. Merit System Principles ................................................................17
Table 2. Transactional Activities ...............................................................36

## List of Figures

Figure 1. OPM Organizational Chart (as of October 2020) ...........................................85

i

# Acronyms and Abbreviations

| Acronym or Abbreviation | Definition |
| --- | --- |
| Academy | National Academy of Public Administration |
| AI | Artificial Intelligence |
| ALJ | Administrative Law Judge |
| CARES | Coronavirus Aid, Relief, and Economic Security Act |
| CBJ | Congressional Budget Justification |
| CDO | Chief Data Officer |
| CFO | Chief Financial Officer |
| CFR | Code of Federal Regulations |
| CHCO | Chief Human Capital Officer |
| CIO | Chief Information Officer |
| CLD | Center for Leadership Development |
| CLIA | Congressional, Legislative, and Intergovernmental Affairs |
| CMO | Chief Management Officer |
| COO | Chief Operating Officer |
| CPDF | Central Personnel Data File |
| CSRA | Civil Service Reform Act of 1978 |
| CSRS | Civil Service Retirement System |
| CXO | Shorthand for a group of chief executive officers (e.g., chief acquisition officer, chief financial officer, and the like) |
| DCSA | Defense Counterintelligence and Security Agency |
| DDM | Deputy Director for Management |
| DEU | Delegated Examining Unit |
| DHS | Department of Homeland Security |
| DOD | Department of Defense |
| EA | Executive Agent |
| ECAS | Enterprise Cost Accounting System |
| EEO | Equal Employment Opportunity |

AR0222

| EHRI | Employee Human Resources Integration |
| EO | Executive Order |
| eOPF | Electronic Official Personnel Folder |
| ES | Employee Services |
| ExecSec | Executive Secretariat |
| FEDSCOPE | Online data visualization and download tool |
| FEDVIP | Federal Employees Dental and Vision Insurance Program |
| FEGLI | Federal Employees' Group Life Insurance |
| FEHB | Federal Employees Health Benefits Program |
| FERS | Federal Employees Retirement System |
| FEVS | Federal Employee Viewpoint Survey |
| FHRI | Federal Human Resources Institute |
| FIRREA | Financial Institutions Reform, Recovery, and Enforcement Act |
| FIS | Federal Investigative Service |
| FITARA | Federal Information Technology Acquisition Reform Act |
| FLTCIP | Federal Long Term Care Insurance Program |
| FOIA | Freedom of Information Act |
| FPRAC | Federal Prevailing Rate Advisory Committee |
| FSAFEDS | Federal Flexible Spending Account Program |
| FSC | Federal Staffing Center |
| FSEM | Facilities, Security, and Emergency Management |
| FTC | Federal Trade Commission |
| FTE | Full-Time Equivalents |
| GAO | Government Accountability Office |
| GPRA | Government Performance and Results Act |
| GPRAMA | GPRA Modernization Act |
| GSA | General Services Administration |
| HCAAF | Human Capital Assessment and Accountability Framework |
| HCDMM | Human Capital Data Management and Modernization |
| HCF | Human Capital Framework |

AR0223

| | |
|---|---|
| HCIS | Human Capital Industry Solutions |
| HHS | Department of Health and Human Services |
| HI | Healthcare and Insurance |
| HR | Human Resources |
| HRIT | Human Resources Information Technology |
| HRLOB | Human Resources Line of Business |
| HRS | Human Resources Solutions |
| HRSES | Human Resources Strategic and Evaluation Solutions |
| IDEA | Integrated Digital Experience Act |
| IT | Information Technology |
| MGT | Modernizing Government Technology Act |
| MSAC | Merit System Accountability and Compliance |
| MSPB | Merit Systems Protection Board |
| NBIB | National Background Investigations Bureau |
| NDAA | National Defense Authorization Act |
| OC | Office of Communications |
| OCFO | Office of the Chief Financial Officer |
| OCIO | Office of the Chief Information Officer |
| OD | Office of the Director |
| OGC | Office of the General Counsel |
| OIG | Office of the Inspector General |
| OMB | Office of Management and Budget |
| OPIM | Office of Privacy and Information Management |
| OPM | Office of Personnel Management |
| OPO | Office of Procurement Operations |
| OSDBU | Office of Small and Disadvantaged Business Utilization |
| PAC PMO | Performance Accountability Council Performance Management Office |
| PIO | Performance Improvement Officer |
| QSMO | Quality Service Management Organization |
| RS | Retirement Services |

iv

| | |
|---|---|
| S&E | Salaries and Expenses |
| SAHRC | Small Agency Human Resources Council |
| SES | Senior Executive Service |
| SuitEA | Suitability Executive Agent |
| TMA | Technology Modernization Act |
| TMF | Technology Modernization Fund |
| U.S.C. | United States Code |
| USSM | Unified Shared Services Management |
| VERA | Voluntary Early Retirement Authority |
| WCF | Working Capital Fund |

AR0225

# Executive Summary

The nation is experiencing turbulent times and unprecedented challenges that are collectively affecting the national psyche. These range from the COVID-19 pandemic and home-grown, as well as foreign, terrorism threats to widespread social unrest and economic uncertainty and disparity. The Federal Government plays a critical role in responding to these crises. But, to do so effectively requires a workforce with both the capability and capacity to tackle these issues head on. The agency charged with administering the federal civil service and merit systems—setting the policies on hiring, staffing, development, performance, accountability, advancement, and benefits, and providing a host of services in support of that workforce—is the U.S. Office of Personnel Management (OPM).

Over the years, OPM has experienced its own set of challenges in executing its mission. Created by the Civil Service Reform Act of 1978 as an independent establishment within the Executive Branch, OPM was expected to promote an efficient civil service system by delegating personnel management authorities to agencies, operating a robust oversight program to ensure consistency with merit system principles, and promoting innovation through research and demonstration projects as well as targeted improvement efforts. However, a lack of clarity and consensus on OPM's mission and role, together with funding and staffing constraints and leadership turnover, have stymied OPM's effectiveness in realizing the vision articulated in the Act. With some exceptions, the agency is viewed as compliance-oriented rather than customer-focused and its credibility and reputation as badly in need of repair. To the extent a consensus exists today, it is that the current federal civil service system is rigid, outdated, and in need of major reform. Federal human resource management and supporting systems are seen as complex, disparate, and difficult to navigate. Almost identical language was used to describe the condition of federal human resource management in the 1970s that led to the passage of the Civil Service Reform Act, demonstrating the difficulty of addressing core problems without a shared vision and support across the Executive Branch and the Congress.

The FY 2020 National Defense Authorization Act (NDAA) directed the OPM Director to contract with the National Academy of Public Administration (the Academy) to conduct an independent study. It tasked the Academy with assessing OPM's statutory and non-statutory functions, identifying associated challenges, and recommending a course of action to address the challenges including any statutory or regulatory changes needed to implement the recommendations. The catalyst for the study was the Trump Administration's plan to move OPM's policy functions to the Office of Management and Budget (OMB) and to merge the remaining functions with the General Services Administration (GSA). The Administration's business case contended that OPM was not resourced or structured to continue to carry out mission functions and that efficiencies could be gained by the merger. Across OPM's stakeholder communities, reactions to the proposal were swift with concerns raised that it would abolish OPM as an independent entity and put policy making under the Executive Office of the President. The Academy Panel did not find that the problems or challenges identified in the proposal would be resolved by transferring OPM functions to OMB and GSA.

In conducting this study, the Panel identified a number of cross-cutting challenges affecting OPM's ability to effectively deliver on its mission to lead federal human capital management.

1

AR0226

These include myriad authorities governing federal human capital; lack of sustained leadership and priorities given the recurrent turnover of directors and deputy directors; limited use of data and data analytics to inform policy; outdated information technology engendering enterprise and operational risks; and constrained financial and staffing resources affecting staff capacity and supporting technology and tools. An expanding and increasingly directive role of OMB in human capital management has created tensions (e.g., which agency is in the driver seat for effecting human capital leadership and reforms) and conflicts with the intent of the Civil Service Reform Act that designated OPM as the lead agency for human capital management.

The Panel concluded that meeting the needs of a 21st century workforce will require a reinvigorated focus on strategic human capital management and performance. The need for an independent, enterprise-wide human capital agency and steward of the merit system principles is clear, as is the critical need to rebuild staff capacity, encourage innovation, and adopt a more data-driven, accountable, and forward-looking human capital approach. In addition, human capital management must be elevated. The OPM Director—and human capital as a whole—needs a "seat at the table." The Director should be *the* principal advisor to the President on human capital, as envisioned in the Civil Service Reform Act, and OPM should be that lead for federal civilian human capital, setting policy, establishing a framework for agencies to manage their workforces, facilitating innovation and the sharing of best practices and lessons learned, and both collecting and using data and data analytics. To execute that role effectively and achieve a strategic vision of elevating and supporting human capital as a strategic priority across the federal enterprise, OPM must reframe its mission, organization, and supporting processes. It must rebuild the agency's credibility and staff capacity—and it must reorient its internal culture from a predominant compliance orientation to a more customer-focused, strategic, and forward-looking mindset. These actions will require the support of the President, Congress, and federal agencies.

With the proliferation of excepted authorities under title 5 and other sections of the U.S. Code, OPM's current mission and focus on title 5 is clearly not sufficient to address the complex workforce issues confronting the federal government. The Panel believes that a more coherent and cohesive government-wide approach is needed—one that affords agencies flexibilities for tailoring to meet their more unique requirements while ensuring adherence to merit system principles through effective oversight.

The Panel offers a number of recommendations with objectives to highlight the intended outcome that would be achieved by implementing the recommendations. Successful implementation should yield the following results:

- Human capital is recognized and supported as a strategic priority across government by the Administration, the Congress, and federal agencies.

- OPM's role is reaffirmed and strengthened as the leader for strategic human capital management government-wide.

- OPM's approach to human capital management evolves from predominantly compliance-oriented to customer-focused, value-added, data-driven and forward-looking, encouraging innovation and sharing of best practices.

2

- OPM's technology platforms are modernized, affording secure and efficient access to human capital data and systems supporting government-wide human capital management.

## Panel Recommendations

The recommendations below, with additional action steps, appear in Sections 1 through 3.

### Section 1: OPM Role, Leadership, and Mission

***Objective: Reaffirm and broaden OPM's role as an independent entity and leader for federal civilian human capital management and reinvigorate strategic human capital management.***

**1.1** Congress should amend title 5, section 1101. (5 USC 1101), Office of Personnel Management, to clarify and redefine the role and mission of OPM as the federal government's enterprise-wide, independent human capital agency and steward of the merit system for ***all*** civilian personnel systems and employees, responsible for providing government-wide leadership in strategic human capital management.

**1.2** Congress should amend title 5, section 1102. (5 USC 1102), Director, Deputy Director; Associate Directors to

- Add a qualifications requirement to the position of OPM Director for demonstrated leadership experience and human capital management expertise (Section 1102 (a)).
- Add a statutory requirement for a career chief management officer, with responsibilities clearly established to assist the Director and Deputy Director in achieving Administration priorities, while providing continuity and strengthening focus on internal agency management to deliver on mission. (Section 1102 (b)).

**1.3** Congress should amend Pub. L. 107-296, title XIII, section 1303, Chief Human Capital Officers Council, to add a rotating vice-chair from among the CHCO membership.

***Objective: Recognize the criticality of the federal workforce as the Government's most important asset for achieving agency missions and focus Congressional attention on federal workforce issues of both today and importantly, the future.***

**1.4** Congress should reestablish civil service subcommittees in the House and Senate oversight committees to (1) address the state of the federal workforce and federal human capital management; (2) promote government-wide policy and legislation in support of the workforce and OPM's role as the lead for federal civilian human capital management; and (3) advance federal human capital management reforms.

***Objective: Refocus OPM to make it a state-of-the-art human capital organization capable of elevating and supporting human capital as a strategic priority across the federal enterprise and address the needs of a 21st century federal workforce.***

AR0228

**1.5** OPM should (1) redefine the OPM mission statement and restructure the organization to effectively and efficiently execute the reframed mission priorities and (2) restore the agency's reputation for human capital leadership, expertise, and service by redirecting the internal culture and rebuilding internal staff capacity.

**1.6** OPM should establish a human capital advisory committee comprising representatives of public, nonprofit (including academia), and private sector organizations to advise OPM on emerging best practices and innovation in human capital management and to serve as a sounding board for agency initiatives.

## Section 2: Core Mission Functions and Programs

*Objective: Reorient OPM's policy development approach toward a proactive, systematic model that streamlines the federal human capital management system.*

**2.1** OPM should work with agency stakeholders to review federal human capital regulations and guidance to identify needed changes with attention to streamlining the human capital management system, clarifying requirements, reducing administrative burden, employing a more decentralized and risk-based approach, and encouraging innovation.

**2.2** OPM should develop policy guidance and information sharing practices that focus on strategic human capital management, innovation, and the identification of best practices and lessons learned.

**2.3** OPM should adopt a proactive, systematic, and inclusive approach to developing government-wide human capital policies that effectively address current and emerging workforce issues and reflect the needs of diverse stakeholder groups.

*Objective: Improve OPM's oversight programs and accelerate the shift from a strictly compliance-oriented approach to a more strategic, risk-based framework.*

**2.4** Congress should review and amend statutory mandates requiring OPM to conduct transactional approval and oversight and, to the maximum extent practical, authorize OPM to develop an alternative approach to carrying out its transactional approval and oversight responsibilities.

**2.5** OPM should adopt a more decentralized and risk-based approach to executing its transactional approval and oversight responsibilities by delegating, to the maximum extent possible, decision-making authorities to agencies and conducting cyclical reviews to ensure compliance with relevant laws, regulations, and policy guidance.

**2.6** OPM should modernize its approach to performing broad programmatic evaluations by expanding its efforts to conduct strategic and performance-oriented evaluations, focusing on government-wide, systemic issues, and providing forward-looking recommendations.

*Objective: Promote OPM's role in strategic human capital management by assisting agencies in effectively implementing federal human capital laws, regulations, and policy guidance, and enhancing federal human capital staff training.*

**2.7** OPM should provide no-fee technical assistance to agencies for policy interpretation, support, and related training, such as delegated examining training, to the extent consistent with OPM appropriations. (Note: OPM will require additional funding to provide no-fee technical training and assistance.)

AR0229

**2.8** OPM should enhance the competencies and capabilities of the federal human capital workforce by prioritizing and accelerating its efforts to upgrade the human capital competency model, institute a certificate program for credentialing staff, and expand training offerings for human capital professionals with a focus on customer service and problem solving.

*Objective: Strengthen OPM's ability to steer efforts that encourage and sustain innovation in federal human capital management.*

**2.9** OPM should expand and prioritize its role in conducting human capital management research and promoting innovative management of the federal workforce.

## Section 3: Supporting Functions Enabling Mission Execution

*Objective: Enable and realize the untapped potential of federal human capital data and data analytics as key drivers and assets in strategic human capital management.*

**3.1** OPM should initiate efforts to (1) improve the quality of the federal human capital data it collects, provide an integrated view of the federal workforce, and standardize the functional, operational, and data components of the human capital management lifecycle, and (2) broaden the availability and accessibility of the data it provides to agencies and the public, in addition to providing tools to help agencies with data collection, analysis, and reporting.

**3.2** OPM should establish a systematic approach and process to measure and track the state and capacity of the federal workforce.

*Objective: Transform OPM's human capital technology platforms and enhance the experience of OPM's customers and employees.*

**3.3** OPM should prioritize IT modernization and seek funding from Congress to modernize the eOPF and develop an employee digital record, upgrade technology systems supporting the federal retirement programs, enable a modern human capital data and analytics platform, and transform its website to be both user-centric and user-friendly.

**3.4** OPM should work with OMB and Congress to develop a clear and agreed-to plan to transition and sunset its ongoing IT operational support to the Defense Counterintelligence and Security Agency (DCSA), based on an assessment of the impact on OPM's IT budget and enterprise priorities.

*Objective: Enable more strategic and sustainable funding to support OPM's mission performance.*

**3.5** OPM should expand its ongoing re-baselining initiative to determine the cost of current OPM operations, assess the cost implications of changes recommended in this report (including provision of core human capital services currently offered on a fee-for-service basis), and identify opportunities to reduce costs and reallocate resources to accomplish mission responsibilities more effectively and efficiently.

**3.6** OPM should continue its efforts to strengthen capacity to track staff costs and implement strategic workforce planning to inform more rigorous budget justifications and manage resources more efficiently and effectively.

**3.7** Congress should provide dedicated funding to be used for specific, major OPM IT modernization projects contingent on the development of an agreed-upon roadmap based on sound IT investment planning and control processes.

AR0230

**3.8** Congress should provide authority to OPM to establish an IT Working Capital Fund, contingent on the completion of an enterprise-wide IT requirements and cost analysis to enable a more flexible and accountable internal process for funding IT operations and maintenance.

AR0231

# Introduction

The U.S. Office of Personnel Management (OPM) was created by the Civil Service Reform Act of 1978 to lead and serve as the chief human resource (HR) and personnel policy management agency for the Federal Government. To carry out that role, OPM defines its mission as providing HR leadership and support to federal agencies in "enterprise human resources management by delivering policies and services to achieve a trusted and effective civilian workforce." OPM develops government-wide HR policies and programs, directs a variety of HR services and products, oversees a merit-based and inclusive hiring process, administers retirement benefits, manages healthcare and insurance programs, and provides a variety of vetting services such as suitability determinations.[1] The agency's key functions are executed by program offices organized around the broad functional categories of human capital management leadership (policy, oversight, and services), benefits, and vetting. A description of those offices may be found in Appendix C.

The Civil Service Reform Act (CSRA) codified in title 5 establishes OPM's core functions and that of the Director in executing those functions.[2] These include:

- developing and issuing government-wide policy and regulations to promote an efficient civilian civil service.
- executing, administering, and enforcing the civil service rules and laws governing civil service and other activities of the Office including retirement and classification activities.
- advising the President on actions to promote an efficient civil service and systematic application of merit system principles, including recommending policies on the selection, promotion, transfer, performance, pay, conditions of service, tenure, and separation of employees.
- conducting research and studies to assure improvements in personnel management and recommending actions to promote an efficient civil service.
- delegating authority vested in the Director, in whole or in part, for personnel management functions including authority for competitive examinations (except administrative law judges)[3] to heads of agencies in the executive branch and setting standards that apply to delegated activities.
- establishing and maintaining an oversight program to ensure delegated authorities are in accordance with merit system principles.

The CSRA also established the Senior Executive Service and merit pay; however, the latter merit pay provision was subsequently rescinded. Many statutory provisions that pre-date the CSRA, such as the Pendleton Act of 1883 which established the principle that federal government positions should be awarded on the basis of merit and employees selected through competitive

---

1. "About Our Agency," U.S. Office of Personnel Management, https://www.opm.gov/about-us/.
2. 5 U.S.C. §§ 1101-1105
3. Exec. Order No. 13843, 83 Fed. Reg. 32755. (July 10, 2018). EO 13843 created a new Schedule E, removing administrative law judges from the competitive service.

AR0232

examinations,[4] as well as later enactments such as veterans' preference, were conveyed to OPM's purview.[5]

Over the years, legislation and executive orders have provided additional authorities and direction. Many of the authorities are quite broad entrusting the implementation to OPM's interpretation through regulations requiring public notice and other forms of guidance such as memoranda; others are more prescriptive. For example, statutes covering retirement programs and employee pay and leave set forth fairly explicit requirements. Within mandated authorities such as establishing policies—most commonly expressed as "OPM shall…"—the authority often provides broad discretion to OPM in developing the rules for agencies' execution of human capital management (i.e., the statute states that OPM shall establish civil service rules but does not explicitly direct what should be included). A plethora of authorities, some provided directly to agencies, govern the federal workforce and human capital management today, engendering complexities and disparate systems.

OPM policies, programs, and services currently support 2.1 million civilian employees, 5 million retirees and their survivors, and over 8 million employees, retirees, and their families in health care/insurance coverage.[6] Over the years, stakeholders and numerous studies, white papers, and articles have highlighted long-standing problems in federal human resource management noting that the Federal Government does not do an effective job attracting, hiring, managing, and retaining a skilled workforce and stressing the need to modernize federal HR. Strategic human capital has held a place on the Government Accountability Office's (GAO's) High Risk List since 2001. GAO subsequently refocused the risk in 2011 to addressing existing mission-critical skill gaps and using workforce analytics to predict and mitigate future gaps so agencies can effectively carry out their missions. On March 2, 2021, GAO published the latest update to the High Risk list, pointing out that federal talent management capabilities have regressed over the past few years and highlighting leadership commitment as a key issue.[7]

In June 2018, the Trump Administration published a plan—*Delivering Government Solutions in the 21st Century: Reform Plan and Reorganization Recommendations*—that included the recommendation to reorganize OPM, moving workforce policy to the Office of Management and Budget (OMB) and merging operational programs and units with the General Services Administration (GSA). The rationale cited for this significant realignment of federal civilian human resource management was that OPM was "not structured or resourced sufficiently to maintain its mission in a sustainable, secure and financial sustainable way."[8] Two major OPM data breaches identified in 2015, the first potentially compromising the personal information of more 4.2 million former and current federal employees and the second exposing background investigation records of 21.5 million current, former and prospective Federal employees and contractors,[9] together with the subsequent move of the National Background Investigations

---

4. U.S. National Archives & Records Administration, *Pendleton Act (1883)*, www.ourdocuments.gov.
5. Pendleton Act (22 Stat.43); Veterans Preference Act of 1944 (P.L. 539, 58 Stat. 387) and subsequent enactments.
6. U.S. Office of Personnel Management, *OPM Strategic Plan Fiscal Years 2018-2022,* (February 2018).
7. U.S. Government Accountability Office, *High-Risk Series: Dedicated Leadership Needed to Address Limited Progress in Most High-Risk Areas*, GAO-21-119SP (March 2021)
8. Executive Office of the President, *Delivering Government Solutions in the 21st Century: Reform Plan and Reorganization Recommendations*, (June 2018).
9. Congressional Research Service, *Cyber Intrusion into the U.S. Office of Personnel Management: In Brief,* Report #R44111, (July 17, 2015).

AR0233

Bureau (NBIB) to the Department of Defense (DOD), were highlighted to support the plan. The document noted that "structural issues and NBIB's move affecting 80 percent of OPM's revolving fund resources undercut the agency's ability to operate and maintain systems supporting the federal civilian workforce." Subsequently, the Administration developed a legislative proposal to carry out the reorganization and merger. The proposal generated copious concerns among stakeholders that it would abolish OPM as an independent establishment as expressly codified in the CSRA and raised alarms about the shifting of OPM's policy and oversight as a guardian of merit system principles to the Executive Office of the President, potentially politicizing the federal workforce.

In response to the legislative proposal, the National Defense Authorization Act (NDAA) for FY 2020 required the OPM Director to contract with the National Academy of Public Administration (the Academy) to conduct an independent study that addresses a series of questions surrounding OPM's functions and responsibilities. No transfer of OPM functions to GSA or the Executive Office of the President could take place until at least 180 days after the Academy's report is submitted to the appropriate Congressional committees and any required legislation is enacted. However, mid-way through the project, the Acting OPM Director at the time informed the Academy that the Trump Administration was no longer pursuing the merger and that OPM looked forward to the Academy's analysis of the agency's functions, identification of challenges, and recommended actions to address the challenges.

## Study Scope

The FY 2020 NDAA defined a specific set of tasks to address OPM's authorities, functions, and challenges. They include:

    A. the statutory mandates assigned to OPM and the challenges associated with the Office's execution of those mandates.

    B. the non-statutory functions, responsibilities, authorities, services, systems, and programs performed or executed by OPM; the Office's justification for carrying out such functions, responsibilities, authorities, services, systems, and programs; and the challenges associated with the Office's execution of same.

    C. the means, options, and recommended course of actions for addressing the challenges identified, including feasibility, costs, and benefits.

    D. a timetable for the implementation of identified options and recommendations.

    E. the statutory or regulatory changes needed to execute the recommendations.

    F. the methods for engaging with other federal entities potentially affected by recommendations involving change to OPM's structure, functions, responsibilities, and authorities.

    G. the views of identified stakeholders, including federal and non-federal entities or organizations representing customers and beneficiaries.

    H. such matters that the Director of OPM may prescribe.

Mid-way through the project, the Acting OPM Director at the time added to the tasking an analysis of the legislative intent of the CSRA and the role of OMB, identifying areas of overlap or conflict. The Acting Director was particularly interested in how OPM could become more efficient and

9

effective as a standalone HR agency supporting federal agencies and the federal civilian workforce.

## Results in Brief

The federal government is the largest employer in the United States. A skilled workforce is crucial to solving complex problems and executing on policy. While references to the workforce being the federal government's most important asset are common, actions to support this statement are limited, at best.

The current federal civil service system is widely recognized as rigid, outdated and in need of major reform. Despite efforts to address these issues, Federal human resource management and supporting systems remain complex, disparate, and difficult to navigate. The need for greater flexibilities to hire (and fire) has led to a proliferation of exceptions from the competitive service and afforded some much-needed flexibilities, but at the same time, engendered fragmentation of the civil service and increased complexities.

A number of cross-cutting challenges affect OPM's ability to effectively deliver on its mission to lead federal human capital management. These include (1) myriad authorities (statutes and executive orders) governing federal human capital; (2) continual churn of leadership and priorities within OPM, together with organizational silos; (3) limited use of data and data analytics to inform policy/decisions; (4) outdated information technology with attendant enterprise and operational risks; and (5) constrained financial and staffing resources affecting staff capacity and supporting technology and tools to effectively and efficiently carry out current functions. In addition, a critical overarching challenge stymies OPM's ability to exert the necessary leadership in federal civilian human resources—that is, the lack of a consistent government-wide vision of, and support for, federal human capital management. OMB's expanding role in human capital has also weakened OPM's leadership role. While a skilled workforce is critical to mission execution, human capital management continues to be viewed as an administrative mission support function on par with property, acquisition, and information technology and not accorded consistent support. That view of human capital management played out with the merger proposal and the planned move of most OPM functions to GSA. The proposed merger and move of policy functions to OMB created overwhelming uncertainty of the future among staff across the agency and, as a result, was highly disruptive, impacting agency morale, turnover, and recruitment.

OPM has weathered substantial turnover at the top, as well as throughout the Agency, in both the political and career ranks. Lack of sustained leadership has a significant impact on OPM's internal operations and employee morale and on external relationships and limits the Agency's ability to address long-term human capital management challenges.

Meeting the needs of a 21st century workforce will require a reinvigorated focus on strategic human capital management and performance. Today, widespread recognition exists across stakeholder communities of the need for an independent, enterprise-wide human capital agency and a steward of the merit system principles, along with the need to rebuild capacity, encourage innovation and become more strategic. OPM should be the lead for federal civilian human capital, setting policy, establishing a framework for agencies to manage their workforces, facilitating innovation and the sharing of best practices and lessons learned, and collecting/using data and data analytics.

AR0235

Human capital needs to be elevated and have a "seat at the table." The OPM director should be **the** principal advisor to the President on human capital, as envisioned in the Civil Service Reform Act. The OPM director should work in concert with OMB on Administration priorities—but as the clear lead on human capital matters. Making this construct real requires commitment and support from both the Administration and the Congress. It will also require a concerted effort to improve the capacity of the human resource community government-wide; training and upskilling are essential. Human capital should be a priority nonpartisan concern. To achieve the strategic vision of elevating and supporting human capital as a strategic priority across the federal enterprise, an appropriately resourced OPM will need to pivot and refresh its organization and operating model.

## Methodology

The Academy assembled a five-member Panel of Fellows to direct and oversee this study. The Panel includes experts who have extensive expertise and experience in the areas of federal human capital systems, labor management relations, technology modernization, organizational analysis and transformation, change management, stakeholder engagement, and customer experience. Panel and study team members, along with brief biographical sketches, may be found in Appendix A.

The study team conducted the assessment based on a gap analysis framework, which entailed developing a sound understanding of the current statutory and non-statutory mandates and functions of OPM, the challenges associated with OPM's execution of these functions, a vision for how the federal government and stakeholders both within and outside the government could be best served, and coherent actions to achieve that vision within a realistic level of resources. As background research, the study team collected and reviewed a wide variety of documents relating to OPM's mission, functions, processes and procedures, relevant federal laws, executive orders, and regulations, and previous reports and reviews. The team also reviewed records of hearings and other documents that shed light on past congressional activity with respect to OPM's responsibilities, functions, and structure. In addition, the study team conducted a broad literature search on human capital management, in general, and best practices.

Reviewing OPM's statutory and non-statutory functions proved arduous, given the expanse of authorities accorded to OPM through statutes, executive orders, and presidential memoranda. OPM does not maintain a central list of relevant statutes and executive orders or associated regulations developed in response to the authorities. The study team identified the mandated and nonmandated authorities and assessed the degree of specificity in the authorizing language, i.e., how prescriptive is the language limiting OPM's flexibility in developing implementing regulations and guidance or conversely, how broad in providing OPM considerable discretion in its interpretation. Identifying the level of specificity in OPM's authorities proved complicated given nuances in the statutory or executive order language. Generally, the term, "shall," is used to denote a mandatory obligation and "may" to denote discretion in translating the authority to regulatory guidance or other action. Often, the authority will include both specific requirements set in the law (or executive order) with other provisions delineated but not specifically tasked, essentially setting parameters for implementing guidance. The framing of the language significantly increases the complexity of the statutory landscape governing OPM's roles and

AR0236

responsibilities.[10] All functions executed by OPM track to statutory or executive order authorities (which also may have a statutory foundation)—that is, Congress or the President has directed OPM to perform a range of human capital management functions.

In terms of primary research, the study team gathered information through structured interviews with OPM officials and key stakeholders and experts, including officials from OMB and GSA; chief human capital officers (CHCOs) and HR directors of federal agencies; representatives of oversight entities, including GAO and the OPM Office of Inspector General; majority and minority staff on both House and Senate Oversight and Appropriations committees; officials representing unions and employee associations; and representatives from academia and good government organizations. All interviews were conducted on a not-for-attribution basis. Because of COVID-19, all interviews and discussions were conducted virtually. A complete list of interviews appears in Appendix B. The study team also reviewed numerous documents provided by OPM in response to requests for information.

The Academy study team also conducted an online survey, HR Leadership Survey, distributed to CHCOs, deputy CHCOs, and agency human resource directors to obtain a broad set of perspectives on OPM, augmenting the interviews and conversations the team had with relevant stakeholders to provide an additional data point. While the number of survey responses was lower than anticipated, responses from those who did participate were consistent with what the study team heard in interviews with HR stakeholders.

Evaluation of the civil service system and specific provisions such as hiring, compensation and classification, performance, or benefits were outside the scope of this study. Audit reports, research studies/evaluations, and white papers addressing those areas are plentiful, highlighting key issues and offering a range of potential actions to address the issues. Also outside the study scope was a detailed organizational and workforce analysis.

## Organization of the Report

This report presents the Panel's key findings and recommendations based on document reviews and interviews. The report is organized as follows:

Introduction
Section 1: OPM Role, Leadership, and Mission
Section 2: OPM Core Mission Functions and Programs
Section 3: Supporting Functions Enabling Mission Execution
Appendices

---

10. Plain Language Action and Information Network, *Federal Plain Language Guidelines*, (May 2011), 25-26. The use of "shall" has been of great debate and resulted the Federal Government's Plain Language initiatives which directed the use of "must" rather than "shall." However, widespread use of "shall" continues today.)

AR0237

# Section 1:    OPM Role, Leadership, and Mission

**The Civil Service Reform Act and OPM—Unrealized Expectations**

The Civil Service Reform Act (CSRA) of 1978 was the last comprehensive effort reforming federal human resources (HR) management.[11] By creating the Office of Personnel Management (OPM) as an "independent establishment" and central, government-wide HR management agency for the civilian workforce, it demonstrated priority attention to HR. A chief architect of the Act and the first OPM Director, Alan K. ("Scotty") Campbell, asserted that enactment of the Act signified that personnel management had taken its place among the top priorities of the federal government.[12] While the CSRA did not address pressing, but more thorny issues of classification or pay, it did place an emphasis on HR management and sought to make the federal HR system more modern and responsive.

The Act established the OPM director and deputy director as Senate-confirmed positions and designated the director position as a 4-year term appointment, not coterminous with an administration but removal by the President at will. Qualification requirements, such as experience in HR or leading large and complex organizations, were not specified for appointment to the OPM director position.

By statute, the OPM director is charged with "executing, administering, and enforcing the civil service rules and regulations of the President and the Office and the laws governing the civil service" and other activities including retirement and classification.[13] Importantly, the statute delineates the director's role—to aid the President in preparing civil service rules and to advise the President on actions to promote an efficient civil service system and a systematic application of merit system principles. It specifies certain actions for OPM including delegating personnel management authorities to federal agencies; operating an oversight program to ensure consistency with merit system principles; and promoting research, demonstration projects, and improvement efforts in such areas as recruitment, retention, and performance management, among others.

In creating OPM, the Act established a dual and at times conflicting role for the agency to both advocate for and execute on administration priorities and goals, while simultaneously ensuring protection of merit system principles as codified in the CSRA.[14] Successful execution of authorities, policies, and programs requires balancing divergent interests and requires appropriate support and resources. How this condition has played out and its impact on federal human resource management has been the subject of numerous books, studies, and white papers

---

11. The Civil Service Reform Act abolished the Civil Service Commission, the predecessor civilian personnel agency. In its place, the Act created three independent agencies: Office of Personnel Management, Merit Systems Protection Board (to oversee Federal merit systems and adjudicate on merit matters), and Federal Labor Relations Authority (to oversee Federal labor-management relations).

12. Alan K. Campbell, "Civil Service Reform: A New Commitment," *Public Administration Review* 38, no. 3 (Mar. – Apr. 1978): 99-103.

13. Civil Service Reform Act, Pub. L. No. 95-452, 92 Stat. 1111, October 13, 1978.

14. U.S. Merit Systems Protection Board, *The U.S. Office of Personnel Management in Retrospect: Achievements and Challenges After Two Decades*, (December 2001), 2, 14.

AR0238

(for example*, The Promise and Paradox of Civil Service Reform)*[15] as well as oversight reviews by the Merit Systems Protection Board (MSPB) and the Government Accountability Office (GAO).

Events from the agency's first two decades illustrate the history and long-standing challenges experienced by OPM in executing its role as the Federal Government's leader in human resource management. A change in administration not long after implementation of the Act significantly reoriented the agency's direction, recentralizing some authorities and abolishing the directorate overseeing research, as well as other research and experimentation efforts in areas such as recruitment, testing, productivity improvement, and evaluation—and ushered in both staffing and budget cuts. The cuts negatively affected staff capacity and competence with the loss of technical experts and decline in staff services and damaged OPM's reputation as the HR institution, as documented by MSPB and GAO.[16] Attention to research was restored during the following administration, in addition to efforts to rebuild competence and leadership. In a 1989 report, GAO concluded that how OPM implemented its leadership role was rooted in the changing philosophies and environment at OPM, noting that the first three directors had fundamentally different interpretations of OPM's role and different operating philosophies on OPM's functional responsibilities. Their divergent views resulted in significant shifts in focus (e.g., delegation of authorities versus centralization) and priorities.[17] During the following decade, Reinventing Government initiatives, in turn, altered OPM's culture and approach for technical assistance and working with agencies, and moved OPM to a fee-for-service model as a key funding mechanism. It also led to major government-wide budget and staffing reductions in mission support services, affecting OPM's capacity and that of federal agency HR offices, as well.

Throughout its history, OPM has routinely experienced shifts in direction and support—some especially significant and impactful. OPM's overall funding and staffing challenges have affected its ability to deliver on mission as repeatedly documented by MSPB and the OPM Office of Inspector General (OIG). The lack of clarity and consensus on OPM's mission and role has hindered the agency's ability to carry out the vision conveyed in the Civil Service Reform Act and exert the leadership necessary to tackle complex federal human capital management issues from a government-wide and forward-looking perspective. These conditions persist today as most recently evidenced in the Trump Administration's proposal to terminate its existence as an independent establishment by moving policy to the Office of Management and Budget (OMB) and merging remaining functions with the General Services Administration (GSA).

Congressional support for personnel/human capital management has also varied over the years with periods of concerted interest and actions, such as in 2002 with the passage of the Chief Human Capital Officers Act (CHCO) to strengthen federal HR, to occasions of intense oversight of administration actions or proposed legislation, such as the proposal to merge OPM with GSA. (The lack of appropriations hearings on OPM or insight into federal HR spending, as a whole, is

---

15. Patricia W. Ingraham and David H. Rosenbloom, ed., *The Promise and Paradox of Civil Service Reform*, (Pittsburgh: University of Pittsburgh Press, 1992).
16. MSPB, *The U.S. Office of Personnel Management in Retrospect*; U.S. Government Accountability Office, *Retrenchment and Redirection at the Office of Personnel Management*, GAO/GGD-83-95, (August 22, 1983); U.S. Government Accountability Office, *Managing Human Resources: Greater OPM Leadership Needed to Address Critical Challenges*, GAO/GGD-89-19, (January 1989)
17. U.S. Government Accountability Office, *Managing Human Resources*, GAO/GGD-89-19, 38.

AR0239

discussed in Section 3.) Stakeholders interviewed repeatedly expressed concern for the lack today—with a few exceptions—of Congressional champions for federal HR.

## OPM Leadership Role Weakened by Expanding Role of OMB in Human Capital Management

While the CSRA clearly established the OPM director as the advisor to the President on human resource management, that role has been diluted over the years with the creation (through the Chief Financial Officer (CFO) Act) and subsequent expanding role and influence of the OMB Deputy Director for Management. MSPB has noted that Congress intended OPM to be a proactive central personnel management agency, providing leadership, guidance and oversight, with OPM performing the role for the President in personnel management that OMB does for financial management.[18] Through legislation including the Government Performance and Results Act (GPRA) and GPRA Modernization Act, together with executive orders, OMB's role has continued to expand. In recent years, executive orders make clear OPM's need to seek review or obtain approval from OMB on presidentially directed actions. In the case of Executive Order 13932 on the assessment of federal job candidates, OPM must consult with both the OMB Director and head of the Domestic Policy Council when reviewing classification and qualification standards. Rather than being partners in government-wide federal HR management, the OPM director role is often more subordinate than of equal stature. In addition, since 2015, there have been three instances where the OMB Deputy Director for Management (DDM) also served as the OPM Director.

Most stakeholders the study team spoke with believe that OMB has a role to play in HR, working in partnership with OPM to carry out presidential priorities. However, there was also an undercurrent in these conversations that OMB was trying to supplant OPM's authority and role as the lead advisor to the President for human capital matters and concern expressed about the growth and reach of OMB's role in recent years. Some noted that OMB tended to be more innovative than OPM; others noted that OMB staff have limited or no direct experience or depth in human capital management. Virtually all believe that boundaries are necessary to ensure OPM's independence from the Executive Office of the President and the dual-hatted roles (whether temporary or not) where the OMB Deputy Director for Management is functionally also the OPM Director should be eliminated. They see each role as important with its own set of responsibilities which should not be diluted—but, most importantly, the OPM director position should be independent of the OMB DDM position.

The issue of an ***independent*** OPM markedly aroused passion among stakeholders interviewed, as they expressed serious concerns about the merger proposal and in particular, the move of policy to OMB. The need for an independent government-wide human capital agency with clear guard rails—a "firewall"—between the agency and the Executive Office of the President to protect a merit-based civil service system was a consistent theme. An underlying apprehension was concern regarding political influence on the federal civil service. Such fears appeared to come to fruition, in part, when on October 21, 2020, the Trump Administration issued Executive Order 13957 on "Creating a Schedule F Excepted Service." The new excepted service classification was designed to remove identified career staff in GS-13-15 positions in "policy-making, policy determining, or

---

18. U.S. Merit Systems Protection Board, *U.S. Office of Personnel Management and the Merit System: A Retrospective Assessment*, (June 1989).

AR0240

policy advocating positions" from the career civil service, along with the protections afforded on adverse actions and competitive selection. Agencies were to identify staff in those positions to convert and send the lists to OPM by January 19, 2021. As of that date, only OMB was reportedly in the process of implementing the executive order, moving 88 percent of its staff (425) from career positions into Schedule F. However, one of the first human resource-related acts undertaken by the new Administration on January 22, 2020 was an executive order rescinding EO 13957. In addition, legislation (HR 302) was introduced in the House of Representatives to prohibit excepted service classifications created after September 30, 2020 and to prevent the creation of any new excepted service outside the merit-based civil service system without Congressional approval.

## Need for an Independent Government-wide Human Resource Agency Affirmed

OPM was created in statute as an "independent establishment;" however, a common, government-wide definition of independent establishment or independent agency does not exist. Definitions are provided by Congress in enabling legislation for specific agencies. For example, a statute may define the degree of autonomy from the President by setting forth a term appointment for the executive leader or establishing limits as to how that person can be removed (e.g., for cause as opposed to at will). The conference report accompanying the Civil Service Reform Act confirms that OPM was expressly established as independent from the Executive Office of the President, with a 4-year term appointment for the director set in statute. The President may remove a director, however, at will.

While stakeholders the study team spoke with had varying opinions on the shape and form of the agency, they affirmed the need for a central, independent human resource management agency, with merit system principles as the cornerstone of the federal civil service system. Table 1 presents the nine merit system principles, as outlined in title 5, section 2301. In addition, stakeholders expressed the need to elevate the status of human capital and human capital management to recognize the critical role of the federal workforce.

16

*Table 1. Merit System Principles[19]*

| Merit System Principles (5 U.S.C. Section 2301) |
|---|
| 1. Recruitment should be from qualified individuals from appropriate sources in an endeavor to achieve a work force from all segments of society, and selection and advancement should be determined solely on the basis of relative ability, knowledge and skills, after fair and open competition which assures that all receive equal opportunity. |
| 2. All employees and applicants for employment should receive fair and equitable treatment in all aspects of personnel management without regard to political affiliation, race, color, religion, national origin, sex, marital status, age, or handicapping condition, and with proper regard for their privacy and constitutional rights. |
| 3. Equal pay should be provided for work of equal value, with appropriate consideration of both national and local rates paid by employers in the private sector, and appropriate incentives and recognition should be provided for excellence in performance. |
| 4. All employees should maintain high standards of integrity, conduct, and concern for the public interest. |
| 5. The Federal work force should be used efficiently and effectively. |
| 6. Employees should be retained on the basis of adequacy of their performance, inadequate performance should be corrected, and employees should be separated who cannot or will not improve their performance to meet required standards. |
| 7. Employees should be provided effective education and training in cases in which such education and training would result in better organizational and individual performance. |
| 8. Employees should be-- <br> A. protected against arbitrary action, personal favoritism, or coercion for partisan political purposes, and <br> B. prohibited from using their official authority or influence for the purpose of interfering with or affecting the result of an election or a nomination for election. |
| 9. Employees should be protected against reprisal for the lawful disclosure of information which the employees reasonably believe evidence-- <br> A. a violation of any law, rule, or regulation, or <br> B. mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety. |

Stakeholders interviewed across human capital communities define the role of an enterprise human capital agency as setting broad government-wide federal human capital policy and oversight, serving as the advocate and gatekeeper of the merit system, and facilitating innovative practices across government agencies. They see the need for a more unified approach to the

---

19. Merit System Principles, 5 U.S.C. § 2301

AR0242

federal workforce than currently exists. Chief human capital officers (CHCOs) and HR directors in agencies with multiple hiring authorities noted that opportunities exist to collapse many of the existing excepted service authorities and place greater focus on commonalities across federal agencies and occupational job families, while enabling appropriate flexibilities at the agency level to address truly unique requirements. The issues of excepted service and various flexibilities will be discussed in Section 2.

Stakeholders interviewed also expressed the need for OPM to reframe its mission to reflect the needs of a 21st century federal workforce. OPM's mission, as defined in its most recent Strategic Plan, is:

*"We lead and serve the Federal Government in enterprise human resources management by delivering policies and services to achieve a trusted effective civilian workforce."*[20]

Based on their experience, these stakeholders perceive OPM as more reactive than proactive—in essence, not delivering on that mission statement. They consistently assert the need to clarify and update OPM's mission to be more strategic and innovative, while pointing out that agencies should have the flexibility to tailor the carrying out of those policies to meet their more unique needs. An exception here is the labor union community who raised concerns that hiring flexibilities circumvent established civil service rules and statutory requirements such as veterans' preference.

Finally, stakeholders interviewed believe that OPM should be conducting appropriate oversight and most assert that oversight should extend beyond the title 5 covered federal workforce. As title 5 today does not represent the full scope of the federal civilian workforce, stakeholders believe that OPM should look across existing human capital titles (i.e., titles 10 [armed services civilian workforce], 22, 38, and 42) and view its role more broadly from the perspective of the Federal Government's employer—not just the title 5 employer.

## Impact of the Merger Proposal on OPM Operations and Staff

The impact of the proposal and related activities involving the merger of OPM with GSA and the move of policy functions to OMB was highly disruptive to the agency. Both internal and external stakeholders noted that the proposed OPM reorganization/merger, along with leadership changes (discussed below), created employee angst and uncertainty across the agency, contributing to employee turnover, declining morale, and trust issues. Staff turnover reduced staff capacity to carry out functions, while concern over the future of the agency affected recruitment. The lack of transparency and turmoil given constantly changing priorities were raised as significant issues.

None of external stakeholders interviewed by the study team supported the combined move of policy functions to OMB and full merger of OPM units with GSA—although some elements, such as moving certain transactional functions, were more amenable to some stakeholders. The proposal was largely driven by the then OMB Deputy Director for Management. With the exception of the move of the CHCO Council support staff from OPM to GSA consolidating all CXO councils' support, activities and meetings related to the merger ceased in mid-FY 2020.

---

20. U.S. Office of Personnel Management, *OPM Strategic Plan Fiscal Years 2018-2022,* (February 2018).

AR0243

The proposal largely focused on information technology (IT) systems and the move of transactions processing to GSA, with the goal of ultimately reducing the costs of the transactional services. The business case for the move did not include a cost-benefit analysis of the transfer of functions to GSA; the case for transferring policy functions to OMB was not detailed in the submission. Apart from human capital issues noted at a very high level (for example, human capital's placement on GAO's High-Risk List), the proposal did not provide a documentation of the specific problems and their root causes to support the merger.

Stakeholders' views on GSA varied on the potential for absorbing some human capital transactional services, given GSA's role in shared services and the various government-wide contract vehicles it provides. However, stakeholders pointed out that GSA does not have human capital expertise and raised alarms about moving all OPM functions, except policy, to GSA. While GSA is one of four government-wide payroll shared services providers and, in collaboration with OPM, provides agencies with access to negotiated contractual arrangements for training and consulting services, GSA itself does not offer the full suite of HR shared services. Not surprisingly, some stakeholders raised concerns about GSA's designation as the Quality Service Management Office for Civilian HR Transaction Services under the Cross-Agency Goal for Sharing Quality Services, given that responsibility for those functions resides in OPM. In discussions with GSA, the study team was told that while the proposed merger of OPM's Human Resources Solutions (HRS) would have fit with GSA's shared service initiatives, the merger as a whole would have posed significant IT risks to GSA. GSA's IT is internal facing, whereas OPM's is external facing, interacting with government and public customers.

## Lack of Sustained Leadership Impedes Mission Execution

The importance of strong, sustained leadership to organizational success cannot be overstated. OPM has weathered substantial turnover at the top, as well as throughout the agency in both the political and career ranks. Disruptive to program leaders and staff, high turnover has limited the Agency's ability to address long-term human capital management challenges and exert government-wide leadership in federal HR. Frequent leadership changes and vacancies in the program units and staff offices make it difficult to implement sustainable initiatives or priorities as priorities routinely shift while approval of plans, policies, and actions face delays or are abandoned. For example, the effort to implement a government-wide Employee Digital Record by September 30, 2019—a key strategic plan goal—was terminated when the champion left the agency.

As previously noted, the Trump Administration's proposal to merge OPM with GSA and move policy to OMB accelerated employee turnover, affected the morale of those who remained, and hindered the Agency's ability to recruit and back-fill positions. Staff capacity was a key concern consistently voiced by internal and external stakeholders, alike. As mission critical career leadership departed, and along with them institutional HR expertise, a number of those positions were filled by political appointees ("senior advisors") with varying degrees of knowledge or experience in human capital management. In some cases, the appointment was to provide a temporary stopover while the political awaited confirmation to another position and agency. For example, the position of Associate Director for Employee Services, the lead office for OPM human capital management policy, was encumbered by a political appointee awaiting confirmation as a

AR0244

member and Chairman of MSPB. Historically, political appointees were assigned to high level and supporting positions in the Director's immediate offices. They typically were not assigned to positions in program offices where they replace career staff with institutional program knowledge.

The total number of political appointees (89) at OPM during the Trump Administration term exceeded that of the prior Administration's two terms (73), reflecting the churn of staff. Entering the start of FY 2021, there were 39 appointees, the highest number historically, eclipsing the prior high of 38 that occurred during the Reagan Administration. Four of the appointees, including the Associate Director in Employee Services, were leading program units, traditionally led by career staff. Since 1981, the number of political appointees has varied from a low of 15 to the most recent high of 39.[21]

Undoubtedly, the most significant leadership issue was the lack of sustained leadership at the director and deputy director levels, a situation crossing recent administrations. Vacancies create uncertainty and acting leaders generally lack the organizational and political clout to forge strong relationships with myriad stakeholders.

The last confirmed OPM director to serve a full 4-year term was John Berry, 2009-2013. Since then, there have been just three confirmed directors—Katherine Archuleta (2013-2015); Jeff Pon (serving 7 months in 2018), and Dale Cabaniss (serving 6 months, 2019-2020). Acting directors have served in the interim, with three of the acting serving in dual hatted roles of Acting OPM Director and OMB Deputy Director for Management.

The situation is even starker for the deputy director position. From 2010 through the last confirmed Deputy Director in 2018—who simultaneously served as the Acting OPM Director and Acting OMB DDM (and for a short time was also the Acting Federal Chief Information Officer [CIO]—there was just one Senate confirmed deputy, Christine Griffin (2010-2011); no executive served in an interim capacity as acting deputy during that time. GPRA-MA established the chief operating officer (COO) role in CFO agencies and identified the deputy position as the principal to carry out the responsibilities. As a CFO agency, OPM has essentially been without a sustained deputy and official COO for more than a decade. To fill the void, OPM established a COO position in 2012, which was incumbered by three different career executives through 2015. The position was replaced by a career chief management officer (CMO) position in 2016 when the acting director at the time determined that the COO role should be reserved for the deputy. Since then, OPM has had a CMO of record—however, responsibilities have varied. Most recently, the functions were split between the career CMO who had oversight for strategic planning and a political appointee whose official title was Senior Advisor to the Director for Operations, a non-existing position. The position descriptions for the two roles were virtually identical. The career CMO had no direct reports whereas the Senior Advisor, typically a staff role, did. Lack of a consistent leadership roles and attention to management issues makes it difficult to break down organizational silos and both set and follow through on strategic direction.

---

21. Analysis based on published Plum Books and Government Accountability Office, *Political Appointees: 10 Year Staffing Trends at 30 Federal Agencies*, GAO/GGD-93-74FS.

AR0245

## CHCO Council—Missed Opportunities to Advance Federal Human Capital Management

The Chief Human Capital Officers Act of 2002 established (1) the CHCO position, elevating attention to human capital management in agencies, and (2) the CHCO Council to advise and coordinate the activities of agency members on such matters as modernization of HR systems, improved quality of HR information, and legislation affecting HR operations and organizations—essentially, provide a strategic focus. The extent to which the Council has fulfilled that vision has varied over the years. By statute, the OPM director is the chair; the OMB DDM, the vice chair. The chair sets the tone; how often the Council meets and how it has functioned varies by who is sitting in the leadership chair and how it aligns with his or her priorities. Council membership comprises CHCOs from the fifteen executive departments with an additional twelve from agencies designated by the OPM director.

The CHCO Council Charter, effective May 24, 2003, reprises the authority, functions, and requirements set forth in the CHCO Act; the latter requirements include ensuring that representatives of labor organizations attend at least one Council meeting each year and submitting an annual report to Congress. Administrative roles and responsibilities are not defined, beyond a broad overview of meetings scheduled at the direction of the chair and committees—both standing and ad hoc—which again can be established by the chair.

Unquestionably, OPM leadership turnover has impacted the CHCO Council. OPM's level of engagement with the CHCO Council has diminished over the years; meetings are infrequent and largely consist of sharing of information by OPM. The statutorily required annual reports are not widely shared and at times, inconsistently prepared. The study team was told that FY 2019 annual report was the first in over a 4-year period. However, hard copies were just recently located for 2016 and 2018. These latter reports are not posted on the CHCO Council member website, and none (past or present) are publicly available. In Council meetings, information typically flows down, rather than a robust dialogue transpiring on issues and concerns raised by members. GAO has repeatedly recommended that OPM work with the CHCO Council to address open priority recommendations. Of the current open priority recommendations, six include working with the Council.

From a business model perspective, OPM leadership has viewed the Council as a communications arm for the Agency more so than a partner to solve problems. In recent years, the CHCOs have voted on sets of regulatory reforms they would like OPM to pursue but have gained little traction on these reforms. Examples shared include (1) 19 deregulatory reforms proposed in 2019, generated in response to frustration over submitting requests to OPM for approval that OPM nearly always grants when other mechanisms and entities exist (e.g., Inspectors General, GAO) that could identify errors; (2) a set of legislative reforms in 2018 to ease complications in the hiring system; and (3) a group of priorities in 2017 aligned with seeking less regulation from OPM and more authority to agencies to deal with hiring shortfalls, skills gaps in the HR occupation, and HR data challenges.

From March 2020 through January 2021, no official formal meetings (i.e., meetings led by the Acting Director) were held. To fill the void, CHCO members met independently—a situation they reportedly found productive as they set the agenda and priorities. Initially, OPM and OMB were

AR0246

not invited to participate. However, they were later included in the sessions to listen and contribute, but not direct the meetings. In addition, beginning in early 2020, OPM staff hosted virtual meetings for CHCO Council members, other CHCOs, and agency HR directors to share information. These calls started out as weekly calls before transitioning to every other week. Most recently, the calls were suspended as the new Administration reinstituted the formal monthly meetings. Efforts are also underway to establish CHCO Council working groups, including a working group to update the CHCO Council charter.

CHCO members note that the present formal Council structure does not allow the CHCOs to collaborate, share their ideas and practices, and have productive discussions. CHCOs with whom the study team spoke would like to see the CHCO Council's role evolve to one of a strategic partner and advisor to OPM, with the CHCOs accorded a "voice" similar to what exists for members of the other federal CXO councils such as the Chief Information Officers, Chief Financial Officers and Performance Improvement Officers Councils, which reportedly have clout.

## OPM Role and Leadership—Roadmap to Address Challenges

The Federal Government is the largest employer in the United States. Recognition that a skilled workforce is crucial to solving complex problems and executing on policy is widespread—the need for a skilled workforce permeates virtually all programs identified by GAO as high risk. Actions are needed to support the statement that the workforce is the Federal Government's most important asset.

The current civil service system is widely recognized as rigid, outdated and in need of major reform—particularly in the areas of hiring, classification, and pay. Virtually, the same language was used to describe the situation in the 1970s that led to the passage of the Civil Service Reform Act, illustrative of the complexity of addressing core problems without champions and support in both the Executive Branch and the Congress. Over the years, numerous studies have highlighted persistent issues and suggested approaches—but no consensus exists today. More recently, studies have noted that the situation is reaching—or has reached—a crisis stage.

The need for greater flexibilities to hire (and fire) have led to a proliferation of exceptions from the competitive service, providing some helpful flexibilities but also creating fragmentation of the civil service and increasing complexities. (A more detailed discussion of this issue appears in Section 2.) A common refrain is the need to "modernize" the merit system. However, while efforts to do so may be framed as improving efficiency and effectiveness, they can also curtail civil service protections for career staff. It is not necessarily the principles that need to be modernized as much as the need to redefine how they are interpreted and executed. The challenge is to find a way to balance flexibilities and innovation while maintaining overarching merit system principles. A more comprehensive, government-wide approach is clearly indicated.

Meeting the needs of a 21st century workforce will require a reinvigorated focus on strategic human capital management and performance. Today, widespread recognition exists among stakeholders of the need for an independent, enterprise-wide human capital agency and a steward of the merit system principles, along with the need to rebuild capacity, encourage innovation, and become more strategic. OPM should be the lead for federal civilian human capital, setting policy, establishing a framework for agencies to manage their workforces, facilitating innovation and the

22

sharing of best practices and lessons learned, and both collecting and using data and data analytics.

Human capital needs to be elevated. The OPM Director should be **the** principal advisor to the President on human capital, as envisioned in the Civil Service Reform Act. The OPM Director should work in concert with the OMB Deputy Director for Management on Administration priorities—but deferred to as the clear lead on human capital matters.

The Director—and HR as a whole—needs a "seat at the table." Currently, there are no qualifications requirements in the statute for the OPM director position. A number of agency head positions, such as the Federal Emergency Management Administrator and the Internal Revenue Commissioner, have statutory qualification requirements as do other leadership positions such as appointment to a CFO position. Turnover has been a major issue—but the CSRA established a 4-year term not coterminous with the term of the President; the President may fire the incumbent at will.

To elevate human capital management requires commitment and support from both the Administration and the Congress. It will also require a concerted effort to improve the capacity of the human resource community government-wide; training and upskilling are essential. Human capital should be a priority, nonpartisan concern.

Opportunity exists for OPM to work more collaboratively with the CHCO Council to address pressing issues, including the reskilling/rebuilding of federal HR staff capacity, and to promote innovation and the sharing of promising practices. The CHCO Council should function as a key stakeholder and partner to OPM during policy development and review, employing both formal and informal channels of feedback on policies, excepted authorities, pilot programs, and the like. OPM and the CHCO Council can also create an effective partnership with the CXO councils as management priorities and initiatives depend on talent. The CXO Councils serve as an important conduit to enable and achieve mission outcomes. As such, the Council could establish a formal partnership agreement with the CXO Councils articulating how the CHCO Council can assist the CXO Councils in addressing HR challenges affecting their communities.

OPM needs to work with CHCO Council members to revise the Council Charter to clearly state the purpose, guiding principles, and organization, as well as the Council's role, responsibilities, and practices. In amending the Council Charter, OPM and Council members should consider instituting a standard schedule of meetings, establishing a number of specific standing committees, and defining a framework for how it will work with other CXO Councils. Most importantly, the OPM Director needs to actively engage the CHCO Council as a partner in promoting strategic human capital management.

## Achieving a Reframed Mission—OPM Organization and Operating Model

To both achieve the strategic vision of elevating and supporting human capital as a strategic priority across the federal enterprise and meet the needs of a 21st century federal workforce, OPM must reframe its mission, organization and supporting processes. With the proliferation of title 5 excepted authorities, OPM's current mission and focus on title 5 is clearly not sufficient to address the complex workforce issues confronting the Federal Government. A more coherent and cohesive

AR0248

government-wide approach that affords agencies flexibilities for tailoring to meet their more unique requirements is needed.

The Academy Reports, **No Time to Wait, Parts 1 and 2**,[22] provided a useful construct for reframing strategic human capital management—mission first, principles always, accountability for both. **Part 2** opined that the central human capital agency must advance the federal government's strategic human capital goals and strike a balance between centralization and flexibility, moving from a culture of compliance to a promise of performance that allows agencies to meet their varied missions. The results of this study support that view. There is a critical imperative to elevate human capital management and for OPM to strategically lead federal civilian human capital by setting policy, establishing a framework for agencies to manage their workforces, facilitating innovation and the sharing of best practices and lessons learned, and collecting/using data and data analytics. To do so will require a different OPM organization and internal culture.

Organizational structure and alignment, together with an agile operating model to execute program responsibilities, are major determinants of an organization's ability to successfully carry out its mission and strategies. To enhance OPM program execution, a review of the organizational placement of both mission and support programs is necessary to maximize performance, optimize resource allocation, and develop an operational model that will enable transforming the organization to meet reframed mission needs. The operating model includes governance, accountability, and capabilities comprising people, processes, and technology. It serves as a blueprint to translate strategy into results.

OPM needs to fundamentally transform itself to better meet the needs of a 21st century workforce and embrace a more strategic, forward-looking mindset. It needs to think beyond its predominantly compliance-oriented view. Internally, it needs to adopt an enterprise mindset to break down organizational silos. The success of these efforts hinges on a critical and foundational element—changing internal organizational culture. As many studies and articles have pointed out, this is not an easy feat; it will take a significant effort and investment on part of leaders and the workforce. But OPM can only be successful if it commits to it and is diligent to ensure the effort does not simply become a paper exercise.

Currently, OPM is not structured organizationally to deliver successfully on its mission as presently defined. The organization is largely siloed, with those silos reinforced by the funding structure—transfers from trust funds, fees from revolving funds and S&E appropriations. Dispersed physical locations can also insulate some units from feeling part of the overall organization; for example, the Retirement Operations Center is located in Boyers, PA. Under the previous Administration, clarity between line and staff functions was lacking and as career executives departed program offices, their positions were often filled by political appointees. As a result, reporting relationships and priorities changed frequently. Leadership turnover, affecting both line and staff functions, made promoting and embracing a "one OPM" vision difficult to achieve, although some efforts, according to agency officials, were active to improve collaboration and address any unintentional competition among program units. The Agency's Delegation of

---

22. National Academy of Public Administration, "No Time to Wait, Part 1 and Part 2: Building a Public Service for the 21st Century," (July 2017 and September 2018).

24

Authorities document, the key internal directive establishing clear decision-making authorities for OPM offices and leaders, was reportedly in the process of being updated; however, the directive of record, dated 2016, was clearly not current. Perhaps, not surprisingly given leadership churn, many of the political appointees with whom the study team spoke were unaware of this document laying out decision-making authorities.

OPM has neither a strategic planning office nor an overarching policy office to look across the Agency, and the Federal Government, to facilitate a workforce human capital lifecycle perspective—from recruitment to separation and retirement—in developing policy, regulations, and guidance; providing services; and crafting and sharing promising practices. During the course of study team's review, OPM disbanded the relatively short-lived Strategic Planning and Innovation office, established by Jeff Pon during his brief term as Director. According to officials, the office did not lead strategic planning; that function is principally performed by the Chief Management Officer. Organizational performance management functions, on the other hand, are housed in the Office of the Chief Financial Officer. In addition, while essentially a regulatory agency today, OPM lacks the institutionalized processes expected in a regulatory agency. Moreover, OPM is not proactive in developing legislative proposals to improve human capital management and not actively engaged with congressional committees. This lack of active engagement was recognized in the FY 2021 appropriations which designated funding for the agency to hire staff in Congressional, Legislative, and Intergovernmental Affairs.[23] The Agency also lacks a responsible official to focus on OPM's myriad customers. Internally, the management or business model is described as plan (policy), do (services) and check (oversight)—a management model most commonly applied to project management and process improvement initiatives. "Plan" does not necessarily equate to policy; "do" is primarily executed by the agencies. These are all areas that require attention as OPM evolves to achieve a reframed and more proactive mission as the Federal Government's leader in civilian human capital management to meet the needs of the 21st century workforce.

Conducting an organizational and workforce review was beyond the scope of this study. However, the Panel believes that a major transformation effort, together with a formal change management strategy, is needed and suggests that OPM consider adopting an integrated management framework to imbue an organizational culture and workplace environment in support of the reframed mission and to promote the importance of effective management practices to achieve the mission. Adopting an integrated, strategic systems thinking approach would afford OPM a more holistic view of the organization, breaking down silos, and aid in realizing the human capital life cycle in Agency efforts. It would impart the view of the Agency's interrelated dependencies and focus on the relationships between programs, processes, and people, both internal and external. Importantly, it would connect all units to a shared vision while affirming the integrity and accountability of the organization through the policies and practices that it communicates to internal and external stakeholders. As a critical step in this effort, OPM must adopt an organizational change management process to engage its employees and stakeholders, shift mindsets and behaviors, and generate commitments to change. It begins with aligning leadership, engaging in open, two-way communications, providing tools and training to shift mindsets and

---

23. "Consolidated Appropriations Act, 2021; Division M – Coronavirus Response and Relief Supplemental Appropriations Act, 2021," Pub. L. No. 116-260

AR0250

behaviors, and developing mechanisms to continuously improve by soliciting feedback throughout the process.

In December 2020, OPM let a contract for a "workforce analysis" to assist OPM in determining what actions are needed to maximize performance and to assist OPM in workforce planning to meet changes in the operating environment for both current and future work. The goal as stated is to identify the "right shape, size, cost, and agility" for OPM. It directs an evaluation of each OPM office's/unit's staffing numbers and competencies and identification of gaps across mission critical positions. The contractor is tasked with proposing a staffing level, organizational structure, and workforce plan to strengthen OPM operations. This is a perfect opportunity to link the results of this study with the upcoming workforce analysis in determining both how to realign the agency and to rebuild staff capacity. As part of this effort, an examination of the numbers and roles of political versus career staff should also be conducted.

## Panel Recommendations

***Objective: Reaffirm and broaden OPM's role as an independent entity and leader for federal civilian human capital management and reinvigorate strategic human capital management.***

**1.1** Congress should amend title 5, section 1101. (5 USC 1101), Office of Personnel Management, to clarify and redefine the role and mission of OPM as the federal government's enterprise-wide, independent federal human capital agency and steward of the merit system for ***all*** civilian personnel systems and employees, responsible for providing government-wide leadership in strategic human capital management.

Functions currently delineated in statute should be revised and expanded to clarify that OPM is responsible for:

- Working with stakeholders to develop policies that foster best practices in all human capital areas and ensure the Government has the mission critical workforce required to execute agency missions and evolving priorities.
- Delegating human capital management authorities to agencies to the maximum extent practicable and feasible and setting standards for the delegated activities.
- Refining and maintaining an oversight program to ensure delegated authorities are in accordance with merit system principles by employing efficient, risk-based, data-driven processes, developed with an eye toward reducing burdensome reporting requirements.
- Leading in the development and use of data and data analytics to forecast needs, identify systemic issues, and inform policy, oversight, and services.
- Promoting and facilitating innovation through research and pilot projects and the development of legislative proposals, where indicated, to advance innovative approaches government-wide.
- Setting standards of practice and working collaboratively with the government-wide federal human capital community.

AR0251

**1.2** Congress should amend title 5, section 1102. (5 USC 1102), Director, Deputy Director; Associate Directors to:

- Add a qualifications requirement to the position of OPM Director for demonstrated leadership experience and human capital management expertise (Section 1102 (a)).
- Add a statutory requirement for a career chief management officer, with responsibilities clearly established to assist the Director and Deputy Director in achieving Administration priorities, while providing continuity and strengthening focus on internal agency management to deliver on mission. (Section 1102 (b)).

**1.3** Congress should amend Pub. L. 107-296, title XIII, section 1303 Chief Human Capital Officers Council, to add a rotating vice-chair from among the CHCO membership.

***Objective: Recognize the criticality of the federal workforce as the Government's most important asset for achieving agency missions and focus Congressional attention on federal workforce issues of both today and importantly, the future.***

**1.4** Congress should reestablish civil service subcommittees in the House and Senate oversight committees to (1) address the state of the federal workforce and federal human capital management; (2) promote government-wide policy and legislation in support of the workforce and OPM's role as the lead for federal civilian human capital management; and (3) advance federal human capital management reforms.

***Objective: Refocus OPM to make it a state-of-the art human capital organization capable of elevating and supporting human capital as a strategic priority across the federal enterprise and address the needs of a 21st century federal workforce.***

**1.5** OPM should (1) redefine the OPM mission statement and restructure the organization to effectively and efficiently execute the reframed mission priorities and (2) restore the agency's reputation for human capital leadership, expertise, and service by redirecting the internal culture and rebuilding internal staff capacity. Among priorities, OPM should:

- Focus on addressing organizational culture issues and silos—in particular, the widely held perception of customers that OPM's mantra is "just say no."
- Identify critical staff skill gaps in human capital competencies and analytical skills, such as data analysis.
  - o Institute a formal knowledge management approach within the agency to strengthen internal knowledge management transfer and minimize the loss of institutional knowledge resulting from staff retirements and attrition.
  - o Consider establishing a rotational program between OPM and agencies' human capital staff to enhance knowledge sharing.
- Establish a strategic planning and policy office.
  - o Within the office, establish a regulatory affairs function to take a government-wide view of all OPM's policy development and issuance processes (including suitability, insurance, and retirement policy) and coordinate policy issuances across program units and externally to avoid inconsistent, incompatible, or duplicative policies.

AR0252

> ○   Consider establishing a chief customer experience officer.

**1.6** OPM should establish a human capital advisory committee comprising representatives of public, nonprofit (including academia), and private sector organizations to advise OPM on emerging best practices and innovation in human capital management and to serve as a sounding board for agency initiatives.

AR0253

# Section 2:    OPM Core Mission Functions and Programs

OPM carries out a broad range of functions and activities in fulfilling its responsibilities as defined in the Civil Service Reform Act (CSRA) of 1978 and codified in title 5 of the U.S. Code. Executive orders and amendments to title 5 further delineate agency responsibilities and tasking. Core mission functions include policy, oversight, and program execution. In addition, OPM provides a wide range of services in support of those core functions.

The state of the federal civil service system and government-wide human capital management, and how well OPM performs its leadership role and executes the core mission functions in support of the federal workforce, are the subject of numerous studies and audits. Typically, these reports include a broad array of recommended actions from incremental changes in programs and processes to major reforms for the Agency and for lawmakers. Addressing the underlying issues that affect OPM's capability, capacity, and credibility to perform and fulfill the role of advancing human capital management government-wide is especially critical, given the challenges confronting the Federal Government and its workforce today and tomorrow.

## 2A: Policy

### Reorientation Needed from Reactive to Proactive, Forward-Looking Policy Development

Policy development is core to OPM's mission. The CSRA assigned OPM the responsibility to prepare civil service rules, advise the President to promote an efficient civil service system, and recommend policies relating to the selection, promotion, transfer, performance, pay, conditions of service, tenure, and separation of employee.[24] While responsibility for policy development is split among a number of program units depending on the program such as retirement, healthcare and insurance, and suitability, the office with the lead policy responsibility for employee selection through separation is Employee Services (ES).

The intent of the CSRA was that OPM would take a proactive role in developing policy. Studies and reviews by the Merit Systems Protection Board (MSPB) and others have found OPM to be more reactive than proactive in policy development. The study team's analysis supports that view—OPM mostly takes a reactive approach, developing and issuing regulations and policy guidance to meet the requirements of laws or executive orders. Seldom does it pursue a legislative or regulatory agenda promoting change. However, OPM has the responsibility to offer guidance and assistance to help agencies beyond implementing statutory requirements; it should also provide leadership in leveraging data and data analytics, solving complex human capital management problems, promoting best practices, sharing lessons learned, and encouraging innovation. Stakeholders across human resource (HR) communities stressed that the reactive approach is not sufficient. Multiple interviewees pointed out the importance of anticipating future workforce challenges and adopting an ongoing, disciplined approach to addressing long-range visioning and planning. OPM should be leading efforts to analyze emerging trends and key issues that may impact the future operating environment of the Federal Government, forecasting future

---

24. 5 U.S.C. § 1103 (a)(7)

AR0254

workforce needs, and providing guidance to help agencies look ahead to what is coming, navigate the unknown, and better prepare for the future.

Federal human capital management and supporting systems are complex, disparate, and difficult to navigate. The federal workforce is governed by a plethora of statutes, executive orders, and regulations. Principal titles in the U.S. Code include title 5 (civilian workforce), title 6 (domestic security), title 10 (armed services civilian workforce), title 22 (foreign service), title 38 (medical/healthcare), and title 42 (Public Health Service Commission Corps). Over the years, many of the changes in federal workforce authorities and programs have been granted through National Defense Authorization Acts (NDAAs), as well as agency-specific legislation and executive orders.

The growing use of hiring flexibilities and excepted service authorities has increased the complexity of managing federal HR. Excepted service employees account for about one-third of federal workers.[25] Numerous excepted service (Schedules A through E) and time-limited excepted hiring authorities are provided to agencies by OPM for title 5 covered agencies and through executive orders. In addition, agency-specific excepted hiring authorities and alternative personnel systems are granted through legislation that exempt agencies from some or all of title 5 requirements. In its report *The Excepted Service: A Research Profile*,[26] the Government Accountability Office (GAO) captures the essence of the complexity of excepted service authorities. Excepted service, as GAO has noted, is not a "coherent service;" it covers all civil service positions that are not in the competitive service or the senior executive service (SES). Exceptions are provided to agencies or to groups of employees (i.e., specific positions) under various circumstances and rationales, engendering a range of variations in the extent to which these agencies or positions are excepted. Some agencies are granted broad exceptions from title 5, while others are still subject to some sets of title 5 provisions. As a result of divergent exceptions, agencies' HR management practices differ significantly across the federal government. GAO identifies a number of challenges in examining the excepted service systematically, including the lack of a central source of information and data on the excepted service system, the varying extent of exceptions, and limited understanding of the excepted service among government officials.

While OPM reports annually on title 5 excepted authorities under its purview, a comprehensive list of all government-wide excepted service authorities currently does not exist. OPM officials note that OPM is not required to publish agency-specific excepted hiring authorities. However, Civil Service Rules IX and X do provide OPM the authority to collect civilian workforce information from all executive agencies and review agencies' HR management programs and practices.[27]

Among stakeholders, there is a pervasive view that the burgeoning number of excepted authorities is primarily the result of agencies requiring hiring flexibilities, and OPM not being responsive to agency needs. For some agencies, it is easier to seek assistance from their Congressional authorizing committees and secure personnel flexibilities through legislation. Despite the availability of numerous authorities, agencies tend to use only a limited number of them. A 2018

---

25. Congressional Research Service, *Categories of Federal Civil Service Employment: A Snapshot*, Report #R45635, (March 26, 2019).
26. U.S. Government Accountability Office, *The Excepted Service: A Research* Profile, GAO/GGD-97-72, (May 1997).
27. Exec. Order No. 13197, 3 Fed. Reg. 123197. (January 18, 2001).

AR0255

OPM study suggests that between FY 2012 and FY 2016, agencies used 51 of the 62 legal authorities available during this period, while 92 percent of excepted service appointments were made using only eleven hiring authorities.[28] Given agency usage patterns, OPM sees the value of reviewing and streamlining current hiring authorities to ensure effective use of excepted service authorities.[29] In addition, Chief Human Capital Officers (CHCOs) in agencies with multiple excepted service authorities that the team spoke with pointed to the need to consolidate the authorities, together with the need to focus on commonalities across communities and occupations or occupational families. Stakeholders representing employee unions, however, expressed concern that excepted service authorities provide avenues to circumvent competitive service and civil service protections. It is essential that flexibilities provided do not undermine civil service and merit system protections and that accountability mechanisms are in place to prevent the skirting of these protections.

General consensus exists among stakeholders interviewed that the requirements of federal HR statutes and regulations are generally restrictive with burdensome reporting requirements, affording agencies limited flexibility to hire, manage, and develop employees. A host of studies have reported long-standing concerns regarding the complexity and rigidity of the federal HR system. For example, the Academy's report *No Time to Wait: Building a Public Service for the 21st Century* points out that federal HR statutes and regulations "have not had a thorough housecleaning in more than two generations" and calls for a complete overhaul of the federal government's human capital guidance.[30] MSPB identifies the complexity of HR laws and regulations as one of the key barriers to transforming the HR workforce. According to the 2016 Merit Principles Survey, the complexity and rigidity of HR policies and procedures were cited by survey respondents as the top two factors causing difficulties for supervisors.[31] A recent report by the Center for Organizational Excellence and Senior Executives Association, *Transforming the Governance of Federal Human Capital Management,* also emphasizes the importance of streamlining and simplifying HR regulations to provide agencies the flexibility they need and recommends a "complete and thorough review of all human capital management related legislation and regulations."[32]

Actions are clearly needed to reform the federal HR system and streamline HR statutes and regulations. The study team's review of relevant statutes, executive orders, and regulations found that in some areas (e.g., federal retirement programs, healthcare and insurance, employee leave), statutory requirements tend to be prescriptive, and reforms or changes would require legislative actions; while in other areas, statutory provisions are broad and afford OPM considerable flexibility in translating the statutory requirements into regulations and guidance. In still others, there may be a mix of some specific requirements with flexibilities afforded for implementing provisions of the statute. From the study team's review, it is clear that many changes can be accomplished by OPM through administrative actions, a conclusion noted in numerous recent

---

28. U.S. Office of Personnel Management, *Usage of Ten Selected Hiring Authorities: Their Use and Effectiveness in the Executive Branch*, (July 2018), i.
29. OPM, *Usage of Ten Selected Hiring Authorities.*
30. National Academy of Public Administration, "No Time to Wait: Part 2", 4.
31. U.S. Merit Systems Protection Board, "The State of the Federal HR Workforce: Changes and Challenges," (May 2020).
32. The Center for Organizational Excellence and Senior Executives Association, *Transforming the Governance of Federal Human Capital Management: Creating Capacity to Enable Effective Change*, (July 29, 2020), 68.

AR0256

studies and white papers, including the Academy's, on the state of federal human capital management. For example, OPM is granted significant flexibility in setting pay for critical positions. Title 5 outlines two broad criteria for setting critical position pay: 1) a position that "requires expertise of an extremely high level in a scientific, technical, professional, or administrative field;" and 2) a position that "is critical to the agency's successful accomplishment of an important mission."[33] OPM, in turn, details the policy and procedural requirements (documentation, pay rate limitations, and the like) to carry out critical pay authority in the Code of Federal Regulations (CFR).[34]

OPM's flexibility in developing regulations and guidance can be limited by various executive order (EO) requirements. Some establish very specific requirements and set clear parameters within which OPM develops rules and regulations. For example, EO 13839, *Promoting Accountability and Streamlining Removal Procedures Consistent with Merit System Principles,* laid out specific requirements on agencies' removal procedures, disciplinary actions, and grievance procedures, and required agencies to submit an annual report on their adverse actions to OPM.[35]

Statutes and executive orders can create considerable burden on the federal human capital system and OPM and agency HR offices' workload. Often, new legislation will include a requirement that OPM provide a one-time report or annual reports, which in turn will require that OPM collect information from the agencies. To do so, OPM will develop and institute reporting requirements on agency HR offices. The same is true for executive orders. EO 13839, *Promoting Accountability,* noted above requires agencies to submit a report on adverse actions to OPM annually. EO 13950, *Combating Race and Sex Stereotyping,* halted diversity training until a required OPM review of agencies' diversity training programs was completed. Multiple executive orders, such as EO 13950 and EO 13957, *Creating Schedule F in the Excepted Service,*[36] were issued by the last Administration in quick succession and without advance notice to OPM staff directing OPM actions, significantly affecting its workload and priorities and that of the agencies government-wide—in turn, affecting the workforce as a whole.

OPM's current process for policy development and issuance is time consuming and appears to lack transparency. Many complained that it takes too long for OPM to issue policy guidance, and OPM does not provide status updates or expected issuance timelines. Additionally, OPM's policy communications are often not timely, and the OPM website, as a source of critical information, is neither user-friendly nor up to date. These stakeholders, however, also acknowledged the challenges confronting OPM staff—leadership turnover, changes in priorities, constrained resources, and staff turnover—and believe that staff do the best they can under trying circumstances.

OPM did not provide data on the average time required to develop and issue policy guidance. Officials told the study team that most regulations and guidance are issued before any required statutory deadline. The timeline varies greatly depending on complexity and priority. In some cases—particularly when the issue is controversial and requires broad stakeholder engagement—

---

33. 5 U.S.C. § 5377
34. 5 CFR Part §§ 535.101-535.107
35. Executive Order 13839 was revoked on January 22, 2021.
36. Executive Order 13950 was revoked on January 20, 2021. Executive Order 13957 was revoked on January 22, 2021.

AR0257

it can take months or years to develop regulations and guidance. OPM does not have a document that maps out all stages and steps of its policy development process, and the study team was told that OPM currently does not have a document management system to track documents through internal and external review processes. The previous document management system was retired in September 2020, and delays have arisen in the implementation of a new system. In the interim, OPM set up an email clearance process for document review and approval. In addition, some stakeholders noted that OPM's guidance needs to be clearer and raised concern about OPM's "one-size-fits-all" approach to policy development, which often overlooks the more unique needs of small agencies with limited resources and expertise. OPM officials repeatedly cite internal resource constraints as an issue. While agency stakeholders acknowledge OPM has resource issues, they also complain that OPM too often uses the lack of resources as an excuse in responding to agencies' suggestions.

As discussed in Section 1, OPM has not fully leveraged the expertise of the CHCO Council. Multiple studies and reviews have noted that the CHCO Council could play a more active role in advising OPM on a broad range of issues, such as policy development and implementation and setting policy priorities, to transform the federal human capital management system. For example, as GAO has noted, the CHCO Council can play a key role in "developing policies that are sensitive to implementation concerns and gain consensus and consistent follow-through within the executive branch."[37] Similarly, a number of interviewees noted that the Small Agency Human Resources Council (SAHRC), representing 102 small agencies, can serve as an important vehicle to facilitate the collaboration between OPM and agencies in developing and implementing federal HR policies more appropriately scaled to their needs.

In general, OPM lacks the institutionalized processes expected in a regulatory agency (e.g., a regulatory affairs function) to coordinate policy issuances across program units and with the Office of Management and Budget (OMB) and agencies. No one official appears to be responsible and accountable for policy. The existing Regulatory Affairs unit within the Office of Executive Secretariat mostly performs administrative support functions. OPM's Office of General Counsel (OGC) is perceived as a barrier by both internal and external stakeholders, but the extent of delays is not clear and contributing factors—such as the degree of involvement of OGC during policy development—vary.

## Action Steps to Refocus Policy Development

As the central federal human capital agency and the President's primary advisor on human capital, OPM's role in policy development needs to be reframed to focus on government-wide strategy, innovation, best practices, and lessons learned. The Panel believes a more proactive approach to developing policy guidance is needed to improve agencies' ability to carry out their human capital management responsibilities, meet future workforce challenges, and promote an effective civil service system.

A well-defined policy development process would also lead to more effective, responsive, and transparent regulatory decisions. Working with stakeholders, OPM should lead in developing

---

37. U.S. Government Accountability Office, "Posthearing Questions Related to Agencies' Implementation of the Chief Human Capital Officers (CHCO) Act," GAO-04-897R, (June 18, 2004), 2.

AR0258

government-wide human capital management policies and programs, employing a redefined and effective regulatory process with clearly defined roles and responsibilities, performance metrics and accountability mechanisms, while facilitating innovation and the sharing of promising practices. OPM should also promote the collection, development and use of data and technology solutions/tools to inform policy and practices, enable efficiencies, and improve transparency.

Addressing the mission critical workforce needs of today and importantly, tomorrow, requires an agile, effective, and efficient federal human capital management system. There has been a long-standing debate over centralization versus decentralization as the favored structure for federal human capital management. The Civil Service Reform Act sought to give agencies more direct control of their human capital management activities to increase the flexibility and responsiveness of the federal HR system;[38] since the passage of CSRA, OPM has undertaken various efforts to delegate operational HR management authorities to agencies.[39] The National Performance Review (NPR), a six-month initiative during the Clinton Administration that spurred many changes in the federal HR system, also pushed for maximum delegation of authorities to agencies and highlighted that OPM's primary role is to provide expert advice and consultative assistance.[40] Over the years, many studies and reviews have emphasized the value of developing an agile federal human capital system. For example, in its report, *No Time to Wait: Building a Public Service for the 21st Century*, the Academy Panel recommends a federated model for reforming the Federal Government human capital management system. In a federated system, the role of enterprise-wide leadership would be redefined. Agencies would have significant flexibility, such as expedited hiring, to manage their workforce. At the same time, the system would bring agencies together by upholding merit system principles and establishing an effective governance structure to ensure accountability and encourage collaboration.[41]

Prioritizing and sequencing changes in current statutes, regulations, and rules to transform government-wide human capital are necessary steps to ultimately support the federal workforce. OPM needs to work with its stakeholders to conduct a thorough, systematic review of existing HR statutes, executive orders, and regulations to identify those pain points in federal human capital management that cause the most burden and should be addressed first. As the central human capital agency, OPM needs to look across the human capital titles and embrace the leadership role for the entire federal civilian workforce. Additional statutory authority beyond Civil Service Rules IX and X would provide OPM the clear authority to collect civilian employee information from executive agencies and establish accountability systems.

## Panel Recommendations

### *Objective: Reorient OPM's policy development approach toward a proactive, systematic model that streamlines federal human capital management.*

**2.1** OPM should work with agency stakeholders to review federal human capital regulations and guidance to identify needed changes, with attention to streamlining the human capital

---

38. U.S. Government Accountability Office, *Managing Human Resources*, GAO/GGD-89-19.
39. MSPB, *The U.S. Office of Personnel Management in Retrospect*.
40. *Accompanying Report of the National Performance Review*, (September 1993), 1.
41. National Academy of Public Administration, "No Time to Wait: Part 1."

AR0259

management system, clarifying requirements, reducing administrative burden, employing a more decentralized and risk-based approach, and encouraging innovation. Steps include:

- Develop a list of government-wide excepted service authorities, including title 5 and other statutorily excepted authorities, and work with constituent groups to review and update the list regularly and identify opportunities to develop a more unified approach that places greater focus on commonalities across agencies and occupations while enabling appropriate flexibilities.
- Establish a cross-cutting taskforce comprising stakeholders from the CHCO Council and representatives from agencies (large, mid-size, and small) to review human capital regulations and identify an initial set of statutory and regulatory changes offering the greatest potential to improve the effectiveness of federal human capital management.

**2.2** OPM should develop policy guidance and information sharing practices that focus on strategic human capital management, innovation, and the identification of best practices and lessons learned.

**2.3** OPM should adopt a proactive, systematic, and inclusive approach to developing government-wide human capital policies that effectively address current and emerging workforce issues and reflect the needs of diverse stakeholder groups. Actions steps include:

- Compiling a checklist to identify the key factors that OPM should consider when developing human capital policies, regulations, and guidance including consideration of the long-term impacts of proposed policies on the future workforce and potential administrative burden.
- Engaging the CHCO Council, the Small Agency Human Resources Council, and other stakeholders in developing priorities, policies, and implementation guidance and providing feedback before full roll-out government-wide.
- Reviewing the policy development process to identify opportunities to improve efficiency by (1) developing internal written guidance on policy development and issuance, addressing key working relationships, identifying performance metrics, and establishing mechanisms for accountability and (2) making broader use of technologies and data that can increase the transparency of the policy guidance development process.

# 2B: Oversight

## Shift Needed in Oversight Approach

OPM has a statutory mandate for oversight to ensure that human capital programs and activities are consistent with merit system principles and related civil service requirements. The oversight function is carried out by broad, programmatic program reviews/evaluations and studies and through actions that can be described as transactional oversight involving adjudications and approvals, based on either a statutory mandate or authority. The latter are activities for which agencies must seek permission from OPM to carry them out, sometimes down to an individual case. In addition, legislation and executive orders that impose additional reporting requirements on agencies and OPM's review of agency submissions add to OPM's transactional workload and divert attention from more strategic activities. The principal oversight office responsible for broad

35

programmatic evaluations and studies is Merit System Accountability and Compliance (MSAC). Transactional approvals and adjudication activities are carried out by different offices based on the subject matter: Employee Services (various hiring through separation approvals), MSAC (classification appeals, compensation claims), Suitability Executive Agent (SuitEA) (suitability determinations and reviews); and Retirement Services and Healthcare and Insurance (various adjudicative activities specific to their programs).

Table 2 below provides a snapshot of some OPM's transactional approvals and adjudication activities. As shown in the table, title 5 provides OPM mandates and authorities to conduct transactional reviews and approvals. In some areas, the requirements in title 5 are very specific, and OPM has limited authority or flexibility when operationalizing those legislative requirements. Any changes to those functions would require legislative action.

*Table 2. Transactional Activities*

| Transactional Activities | | Organizational Owner |
|---|---|---|
| **Approval of agencies' direct hire authority requests** | Statutory Mandate | ES |
| **Pre-appointment review and approval of conversion of employees from political positions to career positions** | Statutory Authority | MSAC |
| **Approval of agencies' special rate requests** | Statutory Mandate | ES |
| **Approval of agencies' critical positions pay rates requests** | Statutory Mandate | ES |
| **Approval of agencies' requests to waive the payment limits on Recruitment, Relocation, and Retention incentives** | Statutory Mandate | ES |
| **Approval of agencies' dual compensation waiver requests** | Statutory Mandate | ES |
| **Suitability** | Statutory Mandate | SuitEA |
| **Approval of employee cash awards over $10,000** | Statutory Mandate | ES |
| **Approval of agencies requests for Voluntary Retirement Early Authority (Voluntary Early Out/Voluntary Separation Incentive Payment)** | Statutory Mandate | ES |
| **Selective Service Registration Adjudications (determine whether failure to register was knowing and willful)** | Statutory Authority | ES |
| **Veterans Passover Requests of preference eligibles with compensable service-connected disabilities of 30 percent or more** | Statutory Mandate | ES |
| **Veteran Passover requests based on concerns of character or conduct** | Statutory Mandate | SuitEA |
| **Classification appeals** | Statutory Mandate | MSAC |
| **Job grading appeals** | Statutory Mandate | MSAC |
| **Declination of reasonable offer appeals** | Statutory Mandate | MSAC |
| **Compensation and leave claims** | Statutory Mandate | MSAC |
| **Fair Labor Standards Act claims** | Statutory Authority | MSAC |

36

AR0261

In interviews with federal agency stakeholders, the study team repeatedly heard the refrain, "Mother, may I?" as an example of OPM's current day-to-day, compliance-oriented approach. Multiple stakeholders view transactional reviews and approvals as a distraction from OPM's role to lead federal strategic human capital management. They would prefer more flexibility, with OPM performing compliance reviews on a cyclical basis rather than case by case.

Transactional activities tend to emphasize title 5 status quo and compliance with detailed rules and standards, while strategic human capital management requires a forward-looking perspective that focuses on overall merit system accountability and the future of the federal workforce. These two roles can create conflict and tension with each other. OPM officials, however, believe that transactional activities are a key element of OPM's efforts to enforce merit principles and deter noncompliance. They note that the purpose of OPM's review and approval is to help agencies detect errors and ensure that agencies' actions comply with relevant HR laws and regulations. However, adopting a more strategic approach neither negates nor devalues the importance of compliance—it simply changes how compliance is reviewed and achieved.

It is not clear how many resources are devoted to transactional activities. OPM officials noted that the amount of time required to review agencies' requests varies depending on the type of request, ranging from ten days to 90 days. OPM's Employee Services does not have staff dedicated to transactional review and approval work, and they do not track the hours spent on transactional reviews and approvals versus developing policies and regulations. Officials noted that the number of requests from agencies has remained relatively stable in most areas (e.g., Direct Hire Authority requests, Voluntary Early Retirement Authority [VERA] requests, Veteran Passover Requests, Dual Compensation Waiver Requests, etc.). There was a ten percent increase in the number of staffing variations requests, however, over the past few years.

In terms of its broader oversight role, OPM has an active program to ensure that agencies are following merit system principles. However, OPM's broad oversight evaluation efforts have suffered from declining resources. As a result, the number of evaluations conducted by MSAC has decreased over the years. MSAC used to have 95 evaluators and evaluate all delegated examining units (DEUs) on a three-year cycle (i.e., 150 DEU reviews per year); however, due to budgetary constraints, MSAC currently has 31 evaluators and conducts under 100 evaluations per year. Some interviewees noted that some agencies are paying less attention to compliance, due to OPM's diminished ability to conduct regular evaluations and audits.

In addition to regular evaluations, MSAC also performs special government-wide studies and comprehensive agency reviews. OPM has conducted four such studies/reviews, including a study on excepted service hiring authorities, a study on the Pathways Programs, a full review of Department of Homeland Security's human capital operations, and a review of the National Park Service's talent acquisition program. OPM officials noted that these types of reviews and studies can be very beneficial in improving the effectiveness and efficiency of the federal human capital system; however, OPM is not sufficiently resourced to do more of these comprehensive studies.

In the past, evaluations conducted by MSAC were more strictly compliance-oriented. More recently, OPM's approach to oversight reviews has shifted with the implementation of human capital reviews consistent with 5 CFR 250, subpart B. Stakeholders the study team spoke with

AR0262

noted the shift from compliance evaluation to performance evaluation through human capital reviews as a positive step.

## Modernizing Oversight and Ensuring Accountability

Oversight is a core mission function for OPM as the central human capital management agency. While the Civil Service Reform Act provides agencies the primary responsibility to manage their workforce, it also highlights the importance of establishing strong oversight programs to ensure agencies' execution of HR management authorities is effective and to enforce merit principles and civil service laws and regulations.[42] Without a doubt, serving as the guardian for the merit system is a critical OPM role, and one universally acknowledged by internal and external stakeholders. It is how the oversight role is executed where opinions differ. What is clear is that the role should be modernized. With a redefined mission focusing on strategy, policy, innovation, best practices, and data/data analytics, OPM needs to evolve from a predominant compliance-oriented culture to one of "trust but verify" with some clear exceptions, such as those based on statutory requirements. However, statutory requirements also need to be reviewed to assess their relevance today and to determine alternative approaches to achieve accountability.

Effective oversight should focus more on addressing government-wide issues and systemic problems. Agencies require greater flexibility to get the work done, with OPM performing periodic reviews to ensure compliance as opposed to reviewing individual cases. The goal of effective oversight should be to hold agencies accountable in a positive, principled way and help improve agencies' performance without looking over their shoulders. OPM should accelerate the shift from compliance evaluation to performance evaluation to provide forward-looking recommendations to address agencies' human capital management challenges. Transactional activities are a small piece of OPM's oversight responsibilities; however, many interviewees cited OPM's transactional reviews and approvals as a major pain point facing agencies. Accordingly, the Panel believes that it is necessary to reexamine and transform OPM's approach to carrying out this responsibility and shift to a more risk-based approach driven by data.

Effective oversight must rely on evidence and data. Data analytics and technology present useful tools to help enhance OPM's oversight capacity and reduce the administrative burden of oversight and compliance reviews. It is essential for OPM to have access to agencies' human capital management data and information to reinforce its oversight efforts to ensure merit system protection, develop best practices, identify lessons learned, and offer recommendations to help agencies improve performance. (Section 3 provides a more detailed discussion on the use data and data analytics.)

## Panel Recommendations

*Objective: Improve OPM's oversight programs and accelerate the shift from a strictly compliance-oriented approach to a more strategic, risk-based framework.*

**2.4** Congress should review and amend statutory mandates requiring OPM to conduct transactional approval and oversight and, to the maximum extent practical, authorize OPM to

---

42. U.S. Government Accountability Office, *Managing Human Resources*, GAO/GGD-89-19.

AR0263

develop an alternative approach to carrying out its transactional approval and oversight responsibilities. Steps should include:

- Reviewing statutory requirements to distinguish (1) actions where OPM has flexibility to delegate authority, (2) high-risk actions where OPM should retain decision-making authority (e.g., where there is past evidence of abuse); and (3) actions where authorities should be updated to reflect current issues or needs and where statutory changes are warranted.
- Taking appropriate actions to amend or eliminate statutory requirements.
- Authorizing OPM to develop an approach in which laws, regulations, and policy guidance are enforced through delegation and periodic reviews or evaluations.

**2.5** OPM should adopt a more decentralized and risk-based approach to executing its transactional approval and oversight responsibilities by delegating, to the maximum extent possible, decision-making authorities to agencies and conducting cyclical reviews to ensure compliance with relevant laws, regulations, and policy guidance. The effort should include developing:

- Policy guidance on how agencies should review transactional cases and exercise decision-making authorities.
- Delegation agreements which set the minimum standards of performance and describe OPM's oversight approach and agency responsibilities (for example, agencies routinely reporting to OPM information relating to their activities under the delegated authority and OPM's authority to require an agency to take corrective action and suspend or revoke a delegation agreement if the agency fails to comply with relevant laws, regulations, or the provisions of the delegation agreement).

**2.6** OPM should modernize its approach to performing broad programmatic evaluations by expanding its efforts to conduct strategic and performance-oriented evaluations, focusing on government-wide, systemic issues, and providing forward-looking recommendations.

## 2C: Services

### Re-Examining Customer-Focused, Fee-Based Products and Services

OPM's Human Resources Solutions (HRS) provides a variety of fee-based HR products and services, both general and customized, to enable agency talent acquisition, management, and workforce performance consistent with an administration's goals and government-wide HR policy guidance. Services include common HR technology systems, recruiting, staffing and candidate assessments, leadership development, training and upskilling of HR professionals, classification and job design, performance management, workforce/succession planning and restructuring, human capital shared services and solutions, and assisted HR acquisition services. Overall, the fee-based services score positively on customer satisfaction. HRS' customer surveys show that, over the past few years, the vast majority of customers (from 90 to 97 percent) believed HRS services contributed to improving organizational effectiveness and indicated that they would

39

recommend HRS to other government organizations.[43] A widespread perception among stakeholders is that HRS staff—including organizational psychologists, HR specialists, educators, training and development professionals, project managers, and contract administrators—are dedicated, knowledgeable, and professional. OPM officials note that HRS' close working relationship with Employee Services and other program units has enhanced its ability to assist agency customers. HRS has also established partnerships with private sector firms, academic institutions, and non-profit organizations to deliver human capital management services.

Multiple agencies find HRS' services, such as USA Staffing, USAJOBS, assessment tools, training, and the like, useful but expensive. Providing common, enterprise-wide technology platforms was identified as a priority service for a central human capital agency by respondents to the HR Leadership Survey administered by the study team. The importance of having a common, customer face to the public was also noted during interviews with stakeholders. Based on agency stakeholder interviews and those with HRS officials, more agencies appear to be moving to USA Staffing and USAJOBS. USA Staffing's onboarding platform was recently recognized as a 2020 Igniting Innovation Award winner by ACT-IAC on September 3, 2020. On the other hand, assisting with acquiring human capital services ranked last on the survey in the importance of OPM providing the service. Some stakeholders asserted that acquisition is not OPM's area of expertise, and other agencies, such as GSA, are probably better suited to providing such services. Still others, in particular small agencies, found the acquisition service helpful. OPM officials noted, however, that as part of its acquisition services, OPM provides assistance to agencies in clarifying human capital requirements and connecting them to agencies' mission needs.

Statutory authority to charge a fee for training, technical assistance, and services has been in place since FY 1970.[44] Revolving fund authority was made more explicit and broadened through the Reinventing Government initiatives and significant government-wide budget and staffing reductions in the 1990s. As a result, the Agency has become reliant on fee-based services to fund a variety of services and internal mission support functions. Given the evolving mission of OPM and the unique value of HRS' services, many stakeholders believe OPM should not be charging for technical assistance services while recognizing that OPM would need additional funding to do so. An overarching concern raised by stakeholders and MSPB during oversight reviews is that a conflict of interest arises when OPM offers fee-based services to help agencies implement OPM-developed policies and guidance, while at the same time it conducts oversight of these agencies. Agencies are not required to purchase the services from OPM, however; they can choose other sources for customized assistance. And, policy and oversight reside in different program units. Still, the current approach can present the appearance of a conflict of interest as HRS staff at times participate in human capital reviews led by their colleagues in MSAC with ES involvement.

Employee Services serves as the definitive source for HR policy guidance and provides agencies policy interpretation assistance. Compared to the technical assistance provided by ES, HRS' customized services always require more time and involvement with agencies. For example, ES provides limited government-wide training to assist agencies in interpreting new policy or policy changes. When an agency requests customized training that requires a deep dive into the agency's specific operational needs, HRS' services become a better option according to OPM officials.

---

43. HRS Briefing for Dale Cabaniss, (March 19, 2019).
44. Public Law 91-189 (December 30, 1969)

AR0265

However, ES will defer to HRS for any training that exceeds three hours, per OPM officials. As a result, it is often difficult, in practice, to draw a clear line between the policy interpretation support provided by ES and the customized support provided by HRS. The fee-based funding model also appears to create disincentives for ES to go above and beyond providing basic policy implementation assistance.

Many stakeholders stressed that services and assistance related to OPM's core mission should be provided to agencies without charge—specifically, OPM's policy interpretation support and training should be available at no-cost to agencies. As the lead in federal human capital management, OPM has the responsibility to assist agencies in interpreting complex HR rules, regulations, and policies. A salient example of desired no-cost assistance is delegated examining (DEU) training. All HR staff involved in delegated examining activities are required to be certified by OPM—the certification lasts for three years and then must be renewed. OPM currently offers a three and a half day training program at a cost of $1,142 per participant to help HR practitioners prepare for the certification test; however, federal HR staff are reportedly not taking the training due to limited funding and resources.[45] The appropriateness of OPM charging for delegated examining training is questionable given the requirement for certification; OPM has acknowledged it has a "vested interest in training employees who can perform examining functions well and in a manner that is defensible."[46] Moreover, DEU training in the past was provided by OPM at no charge.

In some areas, on the other hand, it may be necessary for OPM to continue to offer services on a reimbursable basis—for example, charging agencies for the use of common HR technology platforms (i.e., the USA suite) given vendors' licensing fee structures. In addition, leadership and professional training, which is different from technical assistance, has always been available to agencies on a fee basis.

## Executive and Leadership Development: Building Federal Workforce Capabilities

The lack of effective employee training and development is not a new issue for the Federal Government. In a budget constrained environment, employee training and development budgets are typically among the first to be cut. A host of studies have raised concerns about underinvestment in federal employee training.[47] The lack of capabilities and competencies has become a significant workforce issue: the need to close mission critical skills gaps has been on GAO's high-risk list since 2011. Prior to the Reinventing Government initiative, OPM had the lead role as the Government's trainer for the civilian workforce. OPM still has a key role as a designated provider of leadership development, particularly for the SES corps through the Federal Executive Institute (FEI), but other providers and vendors conduct the majority of training for the federal workforce.

Today, OPM's Center for Leadership Development (CLD), housed within HRS, offers a variety of leadership and professional development programs for federal executives, managers, and

---

45. U.S. Merit Systems Protection Board. "Issues of Merit," (September 2020).
46. U.S. Office of Personnel Management, "OPM Delegated Examining Certification Program Guide," (July 2019).
47. Partnership for Public Service, *Closing the Gap: Seven Obstacles to a First-Class Federal Workforce*, (August 18, 2010).

AR0266

employees at all levels. In FY 2018, 15,505 federal employees participated in CLD's leadership and professional development programs.[48] CLD plays an active role in assisting agencies in addressing existing and emerging skills gaps and developing their learning systems. For example, CLD worked with the Department of Homeland Security to offer the first pilot program for senior leaders in the area of cyber security and four SES labs on preparations for cyber-attacks. Additionally, CLD (USA Learning) and the Department of Defense (DOD) formed a major partnership to modernize the IT infrastructure to support DOD's online education system. As a part of this effort, CLD is working with DOD to develop an Enterprise Course Catalog, which will allow individual DOD components to manage their own learning materials (i.e., local catalogs) and also aggregate the information from local catalogs to a single, department-wide web portal accessible to users across the Department. The effort represents about 80 percent of USA Learning's revenues; in FY 2019, DOD represented $112 million of OPM's USA Learning sales/agreements.

CLD's programs are uniquely designed and delivered to meet the requirements of the federal workforce. Many studies have highlighted the differences between private sector and public sector leadership. Public sector employees operate under various constraints placed by the political environment (e.g., public scrutiny and legislative oversight); a primary task for public sector leaders is to develop and maintain effective relationships with a wide range of stakeholders. Given the unique mission, culture, and tasks of the public sector, the skills and competencies required for effective public sector leadership differ significantly from the private sector. As a McKinsey study noted, "Context is a critical component of successful leadership. A brilliant leader in one situation does not necessarily perform well in another."[49] OPM officials stated that CLD's training programs emphasize addressing the distinctive situations public sector leaders encounter and focus on both "what it means to lead in the public sector" and "how to be successful in the Federal Government." All CLD's courses and programs are designed based on current literature in management, public administration, and public policy and reflect the priorities of the administration at the time.

Some stakeholders raised the issue of whether the current organizational placement of CLD as a subunit in HRS affects its ability to serve agency customers. CLD is a critical component of building federal workforce capacity. Residing in HRS limits CLD's visibility to customers. Additionally, education and training are different from the consulting services and implementation support provided by other subunits of HRS. HRS' operating model and requirements do not always fit CLD's distinctive mission. For example, as some interviewees argue, CLD is constrained by some of the HRS' operational requirements, such as business development, marketing, and sales reporting.

## HR Staff Development: Capacity Building Essential to Advance Human Capital Management

The quality of an agency's human capital management largely depends on the capability of its HR workforce. In its report *No Time to Wait: Building a Public Service for the 21st Century*, an

---

48. HRS Briefing for Dale Cabaniss, (March 19, 2019).
49. "McKinsey Quarterly: Why Leadership Development Programs Fail," McKinsey & Company, January 1, 2014, https://www.mckinsey.com/featured-insights/leadership/why-leadership-development-programs-fail.

AR0267

Academy Panel concludes that "federal human capital management processes cannot be modernized without simultaneously and significantly improving the federal human capital profession throughout the government. The government's human capital professionals will, after all, be the guides for the transformation government needs, and the arms and legs for driving it forward."[50]

Federal HR staff skill levels vary across the government, and systematic training to help HR staff develop these skills is largely lacking due to diminished staffing and budgetary resources. Many studies have highlighted the need to strengthen federal HR workforce.[51] For example, a MSPB study asserted that federal HR staff training is "neither systematic or deep," and most agencies do not have comprehensive HR training plans or programs.[52] The absence of needed training and development opportunities inhibits HR professionals' ability to do their jobs effectively. According to the MSPB's survey, more than one-third of agency leaders were dissatisfied with the HR outcomes and HR staff in their agencies.[53]

The CHCO Council, with OPM, led an effort to establish HR University in 2011 to focus on HR specialists' competencies and curriculum. However, the effort was ultimately not sustained due to lack of funding. Since the demise of HR University in 2017, OPM has assumed the lead in establishing the Federal HR Institute (FHRI) in CLD. Currently, the courses offered by FHRI are largely viewed positively by agencies. Efforts are underway to expand course offerings and ultimately to establish a certification program for HR professionals. OPM is in the process of developing a formal program based on the latest analyses of requisite competencies and career development paths. OPM officials noted that one of the priorities for FHRI in the next five years is to establish a formal federal certification program for HR professionals in government. OPM/FHRI is exploring opportunities to collaborate with external entities to develop the certification program to leverage external expertise and resources and ensure the credibility of the certification program.

## Opportunities to Increase No-Cost Technical Assistance and Strengthen HR Staff Capacity

Policy implementation support is fundamental to the execution of OPM's mission and the quality of federal human capital management. The question of what services related to OPM's core functions should be available to agencies free of charge through appropriations must be addressed and the current fee-based funding model re-examined as OPM's mission is redefined. While it is appropriate for OPM to charge for customized consulting services, the Panel believes that services and assistance that support agencies' implementation of government-wide HR policies and regulations, such as policy interpretation support and training and DEU training, should be provided without cost. As discussed earlier, a principal differentiator between technical assistance provided by ES and HRS reimbursable services today is the amount of time and the level of involvement with an agency (i.e., training requests exceeding three hours are referred to HRS).

50. National Academy of Public Administration, "No Time to Wait: Part 2," (September 2018).
51. Partnership for Public Service, *Closing the Gap*, August 2010; Partnership for Public Service, *Embracing Change: CHCOs Rising to the Challenge of an Altered Landscape*, May 2014.
52. MSPB, "The State of the Federal HR Workforce: Changes and Challenges," 6.
53. MSPB, "The State of Federal HR Workforce."

AR0268

The Panel believes that the funding model should depend entirely on the types of services, rather than the amount of time required to provide the services.

Previous studies also identified some examples of where OPM could provide assistance without cost if appropriately funded. For example, MSPB recommends that OPM develop and provide no-cost or low-cost assessment support to enhance agencies' ability to hire the best and the brightest.[54] The Panel believes that OPM should work with Congress and the agencies to further explore opportunities to increase no-cost assistance and services to strengthen federal human capital management capabilities. OPM should also assess whether to continue providing assisted acquisition services given the usage and costs to support the program.

Improving competencies of the federal workforce through training and development is a crucial part of the government's efforts to address recruitment and retention challenges. OPM plays a unique role in helping to level the playing field by taking a government-wide approach to workforce training and development. The Federal Government needs a strong cadre of highly competent human capital professionals. Investing in staff training and credentialing will enhance the quality, efficiency, and effectiveness of federal human capital management and improve agencies' performance in the long run.

## Panel Recommendations

***Objective: Promote OPM's role in strategic human capital management by assisting agencies in effectively implementing federal human capital laws, regulations, and policy guidance, and enhancing federal human capital staff training.***

**2.7** OPM should provide no-fee technical assistance to agencies for policy interpretation, support, and related training, such as delegated examining training, to the extent consistent with OPM appropriations. (Note: OPM will require additional funding to provide no-fee technical training and assistance.)

**2.8** OPM should enhance the competencies and capabilities of the federal human capital workforce by prioritizing and accelerating its efforts to upgrade the human capital competency model, institute a certificate program for credentialing staff, and expand training offerings for human capital professionals with a focus on customer service and problem solving. Steps include:

- Working actively with agencies to identify training requirements and priorities and exploring more cost-effective training options and tools that are suitable to varying agency needs.
- Leveraging external training resources and expertise to expand human capital training offerings by certifying the training programs developed and offered by agencies or external entities.

---

54. U.S. Merit Systems Protection Board, Office of Policy and Evaluation, "MSPB Perspective: Building on OPM's Hiring Improvement Memo," (October 2019).

AR0269

- Supporting the creation of communities of practice to share promising practices and encourage cross agency collaboration.

## 2D: Program Execution

### Research and Demonstration Projects: Current Approach Limited in Promoting Innovative Human Capital Management

In enacting the Civil Service Reform Act, Congress expected OPM to exercise leadership by encouraging innovative management of the federal workforce and preparing the government to meet critical future challenges. The Senate Report accompanying CSRA states:

> *"...OPM will have the opportunity for innovative planning for the future needs of the federal workforce, executive and employee development, and pilot projects to test the efficacy of various administrative practices. Without the demands generated by a heavy day-to-day workload of individual personnel actions, OPM should provide the President, the civil service, and the Nation with imaginative public personnel administration."*[55]

CSRA provides OPM specific authority to carry out research programs and demonstration projects to test new ideas and concepts in human capital management and plan for the long-term needs of the federal workforce. However, in recent years, OPM has not actively executed this statutorily mandated authority. Since the enaction of CSRA, OPM has approved seventeen demonstration projects, covering a range of hiring and recruitment practices and processes, such as pay banding, alternative selection process, pay for performance, recruitment incentives, and motivation and retention of staff.[56] Currently, OPM has just two active demonstration projects and no active research programs; there are fifteen active DOD projects that grew out of OPM approved demonstrations. OPM officials noted that the main barrier to greater use of demonstration projects is the lengthy approval process and prescriptive project requirements defined in statute. It generally takes nine to twelve months to establish a project. Title 5 specifies procedural requirements for approving a demonstration project and limits the maximum number of active projects to ten at a time. A RAND review of demonstration projects in 2020 identifies a number of statutory and policy constraints that have limited the ability of agencies to establish demonstration projects, such as the requirement to hold public hearings, the limitation on the number of employees involved in a project, and the requirement to seek approval from Congress to make demonstration projects permanent alternative personnel systems.[57]

OPM is exploring other opportunities to collaborate with academia and research institutions to conduct research programs, although some challenges to collaboration exist in the area of federal data privacy and confidentiality. Some stakeholders pointed out that OPM does not advertise these types of innovation-based programs. They note that rather than encouraging agency participation to explore fresh ideas, OPM usually emphasizes the cumbersome approval process and steers agencies to other, more "efficient" options that rely on existing structures or authorities

---

55. U.S. Government Accountability Office, *Managing Human Resources,* GAO/GGD-89-19.
56. RAND Corporation, *Federal Civilian Workforce Hiring, Recruitment, and Related Compensation Practices for the Twenty-First* Century, (July 7, 2020).
57. Rand Corporation, *Federal Civilian Workforce Hiring, Recruitment, and Related Compensation Practices.*

AR0270

to solve their problems. GAO also pointed out that OPM did not proactively encourage agencies to participate in demonstration projects.[58]

An example of OPM's initiatives to encourage innovation is the Innovation Lab (the Lab) in HRS/CLD. Established in 2012 to build human-centered design capacity across the Federal Government,[59] the Lab has assisted various agencies in solving complex problems through a combination of both classroom-based learning and project-based learning approaches. OPM is looking to expand its capacity in this area.

## Benefits Programs: Overall Positive Feedback, but Attention Needed on Automating Processes

Employee benefits programs—insurance and retirement services—are housed in separate program units: Healthcare and Insurance (HI) and Retirement Services (RS). HI manages a range of healthcare and insurance programs offered by the Federal Government—including health insurance services, dental and vision benefits, flexible spending accounts, life insurance, and long-term care insurance programs.[60] To fulfill this function, HI is responsible for policy development, system development and implementation, operational support, and claims adjudication. RS carries out its responsibility to administer retirement programs through various activities, including prescribing relevant policies and regulations, maintaining records and service accounts, conducting eligibility determinations, and adjudicating annuity benefits.

The service programs offered by both HI and RS are largely viewed positively across stakeholder communities. The OPM OIG's 2021 Top Management Challenges report acknowledges that OPM's budgetary issues affect its ability to modernize the IT platform, process retirement claims, and manage and deliver employee benefits such as the Federal Employees Health Benefits Program (FEHB).

While concerns were raised about the timeliness of retirement processing, stakeholders were also quick to point out the complexity of the myriad retirement programs that OPM administers. They also acknowledge that many of the processing errors originate in the agencies, but agencies are often quick to point the finger to OPM for problems generated within their own domain.

Not surprisingly, widespread recognition exists of the critical need to automate the retirement process and move away from the reliance on paper, as well as the need for resources to do so. OPM's Office of the Chief Information Officer (OCIO) is working with RS to update current automated tools such as the retirement calculator and call center system. In addition, OPM also identifies insufficient staffing capacity as a primary cause for retirement processing delays.[61] OPM has taken actions to reduce the complexity and costs of administering the federal employee retirement benefit programs, a key objective in OPM's strategic plan.[62] For example, RS has

---

58. U.S. Government Accountability Office, *Federal Personnel: Status of Personnel Research and Demonstration Projects*, GAO/GGD-87-116BR, (September 21, 1987).
59. "About Us," The Lab at OPM, https://lab.opm.gov/about-us/.
60. OPM, *OPM Strategic Plan Fiscal Years 2018-2022.*
61. U.S. Government Accountability Office, *Federal Retirement: OPM Actions Needed to Improve Application Processing Time*, GAO-19-217, (May 15, 2019).
62. OPM, *OPM Strategic Plan Fiscal Years 2018-2022.*

AR0271

prioritized potential reform proposals to reduce costs and increase the portability of benefits and conducted cost-benefit analysis of these proposals.[63]

In terms of healthcare and insurance programs, stakeholders note that OPM does an excellent job negotiating with insurers and providing a broad array of benefit options. Some did point to the need, from a recruitment and retention perspective, for additional offerings to keep pace with benefit options available in the private sector. OPM expressed its commitment to improving healthcare quality and affordability in FEHB program in its 2018-2022 strategic plan (Strategic Objective 1.4),[64] and identified five strategies to support this objective.[65] Officials noted that OPM has made some limited progress in improving the FEHB enrollment experience by enhancing enrollee decision support (e.g., FEHB plan comparison tools). Additionally, OPM is exploring opportunities to streamline its current decentralized enrollment administration process and phase out the remaining (about 25 percent) paper-based process to achieve greater operational consistency and efficiency. According to OPM's FY 2020 Annual Performance Report, HI completed a detailed FEHB program-wide cost analysis of its current enrollment process, worked with OCIO to enhance the capability of the FEHB Data-Hub, and began to develop the FEHB Master Enrollment Index to serve as the central source of FEHB enrollment data.[66] Once again, OPM officials stressed that inadequate staffing and funding levels are a key challenge in HI and have limited their ability to deliver its mission.

There is a long-standing debate on the organizational placement of benefit programs—should they remain at OPM or be outsourced? The overriding view among stakeholders the study team interviewed was, "If it is not broken—don't move it." Some external stakeholders interviewed noted that retirement and health insurance are essential components of the human capital lifecycle, and accordingly, they should reside in the agency responsible and accountable for that life cycle. For example, RS and HI work closely together to manage the healthcare benefit program for retirees (i.e., FEHB), and both functions are critical HR programs and recruitment/retention tools. Other stakeholders believe that policy should remain in OPM, but transactions could be moved or outsourced, although this would require major infrastructure changes. OPM outsourced the operations of the retirement call centers in the past. However, the costs associated with the contracts were higher than expected. RS officials stated that outsourcing of the call centers was not successful because this function is not purely transactional but rather a part of the overall process and cannot be separated from the rest of the organization.

## Suitability and Credentialing: A Focus on Standards and Vetting Process Improvements

In 2019, the responsibility to conduct background investigations—suitability, fitness, credentialing, and eligibility for (1) enlistment in the military, (2) access to classified information,

---

63. U.S. Office of Personnel Management, *Annual Performance Report Fiscal Year 2020*, (January 2021).
64. OPM, *OPM Strategic Plan Fiscal Years 2018-2022*.
65. OPM, *OPM Strategic Plan Fiscal Years 2018-2022*, 11. Five Strategies to support Strategic Objective 1.4: 1) Increase the quality of healthcare received by enrollees in existing FEHB plans; 2) Increase the affordability of existing FEHB plans; 3) Improve the portfolio of available FEHB plans to increase the proportion that are quality affordable plans; 4) Improve the FEHB enrollment experience, to include enhanced enrollee decision support and greater efficiency in enrollment and premium administration; and 5) shape and respond to the regulatory and legislative environment to promote improvements in quality and affordability in the FEHB program.
66. OPM, *Annual Performance Report Fiscal Year 2020*, 32.

AR0272

and (3) holding a position that is otherwise national security sensitive—was transferred from OPM to the Department of Defense. As the Government's Suitability and Credentialing Agent, OPM retains the authority to develop and administer suitability, fitness and credentialing policies and standards, oversee agencies' suitability and credentialing determination programs, provide suitability training, and perform the suitability adjudication function in cases requiring OPM involvement. OPM's Suitability Executive Agent (SuitEA) office was established in 2016 to carry out OPM's responsibilities in the areas of suitability and credentialing. Based on the feedback collected from CHCOs and agency stakeholders, SuitEA developed a *SuitEA Strategy Map* that clearly identifies three priorities for this office, including forming an engaged suitability community, modernizing and delivering practicable and efficient policies and guidance, and providing training and educational resources.[67]

SuitEA plays an active role in promoting the efforts to improve the effectiveness and efficiency of the federal vetting process. For example, SuitEA worked closely with the Office of the Director of National Intelligence (ODNI) to implement the initiative, *Trusted Workforce 2.0,* a series of efforts to transform the federal personnel vetting model designed to support the Cross-Agency Priority (CAP) Goal on Security Clearance, Suitability and Credentialing Reform (CAP Goal 13). OPM and ODNI refined the policy framework in the *Federal Personnel Vetting Core Doctrine* to guide the development of government-wide and agency-specific vetting policies and developed an Executive Correspondence that lays out a clear roadmap to facilitate the shift to the new vetting process model, *Trusted Workforce 2.0.*[68]

## Changes Needed to Encourage Innovation and Support Employee Benefit Programs

OPM manages a wide range of programs and tools to facilitate the implementation of government-wide policies and guidance. Effective program execution plays a vital role in OPM's ability to accomplish its mission. The future presents the government with an array of challenges and opportunities, and to meet these challenges as the strategic human capital management leader, OPM has the responsibility to champion efforts that encourage and sustain innovation in managing the federal workforce. OPM is required by statute to conduct a research program and authorized to conduct demonstration projects to foster creative HR solutions in government. More flexibility in the existing research and demonstration authority is needed to promote innovation in federal human capital management.

Benefits programs represent key elements of the human capital lifecycle and should be managed by the central human capital management agency. Staffing resources and efforts to invest systematically in automating the retirement process and modernizing OPM's IT platforms are required to improve the performance of these programs. Specific actions needed to address IT systems are discussed in Section 3.

---

67. U.S. Office of Personnel Management, "Suitability Executive Agent (SuitEA) Strategy Map 2018-2020."
68. President's Management Agenda, "Security Clearance, Suitability/Fitness, and Credentialing Reform CAP Goal Action Plan," (September 2020); President's Management Agenda, "Security Clearance, Suitability/Fitness, and Credentialing Reform CAP Goal Action Plan," (January 2021).

AR0273

## Panel Recommendation

***Objective: Strengthen OPM's ability to steer efforts that encourage and sustain innovation in federal human capital management.***

**2.9** OPM should expand and prioritize its role in conducting human capital management research and promoting innovative management of federal workforce. Step should include:

- Working with agencies to leverage its existing authority to expand the use of demonstration projects and seek additional flexibility if needed.
- Reviewing and seeking authority to amend the statutory language in 5 U.S.C. 4703 to streamline and simplify the approval process for establishing demonstration projects.
- Improving the visibility and highlighting the value of research programs and demonstration projects to boost federal agencies' awareness of these options.

49

AR0274

*This page is left intentionally blank.*

AR0275

# Section 3:    Supporting Functions Enabling Mission Execution

For OPM to succeed in achieving a reframed mission and transform its approach to human capital management from a strictly compliance orientation to one more value-added, data-driven, and focused on innovation and the sharing of best practices, it will require strong, effective, and efficient support functions and systems. Attention to those supporting functions is essential—they are critical foundational elements for mission execution. Among the most significant are (1) data and data analytics to inform policy and decision-making, (2) information technology and tools to support human capital activities and practices internally and across the federal government, and (3) funding/resource structures and sources that allow the agency to carry out its myriad responsibilities.

## 3A: Federal Human Capital Data and Analytics: A Critical Strategic Asset

Better use of data and data analytics can propel strategic human capital management government-wide. By employing data and analytics, agencies can make more informed decisions on workforce planning and talent management and identify actions needed to improve organizational and employee performance. Data can be used to inform policies and conduct efficient oversight and compliance. More importantly, it can be used to identify insights and better prepare for the future as work and the workforce evolve.

Today, OPM collects and houses an array of human capital data that could be used to identify systemic issues and inform policy, but for a variety of reasons, success in leveraging the data is limited and opportunities are lost. By embracing data and analytics, OPM can play the role of a strategic, proactive human capital leader, assisting agencies with government-wide insights and truly transforming federal human capital management. By more effectively and comprehensively sharing data with federal agencies, OPM can position those agencies to further their own human capital improvements.

Currently, OPM collects a variety of human capital data on federal civilian employees. The most salient among the data sources include:

1. Federal Employee Human Resources Integration (EHRI) data warehouse—comprises human resource, payroll and training data, and the Electronic Official Personnel Folder (eOPF).
2. USA Suite of common information technology (IT) platforms—contains recruiting and applicant data, including assessment information (USA Hire, USA Staffing, USAJobs), employee performance management data (USA Performance), and employee learning and training data (USA Learning).
3. Federal employee retirement and benefits data—comprises retirement information that is primarily collected when an employee applies for retirement benefits, in addition to information on employee health benefits and insurance, including enrollment data but not claims data.

AR0276

4. Federal Employee Viewpoint Survey (FEVS)—contains data collected through an annual survey of federal employees on their work experience and views on their agency and leadership.

In addition, OPM also collects a variety of other data on agencies (and their employees) through various forums and channels, such as assessment data collected for human capital reviews and data submitted for waiver or exemption requests.

While OPM collects an extensive set of human capital data, the use of these datasets and the sharing of data with agencies are limited for a variety of reasons. For example, the information is subject to the Privacy Act and any use and disclosure must comply with the Act and implementing guidance.[69] Given the sensitive nature of personnel information and its potential for unauthorized use, there are some valid privacy concerns. Second, there are issues with the access, availability, and quality of some datasets, including lack of integration and interoperability. Finally, leadership focus and attention on the potential of data and analytics—and its impact to better inform policy, conduct more efficient and effective oversight, and enhance customer experience—are lacking.

## Federal Human Capital Data Landscape

EHRI, noted above, is the integrated source of Federal workforce data including the eOPF. It comprises four primary datasets: (1) personnel/human resources (HR), (2) payroll, (3) training, and (4) retirement data.[70] It succeeded the earlier Central Personnel Data File (CPDF) which housed personnel data and actions. The CPDF was used by policymakers, agencies and oversight agencies, and researchers to inform policymaking and evaluate and assess human capital management.[71]

Apart from payroll, training, and retirement data, OPM provides access to the above datasets and additional analysis through a number of methods: FEDSCOPE (online data visualizations and downloads), raw dataset downloads from FEDSCOPE, downloads from data.gov and other methods, including data dumps in response to Federal or oversight agency requests. Many stakeholders do not find the user interface with FEDSCOPE to be helpful, noting FEDSCOPE is difficult to navigate. Furthermore, since payroll data is not made available, an integrated view (connected with the other data in EHRI) is not available. While GAO has found a lack of systemic internal controls leading to data quality and reliability issues with the payroll data,[72] some elements of the EHRI payroll data could be reliably used today but are not.

The USA Suite of tools refers to a collection of platforms used across different phases of the federal employment lifecycle.

- **USAJobs** serves as a central place for applicants to search for and find federal job opportunities.
- **USA Hire** is an applicant assessment tool that measures general competencies and soft skills.

---

69. 5 U.S.C. § 552(a)

70. U.S. Government Accountability Office, *Federal Human Resources Data: OPM Should Improve the Availability and Reliability of Payroll Data to Support Accountability and Workforce* Analytics, GAO-17-127, (October 2016).

71. U.S. Government Accountability Office, *OPM's Central Personnel Data File: Data Appear Sufficiently Reliable to Meet Most Customer* Needs, GAO/GGD-98-199, (September 1998).

72. GAO, *OPM Should Improve the Availability and Reliability of Payroll Data,* GAO-17-127.

AR0277

- **USA Staffing** is a talent acquisition system that is used to recruit, evaluate, assess, certify, select, and onboard.
- **USA Learning** is a learning management system that offers delivery of online courses.
- **USA Performance** is a performance management system that offers automaton of the performance appraisal process.

Currently, USA Staffing and USA Performance share an interconnection with eOPF that allows the transmission of documents and forms directly into the federal employees' OPF folder. This has resulted in considerable efficiencies, including virtual onboarding during the COVID-19 pandemic. Connection with the other USA Suite tools provides potential benefits. If EHRI and eOPF data could be interconnected with USAJOBS profile data, federal employees could benefit from a more effective job search and application experience; it would also enhance the experience of job seekers with prior federal experience. Upgrading the connection between USA Staffing and eOPF could allow the creating or updating of an eOPF employee record.

In addition to the above datasets, OPM conducts the Federal Employee Viewpoint Survey (FEVS) each year which measures employees' perceptions of whether, and to what extent, the conditions characteristic of successful organizations are present in their agencies.[73] Based on the study team's HR Leadership Survey and stakeholder interviews, most agencies are increasingly using the FEVS data and find it helpful; but they also point to issues with access to more granular data (subject to privacy concerns) and the scope, length, and frequency of the survey. As a result, agencies are looking to implement their own complementary surveys.

OPM provides a few standard reports on the FEVS data each year and has issued some analytical reports in previous years on employee engagement drivers, women in federal services, millennials hiring, and the like.[74] OPM rolled out a website (see www.unlocktalent.gov) in 2013 which provided a dashboard view of some insights from the FEVS. To provide guidance on strategic human capital management in the Federal Government, OPM introduced the Human Capital Framework (HCF) in 2016, replacing the Human Capital Assessment and Accountability Framework (HCAAF).[75] While OPM has created a diagnostic tool to help agencies assess their alignment with strategic human capital management, there are no reports or assessments on the state of strategic human capital management, nor updated reports on the Global Satisfaction Index since 2017; the Unlocktalent.gov website displays a banner that it is "no longer maintained or updated since May 2020."

Currently, a consistent baseline set of workforce metrics and analyses across the Federal Government is lacking. OPM continues to miss several opportunities to better use data and analysis to inform its policymaking, including identifying future needs as the concept of work and the workforce evolve. One example of using analytics for addressing a government-wide issue is veterans' attrition.[76] OPM has the opportunity to conduct similar analyses to identify drivers for workplace challenges and develop government-wide indices. Another example is building the talent pipeline and identifying agency strategies to improve hiring of a younger workforce which

---

73. "About OPM FEVS," U.S. Office of Personnel Management, https://www.opm.gov/fevs/about/.
74. See OPM FEVS Special Reports: https://www.opm.gov/fevs/reports/special-reports/.
75. 5 Fed. Reg. §§ 250.201-250.209.
76. U.S. Government Accountability Office, *Veteran Federal Employment: OPM and Agencies Could Better Leverage Data to Help Improve Veteran Retention*, GAO-20-592, (July 22, 2020).

AR0278

is under-represented in the federal workforce. At the end of fiscal 2018, employees under 30 represented about six percent of the federal workforce, while they constituted nearly 24 percent of the employed U.S. labor force in 2018.[77]

In a similar fashion, a comprehensive view of the capacity of the federal HR workforce does not exist. As pointed out earlier, many studies have highlighted the need to strengthen the federal HR workforce. A recent Merit Systems Protection Board (MSPB) report pointed out the lack of expertise, skills, and training among HR staff in agencies.[78] However, there is very little systematic collection and analysis of data and metrics on skills, credentials, and training. Many HR specialists point to the magnitude of time spent on transactional tasks, such as processing personnel actions and data entry as opposed to serving as strategic advisors in their agencies.[79] Conducting a systematic assessment of the strategic capacity of the federal HR function could inform the training and leadership development that OPM provides through the recently instituted Federal HR Institute (FHRI).

Finally, OPM's analytical support to agencies is limited. The USA Suite of programs housed in Human Resources Solutions (HRS) have varying levels of maturity in providing analytics services to federal agencies. Officials note that they are working to expand federal agencies' access to data, build new data sources (data warehouses) to enable fast and reliable access to data, and develop new APIs to allow agencies to systematically retrieve data into their systems. During the inaugural human capital reviews led by Merit System Accountability and Compliance (MSAC), agencies identified the need to make more meaningful and strategic use of the data, in addition to tools to help with data collection, analysis, and reporting.[80] In addition to providing tools and resources, OPM can further reduce barriers and enable analytical capacity within agencies by providing government-wide human capital trends and insights, standardizing occupational definitions (e.g., the data science job series), and improving FEVS data access.

The Foundations for Evidence-Based Policymaking Act, passed in January 2019, requires agencies to modernize data management practices, building capacity to better use evidence to inform policymaking.[81] It requires each agency to name a nonpolitical chief data officer by July 13, 2019 and specifies qualification requirements for the position—data officers must have demonstrated knowledge and experience in data science, management, and analysis.[82] OPM has named an acting chief data officer—the Chief Management Officer is serving in the role—but has taken no action to fill the position permanently. This is a critical leadership position that needs to be filled given the importance of, and potential for, data to transform federal human capital management.

---

77. "Federal Figures 2019 – A Snapshot of the Federal Workforce," Partnership for Public Service, (August 13, 2019).
78. MSPB, "The State of the Federal HR Workforce: Changes and Challenges."
79. MSPB, "The State of the Federal HR Workforce: Changes and Challenges."
80. U.S. Office of Personnel Management, *Fiscal Year 2019 Human Capital Reviews* Report, (March 2020).
81. Foundations for Evidence-Based Policymaking Act of 2018, Pub. L. 115-435 (2019).
82. Foundations for Evidence-Based Policymaking Act of 2018. "The Chief Data Officer of an agency shall be designated on the basis of demonstrated training and experience in data management, governance (including creation, application, and maintenance of data standards), collection, analysis, protection, use, and dissemination, including with respect to any statistical and related techniques to protect and de-identify confidential data."

AR0279

## Challenges in Sharing HR Information and Data

Federal HR information technology (IT) systems present many similar challenges with those of broader federal IT—legacy and antiquated technologies, processes, and systems, together with a lack of standards to share information across systems.[83] As a result, many of the federal human capital systems are not interoperable, thereby creating numerous inefficiencies. Federal HR professionals continue to use these antiquated systems; and coupled with stringent compliance and reporting requirements, automating processes is challenging. Moreover, HR technology systems do not enhance the employee experience, and many are still paper based, with limited options for employee self-service.

OPM's role in Federal HR IT is through the Human Resources Line of Business (HRLOB) which was established as one of the e-gov initiatives in 2004. HRLOB was created to develop government-wide standardized and interoperable human resources solutions.[84] Through the HRLOB program, OPM is working to transform government-wide HR information technology using an enterprise approach, governance, and management to improve integration and interoperability of HR systems and promote the use of shared services. OPM recently adopted an enterprise-wide approach to data by creating a new Human Capital Data Management and Modernization Directorate. The priorities for the office include establishing data standards and improving data quality and timeliness; a critical element for focus here is to establish data standards and modernize the eOPF—all necessary elements to enable analytics.

In support of the Federal Government's move towards centralizing mission-support services and as part of the President's Management Agenda of sharing quality services, Office of Management and Budget (OMB) identified Quality Service Management Organizations (QSMOs) for several mission-support functions to promote standardization, reduce duplication, reduce operating costs, and increase customer satisfaction in the long-term.[85] While QSMOs offer technology and services in functional areas, the designated Standards Lead is charged with developing standards for the particular mission-support function. OPM is the designated standards lead for Civilian HR Transaction Services. In that role, it is responsible for defining government-wide human capital standards.

## Harnessing Opportunities to Improve the Quality and Use of Data and Data Analytics

OPM has a significant opportunity to both use and enable the use of data and analytics as key drivers in strategic human capital management, given that it collects myriad data on the federal civilian workforce across the employee lifecycle, from recruiting to employment to retirement. By connecting these datasets and using analytics, OPM can develop key insights on the federal workforce and, most importantly, insights for the future. Improving the quality of payroll data, developing standards, making the data available, and integrating the data with the rest of EHRI

---

83. Note: Federal HR IT was beyond the scope of this study; the focus here is on OPM's role through the Human Resources Line of Business (HRLOB) program to improve the integration and interoperability of HR systems.
84. "Presidential Initiatives: Human Resources Management – Human Resources Line of Business," E-Gov, https://georgewbush-whitehouse.archives.gov/omb/egov/c-6-4-human.html
85. " Centralized Mission Support Capabilities for the Federal Government," Office of Shared Solutions and Performance Improvement, General Services Administration, https://ussm.gsa.gov. Designated offices include cybersecurity, grants management, compensation management, work schedule and leave management services.

AR0280

will allow analysis of the relationship between demographics and pay disparities, employee engagement and telework, and others. By integrating HRS' USA Suite of systems with eOPF, OPM could better enable the federal government to evaluate the overall effectiveness of end-to-end human capital management including recruitment, hiring, appointing authorities, length of service, performance, and training. Interconnecting the data from these systems would enable additional insights and create efficiencies. To illustrate, integrating USAJobs data would enable hiring managers and HR professionals to analyze attrition, performance, and length of service data that would, in turn, inform recruitment, assessment, and succession planning strategies; it would also enhance the candidate employee experience (e.g., allowing federal employee applicants to bring in validated service history). Data from USA Learning could enable eOPF to capture an employee's training and development history over time, while data from USA Staffing could be used to create a new eOPF record based on the stored profile information.

Building on these sets of interconnected datasets, OPM can leverage analytics to develop key insights on the federal workforce such as:

- The capacity of the federal human capital function across the Federal Government. Providing agencies tools and resources to assess the capacity and capability of the human capital function within agencies, such as the skills and competencies of agency HR professionals, will enable OPM to provide an aggregate, government-wide picture of the HR function.
- Federal workforce health. This includes employee engagement, attrition, skills gaps, training, and the like. Assessment could drive OPM's policy development and refinement (for example, building the talent pipeline with a focus on attracting a younger workforce and addressing veterans' attrition).
- Emerging workforce needs of the future given changes in how work is carried out, the concept of work, and the composition of the workforce itself. This includes a strategic assessment of federal workforce needs, especially as agency missions and technologies evolve. Automation, artificial intelligence, digitization, and most recently, the impact of COVID-19 (which may permanently change the way work is carried out) affect the nature of work and workforce composition (e.g., more freelancers/gig workers, crowdsourcing), while evolving concepts of what constitutes a "career" will have major implications for attracting and retaining the workforce needed to address complex national problems.

OPM must provide more granular FEVS data to agencies and explore ways to expand the scope of the FEVS (e.g., including part-time seasonal employees). While there are valid privacy concerns with providing granular FEVS data, OPM must explore means to reduce the risks, such as anonymization of data, using synthetic data, and the like. In addition, it must consider forward-looking alternatives for how to provide access to data (e.g., data-as-a-service) as opposed to canned reports.

OPM has an opportunity to use data, data analytics, and emerging technologies as a resource multiplier. As an example, OPM could have agencies publish data and information on key metrics, with periodic updates. It could review specific areas of merit system compliance and human capital management, including the use of delegated authorities and exemptions. This concept is not new. In fact, the National Performance Review in 1994 had earlier identified how accountability measures can be automated to monitor delegated personal management

56

authorities by using a variety of data sources, such as the CPDF (now EHRI) and a survey of federal employees.[86] Agencies could publish data on their competitive and diversity recruitment, veterans' preference, fair and equitable treatment of employees, and use of exemptions, among others. This data, in conjunction with other data from EHRI, the USA Suite, and the like could be used as indicators of accountability. In addition, this transparency in data could potentially help with streamlining the timeline for the annual human capital reviews which now start in November, and end with feedback provided to agencies in June-July of the following year.[87]

Using automation and artificial intelligence, OPM can improve its processes and reduce the administrative burden on itself and other agencies. For example, case reviews and evaluations have checklists for their compliance evaluators, which could be automated with a bot (AI). All these actions will require investments in technology and an incremental, agile approach to pilot, test, iterate and implement, including identification of the required skillsets to implement successfully. Finally, OPM should continue and expand its partnership with the General Services Administration's (GSA's) 18F program and the U.S. Digital Services to test innovative concepts (an approach that has worked well elsewhere in federal agencies) and bring them into OPM. As an example, OPM, GSA, and U.S. Digital Services recently announced a Hiring Selection and Outcome Assessment Dashboard.[88]

As the future of work and the workforce evolve, federal HR IT needs to transform into a truly integrated, end-to-end solution to provide efficient service delivery and enhance the employee experience. Adopting a government-wide approach provides several potential benefits, such as cost efficiencies, improving service delivery and performance, and reducing risk.[89] The establishment of a common business architecture (the Human Capital Business Reference Model) is a step in the right direction. However, it needs a clear implementation plan, and more importantly, it needs to be used as a unifying framework and lens for government-wide human capital policy, processes, and technology. The supporting governance, standards, and service management functions and activities published by the Unified Shared Services Management (USSM) are necessary drivers and enablers. As the designated standards lead for HR, OPM has a critical role given that standards are a fundamental, underpinning component to enable true HR IT transformation, and ensure interoperability. As opposed to developing standards for the entire human capital management lifecycle as the starting point, OPM may benefit from adopting an agile, incremental approach by focusing on one to three functions or activities and implementing standards with feedback loops to identify lessons learned and best practices.

## Panel Recommendations

***Objective: Enable and realize the untapped potential of federal human capital data and data analytics as key drivers and assets in strategic human capital management.***

---

86. "Reinventing Human Resource Management, HRM12: Eliminate Excessive Red Tape and Automate Functions and Information," National Performance Review, https://govinfo.library.unt.edu/npr/library/reports/hrm12.html.
87. U.S. Office of Personnel Management, *Human Capital Reviews*, (May 2018).
88. "Hiring Assessment and Selection Outcome Dashboard," Enterprise Data Management Office, General Services Administration, https://d2d.gsa.gov/report/hiring-assessment-and-selection-outcome-dashboard.
89. "Federal Shared Services, State of Federal IT Report," Federal Chief Information Officers, https://www.cio.gov/assets/resources/sofit/02.04.shared.services.pdf.

AR0282

**3.1** OPM should initiate efforts to (1) improve the quality of the federal human capital data it collects, provide an integrated view of the federal workforce, and standardize the functional, operational, and data components of the human capital management lifecycle, and (2) broaden the availability and accessibility of the data it provides to agencies and the public, in addition to providing tools to help agencies with data collection, analysis, and reporting.

**3.2** OPM should establish a systematic approach and process to measure and track the state and capacity of the federal workforce. Steps should include:

- Developing and tracking a baseline set of metrics to assess the health of the federal workforce along key dimensions—recruitment, hiring, skills gaps, attrition, among others—and emerging and future workforce needs.
- Systematically assessing the strategic capacity (skills and competencies) of the federal human capital workforce and identifying actions needed to build the skills and competencies needed to carry out strategic human capital management in support of the federal workforce.

## 3B: OPM's Information Technology: The Need for Modern and Secure Systems and Tools

For OPM to be successful in its mission and effectively carry out its government-wide functions of developing human capital policy, performing oversight and administering benefit programs, it needs a capable and modern technology infrastructure. OPM's technology environment is a hybrid that includes an infrastructure that supports its internal employees and systems, tools, and applications that support its external customers, including federal agencies (e.g., USA Suite, EHRI and others), federal employees and annuitants (e.g., Retirement System, Employee Express and e-learning/training tools), and the public (e.g., USAJobs). Building on a modern information technology infrastructure and using emerging technologies, OPM can use technology as an enabler for not only providing efficient government-wide services but also transforming the customer experience.

Over the years, OPM has initiated a number of largely unsuccessful technology modernization efforts. Two primary examples with significant government-wide impact include:

- Retirement Systems Technology Modernization—The technology systems and tools used to process retirement benefits for federal civilian employees rely on outdated technology. Processing retirement actions today still involves paper processes despite OPM's attempts over the past few decades to modernize the technology platforms supporting federal civilian retirement systems. The Government Accountability Office (GAO) identified IT management weakness as a root cause in OPM's failed modernization attempts.[90]
- Employee Digital Record—OPM designated developing an employee digital record to replace the eOPF by September 30, 2020 as a strategic priority. However, the effort was abandoned in early 2020 without identifying a replacement or alternate plan.

---

90. U.S. Government Accountability Office, *Federal Retirement: OPM Actions Needed to Improve Application Processing* Times, GAO-19-217, (May 2019).

AR0283

## Outdated, Antiquated Technology Environment

Not surprisingly, the state of OPM's technology environment is the subject of a number of GAO and OPM Office of Inspector General (OIG) reports. Among priority open recommendations, GAO has highlighted the need to strengthen controls over the agency's IT systems, in addition to improving data availability and quality of the EHRI system.[91] Recent OPM OIG reports have pointed to the need for modernization and transformation of its legacy, mission-critical applications, and outdated infrastructure and processes.[92] In addition, earlier reports highlighted challenges with OPM's information security and IT infrastructure.[93] Recently, the Office of the Chief Information Officer (OCIO) contracted with McKinsey for an independent IT Assessment in September 2019 to examine its current state and develop a roadmap for IT modernization. The review recommended a phased approach focusing on stabilizing, securing, and then modernizing OPM's IT environment.[94]

Technology challenges encompass the core IT infrastructure that runs all OPM mission-critical IT applications. For example, two primary mainframes were in a flood zone with no fail-over capability and untested disaster recovery until they were successfully transitioned with backup in summer of 2020. Retirement Services still relies on paper-based processes despite multiple technology modernization attempts. The Federal Annuity Claims Expert System (FACES) calculator application, an automated tool used to determine the retirement benefits for federal retirees, is based on end-of-life technology with no audit trail or disaster recovery process.

Certain major events have amplified the impact of the above challenges in a significant manner; among them, the 2015 security breach was the most significant. The breach forced OPM and the OCIO to shift focus and divert all resources to address the fallout from the breach. At the same time, Congress transferred the background investigations function from OPM's National Background Investigations Bureau (NBIB) to the Department of Defense (DOD). Since OCIO was unable to serve as an efficient internal service provider over the past few years, shadow IT functions have grown across OPM and continue to perpetuate a fragmented approach.

Currently, OCIO continues to support the background investigation function as a service provider to DOD's Defense Counterintelligence Security Agency (DCSA). This ongoing technical support to DCSA is burdensome. It demands considerable OCIO management attention, as well as technical and customer support from OCIO staff, increases the risk posture for OPM, and distracts management attention from OPM IT priorities.

All these factors—the outdated technology environment and multiple modernization attempts, together with the transfer of NBIB which created a significant funding shortfall (discussed below)—were identified as key drivers behind the proposed merger with the General Services Administration (GSA). It is not surprising that OPM's IT challenges resulted in internal and external customer dissatisfaction. OPM's program units which support government-wide services

---

91. "Priority Open Recommendations: Office of Personnel Management," GAO-19-322SP, Gene L. Dodaro, U.S. Government Accountability Office, (April 3, 2019), (https://www.gao.gov/assets/700/698381.pdf.
92. U.S. Office of Personnel Management Office of the Inspector General, *Top Management Challenges: Fiscal Year 2021*, (October 16, 2020).
93. U.S. Office of Personnel Management Office of the Inspector General, *Top Management Challenges: Fiscal Year 2020*, (January 30, 2020).
94. U.S. Office of Personnel Management internal document: IT Assessment, (September 2019).

AR0284

and which rely on the OCIO as a service provider, have expressed the need for better customer experience, support, and modern technology systems.[95] And, while customers are generally satisfied with retirement benefits, a common theme highlighted during stakeholder interviews (representing agencies, employee unions and associations, congressional staff and the Office of Management and Budget [OMB]) was the need to prioritize the modernization of the systems supporting retirement processing and services.

## Lack of Consistent IT Leadership and Effective IT Governance: A Chronic Problem

OPM's OCIO has experienced high turnover in the CIO position together with critical IT leadership vacancies and a high number of IT staff vacancies. The most recent CIO—who on March 9, 2021 was appointed as new Federal CIO and has since moved to OMB—was the 7th CIO since 2013. Per early conversations in the study with officials, OCIO had approximately 100 vacancies representing a vacancy rate across the organization of approximately 40 percent based on 247 approved full-time equivalents (FTEs). As an example, in December 2019, all the direct line report positions to the CIO were vacant in addition to key staff vacancies in each line unit. The security breach created significant challenges to the staff morale and hindered the OCIO organization's ability to recruit IT talent; declining staff morale was further compounded by the proposed merger with GSA. This attrition also impacted enterprise priorities such as the employee digital record.

Insufficient resources hampered OCIO in a number of ways. For example, OCIO was unable to proactively engage its business partners on IT investment planning and to effectively support agency-wide IT reviews. The IT Investment Review Board just restarted in January 2021 after a hiatus of several years as OCIO had insufficient staff to support these activities. Moreover, resource constraints have impacted diligent tracking and reporting of IT investments. To illustrate, there is variance in the IT budget presented in recent Congressional Budget Justifications (CBJs) compared to what is reported on the IT Dashboard. The FY 2021 CBJ reports an enacted budget of approximately $319M for FY 2020, while the IT dashboard reports approximately $147M.[96] According to OPM officials, the discrepancy reflects delays in staff's ability to keep the dashboard up-to-date and reconcile accounts.

Over the years, OPM has failed to follow OMB's capital planning and investment control processes, including developing a sound business case for modernization initiatives and has lacked an effective IT enterprise approach, resulting in a fragmented and complex system. These factors, in addition to constraints in funding and lack of effective project management, and in combination with failed modernization efforts, have contributed to an antiquated technology environment. The security breach diverted management attention and focus and took funding away from much needed critical IT modernization efforts, in turn, generating substantial risk to the entire organization.

---

95. Summary findings from an IT Assessment conducted by an independent contractor in December 2019.
96. *U.S. General Services Administration and U.S. Office of Personnel Management: FY 2021 Congressional Justification,* General Services Administration, (February 10, 2020) https://www.gsa.gov/cdnstatic/GSA_FY2021_Congressional_Justification.pdf.; "Office of Personnel Management: Information Technology Agency Summary," Clare Martorana, https://itdashboard.gov/drupal/summary/027.

AR0285

Findings from the McKinsey independent IT assessment pointed to considerable variance in how IT costs are tracked and reported internally across OPM based on the underlying data sources, creating a lack of transparency. This hinders the ability to standardize services and provide transparent pricing to OCIO's internal customers for IT common mission support services.

## OPM's Customer Facing Website: Customer Focus Needed

As the authoritative source for Federal human capital policies, programs, and services, it is imperative that OPM's website provide easy access to information that is clear, current, and easy to find for all its audience groups which include agency HR professionals, federal employees and annuitants, and the general public. Each audience group has its own information needs. HR professionals and federal employees visit the website to find the most current OPM policy and guidance on various issues, while applicants rely on the website to learn about career opportunities and benefits.

Unfortunately, the OPM website is neither user-friendly nor user-centric. It is hard to distinguish information that is intended for HR professionals versus federal employees or the public. Further, it is not clear that the website makes use of website feedback tools and mechanisms to collect user views, a commonly accepted best practice. While some associated sites are more user friendly— e.g., Veterans Services—FedsHireVets.gov—these sites also have pages with outdated information.

Overall, the OPM website is difficult to navigate, not well organized, and lacks an integrated design. Links are not provided from organizational charts to the actual program units, and many links immediately take the user out to other sources such as the Federal Register without accompanying context. Moreover, information is often not current; in some cases, documents and pages have not been updated in years, and most of the pages do not have information on when they were last updated. For example, a visitor using an external search engine may land on and view OPM content pages, unaware and unable to determine if the content is current or outdated. Finally, the internal search engine is quite limited and does not help the visitor readily locate current information. OPM.gov does not rank as the authoritative source on the primary external search engines as content is not structured or optimized for them.

## Recent Efforts to Address IT Issues

OPM's OCIO has taken some key steps to fix OPM's IT challenges, adopting a phased approach of stabilizing, securing, modernizing, and transforming. The initial phase has focused attention on stabilizing the core IT systems—migrating the mainframes, filling critical IT vacancies, and replacing obsolete employee equipment among other priorities. The CIO has also established a key partnership with GSA's Centers of Excellence to bring in required expertise in key technology areas. As OPM's OIG noted in its 2021 Management Report, OCIO has developed a persuasive vision with a detailed plan to successfully see it through.[97] Based on the study team's review, it appears that OCIO has made considerable progress addressing IT deficiencies during the last 2-3 years. To illustrate,

---

97. OPM Office of Inspector General, *Top Management Challenges: Fiscal Year 2021.*

AR0286

- OPM's Federal Information Technology Acquisition Reform Act (FITARA) scorecard which measures the management effectiveness of IT in an agency improved from a D+ in 2017 to a C+ in 2020.[98]
- Through prioritized management attention, the mainframe migration and OPM/NBIB System decoupling, critical and foundational elements of the stabilization plan, were accomplished 2.5 months earlier than scheduled.
- OPM received Coronavirus Aid, Relief, and Economic Security (CARES) Act emergency supplemental funding to prevent, prepare for, and respond to coronavirus, including the purchase of needed technology and tools to support the OPM workforce in carrying out its responsibilities. Using an enterprise approach, with intra-agency teams and supported by agency leadership, OPM prioritized investments to implement enterprise solutions to ensure telework readiness and digitization of manual, paper-based operations. This effort was instrumental in helping the agency successfully rely on telework during the pandemic.
- As part of the Retirement Services Call Center Spike, and using an agile, incremental approach (five weeks in duration), OPM reduced sign-in failures by 47 percent and reduced claim number formatting failures by 99 percent.
- Through focused attention on the workforce, OCIO has filled key leadership vacancies and has significantly reduced the number of vacancies in OCIO. (A recent organizational chart showed 208 positions filled out of the 247 approved FTEs—a marked difference from early 2020 where the OCIO had more than 100 vacancies.)
- A refocused customer orientation has resulted in improved employee satisfaction with IT. As an example, the average satisfaction score for IT services quality among OPM employees improved from 3.8 (FY 2015) to 4.97 (FY 2020) on a scale of satisfaction response ranging from 1 (strongly disagree) to 7 (strongly agree).[99]

## Information Technology: Ongoing Organizational Commitment and Support Required

To be successful in the future, OPM must embed technology as a key driver and enabler in the organization. It must transform its IT operating model into one which is based on innovative use of technologies, adopting an enterprise approach and mindset, and a focused customer and service orientation. Technology modernization must be a priority for Agency leaders and the OCIO, and adequate funding and flexibility provided to the OCIO to manage resources and priorities.

OPM has the opportunity to use technology as a key driver in four key areas:

- Developing a modern data architecture and analytical platform (as discussed earlier);
- Creating a seamless customer experience for the federal workforce from recruiting to retirement by modernizing government-wide shared systems such as EHRI, retirement and benefits, and the USA Suite of shared systems;
- Transforming government-wide HR IT through the HRLOB; and

---

98. FITARA 10.0: Hearing Before the Subcommittee on Government Operations, House Committee on Oversight and Reform, 116 Congress, (August 2020). https://oversight.house.gov/legislation/hearings/hybrid-hearing-on-fitara-100
99. OPM Mission-Support Customer Satisfaction Survey. 2020.

AR0287

- Improving internal services for its employees.

To support this transformation, OPM must ensure that a strong IT governance and management framework is in place with a clearly articulated enterprise IT strategy, an enterprise architecture, IT investment and performance management with IT spend visibility, and rigorous, continuous attention to IT security and privacy. It should include strong succession planning at all key levels of leadership within the OCIO. OCIO must build on its recent progress and prioritize the following key activities:

- Adopting sound project management for managing and measuring IT investments and their performance, including modernization initiatives.
- Conducting regularly scheduled IT Investment Review Board meetings to plan for and track enterprise IT investment spend, including those that are less than $250,000.
- Standardizing and streamlining how IT costs are reported across OPM which vary today based on the data source that is used.
- Expanding the use of agile techniques and pilots for IT modernization initiatives, for both acquisition and development.
- Working with OPM leadership to secure organizational commitment to the vision and working with OMB and Congress to proselytize this vision.
- Working as a true partner with customers, adopting a service-orientation, and providing transparency in costs and pricing by developing and using an IT service catalog.[100]

OPM can benefit from its continued partnership with GSA's Centers of Excellence to maintain the momentum of progress in its recent IT projects. OPM should also consider establishing an IT advisory group, composed of public sector and private sector leaders with specific experience and expertise in human capital systems and modernization. (This group could be subcommittee of the Human Capital Advisory Committee discussed in Section 1.)

OPM must refresh the OPM.gov website to be consistent with the modernization principles outlined in the 21st Century Integrated Digital Experience (IDEA) Act to ensure it is accessible, consistent, authoritative, searchable, secure, user-centered, customizable, and mobile-friendly.[101]

Most importantly, to successfully modernize OPM's technology to support mission execution and government-wide human capital management, OCIO will require much needed funding and support from agency leaders, OMB, and the Congress. OPM must also address the issue of providing ongoing support to DCSA as it distracts management attention and focus. It puts OPM and OCIO in the role of a service provider—a role for which OPM is not well suited and which should not be a management focus given its other IT priorities. OPM leaders and OCIO should work with OMB and Congress to develop a clear, agreed-to transition plan, conduct a detailed assessment of the impact, and establish a true transition and sunsetting timeline that includes validation of archived data, records retention and litigation adjudication, and hardware decommissioning and disposal. The transition should be a focus for both OMB and Congress as

---

99. OPM has initiated efforts by adopting the technology business management framework, as part of the agency-wide Enterprise Cost Accounting System (ECAS) upgrades.
101. "21st Century Integrated Digital Experience Act." Technology Transformation Services, General Services Administration, https://digital.gov/resources/21st-century-integrated-digital-experience-act/.

AR0288

well, as they should provide the necessary oversight to ensure deadlines and milestones are successfully met.

## Panel Recommendations

*Objective: Transform OPM's human capital technology platforms and enhance the experience of OPM's customers and employees.*

**3.3** OPM should prioritize IT modernization and seek funding from Congress to modernize the eOPF and develop an employee digital record, upgrade technology systems supporting the federal retirement programs, enable a modern human capital data and analytics platform, and transform its website to be both user-centric and user-friendly.

**3.4** OPM should work with OMB and Congress to develop a clear, agreed-to plan to transition and sunset its ongoing IT operational support to DCSA, based on an assessment of the impact on OPM's IT budget and enterprise priorities.

# 3C: Funding: Structure and Level Hinder Agency Performance

Over the years, constrained funding and a fragmented funding structure have hampered OPM's mission performance. Weaknesses in resource planning and management, and a lack of transparency in the budget development process have further contributed to the problem. To evolve to a stronger strategic human capital leadership role that encourages innovation, promotes data and data analytics, and cultivates a skilled and agile workforce, OPM will need to address these persistent funding and resource barriers to mission performance.

## Sources of Funding Authorities

In FY 2020, OPM's total budget was $1.4 billion. OPM's budget draws on three sources of funding authority:

1. OPM Discretionary authority—budget authority provided at the discretion of Congress, including:
   - general funds for obligation under the Salaries and Expenses (S&E) account; and
   - transfers from the Earned Benefits Trust Funds for obligation under the Trust Fund Annual account to pay for the cost of administering benefits programs.[102]
2. Mandatory authorities—statutory authorities providing for OPM to draw funds from the Earned Benefit Trust Funds to pay for the cost of administering *specific* activities.[103]

---

102. The Office of Personnel Management (OPM) administers the Earned Benefits Trust Funds including: Federal Employees Health Benefits (FEHB); Federal Employees' Group Life Insurance (FEGLI); and Civil Service Retirement and Disability Fund (CSRDF). These funds reflect a mix of employee and government contributions.
103. Several provisions under title 5 of the U.S. Code (U.S.C.) and the Federal Erroneous Retirement Coverage Corrections Act (FERCCA) authorize OPM to administer specific retirement program and insurance activities, and to transfer funds for the administrative cost of these activities from the Trust Funds. These authorities provide additional administrative transfers from the Trust Funds. Per 5 U.S.C. §8348 (a)(1)(B), OPM incurs expenses from Civil Service Retirement and Disability Fund for the following activities: Administering survivor annuities and elections (§8339 and §8341) and other annuity alternatives (§8343a and §8420a); making discretionary allotments and assignments and withholding State income taxes on monthly annuities (§8345(k) or §8469) upon annuitant request; and withholding taxes pursuant to section 3405 of Title 26 or section 8345(k) or 8469 of this title.

AR0289

3. Revolving Fund authority—OPM has statutory authority to charge fees for a range of services provided to other federal agency customers. Revenues generated by these fees are managed through the Revolving Fund.

The amount of OPM's discretionary budget authority is determined by Congress through the appropriations process within overall limits on discretionary spending. For FY 2020, the total discretionary budget for OPM was almost $299.8 million (excluding funding for the Office of the Inspector General), with a little over half ($154.6 million) coming from discretionary transfers. These funds are appropriated in lump sum amounts; funds are generally not programmed for specific functions or programs.

In addition to discretionary transfers, OPM can draw funds from the Earned Benefit Trust Funds under mandatory authorities that provide for transfers to pay for specific types of expenses related to the administration of federal employee benefits programs. (Mandatory transfers were $67 million in FY 2020.) OPM determines the amounts of mandatory transfers subject to the approval of OMB. The allocation of Revolving Fund dollars ($857.2 million in FY 2020) is not subject to review by OMB.

## Funding of Mission Functions: A Mix of Funding Streams and Resource Constraints

OPM's funding streams generally align with different OPM mission operations. Mission programs administered by Employee Services (ES) and Merit System Accountability and Compliance (MSAC) are funded entirely through S&E appropriations, while the administration of OPM's federal employee benefits programs is funded primarily through a combination of discretionary and mandatory Trust Fund transfers. Retirement Services (RS) and Healthcare and Insurance (HI) are funded entirely through Trust Fund transfers. Human Resources Solutions (HRS), on the other hand, is funded entirely through the Revolving Fund.

OPM's core human capital functions are funded through a combination of funding models. With the Reinventing Government initiatives and related Congressional actions in the 1990s, services and a range of technical assistance (e.g., candidate assessments, workforce planning) supporting the execution of core human capital mission functions were transferred from appropriations to a fee-for-service model. Remaining core human capital mission functions (policy and oversight) administered by ES and MSAC are funded through the S&E appropriations account.

The successful performance of OPM's policy responsibilities depends on the willingness and ability of agencies to implement these policies appropriately. The current funding arrangement has hindered mission performance by limiting the provision of supporting services and technical assistance to the ability of agencies to pay. A consistent theme of stakeholder interviews is that the fee-for-service model has created "haves" and "have-nots," with smaller agencies often not able to afford human capital services provided through OPM.

Funding for OPM offices responsible for core mission functions—human capital policy development (principally, ES) and compliance with merit system principles (MSAC)—has been in decline since the Reinventing Government initiatives. This decline in funding and corresponding decline in staffing of these core mission functions has been a recurrent focus of annual reports issued by the Merit Systems Protection Board (MSPB), which has statutory responsibility for

65

reviewing OPM's significant actions. Since FY 2005, staffing of MSAC's core function has declined by 68 percent – from 95 to 31 evaluators. In the last five years (FY 2015 – FY 2020), on-board staffing of ES and MSAC have declined by 30 percent and 25 percent, respectively. MSAC has experienced the hardest hit by staffing declines given its smaller size, with an attrition rate of seventeen percent compared to ten percent for ES.

Extensive interviews with external stakeholders yielded a consensus view that OPM has lacked sufficient funding to carry out its core mission responsibilities. MSPB has repeatedly identified underfunding as an issue in its oversight reports of OPM. In the case of MSAC, the loss of evaluators since FY 2005 (noted above) was accompanied by a sharp decline in evaluations of agency compliance, which dropped from 200 to less than 100 per year. In the case of ES, OPM reports that the reduced staffing has resulted in longer wait times for policy guidance. However, the impact is difficult to assess given the diversity of policies that ES must develop. More generally, given that the demands imposed on OPM by various mandates have only increased over time, it is difficult to conclude that declining funding has not strained the ability of OPM to carry out its mission responsibilities.

## Funding of Common Services: Limitations in Internal Methodology for Funding Mission Support

OPM maintains an internal "common services" fund to finance administrative, financial, and overhead functions.[104] To finance common services, the Office of the Chief Financial Officer (OCFO) assesses each of OPM's three sources of funding authority: OPM Discretionary, Mandatory, and Revolving Fund. Common services for nine operational offices are supported by the fund. There are two bases for distributing costs calculating the proportional contributions to common services. For each of the offices supported by the common services fund, the methodology considers: (1) FTEs; and (2) Revenue. The FTE funding basis proportionally distributes the common services budget amounts based on the prior years' work hours. The Revenue funding basis proportionally distributes the amount based on revenue earned adjusted by Object Class 25 items (i.e., other contractual services such as advisory services) used the prior year. Individual OPM programs are not billed for common services. The common service budgets are taken off the top of OPM's funding sources.

An independent IT assessment completed by McKinsey for OPM in December 2019 found a substantial mismatch among OPM programs between their contribution to IT common services and their consumption of IT common services in FY 2019. With the exception of HI, OPM programs under-contributed. Just one program, National Background Investigations Bureau, contributed $39.1 million to IT common services compared to $21.5 million by the rest of OPM, a difference of $17.6 million.

Following the transfer of NBIB to the Department of Defense, McKinsey projected a shortfall in funding for IT common services of $17.6 to $25.7 million per year over three years for a total of $53−$77 million, the range being contingent on the OPM's ability to scale its IT requirements for its new, smaller, post-transfer size (2,686.9 FTEs in FY 2020 compared to 6,254.5 FTEs in FY

---

104. This description of OPM's common services fund is based on internal documentation provided by OPM. The discussion of common services funding for the OPM Office of Inspector General is omitted as this paper is focused on OPM's mission programs.

AR0291

2019). The high-end of this estimate is built into a buy-back services agreement with DOD for FY 2020, but failing an extension of the agreement going forward, a significant short fall was expected. The McKinsey report recommended that OPM move to a consumption-based approach to budgeting IT common services. The study team was told that OPM is beginning a phased implementation of a consumption-based approach, using HRS as a model.[105] Full implementation is expected by FY 2023.

Leaving aside the limitations of OPM's common services budgeting methodology, OPM faces significant shortfalls in funding common services with the transfer of NBIB to DOD. NBIB accounted for over 80 percent of all Revolving Funds in FY 2019, providing well over half of OPM's total common services budget. In the Administration's 2019 Business Case for the proposed merger of OPM with GSA, it was estimated that the transfer would create an initial funding gap of up to $70 million in FY 2020, when most investigative services were to be transferred to DOD (with the remainder following in FY 2021). This gap was partially addressed as a component of a broader one-year services buy-back agreement with DOD to fund a range of services that OPM would provide including technology, procurement, facilities, and financial management services to enable the background investigation mission at DOD. This $144 million agreement included a total of $35 million for common services, with $25.7 million of that for IT common services. This left half of the shortfall to be addressed through additional S&E appropriations. A similar gap, as well as the possibility of a reduced buy-back agreement resulting in a still larger gap, was the focus of planning for a supplemental request in FY 2021. The final estimated gap in common services funding for FY 2021 is $77.5 million. This gap is addressed in part through a revised DOD buy-back agreement, totaling $86 million. This smaller agreement, reflecting a reduction in services to be provided by OPM included $23.8 million for common services. OPM reports that it was able to further reduce the gap by $24.5 million through a mix of actions, including a reduction in operational costs across the agency.[106] Also, OPM received an additional $30 million in appropriations for FY 2021, which will cover the remaining $29.2 million of the estimated gap. OPM has confirmed that there will be a buy-back agreement for FY 2022, but the value of this agreement is not known at this time. In the meantime, OPM is taking steps further reduce costs by adjusting its common services infrastructure to reflect the requirements of a much smaller organization. However, the costs associated with providing these services are to a large extent fixed in the near term.

## Budget Development and Appropriation Processes: Opportunities for More Efficient and Effective Resource Management

Funding trends and expert assessments discussed earlier provide broad indicators of underfunding. However, requests for increased funding should be based on requirements analysis and cost estimates. Unfortunately, OPM's budget requests are not transparent about the analyses supporting them.

---

105. Consumption data was extracted from OPM's Enterprise Cost Accounting System to support the initial phase of implementation.
106. Actions taken to reduce the gap include the following: increasing the financial contribution of HRS to better reflect actual consumption of common services, extending the period of performance of OCFO operations and maintenance and other services, reducing the costs of retirement records imaging by contracting for the service instead of performing it in-house, and implementing budget reductions identified by programs.

AR0292

To be fair, transparency of budget requests is beyond the control of OPM alone. It depends on how the larger budget and appropriations processes are structured. First and foremost, the decision about what to include in budget requests—absent specific statutory reporting requirements—is the purview of OMB and the incumbent administration. For example, following the data breach in 2015, OPM was directed not to request additional funds from Congress. Instead, OPM financed remediation efforts through internal assessments on the owners and users of the specific systems at risk as identified by the CIO. Also, until recently, OPM lacked a mechanism for addressing resource needs systematically with OMB. The OPM account was handled by staff in the Performance and Personnel Management office reporting to OMB's Deputy Director for Management rather than a resource management office(s) on the budget side of OMB. OPM did not have budget examiners assigned to its accounts and, therefore, did not have the benefit of the usual budget development hearing process.

On the appropriations side, OPM has not had the benefit of regular hearings. The only hearing in recent years was held to discuss the GSA-OPM merger proposed by the prior Administration. This year, for the first time in over a decade, the OPM account is being handled on the budget side of OMB by three examiners, separately responsible for retirement, health insurance, and general government programs, the latter of which encompasses programs administered by ES and MSAC. Still, the OPM account is appropriated as a lump sum and not by function or program. The OPM general government appropriations account is overseen together with two much larger agency accounts—Postal Service and Department of Homeland Security—which hinders close attention to OPM funding.

Lack of clarity and transparency in budget development is a condition shared across federal agencies in terms of what is spent on HR activities. Currently, insight into the Federal Government's human capital management spend is not captured in a way that affords government-wide analysis. Many stakeholders the study team spoke with raised this concern and noted the need for a FITARA-type scorecard for human resources to raise attention to human capital from an enterprise-wide perspective.

Even if the appropriations process is reformed to incentivize more transparent budget justifications, OPM would still need to strengthen its capacity to track staff time across programs, projects, and activities. Also, it would need to improve its ability to translate this capacity into credible budget justifications, strategic workforce planning, and efficient and effective management of additional resources Congress may choose to provide. OPM has a long-established set of labor codes for tracking staff time, but the use of this data for program management and planning has been mixed. OPM is in the process of implementing a new financial management system that provides tools for more readily accessing and using this data. Also, OPM has let a contract to undertake an assessment of workforce skills and utilization and to assist in developing a strategic workforce plan.

## Funding of Major IT Investments: Enabling Sustained Investment in IT Modernization and Operations

Over the years, OPM has sought to maintain funding for core mission functions and to make investments in new business systems and the modernization of IT infrastructure in the context of flat or declining appropriations and in the absence of a dedicated source of funding for major IT

AR0293

investments. To do this, OPM has adopted various strategies for obtaining funding outside the usual limitations of the discretionary budget process.

In interviews, the study team was told of at least three different strategies for off-budget funding of IT projects and sustaining the funding of core mission functions over time.

1. Obtaining money from the Trust Funds outside the congressional limit on discretionary transfers to fund major IT projects. These projects were framed as exceptional and therefore exempted from the discretionary spending limit. This practice dates back to OMB under the Bush Administration; it ended during the Obama Administration.

2. Funding major IT projects through Common Services, taking advantage of excess contributions by HRS. HRS was able to support these contributions based on how they allocated overhead costs to federal agency customers and pass throughs. This practice was abandoned following the imposition of new financial controls on HRS during the Obama Administration.

3. Funding major IT projects through Common Services, taking advantage of excess contributions by NBIB. This last arrangement ended with the transfer of NBIB to DOD, following the 2015 data breach.

In each case, when the off-budget mechanism for funding IT projects became unavailable, a funding crisis ensued. This situation has resulted in part from the lack of a dedicated source for funding IT investments.

OPM currently lacks an IT working capital fund. The current funding model with multiple funding streams, together with the lack of an IT working capital fund, provides little flexibility to the CIO organization to manage resources and priorities. The Modernizing Government Technology (MGT) Act provides Chief Financial Officer (CFO) Act agencies authority to establish an IT modernization and working capital fund in support of IT modernization efforts.[107] A working capital fund provides IT budget flexibility and transparency, allowing agencies to reprogram and transfer IT funds to the working capital fund, including cost savings, unused operations, and maintenance funds. Funds are available for three years (from the fiscal year for which the funds were designated), thereby reducing incentives for the "spend it or lose it" culture.[108]

OPM reportedly sought to establish a working capital fund in the past. However, the fund was not included in the President's Budget request or funded by Congress. The study team was informed that OPM plans to request authority to establish a working capital fund in its submission to OMB for the FY 2022 budget.

---

107. The Modernizing Government Technology Act was enacted in the FY18 NDAA. National Defense Authorization Act for Fiscal Year 2018, Pub. L. No. 115-91, Title X, Subtitle G (§§ 1076-1078).

108. Jon Holladay, Mike Kaczowka, Mike Kuchler, Brian Siegel, Lindsey Trumperi, "Federal CFO: How to Optimize the Modernizing Government Technology Act," Deloitte Consulting LLP, *The Wall Street Journal*, May 11, 2018, https://deloitte.wsj.com/cfo/2018/05/11/federal-cfo-how-to-optimize-the-modernizing-government-technology-act-with-a-working-capital-fund/.

AR0294

## Moving to a More Sustainable and Accountable Funding Model

The ability of OPM to successfully perform its mission responsibilities will require significant changes in how it is funded. First, OPM must determine the current cost of operations. It must develop a cost accounting program that fully reflects the cost of operations and supports budget justifications for requesting the funding necessary to cover these costs. The Panel has offered recommendations throughout this report that will impact what and how OPM carries out a reframed mission. OPM needs to identify the costs of current operations and the impact of the recommended changes including delegating to the extent possible, using a risk-based approach to transactional oversight and approvals, and providing assistance services to agencies to implement policy changes without charge. And, it needs to identify the appropriate funding source. OPM will also need to strengthen its capacity to track costs across programs, projects, and activities and use this capacity to undertake strategic workforce planning to both effectively and efficiently manage resources.

A dedicated source of funding is needed to support major IT projects and enable sustained investment in IT modernization and minimize disruptions to the funding of mission functions, as well as an IT working capital fund to allow some flexibility to better manage priorities and address internal IT requirements that arise. As a critical step, OPM must baseline its IT costs and reinforce its IT investment planning and control processes and IT project management as discussed earlier. Standardizing and streamlining how IT costs are reported across OPM is necessary. OPM will need to pursue specific authority to establish a working capital fund under the Modernizing Government Technology (MGT) Act as it does not currently have that authority. Once established, OMB will oversee the fund and the IT investments it supports consistent with OMB's management, budget development, and oversight role.

## Panel Recommendations

*Objective: Enable more strategic and sustainable funding to support OPM's mission performance.*

**3.5** OPM should expand its ongoing re-baselining initiative to determine the cost of current OPM operations, assess the cost implications of changes recommended in this report (including provision of core human capital services currently offered on a fee-for-service basis), and identify opportunities to reduce costs and reallocate resources to accomplish mission responsibilities more effectively and efficiently.

**3.6** OPM should continue its efforts to strengthen capacity to track staff costs and implement strategic workforce planning to inform more rigorous budget justifications and manage resources more efficiently and effectively.

**3.7** Congress should provide dedicated funding to be used for specific, major OPM IT modernization projects contingent on the development of an agreed-upon roadmap based on sound IT investment planning and control processes.

**3.8** Congress should provide authority to OPM to establish an IT Working Capital Fund, contingent on the completion of an enterprise-wide IT requirements and cost analysis to enable a more flexible and accountable internal process for funding IT operations and maintenance.

AR0295

*This page is intentionally left blank.*

AR0296

*This page is intentionally left blank.*

AR0297

# Appendices

## Appendix A:    Panel and Study Team Member Biographies

### Panel of Academy Fellows

**Janet Hale,*** *Panel Chair***:** Former Director, Deloitte & Touche, LLP; Under Secretary for Management, U.S. Department of Homeland Security; Assistant Secretary for Budget, Technology, and Finance, U.S. Department of Health and Human Services; Chief Financial Officer and Associate Administrator for Finance, U.S. House of Representatives; Vice President of Government Relations, U.S. Telephone Association; Executive Vice President, University of Pennsylvania; Associate Director for Economics and Government, Office of Management and Budget, Executive Office of the President; Assistant Secretary for Budget and Programs, U.S. Department of Transportation; Executive Secretary and Deputy Assistant Secretary for Housing, U.S. Department of Housing and Urban Development.

**J. Edward Kellough:*** Professor and Ph.D. Director in the Department of Public Administration and Policy at the University of Georgia.  Dr. Kellough specializes in public personnel management, public administration, and program evaluation. Previous books include *The New Public Personnel Administration*, seventh edition, with Lloyd G. Nigro (Wadsworth, Cengage Learning, 2014); *Understanding Affirmative Action: Politics, Discrimination, and the Search for Justice* (Georgetown University Press, 2007); and *Civil Service Reform in the States: Personnel Policy and Politics at the Sub-National Level*, edited with Lloyd G. Nigro (State University of New York Press, 2006). He has published in numerous academic journals and has lectured or made research presentations in several countries around the world. He is a past President of the Network of Schools of Public Policy, Affairs, and Administration (NASPAA) and serves currently as the Chair of the Section on Personnel Administration and Labor Relations of the American Society for Public Administration. He served previously at the University of Georgia as the head of the Department of Public Administration and Policy and as Director, Master of Public Administration program.

**Peter Levine:*** Senior Fellow, Strategy, Forces and Resources Division, Institute for Defense Analyses. Former positions include Acting Under Secretary of Defense for Personnel and Readiness, Department of Defense; Deputy Chief Management Officer, Department of Defense; Staff Director, Senate Armed Services Committee; General Counsel, Senate Armed Services Committee; Counsel, Senator Carl Levin; Counsel, Subcommittee on Oversight of Government Management, Senate Governmental Affairs Committee; Associate, Crowell & Moring. Author, "Defense Management Reform:  How to Make the Pentagon Work Better and Cost Less," (Stanford Press, 2020).

**Ellen Tunstall:*** Adjunct Policy Analyst focusing on domestic and international strategic human capital issues, RAND Corporation. Former positions with the U.S. Office of Personnel Management - Deputy Associate Director, Employment Policy; Program Manager, Office of Insurance Programs. Former Department of Defense positions - Acting Deputy Under Secretary for Civilian Personnel Policy; Director, Workforce Issues and International Programs; Division Chief, Civilian Assistance and Re-Employment Division, Defense Civilian Personnel Management

*Academy Fellow

Service; various Department of Air Force human capital positions. Former Senior Advisor, FMP Consulting.

**David Walker:*** Current Distinguished Visiting Professor and Crowe Chair, U.S. Naval Academy. Former positions include: Managing Director and Senior Strategic Advisor, PricewaterhouseCoopers; Founder and Chief Executive Officer, Comeback America Initiative; President and Chief Executive Officer, Peter G. Peterson Foundation; Comptroller General of the United States and head of the U.S. Government Accountability Office (GAO); Partner and Global Managing Director - Human Capital Services, Arthur Andersen, LLP; Public Trustee, U.S. Social Security and Medicare Trust Funds;  Assistant Secretary of Labor for Pension and Welfare Benefit Programs, U.S. Department of Labor, and Acting Executive Director, Pension Benefit Guaranty Corporation. Current and former member of many non-profit boards and advisory groups.

## Study Team

**Brenna Isman**, *Director of Studies*: Ms. Isman has worked for the Academy since 2008 and provides oversight across the Academy's studies. She recently served as the Project Director for the Academy's study that assisted a national regulatory and oversight board in developing and implementing its strategic plan. She also recently directed the Academy's statutorily required assessments of the NASA's use of its Advisory Council and the Environmental Protection Agency's practices for determining the affordability of regulatory mandates, as well as the Academy's organizational assessments of the U.S. State Department's Office of Inspector General and the Amtrak Office of the Inspector General. Ms. Isman has served as a senior advisor on strategic plan development for the Postal Regulatory Commission (PRC) and Social Security Administration (SSA), and organizational change consulting support for the Coast Guard. Her prior consulting experience includes both public and private sector clients in the areas of communication strategy, performance management, and organizational development. Prior to joining the Academy, Ms. Isman was a senior consultant for the Ambit Group and a consultant with Mercer Human Resource Consulting facilitating effective organizational change and process improvement. She holds an MBA from American University and a Bachelor of Science in Human Resource Management from the University of Delaware.

**Cynthia Heckmann,*** *Project Director*: Ms. Heckmann is a fellow of the National Academy of Public Administration. A retired senior executive, Ms. Heckmann served as the Project Director for two related studies examining the scope and impact of sexually transmitted diseases in the United States for the National Coalition of STD Directors to help inform a national action plan; the reports were cited as foundational for the very first STI (Sexually Transmitted Infections) National Strategic Plan, released by the Department of Health and Human Services on December 17, 2020. Previously, she served as Project Director on the Academy's review of the study and administrative processes of the National Academies of Science, Engineering and Medicine, the Secret Service's organizational change efforts, the National Science Foundation's use of cooperative agreements in support of large-scale research facilities, the Department of Justice's Civil Rights Division, and the Center for Disease Control and Prevention's human resource process review. Her extensive career at the Government Accountability Office includes serving as the Chief Human Capital Officer (CHCO) and Deputy Chief Information Officer. Ms. Heckmann also has executive branch experience, as well as state government experience. Ms. Heckmann

74

*Academy Fellow

served as a strategic advisor on research studies for the Partnership for Public Service and is currently a CHCO SAGE—Strategic Advisor for Government Executives—for the Partnership. She holds a Master of Public Administration from Northeastern University and a Bachelor of Arts from Simmons College (now University). She also holds certificates from the Senior Executive Fellows Program at Harvard University's John F. Kennedy School of Government and Yale University's School of Organization and Management.

**Sukumar Rao**, *Senior Advisor*: Mr. Rao is President of the Parnin Group and has specialized in cross-agency program implementation, performance improvement, IT strategy, digital transformation, and information architecture and data management. Previously, he was a Principal at SRA International. He served as the project manager for a number of OMB-led crossagency initiatives to evaluate the performance of operations and service delivery of the 24 CFO ACT agencies, including mission areas, IT and mission-support/administrative operations. He brings a depth of IT strategy experience that includes evaluation of government-wide high risk IT projects, assessment of cloud computing and shared services, and design and implementation of digital transformation initiatives. He also served as Program Manager for a Homeland Security Science and Technology Program, leading and managing the strategic planning process to design a $30 million R&D program to improve a nationwide emergency alert system. Mr. Rao has an MBA from Columbia University and Master of Science and Bachelor of Engineering degrees in Telecommunications. He is a Project Management Professional (PMP) and Certified Technology Business Management Executive (CTBME).

**Jonathan Tucker**, *Senior Analyst*: Dr. Tucker joined the Academy's staff in 2004 and has extensive expertise in policy analysis, program evaluation, organizational design, management assessment, and strategic planning. He recently served as Project Director for the Academy's organizational assessment of the R&D area of the U.S. Forest Service and the Academy's assessment of the Department of Transportation's proposed reorganization of its research entities. He also recently served as a Senior Advisor on the Academy's statutorily required study of the project partnership agreement (PPA) procedures utilized by the Army Corps of Engineers and supported the Academy's recent studies of the NASA Advisory Council and the procurement strategies of the Transportation Security Administration (TSA). He holds a Ph.D. in Public Policy from George Mason University, an M.S. in Science and Technology from Rensselaer Polytechnic Institute and a B.A. in Public Policy from New College of the University of South Florida.

**Chloe Yang**, *Senior Analyst*: Ms. Yang is a Senior Analyst at the Academy. Since joining the Academy in 2009, Ms. Yang has worked on projects with a range of federal and state 36 agencies, including the Oklahoma Corporation Commission, the National Science Foundation, Office of Management and Budget, U.S. Coast Guard, and the Government Accountability Office. Before joining the Academy, Ms. Yang was the research intern at the Foundation of Environmental Security and Sustainability. She is a Ph.D. candidate at George Mason University, from which she also holds an MPA degree. She also holds a bachelor's degree in Financial Management from the Renmin University of China.

**Elise Johnson**, *Senior Research Associate*: Ms. Johnson joined the Academy in 2019. Since then, she has served on a number of Academy projects, including work for the Department of Commerce's Office of Space Commerce, the National Oceanic and Atmospheric Administration,

75

the Bureau of Transportation Statistics, and the National Coalition of STD Directors. Ms. Johnson also supports the Academy's quarterly Grants Management Symposium. In addition to this study, Ms. Johnson also serves on a study for the Agricultural Research Service. Ms. Johnson graduated from the University of Maryland, earning a B.A. in Public Policy and a B.A. in Government and Politics.

**E. Jonathan Garcia**, *Research Associate*: Mr. Garcia joined the Academy as a Research Associate in November 2020. Mr. Garcia graduated in May 2020 from the University of Maryland, earning a B.A. in Public Policy, a B.A. in Communication, and a Minor in Law and Society.

76

# Appendix B:    List of Interviewees

**OPM**

### *Office of the Director (OD)*

- **Michael Rigas**, Former Acting Director and Deputy Director, OPM; former Acting Deputy Director for Management, OMB
- **Alexandra Czwartacki**, Former Senior Advisor for Operations
- **Peggy Grande**, Former Executive Secretary and Resource Management Officer
- **Kathleen McGettigan**, Chief Management Officer and current Acting Director
- **George Nesterczuk**, Former Senior Advisor
- **Rebecca Thacker**, Former Senior Advisor for Research

### *Office of the Chief Financial Officer (OCFO)*

- **Dennis Coleman**, Chief Financial Officer
- **Edward Callicott**, Budget Analyst
- **Margaret Pearson**, Deputy Chief Financial Officer and Performance Improvement Officer
- **Henry Pickens**, Budget Officer
- **Jonathan Soileau**, Chief Evaluation Officer
- **Nathan Uldricks**, Former Senior Advisor for Financial Management

### *Office of the Chief Information Officer (OCIO)*

- **Clare Martorana**, Chief Information Officer

### *Human Resources (HR)*

- **Tyshawn Thomas**, Director of Human Resources and Chief Human Capital Officer

### *Office of Human Capital Data Management and Modernization Directorate (HCDMM)*

- **David Spinale**, Former, Director of Human Capital Data Management and Modernization Directorate and Human Resources Line of Business (HRLOB)

### *Congressional, Legislative, and Intergovernmental Affairs (CLIA)*

- **A.J. Moore**, Former Acting Director
- **Christiana Frazee**, Former Director of Constituent Support Services
- **Kristine Prentice**, Senior Legislative Analyst

### *Office of Communications (OC)*

- **Anthony Marucci**, Former Director
- **Laura Goulding**, Deputy Director, Public Affairs Director
- **Michael Cogar**, Former Public Affairs Specialist

77

*Academy Fellow*

AR0302

### *Office of General Counsel (OGC)*

- **Mark Robbins**,* Former General Counsel
- **Kathie Ann Whipple**, Deputy General Counsel
- **Steven Abow**, Assistant General Counsel, Merit Systems and Accountability
- **Alan Miller**, Associate General Counsel, Compensation, Benefits, Products and Services Division

### *Office of Inspector General (OIG)*

- **Norbert Vint**, Deputy Inspector General Performing the Duties of the Inspector General
- **Michael Esser**, Assistant Inspector General for Audits
- **Drew Grimm**, Assistant Inspector General for Investigations
- **James Ropelewski**, Assistant Inspector General for Management
- **Paul St. Hillaire**, Assistant Inspector General for Legal and Legislative Affairs
- **Lewis Parker**, Deputy Assistant Inspector General for Audits
- **Melissa Brown**, Deputy Assistant Inspector General for Audits
- **Faiza Mathon-Mathieu**, Senior Counsel for Legislative and External Affairs

### *Office of Privacy and Information Management (OPIM)*

- **Kellie Riley**, Chief Privacy Officer
- **Charles 'Corky' Conyers**, Forms/Paperwork Reduction Act Manager
- **Marc Flaster**, Senior Advisor to the Chief Privacy Officer
- **Tammy Hudson**, Records Officer

### *Office of Procurement Operations (OPO)*

- **Todd Anthony**, Director
- **Shreena Lyons**, Director of Contracting Activity

### **Program Offices**

### *Employee Services (ES)*

- **Dennis Kirk**, Former Associate Director
- **Veronica Villalobos**, Former Principal Deputy Associate Director
- **Timothy Curry**, Deputy Associate Director, Accountability and Workforce Relations
- **Kimberly Holden**, Deputy Associate Director, Talent Acquisition and Workforce Shaping
- **David LaCerte**, Former Senior Advisor and Deputy Associate Director, SES and Performance Management
- **Laura Lynch**, Deputy Associate Director, SES and Performance Management
- **Zina Sutch**, Deputy Associate Director, Outreach, Diversity, and Inclusion
- **Samuel Wright**, Former Senior Advisor and Deputy Associate Director, Outreach, Diversity, and Inclusion
- **John York**, Former Senior Advisor and Deputy Associate Director, Strategic Workforce Planning, Employee Services; former Executive Director of Chief Human Capital Officer Council

*Academy Fellow

AR0303

### *Healthcare and Insurance (HI)*

- **Laurie Bodenheimer**, Associate Director
- **Holly Schumann**, Deputy Assistant Director, Program Development and Support
- **Terry Schleicher**, Acting Deputy Assistant Director, Program Development and Support
- **Edward DeHarde**, Assistant Director, Federal Employee Insurance Operations
- **Willie Powers Jr.**, Program Manager, Operations and Resource Management
- **Katrina Bell**, Management Analyst, Operations and Resource Management

### *Human Resources Solutions (HRS)*

- **Sara Ratcliff**, Former Associate Director
- **Reginald Brown**, Principal Deputy Associate Director
- **Dawn Luepke**, Former Senior Advisor and Deputy Associate Director, Center for Leadership Development
- **Leslie Pollack**, Deputy Associate Director, HR Strategy & Evaluation Solutions
- **Dianna Saxman**, Deputy Associate Director, Federal Staffing Center
- **Stuart Gittelman**, Customer Services Branch
- **Suzanne Logan,**\* Deputy Associate Director, Center for Leadership Development
- **John Gill**, Deputy Director, Center for Leadership Development

### *Merit System Accountability and Compliance (MSAC)*

- **Mark Lambert**, Associate Director
- **Ana Mazzi**, Principal Deputy Associate Director

### *Retirement Services (RS)*

- **Kenneth Zawodny**, Associate Director
- **Lori Amos**, Deputy Associate Director for Retirement Operations
- **Nicholas Ashenden**, Deputy Associate Director for Retirement Operations-Boyers

### *Suitability Executive Agent (SuitEA)*

- **Lisa Loss**, Director

### **General Services Administration (GSA)**

- **Emily Murphy**, Former Administrator (written responses only)
- **Allison Brigati**, Former Deputy Administrator

### **Office of Management and Budget (OMB)**

- **Dustin Brown**,\* Deputy Assistant Director for Management, Office of Performance and Management
- **David Connolly**, Chief, Transportation and General Services Administration Branch
- **Kristy Daphnis**, Lead for Governmentwide Personnel Policy
- **Matthew Eanes**, Director, Performance Accountability Council (PAC) Program Management Office

*\*Academy Fellow*

AR0304

- **Anthony Gonzalez**, Program Examiner, Commerce Branch, General Government Programs
- **Ben Skidmore**, Senior Program Examiner

<u>**Congress**</u>[109]

***House Committee on Appropriations, Subcommittee on Financial Services and General Government***

- **John Martens**, Minority Clerk
- **Marybeth Nassif**, Majority Professional Staff Member

***House Committee on Government Oversight and Reform, Subcommittee on Government Operations***

- **Wendy Ginsberg**, Majority Staff Director
- **Ellen Johnson**, Minority Senior Professional Staff Member
- **Cassie Winters**, Majority Legislative Assistant and Professional Staff Member

***Senate Committee on Appropriations, Financial Services and General Government Subcommittee***

- **Alley Adcock**, Majority Professional Staff Member
- **Diana Hamilton**, Minority Professional Staff Member
- **Andy Newton**, Majority Staff Director

***Senate Committee on Homeland Security and Government Affairs, Subcommittee on Regulatory Affairs***

- **Eric Bursch**, Minority Staff Director
- **James Mann**, Majority Senior Counsel

<u>**Agencies**</u>

***Census Bureau, Department of Commerce***

- **Lisa Frid**, Workforce Transformation Program Manager, Human Resources Division
- **Josh Keller**, Assistant Division Chief, Human Capital Strategy and Accountability

***Department of Agriculture (USDA)***

- **Mary Pletcher**, Chief Human Capital Officer

***Department of Defense (DOD)***

- **Anita Blair,**\* Former Chief Human Capital Officer
- **Veronica Hinton**, Principal Director for Personnel Policy
- **Michelle Lowe Solis**, Director, Defense Civilian Personnel Advisory Service

---

109. Positions listed were current as of the close of the 116th session of Congress.

*Academy Fellow

AR0305

***Department of Energy (DOE)***

- **Steven Erhart**, Former Chief Human Capital Officer

***Department of Health and Human Services (HHS)***

- **J. Blair Duncan,** Chief Human Capital Officer

***Department of Homeland Security (DHS)***

- **Angela Bailey,**\* Chief Human Capital Officer

***Department of Interior (DOI)***

- **Ray Limon**, Chief Human Capital Officer

***Department of Veterans Affairs (VA)***

- **Tracey Therit**, Chief Human Capital Officer
- **Joseph Thele**, Associate Deputy Assistant Secretary, HR IT Systems and Analytics
- **Tracy Schulberg**, Executive Director, Labor Management Relations
- **Rondy Waye**, Senior Policy Advisor

***Federal Trade Commission (FTC)***

- **Vicki Barber**, Chief Human Capital Officer
- **Sharrelle Higgins**, Deputy Chief Human Capital Officer
- **Mark Kern**, Chief Learning Officer for Employee Development and Training

***Government Accountability Office (GAO)***

- **Robert Goldenkoff**, former Director of Strategic Initiatives
- **David Hinchman**, Assistant Director, Information Technology and Cybersecurity
- **Susan Irving,**\* Director, Federal Budget Analysis, Strategic Issues
- **Steven Lozano**, Assistant Director, Strategic Issues
- **Nick Marinos**, Director, Information Technology and Cybersecurity
- **J. Christopher Mihm,**\* Managing Director and Director, Strategic Issues
- **Susan Murphy**, Assistant Director, Strategic Issues
- **Leah Nash**, Assistant Director, Strategic Issues

***National Aeronautics and Space Administration (NASA)***

- **Jane Datta**, Chief Human Capital Officer
- **Mary Davie,**\* Deputy Associate Administrator, Mission Support Transformation Office, Mission Support Directorate
- **Elizabeth Kolmstetter**, Director of Talent, Strategy, and Engagement
- **Keith Krut**, Branch Chief, People Analytics

***Peace Corps***

- **Traci DiMartini**, former Chief Human Capital Officer and Chair of Small Agency Human Resource Council, (now Chief Human Capital Officer at GSA)

81

*\*Academy Fellow*

## Fellows

- **Dan Blair,** * former Deputy Director, OPM
- **Beth Cobert,** * former Deputy Director for Management, OMB and Acting Director, OPM
- **Steve Cohen,** * former Senior Advisor, OPM
- **Kay Coles James,** * former Director, OPM
- **Kay Ely,** * former Associate Director, OPM
- **Doris Hausser,** * former Senior Policy Advisor, OPM
- **Donald Kettl,** * Professor and Academic Director, Lyndon B. Johnson School of Public Affairs University of Texas at Austin
- **Nancy Kichak,** * former Associate Director and Chief Human Capital Officer, Employee Services; former Associate Director, Strategic Human Resources Policy, OPM
- **Janice LaChance,** * former Deputy Director and Director, OPM
- **John Palguta,** * former Director, Policy and Evaluation, U.S. Merit Systems Protection Board; former Branch Chief and Personnel Management Advisor, OPM
- **Ronald Sanders,** * former Chief Human Capital Officer, Office of the Director of National Intelligence; former Associate Director, Strategic Human Resource Policy, OPM
- **Linda Springer,** * former Director, OPM; former Controller and Senior Advisor, OMB

## Labor Unions and Employee Associations

### *American Federation of Government Employees (AFGE)*

- **Richard Loeb**, Senior Policy Counsel
- **Jacque Simon**, Policy Director

### *Federal Managers Association (FMA)*

- **Craig Carter**, National President
- **Ronald Gryga**, National Vice President
- **Patricia Niehaus**, Former National President
- **Greg Stanford**, Director of Government and Public Affairs
- **Todd Wells**, Executive Director

### *International Federation of Professional and Technical Engineers (IFPTE)*

- **Lee Stone**, Western Federal Area Vice President
- **Matthew Biggs**, Secretary-Treasurer

### *National Active and Retired Federal Employees Association (NARFE)*

- **Kenneth Thomas**, National President
- **Jessica Klement**, Staff Vice President for Advocacy

### *National Federation of Federal Employees (NFFE)*

- **Bob Beckley**, National Vice President

*Academy Fellow

*National Treasury Employees Union (NTEU)*

- **Anthony Reardon**, National President
- **James Bailey**, National Vice President

*Senior Executives Association (SEA)*

- **Robert Corsi**, Interim President and CEO
- **Jason Briefel**, Director of Policy and Outreach

**Research Organizations and Non-Profits**

- **Dan Chenok,**\* Executive Director, IBM Center for the Business of Government
- **Troy Cribb**, Director of Policy, Partnership for Public Service
- **Steve Goodrich**, President and CEO of Center for Organizational Excellence
- **William Shields**, Executive Director, American Society for Public Administration (ASPA)
- **Max Stier**,\* President and CEO, Partnership for Public Service

**Former OPM Officials**

- **Sydney Heimbrock**, former Chief Learning Officer, OPM
- **Bernie Kluger**, former Deputy Performance Improvement Officer, OPM
- **Lisa Schlosser**, former Federal CIO, OMB; former Acting CIO, OPM
- **Harold Segal**, formerly with OPM Training Management Assistance program
- **Margaret Weichert**, former Acting Director, OPM and Deputy Director for Management, OMB

*\*Academy Fellow*

AR0308

*This page is intentionally left blank.*

*Academy Fellow

AR0309

## Appendix C:    OPM Organizational Profile

The Office of Personnel Management (OPM) was established in 1979, evolving from its predecessor organization, the Civil Service Commission. Over the years, it has experienced changes in structure and functions, in some cases gaining additional responsibilities and in others, losing functions and related resources—and in the case of background security investigations, losing, gaining, and then losing again program responsibility. Today, OPM comprises program divisions and offices that support the Agency's mission, both directly and indirectly. Customers of OPM programs, services, and information span many different communities—federal agencies and human resource staff; federal employees, annuitants, and survivors; job applicants; and the public, in general.

Figure 1 displays the OPM organizational structure that was in place in October 2020. A brief description of the offices and how each unit contributes to fulfilling OPM's mission follows.[110]

*Figure 1. OPM Organizational Chart (as of October 2020)*



---

110. U.S. Office of Personnel Management, *Annual Performance Report: Fiscal Year 2020*, (January 2021).

AR0310

**Executive Offices**

OPM's executive offices include the Office of the Director and offices that support the director and coordinate with units across the agency to carry out OPM's mission and the director's priorities.

| Executive Offices | |
|---|---|
| **Office of the Director (OD)** | Provides guidance and leadership to fulfill OPM's mission; coordinates with the President on human capital and Administration priorities. |
| • **Executive Secretariat (ExecSec)** | Provides administrative management support to OD and other executive offices, reviews and coordinates correspondence with federal partners and the public, and supports offices with drafting regulations. |
| • **Chief Management Officer (CMO)** | Provides organizational management to promote OPM's mission and strategic goals and to improve Agency performance. |
| • **Performance Accountability Council Program Management Office (PAC PMO)** | Handles administrative functions for the Performance Accountability Council, reporting to the Office of Management and Budget (OMB); coordinates activities related to the Council and Executive Agents responsible for national security and suitability vetting and credentialing. |
| **Office of Privacy and Information Management (OPIM)** | Advises the director on privacy laws, administers and implements Freedom of Information Act (FOIA) and Privacy Act requirements, and evaluates risk in projects involving sensitive information. |
| **Office of the General Counsel (OGC)** | Provides legal advice and representation to OPM leadership; reviews policy proposals and other documents for legal compliance; represents OPM in litigation. |
| **Congressional, Legislative, & Intergovernmental Affairs (CLIA)** | Advocates for legislation and policy; represents OPM in interactions with the White House, OMB, Congress, and state, local, and tribal governments; drafts legislation, technical comments, analysis, and testimony. |
| **Office of Communications (OC)** | Coordinates OPM's communication strategy; assists offices with producing communication products; publishes all communication products, including the OPM website. |
| **Human Capital Data Management and Modernization (HCDMM)** | Enhances government-wide human capital strategic management through innovation of interoperable data services and operations, standardizes OPM's data collection efforts, and aims to provide agencies more usable and reliable data. |
| **Office of Small and Disadvantaged Business Utilization (OSDBU)** | Manages OPM's small business program, promoting opportunities available. |
| **Equal Employment Opportunity (EEO)** | Monitors legal compliance with EEO laws, regulations, and policies; processes EEO complaints; offers counseling, alternative dispute resolution, and adjudication of disputes; provides internal training on prohibited discriminatory practices. |

AR0311

| | |
|---|---|
| **Federal Prevailing Rate Advisory Committee (FPRAC)** | Advises the OPM director on administering the prevailing rate system for wage grade employees; conducts studies on the prevailing rate system. OPM director appoints the chairperson. |

## Program Offices

Six program offices, listed below in alphabetical order, contribute to OPM's core mission activities.

| Program Offices | |
|---|---|
| **Employee Services (ES)** | Administers statutory and regulatory provisions related to Federal human capital processes (recruitment, hiring, classification, strategic workforce planning, pay and leave, performance management and recognition programs, leadership and employee development, reskilling, work-life and wellness programs, diversity and inclusion, labor and employee relations, and the Administrative Law Judges Program); supports federal agencies with tools, strategies, flexibilities/authorities, technical assistance, and policy to support the hiring, development, and retention of the federal workforce. |
| **Healthcare and Insurance (HI)** | Operates federal employee healthcare and insurance programs for employees, retirees, and their families (Federal Employees Health Benefits (FEHB) Program, Federal Employees' Group Life Insurance (FEGLI) Program, Long Term Care Insurance Program (FLTCIP), Federal Employees Dental and Vision Insurance Program (FEDVIP), and Federal Flexible Spending Account Program (FSAFEDS); contracts with qualified insurance carriers; and coordinates Federal Benefits Open Season. |
| **Human Resources Solutions (HRS)** | Provides tailored human capital and training products and services and common human resources (HR) technology platforms, (e.g., USA Staffing, USAJOBS) to agencies; offers strategies to agencies to improve their workforces' performance and hire competitively; provides professional and leadership development training programs for federal employees and for federal HR staff; offers assisted acquisition for procuring human capital services. |
| **Merit System Accountability & Compliance (MSAC)** | Conducts oversight of federal agency human capital programs and ensures compliance with merit system principles and civil service regulations; reviews agencies' political appointee conversion requests; adjudicates compensation and classification appeals; oversees the Combined Federal Campaign (CFC) and Voting Rights programs; serves as OPM's audit resolution coordinator for OPM Inspector General and Government Accountability Office audits. |

AR0312

| | |
|---|---|
| **Retirement Services (RS)** | Provides federal annuitants and their survivors with retirement benefits programs and services; administers Civil Service Retirement System (CSRS) and Federal Employees Retirement System (FERS). |
| **Suitability Executive Agent (SuitEA)** | Assists agencies through policy and guidance in determining the suitability of applicants, employees, and contractors for federal employment; renders suitability determination for cases requiring OPM's involvement; prescribes suitability standards and minimum standards of fitness for employment. |

## Mission Support Offices

Mission support offices provide critical services and tools that enable OPM offices to carry out the Agency's mission.

| Mission Support Offices | |
|---|---|
| **Office of the Chief Financial Officer (OCFO)** | Provides leadership in financial policy and strategic planning; manages/coordinates OPM's budget and related planning/analysis processes; executes OPM's accounting, billing, and vendor payments; leads OPM's performance, program evaluation, internal control mechanisms, and enterprise risk management programs. |
| **Office of the Chief Information Officer (OCIO)** | Leads OPM's information technology (IT) strategy; determines long-term enterprise technology needs; manages OPM's IT network, communications infrastructure, and applications; sets Agency-wide technology and security policy; oversees the technology acquisition projects. |
| **Office of Human Resources (HR)** | Performs human capital functions for OPM including recruitment, career development, and processing retirement applications; develops strategy, policy, and solutions to address internal human capital challenges. |
| **Office of Procurement Operations (OPO)** | Supports the Agency's acquisition needs; develops acquisition policy and acquisition practices. |
| **Facilities, Security, and Emergency Management (FSEM)** | Administers OPM's property, building operations, and safety/occupational health programs; completes personnel security actions for OPM employees and contractors; operates OPM's emergency management response programs; manages OPM's physical and information security programs. |

## Independent Offices

The OPM Office of the Inspector General (OIG) is included here for information purposes only. The office is independent from OPM, consistent with statutory requirements. Its functions were outside this study's scope.

88

| Independent Offices | |
|---|---|
| **Office of the Inspector General (OIG)** | Performs audits, investigations, and evaluations of OPM services and programs; promotes accountability and transparency in OPM and its external partners; and produces reports to the OPM director and Congress on identified issues and suggested recommendations. |

AR0314

*This page is intentionally left blank.*

AR0315

# Appendix D:    Selected References

101st United States Congress. 1990. "Chief Financial Officers Act of 1990, Public Law 101-576, HR 5687." November 15.

107th United States Congress. 2002. "Homeland Security Act of 2002, Public Law 107–296, 6 USC 101." November 25.

114th United States Congress. 2016. "National Authorization Act for Fiscal Year 2017, Public Law 114-328, S. 2943." December 23.

115th United States Congress. 2019. "Foundations for Evidence-Based Policymaking Act of 2018, Public Law 115–435, 5 USC 101." January 14.

—. 2018. "Hearing Before the Subcommittee of Regulatory Affairs and Federal Management of the Committee on Homeland Security and Governmental Affairs The Challenges and Opportunities of the Proposed Government Reorganization on OPM and GSA, S. Hrg. 115-451." July 26.

—. 2018. "John S. McCain National Defense Authorization Act for Fiscal Year 2019, Public Law 115-232, HR 5515." August 13.

—. 2017. "National Defense Authorization Act for Fiscal Year 2018, Public Law 115-91, HR 2810." December 12.

116th United States Congress. 2020. "Consolidated Appropriations Act 2021: Division M-Coronavirus Response and Relief Supplemental Appropriations Act, Public Law 116-260."

—. 2020. "FITARA 10.0: Hearing Before the Subcommittee on Oversight and Reform." August 3.

—. 2020. "Inspire to Serve Act of 2020, H.R. 6415." March 27.

—. 2019. "National Defense Authorization Act for Fiscal Year 2020, Public Law 116–92, S.1790." December 20.

—. 2020. "National Defense Authorization Act for Fiscal Year 2021, S. 4049." July 23.

95th United States Congress. 1978. "Civil Service Reform Act of 1978, Public Law 95-454, 92 Stat. 1111." October 13.

Campbell, Alan K. 1978. "Civil Service Reform: A New Commitment." *Public Administration Review 38, no. 3.* March-April. 99-103.

Comptroller General of the United States. 1983. "OPM's Revolving Fund Policy Should be Clarified and Management Controls Strengthened."

Congressional Research Service. 2019. "Administration Proposal to Reorganize the U.S. Office of Personnel Management (OPM), Report IN11110."

—. 2019. "Categories of Federal Civil Service Employment: A Snapshot R45635." March 26.

—. 2015. "Cyber Intrusion into U.S. Office of Personnel Management: In Brief, Report R44111." July 17.

AR0316

—. 2019. "Federal Employees' Retirement System: Budget and Trust Fund Issues, Report RL30023."

—. 2018. "FY2019 Budget: Government Reorganization and Federal Workforce Reform, Report IN10862."

—. 2015. "Statutory Qualifications for Executive Branch Positions, Report RL33886."

Executive Office of the President. 2018. "Delivering Government Solutions in the 21st Century: Reform Plan and Reorganization Recommendations." June.

—. 2020. "Government Reorganization 2020 Budget Fact Sheet."

Groeber, Ginger, Paul Mayberry, Brandon Crosby, Mark Doboga, Samantha E. DiNicola, Caitlin Lee, and Ellen E. Tunstall. 2020. *Federal Civilian Workforce Hiring, Recruitment, and Related Compensation Practices for the Twenty-First Century*. RAND Corporation.

Ingraham, Patricia W., and David H. Rosenbloom, . 1992. *The Promise and Paradox of Civil Service Reform*. Pittsburgh: University of Pittsburgh Press.

National Academy of Public Administration. 2018. "No Time to Wait, Part 2: Building a Public Service for the 21st Century."

—. 2017. "No Time to Wait: Building a Public Service for the 21st Century."

National Commission on Military, National, and Public Service. 2020. "Inspired to Serve."

National Performance Review. 1993. "Reinventing Human Resource Management, HRM12: Eliminate Excessive Red Tape and Automate Functions and Information." https://govinfo.library.unt.edu/npr/library/reports/hrm12.html.

Office of Management and Budget. 2019. "Circular A-11."

—. 2017. "Comprehensive Plan for Reforming the Federal Government and Reducing the Federal Civilian Workforce, M-17-22." April 12.

—. 2018. "Improving the Management of Federal Programs and Projects through Implementing the Program Management Improvement Accountability Act (PMIAA), M-18-19." June 25.

—. 2019. "Legislative Proposal to Establish the Office of Personnel Management within the U.S. General Services Administration." May 16.

—. 2019. "Phase 1 Implementation of the Foundations for Evidence-Based Policymaking Act of 2018: Learning Agendas, Personnel, and Planning Guidance, M-19-23." July 10.

—. 2020. "Phase 4 Implementation of the Foundations for Evidence-Based Policymaking Act of 2018: Program Evaluation Standards and Practices, M-20-12." March 10.

—. 2020. "Training in the Federal Government, M-20-34." 4 September.

Partnership for Public Service. 2014. "Building the Enterprise: A New Civil Service Framework."

—. 2010. "Closing the Gap: Seven Obstacles to a First-Class Federal Workforce." August.

—. 2014. "Embracing Change: CHCOs Rising to the Challenge of an Altered Landscape." May.

AR0317

President's Management Agenda. 2020, 2021. "Security Clearance, Suitability/Fitness, and Credentialing Reform CAP Goal Action Plan." https://trumpadministration.archives.performance.gov/CAP/security-clearance-reform/.

Springer, Linda M. 2019. "Statement of Linda M. Springer Before the Committee on Oversight and Reform, Subcommittee on Government Operations, United States House of Representatives." May 21.

The Center for Organizational Excellence, Senior Executives Association. 2020. "Transforming the Governance of Federal Human Capital Management: Creating Capacity to Enable Effective Change."

Thompson, James R., and Rob Seidner. 2009. *Federated Human Resource Management in the Federal Government: The Intelligence Community Model.* IBM Center for The Business of Government.

U.S. Congress. 1992-2016. "United States Government Policy and Supporting Positions (Plum Book)."

U.S. General Services Administration and U.S. Office of Personnel Management. 2019. "FY 2020 Congressional Justification."

—. 2020. "FY 2021 Congressional Justification." February 10.

U.S. General Services Administration. 2020. "Customer Satisfaction Scores (2018-2019)."

—. 2019. "Qualitative Business Case and Value Proposition for GSA/OPM Merger."

U.S. General Services Administration, Office of Inspector General. 2019. "Semiannual Report to the Congress."

U.S. Government Accountability Office. 2001. "GAO-01-199SP; Federal Trust and Other Earmarked Funds: Answers to Frequently Asked Questions." January 1.

—. 2003. "GAO-03-669; Results-Oriented Cultures: Implementation Steps to Assist Mergers and Organizational Transformation." July 2.

—. 2004. "GAO-04-800T; Human Capital: Observations on Agencies' Implementation of the Chief Human Capital Officers Act." May 18.

—. 2004. "GAO-04-897R; Posthearing Questions Related to Agencies' Implementation of the Chief Human Capital Officers (CHCO) Act." June 18.

—. 2004. "GAO-05-69SP; Human Capital: Principles, Criteria, and Processes for Governmentwide Federal Human Capital Reform." December 1.

—. 2008. "GAO-08-386SP; Federal User Fees: A Design Guide." May 29.

—. 2011. "GAO-12-226T; OPM Retirement Modernization: Longstanding Information Technology Management Weaknesses Need to be Addressed." November 11.

—. 2012. "GAO-12-430T; OPM Retirement Modernization: Progress Has been Hindered by Longstanding Information Technology Management Weaknesses." February 1.

AR0318

—. 2013. "GAO-13-820; Federal User Fees: Fee Design Options and Implications for Managing Revenue Instability." September 30.

—. 2014. "GAO-14-168; Human Capital: Strategies to Help Agencies Meet their Missions in an Era of Highly Constrained Resources." May 7.

—. 2014. "GAO-14-723T; Federal Workforce: Human Capital Management Challenges and the Path to Reform." July 15.

—. 2015. "GAO-15-223; Federal Workforce: OPM and Agencies Need to Strengthen Effort to Identify and Close Mission-Critical Skills Gaps." January 30.

—. 2014. "GAO-15-277T; Federal Retirement Processing: Applying Information Technology Acquisition Best Practices Could Help OPM Overcome a Long History of Unsuccessful Modernization Efforts." December 10.

—. 2016. "GAO-17-127; Federal Human Resources Data: OPM Should Improve the Availability and Reliability of Payroll Data to Support Accountability and Workforce Analytics." October 7.

—. 2019. "GAO-19-217; Federal Retirement: OPM Actions Needed to Improve Application Processing Times." May 15.

—. 2019. "GAO-19-322SP; Priority Open Recommendations: Office of Personnel Management." April 3.

—. 2019. "GAO-19-575T; Government Reorganization: Issues to Consider in the Proposed Reorganization of the Office of Personnel Management." May 21.

—. 2020. "GAO-20-592; Veteran Federal Employment: OPM and Agencies Could Better Leverage Data to Help Improve Veteran Retention Rates." July 22.

—. 2021. "GAO-21-119SP; High-Risk Series: Dedicated Leadership Needed to Address Limited Programs in Most High-Risk Areas." March 2.

—. 2020. "GAO-21-31; USAJobs Website: OPM Has Taken Actions to Assess and Enhance the User Experience." October 13.

—. 1983. "GGD-83-95; Retrenchment and Redirection at the Office of Personnel Management." August 22.

—. 1987. "GGD-87-116BR; Federal Personnel: Status of Personnel Research and Demonstration Projects." September 21.

—. 1989. "GGD-89-19; Managing Human Resources: Greater OPM Leadership Needed to Address Critical Challenges." January 19.

—. 1993. "GGD-93-74FS; Political Appointees: 10-Year Staffing Trends at 30 Federal Agencies." April 30.

—. 1997. "GGD-97-72; The Expected Service: Research Profile." May 1.

—. 1998. "GGD-98-199; OPM's Central Personnel Data File: Data Appear Sufficiently Reliable to Meet Most Customer Needs." September 30.

AR0319

U.S. Merit Systems Protection Board. 2017-2020. "Annual Report for FY 2016-2019."

—. 2017. "Highlight of Reports Issued by the U.S. Merit Systems Protection Board."

—. 2020. "Issues of Merit." September.

—. 2019. "MSPB Perspective: Building on OPM's Hiring Improvement Memo." October.

—. 2016. "The Merit System Principles: Guiding the Fair and Effective Management of the Federal Workforce."

—. 2020. "The State of the Federal HR Workforce: Changes and Challenges." May.

—. 2001. "The U.S. Office of Personnel Management in Retrospect: Achievements and Challenges After Two Decades." December.

—. 1989. "U.S. Office of Personnel Management and the Merit System: A Retrospective Assessment." June 1.

U.S. Office of Personnel Management. 2018. "2018 Federal Workforce Priorities Report (FWPR)."

—. 2019. "Agency Financial Report: Fiscal Year 2019."

—. 2021. "Annual Performance Report Fiscal Year 2020." January.

—. 2003. "Biography of an Ideal: A History of the Federal Civil Service."

—. 2020. "Civil Service Retirement and Disability Fund Annual Report."

—. 2019. "Delegated Examining Certification Program Guide."

—. 2018. "Excepted Service Hiring Authorities: Their Use and Effectiveness in the Executive Branch." July.

—. 2020. "Fact Sheet: Administrative Law Judge (ALJ) Positions."

—. 2020. "Federal Human Capital Business Reference Model (HCBRM)."

—. 2014-2016. "FEVS Special Reports."

—. 2020. "Fiscal Year 2019 Human Capital Reviews Report."

—. 2018. "Human Capital Reviews."

—. 2013. "Human Resources Flexibilities and Authorities in the Federal Government."

—. 2018. "OPM Strategic Plan: Fiscal Years 2018-2022."

—. 2004. "OPM's Guiding Principles for Civil Service Transformation."

U.S. Office of Personnel Management, Office of the Inspector General. 2020. "Final Audit Report: Audit of the Information Technology Security Controls of the U.S. Office of Personnel Management Agency Common Controls, Report Number 4A-CI-00-20-008."

—. 2018. "Final Audit Report: Audit of the U.S. Office of Personnel Management Common Services, Report Number 4A-CF-00-16-055."

AR0320

—. 2020. "Final Audit Report: Audit of the U.S. Office of Personnel Management's Administration of Federal Employee Insurance Programs, Report Number 4A-HI-00-19-007."

—. 2020. "Final Audit Report: Audit of the U.S. Office of Personnel Management's Retirement Services Disability Process, Report Number 4A-RS-00-19-038."

—. 2020. "Final Audit Report: Federal Information Security Modernization Act Audit Fiscal Year 2020, Report Number 4A-CI-00-20-010."

—. 2020. "Management Challenges: Fiscal Year 2020: The U.S. Office of Personnel Management's Management Challenges for Fiscal Year 2020."

—. 2020. "Top Management Challenges: Fiscal Year 2021: The U.S. Office of Personnel Management's Top Management Challenges for Fiscal Year 2021."

Weichert, Margaret. 2019. "Before the Subcommittee on Government Operations Committee on Oversight and Reform United States House of Representatives on The Administration's War on a Merit-Based Civil Service." May 21.

—. 2018. "Testimony to House Oversight and Government Reform Committee Reshaping American Government in the 21st Century." June 27.

AR0321

*This page is intentionally left blank.*

AR0322



1600 K Street, NW
Suite 400
Washington, DC 20006

Phone: (202) 347-3190
Fax: (202) 821-4728
Website: www.napawash.org

AR0323



**UNITED STATES OFFICE OF PERSONNEL MANAGEMENT**
Washington, DC 20415

The Director

December 13, 2023

**Memorandum for Heads of Executive Departments and Agencies**

From:      Kiran A. Ahuja
            Director

Subject:     Maximizing Effective Use of Probationary Periods

As the nation's largest employer, the federal government regularly recruits new talent into the federal workforce.  To give agencies an opportunity to assess, on the job, new hires' overall fitness and qualification for continued employment and permit the swift termination when performance or conduct does not meet acceptable standards to deliver on the mission, new employees must generally complete a probationary period. A probationary period is the final evaluative step in the hiring process of a new employee and is an essential and highly effective supervisory tool to evaluate a candidate's potential to be an asset to the agency before the candidate's appointment becomes final.

Therefore, via this guidance, OPM advises agencies to periodically remind supervisors and managers about the value of the probationary period, particularly as they hire new talent.  This notice to supervisors could occur 4 months prior to expiration of the probationary period, and then again 1 month prior to expiration of the probationary period, or any other time intervals the agency determines appropriate. When doing so, agencies should also advise a supervisor to make an affirmative decision regarding the probationer's fitness for continued employment or otherwise take appropriate action.

These reminders are designed to help supervisors take full advantage of the probationary period in order to make informed decisions about whether to retain an individual in the agency's permanent workforce.  This action also promotes accountability by reminding supervisors of their responsibility to assess the fitness of all probationers and act expeditiously to address any performance or conduct issues.

Attached are Practical Tips for Supervisors of Probationers. Agencies should provide this information to all current and future supervisors for use during the probationary period.  These tips explain the value of a probationary period and recommend good management practices for supervisors and managers to follow during this critical assessment opportunity.

If you have questions or need additional information, please contact OPM's Hiring
Policy team at Employ@opm.gov or OPM's Employee Accountability Policy team at
employeeaccountability@opm.gov.

Attachment: Practical Tips for Supervisors of Probationers

cc:    Chief Human Capital Officers (CHCOs), Deputy CHCOs, Human Resources
      Directors

## Practical Tips for Supervisors of Probationers

- **Understand why the probationary period is important.**
  The probationary period is the final stage of the hiring process for employees in the competitive service. In most cases, agencies can swiftly terminate probationers who have not demonstrated their fitness for continued employment. It is in the Government's interest to assess probationers before they receive finalized appointments as Federal employees.

- **Know your new hire's rights.**
  Most people serve a probationary period, with limited appeal rights upon termination, when they are first hired into the civil service. The process to terminate a probationer usually does not require giving them advanced notice or a right to respond, and their appeal rights afterward are limited, but you do need to follow the rules for how to separate a particular probationer.  There are exceptions that may require you to take additional steps. For example, an individual with prior service may have full statutory procedural rights. Be sure to consult with your human resources advisors before taking action.

- **Make full use of the probationary period for employees.**
  An appointment is not final until the probationary period is over. Probationers have yet to demonstrate their fitness for the job. Performance and conduct problems often first show up during the initial period of Government employment. This period is designed to provide an opportunity for managers and supervisors to address such problems in an expedient manner. Furthermore, removing probationary employees based on conduct and performance issues is less cumbersome as they are not entitled to most of the procedures and appeal rights granted to employees who have completed probationary periods.

- **Communicate expectations for performance and conduct.**
  If your employees don't understand what is expected, it will be very hard, if not impossible, for them to meet those expectations. Providing clear expectations doesn't necessarily require you to lay out precisely written, detailed instructions on conduct or every performance component. Generally, the question you should ask yourself is: "Would a reasonable person understand what was expected?"

AR0326

- **Provide regular and frequent feedback.**
  Feedback, both positive and corrective, whether given in regularly scheduled meetings or in unscheduled discussions, is crucial to ensuring that expectations are understood. Probationers should receive closer supervision and instruction, as needed during the first year of their employment. Managers and supervisors are advised to view this provided time period as an opportunity to potentially course correct with capable employees. These measures aid in preserving the investment the agency has made in the probationer. They also give probationers a fair opportunity to demonstrate why it is in the public interest to finalize an appointment to the Federal service.

- **Set reminders to assess the probationer regularly.**
  For some jobs, it may work best to have the reminders appear on your calendar every few months to remind you of your responsibility to assess a probationer's performance and conduct. For other jobs, you may want to set reminders after training courses or the completion of projects. The important thing is that the assessments are continual and that you do not lose sight of the probationary period's end date.

- **Act promptly.**
  If you conclude that the person is not a good fit for the job, end the probationary period by ending the employment. A probationer will automatically acquire full statutory procedural and appeal rights as defined in law (5 U.S.C. § 7511, 5 U.S.C. § 4303) if you have not separated the probationer within the probationary period.  The probationary period ends when the probationer completes their tour of duty on the day before the anniversary date of the probationer's appointment.

- **Know about the excepted service and the trial period.**
  Just as new hires in the competitive service are placed in a probationary period, new hires in the excepted service are placed in a trial period with similar limitations on their procedural and appeal rights. The length of a trial period can vary, so it is important to check with your human resources advisors to know the situation for your particular hire.

- **Remember that there are other types of probationary periods, too.**
  An employee is required to serve a probationary period upon initial appointment to a supervisory and/or managerial position in the competitive service. Likewise, there is a probationary period when a person first enters the Senior Executive Service (SES). The length of these periods can vary, and

2

the consequences for failing these probationary periods are different than the new hire, competitive service probationary period. For this reason, it is important to check with your human resources advisors to know the conditions for your particular situation.

- **Regularly consult your human resources advisors.**
  If you have questions about whether you have any probationers, how you should assess them, or the separation process, please reach out to your human resources advisors. They are your partners to make sure that you and your staff are successful.

3



OPM.gov / Policy / Hiring Information / Practical Tips for Supervisors of Probationers

# PRACTICAL TIPS FOR SUPERVISORS OF PROBATIONERS

## Understand why the probationary period is important.

The probationary period is the final stage of the hiring process for employees in the competitive service. In most cases, agencies can swiftly terminate probationers who have not demonstrated their fitness for continued employment. It is in the Government's interest to assess probationers before they receive finalized appointments as Federal employees.

## Know your new hire's rights.

Most people serve a probationary period, with limited appeal rights upon termination, when they are first hired into the civil service. The process to terminate a probationer usually does not require giving them advanced notice or a right to respond, and their appeal rights afterward are limited, but you do need to follow the rules for how to separate a particular probationer. There are exceptions that may require you to take additional steps. For example, an individual with prior service may have full statutory procedural rights. Be sure to consult with your human resources advisors before taking action.

## Make full use of the probationary period for employees.

An appointment is not final until the probationary period is over. Probationers have yet to demonstrate their fitness for the job. Performance and conduct problems often first show up during the initial period of Government employment. This period is designed to provide an opportunity for managers and supervisors to address such problems in an expedient manner. Furthermore, removing probationary employees based on conduct and performance issues is less cumbersome as they are not entitled to most of the procedures and appeal rights granted to employees who have completed probationary periods.

## Communicate expectations for performance and conduct.

If your employees don't understand what is expected, it will be very hard, if not impossible, for them to meet those expectations. Providing clear expectations doesn't necessarily require you to lay out precisely written, detailed instructions on conduct or every performance component. Generally, the question you should ask yourself is: "Would a reasonable person understand what was expected?"

## Provide regular and frequent feedback.

AR0329

Feedback, both positive and corrective, whether given in regularly scheduled meetings or in unscheduled discussions, is crucial to ensuring that expectations are understood. Probationers should receive closer supervision and instruction, as needed during the first year of their employment. Managers and supervisors are advised to view this provided time period as an opportunity to potentially course correct with capable employees. These measures aid in preserving the investment the agency has made in the probationer. They also give probationers a fair opportunity to demonstrate why it is in the public interest to finalize an appointment to the Federal service.

## Set reminders to assess the probationer regularly.

For some jobs, it may work best to have the reminders appear on your calendar every few months to remind you of your responsibility to assess a probationer's performance and conduct. For other jobs, you may want to set reminders after training courses or the completion of projects. The important thing is that the assessments are continual and that you do not lose sight of the probationary period's end date.

## Act promptly.

If you conclude that the person is not a good fit for the job, end the probationary period by ending the employment. A probationer will automatically acquire full statutory procedural and appeal rights as defined in law (5 U.S.C. § 7511, 5 U.S.C. § 4303) if you have not separated the probationer within the probationary period. The probationary period ends when the probationer completes their tour of duty on the day before the anniversary date of the probationer's appointment.

## Know about the excepted service and the trial period.

Just as new hires in the competitive service are placed in a probationary period, new hires in the excepted service are placed in a trial period with similar limitations on their procedural and appeal rights. The length of a trial period can vary, so it is important to check with your human resources advisors to know the situation for your particular hire.

## Remember that there are other types of probationary periods, too.

An employee is required to serve a probationary period upon initial appointment to a supervisory and/or managerial position in the competitive service. Likewise, there is a probationary period when a person first enters the Senior Executive Service (SES). The length of these periods can vary, and the consequences for failing these probationary periods are different than the new hire, competitive service probationary period. For this reason, it is important to check with your human resources advisors to know the conditions for your particular situation.

## Regularly consult your human resources advisors.

If you have questions about whether you have any probationers, how you should assess them, or the separation process, please reach out to your human resources advisors. They are your partners to make sure that you and

AR0330

your staff are successful.

AR0331

*The* WHITE HOUSE

PRESIDENTIAL ACTIONS

Hiring Freeze

The White House

January 20, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, I hereby order a freeze on the hiring of Federal civilian employees, to be applied throughout the executive branch. As part of this freeze, no Federal civilian position that is vacant at noon on January 20, 2025, may be filled, and no new position may be created except as otherwise provided for in this memorandum or other applicable law. Except as provided below, this freeze applies to all executive departments and agencies regardless of their sources of operational and programmatic funding.

This order does not apply to military personnel of the armed forces or to positions related to immigration enforcement, national security, or public safety. Moreover, nothing in this memorandum shall adversely impact the provision of Social Security, Medicare, or Veterans' benefits. In addition, the Director of the Office of Personnel Management (OPM) may grant exemptions from this freeze where those exemptions are otherwise necessary.

Within 90 days of the date of this memorandum, the Director of the Office of Management and Budget (OMB), in consultation with the Director of OPM and the Administrator of the United States DOGE Service (USDS), shall submit a plan to reduce the size of the Federal Government's workforce through efficiency improvements and attrition. Upon issuance of the OMB plan, this memorandum shall expire for all executive departments and agencies, with the exception of the Internal Revenue Service (IRS).

AR0332

This memorandum shall remain in effect for the IRS until the Secretary of the Treasury, in consultation with the Director of OMB and the Administrator of USDS, determines that it is in the national interest to lift the freeze.

Contracting outside the Federal Government to circumvent the intent of this memorandum is prohibited.

In carrying out this memorandum, the heads of executive departments and agencies shall seek efficient use of existing personnel and funds to improve public services and the delivery of these services. Accordingly, this memorandum does not prohibit making reallocations to meet the highest priority needs, maintain essential services, and protect national security, homeland security, and public safety.

This memorandum does not limit the nomination and appointment of officials to positions requiring Presidential appointment or Senate confirmation, the appointment of officials to non-career positions in the Senior Executive Service or to Schedule A or C positions in the Excepted Service, the appointment of officials through temporary organization hiring authority pursuant to section 3161 of title 5, United States Code, or the appointment of any other non-career employees or officials if approved by agency leadership appointed by the President. Moreover, it does not limit the hiring of personnel where such a limit would conflict with applicable law.

This memorandum does not abrogate any collective bargaining agreement in effect on the date of this memorandum.

NEWS

ADMINISTRATION

ISSUES

CONTACT

EOP

VISIT

AR0333

GALLERY

VIDEO LIBRARY

AMERICA 250

FOUNDING FATHERS



Subscribe to The White House newsletter

| Your email | SIGN UP |
| --- | --- |

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

AR0334



**UNITED STATES OFFICE OF PERSONNEL MANAGEMENT**
Washington, DC 20415

The Director

# MEMORANDUM

**TO:**     Heads and Acting Heads of Departments and Agencies

**FROM:**   Charles Ezell, Acting Director, U.S. Office of Personnel Management

**DATE**:   January 20, 2025

**RE**:     Guidance on Probationary Periods, Administrative Leave and Details

---

The U.S. Office of Personnel Management (OPM) is providing the following guidance to agencies regarding critical potential personnel actions.  Specifically, this memorandum deals with 1) probationary periods, and 2) administrative leave and details.

## I.      Probationary Periods

Probationary periods are an essential tool for agencies to assess employee performance and manage staffing levels.[1] Employees on probationary periods can be terminated during that period without triggering appeal rights to the Merit Systems Protection Board (MSPB).[2]

Generally, employees in the competitive service with less than one year of service, and in the excepted service with less than two years of service, can be terminated without triggering MSPB appeal rights.[3]  This applies to temporary employees on appointments "not to exceed" a date certain.[4]

No later than January 24, 2025, agencies should identify all employees on probationary periods, who have served less than a year in a competitive service appointment, or who have served less than two years in an excepted service appointment, and send a report to OPM listing all such employees to employeeaccountability@opm.gov, with a copy to Amanda Scales at amanda.scales@opm.gov.  In addition, agencies should promptly determine whether those employees should be retained at the agency.

## II.     Administrative Leave and Details

---

[1] *See* U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005), https://www.mspb.gov/studies/studies/The_Probationary_Period_A_Critical_Assessment_Opportunity_224555.pdf.

[2] *Starkey v. Dep't of Hous. and Urban Dev.*, 2024 MSPB 6, ¶ 16; *Marynowski v. Dep't of the Navy*, 2012 MSPB 82, ¶ 4 (2012).

[3] *Forest v. Merit Sys. Prot. Bd*, 47 F.3d 409, 412 (Fed. Cir. 1995); *Holmes v. Merit Sys. Prot. Bd*., 655 F. App'x 816, 818 (Fed. Cir. 2016); see also 5 U.S.C. §§ 7511(a)(1)(A), (C).

[4] *See Forest,* 47 F.3d at 410*; Holmes,* 655 F. App'x at 816.

"Federal agencies have the discretion to grant paid administrative leave to employees to help manage their workforces when it is in their best interest to do so."[5] The flexibility given to agencies in using paid administrative leave reflects the fact that "heads of Executive agencies have broad authority to manage their organizations, including the authority to grant administrative leave, unless prohibited by law."[6]

OPM regulations note four pertinent areas where paid administrative leave is appropriate: (1) "the absence is directly related to the agency's mission," (2) "the absence is officially sponsored or sanctioned by the agency," or (3) "the absence will clearly enhance the professional development or skills of the employee in the employee's current position," or (4) "the absence is in the interest of the agency or of the Government as a whole."[7] "An agency must retain the discretion to grant or not grant administrative leave in any circumstance based on agency judgments regarding mission needs."[8]

Placing an employee on paid administrative leave may be an appropriate action where the agency component in which the employee works is being eliminated or restructured, or where the agency weighs changes to the individual's role at the agency as part of a workforce realignment. It also may be appropriate when a new agency manager determines that the absence of the employee from the office "is in the interest of the agency or of the Government as a whole."[9] Agencies are encouraged to use flexibilities associated with paid administrative leave as they implement agency restructuring initiatives or determine the best ways to manage agency components going forward.

In addition, agency heads have broad discretion to detail employees "among the bureaus and offices of [their] department[s]" for up to 120 days by written order.[10] An agency may temporarily detail an employee to "unclassified duties."[11] Such details may provide additional

---

[5] *Administrative Leave, Investigative Leave, and Notice Leave*, 89 Fed. Reg. 10,2256-01 (Dec. 17, 2024).

[6] U.S. Office of Personnel Management, *Fact Sheet: Administrative Leave*, https://www.opm.gov/policy-data-oversight/pay-leave/leave-administration/fact-sheets/administrative-leave/.

[7] 5 C.F.R. § 630.1403(a)(1).

[8] 5 C.F.R. § 630.1403(a)(4). OPM reiterates that while "[t]he effective date for these regulations addressing administrative leave (subpart N) and investigative and notice leave (subpart O) is 30 days after the date of publication," nonetheless "the compliance date is set as 270 days after the date of publication." 89 Fed. Reg. at 10,2257. That is, agencies must " revise and implement their internal policies consistent with the Act within 270 calendar days from the date OPM prescribes the regulations," and "[a]gencies are responsible for compliance with time limits provided for in the Act, these OPM regulations, and any related guidance." *Id.* OPM thus believes that agencies are not required to comply with the administrative leave rule and new regulations until September 13, 2025, the deadline for agencies to issue their own implementing regulations. **OPM requests that agencies not issue any agency-specific rules until such rules have been reviewed and approved by OPM.**

[9] 5 C.F.R. § 630.1403(a)(1).

[10] 5 U.S.C. § 3341.

[11] *Frankel v. Dep't of Educ.*, 17 M.S.P.R. 453, 455–56 (1983).

flexibilities to agencies during the transition period and as agencies undertake reorganization efforts and close offices.

Please do not hesitate to contact OPM if you have any questions regarding these matters at employeeaccountability@opm.gov, with a copy to Amanda Scales at amanda.scales@opm.gov.

cc: Chief Human Capital Officers (CHCOs), Deputy CHCOs, and Human Resources Directors

AR0337

| | |
|---|---|
| **From:** | Peters, Noah |
| **To:** | Scales, Amanda D.; Bjelde, Brian |
| **Cc:** | Sullivan, James D. |
| **Subject:** | RE: Regarding Probationary Periods, Administrative Leave and Details |

Fine to exempt them.

**From:** Scales, Amanda D. <█████████████>
**Sent:** Wednesday, February 5, 2025 5:09 PM
**To:** Peters, Noah <█████████████>; Bjelde, Brian <█████████████>
**Cc:** Sullivan, James D. <█████████████>
**Subject:** FW: Regarding Probationary Periods, Administrative Leave and Details

Hi Noah and Brian – wanted to forward the below from NTSB re: probationary employees / critical needs in their group. Good to have in our minds.

**From:** Scales, Amanda <█████████████>
**Sent:** Wednesday, February 5, 2025 5:00 PM
**To:** Scales, Amanda D. <█████████████>
**Subject:** FW: Regarding Probationary Periods, Administrative Leave and Details

**From:** Jennifer Homendy <█████████████>
**Sent:** Wednesday, February 5, 2025 4:59:48 PM (UTC-05:00) Eastern Time (US & Canada)
**To:** EmployeeAccountability <█████████████>; Scales, Amanda <█████████████>
**Cc:** Dana Schulze <█████████████>; Dolline Hatchett <█████████████>; Veronica Marshall <█████████████>; Omar Williams <█████████████>
**Subject:** Regarding Probationary Periods, Administrative Leave and Details

Dear Ms. Scales,

Let me start by thanking the President for his ongoing support of the NTSB's critical safety mission, as well as our requests for various exemptions. As the NTSB continues its work on two major investigations - the recent mid-air collision of an American Airlines regional jet and Black Hawk helicopter at Ronald Reagan Washington Airport killing 67 people, and the air medical jet crash in Philadelphia PA., killing 6 people and injuring 24 - I want to reiterate that our probationary employees are critical to public safety. Currently, of the 20 employees previously provided who are on probationary periods: 13 employees are assigned to the DCA collision, 4 employees are assigned to the Philadelphia crash, and 2 employees are assigned to the ongoing Francis Scott Key Bridge collapse in Baltimore.

As you are aware, the NTSB's workforce is small – 435 employees – and all hands are on deck as we address these catastrophes while continuing our other modal work in highway and motor vehicle accidents, grade crossing incidents, railroad accidents, pipeline accidents, major marine casualties occurring on or under the navigable waters, internal waters, or the territorial sea of the United States, and other accidents related to the transportation of individuals or property when the Board decides the accidents is catastrophic, the accident involves problems of a recurring character, or the investigation of the accident would carry out agency statutory requirements.

Thank you for your time and attention.

Very Respectfully,

Jennifer Homendy
Chair, National Transportation Safety Board

Jennifer Homendy

Chairman

National Transportation Safety Board

490 L'Enfant Plaza, S.W.

Washington, DC 20594

**From:** Jennifer Homendy
**Sent:** Friday, January 24, 2025 4:17:44 PM
**To:** ████████████████████████████████████
████████████████████████████████
**Cc:** Dana Schulze <████████████████████>; Dolline Hatchett <████████████████████>;
Veronica Marshall <████████████████████>; Omar Williams <████████████████████>
**Subject:** NTSB response to OPM Guidance on Probationary Periods, Administrative Leave and Details

In accordance with OPM Guidance on *Probationary Periods, Administrative Leave and Details*, the NTSB is submitting the attached chart of probationary employees. The guidance required the NTSB to identify employees on probationary periods, who have served less than a year in a competitive service appointment, or who have served less than two years in an excepted service appointment and send a report to OPM listing all such employees. In addition, agencies are required to promptly determine whether those employees should be retained at the agency.

The NTSB is charged by Congress with investigating every civil aviation accident in the United States and significant accidents in all other modes of transportation. We investigate about 1300 domestic accidents and serious incidents and lead the U.S.'s participation in another 450 foreign accidents annually with a small workforce of just 436 employees. We have 20 employees in the agency who are on probation. As stated in the attached chart, all 20 employees are critical to our mission of public safety. The NTSB has therefore determined that all 20 employees should be retained by the agency.

Please let me know if you have further questions.

Jennifer Homendy, Chairman, National Transportation Safety Board

CONFIDENTIALITY NOTICE - THIS E-MAIL TRANSMISSION MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, PROPRIETARY, SUBJECT TO COPYRIGHT, AND/OR EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IT IS FOR THE USE OF INTENDED RECIPIENTS ONLY. If you are not an intended recipient of this message, please notify the original sender immediately by forwarding what you received and then delete all copies of the correspondence and attachments from your computer system. Any use, distribution, or disclosure of this message by unintended recipients is not authorized and may be unlawful.

| | |
|---|---|
| **From:** | CHCO Council |
| **Subject:** | Updated Deferred Resignation Agreement Template and FAQ |
| **Date:** | Wednesday, February 5, 2025 12:55:50 PM |
| **Attachments:** | Deferred Resignation Agreement 02 04 25.docx |

Good afternoon, CHCOs and Deputy CHCOs:

Attached please find an updated Deferred Resignation Template Agreement for your agency's use, which now includes the language "Any obligations herein are subject to the availability of appropriations" in item 17.  Agency Heads are strongly encouraged to use formal agreements with respect to the deferred resignation program.

**Additional Noteworthy Items**

1. OPM has completed a Privacy Impact Assessment of the Governmentwide Email System
2. Attorney positions can be exempted from the probationary period data call.

We are planning to hold a call at 3:00 p.m. today to discuss these and other matters.

**Agency FAQ**

**Q: Are employees on administrative leave are eligible for the deferred resignation offer?**
**A:** Yes. If such employees do not have access to their government email, they should send an email stating "Resign" or "Retire" to their agency HR representative, or if they do not know that is, their own government email address where the record will be retained. Their agency HR representative will respond to their personal email and confirm that they wish to accept the deferred resignation offer. Their agency HR representative will then send a formal deferred resignation agreement to them.


Thank you,
The CHCO Council Team

Deferred Resignation Agreement

This agreement is between [AGENCY] and the Employee identified below.

WHEREAS, on or about January 28, 2025, OPM circulated a memorandum to all [AGENCY] employees (Fork in the Road Memo) offering them a voluntary deferred resignation option. The offer allows those employees who accept the offer by February 6, 2025 to retain all pay and benefits and exempts them from all applicable in-person work requirements until September 30, 2025, or earlier if they choose to accelerate the resignation date for any reason (Deferred Resignation Program); and

WHEREAS, [AGENCY] has received Employee's voluntary request to be included in the Deferred Resignation Program; and

WHEREAS, [AGENCY] accepts Employee's request to be included in the Deferred Resignation Program; and

WHEREAS, the parties wish to express the terms and conditions of the agreement between the parties concerning Employee's participation in the Deferred Resignation Program.

WHEREFORE, the parties hereto agree as follows:

1. Employee is accepted into the Deferred Resignation Program.

2. Employee agrees to continue working through February 28, 2025, in an effort to ensure a smooth transition of Employee's duties, responsibilities and work assignments to other staff. Employee is exempt from all in-person work requirements. Employee agrees to turn in all [AGENCY] equipment and property on or before February 28, 2025, as directed by Employee's supervisor.

3. Employee shall be placed on paid administrative leave no later than March 1, 2025. Employee shall remain on paid administrative leave up through and including September 30, 2025, or such earlier date on which Employee may choose to resign or otherwise separate from federal service (deferred resignation period). During the deferred resignation period, [AGENCY] shall continue to pay Employee's current salary and Employee shall continue to retain and receive all benefits of Employee's federal employment, including but not limited to TSP contributions, health, dental, vision and/or any other similar benefits, with [AGENCY] making the government's contribution. Employee will continue to accrue annual and sick leave during the deferred resignation period. Employee will receive retirement service credit during the deferred resignation period. If Employee becomes eligible for a within-grade increase during the deferred resignation period, [AGENCY] shall process the within-grade increase and Employee shall receive the associated salary increase.

4. Employee shall not be expected to work during the deferred resignation period except in rare circumstances as determined by [AGENCY].

5. Employee agrees that Employee's effective resignation date from [AGENCY], and separation from federal service, shall be September 30, 2025. Employee, however, may resign from the federal service on any date prior to September 30, 2025. [AGENCY] shall not take steps to terminate Employee's employment with the federal service prior to September 30, 2025, except where Employee is convicted of a felony crime that would render Employee ineligible for Federal employment.

6. Employee will receive a lump sum payment of accrued annual leave in accordance with 5 CFR part 550 upon separation from service.

7. Nothing in this agreement prevents Employee from retiring from federal service at any time if Employee is eligible to do so under the applicable provisions of CSRS or FERS. If Employee is eligible and elects to retire before September 30, 2025, Employee's retirement election shall override any benefits that would be available to Employee under this agreement after the effective date of Employee's retirement. Employee understands that Employee is responsible for submitting a CSRS or FERS application.

8. Nothing in this agreement prevents Employee from retiring from federal service on or before [INSERT VERA END DATE] if Employee is eligible to do so under the Voluntary Early Retirement Authority (VERA). If Employee is eligible and elects to retire under VERA, Employee's retirement election shall override any benefits that would be available to Employee under this agreement after the effective date of Employee's retirement. Employee understands that Employee is responsible for submitting a VERA application.

9. Employee may accept non-federal employment during the deferred resignation period provided it does not violate the Standards of Ethical Conduct for Employees of the Executive Branch at 5 CFR part 2635 or other applicable federal laws, or any supplemental Standards of Ethical Conduct for Employees or regulations of [AGENCY].

10. By signing this agreement, the parties acknowledge that they have entered the agreement knowingly, voluntarily, and free from improper influence, coercion, or duress. Employee understands that, except as provided in paragraph 14 applicable to Employees 40 years of age or older, this agreement cannot be rescinded, except in the sole discretion of the [AGENCY HEAD], which shall not be subject to review at the Merit Systems Protection Board (MSPB) or any other forum, and waives all rights to challenge the resignation before the MSPB or any other forum.

11. Employee acknowledges that [AGENCY], in conjunction with other federal departments, agencies and units, will immediately rely on the terms of this agreement in consolidating and reassigning roles and otherwise taking steps to reform the agency workforce. Consequently, Employee understands that this agreement is final and Employee's decision to resign effective September 30, 2025, unless Employee resigns or retires earlier as set forth above, is final. [AGENCY] shall comply with all terms of this agreement even if Employee's position is eliminated or reassigned prior to September 30, 2025. Employee shall not be subject to furlough, termination, reduction in force or layoff as a result of an OPM or federal government reorganization or reduction in force. Employee agrees to cooperate with steps taken by

[AGENCY] (such as reassignment to a different component) to exempt Employee from any reduction in force.

12. If there is a lapse in appropriations during the term of this agreement that requires Employee to be placed on furlough status, Employee shall be placed on furlough status during the lapse. Once the lapse is over, Employee shall be taken off furlough and shall receive back pay consistent with the Government Employee Fair Treatment Act of 2019.

13. Employee forever waives, and will not pursue through any judicial, administrative, or other process, any action against [AGENCY] that is based on, arising from, or related to Employee's employment at [AGENCY] or the deferred resignation offer, including any and all claims that were or could have been brought concerning said matters. This waiver includes all claims Employee may have under the Age Discrimination in Employment Act. Employee unconditionally releases [AGENCY] and its present and former employees, officers, agents, representatives, and all persons acting by, through, or in concert with any of those individuals, either in their official or individual capacities, from any and all liability based on, arising from, or relating to the matters that Employee may have against them, including any and all claims that were or could have been brought. Consistent with applicable law, Employee similarly waives any claim that could be brought on Employee's behalf by another entity, including Employee's labor union.

14. If 40 years of age or older, Employee understands that they are entitled to rights and benefits under the Age Discrimination in Employment Act and Older Workers Benefit Protection Act (OWBPA). The parties acknowledge that the Employee has preserved and/or executed the following rights and responsibilities:

    a. The Employee has reviewed the entire agreement and understands its provisions;
    b. The Employee has not waived ▅▅▅▅▅▅ or OWBPA rights or claims that may arise after the date this agreement is signed;
    c. The Employee has the right to consult with an attorney prior to signing this Agreement;
    d. Federal law provides that the Employee may have 45 days from receipt of this Agreement to review and consider this Agreement before signing it;
    e. Federal law further provides that the Employee may revoke this Agreement within seven days after signing and delivering the Agreement to the Agency; the Agreement is not effective and enforceable until this seven-day revocation period has passed; and
    f. Having been informed of these rights and after an opportunity to consult with an attorney, the Employee hereby waives these rights.

15. [AGENCY] agrees to waive any debt owed by Employee to [AGENCY] pursuant to a recruitment incentive, student loan repayment, or other service agreement. [AGENCY] also agrees to waive any remaining service requirements from taking paid parental leave.

16. Should Employee become subject to military orders during the deferred resignation period, then any laws, rules, or other guidance applicable to the Employee as a servicemember that are inconsistent with provisions of this agreement shall supersede the inconsistent terms of this agreement.

17. Any obligations herein are subject to the availability of appropriations.

ON BEHALF OF [AGENCY]:


_____

[NAME, TITLE]


EMPLOYEE


_____

[NAME, TITLE]

**From:** CHCO Council
**Subject:** Updated Deferred Resignation Agreement Template and Meeting Notes
**Date:** Wednesday, February 5, 2025 6:26:15 PM
**Attachments:** (Agency Name) Probationary Employees Template_v2.xlsx

Good afternoon, CHCOs and Deputy CHCOs.

Thank you for attending today's CHCO Council Special Session.

Below you will find new template contract language revising section 10 of the previous template to state that an employee cannot rescind this agreement, except in the sole discretion of the Agency Head:

10.      By signing this agreement, the parties acknowledge that they have entered the agreement knowingly, voluntarily, and free from improper influence, coercion, or duress.  Employee understands that, except as provided in paragraph 14 applicable to Employees 40 years of age or older, Employee cannot rescind this agreement, except in the sole discretion of the Agency Head, which shall not be subject to review at the Merit Systems Protection Board (MSPB), Equal Employment Opportunity Commission (EEOC) or any other forum, and waives all rights to challenge the resignation before the MSPB, EEOC, or any other forum.

 The intent of this section as previously drafted was not to grant the Agency Head the ability to unilaterally rescind the agreement.

As a reminder, Agency Heads and employees may use formal agreements with respect to the deferred resignation program. **However, the use of a contract is not required; an employee typing any of "resign," "retire" or "resign and retire" are sufficient.**

With respect to the template contract, as you have seen, we are engaged in an iterative process with CHCOs to refine the terms. **We will have a final draft of the template tomorrow in advance of the CHCO call.**

For agencies who need it, we're attaching the Probationary Employees Tracker to assist with providing OPM with a list of probationary employees that includes the agency's decision as to whether the employee should be retained.  Agencies may work to scrub from this listing the names of any employees who have already completed their probationary period, and should note any employees who are listed as probationary but have appeal rights. Finally, attorneys can be exempted if they are mission-critical, but do not have to be exempted.

Finally, we are asking that CHCOs encourage agency HR staff to continue all efforts to respond to employee questions concerning the DRP in timely manner, but to please cease copying ███████████ when responding to employee inquiries.

**Agency FAQ**

**Q: May an employee who is eligible for regular retirement or VERA under DRP at any point in 2025 elect a retirement date of December 31, 2025 and remain on administrative leave through that date?**

**A:** Yes, provided the employee indicates their intent to do so when electing DRP by 11:59 p.m. on February 6, 2025.

**Q: How would electing the Deferred Resignation Program impact employees with existing TSP loans?**

**A:** If employees on administrative leave continue earning basic pay, they continue to make TSP contributions and loan payments.  NOTE: Employees may elect to change or stop making TSP contributions; however, employees <u>cannot</u> elect to stop making loan payments.

**Q: How would an extended administrative leave status under the Deferred Resignation Program impact TSP benefits/requirements?**

**A:** If employees on administrative leave continue earning basic pay, they continue to make TSP contributions and loan payments.  NOTE:  Employees may elect to change or stop making TSP contributions; however, employees earning basic pay <u>cannot</u> elect to stop making loan payments. Employees who continue earning basic pay and contributing to the TSP also will continue to receive the agency automatic 1% contribution as well as agency matching contributions on up to 5% of their salary. TSP participants who separate from federal service may leave their savings in the TSP, where it will continue to grow.

**Q: Can outstanding TSP loans be waived for employees who elect DRP?  Employees with outstanding loans are concerned that if they accept this program they will have to pay back loans immediately that they had planned to pay back over several year and it might be enough to create a hardship/disincentive.**

**A:** Under current law, employees who elect DRP <u>cannot</u> waive their outstanding TSP loan. Employees who separate from their federal civilian job or from the uniformed services with an outstanding loan balance must continue to make payments on their own, pay off the balance, or allow the loan to be foreclosed and pay: (1) taxes on the balance and accrued interest; and (2) early withdrawal penalties if they are under the age of 55 by 12/31/2025 per Internal Revenue Code.

Thank you,

The CHCO Council Team

| Agency | Name | Position | Status |
| --- | --- | --- | --- |

**Should employee be retained?**    **Count**    **Employee Start Date**    **Probation Start**    **Probation End**

AR0349

**<u>Salary</u>**

*The* WHITE HOUSE

PRESIDENTIAL ACTIONS

Implementing The President's "Department of
Government Efficiency" Workforce Optimization Initiative

The White House

February 11, 2025

By the authority vested in me as President by the Constitution and the laws of the
United States of America, it is hereby ordered:

Section 1. Purpose. To restore accountability to the American public, this order
commences a critical transformation of the Federal bureaucracy. By eliminating waste,
bloat, and insularity, my Administration will empower American families, workers,
taxpayers, and our system of Government itself.

Sec. 2. Definitions. (a) "Agency" has the meaning given to it in section 3502 of title
44, United States Code, except that such term does not include the Executive Office of
the President or any components thereof.

(b) "Agency Head" means the highest-ranking official of an agency, such as the
Secretary, Administrator, Chairman, or Director, unless otherwise specified in this order.

(c) "DOGE Team Lead" means the leader of the Department of Government
Efficiency (DOGE) Team at each agency, as defined in Executive Order 14158 of
January 20, 2025 (Establishing and Implementing the President's "Department of
Government Efficiency").

(d) "Employee" has the meaning given to it by section 2105 of title 5, United States
Code, and includes individuals who serve in the executive branch and who qualify as

AR0351

employees under that section for any purpose.

(e)  "Immigration enforcement" means the investigation, enforcement, or assisting in the investigation or enforcement of Federal immigration law, including with respect to Federal immigration law that penalizes a person's presence in, entry, or reentry to, or employment in, the United States, but does not include assisting individuals in applying for immigration benefits or efforts to prevent enforcement of immigration law or to prevent deportation or removal from the United States.

(f)  "Law enforcement" means:

(i)  engagement in or supervision of the prevention, detection, investigation, or prosecution of, or the incarceration of any person for, any violation of law; or

(ii)  the protection of Federal, State, local, or foreign government officials against threats to personal safety.

(g)  "Temporary employee" has the meaning given to it in 5 C.F.R. part 316.

(h)  "Reemployed annuitant" has the meaning given to it in 5 C.F.R. part 837.

Sec. 3.  Reforming the Federal Workforce to Maximize Efficiency and Productivity.  (a) Hiring Ratio.  Pursuant to the Presidential Memorandum of January 20, 2025 (Hiring Freeze), the Director of the Office of Management and Budget shall submit a plan to reduce the size of the Federal Government's workforce through efficiency improvements and attrition (Plan).  The Plan shall require that each agency hire no more than one employee for every four employees that depart, consistent with the plan and any applicable exemptions and details provided for in the Plan.  This order does not affect the standing freeze on hiring as applied to the Internal Revenue Service.  This ratio shall not apply to functions related to public safety, immigration enforcement, or law enforcement.  Agency Heads shall also adhere to the Federal Hiring Plan that will be promulgated pursuant to Executive Order 14170 of January 20, 2025 (Reforming the Federal Hiring Process and Restoring Merit to Government Service).

(b)  Hiring Approval.  Each Agency Head shall develop a data-driven plan, in consultation with its DOGE Team Lead, to ensure new career appointment hires are in highest-need areas.

(i)  This hiring plan shall include that new career appointment hiring decisions shall be made in consultation with the agency's DOGE Team Lead, consistent with applicable law.

(ii)  The agency shall not fill any vacancies for career appointments that the DOGE

AR0352

Team Lead assesses should not be filled, unless the Agency Head determines the positions should be filled.

    (iii)  Each DOGE Team Lead shall provide the United States DOGE Service (USDS) Administrator with a monthly hiring report for the agency.

  (c)  Reductions in Force.  Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs.  All offices that perform functions not mandated by statute or other law shall be prioritized in the RIFs, including all agency diversity, equity, and inclusion initiatives; all agency initiatives, components, or operations that my Administration suspends or closes; and all components and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations as provided in the Agency Contingency Plans on the Office of Management and Budget website.  This subsection shall not apply to functions related to public safety, immigration enforcement, or law enforcement.

  (d)  Rulemaking.  Within 30 days of the date of this order, the Director of the Office of Personnel Management (OPM) shall initiate a rulemaking that proposes to revise 5 C.F.R. 731.202(b) to include additional suitability criteria, including:

    (i)   failure to comply with generally applicable legal obligations, including timely filing of tax returns;

    (ii)   failure to comply with any provision that would preclude regular Federal service, including citizenship requirements;

    (iii)   refusal to certify compliance with any applicable nondisclosure obligations, consistent with 5 U.S.C. 2302(b)(13), and failure to adhere to those compliance obligations in the course of Federal employment; and

    (iv)   theft or misuse of Government resources and equipment, or negligent loss of material Government resources and equipment.

  (e)  Developing Agency Reorganization Plans.  Within 30 days of the date of this order, Agency Heads shall submit to the Director of the Office of Management and Budget a report that identifies any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities.  The report shall discuss whether the agency or any of its subcomponents should be eliminated or consolidated.

  (f)  Within 240 days of the date of this order, the USDS Administrator shall

AR0353

5/7/25, 12:35 PM    Implementing the President's Department of Government Efficiency Workforce Optimization Initiative – The White House

Case 3:25-cv-01780-WHA    Document 218-3    Filed 05/09/25    Page 354 of 402

submit a report to the President regarding implementation of this order, including a recommendation as to whether any of its provisions should be extended, modified, or terminated.

Sec. 4. Exclusions. (a) This order does not apply to military personnel.

   (b) Agency Heads may exempt from this order any position they deem necessary to meet national security, homeland security, or public safety responsibilities.

   (c) The Director of OPM may grant exemptions from this order where those exemptions are otherwise necessary and shall assist in promoting workforce reduction.

Sec. 5. General Provisions. (a) Nothing in this order shall be construed to impair or otherwise affect:

   (i)  the authority granted by law to an executive department, agency, or the head thereof; or

   (ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

   (b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

   (c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
   February 11, 2025.

AR0354

NEWS

ADMINISTRATION

ISSUES

CONTACT

EOP

VISIT

GALLERY

VIDEO LIBRARY

AMERICA 250

FOUNDING FATHERS



Subscribe to The White House newsletter

Your email

**SIGN UP**

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

AR0355

5/7/25, 12:35 PM    Implementing The President's Department of Government Efficiency Workforce Optimization Initiative – The White House

Case 3:25-cv-01780-WHA    Document 218-3    Filed 05/09/25    Page 356 of 402

WH.GOV

Copyright

Privacy



AR0356

| | |
|---|---|
| **From:** | Hinton, Veronica E. |
| **To:** | Peters, Noah |
| **Cc:** | Heller-Stein, Colleen E. |
| **Subject:** | RE: Question |
| **Date:** | Tuesday, February 11, 2025 12:17:51 PM |
| **Attachments:** | image001.png |

Copy, will relay accordingly.

Thanks,
V

**From:** Peters, Noah ███████████████
**Sent:** Tuesday, February 11, 2025 12:14 PM
**To:** Hinton, Veronica ██████████████
**Cc:** Heller-Stein, Colleen E. ████████████████
**Subject:** RE: Question

Agencies are responsible for exempting whomever they want- they are not required to exclude people. We have suggested possible categories of exemptions but are not requiring it. It might not make sense for each agency.

**From:** Peters, Noah
**Sent:** Tuesday, February 11, 2025 12:13 PM
**To:** Hinton, Veronica E. ████████████████
**Cc:** Heller-Stein, Colleen E. ████████████████
**Subject:** RE: Question

It's up to each agency. They should consider excluding them but are not required. We should not send out anything more formal. I don't want to be in the weeds of their exemptions.

**From:** Hinton, Veronica E. ████████████████
**Sent:** Tuesday, February 11, 2025 12:06 PM
**To:** Peters, Noah ████████████████
**Cc:** Heller-Stein, Colleen E. ████████████████
**Subject:** FW: Question

Hi Noah,

At a CHCO meeting last week, you indicated that disabled veterans and PMF/interns would be excluded from the probationary exercise. Is that still the case?

Colleen: Did we send out guidance on this in the recap of the session?

Thanks,
V

**From:** Michalski, Lori A ███████████████
**Sent:** Tuesday, February 11, 2025 11:39 AM
**To:** Hinton, Veronica E. ███████████████
**Subject:** Question

Hi Veronica

In one of our last calls you had mentioned that OPM would be sending guidance on Disabled veterans and PMFs/Interns for the probationary employee exercise.. will there be guidance forthcoming?

Thanks!!



**Lori A. Michalski**
Chief Human Capital Officer

**Office of the Chief Human Capital Officer**
**U.S. Department of Housing and Urban Development**
████████████████████████
Office: 202-402-3921

| | |
|---|---|
| **From:** | Peters, Noah |
| **To:** | Hashimi, Donia (JMD) (CTR); Scales, Amanda D. |
| **Cc:** | Lauria, Jolene A. (JMD); Shumate, Brett A (CIV); Burnham, James EOP/DOGE (Volunteer); Raynor, Austin L. EOP/DOGE; Sullivan, James D. |
| **Subject:** | RE: [EXTERNAL] Call with OPM |
| **Date:** | Tuesday, February 11, 2025 6:35:00 PM |
| **Attachments:** | Memo Lifting Caps on TTCs-bll FINAL.pdf |

Lauria,

Want to confirm a couple items from our call:

OPM has granted Civil Appellate, Federal Programs Branch, Office of Immigration Litigation, and Office of the Solicitor General exemptions from the hiring freeze and from any guidance to terminate probationary employees.

Please let us know if you need to waive any requirements around filling those positions found in Part 302 of Title V of the Code of Federal Regulations, pursuant to 5 C.F.R. § 302.101(c)(6), or any other OPM regulations.

In addition, please let us know whether there are any other hiring flexibilities that would allow DOJ to hire qualified candidates quickly in these departments. Please note that DOJ can hire unlimited numbers of attorneys under Temporary Transitional Schedule C hiring authority.

Best,

Noah

**From:** █████████████████████████████
**Sent:** Tuesday, February 11, 2025 2:21 PM
**To:** ████████████████████████████████████
**Cc:** ██████████████████████████████
**Subject:** RE: [EXTERNAL] Call with OPM

> Some people who received this message don't often get email from ████████████████. Learn why this is important

Hi ████████

I'm not sure why we aren't seeing the invite on our end. Thanks for providing the meeting link!

Kind regards,

████████████

**From:** Scales, Amanda D. ██████████████
**Sent:** Tuesday, February 11, 2025 1:39 PM
**To:** Hashimi, Donia (JMD) (CTR) ████████████████>; Peters, Noah ████████████
**Cc:** Lauria, Jolene A. (JMD) ████████████████
**Subject:** RE: [EXTERNAL] Call with OPM

Hi Donia – yes, she's on the invite ████████████████. Not sure why it's not showing on her calendar. Teams dial-in info below:

**Join the meeting now**
Meeting ID: 294 486 205 166
Passcode: 4pz758pU

---

**From:** Hashimi, Donia (JMD) (CTR) ████████████████
**Sent:** Tuesday, February 11, 2025 1:36 PM
**To:** Peters, Noah ████████████████ Scales, Amanda D. ████████████████
**Cc:** Lauria, Jolene A. (JMD) ████████████████
**Subject:** FW: [EXTERNAL] Call with OPM

Some people who received this message don't often get email from ████████████████. Learn why this is important

Good afternoon, Amanda and Noah,

Jolene has not received a calendar invite for this meeting at 2:30 PM today, 2/11. If you would still like to meet, Jolene can be reached at 202-532-5432.

Please let us know if you'd like to coordinate another time for this meeting. Thank you!

Kind regards,

Donia

**From:** "Scales, Amanda D." ████████████████
████████████ 10, 2025 at 8:51:53 PM EST
**To:** "Lauria, Jolene A. (JMD)" ████████████████
**Cc:** "Peters, Noah" ████████████████
**Subject: Re: [EXTERNAL] Call with OPM**

Great — talk to you then.

Get Outlook for iOS

_____

**From:** Lauria, Jolene A. (JMD) ██████████████████████
**Sent:** Monday, February 10, 2025 8:46:08 PM
**To:** Scales, Amanda D. ███████████████
**Cc:** Peters, Noah ████████████████████
**Subject:** Re: [EXTERNAL] Call with OPM

230 works

Sent from my iPhone

> On Feb 10, 2025, at 8:44 PM, Scales, Amanda D.
> ███████████████ wrote:

I originally scheduled it for 2:30! That does work or doesn't work?

Get Outlook for iOS

_____

**From:** Peters, Noah ████████████████
**Sent:** Monday, February 10, 2025 8:36:27 PM
**To:** Lauria, Jolene A. (JMD) ███████████████████; Scales, Amanda D. ████████████
**Subject:** Re: [EXTERNAL] Call with OPM

Yes that is fine

Get Outlook for iOS

_____

**From:** Lauria, Jolene A. (JMD) ████████████████████ >
**Sent:** Monday, February 10, 2025 8:36:09 PM
**To:** Scales, Amanda D. ████████████████; Peters, Noah ████████████████
**Subject:** Re: [EXTERNAL] Call with OPM

I'm sorry can it be 230.  I should not be in charge of my calendar.  I read the wrong day!!!

If not I'll send someone to the other briefing.

Thank you. Sorry for the mistake.
Sent from my iPhone

> On Feb 10, 2025, at 8:22 PM, Scales, Amanda D. ███████████ wrote:

> Invite created – feel free to forward the invite, Jolene. Thanks!

> **From:** Peters, Noah ███████████████
> **Sent:** Monday, February 10, 2025 7:33 PM
> **To:** Lauria, Jolene A. (JMD) ███████████ Scales, Amanda D.███████████
> **Subject:** RE: [EXTERNAL] Call with OPM

> 2-3 is OK.

> Great to have the CHCO and controller join.

> Best,

> Noah

> **From:** Lauria, Jolene A. (JMD) ███████████████
> **Sent:** Monday, February 10, 2025 7:30 PM
> **To:** Scales, Amanda D. ███████████ >
> **Cc:** Peters, Noah ███████████
> **Subject:** Re: [EXTERNAL] Call with OPM

> I have 2-3 open and 4-5. If those don't work then I can move other meetings.
> Looking forward to meeting you.

> If permitted I'd like to have my CHCO MIKE Williams and Controller Chris Alvarez join the call.

> If you prefer one on one that is fine too.

> Thank you.
> Sent from my iPhone

AR0362

On Feb 10, 2025, at 5:50 PM, Scales,
Amanda D. ███████████ wrote:

Hi Jolene,

Amanda Scales, with OPM, here – it's great to
e-meet you! Sarah sent us your contact
information. Noah and I would like to connect
with you tomorrow to cover DOJ components
that should be exempted from hiring freeze,
etc. What times work for you tomorrow to hop
on a call? I'll set up an invite for us.

Thanks,
Amanda



**UNITED STATES OFFICE OF PERSONNEL MANAGEMENT**
Washington, DC 20415

The Director

# MEMORANDUM

| | |
|---|---|
| **TO:** | Heads and Acting Heads of Departments and Agencies |
| **FROM:** | Charles Ezell, Acting Director, U.S. Office of Personnel Management |
| **DATE**: | January 20, 2025 |
| **RE**: | Temporary Transition Schedule C and Schedule C Authorities and Noncareer Senior Executive Service Appointing Authorities. |

To support agencies' transition needs, the U.S. Office of Personnel Management (OPM) is providing the following hiring flexibilities regarding Temporary Transition Schedule C and Schedule C appointments, and Noncareer and Limited Term Senior Executive Service (SES) appointment authorities.[1]

Schedule C positions are excepted from the competitive service because of their confidential or policy-determining character, and most Schedule C positions are at the General Schedule (GS)-15 or lower grade level. Schedule C positions above the GS-15 level are either senior-level (SL) positions or are specifically authorized in law. The SES is a personnel system applicable to the highest-level executive, managerial, supervisory and some policy positions in most Federal agencies.

## I.       Temporary Transition Schedule C (TTC) and Schedule C Authorities

After the inauguration on January 20, 2025, federal departments and agencies are authorized to use the TTC authority for a period of one year beginning January 20, 2025, or when a new agency head has entered on duty—whichever period is later (5 CFR 213.3302(a)). Ordinarily, the number of TTC positions established by an agency cannot exceed either 50 percent of the highest number of permanent Schedule C positions filled in any one of the preceding five years, or three positions – whichever is greater (5 CFR 213.3302(b)). However, in accordance with 5 C.F.R. 213.3302(b), "OPM may approve an increase in an agency's quota to meet a critical need or in unusual." By this memorandum, OPM approves the unlimited use of TTCs. This expansion

---

[1] This memorandum replaces and supersedes the January 8, 2025 Memorandum from Acting OPM Director Rob Shriver for Heads of Executive Departments, Independent Agencies, Inspectors General and the Council of the Inspectors General on Integrity and Efficiency re: Governmentwide Temporary Transition Schedule C Authority and Temporary Transition Senior Executive Service Appointment Authorities. In particular, any permission granted by that memo for Inspector Generals to hire temporary transitional Schedule Cs is hereby rescinded.

of the use of TTCs is necessary to drive the unusually expansive and transformative agenda the American people elected President Trump to accomplish.

An individual may be appointed to a TTC position for a period of up to 120 days, and this period may be further extended once for an additional 120 days without OPM 2 approval. Agencies shall notify OPM within five business days of each appointment by entering the appointment into the Executive and Schedule C System (ESCS) and submitting the completed OPM Form 1019 generated by ESCS. Agencies shall ensure all appropriate fields are completed in the form and the Certification Statement is signed and dated by the department/agency head or designee. Agencies shall notify OPM within three business days when a TTC position is vacated, by submitting a completed OPM Form 1019.

## II.    Noncareer and Limited SES Appointing Authorities

When filling an SES position by noncareer or limited-term appointment, an agency is not required to hold a competition or even announce the position is available. For noncareer (but not limited) positions, the agency head must certify that the appointee meets the qualifications requirements for the position. Any noncareer or limited SES appointee may be removed by the appointing authority at any time and do not have any appeal rights.

OPM approves each use of a noncareer authority by an agency, and the authority reverts to OPM when the noncareer appointee leaves the position. 5 U.S.C. 3134(a), (c).

Upon OPM authorization, a Presidential nominee may receive a noncareer or limited term appointment to an SES position while awaiting Senate confirmation for the permanent position for which he/she is nominated. However, the individual cannot serve in the position for which he/she is nominated until confirmed by the Senate. Thus, individuals awaiting Senate confirmation normally serve in an advisory or consultative capacity in another position until confirmed.

To support the transition of the incoming administration, OPM is delegating a temporary allocation of noncareer SES appointments authorities to all agencies subject to the 25 percent or other applicable limit on noncareer appointments in the agency, which may be used for the time-limited noncareer appointment of an individual for no more than 30 days. The purpose for these authorities is to support efficiency in establishing agency programs and to enable agencies to begin the pre-appointment background investigation process for these appointees. OPM may grant additional noncareer SES appointment authorities on a case-by-case basis upon request.

Consistent with legal and statutory requirements, these noncareer SES authorities may not be exercised prior to the inauguration on January 20, 2025, or after February 15, 2025. The SF-50 initiating temporary appointment shall include remarks noting the temporary appointment with a "Not to Exceed" date, which may serve as the removal notice required by 5 CFR 359.902. Agencies shall notify OPM within five business days of appointment by entering the appointment into ESCS and submitting the completed OPM Form 1652 generated by the system. Agencies shall also notify OPM within three business days when a temporary noncareer SES appointment ends, by submitting a completed OPM Form 1652.

Page 3

For an individual the agency wishes to retain beyond the 30-day temporary appointment, the agency should request OPM approval for any noncareer authority that is not time-limited (or other appropriate appointing authority), at the earliest possible date within the 30 days. This is essential to enable the approval process for any new appointment to be concluded before the 30-day period elapses. This may be done by entering a new request through ESCS and submitting the completed OPM Form 1652 generated by the system.

All forms should be submitted to the OPM Agency Operations and Services (AOS) Group by uploading the completed form in ESCS.

If you have any questions on this or other SES or Schedule C staffing matters, please contact the OPM AOS Group via email at ██████████████, with a copy to Amanda Scales at ████████████████████.

cc: Chief Human Capital Officers (CHCOs), Deputy CHCOs, and Human Resources Directors.

| | |
|---|---|
| **From:** | Peters, Noah |
| **To:** | Adam Ramada (External) |
| **Cc:** | Scales, Amanda D. |
| **Subject:** | RE: Probationary Termination Letter |
| **Attachments:** | image001.png |

Adam- check any CBAs or agency policies for any required notice periods for terminating probationary employees.

Best,

Noah

**From:** Peters, Noah
**Sent:** Tuesday, February 11, 2025 6:15 PM
**To:** Ramada, Adam
**Cc:** Scales, Amanda D.
**Subject:** RE: Probationary Termination Letter

**Q: What is the resignation date agencies should use for probationary employees who elect DRP?**

**A:** Agencies should exempt from DRP any probationary employees it already notified or intends to notify of termination of employment, and use the termination date identified in their termination notice.

**From:** Peters, Noah
**Sent:** Tuesday, February 11, 2025 5:39 PM
**To:** Ramada, Adam <████████████████>
**Cc:** Scales, Amanda D. <████████████████>
**Subject:** Probationary Termination Letter

**Noah Peters**
*Senior Advisor to the Director*
*U.S. Office of Personnel Management*
1900 E Street, N.W. | Washington, D.C. 20415
████████████████████████



**From:** CHCO Council
**Subject:** Key Takeaways from CHCO Council Special Session ███
**Date:** Wednesday, February 12, 2025 5:42:12 PM
**Attachments:** NTE Term Draft.docx
Termination of Probationary Employee-clean.docx
DRP OWBPA notification process.pptx

Good evening, CHCOs and Deputy CHCOs:

We appreciate your participation in today's Special Session!

As promised, we are writing to share key points covered in the meeting, as we know we covered quite a bit in a short period of time.

### I. Process Overview ████/OWBPA Waiver

To assist you with implementation we've developed and attached a process map that provides an overview of the steps listed below.

### Summary of Requirements

1. We recommend that agencies communicate to employees that they are required to take two steps to participate in the DRP: they must (1) indicate their interest in participating in the DRP; and (2) if eligible for the DRP, they must execute a written agreement embodying the terms of the Deferred Resignation Program.

2. Ineligible Employees: For any employees who notified OPM of their interest in the DRP but whom your agency determines should be excluded as not eligible for the DRP, you should notify OPM and those employees of their ineligibility.

3. Agencies should use a waiver agreement, and should use the template waiver agreement (Appendix 1) provided previously to do so.

4. **FOR ANY EMPLOYEE WHO IS 40 YEARS OLD OR OLDER,** the agency also should provide an additional informational disclosure mandated by law.

   a. The Older Workers Benefit Protection Act (OWBPA) Disclosure should be distributed simultaneously with the DRP program written agreement.

   b. An OWBPA Disclosure has two main components: (1) a required narrative section; and (2) a chart.

i. **Narrative**: Create a narrative with a short summary that defines any DRP exclusions that your agency is using or is required to use, and other instructional information, in a manner that can be easily understood:

1. The narrative in your agency's OWBPA Disclosure must explain the group of employees eligible for the DRP in your agency and the specific exclusions from the DRP that apply in your agency.

2. The narrative also must acknowledge the 45-day consideration period and the seven-day revocation period required by law.

3. Include the agency email address to which employees should send signed agreements (if the employee has not yet signed an agreement)

4. Explain how an employee may revoke a previously signed agreement.

ii. **Chart**: Prepare a chart listing the job titles and ages of <u>all</u> agency employees in the "decisional unit" who are eligible for the DRP (all full-time federal employees in your agency, who were not subject to DRP program exclusions or additional agency-specific exclusions), and also include the job titles and ages of all

individuals in the same decisional units who are not eligible for the DRP. See example on page 3 of the guidance document.

1. Smaller agencies may have only one chart, comprised of their entire agency. Depending on how employee eligibility decisions are made in larger agencies (like cabinet departments), some agencies may have multiple charts, one for each separate "decisional unit."

2. You must separately list each job title / job classification in the applicable "decisional unit" of your agency

3. You must list individual ages and the number of individuals who are each age, broken out by individuals who are eligible and not eligible for the DRP.

4. Do not list employees by name; do not use age bands broader than 1 year.

b. You should distribute the chart and the narrative now, even if there is a possibility that you might wish to distribute an updated chart after the program deadline closes.

5. **Timing of Implementing Administrative Leave:** Agencies should not place a participating employee on administrative leave under the DRP before the employee has signed the waiver agreement. And, for any employee who is at least 40 years old, agencies should additionally wait for at least seven days after the agreement is signed (or else provide clear instructions for how employees over 40 can revoke the agreement).

a. For potentially participating employees who are 40 years or older, an agency must give the employee 45 days to consider the waiver agreement and accompanying OWBPA disclosure (the "consideration period"). The consideration period starts when the waiver agreement and accompanying OWBPA disclosure are transmitted to the employee.

b. Once an employee who is 40 years old or older signs the waiver agreement, a mandatory seven-day revocation period begins. **This revocation period cannot be waived, for any reason**. Agencies must clearly communicate to participating employees how and to whom they must notify if they choose to revoke their DRP agreement.

## II. Probationary Periods

Draft letters for terminating a probationary period employee and for terminating an employee on an NTE or term employee are attached.

Per 5 CFR 315.803: "The agency shall utilize the probationary period as fully as possible to determine the fitness of the employee and shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment."

While agencies must identify performance or conduct deficiencies in the notice terminating a probationer, such performance or conduct deficiencies do not have to be identified in a previous performance evaluation.

Thank you,

The CHCO Council Team

MEMORANDUM FOR:      INSERT NAME
                                   INSERT POSITION
                                   INSERT ORGANIZATION

FROM:                    INSERT NAME
                                   INSERT POSITION
                                   INSERT ORGANIZATION

DATE:                    INSERT DATE

SUBECT:                Termination of Temporary/Excepted Appointment

On INSERT DATE, you were hired on a Temporary Excepted Service appointment as an INSERT TITLE, in INSERT ORGANIZATION, at the INSERT AGENCY for a period not to exceed INSERT DATE, to support INSERT REASON FOR APPOINTMENT.

The purpose of this memorandum is to notify you that your employment will be terminated effective at the close of business on INSERT DATE due to INSERT REASON.

If you believe this termination is being taken in whole or in part because of discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, and/or reprisal for prior EEO activity, you may file a discrimination complaint with the INSERT AGENCY EEO INFORMATION,

If you believe this action is in retaliation for your making protected whistleblowing disclosures, you may also seek corrective action from the U.S. Office of Special Counsel (OSC). If you do so, your appeal may be limited to whether the Agency took one or more covered personnel actions against you in retaliation for making protected whistleblowing disclosures, and you will not be able to challenge the decision on other bases in that action. To seek corrective action from the OSC, you may submit your complaint online. More information on or about filing a complaint with the OSC may be found at https://osc.gov/Pages/File-Complaint.aspx.  As an alternative, you may communicate in writing to the following address:

Complaints Examining Unit<br/>
U.S. Office of Special Counsel<br/>
1730 M Street, N.W., Suite 218<br/>
Washington, DC 20036-4505

INSERT INFORMATION ABOUT HOW TO RETURN EQUIPMENT, ETC.

If you have any procedural questions regarding this action, you may contact INSERT HR POC.

[DATE], 2025

MEMORANDUM FOR [EMPLOYEE], [TITLE], [ORGANIZATION]

FROM:                    [NAME]
                         [TITLE]

SUBJECT:                 Notification of Termination During Probationary Period

REFERENCES:              5 U.S.C. § 7511
                         [5 U.S.C. § 3321(a)]
                         [5 C.F.R. §§ 315.803 and 804]
                         [5 C.F.R. § 316.304]
                         [INSERT AGENCY POLICY]

This is to provide notification that the Agency is removing you from your position of [TITLE]  and federal service consistent with the above references.

On [INSERT DATE OF APPOINTMENT], the Agency appointed you to the position of [TITLE]. As documented on your appointment Standard Form 50 (SF-50), you appointment is subject to a probationary/trial period. The agency also informed you of this requirement in the job opportunity announcement for the position.

Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final until the probationary period is over," and the probationary period is part of "the hiring process for employees."[1] "A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service."[2] "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the  civil service for this particular individual."[3]

The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest. For this reason, the Agency informs you that the Agency is removing you from your position of [TITLE] with the Agency and the federal civil service effective [insert date and time, if necessary].

You may have a right to file an appeal with the Merit Systems Protection Board (MSPB) on the limited grounds set forth in 5 C.F.R. § 315.806. Any such appeal must be filed within 30 days of the effective date of this decision or 30 days after the date of your receipt of this decision, whichever is later. You should review MSPB regulations at 5 C.F.R. §§ 1201.14 and 1201.24 for instructions on how to file an electronic appeal and content requirements of the appeal, respectively. For more information, please visit www.mspb.gov

---

[1] OPM, *Practical Tips for Supervisors of Probationers*.

[2] *See* U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005)

[3] *Id*.

or contact your local MSPB regional or field office at: [INSERT MSPB REGIONAL OR FIELD OFFICE CONTACT INFORMATION].

      We appreciate your service to the Agency and wish you the greatest of success in your future endeavors.  If you have any questions, please contact [CONTACT].

               [INSERT NAME OF AGENCY OFFICIAL]
               [INSERT TITLE OF AGENCY OFFICIAL]



AR0373

| | |
|---|---|
| **From:** | Peters, Noah |
| **To:** | Hinton, Veronica E. |
| **Cc:** | Heller-Stein, Colleen E.; Internet, WPI Employ |
| **Subject:** | RE: Probationary Period employee questions |

See below

**From:** Hinton, Veronica E.
**Sent:** Friday, February 14, 2025 7:46 PM
**To:** Peters, Noah
**Cc:** Heller-Stein, Colleen E. ; Internet, WPI Employ
**Subject:** FW: Probationary Period employee questions

Hi Noah,

Can you assist with responses to Treasury's questions on #1? – I assume it is agency discretion but want to ensure this is aligned with any guidance OD may have given to agency chiefs of staff.

For #2, should agencies use the standard NOA and Legal Authority Code in the GPPA for the termination of probationers based on performance? They should use the code based on the basis of the action – if it for performance, use that existing LAC?

Thanks,
V



**Sent:** Friday, February 14, 2025 12:02 PM
**To:** Hinton, Veronica E. <​​​​​​​​​​​​​​​​​​​​​​>
**Cc:** Internet, WPI Employ <​​​​​​​​​​​​​​​​​​​​​​>; Page, Latonia J. <​​​​​​​​​​​​​​​​​​>; Norris, Trevor <​​​​​​​​​​​​​​​​​​​​​​>
**Subject:** Probationary Period employee questions

Hi Veronica and team, please see the questions below:

1. Treasury is hearing that other agencies are giving probationary employees 4 weeks of admin leave before they officially terminate. Has there been specific guidance that allows for an orderly transition? I'm under the impression that employees should be terminated immediately. Please confirm your understanding of how agencies should execute. **OPM advised to separate immediately, but anywhere from 0-4 weeks of admin leave is fine to ensure an orderly transition.**

2. Will there be any new legal authority codes or remarks for cutting actions for the probationary period terminations? We've identified NOA 357 with authority - ZLM - Under circumstances not described elsewhere in this table – 5 U.S.C. § 7511, 5 U.S.C. § 3321(a), 5 C.F.R. §§ 315.803 and 804, 5 C.F.R. § 316.304 . Are we tracking that correctly?

3. I believe you've indicated new codes are being created DRP processing. Any update on that? How about the FAQ's?

Thank you, Carrie

**Balaban, Christopher M.**

| | |
|---|---|
| **From:** | CHCO Council |
| **Sent:** | Friday, February 14, 2025 12:48 PM |
| **Subject:** | Follow up: CHCO Council Special Session |
| **Attachments:** | Termination of Probationary Employee-clean.docx; Copy of (Agency Name) Probationary Employees Template_v3.xlsx |

CHCOs and Deputy CHCOs,

Thank you for your time today.

This message clarifies immediate next steps for probationary employees.

Over the past several days, agencies have worked to review, clean up, and finalize their lists of probationary employees they wish to keep, and wish to terminate, and begin taking action.

We have asked that you separate probationary employees that you have not identified as mission-critical no later than end of the day Monday, 2/17. We have attached a template letter.  The separation date should be as soon as possible that is consistent with applicable agency policies (including those in CBAs).

Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final until the probationary period is over," and the probationary period is part of "the hiring process for employees."  A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service.   "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the  civil service for this particular individual." Thus, the probationary period is part of the federal hiring process; there is currently a hiring freeze; and a probationer has no right to continued employment in the federal government.

An employee's performance must be measured in light of the existing needs and interests of government. OPM has emphasized that individual employee performance measurement should be "aligned with and support organizational goals" and "focus[] employee efforts on achieving organizational and group goals." An employee's performance must be viewed through the current needs and best interest of the government, in light of the President's directive to dramatically reduce the size of the federal workforce.

Through the exemptions process, agencies have identified the highest-performing probationers in mission critical areas. Regulations on probationary periods state: "The agency shall utilize the probationary period as fully as possible to determine the fitness of the employee and shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment." 5 CFR 315.803.  OPM believes "qualifications for continued employment" in the current context means that only the highest-performing probationers in mission-critical areas should be retained.

After actioning, please update the previous probationary employee spreadsheet you've sent us to include the information below. **Please resend the updated version to ▮▮▮▮▮▮▮▮▮ with Amanda Scales and Jamie Sullivan on cc by 8:00pm EST Monday**. This tracker should include:

- Which probationary employees have been terminated and which you plan to keep. For those you plan to keep, provide an explanation of why.

AR0375

- For each probationary employee, indicate if they have opted into the deferred resignation program or not. This can be done by cross-checking the latest submissions sent to you via ███████████ Please also indicate whether you have signed a written deferred resignation agreement with them or not.
- Probation end date.

**Please continue providing these reports daily through at least the end of next week.**

We have also attached a template Probationary tracker for your reports today.

Thank you,
OPM

[DATE], 2025

MEMORANDUM FOR [EMPLOYEE], [TITLE], [ORGANIZATION]

FROM:                    [NAME]
                         [TITLE]

SUBJECT:                 Notification of Termination During Probationary Period

REFERENCES:              5 U.S.C. § 7511
                         [5 U.S.C. § 3321(a)]
                         [5 C.F.R. §§ 315.803 and 804]
                         [5 C.F.R. § 316.304]
                         [INSERT AGENCY POLICY]

This is to provide notification that the Agency is removing you from your position of [TITLE]  and federal service consistent with the above references.

On [INSERT DATE OF APPOINTMENT], the Agency appointed you to the position of [TITLE]. As documented on your appointment Standard Form 50 (SF-50), you appointment is subject to a probationary/trial period. The agency also informed you of this requirement in the job opportunity announcement for the position.

Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final until the probationary period is over," and the probationary period is part of "the hiring process for employees."[1] "A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service."[2] "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the  civil service for this particular individual."[3]

The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest. For this reason, the Agency informs you that the Agency is removing you from your position of [TITLE] with the Agency and the federal civil service effective [insert date and time, if necessary].

You may have a right to file an appeal with the Merit Systems Protection Board (MSPB) on the limited grounds set forth in 5 C.F.R. § 315.806. Any such appeal must be filed within 30 days of the effective date of this decision or 30 days after the date of your receipt of this decision, whichever is later. You should review MSPB regulations at 5 C.F.R. §§ 1201.14 and 1201.24 for instructions on how to file an electronic appeal and content requirements of the appeal, respectively. For more information, please visit www.mspb.gov

---

[1] OPM, *Practical Tips for Supervisors of Probationers*.
[2] *See* U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005)
[3] *Id*.

or contact your local MSPB regional or field office at: [INSERT MSPB REGIONAL OR FIELD OFFICE CONTACT INFORMATION].

We appreciate your service to the Agency and wish you the greatest of success in your future endeavors.  If you have any questions, please contact [CONTACT].

[INSERT NAME OF AGENCY OFFICIAL]
[INSERT TITLE OF AGENCY OFFICIAL]

| **Agency** | **Name** | **Position** | **Status** |
| --- | --- | --- | --- |

AR0379

| Should employee be retained? | Count | Employee Start Date | Probation Start | Probation End |
| --- | --- | --- | --- | --- |

AR0380

| Salary | Why do you want to retain? | Opted in to DRP? | Signed DRP Agreement? |
| --- | --- | --- | --- |

AR0381

| | |
|---|---|
| **From:** | Sullivan, James D. |
| **To:** | Scales, Amanda D.; Conklin, Hayley (OAG); ████████ |
| **Subject:** | RE: [Action Due 2/13] Probationary Employee Actions |
| **Attachments:** | (Agency Name) Daily Tracker_v1.xlsx |

Hey Hayley – looking forward to working together! Quick update that we are now asking for the daily tracker by 5:30pm each night so we can compile and send to WH by 6pm. Appreciate the help.

**Jamie Sullivan**
*Sr. Advisor to the Director*
*Office of Personnel Management*
T:  202-597-2868

**From:** Scales, Amanda D.████████████████
**Sent:** Sunday, February 16, 2025 12:34 PM
**To:** ████████████████ ; ████████████████
**Cc:** Sullivan, James D.████████████████
**Subject:** FW: [Action Due 2/13] Probationary Employee Actions

Hi Hayley,

Great to e-meet you! Chad let us know we should include you as a point of contact for DOJ when it comes to OPM guidance and actions, so wanted to forward the below over. Apologies for leaving you off the original note to begin with.

Here are the key summarized points:

1. Agencies should use the attached letter to separate from probationary employees, with the exception of high-performing employees in mission critical roles and **any employees serving in the functions noted in red\*.** Most agencies have completed separation actions, and others will have actions completed by middle of this coming week.
   a. \*Please note that for DOJ, **OPM has granted Civil Appellate, Federal Programs Branch, Office of Immigration Litigation, and Office of the Solicitor General exemptions from the hiring freeze and from any guidance to terminate probationary employees.**

(2) We're asking each agency to complete and send a daily tracker (also attached) that consolidates reporting across various workstreams – this should be sent to Jamie, cc'd, by 6pm each day. Jamie sent that your way last night, so know you're familiar, but attaching here just in case.

If you have any questions, please let us know. Can you let us know when DOJ plans to have wrapped up probationary employee actions?

Also happy to hop on a quick call over the long weekend or Tuesday to clarify anything for you.

Thanks,
Amanda & Jamie

**From:** Tracking
**Sent:** Thursday, February 13, 2025 3:56 PM
**To:** Tracking ███████████████
**Cc:** Sullivan, James D. ████████████████
**Subject:** RE: [Action Due 2/13] Probationary Employee Actions

Hi all,

Following up on yesterday's email, we are asking each agency to fill out the attached and send it to Jamie (cc'd) with all fields completed by 6pm each day. It is critical that this is reported back on a timely basis as we are rolling up into a consolidated dashboard each night. If any real-time actions will cause numbers to change after 6pm, please give Jamie a call to figure out the right reporting for that night (reachable at 202-597-2868).

Thank you,
OPM

**From:** Tracking
**Sent:** Wednesday, February 12, 2025 8:13 PM
**To:** Sullivan, James D. ██████████████ Scales, Amanda D. ███████████████
**Cc:** Peters, Noah ██████████████ Bjelde, Brian ██████████████
**Subject:** [Action Due 2/13] Probationary Employee Actions

*Bcc: CoS & key partners; DOGE Leads*

Hi all,

This message clarifies immediate next steps for probationary employees following OPM's guidance earlier in the week.

Over the past several days, agencies have worked to review, clean up, and finalize their lists of probationary employees and begin taking action. **Please partner with your CHCO to action those you know you wish to separate from by the end of the day tomorrow, 2/13/2025,**

**using the attached template letter (modified to account for whether the employee is in the competitive or excepted service).**  The separation date should be either immediately or as soon as possible, consistent with applicable agency policies (including those in CBAs).

After actioning, please update the previous probationary employee spreadsheet you've sent us to include the information below. **Please resend the updated version to ████████████ with Amanda Scales and Jamie Sullivan on cc by 5:00pm EST tomorrow**. This tracker should include:

- Which probationary employees have been terminated and which you plan to keep. For those you plan to keep, provide an explanation of why.

- For each probationary employee, indicate if they opted into the deferred resignation program or not. This can be done by cross-checking the latest submission sent to you via ████████████ Please also indicate whether you have signed a written deferred resignation agreement with them or not.

- Probation end date.

- In a separate tab, provide total # of DRP submissions that have been granted thus far.

**Please continue providing these reports daily through at least the end of the week.**

We've also prepared additional guidance around common questions:

- Employees do not need to have received any particular performance rating previously to be separated.

- Through the exemptions process, you have identified high-performing employees in mission critical areas. While you must provide notice of performance deficiencies in the notice, regulations on probationary periods state: "The agency shall utilize the probationary period as fully as possible to determine the fitness of the employee and shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment." 5 CFR 315.803. This guidance applies to probationers who have not demonstrated that their continued employment is in the public interest, and counsels that the government separate from them.  Until the probationary period has been completed, a probationer has the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the civil service for this particular individual.

Thank you,
OPM

| Agency | As of Date | Opted In | Approved | Admin Leave | Terminated | Total Leave | % of Opt-Ins | Total # | Fork Opt-In | To Be Term. | Terminated | Total | Excluded | Admin Leave | Terminated | 1/20 | New Hires | Retirements | Admin Leave | Terminations | Other Depart. | 9/30 PF | 1/20 | Today |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | | | | | |
| [Agency Name] | | – | – | – | – | | | – | – | | | | | | | | | | | | – |

Definitions:   Today's date   # from OPM   # agency has a # on admin lea # terminated   Sum of admin + terminated   Total # on prob o/w how many l How many peru Already termina Sum of column Probationary employees that agency will not termin: 1/20 Headcoun New hires since Retirements sin Total placed on Total terminatio other departure Pro forma 9/30 h # of contr: # contracto

*Note: all numbers cumulative (not daily change)*

AR0385

**From:** Scales, Amanda D.
**To:** Peters, Noah; Raynor, Austin L.
**Cc:** Sullivan, James D.
**Subject:** FW: Department of Justice - Updated Probationary Period Employees Report - 2-18-2025
**Date:** Wednesday, February 19, 2025 9:17:46 AM
**Attachments:** DOJ Probationary Employees-2-18-25.xlsx

Hi Noah and Austin,

Please see message below from Jolene with DOJ – at the bottom, she suggests DOJ be broadly exempted from probationary actions (with the caveat that DOJ is actively working on a broader downsizing / consolidation plan).

Know DOJ is exempted for Civil Appellate, Federal Programs, Office of Immigration Litigation, and Office of the Solicitor General right now and nothing more right now. Let me know what you think here about going broader. Happy to set something up with her to discuss live if we need.

Thanks,

Amanda

**From:** Lauria, Jolene A. (JMD)
**Sent:** Tuesday, February 18, 2025 7:53 PM
**To:** EmployeeAccountability ; Scales, Amanda D.
**Cc:** Williams, Mike ; Alvarez, Christopher C. (JMD) ; Sane, Michael F ; Bittelari, Ralph (JMD)
**Subject:** Department of Justice - Updated Probationary Period Employees Report - 2-18-2025

NOTE: This message contains the attached Department of Justice's updated probationary employees report that was previously transmitted on 1/24/2025. Please note the following information:

At present, there are approximately 10,468 employees in probationary status. Of those employees, 92 percent of the employees are in critical immigration, law enforcement, national security, and other critical support categories. Of the 10,468 probationary employees, 136 requested the Deferred Resignation program (DRP).

## **Law Enforcement (73 percent):**

- 7,651 probationary employees are currently doing law enforcement/public safety work.

- 3,402 are correctional workers in already understaffed BOP institutions. This includes 2,261 correctional officers whom OPM has already approved special salary rates, recruitment, and retention authorities to ameliorate the severe understaffing problem in prisons.

- **1,159 are 1811/ law enforcement investigators**. On average, it can take anywhere from a year to three years to bring a single agent on board. The hiring time is long because they must successfully graduate from basic training, satisfy suitability, and polygraph testing prior to entering on duty. Further, by the time an agent is hired, we have spent well over $100,000 per agent in hiring and training costs. **That means we have invested $115.9 million in hiring and training these probationary law enforcement officers.**
- 640 are critical hires in the USMS, or which 143 are Deputy US Marshals across the nation; and
- 2,799 are recently hired FBI agents/positions, and
- 478 are Drug Enforcement Administration recent hires, **who take over two years to on-board and are critical to fighting the war on drugs/Fentanyl** .

**Immigration /Border (15 percent) :**

- 1,647 probationary employees will be assigned to immigration border priorities. Similar to above notes, it takes almost a year to hire an immigration judge, or an attorney and it costs over $10,000 per hire that has already been spent for these employees. **That means we have already invested $16.5 million to onboard these critical positions.**

Attorneys (12 percent):

- 1,273 are Attorney's (of which 27 requested the DRP) and 162 paralegals (2 requested DRP), who OPM has reported to the Justice Department are exempt. The DOJ and White House rely on their expertise in the law to implement the executive orders as well as defend the government against challenges of its recent executive order implementation.

National Security/Cyber Security :

- 50 of the probationary employees are occupying positions of national security and cyber security and are an exempt category in the Executive Order on the hiring freeze.

Critical Support (2 percent)

- A small but critically important percentage of these probationary employees provide critical support to the implementation of executive orders.

- 296 in total of these probationary employees include: HR and support staff critical to hiring and executing the executive orders (27), new employees in the Office of Legal Policy (3/OMP Exempted), the Civil Division (207 --includes Fed Programs and Civil OIL OPM Exempted), and the Office of Inspector General (59).

**The Department of Justice must be exempt from firing its probationary employees given the criticality of the missions we support.** Please note, however, we are actively pursuing several restructuring and downsizing proposals that will streamline the Department's missions. The planned restructuring and downsizing proposals will include RIFs and reorganizations in strategic areas that will ultimately reduce the overall number of staff in the Department of Justice.

Any questions regarding this information should be sent to Ralph G. Bittelari, at ███████████████████ .

Regards,

Jolene A. Lauria

Assistant Attorney General for Administration

Department of Justice

**Balaban, Christopher M.**

| | |
|---|---|
| **From:** | CHCO Council |
| **Sent:** | Monday, February 24, 2025 9:26 AM |
| **Subject:** | CHCO Updates |
| **Attachments:** | Probationary Period FAQs.docx; Guidance on Return to In-Person Work and Deferred Resignation Program Processing and Reporting.docx |

Good morning, CHCOs and Deputy CHCOs:

Please note that we've rescheduled today's Special Session for noon today and intend to provide additional information concerning the governmentwide email sent this past weekend. We will plan to discuss RIF competitive areas during tomorrow's CHCO Council meeting.

We are also sharing information on two other important topics. We can answer any questions related to these topics at the 12 pm call today.

**I.      Probationary Employees**

On Monday, January 20, 2025, the OPM Memorandum *Guidance on Probationary Periods, Administrative Leave and Details*, reminded agencies that probationary periods are an essential step in evaluating employee performance. Probationary periods serve as one of the most effective tools available to agencies in evaluating whether applicants will advance the agency's missions and functions. Where agencies fail to take advantage of this tool, poor performers tend to remain in the federal service far too long because supervisors are less likely to remove an employee with full appeal rights.

As agencies continue to make decisions on whether to retain probationary employees, OPM has received numerous questions. To assist agencies in carrying out their decisions, OPM offers, attached, the following frequently asked questions for agencies.

**II.      Processing and Reporting Actions Related to Return to In-Person Work and DRP**

OPM has prepared the attached guidance on processing and reporting actions related to return to in-person work.

Thank you,

The CHCO Council Team

AR0389

<u>**FAQs on Probationary Periods**</u>

***Probationary Periods in the Competitive Service***

**Q: How should agencies evaluate the performance of an employee serving a probationary or trial period?**
A: An employee's performance must be measured in light of the existing needs and interests of government. OPM has <u>emphasized</u> that individual employee performance measurement should be "aligned with and support organizational goals" and "focus[] employee efforts on achieving organizational and group goals." An employee's performance must be viewed through the current needs and best interest of the government, in light of the President's <u>directive</u> to dramatically reduce the size of the federal workforce.

**Q: Under 5 C.F.R. § 315.803, agencies are expected to fully utilize probationary periods and terminate an employee during this period "if the employee fails to demonstrate fully his or her qualifications for continued employment." How should agencies evaluate whether an employee demonstrated his or her qualifications for continued employment?**
A: OPM believes "qualifications for continued employment" means that only the highest-performing probationers in mission-critical areas should be retained.

**Q: What procedures should an agency follow when terminating a probationary employee for unsatisfactory performance or conduct?**
A: When an agency decides to terminate an employee serving a probationary period because work performance or conduct fails to demonstrate fitness or qualifications for continued employment, the agency must notify the employee in writing as to why the employee is being terminated and the effective day of the action. 5 C.F.R. § 315.804. The notice must include the agency's conclusions as to the inadequacies of the employee's performance or conduct.

In addition, under 5 C.F.R. § 315.804(b), the probationary period ends when the employee completes his or her scheduled tour of duty on the day before the anniversary date of the appointment.[1]

**Q: What procedures should an agency follow when terminating a probationary employee for conditions arising before appointment?**
A: When an agency decides to terminate an employee serving a probationary period for reasons related to conditions arising before appointment, the employee is entitled to the following procedures established under 5 C.F.R. § 315.805:

- advance written notice from the agency stating the reasons, in detail for the proposed action;
- a reasonable time for responding in writing to the agency; and,

---

[1] *See e.g. Stewart v. Dep't of Transp.*, 2023 MSPB 18, ¶17 (2023).

AR0390

- a notice, in writing, of the reasons for the agency's decision, and the right to appeal to the MSPB.

### *Appeal Rights and Negotiated Grievance Procedures*

**Q: Does prior federal service count towards completion of an employee's probationary period?**
A: Under certain conditions, prior federal civilian service counts toward the completion of the probationary period.[2] If an agency employee meets the statutory definition of "employee" under 5 U.S.C. § 7511(a), the employee may have adverse action procedural rights and may not be terminated using probationary termination procedures.

**Q: May an employee serving a probationary period appeal a termination to the MSPB?**
A: Under 5 C.F.R. § 315.806, an employee may appeal to the MSPB only if the termination is not required by statute and the employee alleges that the agency discriminated against him or her based on partisan political reasons or marital status. Where an agency terminates a probationary employee based in whole or in part on conditions arising before appointment, the employee may appeal to the MSPB if he or she alleges that the agency did not follow the procedures established under 5 C.F.R. § 315.805.

**Q: What procedures must agencies follow when terminating a term employee in the competitive service during a trial period?**
A: Terminating an employee on a trial period in the competitive service are subject to the same procedures described above for terminating an employee on a probationary period in the competitive service.

**Q: What procedures must agencies follow when terminating an employee appointed to a position in the excepted service who is serving a trial period?**
A: The head of an agency may establish a probationary or trial period for an employee given a permanent appointment in the excepted service unless otherwise provided in statute or regulation. The head of the agency must also establish procedures for terminations in the excepted service.

**Q: May an employee serving a probationary or trial period grieve a termination under negotiated grievance procedures?**
A: Generally, employees serving a probationary or trial period do not have recourse under negotiated grievance procedures to challenge terminations exercised under 5 U.S.C. 3321 and OPM's regulations at 5 C.F.R. part 315, subpart H. It is well established that procedural protections that enable probationary employees to challenge terminations and termination-related matters are inconsistent with these legal authorities and, therefore, unenforceable through negotiated

---

[2] *See* 5 C.F.R. § 315.802.

AR0391

grievance procedures.[3] However, agencies operating under different personnel systems need to verify whether the same or similar legal authorities apply to their personnel.

**Q: Which nature of action codes and legal authority codes are used to process probationary termination personnel actions?**

A: Chapter 31 of OPM's Guide to Processing Personnel Actions (GPPA) provides information on appropriate nature of action codes (NOAC) and legal authority codes (LAC) for "Separations Other than Resignations and Retirements." This includes probationary terminations. The NOAC and LAC selected should be consistent with the reasons the agency stated in the probationary termination notices. For example, Rules 31, 32, and 33 address separations based on unacceptable or unsatisfactory performance or other factors unrelated to misconduct or delinquency. If the employee is serving 1) an initial probationary period; or 2) a trial period required by civil service or agency regulation; or 3) a probationary period in the Senior Executive Service, then the NOAC would be 385; the appropriate LAC would be 1) L2M; 2) L4M; or 3) V2M, respectively. Rule 34 of the GPPA addresses the appropriate NOAC and LAC for employees serving on an appointment not described in Rules 31-33.

The GPPA describes other reasons the probationary termination may have been based on. As noted earlier, the NOAC and LAC selected should be consistent with the reasons the agency stated in the termination notices.

Rule 66 of the GPPA may be appropriate "under circumstances not described elsewhere" in Table 31-B of the GPPA. If the reasons stated in the termination letter are outside the other rules in Table 31-B of the GPPA, Rule 66 could be applied.

### *Probationary Periods in the Senior Executive Service (SES)*

**Q: How long is the probationary period for SES career appointments?**

A: An individual who receives an SES career appointment must serve a one-year probationary period.

**Q: What procedural protections must agencies consider when evaluating whether to terminate an SES career appointee?**

A: The procedural protections and placement rights to which the probationer is entitled are determined by the basis for the removal action and the individual's appointment status just before entering the SES.

---

[3] *Nat'l Treasury Emps. Union and Internal Revenue Serv.*, 67 FLRA 24, 26 (2012) (*citing Nat'l Treasury Emps. Union v. Fed. Labor Relations Auth.*, 848 F.2d 1273 (D.C. Cir. 1988) *and Dep't of Justice, Immigration and Naturalization Serv. v. Fed. Labor Relations Auth.*, 708 F.2d 724 (D.C. Circ. 1983)); *Am. Fed'n of Gov't Emps. Council of Marine Corps Locals and Marine Corps*, 35 FLRA 1023, 1026-27 (1990).

AR0392

**Q: Do all career SES appointees terminated during the probationary period have placement rights?**

A: No, only those career SES appointees, who at the time of appointment to the SES held a career or career-conditional appointment, or an appointment of equivalent tenure as defined at 5 C.F.R. § 359.701(a), retain placement rights. Probationers who are not entitled to guaranteed placement are separated from the Federal service.

**Q: What placement rights do prior career or career-conditional SES career appointees (as defined in 5 C.F.R. § 359.701(a) have?**

A: A prior career or career-conditional SES career appointee who is removed from the SES during his or her probationary period due to performance is guaranteed to be placed in a position of GS-15 or above (e.g., Senior Level).

**Q: How does the 120-day moratorium on removal during probation affect an agency's ability to terminate a probationary SES career appointee?**

A: Generally, removal from the SES for unacceptable performance or conduct may not be made effective within 120 days after the appointment of a new agency head, or the appointment in the agency of the career appointee's most immediate supervisor who: is a noncareer appointee and has the authority to remove the career appointee; however, 5 C.F.R. § 359.406(c) addresses exceptions to the 120-day moratorium. One of the exceptions is when the career appointee received a final rating of unsatisfactory before the appointment of a new agency head or the appointment of the career appointee's most immediate noncareer supervisor who has the authority to remove the career appointee. The procedures required when invoking an exception are detailed in § 359.406(d). The imposition of the 120-day moratorium does not extend the probationary period.

**Q: What procedures must an agency follow when removing a probationary SES career appointee for unacceptable performance?**

A: The agency shall notify the appointee in writing before the effective date of the action. The notice shall state, at a minimum, (1) the agency's conclusions as to the inadequacies of the appointee's performance; (2) whether the appointee has placement rights under 5 C.F.R. § 359.701 and, if so, identify the position to which the appointee will be assigned; and (3) the effective date of the action. A removal under this section need not be based upon a final rating under the agency's SES appraisal system.

**Q: What procedures must an agency follow when removing a probationary SES career appointee for conduct?**

A: The agency shall notify the appointee in writing before the effective date of the action; however, there is no required minimum notice period. The notice shall state, at a minimum, (1) the basis for the removal action and (2) the effective date of the action.

*Miscellaneous Questions*

**Q: Is the union entitled to receive information about probationary and trial employees?**

4

A: The union must demonstrate a particularized need for requested information, which is a threshold requirement in determining whether the release of information is necessary under Section 7114(b)(4) of the Statute. A union requesting information under that section must establish a particularized need for the information by articulating, with specificity, why it needs the requested information, including the uses to which the union will put the information and the connection between those uses and the union's representational responsibilities under the Statute. Satisfying this burden requires more than conclusory or bare assertions, and it is not satisfied merely by showing that the requested information would be relevant or useful. Rather, the union must articulate its need for each document, or all information requested. It is also well established that general efforts to "ensur[e] compliance with Merit System Principles," "monitor contract compliance," "address bargaining unit . . . concerns," represent employees in "further legal actions," and otherwise audit management are insufficient to meet particularized need requirements.[4]

---

[4] *See Dep't of the Air Force, Kirtland Air Force Base and Am. Fed'n of Gov't Emps. Local 2263*, 60 FLRA 791 (2005).

5

## Guidance on Return to In-Person Work and Deferred Resignation Program Processing and Reporting

The U.S. Office of Personnel Management (OPM) recently issued memoranda regarding Return to In-Person Work and the Deferred Resignation Program (DRP). Agencies and Shared Service Providers (SSPs) must use the below guidance when processing personnel actions; updating Remote/Telework Agreement Type and Eligibility to Participate in Telework values; and recording Time and Attendance relating to Return to In-Person Work and the DRP.

### I.    Return to In-Person Work

OPM has created Legal Authority Code (LAC) Z3Z to be used as a secondary legal authority code when processing any personnel actions related to the Presidential Action Return To In-Person Work. The Guide to Processing Personnel Actions (GPPA) will be updated in the future to reflect the new LAC2 Z3Z.

**1. Agency Human Resource Offices must:**

    A. Confirm with their SSP that all provider system modifications have been completed.

    B. Use LAC2 Z3Z once provider's systems have been modified to accept the newly developed secondary LAC.

    C. Process personnel actions related to Return to In-Person Work according to GPPA. Personnel actions that use LAC2 Z3Z as a LAC1 will require corrections.

    D. Make retroactive corrections to all personnel actions if the HR System does not have the LAC2 Z3Z available for use and the LAC2 is blank on personnel actions related to Return to In-Person Work.

**2. Shared Service Providers must:**

    A. Communicate with your agencies and the Enterprise Human Resources Integration (EHRI) Team at DSMMALLStaff@opm.gov immediately when required system modifications are completed and LAC2 Z3Z is available to be used to further document actions related to Return to In-Person Work.

    B. Modify HR Systems to only allow LAC Z3Z to be processed as a LAC2.

**3. Processing Personnel Actions:**

The following Nature of Action Codes (NOACs) may be used for the Return to In-Person Work personnel actions. Agencies should use the existing guidance in Chapter 17, 23, 30 and 31 of the GPPA. The LAC1 is specific to the employees' situation, whereas LAC2 Z3Z is to be used to further identify all actions processed for Return to In-Person Work.

| LAC2 | Description | Effective Date |
|------|-------------|----------------|

AR0395

| Z3Z | Return to In-Person Work | 1/20/2025 |
|---|---|---|

| NOAC | Remarks |
|---|---|
| **Terminations** | |
| 357, 385 | M67, N23, N59, N27, N59, S42, S48<br><br>Individual employee situations may require additional remarks. |
| **Removals** | |
| 330 | M67, N23, N59, N27, N59, S47<br><br>Individual employee situations may require additional remarks. |
| **Change in Duty Station** | |
| 792 | Q97 *Change in Duty Station due to Return to In-Person Work status when there is no change in pay.*<br><br>Individual employee situations may require additional remarks. |
| **Reassignment** | |
| 721 | F15 *Reassignment due to Return to In-Person Work status.*<br><br>Individual employee situations may require additional remarks. |
| **Pay Adjustment** | |
| 894 | N50 *Change in pay due to Return to In-Person Work status.* |

**4. Time and Attendance:**

Agencies are reminded, because of employees returning to in-person work, that all employee timecards should be reviewed and updated as applicable. OPM will have more guidance on employee timecards in the near future.

**II.**   **Redesignation of Remote/Telework Agreement Type and Eligibility to Participate in Telework**

2

AR0396

Agencies must review all employee Remote/Telework Agreement Type and Eligibility to Participate in Telework designations to ensure the appropriate code is selected for both data elements by **May 30, 2025**. In addition to processing a personnel action specific to the employee's situation, agencies must update the employee data to reflect their current reporting status. Refer to the Guide to Data Standards for appropriate values for Remote/Telework Agreement Type and Eligibility to Participate in Telework.

### III.    Deferred Resignation Program (DRP)

OPM has created LAC RZM to be used as a secondary legal authority code when processing any personnel actions related to the Deferred Resignation Program (DRP). The GPPA will be updated in the future to reflect the new LAC2 RZM.

**1.  Agency Human Resource Offices must:**

   A.  Confirm with their SSP that all provider system modifications have been completed.
   B.  Begin using LAC2 RZM once the provider confirms the system modifications have been made to accept the newly developed secondary LAC.
   C.  Process personnel actions related to DRP according to the GPPA. Personnel actions that use LAC2 RZM as a LAC1 will require corrections.
   D.  Make retroactive corrections to personnel actions if the HR System does not have the LAC2 RZM available for use and the LAC2 is blank on personnel actions related to DRP.
   E.  Use Remark Code R56 (*Deferred Resignation Program*).

**2.  Shared Service Providers must:**

   A.  Communicate with your agencies and the EHRI Team at **SMMALLStaff@opm.gov** immediately when required system modifications are complete and LAC2 RZM is available to be used to further document actions related to DRP.
   B.  Modify HR Systems to only allow LAC RZM to be processed as a LAC2.

**3.  Processing Personnel Actions:**

   A.  The following Nature of Action Codes (NOACs) may be used for the DRP. Agencies should use the existing guidance in Chapters 30 and 31 of the GPPA. The LAC1 is specific to the employee's situation, whereas LAC2 RZM is to be used to further identify all actions processed for the DRP.

| LAC2 | Description | Effective Date |
|------|-------------|----------------|
| RZM | Separations due to Deferred Resignation Program | 1/28/2025 |

| NOAC | Remarks |
|------|---------|
| **Retirements** | |

3

| 300, 301, 302, 303, 304, 307, 308, 615, 616 | M67, R21, S37, R56 (*Deferred Resignation Program*)<br><br>Individual employee situations may require additional remarks. |
|---|---|
| **Separations** | |
| 353, 390 | M67, N23, N27, N59, R56 (*Deferred Resignation Program*), S31<br><br>Individual employee situations may require additional remarks. |
| **Resignations** | |
| 317 | M67, N23, N27, N59, R56 (*Deferred Resignation Program*), S31, S68<br><br>Individual employee situations may require additional remarks. |

## 4. Time and Attendance

Agencies and/or SSPs may elect to create accounting/labor codes specific to DRP to allow agency tracking and reporting capabilities related to DRP.

Agencies may also elect to add the following remark in the comment or notes section of the employee's timecard: "*Deferred Resignation Program*" for additional traceability within the Time and Attendance system.

Agencies and their payroll providers should record hours of Administrative Leave granted to the DRP participants in timekeeping and payroll systems. This data will then be reported to OPM as part of biweekly payroll data submissions to the (EHRI) data warehouse. The applicable payroll data element in the EHRI data warehouse is ADMINISTRATIVE LEAVE HOURS USED – GENERAL. Agencies and OPM will be able to isolate Administrative Leave used by DRP participants by matching payroll data to human resources data, relying on the RZM legal authority code in the second legal authority field associated with the resignation personnel action.

OPM will establish new or modified payroll data elements related to leave usage as part of the implementation of the final regulation issued on December 17, 2024 (89 FR 102256). As required by law, OPM will establish a separate data element for Administrative Leave under 5 U.S.C. 6329a.

After the new payroll data elements are established, agencies will have until **September 13, 2025**, to implement the new elements in their timekeeping and payroll systems. When an agency has incorporated the new data elements in its timekeeping and payroll systems, Administrative Leave used by DRP participants will be recorded under the new data element for

AR0398

Administrative Leave under 5 U.S.C. 6329a for agencies covered by that law.  Another payroll data element will be available for Administrative Leave provided by agencies not covered by 5 U.S.C. 6329a.

5.  <u>**Points of Contact:**</u>

| Email | Purpose |
|---|---|
| persaction@opm.gov | Processing Personnel Actions |
| DSMMAllStaff@opm.gov | EHRI System Modifications |

5

**UNITED STATES OFFICE OF PERSONNEL MANAGEMENT**
Washington, DC 20415

The Director

# MEMORANDUM

| | |
|---|---|
| **TO:** | Heads and Acting Heads of Departments and Agencies |
| **FROM:** | Charles Ezell, Acting Director, U.S. Office of Personnel Management |
| **DATE**: | January 20, 2025 |
| | **Revised: March 4, 2025** |
| **RE**: | Guidance on Probationary Periods, Administrative Leave and Details |

The U.S. Office of Personnel Management (OPM) is providing the following guidance to agencies regarding critical potential personnel actions. Specifically, this memorandum deals with 1) probationary periods, and 2) administrative leave and details.

## I.    Probationary Periods

Probationary periods are an essential tool for agencies to assess employee performance and ensure that "a probationer's conduct and performance have established that the individual will be an asset to the Government."[1] Employees on probationary periods can be terminated during that period without triggering appeal rights to the Merit Systems Protection Board (MSPB).[2]

Generally, employees in the competitive service with less than one year of service, and in the excepted service with less than two years of service, can be terminated without triggering MSPB appeal rights.[3] This applies to temporary employees on appointments "not to exceed" a date certain.[4]

No later than January 24, 2025, agencies should identify all employees on probationary periods, who have served less than a year in a competitive service appointment, or who have served less than two years in an excepted service appointment, and send a report to OPM listing all such employees to employeeaccountability@opm.gov. In addition, agencies should promptly determine whether those employees should be retained at the agency.

---

[1] *See* U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005).

[2] *Starkey v. Dep't of Hous. and Urban Dev.*, 2024 MSPB 6, ¶ 16; *Marynowski v. Dep't of the Navy*, 2012 MSPB 82, ¶ 4 (2012).

[3] *Forest v. Merit Sys. Prot. Bd*, 47 F.3d 409, 412 (Fed. Cir. 1995); *Holmes v. Merit Sys. Prot. Bd*., 655 F. App'x 816, 818 (Fed. Cir. 2016); see also 5 U.S.C. §§ 7511(a)(1)(A), (C).

[4] *See Forest,* 47 F.3d at 410*; Holmes,* 655 F. App'x at 816.

Please note that, by this memorandum, OPM is not directing agencies to take any specific performance-based actions regarding probationary employees. Agencies have ultimate decision-making authority over, and responsibility for, such personnel actions.

## II.    Administrative Leave and Details

 "Federal agencies have the discretion to grant paid administrative leave to employees to help manage their workforces when it is in their best interest to do so."[5] The flexibility given to agencies in using paid administrative leave reflects the fact that "heads of Executive agencies have broad authority to manage their organizations, including the authority to grant administrative leave, unless prohibited by law."[6]

OPM regulations note four pertinent areas where paid administrative leave is appropriate: (1) "the absence is directly related to the agency's mission," (2) "the absence is officially sponsored or sanctioned by the agency," or (3) "the absence will clearly enhance the professional development or skills of the employee in the employee's current position," or (4) "the absence is in the interest of the agency or of the Government as a whole."[7] "An agency must retain the discretion to grant or not grant administrative leave in any circumstance based on agency judgments regarding mission needs."[8]

Placing an employee on paid administrative leave may be an appropriate action where the agency component in which the employee works is being eliminated or restructured, or where the agency weighs changes to the individual's role at the agency as part of a workforce realignment. It also may be appropriate when a new agency manager determines that the absence of the employee from the office "is in the interest of the agency or of the Government as a whole."[9] Agencies are encouraged to use flexibilities associated with paid administrative leave as they implement agency restructuring initiatives or determine the best ways to manage agency components going forward.

In addition, agency heads have broad discretion to detail employees "among the bureaus

---

[5] *Administrative Leave, Investigative Leave, and Notice Leave*, 89 Fed. Reg. 10,2256-01 (Dec. 17, 2024).

[6] U.S. Office of Personnel Management, *Fact Sheet: Administrative Leave*.

[7] 5 C.F.R. § 630.1403(a)(1).

[8] 5 C.F.R. § 630.1403(a)(4). OPM reiterates that while "[t]he effective date for these regulations addressing administrative leave (subpart N) and investigative and notice leave (subpart O) is 30 days after the date of publication," nonetheless "the compliance date is set as 270 days after the date of publication." 89 Fed. Reg. at 10,2257. That is, agencies must "revise and implement their internal policies consistent with the Act within 270 calendar days from the date OPM prescribes the regulations," and "[a]gencies are responsible for compliance with time limits provided for in the Act, these OPM regulations, and any related guidance." *Id.* OPM thus believes that agencies are not required to comply with the administrative leave rule and new regulations until September 13, 2025, the deadline for agencies to issue their own implementing regulations. **OPM requests that agencies not issue any agency-specific rules until such rules have been reviewed and approved by OPM.**

[9] 5 C.F.R. § 630.1403(a)(1).

and offices of [their] department[s]" for up to 120 days by written order.[10] An agency may temporarily detail an employee to "unclassified duties."[11] Such details may provide additional flexibilities to agencies during the transition period and as agencies undertake reorganization efforts and close offices.

Please do not hesitate to contact OPM if you have any questions regarding these matters at employeeaccountability@opm.gov.

cc: Chief Human Capital Officers (CHCOs), Deputy CHCOs, and Human Resources Directors.

---

[10] 5 U.S.C. § 3341.

[11] *Frankel v. Dep't of Educ.*, 17 M.S.P.R. 453, 455–56 (1983).