Scott A. Kronland (SBN 171693)
Stacey M. Leyton (SBN 203827)
Eileen B. Goldsmith (SBN 218029)
Danielle E. Leonard (SBN 218201)
Robin S. Tholin (SBN 344845)
James Baltzer (SBN 332232)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel. (415) 421-7151
Fax (415) 362-8064
skronland@altber.com
sleyton@altber.com
egoldsmith@altber.com
dleonard@altber.com
rtholin@altber.com
jbaltzer@altber.com

*Attorneys for Plaintiff Organizations*

[Additional Counsel listed on signature pages]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO; AMERICAN FEDERATION OF STATE COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, et al., <br><br> Defendants. | Case No. 3:25-cv-01780-WHA <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY ADJUDICATION OF CLAIMS I–IV** |

1

## <u>NOTICE OF MOTION AND MOTION</u>

2        PLEASE TAKE NOTICE THAT at 8:00 a.m. on August 26, 2025 in Courtroom 12, 19th

3   Floor, United States District Court, Northern District of California, located at 450 Golden Gate

4   Avenue, San Francisco, CA, pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs

5   will and hereby do move for summary adjudication of Claims I–IV of the Second Amended

6   Complaint (Dkt. 90).  The proposed hearing date is 14 days after the close of briefing on cross-

7   motions for summary judgment as set forth in the Court's order approving the parties' stipulated

8   briefing schedule (Dkt. 209).

9        The Motion will be made on the grounds that the administrative record compiled by

10  Defendant OPM conclusively resolves the only material factual dispute in this case: whether (as

11  Plaintiffs have alleged) OPM directed the mass termination of probationary employees at issue in

12  this lawsuit, or whether (as Defendants have asserted) OPM offered mere "guidance" to individual

13  agencies, which were free to take that guidance or to discard it.  As explained in the accompanying

14  Memorandum of Support, the long-awaited administrative record now conclusively demonstrates

15  that OPM in fact directed the mass termination of probationary employees.  The resolution of that

16  factual dispute—together with the legal conclusions reached in this Court's prior legal rulings—

17  makes summary adjudication of Claims I-IV appropriate.

18       This Motion is supported by the accompanying Memorandum in Support; all papers on file

19  in this action; and such argument as may be heard by the Court.

20

21  DATED:  June 5, 2025                Scott A. Kronland
                                        Stacey M. Leyton
22                                      Eileen B. Goldsmith
                                        Danielle E. Leonard
23                                      Robin S. Tholin
                                        James Baltzer
24                                      ALTSHULER BERZON LLP
                                        177 Post St., Suite 300
25                                      San Francisco, CA 94108
                                        Tel: (415) 421-7151
26

27                            By: */s/ Danielle Leonard*  _____

28

*Attorneys for Plaintiff Organizations*

Norman L. Eisen (*pro hac vice*)
Pooja Chaudhuri (SBN 314847)
STATE DEMOCRACY DEFENDERS
FUND
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Pooja@statedemocracydefenders.org


By: */s/ Norman L. Eisen*

*Attorneys for Plaintiff Organizations*

Rushab Sanghvi (SBN 302809)
AMERICAN FEDERATION OF GOVERNMENT
EMPLOYEES
80 F Street, NW
Washington, DC 20001
Tel: (202) 639-6426
Sanghr@afge.org

By: */s/ Rushab Sanghvi*

*Attorneys for Plaintiff American Federation of
Government Employees (AFGE)*

Teague Paterson (SBN 226659)
Matthew Blumin (*pro hac vice*)
AMERICAN FEDERATION OF STATE, COUNTY,
AND MUNICIPAL EMPLOYEES
1625 L Street, N.W.
Washington, D.C.  20036
Tel: (202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org

By: */s/Teague Paterson*

*Attorneys for Plaintiff American Federation of State
County and Municipal Employees (AFSCME)*

Tera M. Heintz (SBN 241414)
Cristina Sepe (SBN 308023)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Cynthia Alexander, WA Bar No. 46019 (pro hac vice)
Deputy Solicitors General
OFFICE OF THE WASHINGTON STATE
ATTORNEY GENERAL
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
tera.heintz@atg.wa.gov
cristina.sepe@atg.wa.gov
cynthia.alexander@atg.wa.gov

By: */s/ Tera M. Heintz*

*Attorneys for Plaintiff State of Washington*

Scott A. Kronland (SBN 171693)
Stacey M. Leyton (SBN 203827)
Eileen B. Goldsmith (SBN 218029)
Danielle E. Leonard (SBN 218201)
Robin S. Tholin (SBN 344845)
James Baltzer (SBN 332232)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel. (415) 421-7151
Fax (415) 362-8064
skronland@altber.com
sleyton@altber.com
egoldsmith@altber.com
dleonard@altber.com
rtholin@altber.com
jbaltzer@altber.com

*Attorneys for Plaintiff Organizations*

[Additional Counsel on signature page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO; AMERICAN FEDERATION OF STATE COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO;  et al., | Case No. 25-cv-01780-WHA<br><br>**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION OF CLAIMS I-IV** |
|       Plaintiffs, | |
|    v. | |
| UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, et al., | |
|       Defendants. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................II

INTRODUCTION ................................................................................................................1

STATEMENT OF FACTS .....................................................................................................2

ARGUMENT .....................................................................................................................7

    I.    The Administrative Record Confirms that OPM Directed the Mass,
        Pretextual Termination of Probationary Employees of Other Agencies....................7

    II. Plaintiffs Are Entitled to Summary Judgment on Their *Ultra Vires* Claim ......................9

    III. Plaintiffs Are Entitled to Summary Judgment on their APA Claims ..............................13

        A.    OPM's Directive to Agencies is Final Agency Action. ...............................13

        B.    OPM's Actions Are Contrary to Law ......................................................14

        C.    OPM's Actions Are Arbitrary and Capricious .................................................14

        D.    OPM Failed to Comply with Notice and Comment Rulemaking
            Obligations ...........................................................................................17

    IV.    Plaintiffs Are Entitled to Declaratory and Permanent Injunctive Relief .................19

CONCLUSION ................................................................................................................23

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*AFGE v. Trump,*
    __ F.4th __, No. 25-3293, 2025 WL 1541714 (9th Cir. May 30, 2025) ................... 1, 9, 11, 12

*In re Aiken Cnty.,*
    725 F.3d 255 (D.C. Cir. 2013)............................................................................................ 10, 12

*Alcaraz v. Block,*
    746 F.2d 593 (9th Cir. 1984) ..................................................................................................... 18

*Armstrong v. Exceptional Child. Ctr., Inc.,*
    575 U.S. 320 (2015)............................................................................................................... 9, 10

*Bennett v. Spear,*
    520 U.S. 154 (1997) ............................................................................................................. 13, 14

*Bowsher v. Synar,*
    478 U.S. 714 (1986) ....................................................................................................................... 10

*Carter v. Local 556, Transport Workers Union of Am.,*
    __ F.4th __, 2025 WL 1340536 (5th Cir. May 8, 2025) ....................................................... 21

*Chamber of Com. of U.S. v. Reich,*
    74 F.3d 1322 (D.C. Cir. 1996)...................................................................................................... 10

*Chief Probation Officers of Cal. v. Shalala,*
    118 F.3d 1327 (9th Cir. 1997)...................................................................................................... 19

*Clinton v. City of New York,*
    524 U.S. 417 (1998) ....................................................................................................................... 10

*Dargo v. United States,*
    176 Ct. Cl. 1193 (Ct. Cl. 1966) ................................................................................................... 16

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
    591 U.S. 1 (2020) ............................................................................................................................ 14

*Dist. Hosp. Partners, L.P. v. Burwell,*
    786 F.3d 46 (D.C. Cir. 2015)........................................................................................................ 15

*Doe v. Trump,*
    288 F.Supp.3d 1045 (W.D. Wash. 2017) ................................................................................... 18

*Driftless Area Land Conservancy v. Valcq,*
    16 F.4th 508 (7th Cir. 2021)......................................................................................................... 20

*Drs. for Am. v. Off. of Pers. Mgmt.*,
    No. CV 25-322 (JDB), 2025 WL 452707 (D.D.C. Feb. 11, 2025) ........................................ 14

*E. Bay Sanctuary Covenant v. Trump*,
    932 F.3d 742 (9th Cir. 2018) ........................................................................................... 13

*Ecology Ctr. v. Castaneda*,
    574 F.3d 652 (9th Cir. 2009) ........................................................................................... 15

*Empire Health Found. for Valley Hosp. Med. Ctr. v. Azar*,
    958 F.3d 873 (9th Cir. 2020), *reversed and remanded on other grounds, sub nom.*
    *Becerra v. Empire Health Foundation*, 597 U.S. 424 (2022) ................................................ 18

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
    36 F.4th 850 (9th Cir. 2022) ........................................................................................... 13

*Fed. Express Corp. v. U.S. Dep't of Commerce*,
    39 F.4th 756 (D.C. Cir. 2022) .................................................................................. 9, 11, 12

