Scott A. Kronland (SBN 171693)
Stacey M. Leyton (SBN 203827)
Eileen B. Goldsmith (SBN 218029)
Danielle E. Leonard (SBN 218201)
Robin S. Tholin (SBN 344845)
James Baltzer  (SBN 332232)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel. (415) 421-7151
Fax (415) 362-8064
skronland@altber.com
sleyton@altber.com
egoldsmith@altber.com
dleonard@altber.com
rtholin@altber.com
jbaltzer@altber.com

*Attorneys for Plaintiffs*

[Additional Counsel not listed]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO; AMERICAN FEDERATION OF STATE COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, et al., <br><br> Defendants. | Case No. 3:25-cv-01780-WHA <br><br> **DECLARATION OF YA'EL SEID-GREEN** |

Declaration of Ya'el Seid-Green, No. 3:25-cv-01780-WHA

**DECLARATION OF YA'EL SEID-GREEN**

I, Ya'el Seid-Green, declare as follows:

1.      I am over 18 years of age. I make this declaration based on my personal knowledge, information, and belief.

2.      Until the termination of probationary employees earlier this year, I was employed by the National Oceanic and Atmospheric Administration ("NOAA") as a management and program analyst.  I was serving as the special assistant to the deputy assistant administrator for programs and administration for NOAA Oceanic and Atmospheric Research ("OAR").

3.      I had been hired pursuant to Schedule A, and I was terminated during my two-year trial period, which started on July 31, 2023.  Before becoming an employee of NOAA, I had been working as a contractor with NOAA since December 2018.  As a contractor, I worked as a policy specialist with the NOAA Marine Debris Program.

4.      I have a bachelor's degree in international relations from Mills College and a master's degree in marine affairs from the University of Washington.

5.      I had a full annual performance review for the end of fiscal year 2024, where I was one of the highest-scoring employees in my pay pool. This performance review entitled me to RIF credit and a bonus.  I also received a time off award for exemplary work on one of my projects.  I also received a National Ocean Service team member of the year group award when I was at the Marine Debris program as a contractor in 2022.

6.      On February 27, I was notified that I was on a list of probationary employees who were supposed to be terminated that day by email.  I did not actually receive the email until March 6, but when I received it, the email showed an effective date of February 27.  I had already been shut out of my government IT access, so my supervisor forwarded the email to me.  A true and correct copy of the termination notice I received is attached hereto as Exhibit 1.  My supervisor's name and email address are redacted.

7.      On March 17, in response to the TRO issued in *Maryland, et al. v. U.S. Dep't of Agriculture, et al.*, D. Md. Case No. 25-00748, I was reinstated.  A true and correct copy of the reinstatement notice I received is attached hereto as Exhibit 2.  This notice was distributed from a

generic Department of Commerce email address, and I was bcc'ed.  I received this at my personal email address.

8.     I was reinstated to administrative leave only, not to full duty, and I received back pay.  I also continued to receive my pay by direct deposit until April 10, when I was re-terminated.  During the time I was on administrative leave, health insurance premium contributions continued to be deducted from my paychecks.

9.     On April 9, the U.S. Court of Appeals for the Fourth Circuit stayed the *Maryland* TRO.  The following day, April 10, I received a short notice by email from the Acting General Counsel of the Department of Commerce, stating that I was being re-terminated, retroactively to February 27.  Again, this notice was distributed from a generic Department of Commerce email address, and I was bcc'ed.  A true and correct copy of the notice I received on April 10 is attached hereto as Exhibit 3.

10.     About a week later, on or about April 17, I received a further notice from the same generic Department of Commerce email address.  Again, I was bcc'ed.  This notice stated that based on the retroactive termination to February 27, my federal employee health, dental, and vision benefits were terminated effective March 31.  The notice further stated that if I had incurred any medical expenses on or after April 9, 2025, I should address payment issues directly with the insurance carrier.  A true and correct copy of this notice is attached hereto as Exhibit 4.

11.     Back in January, I had scheduled some surgery to take place in April.  I had this surgery on April 9, while I was on administrative leave and before I received the notice of retroactive termination dated April 10.  Because of the retroactive cancellation of my federal employee health benefits, the providers are treating this surgery as not covered by insurance.  I have been receiving calls from the providers demanding payment.  At this point, my out-of-pocket exposure is approximately $14,000.  The total bill for the surgery, including the portion that would have been covered by insurance, is more than $50,000.  I am currently attempting to get temporary continuation of coverage (TCC), which is the equivalent of COBRA extended coverage in the private sector.  If I can get TCC, my surgery may be covered retroactively, but I will end up double-paying the premiums

1    because, as noted above, premium contributions were deducted from my pay while I was on

2    administrative leave.

3         12.     On May 7, in connection with the preliminary injunction issued in this case, I received

4    a further form letter from the Acting General Counsel of the Department of Commerce. Again, this

5    letter was distributed from a generic Department of Commerce email address, and I was bcc'ed. This

6    notice informed me that the Court had determined that I was not terminated based on my

7    performance, but as part of a mass termination. However, the letter also stated that the government

8    believed the Court's ruling was "legally and factually erroneous," and that the government is

9    continuing to fight that ruling. The wording of this letter is distressing, as it seems that the

10   government is still taking the position that I was terminated for cause despite my excellent work

11   record and this Court's findings. I absolutely want to make sure that my permanent record with the

12   federal government contains no reference to my being terminated for performance. A true and correct

13   copy of this notice is attached hereto as Exhibit 5.

14        13.     Every federal employee has a permanent official personnel file. An employee's

15   separation from employment is recorded on a form called an SF-50. The reason for separation is

16   reported on the SF-50. I have not received my SF-50 yet, but I have heard from several NOAA

17   probationary employees who were also terminated in February like myself, who have been able to

18   obtain their SF-50s, that their SF-50s record the reason for separation as "5 C.F.R. §315.804" or

19   "performance," and record the date of termination as February 27, 2025. The failure to correct the

20   SF-50s to reflect that we were not terminated for our performance will make it much harder for any

21   of us to obtain future government jobs if we ever choose to reapply. I may want to seek future

22   employment with NOAA, and I am concerned that my chances will be seriously impaired unless I

23   have a clean government personnel file.

24        14.     None of the notices I received in connection with my termination on February 27, and

25   the subsequent developments has my name on it except the original February 27 termination letter.

26   Even the May 7 form letter stating that I was not terminated for my performance does not have my

27   name on it. Because I receive the letter by bcc from a generic email address, I cannot even show that

28   I received the letter to my personal email. This is going to make it harder for me in future job

1     searches to establish that I was not terminated from my position at NOAA for cause, but instead was

2     caught up in a mass termination, because I will always have to prove that I am actually the person to

3     whom the May 7 letter was directed.

4         I declare under penalty of perjury under the laws of the United States that the foregoing is true

5     and correct.  Executed on June 3, 2025, in Berkeley, California.

6

7                                        DocuSigned by:

8                                        Ya'el Seid-Green
                                         841B5D8C6851409
                                                Ya'el Seid-Green

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 1

 

Ya'el Seid-Green < ██████████████ >

---

## Fwd: Notification of Termination During Trial Period

---

**Ya'el Seid-Green** < ████████████ >             Wed, Apr 16, 2025 at 6:07 PM
To: Ya'el Seid-Green < ████████████ >

---------- Forwarded message ---------
From:
Date: Thu, Mar 6, 2025 at 3:44 PM
Subject: Fwd: Notification of Termination During Trial Period
To: < ███████████ >
Cc:

Dear Ya'el,

I am forwarding you the below email at the direction of NOAA DUSO. It is the notification of termination to you from VADM Nancy Hann. I received it this afternoon.

I hope you are holding up well. If there is anything I can do to assist you during this challenging period, please let me know.

Sincerely,
, NOAA Oceanic and Atmospheric Research
1315 East-West Highway, SSMC3/11462
Silver Spring, MD 20910

---------- Forwarded message ---------
From: **Trusted Staff Sender - NOAA Service Account** <trusted.staff.sender@noaa.gov>
Date: Thu, Mar 6, 2025 at 2:53 PM
Subject: Fwd: Notification of Termination During Trial Period
To:
Cc: Octavia Saine - NOAA Federal <octavia.saine@noaa.gov>, OHCS ELRB - NOAA Service Account <ohcs.elrb@noaa.gov>

---------- Forwarded message ---------
From: <trusted.staff.sender@noaa.gov>
Date: Thu, Mar 6, 2025 at 2:51 PM
Subject: Notification of Termination During Trial Period
To: <yael.seid-green@noaa.gov>

Feburary 27, 2025

MEMORANDUM FOR SEID-GREEN, YA'EL NMN, Management and Program Analyst, OAR
FROM: VADM Nancy Hann
Deputy Under Secretary for Operations
SUBJECT: Notification of Termination During Probationary Period
REFERENCES: 5 U.S.C. § 3321(a)
DAO 202-315

This is to provide notification that I am terminating you from the position of
and federal service consistent with the above references.

