Scott A. Kronland (SBN 171693)
Stacey M. Leyton (SBN 203827)
Eileen B. Goldsmith (SBN 218029)
Danielle E. Leonard (SBN 218201)
Robin S. Tholin (SBN 344845)
James Baltzer (SBN 332232)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel. (415) 421-7151
Fax (415) 362-8064
skronland@altber.com
sleyton@altber.com
egoldsmith@altber.com
dleonard@altber.com
rtholin@altber.com
jbaltzer@altber.com

*Attorneys for Plaintiff Organizations*

[Additional Counsel on signature page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO; AMERICAN FEDERATION OF STATE COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO; et al., | Case No. 25-cv-01780-WHA **PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION OF CLAIMS I-IV; OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| Plaintiffs, | |
| v. | |
| UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, et al., | |
| Defendants. | |

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

ARGUMENT ........................................................................................................................2

    I.    OPM Directed the Terminations of Probationary Employees at Other Agencies .........................................................................................................2

    II.    This Court Has Subject Matter Jurisdiction ...............................................7

        A.    Plaintiffs Have Standing.................................................................7

        B.    Congress Did Not Impliedly Divest This Court of Jurisdiction .....................9

    IV.    Plaintiffs Are Entitled to Summary Judgment on Their APA Claims.......................13

        A.    OPM's Actions Were Contrary to Law...........................................13

        B.    OPM's Actions Were Arbitrary and Capricious..................................14

        C.    OPM Violated Notice-and-Comment Rulemaking Requirements ...............15

    V.    Plaintiffs' Requests for Relief Are Not Improper .......................................17

CONCLUSION ...................................................................................................................19

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Federal Cases**

4

*AFGE v. Trump*,
 139 F.4th 1020 (9th Cir. 2025), *stay granted pending appeal on other grounds*,
 *Trump v. AFGE*, No. 24A1174 (U.S. July 8, 2025) ................................................. 9, 10, 11, 12

*Armstrong v. Exceptional Child Ctr., Inc.*,
 575 U.S. 320 (2015) ........................................................................................................ 12

*Baird v. Bonta*,
 81 F.4th 1036 (9th Cir. 2023) ........................................................................................ 18

*Bd. of Governors of the Fed. Rsrv. Sys. v. MCorp Fin., Inc.*,
 502 U.S. 32 (1991) .......................................................................................................... 12

*Block v. Community Nutrition Institute*,
 467 U.S. 340 (1984) ........................................................................................................ 11

*Bowers v. Mich. Acad. of Fam. Physicians*,
 476 U.S. 667 (1986) ........................................................................................................ 11

*Brock v. United States*,
 64 F.3d 1421 (9th Cir. 1995) .......................................................................................... 10

*Carter v. Transport Workers Union of Am.*,
 138 F.4th 164 (5th Cir. 2025) ........................................................................................ 19

*Clapper v. Amnesty Int'l USA*,
 568 U.S. 398 (2013) .......................................................................................................... 9

*Colwell v. Dep't of Health & Human Servs.*,
 558 F.3d 112 (9th Cir. 2009) .......................................................................................... 16

*Dalton v. Specter*,
 511 U.S. 462 (1994) .................................................................................................. 12, 13

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
 591 U.S. 1 (2020) ............................................................................................................ 14

*Desertain v. City of Los Angeles*,
 754 F.3d 1147 (9th Cir. 2014) ........................................................................................ 17

*Doe v. Trump*,
 284 F.Supp.3d 1182 (W.D. Wash. 2018) ........................................................................ 9

*Elgin v. Department of the Treasury*,
 567 U.S. 1 (2012) ............................................................................................................ 10

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Fed. Express Corp. v. U.S. Dep't of Commerce,*
  39 F.4th 756 (D.C. Cir. 2022) ........................................................................ 11

*Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.,*
  589 F.2d 658 (D.C. Cir. 1978)....................................................................... 16

*Hemp Industries Ass'n v. Drug Enf't Admin.,*
  333 F.3d 1082 (9th Cir. 2003) ................................................................. 3, 16

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ......................................................................................... 8

*Mariano v. United States,*
  529 F.3d 1243 (9th Cir. 2008) ...................................................................... 10

*McClouth Steel Prods. Corp. v. Thomas,*
  838 F.2d 1317 (D.C. Cir. 1988)..................................................................... 16

*Merrill v. Milligan,*
  142 S. Ct. 879 (2022) (Kavanaugh, J., concurring)........................................ 9

*Missouri Pub. Serv. Comm'n v. FERC,*
  337 F.3d 1066 (D.C. Cir. 2003)..................................................................... 14

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ........................................................................................ 14

*Murphy Co. v. Biden,*
  65 F.4th 1122 (9th Cir. 2023)........................................................................ 13

*Murthy v. Missouri,*
  603 U.S. 43 (2024) ........................................................................................... 8

*Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown,*
  567 F.3d 521 (9th Cir. 2009) ...................................................................... 7, 8

*Nuclear Regul. Comm'n v. Texas,*
  605 U.S. _, 145 S. Ct. 1762 (2025) ............................................................. 12

*NW Env't Def. Ctr. v. Bonneville Power Admin.,*
  477 F.3d 668 (9th Cir. 2007) ........................................................................ 17

*NW Env'tl Def. Ctr. v. Bonneville Power Admin.,*
  117 F.3d 1520 (9th Cir. 1997) ........................................................................ 7

*OPM v. AFGE,*
  No. 24A904 (U.S. Apr. 8, 2025) (S. Ct. Stay order) ...................................... 9

*Sackett v. EPA,*
  566 U.S. 120 (2012) ...................................................................................... 11

*Sierra Club v. Trump*,
  929 F.3d 670 (9th Cir. 2019) ........................................................................ 11, 13

*Sierra Club v. Trump*,
  963 F.3d 874 (9th Cir. 2020), *vacated on other grounds*, *Biden v. Sierra Club*, 142
  S. Ct. 46 (2021) ......................................................................................... 9, 11, 13

*State v. Su*,
  121 F.4th 1 (9th Cir. 2024) ........................................................................... 9

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023) ...................................................................................... 8

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ...................................................................................... 8

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) ........................................................................ 16

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994) .................................................................................... 9, 10

*Townley v. Miller*,
  722 F.3d 1128 (9th Cir. 2013) .................................................................... 7, 8

*United States v. Fausto*,
  484 U.S. 439 (1988) ...................................................................................... 10

*United States v. Texas*,
  599 U.S. 670 (2023) ...................................................................................... 9

*Veit v. Heckler*,
  746 F.2d 508 (9th Cir. 1984) ........................................................................ 10

