Scott A. Kronland (SBN 171693)
Stacey M. Leyton (SBN 203827)
Eileen B. Goldsmith (SBN 218029)
Danielle E. Leonard (SBN 218201)
Robin S. Tholin (SBN 344845)
James Baltzer  (SBN 332232)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel. (415) 421-7151
Fax (415) 362-8064
skronland@altber.com
sleyton@altber.com
egoldsmith@altber.com
dleonard@altber.com
rtholin@altber.com
jbaltzer@altber.com

*Attorneys for Plaintiff Organizations*

[Additional Counsel on signature page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO; AMERICAN FEDERATION OF STATE COUNTY and MUNICIPAL EMPLOYEES, AFL-CIO; *et al.* <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, *et al.*, <br><br><br> Defendants. | Case No. 3:25-cv-01780-WHA <br><br> **THIRD AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs American Federation of Government Employees, AFL-CIO ("AFGE"), American Federation of State County and Municipal Employees, AFL-CIO ("AFSCME"), AFGE Local 1216, United Nurses Associations of California/Union of Health Care Professionals, AFSCME, AFL-CIO ("UNAC/UHCP"), and AFGE Local 2110 (collectively, "Union Plaintiffs"), along with Main Street Alliance, Coalition To Protect America's National Parks, Western Watersheds Project, Vote Vets Action Fund Inc., Common Defense Civic Engagement, the American Public Health Association, the Association of Flight Attendants-CWA, AFL-CIO ("AFA"), the American Geophysical Union, Climate Resilient Communities, Point Blue Conservation Science, and the State of Washington (collectively, "Plaintiffs"), file this complaint seeking to enjoin the terminations of tens of thousands of federal employees in contravention of federal constitutional and statutory law, against Defendants the United States Office of Personnel Management ("OPM"), Acting OPM Director Charles Ezell, and the Federal Agency Defendants (listed below), who are sued solely for purposes of obtaining complete relief,) and hereby plead as follows:

## INTRODUCTION

1.     On or about February 13, 2025, Defendant OPM and its newly appointed Acting Director, Defendant Charles Ezell, ordered federal agencies across the country to terminate tens of thousands of federal employees by sending them standardized notices of termination, drafted by OPM, that falsely state that the terminations are for performance reasons.  OPM followed up this instruction on February 14, 2025 with a directive in writing to the Chief Human Capital Officers Council ("CHCO") for federal agencies, in which OPM reiterated the order to fire all probationary workers across the government other than those OPM permitted the agencies to retain as "mission critical," and to do so, falsely, for performance.

2.     Probationary employees are employees of the competitive service in their first year of employment in a particular position, and employees of the excepted service in their first two years of employment in a particular position (hereafter collectively "probationary employees").  Probationary employees may include experienced federal employees who have recently become employed in a new position or a new agency.

3.     OPM's directive that federal agencies terminate these employees en masse, on pretextual grounds, seeks to further the newly elected Presidential Administration's policy goals of dramatically curtailing the size and spending of the federal government.  But Congress, not OPM, controls and authorizes federal employment and related spending by the federal administrative agencies, and Congress has determined that each agency is responsible for managing its own employees.  OPM lacks the constitutional, statutory, or regulatory authority to order federal agencies to terminate employees in this fashion that Congress has authorized those agencies to hire and manage, and certainly has no authority to require agencies to perpetrate a massive fraud on the federal workforce by lying about federal workers' "performance," to detriment of those workers, their families, and all those in the public and private sectors who rely upon those workers for important services.

4.     OPM is an agency with no statutory authority to make termination decisions for federal employees (other than for OPM's own employees).  Notwithstanding this lack of legal authority, OPM ordered federal agencies throughout the nation, including in this District, to wipe out their ranks of probationary employees without any regard to applicable statutes, including the Administrative Procedure Act ("APA") and statutes governing federal employment and the respective roles of OPM and the agencies.

5.     OPM also ordered the agencies to use a template e-mail to terminate these workers, provided by OPM, that falsely inform employees that their terminations are for performance reasons rather than as part of a government-wide policy to reduce headcount that was authorized by no law.

6.     The federal agencies that followed OPM's directive did not otherwise have plans to terminate the entirety of their probationary workforce, who were employed in authorized positions to perform services that in each agency's judgment were needed to perform their statutorily mandated role.  In fact, some agencies have confirmed to their employees that they did not want to terminate their probationary employees but were directed to do so by OPM.  And they have confirmed that the notices of termination mandated by OPM were false, because the agencies were *not* firing the workers for performance reasons.

7.      As of the filing of this Second Amended Complaint, tens of thousands of probationary employees across dozens of federal agencies have already been terminated in the summary, assembly-line fashion directed by OPM.  Each day, more such employees receive notice of the termination of their federal employment.  The terminations have been conducted summarily, without any advance notice to the affected employees, throwing their lives, their families' lives, and the entire federal government into chaos.

8.      OPM, the federal agency charged with implementing this nation's employment laws, in one fell swoop has perpetrated one of the most massive employment frauds in the history of this country, telling tens of thousands of workers that they are being fired for performance reasons, when they most certainly were not.

9.      OPM's program is an unlawful *ultra vires* action outside the scope of any statutory or Constitutional authority.  OPM's program also violates the APA's prohibitions of unlawful, arbitrary and capricious, and procedurally improper agency action (including because this government-wide action was taken without notice and comment rule-making).  Where, as here, a federal agency has engaged in unlawful action contrary to the APA, the courts "shall …hold unlawful and set aside" that action.  5 U.S.C. § 702(2).

10.     The APA, was designed to "serve as the fundamental charter of the administrative state." *Kisor v. Wilkie*, 588 U.S. 558, 580 (2019) (plurality opinion) (internal quotation marks omitted).  As the Supreme Court recently explained, "Congress in 1946 enacted the APA 'as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices.'"  *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950)).  OPM's actions disrupt the constitutional balance of power and violate numerous federal statutes, running roughshod over fundamental protections against unlawful and arbitrary federal action.

11.     The Court should immediately enjoin OPM and all those Defendant Federal Agencies that have implemented or that intend to implement OPM's unlawful directive to terminate their

employees in an unlawful manner, to cease implementation of this mass pretextual terminations of probationary federal employees, and to rescind the unlawful terminations that already have occurred.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

13.     Venue is appropriate in this district under 28 U.S.C. § 1391(e).  Plaintiffs AFGE and AFGE Local 1216 represent probationary and trial-period federal employees whose place of employment is within the Northern District of California, and who have been terminated, or are subject to termination, because of OPM's illegal program.

14.     Intradistrict assignment is appropriate in the San Francisco/Oakland division of this Court.

## PARTIES

15.     Plaintiff AFGE, AFL-CIO, is a labor organization and unincorporated association headquartered at 80 F Street N.W., Washington, D.C. 20001.  AFGE, the largest union of federal employees, represents approximately 800,000 federal civilian employees through its affiliated councils and locals in every state in the United States, including employees of numerous agencies of the federal government, including the Department of Veterans Affairs ("VA"), Department of Education, National Institutes of Health, Small Business Administration, and others.  AFGE represents employees of the VA who are employed in San Francisco, Oakland, San Bruno, Eureka, Ukiah, Clearlake, and Martinez, California.

16.     Plaintiff AFSCME, AFL-CIO, is a labor organization and unincorporated association headquartered at 1625 L Street, N.W., Washington, D.C. 20036.  AFSCME is the largest trade union of public employees in the United States, with 1.4 million members organized into approximately 3,400 local unions, 58 councils and affiliates in 46 states, the District of Columbia and Puerto Rico. AFSCME unions represent federal civilian employees in numerous agencies and departments across the federal government, including the Federal Aviation Administration, the Department of Agriculture, the Peace Corps, Americorps, and the Veterans Administration.  Approximately 10,000

1    of Plaintiff AFSCME's members are federal employees; over 1.1 million are state and local

2    government employees, with the remainder retirees and private sector.

3        17.    Plaintiff AFGE Local 1216 is a labor organization and unincorporated association

4    headquartered at 4150 Clement Street, San Francisco, California 94121.  AFGE Local 1216

5    represents hundreds of VA employees who are employed in San Francisco, California.

6        18.    Plaintiff United Nurses Association of California/United Health Care Professionals,

7    AFSCME, AFL-CIO ("UNAC"), is a labor organization and an unincorporated association

8    headquartered at 955 Overland Ct., Suite 150, San Dimas, California 91773.  UNAC represents

9    employees of the VA who are employed at Pettis Memorial Hospital in Loma Linda, California.

10       19.    Plaintiff AFGE Local 2110 is a labor organization and unincorporated association

11   headquartered in Palo Alto, California.  AFGE Local 2110 represents approximately 4,000 employees

12   of the VA at the VA Palo Alto Health Care System, including its Menlo Park and Livermore

13   Divisions, and at several Community-Based Outpatient Clinics in Fremont, San Jose, Monterey, and

14   Capitola.  Those employees work in all non-supervisory classifications, including doctors, nurses,

15   emergency medical services personnel, food service workers, custodial staff, and administrative staff.

16       20.    Plaintiff Main Street Alliance ("MSA") is a national network of small businesses, with

17   approximately 30,000 members throughout the United States.  MSA helps small business owners

18   realize their full potential as leaders for a just future that prioritizes good jobs, equity, and community

19   through organizing, research, and policy advocacy.  MSA also seeks to amplify the voices of its small

20   business membership by sharing their experiences with the aim of creating an economy where all

21   small business owners have an equal opportunity to succeed.  MSA is nonpartisan and is a §501(c)(3)

22   organization.  MSA has approximately 1,410 small business members in California, including more

23   than 70 small businesses in Alameda, Santa Clara, San Francisco, Sonoma, and Contra Costa

24   Counties.

25       21.    Plaintiff Coalition to Protect America's National Parks ("Coalition") is a non-profit

26   organization made up of over 3,400 members, all of whom are current, former, and retired employees

27   and volunteers of the National Park Service. Together, they have accumulated over 50,000 years of

28

experience caring for America's most valuable natural and cultural resources. The Coalition's goal is to support the preservation and protection of the National Park System and the mission-related programs of the National Park Service ("NPS") to ensure the survival of the park system for generations to come. The Coalition's members are regular and avid users of the National Park System and NPS programs, as well as the national forests and other public lands, for recreation and conservation activities.

22.    Plaintiff Western Watersheds Project ("WWP") is a non-profit environmental conservation group that works to influence and improve public lands management throughout the western United States to protect native species and conserve and restore the habitats they depend on. WWP's primary focus is on the negative impacts of livestock grazing, including harm to ecological, biological, cultural, historic, archeological, scenic resources, wilderness values, roadless areas, Wilderness Study Areas and designated Wilderness. WWP was founded in 1993 and has more than 14,000 members and supporters and field offices in Idaho, Montana, Wyoming, Arizona, Nevada, and Oregon. WWP covers over 250 million acres of public land spanning all of the western states.

23.    Plaintiff Vote Vets Action Fund Inc. ("VoteVets") is a non-partisan, non-profit organization incorporated under the laws of the District of Columbia. Its purpose is to lift up the voices of veterans on matters of national security, veterans' care, and everyday issues that affect the lives of those who served as well as their families including foreign policy, veterans' unemployment, robust investment in care for veterans, energy security, protecting the rights of those who serve, and upholding the Constitution and democracy that every military member swore to uphold and protect. VoteVets has nearly two million supporters across the country, in all fifty states, with whom it regularly communicates about issues affecting veterans, including the operations, programs, and services available through the VA. Approximately 417,000 of VoteVets' supporters live in California, including 131,000 in Northern California.

24.    Plaintiff Common Defense Civic Engagement ("Common Defense") is a grassroots membership organization of progressive veterans, military families, and civilian supporters standing

THIRD AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                                    6

up for our communities against the rising tide of racism, hate, and violence. Common Defense invests in the leadership of its members through training and deployment in campaigns that connect directly to their history of service, including voting rights, climate justice, and anti-militarism. Approximately 33,187 of Common Defense's members live in California, including approximately 2,000 veterans.