*Fence Creek Cattle Co. v. U.S. Forest Serv.*,
    602 F.3d 1125 (9th Cir. 2010) ........................................................................................... 7

*Franklin v. Mass.*,
    505 U.S. 788 (1992) ........................................................................................................ 13

*Griffin v. HM Fla.-ORL, LLC*,
    __ U.S. __, 144 S. Ct. 1 (2023) ......................................................................................... 19

*Horne v. United States*,
    419 F.2d 416 (Ct. Cl. 1969) .............................................................................................. 16

*Jane Doe 1 v. Nielsen*,
    357 F.Supp.3d 972 (N.D. Cal. 2018) .................................................................................. 20

*Kalispel Tribe of Indians v. U.S. Dep't of the Interior*,
    999 F.3d 683 (9th Cir. 2021) ........................................................................................... 14

*Karuk Tribe of California v. U.S. Forest Service*,
    681 F.3d 1006 (9th Cir. 2012) (en banc) .............................................................................. 7

*Kaweah Delta Health Care Dist. v. Becerra*,
    123 F.4th 939 (9th Cir. 2024) .................................................................................... 14, 19

*La. Pub. Serv. Comm'n v. F.C.C.*,
    476 U.S. 355 (1986) ........................................................................................................ 10

*Larson v. Domestic & Foreign Com. Corp.*,
    337 U.S. 682 (1949) ........................................................................................................ 11

*Leedom v. Kyne,*
    358 U.S.184 (1958) ................................................................................................ 10

*Loper Bright Enterprises v. Raimondo,*
    603 U.S. 369 (2024) ............................................................................................... 10

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ............................................................................................... 10

*Maryland v. U.S. Dept. of Agric.,*
    Case No. 25-00748 (D. Md.) .................................................................................. 21

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923) ............................................................................................... 10

*McGuffin v. Soc. Sec. Admin.,*
    942 F.3d 1099 (Fed. Cir. 2019) ............................................................................. 16

*Missouri Serv. Comm'n v. FERC,*
    337 F.3d 1066 (D.C. Cir. 2003) ............................................................................. 15

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ................................................................................................. 14

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA,*
    595 U.S. 109 (2022) ............................................................................................... 10

*Nat'l Treasury Emps. Union v. Newman,*
    768 F.Supp. 8 (D.D.C. 1991) ........................................................................... 17, 18

*Northwest Environmental Advocates v. U.S. E.P.A.,*
    537 F.3d 1006 (9th Cir. 2008) ............................................................................... 14

*NTEU v. Helfer,*
    53 F.3d 1289 (D.C. Cir. 1995) ............................................................................... 13

*Nw. Env't Def. Ctr. v. Bonneville Power Admin.,*
    477 F.3d 668 (9th Cir. 2007) ................................................................................. 20

*Oregon Nat. Desert Ass'n v. U.S. Forest Serv.,*
    465 F.3d 977 (9th Cir. 2006) ................................................................................. 13

*Oregon v. Ashcroft,*
    368 F.3d 1118 (9th Cir. 2004), *aff'd sub nom. Gonzales v. Oregon*, 546 U.S. 243
    (2006) ..................................................................................................................... 13

*Patchak v. Zinke,*
    583 U.S. 244 (2018) ............................................................................................... 10

*Plaut v. Spendthrift Farm, Inc.*,
    514 U.S. 211 (1995) ...................................................................................... 10

*Rivera v. Patino*,
    524 F. Supp. 136 (N.D. Cal. 1981) ............................................................... 19

*Shaw v. United States*,
    622 F.2d 520 (Ct. Cl. 1980) ......................................................................... 16

*Sierra Club v. Trump*,
    963 F.3d 874 (9th Cir. 2020) ................................................................. 9, 10, 11

*State v. Su*,
    121 F.4th 1 (9th Cir. 2024) ............................................................................ 13

*United States v. McIntosh*,
    833 F.3d 1163 (9th Cir. 2016) ...................................................................... 11

*United States v. Oakland Cannabis Buyers' Coop.*,
    532 U.S. 483 (2001) ...................................................................................... 19

*United States v. Stanchich*,
    550 F.2d 1294 (2d Cir. 1977) ....................................................................... 15

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ...................................................................................... 10

**Federal Statutes**

5 U.S.C.
    § 301 ............................................................................................................. 11
    § 302 ............................................................................................................. 11
    § 551 ................................................................................................. 13, 17, 18
    § 553 ............................................................................................................. 17
    § 704 ............................................................................................................. 13
    § 706 ............................................................................................. 14, 17, 18
    § 1102 ........................................................................................................... 12
    § 1103 ............................................................................................. 12, 13, 17, 18
    § 1105 ............................................................................................. 12, 13, 17, 18
    § 2301 ........................................................................................................... 15
    § 3101 ........................................................................................................... 11
    § 3502 ........................................................................................................... 12
    § 4303 ........................................................................................................... 12
    § 4304 ........................................................................................................... 12
    § 4305 ........................................................................................................... 12
    § 7513 ........................................................................................................... 12
    § 7514 ........................................................................................................... 12

10 U.S.C.
  § 111 ................................................................................................................11
  § 113 ................................................................................................................11

12 U.S.C.
  § 5491 ..............................................................................................................11
  § 5492 ..............................................................................................................11

16 U.S.C.
  § 551 ................................................................................................................11
  § 554 ................................................................................................................11

20 U.S.C.
  § 3461 ..............................................................................................................11

26 U.S.C.
  § 7801 ..............................................................................................................11
  § 7803 ..............................................................................................................11
  § 7804 ..............................................................................................................11

38 U.S.C.
  § 301 ................................................................................................................11
  § 303 ................................................................................................................11
  § 510 ................................................................................................................11

42 U.S.C.
  § 202 ................................................................................................................11
  § 203 ................................................................................................................11
  § 281 ................................................................................................................11
  § 282 ................................................................................................................11
  § 3411 ..............................................................................................................11
  § 3412 ..............................................................................................................11
  § 7131 ..............................................................................................................11
  § 7231 ..............................................................................................................11
  § 7253 ..............................................................................................................11

51 U.S.C.
  § 20111 ............................................................................................................11
  § 20113 ............................................................................................................11

**Other Authorities**

5 C.F.R. § 315.803.......................................................................................4, 5, 18

5 C.F.R. § 315.804...........................................................................8, 15, 16, 18, 20

5 C.F.R. § 315.805.................................................................................................16

5 C.F.R. § 316.304.................................................................................................15

**INTRODUCTION**

Congress established the federal administrative agencies by statute, and specifically authorized the heads of those agencies—not the Office of Personnel Management ("OPM")—to manage federal employment and make employment decisions in their agencies, consistent with statutory requirements, authorizations, and appropriations. As this Court has previously observed, OPM has never disputed the proposition that "[n]o statute—anywhere, ever—" authorized OPM to direct other federal agencies to terminate their probationary employees. *See* Dkt. 45 at 7-8. From the beginning, OPM's principal response to this lawsuit (aside from jurisdictional arguments this Court has long since rejected, *see* Dkt. 153) has been to insist that OPM did not in fact *direct* the en masse termination of probationary employees on the baseless pretext of unsatisfactory performance, but merely offered "guidance" to individual agencies, which were left free to "ma[k]e their own determinations to terminate or retain their probationary employees." Dkt. 33 at 6; *see also* Dkt. 45 at 8; Dkt. 110 at 2. The administrative record ("AR") compiled by OPM (Dkt. 218-3) belies OPM's claims and conclusively answers the factual issue at the heart of this case: OPM directed the mass, pretextual termination of probationary federal employees.

The building blocks of a final summary judgment ruling on plaintiffs' challenge to the mass termination scheme are already in place. The Court has ruled that the federal-sector union plaintiffs that brought this action have standing to bring the *ultra vires* and Administrative Procedure Act ("APA") claims asserted in this action. Dkt. 202 at 14-19. The Court has also ruled that those claims cannot be channeled to the Merit Systems Protection Board or the Federal Labor Relations Authority, but instead belong in this Court. Dkt. 153; *see also AFGE v. Trump*, __ F.4th __, No. 25-3293, 2025 WL 1541714 at *3-5 (9th Cir. May 30, 2025). There is no basis to revisit either of these rulings. Therefore, the only remaining question is whether the factual record, as set forth in the AR, establishes that OPM directed the mass termination scheme challenged in this case.

The AR created by Defendants confirms that the facts are just as the Court previously found: OPM directed other federal agencies to compile lists of their probationary employees and then "asked" those agencies to terminate those probationary employees who were not identified as "mission-critical"; multiple agencies sought "exemptions" from OPM to blunt the impact of OPM's

1   mass termination directive; and OPM leadership decided whether to "grant" such "exemptions"—all

2   in the absence of any legal authority. *See infra* at 5-7. Nothing in the administrative record compiled

3   by OPM contradicts the "mountain of evidence" this Court relied on when it ordered preliminary

4   relief. Dkt. 132 at 5-7; Dkt. 202 at 2-8. The AR simply confirms that OPM's factual contentions fare

5   no better than its legal arguments.