On December 15, 2026, the agency appointed you to the
position of Management and Program Analyst. As documented on your appointment Standard Form 50 (SF-50), your
appointment is subject to the completion of a probationary/trial period. The agency also
informed you of this requirement in the job opportunity announcement for the position.

Guidance from the Office of Personnel Management ("OPM") states, "An
appointment is not final until the probationary period is over," and the probationary period
is part of "the hiring process for employees." (1) "A probationer is still an applicant for a
finalized appointment to a particular position as well as to the Federal service" (2) "Until the
probationary period has been completed," a probationer has "the burden to demonstrate
why it is in the public interest for the Government to finalize an appointment to the civil
service for this particular individual." (3)

OPM has advised that "[p]robationary periods are an essential tool for agencies to
assess employee performance and manage staffing levels." (4) In light of that guidance, the
Agency finds that you are not fit for continued employment because your ability,
knowledge and/or skills do not fit the Agency's current needs.

For these reasons, I am terminating you from the position of Management and Program Analyst with the
agency and the federal civil service effective Feburary 27, 2025 at 5 p.m. EST.

If you believe that your termination is the result of discrimination, you have the right to file a complaint pursuant to 29
C.F.R. Part 1614.  Any allegation of discrimination based on race, color, religion, sex, national origin, physical or
mental disability, and/or age, must be brought to the attention of an Agency Equal Employment Opportunity (EEO)
Counselor within forty-five (45) days of the effective date of this action.  https://www.noaa.gov/civil-rights/eeo-
counseling-complaints

If you elect to seek corrective action by the Office of Special Counsel's (OSC)
Complaints Examining Unit, your appeal will be limited to a determination as to whether
the Agency took one or more covered personnel actions against you in retaliation for
making one or more protected whistleblowing disclosures, which constitutes a prohibited
personnel practice in accordance with 5 U.S.C. § 2302(b). If OSC dismisses your claim,
you may file an individual right of action appeal to the MSPB, but the MSPB will only
adjudicate whether you proved that your protected disclosure was a contributing factor in
the effected action. For more information, you may visit the OSC's website at:
https://osc.gov/pages/file-complaint.aspx

If you have any questions regarding this notice, please contact Octavia Saine, Acting Director of the NOAA Office of
Human Capital Services, at octavia.saine@noaa.gov.

VADM Nancy Hann
Deputy Under Secretary for Operations


(1)  OPM, Practical Tips for Supervisors of Probationers.
(2)  See U.S. Merit Systems Protection Board Report to the President and Congress, The Probationary Period: A
Critical Assessment Opportunity (August 2005)
(3)  Id.
(4)  OPM, Guidance on Probationary Periods, Administrative Leave and Details

EXHIBIT 2

 **Ya'el Seid-Green** <████████████████►

---

## Reinstatement to Federal Service at NOAA

---

**OHCS Inquiries - NOAA Service Account** <ohcs.inquiries@noaa.gov>      Mon, Mar 17, 2025 at 12:44 PM
Bcc: ████████████████

Greetings,
Please see the attached memorandum with important information regarding your employment status with the National Oceanic and Atmospheric Administration.

Thank you,

Office of Human Capital Services
National Oceanic and Atmospheric Administration



**UNITED STATES DEPARTMENT OF COMMERCE**
**The General Counsel**
Washington, D.C. 20230

March 17, 2025

On March 13, 2025, the United States District Court for the District of Maryland issued a Temporary Restraining Order (TRO) in State of Maryland, et. al. v. United States Department of Agriculture, et. al. (attached), which temporarily stays certain termination actions taken by certain Executive branch agencies, including the Department of Commerce.

Pursuant to the TRO, you will be reinstated to the Federal service and your previous position of record, retroactive to the effective date of your termination, and placed in a paid, non-duty status until such time as this litigation is resolved or the Department of Commerce determines to take other administrative action with respect to your employment.

In the event the TRO is invalidated by a higher court and/or the Department subsequently prevails in this litigation matter, and you remain in your position of record at that time, the Department may revert your prior termination action to its original effective date and waive any indebtedness to the Federal government that you incur resulting from the Department's compliance with the TRO.

Sincerely,

John K. Guenther
Acting General Counsel

---

**2 attachments**

📄 **DOC General Counsel 2025 03 17 Memorandum.pdf**
43K

**gov.uscourts.mdd.578045.1.0_3.pdf**
524K

EXHIBIT 3

 **Gmail**

**Ya'el Seid-Green** <████████████>

---

## Employment Status Update

1 message

---

**OHCS Inquiries - NOAA Service Account** <ohcs.inquiries@noaa.gov>     Thu, Apr 10, 2025 at 5:36 PM
Bcc: ████████████████

Greetings,
Please see the attached memorandum with important information regarding your employment status with the National Oceanic and Atmospheric Administration.

Thank you,

Office of Human Capital Services
National Oceanic and Atmospheric Administration

 **UNITED STATES DEPARTMENT OF COMMERCE**
**The General Counsel**
Washington, D.C. 20230

April 10, 2025

By correspondence dated March 17, 2025, I informed you that pursuant to a Temporary Restraining Order (TRO) in State of Maryland, et al. v. United States Department of Agriculture et al. the Department of Commerce was reinstating you to the Federal service and placing you in a non-duty paid status.

The TRO is no longer in effect. Accordingly, the Department is reverting your termination action to its original effective date. The Department will waive any indebtedness created by the court's order that you be paid beyond your termination date.

Sincerely,

John K. Guenther
Acting General Counsel

---

📄 **DOC General Counsel 2025 04 10 Notice re Termination.pdf**
29K

EXHIBIT 4



## Important Information for Probationary Employees

1 message

---

**OHCS Inquiries - NOAA Service Account** <ohcs.inquiries@noaa.gov>                    Thu, Apr 17, 2025 at 1:11 PM
Bcc: ███████████

Please see the attached information from the Talent Management Office (TMO)

Contact Information:
Phone Number: +1 (888) 316-2285
Email Address: TMServiceCenter@doc.gov
Hours of Operation: 8:00AM – 5:00PM

---

📄 **Important Information Regarding Your Separation Effective February 27, 2025.pdf**
131 KB

Important Information Regarding Your Separation Effective February 27, 2025

This notice is to inform you that your separation from federal service has been made retroactive to February 27, 2025. Your final paycheck will be for the hours of administrative leave recorded through April 10, 2025, which is in pay period (PP) 07.  The remaining days in PP07 must be coded as Leave Without Pay (LWOP).  All benefits are based on the retroactive separation date. Please carefully review the information below about how your federal benefits are affected and any required next steps.

Federal Employees Health Benefits (FEHB):

- Your FEHB coverage ended March 8, 2025, which was the last day of the pay period in which you separated and your last eligible day of coverage based on the February 27, 2025 separation date.

- A 31-day free extension of coverage applied, which ended April 8, 2025. No premiums were required during this period.

- If you used your FEHB insurance between February 27 and April 8, those claims should still be covered by your plan.

- Services received on or after April 9, 2025, will not be covered unless you elect Temporary Continuation of Coverage (TCC).

    o TCC allows you to continue your FEHB coverage for up to 18 months at your own expense. If elected on time, coverage will be retroactive to April 9, 2025, so there is no break in coverage.

    o You must apply for TCC by June 7, 2025 (60 days from April 8).

    o Enrolling in Temporary Continuation of Coverage (TCC):

        ▪ To enroll in TCC, complete Form SF 2809 (Health Benefits Election Form), available here (PDF).
        ▪ Submit the completed form to the Talent Management Service Center at 1800 Corporate Drive, Landover, MD, 20785
        ▪ For questions regarding enrolling in TCC, please reach out to the Talent Management Service Center at 1-888-316-2285
        ▪ For information about TCC, eligibility and coverage visit: Temporary Continuation of Coverage
        ▪ To view TCC premiums rates, visit OPM TCC Premiums

- If you used your health insurance on or after April 9 and have not elected TCC, please contact your provider and insurance carrier to coordinate any claims or out-of-pocket expenses.

**Federal Employees' Group Life Insurance (FEGLI):**

- Your FEGLI coverage will terminate retroactively on February 27, 2025, with the 31-day free conversion period ending March 30, 2025.

- Because that conversion window has already passed, you must act immediately if you are interested in continuing your life insurance coverage through individual conversion.

- Please contact the Office of Federal Employees' Group Life Insurance (OFEGLI) to determine if a conversion is still possible under these unique circumstances:

- Phone: 1-800-633-4542 (Monday–Friday, 8:30 AM – 4:00 PM ET)

- Address: OFEGLI, P.O. Box 6080, Scranton, PA 18505-6080

- Website: OFEGLI via OPM

- When contacting OFEGLI, mention your retroactive separation date of February 27, 2025, and ask whether a late conversion can still be accepted.