*Washington v. FDA*,
  108 F.4th 1163 (9th Cir. 2024) ..................................................................... 9

**Federal Statutes**

5 U.S.C.
  § 551 ........................................................................................................ 15, 16
  § 553 ........................................................................................................ 15
  § 706 ........................................................................................................ 13, 14
  § 3301 ....................................................................................................... 13

**Other Authorities**

5 C.F.R. §§ 315.801-315.806 ......................................................................... 14

5 C.F.R. § 315.803 ......................................................................................... 5

5 C.F.R. § 315.804..................................................................................................... 14, 18

5 C.F.R. § 315.805........................................................................................................ 14

Fed. R. Civ. P. 15 ......................................................................................................... 17

Fed. R. Civ. P. 19 ......................................................................................................... 18

## INTRODUCTION

As Plaintiffs have previously explained, the administrative record (Dkt. 218-3, "AR") compiled by the Office of Personnel Management ("OPM") confirms what this Court has already concluded: that OPM directed other federal agencies to terminate their probationary employees *en masse* on the pretextual ground that those terminations were based on performance.  OPM has never disputed that "[n]o statute—anywhere, ever—" authorized OPM to direct other federal agencies to terminate probationary employees.  Dkt. 45 at 7-8.  It instead continues to insist, despite the plain language of its directives to federal agencies and based on a few out-of-context snippets of the AR, that its repeated communications directing mass terminations were mere "guidance," "mandat[ing] no particular decision by any agency."  Dkt. 228 ("Cross-Mot.") at 1, 3-7.

No reasonable finder of fact could agree with OPM's characterization of the record.  OPM repeatedly fails to acknowledge, much less to explain away, the unmistakably mandatory language with which OPM announced its directives.  In its January 20, 2025 memorandum, OPM set a specific deadline by which other federal agencies were required to compile and transmit lists of their probationary employees to OPM and demanded that each agency "promptly determine whether those employees should be retained at the agency."  AR335.  It subsequently promulgated "immediate next steps for probationary employees," demanding that agencies "separate probationary employees" not already "identified as mission-critical no later than the end of the day, 2/17."  AR375, 383-385.  To facilitate the execution of that directive, OPM told agencies that "[w]hile agencies *must* identify performance or conduct deficiencies in the notice terminating a probationer, such performance or conduct deficiencies do not need to have been identified in a previous performance evaluation."  AR 369 (emphasis added).  It also provided a template termination letter with empty fields for "[NAME]," "[TITLE]," and "[ORGANIZATION]," which stated without further explanation that the termination was "based on…performance."  AR371-372, 377-378.  And when some agencies attempted to resist OPM's directive to terminate all non-mission-critical probationary employees, OPM confirmed the mandatory nature of its directives by unlawfully assuming authority to "grant" or deny "exemptions."  AR338-339, 357-358, 382-386.

OPM's other arguments fare no better.  Many rest on the faulty premise that OPM's unlawful

directives were mere guidance.  Others rehash jurisdictional arguments this Court has already rejected or otherwise distort controlling precedent.  Plaintiffs' motion for summary adjudication of Claims I-IV alleged in the Second Amended Complaint should be granted, and Defendants' cross-motion for summary judgment should be denied as to those claims.  The Court should then enter judgment for Plaintiffs.[1]

## ARGUMENT

### I.    OPM Directed the Terminations of Probationary Employees at Other Agencies

In OPM's telling, Acting Director Charles Ezell's January 20, 2025 memorandum and OPM's subsequent communications concerning probationary employee terminations were mere guidance, "[m]uch like prior OPM memoranda."  Cross-Mot. at 4.  But the AR contains two prior OPM memoranda, and any fair comparison of those examples with the communications at issue here underscores that OPM's mass termination directives were not "[m]uch like" its prior guidance at all.

Consider, first, the "Handbook for Measuring Employee Performance" issued by OPM in the first Trump administration in March 2017.  AR117-208.  That memorandum "provides guidelines" for written performance plans to "maximize the capability that performance plans have for focusing employee efforts on achieving organizational and group goals."  AR119.  It describes "Guiding Principles for Performance Measurement," offering a "checklist" by which supervisors might "ensure that the elements and standards … include[d] in the performance plan are effective."  AR184-185.  The checklist invites supervisors to consider questions like "Is the range of acceptable performance clear?" and "Are the standards attainable?"  AR184; *see also* AR191.  The handbook also includes a parable about the relationship between bees and beekeepers, along with a "moral of the story": that "measuring and recognizing accomplishments rather than activities—and giving feedback to the worker bees—often improves the results of the hive."  AR129-130.

The December 23, 2023 memorandum issued by the then-director of OPM under President Biden is similarly advisory.  That memorandum "*advise[d]* agencies to periodically remind

---

[1] The parties have stipulated to dismiss the only remaining claim, Claim V, without prejudice (Dkt. 234).  Accordingly, Plaintiffs do not address Claim V.

1   supervisors and managers about the value of the probationary period, particularly as they hire new

2   talent." AR324 (emphasis added). "These reminders are designed to help supervisors take full

3   advantage of the probationary period in order to make informed decisions about whether to retain an

4   individual in the agency's permanent workforce." *Id.* The memorandum attached "Practical Tips for

5   Supervisors of Probationers," including suggestions that supervisors "[c]ommunicate expectations for

6   performance and conduct" and "[p]rovide regular and frequent feedback." AR326-327.

7          Plaintiffs agree with OPM that these pre-2025 memoranda constituted guidance, not

8   directives. They were written in broad, aspirational terms, offering "guiding principles" and "tips"—

9   not orders. AR185, 326. They did not demand that any agency take any particular course of action,

10  nor did they set a deadline by which any such action needed to be taken.

11         The same is not true of OPM's January 20 memorandum, nor of OPM's subsequent

12  communications. The January 20 memorandum specifically required each agency to "identify all

13  employees on probationary periods," "send a report to OPM listing all such employees," and

14  "promptly determine whether those employees should be retained at the agency." AR335. OPM set a

15  deadline for compliance with these requests: "No later than January 24, 2025." *Id.*

16         OPM is keen to emphasize that the word "guidance" appears in the subject line and in the first

17  paragraph of the January 20 memorandum, Cross-Mot. at 4, but that ignores crucial context. The

18  specific requests and the deadline for complying with them are written in mandatory language. *Cf.*

19  *Hemp Industries Ass'n v. Drug Enf't Admin.*, 333 F.3d 1082, 1087 (9th Cir. 2003) ("[T]he court need

20  not accept [OPM's] characterization at face value."). Contemporaneous responses from agencies that

21  received OPM's memorandum make clear that they understood it to be mandatory. *See, e.g.*, AR339

22  ("In accordance with OPM Guidance on Probationary Periods…the NTSB is submitting the attached

23  chart of probationary employees. The guidance *required* the NTSB to identify employees on

24  probationary periods…and send a report to OPM listing all such employees. In addition, agencies are

25  *required* to promptly determine whether those employees should be retained at the agency.")