25. Plaintiff the American Public Health Association ("APHA") is a non-partisan, non-profit organization that champions the health of all people and all communities; strengthens the profession of public health; shares the latest research and information; promotes best practices; and advocates for public health issues and policies grounded in scientific research. APHA represents more than 23,000 individual members who reside in all 50 states, including 2,100 individual members in California, and also has 52 state and regional affiliates. APHA is the only organization that combines a 150-year perspective, a broad-based member community, and the ability to influence federal policy to improve the public's health. APHA's membership additionally includes more than 250 California students in university public health schools or related programs, and over 50 California agency or organizational members, including the California Department of Public Health, Contra Costa County Public Health, Marin County Public Health, and the Los Angeles Trust for Children's Health.

26. Plaintiff Association of Flight Attendants-CWA, AFL-CIO ("AFA") is a labor union organized under the Railway Labor Act, 45 U.S.C. § 151, *et seq.* and serves as the leading voice for a safe, healthy and secure aircraft cabin for passengers and crew alike. AFA represents over 55,000 flight attendants at twenty airlines, including flight attendants employed by Alaska Airlines, Hawaiian Airlines, United Airlines, and Avelo Airlines who are based in San Diego, Los Angeles, Burbank, and San Francisco.

27. Plaintiff American Geophysical Union ("AGU") is a 501(c)(3) membership association for Earth and space scientists. The organization, founded in 1919, pursues a mission "to support and inspire a global community of individuals and organizations interested in advancing discovery in Earth and space sciences and its benefit for humanity and the environment." AGU has

more than 42,000 members worldwide, with 29,000 residing in the U.S.; approximately 8,400 of those members work in the federal government, 28,000 are university researchers, and 2,000 are scientists at nonprofit organizations.  In addition to traditional career support provided by an association, AGU publishes a portfolio of 24 high-impact scholarly journals and convenes regular scientific meetings, including its Annual Meeting, which had more than 30,000 attendees in 2024.

28.     Plaintiff Climate Resilient Communities ("CRC") is a small community-based non-profit organization that has grown rapidly through its grassroots work in environmental justice.  CRC works predominantly in southern San Mateo County in East Palo Alto, the Belle Haven neighborhood of Menlo Park, and the unincorporated community of North Fair Oaks.  CRC's work addresses the immediate needs of residents living in heavily polluted neighborhoods and suffering the consequences of decades of disinvestment and overt segregation, by, among other things, distributing air purifiers for children and elders with medical conditions, enrolling low-income families in utility payment assistance programs, making vital home safety repairs for low-income residents, and providing education and resources to help communities weather escalating climate disasters like the January 2025 Los Angeles wildfires.

29.     Plaintiff Point Blue Conservation Science ("Point Blue") is a nonprofit organization founded in 1965 and headquartered in Petaluma, California.  Its mission is to conserve birds, other wildlife, and ecosystems through science, partnership, and outreach.  Over six decades in conservation, Point Blue has curated long term ecological data sets, honed analytical methods, and built a deeply rooted culture of collaboration to address the significant challenges of our time.  Point Blue's 160 scientists are leaders in climate-smart conservation science and are spearheading nature-based solutions to threats to wildlife and our communities.  Point Blue's staff are experts in ecology, data management, restoration, evaluating and building solutions to environmental challenges, and more.  Point Blue records observations of the natural world using rigorous, standardized protocols and use analyses of these observations to deepen our community's understanding of nature to improve conservation outcomes, partnering with local, state, and federal agencies to implement conservation solutions, including the US Department of Defense, the USDA Natural Resources

Conservation Service, NOAA, the National Science Foundation, and the US Fish and Wildlife Service.

30.     Plaintiff State of Washington, represented by and through its Attorney General, is a sovereign state of the United States of America. The Attorney General is Washington's chief law enforcement officer and is authorized under Washington Revenue Code § 43.10.030 to pursue this action.

31.     Plaintiffs bring the claims in this complaint on their own behalf and on behalf of their members.

32.     Defendant Office of Personnel Management ("OPM") is a federal agency headquartered in Washington, D.C.  OPM is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).

33.     Defendant Charles Ezell has been the Acting Director of OPM since January 20, 2025. He is sued in his official capacity.

**Defendants Named for Relief Purposes Only**

34.     Defendant United States Department of Agriculture ("USDA" or "Agriculture") is a federal agency headquartered in Washington, D.C.  USDA is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  USDA's component sub-agencies include the Forest Service, the Natural Resources Conservation Service, the Agricultural Marketing Service, and the Food and Nutrition Service, among others.  USDA is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM email.   Defendant USDA is named solely for purposes of obtaining complete relief.

35.     Defendant Brooke Rollins is the Secretary of Agriculture and is sued in her official capacity.  Defendant Rollins is named solely for purposes of obtaining complete relief.

36.     Defendant United States Department of Commerce ("Commerce") is a federal agency headquartered in Washington, D.C.  Commerce is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  Commerce's component sub-agencies

include the National Oceanic and Atmospheric Administration ("NOAA"), the National Weather Service, and the National Marine Fisheries Service ("NMFS"). Commerce is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM email. Defendant Commerce is named solely for purposes of obtaining complete relief.

37. Defendant Howard Lutnick is the Secretary of Commerce and is sued in his official capacity. Defendant Lutnick is named solely for purposes of obtaining complete relief.

38. Defendant United States Department of Defense ("DoD" or "Defense") is a federal agency headquartered in Washington, D.C. USDA is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1). DoD is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM email. Defendant DoD is named solely for purposes of obtaining complete relief.

39. Defendant Pete Hegseth is the Secretary of Defense and is sued in his official capacity. Defendant Hegseth is named solely for purposes of obtaining complete relief.

40. Defendant United States Department of Education ("Education") is a federal agency headquartered in Washington, D.C. Education is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1). Education is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM email. Defendant Education is named solely for purposes of obtaining complete relief.

41. Defendant Linda McMahon is the Secretary of Education and is sued in her official capacity. Defendant McMahon is named solely for purposes of obtaining complete relief.

42. Defendant United States Department of Energy ("Energy") is a federal agency headquartered in Washington, D.C. Energy is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1). Energy is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving

the February 14, 2025 OPM email.  Defendant Energy is named solely for purposes of obtaining complete relief.

43.     Defendant Chris Wright is the Secretary of Energy and is sued in his official capacity. Defendant Wright is named solely for purposes of obtaining complete relief.

44.     Defendant United States Department of Health and Human Services ("HHS") is a federal agency headquartered in Washington, D.C.  HHS is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  HHS's component sub-agencies include the Centers for Disease Control and Prevention (CDC), the Food and Drug Administration (FDA), the National Institutes of Health (NIH), and the Health Resources and Services Administration (HRSA).   HHS is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM email. Defendant HHS is named solely for purposes of obtaining complete relief.

45.     Defendant Robert F. Kennedy Jr. is the Secretary of HHS and is sued in his official capacity.  Defendant Kennedy is named solely for purposes of obtaining complete relief.

46.     Defendant United States Department of Homeland Security ("DHS") is a federal agency headquartered in Washington, D.C.  DHS is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  DHS is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM email.  Defendant DHS is named solely for purposes of obtaining complete relief.

47.     Defendant Kristi Noem is the Secretary of DHS and is sued in her official capacity. Defendant Noem is named solely for purposes of obtaining complete relief.

48.     Defendant United States Department of Housing and Urban Development ("HUD") is a federal agency headquartered in Washington, D.C.  HUD is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  HUD is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving

the February 14, 2025 OPM email.  Defendant HUD is named solely for purposes of obtaining complete relief.

49.     Defendant Scott Turner is the Secretary of HUD and is sued in his official capacity. Defendant Turner is named solely for purposes of obtaining complete relief.

50.     Defendant United States Department of Justice ("DOJ") is a federal agency headquartered in Washington, D.C.  DOJ is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  DOJ is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM email.  Defendant DOJ is named solely for purposes of obtaining complete relief.

51.     Defendant Pam Bondi is the Attorney General and is sued in her official capacity. Defendant Bondi is named solely for purposes of obtaining complete relief.

52.     Defendant United States Department of the Interior ("DoI" or "Interior") is a federal agency headquartered in Washington, D.C.  Interior is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  Interior's component sub-agencies include the U.S. Fish and Wildlife Service ("FWS"), the U.S. National Park Service ("NPS") and the Bureau of Land Management ("BLM").  Interior is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM email.  Defendant DoI is named solely for purposes of obtaining complete relief.

53.     Defendant Doug Burgum is the Secretary of the Interior and is sued in his official capacity.  Defendant Burgum is named solely for purposes of obtaining complete relief.

54.     Defendant United States Department of Labor ("DOL") is a federal agency headquartered in Washington, D.C.  DOL is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  DOL is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM email.  Defendant DOL is named solely for purposes of obtaining complete relief.

55.     Defendant Lori Chavez-DeRemer is the Secretary of Labor and is sued in her official capacity.  Defendant Chavez-DeRemer is named solely for purposes of obtaining complete relief.

56.     Defendant United States Department of State ("State") is a federal agency headquartered in Washington, D.C.  State is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  State is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM email.  Defendant State is named solely for purposes of obtaining complete relief.

57.     Defendant Marco Rubio is the Secretary of State and is sued in his official capacity.  Defendant Rubio is named solely for purposes of obtaining complete relief.

58.     Defendant United States Department of Treasury ("Treasury") is a federal agency headquartered in Washington, D.C.  Treasury is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  Treasury's component sub-agencies including the Internal Revenue Service ("IRS").  Treasury is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM email.  Defendant Treasury is named solely for purposes of obtaining complete relief.

59.     Defendant Scott Bessent is the Secretary of Treasury and is sued in his official capacity.  Defendant Bessent is named solely for purposes of obtaining complete relief.

60.     Defendant United States Department of Transportation ("DOT") is a federal agency headquartered in Washington, D.C.  DOT is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  DOT's component subagencies include the Federal Aviation Administration ("FAA").  DOT is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM email.  Defendant DOT is named solely for purposes of obtaining complete relief.

61.     Defendant Sean Duffy is the Secretary of Transportation and is sued in his official capacity.  Defendant Duffy is named solely for purposes of obtaining complete relief.

62.     Defendant United States Veterans' Administration ("the VA") is a federal agency headquartered in Washington, D.C.  The VA is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  The VA is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM email.  Defendant the VA is named solely for purposes of obtaining complete relief.

63.     Defendant Doug Collins is the Secretary of the VA and is sued in his official capacity. Defendant Collins is named solely for purposes of obtaining complete relief.

64.     Defendant United States Environmental Protection Agency ("EPA") is a federal agency headquartered in Washington, D.C.  EPA is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  EPA is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM email.  Defendant EPA is named solely for purposes of obtaining complete relief.

65.     Defendant Lee Zeldin is the EPA Administrator and is sued in his official capacity. Defendant Zeldin is named solely for purposes of obtaining complete relief.

66.     Defendant United States General Services Administration ("GSA") is a federal agency headquartered in Washington, D.C.  GSA is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  GSA is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM email.  Defendant GSA is named solely for purposes of obtaining complete relief.

67.     Defendant Robin Carnahan is the GSA Administrator and is sued in her official capacity.  Defendant Carnahan is named solely for purposes of obtaining complete relief.

68.     Defendant United States National Aeronautics and Space Administration ("NASA") is a federal agency headquartered in Washington, D.C.  NASA is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  NASA is one of the Federal

Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM email. Defendant NASA is named solely for purposes of obtaining complete relief.

69.    Defendant Janet Petro is the NASA Acting Administrator and is sued in her official capacity. Defendant Petro is named solely for purposes of obtaining complete relief.

70.    Defendant National Science Foundation ("NSF") is a federal agency headquartered in Alexandria, Virginia. NSF is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1). EPA is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM email. Defendant NSF is named solely for purposes of obtaining complete relief.

71.    Defendant Brian Stone is the NSF Chief of Staff, performing the duties of the Director of the NSF and is sued in his official capacity. Defendant Stone is named solely for purposes of obtaining complete relief.

72.    Defendant United States Office of Management and Budget ("OMB") is a federal agency headquartered in Washington, D.C. OMB is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1). OMB is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM email. Defendant OMB is named solely for purposes of obtaining complete relief.