6         As a result, the Court's earlier findings that plaintiffs were likely to succeed on the merits of

7   their *ultra vires* and APA claims (Dkt. 45 at 7-10; Dkt. 132 at 9-12; Dkt. 202 at 10-14) should be

8   converted to final rulings on the merits.[1] The Court should grant summary judgment to Plaintiffs on

9   Claims I-IV of the Second Amended Complaint and convert the Court's April 18 preliminary

10  injunction into declaratory and permanent injunctive relief.[2]

11  **STATEMENT OF FACTS[3]**

12        The AR recounts the now-familiar story of OPM's direction to other federal agencies to

13  terminate their probationary employees, relying on the pretext—chosen to insulate these terminations

14  from any form of review—that those employees were being separated from government service based

15  on their performance regardless of those employees' *actual* performance. OPM's contention that it

16  merely gave "guidance" to agencies that they could implement or ignore as they pleased is belied by

17  its own documents and the "exemption process" that forced agencies to secure OPM's permission to

18  retain probationary employees.

19

20

21  [1] This Court also found that the State of Washington had standing based on its financial injuries.
    Dkt. 202 at 21-22. Although the Court's finding that the nonprofit organization plaintiffs had standing

22  was rejected by the Supreme Court in its order staying the Court's first preliminary injunction, the
    denial of standing as to the nonprofit organizations has no bearing on whether summary judgment may

23  be granted because all plaintiffs in this action asserted identical claims.

    [2] Claim V of the Second Amended Complaint challenges OPM's new requirement that each

24  federal employee submit a weekly email to OPM detailing five things the employee did during the prior
    week. The AR prepared by OPM entirely ignores this claim.

25
    [3] This statement of facts is drawn from the AR compiled by defendants. While it appears

26  implausible that this AR is a complete, warts-and-all account of OPM's actions, nothing in the AR
    conflicts with the evidentiary record assembled by Plaintiffs that the Court considered on the TRO and

27  PI motions. In the interest of avoiding presenting unnecessary disputes to this Court, Plaintiffs
    therefore move for summary adjudication on the record defendants have presented, without conceding

28  that defendants properly compiled a complete and accurate record of this matter.

On January 20, 2025, his first day in office, OPM Acting Director Charles Ezell distributed a memo to "Heads and Acting Heads of Departments and Agencies" regarding "Guidance on Probationary Periods, Administrative Leave and Details," directing department and agency heads to submit to OPM, by January 24, a list of the agency's "employees on probationary periods, who have served less than a year in a competitive service appointment, or who have served less than two years in an excepted service appointment." AR335-37. The memorandum further directed agencies to "promptly determine whether those employees should be retained at the agency." AR335.

On February 12, in an email signed by "OPM," OPM directed agencies to commence "Probationary Employee Actions." Dkt. 111-5 at 1-2.[4] The email purported to "clarif[y] immediate next steps for probationary employees," including terminating employees "immediately or as soon as possible," demanded that agencies provide reports to OPM "after actioning," and continue to provide daily reports of the probationary employees they had terminated and for any employees they intended to keep, "an explanation of why." *Id.* at 1.

Also on February 12, the CHCO Council[5] also sent an email to federal agencies with the subject line "Key Takeaways from CHCO Council Special Session," providing a template letter "for terminating … probationary period employee[s]." AR368-69. The template letter included empty fields for "[NAME]," "[TITLE]," and "[ORGANIZATION]," and included a statement that: "[T]he Agency is removing you from your position of [TITLE]" because "[t]he Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest." AR371-72.[6]

The AR does not include *any* evidence that OPM directed agencies to conduct individualized performance evaluations before using this template letter to terminate probationary employees, nor does it include any evidence that any agency actually conducted such evaluations. In fact, in the

---

[4] Dkt. 111-5 is a February 12 email that the defendants portrayed as part of "the forthcoming administrative record prepared for this APA matter." Dkt. 111 at 2. Inexplicably, defendants omitted this email from the AR they later filed. *See generally* Dkt. 218-3.

[5] The CHCO Council is an assemblage of Chief Human Capital Officers from multiple departments and agencies.

[6] The template letter at AR371-72 is substantially similar to the template letters considered by this Court at earlier stages of these proceedings. Dkt. 45 at 3; Dkt. 132 at 5 (citing Dkt. 87-1).

body of the email to which this template letter was attached, OPM specifically instructed agencies to use the template letter *even if* no "previous performance evaluation" had identified any concerns with the recipient's performance. AR369 ("While agencies must identify performance or conduct deficiencies in the notice terminating a probationer, such performance or conduct deficiencies do not have to be identified in a previous performance evaluation."). Per OPM's instructions, even employees with exemplary performance evaluations would be told that they were being terminated "based on [their] performance." AR371.[7]

Another CHCO Council email followed on February 14, 2025, informing all "CHCOs and Deputy CHCOs" of "immediate next steps for probationary employees." AR375. The email was signed "OPM." *Id.* Referencing a conference call that had taken place that day, the February 14 email confirmed OPM's directive: "We have asked that you separate probationary employees that you have not identified as mission-critical no later than end of the day Monday, 2/17." *Id.* It also reiterated OPM's views regarding employee performance:

> An employee's performance must be measured in light of the existing needs and interests of government. OPM has emphasized that individual employee performance measurement should be "aligned with and support organization goals" and "focus[] employee efforts on achieving organizational and group goals." An employee's performance must be viewed through the current needs and best interest of the government, in light of the president's directive to dramatically reduce the size of the federal workforce.

> Through the exemptions process, agencies have identified the highest performing probationers in mission critical areas. Regulations on probationary periods state: "The agency shall utilize the probationary period as fully as possible to determine the fitness of the employee and shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment. 5 CFR 315.803. OPM believes "qualifications for continued employment" in the current context means that only the highest-performing probationers in mission-critical areas should be retained.

AR375. The email attached a new version of OPM's template termination letter. AR377-78. The email also instructed each agency: "After actioning,"—an apparent reference to terminations—

---

[7] As the evidentiary record previously assembled by Plaintiffs demonstrates, multiple employees who received a substantially similar template termination letter had received exemplary performance evaluations. *See* Dkt. 202 at 6-7.

"please update the previous probationary employee spreadsheet you've sent us to include…[w]hich probationary employees have been terminated and which you plan to keep.  For those you plan to keep, provide an explanation of why."  AR375.

Five days after this lawsuit was filed, on February 24, 2025, the CHCO Council sent another email to CHCOs and Deputy CHCOs.  AR389.  Unlike the February 14 email, in which OPM explicitly "asked that [agencies] separate probationary employees," AR375, the February 24 email adopts a different framing: "As agencies continue to make decisions on whether to retain probationary employees, OPM has received numerous questions.  To assist agencies in carrying out their decisions, OPM offers, attached, the following frequently asked questions for agencies." AR389.  The attached FAQ reiterates OPM's view that the phrase "qualifications for continued employment," as used in 5 C.F.R. § 315.803, "means that only the highest-performing probationers in mission-critical areas should be retained."  AR390.

On March 5, 2025, a few days after this Court issued its temporary restraining order, Ezell circulated a revised version of his January 20, 2025 memorandum.  AR400-02.  The revised memorandum added a disclaimer not included in the original version: "Please note that, by this memorandum, OPM is not directing agencies to take any specific performance-based actions regarding probationary employees.  Agencies have ultimate decision-making over, and responsibility for, such personnel actions."  AR401.

Throughout this period, OPM also applied an "exemptions process" (AR375) by which agencies could ask to protect at least some of their probationary employees from termination. Several examples from the AR demonstrate that OPM was calling the shots, not the employing agencies.

On January 24, 2025, the Chairman of the National Transportation Safety Board ("NTSB") responded to Ezell's January 20 memorandum with an email identifying the agency's 20 probationary employees, but also informed OPM that "all 20 employees are critical to our mission of public safety."  AR339-40.  On February 4, the NTSB Chairman wrote again, reiterating that all 20 NTSB probationary employees were "critical to public safety."  AR338-39.  OPM Chief of Staff Amanda Scales forwarded this email to OPM Senior Advisor Noah Peters.  AR338 ("[W]anted to forward the

below from NTSB re probationary employees/critical needs in their group. Good to have on our minds.").  Peters responded: "Fine to exempt them." *Id.*

In a February 11, 2025 email, a Department of Defense official asked OPM, on behalf of herself and the CHCO for the Department of Housing and Urban Development ("HUD"), whether OPM would be confirming its representation on an earlier call that certain groups of employees would be exempted from the terminations: "At a CHCO meeting last week, *you indicated that disabled veterans and PMF/interns would be excluded* from the probationary exercise.  Is that still the case?" AR357 (emphasis added); *see also id.* at 358.[8]

On February 16, 2025, Scales and James Sullivan (a Senior Advisor to the OPM Director) emailed Hayley Conklin, a CHCO at the Department of Justice ("DOJ"). Scales directed Conklin to "use the attached letter to separate from probationary employees, with the exception of high-performing employees in mission critical roles and **any employees serving in the functions noted in red\***." AR382 (emphasis in original); *see also id.* ("Please note that for DOJ, **OPM has granted Civil Appellate, Federal Programs Branch, Office of Immigration Litigation, and Office of Solicitor General exemptions from the hiring freeze and from any guidance to terminate probationary employees.**") (emphasis in original).