**Federal Dental and Vision Insurance Program (FEDVIP):**

- Your FEDVIP (dental and vision) coverage ended retroactively on February 27, 2025, with no 31-day grace period or TCC option.

- FEDVIP does not offer a conversion to a private plan.

- Please contact your dental and/or vision carrier directly if you received services after February 27, 2025, to confirm coverage status and resolve any billing issues.

**Federal Long-Term Care Insurance Program (FLTCIP):**

- FLTCIP coverage can continue after separation if you arrange to pay premiums directly.

- To maintain coverage, contact Long Term Care Partners at 1-800-582-3337 as soon as possible to transition your premium payment method.

**Thrift Savings Plan (TSP):**

Your TSP account remains open after separation. You may:

- Leave your funds in the TSP account;

- Transfer them to another qualified plan (such as an IRA or 401(k));

- Withdraw funds, subject to TSP withdrawal rules.

- Important: Withdrawals made before reaching eligible retirement age may incur federal income tax and an early withdrawal penalty.

Thrift Savings Plan (TSP) – Vesting and Forfeiture

- You will keep all of your own contributions, any matching contributions made by the agency (up to 4%), and any earnings from your TSP account.
- If you were not vested in the TSP at the time of separation, you will forfeit the Agency Automatic (1%) contributions and their earnings.
- Most employees are fully vested in their own contributions immediately. Vesting in the agency 1% automatic contributions generally requires 3 years of service (or 2 years for certain positions).

For more information, visit www.tsp.gov or contact TSP directly.

EXHIBIT 5




## Important Information for Probationary Employees
1 message

**OHCS Inquiries - NOAA Service Account** <ohcs.inquiries@noaa.gov>                                 Wed, May 7, 2025 at 9:10 AM
To: OHCS Inquiries - NOAA Service Account <ohcs.inquiries@noaa.gov>
Bcc: ███████████████

Please see the attached information.

**2 attachments**

📄 **2025 05 07 Letter.pdf**
106 KB

📄 **AFGE v OPM - April 18 Order.pdf**
318 KB



**UNITED STATES DEPARTMENT OF COMMERCE**
**Office of the General Counsel**
Washington, D.C. 20230

May 7, 2025

This letter is being provided to you in accordance with the preliminary injunction issued by the Northern District of California in American Federation of Government Employees v. U.S. Office of Personnel Management, No. 3:25-cv-1780 WHA (N.D. Cal.).

On April 18, 2025, U.S. District Judge William Alsup of the Northern District of California required the Department of Commerce (Department) to provide you with "a written statement, directed to [you] individually, stating that [your] termination was not 'performance' or fitness based but was made as part of a government-wide mass termination" (April 18 Order). Judge Alsup's decision is attached.

The Department of Commerce is appealing the Court's April 18 Order.  The Department believes it to be both legally and factually erroneous, specifically with respect to the Department, and intends to rigorously defend its actions as this matter continues through litigation. Nonetheless, the Department must comply with the Order unless and until it is stayed or reversed by an appellate court.

Therefore, in accordance with the Court's April 18 Order, the Department of Commerce hereby informs you, as required by the Court, that your earlier termination "was not 'performance' or fitness based but was made as part of a government-wide mass termination."

This letter is to be (i) implemented consistent with applicable law and (ii) shall not serve as any basis for liability against the Department of Commerce or any other agency or instrumentality of the Federal government before any court or in any administrative proceeding. The Department of Commerce reserves all rights.

Regards,

JOHN
GUENTHER

Digitally signed by JOHN
GUENTHER
Date: 2025.05.07 11:05:40
-04'00'

John K. Guenther
Acting General Counsel

1
2
3
4
5
6            UNITED STATES DISTRICT COURT
7
8            NORTHERN DISTRICT OF CALIFORNIA
9
10  AMERICAN FEDERATION OF
    GOVERNMENT EMPLOYEES, AFL-CIO,
11  et al.,                                      No.  C 25-01780 WHA
12           Plaintiffs,
                                                 **ORDER ON MOTION FOR**
13      v.                                       **PRELIMINARY INJUNCTION BY**
                                                 **UNION PLAINTIFFS AND STATE**
14  UNITED STATES OFFICE OF                      **OF WASHINGTON**
    PERSONNEL MANAGEMENT, et al.,
15
             Defendants.
16
17
18                    **INTRODUCTION**

19          Three groups of plaintiffs — private organizations, public-sector labor unions, and the

20  State of Washington — challenge the Office of Personnel Management's unlawful usurpation

21  of other federal agencies' authority to hire and fire their own employees.  After holding that

22  OPM's recent directive to fire employees at other agencies was unlawful, the district court

23  granted provisional relief, including an order requiring the reinstatement of employees at six

24  federal agencies.  That reinstatement order, however, was stayed by the Supreme Court.  Since

25  then, additional plaintiffs have joined the suit and seek additional relief, and an order held that

26  the public-sector labor union plaintiffs have standing to seek provisional relief.  This order

27  rules on provisional relief as to those plaintiffs.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

**FINDINGS OF FACT**

In February 2025, the United States Office of Personnel Management unlawfully directed the mass termination of thousands of probationary employees in all federal agencies.  OPM did not merely suggest such terminations — it directed them.

*First*, OPM directed federal agencies to fire their probationary employees.

In a January 20 memo to federal agencies, OPM directed each agency to identify all employees on probationary periods and send a list to OPM.  (Dkt. No. 111-1 at 1).  The memo explained:  "Employees on probationary periods can be terminated during that period without triggering appeal rights to the Merit Systems Protection Board (MSPB)" (*ibid.*).  In a February 12 email, OPM directed agencies "to action those you know you wish to separate by the end of the day tomorrow, 2/13/2025, using the attached template letter," and requested further "daily" progress reports "through at least the end of the week" (Dkt. No. 111-5 at 1).

At this time, OPM conducted conference calls with the Chief Human Capital Officer Council "every day"  (Dkt. No. 188-1 at 63:13–17).  OPM also held "probably about maybe 7 to 15" individual calls with various chiefs of staff and other agency political appointees concerning probationary employees (Dkt. No. 188-1 at 65:19–66:2).  Despite requests by the district judge, defendants have declined to place direct evidence of the contents of those calls into the record.

In a February 14 email, OPM pushed the "action" deadline back, stating:

> We have asked that you separate probationary employees that you have not identified as mission critical no later than end of the day Monday, 2/17.  We have attached a template letter.

(Dkt. No. 111-2 at 1).

A "Forest Service Briefing Paper" circulated by its human resource management to "Supervisor[s]/Leader[s]" stated:

> All federal agencies, including the Department of Agriculture, were notified on February 12, 2025, by the Office of Personnel Management (OPM) to terminate all employees who have not completed their probationary or trial period. . . .  OPM *directed* agencies to separate Probationary employees starting 2/13/25 . . . .

2

> Based on this *direction* it is necessary to start providing notices of separation to employees in probationary and trial period positions starting 2/13/25.

(Dkt. No. 71 at 16 (emphasis added) (February 13, 2025)).

On February 13, the Department of Energy sent one or more termination letters stating: "*Per OPM instructions*, DOE finds that your further employment would not be in the public interest" (Dkt. No. 70-14 at 15 (emphasis added)).

That same day, a probationer at the Bonneville Power Administration (within the DOE) received a termination letter that stated: "*Per OPM instructions*, DOE finds that your further employment would not be in the public interest. For this reason, you are being removed from your position with DOE and the federal civil service effective today" (Dkt. No. 39-4 at 10 (emphasis added)).

On February 14, a probationer terminated by the Foreign Agricultural Service asked the Department of Agriculture's deputy CHCO, Crystal Harris, about the "specific details of my performance that were evaluated and found to be insufficient" (Dkt. No. 39-6 at 5–6). The response: "[A]gencies were *directed* to begin providing termination notices . . . beginning immediately upon OPM notification" (*ibid*.).

On February 18, meanwhile, the National Science Foundation fired its probationers *en masse* via Zoom. During that call, NSF officials stated: "We were *directed* last Friday [February 14] by OPM to terminate all probationers except for a minimal number of mission critical probationers" (Dkt. No. 18-9 at 27 (emphasis added)). When confronted by the terminated probationers, the officials continued: "Up until Friday [February 14]. Yes. We were told by OPM it was the agency's discretion whether to remove probations or not. We chose to retain them all" (*id*. at 26). But "late Friday night," "[t]hey told us that they *directed* us to remove probationers." "[T]here was no limited discretion. This is not a decision the agency made. This is a *direction* we received" (*id*. at 21 (emphasis added)). Asked if NSF had at least *attempted* to negotiate with OPM to minimize the number of terminations, NSF responded: "There's no negotiation" (*id*. at 34). Significantly, as soon as an earlier order

3

herein made clear that OPM had no such authority, NSF's director re-hired nearly all those

probationers.