26  (emphases added). Likewise, OPM's subsequent communications were consistent with the

27  understanding this was a mandatory order: OPM subsequently announced through the CHCO

28

Council[2] that "Attorney positions can be exempted from the probationary period data call." AR341. The only reasonable implication from that statement is that all other positions could *not* be excluded from OPM's "call" for probationary employee data.

Soon after, OPM ordered agencies to terminate their employees. On February 12, in an email to federal agency Chiefs of Staff and other political appointees with the subject line "[Action Due 2/13] Probationary Employee Actions," and signed by "OPM," OPM announced "*immediate* next steps for probationary employees." AR383 (emphasis added). Again, OPM demanded a specific course of action and imposed a deadline for its completion: "**Please partner with your CHCO to action those you wish to separate from by the end of the day tomorrow, 2/13/2025, using the attached template letter.**" AR383-384 (emphasis in original). OPM's email also demanded that all agencies "please update the previous probationary employee spreadsheet you've sent us" to include "[w]hich probationary employees have been terminated and which you plan to keep. For those you plan to keep, provide an explanation of why." AR384. "**Please continue providing these reports daily through at least the end of the week.**" *Id.* (emphasis in original). That same day, the CHCO Council provided each agency with a template letter "for terminating … probationary period employee[s]." AR368-372; *see also* Dkt. 222 ("Mot.") at 3. That letter stated without explanation that probationary employees were being terminated on the basis of performance. AR371-372.

OPM followed with another email on February 14, 2025 to the agency CHCOs. There, OPM again purported to "clarif[y] *immediate* next steps for probationary employees." AR375 (emphasis added). OPM stated: "We have asked that you separate probationary employees that you have not identified as mission-critical no later than end of the day Monday, 2/17." *Id.* OPM further directed that "[a]n employee's performance *must* be measured in light of the existing needs and interest of the government," an unprecedented and distorted definition of "performance." *Id.* (emphasis added). This email also repeated OPM's demand that, if an agency wished to keep *any* probationers, it was

---

[2] The CHCO Council consists of Chief Human Capital Officers from multiple departments and agencies. OPM concedes that it acted through the CHCO Council when it issued communications relevant to this case. *See* Cross-Mot. at 5-6 ("OPM—by way of the CHCO Council—sent agencies a draft template letter for terminating probationary period employees….").

required to "provide an explanation of why" to OPM, and instructed agencies to report back to OPM "after actioning." *Id.*

OPM's cross-motion does not acknowledge that OPM ever made these statements. Cross-Mot. at 6, 19-20. Instead, OPM characterizes its February 14 email as "simply" having "conveyed OPM's *belief* that mission-critical employees should be retained." Cross-Mot. at 19-20 (emphasis in original). But OPM's instruction to agencies that "OPM believes 'qualifications for continued employment' in the current context means that only the highest-performing probationers in mission-critical areas should be retained" must be read in the context of its directives to terminate those employees *en masse.* AR375. That OPM included the words "OPM believes" in one paragraph of the February 14 email cannot wash away the email's other, plainly mandatory language, where OPM explicitly "asked" agencies to "separate" *all* probationary employees not already deemed "mission-critical." AR375; *see also* Dkt. 132 at 10 ("An 'ask,' followed by a directive, is a directive.").

Moreover, OPM elsewhere framed its purported "belief"—that performance-based terminations of probationary employees need not be based on those employees' actual performance—in terms that were not so qualified. *See* AR369 ("While agencies must identify performance or conduct deficiencies in the notice terminating a probationer, such performance or conduct deficiencies do not have to be identified in a previous performance evaluation."); AR390 ("'[Q]ualifications for continued employment' [as used in 5 C.F.R. §315.803] means that only the highest-performing probationers in mission-critical areas should be retained."). Far from merely "reiterat[ing] what OPM and other agencies had repeatedly said before: that agencies should use the probationary period to evaluate the fitness of probationary employees for continued employment," Cross-Mot. at 18, OPM's communications instructed agencies that they must terminate probationers, ostensibly for performance reasons, *without regard* for their actual performance.[3]

Against this backdrop, OPM's insistence that it "did not direct agencies to terminate

---

[3] Indeed, in the February 12, 2025 email to high-level agency officials, OPM expressly instructed: "Employees do not need to have received any particular performance rating previously to be separated." AR384. OPM was telling agencies in no uncertain terms: actual performance is irrelevant.

employees" because "it was up to the agencies to determine which probationary employees to exempt" is not a reasonable reading of this record. Cross-Mot. at 17. Granted, OPM did not identify by name the probationary employees it "asked" agencies to terminate. *Cf.* AR375. But that is not the only way to "direct agencies to terminate employees." Instead, OPM's January 20 memorandum directed agencies to compile and submit their lists of their probationary employees by January 24. AR335. Once those lists were compiled, OPM instructed each agency to "separate probationary employees that you have not identified as mission-critical no later than the end of the day Monday, 2/17." AR375; *see also* AR390. In that sense, OPM *did* tell agencies "which probationary employees to exempt"—not by name, but by criterion. Cross-Mot. at 17. OPM cites no authority for the proposition that an instruction is not a directive simply because it is framed in categorical rather than individualized terms. *Cf.* Cross-Mot. at 2.

OPM's reliance on the alleged flexibility of the "exemptions process" fails for similar reasons. AR375; Cross-Mot. at 16-17. As this Court previously recognized: "A choice—you may choose to retain your probationers—followed by a caveat—if OPM grants your exemption request—is not a choice." Dkt. 202 at 13.[4] The record shows that multiple federal agencies requested "exemptions" from OPM's "probationary exercise," and that OPM repeatedly purported to exercise authority to "grant" such requests. *See* Mot. at 5-6; AR338-339, 357-358, 382, 386. That OPM declined to "be in the weeds" of such requests (AR357) does not change the fact that OPM assumed authority to grant or deny permission. To be sure, as OPM observes, the Department of Justice ("DOJ") ultimately did not fire any of its probationary employees, but even that instance cuts the other way: the record shows that DOJ initially sought permission to exempt probationers only in certain of its sections. AR386 ("DOJ is exempted for Civil Appellate, Federal Programs, Office of Immigration Litigation, and Office of the Solicitor General right now and nothing more right now."); AR382 ("Please note that for DOJ, OPM has granted Civil Appellate, Federal Programs Branch, Office of Immigration

---

[4] If agencies were simply exercising their own discretion, as OPM argues in hindsight here, there would have been nothing to exempt. The very reason for an "exemptions" process is the *requirement* in the first place that agencies terminate all probationary employees not already deemed mission-critical.