73.    Defendant Russell Vought is the Director of OMB and is sued in his official capacity. Defendant Vought is named solely for purposes of obtaining complete relief.

74.    Defendant United States Small Business Administration ("SBA") is a federal agency headquartered in Washington, D.C. SBA is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1). SBA is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM email. Defendant SBA is named solely for purposes of obtaining complete relief.

75.    Defendant Kelly Loeffler is the Administrator of the SBA and is sued in her official capacity.  Defendant Loeffler is named solely for purposes of obtaining complete relief.

76.    Defendant United States Social Security Administration ("SSA") is a federal agency headquartered in Baltimore, Maryland.  SSA is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  SSA is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM email.  Defendant SSA is named solely for purposes of obtaining complete relief.

77.    Defendant Frank Bisignano is the Commissioner of the SSA and is sued in his official capacity.  Defendant Bisignano is named solely for purposes of obtaining complete relief.

78.    The "Federal Agency Defendants" include all those federal agencies and their agency heads that were ordered by OPM to terminate probationary employees, as identified in the preceding paragraphs ¶¶34-77.

79.    The Federal Agency Defendants are each named solely pursuant to Rule 19(a)(1)(A) for purposes of effectuating complete relief as to Claims One through Four against Defendants OPM and Ezell.

## FACTUAL ALLEGATIONS

### I.    Statutes and Regulations Governing Termination of Federal Employment

#### A.    Congressional Authorization to Federal Agencies and OPM

80.    Congress created the federal agencies that employ federal workers through an exercise of its Article I legislative power.  The executive agencies of the federal government are identified in various statutes, including 5 U.S.C. § 101 (listing agencies).

81.    Each agency has its own authorizing statutes that govern its administration, including statutory provisions that authorize one or more individuals to act as the head of the agency.  *See e.g.*, 10 U.S.C. §§ 111, 113 (Defense); 12 U.S.C. § 5491 (CFPB); 16 U.S.C. § 551 (Agriculture/Forest Service); 26 U.S.C. §§ 7801, 7803 (IRS); 38 U.S.C. §§ 301, 303 (VA); 42 U.S.C. §§ 202, 203 (HHS);

42 U.S.C §§ 281, 282 (NIH); 42 U.S.C. §§3411, 3412 (Education); 42 U.S.C. § 7131 (Energy); 51 U.S.C. § 20111 (NASA).

82.    Congress has also authorized, in these agency-specific establishing statutes, each agency head to exercise powers of management over that agency and its employees, including the hiring and firing of employees, consistent with any generally applicable laws.  For example:

- 26 U.S.C. §§ 7803, 7804 (IRS: "the Commissioner of Internal Revenue is authorized to employ such number of persons as the Commissioner deems proper for the administration and enforcement of the internal revenue laws, and the Commissioner shall issue all necessary directions, instructions, orders, and rules applicable to such persons.");

- 42 U.S.C. §§ 7231, 7253 (Energy: "In the performance of his functions the Secretary is authorized to appoint and fix the compensation of such officers and employees, including attorneys, as may be necessary to carry out such functions. Except as otherwise provided in this section, such officers and employees shall be appointed in accordance with the civil service laws …"; "the Secretary is authorized to establish, alter, consolidate or discontinue such organizational units or components within the Department as he may deem to be necessary or appropriate.");

- 20 U.S.C. § 3461 (Education: "The Secretary is authorized to appoint and fix the compensation of such officers and employees, including attorneys, as may be necessary to carry out the functions of the Secretary and the Department.  Except as otherwise provided by law, such officers and employees shall be appointed in accordance with the civil service laws …");

- 42 U.S.C. § 203 (HHS: "The Secretary is authorized … to establish within them such divisions, sections, and other units as he may find necessary; and from time to time abolish, transfer, and consolidate divisions, sections, and other units and assign their functions and personnel in such manner as he may find necessary for efficient operation of the Service.");

- 12 U.S.C. § 5492 (CFPB: "The Bureau is authorized to establish the general policies of the Bureau with respect to all executive and administrative functions, including—…(7) the appointment and supervision of personnel employed by the Bureau; (8) the distribution of business among personnel appointed and supervised by the Director and among administrative units of the Bureau");

- *See also, e.g.,* 16 U.S.C. §§ 551, 554a, e (Agriculture; management and employment in Forest Service); 38 U.S.C. §§ 303, 510 (VA: Secretary; "control, direction, and management of the Department"; "authority to reorganize offices"); 10 U.S. C. § 113 (DoD: Secretary; "authority, direction, and control over the Department of Defense"); 42 U.S.C. § 282 (NIH:  Director,

management authority); 51 U.S.C. §§ 20111, 20113  (NASA: Administrator "shall have authority and control over all personnel and activities thereof.").

83.     In addition to the specific authority granted to each agency head by these authorizing statutes, Congress also enacted a "General authority to employ" that applies to all federal agencies:

> Each Executive agency, military department, and the government of the District of Columbia may employ such number of employees of the various classes recognized by chapter 51 of this title as Congress may appropriate for from year to year.

5 U.S.C. § 3101.

84.     Besides this specific authority regarding employment decisions, Congress also delegated general authority to each federal agency head to adopt regulations "for the government of his department, the conduct of its employees, the distribution and performance of its business…" 5 U.S.C. § 301; *see also* 5 U.S.C. § 302 (authorizing agency heads to delegate their authority to subordinate employees).

85.     Congress also enacted the Civil Service Reform Act of 1978 ("CSRA") to establish uniform standards for agencies and civil service employment across the federal government.  5 U.S.C. § 2101 (defining "civil service"); § 2015 (defining "employee").  The provisions of the CSRA include statutes governing agency termination of employees for cause based on performance (5 U.S.C. § 4303(a); 5 U.S.C. § 7513(a)), and agency layoffs ("reductions in force, or "RIFs") (5 U.S.C. § 3502).

86.     Congress also established the OPM by statute.  5 U.S.C. § 1101.  Congress did *not* authorize the OPM to hire or fire any federal employees employed by any agency other than OPM itself.  5 U.S.C. §§ 1102, 1103.  Rather, OPM's role, as established by Congress, is to act as the human resources agency for the federal government, including by creating and publishing government-wide rules in compliance with the APA.  5 U.S.C. §§ 1103, 1105.  OPM's authority with respect to the termination of employees of other agencies and departments is limited to providing technical assistance and writing regulations.  5 U.S.C. §§ 4304, 4305, 7514.

87.     As the Acting Solicitor General recently confirmed in a petition to the U.S. Supreme Court on behalf of the President and other federal officials, "*[a]gency heads control hiring and firing*

*decisions for subordinates*—here, an agency of over 100 people who perform important investigative and enforcement functions affecting the entire federal workforce."  Thus, in support of its request to vacate a district court temporary restraining order reinstating the head of the Office of Special Counsel, the federal government argued that the President's inability to remove the head of the agency deprived him of the power to control agency's employees—because *only the agency head* is authorized to hire and fire an agency's employees.[1]

### B.        Probationary and Trial-Period Employees in Federal Service

88.        Approximately 200,000 probationary employees are employed in agencies throughout the federal government nationwide.[2]  Of these, at least 15,000 are employed in California, providing services that range from fire prevention to veterans' care.

89.        OPM's mass termination program has swept up two categories of federal employees, whose employment is governed by statute and regulation: probationary employees in the "competitive" service, and employees within their first two years of employment in a position in the "excepted" service.  Plaintiffs refer herein to all such employees as "probationary employees."

90.        Probationary employees in the competitive service are, with some exceptions, those who have been employed in their current position for less than one year.  5 U.S.C. § 7511(a)(1)(A)(ii); 5 C.F.R. § 315.801.  Employees are appointed as "career" or "career-conditional employees" subject to completing the probationary period.  5 C.F.R. § 315.201(a).

91.        The probationary period provides the opportunity for the federal agency to assess the individual performance of the employee.  Under governing OPM regulations, an agency "shall utilize the probationary period as fully as possible to determine the fitness of the employee and shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment."  5 C.F.R. § 315.803(a).

---

[1] Application to Vacate the Order Issued by the U.S. District Court for the District of Columbia and Request for an Immediate Administrative Stay, *Bessent v. Dellinger*, No. 24A790, https://www.documentcloud.org/documents/25536868-dellinger-scotus-emergency-filing/?mode=document at 27 (filed U.S. Supreme Court Feb. 16, 2025).

[2] https://www.businessinsider.com/trump-administration-fired-probationary-federal-workers-veterans-affairs-agencies-2025-2

92.     Most employees in the excepted service are also subject to a statutory trial period of two years, which, like the probationary period in the competitive service, is intended to permit the agency to evaluate the employee's performance and fitness for long-term employment in that position.  5 U.S.C. § 7511(a)(1)(C)(ii).

93.     Probationary employees throughout the federal government often have many years (or even decades) of federal service, and can include those who have transferred to a new agency or who are newly promoted to supervisory or management positions.

## C.    Regulations Governing the Termination of Probationary Employees

94.     Federal agencies may lawfully terminate probationary employees based on the agency's assessment of the employee's performance during the probationary period, pursuant to 5 C.F.R. § 315.804(a), which is entitled: "Termination of probationers for unsatisfactory performance or conduct."

95.     Under that regulation, "when an agency decides to terminate an employee serving a probationary or trial period because his work performance or conduct during this period fails to demonstrate his fitness or his qualifications for continued employment, it shall terminate his services by notifying him in writing as to why he is being separated and the effective date of the action."  5 C.F.R. § 315.804(a).  "The information in the notice as to why the employee is being terminated shall, as a minimum, consist of the agency's conclusions as to the inadequacies of his performance or conduct."  *Id.*  Trial-period employees in the excepted service have the same notice rights when removed from their positions for performance reasons.  5 C.F.R. § 316.304.

96.     Federal agencies may also lawfully terminate a probationary employee "for reasons based in whole or in part in conditions arising before his appointment."  5 C.F.R. § 515.805.

## D.    Statutes and Regulations Governing the Termination of Employees as Part of a RIF

97.     Federal agencies may also terminate probationary employees as part of an agency RIF.  An agency may conduct a RIF "to reduce the size of its workforce."  *Tiltti v. Weise*, 155 F.3d 596, 601 (2d Cir. 1998).  "RIFs are not aimed at removing particular individuals; rather, they are directed solely at positions."  *Grier v. Dep't of Health & Hum. Servs.*, 750 F.2d 944, 945 (Fed. Cir. 1984).

98.     Agencies must follow specific statutory directives in conducting a RIF, including detailed requirements for retention preferences, considerations for veterans, and the consideration of tenure of employment and length of service.  5 U.S.C. § 3502(a)(1), (3).  Congress delegated to OPM the authority to promulgate regulations that agencies must follow in implementing RIFs.  5 U.S.C. § 3502(a).

99.     Pursuant to that statutory authorization, and through notice-and-comment rulemaking, OPM has issued detailed regulations setting forth the procedures by which RIFs must be conducted. *See* 5 C.F.R. Part 351.  These RIF regulations apply whenever an agency determines that it is necessary to release employees "because of lack of work; shortage of funds; insufficient personnel ceiling; reorganization; the exercise of reemployment rights or restoration rights; or reclassification of an employee's position due to erosion of duties … ."  5 C.F.R. § 351.201(a)(2).

100.    All agencies of the federal government are required to comply with the RIF regulations whenever an agency "determines that a reduction force is necessary."  5 C.F.R. § 351.204; *see also* 5 C.F.R. § 351.201(c) ("Each agency is responsible for assuring that the provisions in this part are uniformly and consistently applied in any one reduction in force.").

101.    The RIF regulations apply to employees in the competitive and excepted services.  5 C.F.R. § 351.202(a), (b).  Probationary employees are expressly protected by the RIF regulations.  5 C.F.R. §§ 351.501(b)(2), 351.502(b)(2).  Probationary employees are included in "group II" of three groups of employees, and may only be released, in order of retention, after the release of "group III" employees, a group that includes employees under various temporary, term, and other provisional appointments.  5 C.F.R. § 351.501(b).