Two days later, on February 18, DOJ's Assistant Attorney General for Administration, Jolene Lauria, emailed Scales, asking for a broader, department-wide exemption from the plan to terminate probationary employees.  AR386-88 ("92% of [DOJ's probationary] employees are in critical immigration, law enforcement, national security, and other critical support categories… **The Department of Justice must be exempt from firing its probationary employees given the criticality of the missions we support**.") (emphasis in original).  Scales forwarded the email to Peters and Sullivan, writing: "Know DOJ is exempted for Civil Appellate, Federal Programs, Office

---

[8] Although Peters responded to the DoD official that it was "up to each agency" and "We should not send out anything more formal," AR358, this cannot be viewed as evidence that agencies had any meaningful right to opt out of the mass termination plan without OPM's permission.  If CHCOs had understood that their agencies were free to make unfettered decisions whether to terminate their probationary employees, they would have had no reason to seek clarification from OPM about which employees they could protect.  *Cf.* Dkt. 202 at 12 ("If the agencies exercised ultimate discretion, why did OPM make them apply for exemptions?").

1   of Immigration Litigation, and Office of Solicitor General right now and nothing more right now.  Let

2   me know what you think here about going broader.  Happy to set something up with her to discuss

3   live if we need."  AR386.

4          While the AR does not record the actual terminations of thousands of probationary employees

5   in multiple departments and agencies that ensued in February 2025, defendants have never disputed

6   that those well-documented terminations occurred.  *See* Dkt. 45 at 8-9; Dkt. 132 at 10-11; Dkt. 202 at

7   11-14; *see also* Dkt. 144 and 144-1–144-8; Dkt. 185 and 185-1–185-6; Dkt. 216 and 216-1–216-19

8   (government compliance reports regarding terminated probationary employees).

9                                          **ARGUMENT**

10         "Summary judgment is appropriate when there is no genuine issue of material fact and the

11  moving party is entitled to judgment as a matter of law."  *Karuk Tribe of California v. U.S. Forest*

12  *Service*, 681 F.3d 1006, 1014 (9th Cir. 2012) (en banc).  "Generally, judicial review of an agency

13  decision is limited to the administrative record on which the agency based the challenged decision."

14  *Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010).

15  **I.     The Administrative Record Confirms that OPM Directed the Mass, Pretextual**
        **Termination of Probationary Employees of Other Agencies.**

16         Even on the sparse and self-serving administrative record compiled by OPM, there is no

17  reasonably disputing that OPM directed the mass termination of probationary employees.  First, OPM

18  ordered agencies to compile and send to OPM lists of their probationary employees, AR335-37, and

19  then it instructed those agencies to commence "actioning" those employees, AR375.  As is clearly

20  stated in the February 14 email signed by OPM recounting OPM's February 14 CHCO call: "We

21  have asked that you separate probationary employees that you have identified as mission-critical no

22  later than end of the day, Monday, 2/17."  AR375.  That email proceeds to detail OPM's views about

23  how probationary employees' performance "*must*" be evaluated, directing agencies to terminate

24  employees *en masse* on the pretext that the terminations were "based on [their] performance," while

25  simultaneously instructing that this "find[ing]" of inadequate performance need not be supported by

26  any performance evaluation.  *Id.*; *see also* AR369 ("While agencies must identify performance or

27  conduct deficiencies in the notice terminating a probationer, such performance or conduct

28

deficiencies do not have to be identified in a previous performance evaluation."); AR390 (OPM "FAQ" stating that although 5 C.F.R. §315.804 requires that any termination notice "must include the agency's conclusions as to the inadequacies of the employee's conduct," "only the highest-performing probationers in mission-critical areas should be retained."). As this Court has previously recognized, "An 'ask,' followed by a directive, is a directive." Dkt. 132 at 10.

Moreover, the very existence of an "exemptions process" by which agencies could obtain OPM's permission to retain certain employees (AR375) cannot be squared with the OPM's fiction that it offered mere "guidance" to the agencies. If OPM had merely been offering take-it-or-leave-it advice to the agencies, there would have been no reason for agencies to seek OPM's permission to exempt their employees from the mass termination directive. But the administrative record here shows that multiple federal agencies explicitly asked requested "exemptions" from OPM's "probationary exercise." AR338-39; AR357-58; AR382; AR386. When OPM leadership received these "exemption" requests, it did not respond by stating that the recipients of its purported "guidance" were free to take that guidance or to ignore it, or by stating there was no need to ask for permission. Instead, OPM decided whether to "grant" or deny such "exemptions." AR338 (OPM Senior Adviser Peters approving exemption for NTSB); AR382 (OPM Chief of Staff Scales confirming that "OPM has granted [several DOJ sections] exemptions from…any guidance to terminate probationary employees.").[9] When OPM assumed authority to "grant" or deny "exemptions" from its purported "guidance to terminate probationary employees," it usurped the authority undisputedly conferred by Congress on each agency to make its own employment decisions. Again, as the Court previously recognized, "A choice—you may choose to retain your probationers—followed by a caveat—if OPM grants your exemption request—is not a choice." Dkt.

---

[9] The administrative record compiled by OPM includes examples where OPM "grants" exemptions, but no examples of denials. As this Court previously recognized, however, the record compiled by Plaintiffs earlier in these proceedings is replete with such examples (including "agency memos, termination letters, congressional testimony, meeting transcripts, emails, and more") where OPM denied exemption requests. *See* Dkt. 132 at 11; Dkt. 45 at 2-5 (collecting evidence). OPM's failure to include these denials in the administrative record it compiled—whether inadvertent or not—does matter to any legal issue in this case; what matters is that OPM assumed the authority to decide whether agencies would be excused from terminating probationary employees, and it exercised that authority. *See supra* n.8.

202 at 13.

To be sure, there is no formal memorandum on OPM letterhead directly ordering the mass termination of probationary employees (instead, OPM sent emails). Nor does the administrative record disclose the exact contents of the CHCO Council conference calls where OPM announced various directives. *See* Dkt. 45 at 1-2; AR368-69; AR375. But that is not surprising; the administrative record reveals that OPM tried to conceal its role. *See, e.g.*, AR357 (Peters, in response to a CHCO's request that OPM to confirm its oral representations that "disabled veterans… would be excluded from the probationary exercise": "We should not send out anything more formal."). Nevertheless, the administrative record as a whole confirms the uncontroverted narrative that the Court already understood: OPM directed agencies to terminate their probationary employees on the pretext that the terminations were for performance reasons; and agencies understood, and did, exactly what OPM directed. *Cf. AFGE v. Trump*, 2025 WL 1541714 at *6-7 (rejecting OPM's attempt to characterize a directive to other agencies as mere "guidance" where the record showed that agency action was subject to OPM's approval).

## II. Plaintiffs Are Entitled to Summary Judgment on Their *Ultra Vires* Claim

As this Court previously recognized, "[n]o statute—anywhere, ever—has granted OPM the authority to direct the termination of employees in other agencies." Dkt. 45 at 7-8; *see also* Dkt. 132 at 9-10 ("OPM did not have the authority to direct the firing of employees, probationary or otherwise, in any *other* federal agency.") (emphasis in original). OPM's actions, as confirmed in the AR, run roughshod over the statutes creating and granting authority to other federal agencies, as well as OPM's own narrow statutory mandate. As such, they rise to the level of such "extreme" agency error, *Fed. Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 764 (D.C. Cir. 2022), as to be enjoined as an *ultra vires* attempt to usurp Congress' Article I legislative power.

"The ability to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action…" *Armstrong v. Exceptional Child. Ctr., Inc.*, 575 U.S. 320, 327 (2015). "Equitable actions to enjoin *ultra vires* official conduct do not depend upon the availability of a statutory cause of action; instead, they seek a 'judge-made remedy' for injuries stemming from unauthorized government conduct, and

1   they rest on the historical availability of equitable review." *Sierra Club v. Trump*, 963 F.3d 874, 890-

2   91 (9th Cir. 2020) (citing *Armstrong*, 575 U.S. at 327), *vacated and remanded on other grounds*

3   *(mootness)*, 142 S. Ct. 46 (2021).

4          "Administrative agencies are creatures of statute.  They accordingly possess only the authority

5   that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, *OSHA*, 595 U.S. 109, 117

6   (2022); *see also La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986) ("[A]n agency literally

7   has no power to act … unless and until Congress confers power upon it.").  The President and

8   Executive branch agencies have no constitutional power to exercise Congress' Article I powers by

9   attempting to unilaterally enact, amend, or repeal duly enacted statutes.  *Clinton v. City of New York*,

10  524 U.S. 417, 438–39 (1998); *see also In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) ("the

11  President may not decline to follow a statutory mandate or prohibition simply because of policy

12  objections … Those basic constitutional principles apply to the President and subordinate executive

13  agencies").  Indeed, because "the accumulation of all powers, legislative, executive, and judiciary, in

14  the same hands ... pose[s] an inherent threat to liberty[,]" each branch of the federal government must

15  stay within its proper domain.  *Patchak v. Zinke*, 583 U.S. 244, 250 (2018) (plurality op.) (cleaned

16  up); *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923); *see also Bowsher v. Synar*, 478 U.S. 714,

17  721–22 (1986) ("there can be no liberty where the legislative and executive powers are united in the

18  same person") (quoting The Federalist No. 47, p. 325 (J. Cooke ed. 1961)).