In a February 21 Internal Revenue Service "town hall," IRS Chief Human Capital Officer

Traci DiMartini stated:

> I'm not sure why it's happening . . . .  Regarding the removal of
> the probationary employees, again, that was something that was
> *directed* from OPM.  And even the letters that your colleagues
> received yesterday were letters that were written by OPM, put
> forth through Treasury, and given to us . . . .  I cannot explain to
> you why this has happened.  I've never seen OPM *direct* people at
> any agency to terminate.

(Dkt. No. 39-5 at 8–9 (emphasis added)).

She continued:

> And our actions are being watched by OPM.  So that's, again,
> something else that's unprecedented. . . .  Everything we do is
> scrutinized.  Everything is being looked at twice.  Any changes
> that are made in our system that show any type of action that has
> been deemed impermissible, we have to respond to why it
> happened.

(*id*. at 7–8).

On February 25, Tracey Therit, chief human capital officer for the Department of

Veterans Affairs, testified under oath at a congressional hearing before the House Committee

on Veterans Affairs:

> **RANKING MEMBER TAKANO**:  So nobody ordered you to
> carry out these terminations?  You did it on your own?
>
> **MS. THERIT**:  There was *direction* from the Office of Personnel
> Management.

(Dkt. No. 39-1 at 13 (emphasis added)).

On February 26, members of the Civilian Personnel Policy Council at the Department of

Defense stated by email:  "In accordance with *direction* from OPM, beginning February 28,

2025, all DOD Components must terminate the employment of all individuals who are

currently serving a probationary or trial period" (Dkt. No. 39-4 at 14 (emphasis added)).

4

In a March 6 sworn declaration filed in the District of Maryland and introduced into the

record by plaintiffs, meanwhile, IRS Chief Human Capital Officer DiMartini stated:

> I attended several virtual meetings with Trevor Norris and other
> Human Capital Officers at Treasury agencies (which include the
> Office of the Comptroller of the Currency, the Bureau of
> Engraving and Printing, and the U.S. Mint) during which we
> discussed the *directive* to conduct mass terminations of
> probationary employees.
>
> . . . .
>
> Mr. Norris informed us that Charles Ezell, the Acting Director of
> OPM, Amanda Scales, Mr. Ezell's Chief of Staff, and Noah Peters,
> were the individuals spearheading the termination of probationary
> employees at OPM.
>
> . . . .
>
> Mr. Norris specifically instructed me and the other Human Capital
> Officers at Treasury that *OPM would not allow us to exempt
> military veterans from the probationary terminations*.

(Dkt. No. 94-1 at 3–4 (emphasis added)).

An agency's "decision" *not* to terminate was contingent on OPM approval via an

"exemptions process" (*ibid.*; Dkt. No. 188-1 at 87–88; 140:2–4).

After providing OPM with the required lists of employees and seeking exemptions, if

any, the federal agencies put OPM's termination directive into practice, firing more than

24,000 probationary employees in three weeks.

*Second*, OPM directed agencies to fire those employees under the false pretense of

"performance."

In early February, OPM disseminated a template termination letter to be used by all

agency chief human capital officers (Dkt. No. 87-1).  The OPM template stated:

> The Agency finds, based on your performance, that you have not demonstrated that
> your further employment at the Agency would be in the public interest. For this reason, the
> Agency informs you that the Agency is removing you from your position of [TITLE] with
> the Agency and the federal civil service effective [insert date and time, if necessary].

(*ibid.* (highlighting added)).

5

From IRS Chief Human Capital Officer DiMartini:

> My colleagues and I asked Mr. Norris what the termination letter for affected probationary employees should consist of, and they informed me that OPM had drafted a letter, Treasury made a few modifications, and that we were instructed to send this letter out.

(Dkt. No. 94-1 at 3–4).

The IRS did *not* consider probationer performance:

> My office did not review or consider the actual job performance or conduct of any IRS probationary employee when issuing the termination notices. I also know that Treasury did not review or consider the actual job performance or conduct of any IRS probationary employee when issuing the termination notices. I know this because this fact was discussed openly in meetings. Practically speaking, it would take weeks or months to evaluate the job performance of 6,700 probationary employees.

(*id*. at 4).

The Department of Agriculture, for example, used the OPM template to terminate probationers "based on [their] performance" (Dkt. Nos. 18-5 at 11 (emphasis added); 181-1 at 15–16). The Department of Agriculture's deputy chief human capital officer stated OPM "*directed* the use of a specific template and language for the notice beginning immediately upon OPM notification" (Dkt. No. 39-6 at 6 (emphasis added)). The Department of Transportation informed probationers that "based on your performance you have not demonstrated that your further employment at the DOT FAA would be in the public interest" (Dkt. Nos. 18-17 (emphasis added); 181-1 at 12–13). The Department of Defense circulated the OPM template to its civilian personnel policy council members, "[a]s provided by OPM, and for your convenience" (Dkt. No. 39-4 at 15).

On February 13, Leandra Bailey, a Physical Science Information Specialist for the Forest Service, was terminated (Dkt. No. 71). In her most recent performance review, she received the highest mark possible in every category (*id*. at 11). The OPM template she received nevertheless stated: "The Agency finds, *based on your performance*, that you have not demonstrated that your further employment at the Agency would be in the public interest" (*id*. at 13 (emphasis added)).

United States District Court
Northern District of California

On February 18, Dr. Andrew Frassetto, a probationer terminated by the NSF, received the OPM template (Dkt. No. 18-9 at 38).  In a February 13 performance review — *five days* before he was terminated "*based on* [*his*] *performance*" — Dr. Frassetto's supervisor reported in a performance review:

> [H]is role [is] mission critical.  Dr. Frassetto has been an outstanding program director, and he has taken the lead role in overseeing this important and complicated portfolio for the division.  Dr. Frassetto came to NSF with a unique skill set in interdisciplinary scientific research . . . .  He has already demonstrated an outstanding ability to balance the various aspects of his job responsibilities and is highly effective at organizing and completing all his work in an accurate and timely manner.
>
> . . . .
>
> Dr. Frassetto's work on this portfolio has been outstanding and he has brought important experience to the role and has demonstrated highly competent project management and oversight.  He is a program director who has needed minimal supervision and eagerly seeks special assignments at higher levels of difficulty.  He has been an outstanding contributor to the division, directorate, and agency.

(*id*. at 7–8).

NSF said:  "The cause comes from boilerplate we received from OPM.  The cause says that the agency finds based on your performance that you have not demonstrated that your further employment at the agency would be in the public interest" (*id*. at 30 (emphasis added)).

Other agencies made slight tweaks to OPM's language — but maintained the central pretense.  For example, the Department of Health and Human Services substituted "fitness" for "performance," telling those fired:  "Unfortunately, the Agency finds that *you are not fit for continued employment* because your ability, knowledge, and skills do not fit the Agency's current needs . . . ." (Dkt. No. 18-10 (emphasis added)).  They otherwise stayed true to the OPM template, down to the footnotes (*ibid*.).

The National Oceanic and Atmospheric Administration used the same "fitness" language.  Dr. Alexandra Avila, a marine scientist from Port Angeles, Washington, began working at NOAA's Olympic Coast National Marine Sanctuary (Olympic Coast NMS) in September 2024 (Dkt. No. 156-3 ¶3).  NOAA's Office of National Marine Statuaries helped fund Dr. Avila's

7

United States District Court
Northern District of California

1  doctorate through a $180,000 scholarship. Following completion of her Ph.D., Dr. Avila

2  completed two post-doctorate fellowships through Oregon Sea Grant, also a part of NOAA,

3  and then joined NOAA's Olympic Coast NMS, where she worked until she was fired on

4  February 27 (*id*. ¶10). Dr. Avila's most recent performance review — completed *nine days*

5  before her termination — reported that she "is a highly functioning and valuable member of

6  the OCNMS team and her first 4 months as OCNMS have been a resounding success!" (*id*. at

7  10). Prompted to document any "Deficiencies, Areas of Concern," or "Suggestions/Strategies

8  for Improvement" by NOAA's standardized review form, her supervisor responded "None"

9  and "None" (*ibid*.).

10  NOAA terminated Dr. Avila nine days later, using language similar to that used in HHS's

11  termination letters: "[T]he Agency finds that you are not fit for continued employment

12  because your ability, knowledge and/or skills do not fit the Agency's current needs" (*id*. at 7;

13  Dkt. No. 18-10). The termination letter otherwise followed the OPM script (Dkt. No. 156-3 at

14  7–8).

15  Krista Finlay, a natural resource management specialist with NOAA's National Marine

16  Fisheries Service (NMFS) "received the highest possible commendations her supervisor could

17  make" in her most recent performance reviews, and her supervisors identified her as "mission

18  critical for NOAA" in reports requested by OPM (Dkt. No. 70-9 ¶¶ 2, 10–11). Finlay was

19  terminated on February 27 because she, like Dr. Avila and those at HHS, was "not fit for

20  continued employment because [her] ability, knowledge and/or skills do not fit the Agency's

21  current needs" (*id*. ¶ 13). Her branch chief — who first realized Finlay was fired when she

22  forwarded the termination email to him — believed a mistake had been made and assured her

23  that "local NOAA officials would do everything in their power to advocate for" her (with no

24  apparent success) (*id*. ¶ 15).