1    Litigation, and Office of the Solicitor General exemptions … from any guidance to terminate

2    probationary employees."). After securing that initial exemption, DOJ *returned* to OPM for a broader

3    one. AR386-388. DOJ evidently *twice* understood that it needed OPM's permission to exempt its

4    probationary employees from OPM's mass termination directive. Again, OPM did nothing to dispel

5    that understanding; instead, it continued to exercise authority to grant exemptions. *Id.* There is

6    simply no avoiding that OPM was calling the shots.

7         **II.      This Court Has Subject Matter Jurisdiction**

8              **A.      Plaintiffs Have Standing**

9         OPM asserts that none of the Plaintiffs have standing to maintain this lawsuit—neither the

10   public-sector unions, nor the nonprofit groups, nor the State of Washington. Cross-Mot. at 8-10. "As

11   a general rule, in an injunctive case [courts] need not address standing for each plaintiff if [they]

12   conclude[] that one plaintiff has standing." *Nat'l Ass'n of Optometrists & Opticians LensCrafters,*

13   *Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009). This Court therefore need only determine whether

14   "at least one plaintiff has standing." *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013).

15        The public-sector union Plaintiffs' standing easily suffices. As this Court has explained, these

16   Plaintiffs have both "organizational and associational standing" because "[t]heir members' unlawful

17   terminations cause public-sector unions to lose dues, divert or raise resources to help those

18   terminated, or suffer legal wrongs." Dkt. 153 at 3. OPM contends this finding was based exclusively

19   "on the declaration of one Veteran Doe let go from the Foreign Agriculture Service," Cross-Mot. at 9,

20   but OPM ignores the numerous declarations in the record detailing precisely the harms this Court

21   identified in its March 24 order. *See, e.g.*, Dkts. 18-5 (Bachelder Dec.); 18-6 (Blake Dec.); 18-10

22   (Jacobs Dec.); 18-12 (Kelley Dec.); 18-14 (Nemeth-Greenleaf Dec.); 18-17 (Ronneberg Dec.); 18-18

23   (Turner-Nichols Dec.); 39-6 (Supp. Blake Dec.); 161-1 (Glymph Dec.); *NW Env'tl Def. Ctr. v.*

24   *Bonneville Power Admin.*, 117 F.3d 1520, 1527-28 (9th Cir. 1997) (court may consider supplemental

25   evidence of standing in APA action on administrative record). OPM has not rebutted that extensive

26   evidence, which fully supports Plaintiffs' standing at this stage of the litigation.

27        OPM also disputes the public-sector union Plaintiffs' standing on the ground that they are

28   "unable" to identify all probationary employee members who were impacted by OPM's unlawful

mass termination program.  Cross-Mot. at 9.  But the union Plaintiffs have already identified in sealed filings 1,410 dues-paying members who were probationary employees fired pursuant to OPM's unlawful directives, including at least one member in each relief defendant agency.  *See* Dkts. 199-1, 199-2.  The fact that those lists are not exhaustive is no barrier to standing; it is settled that plaintiffs asserting associational standing need only identify a *single* injured member to seek relief on behalf of *all* members.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (for standing to obtain injunctive relief, a plaintiff association must "establish[] that at least one identified member had suffered or would suffer harm"); *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (finding associational standing to invalidate college admissions policies in all applications based on a showing that plaintiff had 47 members in one case and four identified members in the other).[5]

Finally, OPM argues that the public-sector union Plaintiffs cannot establish a "cognizable injury based on the supposed reduction in union dues" because, according to one union's press release, union membership is at its "highest level ever."  Cross-Mot. at 9.  This argument makes little sense.  Unions are injured by the reduction of union dues caused by the unlawful termination of employees they represent.  Such harm is not erased by the fact that new dues-paying members may have joined the union around the same time.  If standing to seek relief over the reduction of one source of income could be eliminated by the presence of a separate source of income, few profitable businesses would ever have standing to sue.  That is not the law.

Because the public-sector union Plaintiffs have standing, this Court need not reach OPM's additional arguments concerning the standing of the State of Washington and of the organizational Plaintiffs.  *LensCrafters*, 567 F.3d at 523; *Townley*, 722 F.3d at 1133.  In any event, those arguments

---

[5] *Murthy v. Missouri*, 603 U.S. 43 (2024), is inapposite here.  *Murthy* concerned plaintiffs' standing to sue multiple agencies where they could not show they were harmed by each separate agency's distinct actions.  *Id.* at 61.  Plaintiffs do not sue each of the Rule 19 defendants, who are named only to afford complete relief, and need only show harm for Article III purposes with respect to OPM and its director.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 569 n.4 (1992) ("The redressability element of the Article III standing requirement and the "*complete* relief" referred to by Rule 19 are not identical.") (emphasis in original).

1   fail.  As for Washington, OPM relies on *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023), and

2   *Washington v. FDA*, 108 F.4th 1163 (9th Cir. 2024), for the proposition that "indirect effects on state

3   revenues or state spending" are "too attenuated" to confer standing.  But the financial harms to

4   Washington's unemployment program are hardly "indirect"; they flow directly from OPM's unlawful

5   mass termination directive.  *See* Dkt. 70-8, ¶¶6-17; *see also State v. Su*, 121 F.4th 1, 13 n.5 (9th Cir.

6   2024) (rejecting a similar attempt to rely on *Texas* to defeat standing where states demonstrated they

7   would lose tax revenues as a result of government action).  As for the organizational plaintiffs, this

8   Court correctly held that they "face concrete harms" because "the unlawfully directed terminations

9   disable[d] the federal agency services on which they or their members depend."  Dkt. 132 at 12; *see*

10  *also* Dkt. 45 at 13-22.[6]

### B.    Congress Did Not Impliedly Divest This Court of Jurisdiction

12      OPM offers no basis for this Court to revisit its prior rulings on subject matter jurisdiction.

13  *See* Dkt. 153.  OPM merely repeats its prior argument that this Court lacks subject-matter jurisdiction

14  on the theory that any claim that touches on federal employment is precluded by the administrative

15  schemes created by the Civil Service Reform Act of 1978 ("CSRA") and the Federal Service Labor-

16  Management Relations Statute ("FSL-MRS").  This Court has long since rejected that argument.

17  Dkt. 153 at 11 ("All three *Thunder Basin* factors counsel that the public-sector unions' claims are not

18  of the kind Congress intended to be reviewed through the CSRA... The district court has subject-

19  matter jurisdiction to hear and decide the public-sector union plaintiffs' claims.").