102.    Before conducting a RIF, a federal agency must establish "competitive areas in which employees compete for retention."  5 C.F.R. § 351.402.  Thus, RIFs are not conducted based on agency-wide seniority.  Many probationary employees are veterans or would otherwise be entitled to preference in the event of a RIF.

103.    The RIF regulations require that employees receive notice of at least 60 days before being released from employment, or at least 30 days from when the RIF is caused by circumstances that were not reasonably foreseeable.  5 C.F.R. § 351.801(a), (b).

104.    The governing statute and the RIF regulations also require that states and local governments be notified in advance of RIFs of 50 or more employees in an affected geographic area so they can be prepared to assist affected employees.  5 U.S.C. § 3502; 5 C.F.R. § 351.803.

## II.    OPM's Unlawful February 13, 2025 Order to Fire Probationary Employees Across the Nation

105.    Before the first day of the new Presidential Administration, OPM had never taken the position that it had the authority to direct other agencies to terminate employees.  As of early January 2025, the Acting OPM Director was Rob Shriver.  On January 16, 2025, he issued a press release, and gave an interview discussing OPM's work with agencies throughout the federal government on issues ranging from "skills-based federal hiring"; the ""retirement claims backlog"; a "new health insurance program for Postal workers"; and, significantly, "*how agencies recruit and retain early-career employees*." (Emphasis added).[3]  No mention was made of any federal government plan to terminate the employment of probationary employees at any agency, or across the nation.

106.    Before January 20, 2025, OPM had made no public statement regarding any program to terminate probationary employees.  Neither had any agency in the federal government made any public statement regarding any desire to terminate probationary employees.  No union or group of federal employees had been provided any notice of any program or decision to terminate probationary employees.  On information and belief, before January 20, 2025, OPM had no plans to order federal agencies to terminate their probationary employees, and no agency had such a plan.

107.    Before January 20, 2025, no OPM Director had ever taken the position that OPM had the legal authority to direct agencies to terminate the employment of employees of other federal agencies.

---

[3] https://federalnewsnetwork.com/workforce/2025/01/after-years-of-work-opm-is-hitting-on-all-cylinders-acting-director-says/.

108.    On January 20, 2025, the first day of the incoming Presidential Administration, President Donald J. Trump appointed Charles Ezell to serve as Acting OPM Director.

109.    The same day, Acting OPM Director Ezell distributed a memo to "Heads and Acting Heads of Departments and Agencies" regarding "Guidance on Probationary Periods, Administrative Leave and Details."  In this memo, Acting Director Ezell directed department and agency heads to submit to OPM, no later than January 24, 2025, a report listing all "employees on probationary periods, who have served less than a year in a competitive service appointment, or who have served less than two years in an excepted service appointment."[4]  The memorandum directed agencies to "promptly determine whether these employees should be retained at the agency."[5]

110.    OPM required agencies to adhere to a *200-character limit* in any explanation provided as to why any individual employee should be retained by the agency.[6]

111.    On February 11, 2025, President Trump issued Executive Order 14210, entitled "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative."[7]  The Executive Order instructed that "Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs)."[8]

112.    OPM did not wait for agencies to plan for or initiate any RIF.

113.    On or about February 13, 2025, OPM officials met with agency leaders across the federal government and directed them to begin firing their probationary employees without following RIF procedures.[9]

------

[4] https://www.opm.gov/media/yh3bv2fs/guidance-on-probationary-periods-administrative-leave-and-details-1-20-2025-final.pdf

[5] *Id.*

[6] https://federalnewsnetwork.com/workforce/2025/02/opm-asks-agencies-to-justify-keeping-probationary-employees/

[7] https://www.whitehouse.gov/presidential-actions/2025/02/implementing-the-presidents-department-of-government-efficiency-workforce-optimization-initiative/

[8] *Id.*

[9] https://thehill.com/homenews/administration/5144113-federal-probationary-employees-fired/ (Feb. 13, 2025); https://www.washingtonpost.com/dc-md-va/2025/02/13/trump-administration-fires-probationary-federal-workers/ (Feb. 13, 2025); https://apnews.com/article/trump-federal-workers-layoffs-doge-406752da1614755b8fabe9c94e0c71a8 (Feb. 13, 2025).

114.    CBS News has reported that:  "**The decision on probationary workers**, who generally have less than a year on the job, **came from the Office of Personnel Management**, which serves as a human resources department for the federal government.  The notification was confirmed by a person familiar with the matter, who spoke on condition of anonymity because they weren't authorized to discuss it publicly."  (Boldface added.)[10]

115.    On information and belief, as of February 13, 2025, prior to the order from OPM, no federal agency intended to terminate its probationary employees en masse, and no agency intended to terminate probationary employees (other than on an individualized basis for actual performance or conduct reasons) without complying with RIF procedures.

116.    On February 14, 2025, OPM sent an email with the subject "Follow up: CHCO Council Special Session."[11]  The CHCO is the "Chief Human Capital Officers Council," an entity established by statute.[12]   The statutory purpose of the CHCO is publicly set forth:

> The CHCO Council is the principal interagency forum to advise and coordinate the activities of the agencies of its members on such matters as modernization of human resources systems, improved quality of human resources information and legislation affecting human resources operations and organization[13]

The CHCO statutory mandate does not include acting as a conduit for OPM orders to agencies regarding their employees, or receiving or effectuating instruction from OPM on terminating any employees.

117.    OPM sent the February 14 email to the "CHCOs and Deputy CHCOs."  OPM's public website identifies all of the following individuals as CHCOs and Deputy CHCOs of the agencies:

- Agriculture (CHCO Anita Adkins; Acting Deputy CHCO Michelle Long)

---

[10]https://www.cbsnews.com/news/federal-layoffs-probationary-workers-warnings-bigger-cuts-on-way/

[11] This email was revealed for the first time to the public on February 26, 2025 as an exhibit to the Ezell Declaration in support of Defendants' opposition to the TRO in this case, which was submitted after the filing of Plaintiffs' First Amended Complaint.   A copy of the document submitted by Defendants is attached hereto as **Exhibit A.**

[12] CHCO was created by the Chief Human Capital Officers Act of 2002 (Act), which was enacted as part of the Homeland Security Act, Public Law 107-296.

[13] https://beta.chcoc.gov/static/content/CHCOCouncilCharterFinal20211214.pdf

- Commerce (CHCO Jessica Palatka; Deputy CHCO VACANT)
- Defense (CHCO Zev Goldrich; Acting Deputy CHCO Daniel Hester)
- Education (CHCO Jacqueline Clay; Deputy CHCO Bonnie Hochhalter])
- Energy (CHCO Erin Moore; Deputy CHCO Todd Turner)
- HHS (CHCO Jeffery Anoka, Deputy CHCO Jonathan Gardner)
- Homeland Security (CHCO Roland Edwards, Deputy CHCO Roger Brown)
- HUD (CHCO Lori Michalski, Deputy CHCO Priscilla Clark)
- Interior (CHCO Mark Green, Deputy CHCO Jennifer Ackerman)
- Justice (CHCO Mike Williams, Deputy CHCO VACANT)
- Labor (CHCO Sydney Rose, Deputy CHCO Carin Otero)
- State (CHCO Marcia Bernicat, Deputy CHCO Jameela Akbari)
- Treasury (CHCO Trevor Norris, Deputy CHCO VACANT)
- Transportation (CHCO VACANT, Deputy CHCO Anne Audet)
- VA (CHCO Tracey Therit, Deputy CHCO VACANT)
- EPA (CHCO Helena Wooden-Aguilar, Deputy CHCO Mara Kamen)
- GSA (CHCO Arron Helm, Deputy CHCO Jermey Taylor)
- NASA (CHCO Kelly Elliot, Deputy CHCO Anne Roemer)
- NSF (CHCO Wonzie Gardner, Deputy CHCO Eric Dilworth)
- OMB (CHCO Sarah Spoone, Deputy CHCO VACANT)
- OPM (CHCO Carmen Garcia< Deputy CHCO Joe Knouff)
- Office of the Dir. Nat. Intelligence (CHCO Cynthia Snyder; Deputy CHCO VACANT)
- SBA (CHCO Elias Hernandez, Deputy CHCO Julie Brill)
- SSA (CHCO Florence Felix-Lawson, Deputy CHCO Kristen Medley-Proctor)
- USAID (CHCO Cynthia Snyder, Deputy CHCO Sheila Wright)

- Small Agency Human Resources Council Chair Arrie Etheridge; Deputy Chair Star Anderson)[14]

118. The Small Agency Council is an "association of sub-Cabinet, independent Federal agencies," that "represents about 80 small agencies." The Small Agency Council Human Resources representatives "supports these employees by working with OPM and the CHCO Council on the various Government-wide priorities."[15]

119. The Merit Systems Protection Board ("MSPB") and Federal Labor Relations Authority ("FLRA") are members of the Small Agency Council and are among the small independent agencies instructed by the February 14 email to terminate probationary employees.[16]

120. In the February 14 email, OPM instructed these CHCOs and Deputy CHCOs at each federal agency as to the "immediate next steps for probationary employees." OPM stated: "We have asked that you separate probationary employees that you have not identified as mission-critical no later than end of day Monday, 2/17 [President's Day, a federal holiday]. We have attached a template letter." The email further instructed agencies that "OPM believes 'qualifications for continued employment' in the current context means that only the highest-performing probationers in mission-critical areas should be retained."

121. The February 14, 2025 email then instructed agencies that, "[a]fter *actioning*" (emphasis added), they must update their previous probationary worker spreadsheets and submit those lists to OPM, and continue to do so every day.

122. OPM's template letter attached to the February 14 email stated:

MEMORANDUM FOR [EMPLOYEE], [TITLE], [ORGANIZATION]
FROM: [NAME]
[TITLE]
SUBJECT: Notification of Termination During Probationary Period
REFERENCES: 5 U.S.C. § 7511
[5 U.S.C. § 3321(a)]
[5 C.F.R. §§ 315.803 and 804]

---

[14] https://beta.chcoc.gov/members
[15] https://www.chcoc.gov/content/small-agency-human-resources-council-sahrc
[16] *E.g.*,https://www.chcoc.gov/content/small-agency-human-resources-council-sahrc and https://www.sac.gov/about/members.htm

[5 C.F.R. § 316.304]
[INSERT AGENCY POLICY]

This is to provide notification that the Agency is removing you from your position of [TITLE] and federal service during your probationary/trial period consistent with the above references.

On [INSERT DATE OF APPOINTMENT], the Agency appointed you to the position of [TITLE]. As documented on your appointment Standard Form 50 (SF-50), your appointment is subject to a probationary/trial period. [The agency also informed you of this requirement in the job opportunity announcement for the position.]

Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final until the probationary period is over," and the probationary period is part of "the hiring process for employees."1 "A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service." 2 "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the civil service for this particular individual."3 Furthermore, OPM has emphasized that individual employee performance measurement should be aligned with and support organizational goals and focus employee efforts on achieving organizational and group goals. In addition, OPM has instructed Agencies to consider whether an employee's performance is in the best interest of the government, in light of the President's directive to dramatically reduce the size of the federal workforce.

**Based on the OPM guidance referenced above**, **the Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest**. For this reason, the Agency informs you that the Agency is removing you from your position of [TITLE] with the Agency and the federal civil service effective [insert date and time, if necessary].

You may have a right to file an appeal with the Merit Systems Protection Board (MSPB) on the limited grounds set forth in 5 C.F.R. § 315.806. Any such appeal must be filed within 30 days of the effective date of this notice or 30 days after the date of your receipt of this notice, whichever is later. You should review MSPB regulations at 5 C.F.R. §§ 1201.14 and 1201.24 for instructions on how to file an electronic appeal and content requirements of the appeal, respectively. For more information, please visit www.mspb.gov or contact your local MSPB regional or field office at: [INSERT MSPB REGIONAL OR FIELD OFFICE CONTACT INFORMATION].

We appreciate your service to the Agency and wish you the greatest of success in your future endeavors. If you have any questions, please contact [CONTACT].