19         When one of the three branches exceeds the scope of its statutory or constitutional authority, it

20  falls to the federal courts to reestablish the proper division of federal power.  *See, e.g.*, *Plaut v.

21  Spendthrift Farm, Inc.*, 514 U.S. 211, 218 (1995) (rebuking Congress's intrusion into judicial sphere);

22  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577 (1992) (preventing judiciary from intruding into

23  executive sphere); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 655 (1952) (halting

24  President's encroachment upon legislative sphere); *cf. Loper Bright Enterprises v. Raimondo*, 603

25  U.S. 369, 391-92 (2024) (refusing to imply into APA any deference to agency decisions interpreting

26  laws, because that would permit other branches to usurp Article III).

27         Federal agency action outside of any constitutional or statutory authority therefore may be

28  struck down as *ultra vires*.  *See, e.g.*, *Sierra Club*, 963 F.3d at 888-93 (9th Cir. 2020); *Chamber of*

1    *Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996); *see also Leedom v. Kyne*, 358 U.S.184,

2    188 (1958); *Larson v. Domestic & Foreign Com. Corp*., 337 U.S. 682, 691 (1949); *cf. United States v.*

3    *McIntosh*, 833 F.3d 1163, 1174 (9th Cir. 2016) ("both federalism and separation-of-powers

4    constraints in the Constitution serve to protect individual liberty, and a litigant in a proper case can

5    invoke such constraints '[w]hen government acts in excess of its lawful powers.'"); *AFGE v. Trump*,

6    2025 WL 1541714 at *8-9.  It is well-established that there is "'extreme' agency error where the

7    agency has 'stepped so plainly beyond the bounds of [its statutory authority], or acted so clearly in

8    defiance of it, as to warrant the immediate intervention of an equity court.'"  *Fed. Express*, 39 F.4th at

9    764 (analyzing both "extent of the agency's delegated authority" and whether "agency has acted

10   within that authority") (quotations omitted); *see also Sierra Club*, 963 F.3d at 888-93.

11        Here, OPM's conduct is readily established as *ultra vires*.  Each federal agency has its own

12   authorizing statutes that govern its administration, including statutory provisions that authorize one or

13   more individuals to act as the head of the agency.  *See, e.g.*, 10 U.S.C. §§111, 113 (Defense); 12

14   U.S.C. §5491 (CFPB); 16 U.S.C. §551 (Agriculture); 26 U.S.C. §§7801, 7803 (IRS); 38 U.S.C.

15   §§301, 303 (VA); 42 U.S.C. §§202, 203 (HHS); 42 U.S.C §§281, 282 (NIH); 42 U.S.C. §§3411, 3412

16   (Education); 42 U.S.C. §7131 (Energy); 51 U.S.C. §20111 (NASA).  Congress has then authorized

17   each agency head to exercise powers of management over that agency and its employees, including

18   the hiring and firing of employees, consistent with any applicable laws.  *See, e.g.*, 26 U.S.C. §§7803,

19   7804 (IRS); 42 U.S.C. §§7231, 7253 (Energy); 20 U.S.C. §3461 (Education); 12 U.S.C. §5492

20   (CFPB); 16 U.S.C. §§551, 554a, 554e (Agriculture); 38 U.S.C. §§303, 510 (VA); 10 U.S.C. §113

21   (Defense); 42 U.S.C. §203 (HHS); 42 U.S.C. §282 (NIH); 51 U.S.C. §§20111, 20113 (NASA).

22        In addition to these specific authorizing statutes, Congress also enacted a "General Authority

23   to Employ" statute that applies to all federal agencies.  5 U.S.C. §3101; *see also* 5 U.S.C. §301

24   (delegating general authority to each federal agency head to adopt regulations "for the government of

25   his department, the conduct of its employees, the distribution and performance of its business…"); 5

26   U.S.C. §302 (authorizing agency heads to delegate their authority to subordinate employees).

27        OPM's actions seek to usurp these other agencies' statutory authority by arrogating to OPM

28   itself the authority to direct other agencies' employment decisions.  By contrast to the employing

1    power that Congress vested in agency heads, Congress did not authorize OPM to hire or fire any

2    federal employees employed by any agency other than OPM itself. 5 U.S.C. §§1102, 1103. Rather,

3    OPM's statutory role is merely to provide human resources support for the federal government

4    agencies, including by creating and publishing government-wide rules in compliance with the APA.

5    5 U.S.C. §§1103, 1105; *see also* §1101 (Notes) (President's message: "The positive personnel

6    management tasks of the government--such as training, productivity programs, examinations, and pay

7    and benefits administration--would be the responsibility of an Office of Personnel Management.").

8    Further, OPM's authority with respect to the termination of employees of other agencies and

9    departments is limited to providing technical assistance and promulgating regulations. 5 U.S.C.

10   §§4304, 4305, 7514; *see also AFGE v. Trump*, 2025 WL 1541714 at *8 ("OPM [has] only

11   supervisory authority over the other federal agencies... We therefore agree with the district court that

12   [OPM's] actions directing other federal agencies to engage in restructuring and large-scale RIFs were

13   ultra vires.").

14       Moreover, even if OPM did have the power to terminate employees of other agencies it

15   cannot evade the statutory requirements with which agencies must comply. In the Civil Service

16   Reform Act, Congress established uniform standards for civil service employment across the federal

17   government, which govern agencies' termination of employees for cause based on performance (5

18   U.S.C. §4303(a); 5 U.S.C. §7513(a)), and agency layoffs ("reductions in force," or "RIFs") (5 U.S.C.

19   §3502). These statutes do not permit agencies to terminate probationary employees, immediately and

20   en masse, or for pretextual "performance" reasons, and OPM cannot override these provisions.

21       OPM's directive that agencies terminate their probationary employees *en masse* and for

22   uniform, pretextual performance reasons is so "extreme" and far outside OPM's delegated power as

23   to assume legislative authority in violation of the Constitution's separation of powers and myriad

24   statutes described above, and is therefore *ultra vires*. *Fed. Express*, 39 F.4th at 764. As in *Aiken*

25   *County*, "our constitutional system of separation of powers would be significantly altered if we were

26   to allow executive and independent agencies to disregard federal law in the manner asserted in this

27   case …." 725 F.3d at 266-67. Now that the administrative record has put to rest the fiction that

28   OPM's unlawful directives were mere guidance, summary judgment should be granted.

1

### III. Plaintiffs Are Entitled to Summary Judgment on their APA Claims

2        OPM is an "agency" subject to the APA.  *NTEU v. Helfer*, 53 F.3d 1289, 1292–93 (D.C. Cir.

3   1995); 5 U.S.C. §§551; 1103(a)(5), (7); 1105 (requiring OPM to comply with APA).  Congress

4   granted OPM a single exception to APA compliance, inapplicable here, for rules that extend only

5   internally within OPM's own "Office or its employees."  5 U.S.C. §1103(b)(1).[10]  OPM's actions

6   violated the APA in three different ways: they are contrary to law, arbitrary and capricious, and

7   constitute rulemaking that should have been conducted pursuant to APA procedures.

8        **A.        OPM's Directive to Agencies is Final Agency Action.**

9        As an initial matter, OPM's order that other federal agencies terminate their probationary

10  employees, nominally but not in reality based on their performance, constitutes final agency action

11  for purposes of an APA challenge.  5 U.S.C. §704.  Final agency action marks the "consummation of

12  the agency's decisionmaking process" and is the action by which "rights or obligations have been

13  determined," or from which "legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177-78

14  (1997).[11]  In ascertaining whether agency action is final, courts look at the action's "practical effect,"

15  and in particular, whether "immediate compliance is expected."  *Oregon Nat. Desert Ass'n v. U.S.*

16  *Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006).  OPM's order to terminate probationary workers was

17  not "tentative or interlocutory"; it has all the hallmarks of a programmatic decision that constitutes

18  final OPM action.  *Bennett*, 520 U.S. at 178; *see also, e.g.*, *Helfer*, 53 F.3d at 1292-93 (OPM

19  rulemaking final action subject to APA review).

20

21

22        [10] Although the administrative record does not disclose whether OPM acted at the President's
    direction, the President's involvement would not excuse OPM from APA compliance.  The APA has
23  long been held to apply with full force to agency action that implements presidential directives.  *See,*
    *e.g.*, *Franklin v. Mass.*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring); *E. Bay Sanctuary Covenant*
24  *v. Trump*, 932 F.3d 742, 770 (9th Cir. 2018); *see also State v. Su*, 121 F.4th 1, 15 (9th Cir. 2024) ("The
    Supreme Court has never excepted a final rule from APA review because it carried out a presidential
25  directive. Nor have we—or any other circuit.").