25  The template was a sham, citing "performance" as the basis for the terminations in order

26  to evade statutory and regulatory requirements, including, for example, the construction of an

27  "order of retention" that honors veterans' preference eligibility.

28  *          *          *

The present action has come to include three distinct groups of plaintiffs: (1) private organizations, (2) public-sector labor unions, and (3) the State of Washington (Dkt. No. 90 ¶¶ 15–30).

On February 23, the union and organizational plaintiffs moved for a temporary restraining order (Dkt. No. 18). On February 27, the undersigned granted a temporary restraining order on behalf of the organizational plaintiffs but held that this district court likely lacked jurisdiction as to the claims of the union plaintiffs (Dkt. No. 42, 45). On March 11, plaintiffs filed their second amended complaint, adding the State of Washington to the matter (Dkt. No. 90). On March 13, the undersigned extended the existing TRO and issued a preliminary injunction, again based only on the claims of the organizational plaintiffs, requiring six relief defendant agencies to offer reinstatement to probationary employees terminated on or about February 13 or 14 (Dkt. No. 120 at 51–52). Also on March 13, the undersigned stated that the question of relief for both the union plaintiffs and the State of Washington would be considered following additional briefing (*id*. at 18, 57).

The government timely appealed the March 13 injunction (Dkt. No. 119). Our court of appeals denied the government's request for an immediate administrative stay (Dkt. No. 136) and emergency motion for a stay pending appeal (Dkt. No. 157). On March 24, the government petitioned the Supreme Court for an administrative stay. The Supreme Court granted the stay on April 8. *OPM v. AFGE*, No. 24A904, 2025 WL 1035208 (Apr. 8, 2025). The Supreme Court clarified that "[t]his order does not address the claims of the other plaintiffs, which did not form the basis of the District Court's preliminary injunction." *Ibid*.

This order concerns the remaining plaintiffs: The unions and State of Washington. Following further briefing on the issue, an order held that the district court has jurisdiction over the union plaintiffs (Dkt. No. 153) and issued an order to show cause why the relief extended to the private organizations (or more, or less) should not be extended to the union plaintiffs (Dkt. No. 154). It also set a briefing schedule for Washington's motion for a preliminary injunction (Dkt. No. 164). The parties have finished all briefing, and oral argument was heard on April 9.

The unions assert that probationary employees have been terminated *en masse* at the following agencies, and request an injunction reversing those actions pending resolution of this litigation:  the Departments of Agriculture, Commerce, Defense, Education, Energy, Health and Human Services, Homeland Security, Housing and Urban Development, Interior, Treasury, Transportation, and Veterans Affairs, the Environmental Protection Agency, General Services Administration, National Science Foundation, and Small Business Administration (Dkt. No. 161-1 at 2–3).

For its part, the State of Washington seeks an injunction reinstating employees at:  the Departments of Agriculture, Commerce, Defense, Education, Health and Human Services, Homeland Security, Housing and Urban Development, and the Interior (Dkt. No. 156 at 2).

This order grants provisional relief but not as broadly as requested.

## ANALYSIS

"A plaintiff seeking a preliminary injunction must establish that [1] he is likely to succeed on the merits, that [2] he is likely to suffer irreparable harm in the absence of preliminary relief, that [3] the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents."  *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017).  "[A] court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case."  *Id*. at 580 (internal quotation marks omitted).

1.   **LIKELIHOOD OF SUCCESS ON THE MERITS.**

   A.   **PLAINTIFFS' ULTRA VIRES AND APA CLAIMS.**

*First*, OPM's directive constituted an *ultra vires* act that infringed upon all impacted agencies' statutory authority to hire and fire their own employees.

"The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive

United States District Court
Northern District of California

action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). "Equitable actions to enjoin *ultra vires* official conduct do not depend upon the availability of a statutory cause of action; instead, they seek a 'judge-made remedy' for injuries stemming from unauthorized government conduct, and they rest on the historic availability of equitable review." *Sierra Club v. Trump*, 963 F.3d 874, 890–91 (9th Cir. 2020) (citing *Armstrong*, 575 U.S. at 327), *vacated and remanded on other grounds (mootness)*, 142 S. Ct. 46 (2021).

No statute — anywhere, ever — has granted OPM the authority to direct the termination of employees in other agencies. "Administrative agencies [like OPM] are creatures of statute. They accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 117 (2022).

Instead, Congress's statutory scheme grants to each agency head the authority to manage its own affairs, including the hiring and firing of employees. 5 U.S.C. § 3101 ("Each Executive agency, military department, and the government of the District of Columbia may employ such number of employees of the various classes recognized by chapter 51 of this title as Congress may appropriate for from year to year."); 5 U.S.C. § 301 ("The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees . . . ."); *see also, e.g.,* 42 U.S.C. § 7231 (DOE) (re employees); *id.* § 7253 (re reorgs.); 38 U.S.C. §§ 303, 510 (VA); 10 U.S.C. § 113 (DOD).

The same is true of OPM. Congress has vested its director with the authority to "secur[e] accuracy, uniformity, and justice in the functions of the Office," "appoint[] individuals to be employed by the Office," and "direct[] and supervis[e] employees of the Office." 5 U.S.C. § 1103(a)(1)–(3). But that's it. OPM did not have the authority to direct the firing of employees, probationary or otherwise, in any *other* federal agency.

Defendants concede as much. Their opposition rests instead on the factual contention that OPM did not issue a directive. Its sanitized record provided in support — press releases, a feeble start to a yet-to-come "administrative record," and the deposition of newly-appointed OPM Special Advisor Noah Peters — is unpersuasive.

11

United States District Court
Northern District of California

For example, defendants point to a trio of OPM Memos to suggest that agencies made their own decisions. The first, issued on January 20, directed agencies to "identify all [probationary employees] and send a report to OPM listing [them]. In addition, *agencies should promptly determine* whether those employees should be retained at the agency" (Dkt. No. 37 at 1 (emphasis added)). The second, circulated on February 12, directed agencies to "action those *you know you wish to separate* by the end of the day tomorrow, 2/13/2025, using the attached template letter" (Dkt. No. 111-5 at 1 (emphasis added)). The third, sent out on February 14, "*asked*" the agencies to "separate probationary employees that *you* have not identified as mission-critical no later than end of the day Monday, 2/17" (Dkt. No. 111-2 at 1 (emphasis added)).

A mountain of evidence shows that the actual situation was not as these memos would make it seem.

The February 14 memo itself went on to note that "[t]hrough *the exemptions process*, agencies have identified the highest-performing probationers in mission critical areas" (*id*. at 2 (emphasis added)). OPM Special Advisor Peters clarified that agencies went to OPM for "exemptions" from the *en masse* termination program during a three-week long "process." The EEOC, FAA, and "some sort of nuclear inspection agency" requested, and received, "exemptions" from OPM (Dkt. No. 188-1 at 87:13–88:16). If the agencies exercised ultimate discretion, why did OPM make them apply for exemptions? The reason is obvious — OPM's directive did not leave the agencies free to keep their probationers. Defendants respond that the exemption process was also just a suggestion: "But at any time an agency could have just said . . . we're not going to do anything" (*id*. at 89:10–13).

The record betrays defendants' characterization of the exemptions process as a toothless formality. IRS Chief Human Capital Officer DiMartini, for example, attested that Treasury obeyed OPM's denial of an exemption for veterans:

> Mr. Norris specifically instructed me and the other Human Capital Officers at Treasury that *OPM would not allow us to exempt military veterans from the probationary terminations*.

(Dkt. No. 94-1 at 4 (emphasis added)).

The record also shows that NSF, which did try to "just ignore" OPM's real-but-not-real exemption process *was directed to — and did — fire*. The NSF officials implementing the OPM directive stated: "Up until Friday [February 14]. Yes. We were told by OPM it was the agency's discretion whether to remove probations or not. We were told by OPM it was the agency's discretion whether to remove probations or not. *We chose to retain them all*" (Dkt. No. 18-9 at 26 (emphasis added). But "late, late Friday night," "[t]hey told us that they *directed* us to remove probationers" (*ibid.* (emphasis added)). "[T]here was no limited discretion. *This is not a decision the agency made*. This is a *direction* we received" (*id.* at 21) (emphasis added). Defendants point to no other agency that "just ignored it" — only those that were *granted* an exemption (and DOJ, which Special Advisor Peters swore was both *granted* an exemption, and "just ignored it," as convenient). [*] And even if some agencies refused to follow OPM's directive, the evidence is overwhelming that most felt compelled to and did follow it. An "ask," followed by a directive, is a directive. A choice — you may choose to retain your probationers — followed by a caveat — if OPM grants your exemption request — is not a choice.