20      The Ninth Circuit recently concurred in this Court's analysis in a published opinion.  *AFGE v.*

21  *Trump*, 139 F.4th 1020 (9th Cir. 2025), *stay granted pending appeal on other grounds*, *Trump v.*

22

23      ───────────────

        [6] Although the Supreme Court stated, without analysis, that the organizational Plaintiffs'
24  "allegations" were "presently insufficient to support the organizations' standing," *OPM v. AFGE*, No.
    24A904 (U.S. Apr. 8, 2025) (S. Ct. Stay order) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398
25  (2013)), that order "is not a ruling on the merits."  *Merrill v. Milligan*, 142 S. Ct. 879 (2022)
    (Kavanaugh, J., concurring). This Court is not bound by that initial emergency order.  *See Sierra Club*
26  *v. Trump*, 963 F.3d 874, 887-93 (9th Cir. 2020), *vacated on other grounds*, *Biden v. Sierra Club*, 142 S.
    Ct. 46 (2021) (declining to follow an emergency stay order issued by the Supreme Court based on an
27  independent review of the arguments and the record); *see also Doe v. Trump*, 284 F.Supp.3d 1182, 1185
    (W.D. Wash. 2018).

28

1    *AFGE*, No. 24A1174 (U.S. July 8, 2025), involved a challenge to the Trump administration's

2    government-wide efforts to "transform[] the Federal bureaucracy," including through directives

3    issued by OPM, requiring agencies to reorganize and engage in large-scale reductions-in-force

4    ("RIFs").  *Id.* at 1028.  "A collection of unions, non-profit organizations, and local governments"

5    sued various government defendants, *including OPM*, alleging that this latest effort violated the

6    constitutional separation of powers, exceeded statutory authority, and violated the APA.  *Id.*

7    (emphasis added).  The government argued that Congress had impliedly removed jurisdiction over

8    the challenge to these government-wide actions, because claims were either "channeled" in the first

9    instance to the "the administrative system established by the CSRA," *id.* at 1030, or precluded

10   entirely because they could not be adjudicated through that system.  Applying the test articulated in

11   *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994), for determining whether the claims at

12   issue "are of the type Congress intended to be reviewed" by an administrative system and not in the

13   first instance by federal courts, the Ninth Circuit concluded that "the district court below correctly

14   determined that Plaintiffs' claims [including those against OPM] were properly raised" in federal

15   district court.  *Id.* at 1033 (quoting *Thunder Basin*, 510 U.S. at 212).  *AFGE v. Trump* held that the

16   plaintiffs' claims were *not* impliedly precluded by Congress from being heard under *United States v.*

17   *Fausto*, 484 U.S. 439, 454 (1988).  139 F.4th at 1030-33.

18          Here, OPM's reliance on *Fausto* and various circuit cases is no more persuasive than it was in

19   *AFGE v. Trump*.  *Id.* at 1030-33; *see also* Cross-Mot. at 11-13.  Those authorities consistently held

20   that a federal employee who sues his or her employing agency over a covered adverse employment

21   decision must first use the administrative channels created by Congress, but neither the Supreme

22   Court nor the Ninth Circuit has ever extended those conclusions to government-wide rules or actions

23   directed by OPM.  *See Fausto*, 484 U.S. at 454 (individual employee challenge to employer action);

24   *Elgin v. Department of the Treasury*, 567 U.S. 1, 10 (2012) (same); *Veit v. Heckler*, 746 F.2d 508, 509

25   (9th Cir. 1984) (same); *Brock v. United States*, 64 F.3d 1421, 1424 (9th Cir. 1995) (same); *Mariano v.*

26   *United States*, 529 F.3d 1243, 1246 (9th Cir. 2008) (same).  *AFGE v. Trump* confirms that this Court

27

28

1    may properly exercise jurisdiction here.[7]

2    **III.    Plaintiffs Are Entitled to Summary Judgment on Their *Ultra Vires* Claim**

3        Again: "No statute—anywhere, ever—has granted OPM the authority to direct the

4    termination of employees in other agencies."  Dkt. 45 at 7-8; *see also* Dkt. 132 at 9-10 ("OPM did not

5    have the authority to direct the firing of employees, probationary or otherwise, in any *other* federal

6    agency.") (emphasis in original).  As Plaintiffs' motion for summary adjudication explained, courts

7    have long exercised equitable authority to enjoin such "extreme" agency overreach as *ultra vires*, and

8    this Court should do so here.  Mot. at 9-12 (quoting *Fed. Express Corp. v. U.S. Dep't of Commerce*,

9    39 F.4th 756, 764 (D.C. Cir. 2022)).  OPM's counterarguments do not justify a different conclusion.

10       First, OPM asserts "Plaintiffs cannot pursue their *ultra vires* claim because it parrots their

11   APA claims."  Cross-Mot. at 13.  That is not the law of this Circuit, which specifically permits

12   parallel ultra vires and APA claims.  *Sierra Club v. Trump*, 963 F.3d 874, 888-93 (9th Cir. 2020),

13   *judgment vac'd on other grounds, sub nom. Biden v. Sierra Club*, 142 S. Ct. 46 (2021) ("the APA

14   does not displace all constitutional and equitable causes of action"); *accord Sierra Club v. Trump*, 929

15   F.3d 670, 699 (9th Cir. 2019) ("The dissent argues that Plaintiffs' claim is necessarily one

16   encompassed by the APA, and that the availability of an APA cause of action precludes Plaintiffs'

---

18       [7] OPM relies on *Block v. Community Nutrition Institute*, 467 U.S. 340, 347 (1984), to argue that
Congress impliedly precluded the State of Washington or non-profit organization Plaintiffs from raising
their ultra vires and APA claims here.  *See* Cross-Mot. at 12-13.  That same argument failed in *AFGE
v. Trump*: "We find it unlikely that Congress intended for the CSRA to preclude review for parties not
even covered by that statute who allege claims outside the MSPB's and FLRA's jurisdiction."  139
F.4th at 1033.  The statute at issue in *Block* precluded consumers from challenging regulatory milk
pricing market orders where the statute: 1) explicitly allowed only milk handlers and producers to
participate in the regulatory and adjudicatory process; and 2) expressly allowed consumers to
participate (only) by notice-and-comment.  467 U.S. at 348.  The Court concluded that permitting
consumers—expressly mentioned in the statute but *not* included in the adjudicatory process—to sue
under those circumstances would "nullify" the procedures Congress had intentionally established.  *Id.*
As the Supreme Court more recently explained: "[T]he mere fact that some acts are made reviewable
should not suffice to support an implication of exclusion as to others.  The right to review is too
important to be excluded on such slender and indeterminate evidence of legislative intent."  *Bowers v.
Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 674 (1986); *accord Sackett v. EPA*, 566 U.S. 120, 129
(2012).  In any event, the Supreme Court's decades-old interpretation of an entirely separate regulatory
scheme does not displace the Ninth Circuit's more recent interpretation of the CSRA and FSL-MRS.
*See AFGE v. Trump*, 139 F.4th at 1030-33.