[INSERT NAME OF AGENCY OFFICIAL]
[INSERT TITLE OF AGENCY OFFICIAL]

[emphasis added].[17]

123.    OPM later followed up with "FAQs" provided to agencies regarding this directive. Those FAQs instructed agencies that "'qualifications for continued employment' means that only the highest-performing probationers in mission critical areas should be retained" and "The notice **must** include the agency's conclusions as to the inadequacies of the employee's performance or conduct." OPM also instructed agencies to use the "codes" for "processing" terminations for "unacceptable or unsatisfactory performance" and instructed the agencies (twice) that the "codes should be consistent with the reasons the agency stated in the termination notices" that OPM gave them to use.  Finally, OPM instructed agencies that they need not provide employee unions with notice or information regarding the termination of probationary and trial employees.

124.    On information and belief, OPM has lists containing every probationary employee terminated as a result of its orders throughout the federal government, because it ordered agencies to submit those reports to OPM Chief of Staff on a daily basis.

### III.    Federal Agencies' Immediate and Ongoing Implementation of OPM's Unlawful Directive

125.    Agencies across the federal government began acting on OPM's February 13, 2025 directive immediately through chaotic mass terminations of their probationary employees.[18]

126.    Tens of thousands of probationary employees have already been subjected to mass terminations, with no advance notice, by agencies across the federal government, including employees at the following agencies:

U.S. Forest Service[19]
Department of Veterans Affairs[20]

---

[17] A copy of OPM's template is attached hereto as __Exhibit B__.

[18] https://www.washingtonpost.com/politics/2025/02/14/trump-firing-probation-workforce-buyouts-layoffs-doge/f816fbea-eb23-11ef-969b-cfbefacb1eb3_story.html

[19] https://www.reuters.com/world/us/mass-firings-federal-workers-begin-trump-musk-purge-us-government-2025-02-13/; https://www.sfgate.com/california-parks/article/joshua-tree-yosemite-locals-protest-mass-layoffs-20174425; https://www.nytimes.com/2025/02/18/climate/trump-layoffs-park-and-forest-service-workers.html

[20] *Id.*; https://www.washingtonpost.com/nation/2025/02/17/trump-fires-federal-workers-performance/

Department of Education[21]
National Science Foundation[22]
General Services Administration[23]
Small Business Administration[24]
Consumer Financial Protection Bureau[25]
Department of Energy[26]
National Nuclear Security Administration[27]
Department of Housing and Urban Development[28]
Centers for Disease Control[29]
National Park Service[30]
National Institutes of Health[31]
Environmental Protection Agency[32]
Bureau of Reclamation[33]
Department of Interior[34]
Bonneville Power Administration[35]
US Department of Agriculture[36]
Bureau of Land Management[37]
US Fish and Wildlife Service[38]

---

[21] https://www.reuters.com/world/us/mass-firings-federal-workers-begin-trump-musk-purge-us-government-2025-02-13/

[22] https://www.wired.com/story/national-science-foundation-february-2025-firings/; https://www.nytimes.com/2025/02/18/us/politics/national-science-foundation-firings.html.

[23] https://www.reuters.com/world/us/mass-firings-federal-workers-begin-trump-musk-purge-us-government-2025-02-13/

[24] https://www.businessinsider.com/federal-workers-fired-not-fired-then-terminated-sba-2025-2

[25] https://www.reuters.com/world/us/mass-firings-federal-workers-begin-trump-musk-purge-us-government-2025-02-13/

[26] https://www.eenews.net/articles/doe-to-lay-off-probationary-staff-today/

[27] https://www.npr.org/2025/02/13/nx-s1-5296928/layoffs-trump-doge-education-energy

[28] https://www.nbcnews.com/politics/white-house/trump-administration-federal-agencies-fire-probationary-employees-rcna192149

[29] https://apnews.com/article/trump-firing-probation-workforce-buyouts-layoffs-doge-159a6de411622c2eb651016b1e99da37

[30] https://www.nytimes.com/2025/02/18/us/politics/national-science-foundation-firings.html (1000 NPS employees)

[31] https://www.nbcwashington.com/news/president-trump-politics/taking-away-years-of-experience-nih-probationary-employees-fired-friday/3845749/

[32] https://abcnews.go.com/US/agencies-federal-workers-fired/story?id=118901289

[33] https://www.nytimes.com/2025/02/18/us/politics/national-science-foundation-firings.html

[34] *Id.* (1300 Interior Dept employees fired over holiday weekend).

[35] https://www.opb.org/article/2025/02/19/bonneville-power-administration-reverses-30-job-cuts-continues-with-plans-to-eliminate-430-positions/

[36] https://www.npr.org/2025/02/18/nx-s1-5300150/among-the-federal-workers-fired-usda-workers-who-keep-food-safe-and-crops-growing

[37] https://www.nytimes.com/2025/02/18/us/politics/national-science-foundation-firings.html; https://www.cnn.com/2025/02/14/politics/probationary-federal-employees-agencies-firings-doge/index.html

[38] https://www.cnn.com/2025/02/14/politics/probationary-federal-employees-agencies-firings-doge/index.html

Cybersecurity and Infrastructure Security Agency[39]
US Citizenship and Immigration Services[40]
Federal Emergency Management Agency[41]
Federal Aviation Administration[42]
Department of Transportation[43]
Food and Drug Administration[44]
National Highway Traffic Safety Administration[45]
Pipelines and Hazardous Materials Safety Administration[46]
Centers for Medicare & Medicaid Services[47]
Substance Abuse and Mental Health Services Administration[48]
Federal Deposit Insurance Corporation[49]

127.    While implementing OPM's orders, numerous federal agencies informed workers that OPM ordered the terminations.  For example, at the National Science Foundation meeting for probationary employees, employees were told the following:

> You've been invited here today because you were either a probationary employee or you are an expert on intermittent appointment.

> We've asked you here today to tell you face to face that we will be terminating your employment at the end of the day today.

> *We've been directed by the administration to remove all term probationary employees.*

> Today at 11 o'clock, each of you will receive a termination letter by email.

---

[39] https://thehill.com/homenews/5154340-dhs-fires-probationary-employees/

[40] *Id.*

[41] https://www.politico.com/news/2025/02/19/fema-email-firings-affect-majority-staff-00204779

[42] https://apnews.com/article/doge-faa-air-traffic-firings-safety-67981aec33b6ee72cbad8dcee31f3437

[43] https://www.nbcphiladelphia.com/news/national-international/transportation-department-workers-with-exceptional-reviews-told-theyre-fired-for-performance-issues/4111423/?os=iosdF&ref=app

[44] https://www.nytimes.com/2025/02/18/us/politics/fda-food-safety-jim-jones-resignation.html (terminated workers "included people with specialized skills in infant formula safety and food safety response"; FDA food safety chief resigns because "loss of critical employees overseeing the nation's food supply made his work impossible").

[45] https://www.politico.com/news/2025/02/18/layoffs-auto-pipeline-safety-00204715

[46] *Id.*

[47] https://www.fiercehealthcare.com/regulatory/mass-layoffs-hhs-cdc-cuts-1300-probationary-workers-reports-say

[48] *Id.*

[49] https://www.reuters.com/world/us/fdic-fires-new-employees-part-broader-government-layoffs-2025-02-18/

THIRD AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                                                  30

At 1 p.m, you will lose access to the network[.]  And at the end of the day today, you'll be terminated.

You ready? You have one more thing.  You have the option to resign in lieu of termination.

That may be beneficial to you.  If you choose to resign, you will not be eligible for unemployment.

However, if asked when you apply for future positions, you will be able to say that you were not terminated.

So for those of you that have federal benefits.  Sorry.  Okay.  For those of you that have federal benefits, your health insurance will be terminated at the end of the pay period.

Your federal dental and vision insurance plan, they will terminate at the end of the pay period. There is no extension for coverage under FedVIP.
…
This is in executing Government-wide guidance from the administration.  I'm sure you've read in the news that all agencies are terminating probationary employees.
…
So there was no limited discretion.  *This is not a decision the agency made.  This is a direction we received*, first of all.  Second of all, this is the first of many forthcoming workforce reductions.
…
*We are following orders*.  We are part of the executive branch.  We follow that.  I apologize for people that have made life-changing career moves.
…
We were directed last Friday by OPM to terminate all probationers except for a minimal number of mission critical probationers.
Mission critical determination, first of all, it is exceptionally small number that we're permitted to have.
…
There's no negotiation, first of all.  *And second of all, the administration has already announced its intention to significantly reduce the workforce*.

It is only a matter of time. It is not today is not the only workforce reduction that we will do.

(Emphasis added.)

128.    The NSF explained that the agency had previously been told that it would have discretion to retain workers, and had in fact made the decision to retain all of its probationary employees, only to have OPM issue a superseding order on February 13, 2025 requiring the agency to terminate everyone:

We did.  In the last two weeks.  Up until Friday.  Yes.  We were told by OPM it was the agency's discretion whether to remove probations or not.

*We chose to retain them all.* Last Friday night.

They gave direction to there was some direction that was given to cabinet level agencies. And so you saw those actions taking place at the end of last week.

But the directions we received were it was our discretion. And late, late Friday night….

*They told us that they directed us to remove probationers.*

(Emphasis added.)

129.    Under oath at a congressional hearing on February 25, 2025, Tracey Therit, the Chief Human Capital Officer of the VA, responded to questioning:

RANKING MEMBER TAKANO: So nobody ordered you to carry out these terminations?·

You did it on your own?

MS. THERIT: There was direction from the Office of Personnel Management.

130.    Other agencies across the government have also told the public and their employees the same thing: that OPM *ordered* the terminations, including in the following documented instances:

- In an online town hall for IRS employees, the IRS CHCO told employees, "Regarding the removal of the probationary employees, again, that was something that was directed from OPM. And even the letters that your colleagues received yesterday were letters that were written by OPM, put forth through Treasury, and given to us." The IRS CHCO was one of the recipients of the February 14 email.

- On February 26, 2025, Civilian Personnel Policy Council Members at the Department of Defense (DoD) received an email from Defense Civilian Personnel Advisory Service Director Daniel J. Hester stating: "In accordance with direction from OPM, beginning February 28, 2025, all DoD Components must terminate the employment of all individuals who are currently serving a probationary or trial period." The termination letters were sent to DoD employees by the Dod CHCO. The DoD CHCO was one of the recipients of the February 14 email.

- Termination letters to employees at the Bonneville Power Administration stated: "Per OPM instructions, DOE finds that your further employment would not be in the public interest. For this reason, you are being removed from your position with DOE and the federal civil service."

- USDA's Deputy CHCO told USDA employee: "Last night, agencies were notified by the Office of Personnel Management (OPM) that the Administration has decided probationary employees are not eligible for the Deferred Resignation program and also that these employees are to be terminated." The USDA CHCO was one of the recipients of the February 14 email.

1

2          131.    OPM required agencies to use its template termination notices, which OPM created

3   and provided to the agencies, to be sent to those agencies' probationary employees, citing

4   performance as the basis for the termination.

5          132.    Reflecting that directive, many agencies have used identical or nearly identical text in

6   letters notifying probationary employees of their termination.  For example:

7          a.   Termination letters received by probationary employees in multiple agencies,

8               including the Departments of Homeland Security, Health and Human Services,

9               Agriculture, and Education, included identical introductory language stating as

10              follows, with identical footnotes and footnote text:

11                   Guidance from the Office of Personnel Management ("OPM") states,
                     "An appointment is not final until the probationary/trial period is over,"
12                   and the probationary/trial period is part of "the hiring process for
                     employees."[1]  "A probationer is still an applicant for a finalized
13                   appointment to a particular position as well as to the Federal
                     service."[2]  "Until the probationary period has been completed," a
14                   probationer has "the burden to demonstrate why it is in the public
                     interest for the Government to finalize an appointment to the civil
15                   service for this particular individual."[3]
16

17         b.   Termination letters received by probationary employees in multiple agencies included

18              the following boilerplate language describing the reasons for their termination: "The

19              Agency finds, **based on your performance**, that you have not demonstrated that your

20              further employment at the Agency would be in the public interest."  (Boldface added).