26        [11] Final agency action is the programmatic decision, even if further steps are necessary to
    implement the program and comply with the directive.  *E.g.*, *Oregon v. Ashcroft*, 368 F.3d 1118, 1148
27  (9th Cir. 2004), *aff'd sub nom. Gonzales v. Oregon*, 546 U.S. 243 (2006) ("An agency action can be
    final even if its concrete legal effects are contingent upon a future event."); *Env't Def. Ctr. v. Bureau*
28  *of Ocean Energy Mgmt.*, 36 F.4th 850, 869 (9th Cir. 2022) ("programmatic review" is final agency
    action regardless of whether "reviewing and approving individual, site-specific permits" remains).

Here, the administrative record shows that OPM directed each federal agency to "separate probationary employees that you have not identified as mission-critical no later than Monday, 2/17." AR375. OPM provided the agencies with a template termination letter to facilitate immediate compliance with its directive. AR 377-38; *see also, e.g.*, AR382 (OPM Chief of Staff Scales; directing DOJ to "use the attached letter to separate from probationary employees."). OPM proceeded to grant (or deny) "exemptions" from that directive. Both the directives and the "exemption" decisions were final agency action. *Bennett*, 520 U.S. at 178; *see also supra* at 2-7.

**B.     OPM's Actions Are Contrary to Law**

The APA prohibits agency action that exceeds statutory or constitutional authority or is otherwise contrary to law. 5 U.S.C. §706(2)(A), (C); *Kaweah Delta Health Care Dist. v. Becerra*, 123 F.4th 939, 944 (9th Cir. 2024) ("[U]nder our system of separation of powers, neither good intentions nor pressing policy problems can substitute for an agency's lack of statutory authority to act."); *Northwest Environmental Advocates v. U.S. E.P.A.*, 537 F.3d 1006, 1025-27 (9th Cir. 2008). For the same reasons that OPM's actions are *ultra vires*, OPM has exceeded its own statutory authority and usurped the authority of other agencies, and has therefore violated 5 U.S.C. §706(2)(A) and (C). Dkt. 45 at 9 ("OPM's direction to other agencies was not supported by any statutory authority. Plaintiffs are therefore likely to show that OPM's directive constituted an agency action that was 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right' that must be '[held unlawful and set aside.'") (quoting 5 U.S.C. §706(2)(C)); Dkt. 132 at 9-10. Accordingly, "the only appropriate remedy is vacatur." *Kaweah*, 123 F.4th at 944.

**C.     OPM's Actions Are Arbitrary and Capricious**

The APA also prohibits arbitrary and capricious action. 5 U.S.C. §706(2)(A); *Kalispel Tribe of Indians v. U.S. Dep't of the Interior*, 999 F.3d 683, 688 (9th Cir. 2021). Pursuant to this standard, federal agencies are required to engage in "reasoned decisionmaking." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020). To do so, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotations omitted); *see also Drs. for Am. v. Off. of Pers. Mgmt.*, No. CV 25-

322 (JDB), 2025 WL 452707, at *8 (D.D.C. Feb. 11, 2025) ("[Plaintiff's] arbitrary and capricious

argument is simple: the agencies' removal decisions were "completely unreasoned" and thus were not

the product of reasoned decisionmaking. … The Court agrees that [Plaintiff] has demonstrated a

likelihood of success on the merits as to this claim.").

"Reliance on facts that an agency knows are false at the time it relies on them is the essence of

arbitrary and capricious decisionmaking." *Missouri Serv. Comm'n v. FERC*, 337 F.3d 1066, 1075

(D.C. Cir. 2003); *see also Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 57 (D.C. Cir. 2015)

("An agency contravenes the APA when it "fails to examine the relevant data," which could reveal

"that the figures being used are erroneous."); *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 656 (9th Cir.

2009) (arbitrary and capricious action includes an "an explanation that runs counter to the evidence

before the agency or is so implausible that it could not be ascribed to a difference in view or the

product of agency expertise."); *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977)

(Friendly, J.) ("Our review is deferential, but we are 'not required to exhibit a naiveté from which

ordinary citizens are free.'").

Because it was based on an unreasoned and pretextual attempt to characterize these

terminations uniformly as being based on employees' "performance," OPM's mass termination order

must be voided as arbitrary and capricious on several grounds.

First, OPM disregarded 5 C.F.R. §315.804, which establishes procedural requirements for

probationary employee terminations for cause.  Under that regulation, federal agencies may

"terminate an employee serving a probationary or trial period because his work performance or

conduct during this period fails to demonstrate his fitness or his qualifications for continued

employment," but in so doing must "notify[] him in writing as to why he is being separated," and

state, "as a minimum, … the agency's conclusions as to the inadequacies of his performance or

conduct."  5 C.F.R. §315.804(a) [12]; *see also* 5 C.F.R. §316.304 (same notice rights for other trial-

---

[12] Executive Order 14284, issued April 24, 2025, purports to revoke 5 C.F.R. §315.804 and
replace it with a new civil service rule.  The legality of that EO is not at issue in this case.  At the time
of the mass probationary employee termination challenged in this case, §315.804 was in full force and
effect.

period employees in the excepted service).[13]  Instead, OPM directed agencies to send template termination letters with no individualized statements of reasons and with a statement that employees were being terminated for cause that had no factual basis (except in a tiny fraction of instances, *see* Dkt. 217).

Second, OPM categorically directed agencies to terminate all probationary employees for performance, except those previously identified as "mission critical," without regard for any individualized assessment of any given employee's performance.  AR369 ("While agencies must identify performance or conduct deficiencies in the notice terminating a probationer, such performance or conduct deficiencies do not have to be identified in a previous performance evaluation.").

Third, OPM categorically directed agencies to retain only their "mission-critical" probationary employees, notwithstanding the limits on terminating probationers for cause that are set forth in 5 C.F.R. §§315.804 (performance and misconduct) and 315.805 (reasons predating federal employment).  *See* AR375 (reiterating OPM's view that only "mission-critical" employees "should be retained").

And fourth, as this Court previously explained: "The OPM template letter used to effectuate [the] terminations—'[t]he Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest'—was an obvious pretext intended to obstruct appeal and avoid statutory and regulatory reduction-in-force procedures (for example, the honoring of veteran preferences in the order of retention)."  Dkt. 132 at 10-11 (citing Dkt. 87-1 at 1; Dkt. 94-1 at 3-5); *see also* AR369.

---

[13] Section 315.804 codifies the concept inherent to the merit system, *see* 5 U.S.C. §2301(b)(6) and (b)(8)(A), that to terminate a probationary employee for cause, the employer "'must *honestly* be dissatisfied with the probationer's conduct or performance after giving him a fair trial on the job.'" *McGuffin v. Soc. Sec. Admin.*, 942 F.3d 1099, 1102 (Fed. Cir. 2019) (quoting *Shaw v. United States*, 622 F.2d 520, 544 (Ct. Cl. 1980) (emphasis added)); *see also Dargo v. United States*, 176 Ct. Cl. 1193, 1206 (Ct. Cl. 1966) (termination of probationary employee for "competence" reasons must reflect agency's "honest judgment"); *Horne v. United States*, 419 F.2d 416, 419 (Ct. Cl. 1969) (termination of probationary employee may not be "so lacking in rational support that it must be characterized as arbitrary or capricious").

1      Thus, the administrative record further confirms this Court's prior findings that OPM's

2    directive that agencies characterize the terminations as performance-based was a sham.  By

3    disregarding limits upon its authority and directing agencies to deceive their employees, OPM acted

4    arbitrarily and capriciously in violation of 5 U.S.C. §706(2)(A).

5        **D.**     **OPM Failed to Comply with Notice and Comment Rulemaking Obligations**

        The APA further requires the Court to "hold unlawful and set aside" any program that fails to

6    comply with "procedure required by law."  5 U.S.C. §706(2)(D).  In particular, when a federal agency

7

8    promulgates a "rule," defined in the APA as " the whole or a part of an agency statement of general or

9    particular applicability and future effect designed to implement, interpret, or prescribe law or policy

10    or describing the organization, procedure, or practice requirements of an agency," 5 U.S.C. §551(4),

11    the agency must first comply with procedural requirements prescribed by statute, including the

12    requirement to follow the notice-and-comment rulemaking process described in 5 U.S.C. §553.  That

13    process requires the rulemaking agency to publish a general notice of rulemaking in the federal

14    register and to "give interested persons an opportunity to participate in the rule making through

15    submission of written data, views, or arguments."  5 U.S.C. §553(b)-(c).