Most of all, the government fails to rebut evidence drawn from a broad swathe of agencies proving that they were operating under OPM direction: "OPM *directed* agencies to separate Probationary employees starting 2/13/25" (USDA); "We were *directed* last Friday by OPM to terminate all probationers" (NSF); "Regarding the removal of the probationary employees, again, that was something that was *directed* from OPM" (Treasury); "There was *direction* from the Office of Personnel Management" (VA); "In accordance with *direction* from OPM . . . all DOD Components must terminate the employment of all individuals who

---

[*] Peters initially claimed that DOJ requested, and received, an exemption from the termination directive (Dkt. No. 188-1 at 87:13–88:16). Later in his deposition, Peters' recollection reversed course: "I *think* DOJ just said, 'We're not doing this,' And *I don't even know* that there was any reach back on or any response to that" (Dkt. No. 188-1 at 136:1–4 (emphasis added)). Peters did not otherwise identify a single agency that "just ignored" the exemption process.

13

are currently serving a probationary or trial period" (DOD) (emphases added).  Defendants did

not credibly rebut any of those statements (*see* Dkt. No. 188-1 at 11:15, 126:11–14, 130:1–15).

*Finally*, on March 14, defendants submitted declarations from six of the twenty-two relief

defendant agencies (Dkt. Nos. 127-1–7).  Of the six, just two (the Departments of the Interior

and Defense) stated, in identical terms, that they "reviewed all probationary and trial period

appointees' performances to determine which individuals to keep and which to terminate"

(Dkt. Nos. 127-1 ¶ 7; 127-3 ¶ 7).  The remaining four agencies (Treasury, Energy, Agriculture

and the VA) omitted that claim from otherwise sound-alike declarations.  These made-for-

litigation declarations are unconvincing on their own and do not convincingly rebut the

evidence above.

## B.    ARTICLE III STANDING.

"The 'gist of the question of standing' is whether the plaintiff has a sufficiently 'personal

stake in the outcome of the controversy' to ensure that the parties will be truly adverse and

their legal presentations sharpened."  *Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017)

(quoting  *Massachusetts v. EPA*, 549 U.S. 497, 516 (2007)).  A plaintiff must show that "it has

suffered a concrete and particularized injury that is either actual or imminent, that the injury is

fairly traceable to the defendant, and that it is likely that a favorable decision will redress that

injury."  *Massachusetts*, 549 U.S. at 517.

Both representational standing and direct organizational standing are at issue here.

"An organization has standing to bring suit on behalf of its members if '(1) at least one of

its members would have standing to sue in his own right, (2) the interests the suit seeks to

vindicate are germane to the organization's purpose, and (3) neither the claim asserted nor the

relief requested requires the participation of individual members in the lawsuit.'"  *Fellowship

of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 680–81 (9th

Cir. 2023) (en banc) (quoting *Fleck & Assocs., Inc. v. City of Phoenix*, 471 F.3d 1100, 1105–06

(9th Cir. 2006)).

An organization has direct organizational standing, meanwhile, "where it establishes that

the defendant's behavior has frustrated its mission and caused it to divert resources in response

14

to that frustration of purpose." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021). "Of course, organizations cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all, but they can show they would have suffered some other injury had they not diverted resources to counteracting the problem." *Ibid*. (internal quotation marks omitted); *see also FDA v. All. for Hippocratic Med*., 602 U.S. 367, 384–86 (2024). At bottom, the test is whether the challenged action has "directly affected and interfered with [the organization's] core business activities." *Hippocratic Med.*, 602 U.S. at 395.

### *(i)    Union plaintiffs.*

Public union plaintiffs "each represent probationary employees who have been summarily fired, and falsely informed that their termination was based on performance" (Dkt. No. 90 ¶ 145). "Each Union Plaintiff has the core function of representing employees in federal bargaining units in collective bargaining and providing counseling, advice, and representation to represented employees in the event of adverse employment actions" (*id*. ¶ 146).

*First*, the union plaintiffs stand in the shoes of their members, some of whom have been injured due to termination under the pretext of "performance" (Dkt. No. 198-2). Termination is as clear an injury as any. Each terminated probationer has lost their livelihood, access to health insurance, and myriad other rights and privileges tied to their employment. For example, an unnamed international economist with the Foreign Agricultural Service (FAS), Veteran Doe, was let go on grounds of "performance" (Dkt. No. 18-5 ¶¶ 10, 20). Before joining FAS, he spent five years serving as a Navy Corpsman (*id*. ¶ 20). He was deployed twice, to Iraq and Southeast Asia, where he provided medical support to the Marine Corps (*ibid*.). Veteran Doe must now find more affordable housing for himself and his young son and expects to use credit and his retirement savings to cover his living expenses while he looks for work (*ibid*.). The government's failure to timely furnish the standardized termination forms necessary to file for unemployment insurance has further delayed Veteran Doe's access to financial aid (*ibid*.). "He thought he was protected as a veteran, by his status as a

15

1    [Presidential Management Fellow], and by his outstanding performance. He feels betrayed by

2    the government because he went to bat for this country as a soldier serving two overseas

3    deployments, but the government did not go to bat for him" (*ibid.*).

4        The above is more than enough injury for standing. But there's more still. The decision

5    to terminate Veteran Doe under the pretense of "performance" will, unless redressed, continue

6    to injure him for the rest of his working life. Each time he applies for a job, he will no doubt

7    be asked if he has been terminated for performance, and, as it stands, he will have to concede

8    that he has — no matter the truth of it. The decision to deploy false pretense also inflicted a

9    grievous legal injury: It stripped Veteran Doe of the few statutory protections afforded to

10   probationary employees, including hard-earned veteran preferences during reductions in force.

11       The financial and legal injuries suffered by Veteran Doe are common to all terminated

12   probationers. While this order cannot possibly document how those common injuries have

13   thrown each terminated civil servant's life into disarray, as they did Veteran Doe's, it

14   recognizes that that was the outcome of OPM's directive. For example, AFSCME Local 1653,

15   which represents a bargaining unit of over 2,000 civil servants at the Federal Aviation

16   Administration, reports:

17           One probationary employee who was terminated was diagnosed
             with thyroid cancer the following day and will now lose her health
18           insurance in the face of this catastrophic diagnosis. Another
             affected employee is a single mother of three that was already
19           waiting tables on the weekends to make ends meet. Now she has
             lost her primary employment. Another employee was a federal
20           contractor working at the FAA for more than twenty (20) years,
             who was recently promoted to the federal service in recognition for
21           her outstanding performance.

22   (Dkt. No. 18-17 ¶ 20).

23       These injuries are fairly traceable to each civil servant's termination at the behest of

24   OPM. The unions have standing to seek redress on behalf of their members.

25       *Second*, the unions have themselves been harmed. Terminated union members cease to

26   pay their union dues — collected through voluntary payroll deductions — and thus reduce a

27   key source of operational funding (Dkt. Nos. 18-5 ¶ 23; 18-6 ¶ 20; 18-10 ¶ 19; 18-12 ¶ 17–18;

28

United States District Court
Northern District of California

18-14 ¶ 13).  Diminished funds will in turn diminish union plaintiffs' ability to provide services to members.

These terminations have also frustrated the union plaintiffs' ability to perform their core functions.  For example, Kory Blake, an area field services director for the Eastern Region of the AFSCME, has been diverted from his typical work — organizing and representing a largely non-Federal workforce in Maryland, DC, and Virginia — to address the terminations of the union's affected federal employee members (Dkt. No. 18-6 ¶ 17).  Blake was not alone:

> AFSCME has assigned several AFSCME International Union staff, including myself, from various departments to address the issues arising from the mass terminations and to support our members. This includes three attorneys from AFSCME's Office of the General Counsel to assess the terminations, conduct legal research on how to protect affected members' legal rights, and engage in legal advocacy; staff from AFSCME's Data and Analytics department to help gather and analyze member data to understand the scope of the terminations and engage in member outreach; several additional staff from AFSCME's Organizing and Field Services department not normally assigned to assist our federal sector affiliates who are engaging directly with our affected affiliates and members to provide support and coordinate resources[.]
>
> . . . .
>
> [T]hree out of a total of eight attorneys in the AFSCME Office of the General Counsel are spending an extensive amount of their workday addressing the terminations. One of those AFSCME attorneys is assigned to support AFSCME's organizing efforts in other states but has had to temporarily pause that important representation work—which is work that grows union membership— to focus on addressing the mass terminations on an almost full-time basis.

(Dkt. No. 18-6 ¶ 16–17).