1    equitable claim.  We do not think that the APA forecloses Plaintiffs' equitable claim.").  The Ninth

2    Circuit most recently applied that law in *AFGE v. Trump*, which expressly permitted Plaintiffs to

3    pursue both APA and *ultra vires* claims against federal agencies including OPM (along with claims

4    against the President) arising out of the same core allegations—namely, that the Trump

5    administration's government-wide reorganization and workforce reductions were in excess of and

6    contrary to statutory authority.  139 F.4th at 1033-40.

7         The Supreme Court has not held that APA and *ultra vires* review are mutually exclusive, and

8    the Government overreads the cases it relies on to contend that Plaintiffs may not pursue both claims,

9    as the Ninth Circuit has expressly allowed.  Cross-Mot. at 13.  First, *Bd. of Governors of the Fed.*

10   *Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43-44 (1991), interpreted the Financial Institutions

11   Supervisory Act's express preclusion provision (which stated "no court shall have jurisdiction to

12   affect by injunction or otherwise the issuance or enforcement of any notice or order under this

13   section…," *id.*); nothing comparable exists here.  Next, the recent *Nuclear Regul. Comm'n v. Texas*

14   decision involved the equally inapposite question of whether the Hobbs Act provision permitting

15   direct judicial review of agency adjudication in the Courts of Appeals allowed a *non-party* to join and

16   assert an *ultra vires* claim.  605 U.S. _, 145 S. Ct. 1762, 1775-76 (2025).  Finally, the cited passage

17   from *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327-28 (2015), holds that statutes can

18   displace equitable causes of action, but certainly does not hold that all statutes always do (indeed, it

19   goes on to examine whether the Medicaid Act does displace equitable claims, *id.*).  These cases do

20   not stand for the broadbrush statutory preclusion OPM asserts here.

21        Next, OPM argues that *ultra vires* claims are available only where the government acts

22   without any authority at all, or where action is contrary to "clear statutory prohibition."  Cross-Mot.

23   at 14.  Setting aside any dispute with the contours of the Government's characterization (which again

24   overreads the cases and skews far too narrowly), Plaintiffs' claims fall squarely within such a

25   standard.  OPM has no authority, whatsoever, to issue the orders it has here, and has directly defied

26   its own authorizing statutes as well as express delegations to other agencies.

27        Nor are Plaintiffs' *ultra vires* claims foreclosed by *Dalton v. Specter*, 511 U.S. 462, 473

28   (1994).  *Dalton* rejected the proposition that "whenever the President acts in excess of his statutory

authority, he also violates the constitutional separation of powers." *Id.* at 471. "But *Dalton* does not hold that *every* action in excess of statutory authority is *not* a constitutional violation." *Sierra Club v. Trump*, 963 F.3d at 889 (emphasis in original). OPM ignores the Ninth Circuit's subsequent *Dalton* jurisprudence, which allows separation-of-powers challenges to action lacking in "'statutory authority' and 'background constitutional authority.'" *Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (9th Cir. 2023) (quoting *Sierra Club v. Trump*, 929 F.3d at 696-97). That is precisely the nature of Plaintiffs' *ultra vires* claim, because neither the statutory scheme governing OPM nor any inherent constitutional authority allows OPM to direct the *en masse* termination of probationary employees—a fact OPM does not dispute.[8]

Finally, OPM contends that Plaintiffs' *ultra vires* claims fail because "OPM in fact did not direct other agencies' employment decisions [but] … merely provided guidance…." Cross-Mot. at 15. As explained above, that contention cannot be reconciled with the record. *Supra* at 2-7.

### IV.    Plaintiffs Are Entitled to Summary Judgment on Their APA Claims

#### A.    OPM's Actions Were Contrary to Law

Plaintiffs are entitled to summary judgment on their claim OPM's mass termination directive violates the APA's prohibition on agency action that is "not in accordance with law" for the same reasons that they are entitled to summary judgment on their *ultra vires* claims: OPM had no statutory authority to direct the mass termination of probationary employees in other agencies. 5 U.S.C. §706(2)(A), (C); *see also supra* at 11. OPM counters principally on the ground that it provided mere guidance to other agencies, Cross-Mot. at 15, but that is wrong, as already discussed. *Supra* at 2-7.

OPM also claims that Plaintiffs effectively conceded that "it was the agencies [that were] responsible for the terminations," because Plaintiffs asserted that "the relevant provisions of the CSRA 'do not permit agencies to terminate probationary employees, immediately and en masse, or

---

[8] OPM purports to dispute the "premise of Plaintiffs' *ultra vires* claim—that OPM has no authority to direct other agencies' employment decisions," Cross-Mot. at 15, by pointing to a provision of the CSRA authorizing OPM to "ascertain the fitness of applicants as to age, health, character, knowledge, and ability for the employment sought." 5 U.S.C. §3301. But OPM has never argued, and does not now argue, that its mass termination directive was justified by its authority to make negative suitability determinations. Nor could it.

for pretextual 'performance' reasons.'"  Cross-Mot. at 16-17.  Plaintiffs concede no such thing.  It is true that OPM's directive that agencies terminate all probationary employees except those already identified as "mission-critical" was incompatible with existing law.  *Compare* AR375 (directing termination of all non-mission-critical probationers) *with* 5 C.F.R. §§315.804, 315.805 (limiting the permissible reasons for terminating probationers to performance, misconduct, or reasons that predate the employee's federal employment).[9]  That is precisely why OPM instructed agencies to say they were terminating probationary employees on the basis of performance, a ground that would be lawful if it comported with employees' actual performance records.  *See* AR369, 375, 390.  OPM's instructions did not erase OPM's responsibility for the terminations, but rather reinforced it: OPM facilitated the execution of its unlawful directive by further directing agencies to disregard applicable law.  The APA prohibits such unlawful directives.  5 U.S.C. §706(2)(A), (C).