21         c.   Similarly, termination letters received by probationary employees in multiple agencies

22              included the following boilerplate language describing the reasons for their

23              termination: "Unfortunately, the Agency finds that that you are not fit for continued

24              employment because your ability, knowledge and skills do not fit the Agency's current

25

26

27

28

THIRD AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                                                  33

needs, and **your performance** has not been adequate to justify further employment at the Agency."  (Boldface added).[50]

133.    At the National Science Foundation meeting reference above, employees were told the language in the letters came from the "boilerplate" language from OPM:

> "The cause comes from boilerplate we received from OPM.  The cause says that the agency finds based on your performance that you have not demonstrated that your further employment at the agency would be in the public interest."

134.    The termination letters issued to probationary employees cite, as authority for the terminations, the regulations that govern terminations **for performance reasons**:  5 C.F.R. § 315.803 (directing agencies to terminate probationary employees "if the employee fails to demonstrate fully his or her qualifications for continued employment"); 5 C.F.R. § 315.804 (requiring notice of the reasons when an agency "decides to terminate an employee serving a probationary or trial period because his work performance or conduct during this period fails to demonstrate his fitness or his qualifications for continued employment," including a statement of the "agency's conclusions as to the inadequacies of [the employee's] performance or conduct"); and 5 C.F.R. § 316.304 (entitling trial period employees in the excepted service to the same notice rights upon termination for performance reasons as probationary employees in the competitive service).

135.    Despite the citation of these authorities in the template termination letters, the letters fail to provide any individualized reasons why the employees' performance warranted termination. Many termination letters appear to have been created by means of mail merges.  Some termination letters do not even specify the name of the employee being terminated.

136.    The reference to employee performance in the mass termination letters and the citation to the authority for the termination of probationary employees for performance reasons is a pretext.

---

[50] Recent reporting by the Washington Post revealed similar templates and instructions by OPM to agencies in January and February 2025 with respect to employees unlawfully targeted for termination and/or administrative leave because of perceived participation in work related to Diversity, Equity, and Inclusion programs.  Washington Post, Feb. 15, 2025, *Records show how DOGE planned Trump's DEI purge — and who gets fired next,* available at: https://wapo.st/4jVWqEd.

The real reason for the mass terminations, as expressed by the incoming Presidential Administration, is to reduce the size of the federal workforce.

137.    Many terminated probationary employees had received excellent performance reviews from their agencies.  Supervisors were not consulted as to the performance of individual probationary employees before they were terminated.  On information and belief, some probationary employees have subsequently been told by agency representatives that they were terminated solely because their agencies were being restructured, not based on any performance or conduct by the employee.

138.    USA Today recently reported that "Fired probationary employees interviewed by USA TODAY all said they were never told of any performance problems.  One hadn't been in the job long enough to have a performance review.  Another was fired just a month into her job after relocating from more than 1,700 miles away to take it.  And a third employee said his supervisor explicitly told him he wasn't being terminated for performance reasons.[51]

139.    NBC News reported that although Department of Transportation probationary employees received letters stating that they were being terminated for performance reasons, "most of those employees were rated as being 'exceptional' performers by their supervisors."[52]

140.    The Washington Post reported that: "One well-rated Veterans Affairs staffer texted her boss to complain after she was fired.  In text messages obtained by The Post, he replied, "It states it's due to your performance which is not true. … Your performance has nothing to do with this.'"[53]

141.    On information and belief, Defendants plan further waves of mass pretextual terminations of probationary employees.  The New York Times maintains a tracker of public information regarding probationary terminations, and states (as of March 4, 2025): "These figures are

---

[51]https://www.msn.com/en-us/news/us/its-a-lie-federal-workers-incensed-by-performance-language-in-termination-letters/ar-AA1zcrmN?ocid=BingNewsSerp

[52]https://www.nbcnews.com/politics/doge/federal-workers-exceptional-reviews-fired-performance-issues-rcna192347

[53] https://www.washingtonpost.com/nation/2025/02/17/trump-fires-federal-workers-performance/

just a portion of the more than 200,000 probationary employees that the Trump administration aims to cut, and more dismissals are expected."[54]

142.    Further proving that the NSF did not make the decision at the agency level to fire its probationary workers, following the Temporary Restraining Order in this case, the Director of NSF immediately ordered all terminated probationary workers reinstated.  On Monday, March 3, 2025, at 9:12 a.m. the NSF Office of the Director issued a Staff Memorandum that said:

> A Federal court issued an opinion on Friday relative to the probationary employees.  NSF has immediately started the process of reinstating our other probationary employees.  All impacted probationary employees will receive backpay and no break in service.
> This is welcome news to all of us.  We recognize that these actions have had a significant impact on the terminated staff and all of you…
>
> I want to thank all of you for your tireless efforts, even under great stress and uncertainty, to do the hard work that is necessary to allow NSF to continue to advance incredible ideas and talent throughout our nation.

Another post on this subject from the Director stated further:  "NSF welcomes the return of our probationary employees who will help ensure the United States remains the global leader in scientific discovery and innovation."

143.    To Plaintiffs' knowledge, as of the date of this filing, the Department of Defense delayed terminations of probationary employees that were set to occur on February 28, 2025 but since that date has terminated some probationary employees, in at least some cases using the OPM template.

144.    Other agencies have reinstated limited numbers of workers, demonstrating the government's interest in employing these individuals and lack of difficulty in reinstatement.  Scores of federal workers want their jobs to be reinstated, and on information and belief, those reinstatements can occur as easily as the NSF's reinstatement on March 3, 2025.  These employees were fired by email en masse and can be reinstated en masse.

---

[54]https://www.nytimes.com/interactive/2025/02/11/us/politics/trump-musk-doge-federal-workers.html

1

2

3    **IV.    Impact on Plaintiffs, the Federal Government, and the Public**

4        145.    Plaintiffs AFSCME, AFGE, AFGE Local 1216, AFGE Local 2110, and UNAC

5    (hereafter "Union Plaintiffs") each represent probationary employees who have been summarily fired,

6    and falsely informed that their termination was based on performance, as a result of OPM's orders to

7    federal agencies, or who are at risk of summary termination as a result of OPM's orders.

8        146.    Each Union Plaintiff has the core function of representing employees in federal

9    bargaining units in collective bargaining and providing counseling, advice, and representation to

10   represented employees in the event of adverse employment actions.

11       147.    Each Union Plaintiff has been prevented, by the surprise mass terminations, from

12   exercising those core functions as employee representative, including because by providing sham

13   reasons for probationary employees' terminations, OPM has undermined the Plaintiffs' ability to

14   effectively assist represented employees in vindicating their rights and seeking appropriate remedies.

15       148.    Each Union Plaintiff has expended substantial time and resources in the days

16   following the surprise mass terminations addressing member concerns and attempting to provide

17   employees with effective representation.  As a result of the surprise mass terminations, each Plaintiff

18   has been forced to divert resources that would be devoted to representing employees who have

19   experienced adverse employment action for legitimate resources.

20       149.    Each Union Plaintiff has been harmed in multiple other ways by the termination of its

21   members, including by the loss of dues income and bargaining power.

22       150.    Each Union Plaintiff has organizational standing to sue in its own right and has

23   associational standing to sue on behalf of its members.

24       151.    Plaintiff Main Street Alliance's members face imminent harm as a result of the

25   anticipated reductions and delays in services provided by the Small Business Administration, on

26   which its members rely for critical services.  Those services include but are not limited to: loan

27   guarantees to enable small businesses to obtain financing to start up or grow; and emergency disaster

28

relief, such as in response to the January 2024 Los Angeles wildfires and Hurricane Helene in Western North Carolina.  Plaintiff Main Street Alliance's members also face imminent harm as a result of the anticipated reductions and delays in services provided by the USDA, on which many MSA members rely.  For example, MSA members have utilized grant funding through various programs administered by the Agricultural Marketing Service to grow their businesses.  The terminations of USDA employees are likely to lead to reductions and delays in the operation of those programs, harming MSA members.

152.    Plaintiff Coalition to Protect America's National Parks' members face imminent harm as a result of the anticipated reductions and delays in services provided by the National Park Service. The Coalition's members are regular and avid users of America's national parks, national forests, wildlife refuges operated by the Fish & Wildlife Service, marine sanctuaries operated by NOAA, and other public lands, both for recreation and conservation purposes, and would be adversely affected by any degradation of the parks and the programs of the NPS, the Forest Service, the Fish & Wildlife Service, the NOAA Office of National Marine Sanctuaries, and the Bureau of Land Management ("BLM"), and the ability of those agencies to preserve and protect parks and public lands, and make them available to visitors.  Such degradation in safety and services provided to the public in the National Parks and other public lands, marine sanctuaries, and wildlife refuges is already happening, and further degradation is inevitable based on the Coalition's experience in prior government shutdowns and with reductions in services to the public in those circumstances.

153.    Plaintiff Western Watersheds Project ("WWP") faces imminent harm to its mission to protect and restore wildlife and public lands.  The mass termination is likely to cause further degradation of public lands and wildlife.  WWP's members are regular and avid users of the public lands in the Western United States.  They use the National Parks, public lands and wilderness areas controlled by the BLM and Forest Service, and other federal lands for recreation, conservation, and study activities.  WWP's members would be adversely affected by the degradation of public lands and the worsening threats to species that are likely to result from the reductions of staffing in the

National Park Service, BLM, and the Fish & Wildlife Service and other federal agencies that will delay Endangered Species Act listing decisions.

154.    Additionally, in performing its own conservation work, WWP engages with numerous federal agencies and relies on those agencies being fully staffed to enable WWP to achieve its mission.  This includes coordinating and communicating with the Fish & Wildlife Service and the National Marine Fisheries Service (which is a component agency of NOAA, which is itself a component agency of the Department of Commerce) in conservation activities to protect various species.  WWP also relies on data provided by NOAA through its component agency the National Weather Service in identifying and analyzing conservation issues, such as using NOAA's drought data to inform WWP's work with respect to overgrazing on public lands.  The loss of probationary employees in these agencies is likely to lead to reductions and delays in providing these public services and maintaining the data that WWP relies on for its conservation work.

155.    Plaintiff VoteVets faces imminent harm to its supporters who are veterans and who rely on the VA medical system and other critical federal services provided to veterans. The VA has dismissed over 1,000 probationary employees across various roles, including those in mental health research, cancer treatment, addiction recovery, prosthetics, and burn pit exposure studies. The mass termination has also hindered the recruitment of essential support staff for the Veterans Crisis Line, which provides critical emergency mental health care (including suicide prevention) and support for military veterans, service members, their families, and caregivers positions such as trainers and quality assurance personnel.  The mass termination of probationary employees is likely to impair the quality of these essential services.  In addition, many of VoteVets' supporters are themselves employed by the federal government, including many probationary employees who lost their jobs pursuant to this mass termination.

156.    The mass termination has also directly harmed VoteVets as an organization.  The time of VoteVets' staff and consultants has been diverted from VoteVets' regular activities to field and respond to inquiries from veterans and their families and to connect them with case workers in congressional offices.

157.    Plaintiff Common Defense also faces imminent harm to itself and its members.  Its veteran members also rely on services provided by the VA medical system and other critical mental health services available to veterans.  Military families and veterans experience food insecurity at higher rates than the general population, and many members of Common Defense rely on the Supplemental Nutrition Assistance Program (SNAP) provided through the USDA.  Members of Common Defense also rely on federal educational assistance offered to veterans, including through student loans and loan deferral, cancellation, and forgiveness programs administered by the Department of Education.  The mass terminations at all these agencies risk severe disruption to those services.  Further, Common Defense has had to devote considerable resources to responding to requests from its members and providing guidance about the mass probationary terminations, diverting resources that Common Defense ordinarily devotes to its other core priorities.