16        OPM's authorizing statutes expressly incorporate these APA requirements.  5 U.S.C.

17    §§1103(b), 1105.  Although the APA generally waives notice and comment requirements for internal

18    agency "personnel" rules (5 U.S.C. §553(a)), Congress expressly made any government-wide rules

19    created by OPM subject to APA notice and comment.  *See* 5 U.S.C. §1105 ("Subject to §1103(b) of

20    this title, in the exercise of the functions assigned under this chapter, the Director shall be subject to

21    subsections (b), (c), and (d) of section 553 of this title"); *see also id.* §1103(b)(1) ("The Director shall

22    publish in the Federal Register general notice of any rule or regulation which is proposed by the

23    Office and the application of which does not apply solely to the Office or its employees. Any such

24    notice shall include the matter required under section 553(b)(1), (2), and (3) of this title.").  Courts

25    have accordingly recognized that when OPM promulgates a new policy concerning federal

26    employees outside OPM itself, OPM is subject to notice-and-comment rulemaking requirements.

27    *See, e.g.*, *Nat'l Treasury Emps. Union v. Newman*, 768 F.Supp. 8, 11 (D.D.C. 1991) (holding OPM's

28

1  "new program of examinations governing hiring for 112 career positions within the federal

2  government" was "clearly" a rule under the APA, subject to notice-and-comment rulemaking).

3          Here, the AR shows that OPM promulgated at least three government-wide "rules" which,

4  pursuant to 5 U.S.C. §§1105 and 1103(b)(1), could only be issued by means of notice-and-comment

5  rulemaking.  First, OPM directed all department and agency heads to prepare and submit a report

6  listing all employees on probationary periods; to "promptly determine whether those employees

7  should be retained at the agency"; and to terminate all but their "mission-critical" probationers by

8  February 17.  AR335-37, AR375.  Second, OPM purported to redefine—on a government-wide

9  basis—employee "fitness" and "qualifications" as those terms are used in 5 C.F.R. §315.803, and

10 employee "performance" as a ground for termination as used in 5 C.F.R. §315.804, by instructing all

11 agencies that "only the highest-performing probationers in mission critical areas" were to be

12 considered fit for continued employment, AR377-78, and that "[w]hile agencies must identify

13 performance or conduct deficiencies in the notice terminating a probationer, such performance or

14 conduct deficiencies do not have to be identified in a previous performance evaluation," AR369.

15 Third, OPM created a novel process by which agencies could secure exemptions from OPM's equally

16 novel mass termination program.  AR338-39, 357-58, 382, 386-88.

17         Each of OPM's new government-wide policies were "statements of general … applicability

18 and practical effect."  5 U.S.C. §551(4).  Such "change[s] in existing law or policy," *Alcaraz v. Block*,

19 746 F.2d 593, 613 (9th Cir. 1984), were therefore "clearly … 'rule[s]'" that were subject to notice-

20 and-comment rulemaking requirements.  *Newman*, 768 F. Supp. at 11.  This is particularly clear with

21 respect to OPM's wholesale revisions of 5 C.F.R. §§315.803 and 315.804, which were themselves

22 rules that were adopted pursuant to the APA.  *See Doe v. Trump*, 288 F.Supp.3d 1045, 1075 (W.D.

23 Wash. 2017) ("Where the original rule was adopted after a notice and comment period, courts have

24 generally found the decision to alter those rules to be substantive, and therefore subject to APA

25 rulemaking procedures as well.").

26         It cannot reasonably be disputed that OPM did not comply with the APA's notice-and-

27 comment requirements.  OPM therefore adopted its new government-wide rules "without observance

28 of procedure required by law," and those rules are invalid.  *Empire Health Found. for Valley Hosp.*

*Med. Ctr. v. Azar*, 958 F.3d 873, 882 (9th Cir. 2020), *reversed and remanded on other grounds, sub nom. Becerra v. Empire Health Foundation*, 597 U.S. 424 (2022) (quoting 5 U.S.C. §706(2)(D)); *see also Chief Probation Officers of Cal. v. Shalala*, 118 F.3d 1327, 1329 (9th Cir. 1997) ("Rules requiring notice and comment are invalid if the promulgating agency fails to comply with the applicable procedural requirements."); *Rivera v. Patino*, 524 F. Supp. 136, 147 (N.D. Cal. 1981) ("It is fundamental that administrative regulations are void unless they are promulgated in strict compliance with the Administrative Procedure Act.").

### III.    Plaintiffs Are Entitled to Declaratory and Permanent Injunctive Relief

Because the administrative record leaves no disputes of material fact, and plaintiffs are entitled to judgment as a matter of law on that record, this Court should enter declaratory and permanent injunctive relief as demanded in the Second Amended Complaint.  *See* Dkt. 90 at 55-56.

First, the Court should issue a declaratory judgment that OPM lacked the authority to direct other agencies to terminate their probationary employees, and that OPM's actions and the resulting February mass terminations were *ultra vires* and violated the APA.

Second, the Court should vacate OPM's unlawful mass termination directive and enter such relief as is necessary to fully unwind that unlawful action.  This is the appropriate form of relief for Plaintiffs' APA and *ultra vires* claims, and includes converting the Court's April 18 preliminary injunction to permanent relief and prohibiting OPM and the relief defendant agencies from giving any further effect to the unlawful February mass terminations.  *See United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 496 (2001) ("[W]hen district courts are properly acting as courts of equity, they have discretion unless a statute clearly provides otherwise.") (*ultra vires*); *Kaweah*, 123 F.4th at 953 ("Section 706(2) of the APA states that if a reviewing court finds that an agency action is 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right' then the court '*shall* ... hold unlawful and set aside' that agency action.") (emphasis in original). The "statutory power [under the APA] to 'set aside' agency action is more than a mere non-enforcement remedy," and encompasses "the power to 'strike down' an agency's work, and the disapproved agency action is treated as though it had never happened."  *Griffin v. HM Fla.-ORL, LLC*, __ U.S. __, 144 S. Ct. 1, 2 n.1 (2023) (Kavanaugh, J.) (quotation omitted).

1    "[T]his court, as a court of equity conducting judicial review under the APA, has broad

2    powers to order mandatory affirmative relief, if such relief is necessary to accomplish complete

3    justice." *Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 680–81 (9th Cir. 2007)

4    (internal quotation marks and citations omitted); *see also Driftless Area Land Conservancy v. Valcq*,

5    16 F.4th 508, 522 (7th Cir. 2021) ("Vacatur [of agency action] retroactively undoes or expunges a

6    past [agency] action....*vacatur unwinds the challenged agency action*.") (emphasis added); *Jane Doe

7    1 v. Nielsen*, 357 F.Supp.3d 972, 1003–04 (N.D. Cal. 2018) (exercising equitable authority under the

8    APA to unwind unlawful denials of refugee status by setting aside the unlawful notices of

9    ineligibility, requiring that any future notices be corrected and re-issued, and reinstating the time

10    within which potential refugees could seek review).  Notwithstanding the Court's preliminary

11    injunctions, probationary employees who were wrongfully terminated pursuant to OPM's unlawful

12    directive continue to suffer adverse consequences that must be "unw[ou]nd" to effectively strike

13    down that unlawful action.  *Valcq*, 16 F.4th at 522.

14         To give full effect to the Court's injunction, certain further corrective actions are necessary to

15    purge the remaining taint on probationary employees' careers from OPM's unlawful conduct.

16    Despite this Court's April 18 order that the relief defendant agencies issue corrective letters to

17    probationary employees attesting that they were not in fact terminated for performance-based

18    reasons, many affected probationary employees have reported that their official government

19    personnel files continue to reflect that they were terminated for performance reasons.  *See, e.g.*,

20    Holbrook Dec. Exh. 7 (Commerce); Kot Dec. Exh. 6 (Commerce); Schwarz Dec. Exh. B (HHS) (SF-

21    50 forms stating that employees were terminated on the basis of their performance and/or pursuant to

22    5 C.F.R. §315.804).  In addition to the corrective notices the Court ordered each employee to receive,

23    the relief defendant agencies should be further ordered to promptly update each terminated

24    probationary employees' personnel files, including employee status change forms called SF-50s, to

25    remove any references to performance-based terminations.  Probationary employees who were

26    unlawfully terminated in February 2025 may seek new or different positions in the federal service in

27    the future, and, to enable those employees to compete fairly for future employment, their official

28    government personnel files should accurately reflect that they were *not* terminated based on their

performance.  *See, e.g.*, Holbrook Dec. ¶15 ("The government's failure to correct my SF-50 to reflect that I was not terminated for performance will make it much harder for me to obtain a future government job.  I've always wanted to be a public servant, and working for the federal government was my dream job.  But any department or agency that would consider hiring me in the future will obtain my official personnel file, and see the SF-50 and its reference that I was fired based on performance."); Schwarz Dec. ¶¶7-8.[14]  Further to cleanse the taint of OPM's unlawful actions, employees' personnel files should be corrected to reflect that any dates of retroactive reinstatement pursuant to this Court's orders (or orders issued by the district court in *Maryland v. U.S. Dept. of Agric.*, Case No. 25-00748 (D. Md.)), should be counted toward the employee's probationary or trial period.