The president of AFGE Local 2883 — representing a bargaining unit of over 1,500 civil servants at the Center for Disease Control — attests:

> Since HHS issued its probationary employee termination letters, the Union has had to divert all its time and resources to engage with the membership on this issue and address their concerns. The substantial increase in emails, phone calls, and text messages concerning the probationary employee terminations has diverted time and resources that the Union dedicates to its mission of advocating and negotiating for improved workplace conditions, organizing new members, representing employees, and non-urgent

United States District Court
Northern District of California

administrative tasks to maintain the Union.

The demands placed on my time to respond to member inquiries about the mass termination have required me to set aside the representation needs of other bargaining unit employees until the evenings and weekends, have interfered with my ability to carry out my tour of duty, and necessarily postponed collective bargaining negotiations with CDC's labor relations team, scheduled for the week of February 17, 2025

(Dkt. No. 18-10 ¶¶ 14–15).

Everett Kelley, AFGE's national president, further attests:

Altogether, AFGE staff have been forced to spend literally thousands of hours responding to the calls and emails from members and affiliates related to probationary employee terminations that would have otherwise been spent on other matters.

For instance, the time spent responding to and addressing probationary terminations have prevented AFGE's field representatives from filing grievances for affiliates, advising affiliates on other pressing matters such as responding to attacks on collective bargaining and organizing unrepresented members.

(Dkt. No. 18-12 ¶ 10–11; *see also* Dkt. Nos. 18-5 ¶ 11–14; 18-10 ¶ 8–9).

The unions have established that OPM's directive "directly affected and interfered with [their] core business activities" and organizational mission. *Hippocratic Med.*, 602 U.S. at 395. That injury is fairly traceable to OPM's directive to terminate probationary civil servants *en masse*. Union plaintiffs have direct organizational standing.

The government's counters fall short.

*First*, the government argues that the unions lack standing because the second amended complaint does not describe their organizational harms with the requisite specificity (Dkt. Nos. 160 at 9; 180 at 3). In one breath, the government demands that this injunction be decided within the four corners of the complaint; in the next, it insists that the analysis must be limited to a yet-to-come "administrative record"; in the third, it grounds its counterfactual in the declaration and now deposition of OPM Special Advisor Noah Peters — not a part of the complaint *or* the administrative record. The undersigned has considered the *whole* record in crafting the present injunction.

18

United States District Court
Northern District of California

*Second*, the government argues that union plaintiffs do not have representational standing because they have not provided a complete accounting of each terminated probationer (Dkt. No. 180 at 5). The government did not provide union plaintiffs notice when it terminated their members, and when asked for a list of affected civil servants, several agencies failed to provide that information (Dkt. No. 18-5 ¶ 10; 18-6 ¶ 11). "As a general rule of representational standing, when it is clear and not speculative that a member of a group will be adversely affected by a challenged action and a defendant does not need to know the identity of a particular member to defend against an organization's claims, the organization does not have to identify particular injured members by name." *Mi Familia Vota v. Fontes*, 129 F.4th 691, 708 (9th Cir. 2025).

*Third*, the government argues that union plaintiffs cannot show representational standing because they "have not alleged . . . nor could they show, that *all* of their members: [] have been affected by the terminations of probationary employees as not all their members are probationary employees" (Dkt. No. 180 at 5 (emphasis added)). True, union plaintiffs represent non-probationary employees unaffected by the OPM directive at issue here. So what? The Sierra Club was not asked to show that every last member sat in solitude and wonderment at Mineral King. *See Sierra Club v. Morton*, 405 U.S. 727 (1972). An organization establishes representational standing where it shows that some subset of its members have been, or imminently stand to be, injured. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 182–183 (2000). Union plaintiffs have done so here.

*Fourth*, the government argues that union plaintiffs' injury is not redressable in federal court: "Quite simply, reinstatement is not an available equitable remedy" (Dkt. No. 167 at 17 (citing *Sampson v. Murray*, 415 U.S. 61, 83 (1974)). Because this order does not grant the remedy of additional reinstatement, the government's argument is moot.

*Finally*, the government attempts to re-litigate mootness, arguing that its compliance with the February 27 TRO rendered this action moot (Dkt. No. 167 at 18-19). The undersigned heard — and denied — that argument in a prior order (Dkt. No. 88). That analysis is incorporated here.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

### (ii)    State of Washington.

Washington fails to make out standing based on the purported loss of federal services. Washington argues, for example, that the termination of natural resource management specialists at NOAA will result in NOAA's inability to timely "writ[e] biological opinions to permit the release of chinook salmon from WDFW and Washington Treaty Tribes hatcheries," as required by Section 7 of the Endangered Species Act (Dkt. No. 70-9 ¶ 5). Terminations at NOAA's Olympic Coast National Marine Sanctuary (Olympic Coast NMS), meanwhile, will render NOAA an ineffective partner in the management of that area (Dkt. No. 70-11 ¶ 7–13). Disruptions caused by terminations at FEMA, meanwhile, threatens the continued operation of Washington's Floodplains by Design program, which has spent some $280 million dollars to restore 131 miles of river and protect 7,778 acres of land and is now receiving funding applications for work through 2027 (Dkt. No. 70-2. ¶¶ 7–10). As to Housing and Urban Development, meanwhile, Washington asserts: "*If* termination of HUD staffing extends the delay in federal contracting, reimbursement, and release of grant funds, the County *may* have to cancel contracts with service providers" (Dkt. No. 70-6 at 6 (emphasis added)). As to the CDC: "The State continues to rely on data from the CDC relating to other highly contagious diseases, including measles. The recent measles outbreak has reached Washington, and the State relies on adequate staffing levels at CDC to help track and contain this disease if it spreads" (Dkt. No. 70-7 at 6-7).

The present record does not support Washington's assertion that the cessation or diminishment of federal services constitutes an actual or imminent injury "fairly traceable to the challenged action." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010). The Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). The assertion that the termination of probationers at NOAA and other agencies will necessarily result in the diminishment of the specific services and partnerships identified by Washington rests on a speculative chain of contingencies. There

United States District Court
Northern District of California

1    is little record evidence to suggest that NOAA, FEMA, *et. al.*, cannot function without the

2    probationary employees at issue here.  While Washington asserts that it "continues to rely on

3    data from the CDC relating to []highly contagious diseases, including measles," for example,

4    the inference that the termination of probationers has rendered the generation of that data

5    impossible is entirely speculative.  The notion that delays at NOAA will interfere with

6    Washington's annual release of chinook Salmon likewise rests on the unsupported inference

7    that there *will be* a delay, and that the termination of probationary employees will be the

8    proximate cause of that delay.

9         Washington also faces a redressability problem.  NOAA, CDC, HUD, and others have

10   been subject to deferred resignation programs and the widespread termination of non-

11   probationary employees, neither of which are at issue here.  What is to say that the

12   reinstatement of probationary employees will adequately remedy the harms identified by

13   Washington or return each agency to what Washington believes to be "adequate staffing

14   levels" (Dkt. No. 70-7 ¶ 11)?  If, for example, NOAA has decided to reduce the testing

15   capacity of the Pacific Marine Environmental Laboratory, will the return of probationary

16   workers under court order remedy purported impending delays in sample turnaround?  How

17   will the Court, moreover, ensure that each probationer is not only rehired and returned to active

18   duty, but is assigned to the specific tasks and teams identified by Washington?  Such

19   micromanagement of agency staffing is a problem.

20        Washington has, however, established a legitimate financial injury.  The state's

21   Employment Security Department reports that it saw a 470% increase in unemployment benefit

22   claims from federal employees from February 13 to March 3, when compared to the same

23   period in the prior year (Dkt. No. 70-8 ¶¶ 11, 13).  Washington has established that at least

24   some of those claimants were probationary employees.  The state has expended considerable

25   additional time and resources to process those employees' unemployment insurance claims

26   (Dkt. No. 70-8 ¶¶ 11, 13) ("Overall, the intake process is far more time-consuming for federal

27   employee unemployment benefits claimants than for most claimants").  The diversion of

28   resources necessary to service federal employees' claims has delayed benefits payments to

1    Washingtonians and required Washington to expend additional funds from its Administrative

2    Contingency Account and Employment Services Administrative Account (*id*. ¶¶ 15, 16).

3    "A dollar of economic harm is [] an injury-in-fact for standing purposes." *E. Bay Sanctuary*

4    *Covenant v. Trump*, 950 F.3d 1242, 1267 n.5 (9th Cir. 2020) (quoting *Carpenters Indus.*

5    *Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017)).

6        The government counters that the Supreme Court "expressly held that indirect injuries are

7    insufficient to create standing for a state to sue" in *United States v. Texas* (Dkt. No. 167 at 11

8    (citing *United States v. Texas*, 599 U.S. 670, 674 (2023)).

9        The government misstates *United States v. Texas*. "The holding of a case is not the same

10   thing as a quotation from a case. The holding is the proposition of law which requires that the

11   particular facts in that case produce the result." *United States v. Andrade-Larrios*, 39 F.3d 986,

12   990 (9th Cir. 1994).