### B.    OPM's Actions Were Arbitrary and Capricious

The APA's prohibition on arbitrary and capricious action requires agencies to engage in "reasoned decisionmaking," *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020), by "examin[ing] the relevant data and articulat[ing] a satisfactory explanation for [their] action[s] including a rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) (quotations omitted). "Reliance on facts that an agency knows are false at the time it relies on them is the essence of arbitrary and capricious decisionmaking." *Missouri Pub. Serv. Comm'n v. FERC*, 337 F.3d 1066, 1075 (D.C. Cir. 2003); *see also State Farm*, 463 U.S. at 43 ("Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, [or] offered an explanation for its decision that runs counter to the evidence before the agency").  OPM's directives were arbitrary and capricious because, at minimum, they disregarded 5 C.F.R. §§315.804 and 315.805, which limit the grounds for probationary terminations and require the employing agency truthfully to "notify[] [the employee] in writing as to why he is being separated,"

---

[9] Executive Order 14284 (Apr. 24, 2025) purported to order OPM to rescind 5 C.F.R. Part 315, Subpart H, which includes 5 C.F.R. §§315.801-315.806.  The mass terminations at issue here occurred while Subpart H was in full force and effect.

1   and because they directed agencies to terminate all probationary employees except those previously

2   identified as "mission-critical" on the stated ground of performance, without regard for any

3   individualized assessment of an employee's actual performance.  Mot. at 15-16.

4        OPM's principal defense is to insist, yet again, that OPM "merely provided guidance to

5   agencies regarding how agencies could act 'in light of the President's directive to dramatically reduce

6   the size of the federal workforce.'"  Cross-Mot. at 18 (quoting AR375).[10]  That factual contention is

7   not consistent with the record.  *Supra* at 2-7.  Nor is the President's January 20, 2025 hiring freeze

8   memorandum somehow exculpatory.  That directive instructed agencies to "seek efficient use of

9   existing personnel and funds to improve public services and the provision of these services," and

10  directed the Office of Management and Budget, in consultation with OPM and DOGE, to "submit a

11  plan" within 90 days "to reduce the size of the Federal government's workforce through efficiency

12  improvements and attrition."  AR332-333.  Nothing in that memorandum (or the Administration's

13  general workforce reduction policy goals) purports to, or could lawfully, authorize OPM to direct *en*

14  *masse* terminations of probationary employees in complete disregard of existing federal regulations,

15  much less to facilitate such terminations by instructing agencies that employees may be terminated on

16  the false pretext of "performance" without regard for their actual performance.  *Supra* at 11.  The

17  President's January 20 hiring freeze memorandum does not mention probationary employees at all.

18            **C.      OPM Violated Notice-and-Comment Rulemaking Requirements**

19       When a federal agency promulgates a rule—"the whole or a part of an agency statement of

20  general or particular applicability or future effect designed to implement, interpret, or prescribe law

21  or policy," 5 U.S.C. §551(4)—that agency must first comply with the notice-and-comment

22  rulemaking process set forth in 5 U.S.C. §553.  The record shows that OPM did not.  *See* Mot. at 17-

23

---

24       [10] OPM makes much of the fact that the emails to which the template letters were attached do
25  not explicitly include an instruction that the agencies were required to use the template letters.  That
     misses the point.  As explained above, OPM ignores the mandatory language in those emails directing
26  agencies to terminate all probationary employees not already deemed mission-critical, and told them
     that employees' actual performance could be ignored.  AR375, 383-385.  In that context, OPM's
27  attachment of the template letter uniformly relying on performance (regardless of actual performance)
28  must be understood as meant to facilitate the execution of its unlawful directives.

1    19. Self-styled "guidance" or "interpretations" that are "inconsistent with prior rules," as OPM's

2    directives are here, *supra* at 5-6, are rules that require notice and comment.  *Hemp*, 333 F.3d at 1088.

3         Here, too, OPM repeats its argument that the January 20 memorandum and subsequent

4    communications announced only "guidance" or "general statements of policy" that would not trigger

5    notice-and-comment requirements.  Cross-Mot. at 20-22.  But, as OPM acknowledges, courts look to

6    whether "[g]uidance contains a great deal of language suggesting that its directions are mandatory" in

7    assessing whether such guidance amounts to a rule that requires notice and comment.  *Colwell v.*

8    *Dep't of Health & Human Servs.*, 558 F.3d 112, 1126 (9th Cir. 2009).  OPM can defeat the procedural

9    APA claim only if its directives to other agencies *were* mere "guidance," and, as explained, they were

10   not.  *Supra* at 2-7.  OPM has failed to explain away the "great deal" of mandatory language in its

11   communications to other agencies to terminate their probationary employees.

12        OPM next contends that its directives cannot have constituted "rules" subject to notice-and-

13   comment requirements because they left agencies "'free to exercise discretion.'"  Cross-Mot. at 21-22

14   (quoting *McClouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1320 (D.C. Cir. 1988)).  But the

15   APA's notice-and-comment requirements apply to "agency statement[s] of general *or* particular

16   applicability," 5 U.S.C. §551(4) (emphasis added); the fact that certain specifics are left to agency

17   discretion does not reduce a statement to mere guidance.  *See Texas v. United States*, 809 F.3d 134,

18   173 (5th Cir. 2015) (Even guidance that "purport[s] to grant discretion … can be binding if it is

19   applied by the agency in a way that indicates it is binding") (citation omitted); *Guardian Fed. Sav. &*

20   *Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 667 (D.C. Cir. 1978) ("The mere existence

21   of some discretion is not sufficient … for a rule to be classified as a general statement of policy.").

22   The relevant question is whether the relevant statements "*constrain*[] the agency's discretion."

23   *McLouth Steel Prods.*, 838 F.2d at 130 (emphasis added).  The record here makes plain that agency

24   discretion *was* constrained: to the extent that any agency sought to resist OPM's explicit directive to

25   "separate probationary employees" not already identified as "mission-critical," it had to "provide an

26   explanation of why" and secure an "exemption" from OPM.  AR375, 384; *see also* AR338-339, 357-

27   358, 382-386.  The administrative record does not contain a single example where an agency declined

28   to comply with OPM's directives without first obtaining permission from OPM.

Finally, OPM advances the remarkable argument that Plaintiffs cannot challenge OPM's "provision of a template letter," its attempt to "redefine[]" employee fitness and performance by instructing that only mission-critical employees were fit for continued employment, or the "exemptions process" by which OPM assumed authority to "grant" exemptions, because (says OPM) those theories were not pleaded with sufficient specificity in the operative complaint. Cross-Mot. at 17 n.5, 22. But the Second Amended Complaint gave OPM ample notice that Plaintiffs were challenging the pretextual aspect of OPM's mass-termination program, including specific allegations about the template letter and the ostensibly performance-based terminations of employees with exemplary performance records. *See* Dkt. 90 at 2, 4, 34-36. Those allegations were incorporated by reference into each claim for relief. *Id.* at 48-55.

As for the "exemptions process," its details first emerged in the Noah Peters deposition on March 26 (which OPM itself added to the record). *See* Dkt. 188-1, 197 at 2-3. OPM makes no argument that it did not have fair notice that the exemptions process was part of this case, nor could it. The implications of that process for the merits of this case were apparent once this Court relied on that process in granting the second preliminary injunction. Dkt. 202 at 5, 12-13. Regardless, even "where plaintiffs fail to raise a claim properly in their pleadings, ... if they raised it in their motion for summary judgment, they should be allowed to incorporate it by amendment under Fed. R. Civ. P. 15(b)." *Desertrain v. City of Los Angeles*, 754 F.3d 1147, 1154 (9th Cir. 2014) (cleaned up). If the Court deems it necessary, it should permit Plaintiffs to amend the complaint to conform to the facts as disclosed by the AR, including those concerning the "exemptions process."[11]

## V.    Plaintiffs' Requests for Relief Are Not Improper

OPM also objects to Plaintiffs' remaining requests for relief. Cross-Mot. at 24-27. Its objections ignore that Plaintiffs are entitled to "such relief as is necessary to accomplish complete justice"—including relief that fully unwinds all consequences of OPM's unlawful actions. *NW Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 680-81, 691 (9th Cir. 2007) (exercising "broad

---

[11] Even if OPM's exemptions process were not a "rule" whose validity the SAC directly places in issue, that process, as documented in the AR, confirms that OPM's directives to agencies were mandatory rather than mere guidance.

equitable powers under the APA to "set aside" an agency's unlawful transfer of functions to contractors by ordering relief that extended not only to the agency, but to the contractors to whom the functions were unlawfully transferred). The reason for naming the relief defendant agencies was to enable this Court to grant complete relief. Fed. R. Civ. P. 19(a); Dkt. 88 at 3-4.

Contrary to OPM's assertion that a declaratory judgment is unnecessary because OPM concedes that it had no authority to direct terminations at other agencies, Cross-Mot. at 24, OPM still refuses to concede that its actions were *ultra vires* and violated the APA. Plaintiffs' requested declaratory judgment (Dkt. 222-1) therefore remains necessary.

OPM further asserts that Plaintiffs' additional requests for relief would "inappropriately involve the Court in oversight of the employment decisions of agencies *other than OPM*" given the Executive Branch's "latitude" in the conduct of its own affairs. Cross-Mot. at 24-25 (emphasis in original). But courts "may not allow constitutional violations to continue simply because a remedy would involve intrusion into" government operations. *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th Cir. 2023). As Plaintiffs' motion explained, employees who were terminated on pretextual performance grounds at OPM's direction will suffer harm so long as their personnel files continue to reflect that falsehood; their future employment prospects may turn on how easily they can show they were not actually fired for cause. Mot. at 19-23. Relief that unwinds the harm caused by the implementation of OPM's orders is not unduly burdensome or overbroad.[12]

Next, OPM objects to Plaintiffs' request that the relief defendants issue corrective letters, because "these agency statements are not ultimately attributable to OPM." Cross-Mot. at 26. OPM ignores that this Court specifically ordered *relief defendants* to issue those corrective notices to undo the "stain created by OPM's pretense." Dkt. 202 at 25-26. As Plaintiffs explained, relief defendants

---

[12] OPM also contends, without evidence, that the relief defendant agencies cannot fix terminated employees' personnel records because those agencies "may have limited options in how to code a probationary employee's termination." Cross-Mot. at 26 n.7. For this proposition, OPM cites only 5 C.F.R. §315.804, which limits the permissible grounds for termination of probationary employees to "unsatisfactory performance or conduct." That citation certainly shows that the February OPM-ordered terminations were unlawful, but it does not support the assertion that the administrative task of writing some new code outweighs the need to provide complete relief.

have not complied with that order because their notices to affected employees included a further, contradictory statement that the Court's order was "legally and factually incorrect." *Carter v. Transport Workers Union of Am.*, 138 F.4th 164, 207-08 (5th Cir. 2025).

Finally, the Court should grant the requested remedies for the Department of Commerce employees at NOAA. OPM asserts that the decision to make the April 10 re-terminations of these employees "retroactive[] to February 27" was made by the agency, not OPM. Cross-Mot. at 26-27. But by making those terminations retroactive, the Department of Commerce is continuing to give effect to the unlawful February terminations ordered by OPM, in violation of this Court's order that any future terminations must be undertaken by agencies "wholly on [their] own." Dkt. 202 at 26.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for summary adjudication of Claims I-IV of the Second Amended Complaint, and deny OPM's cross-motion for summary judgment. Because Claim V is being dismissed without prejudice, and therefore nothing else of the case remains, the Court should enter judgment for Plaintiffs.

DATED: July 24, 2025

Scott A. Kronland
Stacey M. Leyton
Eileen B. Goldsmith
Danielle E. Leonard
Robin S. Tholin
James Baltzer
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151

By: */s/ Danielle Leonard*         

*Attorneys for Plaintiff Organizations*

Norman L. Eisen (*pro hac vice*)
Pooja Chaudhuri (SBN 314847)
STATE DEMOCRACY DEFENDERS
FUND
600 Pennsylvania Avenue SE #15180
Washington, DC 20003

Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Pooja@statedemocracydefenders.org

By: */s/ Norman L. Eisen*

*Attorneys for Plaintiff Organizations*

Rushab Sanghvi (SBN 302809)
AMERICAN FEDERATION OF GOVERNMENT
EMPLOYEES
80 F Street, NW
Washington, DC 20001
Tel: (202) 639-6426
Sanghr@afge.org

By: */s/ Rushab Sanghvi*

*Attorneys for Plaintiff American Federation of
Government Employees (AFGE)*

Teague Paterson (SBN 226659)
Matthew Blumin (*pro hac vice*)
AMERICAN FEDERATION OF STATE, COUNTY,
AND MUNICIPAL EMPLOYEES
1625 L Street, N.W.
Washington, D.C.  20036
Tel: (202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org

By: */s/Teague Paterson*

*Attorneys for Plaintiff American Federation of State
County and Municipal Employees (AFSCME)*

Tera M. Heintz (SBN 241414)
Cristina Sepe (SBN 308023)
Cynthia Alexander, WA Bar No. 46019 (pro hac vice)
Deputy Solicitors General
OFFICE OF THE WASHINGTON STATE ATTORNEY
GENERAL
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
tera.heintz@atg.wa.gov
cristina.sepe@atg.wa.gov
cynthia.alexander@atg.wa.gov

By: _/s/ Tera M. Heintz_

*Attorneys for Plaintiff State of Washington*