158.    Plaintiff APHA also faces imminent harm to itself and its members.  APHA's membership includes individual public health care workers, student members in schools or programs in public health or related fields, and agency members such as local health departments and public and private health organizations.  The termination of probationary employees at HHS restricts these members' ability to do their jobs in numerous ways.  Members who are students and academics rely on NIH staff to manage grants and proposals for ongoing public health research.  Local health department members and public health worker members across the country depend on the work, expertise, and information provided by the CDC to track and respond to public health threats, including rapidly spreading diseases.  CDC employees, including probationary employees, work to track disease spread; conduct and validate lab analysis of public health data nationwide; screen travelers for dangerous pathogens at airports and border crossings; and provide on-the-ground support to local health departments when needed.  Disruptions to this key public health testing, prevention, and response work place additional burdens on APHA members to respond to public health threats, such as the ongoing spread of bird flu and measles throughout the country, and the possible entry into the US of diseases surging around the world, such as mpox, Ebola, or polio.

159.    In addition, APHA's organizational mission includes providing public information about outbreaks and public health risks, for which APHA relies on data and information provided by the CDC and other components of HHS.  The terminations of probationary employees are likely to lead to delays and reductions in the information gathered by the agency and the information available to APHA for its public education work.  These mass terminations have also required APHA to take on additional work responding to member questions and will require APHA to devote more resources to public education about outbreaks and public health risks to compensate for the reductions in agency workforce and capacity.

160.    Plaintiff AFA also faces imminent harm to itself and its members.  Aviation safety is fundamental to the flight attendant profession.  Recent terminations of FAA employees introduce unnecessary risk and stress that distracts from the mission of safe flight for civil and military operations.  Chaotic workplaces harm recruitment, training and retention of critical personnel.  FAA specialists are responsible for repairing air traffic control facilities and updating digital maps for pilots.  Meteorologists provide critical reports that help navigate safe flights and avoid the dangers of turbulence that range in harm from air sickness and coffee burns to serious injury and even death.  If FAA specialists cannot do their jobs, flight attendants cannot do theirs.  In the wake of the events of the past few weeks, some flight attendants have decided to leave the profession altogether while others are getting pressure from their families to get another job.  Flight attendants rely upon a robust federal workforce to ensure our skies are safe and secure.  AFA is already observing the adverse effects of a diminished workforce on the federal aviation system.

161.    Plaintiff American Geophysical Union also faces imminent harm to itself and its members.  Not only do AGU members work in agencies across the federal government, AGU's scientific community outside the federal government significantly relies on federal grants to support research, including awards from the National Science Foundation, Department of Energy, U.S. Forest Service, Environmental Protection Agency, Department of Interior, U.S. Fish and Wildlife Service, Bureau of Land Management, and National Oceanic and Atmospheric Administration, to name only a few.  Further, observations and data collected and curated by these agencies are the backbone of

global science, are particularly critical for protecting health and human safety, and are relied on by AGU members both inside and outside of the government to support their own work.  The scientific work supported by these federal agencies and resources protects communities by improving advance warning of flooding, refining forecasts of hurricane paths, and anticipating wildfire risk.  Federal science also bolsters the economy.  Farmers use scientific drought outlooks to inform seasonal investments, and the insurance industry relies on geoscience to assess risks to infrastructure for natural hazards including earthquakes, volcanoes, floods and sea level rise.  Federal science is necessary to design solutions to the climate crisis by driving innovations in energy production and the sustainable extraction of critical minerals for low carbon transportation.  The loss of staff in these federal agencies will reduce the availability of this data, and delay and undermine the administration of federal grants, impairing the ability of AGU members to perform their research.

162.    Plaintiff Climate Resilient Communities also faces imminent harm.  CRC was recently approved for an Environmental Justice Collaborative Problem Solving Grant from the EPA to distribute air purifiers to residents of East Palo Alto, which suffers from poor air quality that is the result of the decades of results of environmental injustice.  CRC's grant officer at the EPA was a probationary employee who was terminated in February 2025.  CRC had relied on its grant officer to navigate the complex compliance requirements associated with this grant.  With the loss of its grant officer, and a blackout on agency communications to the public, CRC fears that its grant funding now may be discontinued.  CRC had already increased staffing to support the work funded by this EPA grant, and has been compelled to reassign those employees to other projects, thereby diverting resources that were intended to support those other projects.

163.    Plaintiff Point Blue faces actual and imminent harm to its conservation activities.  Fourteen of Point Blue's employees are designated as "partner biologists" who have been partially funded through the Natural Resources Conservation Service ("NRCS"), which is a component agency of the USDA.  This program helps private landowners obtain grants to support various conservation practices on their land, including wildlife friendly agriculture and healthy forests and wildfire resilience practices.  The Point Blue partner biologists work with landowners to develop their

conservation plans and obtain multiple certifications required by NRCS.  Point Blue has recently

learned that multiple employees of NRCS were terminated in February, including soil conservation

specialists, range conservation specialists, engineers, and administrative staff.  The loss of these

NRCS staff members prevents conservation plans from being certified.  Point Blue has had to

reassign its partner biologists to other projects, diverting resources that were intended for other work.

In addition, the loss of federal employees at other agencies from which Point Blue receives grant

funding or partners with, including NOAA, DoD, the National Science Foundation, the Forest

Service, and the Fish & Wildlife Service is likely to impair grant activities and administration,

thereby impairing Point Blue's ability to pursue its conservation work.

164.    Plaintiff State of Washington relies every day on the services of agencies across the

federal government, including the work of individuals located in the State of Washington but also

individuals who work in other states and the District of Columbia.  The agencies whose work and

services directly impact the State include Cabinet-level Departments (including at least the USDA,

Commerce, Education, Energy, HHS, DHS, HUD, Interior, Labor, Treasury, Transportation, and VA)

and many independent agencies (including EPA, SSA, FTC, CFPB and others).  The State also

works, daily, alongside the enforcement arms of many federal agencies to protect Washingtonians

from unlawful acts ranging from environmental harm to labor abuses. The State contains numerous

federal offices and extensive federal lands, including three National Parks (Olympic, North Cascades

and Mount Rainier), eight National Forests, extensive lands administered by the Bureau of Land

Management, six military bases (which employ significant numbers of civilian staff), and significant

dams on the Columbia and Snake Rivers run by the Bureau of Reclamation and Army Corps of

Engineers.  The State relies heavily on data created by many offices within the federal government,

ranging from weather data produced by NOAA to education-statistics created by the Department of

Education.

165.    The State is also impacted in multiple ways when residents of Washington lose their

jobs.  While the federal government is not revealing the numbers of federal employees who have

been terminated, the State believes it to be at least 1,000 individuals in Washington thus far and

THIRD AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                    43

growing every day. Local governments within the State also rely on and interact with the federal government every day: from FEMA in the event of a disaster, to NOAA weather data for emergency preparedness planning, to the CDC for expertise and data on broad public health issues that affect the State.

166.    Reduced staffing at any of the federal agencies on which the State relies and interacts with every day will directly impact the State, far beyond the immediate harm to federal employees based in Washington who have lost their livelihood and benefits. The State faces imminent harm as the result of the reductions and delays in services provided by numerous federal agencies that stem from the termination of probationary employees. Reductions to the VA medical system cause uncertainty and confusion, disrupting the availability and quality of crucial medical and mental health services for veterans.[55] Workforce reductions to the National Park Service, national forests, and other public lands threaten wildlife, workers, and visitors. The State relies on partnerships with the federal government to fight wildfires, contain outbreaks of communicable diseases, keep its waters clean, and respond to natural disasters. Without sufficient federal staffing, the State's workload and costs will increase, forest fires within the State will be harder to fight, diseases will be harder to control, and emergency response times will drop.[56] In yet another example, the State's Department of Fish and Wildlife ("WDFW"), Oregon, PNW Tribes, and the Federal Government negotiate annual salmon harvests each year in what is called the "North of Falcon" process. Those planning talks are underway now for the 2025 season, with final agreement expected in April, after which WDFW would update their fishing rules, and NOAA would be expected to promptly review and issue a 2025 Biological Opinion and Endangered Species Act coverage for the North of Falcon fisheries. Any NOAA delay would wreak havoc on the fishing communities, both commercial and recreational.

167.    Terminated employees and their families now face an immediate loss of income and benefits (including health benefits); economic insecurity; the immediate need to search for alternative

---

[55]  https://www.king5.com/article/news/local/washington-veteran-family-says-nationwide-va-layoffs-already-hurt-quality-of-care/281-fd7a2530-4631-42eb-8a56-9edf215c6dee

[56]  https://www.murray.senate.gov/wp-content/uploads/2025/02/WA-Impacts-of-Trump_Musk-Mass-Layoffs-1.pdf

employment; and the future adverse impact of an employment termination falsely predicated on performance.

168.    OPM's actions have already had impacts in California beyond terminated employees, their families, and their representatives.  For example, "the Trump administration has already made the United States more exposed to catastrophic wildfires in ways that will be difficult to reverse, current and former federal employees say….The job cuts, which amount to roughly 10 percent of the agency's work force, could hobble the Forest Service, which was already struggling to remove vegetation across its vast land holdings at a pace that matches the growing threat from fires, according to current and former federal employees, as well as private companies and nonprofit organizations that work on thinning forested lands." [57]  The effects have been immediate:

> In California, the Forest Service's efforts to remove underbrush are on pause, according to a person who manages an organization that runs wildfire prevention projects in the state and who spoke on the condition of anonymity out of concern of reprisals. [58]


### CLAIMS FOR RELIEF

#### Claim I:
#### Separation of Powers/*Ultra Vires* Against Defendants OPM and Acting OPM Director Ezell

#### OPM's Order to Federal Agencies to Terminate Probationary Employees
#### Unlawfully Conflicts with and Overrides Legislative Power

169.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

170.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

171.    The Constitution vests the legislative power in Congress.  U.S. Const., art. I.  Federal legislation must be passed by both chambers of Congress before it may be presented to the President, and, if signed, become law.  U.S. Const., art. I.; *I.N.S. v. Chadha*, 462 U.S. 919, 951 (1983).

---

[57] https://www.nytimes.com/2025/02/15/climate/us-forest-service-layoffs-wildfires.html
[58] https://www.nytimes.com/2025/02/15/climate/us-forest-service-layoffs-wildfires.html

172.     The Constitution vests executive power in the President.  U.S. Const., art. II, and imposes on the President a duty to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3.

173.     The President and Executive Branch have no constitutional power to unilaterally enact, amend, or repeal parts of duly enacted statutes.  *Clinton v. City of New York*, 524 U.S. 417, 438–39 (1998).  The declared purpose of separating and dividing the powers of government was to "diffus[e] power the better to secure liberty."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring); *see also Bowsher v. Synar*, 478 U.S. 714, 721–22 (1986) ("Justice Jackson's words echo the famous warning of Montesquieu, quoted by James Madison in The Federalist No. 47, that 'there can be no liberty where the legislative and executive powers are united in the same person, or body of magistrates'...."  The Federalist No. 47, p. 325 (J. Cooke ed. 1961).").

174.     Congress exercised its Article I legislative authority to create the agencies of the federal government.  *See generally* United States Code, Title 5 (Government Organization and Employees).  To the agency heads, Congress has also expressly delegated the power to manage the functions of the agencies, including the right to employ and discharge subordinate employees of the agencies and to spend appropriated funds on those positions.

175.     In addition to specific authorizing statutes, Congress has also generally authorized the heads of administrative agencies to make employment decisions (5 U.S.C. § 3101), manage the employees of that agency (5 U.S.C. § 301), or delegate to subordinate officers the management decisions, including the hiring and firing of employees (5 U.S.C. § 302).

176.     Congress also made the federal administrative agencies subject to the requirements of the CSRA, which sets forth uniform rules pertaining to employment for the civil service across federal agencies.  The agencies, led by their agency heads, are obligated by Congress to comply with the CSRA with respect to their employees.

177.     The OPM Program requiring federal agencies to remove probationary employees throughout the federal government unlawfully usurps the legislative authority of Congress and is

therefore ultra vires, by overriding the direct Congressional authorization of agency heads to manage the affairs and employees of their respective agencies, including by overriding each of the following statutes:

a.    The authorization to all agencies to employ: 5 U.S.C. § 3101;

b.    The authorization to all agencies to manage agency affairs via rules, including rules for employment: 5 U.S.C. §§ 301, 302;

c.    The specific authorizing statutes for each federal agency, which create the office of agency head to administer the agencies, and enumerate the duties of the agency heads including with respect to employment: *e.g.*, 26 U.S.C. §§ 7803, 7804 (IRS); 42 U.S.C. §§ 7231, 7253 (DOE); 20 U.S.C. § 3461 (Dept. of Ed.); 42 U.S.C. § 203 (HHS); 12 U.S.C. § 5492 (CFPB); 16 U.S.C. §§ 551, 554a, e (Agr.; Forest Service); 38 U.S.C. § 303, 510 (VA): 10 U.S.C. § 113 (DoD):  42 U.S.C. § 282  (NIH); 51 U.S.C. §§ 20111, 20113  (NASA).

d.    The CSRA authorization to agencies that govern employee removal: 5 U.S.C. §§ 7512, 7513;

e.    The CSRA provisions that apply to agency RIFs, which authorize OPM to create regulations by which agencies may conduct RIFs of their employees: 5 U.S.C. § 3502; *see also* 5 C.F.R. § 351.204 Responsibility of agency ("Each agency covered by this part is responsible for following and applying the regulations in this part when the agency determines that a reduction force is necessary."); *id.* § 351.205 Authority of OPM ("The Office of Personnel Management may establish further guidance and instructions for the planning, preparation, conduct, and review of reductions in force.").

178.    OPM's actions also exceed any statutory authority granted to it by Congress.  In creating OPM and delegating duties to its Director, Congress did not authorize OPM or its Director to order the termination of employees at any other federal agency.  *See* 5 U.S.C. § 1103 (authorizing Director of OPM to "appoint[] individuals to be employed *by the Office*" and "direct[] and supervis[e] employees *of the Office*, distribut[e] business among employees and organizational units of the Office, and direct[e] the internal management *of the Office*") (emphases added).

179.    OPM's actions were not authorized by any Article II Executive power, because no Article II constitutional power authorizes OPM to order federal agencies created by Congress to discharge subordinate agency employees, or either to order OPM to direct agencies, or order agencies

themselves, to rely on false statements regarding employee performance to effectuate the discharged ordered by OPM.

180.    Therefore, OPM's order to the federal agencies to terminate probationary employees was issued without legal authority and is ultra vires.

**Claim II:**
**Administrative Procedures Act Section 706(2)(A) and (C) Against Defendants OPM and Acting OPM Director Ezell**
**(Action Inconsistent with Law and Exceeding Statutory Authority)**

**The OPM Order to Terminate Probationary Employees Government-Wide Violates Statutes Governing Agency Powers and the CSRA**

181.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

182.    Federal probationary employees, including Plaintiff Unions' members, are subject to the requirements of the OPM order that all federal agencies terminate probationary employees, and the acts of the Federal Agency Defendants implementing that order.  Plaintiffs and their members and supporters are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by, OPM and Acting OPM Director's actions for purposes of 5 U.S.C. § 702.

183.    OPM is an agency that Congress has made subject to the APA.  5 U.S.C. § 701. OPM's mass termination program and order to federal agencies constitutes a final agency action under the APA.  5 U.S.C. § 704.

184.    Under the APA, a court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" (5 U.S.C. § 706(2)(A)), or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" (5 U.S.C. § 706(2)(C)).

185.    The actions of OPM and its Acting Director, including but not limited to the OPM program requiring federal agencies to terminate probationary employees, violate the Administrative Procedure Act because they are inconsistent with law in violation of 5 U.S.C. § 706(2)(A), and exceed statutory authority, in violation of 5 U.S.C. § 706(2)(C), and are for those reasons also arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A).

186.    The actions of OPM and its Acting Director overriding the direct Congressional authorization of agency heads to manage the affairs and employees of their respective agencies, including by overriding each and every one of the following statutes:

   a.    The authorization to employ: 5 U.S.C. § 3101;

   b.    The authorization to manage agency affairs via rules, including rules for employment: 5 U.S.C. §§ 301, 302;

   c.    The specific authorizing statutes for each federal agency, which create the office of agency head to administer the agencies, and enumerate the duties of the agency heads including with respect to employment: *e.g.*, 26 U.S.C. §§ 7803, 7804 (IRS); 42 U.S.C. §§ 7231, 7253 (DOE); 20 U.S.C. § 3461 (Dept. of Ed.); 42 U.S.C. § 203 (HHS); 12 U.S.C. § 5492 (CFPB); 16 U.S.C. § 551, 554a, e (Agr.; Forest Service); 38 U.S.C. §§ 303, 510 (VA): 10 U.S.C. § 113 (DoD): 42 U.S.C. § 282 (NIH); 51 U.S.C. §§ 20111, 20113 (NASA).

   d.    The CSRA authorization to agencies that govern employee removal: 5 U.S.C. §§ 7512, 7513;

   e.    The CSRA provisions that apply to agency RIFs, which authorize OPM to promulgate regulations by which agencies may conduct RIFs of their employees: 5 U.S.C. § 3502; *see also* 5 C.F.R. § 351.204 Responsibility of agency ("Each agency covered by this part is responsible for following and applying the regulations in this part when the agency determines that a reduction force is necessary."); *id.*, § 351.205 Authority of OPM ("The Office of Personnel Management may establish further guidance and instructions for the planning, preparation, conduct, and review of reductions in force.").

187.    OPM's actions also exceed any statutory power or duties granted by Congress to OPM.  In creating OPM and delegating duties to its Director, Congress did not authorize OPM or its Director to order the removal of employees employed by any other federal agency.  See 5 U.S.C. § 1103 (authorizing Director of OPM to "appoint[] individuals to be employed *by the Office*" and "direct[] and supervis[e] employees *of the Office*, distribut[e] business among employees and organizational units *of the Office*, and direct[e] the internal management *of the Office*") (emphases added).

**Claim III: Administrative Procedures Act Section 706(2)(A) (Arbitrary and Capricious) Against Defendants OPM and Acting OPM Director Ezell**

**The OPM Order to Terminate Probationary Employees Government-Wide by Falsely Invoking Performance is Arbitrary and Capricious**

188.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

189.    Federal probationary employees, including Plaintiff Unions' members, are subject to the requirements of the OPM order to federal agencies to terminate probationary employees and the acts of the Federal Agency Defendants implementing that order.   Plaintiffs and their members and supporters are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by, OPM and Acting OPM Director's actions for purposes of 5 U.S.C. § 702.

190.    OPM is an agency that Congress has made subject to the APA.  5 U.S.C. § 701. OPM's order to federal agencies constitutes final agency action under the APA.  5 U.S.C. § 704.

191.    The actions implementing OPM's mass termination program also constitute final agency actions under the APA.

192.    The actions of OPM and its Acting Director, including but not limited to the OPM program requiring federal agencies to terminate probationary employees, violate the APA because they are arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A), for reasons that include the following:  OPM's actions are based on the fiction that the employees are being terminated for performance reasons; OPM's actions are intended to deprive terminated employees of an administrative remedy; OPM's actions required agencies to terminate employees immediately, often with only a few hours notice; OPM's actions required agencies to violate commitments made to employees and the agency's own plans for those employees; and OPM's actions had no relationship to agencies' staffing needs or statutory mandates.

### Claim IV:
### Administrative Procedures Act Section 706(2)(D) Against Defendants OPM and Acting OPM Director Ezell
### (Notice and Comment Rulemaking; Mass Termination)

**The OPM Order to Terminate Probationary Employees Government-wide is Void for Failure to Comply with Required Notice and Comment Rulemaking**

193.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

194.    Federal probationary employees, including members of Plaintiff Unions, are subject to the requirements of the OPM Program requiring federal agencies to terminate probationary employees. Plaintiffs and their members and supporters are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by, OPM and Acting OPM Director's actions for purposes of 5 U.S.C. § 702.  Had OPM followed notice-and-comment procedures required by the APA, Plaintiffs would have provided comments about the OPM Program.

195.    OPM is an agency that Congress has made subject to the APA.  5 U.S.C. § 701. OPM's order to federal agencies constitutes final agency action under the APA.  5 U.S.C. § 704.

196.    Under the APA, a court shall "hold unlawful and set aside agency action …found to be …. without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

197.    The OPM Order directing agencies to terminate probationary employees is a "rule" for purposes of the APA.  5 U.S.C. § 551(4).

198.    Congress assigned to the Director of OPM the duty of "executing, administering, and enforcing—(A) the civil service rules and regulations of the President and the Office and the laws governing the civil service."  5 U.S.C. § 1103(a)(5)(1).  Congress also required that "in the exercise of the functions assigned under this chapter, the Director shall be subject to subsections (b), (c), and (d) of section 553 of this title."  5 U.S.C. § 1105.  Congress expressly made the requirements of section 553 apply to OPM actions "notwithstanding subsection (a) of such section 553," which otherwise exempts "matter[s] relating to agency management or personnel or to public property, loans, grants, benefits, or contracts."  5 U.S.C. § 553(a).

199.    Notwithstanding the OPM Director's express obligations pursuant to 5 U.S.C. §§ 1103 and 1105 to comply with notice and comment rule-making pursuant to the APA, neither OPM nor its Acting Director complied with the rule-making provisions set forth in 5 U.S.C. § 553 before issuing the OPM order directing agencies to terminate probationary employees.

200.    OPM's order directing agencies to terminate probationary employees therefore also violates 5 U.S.C. § 706(2)(D) by failing to observe procedures required by law.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray that this Court:

1.    Declare that OPM's new program requiring federal agencies to terminate probationary employees is unlawful;

2.    Enter preliminary or permanent injunctive relief setting aside OPM's order as unlawful; requiring OPM and Federal Agency Defendants to cease terminations of probationary employees pursuant to OPM's program and order; and requiring OPM and Federal Agency Defendants to rescind the prior unlawful terminations of probationary employees pursuant to OPM's Order.

3.    Award Plaintiffs their costs, reasonable attorneys' fees, and other disbursements as appropriate;

4.    Grant such other and further relief as the Court deems just and proper.

DATED:  August 8, 2025                         Scott A. Kronland
                                               Stacey M. Leyton
                                               Eileen B. Goldsmith
                                               Danielle E. Leonard
                                               Robin S. Tholin
                                               James Baltzer
                                               ALTSHULER BERZON LLP
                                               177 Post St., Suite 300
                                               San Francisco, CA 94108
                                               Tel: (415) 421-7151


                                    By: */s/ Danielle E. Leonard*

                                        *Attorneys for Plaintiff Organizations*


                                        Norman L. Eisen (*pro hac vice*)
                                        Pooja Chaudhuri (SBN 314847)
                                        STATE DEMOCRACY DEFENDERS
                                        FUND
                                        600 Pennsylvania Avenue SE #15180
                                        Washington, DC 20003
                                        Tel: (202) 594-9958
                                        Norman@statedemocracydefenders.org
                                        Pooja@statedemocracydefenders.org

By: /s/ Norman L. Eisen

*Attorneys for Plaintiff Organizations*

Rushab Sanghvi (SBN 302809)
AMERICAN FEDERATION OF GOVERNMENT
EMPLOYEES
80 F Street, NW
Washington, DC 20001
Tel: (202) 639-6426
Sanghr@afge.org

By: /s/ Rushab Sanghvi

*Attorneys for Plaintiff American Federation of
Government Employees (AFGE)*

Teague Paterson (SBN 226659)
Matthew Blumin  (*pro hac vice*)
AMERICAN FEDERATION OF STATE, COUNTY,
AND MUNICIPAL EMPLOYEES
1625 L Street, N.W.
Washington, D.C.  20036
Tel: (202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org

By: /s/Teague Paterson

*Attorneys for Plaintiff American Federation of State
County and Municipal Employees (AFSCME)*

Tera M. Heintz (SBN 241414)
Cristina Sepe (SBN 308023)
Cynthia Alexander, WA Bar No. 46019 (*pro hac vice*)
Deputy Solicitors General
OFFICE OF THE WASHINGTON STATE
ATTORNEY GENERAL
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
tera.heintz@atg.wa.gov
cristina.sepe@atg.wa.gov
cynthia.alexander@atg.wa.gov

By: */s/ Tera M. Heintz*

*Attorneys for Plaintiff State of Washington*