In addition, the corrective letters sent by several agencies pursuant the Court's April 18 preliminary injunction conflict with the plain terms of that injunction.  Schwarz Dec. ¶¶3-5 & Exh. A (Agriculture, HHS, HUD, and Interior); Blake Dec. ¶¶4-5 & Exh. 1 (Transportation); Cooley Dec. Exh. 5 (Commerce); Dkt. 216-16 at 4 (EPA).  All such letters require further corrective action.

Although these agencies' letters accurately report this Court's finding that probationary employees were not terminated for performance reasons, they also include an agency statement that the Court's finding is "legally and factually incorrect" and is being appealed.  Schwarz Dec. ¶¶3-5 & Exh. A (Agriculture, HHS, HUD, and Interior); Blake Dec. ¶¶4-5 & Exh. 1 (Transportation); Cooley Dec. Exh. 5 (Commerce); Dkt. 216-16 at 4 (EPA).[15]  These letters can be fairly construed, therefore, as agency statements that the recipients actually *were* terminated for performance reasons.  Indeed, many probationary employees have found this refusal to comply with this Court's order particularly distressing, as it appears the government is deploying semantics to avoid responsibility for its actions. *Cf. Carter v. Local 556, Transport Workers Union of Am.*, __ F.4th __, 2025 WL 1340536 at *28 (5th

---

[14] In response to the Court's April 18 injunction, the relief defendants submitted declarations under seal establishing that agencies terminated only a tiny number of probationary employees in February 2025 for genuine performance-based reasons.  Dkt. 217.

[15] These letters further state that they "shall not serve as any basis for liability against the [issuing agency] or any other agency or instrumentality of the Federal government, before any court or in any administrative proceeding."  *See, e.g.*, Dkt. 216-16 at 4.

1    Cir. May 8, 2025) (affirming contempt finding where defendant undermined efficacy of court-ordered

2    notice through self-serving alteration of the court's intended message; "[Defendant's] bad-faith,

3    semantic attempt to avoid internal responsibility for its actions by simply notifying its employees of

4    the judgment in no way reflects compliance, let alone compliance describable as substantial.").  Each

5    relief defendant should be required to state in further corrective letters, without hedging or

6    qualification, that these probationary employees were not terminated for performance-based reasons.

7        Also, many of the corrective letters do not include the recipient employee's name.  *See, e.g.*,

8    Schwarz Dec. ¶6 & Exh. A at 3 (HUD); Cooley Dec. Exh. 5 (Commerce); Reed Dec. Exh. 5; Valenti

9    Dec. Exh. 5.  While this might appear to be a minor issue because the affected employees plainly

10    received the letters at their home or email addresses, it is likely to affect employees who are searching

11    for new jobs, or currently seeking unemployment, who need to demonstrate they were not terminated

12    for cause.  An employee bearing a form letter that does not include the employee's name on its face

13    may be hindered in convincing a potential employer or state unemployment agency that they are the

14    legitimate recipient of the letter.  *See, e.g.*, Reed Dec. ¶14 ("This is going to make it harder for me in

15    future job searches to establish that I was not terminated from my position at NOAA for cause, but

16    instead was caught up in a mass termination, because I will always have to prove that I am actually

17    the person to whom the May 7 letter was directed.").[16]

18        Finally, terminated probationary employees of the National Oceanic & Atmospheric

19    Administration ("NOAA") have been subjected to unique noncompliance that must be corrected.

20    Those employees, who were originally terminated on February 27 as part of the mass termination,

21    were briefly reinstated effective March 17 in compliance with the TRO in *Maryland v. U.S.*

22    *Department of Agriculture*, and were later re-terminated on April 10, *retroactively to February 27*,

23    after the Fourth Circuit stayed the *Maryland* district court's order.  Holbrook Dec. Exh. 3; Cooley

24    Dec. Exh. 3; Kot Dec. Exh. 3; Reed Dec. Exh. 3; Valenti Dec. Exh. 3; Seid-Green Dec. Exh. 3.  Thus,

25

26    _____

27        [16] For example, the Department of Commerce sent its form corrective letters to employees
        listed as bcc's on a generic email, so an employee cannot even demonstrate that she received the
        email in question without providing further information.  *See, e.g.*, Reed Dec. ¶14; Holbrook Dec.
28    ¶16.

NOAA has continued to give effect to the unlawful OPM-directed mass termination from February. Indeed, the Commerce Department (NOAA's parent agency) has disputed unemployment claims on the grounds that probationary employees were actually terminated for performance reasons, *even after those employees were issued corrective notices pursuant to Court's April 18 order*. Holbrook Dec. ¶¶10-13 & Exhs. 5-7. All relief defendants, and the Commerce Department in particular, should be permanently enjoined from giving further effect to the unlawful OPM-directed mass termination, including specific prohibition of retroactive terminations.

Moreover, at NOAA, the retroactive re-termination threatens concrete harm to many of those employees, notwithstanding corrective notices issued pursuant to this Court's April 18 preliminary injunction, because the affected employees were also notified that as a result of the retroactive termination, their federal employee health benefits were retroactively cancelled effective April 8, 2025, despite any medical expenses they might have incurred after that date – and even though during their reinstatement, those employees had deductions from their pay for their share of federal health benefits premiums. *See, e.g.*, Seid-Green Dec. ¶¶8, 11 (out-of-pocket expenses for surgery on April 9); *see also id.* Exh. 4 (notice re retroactive health benefits termination; Cooley Dec. Exh. 4; Kot Dec. Exh. 4; Reed Dec. Exh. 4; Holbrook Dec. Exh. 4; Valenti Dec. Exh. 4.[17] To fully unwind the effects of the unlawful OPM-directed terminations, these employees should be made whole for any out-of-pocket medical expenses incurred as a result of the retroactive terminations.

## CONCLUSION

For the forgoing reasons, Plaintiffs' motion for summary adjudication of Claims I-IV of the Second Amended Complaint should be granted.

---

[17] *See also* https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/evo-media-document/2025-06-04.lynch-to-commerce-lutnick-re-fired-worker-health-coverage.pdf (letter from Rep. Steven Lynch, Acting Ranking Member of House Oversight Committee, to Secretary of Commerce); Valenti Dec. ¶10 (out-of-pocket medical expenses not covered by federal benefits); Kot Dec. ¶11 (same); Holbrook Dec. ¶9 (delaying medical appointments to avoid out-of-pocket expenses); Reed Dec. ¶11 (same). All of the NOAA declarants report that health benefits premiums were deducted from their pay while they were on administrative leave until they were terminated retroactively on April 10. Cooley Dec. ¶9; Kot Dec. ¶8; Holbrook Dec. ¶6; Reed Dec. ¶8; Seid-Green Dec. ¶8; Valenti Dec. ¶7.

1    DATED:  June 5, 2025                      Scott A. Kronland
                                               Stacey M. Leyton
2                                              Eileen B. Goldsmith
                                               Danielle E. Leonard
3                                              Robin S. Tholin
                                               James Baltzer
4                                              ALTSHULER BERZON LLP
                                               177 Post St., Suite 300
5                                              San Francisco, CA 94108
                                               Tel: (415) 421-7151
6
7                                        By: */s/ Danielle Leonard*_____

8
                                             *Attorneys for Plaintiff Organizations*
9
                                             Norman L. Eisen (*pro hac vice*)
10                                           Pooja Chaudhuri (SBN 314847)
                                             STATE DEMOCRACY DEFENDERS
11                                           FUND
                                             600 Pennsylvania Avenue SE #15180
12                                           Washington, DC 20003
                                             Tel: (202) 594-9958
13                                           Norman@statedemocracydefenders.org
                                             Pooja@statedemocracydefenders.org
14

15
16                                       By: */s/ Norman L. Eisen*_____

17                                           *Attorneys for Plaintiff Organizations*

18                                           Rushab Sanghvi (SBN 302809)
19                                           AMERICAN FEDERATION OF GOVERNMENT
                                             EMPLOYEES
20                                           80 F Street, NW
                                             Washington, DC 20001
21                                           Tel: (202) 639-6426
                                             Sanghr@afge.org
22
23                                       By: */s/ Rushab Sanghvi*_____

24                                           *Attorneys for Plaintiff American Federation of
                                             Government Employees (AFGE)*
25
26                                           Teague Paterson (SBN 226659)
                                             Matthew Blumin (*pro hac vice*)
27                                           AMERICAN FEDERATION OF STATE, COUNTY,
                                             AND MUNICIPAL EMPLOYEES
28                                           1625 L Street, N.W.

Washington, D.C.  20036
Tel: (202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org

By: */s/Teague Paterson*

*Attorneys for Plaintiff American Federation of State
County and Municipal Employees (AFSCME)*

Tera M. Heintz (SBN 241414)
Cristina Sepe (SBN 308023)
Cynthia Alexander, WA Bar No. 46019 (pro hac vice)
Deputy Solicitors General
OFFICE OF THE WASHINGTON STATE ATTORNEY
GENERAL
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
tera.heintz@atg.wa.gov
cristina.sepe@atg.wa.gov
cynthia.alexander@atg.wa.gov

By: */s/ Tera M. Heintz*

*Attorneys for Plaintiff State of Washington*