13       In *Texas*, a cohort of states challenged new guidelines for immigration enforcement

14   issued by the Department of Homeland Security,  arguing that the guidelines "violated federal

15   statutes that purportedly required the Department to arrest *more* criminal noncitizens pending

16   their removal." *Texas*, 599 U.S. at 673-74. *Texas* reaffirmed the well-established rule that

17   parties do not have a judicially cognizable interest in the prosecution of others. *Id*. at 677. The

18   government's attempt to graft *Texas* onto the present dispute runs headlong into *Texas* itself:

19           And this case raises only the narrow Article III  standing question
20           of whether the Federal Judiciary may in effect order the Executive
             Branch to take enforcement actions against violators of federal
21           law—here, by making more arrests. Under this Court's Article
             III precedents and the historical practice, the answer is no.

22   *Id*. at 684–85. It is unsurprising, then, that our court of appeals has already rejected this

23   argument. *State v. Su*, 121 F.4th 1, 13 n.5 (9th Cir. 2024).

24               **C.    IRREPARABLE HARM.**

25       In *Winter*, the Supreme Court reversed a preliminary injunction based only on a

26   "possibility" of irreparable harm, explaining: "Issuing a preliminary injunction based on a

27   possibility of irreparable harm is inconsistent with our characterization of injunctive relief as

28

an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. The party seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. "[U]nsupported and conclusory statements regarding harm" are not enough. *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013).

### (i) The unions.

There is much less need now for an order reinstating probationary employees than there was in March — when the district court did order reinstatement. On March 4, in response to this Court's TRO, OPM re-circulated a revised version of the January 20 memo, which read:

> Please note that, by this memorandum, OPM is not directing agencies to take any specific performance-based actions regarding probationary employees. Agencies have ultimate decision-making authority over, and responsibility for, such personnel actions.

(Dkt. Nos. 64-1 at 2; 188-1 at 149:11–21). On May 13, the district court issued a preliminary injunction requiring six relief defendants to reinstate their probationary employees. That same day, a separate preliminary injunction issued by a district court in Maryland required all remaining relief defendants, except NSF, to rehire their probationers. NSF, meanwhile, had rehired all probationers following this district court's TRO. Yes, both district court orders were eventually stayed, but much good was done in the interim. Compliance reports submitted in this district court and in Maryland showed that relief defendants rehired their terminated probationers *after* having received the March 4 revised memorandum. So, if any reinstated employees are now terminated (yet again), it will be because the agency has made the decision to do so, not because OPM has directed it. The whole point of this lawsuit has been OPM's *ultra vires* act — not terminations made wholly by agencies themselves.

Union plaintiffs' contention that they continue to face irreparable organizational harms falls short for the same reason. Just as there is little to suggest that agencies are still acting at the behest of OPM, there is little on the record to suggest that the unions' core business

United States District Court
Northern District of California

23

functions are still being frustrated by such terminations.  Plaintiffs' declarations attesting to such disruptions have by now grown stale.

*              *              *

Plaintiffs have, however, made out irreparable harm flowing from OPM's template termination letter, and its pretense of "performance" based firings.  In our circuit, the "loss of opportunity to pursue [one's] chosen profession[] constitutes irreparable harm." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (cleaned up); *see Chalk v. U.S. Dist. Ct. Cent. Dist. of California*, 840 F.2d 701, 709-10 (9th Cir. 1988).  In *Brewer*, Arizona Governor Janice Brewer issued an executive order directing state agencies to prevent DACA recipients from becoming eligible for any state identification, including a driver's license.  *Brewer*, 757 F.3d at 1059 (internal quotations omitted).  Plaintiffs, five individual DACA recipients and the Arizona DREAM Act Coalition, filed suit and moved for a preliminary injunction.  *Ibid*.  Our court of appeals held that plaintiffs had "introduced ample evidence that Defendants' policy causes them to suffer irreparable harm" by "limiting their professional opportunities."  *Id*. at 1068 ("Plaintiffs' ability to drive is integral to their ability to work — after all, eighty-seven percent of Arizona workers commute to work by car. It is unsurprising, then, that Plaintiffs' inability to obtain driver's licenses has hurt their ability to advance their careers.").

Here, "performance" (or "fitness") was a total sham, a pretense supplied by OPM via their template termination letter.  As IRS Chief Human Capital Officer DiMartini explained, "it would take weeks or months to evaluate the job performance of 6,700 probationary employees" (Dkt. No. 94-1 at 4).  OPM's deadline, meanwhile, afforded federal agencies mere days.  As a result, countless high-performing employees, including those highlighted above, were terminated through a lie.  The terminations were so divorced from reality that one *non-*probationary USDA employee, who had "received two cash awards for her excellent performance" and was recognized in 2023 for "expanding U.S. agriculture exports through trade supporting initiatives" was wrongfully terminated because of "performance" on February

24

United States District Court
Northern District of California

13 (Dkt. No. 18-5 at 8).  USDA reversed course when she notified them that she was a full year removed from her probationary period.

Termination under the false pretense of performance is an injury that will persist for the working life of each civil servant.  In pursuing future employment, each will have to concede that they have been terminated based on performance.  The stain created by OPM's pretense will follow each employee through their careers and will limit their professional opportunities.  As in *Brewer*, the irreparable nature of many probationers' injury is heightened because "[s]etbacks early in their careers are likely to haunt Plaintiffs for the rest of their lives." *Brewer*, 757 F.3d at 1068.  The below injunction is narrowly tailored to address the ongoing harm made out by plaintiffs.

### (ii)   *State of Washington.*

Washington asserts that it faces irreparable harms from the "widespread impairment to services provided to the public and fragile ecosystems in national parks and other public lands" (Dkt. No. 156-1 at 13).  As explained with regards to standing, the link between the terminations at issue here and the purported impairment to services provided by the employing agencies is "premised on a speculative chain of possibilities." *Clapper*, 568 U.S. at 410.

### D.   *THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST.*

Where the government is a party, the balance of the equities and the public interest merge.  *See Nken v. Holder,* 556 U.S. 418, 435 (2009).  The government argues that it has a "strong interest in maintaining its authority to manage its own internal affairs" (Dkt. No. 167 at 28; *see also* Dkt. No. 180 at 15).  That argument loses much of its force where plaintiffs show — as they have here — that the government is likely to have managed those affairs in an unlawful manner.  "The preservation of the rights in the Constitution and the legality of the process by which government agencies function certainly weighs heavily in the public interest." *Nat'l Treasury Emps. Union v. U.S. Dep't of Treasury*, 838 F. Supp. 631, 640 (D.D.C. 1993) (Judge Harold Greene).  The assertion that plaintiffs have no interest in "restor[ing] or maintain[ing] employment at federal agencies at their preferred level and in their preferred manner," meanwhile, mischaracterizes the relief sought by plaintiffs and is, in

25

any event, moot considering the scope of the relief granted (Dkt. No. 180 at 15).

**PROVISIONAL RELIEF**

Provisional relief is hereby granted as follows:

1. Defendants OPM and Charles Ezell are enjoined from ordering, directing, or telling any other federal agency to terminate the employment of any federal employee or group of federal employees.

2. All relief defendant agencies are enjoined from following any OPM order or direction to fire any agency employee.

3. All relief defendant agencies are enjoined from any further use of the OPM template termination letter provided by OPM — including any altered or modified versions.

4. All relief defendant agencies who used the OPM template termination notice — or variation thereof — shall provide recipients with a written statement, directed to the employee individually, stating that their termination was not "performance" or fitness based but was made as part of a government-wide mass termination. This shall be done by **MAY 8, 2025**.

5. If a particular termination was in fact carried out after an individualized evaluation of that employee's performance or fitness, the Chief Human Capital Officer (or equivalent) of that agency may instead submit, by **MAY 8, 2025, AT NOON**, a declaration, under oath and seal, stating so and providing the individual reasoning underpinning that termination.

6. Each Chief Human Capital Officer (or equivalent) at the relief defendant agencies shall acknowledge, in writing, having received and read this order. Such acknowledgements shall be filed with the Court by **MAY 8, 2025, AT NOON**.

7. Nothing in this order prohibits any federal agency from terminating any employee so long as the agency makes that decision wholly on its own, does not use the OPM template termination notice, and is otherwise in compliance with applicable law.

United States District Court
Northern District of California

The government requests a security pursuant to Rule 65(c), which provides that the court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The government does not provide any insight into the purported costs and damages it may sustain. "The district court retains discretion 'as to the amount of security required, *if any.*'" *Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011) (quoting *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir.2009)). In *Diaz*, the district court granted a preliminary injunction "to prevent a state law from taking effect that would have terminated eligibility for health-care benefits of state employees' same-sex partners." *Id*. at 1010. Our court of appeals affirmed the district court's decision not to require a bond. *Id*. at 1015.

The undersigned finds that security is appropriate in the amount of one dollar per union plaintiff.

**IT IS SO ORDERED.**

Dated: April 18, 2025.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE